## **EXHIBIT C-1**



AWARD 裁决

قرار التحكيم

LAUDO ARBITRAL

SENTENCE ARBITRALE

АРБИТРАЖНОЕ РЕШЕНИЕ



Arbitration No: 142683

www.lcia.org

The London Court of International Arbitration

# LONDON COURT OF INTERNATIONAL ARBITRATION

# IN THE MATTER OF AN ARBITRATION

between

## VALE S.A.

… Claimant

and

## BSG RESOURCES LIMITED

… Respondent

## LCIA ARBITRATION NO. 142683

---

# AWARD

---

**Members of the Tribunal:**
Sir David A.R. Williams, QC
Dr Michael Hwang, SC
Professor Filip De Ly, Chairman

**4 April 2019**

# TABLE OF CONTENTS

**List of Abbreviations** ................................................................................................ 7

**DRAMATIS PERSONAE** ........................................................................................... 11

**I.     INTRODUCTION – NATURE OF THE DISPUTE** ................................................ 17

**II.    PARTIES, ARBITRATION AGREEMENT AND PROCEDURAL HISTORY** .......... 21

  A.   The Parties and their Representatives ................................................................ 21

     1.   The Claimant ................................................................................................. 21

     2.   The Respondent ............................................................................................ 22

  B.   The Arbitration Agreement ................................................................................... 22

  C.   Procedural History of the Arbitration .................................................................. 24

     1.   The initial phase of the arbitral procedure ...................................................... 24

     2.   Procedural Order No. 1 and Procedural Order No. 2 ....................................... 24

     3.   Respondent's Stay Application and Procedural Order No. 3 ............................ 24

     4.   Procedural Order No. 4 .................................................................................. 25

     5.   Procedural Order No. 5 and U.S. Discovery .................................................... 25

     6.   Second Stay Application ................................................................................. 25

     7.   BSGR's Statement of Defence ....................................................................... 26

     8.   Procedural Order No. 6 .................................................................................. 26

     9.   Procedural Order No. 7 .................................................................................. 26

     10.  Document Production and U.S. Discovery ....................................................... 27

     11.  Procedural Order No. 8 .................................................................................. 27

     12.  Procedural Order No. 9 and Second Decision on Document Production ........... 27

     13.  Procedural Order No. 10 ................................................................................ 28

     14.  Third Decision on Document Production .......................................................... 28

     15.  Vale's Statement of Reply and Procedural Order No. 11 ................................. 28

     16.  Further Document Production Issues ............................................................... 29

     17.  The Respondent's First Challenge against all three Tribunal members in May 2016 ................................................................................................................ 30

     18.  Procedural Order No. 12 and Procedural Order No. 13 .................................... 30

     19.  Fourth Decision on Document Production ........................................................ 31

     20.  BSGR's Statement of Rejoinder ..................................................................... 31

     21.  Procedural Order No. 14 ................................................................................ 31

     22.  LCIA Decision on the First Challenge ............................................................. 33

     23.  The Appointment of a New Chair by the Parties .............................................. 33

     24.  The Appointment of a New Chair of the Tribunal ............................................. 33

     25.  Vale's Rejoinder on Counterclaims ................................................................. 34

26.  The Appointment of a New Chair by the LCIA ..................................................... 35

27.  Respondent's Second Challenge to co-arbitrators Hwang and Williams and Procedural Order No. 16 ......................................................................................... 35

28.  Procedural Order No. 15, cancellation of hearing scheduled for 29 August – 16 September, and establishment of educational hearing for 5 – 9 September 2016 36

29.  Respondent announces it will not attend the Educatory Hearing until its Second Challenge was decided by the LCIA ................................................................. 36

30.  Respondent announces it will not appear at the Educatory Hearing .................. 36

31.  The 5–8 September 2016 Educatory Hearing ..................................................... 37

32.  Respondent announces High Court Proceedings for removal of co-arbitrators Hwang and Williams .......................................................................................... 37

33.  Procedural Order No. 17 – Procedural Order following reconstitution of the Tribunal ........................................................................................................... 38

34.  Procedural Order No. 18 .................................................................................. 39

35.  The Challenge to the ICSID Tribunal is denied ................................................. 39

36.  The LCIA Division dismisses the Second Challenge .......................................... 39

37.  Procedural Order No. 19 .................................................................................. 40

38.  Respondent advises that it will not participate in the merits hearing .................. 40

39.  Procedural Order No. 20 .................................................................................. 40

40.  English High Court dismisses BSGR application to remove arbitrators and for a document disclosure order ............................................................................... 41

41.  Procedural Order No. 21 .................................................................................. 41

42.  Merits Hearing 20 – 22 February 2017 ............................................................. 42

43.  Procedural Order No. 23 .................................................................................. 42

44.  Respondent's non-payment of deposit .............................................................. 42

45.  Corrections to transcript .................................................................................. 43

46.  Claimant's application to introduce new exhibits and to amend its costs submissions ...................................................................................................... 43

47.  Procedural Order No. 24 .................................................................................. 44

48.  Procedural Order No. 25 .................................................................................. 44

49.  Administration Order and Procedural Order No. 26 ........................................... 44

50.  Payment of further deposits .............................................................................. 45

51.  Procedural Order No. 27 .................................................................................. 45

52.  Concluding Comment of the Tribunal ............................................................... 46

III.  **RELEVANT FACTUAL BACKGROUND** ............................................................. 52

A.  Introduction ...................................................................................................... 52

B.  BSGR in Africa ................................................................................................. 52

C.  Background 1997-2005 ...................................................................................... 53

D.  BSGR enters Guinea ......................................................................................... 54

E.   Exploration Permits in Simandou North and South and the contractual relationship with Pentler.................................................................................................. 55

    1.    BSGR-Pentler Milestone Agreement ................................................. 57

    2.    Services Agreement ......................................................................... 58

    3.    Pentler-Bah Milestone Agreement................................................... 58

    4.    Pentler-Daou Milestone Agreement................................................. 58

    5.    Touré MoU ....................................................................................... 59

    6.    MoU between BSGR Guinea BVI and the GoG.................................. 59

    7.    First payment under BSGR-Pentler Milestone Agreement................. 59

F.   Shareholding in BSGR Guinea BVI provided to Pentler and Mme. Touré ............... 61

G.   BSGR commences work in Guinea ...................................................................... 62

H.   Simandou Blocks 1 and 2 ................................................................................... 63

I.   Share Buyback – Pentler.................................................................................... 64

J.   GoG revokes Rio Tinto's mining concessions and grants exploration permits to BSGR ................................................................................................................... 65

K.   The death of President Conté .............................................................................. 66

L.   Renewal of Exploration Permits for Simandou North and South .............................. 66

M.   Restructure by BSGR ......................................................................................... 67

N.   Dispute between Pentler and BSGR..................................................................... 68

O.   Payments to Mme. Touré ................................................................................... 69

P.   Base Convention ................................................................................................ 70

Q.   The Joint Venture - Due Diligence and Negotiations............................................. 70

R.   BSGR, Pentler and Various Contractors .............................................................. 73

S.   President Condé and the Revocation of Mining Rights ............................................ 75

T.   Frédéric Cilins in the United States...................................................................... 77

IV.   SUMMARY OF THE PARTIES' POSITIONS ............................................................. 78

A.   Claimant's Position ............................................................................................ 78

    1.    Vale's Allegations ............................................................................. 78

    2.    Fraudulent misrepresentation........................................................... 80

    3.    Breach of Warranty .......................................................................... 82

    4.    Frustration........................................................................................ 83

    5.    Response to BSGR's Defences ......................................................... 83

    6.    Quantum .......................................................................................... 84

B.   Respondent's Position ........................................................................................ 84

    1.    Response to Vale's Allegations ......................................................... 85

    2.    Response to allegation of fraudulent misrepresentation .................... 87

    3.    Vale's Requests for Relief ................................................................. 89

    4.    Warranties........................................................................................ 89

| | 5. | Frustration | 90 |
|---|---|---|---|
| | 6. | BSGR's Counterclaims | 90 |
| **V.** | | **PRELIMINARY JURISDICTION ISSUE** | **93** |
| **VI.** | | **FRAUDULENT MISREPRESENTATION** | **98** |
| A. | | Standard of proof | 98 |
| | 1. | The appropriate standard of proof is the "balance of probabilities test", albeit there should be a high evidentiary threshold before the Tribunal finds that BSGR had committed fraudulent activities | 98 |
| | 2. | The burden of proof may be shifted in "special circumstances" where appropriate | 99 |
| | 3. | The Tribunal is not precluded from drawing adverse inferences | 99 |
| B. | | Elements of the tort of deceit | 102 |
| | 1. | The allegation that BSGR made numerous false representations to Vale | 103 |
| | 2. | BSGR made representations that were false | 106 |
| | 3. | BSGR knew that its representations were false | 187 |
| | 4. | BSGR intended that Vale should act in reliance on its representation | 196 |
| | 5. | Vale acted in reliance on the representations and suffered loss | 197 |
| C. | | BSGR's contractual estoppel defence | 202 |
| **VII.** | | **BREACH OF WARRANTIES** | **207** |
| A. | | Analysis of applicable legal principles | 207 |
| | 1. | Liability for breach of warranty | 207 |
| | 2. | BSGR's interpretation of "knowledge" as referring to "actual knowledge (or the equivalent) by a defined group of BSGR people" is wrong | 207 |
| B. | | Has there been a breach of warranty? | 208 |
| | 1. | Section 2.1 of Schedule 4 | 208 |
| | 2. | Section 3.1 of Schedule 4 | 209 |
| | 3. | Section 3.2 of Schedule 4 | 210 |
| | 4. | Section 3.5 of Schedule 4 | 211 |
| | 5. | Section 3.6 of Schedule 4 | 211 |
| | 6. | Section 4.2 of Schedule 4 | 212 |
| | 7. | Section 16.1 and Schedule 3 of the SHA | 213 |
| **VIII.** | | **FRUSTRATION** | **221** |
| A. | | Introduction | 221 |
| B. | | Preliminary Issue: whether frustration is "parasitic" on other heads of claim | 222 |
| C. | | Bar I: *Force majeure* clause | 223 |
| D. | | Bar II: Foreseeability | 229 |
| E. | | Application of the doctrine of frustration | 232 |
| **IX.** | | **REFLECTIVE LOSS** | **235** |

A.    The Parties' Positions ................................................................ 235

B.    The Rule Against Reflective Loss ............................................... 238

C.    Was the burden on BSGR to raise the issue of reflective loss? .............................. 240

D.    Application of the Rule Against Reflective Loss to the Facts – the Effect of the Share Purchase Deed of 13 March 2015 on any Application of the Rule Against Reflective Loss ...................................................... 241

E.    Tribunal's Conclusion ................................................................ 244

**X.    REMEDIES ................................................................................ 245**

A.    Cumulative remedies ................................................................ 245

    1.    Chronological history of pleadings ......................................... 245

    2.    Tribunal's decision ............................................................... 246

B.    Remedies for Fraudulent Misrepresentation ............................... 249

    1.    Rescission ........................................................................... 250

    2.    Damages ............................................................................. 259

    3.    Conclusion .......................................................................... 271

C.    Remedies for Breach of Warranty ............................................. 272

D.    Remedies for Frustration ........................................................... 272

E.    Interest .................................................................................... 272

**XI.    COSTS ...................................................................................... 275**

**XII.    SUMMARY OF FINDINGS ......................................................... 277**

**XIII.    DISPOSITIF .............................................................................. 279**

**APPENDIX – CHART OF KEY INDIVIDUALS ........................................ 281**

## List of Abbreviations

| | |
|---|---|
| ABL Solution | Anti-Bribery Laws Solution |
| Administration Order | The Administration Order issued by the Royal Court of Guernsey dated 6 March 2018 placing BSGR into voluntary administration |
| Base Convention | Basic Agreement between the Republic of Guinea and BSG Resources for the Exploitation of the Zogota / N'zerekore Iron Ore Deposits, between BSGR Guernsey, BSGR Guinea and the GoG, dated 16 December 2009 |
| Boutros Contract | Subcontracting and Service Provision Agreement between LMS and BSGR Guinea |
| BSG Group | BSGR and related companies (unless otherwise defined) |
| BSG Metals and Mining | BSG Metals and Mining Limited |
| BSGR or Respondent | BSG Resources Limited |
| BSGR Guernsey | BSGR Resources (Guinea) Limited (incorporated in Guernsey) |
| BSGR Guinea | BSG Resources (Guinea) S.à.r.l |
| BSGR Guinea BVI | BSGR Resources (Guinea) Limited (incorporated in the British Virgin Islands) |
| BSGR-Pentler Milestone Agreement | Milestone Agreement between Pentler and BSGR Guinea BVI, dated 14 February 2006 |
| BSGR Steel | BSGR Steel Holdings Limited |
| BVI | British Virgin Islands |
| Claimant | Vale S.A. |
| Commission Contract | Commission Contract allegedly concluded between Matinda and BSGR Guinea BVI dated 27 February 2008 |
| Concession Areas | Simandou Blocks 1 and 2 and Zogota |
| CPDM | Centre de Promotion et de Développement Miniers |
| DDI | Descriptive Declaration of Importation dated 17 August 2009 |
| FBI | United States' Federal Bureau of Investigations |

| FCPA | Foreign Corrupt Practices Act (US) |
|---|---|
| February 2008 MoU | Memorandum of Understanding allegedly concluded between BSGR Guinea BVI and Matinda, dated 28 February 2008 |
| Framework Agreement | Joint Venture Framework Agreement dated 30 April 2010 between the Claimant Vale and the Respondent BSG Resources Limited |
| GoG | Government of Guinea |
| IBA Rules on Evidence | IBA Rules on the Taking of Evidence in International Arbitration (2010, International Bar Association) |
| ICSID Proceedings | ICSID Arbitration Proceedings between BSGR and the Republic of Guinea registered as ICSID case no. ARB/14/22 |
| I.S. Touré | Ibrahima Sory Touré |
| Joint Venture Agreements | The Framework Agreement and the Shareholders Agreement |
| LCIA Rules | 1998 Rules of Arbitration of the London Court of International Arbitration |
| LTS | Liberian Transport Solution |
| LMS | Logistics & Maintenance Services Sàrl |
| Matinda | Matinda and Co. Limited |
| Mme. Touré | Mamadie Touré |
| MoU | Memorandum of Understanding between BSGR Guinea BVI and the GoG, dated 20 February 2006 |
| NMC | National Mining Commission |
| Nysco | Nysco Management Corporation Limited |
| Onyx | Onyx Financial Advisors Limited |
| Parties | Vale and BSGR |
| Pentler | Pentler Holdings Limited |
| Pentler-Bah Milestone Agreement | Milestone Agreement between Pentler, I.S. Touré and Bah, dated 20 February 2006 |
| Pentler-Daou Milestone Agreement | Milestone Agreement between Pentler and Ismaila Daou, dated 20 February 2006 |

| | |
|---|---|
| Pentler-Daou Shareholding Agreement | Shareholding Agreement between Pentler and Ismaila Daou, dated 20 February 2006 |
| Pentler Shareholders Agreement | Shareholders Agreement between BSGR Steel, Pentler and BSGR Guinea BVI, backdated to 10 March 2006 |
| Project Hills | The Project which was the subject of the Joint Venture Agreements |
| Respondent | BSGR |
| Rio Tinto | Rio Tinto plc |
| Rio Tinto Proceedings | Proceedings brought by Rio Tinto plc against Vale, VBG and BSGR and other defendants on 30 April 2014 in the Southern District of New York, docket no. 14-cv-3042 |
| Services Agreement | Services and Co-operation Agreement between Pentler and BSG Metals and Mining Limited, backdated to 15 October 2005 |
| Settlement Agreement | Settlement Agreement between Pentler and BSGR Steel, dated 25 July 2009 |
| SHA | Shareholders' Agreement between Vale, BSGR and BSGR Guernsey dated 30 April 2010 |
| Share Purchase Agreement | Share Purchase Agreement of Shares in BSG Resources (Guinea) Ltd between BSGR Steel and Pentler, dated 24 March 2008 |
| Simandou Blocks 1 and 2 | Blocks 1 and 2 of the Simandou iron ore deposit |
| Touré MoU | The Memorandum of Understanding signed by Pentler and Mme. Touré, dated 20 February 2006 |
| UBO | Ultimate Beneficial Owner |
| USD | United States dollar |
| U.S. DOJ | United States Department of Justice |
| Vale or Claimant | Vale S.A. |
| Vale GmbH | Vale International Holdings GmbH |
| Vale International | Vale International S.A. |
| VBG | Vale BSGR Guinea Limited (Guernsey incorporated) |

| Zogota Feasibility Study | BSGR's Feasibility Study for Zogota, completed at the end of October 2009 and submitted to the Ministry of Mines on 16 November 2009 |
|---|---|

# DRAMATIS PERSONAE[1]

## I. INDIVIDUALS[2]

| Name | Position |
|---|---|
| Agnelli, Roger | Chief Executive Officer, Vale, 2001 to 2011 |
| Antaki, Paul | New Business Development Manager, Vale |
| Avidan, Asher | Chief Executive Officer, BSGR Guinea; President, BSGR, May 2010 to present |
| Bah, Aboubacar | Businessman from Mali who resided in Guinea |
| Bangoura, Issiaga | Security Director, BSGR |
| Barnett, David | Internal Counsel, BSGR |
| Boutros, Ghassan | Lebanese businessman; BSGR equipment supplier and alleged consultant operations |
| Camara, M'Bemba | Security Agent for the company "Fist Interim" |
| Camara, Moussa Dadis | President of the Republic of Guinea from 23 December 2008 to 3 December 2009 |
| Cilins, Frédéric | Principal of Pentler |
| Clark, David | Director, BSGR; Director and Group Treasurer, BSGR Guinea |
| Condé, Alpha | President of the Republic of Guinea from 21 December 2010 to present |
| Conté, Lansana | President of the Republic of Guinea from 26 March 1984 to 22 December 2008 |
| Cramer, Dag | Director, BSGR; Chief Executive Officer, Onyx Financial Advisors |

---

[1] Based on the Dramatis Personae provided by the Claimant in its Statement of Reply, Appendix A.
[2] Unless specified otherwise, this appendix – pursuant to footnote 1 above – sets out the role of the individual at the time of the events described in the Statement of Case and Statement of Reply.

| | |
|---|---|
| Daou, Ismaila | Malian businessman |
| Doumbia, Mohammed L. | BSGR's local Guinean counsel |
| Etchart, Eduardo | General Manager for Exploration in Africa, Vale; presently Manager for the Evaluation of Mineral Resources, Vale Mozambique |
| Fofana, Ibrahima Kassory | Economy and Finance Minister of the Republic of Guinea from 1997 to 2000; principal of IF Global LLC; consultant to BSGR |
| Freeh, Louis | Attorney commissioned by the Balda Foundation to conduct an internal investigation into BSGR's acquisition of mining rights in Guinea |
| Hennig, Walter | South African businessman<br>Allegedly attempted to "blackmail" BSGR |
| Kanté, Ahmed | Minister of Mines of the Republic of Guinea from March 2007 to August 2008 |
| Kleinfeld, George | Partner, Clifford Chance<br>Advised Vale during the Project Hills negotiations |
| Konaté, Sékouba | President of the Republic of Guinea from 3 December 2009 to 21 December 2010 |
| Kouyaté, Lansana | Prime Minister of the Republic of Guinea from March 2007 to May 2008 |
| Ledsham, Eduardo | Exploration Department Executive Director, Vale from 2010-2011 |
| Lev Ran, Avraham | Principal of Pentler |
| Lieberman, Joseph | Attorney commissioned by the Balda Foundation to conduct an internal investigation into BSGR's acquisition of mining rights in Guinea |
| Mebiame, Samuel | Gabonese businessman; alleged associate of Walter Hennig |
| Merloni-Horemans, Sandra | Director, BSGR and Onyx Financial Advisors |

| | |
|---|---|
| Monteiro, Alex | General Manager of Corporate Mergers & Acquisitions Department, Vale from 2010-2011; Director of Mergers & Acquisitions Department, Vale from 2011–2014; presently Director of Production, Planning, Governance and Operational Excellence for Base Metals, Vale Canada |
| Nabé, Dr Lounceny | Minister of Mines of the Republic of Guinea between August and December 2008 |
| Noy, Michael | Principal of Pentler |
| Oron, Roy | Chief Executive Officer, BSGR until April 2007 |
| Pollak, Daniel | Business Development Manager and Consultant, BSGR; Country Manager, VBG Logistics |
| Saad, Ricardo | Director and CEO, VBG Guinea from 2010 to 2012 |
| Saada, Patrick | Director, Steinmetz Diamonds Group from 1990 to 2007; Vice Chairman and Chief Marketing Officer of Octea Ltd from 2007 to 2013; Director of Koidu Holdings |
| Sidibe, Adama | Business associate of Ghassan Boutros |
| Souaré, Dr. Ahmed Tidiane | Minister of Mines of the Republic of Guinea from 2005 to 2006 under President Lansana Conté; Prime Minister from May 2008 to December 2008 |
| Soumah, Fodé | Minister of Youth and Sports of the Republic of Guinea under President Lansana Conté |
| Soumah, Mamady Sam | Secretary General to the President of the Republic of Guinea under President Lansana Conté |
| Steinmetz, Benjamin ("Beny") | Beneficial owner of BSGR |
| Struik, Marc | Director, BSGR Guernsey, BSGR Guinea/VBG Guinea and BSGR BVI; CEO of BSG Metals and Mining from May 2007 to present |
| Tchelet, Yossie | Chief Financial Officer, BSGR |

| Teles, Leandro | Simandou Finance Manager and Project Leader for VBG Guinea from August 2010 to June 2015 |
|---|---|
| Thiam, Mahmoud | Minister of Mines of the Republic of Guinea from 2009 to 2010 under President Moussa Dadis Camara |
| Touré, Ibrahima Sory (I.S.) | Half-brother of Mamadie Touré<br><br>Pentler's local partner; Director of External Relations, BSGR Guinea S.à.r.l, from 2007 to 2010; Vice-President, BSGR Guinea S.à.r.l from 2010 to 2011 |
| Touré, Mamadie | Fourth wife of President Conté; owner of Matinda & Co. Ltd; "Confidential Witness" in FBI investigation |
| Touré, Sékou | President of Guinea from 1958 until 1984 |

## II.    ENTITIES

| Name | Position |
|---|---|
| Balda Foundation | Liechtenstein trust and BSGR's ultimate holding company, of which Steinmetz and his family are the sole beneficiaries |
| BSG Resources Limited | Respondent in this arbitration; wholly owned by Nysco; 100% owner of BSGR Guernsey, BSGR Guinea BVI, BSGR Guinea, BSGR Liberia, and BSGR Liberia BVI |
| BSG Resources (Guinea) Limited | BSGR subsidiary registered in the BVI<br>Party to the Shareholders Agreement with Pentler |
| BSG Resources (Guinea) Limited | BSGR subsidiary registered in Guernsey; 100% owner of BSGR Guinea as of 2009 |
| BSG Resources (Guinea) S.à.r.l. | BSGR subsidiary registered in Guinea; wholly owned by BSGR Guernsey as of 2009<br>Permit-holder of BSGR's Guinean mining rights |

| | |
|---|---|
| BSG Resources (Liberia) Limited (Liberia) (**"BSGR Liberia"**) | BSGR subsidiary registered in Liberia; wholly owned by BSGR Liberia BVI<br><br>Permit holder of BSGR's Liberian mining rights |
| BSG Resources (Liberia) Limited (BVI) (**"BSGR Liberia BVI"**) | BSGR subsidiary registered in Liberia |
| BSGR Treasury Services Limited (BVI) | BSGR subsidiary |
| BSGR Steel Holdings Limited | BSGR subsidiary; co-shareholder and party to Shareholders Agreement in BSGR Guinea BVI alongside Pentler; party to Share Purchase Agreement with Pentler regarding the buyback of its stake in BSGR Guinea BVI; party to Settlement Agreement with Pentler |
| CW France | Pentler affiliate |
| FMA International Trading (Pty) Ltd. | Pentler affiliate |
| Koidu Holdings | BSGR subsidiary; diamond mining operation based in Sierra Leone |
| Logistic and Maintenance Services SARL | Company owned by Boutros; service and equipment provider to BSGR |
| Margali Management Corporation | Onyx subsidiary; sole director of BSGR Steel; sole director of Pentler until 15 February 2006 |
| Matinda & Co. Ltd. | Company owned by Mamadie Touré |
| Matinda & Co. LLC | Limited liability company owned by Mamadie Touré |
| Nysco Management Corp. | Holding company registered in the BVI wholly owned by Balda; wholly owns BSGR |
| Onyx Financial Advisors S.A. | BSGR's English agent and management company; includes companies incorporated in the British Virgin Islands, Switzerland and the U.K. |
| Pentler Holdings | BVI shelf company sold by Onyx to Cilins, Lev Ran, and Noy in February 2006 |
| Resources Advisory Services (BVI) | BSGR subsidiary used to procure advisory and consulting services for BSGR's operations in Guinea |

| | |
|---|---|
| Thiam & Co. | Company owned by former Minister of Mines Mahmoud Thiam |
| Vale BSGR Guinea Limited | Joint Venture company and owner of mining rights – formerly BSG Resources (Guinea) S.à.r.l. |
| Vale International Holdings GmbH | Wholly owned subsidiary of Vale, registered in Austria |
| Vale International S.A. | Wholly owned subsidiary of Vale, registered in Switzerland |
| Vale S.A. | A publicly limited company registered in Brazil |
| Windpoint Overseas Limited (**"Windpoint"**) | BSGR affiliate |

## I.    INTRODUCTION – NATURE OF THE DISPUTE

1.    This arbitration was commenced by the Claimant, Vale S.A., on 28 April 2014 pursuant to the Joint Venture Framework Agreement dated 30 April 2010 between Vale S.A. and the Respondent, BSG Resources Limited (the "**Framework Agreement**").[3] In accordance with the Framework Agreement, the arbitration is conducted under the 1998 version of the LCIA Rules of Arbitration (the "**LCIA Rules**").

2.    Vale S.A. ("**Vale**" or the "**Claimant**") is a public limited company registered under the laws of Brazil. Vale's principal lines of business are mining and related logistics. It is the world's largest producer of iron ore, and also produces nickel, manganese ore, ferroalloys, coal, copper, platinum group metals, gold, silver, cobalt and potash, phosphates, and other fertilizer nutrients. Vale's securities are traded on the stock exchanges of Sao Paulo, New York, Hong Kong, Madrid, and Indonesia, as well as on Euronext, and are included in the Indice Bovespa benchmark index of the Sao Paulo Stock Exchange.

3.    BSG Resources Limited ("**BSGR**" or the "**Respondent**") is a company registered under the laws of Guernsey. In this Award, a reference to BSGR refers to BSG Resources Limited but may also (depending on its context) refer to BSGR and its subsidiaries or to any of its affiliates. BSGR is principally engaged in mining operations in Africa and Eastern Europe, and also engages in power generation and oil and gas exploration and production. The company is wholly owned by Nysco Management Corporation Limited ("**Nysco**"), a company incorporated in the British Virgin Islands, which is in turn wholly owned by the Balda Foundation, an irrevocable trust established in the Principality of Liechtenstein whose beneficiaries are Beny Steinmetz ("**Steinmetz**"), an Israeli businessman domiciled in Switzerland, and members of his family. During the arbitration proceedings, BSGR – as further discussed below – was put into administration by an order dated 6 March 2018 of the Royal Court of Guernsey.

4.    Vale brings this arbitration against BSGR (collectively, the "**Parties**") in connection with (i) the Framework Agreement (defined above), and (ii) a Shareholders' Agreement between Vale, BSGR and BSGR Resources (Guinea) Limited ("**BSGR Guernsey**") dated 30 April 2010 (the "**SHA**")[4] (collectively, the "**Joint Venture Agreements**").

5.    The Agreements followed the Government of Guinea in West Africa (the "**GoG**") granting to BSGR on 19 March 2010 concessions to exploit Blocks 1 and 2 of the Simandou iron ore deposit ("**Simandou Blocks 1 and 2**") and the Zogota iron ore deposit, all of which are located in the far east of Guinea (collectively, the "**Concessions**" or the "**Concession Areas**"). The Simandou deposit was widely acknowledged to be one of the largest, if not the largest, remaining unexploited iron ore deposits in the world. A map outlining the geography of the Concession Areas taken from Appendix D of Vale's Statement of Case is reproduced below:

---

[3] Framework Agreement, 30 April 2010, **C-1**.
[4] SHA, 30 April 2010, **C-2**.



6.      BSGR approached Vale with the possibility of selling Vale an interest in the Concessions as BSGR needed a partner that could both invest capital and offer technical expertise for the development of the Concession Areas. BSGR and Vale negotiated and signed the Joint Venture Agreements. The project was known as "Project Hills".

7.      Vale now claims that BSGR obtained those Concessions by bribery and corruption of Guinean government officials. It notes that the GoG revoked the Concessions on 17 April 2014 after the GoG's formal investigation into how BSGR obtained the Concessions uncovered what the investigating committee found to be the bribery and corruption committed by BSGR. BSGR has since initiated ICSID proceedings against the Republic of Guinea in which it challenges the bribery and corruption findings and the revocation of its Concessions.[5] In a 25 February 2019 statement reported by the financial press, BSGR indicated that its dispute with the GoG has been settled and that pending suits will be withdrawn.

8.      Vale contends in this case that it was induced to enter into the Joint Venture Agreements with BSGR on the basis of extensive representations by BSGR and its representatives first, during an intensive due diligence process undertaken by an international law firm, Clifford Chance LLP ("**Clifford Chance**"), on behalf of Vale, and secondly, as warranties in the Framework Agreement itself. These representations covered a wide range of subjects. Some questions posed by Clifford Chance were addressed directly and specifically to bribery and corruption, whereas others were designed to uncover indicia or red flags of bribery. Vale's position is that, either individually or taken as a collective representation (that BSGR had obtained the mining rights lawfully and without engaging in any bribery or corruption), BSGR had made false representations to Vale and violated the warranties of the Joint Venture Agreements.

---

[5] *BSG Resources Limited, BSG Resources (Guinea) Limited and BSG Resources (Guinea) SÀRL v. Republic of Guinea*, ICSID Case No. ARB/14/22.

9.     In asserting that the representations were false, Vale relies in part on the fact that one of BSGR's alleged agents (or intermediaries), who was involved in BSGR's efforts in Guinea to obtain the Concessions, has pleaded guilty in the United States to criminal acts that he committed in an unsuccessful effort to destroy documentary evidence of the bribery in which BSGR was alleged to have engaged.

10.    Vale contends that BSGR's corrupt activities all occurred prior to Vale's investment and were completely contrary to the representations and warranties made by BSGR to Vale that neither BSGR nor its agents had engaged in any such conduct. Vale further contends that the GoG's revocation of the Concessions due to BSGR's corrupt activities resulted in Vale losing its entire USD 750 million investment in the mining operations under the Concessions, as well as the USD 500 million that it initially paid to BSGR when it entered into the Joint Venture Agreements. Vale therefore seeks the return of the money that it contends BSGR fraudulently obtained from Vale, rescission of the Joint Venture Agreements and (if and to the extent necessary) a declaration that the Joint Venture Agreements have been frustrated, relieving Vale of any further obligations it would have under the Joint Venture Agreements.

11.    BSGR contests Vale's allegations vigorously. It denies that BSGR deceived Vale when entering into the Joint Venture Agreements or that it misrepresented facts and breached any of its representations and warranties. It disputes that Vale may declare the Agreements frustrated. For BSGR, the crux of the matter is that the new government of the Republic of Guinea resulting from President Condé's election in 2010 chose to cancel the Concessions awarded to BSGR so that it could re-issue the Concessions to other mining companies that had assisted it during the election. BSGR contends that the Republic did so for improper reasons (i.e., to pay for the new President's election campaign and other commitments made to obtain support for that campaign). Hence, the GoG invoked fake pretexts related to alleged corruption by BSGR in obtaining the Simandou mining rights and Concessions.

12.    The ICSID arbitration referred to above has in this respect been instituted by BSGR to seek relief against the Republic's alleged expropriation and unfair and inequitable treatment of BSGR's investment in the Republic. In sum, BSGR contends that the Republic is liable under international law for the divesture of BSGR's investment in Simandou as its investment was lawfully obtained. Consequently, BSGR asserts that Vale's claims in this LCIA arbitration should also be dismissed, as they are based on the assumption that the mining rights and the Concessions were procured in an illegal manner. That assumption being false, BSGR alleges that it did not deceive Vale, that it did not breach the Joint Venture Agreements' representations and warranties and that the Agreements have not been frustrated. In addition, BSGR has instituted counterclaims against Vale. However, as will be discussed below, these counterclaims are deemed, in accordance with the LCIA Rules, to have been withdrawn as a result of BSGR's failure to pay requested deposits to fund this arbitration.

13.    The Tribunal notes that this arbitration has been procedurally complex, as detailed in the following section. The reasons for this complexity include: (a) managing parallel ICSID proceedings, with three stay applications; (b) multiple document production issues; (c) parallel criminal proceedings with subsequent applications to submit documents to this Tribunal; (d) two arbitral challenge proceedings; (e) the removal and replacement of the Chairman of the Tribunal; (f) ancillary proceedings in the English High Court, as well as

disclosure requests in the LCIA, English and US Courts; (g) BSGR's voluntary administration in Guernsey; and (h) the proceedings by and large being conducted as of September 2016 by default without the benefit of BSGR's oral hearing submissions, the presentation of its witness and expert evidence and its examination of Claimant's witnesses and expert.

14. Two hearings were held, although the case was not bifurcated. The first hearing was held in September 2016, using some of the time that had initially been allocated for the merits hearing. This was an "educatory hearing" for the new Chairman of the Tribunal. The second hearing was the merits hearing and was held in February 2017. BSGR did not participate in either hearing.

15. The arbitration took more than four and a half years to complete as a result of the complex nature of the dispute and the various complexities described above.

## II.    PARTIES, ARBITRATION AGREEMENT AND PROCEDURAL HISTORY

16.    By and large, arbitral awards can be short as to describing the history of the arbitration proceedings. It is usual to summarise the major milestones of the arbitration proceedings, without a lengthy discussion of minor procedural incidents that arose during the proceedings and how these were resolved by the parties or by the tribunal. This Award is an exception and – in the opinion of the Tribunal – requires a much longer section on procedural issues as the arbitration proceedings since September 2016 have largely been conducted *ex parte* due to BSGR's failure to participate in two hearings, as described in more detail below. In addition, there have been other procedural complications such as challenges against the arbitrators before the LCIA Court and the High Court in London, discovery requests in the U.S.A., issues regarding the relationship between the present arbitration and the pending ICSID arbitration between BSGR and the Republic of Guinea and the 6 March 2018 order of the Royal Court of Guernsey putting BSGR in administration. These and other elements will be elaborated upon below. From the outset, the Tribunal emphasises that it considers that – notwithstanding the issues identified above – its duty at all times is to conduct these arbitration proceedings in an independent and impartial way in compliance with the LCIA Rules and the English Arbitration Act as the law of the place of arbitration agreed upon by the Parties. In discharging its duty, the Tribunal has sought to balance at all times both Parties' due process rights, the equality of the Parties and the fairness and efficiency of the proceedings.

### A.    The Parties and their Representatives

#### 1.    The Claimant

17.    Vale is a public limited company (*Pr. Sociedade Anónima*) registered under the laws of Brazil, with its principal office at Av. Graca Aranha, 26, 20.300-900, Rio de Janerio, RJ, Brazil.

18.    Vale is represented in this arbitration by Jonathan Blackman, Joaquin Terceño and Esti Tambay of:

        Cleary Gottlieb Steen & Hamilton LLP
        One Liberty Plaza
        NY 10006 New York
        U.S.A.

And by Mr. Jonathan Kelly of:

        Cleary Gottlieb Steen & Hamilton LLP
        City Place House
        55 Basinghall Street
        London EC2V 5EH
        United Kingdom

## 2.    The Respondent

19.    BSGR is a company registered under the laws of Guernsey with registered number 46565, with its registered office at West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX.

20.    BSGR is represented in this arbitration by Karel Daele, James Lisbon and Heidrun Walsh of:

> Mishcon de Reya LLP
> Summit House
> 12 Red Lion Square
> London WC1R 4QD
> United Kingdom

21.    BSGR is also represented by David Wolfson QC of One Essex Court.

22.    For part of this arbitration, BSGR was also represented by Messrs. Asserson and Baigel of:

> Asserson Law Offices
> 38 Wigmore Street
> London W1U 2RU
> United Kingdom

## B.    The Arbitration Agreement

23.    The governing law of the Joint Venture Agreements is English law and the place of arbitration is London, England.

24.    Section 16.10 of the Framework Agreement provides:

> 16.10 Governing Law; Arbitration
>
> a)    This Agreement is governed by English law. The Parties agree that all disputes arising out of or in connection with this Agreement, or with its negotiation, legal validity or enforceability, or with its consequences, whether the alleged liability shall be said to arise under the law of England or under the law of some other country, and whether the same shall be regarded as contractual claims or not, shall be exclusively governed by and determined only in accordance with English law.
>
> b)    Any dispute, controversy or claim arising between any of the Parties to this Agreement out of or in connection with this Agreement, including any question regarding the existence, validity, or termination of this Agreement, shall be referred to and finally resolved by arbitration under the Rules of Arbitration of the London Court of International Arbitration (the "LCIA Rules"), which Rules are deemed to be incorporated by reference into this Section 16.10. There shall be three arbitrators, and the Parties agree that one arbitrator shall be nominated by each Party to the arbitration for appointment by the LCIA Court in accordance with the LCIA Rules. The third arbitrator, who shall act as the chairman of the tribunal, shall be nominated by agreement of the two Party nominated arbitrators within 14 days of the confirmation of the appointment of the second arbitrator, or in default of such agreement, appointed by the LCIA Court. The seat or place of arbitration shall be London, England. The language to be used in the arbitral proceedings shall be English. The award shall be final and binding on the parties to the arbitration and may be entered and enforced in any court having jurisdiction. Any request for arbitration shall be

served on the other party pursuant to the notice provision in Section 16.2 of this Agreement.

c)  In order to facilitate the comprehensive resolution of related disputes, and upon request of any party to an arbitration pursuant to this Section 16.10, an arbitral tribunal may, within 90 days of its appointment, consolidate the arbitration proceedings before it with any other arbitration proceedings or proposed arbitration proceedings involving the Parties. An arbitral tribunal shall not consolidate such arbitration proceedings unless it determines that (i) there are issues of fact or law common to the arbitrations in question so that a consolidated proceeding would be more efficient than separate proceedings and (ii) no party to the proceedings sought to be consolidated would be materially prejudiced as a result of such consolidation for any reason, including (a) a failure to have an equal say in the formation of the arbitral tribunal which would hear the consolidated proceedings, (b) a failure to be heard on the issue of consolidation or (c) undue delay. Unless the parties to the proceeding sought to be consolidated agree otherwise, the arbitral tribunal first formed shall determine the disputes arising in the consolidated proceedings. In the event of different rulings on the question of consolidation by differently constituted arbitral tribunals formed pursuant to this Section 16.10, there shall be no consolidation of proceedings unless all of the parties to the proceedings sought to be consolidated agree otherwise.

d)  By agreeing to arbitration in accordance with this Section 16.10, the Parties do not intend to deprive any competent court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment or other order in aid of the arbitration proceedings or the enforcement of any award. The arbitral tribunal shall have full authority to order a Party to seek modification or vacation of any order issued by a national court, and to award damages or give other appropriate relief for the failure of any Party to respect the arbitral tribunal's orders to that effect.

e)  The Parties hereby waive their rights to apply or appeal under Sections 45 and 69 of the Arbitration Act 1996.

f)  To the extent that any Party hereto (including permitted assignees of any Party's rights or obligations under the Agreement) may be entitled, in any jurisdiction, to claim for itself or its revenues, assets or properties, sovereign immunity from service of process, from suit, from the jurisdiction of any court, from attachment prior to judgment, from attachment in aid of execution of an arbitral award or judgment (interlocutory or final), or from any other legal process, and to the extent that, in any such jurisdiction there may be. attributed such a sovereign immunity (whether claimed or not), each Party hereto hereby irrevocably agrees, to the extent permitted by law, not to claim, and hereby irrevocably waives generally, to the extent permitted by law, such sovereign immunity.

g)  Vale hereby confirms that it has irrevocably appointed TMF Corporate Services Limited at its registered office for the time being, being at the date hereof Pellipar House, 1st floor, 9 Cloak Lane, London, EC4R 2RU as its authorized agent for service of process in England of the kind described in Section 16.10(b) above. If for any reason Vale does not have such an agent in England, it will promptly appoint a substitute process agent and notify BSGR of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

h)  BSGR hereby confirms that it has irrevocably appointed BSG Management Services Limited, a company registered in England and Wales with registered no. 05459227 at its registered office for the time being, being at the date hereof Level 3, 7 Old Park Lane, London, W1K 1QR as its authorized agent

for service of process in England of the kind described in Section 16.10(b) above. If for any reason BSGR does not have such an agent in England, it will promptly appoint a substitute process agent and notify Vale of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

25.   Section 17.10 of the SHA contains a substantially identical clause to that above, other than in respect of provisions concerning multiparty arbitration and joinder, which are not relevant to this arbitration.

## C.   Procedural History of the Arbitration

### 1.   The initial phase of the arbitral procedure

26.   Vale filed its Request for Arbitration with the LCIA on 28 April 2014, in which it nominated David Williams QC as its arbitrator. On 29 May 2014, BSGR filed its Response, including Counterclaims, with the LCIA and nominated Michael Hwang SC as its arbitrator.

27.   Following a list procedure whereby the Parties ranked their preferred candidates for Chairman, the co-arbitrators nominated the Hon. Judge Charles Brower as the Chairman of the Tribunal. The Tribunal was constituted on 1 August 2014.

### 2.   Procedural Order No. 1 and Procedural Order No. 2

28.   On 22 August 2014, the Tribunal issued Procedural Order No. 1 in which it appointed Michael Daly as Secretary to the Tribunal with the consent of the Parties and scheduled an Initial Session. On 6 October 2014, the Chairman of the Tribunal, with the consent of his co-arbitrators and the Parties, presided alone over the Initial Session, which was held in-person in London. Following the Initial Session and a further discussion with the Parties, the Tribunal issued Procedural Order No. 2 on 5 November 2014, reflecting the procedural aspects of this arbitration that were agreed on by the Parties, recording the expedited schedule agreed on by the Parties in respect of a stay application that BSGR intended to file, and deciding on a procedural schedule to take effect should the proposed stay application be denied. Paragraph 12 of Procedural Order No. 2 records the agreement that the International Bar Association's IBA Rules on the Taking of Evidence in International Arbitration (2010) (the "**IBA Rules on Evidence**") may be referred to by the Tribunal as guidelines.

### 3.   Respondent's Stay Application and Procedural Order No. 3

29.   On 20 October 2014, BSGR filed its stay application (the "**First Stay Application**") pursuant to Procedural Order No. 1, seeking an order staying this arbitration in favour of a separate arbitration between BSGR and the Republic of Guinea registered with the International Centre for the Settlement of Investment Disputes on 8 September 2014 (the "**ICSID proceedings**"). The parties filed two rounds of written submissions, followed by a hearing on 1 December 2014 in Paris (attended by Michael Hwang SC by telephone). On 10 December 2014, the Tribunal issued Procedural Order No. 3, in which the Tribunal stated that it had concluded its deliberations on the First Stay Application and was actively embarking on drafting the accompanying decision. The Tribunal also fixed the merits hearing on 4–8 April 2016 and 11–15 April 2016, with a further week (18-22 April) held in reserve should the Parties require it to present their cases.

30.   On 16 December 2014, the Tribunal issued its Decision on Respondent's Application to Stay the Arbitration, dismissing the First Stay Application on the basis that it was too early to know how the ICSID dispute would develop, and whether there would be unnecessary delay and expense in allowing parallel proceedings to continue. The Tribunal stated that BSGR could renew its First Stay Application in the future based on new developments in the ICSID proceedings or otherwise and ordered BSGR to submit to the Tribunal a short report each month concerning the status of the ICSID proceedings. The full procedural history of that Decision, as set out in section II of the Decision, is incorporated by reference into this Award.

31.   On 4 February 2015, Vale submitted its Statement of Case, appendices, consolidated indices of factual exhibits and legal authorities and its factual exhibits and legal authorities. Vale filed four factual witness statements in support of its case from: Eduardo Etchart; George Kleinfeld; Alex Monteiro; and Ricardo Saad.

### 4.   Procedural Order No. 4

32.   On 12 February 2015, after consulting the Parties, the Tribunal issued Procedural Order No. 4 where it amended the dates of the merits hearing in the light of a potential scheduling conflict faced by the Chairman. The hearing was to take place on 29 August to 2 September 2016, and 5–9 September 2016, with the week of 12–16 September 2016 held in reserve should the Parties require it.

### 5.   Procedural Order No. 5 and U.S. Discovery

33.   On 20 February 2015, Vale sent the Tribunal a proposed amended procedural schedule which was represented to have been agreed to by both Parties. BSGR did not object to this schedule. On 3 March 2015, the Tribunal issued Procedural Order No. 5 where it adopted the procedural schedule proposed by Vale in its letter dated 20 February 2015.

34.   On 2 April 2015, Vale wrote to the Tribunal seeking permission to produce documents from these proceedings to Rio Tinto plc ("**Rio Tinto**") as part of an ongoing litigation taking place in the United States District Court for the Southern District of New York between Rio Tinto and Vale, BSGR and VBG (the "**Rio Tinto proceedings**"). BSGR objected to this request.

35.   On 30 April 2015, the Tribunal issued its "Decision on Claimant's Request Concerning U.S. Discovery". The full procedural history of this decision, as set out in section I of the Decision, is incorporated by reference into this Award. The Tribunal ruled that Vale's request should be denied as it could not point to any existing legal requirement to produce the documents in issue. The decision prohibited Vale from disclosing documents in the Rio Tinto proceedings, and held that, in the event that the US court rendered a decision that Vale considered constituted a "legal duty" to compel it to produce documents from this arbitration in the Rio Tinto proceedings, Vale should not disclose such documents before securing an additional written authorisation from the Tribunal.

### 6.   Second Stay Application

36.   On 20 May 2015, BSGR renewed its application to stay the arbitration (the "**Second Stay Application**"), which was opposed by Vale.

37.    On 28 June 2015, the Tribunal issued its "Decision on Claimant's Request to Share LCIA Record with the Republic of Guinea and the ICSID Tribunal". The procedural history of the Decision, set out at paragraphs 1–9 of the Decision, is incorporated by reference into this Award. The Tribunal ruled that BSGR should disclose, on an ongoing basis, all documents from the ICSID proceedings to Vale and the Tribunal, and that the Parties were authorised to provide to the Republic of Guinea and to the ICSID Tribunal all documents produced or rendered in the LCIA arbitration with the exception of witness statements and documents over which BSGR claimed confidentiality, reserving a right for Vale to respond to BSGR's alleged confidentiality grounds.

38.    On 24 July 2015, the Tribunal issued its "Decision on Respondent's Renewed Application to Stay the Arbitration", denying BSGR's Second Stay Application. The procedural history of the decision, as set out in section I of the Decision, is incorporated by reference into this Award.

### 7.    BSGR's Statement of Defence

39.    Shortly before this Decision was issued, on 1 July 2015, BSGR filed its Statement of Defence (corrected on 7 July 2015). The Statement of Defence was filed together with consolidated indices of factual exhibits and legal authorities and its factual exhibits and legal authorities. BSGR filed 14 factual witness statements in support of its case from: Beny Steinmetz; Marc Struik; Asher Avidan; Michael Noy; Frédéric Cilins; Avraham Lev Ran; Mahmoud Thiam; Patrick Saada; David Barnett; Yossie Tchelet; David Clark; Daniel Pollak; Dag Cramer; and Sandra Merloni-Horemans.

### 8.    Procedural Order No. 6

40.    On 14 August 2015, BSGR sent the Tribunal a proposed amended procedural schedule agreed to by both Parties. On 15 August 2015, the Chairman of the Tribunal made two requests to the Parties arising out of BSGR's letter. The first sought confirmation of Vale's agreement to the proposed amended procedural schedule. The second sought the Parties' confirmation that they no longer wished for the Tribunal to hold a third week, 12–16 September 2016, in reserve for the hearing.

41.    On 17 August 2015, Vale confirmed its agreement to the proposed amendments to the procedural timetable, and reaffirmed the view that two weeks for the merits hearing were sufficient. BSGR remained of the view that a third week for the hearing should be held in reserve.

42.    On 19 August 2015, the Tribunal issued Procedural Order No. 6, adopting the amended procedural schedule, and ruled that it continued to hold the week of 12–16 September 2016 in reserve for the merits hearing.

### 9.    Procedural Order No. 7

43.    On 1 September 2015, the United States Department of Justice (the "**U.S. DOJ**") served a subpoena on Vale as part of a Grand Jury proceeding, commanding Vale to produce any and all documents and records related to this arbitration.

44.    On 3 September 2015, Vale wrote to the Tribunal requesting authorisation for Vale to make legally required disclosures pursuant to the subpoena. The Tribunal invited BSGR to

respond to the request by 9 September 2015. On 14 September 2015, BSGR informed the Tribunal that it had no objections to Vale's request. The Tribunal issued Procedural Order No. 7 on the same day, granting Vale's application to make document disclosures in accordance with the subpoena.

## 10.  Document Production and U.S. Discovery

45.   In accordance with the agreed timetable, the Parties submitted Redfern Schedules (accompanied by exhibits and legal authorities) to the Tribunal on 11 September 2015. On 24 September 2015, BSGR wrote to the Tribunal raising additional comments regarding the Redfern Schedules. Vale requested that the Tribunal disregard BSGR's additional comments, or permit Vale to submit a response by 28 September 2015. On 25 September 2015, the Tribunal authorised Vale to submit a response in accordance with the Tribunal's instructions. In accordance with the Tribunal's instructions, Vale submitted its response requesting that the Tribunal order BSGR to produce certain documents requested by Vale.

46.   On 28 September 2015, Vale informed the Tribunal that the U.S. Court in the Rio Tinto proceedings had ordered that Vale disclose the Parties' documents from this arbitration pursuant to an order from Judge Andrew J. Peck. Based on the attached transcript from the hearing before Judge Peck, Vale renewed its request that the Tribunal grant permission for the production of documents from this arbitration in the Rio Tinto proceedings. BSGR was invited to comment on Vale's request by 30 September 2015. BSGR stated that it had no further comments on Vale's request, noting that the documents were covered by the protective order in force in relation to the U.S. proceedings.

47.   On 1 October 2015, the Tribunal issued its "Second Decision on Claimant's Request Concerning U.S. Discovery", granting Vale's application in relation to Judge Peck's order, permitting Vale to produce Vale's and BSGR's documents in the Rio Tinto proceedings.

48.   On 17 October 2015, the Tribunal issued its "Decision on Document Production", together with the Parties' Redfern Schedules, containing orders granting or denying production for each specific request. The Decision on Document Production included an order directing BSGR to make a good faith effort at obtaining and producing documents held by third parties and directing the Parties to produce privilege logs detailing any documents over which privilege was claimed.

## 11.  Procedural Order No. 8

49.   On 2 November 2015, BSGR sent the Tribunal a proposed amended procedural schedule agreed on by both Parties. Vale confirmed its agreement to the proposed schedule. The schedule was adopted by the Tribunal on 4 November 2015 in Procedural Order No. 8. Accordingly, the amended deadline for the Parties to make the required document productions along with any corresponding privilege logs was 18 November 2015 for document production, and 3 December 2015 for privilege logs respectively.

## 12.  Procedural Order No. 9 and Second Decision on Document Production

50.   On 23 November 2015, the Tribunal issued Procedural Order No. 9, ordering BSGR to submit a report concerning the status of the ICSID proceedings, and all documents from the ICSID proceedings that had been filed in such proceedings or become available in it. The Tribunal also ordered BSGR to meticulously comply with both of these obligations that

were initially set out in the Tribunal's "Decision on Respondent's Application to Stay the Arbitration" and "Decision on Claimant's Request to Share LCIA Record with the Republic of Guinea and the ICSID Tribunal". For a period, BSGR provided these monthly updates.

51.   On 14 December 2015, Vale sent a letter to the Tribunal alleging deficiencies in BSGR's document production that breached the Tribunal's "Decision on Document Production". Following instructions from the Tribunal, both Parties filed further correspondence and submissions on this matter. The Chairman heard oral arguments from the Parties via teleconference on 4 February 2016, with a copy of the transcript provided to the co-arbitrators. The Tribunal issued its "Second Decision on Document Production" on 15 February 2016. A more detailed procedural history for this decision, principally set out at paragraphs 1–3 of the Decision, is incorporated by reference into this Award.

52.   On 17 February 2016, Vale advised the Tribunal that Mahmoud Thiam ("**Thiam**") (Minister of Mines of the Republic of Guinea from 2009 to 2010) had filed an objection to the U.S. Court's order granting Vale the right to use 83 documents produced in the Rio Tinto proceedings in the present arbitration.

### 13.   Procedural Order No. 10

53.   On 24 February 2016, Vale sent the Tribunal a proposed amended procedural schedule represented to have been agreed on by both Parties. BSGR provided confirmation on 26 February 2016, as requested by the Tribunal. On 27 February 2016, the Tribunal issued Procedural Order No. 10, adopting the amended schedule.

### 14.   Third Decision on Document Production

54.   On 18 March 2016, the Tribunal issued its "Third Decision on Document Production", denying Vale's further request for relief. The procedural history of the Third Decision, set out at paragraphs 1–8 of the Third Decision, is incorporated by reference into this Award. Subject to any substantiated objections from BSGR, the Tribunal directed BSGR to produce all remaining documents pursuant to the Tribunal's "First Decision on Document Production" and "Second Decision on Document Production" and to submit any necessary privilege logs to Vale on or before 24 March 2016.

55.   On 24 March 2016, BSGR confirmed to the Tribunal that it had complied with the Tribunal's "Second Decision on Document Production" and "Third Decision on Document Production" subject to four outstanding points, which it stated it would complete as soon as possible.

### 15.   Vale's Statement of Reply and Procedural Order No. 11

56.   On 24 March 2016, Vale submitted its Statement of Reply and attachments. Vale filed eight factual witness statements in support of its case from: Eduardo Etchart; Roger Agnelli; Alex Monteiro; Ahmed Kanté; Lounceny Nabé; Ricardo Saad; Ahmed Tidiane Souaré; and Leandro Teles. Vale also filed an Expert Report from Dr Min Shi.

57.   On 28 March 2016, Vale requested the Tribunal's permission to submit a revised Statement of Reply incorporating the 83 documents produced by Thiam (or his banks) in the Rio Tinto proceedings following a ruling from the U.S. Court on 25 March 2016. Vale also sought an extension to the deadline for it to submit USB drives and hyperlinked copies

of its submission from 31 March 2016 to 4 April 2016. The Tribunal invited BSGR to provide its view on the request by 29 March 2016.

58.    On 29 March 2016, BSGR conveyed to the Tribunal that it was not in a position to deal with Vale's request regarding the Thiam documents, and proposed an extension to respond by 31 March 2016. On 31 March 2016, BSGR expressed the view that it was unnecessary to respond until Vale substantiated its request in accordance with Article 22.1 of the 1998 LCIA Rules and paragraphs 11 and 12(c) of Procedural Order No. 2. Vale responded that it had fully substantiated its request and submitted its Statement of Reply submission from 24 March 2016 with minor typographical corrections on 31 March 2016. The Parties subsequently provided additional comments on the request.

59.    On 29 March 2016, BSGR wrote to the Tribunal requesting clarification and disclosure regarding the Tribunal Secretary's role, following a misdirected email sent by the Chairman of the Tribunal dated 23 March 2016. The Tribunal responded on 8 April 2016. BSGR subsequently wrote to the Tribunal on 12 April 2016 expressing its view that the Tribunal's response was inadequate and incomplete. BSGR repeated its initial requests (subject to an amendment to its fifth request) and conveyed additional requests to the Tribunal.

60.    On 31 March 2016, BSGR wrote to Vale enclosing its updated privilege log and requesting confirmation that a specific privileged communication identified in Exhibit C-542 would be redacted or deleted from Vale's storage system. Vale proposed substituting the document with a redacted version along with its submission of a revised Statement of Reply incorporating Thiam's documents, should the Tribunal grant Vale's request of 28 March 2016.

61.    On 11 April 2016, the Tribunal issued Procedural Order No. 11, permitting Vale's request to submit an amended Statement of Reply to incorporate references to the 83 Thiam documents from the Rio Tinto proceedings and to substitute a redacted version of Exhibit C-542 within three business days.

### 16.    Further Document Production Issues

62.    On 19 April 2016, BSGR wrote to the Tribunal, expressing no objection to Vale's request to submit a further revision to the Statement of Reply, but reserving its right to apply for an extension of time to serve its Second Memorial and evidence in support should the need arise. It additionally requested that the Tribunal require Vale to provide a redline version of its amended submission to reflect any changes made to the original version dated 24 March 2016. BSGR informed the Tribunal, in relation to Vale's second request, that it would endeavour to provide the certifications in accordance with the Tribunal's "Second Decision on Document Production" by 27 April 2016. The Tribunal was subsequently notified on 27 April 2016 that BSGR would only be in a position to submit the certifications by 28 April 2016.

63.    On 28 April 2016, BSGR provided the three separate certifications regarding the disclosure process in accordance with the Tribunal's "Second Decision on Document Production". BSGR reserved the right to make further submissions on the Tribunal's decision in relation to the provision of certificates. The supporting documents to the certifications were provided on 5 May 2016.

64.   On 3 May 2016, BSGR applied to the Tribunal for an order that Vale produce the "Nardello Report" and any other documents responsive to Respondent's Request No. 19(b). By separate letter on the same date, BSGR also informed the Tribunal that BSGR would be represented by an additional firm, Asserson Law Offices, and requested that any future communications reflect this appointment.

### 17.   The Respondent's First Challenge against all three Tribunal members in May 2016

65.   On 5 May 2016, BSGR filed a challenge in the LCIA Court against all three members of the Tribunal seeking to revoke their appointment in accordance with Article 10(4) of the LCIA Rules (the **"First Challenge"**). The Court appointed Dr. Inka Hanefield, Professor Luca Radicati di Brozolo and Peter J. Rees QC to be the Division of the LCIA Court to determine the challenge, with Peter J. Rees QC presiding.

66.   BSGR's challenge was based on five grounds.

66.1.   Ground 1: The Tribunal improperly delegated its role to the Secretary by systematically entrusting the Secretary with a number of tasks beyond what was permissible under the LCIA Rules and the LCIA Policy on the use of arbitral secretaries;

66.2.   Ground 2: The Chairman breached his mandate as an arbitrator and his duty not to delegate by seeking the views of a person who was neither a party to the arbitration nor a member of the tribunal on substantial procedural issues (i.e. the Secretary);

66.3.   Ground 3: The other members of the Tribunal equally breached their mandate as arbitrators and their duty not to delegate by not sufficiently participating in the arbitration proceedings and the decision-making process;

66.4.   Ground 4: Circumstances existed which gave rise to justifiable doubts as to the Chairman's independence or impartiality; these arose out of comments the Chairman had made at an international conference;

66.5.   Ground 5: The Chairman breached his duty to maintain the confidentiality of the arbitral proceedings.

67.   On 10 May 2016, Vale wrote to the Tribunal regarding alleged alterations made to the language of the certifications that BSGR's counsel had provided on 28 April 2016. Vale requested the Tribunal to direct BSGR's counsel to answer certain questions regarding the certifications and further requested that the Tribunal should draw the appropriate adverse inference if BSGR's counsel fail to comply. The Parties provided further comments on Vale's letter of 10 May 2016 on 20 and 23 May 2016, culminating in Vale renewing its request that the Tribunal hold BSGR to its original order and require it to explain any rewording of the certifications.

### 18.   Procedural Order No. 12 and Procedural Order No. 13

68.   On 2 June 2016, the Tribunal issued Procedural Order No. 12, directing the Parties to respond to each other's arguments of privilege raised in an exchange of correspondence

beginning 3 May 2016 in respect to the production of the "Nardello Report" and certain other documents. The Tribunal also expressed its willingness to give BSGR additional time to file its Rejoinder Submission and Reply on Counterclaims and proposed a revised procedural schedule. Vale wrote to the Tribunal on the same day, contending that the proposed revised schedule was unnecessary and unfair. Following further correspondence from BSGR, the Tribunal issued Procedural Order No. 13 on 4 June 2016, adopting the procedural schedule annexed to Procedural Order No. 12. The Tribunal directed the Parties to make their further submissions in accordance with the new schedule.

69.    On 7 June 2016, Vale wrote to the Tribunal, requesting its intervention as BSGR had allegedly failed to engage with Vale regarding the organisation of hearing logistics. The request was withdrawn on the same day.

### 19.    Fourth Decision on Document Production

70.    On 13 July 2016, the Tribunal issued its "Fourth Decision on Document Production", addressing all remaining document production issues that had been raised by the Parties in an extensive exchange of correspondence. The procedural history detailed throughout that Decision is incorporated by reference into this Award.

### 20.    BSGR's Statement of Rejoinder

71.    On 15 July 2016, BSGR informed the Tribunal that it did not anticipate being able to finalise and serve its Statement of Rejoinder and supporting evidence by 15 July 2016, and requested an extension of the deadline to 18 July 2016. Vale opposed the extension, but requested that, if the Tribunal accepted the extension, it orders that no further delay would be tolerated, and to expressly reserve the right to refuse to admit into the record any submission by BSGR made after that date. Vale also reserved the right to file its Rejoinder on Counterclaims on 15 August 2016, being four weeks after BSGR contended it would file its Statement of Rejoinder.

72.    The extension was granted, and BSGR filed its Statement of Rejoinder on 18 July 2016 with supporting exhibits and legal authorities. BSGR filed 15 factual witness statements in support of its case. Second witness statements were given by: Beny Steinmetz; Marc Struik; Asher Avidan; Michael Noy; Mahmoud Thiam; Patrick Saada; David Barnett; Yossie Tchelet; David Clark; Daniel Pollak; Dag Cramer; and Sandra Merloni-Horemans. First witness statements were also given by Cesare Morelli, Yuval Sasson and Arieh Ovadia. BSGR filed an Expert Witness Report from Francois Ferreira.

### 21.    Procedural Order No. 14

73.    On 21 July 2016, Vale wrote to the Tribunal expressing its concerns regarding BSGR's allegedly delayed compliance with the Tribunal's "Fourth Decision on Document Production" and requested that the Tribunal mandate BSGR's full compliance with the decision no later than 26 July 2016. Vale further requested that the Tribunal order a specific schedule for compliance with the decision. Following the Tribunal's invitation to respond, BSGR accepted Vale's proposed schedule in relation to documents referred to in paragraphs 154, 166 and 182 of the "Fourth Decision on Document Production", but requested an extension to 28 July 2016 in order to amend the privilege log and consider whether additional production would be required. Vale opposed the extension, and made further requests of BSGR by the same deadline proposed in its 21 July 2016 letter.

74. On 22 July 2016, the Tribunal issued Procedural Order No. 14, ordering BSGR to produce all documents pursuant to the Tribunal's "Fourth Decision on Document Production" by the close of business on 25 July 2016. To the extent BSGR contended that any document it was directed to either produce or log was not within its possession or control, BSGR was directed to identify those documents and provide an explanation as to why it did not have possession or control over said documents by close of business on 25 July 2016 (subsequently corrected to 27 July 2016 in Revised Procedural Order No. 14 issued on 24 July 2016). BSGR was additionally ordered to provide revised privilege log entries (or else produce the withheld documents) by the close of business on 27 July 2016. The Tribunal additionally invited BSGR to respond to Vale concerning paragraph 121 of the Tribunal's "Fourth Decision on Document Production".

75. Vale wrote to the Tribunal on 26 July 2016 stating that BSGR had failed to comply with the order in Procedural Order No. 14 to produce all documents it was ordered to produce under the Tribunal's "Fourth Decision on Document Production" by close of business on 25 July 2016. Vale requested that the Tribunal order BSGR to produce the two 19 February 2014 Crowe Horwath reports and the 8 December 2014 Crowe Horwath report immediately.

76. Additionally, Vale wrote to the Tribunal on 27 July 2016 alleging that BSGR had violated Procedural Order No. 14 by failing to produce its revised privilege log or to identify any documents it claimed were not in its possession or control by the deadline given. Vale contended that BSGR had therefore failed to substantiate its privilege claims, or to establish that it was not in control of any document it had been ordered to produce. Vale requested the Tribunal to direct BSGR to produce all documents covered by Procedural Order No. 14.

77. BSGR produced its revised privilege log later that day.

78. On 28 July 2016, Vale wrote again to the Tribunal to request an order enforcing the Tribunal's "Fourth Decision on Document Production" as well as Procedural Order No. 14. Vale requested the Tribunal to direct BSGR to produce all documents covered by Procedural Order No. 14 forthwith, including (without limitation), documents contained in BSGR's privilege log produced on 27 July 2016.

79. On 28 July 2016, BSGR wrote to the Tribunal regarding Vale's assertion in its letter of the same date that no further production by Vale was required under paragraph 121 of the Tribunal's "Fourth Decision on Document Production". BSGR invited the Tribunal to order Vale to comply with paragraph 121 of that decision by close of business on 1 August 2016. Vale responded on 5 August 2016, contending that it had no further obligation to produce documents or information in response to paragraph 121 of that decision.

80. On 1 August 2016, BSGR provided a response by letter to Vale's assertion that it should produce all documents, including those on its privilege log. By letter of the same date, Vale responded by requesting that the Tribunal find that BSGR had not substantiated its privilege claims and that it direct that BSGR produce all of those documents within 48 hours of the Tribunal's decision on the issue.

81. On 4 August 2016, BSGR wrote to the Tribunal requesting partial reconsideration of the Tribunal's "Fourth Decision on Document Production" in relation to the passage regarding production of reports generated by Ernst & Young that post-dated 30 April 2010. BSGR

requested that Vale be required to produce reports and other documents generated by Ernst & Young up to the end of June 2010. Vale opposed the request on 8 August 2016.

## 22.    LCIA Decision on the First Challenge

82.    On 4 August 2016, the Division of the LCIA Court issued its Decision on the First Challenge (referred to in paragraph 65 above). The "Decision of the Division of the LCIA Court on Respondent's Challenge to the Tribunal" revoked the appointment of Hon. Judge Charles N. Brower as Chairman of the Tribunal in this arbitration on the basis that his remarks concerning this arbitration at an ITA-ASIL conference gave rise to justifiable doubts as to his independence or impartiality, but denied the application to revoke the appointment of the two co-arbitrators, finding that there had been no inappropriate use of an arbitral secretary as regards Ground 1, and that there had been no improper delegation of their duty not to delegate by leaving it to the Chairman and the Tribunal Secretary to make decisions as regards Ground 2. As to costs, the Division said at paragraph 343 that "the issue of costs and expenses generated by this challenge should be treated as costs in the arbitration, and determined as part of the arbitral award". The procedural history set out at Section I(C) of that Decision is incorporated by reference into this Award.

## 23.    The Appointment of a New Chair by the Parties

83.    On 5 August 2016, Vale wrote to the LCIA, requesting that the LCIA Court decide that the new Chairman of the Tribunal be appointed in accordance with the original nominating process and invite the co-arbitrators to nominate the new Chair by 18 August 2016.

84.    On 5 August 2016, BSGR wrote to the co-arbitrators, confirming that both Parties endorsed the use of the original nominating process to select a new Chairman of the Tribunal. BSGR additionally requested to stay proceedings pending appointment of a new Chairman and to release the hearing dates of 29 August to 18 September 2016. BSGR contended that all decisions already made by the Tribunal would need to be re-examined, and that any future involvement of the Tribunal Secretary would be inappropriate.

85.    On 5 August 2016, Vale responded that it was premature to release the existing hearing dates and that, if it became necessary to release those dates, the hearing should be rescheduled to the nearest available dates. Vale further contended that there was no basis for altering the other dates in the existing procedural timetable, disagreed that the Tribunal decisions would need to be re-examined, and pointed out that there was no suggestion that the Tribunal Secretary engaged in any impropriety.

86.    On 6 August 2016, Vale wrote to the Division of the LCIA Court requesting reconsideration of its "Decision of the Division of the LCIA Court on Respondent's Challenge to the Tribunal" with respect to the decision whether BSGR met its burden of proof that Ground 4 was raised on a timely basis and the decision revoking the appointment of the Chair of the Tribunal. On 8 August 2016, the LCIA replied that the LCIA Court's decisions were not subject to reconsideration.

## 24.    The Appointment of a New Chair of the Tribunal

87.    On 8 August 2016, BSGR wrote to the co-arbitrators rejecting the co-arbitrators' proposal sent earlier that day to use the original list of candidates as ranked by the parties in July 2014 in the selection process of a new Chair of the Tribunal. BSGR contended that there

should be a new list procedure, conducted *de novo*. Vale disagreed and expressed the view that an extension in respect of the nomination process would not be appropriate. Vale agreed with the co-arbitrators' proposal to approach Professor William Park to check his availability and conflicts on the basis of his ranking in the original list of candidates.

88.    On 9 August 2016, Michael Hwang SC wrote to the LCIA on behalf of the co-arbitrators, formally nominating Professor Park as Chairman of the Tribunal.

89.    On 9 August 2016, BSGR wrote to the LCIA requesting that the co-arbitrators' nomination of Professor Park as Chairman of the Tribunal should be rejected. BSGR requested the LCIA Court to order the co-arbitrators to withdraw their nomination of Professor Park and to nominate a new Chairman in accordance with the original nominating process. Vale, in response, expressed the view that the LCIA Court should appoint the co-arbitrators' choice of a new Chairman and let the reconstituted Tribunal deal with any complaints that BSGR may raise about maintaining the long-agreed schedule.

90.    On 10 August 2016, BSGR wrote to the LCIA repeating its request that the LCIA order the co-arbitrators to withdraw their nomination of Professor Park and nominate a new Chair of the Tribunal in accordance with the original nominating process, including a consultation and ranking process. Vale wrote to the LCIA in response requesting the LCIA Court to reject BSGR's protestations as to the nomination process. The Parties provided further comments to the LCIA on 11 August 2016.

91.    On 12 August 2016, Vale wrote to the LCIA requesting confirmation of the appointment of Professor Park, who had been nominated by the co-arbitrators.

92.    On 15 August 2016, Michael Hwang SC wrote to the Parties, on behalf of the co-arbitrators, advising that the "Fourth Decision on Document Production" had been decided and could not be revisited until the Tribunal had been reconstituted.

93.    On 15 August 2016, BSGR wrote to the co-arbitrators stating that BSGR no longer had confidence in the co-arbitrators' ability properly to conduct the proceedings. It expressed the view that the fairest outcome was for the co-arbitrators to revoke their appointments as arbitrators of this arbitration. BSGR reserved its rights in relation to further challenges.

94.    On 15 August 2016, BSGR repeated its request to the LCIA Court to confirm the LCIA Court's previous decision that the original nominating process must be followed, to confirm that the co-arbitrators' nomination of Professor Park was not made in accordance with the original nominating process, and to reject the nomination of Professor Park on that basis. On the same date, Vale wrote to the LCIA requesting prompt confirmation of the appointment of Professor Park.

### 25.    Vale's Rejoinder on Counterclaims

95.    On 15 August 2016, Vale filed its Statement of Rejoinder on Counterclaims with supporting documents (including witness statements from Elizia Boechat, Ricardo Saad and Leandro Teles). Vale wrote to BSGR identifying the witnesses it wished to cross-examine at the hearing.

### 26.    The Appointment of a New Chair by the LCIA

96.    On 17 August 2016, the LCIA notified the Parties that, pursuant to Article 10.1 of the LCIA Rules, the LCIA Court formally revoked the appointment of the Hon. Judge Charles N. Brower and, pursuant to Articles 5.5 and 11 of the LCIA Rules, the LCIA Court appointed Professor Dr. Filip De Ly as the replacement Chair of the Tribunal in this arbitration.

97.    On 17 August 2016, Vale wrote to the new Chairman of the Tribunal regarding the provision of copies of submissions and other documents. On the same day, BSGR wrote to the Chairman requesting confirmation that the Chairman would not read any material sent by Vale without BSGR's agreement. After receiving Vale's reply, Professor De Ly responded that he would refrain from reading such material until the matter had been discussed with counsel and a determination made. The Parties were also requested to provide an indication of any objection to the Chairman reading documents sent by the LCIA. The Parties confirmed that there were no objections.

98.    On 17 August 2016, Vale requested that the Tribunal enforce the procedural timetable, and order that BSGR promptly identify Vale's witnesses it wished to cross-examine at the hearing, no later than close of business on 18 August 2016. Vale also requested confirmation that the telephone conference scheduled for 19 August 2016 would proceed as previously scheduled, or an indication, if that time was no longer available, when the Tribunal wished to conduct it.

99.    On 18 August 2016, Vale wrote to the Tribunal to identify and summarise its position as to the issues to be discussed during the 19 August 2016 pre-hearing conference call. The Tribunal confirmed that the pre-hearing conference call would proceed with an open agenda at 9 a.m. EST, subject to the availability of the Parties. Both Parties confirmed their availability.

### 27.    Respondent's Second Challenge to co-arbitrators Hwang and Williams and Procedural Order No. 16

100.    On 23 August 2016, BSGR submitted a second challenge to the co-arbitrators to the LCIA Court (the "**Second Challenge**") and on the same day filed another application for a stay of the arbitral proceedings pending determination of the Second Challenge. Vale opposed the stay application on 24 August 2016. The Second Challenge asserted that the co-arbitrators had failed, *inter alia*, to act fairly and impartially on several grounds, including nominating Professor Park as the replacement Chair instead of conducting the whole appointment process again. Professor Park had been the equal favourite for appointment with Judge Brower under the list procedure which the Tribunal had utilised in the initial appointment process. BSGR subsequently sought the Tribunal's consent to reply to Vale's letter of opposition. Vale opposed the request. The Tribunal decided to authorise a brief further submission by BSGR and a further reply by Vale. Following an exchange of further submissions by the Parties, the Tribunal dismissed the stay application on 29 August 2016 in Procedural Order No. 16.

### 28. Procedural Order No. 15, cancellation of hearing scheduled for 29 August – 16 September, and establishment of educational hearing for 5 – 9 September 2016

101.    Following the conference call with the Parties on 19 August 2016, the Tribunal issued Procedural Order No. 15 on 24 August 2016 in which it cancelled the evidentiary hearing scheduled for the period from 29 August to 16 September 2016 in view of the removal of the previous Chairman and his replacement by a new Chairman. The Tribunal directed instead that a hearing dealing with procedural issues and during which the Parties would make oral submissions for the purpose of educating the Tribunal be held on 5–9 September 2016, with 12 September 2016 as a reserve day (the "**Educatory Hearing**"). The Parties were requested to make appropriate modifications as to the organisation of the Educatory Hearing including the reservations with the International Dispute Resolution Centre as to the hearing room facilities and the bookings with court reporters.

102.    On 25 August 2016, BSGR wrote to the Tribunal proposing an alternative procedural timetable. Vale opposed the alternative timetable on 29 August 2016, and requested that the Tribunal direct the Parties and counsel to be prepared at the upcoming Educatory Hearing to provide their availability for the next six months.

### 29. Respondent announces it will not attend the Educatory Hearing until its Second Challenge was decided by the LCIA

103.    On 25 August 2016, BSGR wrote to the Tribunal, indicating that it would not participate in the Educatory Hearing, nor would it provide written submissions on various procedural issues set out in Procedural Order No. 15 (including the issue of reviewing the Tribunal's previous decisions in accordance with Section 27(4) of the English Arbitration Act). It expressed the view that the Educatory Hearing must be held after a determination had been made on the Section 27(4) issues, which itself could not be made until its Second Challenge had been decided. BSGR indicated that, in any event, it would only attend under strict conditions including that the co-arbitrators not be present at the hearing and that no documents exhibited in the Parties' second or third round of submissions be shown to, or discussed with, the Chairman.

104.    On 28 August 2016, having received BSGR's Second Challenge against the co-arbitrators dated 23 August 2016, the Tribunal wrote to the Parties and to the LCIA declaring that the co-arbitrators had decided not to withdraw from their appointed function as members of the Tribunal.

105.    On 30 August 2016, BSGR wrote to the Tribunal stating that it had not submitted a brief on the Section 27(4) issue, nor would it be responding to Vale's brief on the matter. BSGR indicated that it would not be attending the Educatory Hearing before the Tribunal until the Second Challenge had been decided and until the Tribunal was properly reconstituted. BSGR repeated its position that it would attend an educatory hearing, but only on the conditions set out in section 4 of its letter of 25 August 2016.

### 30. Respondent announces it will not appear at the Educatory Hearing

106.    On 1 September 2016, BSGR wrote to the Tribunal indicating that it would not be filing written submissions, nor a bundle of documents, for the forthcoming Educatory Hearing. BSGR also indicated that it would not be attending the Educatory Hearing. Vale filed its

Pre-Hearing Written Submissions and wrote to the Tribunal in response to BSGR, expressing the view that the Tribunal should proceed with the Hearing to resolve any outstanding procedural issues, and to schedule a merits hearing.

### 31.   The 5–8 September 2016 Educatory Hearing

107.   Over the course of 5–8 September 2016, the Educatory Hearing – being a hearing to educate the Chairman as to the issues in the case generally, resolve outstanding procedural issues and schedule a merits hearing – took place in London. Attending the Educatory Hearing on behalf of Vale were Jonathan Blackman, Jeffrey Rosenthal, Jonathan Kelly, Joaquin Terceño, Emily Balter and Rikki Stern, all from Cleary Gottlieb Steen & Hamilton. It is important to record that, while BSGR did not attend the Educatory Hearing, it was sent a copy of the transcript from the hearing at the end of each hearing day.

108.   On 6 September 2016, BSGR made three applications to the Tribunal in case it chose to determine the outstanding procedural issues before the pending challenges against the co-arbitrators were determined by the LCIA. First, BSGR applied to fix the hearing on the merits only in a period in which BSGR's counsel, David Wolfson QC, had sufficient availability to prepare and attend such hearing (this would not be before May 2017). Second, BSGR applied for leave to file additional submissions in response to Vale's Rejoinder on Counterclaims and new evidence adduced therein. Third, BSGR applied for leave to file additional submissions in relation to a criminal complaint filed in the U.S. on 12 August 2016 against Samuel Mebiame ("**Mebiame**"), a Gabonese businessman, for bribing Guinean government officials in 2010–2012 in exchange for "an opportunity to be partners with a Guinean state-owned mining company",[6] and its relevance to the issues in this arbitration. BSGR proposed to incorporate the latter submissions in its reply to Vale's Rejoinder on Counterclaims.

109.   By email dated 7 September 2016, the Tribunal proposed that BSGR attend the Educatory Hearing the following day (8 September) to discuss the matters referred to by BSGR in its three letters of 6 September 2016. Later that day, BSGR notified the Tribunal that it would not be attending the Hearing scheduled for 8 September to discuss the procedural matters referred to above.

110.   On 12 September 2016, David Wolfson QC (lead counsel for BSGR) wrote to the Tribunal commenting on the transcript from the Educatory Hearing on 8 September 2016 and, in particular, his availability for a merits hearing. Vale wrote to the Tribunal in response later that day.

111.   On 15 September 2016, BSGR wrote to the Tribunal providing observations in relation to the transcripts from the Educatory Hearing dated 5–8 September 2016. Vale provided a response to the Tribunal (copied to BSGR) later that day.

### 32.   Respondent announces High Court Proceedings for removal of co-arbitrators Hwang and Williams

112.   On 7 October 2016, BSGR informed the Tribunal and Vale of its intent to issue a claim pursuant to Section 24(1) of the Arbitration Act in the English High Court for the removal of

---

[6] *USA v. Samuel Mebiame*, Complaint, Dkt. No. 1, 12 August 2016, **R-403**.

the co-arbitrators. On 21 October 2016, BSGR commenced removal proceedings in respect of its challenge before the High Court in London seeking removal of Sir David A.R. Williams QC and Dr Michael Hwang SC (the "**High Court Challenge**"). BSGR also made an interim application for disclosure of the Tribunal's internal correspondence.

### 33.   Procedural Order No. 17 – Procedural Order following reconstitution of the Tribunal

113.   On 17 October 2016, the Tribunal issued Procedural Order No. 17, addressing a number of procedural issues identified following the reconstitution of the Tribunal. It confirmed previous Procedural Orders issued by it and further confirmed its "Decision on Respondent's Application to Stay the Arbitration" dated 16 December 2014 and "Decision on Respondent's Renewed Application to Stay the Arbitration" dated 24 July 2015. In addition, it (1) authorised BSGR to brief the Tribunal on the relevance of the U.S. criminal complaint against Mebiame (as referred to in paragraph 108 above), giving Vale a right of reply; (2) adopted a provisional timetable for the arbitral proceedings, (3) adopted a formula for determining the activities of the Tribunal Secretary and (4) provided further notice that the current Tribunal Secretary would continue to provide services as defined in the formula to the Tribunal for the remainder of the arbitration unless his services were terminated at an earlier date.

114.   In relation to the provisional timetable, Procedural Order No.17 records in detail the issues around the availability of BSGR's counsel (including Mr Wolfson QC and Mishcon de Reya) which, in effect, meant that BSGR did not want to proceed with a merits hearing until June 2017. Mr Wolfson had previously indicated that he had a three-week trial commencing on 30 January 2017 and scheduled to last until 23 February 2017.[7] As the provisional dates for the merits hearing commenced on 20 February 2017, Mr Wolfson would be unavailable for the first few days of the hearing (assuming all three weeks were required).

115.   However, having concluded in Procedural Order No.17 that the "Arbitral Tribunal is insufficiently convinced that Mr. Wolfson has no capacity in the next nine months to conduct a trial for which he was fully prepared in August 2016," the Tribunal provisionally reserved the relevant dates in February and April 2017 for the hearing. The Tribunal further observed that, should those dates prove impossible for Mr Wolfson QC, "there is a vast pool of excellent professionals with unquestionable reputation in the London market and elsewhere to perform arbitration advocacy, which can take over the tasks of Mr. Wolfson if he were to be unavailable."[8]

116.   On 18 October 2016, BSGR wrote to the Tribunal applying for a three-week extension until 21 November 2016 to file the additional memorial addressing the Mebiame investigation. Vale opposed the extension.

117.   On 9 November 2016, BSGR wrote to the Tribunal expressing concern that proceeding with the provisional hearing dates would lead to an unfair handling of the case. BSGR proposed that the first week of a split hearing be held in the first week of April 2017, with

---

[7] See Letter from Mr Wolfson to the Tribunal, 12 September 2016.  It transpired that Mr Wolfson's trial finished early and he would have been available to appear on 20 February 2017 (see Transcript, Merits Hearing, Day 1: p. 239, lines 6-14).
[8] Procedural Order No.17, paragraph 47.

the second and potential third week to be fixed after the dates fixed for the ICSID hearing. Vale opposed the proposal.

### 34.    Procedural Order No. 18

118.    On 7 December 2016, the Tribunal issued Procedural Order No. 18, confirming Procedural Order No. 17 and dismissing BSGR's request to amend the provisional timetable of the arbitration proceedings, subject to three qualifications. The Tribunal repeated its offer in paragraph 46 of Procedural Order No. 17 that BSGR was free to indicate alternative merits hearing dates for consideration, if Mr Wolfson QC remained unable to make the dates provisionally reserved for the hearing. The Tribunal vacated two hearing days and invited the Parties, within a period of five working days, to comment on its suggestion to sit on two additional proposed reserve days. The Tribunal also invited the Parties, within a period of five working days, to comment on the possibility of using the three weeks commencing 10 May 2017, in whole or in part, for the merits hearing if the ICSID hearing dates were to be vacated (due to a challenge against the Tribunal that was in the process of being determined by ICSID).

### 35.    The Challenge to the ICSID Tribunal is denied

119.    On 14 December 2016, Vale wrote to the Tribunal reiterating its availability for the hearing dates originally scheduled by the Tribunal. It also informed the Tribunal that, to the extent that additional hearing dates were deemed necessary, it would be available on the proposed reserve dates of 1–2 April 2017. Additionally, it expressed an intention to oppose, even on a conditional basis, abandonment of the current schedule in favour of holding the hearing in this matter in May 2017. BSGR responded on 29 December 2016 noting that, subject to the ICSID hearing dates in May 2017 becoming available, BSGR would be available as well as its counsel of choice, David Wolfson QC. Vale then informed the Tribunal that, on 28 December 2016, ICSID had denied BSGR's challenge to the ICSID Tribunal and the ICSID proceedings had resumed.

### 36.    The LCIA Division dismisses the Second Challenge

120.    On 16 December 2016, the Division of the LCIA Court issued its "Decision of the Division of the LCIA Court on Respondent's Challenge to the Tribunal", dismissing BSGR's Second Challenge application dated 23 August 2016 against the co-arbitrators. The procedural history set out at section I(C) of the Decision is incorporated by reference into this Award. The LCIA Division found, in paragraph 203 of its Decision, that there was nothing to support the BSGR claim that the co-arbitrators were acting in any way unfairly between the parties in nominating Professor Park as replacement Chairman, nor were any other of the complaints made against the co-arbitrators valid. As to costs, and as with the first LCIA Decision, costs were to be treated as costs in the arbitration and determined as part of the Final Award.

121.    On 21 December 2016, BSGR filed a petition in the United States District Court for the District of Columbia against the former Chairman of the Tribunal, the Hon. Judge Charles N. Brower, and the Tribunal Secretary, Michael Daly, to produce documents and appear for depositions under 28 U.S.C. § 1782, compelling discovery in aid of the pending judicial proceedings in the English High Court seeking the removal of the co-arbitrators.

122.    On 9 January 2017, Asserson Law Offices informed the Tribunal that it was no longer instructed by BSGR in relation to this arbitration.

123.    On 5 and 20 January 2017, Vale wrote to the Tribunal, seeking to supplement the record with additional exhibits which became available to Vale after it had filed its Statement of Rejoinder on Counterclaims. BSGR responded on 26 January 2017, questioning the relevance of the proposed exhibits.

124.    On 13 January 2017, Vale wrote to the Tribunal proposing a procedural timetable and requesting the Tribunal to direct BSGR to co-operate with Vale in making the necessary logistical arrangements for the hearing. Vale sought identification of BSGR's appropriate contact person for this purpose.

125.    On 13 January 2017, BSGR updated the Tribunal on the status of the ICSID proceedings, and informed the Tribunal that a hearing was scheduled for 22 May to 2 June 2017.

126.    On 17 January 2017, BSGR wrote to the Tribunal urging it to set aside the provisional hearing dates for the merits hearing and put in place a new procedural timetable. Vale wrote to the Tribunal in response on 19 January 2017.

127.    On 24 January 2017, the Tribunal Secretary, Michael Daly, tendered his resignation for personal reasons. No replacement has since been appointed by the Tribunal.

### 37.    Procedural Order No. 19

128.    On 26 January 2017, the Tribunal issued Procedural Order No. 19, dealing with several outstanding issues, including the remaining procedural issues identified by the Parties which were not the subject of Procedural Order No. 17, the detailed hearing timetable, and the Tribunal Secretary.

129.    On 27 January 2017, Vale provided the Chair of the Tribunal with its Statement of Reply, BSGR's Statement of Rejoinder and Vale's pre-hearing written submissions.

### 38.    Respondent advises that it will not participate in the merits hearing

130.    On 31 January 2017, BSGR wrote to Vale indicating that it would not be participating in the forthcoming merits hearing. Vale wrote to the Tribunal on the same day, requesting for an acceleration of the pre-hearing conference call to discuss hearing issues.

131.    On 2 February 2017, BSGR wrote to the Tribunal in relation to Procedural Order No. 19. BSGR disagreed with various determinations of the Tribunal, refused to disclose certain documents and recorded its intention to file a response to Vale's Statement of Rejoinder on Counterclaims on 9 February 2017. Vale wrote to the Tribunal in response on the same day and requested the Tribunal to draw appropriate adverse inferences against BSGR for refusing to comply with its document production obligations. Vale reserved the right to request further relief as appropriate.

### 39.    Procedural Order No. 20

132.    On 3 February 2017, the Tribunal issued Procedural Order No. 20. The Tribunal interpreted BSGR's letter of 31 January 2017 as expressing an intention not to participate in the hearing on the hearing dates indicated. The Tribunal decided to proceed with the hearing

as scheduled, but invited BSGR to correct the Tribunal's interpretation or to cure BSGR's default regarding the preparation and organisation of the hearing before 7 February 2017. The Tribunal again confirmed the hearing dates and directed Vale to proceed with various aspects for the hearing arrangements. BSGR was ordered to produce any witnesses for the purposes of Vale's cross-examination and was further directed, within five working days, to communicate a list of the witnesses to be produced and the dates and times at which they could be examined at the hearing. The Tribunal cancelled the pre-hearing conference call scheduled for 10 February 2017 and dismissed Vale's request for the rescheduling of the call.

### 40.   English High Court dismisses BSGR application to remove arbitrators and for a document disclosure order

133.   On 3 February 2017, Popplewell J in the English High Court dismissed BSGR's High Court Challenge application to remove the co-arbitrators as well as its application seeking disclosure of documents from the Tribunal, which documents it had proposed to use in its second application for removal of the co-arbitrators. Popplewell J held, at paragraph 22 of his judgment, that it is only in the very rarest cases, if ever, that arbitrators should be required to give disclosure of internal documents of the Tribunal. On 9 February 2017, Popplewell J delivered his reasons for his dismissal of both applications in *P v Q and Ors* [2017] EWHC 148 (Comm) and *P v Q and Ors* [2017] EWHC 194 (Comm). Permission to appeal the application for a disclosure order was refused by the Court of Appeal on 22 February 2017.

134.   On 6 February 2017, Vale wrote to the Tribunal, reporting back in relation to the Tribunal's directions in Procedural Order No. 20 at paragraph 20.

135.   On 9 February 2017, BSGR filed its Reply to Vale's Statement of Rejoinder on Counterclaims. On 13 February 2017, Vale wrote to the Tribunal expressing concern about BSGR's alleged non-compliance with Procedural Order No. 19 in its latest submissions. BSGR wrote to the Tribunal in response on 16 February 2017 requesting the Tribunal to confirm that its submissions were compliant, that the submissions would be admitted into the record, and that they would be afforded the same weight as Vale's and BSGR's earlier substantive submissions.

136.   On 8 February 2017, the LCIA acknowledged receipt of Vale's payment of the further advance on fees that had been requested by the LCIA on 26 January 2017. On 10 February 2017, the LCIA wrote to the Parties, advising that BSGR had not paid its share of the advance and requesting BSGR to confirm whether it had made arrangements for payment.

137.   On 13 February 2017, Vale requested that the LCIA treat BSGR's non-payment of the required advance as a withdrawal of its counterclaims in the proceeding and to notify the Tribunal and the Parties of its decision as a matter of urgency and in advance of the upcoming merits hearing scheduled to begin on 20 February 2017.

### 41.   Procedural Order No. 21

138.   On 14 February 2017, the Tribunal issued Procedural Order No. 21, noting that BSGR failed to cure its default regarding hearing preparation (as indicated in Procedural Order No. 20) or provide any other explanation for the default. The Tribunal thus confirmed that it would proceed to a hearing on the basis that there was actual default of BSGR in preparing

and assisting regarding the organisation of the hearing. The Tribunal noted that BSGR had failed to comply with Procedural Order No. 20 ordering that BSGR communicate a list of witnesses to be produced or otherwise to have the witnesses called by Vale produced for examination. The Tribunal made requests in relation to the hearing bundle availability and adopted a modified version of Vale's draft hearing schedule. The Tribunal gave notice to the Parties that the hearing would take place at the International Dispute Resolution Centre, 70 Fleet Street, London.

## 42.    Merits Hearing 20 – 22 February 2017

139.    Over the course of 20–22 February 2017, the merits hearing took place in London (the "**Merits Hearing**"). Vale was represented by the same counsel as in the Educatory Hearing, with the addition of Jean Yves Garaud, Elizabeth Iung and Matt Karlan, all of Cleary Gottlieb. Ten witnesses gave oral evidence on behalf of Vale at the hearing. They were: Ahmed Tidiane Souaré; Ahmed Kanté; Louncény Nabé; George Kleinfeld; Eduardo Etchart; Alex Monteiro; Ricardo Saad; Elizia Boechat; Leandro Teles; and Dr Min Shi.

140.    BSGR and its witnesses did not attend the hearing, but, at the direction of the Tribunal, a copy of the transcript from each day's proceedings was provided to BSGR by email each evening.

## 43.    Procedural Order No. 23

141.    On 21 February 2017, the Tribunal issued Procedural Order No. 22, noting that BSGR failed to appear at the start of the hearing on 20 February 2017 at 10 a.m. at the notified venue and failed to cure that default during the first hearing day.

142.    On 21 February 2017, BSGR wrote to the Tribunal seeking confirmation of the company providing translation services and the names of the qualified interpreters. Vale confirmed that Elizabeth Zendle and Corrine Kennedy, both of whom are professional interpreters engaged through Geotext Translations, conducted the simultaneous interpretation during the examination of Vale's francophone witnesses during the hearing.

143.    On 3 March 2017, the Tribunal issued Procedural Order No. 23, noting that BSGR also failed to appear at, and did not participate in, Days 2 and 3 of the hearing on 21 and 22 February 2017. The Tribunal vacated all unused hearing days and closed the proceedings. The Parties were directed, within two weeks, to present to the Tribunal, the other party and the court reporter a list of any corrections to the hearing transcript. Vale was also directed to present a separate list of its suggestions for corrections to the transcript related to the simultaneous interpretation where Vale, at the end of the hearing, indicated that there were discrepancies between the testimony in French and its interpretation into English. The Parties were also directed, within three weeks, to simultaneously file short costs submissions with a summary overview of the various heads of costs that were claimed.

## 44.    Respondent's non-payment of deposit

144.    On 8 March 2017, the LCIA wrote to the Parties, noting that BSGR had not paid its outstanding deposit and setting a final deadline for payment of 15 March 2017. The LCIA reminded BSGR of the provisions of Article 24.4 of the LCIA Rules, in that failure by a counterclaiming party to provide promptly and in full the required deposit may be treated by the LCIA Court and the Tribunal as a withdrawal of the counterclaim. On 16 March 2017,

the LCIA further wrote to BSGR, noting its failure to pay the outstanding advance by the final deadline and stating that, accordingly, "the LCIA Court and the Arbitral Tribunal have decided to treat BSGR's counterclaim as withdrawn pursuant to Article 24.4 of the Rules."

### 45.   Corrections to transcript

145.   Pursuant to Procedural Order No. 23, Vale submitted corrections to the transcript on 17 March 2017, including some corrections related to the simultaneous interpretation into English of the examinations of the witnesses who testified in French. On the same date, BSGR wrote to the Tribunal regarding the Tribunal's direction to the Parties to present a list of corrections to the transcripts. BSGR agreed that it was unnecessary for it to send separate typographical error corrections to the transcripts. BSGR urged the Tribunal to proceed with caution in respect of Vale's corrections to the translation of witness testimony and to take care to verify the statements of Vale against the submissions on the record. BSGR noted some additional information concerning David Wolfson QC's calendar which it said was in aid of ensuring that the "record in the case be correct". Vale wrote to the Tribunal in response on 21 March 2017 taking issue with the "gratuitous submission" regarding David Wolfson QC.

146.   Both Parties filed Submissions on Costs on 24 March 2017.

### 46.   Claimant's application to introduce new exhibits and to amend its costs submissions

147.   On 26 May 2017, Vale wrote to the Tribunal, requesting leave to update the record with respect to two recent developments. The first development concerned three additional exhibits that Vale wished to introduce into the record related to the recent criminal conviction of Thiam (former Minister of Mines for the GoG) in the United States District Court for the Southern District of New York on charges related to his acceptance of bribes. The second concerned a requested amendment to Vale's Submission on Costs.

148.   On 29 May 2017, BSGR wrote to the Tribunal requesting a one-week extension of time to respond to Vale's letter of 26 May 2016. Vale objected to the requested extension. Alternatively, Vale requested the Tribunal to clearly direct BSGR to limit its response to the two subjects of Vale's letter.

149.   On 9 June 2017, BSGR wrote to the Tribunal agreeing to Vale's request to amend its Submission on Costs and to submit three exhibits from Thiam's trial. BSGR requested leave to reopen the record and add the following documents: (i) the transcript of a United States' Federal Bureau of Investigations (the "FBI"), Interview with Thiam dated 13 December 2016 (as Exhibit R-524); (ii) the transcripts from the ICSID hearing; and (iii) the forensic expert report to be produced in the ICSID proceedings regarding the authenticity of certain "Mamadie Touré contracts". BSGR also requested that it be allowed to provide an explanation of the relevance of the evidence heard in the ICSID proceedings to the current proceedings and permission for the Parties to comment on the forensic expert report.

150.   On 16 June 2017, Vale objected to the application in relation to the ICSID transcripts and the forensic expert report from the ICSID proceedings, but did not object to the FBI interview being accepted into the record. On 23 June 2017, BSGR repeated its request in relation to the ICSID documents, and conveyed a proposal in order to improve the

efficiency of the process. Vale again objected to the application. On 30 June 2017, BSGR wrote to the Tribunal, proposing that its application in relation to addition of the forensic examination be stayed pending the establishment of a schedule by the ICSID Tribunal in relation to the forensic examination of the "Mamadie Touré contracts", but that, in the interim, the Tribunal should deliver its decision on the addition of the ICSID hearing transcripts. Vale again requested that the Tribunal reject BSGR's application. On 27 July 2017, BSGR updated the Tribunal regarding the ICSID forensic examination process.

151.   On 14 July 2017, BSGR notified the Tribunal that the date for the agreement of the parties to the ICSID proceedings regarding the transcripts from the ICSID hearing had been amended from 12 July 2017 to 26 July 2017.

### 47.   Procedural Order No. 24

152.   On 6 September 2017, the Tribunal issued Procedural Order No. 24 in which it confirmed that it would accept:

   (a) Vale's proposed amendment to its Submission on Costs; and

   (b) The three Thiam documents it sought to admit into the record, as was the transcript of the FBI interview of Thiam that BSGR requested be admitted.

The Tribunal stayed the application to admit the ICSID transcript pending the Tribunal's deliberations and preparation of the Award. The application to admit the forensic report to be provided in the ICSID case was dismissed as premature, but BSGR was granted leave to apply to admit the report into the record if and when it became available.

### 48.   Procedural Order No. 25

153.   On 26 November 2017, the Tribunal issued Procedural Order No. 25 in response to a letter from BSGR dated 18 October 2017 regarding the alleged unfairness of Procedural Order No. 24. Following a reply from Vale and a further letter from BSGR, the Tribunal confirmed that it was not the appropriate time for a final decision on BSGR's requests to admit the documents detailed in Procedural Order No. 24.

### 49.   Administration Order and Procedural Order No. 26

154.   On 7 March 2018, counsel for BSGR informed the Tribunal that BSGR had been placed into voluntary administration in Guernsey and provided a copy of the Administration Order issued by the Royal Court of Guernsey dated 6 March 2018 ("**Administration Order**"). Counsel for BSGR asserted that the Tribunal, during the administration, could not continue the proceedings against BSGR except with the consent of the administrators or leave of the Court. No such consent had been given.

155.   After receiving submissions from Vale and further submissions from BSGR, the Tribunal sent the Parties an email on 23 March 2018 which:

   155.1.   acknowledged receipt of the Administration Order;

   155.2.   acknowledged BSGR's counsel's right to continue to represent BSGR based on Mishcon de Reya's representation that it continued to represent BSGR and

without prejudice to the Tribunal's decision as to the effects of the 6 March 2018 Order on the arbitration proceedings; and

155.3.   requested the parties to comment further on the effect of the Administration Order on proceedings in this arbitration.

156.   Following receipt of those additional submissions, the Tribunal issued Procedural Order No. 26 on 17 April 2018. The Tribunal noted that, in their further submissions on the effect of the Administration Order, the Parties came to a common ground that the Order did not automatically suspend the present arbitration, seated in London. However, BSGR in its submission of 30 March 2018, applied for a stay of proceedings for the sake of efficiency. The Tribunal considered this request, but denied the application for a stay because:

156.1.   the Tribunal was not convinced that recognition of the Order in the UK could be obtained in a matter of weeks, as suggested by BSGR; and

156.2.   it was unclear whether recognition would be granted by the English High Court.

157.   Up to and including the date of this Award, the Tribunal has not been informed about recognition proceedings in the United Kingdom regarding the Administration Order.

### 50.   Payment of further deposits

158.   On 22 June 2018, the LCIA requested a further deposit from both Parties of £150,000 each. On 10 July 2018, Vale wrote to the LCIA reciting BSGR's failure to pay certain previous deposits requested and stating that, on the presumption that BSGR would once again default on payment, Vale would make a substitute payment of BSGR's outstanding balance. The payment was made without prejudice to Vale's ability to recover the sum in the final costs award.

159.   On 11 March 2019, the LCIA requested a deposit from Claimant of GBP 131,623.29. On 15 March 2019, Vale wrote to the LCIA reciting BSGR's failure to pay certain previous deposits requested and stating that, on the presumption that the requested deposit includes BSGR's share of remaining costs of the arbitration, Vale would pay the requested deposit without prejudice to Vale's ability to recover the sum from BSGR under Article 24.3 of the LCIA Rules and its position that BSGR is responsible for this sum, and others, in the final cost award. On that same day, the LCIA acknowledged receipt of the deposit of GBP 131,623.29.

### 51.   Procedural Order No. 27

160.   On 25 October 2018, the Tribunal issued Procedural Order No. 27 in which it dismissed BSGR's application to introduce its Post-Hearing Brief from the ICSID proceedings, consistent with its ruling in Procedural Order No. 24.

161.   On 12 March 2019, BSGR wrote to the Tribunal referring to the accommodation that the parties to the ICSID proceedings had reached in those proceedings. BSGR reiterated its request that the materials and evidence in the ICSID proceedings be considered in the present arbitration in view of any such evidence being clearly exculpatory of BSGR and, if it were to be ignored, would give rise to a potential miscarriage of justice. At the request of the Tribunal, Vale replied by letter of 13 March 2019 requesting the Tribunal to reject

BSGR's request and to proceed to an award. Vale considered that the accommodation in the ICSID proceedings was irrelevant to the present arbitration and that the Tribunal in the present proceedings properly rejected BSGR's attempts to re-open the record on a number of occasions. On 20 March 2019, the Arbitral Tribunal acknowledged receipt of Vale's letter and indicated that it would address any issues raised by the Parties' respective letters of 12 and 13 March in further directions or in an award (as to which par. 164-169 below).

## 52.    **Concluding Comment of the Tribunal**

162.    As indicated above, the Tribunal – notwithstanding the procedural complexities above – at all times intended and attempted to conduct the arbitral proceedings in an independent, impartial and fair way respecting the Parties' rights to natural justice and equality of treatment. It did so, notwithstanding the challenges to the co-arbitrators and criticisms as to the way the Tribunal conducted the proceedings, including regarding the role of the Tribunal Secretary, the alleged delegation of powers by the co-arbitrators to the Chairman and the Tribunal Secretary, and the alleged deficiencies regarding the appointment process leading to the nomination of a replacement Chair.

163.    In relation to other matters, the Tribunal had the duty to take the proceedings forward and had to rule on numerous procedural issues, such as the production of documents, the relationship between the current arbitration proceedings and the ICSID proceedings, the effects of the Administration Order on the arbitration and its role in conducting the arbitration proceedings as of the September 2016 Hearing on a – by and large – default basis. Absent agreement between the Parties, the Tribunal in discharging its duties progressed the proceedings and, in that process, may have taken decisions that were unfavourable or unsatisfactory to one of the Parties. The consensual nature of arbitration proceedings in this respect stops where the Parties cannot find common ground and put the Tribunal in the role of a final decision maker regarding procedural issues subject to overriding considerations of natural justice and procedural fairness. The Tribunal has taken care to ensure that, in discharging its duties, it has complied with these basic propositions and refers in this respect to the reasoning of its numerous procedural orders detailed above. In this respect, three issues deserve some further comments: (1) the ICSID proceedings; (2) the default nature of a significant part of the current arbitration proceedings; and (3) the assessment of hearsay evidence.

*ICSID Proceedings*

164.    The Tribunal considers that specific mention should be made of the parallel ICSID arbitration (ICSID Case No. Arb/14/22) that is ongoing between BSGR, BSGR Guinea and the Republic of Guinea. In particular, the Tribunal wishes to record (in addition to what is said at paragraph 1001 of this Award) the reasons that it has decided not to admit as evidence in this arbitration the transcripts from the ICSID proceedings, as well as the Post Hearing Briefs from those proceedings. It has also declined to receive further submissions regarding the suggested impact of the ICSID proceedings on the current arbitration.

165.    At the outset, the Tribunal refers to Procedural Orders Nos. 24, 25 and 27 which are summarised at paragraphs 152, 153 and 160 above. In these Procedural Orders, the Tribunal made it clear that, although its proceedings were closed in accordance with Procedural Order No. 23, additional evidence could still be admitted with agreement of the Parties or permission from the Tribunal. Hence, new evidence could be accepted up until the rendering of this Award. However, the Tribunal has also sought to manage the

proceedings efficiently so that its deliberations on and preparation of an award were not disturbed whenever new evidence arose in the ICSID proceedings. A case in point is the forensic report prepared in the ICSID proceedings as to BSGR's allegations that some contracts were forgeries. In Procedural Order No. 24, the Tribunal dismissed the request for submission of this report into these proceedings as being premature as no forensic report was yet available. However, the Tribunal authorised BSGR to seek leave to submit that report when it became available. In the event, BSGR never sought such permission.

166.    As noted above, these proceedings were closed by Procedural Order No. 23, which stated at paragraph 13 that no further submissions, correspondence or evidence were to be filed without the consent of the other side or the prior authorisation of the Tribunal upon a reasoned application of any Party. Paragraph 10 of Procedural Order No. 24 then clarified that any evidence or other documents related to the ICSID proceedings were no longer governed by the Record Sharing Decision or the First or Second Stay Decisions but by paragraph 13 of Procedural Order No. 23. Paragraph 9.3 of Procedural Order No. 24 then indicated that, if and to the extent necessary or proper, the Tribunal would reopen the proceedings, or alternatively deal with the issue of the ICSID hearing transcript in any other appropriate way in its Award. Such language was repeated at paragraph 4.1 of Procedural Order No. 25 and at paragraph 8 of Procedural Order No. 27.

167.    This Award now records that the Tribunal did not consider it necessary or proper to reopen the proceedings in relation to the ICSID transcripts or other documents or to deal with this issue in any other way other than in this Award. The reasons for this decision are as follows.

167.1.    First, the ICSID proceedings are separate proceedings with different substantive principles and procedural rules as compared to this arbitration. Whether a particular conduct involves breach of a treaty (as alleged in the ICSID proceedings) is not determined by asking whether there has been a breach of contract or the commission of a tort, which are the key issues in this arbitration. As a result, it is difficult to know what, if any, weight could be given in this arbitration to evidence received from that proceeding. This is particularly so in relation to the transcripts of witness evidence where neither the Tribunal nor the Claimant in this arbitration had any opportunity to observe and evaluate the relevance of such evidence or assess the credibility of the witnesses or ask questions of them.

167.2.    Secondly, BSGR – in the Tribunal's opinion– failed, save for the forensic report, to specifically indicate what precise evidence from the ICSID proceedings it sought to submit. Instead, BSGR sought to submit the full ICSID hearing transcript without any sufficient precision as to what material was relevant and why. To have accepted this evidence would have risked reopening the full LCIA arbitration or major parts of it. The same holds true for BSGR's request to submit the ICSID hearing transcripts in relation to six Guinean fact witnesses, three of whom were heard by this Tribunal. Although the latter three are easily identifiable by the Tribunal, the identity of the other three Guinean fact witnesses heard by the ICSID Tribunal but not by this Tribunal, was not disclosed nor was the precise scope of their witness evidence in the ICSID proceedings explained to this Tribunal. Indeed, as a matter of principle, the Tribunal would, absent exceptional circumstances, take the view that the findings of another tribunal between different parties on

different issues would not be binding on this Tribunal or even relevant to its inquiry. And if the findings of such other tribunal are not relevant, it follows that, again subject to exceptional circumstances, the evidence in support of such findings would be equally irrelevant.

167.3.  Thirdly, leaving aside the issue of specificity just discussed, the Tribunal considers that BSGR did not make a sufficiently compelling case that the evidence from the ICSID proceedings it intended to submit in these proceedings was sufficiently relevant to this case or material to its outcome. For example, with regard to the six Guinean fact witnesses, BSGR failed to indicate to what extent the witness evidence of the three Guinean witnesses heard in these proceedings, Ahmed Kanté ("**Kanté**"), Dr. Lounceny Nabé ("**Nabé**") and Dr. Ahmed Tidiane Souaré ("**Souaré**") (all former Minister of Mines), was identical, similar or contradictory to their evidence in the ICSID proceedings and whether that was relevant or material in this case. Similarly, the Tribunal is not convinced that the evidence of the three other Guinean fact witnesses before the ICSID Tribunal would be relevant or material to the issues to be decided by this Tribunal, which differ considerably from those at issue in the ICSID proceedings. Moreover, it was never suggested by BSGR that these witnesses were to be called before this Tribunal for examination and without hearing these witnesses it would of course be difficult, if not impossible, to assess their veracity. This is particularly so in light of the fact that the corruption issues addressed by this Tribunal as part of the misrepresentation and warranty allegations primarily concern the interaction between Mamadie Touré ("**Mme. Touré**") (fourth wife of President Conté) and Pentler Holdings Limited ("**Pentler**") as to which other members of the GoG did not have first-hand knowledge.

167.4.  Fourthly, in relation to Kanté, Nabé and Souaré, BSGR chose not to appear at the Merits Hearing and thus not to cross examine these witnesses produced by Claimant.

167.5.  Fifthly, regarding the forensic expert report, BSGR did not apply for leave to submit the actual forensic report, if any, produced in the ICSID proceedings. The Tribunal would have considered this request on its merits, had BSGR decided to make such a request when the report became available.

167.6.  Finally, regarding the Post-Hearing Briefs, the Tribunal considers that a request for submission of evidence from other proceedings does not extend to pleadings and submissions in these other proceedings. The Post-Hearing Briefs merely contain the submissions of BSGR, which would presumably make reference to the evidence of certain witnesses but would not contain the actual testimony of such witnesses (except possibly on a selective basis) nor the context in which selected extracts of such testimony was given. There can be no evidential value in submissions, as opposed to testimonial evidence, which has already been discussed in paragraphs 167.2 and 167.3 above. Consequently, there is no sound basis upon which the Briefs should have been admitted in these proceedings.

168.  Apart from the reasons set out above, the Tribunal has been and remains, reluctant to accept new evidence on the record after the closure of proceedings, given that the Parties in this case have already had the benefit of a full opportunity to be heard. This opportunity has included written submissions, document production and an evidentiary hearing. There

is certainly no obligation or compulsion on a tribunal to receive new evidence from a parallel arbitration after the proceedings have closed, especially where the evidence is not material to the outcome of the case. Indeed, to do so would run the risk of creating unfairness to Vale that was not a party to the parallel arbitration.

169.    Furthermore, the Tribunal notes that, in its deliberations and preparation of the Award, the Tribunal has meticulously reviewed the record and has come to the conclusion that the evidence sought to be submitted from the ICSID proceedings regarding forged documents, the cooperation of Mme. Touré with the FBI investigations regarding bribery in relation to the procurement of the mining rights or the examination of six Guinean fact witnesses in the ICSID arbitration regarding the alleged fraudulent procurement of the mining rights is highly unlikely to change the conclusions of the Tribunal set out in this Award. In addition, the Tribunal is convinced that the overall outcome of the arbitration as expressed in the dispositif would not be altered by the ICSID evidence, given that the Tribunal has found multiple misrepresentations by BSGR during the pre-contractual due diligence process, other than the misrepresentation as to the absence of corruption (to which BSGR suggests the ICSID transcripts relate). Consequently, even absent a finding of corruption, the multiple remaining misrepresentations would warrant the Tribunal's conclusions and its decisions as to Vale's primary prayer for relief regarding fraudulent misrepresentation. Therefore, the evidence BSGR seeks to admit would have ultimately no bearing on the relief to be awarded in this arbitration. This is yet another reason why the Tribunal has decided not to accept the ICSID transcripts and post-hearing briefs into the record. Finally, the settlement and any withdrawal of the ICSID proceedings – in the opinion of the Tribunal – does not have a material bearing on the issues discussed above.

### Hearsay Evidence

170.    Another general evidentiary matter which has often arisen in this arbitration is the Parties' reliance on hearsay evidence, i.e. oral and written statements made by persons who are not called as witnesses that are tendered as evidence of the matters stated. This includes sworn testimony in other proceedings by persons who are not called as witnesses in the present proceedings. Because of the frequency of the Parties' reliance on such evidence in respect of a variety of factual issues, the Tribunal will now explain its approach to hearsay evidence at the outset. One would then be able to appreciate the consistency of the Tribunal's approach when reading the Tribunal's analysis of the various forms of hearsay evidence in this Award.

170.1.    The rule under English common law was that hearsay evidence is generally inadmissible, subject to certain limited exceptions. The orthodox justification for this rule is that hearsay evidence is not the "best evidence". However, while the rule may sometimes serve to promote accurate truth-finding, the rule has been criticised on the basis that hearsay evidence in certain cases may well be highly reliable (and sometimes the only available) evidence. In recognition of these criticisms, the U.K. Parliament passed the Civil Evidence Act 1995 which virtually abolished the rule in civil proceedings.

170.2.    Another rule in English common law was that a judgment *in personam* delivered in civil or criminal proceedings is generally inadmissible against a stranger as evidence of the facts found or legal conclusions drawn in that judgment.

170.3.    The governing law of the dispute in this arbitration is English law and the arbitration is seated in London. However, the Tribunal is not bound to apply the strict rules of evidence at common law, because it is empowered by section 34(2)(f) of the English Arbitration Act 1996 and Article 22(f) of the LCIA Rules 1998 to decide "whether to apply strict rules of evidence (or any other rules) as to the admissibility, relevance or weight of any material (oral, written or other) sought to be tendered on any matters of fact or opinion" (subject to the Parties' right to agree otherwise). This is consistent with Article 9(1) of the IBA Rules on Evidence[9] , which requires the Tribunal to "determine the admissibility, relevance, materiality and weight of evidence" without specifying the rules to be applied to make that determination. This effectively confers upon the Tribunal a *discretion* to decide these issues.

170.4.    In the experience of all members of the Tribunal, the general practice in international arbitration is that arbitral tribunals would (in the absence of special circumstances) refrain from excluding evidence on technical grounds of inadmissibility, and evaluate the relevance, credibility, and weight of the evidence instead. The Tribunal's settled approach to hearsay evidence and earlier judgments tendered in this arbitration is therefore to regard them as admissible, but to assess their weight individually, having regard to the surrounding circumstances that would shed light on their reliability. For example, in respect of witness testimony in other proceedings by persons who are not called as witnesses in this arbitration, such as Mme. Touré's written statement to the U.S. authorities (which the Technical Committee relied on in its Report)[10] and Ghassan Boutros' oral testimony in Guinean and Swiss proceedings, [11] the Tribunal considers that the accuracy of these testimony and the credibility of the persons giving these testimony are particularly vital, because they bear upon critical (and deeply contested) factual issues in this arbitration. These are qualities which can only be tested in cross-examination, and the Tribunal would ascribe little, if any weight to such testimony if the persons giving such testimony have not been called as witnesses in this arbitration.

### Default Arbitration Proceedings

171.    As a final observation, the Tribunal considers it appropriate to explain its role regarding the conduct of the hearings and the preparation of the Award in view of BSGR's default. As this arbitration (governed by English law and the LCIA Rules) could proceed notwithstanding BSGR's refusal to participate in the hearings and the examination of evidence at those hearings, the question arose as to how the Tribunal was obliged to conduct the hearings and to prepare the Award in view of the proceedings having lost their adversarial character as to oral submissions and evidence at and after the September 2016 hearing. In this respect, the Tribunal – absent much guidance under English law and the LCIA Rules – has taken the approach that the oral submissions and the evidence presented at the hearings by Claimant were not to be taken as granted and that Claimant's claims should not be awarded automatically, but needed to be tested separately by the Tribunal as to the weight

---

[9] As noted in paragraph 28, Procedural Order No.2 stated that the IBA Rules on Evidence could be referenced as guidelines by the Tribunal.
[10] Recommendation and Report of the Technical Committee, 21 March 2014, pp. 36-41, **C-6**.
[11] Report of questioning for Ghassan Boutros, 29 August 2013, **R-132**; Procès verbal of G. Boutros, 7 July 2015, **C-278**.

to be given to the Claimant's evidence and the strength of Claimant's arguments. The Tribunal considered Claimant's evidence against the evidence in writing produced by BSGR in its factual exhibits, its witness statements and its expert report, taking into account that such evidence had not been subject to cross-examination by reason of BSGR's default. Likewise, the Tribunal sought to test the Claimant's arguments against those of BSGR, given that BSGR did not appear and therefore did not directly challenge the Claimant's arguments at the hearings. Although a full adversarial hearing is, of course, preferable, the Tribunal confirms that it has considered BSGR's position, arguments and evidence as much as possible within the confines mentioned above.

## III.    RELEVANT FACTUAL BACKGROUND

### A.    Introduction

172.    In this section of the Award, the Tribunal outlines the evidence and its findings concerning the largely undisputed factual background relating to this dispute which it has drawn from the factual exhibits, the signed witness statements of both sides and the Parties' submissions.[12] Where facts are disputed by a Party, that dispute has been indicated in the text.

173.    This Section includes a number of structural diagrams drawn from the evidence provided by the Parties, demonstrating the ownership of relevant companies at different points in time. A chart in the Appendix to this Award also provides further information regarding a number of key people involved in the factual narrative. This chart was supplied by Vale at the Educatory Hearing. Additionally, a full *dramatis personae* is included at pages 11–16 of this Award.

### B.    BSGR in Africa

174.    BSGR had mining operations in Africa prior to entering Guinea in 2005, including diamond mining in Sierra Leone, copper and cobalt production in Zambia and the Democratic Republic of Congo and an alumina smelting project in South Africa. It also had exploration projects in iron ore, coal and other commodities.[13] BSGR ran these operations through local subsidiaries, supported by various entities within the wider BSG group of companies (the "**BSG Group**").

175.    Onyx Financial Advisors Limited ("**Onyx**") was a company incorporated in the British Virgin Islands (the "**BVI**") to provide management services and other business support functions to the Balda Foundation, a Liechtenstein trust, of which Beny Steinmetz and members of his family were the sole beneficiaries. The Balda Foundation was the 100% beneficial owner of BSGR through Nysco.

176.    The relationship between Onyx and the BSG companies owned by the Balda Foundation is not clear to the Tribunal, although it is evident that the companies were related. Vale submitted that:

> [Onyx is] an ostensibly "independent" company that is the financial arm of the Beny Steinmetz Group. BSGR has admitted that Onyx is related to BSGR. The Onyx name has been used by the Beny Steinmetz Group in several jurisdictions. Indeed, "Onyx's former name was BSG Management Services Limited, which was changed to Onyx on 7 March 2011." There are clear ties between the two companies, including an overlap in directors and officers, such as Dag Cramer and Sandra Merloni-Horemans. Onyx Financial Advisors even shares an address with BSGR.[14]

177.    As a convenient point of reference, the Tribunal has, based on uncontroversial facts in the record, prepared the following diagram showing the management structure of relevant companies within the Steinmetz group.

---

[12] See paragraphs 31, I.A.7, I.A.15, 72 and I.A.25 for the list of witnesses relied upon by the Parties.
[13] BSGR's Statement of Defence, paragraph 22.
[14] Vale's Statement of Case, paragraph 149.



## C.    Background 1997-2005

178.    As described in the introductory paragraphs of this Award (see paragraphs 1 to 15), this dispute arose as a result of the GoG's revocation of BSGR's exploration and mining concessions in the Simandou area, following allegations of bribery by BSGR in obtaining those concessions.

179.    In 1997, a local subsidiary of Rio Tinto, a large multinational mining company, was granted four exploration permits to explore iron ore deposits around Mount Simandou in Guinea. In May 2000, the permits were renewed by the GoG, but the area covered by the renewed permits was half of the original total surface area. The areas covered by the renewed permits became known as Simandou Blocks 1, 2, 3, and 4.

180.    During this period, the president of Guinea was Lansana Conté who came to power in 1984 and remained in power until his death in 2008. The passport of Mme. Touré indicates that she was the spouse of President Conté.[15] Vale alleges that she was his fourth wife.

181.    In 2005, Michael Noy ("**Noy**") and his business partners, Frédéric Cilins ("**Cilins**") and Avraham Lev Ran ("**Lev Ran**") (all serving as principals of Pentler), began working in Guinea to explore business opportunities, including mining opportunities. Lev Ran was from South Africa. Noy and Cilins lived in France. Through their company, FMA Trading International, they had substantial business interests across Africa, particularly in the pharmaceutical industry. However, none of the men lived in Guinea or had any experience in the mining sector.

---

[15] Diplomatic Passport of M. Touré, **C-75**.

182. The local contacts who introduced various business opportunities in Guinea to Noy and his colleagues (including in the mining sector) were Ismaila Daou ("**Daou**") and Aboubacar Bah ("**Bah**") (both Malian businessman) and Ibrahima Sory Touré ("**I.S. Touré**").[16]

183. I.S. Touré was the half-brother of Mme. Touré and was later employed as BSGR's public relations officer in Guinea.

#### D.    BSGR enters Guinea

184. Noy and his associates did not have the experience to develop the mining opportunities themselves but decided to introduce these opportunities to someone in the mining sector who could develop them. Their intention was to make a return through the introduction.[17]

185. At a chance meeting in an airport in South Africa, Noy told Roy Oron ("**Oron**"), then CEO of BSGR, about various mining opportunities in Africa, including an opportunity in Guinea regarding iron ore.[18] Following this conversation, on 14 July 2005, Oron wrote to Cilins asking him to introduce BSGR to mining opportunities in Guinea.[19] Cilins then arranged for Oron to visit Guinea and meet with Guinea's Minister of Mines.[20] This meeting took place sometime on or about 20 July 2005.[21]

186. In November 2005, Oron and Marc Struik ("**Struik**") (CEO of BSG Metals and Mining Limited) embarked on a five-day trip to Guinea, including meeting Cilins and I.S. Touré. Struik also spent time at the Centre de Promotion et de Développement Miniers ("**CPDM**") – the government agency where information about mining opportunities was stored.

187. According to Struik, during his discussions with the CPDM, it became clear that (a) Simandou North and Simandou South were available for exploration, (b) the Government was eager to grant these licences, but (c) BSGR was not the only interested party.[22] North and South Simandou are separate and distinct areas from Simandou Blocks 1, 2, 3 and 4 over which Rio Tinto held exploration permits.

188. On 24 November 2005, BSGR submitted the first draft of a Memorandum of Understanding (the "**MoU**") to the GoG. The MoU covered a large area of Simandou, including Simandou North and South and Simandou Blocks 1 and 2, which were already subject to licences granted to Rio Tinto at the time.

189. The Minister of Mines at this time was Souaré. Souaré described a short meeting that he had with President Conté and two representatives from BSGR (possibly Cilins and Steinmetz) in late November or early December 2005 at the Palais des Nations.[23] Also present was Mme. Touré and (possibly) I.S. Touré. Souaré was told by the President "to facilitate [BSGR's] investment in the country".[24] It is alleged that at one of BSGR's

---

[16] Noy First WS, paragraph 23.
[17] Noy First WS, paragraphs 6, 25 and 28.
[18] Noy First WS, paragraphs 29-30.
[19] Letter from BSGR to the Ministry of Mines, 25 October 2010, **R-43**.
[20] Noy First WS, paragraph 34.
[21] Letter from BSGR to A. Souaré, 2 August 2005, **R-144;** Email from C. Swart to F. Cilins, 30 August 2005, **R-145** (Noy First WS, paragraph 34). See also Letter from Minister of Mines to BSGR, 1 November 2010, **R-44**.
[22] Struik First WS, paragraph 23.
[23] Souaré WS, paragraph 9.
[24] Souaré WS, paragraph 10; Transcript, Merits Hearing, Day 1, p. 213, lines 12-18.

meetings with the President in 2005, Oron gave President Conté a gold watch inlaid with Steinmetz diamonds, with an approximate value of USD 60,000.[25] BSGR denies ever gifting such a watch to President Conté and denies that a meeting in late 2005 took place or, at least, that any representatives from BSGR attended any such meeting.[26]

190.   Souaré said that the following day, the presidential helicopter containing representatives from BSGR and the assistant director of the CPDM landed in the Mount Simandou area. A later report by the CPDM confirmed the visit. This was an area over which Rio Tinto held permits.[27] Struik confirmed that BSGR did borrow a government helicopter but said that was later in 2006 and the helicopter did not land on areas subject to Rio Tinto permits.[28]

**E.   Exploration Permits in Simandou North and South and the contractual relationship with Pentler**

191.   Struik again travelled to Guinea in mid-January 2006 to meet with Government officials and negotiate the MoU for the Simandou area on behalf of BSGR.[29]

192.   Around this time, on 16 January 2006, Onyx transferred the shares in BSG Resources (Guinea) Limited ("**BSGR Guinea BVI**"), a subsidiary of BSGR incorporated in the BVI, to BSGR Steel Holdings Limited ("**BSGR Steel**"), also a subsidiary of BSGR incorporated in the BVI.[30] BSGR Guinea BVI was the parent company of BSG Resources (Guinea) S.à.r.l. ("**BSGR Guinea**") – the local Guinean subsidiary that would eventually be granted the mining concessions in Simandou. As a convenient point of reference, the Tribunal has, based on uncontroversial facts in the record, prepared the following diagram setting out the holding structure as at February 2006. The structure is relevant as it was later amended by BSGR, as described in paragraph 256 of this Award.

---

[25] Vale's Statement of Case, paragraph 144.
[26] BSGR's Statement of Rejoinder, paragraphs 99-100 and footnote 145.
[27] Souaré WS, paragraphs 11-19.
[28] Struik Second WS, paragraph 19.
[29] Struik First WS, paragraph 29.
[30] Merloni-Horemans First WS, paragraph 28.



193.    On 6 February 2006, GoG granted BSGR Guinea four exploration permits over specified areas in Simandou South, and three exploration permits over specified areas in Simandou North.[31] These permits enabled BSGR to begin exploration for iron ore deposits in the specified area but did not amount to a concession for mining iron ore for which a separate exploitation permit was required.

194.    Around this time, BSGR met with President Conté. BSGR was represented by Cilins, Noy, I.S. Touré, Oron and Patrick Saada ("**Saada**") (the Director of Steinmetz Diamond Group). Vale asserts that Steinmetz and Struik also attended the meeting, which was arranged by Mme. Touré.[32] The meeting took place in a courtyard of the presidential palace. According to Vale, Steinmetz offered Mme. Touré a 5% interest in BSGR Guinea in exchange for further assistance to obtain mining concessions over Simandou Blocks 1 and 2.[33] BSGR disputes Vale's account of the meeting, stating that the purpose of the meeting was to introduce BSGR to President Conté, given that it had just been granted exploration permits.[34]

195.    As their work in Guinea was increasing, Noy, Cilins and Lev Ran wanted a company through which to conduct their affairs. At BSGR's suggestion, Noy contacted Sandra Merloni-Horemans ("**Merloni-Horemans**") (Director of Onyx and BSGR) and requested

---

[31] Ministerial Order No. A 2006/706/MMG/SGG, 6 February 2006, **C-21**; Ministerial Order No. A 2006/707/MMG/SGG, 6 February 2006, **C-22**.
[32] Vale's Statement of Reply, paragraph 353.
[33] Vale's Statement of Case, paragraph 145.
[34] Noy First WS, paragraphs 44-46; Saada First WS, paragraph 6.

that Onyx sell them one of its BVI shelf companies. Merloni-Horemans agreed to sell Pentler Holdings Limited to Noy, Cilins and Lev Ran for USD 1,500.[35] Pentler was a shelf company that had been incorporated by Onyx in October 2005.

196.    Noy asked Merloni-Horemans if Onyx would continue to hold the shares in Pentler as trustee for the three men until further notice.[36] Consequently, Onyx (as trustee) remained the formal shareholder of Pentler until November 2006. A power of attorney was issued to Noy and Lev Ran. From this time onwards, Pentler became the vehicle through which Noy, Cilins and Lev Ran operated in Guinea.

197.    Over the course of the next few months, Pentler entered into a number of agreements with BSG companies and with various other contacts in Guinea. These agreements form the basis of Pentler's role in assisting BSGR to exploit mining opportunities in Guinea.

## 1.    BSGR-Pentler Milestone Agreement

198.    On 14 February 2006, Pentler and BSGR Guinea BVI entered into a Milestone Agreement (the "**BSGR-Pentler Milestone Agreement**").[37] This Agreement took the form of a letter from Struik to Pentler which provided Pentler a shareholding in BSGR Guinea BVI (the parent of the local subsidiary company) and set out various milestones and success fees that related to the Simandou project.

199.    The letter stated:

> This letter serves to clarify the relationship between BSGR (Guinea) and Pentler with regards to the Simandou iron ore project, located in the Republic of Guinea.
>
> BSGR (Guinea) affords Pentler an interest of 15% (free carry) in the Simandou iron ore project. In order to effect this interest, the 17.65% shareholding in BSGR Guinea will be made available to Pentler.
>
> Further details of the relationship will be formulated in a Shareholders' Agreement.
>
> With specific regard to the Simandou iron ore project, success fees are based on the mutually agreed milestones as shown in the table overleaf.
>
> Pentler has agreed to continue its efforts to reach an agreement for Blocks 1 and 2, and assist in acquiring these blocks for the Simandou iron ore project and assist in any possible manner with the Simandou iron ore project.

200.    As can be seen from the text above, the BSGR-Pentler Milestone Agreement related to the Simandou project generally, but also specifically required Pentler to "continue its efforts to reach an agreement for Blocks 1 and 2". Simandou Blocks 1 and 2 were part of the area over which Rio Tinto held permits. Under this Agreement, if BSGR acquired a mining concession over Simandou Blocks 1 and 2, Pentler would receive a "success fee" of up to USD 4.5 million. In total, up to USD 19.5 million in success fees were potentially payable to Pentler under this Agreement.

---

[35] Emails between S. Merloni-Horemans and M. Noy, 13-14 February 2006, **R-146**.
[36] Merloni-Horemans First WS, paragraph 18; Email from S. Merloni-Horemans to M. Noy, 15 February 2006, **C-333**.
[37] Letter from BSGR Guinea BVI to Pentler, 14 February 2006, **R-117**.

### 2.    Services Agreement

201.    A Services and Co-operation Agreement was also signed by Pentler and BSG Metals and Mining Limited ("**BSG Metals and Mining**"), a company incorporated in the BVI, (the "**Services Agreement**").[38] The Services Agreement specified that the parties were "independent contractors" and stated that:

201.1.    Pentler "agrees to offer its deal flow in the mining sector to BSGR" (clause 3.1); and

201.2.    the Parties "hereby agree to provide consideration to the other Party for their respective cooperation as they may agree upon from time to time on a case by case basis" (clause 4.1).

202.    Although it was signed in 2006, the Services Agreement was backdated to 15 October 2005.

### 3.    Pentler-Bah Milestone Agreement

203.    Sometime in January 2006, BSGR prepared a draft of a milestone agreement to be signed with I.S. Touré and Bah – two of the local Guinean contacts (the "**Pentler-Bah Milestone Agreement**"). The counterparty for this agreement was not specified in BSGR's draft. According to Vale, the draft was disclosed by BSGR from the files of Struik and had been prepared within the BSG Group.[39]

204.    On 15 February 2006, the day after the BSGR-Pentler Milestone Agreement was signed, Noy sent Merloni-Horemans a draft of the Pentler-Bah Milestone Agreement with Pentler as the counterparty. Merloni-Horemans reviewed and commented on the Agreement.[40]

205.    Pentler, I.S. Touré and Bah signed the Pentler-Bah Milestone Agreement on 20 February 2006.[41] The milestones in that Agreement mirrored the milestones contained in the BSGR-Pentler Milestone Agreement. Under the Pentler-Bah Milestone Agreement, I.S. Touré and Bah would be remunerated for their "services, counsel, assistance and development of a project for the exploration and exploitation of the Simandou iron ore deposit."

### 4.    Pentler-Daou Milestone Agreement

206.    Also on 20 February 2006, Pentler and Daou (another local contact) entered into a separate milestone agreement (the "**Pentler-Daou Milestone Agreement**") and a shareholding agreement (the "**Pentler-Daou Shareholding Agreement**").[42] Like the Bah Milestone Agreement, the Pentler-Daou Milestone Agreement was based on the terms of the original Milestone Agreement between Pentler and BSGR.

---

[38] Services and Co-operation Agreement between BSG Metals and Mining and Pentler, 15 October 2005, **R- 23**.
[39] Letter of Commitment from Pentler to I.S. Touré & A. Bah, 17 January 2006, **C-652**.
[40] Emails between S. Merloni-Horemans & Karine (Noy's assistant), 15 February 2006, **C-341**; Email from Karine (Noy's assistant) to S. Merloni-Horemans, 15 February 2006, **C-343**; and Email from Karine (Noy's assistant) to S. Merloni-Horemans, 15 February 2006, **C-344**.
[41] Memorandum of Understanding between Pentler, A. Bah and I.S. Touré, 20 February 2006, **C-96**.
[42] Memorandum of Understanding between Pentler and I. Daou, 20 February 2006, **C-602**. A copy of the Shareholding Agreement has not been provided in the arbitration but Noy refers to it in his evidence (see Noy First WS, paragraph 60.3.1; Vale's Statement of Reply, paragraph 388).

207.  The success fees that Pentler agreed to pay to I.S. Touré, Bah and Daou under the Pentler-Bah and Pentler-Daou Milestone Agreements added up to the same total success fee as BSGR Guinea BVI had agreed to pay to Pentler under the BSGR-Pentler Milestone Agreement. In other words, the money received by Pentler from BSGR Guinea BVI under the BSGR-Pentler Milestone Agreement would be paid to the three local contacts assisting with arrangements in Guinea while Pentler would obtain a shareholding in BSGR Guinea BVI.

### 5.    Touré MoU

208.  Again, on that same day (20 February 2006), Pentler entered into a Memorandum of Understanding with Mme. Touré (the "**Touré MoU**").[43] According to this MoU, Mme. Touré (as a "local partner") would acquire a 5% interest in the local Guinean subsidiary (BSGR Guinea) that would ultimately own and operate the mining rights in Simandou. To facilitate this interest, Pentler agreed to transfer to Mme. Touré, free of charge, a 33.3% interest in Pentler. As a result of Pentler's 17.65% interest in BSGR Guinea BVI, Mme. Touré would ultimately own a 5% interest in the local Guinean operator. Noy gave evidence that this interest was granted to Mme. Touré "following our local partners' agreement with her."[44]

209.  Both the Pentler-Bah Milestone Agreement and the Touré MoU were reviewed by Merloni-Horemans (Director of BSGR) before they were entered into by Pentler.[45]

### 6.    MoU between BSGR Guinea BVI and the GoG

210.  Finally, also on 20 February 2006, BSGR Guinea BVI and the GoG signed the MoU for the Simandou project, which "set the legal, economic, technical and financial conditions governing the relations between the parties for the development of a part of the iron ore deposits in Simandou."[46] The area covered by the MoU included Simandou North and South, as well as Simandou Blocks 1 and 2, as described in Appendix 1 to the MoU. The MoU granted BSGR's local subsidiary, BSGR Guinea, exclusive right to the relevant mining concessions for the agreed areas for the duration of the MoU.

211.  A model miniature car plated in gold and diamonds was presented to the GoG by BSGR at the signing ceremony for the MoU as a "symbolic gift".[47]

### 7.    First payment under BSGR-Pentler Milestone Agreement

212.  The first payment under the BSGR-Pentler Milestone Agreement (and under the Pentler-Bah and Pentler-Daou Milestone Agreements) was triggered by the signing of the MoU between BSGR Guinea BVI and the GoG. As noted above, the signing of these three agreements all occurred on the same day (20 February 2006), and it was on this day that the first success fee of USD 500,000 became due and payable by BSGR Guinea BVI to Pentler under the BSGR-Pentler Milestone Agreement. The signing of the MoU with the

---

[43] Touré MoU, 20 February 2006, pp. 223-224, **C-6**.
[44] Noy First WS, paragraph 8.
[45] Emails between S. Merloni-Horemans & Karine (Noy's assistant), 15 February 2006, **C-341**; Email from Karine (Noy's assistant) to S. Merloni-Horemans, 15 February 2006, **C-343**; Email from Karine (Noy's assistant) to S. Merloni-Horemans, 15 February 2006, **C-344**.
[46] Memorandum of Understanding between the Republic of Guinea and BSGR Guinea BVI, 20 February 2006, **R-25**.
[47] Souaré First WS, paragraph 28; Transcript, Merits Hearing, Day 1, p. 227, lines 3-21.

GoG also triggered payments of USD 425,000 from Pentler to I.S. Touré and Bah under the Pentler-Bah Milestone Agreement, and of USD 75,000 from Pentler to Daou under the Pentler-Daou Milestone Agreement.

213.    As it happened, Pentler did not receive the money at all. BSGR Guinea BVI paid the money directly (in cash) to Bah, I.S. Touré and Daou.[48]

214.    BSGR compensated the owners of Pentler (i.e. Noy, Lev Ran and Cilins) separately for the provision of services. On 27 February 2006, the owners of Pentler sent invoices to BSGR to pay a total of USD 125,000 for assistance in signing the 2006 MoU with the GoG.[49] The invoices were made payable to CW France and FMA International Trading Pty (companies owned by Noy, Cilins and Lev Ran). BSGR paid these invoices on 6 March 2006.

215.    To summarize, the Tribunal has, based on uncontroversial facts in the record, prepared a diagram showing the agreements in place as of 27 February 2006:



---

[48] Letter from A. Bah to M. Struik, 19 August 2010, **C-337**.
[49] Payments to CW France and FMA International Trading (Pty) Ltd, 27 February 2006, **R-178**.

216.   According to BSGR, Bah and I.S. Touré later assigned their rights under the Pentler-Bah Milestone Agreement to Mme. Touré's company, Matinda and Co. Limited ("**Matinda**").[50] Pentler was allegedly a party to this assignment agreement, although Noy stated that he did not know why or when the rights were assigned.[51]

**F.    Shareholding in BSGR Guinea BVI provided to Pentler and Mme. Touré**

217.   In accordance with the BSGR-Pentler Milestone Agreement, on 10 March 2006, BSGR Steel transferred 8,825 shares in BSGR Guinea BVI to Pentler – constituting a 17.65% shareholding in BSGR Guinea BVI.[52] The shares were held by Oynx "on trust" for Pentler.[53]

218.   Pursuant to the Touré MoU, Pentler was obliged to transfer 5% of this interest to Mme. Touré by granting her a 33.3% shareholding in Pentler. Noy gave evidence that this MoU was signed but that Pentler "never formalised the transfer of shares to Mamadie Touré."[54] Nonetheless, Noy said that Mme. Touré was a considered to be a "stakeholder" in Pentler, "although, we never formally transferred 33% of Pentler to Mamadie Touré".[55]

219.   Pentler had also agreed to transfer a small interest to Daou under the Daou Shareholding Agreement, which was conditional on obtaining the mining rights. Pentler apparently repurchased these shares in September 2007.[56]

220.   In addition to these contracts, there was also a Shareholders Agreement between BSGR Steel, Pentler and BSGR Guinea BVI (the "**Pentler Shareholders Agreement**").[57] Under section 2.2.2 of that Agreement, Pentler had a 17.65% interest in shares of BSGR Guinea BVI. Of an initial Board of three directors, Pentler was entitled to appoint one director, while BSGR Steel was entitled to appoint the remaining two directors.[58] The Shareholders Agreement was signed on 19 July 2007 but backdated to 10 March 2006 (the date that Pentler received the shares).

221.   At this time, the relevant corporate structure was as follows in the diagram below. Again, this diagram was prepared based on uncontroversial facts in the record.

---

[50] Amendment to the Agreement Protocol of 20 February 2006 between Pentler, A. Bah and I.S. Touré, **R-150** (the assignment agreement is signed, but undated).
[51] Noy First WS, paragraph 60.2.3. See also Email from M. Noy to D. Barnett, 7 June 2009, **R-153**.
[52] Emails between M. Struik & S. Merloni-Horemans, 1-2 March 2006, **C-236**; Shareholding Certificate in BSGR Guinea BVI issued to Pentler, 10 March 2006 **R-149**.
[53] Merloni-Horemans First WS, paragraphs 18-19.
[54] Noy First WS, paragraph 60.1.4.
[55] Noy First WS, paragraph 72.
[56] Noy First WS, paragraph 60.3.1.
[57] Shareholders Agreement between BSGR Steel, Pentler and BSGR, 19 July 2007, **R-24**
[58] Shareholders Agreement between BSGR Steel, Pentler and BSGR, 19 July 2007, clause 4.3.2, **R-24**.



### G.   BSGR commences work in Guinea

222.   On 30 March 2006, the GoG, by Presidential Decree, granted Rio Tinto's local subsidiary a mining concession for Simandou Blocks 1, 2, 3 and 4 for 25 years.[59]

223.   Around the same time (April 2006), BSGR established an office in Conakry (Guinea's capital city), although it was not officially opened until September 2006.[60] In June, BSGR informed the Minister of Mines of its exploration plan for Simandou North and South. Struik, with the help of Cilins, ran the business during this period.[61] BSGR also employed I.S. Touré from this time (eventually making him its public relations officer).

224.   On 9 May 2006, the GoG also granted BSGR (upon BSGR's application) a number of exploration licences for areas containing bauxite deposits on the Guinean border with Mali in the North. Just after this, Pentler entered into two further "engagement letters" with Mme. Touré which confirmed the terms of the Touré MoU in relation to Mme. Touré's 33.3% interest in Pentler, but also referenced her assistance in obtaining the bauxite permits. They were signed by Lev Ran and are dated 21 July 2006.[62]

225.   Asher Avidan ("**Avidan**") (Chief Executive Officer of BSGR Guinea and now President of BSGR) arrived in Guinea to take up the role of "Country Manager" in June 2006. On the

---

[59] BSGR's Statement of Defence, paragraph 60.
[60] Struik First WS, paragraph 40.
[61] Struik First WS, paragraph 41.
[62] Engagement Letter, 21 July 2006, pp. 226-229, **C-6**; Engagement Letter, 21 July 2006, pp. 231-232, **C-6**.

day of the official office opening in September 2006, Oron, Avidan, Cilins and I.S. Touré held a presentation attended by the press, where they presented BSGR's exploration plan on the Simandou project.[63]

226. Avidan met with Mme. Touré at her house in Dubréka a few months later (around September) to discuss the Simandou mining venture – which she referred to as "her project". She told Avidan that she thought Cilins should be running things for BSGR, rather than Avidan.[64]

227. On 28 February 2007, BSGR obtained uranium permits, allegedly with the assistance of Mme. Touré. On 20 June 2007, BSGR Guinea and Matinda allegedly entered into an agreement whereby Matinda was promised a 5% direct shareholding in BSGR Guinea as a reward for Mme. Touré's assistance in obtaining these permits.[65] The contract was legalized by a Greffier of the Conakry Court of First Instance on 20 July 2007.[66] BSGR has submitted that this agreement is a forgery.[67]

## H.   Simandou Blocks 1 and 2

228. In July 2007, BSGR Guinea applied for exploration permits for Simandou Blocks 1 and 2.[68] At the time, Rio Tinto held mining concessions over these areas. Kanté (who was then Minister of Mines) gave evidence that he was not receptive to BSGR's approaches with regard to Blocks 1 and 2.[69]

229. As noted above, BSGR Steel, Pentler and BSGR Guinea BVI entered into the Pentler Shareholders Agreement on 19 July 2007, although it was backdated to 10 March 2006.[70] BSGR Steel and BSGR Guinea BVI also entered into a management agreement granting BSGR Steel the authority to manage the business on behalf of BSGR Guinea BVI.[71]

230. Over the course of 2007, BSGR continued with the exploration of Simandou North and South. BSGR initially concentrated on Simandou North. However, around mid-2007, BSGR discovered deposits of iron ore around the Zogota area in Simandou South and thereafter concentrated its exploration on Zogota.

231. In August 2007, Avidan and I.S. Touré met with Kanté to make known BSGR's interest in Simandou Blocks 1 and 2. This was followed by a further meeting in late September 2007 with President Conté and Kanté, where – once again – BSGR's interest in Blocks 1 and 2 was discussed, but no orders were given to grant concessions over Simandou Blocks 1 and 2.[72] Kanté said he had a further meeting with BSGR at the Ministry of Mines about an hour later where he reiterated he had been given no orders in relation to Blocks 1 and 2

---

[63] Struik First WS, paragraph 51; BSGR's Chronicle of Events and Overview of BSGR's Iron Ore Investment in Guinea in Response to the Technical Committee, 26 December 2012, **C-23**.
[64] Avidan First WS, paragraph 37.
[65] Memorandum of Understanding between BSGR and Matinda, 20 September 2007, **R-234**.
[66] Attestation of Lansana Tinkiano, 9 January 2015, **C-98**.
[67] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.
[68] BSGR Application for Exploration Permits for Simandou Blocks 1 and 2 (ICSID Ex. R-214), 12 July 2007, **C-694**.
[69] Kanté WS, paragraphs 12-19.
[70] Shareholders Agreement between BSGR Steel, Pentler and BSGR, 19 July 2007, **R-24**.
[71] Management Agreement between BSGR Steel and BSGR Guinea BVI, 19 July 2007, **R-202**.
[72] Kanté WS, paragraphs 22-29; Avidan First WS, paragraph 63.

which still belonged to Rio Tinto.[73] Another meeting between Avidan, Struik, Mme. Touré and President Conté occurred sometime in 2007 or 2008 (accounts are inconsistent) late at night, where the President asked for a progress update from BSGR and allegedly became angry at Mme. Touré's interruptions.[74]

232.    A third meeting took place around December 2007 between President Conté, Prime Minister Lansana Kouyaté ("**Kouyaté**") (then Prime Minister of the Republic of Guinea), Kanté and Mme. Touré at which Kanté voiced objections to granting BSGR further permits until they had proven their abilities.[75]

233.    It is alleged that a further meeting took place between Avidan, Issiaga Bangoura ("**Bangoura**") (Security Director for BSGR) and Mme. Touré (with Steinmetz joining by phone) at the President's house in early 2008. Avidan said that BSGR wanted Mme. Touré's assistance to secure Blocks 1 and 2. BSGR denies that this meeting occurred.[76] Shortly after this meeting allegedly occurred, it is alleged that BSGR Guinea BVI entered into two contracts with Matinda. The first Agreement (entitled a "**Commission Contract**") was dated 27 February 2008 and provided for a USD 4 million commission to be paid to Matinda for assistance in obtaining permits for Simandou Blocks 1 and 2. Of this USD 4 million, USD 2 million was to be paid to Matinda and the remaining USD 2 million was to be "distributed among the people of goodwill who would have contributed to the facilitation of the granting of said blocks."[77]

234.    The second agreement, dated 28 February 2008, was a Memorandum of Understanding which provided Matinda with a 5% interest in Blocks 1 and 2 (the "**February 2008 MoU**").[78] Both Agreements bore BSGR's stamp and were allegedly signed by Avidan.[79]

235.    BSGR has alleged that both of these agreements are forgeries.[80]

236.    Around this time, Steinmetz visited Guinea and met with the President to discuss Simandou Blocks 1 and 2.[81] Also present at the meeting were Cilins, Mme. Touré and Struik. It is alleged that Steinmetz gave the President a small model car encrusted with diamonds as a gift. Steinmetz denies this.[82]

**I.    Share Buyback – Pentler**

237.    On 24 March 2008, BSGR Steel and Pentler entered into a Share Purchase Agreement of Shares in BSG Resources (Guinea) Ltd (the "**Share Purchase Agreement**"),[83] under which BSGR Steel purchased Pentler's 17.65% holding in BSGR Guinea BVI for a total payment of USD 22 million (to be paid in four instalments). In addition, the parties agreed

---

[73] Kanté WS, paragraphs 27-29.
[74] Avidan First WS, paragraph 101; Struik First WS, paragraph 112.
[75] Kanté WS, paragraphs 30-34.
[76] Avidan First WS, paragraph 97.
[77] Commission Agreement between BSGR Guinea BVI and Matinda, 27 February 2008, **R-128**.
[78] Memorandum of Understanding between BSGR Guinea BVI and Matinda, 28 February 2008, **R-129** (see also p. 221, **C-6**).
[79] Commission Agreement between BSGR Guinea BVI and Matinda, 27 February 2008, **R-128**.
[80] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.
[81] Steinmetz First WS, paragraph 28.
[82] Steinmetz First WS, paragraph 61.
[83] Share Purchase Agreement between BSGR Steel and Pentler, 24 March 2008, **R-28**.

on a potential further payment of USD 8 million if BSGR Steel realised a profit in excess of USD 1 billion. Pursuant to clause 6 of the Share Purchase Agreement, "[t]he Consultant (Pentler's shareholders) will continue to advise and act as consultant for the period of 5 years from signing date hereof to the best interest of the Company". In 2010, following a renegotiation, the Parties agreed to increase the payment for the share purchase to USD 30 million.[84] Vale claims that Pentler received USD 34.5 million in payments from BSGR in total.[85]

238.    Mme. Touré held a 33.3% interest in Pentler, which effectively gave her a 5% interest in BSGR Guinea BVI. As Pentler was to sell its shares in BSGR Guinea BVI back to BSGR Steel, Vale alleges that BSGR offered Mme. Touré a direct 5% interest in Simandou Blocks 1 and 2 pursuant to the February 2008 MoU (discussed above).

**J.    GoG revokes Rio Tinto's mining concessions and grants exploration permits to BSGR**

239.    A series of meetings took place in April 2008 between BSGR and the GoG to discuss the revocation of Rio Tinto's rights to Blocks 1 and 2. Avidan attended these meetings, with Steinmetz also attending two of the meetings.[86] Mme. Touré also attended this meeting. Steinmetz then returned to Guinea in May 2008 for a two-day visit. During this time, Prime Minister Kouyaté, who opposed the revocation of Rio Tinto's rights, was removed from office.[87]

240.    Rio Tinto's mining concession granted in 2006 was revoked by the GoG on 28 July 2008. According to the GoG, the concession was revoked because of Rio Tinto's prolonged failure to conduct exploration activities.[88] While Rio Tinto was allowed to retain some exploration licences in the area, it was required to retrocede half of its permit area back to the GoG. Consequently, on 4 December 2008, the Council of Ministers ordered the Ministry of Mines to withdraw half of the concession, corresponding to Simandou Blocks 1 and 2.[89] Rio Tinto retained exploration permits over Simandou Blocks 3 and 4.

241.    After the July 2008 decree, the GoG publicly announced that Simandou Blocks 1 and 2 were available for exploration and asked for applications from interested parties. BSGR submitted an application in August 2008.[90] Following these events, sometime in September or October 2008, Avidan, Steinmetz, Mme. Touré, and President Conté met to discuss BSGR's application.[91] Ibrahima Kassory Fofana ("**Fofana**") (allegedly working as a consultant for BSGR) also met with the new Minister of Mines, Nabé, to discuss the application.[92]

---

[84] See Noy First WS, paragraph 97.
[85] Vale's Pre-Hearing Written Submissions, paragraph 40.
[86] Avidan First WS, paragraphs 91-94.
[87] Vale's Pre-Hearing Written Submissions, paragraph 98(c); Guinée Information, "Ahmed Tidiane Souaré, le dernier premier ministre du Général Lansana Conté répond aux accusations de son prédécesseur Lansana Kouyaté", 15 May 2014, **C-77**.
[88] Decree No. D/2008/041/PRG/SGG, 28 July 2008, **C-27**.
[89] Email from M. Berkner of Skadden to M. Gordon of Clifford Chance, 9 April 2010, **C-47**.
[90] Letter from A. Avidan to Minister of Mines L. Nabé, 5 August 2008, **C-29**.
[91] Avidan First WS, paragraph 95.
[92] Nabé WS, paragraph 20; Transcript of Meeting between Minister of Mines M. Thiam and S. Mebiame, **C-81**. See also Nabé WS, paragraphs 8-9 where Nabé said he felt pressured to retrocede the Blocks to BSGR.

242.    On 9 December 2008, the GoG granted BSGR Guinea an exploration licence covering the area of Simandou Blocks 1 and 2. This permit was valid for three years and renewable for another two years.[93]

**K.    The death of President Conté**

243.    President Conté died on 22 December 2008, following a long illness. Following his death, Captain Moussa Dadis Camara seized power in Guinea through a military coup until he was exiled in late 2009. General Konaté Sékouba then served as interim President. Finally, Alpha Condé was elected as President of Guinea in December 2010.

244.    After the death of President Conté, Mme. Touré was exiled to Sierra Leone. While living in Sierra Leone, Vale has alleged that Mme. Touré received from BSGR:

244.1.    a payment of USD 50,000 in early 2009; and

244.2.    a payment of USD 998,000 on 3 September 2009 from Ghassan Boutros ("**Boutros**") (Lebanese businessman and allegedly BSGR's agent/consultant), plus an additional $2,000 from Boutros in December 2009.

245.    In addition, Mme. Touré allegedly signed a contract with BSGR under which she would receive USD 4 million in instalments. BSGR alleges that this contract is a forgery.[94]

246.    During the interim period from January 2009 to December 2010, Thiam served as the Minister of Mines. Thiam was later convicted in the United States of corruption and money laundering charges in relation to certain mining rights granted to Chinese interests.[95] These charges were not related to BSGR.

247.    On 5 May 2009, Minister Thiam confirmed the validity of BSGR's exploration permit for Simandou Blocks 1 and 2. As noted below, Thiam also granted BSGR's request to renew the exploration permits for Simandou North and South on 10 June 2009.

248.    The Technical Committee (discussed below) would later allege that Minister Thiam worked aggressively to promote the interests of BSGR during this time, in return for travel benefits (including use of BSGR's airplane) and other gifts.[96] Vale has alleged that BSGR's payments to Thiam also enabled him to purchase USD 5.27 million worth of real estate in the United States.[97]

**L.    Renewal of Exploration Permits for Simandou North and South**

249.    In January 2009, the three-year initial term for BSGR's exploration permits in Simandou North and South was about to expire. Avidan filed a request on behalf of BSGR for the renewal of the exploration permits to the CPDM together with a proposal to retrocede half of the area covered under the permits.[98] BSGR wanted to retain permits for the Zogota area in the South (around Mount Younon) which had yielded promising results and which

---

[93] Ministerial Order No. A 2008/I-4980/MMG/SGG, 9 December 2008, **C-31**.
[94] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.
[95] *USA v. Thiam*, Criminal Complaint, Dkt. No. 1, 12 December 2016, **C-828**.
[96] Letter from the Technical Committee to BSGR, 30 October 2012, pp. 6-7, **C-5**.
[97] Vale's Statement of Case, paragraph 172.
[98] Struik First WS, paragraph 59.

became known as the "Zogota Project". It therefore proposed to retrocede 50% of Simandou North and part of Simandou South that did not include Zogota.

250.   In June 2009, the Minister of Mines granted the request as recommended by the CPDM.[99] As a result, BSGR reassigned 50% of Simandou North and 50% of Simandou South back to the GoG in accordance with the requirements of the 1995 Mining Code, leaving BSGR with exploration rights over the remaining area.

251.   Therefore, as of June 2009, BSGR held exploration permits for Zogota in Simandou South, part of Simandou North and Simandou Blocks 1 and 2.

## M.   Restructure by BSGR

252.   On 10 February 2009, BSGR incorporated BSGR Guernsey. This new Guernsey-registered entity had the same corporate name, BSG Resources (Guinea) Limited, as the existing BVI entity referred to here as BSGR Guinea BVI, whose full corporate name was also BSG Resources (Guinea) Limited.

253.   BSGR Guernsey was 100% owned directly by BSGR. It would later become the joint venture entity.

254.   One week after incorporating BSGR Guernsey, on 17 February 2009, BSGR Guinea (the local Guinean subsidiary which held the mining rights) was transferred from BSGR Guinea BVI to BSGR Guernsey. As BSGR directly owned BSGR Guernsey, BSGR Steel and BSGR Guinea BVI (the two companies that had interacted with Pentler) were no longer part of the corporate structure involved in the Simandou project.

255.   At that time, BSGR Steel and BSGR Guinea BVI were still owned by BSGR. However, in late March 2010, BSGR sold these two companies to BSG Metals and Mining which was owned by Nysco. As a result, these two companies were no longer within BSGR's corporate group – in other words, they had been completely separated from the entities involved in any future joint venture.

256.   A comparison of the various corporate structures between February 2009 and March 2010 is shown below. These diagrams were prepared by the Tribunal as a convenient point of reference, based on uncontroversial facts in the record.

---

[99] Ministerial Order No. A 2009/1327/PR/MMEH/SGG, 10 June 2009, **C-25**.

**10 February 2009:**



**Mid-February 2009:**                    **Late March 2010:**

    

N.    **Dispute between Pentler and BSGR**

257.    On 15 April 2009, BSGR failed to pay Pentler one of the instalments that was due under the Share Purchase Agreement. Having made an initial demand for payment, several contentious letters were exchanged between Pentler and BSGR during May 2009.[100] These letters included allegations of breach of obligations by both sides.[101] On 8 June 2009, Noy wrote to David Barnett ("**Barnett**") (BSGR's internal legal counsel) noting that BSGR was two months late on the latest instalment and was therefore in default under

---

[100] Letters between A. Lev Ran, S. Merloni-Horemans, & M. Struik, 8 May – 5 October 2009, **C-552**.
[101] Letters between A. Lev Ran, S. Merloni-Horemans, & M. Struik, 8 May – 5 October 2009, **C-552**.

the Agreement. Pentler demanded payment of the entire amount due (not just the instalment) and said that it would not accept a settlement.[102] Three days later, Lev Ran wrote another letter to BSGR threatening to "properly ventilate[]" the communications of Steinmetz before the relevant court if payment was not made.[103]

258.    On 17 June 2009, Lev Ran again wrote to BSGR saying that Pentler elected to cancel the Share Purchase Agreement and would seek to sell its shares in BSGR Guinea BVI to a third party.[104] He also demanded payment of the USD 1.5 million success fee Pentler claimed was due under the BSGR-Pentler Milestone Agreement in relation to Blocks 1 and 2.[105]

259.    Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden Arps**") (BSGR's then external legal counsel) responded to Pentler on behalf of BSGR.[106] Skadden Arps rejected Pentler's ability to cancel the Share Purchase Agreement or sell the shares to a third party. Skadden Arps referred to Pentler's alleged breaches of its obligations to BSGR and also to "third parties that are causing our client loss."[107] This appears to be a reference to Bah who was threatening BSGR at the time (discussed at paragraph 261 below). Pentler's lawyers responded by providing notice that they intended to commence arbitration proceedings over the matter.[108]

260.    Following settlement discussions, Pentler and BSGR Steel reached a Settlement Agreement on 25 July 2009 (the "**Settlement Agreement**") which set out a renewed payment schedule for the outstanding monies owed under the Share Purchase Agreement. On the same day, Pentler provided an indemnity to BSGR for any claims against BSGR made by Bah.

261.    The reference to indemnifying BSGR against claims by Bah (one of the local contacts who had initially assisted BSGR in 2005–2006) relates to demands made by Bah for payments outstanding under the Pentler-Bah Milestone Agreement. Bah made a further demand for this money on 30 November 2009, when he wrote to BSGR demanding payment of USD 15.2 million pursuant to the Pentler-Bah Milestone Agreement.[109] BSGR threatened litigation in response, but Bah made a further demand in March 2010.[110]

O.    **Payments to Mme. Touré**

262.    As noted in paragraph 208 above, in the Touré MoU, Pentler agreed to give Mme. Touré a 5% interest in BSGR Guinea in return for her assistance in gaining the mining rights. This interest was achieved by granting Mme. Touré a 33% interest in Pentler. After Pentler sold its interest in BSGR Guinea back to BSGR, Mme. Touré has alleged that

---

[102] Emails between M. Noy & D. Barnett, 8 June 2009, **C-294**.

[103] Letters between A. Lev Ran, S. Merloni-Horemans, & M. Struik, 8 May – 5 October 2009, **C-552**.

[104] Emails between M. Struik, B. Steinmetz, & M. Noy, 17 June 2009, **C-296** and Email from M. Struik to B. Steinmetz, enclosing Letter from A. Lev Ran to M. Struik, 17 June 2009, **C-297**.

[105] Email from M. Struik to B. Steinmetz, enclosing Letter from A. Lev Ran to M. Struik, 17 June 2009, **C-298**.

[106] Letter from Skadden Arps, 23 June 2009, p. 19, **C-552**.

[107] Letter from Skadden Arps, 23 June 2009, p. 19, **C-552**.

[108] Letter from John Walker Attorneys, 25 June 2009, p. 21, **C-552**.

[109] Letter from A. Bah to BSGR, 30 November 2009, **R-125**.

[110] See Letter from BSGR to A. Bah, 3 December 2009, **R-173**; Letter from A. Bah to M. Struik, 5 May 2010, **C-337**.

BSGR agreed to pay her USD 4 million, which represented the value of her 5% interest in BSGR Guinea and the assistance she provided in obtaining the mining titles for BSGR.[111]

263.    It is alleged that the first payment under this arrangement came through the BSGR consultant named Boutros. On 18 August 2009, BSGR transferred USD 1.3 million to Boutros's bank account.[112] Boutros then transferred USD 998,000 to Mme. Touré on 3 September 2009 pursuant to an invoice from her company for heavy machinery.[113]

264.    A further payment of USD 100,000 was transferred to Boutros on 12 November 2009.[114] Vale has alleged that the heavy machinery was never delivered, but BSGR maintains that the purchases were legitimate and the machinery was delivered.

## P.    Base Convention

265.    BSGR completed its Feasibility Study for Zogota (the "**Zogota Feasibility Study**") at the end of October 2009. On 16 November 2009, BSGR submitted the Zogota Feasibility Study to the Ministry of Mines, which approved it in early December.

266.    On 16 December 2009, BSGR Guernsey, BSGR Guinea and the GoG entered into a "Basic Agreement between the Republic of Guinea and BSG Resources for the Exploitation of the Zogota / N'zerekore Iron Ore Deposits" (the "**Base Convention**").[115] The Base Convention defined "the rights and obligations of the Parties and the general economic, legal, administrative, financial, fiscal, customs and excise, mining, environmental, social, transport and shipping conditions according to which the Parties undertake to carry out the Project for working the iron deposits at Zogota" (clause 4). The "project" that was subject to the Base Convention was (i) the working, transportation, exporting and marketing of iron ore; and (ii) the rebuilding of a railway line from Conakry to Kankan.[116] The project had two phases – the first concerned the Zogota deposit and the second concerned Blocks 1 and 2.[117] BSGR was to present a feasibility study for Blocks 1 and 2 within 24 months of the date of the Base Convention.

## Q.    The Joint Venture - Due Diligence and Negotiations

267.    BSGR began looking for a joint venture partner in April 2009. It undertook initial discussions with a number of entities, all of which ultimately failed.[118] In July 2009, Struik and Paul Antaki (New Business Development Manager for Vale) had a preliminary discussion regarding BSGR's activities in Guinea. However, it was not until February 2010 that serious discussions between BSGR and Vale regarding a possible joint venture began. The joint venture negotiation was called "Project Hills". The Parties signed a non-

---

[111] Affidavit of M. Touré, 2 August 2009, **C-690**.
[112] Payment from BSGR Treasury Services to LMS, 18 August 2009, **R-187**.
[113] Email from G. Boutros to the Managing Director of the F.I.B., 3 September 2009, p. 195, **C-6**.
[114] Payment from BSGR Treasury Services to LMS, 12 November 2009, **R-188**.
[115] Basic Agreement among BSGR Guernsey, BSGR Guinea, and the Republic of Guinea, 16 August 2009, **C-34**; Report from Committee Analyzing BSGR's Feasibility Study, 14 December 2009, **C-696**.
[116] Basic Agreement among BSGR Guernsey, BSGR Guinea, and the Republic of Guinea, 16 August 2009, clause 10, **C-34**.
[117] Basic Agreement among BSGR Guernsey, BSGR Guinea, and the Republic of Guinea, 16 August 2009, clauses 10.1-10.2, **C-34**.
[118] BSGR's Statement of Defence, paragraphs 91-94.

disclosure agreement on 22 February 2010[119] and Vale conducted its due diligence during March and early April 2010.

268.   During this time, BSGR and Vale held exploratory meetings at Vale's offices in Rio de Janeiro to discuss the joint venture. Steinmetz, Avidan, Tchelet and Barnett attended these meetings on behalf of BSGR. BSGR gave assurances that its mining permits and concessions had been obtained lawfully.[120] During the joint venture negotiations Skadden Arps acted for BSGR and Clifford Chance (London) acted for Vale.

269.   Technical due diligence was completed by Clifford Chance and Vale during this time. As Vale was listed on the New York Stock Exchange, Clifford Chance used its Washington DC office to conduct a separate due diligence exercise on compliance with the US Foreign Corrupt Practices Act (the "**FCPA**").

270.   The FCPA compliance due diligence process included the following elements:

270.1.   review of documents provided by BSGR in an electronic data room;

270.2.   separate review of the principal entities and persons connected with Project Hills;

270.3.   legal advice from local counsel in Guinea regarding compliance with local law;

270.4.   two compliance due diligence questionnaires addressed to BSGR;[121]

270.5.   a legal due diligence questionnaire and a financial due diligence questionnaire which included questions related to anti-bribery and corruption issues;[122]

270.6.   a follow-up due diligence request list dated 4 April 2010;[123]

270.7.   anti-bribery certifications by BSGR as an entity given by David Clark ("**Clark**") (Director of BSGR) and an additional certification given by Steinmetz personally;

270.8.   interview of BSGR's principals in London (Avidan, Tchelet, Struik and Cramer);[124] and

270.9.   FCPA contractual protections, including several representations and warranties.

271.   In the meantime, on 19 March 2010, the GoG granted BSGR Guinea mining concessions over the Zogota area and ratified the Base Convention.[125] On the same day, Thiam wrote

---

[119] Confidentiality Agreement, 1 March 2010, **C-42**.
[120] Monteiro First WS, paragraphs 11-15; Vale's Statement of Case, paragraph 53.
[121] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, **C-30**; Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, **C-43**.
[122] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, **C-233**; Project Hills Clifford Chance Due Diligence Request List, 29 March 2010, **C-235**.
[123] Project Hills Follow Up Diligence Request List, 4 April 2010, **C-44**.
[124] Kleinfeld WS, paragraph 20.
[125] Ordinance No. 003/PRG/CNDD/SGG/2010, 19 March 2010, **C-35**; Decree No. D2010/024/PRG/CNDD/SGG, 19 March 2010, **C-36**.

to Vale to confirm BSGR's mining rights were valid and to express his support of the joint venture.[126]

272.   On 15 April 2010, BSGR and Liberia entered into a Memorandum of Understanding for the exportation of iron ore through Liberia as the distance from Simandou to the Liberian coast for exportation of the iron ore was substantially shorter than through a trans-Guinean railroad to the port of Conakry, the capital of Guinea.[127] This was known as the Liberian Transport Solution ("LTS"). Vale BSGR Guinea Limited ("VBG"), referred to in the following paragraph, and the Government of Liberia then began to negotiate the terms of the commercial agreement. Under the Framework Agreement, Vale would pay a further USD 500 million into the joint venture once agreement had been reached on the LTS.

273.   Following the conclusion of the due diligence process and commercial negotiations, the GoG approved the joint venture.[128] On 30 April 2010, Vale and BSGR entered into the Framework Agreement and the Shareholders' Agreement.[129] Through these Agreements, Vale purchased a 51% share of BSGR Guernsey which owned BSG Guinea – the local company that held the mining rights. BSGR Guernsey was renamed "VBG – Vale BSGR Guinea" on 14 June 2010.[130] Vale's shareholding in VBG was held through Vale International Holdings GmbH ("Vale GmbH"), a wholly owned subsidiary registered and with its principal office in Austria.

274.   Under the joint venture arrangements, Vale paid an initial sum of USD 500 million upon formation of the joint venture. Vale was due to pay a further USD 2 billion upon the achievement of specified milestones in the development of the project.[131] Vale's obligations under the joint venture were in part performed by subsidiaries, notably Vale International S.A. ("Vale International"), a wholly owned subsidiary registered and with principal office in Switzerland.

275.   Over the course of 2010, VBG continued its work on the feasibility studies for Blocks 1 and 2 and for the Trans-Guinean Railway. Construction also commenced on part of the Conakry to Kankan railway, with authorisation from the Ministry of Mines. VBG conducted other environmental and social studies and began constructing camps and paving roads around Zogota and Blocks 1 and 2. During this time, Vale alleges that it invested a further USD 945 million in the development of the mining area and associated activities.[132] Vale also assumed full control of the joint venture in Guinea – BSGR was not involved in the day-to-day operations at this time.[133] By late 2011, the joint venture began to hit obstacles as described further in paragraphs 282 to 289 below.

---

[126] Letter from M. Thiam to E. Ledsham of Vale, 19 March 2010, C-49.
[127] Memorandum of Understanding between the Republic of Liberia, BSGR Guernsey, BSGR Guinea, BSG Resources (Liberia) Limited, and BSGR (Liberia) Limited, 15 April 2010, C-61.
[128] Letter from A. Avidan to M. Thiam with Endorsement from Thiam, 16 April 2010, C-50.
[129] Framework Agreement, 30 April 2010, C-1; SHA, 30 April 2010, C-2.
[130] Ministry of Justice Tribunal of the first instance, 14 June 2010, R-42.
[131] Framework Agreement, 30 April 2010, section 3, C-1.
[132] Vale's Statement of Case, paragraph 99.
[133] SHA, 30 April 2010, section 5.1, C-2; Saad First WS, paragraphs 10-12.

**R.    BSGR, Pentler and Various Contractors**

276.    The involvement of Mme. Touré with Pentler continued when, sometime in 2010, Mme. Touré moved to the United States. She remarried and had a child. While in the United States, Mme. Touré continued to receive payments from Pentler. The evidence in the case *USA v Cilins* established the following payments:[134]

276.1.    USD 149,970 on 21 July 2010;

276.2.    USD 100,000 on 27 July 2010; and

276.3.    USD 50,000 and USD 99,970 on 5 August 2010.

277.    In total, it is alleged that Mme. Touré received USD 2,136,391.02 from Pentler between 2010 and May 2012.[135] This amount does not include separate payments made by Cilins to a title company in the United States allegedly to make more payments to Mme. Touré.[136] It also excludes payments made pursuant to the agreements described in the following paragraphs.

278.    On 8 June 2010, Mme. Touré (in the name of Matinda) demanded that BSGR honour the contracts of 27 and 28 February 2008 which included the payment of USD 4 million and the transfer of 5% of shares in Blocks 1 and 2.[137] She denounced an attestation dated 2 August 2009 which stated that she had received USD 4 million for her 5% interest. BSGR claimed that this was an extortion attempt using forged contracts.[138] BSGR threatened to bring criminal and civil proceedings against her.[139] Mme. Touré withdrew the claims on 23 June 2010[140] and once again on 30 July 2010.[141]

279.    The 30 July withdrawal may have been linked to a series of agreements signed in July and August 2010 between Pentler and Mme. Touré:

279.1.    Pentler and Mme. Touré allegedly signed an agreement on 8 July 2010 whereby Mme. Touré would receive USD 5 million from Pentler. The payment was subject to the "proper implementation and functioning and the next stages of the operation conducted by our partners on the Simandou project in Guinea."[142] Of the five agreements detailed in this paragraph, there are two agreements that reference the Simandou project by name: the one referred to in this subparagraph and the one referred to in the following subparagraph. BSGR

---

[134] Cheque number 96 dated 27 July 2010, p. 191, **C-6**; Cheque number 97 dated 5 August 2010, p. 192, **C-6**; *see also USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, p. 3, **C-111**; *USA v. Touré Properties*, Complaint ¶ 25, Dkt. No. 1, 21 November 2014, **C-76**.
[135] *USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, dated 18 July 2014, p. 4, **C-111**.
[136] Vale's Statement of Case, paragraph 187.
[137] BSGR's Statement of Defence, paragraph 115; Document invalidating the claimed attestation of 2 August 2009, 8 June 2010, **R-55**.
[138] BSGR's Statement of Defence, paragraph 116.
[139] Letter from BSGR Guinea to N. Moussi, 20 June 2010, **R-56**.
[140] Letter from N. Moussi to BSGR, 23 June 2010, **R-57**.
[141] Annulment of the Document Invalidating the Claimed Attestation of 2 August 2009, 30 July 2010, **R-130**.
[142] Untitled Agreement between Mme. Touré and Pentler, 8 July 2010, p. 234, **C-6**.

alleges (based on Noy's written evidence) that the agreement referred to in this subparagraph is a forgery.[143]

279.2.   On the same date, Mme. Touré and Pentler appear to have entered into another contract. The Tribunal has been provided with a translation of this contract (which was disclosed by BSGR during the arbitration) but it has not seen the original.[144] Its terms are similar to those in the undated agreement described below at paragraph 279.5, but the amount to be paid was USD 5.5 million. The contract also specifically states that Mme. Touré "agree to delivery [sic] all the originals & copies of the documents and agreements signed with the company Pentler Holdings Ltd. & its partners with regard to the SIMONDOU project in Guinea".

279.3.   On 3 August 2010, Mme. Touré and Pentler signed an agreement under which she would receive an "extra sum" of USD 5 million over the next four years following the successful completion of the next stages of Pentler's activities in Guinea.[145] Matinda agreed to "refrain from making use of this document ... against company Pentler and/or its partners and/or its associates in Guinea." Mme. Touré agreed to take responsibility for "all actions taken in Guinea by any third party against Pentler and/or its associates".

279.4.   Yet another agreement, also signed on 3 August 2010, provided that Mme Touré would receive the sum of USD 5.5 million for her "participation in all activities conducted in Guinea."[146] Noy gave evidence that the two agreements of 3 August 2010 (which totalled USD 10.5 million) provided Mme. Touré with her share of the buyback money paid to Pentler by BSGR for the shares in BSGR Guinea BVI (i.e., 33% of USD 30 million).[147]

279.5.   An undated "Agreement" references Pentler's role in Guinea as "advisor and business provider" in the commercial, mining and medical fields and the contribution Matinda had made to Pentler's success in those areas. Under that agreement, in recognition of that contribution, Matinda would receive USD 3.1 million.[148] Noy has explained that this was the balance of the 5.5 million initially promised (2.4 million of which had already been paid).[149] This agreement also guaranteed the "absolute confidentiality" of all common business conducted in Guinea and that Matinda would not contact any of the Guinean companies with which they had collaborated. The agreement also formally terminated all previous contracts and obligations between the two parties. Finally, Matinda undertook responsibility for any "complaints, actions, concerns or any other requests" filed by Guinean institutions against Pentler.

---

[143] Noy First WS, paragraph 80.
[144] Contract between Matinda & Co. Ltd and Pentler, 8 July 2010, C-563.
[145] Untitled Agreement between Mme. Touré and Pentler, 3 August 2010, pp. 236-237, C-6.
[146] Contract between Pentler and Mme. Touré / Matinda, 3 August 2010, R-151.
[147] Noy First WS, paragraph 74.
[148] Undated Agreement between Pentler and Matinda/Mamadie Touré, pp. 239-240, C-6.
[149] Noy First WS, paragraph 77.

279.6.    There is also a statement confirming that Matinda had received USD 2.4 million from Pentler pursuant to a "collaboration agreement" signed in 2005.[150]

280.    By May 2010, BSGR had paid Pentler a total of approximately USD 30 million for its shares in BSGR Guinea BVI.[151] Two further payments totalling USD 4.5 million were made in August 2010 and March 2011 which were success fees due under the BSGR-Pentler Milestone Agreement.[152] Noy said in his First Witness Statement in this arbitration that:[153]

> Although we never formally transferred 33% of Pentler to Mamadie Touré, we felt we had entered into an agreement with her and therefore it was right to pay her. We had just received most of the $30 million agreed with BSGR for our share in BSGR (Guinea). I therefore calculated that a fair sum to pay Mamadie Touré for her share was around $10 million.

281.    It is also alleged that Mme. Touré received other payments from BSGR's consultants or intermediaries during 2009–2010, in particular from Boutros.

## S.    President Condé and the Revocation of Mining Rights

282.    During the second half of 2010, national elections were held to elect the President of Guinea. Following some controversy and a decision from the Supreme Court as to the result of the elections, Alpha Condé became the President of Guinea on 21 December 2010 ("Condé" or "President Condé"). In February 2011, President Condé decided that all iron ore from Simandou should be exported through Guinea.[154] Consequently, the GoG directed VBG to cease work on constructing the Conakry-Kankan passenger railway and refused to sign the *Protocole d'Accord* regarding that railway. The GoG also signalled its intention to reform mining practices so that the State would take a profit from all phases of mining activity.[155]

283.    In August 2011, the GoG established a new company called Société Guinéenne du Patrimoine Minier ("**SOGUIPAMI**") to hold the State's interests in mining projects and on 9 September 2011 a new Mining Code was introduced.[156]

284.    In October 2011, further to its earlier announcements that all ore should be exported through Guinea, the GoG formally advised VBG that it was not able to export iron ore extracted from Simandou Blocks 1 and 2 through Liberia.[157] Following this, on 4 October 2011, the GoG ordered VBG to stop all work in Guinea due to lack of proper authorisations and to produce its official documents and agreements with the GoG.[158] BSGR requested that the order to stop work be delayed by three months so that the relevant information and documents could be gathered. The GoG granted this request.[159] However, it also provided a long list of information and documents that BSGR was

---

[150] Undated Statement of Mme. Touré, p. 244, **C-6**.
[151] Tchelet First WS, paragraphs 61-62.
[152] Tchelet First WS, paragraph 62; BSGR's Statement of Rejoinder, paragraph 39.
[153] Noy First WS, paragraph 72.
[154] Vale Weekly Guinean Press Review, 28 February 2001, **C-214**.
[155] Policy Information for the Guinean Mining Sector, 10 February 2011, **R-67**.
[156] Mining Code 2011, 9 September 2011, **R-71**.
[157] Saad First WS, paragraph 20; Letter from Ministry of Mines to R. Saad, 11 October 2012, **R-68**.
[158] Letter from Minster of Mines to BSGR, 4 October 2011, **R-74**.
[159] Letter from Minster of Mines to BSGR, 31 October 2011, **R-75**.

required to produce within 30 days.[160] After further correspondence, BSGR responded in detail on 3 February 2012.[161]

285.    On 26 March 2012, a National Mining Commission ("**NMC**") with responsibility for mining titles was established by Presidential decree.[162] Two sub-committees were established by a further Presidential decree, dated 29 March 2012[163] – the Strategic Committee and the Technical Committee. The Technical Committee was the operational arm of the NMC, responsible for daily activities concerning issuance and withdrawal of mining permits.

286.    On 30 October 2012, the Technical Committee wrote to BSGR notifying it that it had learned of "several serious allegations concerning the manner in which BSGR obtained its Guinean mining titles" and that it had "decided to collect from [BSGR], in an adversarial proceeding, the information relevant to these allegations."[164] BSGR denied the allegations.[165]

287.    Following a further exchange of letters in May-June 2013,[166] the Technical Committee wrote to BSGR on 1 November 2013 repeating its allegations of bribery and misconduct.[167] Skadden Arps responded on behalf of BSGR on 8 December 2013 denying the allegations in detail.[168] Following previous requests from BSGR and Skadden Arps, the Technical Committee had provided some further documentation upon which it relied when making the allegations.[169]

288.    The Technical Committee held a hearing on 16 December 2013, which BSGR did not attend as it said it was concerned for the safety for its representatives.[170] Mme. Touré provided a written statement which formed part of the evidence relied upon by the Technical Committee,[171] but she was not called for oral questioning. On 21 March 2014, the Technical Committee recommended that VBG's rights be revoked.[172] The GoG consequently revoked VBG's mining rights on 19 April 2014.

289.    BSGR has alleged that the motivation for revoking BSGR's rights stems from President Condé's need to repay certain "backers" who provided logistical and financial assistance during the election.[173] BSGR has also alleged that other mining companies in Guinea that agreed to pay large sums to the GoG were exempted from the review process that stripped BSGR of its mining rights.[174] The Tribunal understands that the legality of the revocation of the mining rights, which according to BSGR was based on false allegations

---

[160] Letter from Minster of Mines to VBG, 17 November 2011, **R-76**.
[161] Letter from Veil Jourde to the Minister of Mines, 3 February 2012, **R-80**.
[162] Decree D/2012/041/PRG/SGG, 26 March 2012, **R-83**.
[163] Decree D/2012/045/PRG/SGG, 29 March 2012, **R-84**.
[164] Letter from the Technical Committee to BSGR, 30 October 2012, p. 1, **C-5**.
[165] Letter from BSGR to Technical Committee, 26 December 2012, **C-74**.
[166] Letter from Technical Committee to VBG Guinea, 7 May 2013, **C-194**; Letter from Skadden Arps to Technical Committee, 4 June 2013, **C-115**.
[167] Letter from Technical Committee to VBG Guinea, 1 November 2013, **C-196**.
[168] Letter from BSGR to Technical Committee, 8 December 2013, **C-206**.
[169] Letter from Technical Committee to VBG Guinea, 4 December 2013, **C-203**.
[170] BSGR's Statement of Defence, paragraph 160.
[171] Mme. Touré's Written Statement to the U.S. authorities, 2 December 2013, pp. 36-41, **C-6**
[172] Recommendation and Report of the Technical Committee, 21 March 2014, p. 5, **C-6**.
[173] BSGR's Statement of Defence, paragraph 170(iii).
[174] BSGR's Statement of Defence, paragraph 171.

of corruption in obtaining these rights, is the subject of its ICSID proceedings against the Republic of Guinea, which proceedings Vale refused to join.

## T.    Frédéric Cilins in the United States

290.    During the investigation by the Technical Committee described above, Cilins travelled to the United States to visit Mme. Touré. Cilins' first visit was in 2012 and this was followed by visits in March/April 2013. The purpose of these visits was allegedly to convince Mme. Touré to destroy certain incriminating documents (including the allegedly forged contracts between Mme. Touré and BSGR) in return for payment and to sign allegedly false affidavits regarding her dealings with BSGR.

291.    Mme. Touré was, by this stage, co-operating with the FBI, which launched a criminal investigation into BSGR's activities in January 2013. Several phone calls and meetings in March – April 2013 between Cilins and Mme. Touré were recorded and transcribed by the FBI.[175]

292.    Cilins was arrested and charged with obstruction of justice in April 2013. He pleaded guilty and was sentenced to 24 months imprisonment with three years' supervised release. He was also fined USD 75,000.

293.    The revocation of VBG's mining rights by the GoG on 19 April 2014 has put an end to VBG's mining operations in Guinea and led to the dispute between the Parties. As Vale refused to join BSGR and BSGR Guinea in the ICSID proceedings against the Republic of Guinea relating to the alleged unlawful revocation of BSGR Guinea's mining rights, the Parties concluded a share purchase agreement dated 13 March 2015 under which Vale exited from the joint venture.[176] Vale's shares in VBG were sold to BSGR for USD 1 and the Framework Agreement and SHA were terminated by mutual agreement of the parties, without prejudice to any disputes being arbitrated in the present arbitration which had been instituted by Vale on 28 April 2014. Allegedly, the share purchase agreement enabled BSGR Guinea to join the ICSID proceedings as BSGR Guinea, by virtue of that agreement, became a (directly or indirectly held) wholly owned subsidiary. Prior to the share purchase agreement, it was majority controlled by Vale which had 51% of its share capital.

---

[175] See Transcripts contained in Recommendation and Report of the Technical Committee, 21 March 2014, Exhibit 3, **C-6**.
[176] Share Purchase Deed between Vale S.A., BSG Resources Limited & VBG – Vale BSGR Limited, 13March 2015, **C-487**.

## IV.    SUMMARY OF THE PARTIES' POSITIONS

### A.    Claimant's Position

#### 1.    <u>Vale's Allegations</u>

294.    Vale's makes three alternative claims in this arbitration:

294.1.    Vale claims that BSGR made fraudulent misrepresentations during the due diligence phase of contractual negotiations which induced Vale to enter into the joint venture with BSGR. Vale seeks relief in the form of rescission of the Framework Agreement and the SHA and damages in the amount of USD 1.45 billion (plus interest); or

294.2.    Vale claims that BSGR breached certain warranties provided in the joint venture agreements. Vale claims damages of USD 1.45 million (plus interest) for this breach; or

294.3.    Vale seeks a declaration that the Framework Agreement and the SHA are discharged by frustration, with restitution in the amount of USD 1.45 billion (plus interest).

295.    In addition, Vale seeks an order for costs (plus interest) and any other relief that the Tribunal deems just and proper.

296.    At the September 2016 Hearing, the Chairman sought clarification from Vale's Counsel as to the relationship between the three alternative claims described above. The Tribunal sets out the relevant extract from the transcript:

THE CHAIRMAN:    Before you continue, if I may interrupt, can you explain to us what the relationship is between these three different freestanding causes of action? Is one an alternative cause of action, an alternative prayer for relief, as to the former one? You want us first to rule on fraudulent misrepresentation. If the end result is, dismissed, then we go to breach of warranty. If the end result is, dismissed, then we go to frustration? Is that how we have to see that relationship?

MR KELLY:    Yes, Mr Chairman, that certainly may be one way of approaching the legal analysis. In practice, you will be looking at the same facts with each of those different legal cloaks on on those facts. So the fraudulent misrepresentation, if we cannot prove that BSGR was dishonest, that cause of action falls away. Into its place steps breach of warranty, which doesn't require dishonesty for these purposes. That requires an objective assessment of what the contract meant and what in fact happened. If that falls away, you look at frustration. Then you look at what were the circumstances and events surrounding the frustrating event, the revocation of the licences, and, to an extent, you then may have to look back at the involvement of one or other of the parties and whether they provided for it in their contract.

THE CHAIRMAN:    It is the same question again, so to clarify, the road map for the Tribunal requested by Claimant is: first look into our

fraudulent misrepresentation cause of action, then look into breach of warranties, and then only then look to frustration. Is that how we need to understand the relationship between the three causes of action?

MR KELLY:          Correct.[177]

297.    The factual basis upon which Vale makes the above claims is that, from 2005 onwards, BSGR directly and indirectly engaged in bribery and corruption to obtain mining rights in the Simandou area of Guinea. BSGR then lied repeatedly to Vale during the joint venture due diligence process so as to hide all indications of such conduct, thereby inducing Vale to enter into the joint venture and invest significant amounts of money to buy a participation and to fund the joint venture's operations. As a result of the alleged misconduct, BSGR also breached warranties given in the joint venture agreements.

298.    Vale alleges – with the help of evidence uncovered during this case – that it has been able to trace illicit payments from BSGR to Pentler and its principals, and through them to other agents of corruption, including Mme. Touré and the former Minister of Mines, Mahmoud Thiam.[178]

299.    Specifically, Vale claims that BSGR (either itself or through intermediaries, agents or consultants) bribed these individuals, and the President himself, in order to gain their assistance in obtaining mining concessions in Simandou North and South and Simandou Blocks 1 and 2, as follows:

299.1.    Mme. Touré, the fourth wife of President Conté, who influenced her husband to award mining rights to BSGR. Vale alleges that Mme. Touré received millions of dollars in illicit payments in return for exercising her influence over the President and other officials in BSGR's favour. She also provided access to the President for BSGR. In addition to the payments, she allegedly received a 5.88% indirect interest in BSGR Guinea through Pentler and other gifts, such as two Land Cruisers in July 2008.[179]

299.2.    Mohammed Thiam, Minister of Mines from 2009-2010. Vale submits that Thiam oversaw key steps in confirming BSGR's rights prior to the signing of the Base Convention granting BSGR the right to exploit Zogota (Simandou South). Vale contends that BSGR bribed Thiam to help "fend off Rio Tinto's challenges to BSGR's newly-acquired rights"[180] and to assist in attracting potential joint venture partners (including Vale). Vale alleges that Thiam helped to induce it to enter into the Framework Agreement and Shareholders Agreement with BSGR by providing assurances that the mining rights had been legally obtained. Vale submitted evidence that BSGR rewarded Thiam for his assistance through (a) the purchase of real estate in the US (funds to acquire a USD 3.75 million property at 771 Duell Road in Dutchess County, New York[181]), (b) reimbursement for travel and (c) payments totalling approximately USD 23,000. According to BSGR's own witnesses these payments "would have been

---

[177] Transcript, Educatory Hearing, Day 2, p. 161, line 18 – p. 162, line 25.
[178] Vale's Statement of Reply, paragraph 4.
[179] Vale's Statement of Reply, paragraphs 594 and 877.
[180] Vale's Statement of Reply, paragraph 878.
[181] Vale's Statement of Reply, paragraph 879.

connected to work that BSGR was doing with Mr Thiam" and indeed "likely" related to BSGR's mining rights;[182] and

299.3.    President Conté was given gifts by BSGR, including:

299.3.1.    a gold watch presented by Oron inlaid with Steinmetz diamonds, which had an approximate value of USD 60,000;[183]

299.3.2.    a miniature Formula 1 car plated in gold and diamonds was presented to President Conté by Struik and another such car had been previously given to Souaré (Minister of Mines) who also gave the car to the President.[184]

## 2.    Fraudulent misrepresentation

300.    According to Vale, much of the alleged corruption was facilitated through intermediaries such as Pentler (a BVI company) sold by Onyx to Noy, Cilins and Lev Ran in 2006. Vale alleges that, during the joint venture due diligence phase, BSGR should have disclosed the role that Pentler and its principals played in obtaining the mining rights but did not do so. In particular:

300.1.    Pentler and its principals should have been disclosed as BSGR's consultants, agents and/or intermediaries.

300.2.    Contracts between BSG entities and Pentler should have been included in the data room. These include the BSGR-Pentler Milestone Agreement, the Shareholders Agreement, the Share Purchase Agreement and the Settlement Agreement.

300.3.    Pentler should have been revealed as the "minority shareholder" of the BSGR Guinea BVI shares that were the subject of the USD 22 million buyback.

300.4.    The assistance Pentler provided in obtaining the mining rights should have been revealed.

301.    Vale alleges that BSGR deliberately hid the role of Pentler by restructuring the BSG Group so as to remove entities from the group that had contracted directly with Pentler. However, Vale contends that the due diligence questions were broad enough to have required BSGR to disclose Pentler's interest in the mining rights (through its shareholding in BSGR Guinea BVI) and the role it played in securing those rights.

302.    Vale also relies on BSGR's direct relationship with Mme. Touré, which it says is evidenced as follows:

302.1.    Avidan stated in his written evidence in this case that he made a point of meeting with Mme Touré on many occasions and contemporaneous emails from Avidan described her as one of the "key people" in Guinea for advancing BSGR's plan to obtain mining rights. This is supported by Mme. Touré's

---

[182] Vale's Statement of Reply, paragraph 878.
[183] Vale's Statement of Reply, paragraphs 351 and 632.
[184] Vale's Statement of Reply, paragraphs 357 and 632.

attendance at many of the key meetings between BSGR and the President of the Republic of Guinea. Vale alleges that Mme. Touré was responsible for arranging many of these meetings.[185]

302.2.    Three contracts between BSGR and Mme. Touré (dated 20 June 2007, 27 and 28 February 2008 respectively) which Cilins attempted to get Mme. Touré to destroy in 2013. Vale rejects BSGR's assertions that these contracts were forgeries, and notes that BSGR's records show that it produced company stamps around the time the February 2008 contracts were signed.[186] Vale points out that the contracts were signed in duplicate, which accounts for any discrepancies in the place and date of signing,[187] and that Cilins' efforts to get the contracts destroyed also supports the conclusion that they were genuine.[188]

303.    According to Vale, other consultants involved in the alleged corruption included Fofana[189] and Boutros[190]. Vale alleges that both gentlemen assisted in making payments to Mme. Touré for her services in assisting BSGR to gain mining rights in the Simandou. Neither the roles played by these men nor any contracts between them and BSGR entities were disclosed by BSGR during the due diligence phase.

304.    Vale submits that other misrepresentations made by BSGR during the due diligence phase included representing that:

304.1.    all relevant consulting agreements had been disclosed;

304.2.    all relevant documents and information relating to the share capital and ownership had been disclosed;

304.3.    all requested contracts, including those incapable of performance within six months of date of entry and contracts otherwise than at arm's length had been disclosed;

304.4.    all material settlements and potential litigation had been disclosed;

304.5.    no BSGR personnel/shareholder or their families were Government Officials;

304.6.    BSGR was not involved in the Government's decision to revoke Rio Tinto's mining rights;

304.7.    BSGR had no financial or business relationship with any Government Official or spouse;

304.8.    BSGR had not made any payments to Government Officials in connection with obtaining the mining rights; and

---

[185] Vale's Statement of Reply, paragraph 8.
[186] Vale's Pre-Hearing Written Submissions, paragraph 97.
[187] Vale's Statement of Reply, paragraphs 418 and 428.
[188] Vale's Statement of Reply, paragraph 484.
[189] See paragraphs 461-467 for the discussion on whether Fofana provided consulting services to BGSR.
[190] See paragraphs 429-458 for the discussion on whether Boutros provided consulting services to BGSR.

304.9.   BSGR had not engaged in bribery or corruption.

305.   Vale sets out the legal test for fraudulent misrepresentation and addresses each element in turn. Vale emphasises that these misrepresentations were made by BSGR deliberately to hide its corruption and to induce Vale to enter into the joint venture. Vale asserts that it relied on the statements and would not have entered into the joint venture had the relevant information been disclosed. Vale's witnesses confirm that, had the company been made aware of the "red flags" or indicia of corruption that existed, Vale would not have entered into the joint venture regardless of whether corruption had been proven. In this regard, Vale's counsel argued that the Tribunal was not required to make a positive finding of corruption in order for Vale to succeed on its fraudulent misrepresentation claim, [191] it was sufficient that the disclosure of the information would have caused Vale not to enter the joint venture due to heightened risk.

306.   In support of its position, Vale emphasises the importance of the due diligence exercise during the contract negotiation phase of Project Hills. It says that Vale's due diligence was designed to uncover red flags or indicia of bribery and corruption and that Vale insisted that BSGR represent, certify, warrant, and covenant that it had not engaged in bribery or corruption.

307.   Although Vale contends that the Tribunal is not required to make a finding of corruption in order to uphold its causes of action, Vale nonetheless submits that the evidence it has produced is sufficient to satisfy its burden of proving that corruption did occur. In particular:

307.1.   Cilins' conviction in the United States for obstruction of justice, based on recorded conversations with Mme. Touré, where she was asked to destroy incriminating documents and to lie about her association with BSGR.

307.2.   Contracts between Pentler and Mme. Touré and between BSGR and Mme. Touré for the payment of substantial sums of money in return for her assistance in obtaining the mining rights.

307.3.   Witness accounts of Mme. Touré's attendance at meetings regarding the mining rights and her influence over her ailing husband.

307.4.   Records of payments made to Mme. Touré, Pentler and others for which BSGR has provided no plausible explanation. For example, Pentler received around USD 34.5 million from BSGR, which cannot be explained by the limited role BSGR suggests Pentler played in introducing BSGR to the initial opportunity.

308.   Vale requests that, as a result of these fraudulent misrepresentations, the Tribunal rescinds the Joint Venture Agreements and upholds its damages claims.

### 3.   Breach of Warranty

309.   BSGR also gave a number of warranties in the Framework Agreement and the SHA which Vale alleges were breached, based on the same facts as those supporting the misrepresentation allegations above. The warranties include:

---

[191] Transcript, Educatory Hearing, Day 2, pp. 145-148.

309.1.   Section 2.1 of Schedule 4 to the Framework Agreement: "The information in [the] [Framework] Agreement, Disclosure Bundle and Disclosure Letter is accurate in all material respects".

309.2.   Section 3.1 of Schedule 4 to the Framework Agreement: "The business of each BSGR Guinea Group Company has been carried out in compliance with all Applicable Law".

309.3.   Section 3.2 of Schedule 4 to the Framework Agreement: "no BSGR Guinea Group Company is aware of the existence of circumstances which represent a real threat that any Relevant Permit […] is likely to be revoked".

309.4.   Section 3.5 of Schedule 4 to the Framework Agreement: No corrupt payment was made to a Government Official.

309.5.   Section 3.6 of Schedule 4 to the Framework Agreement: No violation of the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions was committed.

309.6.   Section 4.2 of Schedule 4 to the Framework Agreement: "No litigation [or other proceedings] are threatened or pending by or against any BSGR Guinea Group Company […] which would adversely affect any BSGR Guinea Group Company in the performance of its obligations under [the] [Framework] Agreement".

309.7.   Anti-corruption warranties contained in Section 16.1 of the SHA.

## 4.   Frustration

310.   Finally, Vale submits it is entitled to a declaration that the joint venture agreements have been frustrated because of the revocation of VBG Guinea's mining rights, and that it is entitled to recovery from BSGR of monies paid under those arrangements. Vale argues that since the mining rights have been revoked, it is no longer possible for the joint venture agreements to be fulfilled, through no fault whatsoever of Vale. It suggests those agreements are therefore frustrated, relieving Vale of any further obligations it would have under them and entitling Vale to recovery of monies paid to date by Vale thereunder.

## 5.   Response to BSGR's Defences

311.   Vale makes a number of submissions in relation to BSGR's defences:

311.1.   Vale addresses BSGR's submission that it was under no duty to disclose Pentler because of the limited scope of Vale's due diligence requests, that it was indeed advised not do so to by its legal counsel (Skadden Arps) and that in any case Pentler was implicitly disclosed. Vale asserts that BSGR not only failed to disclose the existence of Pentler, but also took affirmative steps to hide any connection between itself and Pentler or its principals.[192] Vale also submits that BSGR's reliance on Skadden Arps' alleged advice was not credible.[193] It

---

[192] Vale's Pre-Hearing Written Submissions, paragraphs 143-155.
[193] Vale's Pre-Hearing Written Submissions, paragraphs 156-157.

suggests BSGR's claim that Pentler was "disclosed" implicitly further evidences BSGR's obfuscation.[194]

311.2.    Vale submits that BSGR failed to produce any evidence suggesting a legitimate reason for granting Pentler a 17.65% interest in the mining rights, let alone making a payment of such a large sum for that interest.[195]

311.3.    Vale submits that BSGR's arguments regarding Mme. Touré's lack of credibility are meritless. Vale has provided evidence in support of its assertion that Mme. Touré has not profited from testifying in the US Department of Justice criminal investigation.

311.4.    Vale asserts that BSGR's "internal investigations" expose rather than disprove BSGR's involvement in corruption. The investigations were "deeply flawed" as they were commissioned by BSGR and the investigators were on BSGR's payroll.[196]

## 6.    Quantum

312.    Vale's claim for the recovery of USD 1.45 billion is based on the following breakdown of costs and monies paid:[197]

312.1.    USD 500 million paid for a 51% participation in the joint venture;

312.2.    USD 781 million in loans provided to VGB as operating funds (this includes loans totalling approximately USD 581 million, plus interest of USD 199 million as at 29 April 2014);

312.3.    USD 85.4 million to fund the feasibility study;

312.4.    USD 80.5 million costs relating to personnel, travel, services, and other costs incurred by Vale to support the joint venture's operations outside of Guinea in 2010-2013.

313.    Vale provided the above funding through its indirect subsidiary company Vale International SA incorporated in Switzerland. The shares in VBG were held by Vale's direct subsidiary, Vale GmbH. Vale provided the funding pursuant to its obligations under the Framework Agreement which specifically authorised Vale to provide the funds through a subsidiary if it so chose.

## B.    Respondent's Position

314.    BSGR refutes Vale's allegation that it engaged in bribery or corruption, or any wrongdoing whatsoever, in connection with obtaining the Simandou mining rights. BSGR asserts that the Republic of Guinea lawfully granted BSGR mining rights to Simandou North and South and Blocks 1 and 2. The withdrawal of these rights was brought about by the establishment of a new Mining Code introduced by the newly elected President

---

[194] Vale's Pre-Hearing Written Submissions, paragraphs 158-162.
[195] Vale's Pre-Hearing Written Submissions, paragraphs 163-167.
[196] Vale's Pre-Hearing Written Submissions, paragraphs 171-175.
[197] Vale's Statement of Reply, paragraph 318.

Condé and facilitated in part by extortion attempts launched against BSGR, as well as Vale's decision to back out of the joint venture at a critical moment.

## 1.    Response to Vale's Allegations

315.    In response to Vale's claim of fraudulent misrepresentation, BSGR denies that its responses during the due diligence phase of Project Hills were inadequate, stating that there is no basis for the allegation that its representations were false, let alone fraudulently so. BSGR denies any ill-motive in selling a participation in its mining rights to Vale, instead claiming that, as a small entity, it was in need of funding, and Vale was incentivised to buy in order to challenge Rio Tinto's holdings at the time.

316.    BSGR sets out its reasons for not disclosing Pentler, or the roles played by Cilins, Noy, Lev Ran and Boutros, of whom BSGR argues were not "intermediaries", "agents" or "consultants" to BSG Group companies, as defined in the relevant questionnaires.[198] BSGR acknowledges that Fofana was a consultant and should have been disclosed, but says that the non-disclosure was inadvertent.

317.    BSGR also asserts that it did not take steps to hide Pentler's shareholding (as Vale suggests), and that its changes to the ownership structure had nothing to do with concealing Pentler.[199] BSGR argues that the questions put to it during the due diligence phase did not require it to disclose Pentler's former shareholding in BSGR Guinea BVI or the various agreements between BSGR Steel and BSGR Guinea BVI and Pentler.[200] BSGR notes that it did reveal the $22 million payment to Pentler as minority shareholder.[201] Lastly, BSGR asserts that, contrary to Vale's submissions, the award and buyback of Pentler's shareholding in BSGR Guinea BVI was commercially reasonable. According to BSGR, the allegation that the award of the shareholding and its subsequent buyback made no commercial sense is contradicted by expert evidence, and that the factual evidence shows that the buyback of Pentler's shareholding was reasonable – hence, Vale had originally expressed no concerns when it first discovered the payment.[202]

318.    BSGR disputes Vale's account of the factual background. In particular, it denies any significant association with Mme. Touré and asserts that the affidavit she provided to the Technical Committee was false.[203] BSGR categorically denies bribing Mme. Touré either directly or through Pentler.[204] BSGR distances itself from any relationship that Pentler may have had with Mme. Touré, stating that this involved other business interests quite separate from BSGR. It similarly distances itself from Pentler's MoU with Bah and I.S. Touré and Pentler's MoU with Daou.[205] Finally, BSGR alleges that the three contracts between BSGR and Mme. Touré's company (Matinda), adduced as evidence of bribery

---

[198] See BSGR's Statement of Rejoinder, paragraphs 32-61.
[199] See BSGR's Statement of Rejoinder, paragraphs 62-70.
[200] BSGR's Statement of Rejoinder, paragraph 71.
[201] BSGR argues that Vale's characterisation of Pentler as a minority shareholder to be disclosed is inaccurate (BSGR's Statement of Rejoinder, paragraph 74).
[202] BSGR's Statement of Rejoinder, paragraphs 75-86.
[203] BSGR's Statement of Rejoinder, paragraph 245.
[204] For a summary of BSGR's submissions on Vale's bribery case, see BSGR's Statement of Rejoinder, paragraphs 205-209.
[205] BSGR's Statement of Rejoinder, paragraphs 115-116.

before the Technical Committee, were forgeries and that it had never entered into any such contracts.[206]

319.    On BSGR's case, it had direct access to President Conté and did not need the assistance of Mme. Touré or I.S. Touré in this regard.[207] BSGR asserts that it obtained the mining rights in the Simandou area on its own merit, and its small size meant it could act quickly and decisively in developing the mining sites.[208] BSGR's commitment to building a trans-Guinean railway (from Conakry to the Eastern Guinean city of Kankan) also served as valuable consideration and made it an attractive proposition for the GoG.[209] It was for these reasons that the GoG decided to award BSGR the mining rights in the Simandou – not because of any misconduct.

320.    BSGR contends that Vale exaggerated the importance of the due diligence and other steps it allegedly took to ensure the mining rights in question had been obtained lawfully, and that in any event BSGR was obliging and honest in regard to these processes because it felt it had nothing to hide. BSGR conducted the due diligence process in good faith. BSGR also submits that documents were provided quickly and that Yossie Tchelet ("**Tchelet**") (Chief Financial Officer of BSGR) ensured Vale had unfettered access to all documentation in the BSGR Guernsey office (the agreed upon scope of the due diligence), which included documents relating to Pentler.[210] BSGR says that it relied on its legal advisers, Skadden Arps, who advised that Pentler did not have to be disclosed.[211]

321.    BSGR's position is that the GoG's withdrawal of BSGR Guinea's Simandou mining rights was without foundation. Because of BSGR's refusal to agree to the President's demand that it pay the Government USD 1.25 billion, the GoG decided to expel BSGR from the Simandou area.[212] BSGR points out that other companies paid the "bribe" and were not expelled. In addition, President Condé had promised to grant lucrative mining rights to his political backers in return for their assistance in rigging the 2010 President election. BSGR surmises that President Condé needed assets with which to reward these political backers.[213]

322.    According to BSGR, Vale used BSGR to gain access to Simandou and then tried to shake off the joint venture. BSGR submits that there is a strong body of evidence from Vale's disclosure demonstrating that Vale treated the joint venture as a last resort, having tried and failed "to get a slice of the Simandou action through other means".[214] BSGR suggests that it was always Vale's intention to enter into the arrangement to secure rights in Simandou, and then push BSGR out.

---

[206] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.
[207] Although BSGR states that I.S. Touré was "of occasional assistance in arranging meetings with government officials" (BSGR's Statement of Rejoinder, paragraph 95).
[208] BSGR's Statement of Defence, paragraph 25.
[209] BSGR's Statement of Defence, paragraph 87.
[210] BSGR's Statement of Rejoinder, paragraphs 3-5.
[211] BSGR's Statement of Rejoinder, paragraphs 25-28.
[212] BSGR's Statement of Defence, paragraphs 9 and 130.
[213] BSGR's Statement of Rejoinder, paragraph 246.
[214] BSGR's Statement of Rejoinder, paragraph 18.

323.    With regard to the Pentler contracts, BSGR submits that Pentler was a legitimate shareholder in BSGR Guinea BVI between 2006 and 2008. BSGR submits that its role was a valuable one, and thus it was paid a fair sum for its shares when it was inevitably bought out by BSGR.[215]

324.    BSGR denies any corruption, and asserts that Mme. Touré's affidavit is "demonstrably false",[216] that she had motivation to lie about her encounters with Cilins, and that, in any case, Mr Cilins acted on his own accord.[217] According to BSGR, its inability to cross-examine Mme. Touré is a serious impediment to the persuasiveness of her evidence and indicative of Vale's own mistrust of her as a reliable witness.

325.    BSGR refutes the allegation that it bribed Thiam (Minister of Mines in 2009–2010). It contends that Vale's evidence relating to the bribery of Thiam is speculative, and that evidence adduced from Government officials on the part of Vale is both irrelevant and biased (because such individuals are likely linked to President Condé's Government, BSGR's opponent in the ICSID proceedings).[218] BSGR states that Thiam acted properly in upholding BSGR's rights to Blocks 1 and 2 and that Thiam did not make payments on behalf of BSGR.[219] Thiam's limited involvement with BSGR (namely, his involvement in the joint venture negotiations and in BSGR's defence strategy) was in his own interests or in the interests of Guinea. BSGR says that it did not reward him in any way and that its continuing relationship with Thiam after his tenure as Minister of Mines ended is not evidence of any misconduct.

326.    BSGR asserts that it always followed appropriate payment approval processes. The gifting of a miniature Formula 1 car in a very public setting to Souaré (Minister of Mines 2006) provides no basis for Vale's allegation of BSGR's "broader pattern of bribery".[220] BSGR's investigations (namely, Daniel Pollak's 2012 review and the Freeh-Lieberman Report) were instigated in good faith, and not, as Vale alleges, mere "whitewash".[221]

327.    BSGR refutes Vale's submission that Steinmetz had ultimate control over BSGR and knew of the alleged corruption. BSGR states that Steinmetz was an advisor to BSGR, but was not an employee or director and had no control over the entity.[222] Steinmetz says that he did not travel to Guinea until 2008.[223]

**2.    Response to allegation of fraudulent misrepresentation**

328.    In relation to the Vale's claim for rescission and damages as a result of fraudulent misrepresentation, BSGR denies that any such misrepresentations were made:

328.1.    BSGR provides analysis for each representation made by BSGR, arguing that, when read in context, many of the statements are far from fraudulent, or even false. In cases where incorrect statements were provided, for example the

---

[215] BSGR's Statement of Defence, paragraphs 33-34.
[216] BSGR's Statement of Defence, paragraph 215.
[217] BSGR's Statement of Defence, paragraph 223.
[218] BSGR's Statement of Rejoinder, paragraphs 9-10.
[219] BSGR's Statement of Rejoinder, paragraphs 159-161.
[220] BSGR's Statement of Rejoinder, paragraph 197.
[221] BSGR's Statement of Rejoinder, paragraph 198.
[222] BSGR's Statement of Rejoinder, paragraphs 181-187.
[223] BSGR's Statement of Rejoinder, paragraph 191.

failure to disclose Fofana's role as a consultant, this was an inadvertent mistake and not sufficient to constitute a fraudulent misrepresentation. BSGR honestly believed that what it asserted was true.[224]

328.2.   BSGR reiterates that what is being represented must be fact, and not belief or opinion. BSGR provides legal authorities confirming that silence will not support an action for deceit and that the alleged representations must be precisely identified.[225]

328.3.   BSGR submits that Vale has failed to establish that BSGR knew the representations were false. Vale cannot simply assert that BSGR's "dishonesty is self-evident". BSGR asserts, with legal authorities, that:

328.3.1.   there is no liability where an agent did not have knowledge that the statement was false (but does not state which misrepresentations this assertion would be applicable to);

328.3.2.   a higher standard of proof than the normal "balance of probabilities" needs to be met. There is no English authority to support Vale's suggestion that this standard should shift from Vale to BSGR; and

328.3.3.   adverse inferences should not be drawn in favour of Vale.[226]

328.4.   BSGR submits in any case that Vale did not rely to the necessary degree on the representations. Even if the representations were shown to be false, Vale would have gone ahead with the joint venture anyway because it wanted access to the Simandou deposits.[227] BSGR refutes the legal authorities provided by Vale on this point, saying that Vale has misconstrued the cases, which suggest that the defendant's intention is relevant (and that in any case BSGR's intent to deceive has not been made out). BSGR contends that actual reliance must be shown by Vale and it is not sufficient for Vale to assert that, had it known the truth it would not have entered into the contracts.[228]

328.5.   To show reliance, BSGR asserts that Vale must prove that the representations played a causative part in inducing the contract - "the question of reliance is to be decided by asking whether the Claimant would have entered into the contract but for the misrepresentation being made, not for the misrepresentation having been false".[229] BSGR also argues that Vale is contractually estopped from arguing actual reliance on BSGR's alleged misrepresentations, because s 17.3(b) of the SHA holds that "representations" made by either party were superseded by the Agreement.[230]

328.6.   Finally, BSGR submits that Vale's loss was not caused by its reliance on the alleged misrepresentations, but by the GoG's political investigation and

---

[224] BSGR's Statement of Defence, paragraph 245.
[225] BSGR's Statement of Rejoinder, paragraph 273.
[226] BSGR's Statement of Rejoinder, paragraphs 308-363.
[227] BSGR's Statement of Defence, paragraph 251.
[228] BSGR's Statement of Rejoinder, paragraph 388.
[229] BSGR's Statement of Rejoinder, paragraph 393.
[230] BSGR's Statement of Rejoinder, paragraph 417.

revocation of the rights, which had nothing to do with whether Vale relied on the representations or not.[231]

### 3.   Vale's Requests for Relief

329.   In terms of remedies for misrepresentation, BSGR submits that Vale must elect either rescission and damages for fraudulent misrepresentation, or damages for breach of warranty.[232] In respect of Vale's claim for rescission, BSGR suggests such a remedy cannot be ordered because it is not possible to restore the parties to the position that they were in prior to the joint venture. BSGR would be unjustifiably worse off if the Agreements were rescinded because it no longer holds the mining rights.[233]

330.   In respect to Vale's claim for damages, BSGR contends that the correct measure of damages is the loss directly flowing from the representee's reliance on the allegedly false statements. Vale's claim is therefore inappropriate, as the losses claimed by Vale were not directly caused by the transaction, but by the GoG's decision to withdraw its mining rights.[234] As to Vale's wasted costs claim (to the amount of USD 779,184,381.21), BSGR says that to grant this sum would be premature because Vale may still seek to be further involved in mining activities in Guinea, in which case funding spent on the Feasibility Study will not have gone to waste.[235]

331.   Finally, BSGR contends that Vale failed to mitigate its losses.[236]

332.   In relation to specific amounts claimed, BSGR disputes the amounts as follows:

332.1.   Regarding capital equipment, BSGR says that Vale has failed to prove exactly what capital equipment was purchased. BSGR makes a similar evidentiary objection in relation to Vale's claim for personnel costs it says it incurred in Brazil.[237] These costs included those relating to a Swiss-based employee that Vale made available to the joint venture through a subsidiary – Vale International SA.

332.2.   BSGR asserts that Vale's compound interest claim "is wrong as a matter of English law".[238]

### 4.   Warranties

333.   BSGR refutes Vale's claim that the warranties provided in the Framework Agreement were untrue:

333.1.   BSGR says that Vale "goes on" at length to explain why the warranties were "untrue", yet it is unable to demonstrate, beyond broad unsupported assertions,

---

[231] BSGR's Statement of Defence, paragraph 252.
[232] BSGR's Statement of Defence, paragraph 255.
[233] BSGR's Statement of Defence, paragraph 257; BSGR's Statement of Rejoinder, paragraph 428.
[234] BSGR's Statement of Defence, paragraph 265.
[235] BSGR's Statement of Defence, paragraphs 266-267.
[236] BSGR's Statement of Defence, paragraph 269.
[237] BSGR's Statement of Rejoinder, paragraphs 458-459; BSGR's Statement of Defence, paragraphs 266-268.
[238] BSGR's Statement of Rejoinder, paragraph 464.

that BSGR was aware that any such matters were false, and that this is a "glaring omission in its case".[239]

333.2.   BSGR considers each warranty in its context and interprets the wording differently from Vale in order to refute Vale's allegations of breach. For instance, BSGR notes that some warranties went to future conduct (and that Vale's allegations are historical in nature), or that the warranty included the phrase "as far as BSGR is aware" and therefore the warranty was true at the time it was made.[240]

334.   Regarding remedies, BSGR submits that the purpose of damages in this instance would be to put Vale in the position it would have been in had the warranty been true, a notion that does not support Vale's claim for "lost expenditures" amounting to USD 1.45 billion. BSGR says that Vale cannot recover damages for wasted expenditure because these amounts would not have been recouped had the contract been performed given Vale's conduct which BSGR alleges led to all Liberian Transport Solution prospects being cut off.[241] BSGR also argues that Vale failed to mitigate its losses.[242]

## 5.   Frustration

335.   Finally, BSGR argues that a declaration of frustration is not an available remedy in this case. BSGR contends that the joint venture agreements were not frustrated because Vale has failed to make out bribery[243] and because, in any case, the *force majeure* clause in the Framework Agreement clearly anticipated present events.[244] BSGR also contends that it was foreseeable that a subsequent Guinean President might expropriate the mining rights – this being a risk that both parties took in contracting for those rights.[245] BSGR argues that any remedy under this head should be limited to the consideration paid directly to BSGR under the joint venture agreement.[246]

336.   Ultimately, BSGR requests the Tribunal to dismiss Vale's claims and award BSGR all costs, plus interest in BSGR's favour.

## 6.   BSGR's Counterclaims

337.   BSGR advances a number of counterclaims pursuant to which BSGR claims damages flowing from Vale's numerous alleged breaches of the joint venture agreements.

337.1.   Vale failed to take steps to resist the GoG's withdrawal of the mining rights[247] and failed to join the ICSID action against the GoG. More specifically, BSGR alleges that Vale breached its contractual obligations when it (i) failed to act in good faith and to promote the best interests of VBG; (ii) failed to exercise Vale's powers so as to give effect to the provisions of the joint venture agreements; (iii)

---

[239] BSGR's Statement of Rejoinder, paragraph 465.
[240] BSGR's Statement of Rejoinder, paragraphs 466-485.
[241] BSGR's Statement of Defence, paragraph 306.
[242] BSGR's Statement of Rejoinder, paragraphs 504-511.
[243] BSGR's Statement of Defence, paragraph 319. See also BSGR's Statement of Rejoinder, paragraphs 512-519.
[244] BSGR's Statement of Defence, paragraph 320.
[245] BSGR's Statement of Defence, paragraph 321.
[246] BSGR's Statement of Rejoinder, paragraph 525.
[247] BSGR's Statement of Defence, paragraphs 326-343.

failed to take reasonable and necessary steps to carry out the intended purpose of the joint venture agreements; and (iv) failed to enforce Vale's rights against a third party.

337.2.  Vale refused to pursue the Liberian Transport Solution, which was obviously in the best interests of VBG and necessary for the joint venture to succeed.[248] Refuting Vale's assertion that there is no causal connection between the LTS and the revocation of mining rights, BSGR asserts that it need not show that the GoG would not have revoked the mining rights but for Vale's breach of contract, because the GoG was acting as a third party when it made this decision. It is sufficient to show that there was a chance that the rights would not have been revoked had Vale's breach of contract not occurred. BSGR submits that, had the LTS been approved, the GoG would have been under significant diplomatic pressure not to interfere with VBG's mining rights as they were to allow profits to flow to Liberia as agreed.[249]

337.3.  Vale failed to comply with the Anti-Bribery Laws Solution ("**ABL Solution**"), a contractual mechanism intended to bring the parties together to find answers in the event of problems arising.[250] BSGR says that the ABL Solution was more comprehensive and even-handed than simply providing a right for Vale to dispose of its shares.[251]

337.4.  Finally, Vale failed to comply with notice provisions and instead commenced proceedings just five days after the mining rights were revoked.[252] In response to Vale's suggestion that BSGR had waived any right to object, BSGR contends that it did object at the first reasonable opportunity and therefore that it did not waive the provision.[253]

338.  BSGR also asks the Tribunal to declare that Vale is prohibited from participating in any tender for Simandou Blocks 1 and 2 because, amongst other reasons, English law prevents third parties to proceedings (in this case the ICSID proceedings) from taking action that would destroy the subject matter of the proceedings.[254]

339.  As noted in paragraph 144 above, BSGR did not pay its share of the deposit funds for the arbitration to the LCIA. The LCIA wrote to BSGR on 16 March 2017 stating that, in accordance with Article 24.4 of the LCIA Rules, BSGR's counterclaims would be treated as withdrawn. For this reason, the Tribunal does not need to address the Counterclaims in this Award.

340.  After a review of the Parties' respective positions, the Tribunal now moves to its discussion and analysis regarding Vale's claims. As indicated in paragraph 296 above, Vale indicated at the September 2016 Hearing that its prayers for relief were alternative to each other and suggested that the Tribunal first deal with its prayers for relief regarding fraudulent misrepresentation, then, if necessary, those regarding breach of warranty and,

---

[248] BSGR's Statement of Defence, paragraphs 344-348.
[249] BSGR's Statement of Rejoinder, paragraphs 581-598.
[250] BSGR's Statement of Defence, paragraphs 349-359.
[251] BSGR's Statement of Rejoinder, paragraphs 599-615.
[252] BSGR's Statement of Defence, paragraphs 370-373.
[253] BSGR's Statement of Rejoinder, paragraphs 625-636.
[254] BSGR's Statement of Rejoinder, paragraphs 616-623.

finally (but again, only if necessary), those based on frustration. The Tribunal will follow the ranking of Claimant's prayers for relief and, after discussing a preliminary jurisdictional issue (section V) below, in section VI of this Award deal with fraudulent misrepresentation, in part VII with breach of warranty and in section VIII with frustration.

## V.   PRELIMINARY JURISDICTION ISSUE

341.   Before turning to consider Vale's claims in this arbitration, the Tribunal addresses a preliminary jurisdictional point raised by BSGR in its counterclaims. Although BSGR's counterclaims have been treated as withdrawn (see paragraph 144 above), the Tribunal considers that it should nonetheless address this particular claim as it goes to the Tribunal's jurisdiction.

342.   BSGR has alleged that Vale failed to comply with the notice provisions in the SHA by commencing proceedings just five days after the mining rights were revoked.[255] Section 12 of the SHA states as follows.

> **Section 12. Dispute Resolution**
>
> In the event that either Party, acting reasonably, forms the view that the other Party has caused a material breach of the terms of any of the Ancillary Agreements or a breach of this Agreement or the Framework Agreement, then the Party that forms such a view <u>shall serve notice of the alleged breach on the other Party and both Parties shall work together in good faith to resolve any such alleged breach within 30 Business Days</u> of such notice and if any such alleged breach <u>is not so resolved, then a senior executive of each Party shall in good faith attempt to resolve any such alleged breach within the following 20 Business Days</u> of the referral of the matter to the senior executives. If no resolution is reached with respect to any such alleged breach in accordance with the procedures contained in this Section 12, then such matter will be referred to arbitration in accordance with Section 17.10. [emphasis added]

343.   At the outset, it is noted that the requirement to negotiate before commencing arbitration is found only in the SHA. It is not part of the arbitration clause which is contained in Section 17 of the SHA, but nonetheless features in the Section 12 "Dispute Resolution" clause and is therefore applicable to the Parties. The same provision has not been included in Section 16.10 of the Framework Agreement (as set out in paragraph 24 above). However, the clause states that it applies to disputes arising under the Framework Agreement as well as the SHA, therefore the Tribunal will consider the issue.

344.   Vale contended that BSGR had waived any right to object to jurisdiction by failing to object promptly and by participating in the proceedings.[256]   BSGR maintained that it raised its objection at the first reasonable opportunity (in its response to the request for arbitration) and therefore that it did not waive its right to object on the ground of non-compliance with Section 12.[257]

345.   Vale also initially argued that Section 12 was unenforceable for lack of certainty.[258] Vale did not pursue that argument in its Rejoinder to the Counterclaims, but reiterated that it

---

[255] BSGR's Statement of Defence, paragraphs 370-373.
[256] Vale's Statement of Reply, paragraphs 1095-1096.
[257] BSGR's Statement of Rejoinder, paragraph 636.
[258] Vale's Statement of Reply, paragraph 1092.

complied with the clause.[259] The Tribunal has reviewed the evidence which Vale relies on in support of its submission and sets out its own analysis below.

345.1.  During the early stages of the Technical Committee's investigation, there was a series of letters between the parties urging co-operation and discussing the way forward.[260] However, the Tribunal notes that no formal allegation of breach of contract was contained in these communications.

345.2.  However, by April 2013, both parties had involved lawyers and a further series of letters were exchanged between April and July 2013 which contained allegations of breach. Vale repeatedly asks BSGR to explain what happened in relation to the corruption allegations that had been raised by the Technical Committee and in the US proceedings against Cilins. BSGR's response was general denials that it had done anything wrong, but it did not address the specific issues raised by Vale.

345.3.  Specific details of these letters are set out below.

345.3.1.    A letter from Cleary Gottlieb, on behalf of Vale, dated 19 April 2013, states:[261]

"BSGR has repeatedly assured our client Vale, both in representations and warranties in the Framework Agreement and since that time... that BSGR did not engage in any bribery ... The statements in the criminal complaint [against Cilins] are directly at odds with these representations and assurances.

It is essential ... that BSGR promptly provide Vale with answers to the following questions regarding its activities ... [4 questions posed]

The matters alleged in the criminal complaint, if accurate, would constitute breaches inter alia, of the representations made by BSGR in ... the Framework Agreement and... would constitute fraudulent misrepresentation and deceit by BSGR.  It is therefore necessary that BSGR promptly address these matters, or Vale may be constrained to take action to protect its legal rights..."

345.3.2.    Skadden Arps responded on behalf of BSGR on 22 April 2013 with a short two paragraph letter stating that BSGR acknowledges the seriousness of the allegations against Cilins and that it has "stated publicly and to Vale that allegations of fraud ... are entirely baseless ... Accordingly, any action by Vale to protect its legal rights would be unnecessary and unfounded."[262] The letter did not refer or respond to any of the specific questions posed by Vale in its previous letter.

345.3.3.    Cleary Gottlieb replied on 23 April 2013 notifying BSGR that it had received a grand jury subpoena in the Cilins case and to formally notify BSGR "of potential Third Party Claims ... that will or are likely to result in

---

[259] Vale's Statement of Rejoinder on Counterclaims, paragraphs 148-149.
[260] Email from P. Rodrigues to A. Avidan et al., 26 November 2012, **C-188**; Letter from G. Chaim (Vale) to BSGR & VBG Guinea, 27 December 2012, **C-190**; Emails between A. Avidan, P. Rodrigues and C. Torres, 14-22 November 2012, **C-676**.
[261] Letter from Cleary Gottlieb to Skadden, 19 April 2013, **C-154**.
[262] Letter from Skadden to Cleary Gottlieb, 22 April 2013, **C-155**.

claims for breach of warranties under ... the Framework Agreement, and related claims".[263]

345.3.4.        Cleary Gottlieb wrote again on 7 June 2013 referring to BSGR's statements to the Technical Committee that certain documents were forgeries and of past attempts to blackmail BSGR.[264] The letter stated that it was "inexplicable" that BSGR had not previously informed Vale of these matters (including in response to Vale's 19 April letter) or raised them with the Technical Committee earlier, so as to dispel the allegations of corruption. Cleary Gottlieb reasserted the potential breach of warranty claims and reserved all Vale's rights.

345.3.5.        On 18 June 2013, Skadden Arps responded noting that Vale was "setting up a position for dispute" and defended its previous actions before the Technical Committee and in relation to Vale. It stated "BSGR has made (and continues to make) every effort to cooperate with your client... we would urge you to adopt a more constructive approach".[265]

345.3.6.        By letter dated 20 June 2013, Cleary Gottlieb reiterated Vale's "deep concern" that BSGR had never informed it of the allegedly fraudulent documents.[266] The letter stated that BSGR had still not responded to the questions posed in its letter of 19 April 2013 and that "Vale is entitled to specific answers to its questions", not just broad denials of wrongdoing. The letter concluded that "BSRG's response to Vale and its treatment of this matter remain highly unsatisfactory. Vale continues to reserve all of its rights..."

345.3.7.        Skadden Arps responded on 4 July 2013 stating at the end of its letter:[267]

> "Our client has sought to create an open and constructive dialogue with you in order to keep you informed of the CTRTCM's "review process". You have simply frustrated that and, given your stance, we do not see the utility of corresponding further on these issues."

345.3.8.        Finally, on 21 February 2014, Cleary Gottlieb wrote to Skadden Arps with reference to the proceedings against Cilins and the clear link to BSGR that has emerged from that evidence.[268] The letter states:

> "Despite many months of asking, we have yet to receive any convincing explanation on this subject. Accordingly, our client continues to reserve all of its rights with respect to potential breaches of the Framework Agreement and the Shareholders Agreement and fraudulent misrepresentations by BSGR in connection with its entry into those agreements."

---

[263] Letter from Cleary Gottlieb to Skadden, 23 April 2013, **C-156**.
[264] Letter from Cleary Gottlieb to Skadden, 6 June 2013, **C-157**.
[265] Letter from Skadden to Cleary Gottlieb, 18 June 2013, **C-158**.
[266] Letter from Cleary Gottlieb to Skadden, 20 June 2013, **C-159**.
[267] Letter from Skadden to Cleary Gottlieb, 4 July 2013, **C-160**.
[268] Letter from Cleary Gottlieb to Skadden, 21 February 2014, **C-164**.

346.    There are a number of other instances where the Parties and their related entities correspond on these matters, but the sequence of letters detailed above is the most directly relevant to whether the Section 12 obligation has been clearly fulfilled.

347.    Based on these letters, the Tribunal finds that:

347.1.    Although Section 12 of the SHA was not specifically referenced in any of these letters, the sequence of letters between the Parties (through their lawyers) fulfil Vale's obligation under Section 12 of the SHA to "serve notice of the alleged breach" and to "work together in good faith to resolve" the dispute.

347.2.    Vale's letters expressly state the alleged breaches giving rise to the potential dispute, as required by Section 12.

347.3.    Through these letters, the Parties engaged in discussion to try to resolve the dispute and put forward their own respective positions in relation to the dispute (including requests for more information). Both Parties eventually alleged that the other did not participate in the process in a satisfactory manner (while defending their own conduct). BSGR eventually abandoned the discussions.

347.4.    Although both Parties alleged at the time that the other Party was not engaging in the process satisfactorily, there is nothing in the letters that would justify a finding that Vale did not engage in discussions in "good faith" and was therefore in breach of the Section 12 requirements (and not entitled to commence the arbitration). The Tribunal considers that Vale's request for more specific information was a genuine attempt to resolve the concerns that had arisen regarding corruption. In its Rejoinder on the Counterclaims, Vale stated:[269]

> "BSGR complains that this correspondence did not "resolve" the dispute. If that is its concern, the point is acknowledged – Vale could do nothing further to "work together," much less "resolve" this dispute with BSGR given the extensive evidence of its corruption, combined with BSGR's blanket denials of those facts without any attempt to provide explanations."

347.5.    The letters described in paragraph 345 above were exchanged over a period of 11 weeks. The Tribunal is therefore satisfied that they fulfil the requirement of engaging in discussion for 50 working days (being 30 working days, plus 20 working days at senior executive level).

347.6.    Given the gravity of the allegations and the vast amounts of money which were at stake (which Vale had paid and BSGR received), as well as the fact that the letters were being written by partners in top international law firms, the Tribunal is satisfied that senior executives from both sides would have been involved in this process for the entire duration. Thus, the requirement to escalate the dispute to senior executives after 30 days was met. Failing an amicable settlement at executive level though the Parties' lawyers, Vale was entitled to institute arbitration proceedings immediately after the revocation of the mining rights by the GoG.

---

[269] Vale's Statement of Rejoinder on Counterclaims, paragraph 148.

348.    Finally, the Arbitral Tribunal does not read the language of Section 12 of the SHA as constituting a condition precedent preventing the institution of arbitration proceedings if the various steps of the multitier clause are not met. Rather, it interprets Section 12 as a roadmap for the Parties in case of a dispute outlining the steps to be followed to manage a dispute without elevating this dispute management technique to the level of a legally binding condition precedent affecting the admissibility of a claim or the jurisdiction of the Tribunal. This view is supported by the fact that Section 12 sits outside of the Arbitration Agreement found in Section 16 of the Framework Agreement and Section 17 of the SHA. In addition, Section 12 refers only to breach of contract and does not encompass Vale's causes of action based on fraudulent misrepresentation and frustration.

349.    Based on the above analysis, the Tribunal finds that Vale complied with the requirements of Section 12 of the SHA and dismisses BSGR's allegation in this regard.

## VI.    FRAUDULENT MISREPRESENTATION

### A.    Standard of proof

350.    Before considering the individual legal components of the fraudulent misrepresentation, deceit and non-disclosure causes of action, it is appropriate to start by considering the appropriate standard of proof that Vale has to meet in order to succeed in its claims of fraudulent misrepresentation and non-disclosure.

### 1.    The appropriate standard of proof is the "balance of probabilities test", albeit there should be a high evidentiary threshold before the Tribunal finds that BSGR had committed fraudulent activities

351.    Vale submits that the Parties are "agree[d]" that the "standard of proof applied by international arbitral tribunals when evaluating allegations of fraud and corruption is the "balance of probabilities" standard"[270] citing paragraph 346 of BSGR's Rejoinder.

352.    However, having read BSGR's Rejoinder, it is not clear to the Tribunal that agreement has been reached. In paragraph 346, BSGR states that "it is clear that the standard of proof to be applied to deceit claims, *in English law*, is the balance of probabilities". However, BSGR then goes on to state that "it is the common practice of arbitral tribunals to apply a higher standard of proof than the normal "balance of probabilities" in claims concerning fraud and other dishonesty".[271] The Tribunal considers this to be incorrect. While there is controversy as to a higher standard of proof in investment arbitrations, the standard of proof in English law in comparable cases involving serious allegations is that set out by the House of Lords in *Re H* [1996] AC 563. In the judgment of Lord Nicolls:

> Where the matters in issue are facts that standard of proof required in non-criminal proceedings is the preponderance of probability, usually referred to as the balance of probability. This is the established general principle. [...]. The balance of probability standard means that a court is satisfied that an event occurred if the court considers that, on the evidence, the occurrence of the event was more likely than not. When assessing the probabilities the court will have in mind as a factor, to whatever extent is appropriate in the particular case, that the more serious the allegation the less likely it is that the event occurred and, hence, the stronger should the evidence before the court concludes that the allegation is established in the balance of probability [...]. Built into the preponderance of probability standard is a generous degree of flexibility in respect of the seriousness of the allegation. Although the result is much the same, this does not mean that where a serious allegation is an issue the standard of proof required is higher. It means only that the inherent probability or improbability of an event is itself a matter to be taken into account when weighing the probabilities and deciding whether, on balance, the event occurred. The more improbable the event, the stronger must be the evidence before, on the balance of probability, its occurrence will be established.[272]

353.    Whilst subsequent decisions have on occasions added a slight gloss to the *Re H* test, the general trend of subsequent authorities is to apply the *Re H* test as expressed in the opinions.

---

[270] Vale's Pre-Hearing Written Submissions, paragraph 278.
[271] BSGR's Statement of Rejoinder, paragraphs 357-358 citing *Waughih Elie George Siag and Clorinda Vecchi v The Arab Republic of Egypt*, ICSID Case No. ARB/05/15, Award (4 May 2009), **RL-143**.
[272] *In Re H. and Others (Minors) (Sexual Abuse: Standard of Proof)* [1996] AC 563, 586, **RL-121**.

354.    *Re H* establishes that where the allegation is a serious one, the standard remains at all times the civil standard.

355.    However, given the gravity of the allegations raised (in *Re H*, allegations of sexual abuse, or, in the present case, allegations of fraudulent misrepresentation or non-disclosure), the Tribunal requires to be satisfied in accordance with the available evidence that it is cogent and commensurate with the gravity of the allegations.

356.    Put another way, is it more likely or probable than not that the defendant was guilty of fraud in its dealings with Vale and during the Clifford Chance interrogations? As the Court will be more likely than not to find no fraud, the evidence it expects to support a finding of fraud must therefore be somewhat stronger or more cogent – i.e. sufficient to tip the balance from being unlikely in the ordinary course of events to likely, or more probable than not probable.

357.    Although some later House of Lords decisions do put a slight gloss on *Re H* and express the test a little differently, it was made clear by Lord Hoffmann in *Home Secretary v Rehman* [2001] UKHL 47 [55] that the test is as set out in *Re H* that "cogent evidence is generally required to satisfy a civil tribunal that a person has been fraudulent or behaved in some other reprehensible manner. But the question is always whether the Tribunal thinks it more probable than not".[273]

358.    Given the ambiguity and the absence of any confirmation from BSGR, it would be inappropriate for the Tribunal to conclude that the Parties were *ad idem*. Nevertheless, having considered the parties' submissions, it is clear that the applicable standard should be the "balance of probabilities", albeit that "the fact that fraud is a very serious allegation may be relevant to the inherent probabilities of its occurrence, [though] it does not affect the standard of proof".[274] The Parties' dispute is governed by English law, which should inform the applicable standard, particularly in international commercial arbitrations with a London seat. In any event, it makes no difference. After careful examination of the Parties' positions [and the drawing of appropriate adverse inferences (see below)], the Tribunal is satisfied – as set forth below – that the evidence put forth by Vale is sufficient to meet even the "heightened evidential standard" put forth by BSGR.

    **2.    The burden of proof may be shifted in "special circumstances" where appropriate**

359.    Since the Tribunal has found – as to which further below – that Vale has satisfied its burden of proof in making good its claims, there is no need to consider whether this is an appropriate situation for shifting the burden of proof.

    **3.    The Tribunal is not precluded from drawing adverse inferences**

360.    Given that the allegations of civil fraud and corruption (which are notoriously difficult to prove) are at the heart of the Parties' dispute, it is unsurprising that Vale has sought to rely on numerous adverse inferences which it has requested that the Tribunal order. BSGR resists the drawing of adverse inferences, arguing that adverse references should

---

[273] *Secretary of State for the Home Department v Rehman (AP)* [2001] UKHL 47 [55], **CL-43**.
[274] Lord Mackay of Clashfern (ed), *Halsbury's Laws of England*, vol 76 (5th edn, LexisNexis 2013) [757], **RL-75**.