**EXHIBIT C-2**

not be drawn without "strong or [...] more cogent evidence".[275] Each adverse inference that Vale has argued for has been dealt with individually in the following sections as and when they arose. In this section, the Tribunal will simply deal with the Parties' dispute over the principles for drawing adverse inferences.

361.    As a general starting point, it cannot be doubted that the Tribunal has the power to draw adverse inferences wherever appropriate – this is a function of the broad discretion which the Tribunal possesses by virtue of the LCIA Rules 1998, the English Arbitration Act and the IBA Rules on Evidence.

361.1.    Article 14.2 of the LCIA Rules 1998 states: "Unless otherwise agreed by the parties under Article 14.1, the Arbitral Tribunal shall have the widest discretion to discharge its duties allowed under such law(s) or rules of law as the Arbitral Tribunal may determine to be applicable; and at all times the parties shall do everything necessary for the fair, efficient and expeditious conduct of the arbitration."

361.2.    Article 34(1) of the English Arbitration Act 1996 states: "It shall be for the tribunal to decide all procedural and evidential matters, subject to the right of the parties to agree any matter".

361.3.    Article 9.1 of the IBA Rules on Evidence states: "The Arbitral Tribunal shall determine the admissibility, relevance, materiality and weight of evidence."[276]

361.4.    Article 9.6 of the IBA Rules on Evidence states: "If a Party fails without satisfactory explanation to make available any other relevant evidence, including testimony, sought by one Party to which the Party to whom the request was addressed has not objected in due time or fails to make available any evidence, including testimony, ordered by the Arbitral Tribunal to be produced, the Arbitral Tribunal may infer that such evidence would be adverse to the interests of that Party."

362.    The question therefore is solely a matter of how this discretion should be exercised.

362.1.    Vale argues that the Tribunal's drawing of adverse inferences against BSGR is justified in light of BSGR's failure to adduce counter evidence where *prima facie* evidence of its involvement in corruption has been produced.[277]

362.2.    BSGR, on the other hand, argues that these adverse inferences should not be drawn for the following reasons.

362.2.1.    Since the gravity of a claim in fraud requires stronger or more cogent evidence than would usually be sufficient to satisfy the burden of proof, "[t]he drawing of adverse inferences is not available where

---

[275] BSGR's Statement of Rejoinder, paragraph 361.
[276] Note that paragraph 12 of Procedural Order No. 2 states: "The IBA Rules on the Taking of Evidence in International Arbitration (2010) may be referred to by the Tribunal as guidelines."
[277] Vale's Pre-Hearing Written Submissions, paragraph 284.

such evidence is not put before the tribunal",[278] otherwise the requirement would be undermined.

362.2.2.  Vale cites no English law which would allow the drawing of inferences in a fraudulent misrepresentation claim.[279]

362.2.3.  Adverse inferences must be specific inferences to specifically pleaded issues whereas Vale's sought-after inferences are of a general nature.[280]

362.3.  Vale makes the following points in response.

362.3.1.  BSGR's argument that adverse inferences should not be drawn without the Claimant first having provided strong and cogent evidence is "counter-intuitive to the rationale behind the drawing of adverse inferences."[281]

362.3.2.  It is clear from *The Commissioners of HMRC v Sunico A/S* (HC) (which was cited by BSGR) that English law allows for the drawing of adverse inferences.[282] There are also numerous arbitral cases where corruption has been found on the basis of "red flags" where direct exculpatory evidence was lacking, such as ICC Case No. 13914, Award of 2008, and *Metal-Tech Ltd v. Republic of Uzbekistan*, ICSID Case No. ARB/10/3 (2013).

362.3.3.  Vale *is* indeed requesting the Tribunal to draw adverse inferences in relation to specific issues.

363.  Having carefully considered the Parties' submissions, the Tribunal disagrees with BSGR's suggestion that Vale has to present strong and cogent evidence first before adverse inferences can be drawn in its favour. If Vale were able to compile such evidence then it would already have satisfied its burden of proof and would not need to rely on adverse inferences. Such a requirement would therefore defeat the purpose of adverse inferences altogether. To be clear, this does not mean that Vale is relieved from its evidential burden completely. While adverse inferences may be used to strengthen a party's case, they must build on a foundation of existing evidence which may not quite get the party over the line. This is in line with the English Court's approach in *Wisniewski v Central Manchester Health Authority* [1998] PIQR 324 (CA), cited in *The Commissioners of HMRC v Sunico A/S* (HC):

(1)  In certain circumstances, a court may be entitled to draw adverse inferences from the absence or silence of a witness who might be expected to have material evidence to give on an issue in an action.

(2)  If a court is willing to draw such inferences, they may go to strengthen the evidence adduced on that issue by the other party or to weaken the

---

[278] BSGR's Statement of Rejoinder, paragraph 361.
[279] BSGR's Statement of Rejoinder, paragraph 362.
[280] BSGR's Statement of Rejoinder, citing *The Commissioners of HMRC v Sunico A/S* [2013] EWHC 941 [98], **RL-46** (emphasis added).
[281] Vale's Pre-Hearing Written Submissions, paragraph 286.
[282] Vale's Pre-Hearing Written Submissions, paragraph 286.

evidence, if any, adduced by the party who might reasonably have been expected to call the witness.

(3)    **There must, however, have been some evidence, however weak, adduced by the former on the matter in question before the court is entitled to draw the desired inference: in other words, there must be a case to answer on that issue.**

(4)    If the reason for the witness's absence or silence satisfies the court then no such adverse inference may be drawn.[283]

364.    In other words, a case cannot be built solely on adverse inferences. However, in the Tribunal's view, where the body of evidence adduced by Vale is sufficient to establish a *prima facie* evidence of BSGR's corruption, then appropriate adverse inferences may be drawn to strengthen Vale's case. Whether or not this condition has been met has been considered below in the context of the specific adverse inference that is sought.

365.    A feature of these arbitration proceedings is that they have been conducted largely by default since September 2016 hearing. In the absence of the BSGR's full participation, the Tribunal has carefully reviewed, as discussed below, any adverse inferences to be drawn from BSGR's failure to cross-examine Claimant's witnesses and expert at the evidentiary hearing of February 2017.

366.    Further, the Tribunal also finds that adverse inferences may be drawn in fraudulent misrepresentation claims. This was accepted by Proudman J in *The Commissioners of HMRC v Sunico A/S* (HC) when she stated that "[i]f I do accept HMRC has shown a *prima facie* case to answer, the effect of adverse inferences can be to strengthen that case."[284] In fact, she holds that "[the principles in *Wisniewski v Central Manchester Health Authority*] are especially applicable in cases which raise serious allegations of wrongdoing against a defendant."[285] This approach has been adopted in international arbitrations, as seen in *Metal-Tech Ltd. v. Republic of Uzbekistan.*[286]

367.    Finally, the Tribunal notes that the parties are agreed on the existence of a specificity requirement in drawing adverse inferences.[287] Having carefully considered each of the adverse inferences requested by Vale, the Tribunal is satisfied that they have been framed with sufficient detail except as discussed below.

## B.    Elements of the tort of deceit

368.    Having dealt with the appropriate standard of proof that Vale has to meet, the Tribunal now turns to consider the individual elements of the tort of deceit.

369.    The elements of the tort of deceit were summarised by Lord Justice Jackson in the English Court of Appeal:

---

[283] *Wisniewski v Central Manchester Health Authority* [1998] PIQR 324, 340, in *The Commissioners of HMRC v Sunico A/S* [2013] EWHC 941 [91] (emphasis added), **RL-46.**
[284] *The Commissioners of HMRC v Sunico A/S* [2013] EWHC 941 [99], **RL-46.**
[285] *The Commissioners of HMRC v Sunico A/S* [2013] EWHC 941 [92], **RL-46.**
[286] *Metal-Tech Ltd v. Republic of Uzbekistan*, ICSID Case No. ARB/10/3, Award (4 October 2013), **CL-44.**
[287] Vale does not dispute BSGR's argument that adverse inferences must be specific inferences in relation to specific pleaded issues but merely responds that this is "precisely" what Vale is requesting the Tribunal to do (Vale's Pre-Hearing Written Submissions, paragraph 287).

What the cases show is that the tort of deceit contains four ingredients, namely:

(i)     The defendant makes a false representation to the claimant.

(ii)    The defendant knows that the representation is false, alternatively he is reckless as to whether it is true or false.

(iii)   The defendant intends that the claimant should act in reliance on it.

(iv)    The claimant does act in reliance on the representation and in consequence suffers loss.

Ingredient (i) describes what the defendant does. Ingredients (ii) and (iii) describe the defendant's state of mind. Ingredient (iv) describes what the claimant does.[288]

370.   In its Statement of Case, Vale argues that, so long as the Tribunal finds that "bribery or corruption by or on behalf of BSGR occurred (as the evidence shows it did) the legal dominoes fall inexorably in Vale's favour".[289] However, BSGR disputes each of the elements, and so they will have to be taken in turn.

### 1.   The allegation that BSGR made numerous false representations to Vale

371.   During the negotiations prior to the formation of the joint venture, BSGR, at Vale's insistence, provided Vale with multiple representations via eight principal means:

371.1.   BSGR's responses to the Compliance Due Diligence Questionnaire;

371.2.   BSGR's responses to the Supplemental Compliance Due Diligence Questionnaire;

371.3.   BSGR's responses to the Follow Up Due Diligence Request List;

371.4.   BSGR's responses to the Legal Due Diligence Questionnaire;

371.5.   BSGR's responses to the Financial Due Diligence Questionnaire;

371.6.   Certifications provided by David Clark on behalf of BSGR and by Steinmetz;

371.7.   Interviews with BSGR principals conducted by Clifford Chance; and

371.8.   Pre-contractual discussions between the parties (e.g. between Alex Monteiro and Tchelet).

372.   These representations covered a wide range of subjects. Some were addressed directly and specifically to bribery and corruption, whereas others were designed to uncover indicia or red flags of bribery. Vale's position is that, either individually or taken as a collective representation (that BSGR had obtained the mining rights lawfully and without engaging in any bribery or corruption), BSGR had made false representation(s) to Vale.

---

[288] *Eco3 Capital Ltd and others v Ludsin Overseas Ltd* [2013] EWCA Civ 413 [77], **CL-8**.
[289] Vale's Statement of Case, paragraph 269.

373. BSGR's main defence is a factual one – it asserts that its representations were true. However, BSGR also raises arguments which seek to characterise its representations as ones that are incapable of grounding a fraudulent misrepresentation claim, namely:

   373.1. a statement of belief or opinion cannot constitute a misrepresentation;

   373.2. silence cannot found an action in the tort of deceit; and

   373.3. the representations pleaded by Vale are insufficiently precise to ground a fraudulent misrepresentation claim.

374. If BSGR is correct, these arguments would have a significant impact on how each representation is viewed, and so it is here that the analysis of those arguments proceeds.

   (a)    _**A statement of belief or opinion can constitute a misrepresentation**_

375. It is trite law that a representation must be one of fact. As _Clerk & Lindsell_ note, "a mere statement that one thinks a given state of affairs exists is not a statement that it does in fact exists: it follows that it cannot engender liability in deceit on that basis".[290]

376. However, it is also settled law that a statement of opinion may still be sufficient to found a tort of deceit, provided that "the deceit is in the fact that the opinion was not, or not honestly, held or in some further implicit dishonest misrepresentation of fact to be derived from the statement of opinion".[291] Both Parties accept this.[292]

377. The dispute between the Parties as to whether a statement of opinion can found a misrepresentation appears to have been caused by ambiguity in Vale's Statement of Reply, where it argued that "it was reasonable for Vale to understand and proceed on the basis that the opinion [Avidan's statement that Steinmetz and Balda were so focused on reputational risk that they would not allow improper activities to take place] was based on factual knowledge that no improper activities had taken place." BSGR argues that Vale has not made any attempt to justify its position that it should be inferred that Avidan's statement of opinion contained an implied assertion of fact that there had been no "improper activities".[293] BSGR then says that "Avidan's statement of opinion [could at most be said to contain] an implied assertion that he knew of no improper activities [which] is a much more limited representation."[294]

378. Vale, in its Pre-Hearing Written Submissions, clarified that its position is indeed that Avidan's statement "contained an implied representation of fact that he knew of no improper activities", and so this dispute has now fallen away.

---

[290] M Jones, A Dugdale and M Simpson (eds), _Clerk & Lindsell on Torts_ (21st edn, Sweet & Maxwell 2014) [18-13], **RL-38**, cited by BSGR's Statement of Rejoinder, paragraph 274.
[291] _AIC Testing Services (UK) Ltd (The Kriti Palm)_ [2006] EWCA Civ 1601 [255], **RL-3**.
[292] BSGR's Statement of Rejoinder, paragraph 284; Vale's Pre-Hearing Written Submissions, paragraph 256.
[293] BSGR's Statement of Rejoinder, paragraph 284.
[294] BSGR's Statement of Rejoinder, paragraph 284.

**(b)    Silence as compared to omission**

379.    In paragraphs 286 to 293 of its Statement of Rejoinder, BSGR asserts that silence will not support an action in deceit, citing *Clerk & Lindsell*,[295] *Cartwright*,[296] and *Peek v Gurney* (HL).[297] It then equates BSGR's "omissions" to silence,[298] concluding that Vale's case on BSGR's alleged "omissions" must fail.

380.    Vale agrees that silence, as a general rule, may not found an action in deceit. However, Vale submits that there are several recognised qualifications to that principle. The key exception that Vale seeks to rely on pertains to half-truths, where a fragmentary or partial statement together with an omission conceals the truth.[299]

381.    The Tribunal agrees with Vale. In *Peek v Gurney* (1873) LR 6 HL 377, 390 (HL), it was held that a representation could be founded on "a partial and fragmentary statement of fact, [if] the withholding of that which is not stated makes that which is stated absolutely false".[300] Vale says that it "does not allege that mere silence on the part of BSGR constitutes a representation of fact. Vale refers to "omissions" where specific enquiries were made of BSGR and BSGR made a representation of fact in response, but omitted to disclose certain information".[301] To the extent that BSGR has omitted to disclose certain information in response to specific enquiries, the Tribunal considers that there can be no doubt that such omissions can found the basis of a representation. Therefore, BSGR has misconstrued Vale's terminology. This distinction between silence and omission has been borne in mind by the Tribunal when reaching factual findings.

**(c)    Are the representations pleaded by Vale sufficiently precise to ground a fraudulent misrepresentation claim?**

382.    BSGR, in its Statement of Defence, argued that the alleged representations by BSGR that Vale sought to rely on in its Statement of Case were too vague to ground a fraudulent misrepresentation claim.[302]

383.    Vale, in its Statement of Reply, did not disagree that the representations had to be sufficiently clear and precise,[303] but cited *IFE Fund v Goldman Sachs International* [2006] EWHC 2887 (QB) (Comm) for the proposition that "[i]n determining whether there has been an express representation, and to what effect, the court has to consider what a reasonable person would have understood from the words used in the context in which they were used."[304] Judged in that manner, Vale submitted that BSGR's central misrepresentation was that BSGR had not committed bribery or corruption in obtaining the mining rights, and this is what BSGR's statement would objectively have meant to

---

[295] M Jones, A Dugdale and M Simpson (eds), *Clerk & Lindsell on Torts* (21st edn, Sweet & Maxwell 2014) [18-06], **RL-43**.

[296] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [3-03], **RL-21**.

[297] *Peek v Gurney* (1873) LR 6 HL 377, 390, **RL-115**.

[298] BSGR's Statement of Rejoinder, paragraph 286.

[299] Vale's Pre-Hearing Written Submissions, paragraph 258.

[300] *Peek v Gurney* (1873) LR 6 HL 377, 403, **RL-115**.

[301] Vale's Pre-Hearing Written Submissions, paragraph 260.

[302] BSGR's Statement of Defence, paragraph 235.

[303] Vale's Statement of Reply, paragraph 897.

[304] *IFE Fund v Goldman Sachs International* [2006] EWHC 2887 (QB) (Comm) [50], **CL-55**.

Vale at the time. Vale also set out a list of specific statements that it relied on to constitute misrepresentations.[305]

384.  In response, BSGR asserted that there was nothing in *IFE Fund v Goldman Sachs International* that suggested that, in deciding what an express representation means, one should depart from the actual words used and look to the general gist or the "central misrepresentation". BSGR also argued that the fact that all the alleged misrepresentations were made in a commercial context, at arm's length, and with the significant involvement of lawyers, meant that BSGR's representations must be strictly confined to the words used, and more general implications should not be drawn from them.[306] In addition, BSGR noted that Vale had only set out a list of the specific statements that it was relying on in the Statement of Reply, which is said begged the question of why, "if they were as important to Vale's decision to enter into the agreements with BSGR as Vale says, and if they were so obviously untrue [...] they were overlooked in the initial pleadings."[307]

385.  Vale did not see the need to make a further response in its Pre-Hearing Written Statement and chose to simply rely on its list of representations, which it contended would make it evident that its pleadings were sufficiently clear.

386.  From the above narration of the Parties' arguments, it is clear that the Parties do not disagree over the need for specificity in defining the representations and merely contest whether or not this requirement has been satisfied. The Tribunal has already found that Vale has defined the representations it is relying on in sufficient detail during its discussion on adverse inferences at paragraphs 360 to 367 above. This is equally applicable to this section.

387.  The Tribunal does not accept that BSGR intended to place much weight on its rhetorical question doubting (a) the importance placed by Vale on the alleged misrepresentations; and (b) Vale's current belief in their untruthfulness. At best, this constitutes a passing comment to be taken into consideration in ascertaining Vale's reliance on BSGR's representations, but, even in that context, it is hard to see how the mere fact that Vale did not explicitly mention certain representations in its Statement of Case can be given much weight.

### 2.   BSGR made representations that were false

388.  Having rejected each of BSGR's legal arguments, the Tribunal now turns to consider the nub of the Parties' disagreement – the alleged truthfulness or falsity of BSGR's representations. Given the numerous misrepresentations Vale has alleged, these have to be considered individually and in the light of the factual background that the Tribunal has set out in Section III above and further in this section below.

### *BSGR's representation that it had not used any agents, intermediaries and consultants in the process of obtaining the mining rights*

389.  During the due diligence phase, BSGR represented that it had not used any consultants, agents or intermediaries in obtaining the mining rights (other than those specifically

---

[305] Vale's Statement of Reply, paragraphs 820-883.
[306] BSGR's Statement of Rejoinder, paragraph 304.
[307] BSGR's Statement of Rejoinder, paragraph 306.

referenced). Vale submits that BSGR knowingly and deliberately failed to disclose the roles of certain persons whom it says were consultants, intermediaries and/or agents assisting BSGR to obtain the mining rights in Guinea. The Tribunal analyses the relevant evidence below and sets out its conclusions.

*i.    The representations made by BSGR as to the non-use of consultants and agents*

390.    In the First Compliance Due Diligence Questionnaire, Vale requested the following information: "[p]lease indicate if the BSG Group used any intermediaries to interact with the Government of Guinea in relation to BSG Group's efforts to obtain the Concessions."[308]

391.    "BSG Group" was defined as BSGR Guernsey, BSGR Guinea (the local subsidiary that owned the mining rights) and two Liberian companies, BSGR (Liberia) Ltd and BSG Resources (Liberia) Ltd, which were involved in the Liberian element of the project. It excluded BSGR itself as well as the – at the time – former subsidiaries of BSGR that had contracted with Pentler (BSGR Steel and BSGR Guinea BVI), as indicated by the red circle in the diagram below. This diagram represents a convenient point of reference, prepared by the Tribunal, based on uncontroversial facts in the record showing the BSGR structure.



392.    In response, BSGR stated that all concessions were gained through "formal application in writing" and that "BSGR Guinea did not use any intermediary in its application process nor during any further discussions with the CPDM."[309] BSGR specifically referenced the

---

[308] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, p. 5 (Question III.F), **C-30**.

[309] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, p. 5 (Question III.F), **C-30**.

exploration licences for Simandou North and South, Simandou Blocks 1 and 2 and the bauxite permits.

393.  The First Compliance Due Diligence Questionnaire also asked BSGR to "identify any consultants, representatives, agents, brokers, or other intermediaries (collectively, "Consultants") retained by or acting on behalf of the BSG Group (directly or indirectly) in connection with the Simandou project or Project Hills."[310] In response, BSGR disclosed three names (Ian Cope, WSP and Bateman Engineering), followed by "etc." and referred Vale to the Section 1K contracts in the data room.

394.  In the Supplemental Compliance Due Diligence Questionnaire, BSGR was asked to "identify the entire local advisory team, including counsel, public relations advisors and lobbyists, retained by or acting on behalf of the BSG Group (directly or indirectly) in connection with the Simandou project, Project Hills or the Liberian project (collectively "Consultants")."[311] In response, BSGR named Mohammed Doumbia (local counsel) and some labour brokers who acted on behalf of the Guinean subsidiary. It did not name Cilins, Noy, Lev Ran, Fofana and Boutros.

    *ii.    Who were the alleged consultants?*

395.  Vale alleges that the following people were consultants, intermediaries or agents acting on behalf of BSGR: Cilins, Noy, Lev Ran (who were the main shareholders of Pentler), as well as Fofana and Boutros. The relationship between BSGR or any BSG Group company and these individuals (or Pentler) was not disclosed at any stage during the due diligence process.

396.  Vale states that it deliberately defined the term "Consultant" broadly in its Questionnaires, using it as a "catch-all term for all [...] third parties" that "directly or indirectly, were used by BSGR in connection with its mining activities in Guinea."[312] The term included consultants, representatives, agents, brokers, or intermediaries acting directly or indirectly in connection to Project Hills.

397.  This definition was further broadened in Vale's Supplemental Compliance Due Diligence Questionnaire to include "the entire local advisory team, including counsel, public relations advisors and lobbyists, retained by or acting on behalf of the BSG Group."

    *iii.    Contracts between BSGR and Pentler*

398.  In order to assess whether Pentler or any of its principals (Cilins, Noy or Lev Ran) was a consultant, intermediary or agent for BSGR, the Tribunal first considers the content of the various agreements between BSG entities and Pentler (or its principals). The following extracts from contracts between Pentler and BSGR entities refer to the services that Pentler would provide to BSG Group companies:

---

[310] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, p. 6 (Question IV.A), **C-30**.
[311] Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, p. 6 (Question IV.A), **C-43**.
[312] Kleinfeld WS, paragraph 33; Vale's Statement of Reply, paragraphs 93-94.

Milestone Agreement

"Pentler has agreed to continue its efforts to reach an agreement for Blocks 1 and 2 and assist in acquiring these blocks for the Simandou Iron Ore Project, and assist in any possible manner with the Simandou Iron Ore Project"

Share Purchase Agreement (clause 6)

"The Consultant (Pentler's shareholders) will continue to advise and act as consultant for the period of 5 years from signing date hereof to the best interest of [BSGR Guinea BVI]"

Shareholders Agreement (clause 4.2.2)

"BSGR Steel shall be entitled to call upon Pentler to provide such services and to assist BSGR Steel in its functions from time to time and Pentler undertakes to provide any such assistance to BSGR Steel as and when reasonably required by BSGR Steel and always on the basis that Pentler shall be entitled to remuneration in respect of any such services provided on a cost recovery basis only, (i.e. Pentler shall be entitled to be reimbursed all direct costs incurred by Pentler in providing any such services)"

399. In the Tribunal's view, the above extracts suggest, at first glance, that Pentler and its shareholders agreed to provide consultancy services to BSGR in Guinea.

400. BSGR defends its non-disclosure of the above agreements (or the role played by Pentler and its shareholders) by stating that:

400.1. The BSG companies that were party to these agreements were not included within the definition of "BSG Group" as contained in the due diligence questionnaires.

400.2. In any case, none of the services provided by Pentler or its principals were consulting services,[313] nor did Pentler (or any of the named individuals) act as an intermediary for BSGR.[314]

400.3. Neither Pentler nor any of its principals was involved in BSGR's applications for exploration permits.[315] While Pentler's principals made initial introductions, they were not involved in the application process (either for Simandou North and South or Simandou Blocks I and 2).[316]

400.4. The clause in the Share Purchase Agreement that referred to consulting services was "intended as a form of restrictive covenant"[317] and Pentler's shareholders did not actually provide any services pursuant to this clause.

---

[313] BSGR's Statement of Defence, paragraph 58.
[314] BSGR's Statement of Defence, paragraph 102.
[315] BSGR's Statement of Rejoinder, paragraph 34.
[316] BSGR's Statement of Defence, paragraphs 102 and 237(ii).
[317] BSGR's Statement of Defence, paragraph 58.

> ***iv.*** *Did Pentler, Cilins, Noy and Lev Ran provide consulting services to BSGR?*

401.   Having identified the contractual framework between Pentler and BSGR, the Tribunal now records its findings as to the role played by Pentler and its principals – Noy, Cilins and Lev Ran – in applying for the relevant mining concessions included within Project Hills.

402.   It is generally agreed by the Parties that Noy and Lev Ran initially introduced BSGR to opportunities in Guinea for mining iron ore (and other minerals). However, it was Cilins that provided the main assistance "on the ground" in the initial stages of the project. The nature and extent of this assistance is not agreed by the Parties.

403.   The Tribunal observes that Cilins spent time in Guinea forming networks and relationships that he was then able to exploit to assist BSGR in obtaining the mining rights.

403.1.   In 2005, Cilins introduced BSGR to Bah and I.S. Touré, who became BSGR's local contacts.

403.2.   Cilins and Pentler cultivated a relationship with Mme. Touré. One of the issues in contention in this arbitration is whether Mme. Touré used her influence over the President to assist BSGR in obtaining the mining rights. There is no dispute, however, that Pentler and its principals had a relationship with her. Noy gave evidence that "Pentler had business relations with Mamadie Touré and later with her company, Matinda, in consumer goods, foods, pharmaceuticals and mining."[318]

404.   As set out in Section III above, the Tribunal finds that the actual assistance provided by Pentler and its principals to BSGR included the following.

404.1.   Noy introduced Oron to the Simandou opportunity in early-mid 2005.

404.2.   Cilins arranged and attended a meeting between Oron and the Minister of Mines in July 2005.

404.3.   Cilins, together with I.S. Touré, undertook research at the CPDM for BSGR in relation to the mining opportunities in Simandou (including the process for applying for permits). Noy stated at paragraph 39 of his First Witness Statement:

> At the time, BSGR did not have a presence in Guinea and so Mr Oron used Mr Cilins to get essential information from the CPDM and the Ministry of Mines. When Mr Cilins was not in Guinea, he would in turn ask Mr Touré to assist. A lot of this assistance comprised Mr Cilins or Mr Touré visiting the Ministry of Mines or CPDM to request geological information, such as maps of available deposits or geological studies, which they would in turn pass on to Mr Oron or to BSGR's geologists.

404.4.   Cilins also attended a meeting with the Minister of Mines, President Conté and BSGR in December 2005. It is noted that, through to at least mid-2006, Cilins appeared to attend every meeting that BSGR had with Guinean officials with

---

[318] Noy First WS, paragraph 8.

regard to mining opportunities. While BSGR has explained his attendance as being required for translation purposes (Struik did not speak French), it is clear that Cilins arranged these meetings and that he had the primary relationship with the Guinean officials attending such meetings. Struik described him as BSGR's "eyes and ears on the ground".[319]

404.5.    In early 2006, Noy and Cilins accompanied Oron to Guinea to assist him in finalising the MoU with the Government. All three men attended a meeting with representatives from the Ministry of Mines (and a lawyer from each side). Later that day, Noy and Cilins accompanied Oron to the Presidential palace to meet President Conté.[320] I.S. Touré and Mme. Touré were also present at this meeting.

404.6.    Cilins assisted in the negotiations of the 2006 MoU with the Government, including arranging and attending meetings and arranging BSGR's local legal counsel.[321] Noy gave evidence that he was also involved in assisting BSGR at this time and that he and Cilins paid local counsel on behalf of BSGR:

> Following the signing of the MOU, we requested the repayment of Mr Cilins' and my direct expenses relating to the MOU from BSGR. This related to local lawyer fees and other expenses incurred in the lead up to the signing of the agreement.[322]

404.7.    Cilins provided logistical advice and assistance, including sourcing and establishing a local office for BSGR in Conakry, Guinea.[323] He also assisted in hiring local staff for the office.[324]

404.8.    Cilins and I.S. Touré arranged for BSGR's geologists to visit the potential sites for which BSGR might apply for a permit. This included hiring helicopters to transport them to the field.[325] It appears that they may have used the President's helicopter for this purpose.[326]

404.9.    Together with Avidan, Oron and I.S. Touré, Cilins presented BSGR's mining plans for the Simandou project at a press conference held in conjunction with the official opening of the Conakry office in September 2006.

404.10.    For his work with BSGR, BSGR paid Cilins a monthly stipend of USD 10,000 from January 2006 to June 2006,[327] together with other payments described at paragraphs 410 and 413 below.[328] Noy also confirmed that BSGR paid Cilins a "consultancy fee" and reimbursed his expenses.[329]

---

[319] Struik First WS, paragraph 17.
[320] Noy First WS, paragraph 44.
[321] Noy First WS, paragraph 41.
[322] Noy First WS, paragraph 41.
[323] Noy First WS, paragraph 39.
[324] Avidan First WS, paragraph 13.
[325] Noy First WS, paragraph 39.
[326] See paragraph 190 above.
[327] Tchelet First WS, paragraph 31.
[328] See also Selected BSG Resources Guinea SARL Payments, 2006, **C-666**.
[329] Noy First WS, paragraph 42.3.

404.11.  While it is clear that Pentler and its principals played less of a role in BSGR's Guinea operations from 2007 onwards, Vale alleges that the role of Pentler and its principals did not cease at this time. For example, when BSGR was preparing to apply for its exploration permits for Simandou Blocks 1 and 2 in 2008, Cilins (along with I.S. Touré) helped to present BSGR's progress at Zogota (Simandou South) to the Ministry of Mines.[330] Vale also highlighted that, during 2008, BSGR made a number of payments to Pentler for which it has offered no invoices or explanations whatsoever.[331]

404.12.  Vale notes that:

> BSGR's entry into the joint venture with Vale did not mark the end of its close relationship with Pentler. BSGR continued to involve Pentler in its affairs; Pentler and Cilins worked on BSGR's behalf to broker a settlement with the GoG and to eradicate all evidence of their prior acts of corruption. BSGR's own witnesses confirm that Pentler lived up to its commitments "to continue to advise and act as consultant for the period of 5 years" under the Share Purchase Agreement by continuing to work closely with BSGR through April 2013, when Cilins was arrested in the United States.[332]

404.13.  In April 2012, Cilins travelled to Florida to visit Mme. Touré. The purpose of this visit was to convince her to sign a declaration denying that she ever received bribes or entered into illegal contracts regarding BSGR's activities.[333]

404.14.  Cilins travelled to Florida again in 2013 to meet Mme. Touré and offer her money in return for destroying documents related to BSGR. His conversations with her were recorded by the FBI (with Mme. Touré's co-operation).[334] As a result of these conversations, on 10 March 2014, Cilins pleaded guilty to obstructing a criminal investigation (being the investigation of BSGR). He was sentenced to two years' imprisonment and three years' supervised release.[335]

405.  Despite this long list of activities and the intensity with which Cilins worked on BSGR's project, BSGR has maintained throughout these proceedings that:

> Cilins was not involved in the application for exploration permits over Simandou North and Simandou South. He provided basic services to Struik such as delivering letters or documents and helping to find a house in Conakry. He assisted Struik with communication, as Struik had only a basic level of French. Cilins took no part in mining discussions.[336]

406.  BSGR also maintains that Cilins ceased to provide any assistance in Guinea at the end of 2006, and that Pentler played no part in the application for exploration permits over Blocks 1 and 2 in 2008.[337]

---

[330] Noy First WS paragraph 56.2; Vale's Statement of Reply, paragraph 91.
[331] Vale's Pre-Hearing Written Submissions, paragraph 50.
[332] Vale's Statement of Reply, paragraph 154.
[333] Affidavit of M. Touré, 27 April 2012, **R-114** (Vale disputes the authenticity of this document).
[334] Transcripts of recorded phone calls between Cilins and Mme. Touré, pp.71-188, **C-6**.
[335] *USA v. Cilins*, Superseding Information, Dkt. No. 60, 10 March 2014, **C-10**; *USA v. Cilins*, Plea Hr'g Tr., Dkt. No. 62, 10 March 2014, **C-150**.
[336] BSGR's Statement of Rejoinder, paragraph 34(2).
[337] BSGR's Statement of Rejoinder, paragraph 34(3).

407.   The Tribunal disagrees with BSGR's interpretation of the role played by Cilins and by Pentler more generally. The facts that the Tribunal has just set out in the preceding paragraphs belie BSGR's minimisation of Cilins' role, at least during the first 18 months of BSGR's venture into Guinea. Indeed, Avidan said in his First Witness Statement that:

> Mr Cilins told me that he had introduced BSGR to Guinea and he had assisted Mr Struik in establishing contacts and in dealing with a range of planning practicalities for the setting up of BSGR's offices. I think Mr Cilins had been in Guinea since the beginning of 2005. [...]: Mr Cilins kept talking about "his project" and that "he brought us over".[338]

408.   Others involved in the Project shared this perception. As noted above, Struik considered Cilins to be his eyes and ears on the ground in Guinea. Avidan gave evidence that the first time he met Mme. Touré she had told him that he "should not be there because Mr Cilins should be running things for BSGR."[339]

409.   The Tribunal considers that the importance of Cilins and Noy is further supported by an email from Struik to Oron dated 10 May 2006 in which Struik said:

> The Lady phoned Fred [Cilins] today (he is back in France) asking him whether I was happy now with these permits. Michael [Noy] also phoned me saying that we need to process the "first payment" now, hence the invoice attached (which I asked for).[340]

410.   The same email chain authorised a payment of USD 250,000 to FMA (a company owned by Cilins and Noy) in payment for "Fred [Cilins'] services and success fees".[341] The invoice itself indicated that the payment was for "Our assistance and consulting for acceptance of bauxite permits in Republic of Guinea."[342]

411.   The Tribunal notes that Cilins' role representing BSGR in 2006 extended to making payments on behalf of BSGR. Noy confirmed that:

> Mr Cilins offered to use his local bank account to cover some of BSGR's local expenses either before BSGR had its own local account or at times when BSGR personnel were not available to sign off on payments from BSGR's local company account. I believe that Mr Cilins also gave Mr I.S. Touré signing powers over his account for these purposes. When money needed to be transferred in this way, either BSGR would transfer money into Mr Cilins' account or Mr Cilins would lay out funds which would then be reimbursed by BSGR.[343]

412.   The evidence demonstrates that Cilins was integral to BSGR's operations in Guinea during the initial phase. Avidan's First Witness Statement confirms this conclusion:

> After Mr Cilins had left Guinea, I developed a closer relationship with Mr Touré. It took a while to gain his trust because he had been working closely with Mr Cilins until I asked Mr Cilins to leave, and I think he struggled to adjust to working with me at the beginning. He used to call Mr Cilins every time he felt he had an issue;

---

[338] Avidan First WS, paragraph 12.
[339] Avidan First WS, paragraph 37.
[340] Email chain between Y. Tchelet, R. Oron et al re: Invoice, 10-15 May 2006, p. 3, **R-179**.
[341] Email chain between Y. Tchelet, R. Oron et al re: Invoice, 10-15 May 2006, p. 2, **R-179**.
[342] Email chain between Y. Tchelet, R. Oron et al re: Invoice, 10-15 May 2006, p. 6, **R-179**.
[343] Noy Second WS, paragraph 6.

for example, if he felt he was not being paid enough he would complain to Mr Cilins about that.[344]

413.    Noy confirmed that Cilins was compensated by BSGR.[345] Aside from the monthly stipend paid to Cilins of USD 10,000, the evidence shows that payments of approximately USD 661,000 in consulting fees were paid to Cilins or to his associated companies – including Pentler.[346] This level of compensation does not accord with Noy's description of the limited role played by himself and his colleagues in BSGR's activities – "[o]ur role was limited to providing the initial information and logistical assistance required to put BSGR in a position where it could apply for exploration permits."[347]

414.    Noy further confirmed that, up until May 2007, Pentler paid for much of BSGR's local expenditure and then sought reimbursement from BSGR. For example, Pentler (or Cilins) paid for geologists, local lawyers, all work relating to renovating and equipping BSGR's offices in Conakry, helicopter hire, car purchases, travel expenses, security and costs relating to the camps set up on site.[348] These expenses were considerable.

415.    The Tribunal finds that the above evidence establishes that Pentler and, in particular, Cilins provided consultancy services to BSGR in relation to the application for exploration rights in the Simandou area.

416.    The role of Noy and Lev Ran was more limited, albeit that Noy was clearly the initial introducer of the mining opportunities in Guinea. The Tribunal considers that disclosure of the consulting role played by Pentler would have been sufficient to encompass the activities of Noy and Lev Ran undertaken in Pentler's name.

### v.    Were Pentler, Cilins, Noy or Lev Ran BSGR's agents?

417.    The Tribunal now turns to consider whether Pentler and/or Cilins were also "agents" of BSGR whom BSGR ought to have disclosed in the due diligence questionnaires (since BSGR was asked not only to disclose its *consultants* but also its *agents*: see paragraph 393 above). The Parties not having argued otherwise, the Tribunal notes that the following statement on the English law of agency should be uncontroversial:

> whenever one person, called the 'agent,' has authority to act on behalf of another, called the 'principal,' and consents so to act. Whether that relation exists in any situation depends not on the precise terminology employed by the parties to describe their relationship, but on the true nature of the agreement or the exact circumstances of the relationship between the alleged principal and agent.[349]

418.    In the Tribunal's view, the collective weight of the facts described above (in paragraphs 401 to 416) also justifies a finding of agency between BSG entities and Pentler (with Pentler's principals, in particular Cilins, as subagents). Pentler and Cilins were certainly authorised to do more than simply introduce opportunities to BSGR. They were authorised to communicate (speak and listen) on behalf of BSG parties with the GoG, to

---

[344] Avidan First WS, paragraph 22.
[345] Noy Second WS, paragraph 39.
[346] Crowe Howarth Agreed-Upon Procedures, 20 March 2016, p. 32, **R-367**; Crowe Horwath, "BSGR Resources Ltd.: Report on Agreed Upon Procedures", 29 January 2014, pp. 24-25, **C-812**.
[347] Noy First WS, paragraph 40.
[348] Noy Second WS, paragraph 38.
[349] Lord Mackay of Clashfern (ed), *Halsbury's Laws of England*, vol 1 (Lexis Nexis 2008) p. 1, **CL-90**.

organise and attend meetings, and to represent BSGR, if not negotiate the terms of the agreements. The role was more than being simply "eyes and ears", but Pentler was also to some extent a mouthpiece for BSGR during the early months of establishing the projects and obtaining the mining permits.

419.   The Tribunal reiterates once again the following facts which strongly support a finding of an agency relationship in the present case.

419.1.   The BSGR-Pentler Milestone Agreement effectively appointed Pentler as a negotiating – or at least communicating – agent for BSGR Guinea BVI. In return for a 17.65% interest in the mining concessions, Pentler agreed to "continue its efforts to reach an agreement for Blocks 1 and 2, and assist in acquiring these blocks for the Simandou iron ore project and assist in any possible manner with the Simandou iron ore project."

419.2.   According to BSGR's witnesses, Cilins "acted as the project liaison person on the ground in Conakry."[350] He was effectively BSGR's "eyes and ears on the ground" in Guinea[351] – he attended all meetings at which BSGR was present and made all pertinent introductions. BSGR used Pentler, and Cilins specifically, to "build relationships"[352] with the Ministry of Mines and CPDM and to assist in its applications for mining licences. The fact that Cilins fronted the relationship with the Government on behalf of BSGR meant that he was not just BSGR's "eyes and ears", but effectively also BSGR's "mouthpiece" in Guinea.

419.3.   Cilins was part of the BSGR delegation sent to meet the President in February 2006 when – according to BSGR's account – the President wanted to be introduced to BSGR. Cilins was also part of the BSGR team that presented BSGR's mining plans to the media in September 2006. Indeed, Cilins was present at all important events in Guinea involving BSGR during 2005 and the first half of 2006.

419.4.   Pentler / Cilins performed a number of tasks on behalf of BSGR. As described in paragraph 414 above, they engaged and paid subcontractors on behalf of BSGR.[353] Struik also used Cilins to "open bank accounts with local banks, to buy cars, to get insurance".[354] BSGR gave Cilins money for this purpose as is demonstrated by the email below.[355]

---

[350] Tchelet First WS, paragraph 31.
[351] Struik First WS, paragraph 17.
[352] BSGR's Statement of Defence, paragraph 31.
[353] BSGR Guinea, Copies of Emails and Correspondence in Respect of Payments, 2006-2007, **C-526**.
[354] Struik First WS, paragraph 41.
[355] Emails between F. Cilins, M. Struik, R. Oron et al., 19 June 2006, **C-240**.

----- Original Message -----
From: cw@cwfr.net
To: marc@bsgresources.com
Cc: roy@bsgresources.com
Sent: Monday, June 19, 2006 2:44 PM
Subject: Following Michael's meeting

Dear Marc,

Following Michael's meeting with Roy and Beny I would like you please to clarify to Roy that all the money that you are sending to my account in Conakry is destined for your needs and has nothing to do with any of my expenses, personal or professional.

All the money is used by you or Ibrahim and this account was created just to make life easier for you.

Best regards,
Fred

419.5.   Pentler / Cilins sourced BSGR's office in Conakry and facilitated the hiring of local staff on behalf of BSGR (for example, I.S. Touré). Cilins had the primary relationship with BSGR's local staff, as attested to by Avidan.[356] Cilins purchased equipment for BSGR.[357]

419.6.   During a brief encounter with Eduardo Etchart ("**Etchart**") (Vale's then-General Manager for Exploration in Africa) and Marco Monteiro (Vale's then-Country Manager for Guinea), Cilins represented that he was working for BSGR.[358]

419.7.   While Pentler entered into the Pentler-Bah and Pentler-Daou Milestone Agreements, it was BSGR that paid the success fees due under those Milestone Agreements directly to Bah, I.S. Touré and Daou. Merloni-Horemans (Director of BSGR) approved the Pentler-Bah and Pentler-Daou Milestone Agreements before they were signed by Pentler. The evidence suggests that Pentler was inserted as the signatory company, rather than a BSGR entity.[359]

419.8.   Developments that occurred after the mining rights were granted as set out below, although not necessary for the Tribunal's findings, corroborate the existence of an agency relationship with BSGR. According to Noy, when the GoG and President Condé were having difficulties with BSGR in 2012, representatives from Guinea came to Cilins (not to BSGR itself) to attempt to resolve the issues. Noy said:

> we arranged for [Mr. de Combret – representing the GoG] to meet with BSGR, in the presence of Mr Cilins. Following this first meeting, Mr de Combret exchanged numerous emails and phone calls with Mr Cilins. Mr de Combret suggested a range of proposals to resolve the dispute, including BSGR agreeing to give its entire 49% shareholding in VBG to the GoG; BSGR staying in the project and paying a settlement fee to

---

[356] Avidan First WS, paragraph 22.
[357] See Vale's Statement of Reply, paragraphs 105-107.
[358] Etchart First WS, paragraph 14.
[359] Vale's Statement of Reply, paragraphs 408-410. See Letter of Commitment, last modified on 17 January 2006, **C-652**; Sale and Purchase Agreement for Monital Investments Limited, 16 January 2006, pp. 207-210, **C-244**; Written Memorandum of the Sole Director of Monital Investments Limited, 17 January 2006, p. 212, **C-244**.

the GoG; and VBG granting the GoG a larger free carry in the Simandou project.[360]

Once again, Cilins appears to be placed in the role of communicating with others on behalf of BSGR.

419.9.    Cilins interacted with Mme. Touré in 2012–2013 on behalf of BSGR. The documents he was seeking to have destroyed included the contracts between Matinda and BSGR signed in February and July 2008. He told her that he was instructed – indeed had "strict orders"[361] – to witness the destruction of the documents in person and that he would have to report back on this.[362] She asked if "Beny" wanted them to meet and whether he agreed with giving her the money. Cilins answered "of course".[363] The conversation makes it clear that Cilins was acting on behalf of Steinmetz:

> Cilins: There will be the 5 [million dollars] and there will be the 800 [thousand dollars]... Depending on how it ends. If it's good for him, if we don't cut too right, left, I don't know, there will be more. I don't know how much. There will be 3, 4, 5 [million] more, I don't know. But there will be more. And that's the communication I was given directly by number 1, I don't even want to mention his name...
>
> Touré: Number one? Michael [Noy]?
>
> Cilins: No, no... Beny [Steinmetz] [whispering].
>
> Touré: Ok.
>
> Cilins: Ok? Everything I tell you is directly from Beny.[364]

Although Cilins "fronted" all of the interactions with Mme. Touré, the Tribunal finds that he was clearly doing so on behalf of BSGR – again as BSGR's representative.

419.10.    A recorded conversation between Thiam and Mebiame (a businessman from Gabon) also strongly suggests that Cilins was acting on behalf of BSGR in the United States:

> [Mebiame:] [...] BSGR sent me a delegation to Miami with a certain Frederic, who came to see me in Miami. "Listen, Samy, we know that you have some very interesting things that could help us, because we know that Conde is making life hard for you too, and let's try to put what we have together to fight back. But he was very clumsy...
>
> [Thiam:] This Frederic, is he French?
>
> [Mebiame:] Yes. He's French -one of their emissaries apparently.
>
> ...

---

[360] Noy First WS, paragraph 106.

[361] *USA v. Cilins*, Complaint, Dkt. No. 1, 15 April 2013, paragraph 20(o), **C-8**.

[362] *USA v. Cilins*, Complaint, Dkt. No. 1, 15 April 2013, paragraph 20(k), **C-8**.

[363] Recommendation and Report of the Technical Committee, 21 March 2014, p. 87, **C-6**.

[364] Recommendation and Report of the Technical Committee, 21 March 2014, p. 213, paragraph 22(a) and p. 134, **C-6**.

[Thiam:] Was he really sent by DSGR [sic]? Because ..

[Mebiame:] No idea.

[...]

[Thiam:] [...] So, it interests me to know if it's them who sent him. Because if that is the case, it means that the connections are still there, contrary to what they say.

[Mebiame:] Yes. Because - you see, it's very interesting ... But they were coordinated.

[Thiam:] Who and who? Frederic and...

[Mebiame:] [...] Asher [Avidan].

[Thiam:] OK.

[Mebiame:] They always knew what Walter had said to...

[Thiam:] To Frederic?

[Mebiame:] To Asher. Frederic knew everything we had said to Asher in London in our offices. So I understood that they were connected and that the company- in my opinion, as far as I can tell- is called Pentler: Pentler Holdings Limited. It's the company that started to... to negotiate with... with Mamadi.[365]

420.    The Tribunal recalls that some documents between Pentler and BSGR contain specific references that no agency relationship has been created. For example, the Pentler Shareholders Agreement states that it does not "make[] a Party the agent of another Party for any purpose. A Party has no authority or power to bind, to contract in the name of, or to create a liability for another Party in any way or for any purpose."[366]

421.    The Services and Cooperation Agreement (backdated to 15 October 2005 between Pentler and BSG Metals and Mining) calls the parties "independent contractors" and states that "[n]othing contained in this Agreement shall authorise or empower either Party to enter into any contracts or other commitments on behalf of the other."[367]

422.    Vale discounts these Agreements saying that both Agreements were backdated for convenience and notes that the Services Agreement offers no tangible benefit to either party. Vale calls the Agreements "meaningless "paper trail" documents that are devoid of any true substance, as apparent from the fact that they are both backdated by conspicuously long periods of time."[368] In the Tribunal's view, whether an agency relationship existed must be assessed on the facts of the case. Statements such as those found in the Pentler Shareholders' Agreement and the Services Agreement form part of the factual matrix, but cannot override or alter the actual relationship that existed on the facts. The Tribunal finds such agreements (especially when backdated) are not determinative as to whether an agency relationship existed.

---

[365] Transcript of Meeting between Minister of Mines M. Thiam and S. Mebiame, p. 10, **C-81**.
[366] Pentler Shareholders Agreement, 19 July 2007, section 12, **R-24**.
[367] Services Agreement, 15 October 2005, section 5.2, **R-23**.
[368] Vale's Statement of Reply, paragraph 135.

Finding that Pentler and Cilins were agents of BSGR

423.    Based on the facts the Tribunal has just set out, and for the reasons set out in paragraph 418 above, the Tribunal finds that the communication role played by Pentler, its principals and, in particular, by Cilins, is amply sufficient to demonstrate an agency relationship under English law. The surrounding factual circumstances strongly support this conclusion.

>    ***vi.***    *Did either of BSGR's agents/consultants (namely Pentler and Cilins) perform these services for a "BSG Group" Company?*

424.    BSGR states that any services provided by Pentler and its principals were not provided to a BSG Group company as defined in the various Due Diligence Questionnaires. As noted above, the companies included in the definition of BSG Group were BSGR Guernsey (established in 2009), BSGR Guinea (the local subsidiary that owned the mining rights) and certain Liberian entities.

425.    Pentler primarily dealt with BSGR Guinea BVI (in whom it held shares) and BSGR Steel. Both of these companies were removed from the Project Hills structure in 2009, prior to the commencement of the due diligence process.

426.    Vale contends that this restructure was deliberately undertaken to enable BSGR to hide the role of Pentler and its principals. When Vale broadened the Questionnaires to include BSGR itself and its subsidiaries (which at the time included BSGR Guinea BVI and BSGR Steel), BSGR undertook a further restructuring whereby BSGR Guinea BVI and BSGR Steel were transferred to a related company, and therefore were no longer direct subsidiaries of BSGR. According to Vale, this was to ensure that BSGR could avoid making any disclosures about BSGR Steel and BSGR Guinea BVI, or their relationship with Pentler. The sale of these entities in 2010 to BSG Metals and Mining occurred on the same day that BSGR received the Supplemental Questionnaire from Vale with the broadened definition.[369]

427.    Vale contends that neither the 2009 nor the 2010 restructure altered BSGR's obligation to disclose the consultancy / agency services provided by Pentler and Cilins.

428.    The Tribunal notes that the due diligence questions relating to consultants and agents are broadly framed. They require disclosure of any consultants and agents acting "on behalf of the BSG Group (directly or indirectly)."[370] In this respect, the word "indirectly" is relevant as it implies that consultants and agents retained by affiliates of BSGR other than those which were the subject of the BSG Group definition, would fall within the scope of the disclosure obligations and could not be avoided by the restructurings. Because of the word "indirectly", no finding is necessary to pierce the corporate veil of any of the entities outside the BSG Group.

429.    Moreover, the assistance provided by Pentler and Cilins was for the purpose of obtaining mining rights in Simandou, as stated in the Milestone Agreement between Pentler and BSGR Guinea BVI. It was BSGR Guinea – the local subsidiary company – that applied for and eventually obtained the mining licences. BSGR Guinea was a member of the

---

[369] Vale Pre-Hearing Written Submissions, paragraph 152; Emails between D. Cramer & S. Merloni-Horemans, 9-12 November 2012, **C-664**.
[370] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, p. 6, **C-30**.

BSG Group, as defined in the due diligence questionnaires. Given that Pentler and Cilins were working primarily to assist BSGR Guinea to obtain the mining rights, the fact that the BSGR-Pentler Milestone Agreement was with BSGR Guinea's (then) parent company does not preclude a finding that their "indirect" role should have been disclosed in response to the broadly framed questions.

430.    To conclude, the Tribunal finds that Pentler and Cilins rendered services for the primary benefit of BSGR Guinea and its parent companies, BSGR and (from 2009) BSGR Guernsey, on whose behalf they were acting. The Tribunal is satisfied that these services were provided – if not directly then at the very least "indirectly" – to BSGR Guinea, BSGR Guernsey and BSGR. It was BSGR Guinea that would ultimately benefit from the services provided by Pentler and Cilins by being granted the mining rights in the Simandou area. Similarly, Pentler and, in particular Cilins, acted as the agent for BSGR and its subsidiaries operating in Guinea. The role played by Pentler and Cilins should therefore have been disclosed by BSGR in response to the due diligence questionnaires.

### vii.    Did Ghassan Boutros provide consulting services to BSGR?

431.    Boutros was an engineer, originally from Lebanon. Boutros' company, Logistics & Maintenance Services S.à.r.l ("**LMS**"), specialised in services relating to telecommunications, electrical work, infrastructure, and equipment. Avidan described Boutros as BSGR's "main supplier in Guinea for machinery and various other equipment, including communications equipment".[371] Avidan also said he was a friend.[372]

432.    LMS was contracted by BSGR Guinea to provide certain services pursuant to a "Subcontracting and Service Provision Agreement" (the "**Boutros Contract**").[373] Under the Boutros Contract, LMS agreed to the following:

> LMS undertakes to provide all equipment, replacement parts and materials necessary to carry out the works.

> LMS has representatives throughout Guinea and shall provide technical intervention at any time and as quickly as possible in all BSG Resources camps.

> LMS shall maintain all electrical equipment, household appliances, IT hardware, VSAT installations and generating sets that have already been sold to BSG Resources, under its responsibility.

433.    The term of the Contract was one year. The "Payment" provision for the Boutros Contract was unusually vague for a services agreement. There was no mention of rates or payment amounts. It simply stated:

> Payment shall be made a maximum of 30 days after receipt of invoice, proven by acknowledgement of receipt, and after confirmation of the camp leaders, to the following bank account:

> LMS

> Banque populaire maroco guineen – Account: 21201714001-81

---

[371] Avidan First WS, paragraph 121.
[372] Avidan First WS, paragraph 122.
[373] Subcontract and Service Provision Agreement between LMS and BSG, **R-180**. The Contract is dated 2008, but no specific date is provided.

Payments to Boutros

434.   In 2009 and 2010, BSGR made several payments to Boutros. The details of these payments are set out below.

435.   A series of payments were made between 18 February 2009 and July 2009 totalling over USD 630,000:[374]

435.1.   These payments were made to the bank account at Banque Populaire 2110 1524 802 (not the account specified in the Boutros Contract).

435.2.   The payments were primarily for technical equipment, generator costs and siteworks. One invoice included a fee for "study complete / planning".[375]

435.3.   The invoices provided little detail of the breakdown of costs and were generally for rounded amounts – USD 100,000, USD 200,000 etc.

436.   On 18 August 2009, BSGR paid USD 1.3 million to Boutros which was described in BSGR's internal payment form as a "consulting fee".[376] Notable details about this payment include:

436.1.   It was paid into a different bank account number from the payments above (and different again from the account specified in the Boutros Contract).

436.2.   The fee was paid pursuant to an email instruction from Tchelet to Clark (Director of BSGR) and Helen Nicolle ("**Nicolle**") dated 17 August 2009 which stated:

Hi-these are the banking details to be used for the USD1.3million consulting fee payment to Ghassan.

You must enter these details NOT the regular ones-code to R1029/North/Consulting.[377]

436.3.   The invoice from LMS for this payment appears to have been rendered the following day (18 August) – the same day on which the payment was made. The invoice refers to two Caterpillar pieces of equipment and a USD 40,000 charge for generator running costs.[378]

436.4.   A hand-written note on the payment instruction directs that the fee should be removed from the "consulting" code and distributed amongst other codes.

437.   Another payment for USD 100,000 was made to LMS on 12 November 2009 pursuant to an invoice which listed a range of items, but provided no breakdown of costs (just a total of USD 100,000).[379] The invoice was dated 23 November 2009 – nine days after the payment was made.[380] Once again, the payment was initially labelled "consulting fees"

---

[374] See Tchelet First WS, paragraph 37 for detail. See also **R-181** to **R-186** for evidence of payments.
[375] Payment from BSGR Treasury Services to G. Boutros, 6 April 2009, **R-183**.
[376] Payment from BSGR Treasury Services to LMS, 18 August 2009, **R-187**.
[377] Payment from BSGR Treasury Services to LMS, 18 August 2009, **R-187**.
[378] Payment from BSGR Treasury Services to LMS, 18 August 2009, **R-187**.
[379] Payment from BSGR Treasury Services to LMS, 12 November 2009, **R-188**.
[380] Payment from BSGR Treasury Services to LMS, 12 November 2009, **R-188**.

but a handwritten instruction on the payment form directed that it should be allocated to other codes instead.

438.   Three months later, on 16 February 2010, an urgent "consulting fee" of USD 1 million was paid to Boutros.[381] The details of the payment are as follows.

438.1.   The payment was made on 16 February 2010, pursuant to an email on 14 February from Tchelet to Clark which stated:

> Hi Dave,
>
> BSGR Guinea needs to make payment tomorrow morning amounting to USD 1,000,000 (One Million United States Dollars) as consulting fees in respect of Ghassan Boutros.
>
> Please note that payment is extremely urgent.
>
> I suggest that you arrange the necessary funding.
>
> Please note that payment needs to be made to the banking details below.
>
> Regards
>
> Yossie[382]

438.2.   The payment was made into a different bank account to the previous payments, but once again, not the bank account contained in the Boutros Contract. It was made into a Belgian account bearing the name "Adama Sidibe" (Fortis Bank).

438.3.   An email dated 24 February 2010 from Tchelet to Clark and others attaches an invoice from LMS dated 18 January 2010 and states "Hi-attached is the supporting invoice relating to the recent payment to Ghassan as consulting fees last week, slight difference due to bank charges etc, for your records."[383]

438.4.   The invoice rendered by LMS was for USD 998,870. As indicated by Tchelet's email, this is slightly less than the $1 million that was paid. A hand-written note on the invoice (which appears to be from someone in BSGR) states "$1,130 Bank Charges".

438.5.   The invoice stated that the fee was for certain equipment, generator running costs and "works" completed at Zogota.

438.6.   As with the previous invoices, a hand-written instruction on the payment instruction sheet directs that the payment should be re-allocated from "consulting fees" to certain other codes.

439.   On 1 March 2010, a further payment was made to LMS for USD 300,000.[384] In a series of emails on 1 March, Clark insisted that the payment be made immediately to the Belgian

---

[381] Payment from BSGR Treasury Services to A. Sidibe, 16 February 2010, **R-189**.
[382] Payment from BSGR Treasury Services to A. Sidibe, 16 February 2010, **R-189**.
[383] Payment from BSGR Treasury Services to A. Sidibe, 16 February 2010, **R-189**.
[384] Payment from BSGR Treasury Services to A. Sidibe, 1 March 2010, **R-190**.

account named "Adama Sidibe" – describing it as "very urgent".[385] A week later, on 8 March 2010, a further payment of $550,000 was made to the same Belgian bank account for consultation services. The payment was made pursuant to an email direction from Tchelet which stated:

> I have been informed this afternoon of a requirement to pay an amount of USD550,000 as R.A.S consulting fees in respect of services rendered by Ghassan. Invoice to follow.
>
> Please load to same Fortis Bank Belgian banking details as last time.[386]

Vale contends that R.A.S. in this email refers to Resources Advisory Services – a BSGR entity.[387]

440.   Further payments followed on 24 March 2010 (USD 300,000),[388] 29 March 2010 (USD 250,000),[389] 9 April 2010 (USD 212,000),[390] 12 April 2010 (USD 325,000),[391] and 21 April 2010 (USD 200,000).[392] All payments were to the same Belgian account at Fortis Bank and Tchelet instructed that they be paid immediately with an invoice to follow. The invoice for the USD 300,000 payment referred to consultation services for an environmental study and solution, whereas the other invoices referred to certain costs (transport, solar panels, parts etc) and the completion of road and drainage works.

441.   In relation to these payments, Tchelet said in a message to Clark:

> all payments to Ghassan relate to transport, electrical, site preparation etc-Sarah has the allocations, we are missing the last 3-4 invoices but they are en route from Guinea. all allocated to Simandou Blocks 1 & 2 -none of it is anything remotely resembling consulting but actual work as per the descriptions previously, I am pushing constantly on the outstanding invoices.[393]

<u>Payments to Mme. Touré</u>

442.   Vale alleges that, in addition to providing consultancy services, Boutros also was used as an intermediary to make payments to Mme. Touré on behalf of BSGR. The basis for this allegation is as follows.

443.   In 2009, BSGR allegedly asked Boutros to purchase two Caterpillar machines on its behalf for site works,[394] although it did not produce any contemporaneous documentary evidence of this request. Avidan said in his First Witness Statement:[395]

> The transaction Ms Touré refers to was one in which BSGR asked Mr Boutros (through his company, Logistics and Maintenance Services SARL) to obtain two

---

[385] Payment from BSGR Treasury Services to A. Sidibe, 1 March 2010, **R-190**.
[386] Payment from BSGR Treasury Services to A. Sidibe, 8 March 2010, **R-191**.
[387] Vale's Statement of Reply, paragraph 233.
[388] Payment from BSGR Treasury Services to A. Sidibe, 24 March 2010, **R-192**.
[389] Payment from BSGR Treasury Services to A. Sidibe, 29 March 2010, **R-193**.
[390] Payment from BSGR Treasury Services to A. Sidibe, 9 April 2010, **R-194**.
[391] Payment from BSGR Treasury Services to A. Sidibe, 12 April 2010, **R-195**.
[392] Payment from BSGR to A. Sidibe, 21 April 2010, **R-196**.
[393] Payment from BSGR Treasury Services to A. Sidibe, 29 March 2010, **R-193**.
[394] Avidan First WS, paragraph 121.
[395] Avidan First WS, paragraph 121.

Caterpillars for us. We had many of them in the field and needed two more for our exploration work. Mr Boutros obtained the Caterpillars for us, and we duly paid him the amount he invoiced for them. I did not know, and I am not aware that anyone else from BSGR knew, that Mr Boutros had used Ms Touré to obtain this equipment. It was certainly not a backhanded way of BSGR paying Ms Touré.

444. Also in 2009, Mme. Touré allegedly demanded money from BSGR, although Avidan said that he now cannot locate the letters containing such demands.[396] Avidan also said that he was briefly detained by a General acting on Mme. Touré's behalf in relation to these demands.[397]

445. Vale claims that the purchase of Caterpillar machines by Boutros was a ruse to allow BSGR to meet Mme. Touré's payment demands.[398] Circumstantial evidence that supports Vale's assertion includes:

445.1. Vale states that the payments coincided with demands for payments made by Mme. Touré for amounts she claimed were owed pursuant to contracts with Pentler.[399] Vale also says that the payment was consistent with an affidavit signed by Mme. Touré on 2 August 2009 in front of Bangoura (BSGR's Security Director) which states that she and BSGR agreed:

> on the payment of the sum of four million U.S. dollars (USD 4,000,000), representing the total value of all of my shares of stock (a 5% interest), as well as of my services provided for obtaining the mining titles for the benefit of the company BSGR in Guinean territory.
>
> Said amounts shall be paid to me in full in instalments payable over four quarters, that is, one million dollars (USD 1,000,000) per quarter.[400]

445.2. No correspondence has been provided evidencing BSGR's instruction to Boutros to purchase the Caterpillar machines.

445.3. The initial invoice provided for the machines came from the unknown "Matilda & Co. Ltd." (not Matinda & Co).[401] The invoice itself does not specify the date on which it was generated, but the signature inside the company stamp appears to be dated 7 July 2009.

445.4. On 17 August 2009, Tchelet instructed BSGR to pay Boutros the sum of USD 1.3 million. The payment was made to Boutros on 18 August 2009.[402]

445.5. Boutros did not invoice BSGR for the Caterpillar machines until 18 August 2009, the day after the payment instruction had been issued. Boutros did not include with his invoice to BSGR any proof of purchase for the Caterpillar machines. The amount charged for the machines is different to the cost of the machines as specified in the "Matilda" invoice.

---

[396] Avidan First WS, paragraph 105.
[397] Avidan First WS, paragraph 105.
[398] Vale's Statement of Reply, paragraphs 445-449.
[399] Vale's Statement of Reply, paragraphs 452-454.
[400] Affidavit of M. Touré, 2 August 2009, C-690; see Vale's Statement of Rejoinder on Counterclaims, 15 August 2016, paragraphs 73-75.
[401] Guinean Import Declaration, 17 August 2009, R-259.
[402] Payment from BSGR Treasury Services to LMS, 18 August 2009, R-187

445.6. Boutros issued a transfer order to his bank on 20 August 2009 for the payment of USD 998,000 to Matilda Ltd which appears to have failed.[403]

445.7. A second invoice was generated for the machinery on 28 August 2009, this time the correct company – Matinda & Co – is used on the invoice.[404] The bank account for payment of the second invoice is different to the bank account in the original "Matilda" invoice.

445.8. Boutros then sent a message to his bank entitled "Request to change the name of the recipient of a transfer order" on 3 September 2009. He instructed his bank to make the payment of USD 998,000 to "Mamadie Touré" personally, rather than Matilda Ltd.[405] He did not, however, change the bank account number to correspond with the second invoice. The payment appears to have been made to Mme. Touré personally at the bank account specified on the original "Matilda" invoice.

445.9. Boutros made a further payment to Mme. Touré's personal account of USD 2,000 in December 2009.[406]

445.10. Vale contends that the Caterpillar machinery never arrived.

446.   Conversely, BSGR states that the equipment was in fact delivered as evidenced by an import declaration dated 17 August 2009.[407]

447.   As to this latter claim, Vale notes that:

> the Customs Invoice, on its face, does not confirm that the equipment was in fact delivered, but rather that it could be sent through customs for a period of 6 months.[408]

448.   Vale also notes that BSGR attempted to keep Boutros' name out of the records provided to local BSGR contacts. Emails from Tchelet to Nicolle state:[409]

> What is sensitive is the names in respect of consulting fees paid – please always check with me first before sending reports which include those details to her or anyone inside Guinea ...

> I am referring to cases where BSGR TS pay on behalf of newco consulting fees to for eg Ghassan or others – those are the type of consulting fees that you should check with me first before sending the details automatically to Guinea local.

449.   A previous email from Tchelet to Nicolle included a hand-written note which said "*remove Ghassan Boutros' name from Guinea spreadsheet*".[410]

---

[403] Email from G. Boutros to the Managing Director of the F.I.B., 3 September 2009, p. 195, **C-6**.
[404] Invoice from Matinda dated 28 August 2009, p. 194, **C-6**.
[405] Email from G. Boutros to the Managing Director of the F.I.B., 3 September 2009, p. 195, **C-6**.
[406] Invoice 489 to LMS dated 20 December 2009, p. 196, **C-6**.
[407] Guinean Import Declaration, 17 August 2009, **R-259**.
[408] Vale's Pre-Hearing Written Submissions, note 316 (referencing **C-799**; **C-800**; **C-801**).
[409] Emails between Y Tchelet, D Clark, & H Nicolle of BSGR, 26-27 April 2009, **C-540**.
[410] Emails between Y Tchelet & H Nicolle of BSGR, 20-21 April 2009, **C-650**.

450.    Finally, Vale claims that Boutros also assisted in making a USD 2 million cash deposit into Mme. Touré's bank account in May 2010. This payment, Vale submits, was a reward for completion of the joint venture contracts.[411] BSGR rejects this argument, saying that no such payment occurred.

451.    In support of its claims, Vale has placed before this Tribunal transcripts of oral evidence provided by Boutros as part of court proceedings in Switzerland and Guinea regarding alleged corruption.[412] As Boutros has not appeared as a witness in the current arbitration and there has been no opportunity for the Tribunal or the parties to test his evidence, the Tribunal has placed no weight on these transcripts.

Tribunal's analysis of Boutros' role

452.    The Tribunal makes the following findings based on the evidence and submissions before it.

452.1.    In and around the time of the Project Hills due diligence, BSGR in its internal correspondence repeatedly referred to the services provided by Boutros as "consultancy services" and his invoices as being for "consultancy fees". At least three of Boutros' invoices specifically refer to "consultation services" or studies carried out by Boutros for BSGR (see payments of 6 April 2009, 8 March 2010 and 24 March 2010).

452.2.    In the Tribunal's view, it is clear that BSGR considered that Boutros was receiving consulting fees for providing consulting services (including of a technical nature).

452.3.    Tchelet's email to Nicolle on 26-27 April 2009 confirms BSGR's view of Boutros as a consultant, but also demonstrates BSGR's desire to keep his role secret.

> I am referring to cases where BSGR TS pay on behalf of newco consulting fees to for eg Ghassan or others – those are the type of consulting fees that you should check with me first before sending the details automatically to Guinea local[413]

452.4.    A previous email from Tchelet to Nicolle included a hand-written note which said "remove Ghassan Boutros' name from Guinea spreadsheet".[414]

452.5.    It is also clear that Boutros (through LMS) paid Mme. Touré USD 1 million in 2009, purportedly for two Caterpillar machines. The Tribunal notes that this payment was made at around the time that Mme. Touré was demanding money from BSGR and just after Mme. Touré had signed a document stating she would receive USD 4 million from BSGR in USD 1 million instalments.[415]

452.6.    The Tribunal has not been provided with any evidence that the Caterpillar machines actually arrived. As noted by Vale, the "Descriptive Declaration of Importation" ("**DDI**") exhibited by BSGR appears to provide a delivery window for

---

[411] Vale's Statement of Reply, paragraphs 10 and 450-451.
[412] See Report of questioning for Ghassan Boutros, 29 August 2013, **R-132;** Procès verbal of G. Boutros, 7 July 2015, **C-278.**
[413] Emails between Y Tchelet, D Clark, & H Nicolle of BSGR, 26-27 April 2009, **C-540.**
[414] Emails between Y Tchelet & H Nicolle of BSGR, 20-21 April 2009, **C-650.**
[415] Affidavit of M. Touré, 2 August 2009, **C-690.**

the machines between 17 August 2009 and 17 February 2010 but does not confirm whether they were actually delivered within this timeframe.[416]

452.7.  The invoices for the Caterpillar machines support Vale's argument that the transaction was a sham:

452.7.1.  The invoice attached to the DDI bore the wrong company name and stamp - "Matilda & Co."

452.7.2.  After Boutros first attempted – but failed – to transfer the money to Matinda, a new invoice in the correct name was issued.

452.7.3.  The bank account into which the fees were paid belonged to Mme. Touré.

452.8.  Further supportive of Vale's position is that:

452.8.1.  BSGR had many Caterpillar and other work machines at their sites, it is unclear why Boutros was requested to purchase additional machinery for BSGR, rather than BSGR sourcing the machines from its usual supplier.

452.8.2.  Other contractors appeared to use their own machinery, not machinery purchased by BSGR.[417]

452.8.3.  The evidence before the Tribunal suggests that the business interests of Mme. Touré (and by extension, Matinda) while she resided in Guinea primarily involved distributing pharmaceuticals, food, and consumer goods.[418] None of these activities suggest that Matinda or Mme. Touré (who was by 2009 living in exile in Sierra Leone[419]) would be a natural supplier of heavy construction machinery into Guinea.

452.8.4.  Throughout the course of the relationship between BSGR and Boutros, it appears that these two Caterpillar machines were the only heavy construction machinery Boutros was asked to purchase for BSGR. All other invoices related to site works, consultations, generator costs and electrical and telecommunications equipment.

453.  Based on the evidence above, the Tribunal considers that BSGR's version of events whereby Boutros sourced these machines from Matinda in Sierra Leone without the knowledge of BSGR is improbable.

454.  Tchelet's desire to keep Boutros' name off the Guinea spreadsheets and effectively "secret" reinforces the Tribunal's view that the relationship between BSGR and Boutros was not a standard contracting relationship.

---

[416] Guinean Import Declaration, 17 August 2009, **R-259**.
[417] See Sub-Contract Agreement between Bassad-Guinée S.A. and BSG Resources (Guinea) Limited – S.A.R.L., 2 January 2010, clause 3(I)(b), **C-799**.
[418] See Noy First WS, paragraph 8; Avidan First WS, paragraph 45; Struik First WS, paragraph 41.
[419] Vale's Statement of Case, paragraph 170.

455.  The unusual nature of the relationship between Boutros and BSGR is further confirmed by the curious payment process for Boutros' (forthcoming) invoices:

455.1.  BSGR generally paid LMS on an "urgent" basis in round figures and before any invoice was actually rendered. The contemporaneous correspondence indicates that many invoices were backdated. No explanation has been provided as to why these payments were urgent, particularly when the Boutros Contract provided BSGR with 20 days to pay any such invoices. BSGR's practice of simply paying Boutros any amount requested without first having received invoices or receipts, has not been adequately explained by BSGR.

455.2.  Vale argues that:

> These "consulting fee" payments are also notable because they were all approved and dispensed before BSGR had received any supporting invoices or documentation. In one instance, just a couple of weeks before Vale sent BSGR its compliance due diligence questionnaire, Clark emailed Tchelet and others at BSGR: "I have been informed this afternoon of a requirement to pay an amount of USD550,000 as R.A.S[.] [Resources Advisory Services, a BSGR affiliate] consulting fees in respect of services rendered by Ghassan. Invoice to follow." [R-189] This shows that Tchelet and Clark were instructing BSGR to make payments to Boutros, unsubstantiated by invoices, simply because Avidan or others on the ground in Guinea were demanding that these payments be made.[420]

455.3.  The invoices themselves – including those for large sums of money – contain scant detail as to how these amounts were derived. For example, there is no breakdown of rates for services and no invoices for fixed costs were provided. Most invoices were also for "round numbers". On one occasion where the invoice was not a round number and did not match the amount that had already been paid, a hand-written note on the invoice stated that the difference was made up in "bank charges" which happened to bring the total to exactly USD 1 million. The urgency of payment and the scant detail in the invoices can be contrasted with other contractors who specified hours and rates and whose invoices appear to have been scrutinised in detail before payment approved.[421]

455.4.  Overall, BSGR paid Boutros a total of over USD 5 million pursuant to these invoices during 2009-2010.

456.  Vale also makes allegations about an alleged USD 2 million cash deposit made by Boutros to Mme. Touré's account. However, this payment occurred in May 2010 and is not relevant for the purposes of assessing whether the due diligence responses were accurate.

457.  The Tribunal concludes, based on the above analysis, that Boutros' consultancy role is clear from the contemporaneous documents. There is also significant evidence which establishes, at least in relation to the USD 1 million allegedly paid for machinery, that Boutros was acting as an intermediary for BSGR. The apparent secrecy around Boutros' role; the urgent nature of payments without invoices; the timing of the payment just after

---

[420] Vale's Statement of Reply, paragraph 233.
[421] See, for example, Payment from BSGR to K. Amir of Bassad, 15 April 2010, **C-800** and Payment from BSGR Treasury to Global Travaux Publics Constructions, 28 July 2009, **C-801**.

Mme. Touré had demanded money from BSGR; the lack of evidence that the machines were delivered; and the unlikely coincidence that Boutros would have sourced heavy machinery from Mme. Touré after she was exiled (especially when sourcing such machinery does not appear to have been her core business) suggest that Vale's version of events are more likely accurate than BSGR's protestations that Boutros' dealings with Mme. Touré were unknown to it.

<u>Tribunal's findings on whether Boutros provided consulting or agency services</u>

458.    The Tribunal therefore finds that the arrangement with Boutros involved at least some consultancy services and indeed was viewed as such by BSGR. The Tribunal also considers that Vale has shown that, on the balance of probabilities, Boutros acted as an intermediary for BSGR. There is no evidence to suggest Boutros was BSGR's agent.

459.    Therefore, BSGR should have disclosed the role of Boutros in response to Vale's due diligence questions regarding consultants and intermediaries. BSGR's failure to do so meant that its responses to those questions were false.

460.    Moreover, even if the Tribunal were wrong in its conclusions above, BSGR still should have disclosed the Subcontracting and Service Provision Agreement with LMS in the "Third Party Service and Supply Agreements" in Section 1K of the due diligence data room, especially as this Agreement was with BSGR Guinea – one of the "BSG Group" companies.

### viii.    Ibrahima Kassory Fofana

461.    Vale alleges that BSGR also retained Fofana, Guinea's former Economy and Finance Minister, as a consultant. Vale points to the fact that BSGR admitted that Fofana provided "high level strategic advice" in relation to BSGR's acquisition of the Simandou mining rights as evidence of his role as a consultant.

462.    In July 2008, Fofana met with the Minister of Mines, Dr. Nabé, to discuss BSGR's application for Blocks 1 and 2.[422] Vale also noted the close relationship between Fofana and Mahmoud Thiam, the Minister of Mines in 2009-2010. Indeed, Thiam referred to the important role that Fofana played on behalf of BSGR several times in a recorded conversation with Mebiame.[423] Consequently, according to Vale, BSGR should have disclosed Fofana's consultancy role during the due diligence process.

463.    BSGR accepts that Fofana was a consultant and should have been disclosed in its responses to the due diligence questionnaires.[424] BSGR agrees that Fofana provided consultancy services in relation to Blocks 1 and 2, but said that the failure to disclose Fofana's role was an oversight. BSGR has pointed out that the wire transfers to Fofana were included in the disclosures, which belies Vale's contention that BSGR deliberately concealed his role.[425]

---

[422] Nabé WS, paragraph 20.
[423] Transcript of Meeting between Minister of Mines M. Thiam and S. Mebiame, **C-81**. For example, Thiam says at p. 9 "And BSGR can say to you: 'Yes, we used Kassory as a 'lobbyist' to help us' and Kassory does not keep this fact a secret."
[424] BSGR's Statement of Rejoinder, paragraph 51.
[425] BSGR's Statement of Rejoinder, paragraph 52.

464.   Avidan stated in his First Witness Statement that Fofana's advice was "primarily in relation to a potential issue with the IFC and the World Bank, which had a share in Rio Tinto's rights over blocks 1 to 4 in Simandou."[426]

465.   During the period from 2008 to 2014, BSGR made the following payments to Fofana:

465.1.   BSGR paid Fofana USD 100,000 in consulting fees on 15 December 2008;

465.2.   BSGR paid USD 23,592.10 for travel by Fofana and his family in November/December 2008;[427]

465.3.   BSGR paid Fofana EUR 80,000 in consulting fees on 5 February 2009;

465.4.   BSGR reimbursed Fofana (or paid) for certain travel costs between April 2009 and February 2010, to a total sum of USD 18,536.76.[428]

466.   In view of BSGR's admission that Fofana was a consultant, the Tribunal finds that Fofana was a consultant to BSGR, and that his role should have been disclosed in response to the due diligence questionnaires.

>   ***ix.   Conclusion on representation that BSGR had not used any agents, intermediaries and consultants in the process of obtaining the mining rights***

467.   In response to Vale's due diligence questions about the use of agents, intermediaries and consultants in the Compliance Due Diligence Questionnaire and the Supplemental Compliance Due Diligence Questionnaire, BSGR disclosed only "Ian Cope, WSP, Bateman Engineering, Mohammed Doumbia, Fist Interim" and referred Vale to the contracts in Section 1K of the data room.

468.   BSGR has admitted that it should have included Fofana in its list of consultants.

469.   The Tribunal has found that BSGR should also have disclosed as consultants Pentler, Cilins and Boutros. In addition, Pentler and Cilins acted as BSGR's agents in Guinea during the process of obtaining the mining rights for BSGR Guinea. This agency role should also have been disclosed by BSGR in its response to the due diligence questions.

### ***BSGR's representation that it had disclosed all agreements with Consultants***

470.   In response to the due diligence questions outlined above with regard to consultants, BSGR represented that all agreements with consultants were disclosed in Section 1K of the data room.[429]

---

[426] Avidan First WS, paragraph 150.
[427] Diesenhaus-Unitours Spreadsheet of 2008 BSGR Travel, **C-539**.
[428] Payment from BSGR Treasury to Diesenhaus-Unitours, 7 May 2009, **C-268**; Payment from BSGR Treasury to Diesenhaus-Unitours, 7 January 2010, **C-269**; see also footnote 498 of Vale's Statement of Reply.
[429] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question IV, **C-30**.

471.    Section 1K of the data room contained the following documents:[430]

|  | K |  | Third Party Service and Supply Agreements |  |  |
|---|---|---|---|---|---|
| 1. |  | 1 | BSG Resources Guinée S.A.R.L/Foraco SAS Drilling Agreement 29/10/07 | Legal/ Tech | 1K |
| 2. |  | 2 | Energold Drilling | Legal/ Tech | 1K |
| 3. |  | 3 | Geoprospect Drilling | Legal/ Tech |  |
| 4. |  | 4 | Fugro Airborne Surveys | Legal/ Tech | 1K |
| 5. |  | 5 | KPMG Conakry | Finance | 1K |
| 6. |  | 6 | UIBG | Admin | 1K |
| 7. |  | 7 | Probiz Guinea (hire of air transport services) | Admin | 1K |
| 8. |  | 8 | Total | Admin | 1K |
| 9. |  | 9 | DHL | Admin | 1K |
| 10. |  | 10 | Contract Poubelles de Conakry (Bin hire and waste removal) | Admin | 1K |
| 11. |  | 11 | 11.1 GTC (Bulldozers) | Admin | 1K |
| 12. |  |  | 11.2 GTC (Fuel Tank) | Admin | 1K |
| 13. |  |  | 11.3 GTC (Water Tank) | Admin | 1K |
| 14. |  |  | Technical Advisory and Royalty Agreement |  |  |

472.    Vale alleges that, in response to these due diligence questions, BSGR should have disclosed the following agreements:

472.1.    Milestone Agreement between BSGR Guinea BVI and Pentler dated 20 February 2006;[431]

472.2.    Share Purchase Agreement between BSGR Steel and Pentler, dated 24 March 2008;[432]

472.3.    Settlement Agreement between BSGR Steel and Pentler, dated 25 July 2009;[433]

472.4.    Shareholders Agreement between BSGR Steel, Pentler and BSGR Guinea, dated 19 July 2007;[434] and

472.5.    The Agreements with LMS (Boutros) and with Fofana.

473.    In paragraph 458 above, the Tribunal has found that Boutros (through LMS) provided services to BSGR Guinea (a BSG Group Company), including consultancy services. The Tribunal has already found that the Boutros Contract should have been disclosed in

---

[430] Project Hills: FTP/Data Room Index, **R-216**.
[431] Letter from BSGR Guinea BVI to Pentler, 14 February 2006, **R-117**.
[432] Share Purchase Agreement between BSGR Steel and Pentler, 24 March 2008, **R-28**.
[433] Settlement Agreement between BSGR Steel and Pentler, 25 July 2009, **R-33**.
[434] Shareholders Agreement between BSGR Steel, Pentler and BSGR, 19 July 2007, **R-24**.

Section 1K of the data room, both as a third-party service and supply agreement as well as an agreement with a Consultant. BSGR provided no satisfactory explanation as to why the agreement was omitted from Section 1K, especially as Boutros was allegedly supplying these services over the very period that the due diligence was being conducted.

474.    The Tribunal has also found that Cilins and Pentler were consultants to BSGR Guinea within the definition provided in the due diligence questionnaires (see paragraph 415 above). The BSGR-Pentler Milestone Agreement, the Share Purchase Agreement and the Pentler Shareholders Agreement all make references to the provision of services by Pentler, and specifically to Pentler (or its shareholders) as "consultants".[435] None of these Agreements was disclosed.

475.    The Settlement Agreement does not contain any reference to the provision of services, so it is not discussed further here.

476.    The Tribunal finds that, even if BSGR mistakenly considered that Cilins or Pentler were not "consultants", they provided services to BSGR and, on that basis, the agreements should still have been included in Section 1K of the data room.

477.    BSGR contends that the various agreements with Pentler were not entered into directly by a BSG Group company (as defined in the due diligence questionnaires). This is true. The BSGR entities that signed these agreements were BSGR Guinea BVI and BSGR Steel, which had been removed from the BSG Group during the 2009 restructuring (described at paragraph 256 above). This restructure meant that, while BSGR Guinea BVI and BSGR Steel were no longer part of the ownership chain of BSGR Guinea, they were still wholly owned subsidiaries of BSGR.

478.    The Tribunal considers that, although the definition of BSG Group was limited initially to BSGR Guernsey and BSGR Guinea, plus certain Liberian companies, the question regarding consultants and agents in each Questionnaire was broader. As described at paragraph 428 above, the question asked BSGR to identify all consultants / agents "retained by or acting on behalf of the BSG Group (directly or indirectly)."[436] The Questionnaires asked for copies of any agreements with such consultants which were not already included in Section 1K of the data room.[437] None of the agreements with Pentler, Cilins, Boutros or Fofana[438] was provided.

479.    In the Tribunal's view, the breadth of this question means that the fact that the signatory companies to these agreements fell outside of the narrow definition of a "Group company" did not exempt these agreements from being disclosed. The consultants performed

---

[435] Share Purchase Agreement between BSGR Steel and Pentler, 24 March 2008, **R-28**.

[436] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question IV.A, **C-30**, and Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, Question IV.A, **C-43**.

[437] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question V.B, **C-30**; Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, Question V.A, **C-43**.

[438] The Tribunal is aware of BSGR's assertion that no written agreement with Fofana existed, see BSGR's Statement of Rejoinder, paragraph 54(1).

services on behalf of BSGR Guinea to assist it in gaining the mining rights included within Project Hills (that is, "*Simandou Blocks 1 and 2, North Block and Zogota in Guinea*"[439]).

480.    BSGR submits that it did not disclose the Pentler agreements as its lawyers, Skadden Arps, told BSGR that it did not have to disclose this information. Steinmetz gave evidence of this advice in his First Witness Statement, stating:

> The only other aspect of the negotiations that related to the FCPA issues that I recall was a short deliberation that I participated in about whether the Pentler relationship should be disclosed. I cannot remember if it was someone from the BSGR side or Skadden themselves who mentioned it first. Skadden knew the relationship we had with Pentler because they had advised on the dispute I refer to above. I was ambivalent as to whether Pentler should be disclosed and listened to the advice that was given. The advice was that we did not have to disclose the relationship. They were our former partner and shareholder in the business and the existence of a minority shareholder in the business was a matter of record from the accounts and elsewhere.[440]

481.    Unfortunately, however, Steinmetz did not attend the hearing (either in person or by videolink). Avidan who also mentioned the Skadden Arps advice in his second witness statement also failed to attend the hearing (Avidan stated that "Mr Hatchard" was the lawyer who gave the advice[441]). Therefore, this evidence was unable to be tested under cross-examination.

482.    Vale requested copies of any such advice during the document production phase of these proceedings, but BSGR stated that no written advice from Skadden Arps was ever received and it did not possess any documents on this topic. Vale repeated its request on the basis that BSGR's efforts to locate responsive documents had been inadequate. Vale also requested an order from the Tribunal that BSGR disclose who gave the advice and when it was provided and noted that it would seek an adverse inference at the appropriate time.[442] BSGR objected to this request and said that the matter could be addressed at the evidentiary hearing and that the drawing of adverse inferences would be the appropriate remedy if necessary.[443]

483.    The Tribunal requested a certification from BSGR's Counsel detailing efforts made to find responsive documents and identifying the Skadden lawyer who provided the advice and to whom it was provided. Certifications were provided by BSGR's Counsel on 28 April 2016 detailing efforts made to search for responsive documents for outstanding requests and specifically, in relation to the alleged advice provided by Skadden Arps, the certifications stated that "the identity of the Skadden lawyer who gave the advice concerning Pentler is Michael Hatchard and the persons receiving the advice on behalf of BSGR were Mr Cramer, Mr Barnett and Mr Steinmetz."[444] The Tribunal notes that Avidan claims he was also at this meeting although this was not recorded in the certification.[445]

484.    In his second witness statement dated 14 July 2016, Mr Barnett described the extensive advisory role that Skadden Arps had in relation to BSGR's activities in Guinea. He also

---

[439] Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, note 1, **C-43**.
[440] Steinmetz First WS, paragraph 78.
[441] Avidan Second WS, paragraph 24.
[442] See Second Decision on Document Production, paragraphs 148-153.
[443] Second Decision on Document Production, paragraph 155.
[444] Mishcon de Reya Certification on "BSGR/Onyx/Mr Steinmetz", 28 April 2016.
[445] See Avidan Second WS, paragraph 24.

described the advice provided by Mr Hatchard in relation to the Pentler disclosure issue. Mr Barnett said that "BSGR's lawyers have approached Skadden in relation to this arbitration. As it currently stands, Skadden has said that it is not now prepared to engage with BSGR's lawyers in relation to this arbitration. I assume that they have concerns about their own position."[446]

485.    Given the close relationship that BSGR appeared to have with Skadden Arps throughout the relevant time, the fact that no witness from Skadden Arps (in particular, Mr Hatchard) was willing to provide evidence on behalf of BSGR to verify that the advice was provided or corroborate Steinmetz's account is most surprising indeed.

486.    The Tribunal observes that, in addition to the surprising unwillingness of Skadden Arps to cooperate, even the evidence of BSGR's witnesses on this alleged advice would have been insufficient to support a finding that no reliance was intended. While Steinmetz asserted that Skadden Arps was well aware of the Pentler relationship because it had advised on BSGR's dispute with Pentler, he did not clearly set out the basis for the purported view that the Pentler relationship need not be disclosed to Clifford Chance. Taken at face value, the rationale set out in Steinmetz's statement that Pentler was BSGR's "former partner and shareholder in the business and the existence of a minority shareholder in the business was a matter of record from the accounts and elsewhere"[447] is unpersuasive and the Tribunal doubts that this statement could really have been Skadden Arps' expressed views.

487.    In addition to the inherent improbability of Skadden Arps genuinely holding the view expressed by Steinmetz in his statement, BSGR cannot have its cake and eat it too. It cannot, on the one hand, assert that it took legal advice on whether or not to disclose the Pentler relationship but, then, on the other hand, fail to produce any written record of such advice or to even proffer the lawyer who allegedly gave the advice (no privilege having been claimed).

488.    And finally, BSGR's witnesses (Steinmetz, Avidan and Barnett), having referred to and supposedly relied upon the alleged advice, chose not to appear in person to answer questions on their respective testimonies.

489.    In short, no corroborative documentary evidence has been adduced by BSGR (including meeting notes which the Tribunal would expect to exist) and Skadden Arps has allegedly refused to provide witness evidence in support of BSGR's assertions. As a result, the Tribunal simply cannot accept a bare statement by Steinmetz and his colleagues to this effect without more conclusive proof. All of the above circumstances lead the Tribunal to the conclusion that these allegations must be rejected.

490.    Vale submits that:

> BSGR's claim that – in the midst of an FCPA due diligence exercise, and all of the associated questions, certificates, representations, warranties, meetings and other antibribery inquiries made to Vale, and the numerous red flags that Pentler would have suggested – Skadden provided unwritten advice on which BSGR relied (i) to withhold agreements to pay a minority shareholder more than USD 30 million, (ii) to withhold all its other agreements with Pentler that were responsive

---

[446] Barnett Second WS, paragraph 12.
[447] Steinmetz First WS, paragraph 78.

to due diligence inquires, and (iii) to nonetheless represent to Vale that it had produced all documents involving the shareholders in BSGR Guernsey and all of its subsidiaries, is not credible. Either BSGR never was given any such advice or it never revealed to Skadden the extent of its relationship with Pentler. It is inconceivable that, if the facts had been fully disclosed to it, a law firm of Skadden's stature would have told BSGR that it did not need to disclose its relationship with Pentler or any of the associated documents. It is striking in this regard that to date BSGR has not produced or identified the mysterious Skadden lawyer who supposedly gave this advice

[...]

Even on the doubtful assumption that BSGR did receive this purported advice from Skadden, that there is not a single record of the request for or contents of this alleged advice – no emails, no meeting notes, no research or analysis, no memoranda – suggests that BSGR recognized its relationship with Pentler was so problematic that – if it disclosed it to Skadden at all – it instructed its lawyers not to put anything in writing.[448]

491.　The Tribunal accepts these submissions and considers that the lack of any written record of or related to Skadden Arps' alleged advice is surprising and telling. Even if the advice was provided orally at a meeting, as described by Steinmetz, it is standard practice to make file notes of such meetings and any advice provided. It would be unusual not to have had a junior lawyer or administrative assistant taking notes, which could have been produced in support of BSGR's account.

492.　The fact that:

492.1.　no corroborating evidence whatsoever (either in documentary form or from a witness from Skadden Arps) was provided by BSGR in circumstances where corroborating evidence should have been available; and

492.2.　Steinmetz did not present himself for cross-examination (nor did Avidan or Barnett who gave evidence on this issue),

leads the Tribunal to find it appropriate to attach no weight to this unsupported evidence regarding Skadden's alleged oral advice. Applying the principles on adverse inferences discussed at paragraphs 360 - 367 above and contained in the IBA Rules on Evidence, the Tribunal draws the inference that any evidence that does exist and that BSGR has failed to produce (including evidence from Mr Hatchard) must have been adverse to BSGR's interests. The Tribunal accordingly finds that no such advice was given by Skadden Arps to BSGR.

493.　Based on the above analysis, the importance of the due diligence process and BSGR's assertion that all relevant agreements were included in the data room, the Tribunal finds that BSGR should have disclosed the Boutros Contract, any agreements with Fofana, as well as the BSGR-Pentler Milestone Agreement, the Pentler Shareholders Agreement and the Share Purchase Agreement. All of these agreements should have been included in Section 1K of the data room.

---

[448] Vale's Statement of Reply, paragraphs 253-254.

494. BSGR's confirmation that it had disclosed all relevant agreements in the data room, despite having failed to disclose the documents just described, constituted a misleading and false statement.

***BSGR's representation that it had disclosed all relevant documents and information relating to the shareholder structure of BSGR Guernsey and its subsidiaries***

495. In the Legal Due Diligence Questionnaire, Vale asked BSGR to disclose copies of any of the following types of agreements entered into between any of the shareholders of any Group Company as follows:[449]

495.1. Any shareholders' agreements (and any other agreements between shareholders of a Group Company relating to their shareholding in such Group Company).

495.2. Agreements to transfer or to call for the transfers of any shares in the share capital of any Group Company, whether on a change of control or otherwise.

495.3. Agreements relating to the share capital or ownership, control, management or operation of a Group Company.

495.4. Copies of any such agreements between any Group Company and any third party.

496. Vale also requested:[450]

496.1. Any agreements dealing with the acquisition or disposal of shares in any Group Company entered into during the last 3 years or currently proposed, including the acquisition or disposal of shares in any company that was a Group Company during that 3-year period but that is no longer a Group Company.

496.2. All agreements relating to the acquisition or disposal of the business of any Group Company or a significant asset of any Group Company (such as shares in another company or fixed assets) entered into in the last 3 years or currently proposed.

497. BSGR represented that all such agreements were contained in Section 1A of the data room.

498. The definition of "Group Company" in the Legal Due Diligence Questionnaire was amended by BSGR to reduce its scope. Clifford Chance's Questionnaire had encompassed BSGR and all associated or subsidiary companies (which would have included BSGR Guinea BVI of which Pentler had been a shareholder). BSGR amended the definition to a much narrower group of companies under BSGR Guernsey. As a result of this amendment, BSGR Guinea BVI did not fall within the definition of "Group Company".

---

[449] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, Requests 1.5 and 1.7, **C-233**.
[450] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, Requests 3.14 and 3.15, **C-233**.

499.  In its Financial Due Diligence Questionnaire, Vale asked for all agreements relating to the acquisition or sale of shares in BSGR and BSGR Guernsey, or any of their subsidiaries, the business or a significant asset of such entities.[451]

500.  In its response to the Financial Due Diligence Questionnaire, BSGR crossed out the reference to itself (which would have required it to disclose documents related to Pentler's interest in BSGR Guinea BVI) and answered that all agreements were contained in Section 1A of the data room.

501.  Vale contends that, in response to these questions:

> BSGR should have disclosed – but did not – the existence of Pentler, including by providing to Vale all of the relevant documents evidencing Pentler's shareholding relationship with BSGR, such as the Shareholders Agreement dated 19 July 2007, Share Purchase Agreement dated 24 March 2008, and Pentler and BSGR's Settlement Agreement dated 25 July 2009, all of which relate to the acquisition or disposal of shares in a Group Company within the last three years prior to April 2010 (i.e., going back to April 2007).[452]

502.  However, the Tribunal notes that Vale does not explain why these agreements – which relate to the transfer of shares in BSGR Guinea BVI – should have been disclosed, given that BSGR Guinea BVI was not a "Group Company" under the amended definition inserted by BSGR. While Vale may have argued that BSGR deliberately amended the definition so as to avoid having to disclose these agreements (which would have been disclosable under the original definition in the Legal Due Diligence Questionnaire), this alone does not mean BSGR's disclosures under the amended definition constituted a misrepresentation.

503.  In contrast, the Tribunal considers that documentation relating to the transfer of BSG Group entities should have been disclosed. For example, BSGR Guinea was transferred from BSGR Guinea BVI to BSGR Guernsey on 17 February 2009 but this transfer was not disclosed.[453] Agreements documenting this transfer should have been provided to Vale, as they are "agreements dealing with the [...] disposal of shares in any company that was a Group Company during [the last 3 years] but that is no longer a Group Company".[454]

504.  The Index to the data room indicates that the existing and proposed corporate structure charts were disclosed as well as a "Status Modification" which refers to "New BSG Resources (Guinea) Limited share certificates totalling 100 shares (see tab 17)".[455] It is not clear to the Tribunal exactly what this document refers to and whether it showed the transfer from the BVI company to the newly incorporated BSGR Guernsey. In any case, at the very least, the share purchase agreement dated 17 February 2009 between BSGR Guinea BVI and BSGR Guernsey should have been disclosed by BSGR in the data room.[456] This agreement detailed the transfer of BSGR Guinea BVI's shares in BSGR

---

[451] Project Hills Clifford Chance Due Diligence Request List, 29 March 2010, p. 2, **C-235**.
[452] Vale's Statement of Reply, paragraph 59.
[453] Emails between D. Cramer & S. Merloni-Horemans, 9-12 November 2012, p. 6, **C-664**.
[454] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, Request 3.14, **C-233**; Vale's Pre-Hearing Written Submissions, paragraph 230.
[455] Project Hills: FTP/Data Room Index, **R-216**.
[456] Sale of BSG Resources Guinée S.A.R.L. from BSGR Guinea BVI to BSG Resources (Guinea) Limited (Guernsey), 25 February 2009, **C-285**.

Guinea to BSGR Guernsey, and clearly fell within this due diligence request. The Tribunal has no hesitation in finding that this agreement ought to have been disclosed by BSGR.

505.   On the basis of the above evidence, the Tribunal finds that BSGR was not compelled to disclose the agreements relating to Pentler's shareholding in BSGR Guinea BVI. However, BSGR was required to disclose the agreement relating to the sale of BSGR Guinea to BSGR Guernsey in February 2009. BSGR having failed to disclose this agreement despite its representation that all documents that had been requested by Vale had been disclosed in Section 1A of the data room, the Tribunal finds that BSGR made a false representation in this regard.

### *BSGR's representation that it had disclosed to Vale all agreements between the shareholders of BSGR Guernsey and any of its subsidiaries, as well as all agreements relating to the share capital or ownership, control, management or operation of a Group Company*

506.   Unlike BSGR's other representations, the Parties' dispute over this representation is not factual (i.e. whether the facts represented were true) but legal (concerning the scope of BSGR's representation).

507.   Vale argues that BSGR should have disclosed the agreements between BSGR Steel and BSGR Guinea BVI either in response to (a) due diligence request 1.5 for "all agreements between the shareholders of BSGR Guernsey and any of its subsidiaries, as well as all agreements relating to the share capital or ownership, control, management or operation of a Group Company";[457] or (b) due diligence request 1.7 for "all agreements relating to the acquisition or sale of shares in the Holdco, or any of their subsidiaries, the business or a significant asset of such entities".[458]

508.   BSGR *accepts* that it did not disclose the agreements between BSGR Steel and BSGR Guinea BVI, but argues that there had been no misrepresentation as those agreements did not fall within the agreed scope of due diligence request 1.5 and 1.7. This argument is founded on the definition of "BSG Group" in the Compliance Due Diligence Questionnaire, which is reproduced below.

> BSG Resources (Guinea) Limited and BSGR Guinea SARL, BSG Resources (Liberia) Limited and BSGR (Liberia) Limited (collectively the "BSG Group"). For purposes of this questionnaire BSG Resources Limited (Guernsey) is excluded from scope.

509.   Since none of the Group Companies (as defined in the Compliance Due Diligence Questionnaire) was a party to the Pentler Shareholders Agreement, the Share Purchase Agreement or the Settlement Agreement, BSGR says that it was "not required to disclose its shareholding/settlement agreements with Pentler".[459]

510.   In reply, Vale alleges that the narrowing of the definition of a "Group Company" was proposed by BSGR "precisely to hide the existence of BSGR Steel and BSGR BVI".[460]

---

[457] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, Requests 1.5 and 1.7, **C-233**.
[458] Project Hills Clifford Chance Due Diligence Request List, 29 March 2010, p. 2, **C-235**.
[459] BSGR's Statement of Rejoinder, Section header to paragraphs 71-73.
[460] BSGR's Statement of Rejoinder, paragraph 230.

Further, Vale argues that, even on BSGR's interpretation of the due diligence request, BSGR was still obliged to at least disclose any share purchase agreement or other similar documentation related to the transfer of the shares in BSGR Guinea from BSGR Guinea BVI to BSGR Guernsey, as BSGR Guinea falls squarely within the definition of a "Group Company".

511.   After carefully considering the Parties' submissions, the Tribunal is of the view that BSGR – pursuant to request 1.5 for all agreements relating to the share capital or ownership, control, management or operation of a Group Company – should have disclosed all documents relating to the transfer of the shares in BSGR Guinea from BSGR Guinea BVI to BSGR Guernsey. As noted in paragraph 504 above, BSGR did not disclose the share purchase agreement that existed between BSGR Guinea BVI and BSGR Guernsey for the transfer of the shares in BSGR Guinea,[461] BSGR's failure to disclose this document, and any others that may have existed in relation to this transfer, constituted a breach of due diligence request 1.5.

512.   Since BSGR Guinea BVI and BSGR Steel do not fall within the definition of "Group Company", the Tribunal accepts BSGR's position that no "Group Companies" were involved in the Pentler Shareholders Agreement, Share Purchase Agreement, and the Settlement Agreement. Consequently, BSGR did not have to disclose those agreements simply because BSGR Guinea BVI and BSGR Steel were a party to them.

513.   The Tribunal also finds that BSGR's failure to disclose the Pentler Shareholders Agreement, Share Purchase Agreement and Settlement Agreement does not constitute an omission which "makes that which is stated absolutely false"[462] and which makes the representation false. Leaving aside BSGR's failure to disclose the share purchase agreement regarding shares in BSGR Guinea, BSGR's representation in response to due diligence request 1.5 is otherwise true, and BSGR's failure to disclose the Pentler Shareholders Agreement, Share Purchase Agreement and Settlement Agreement does not make that representation any less true.

514.   Against Vale's accusations that BSGR had deliberately narrowed the definition of "Group Company", BSGR explains via Tchelet's first witness statement that the evolution of BSGR's corporate organisation of companies was in furtherance of the aim of improving its corporate governance by simplifying the corporate structure. Further, BSGR also points out Tchelet had revealed the corporate reorganisation to Alex Monteiro ("Monteiro") (of Vale),[463] which militates against the idea that the restructuring was intended to deceive. The Tribunal makes no comment on this matter here.

515.   In any event, even if BSGR *had* deliberately moved to conceal BSGR Guinea BVI and BSGR Steel, this would not have changed the Tribunal's conclusion that BSGR's failure to disclose the Pentler Shareholders Agreement, Share Purchase Agreement and Settlement Agreement did not constitute a misrepresentation. Given the fact that both Parties are sophisticated commercial parties with legal representation, the Tribunal agrees with BSGR that its response to due diligence request 1.5 has to be taken literally, which thus omits BSGR Steel and BSGR Guinea BVI from its ambit. However, the

---

[461] Sale of BSG Resources Guinée S.A.R.L. from BSGR Guinea BVI to BSG Resources (Guinea) Limited (Guernsey), 25 February 2009, **C-285**.
[462] *Peek v Gurney* (1873) LR 6 HL 377, 403, **RL-115**.
[463] Tchelet First WS, paragraph 86; Monteiro Second WS, paragraph 11.

Tribunal accepts Vale's more limited argument that BSGR should still have disclosed the share purchase agreement regarding shares in BSGR Guinea for the reasons stated in paragraphs 493 and 504 above, and thus finds BSGR's representation to have been false to that extent.

### *BSGR's representation that it had disclosed all contracts incapable of performance in full within six months of the date of entry, all contracts that were outside the ordinary course of business and all contracts that were entered into otherwise than at arm's length*

516.    Request 3.13 of the Legal Due Diligence Due Diligence Questionnaire requested "[a]ll contracts or arrangements entered into by any Group Company which [...] are outside the ordinary course of the relevant Group Company's business; [or] are incapable of performance in full within 6 months of the date being entered into."[464]

517.    BSGR responded "n/a".

518.    The same Request also asked for "[a]ll contracts or arrangements entered into by any Group Company which [...] are entered into otherwise than at arm's length."

519.    In its answer, BSGR referred to a contract with another BSG group company – Resources Advisory Services – which had been disclosed in Section 1Q of the due diligence data room. Vale notes that this contract did not raise any red flags.[465]

520.    Vale alleges that BSGR's representations in response to these questions were false. It submits that the BSGR-Pentler Milestone Agreement, the Share Purchase Agreement and the Settlement Agreement should have been disclosed in response to these questions as these Agreements were not capable of performance within six months.[466] Vale also alleges that the Agreements with Boutros and with Fofana were not in the ordinary course of business or at arm's length and therefore should have been disclosed.

521.    Vale contends that:

> The Share Purchase Agreement specifically contemplated that Pentler would act as a consultant "for the period of 5 years from signing date hereof," and all three agreements set forth a payment schedule that required performance extending well beyond six months from the date of entry.[467]

522.    BSGR rejects the contention that these Agreements should have been disclosed, stating that they fell outside the scope of the questions as they were not entered into by a Group Company, or a Shareholder of a Group Company at the time of the due diligence.[468]

523.    As noted above, Pentler signed the Milestone Agreement with BSGR Guinea BVI. Pentler entered into the Share Purchase Agreement and the Settlement Agreement with BSGR Steel.

524.    Leaving aside Vale's contentions that:

---

[464] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, **C-233**.
[465] Vale's Statement of Reply, paragraph 55.
[466] Vale's Pre-Hearing Written Submissions, paragraph 233.
[467] Vale's Statement of Reply, paragraph 139.
[468] BSGR's Statement of Rejoinder, paragraph 71.

524.1.   BSGR deliberately restructured the group, so as to remove all companies that had a connection to Pentler (and thus hide the relationship with Pentler); and

524.2.   BSGR unilaterally amended the definition of "Group Company" in the Legal Due Diligence Questionnaire so as to exclude BSGR Guinea BVI and BSGR Steel,

it is clear to the Tribunal that neither BSGR Guinea BVI nor BSGR Steel were included within the definition of Group Company for the purposes of the Legal Due Diligence Questionnaire.

525.   The Tribunal finds that BSGR is therefore correct that these Agreements were beyond the scope of the questions asked, and it was not required to disclose them. The Tribunal finds that there was no misrepresentation by BSGR on this ground.

### *BSGR's representation that it had disclosed all material settlements and potential litigation*

526.   Vale alleges that BSGR should have disclosed the Settlement Agreement between BSGR Steel and Pentler dated 25 July 2009,[469] whereby BSGR Steel and Pentler agreed amended payment terms for the share buyback arrangement previously agreed under the Share Purchase Agreement.

527.   In the Legal Due Diligence Questionnaire, Vale asked BSGR to disclose all "[d]etails of all prior litigation, arbitrations, investigations or settlement agreements as a result of which any Group Company has been materially affected, either financially or by adverse publicity or in any other way."[470] BSGR responded "none whatsoever".

528.   The circumstances surrounding the Settlement Agreement between BSGR Steel and Pentler are set out at paragraphs 257 to 261 above. The Tribunal observes that:

528.1.   Because of the restructure that occurred in 2009, BSGR Steel was not a "Group Company" at the time the Legal Due Diligence questionnaire was answered.

528.2.   The Settlement Agreement was not a public document and no suggestion has been made that the Agreement resulted in adverse publicity for a Group Company.

528.3.   The Settlement Agreement set a new timetable for payment obligations that were already owed under the Share Purchase Agreement. No additional financial obligations were included in the Agreement, so it did not have a financial impact on any Group Company.

529.   The Tribunal observes that BSGR Steel (the BSG party to the Settlement Agreement) did not fall within the definition of a "Group Company" under that amended definition in the Legal Due Diligence Questionnaire. Vale therefore must demonstrate that one of the companies that did fall within that definition was "materially affected, either financially or by adverse publicity or in any other way" by the Settlement Agreement. Vale has not provided any submissions on how a "Group Company" was materially affected by the Settlement Agreement. Given the Settlement Agreement did not impose any additional

---

[469] Settlement Agreement between BSGR Steel and Pentler, 25 July 2009, **R-33**.
[470] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, Request 9.7, **C-233**.

financial liability on BSGR Steel (just a revised timetable for the payment of previously agreed financial commitments), it is difficult to see how it might have had any adverse impact on the wider BSG Group. The Tribunal therefore finds that there was no misrepresentation in this regard.

530. Further disputes information was provided as follows:

530.1. The Legal Due Diligence Questionnaire asked BSGR to disclose details of any current, pending, threatened or reasonably foreseeable disputes "in which any Group Company or any of its directors, employees, or officers are presently or may become involved".[471] BSGR responded "n/a".

530.2. The Financial Due Diligence Questionnaire asked BSGR to disclose "current or anticipated litigation/claims/court proceedings."[472] Holdco was defined as BSGR Guernsey. BSGR responded "n/a".

531. Vale submits that BSGR should have disclosed (either in response to the Financial or the Legal Due Diligence questions) pending disputes with Bah, Pentler, Mme. Touré and M'Bemba Camara ("Camara") (security agent).[473] A brief description of each of these disputes is set out below.

531.1. The Bah dispute arose out of demands for payment made by Bah against BSGR pursuant to the Pentler-Bah Milestone Agreement of February 2006.[474] Pursuant to that Agreement, Pentler had agreed to pay Bah and I.S. Touré a total of USD 15.2 million based on the achievement of specified milestones. In a letter dated 30 November 2009 to Struik,[475] Bah demanded implementation of the Pentler-Bah Milestone Agreement and full payment of the sum allegedly owed (USD 15.2m). BSGR states that Bah had made previous demands for payment earlier in 2009, although no documentary evidence is provided of these demands.[476] A flurry of activity[477] in mid-2009 resulted in Pentler indemnifying BSGR for any claims made by Bah. BSGR responded to Bah on 3 December 2009 disclaiming responsibility and threatening litigation.[478] The letter came from David Clark on behalf of BSGR. Bah made a further demand addressed to Pentler, but copied to BSGR, on 15 March 2010[479] – a few days before the Legal and Financial Due Diligence Questionnaires were answered by BSGR.

531.2. The Pentler dispute relates to BSGR's failure to pay instalments due under the Share Purchase Agreement, resulting in the Settlement Agreement (as described above).

---

[471] Project Hills Legal Due Diligence Questionnaire, 29 March 2010, Request 9.1, **C-233**.
[472] Project Hills Clifford Chance Due Diligence Request List, 29 March 2010, p. 2, **C-235**.
[473] Vale's Statement of Reply, paragraph 863.
[474] Memorandum of Understanding between Pentler, Bah and I.S. Touré, 20 February 2006, **C-96**.
[475] Letter from A. Bah to BSGR, 30 November 2009 **R-125**.
[476] See Barnett First WS, paragraph 25; Noy First WS, paragraph 89; and Struik First WS, paragraph 124.
[477] This is described in Vale's Statement of Reply, paragraphs 644-648.
[478] Letter from D. Clark to A. Bah, 3 December 2009, **R-173**.
[479] Letter from A. Bah to A. Lev Ran & F. Cilins (copy BSGR), 15 March 2010, **R-51**.

531.3. The detail around a potential dispute with Mme. Touré is vague. BSGR alleges that Mme. Touré demanded money in 2009, but no documentary evidence exists of any such demands. Avidan said in his First Witness Statement that:

> Ms Touré had also tried to demand money from BSGR in 2009, although I do not remember that she used the February 2008 Contracts then. I cannot now remember exactly what happened, and it seems that we no longer have the paperwork from this incident, but I believe a lawyer acting on behalf of Ms Touré sent a letter to me at our office in Guinea and demanded payment. I cannot now remember how much they demanded. I believe I asked Mr Touré to deal with it with our lawyers.[480]

Avidan described being arrested by a General on (he believes) Mme. Touré's instruction. Avidan said he reported the incident to Thiam – the Minister of Mines – who told him not to worry.[481]

531.4. The Camara dispute involved an alleged blackmail attempt by Camara, who was a security agent for Fist Interim – a firm that consulted for BSGR. Camara sent a letter to the Ministry of Mines on 25 February 2010 alleging that he was a founding member of BSGR Guinea who had initially assisted the company in obtaining its mining rights, and that he had been appointed Director of Logistics.[482] Camara's letter referred specifically to Cilins and others who were involved in obtaining the mining rights for BSGR Guinea. He said that he had been denied the privileges of this position and demanded backpay of 92,224,000 Guinean Francs, as well as reinstatement of his position as Director of Logistics. BSGR denied Camara's claims and demanded that Fist Interim terminate his employment ("**Camara Dispute**").

532. BSGR asserts that Skadden Arps was aware of the correspondence with Bah, but did not advise BSGR that it should be disclosed.[483]

533. The Tribunal notes that the dispute with Bah did not directly involve BSGR Guernsey or its subsidiaries and would not have resulted in any direct financial liability for these companies. There was however a publicity exposure for BSGR and its subsidiaries (including BSGR Guernsey and BSGR Guinea). In an email dated 26 March 2010 referring to Bah's demands for money, Struik said to Clark "This "schmuck" from Mali [i.e., Bah] has sent again an email to all and sundry and you should have received it as well."[484] The exposure that BSGR may have faced if Bah went public with his complaints is obvious from Bah's 15 March 2010 letter to Cilins and Lev Ran:

> Mr. Frederic Cilins. this game must stop. You have played with everyone and deceived everyone. [...]
>
> I agreed to sign this contract between Pentler Holding and myself because of the relations between BSGR and Pentler Holding.

---

[480] Avidan First WS, paragraph 105.
[481] Avidan First WS, paragraph 108.
[482] Letter from M. Camara to the Minister of Mines, 25 February 2010, p. 258, **C-244**.
[483] BSGR's Statement of Rejoinder, paragraph 26.
[484] Email from M. Struik to D. Clark & S. Bryce, 26 March 2010, **C-592**.

Mr. Frederic Cilins, do you recall that you came to see me in my office in Bamako with Mr. Dao Ismael? You begged me to do everything I could to help you by making it possible for BSGR to secure a contract in Guinea. All this in spite of the unsuccessful efforts you made in Guinea alongside Mr. Dao Ismael.

I have called the former minister, Mr. El hadj Fodé Soumah, who introduced you to Ms. Mamady Touré and Mr. Sory Touré.

As a result, it was thanks to my network and contacts that you met them, and this is how you established BSGR's activities.

Mr. Frederic Cilins, for 7 years. you have played with everyone and have involved everyone. You should remember that I am Guinean and Guinea is not like it was before. It is no longer a Guinea of injustice. The country will return to its values and rediscover its rights very soon.[485]

534.    On this basis, the Tribunal considers that there was significant risk to BSGR and its subsidiaries – particularly BSGR Guinea – of adverse publicity resulting from any claims Bah may have made public. However, the question in the Legal Due Diligence Questionnaire that directly referred to adverse publicity related to previous litigation, rather than anticipated disputes. The anticipated disputes question relates to disputes in which any Group company or its directors, employees or officers may become involved. Even if BSGR Guernsey or BSGR Guinea were not direct parties to any proceedings against Bah, it is likely that the companies and/or their directors (being Clark, Merloni-Horemans, Struik and Avidan[486]) would have been involved. This is not least because the contract at the centre of the dispute was also signed by I.S. Touré – an employee of BSGR in Guinea.

535.    Those involved in answering the Questionnaire were clearly aware of the Bah dispute as it was active at the time. In the Tribunal's view, the Bah dispute should have been disclosed in response to question 9.1 of the Legal Due Diligence Questionnaire and the failure to do so renders BSGR's response to that question misleading.

536.    The potential dispute between BSGR and Mme. Touré may well have involved BSGR Guinea (who signed the alleged 2007 Agreement with Mme. Touré) or directors and officers of BSGR Guernsey. However, the evidence surrounding these allegations is simply too vague to make any assessment as to whether disclosure was required under the Due Diligence Questionnaires. The Tribunal finds that evidence does not support a finding of false representation in this regard.

537.    The Pentler dispute has already been discussed above. The dispute had been settled and the Tribunal is not aware of any financial or other impact on BSGR Guernsey or its subsidiaries. It therefore was not captured within the due diligence questions discussed above.

538.    However, the Tribunal considers that the Camara Dispute is relevant. The allegations in Camara's letter to the Minister of Mines in February 2010 (the month before the due diligence commenced) were directed at BSGR Guinea – the local subsidiary that was included within the definition of BSG Group. While BSGR denies that Camara's allegations are true (and pointed to them as an example of blackmail typically

---

[485] Letter from A. Bah to A. Lev Ran & F. Cilins (copy BSGR), 15 March 2010, **R-51**.
[486] Project Hills Follow Up Diligence Request List, 4 April 2010, p. 4, **C-44**.

encountered in Guinea[487]), it does not explain why the attempted extortion was not disclosed in response to the Legal Due Diligence Questionnaire. As Vale notes:

> The Camara incident thus presented potential litigation in three respects: (1) BSGR could bring an action against Camara for his alleged blackmail, (2) Camara could bring an action against BSGR for his claimed back wages, and (3) Camara could bring an employment action against BSGR. Camara's claims, even if frivolous, triggered BSGR's disclosure requirements, as the Legal Due Diligence Questionnaire called for the disclosure of any threatened lawsuit or, at a minimum, an "active dispute".[488]

539. The Tribunal agrees with Vale and finds that BSGR should have disclosed the Camara dispute which directly involved BSGR Guinea.

540. In summary, the Tribunal finds that BSGR should have disclosed the potential disputes with Camara and Bah in its answers to the Legal Due Diligence Questionnaire. Consequently, BSGR's response to Question 9.1 that there were no pending, threatened or reasonably foreseeable proceedings was false and misleading.

### *BSGR's representation that no personnel or shareholders of BSGR or their immediate family were Government Officials*

541. The Compliance Due Diligence Questionnaire and Supplemental Compliance Due Diligence Questionnaire asked BSGR to disclose the names of any employees who were also "Government Officials" (as defined in the Questionnaires), and also to identify any family members of BSG employees who were Government Officials.

542. In its responses to the Compliance Due Diligence Questionnaire and the Supplemental Due Diligence Questionnaire, BSGR represented to Vale that no personnel, shareholders, or ultimate beneficial owners of the BSG Group (the "**UBO**"), or their spouses, siblings, or children, were Government Officials.[489]

543. Vale alleges that this response constituted a misrepresentation because Mme. Touré fell within the definition of "Government Official" in the Questionnaires and should have been disclosed, as she was the half-sister of I.S. Touré (a BSG employee).

544. The Tribunal is satisfied on the evidence that Mme. Touré was the President's fourth wife[490] and that she was also the half-sister of I.S. Touré. It is common ground that I.S. Touré was an employee of the BSG group.[491] Therefore, if Mme. Touré was a "Government Official", this fact should have been disclosed by BSGR.

545. The term "Government Official" is defined in the relevant Due Diligence Questionnaires in the following manner.

> For purposes of this questionnaire, "Government Official" means (i) an employee, officer or representative of, or any person otherwise acting in an official capacity

---

[487] BSGR's Statement of Defence, paragraphs 112-113.
[488] Vale's Statement of Reply, paragraph 678.
[489] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question II.D, **C-30**; Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, Question II.D, **C-43**.
[490] See Vale's Statement of Reply, paragraphs 483-492.
[491] Avidan First WS, paragraph 23.

for or on behalf of, (a) a national government, political subdivision thereof, or local jurisdiction therein; (b) an instrumentality, board, commission, court, or agency, whether civilian or military, of any of the above, however constituted; (c) a government-owned/government-controlled association, organization, business or enterprise; or (d) a political party (collectively, a "Government Authority"); (ii) a legislative, administrative, or judicial official, regardless of whether elected or appointed; (iii) an officer of or individual who holds a position in a political party; (iv) a candidate for political office; (v) an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or any of its agencies; or (vi) an officer or employee of a supra-national organization (e.g, World Bank, United Nations, International Monetary Fund, OECD)

546.   Vale discusses at length the evidence that supports its contention that Mme. Touré was the President's wife. Vale then asserts that she would fall within the definition of a "Government Official" as "an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or any of its agencies." Vale presents advice from the U.S. Department of Justice (the "**U.S. DOJ**") that, under the FCPA, the definition of "Government Official" could include a spouse of the Government Official who exerts significant influence over that Official.

547.   The Tribunal does not find the U.S. DOJ's views on the FCPA persuasive as (i) Vale has produced no evidence that it was made clear to BSGR that the definition was broad enough to include a spouse who was influential, but did not hold a formal Governmental position, or that the U.S. DOJ's views were known to BSGR; and (ii) in any case, the definition of "Government Official" under the FCPA is not the same as that provided in the due diligence questionnaires. This is particularly so in relation to the ceremonial position on which Vale concentrates its arguments.

548.   The Tribunal has considered whether Mme. Touré could be considered to hold a ceremonial position with the GoG or any of its agencies. Mme. Touré was the President's wife and acted in that capacity at public functions. An example of such a function was the occasion of the opening of BSGR's Conakry office in September 2006, as shown on a video during the Educatory Hearing in September 2016.[492] The video was also exhibited by Vale with its Statement of Case.[493] The video clearly demonstrates the ceremonial role played by the President's wife at such functions, which is supported by the fact that Mme. Touré attended a number of the meetings between BSGR and the President (and/or Government Ministers) as described in Section III above. Further evidence of Mme. Touré's ceremonial position within the GoG is contained in another video of her attending a ceremony marking the fiftieth anniversary of Guinea's independence in 2008.[494] The Tribunal considers that Vale has discharged its burden of proof that she held a ceremonial function with the government which was insufficiently challenged by BSGR. BSGR primarily argues that it remained unproven that Mme. Touré was the President's fourth wife which allegation runs counter to the Tribunal's finding at paragraph 544 above.

549.   Taking the above into account, together with the fuller analysis contained in paragraphs 583 to 591 below, the Tribunal finds that BSGR's answers to the Compliance Due Diligence Questionnaire and Supplemental Questionnaire that no BSG employee or their family members were "Government Officials" constituted a false representation. This

---

[492] Transcript, Educatory Hearing, Day 2, p. 45, line 2 ff.
[493] Global Witness Video, "BSGR and the former Guinean President's wife", September 2008, **C-99**.
[494] Video of the 50th Anniversary Ceremony of the Independence of Dubréka, 2 October 2008, **C-695**.

conclusion is corroborated by the Tribunal's finding below as to Avidan's separate representation regarding the relationship between I.S. Touré and Mme. Touré.

<u>Separate representation by Avidan</u>

550.    Avidan made statements to George Kleinfeld ("**Kleinfeld**") (Vale's FCPA lawyer from Clifford Chance, Washington D.C.) during a pre-contractual interview on 8 April 2010 that went even further than the Questionnaire responses referred to above. Vale submitted that Avidan had positively stated that I.S. Touré and Mme. Touré were not related. Kleinfeld gave evidence in his Witness Statement that:

> Specifically, I asked during the interview about the BSGR employee in Guinea, Ibrahima Sory Touré, who handled public relations in-house, and whether he had any family ties to any government official. In response, Avidan volunteered that their public relations consultant in Guinea, who has the last name of "Touré," was not related to the former president of Guinea or his wife. Avidan said that he may have been from the same village as one of the former presidents, but to his knowledge, the employee is not related to anyone in the Government. Avidan said that Touré is a common name in the country.[495]

551.    In the Tribunal's view, Avidan's explanation for this statement was that, although he could not recall the specific questions, he thought he was asked about whether I.S. Touré was related to former President Ahmed Sékou Touré.[496] Importantly, Avidan also said that, had he been asked whether I.S. Touré was related to Mme. Touré, he would have said yes.[497] There is, therefore, no dispute between the Parties that BSGR knew that I.S. Touré was Mme. Touré's half-brother at the time of the due diligence process.

552.    Given that President Ahmed Sékou Touré died in 1984 and had nothing to do with the Simandou mining rights or BSGR's operations in Guinea, the Tribunal does not find Avidan's explanation plausible. It would have made no sense for Kleinfeld to have asked Avidan questions about a President who had died over 20 years before BSGR entered Guinea.

553.    The Tribunal notes that Kleinfeld is a respected FCPA specialist in a large international law firm. He provided a written witness statement and appeared at the February 2017 hearing to provide oral evidence. At the hearing, the Tribunal found him to be a credible witness. Avidan, on the other hand, did not make himself available for questioning at the February 2017 hearing (including by video link, as the Tribunal understands he could not travel out of Israel at the time). In addition, Avidan's written evidence on the matter is vague as he could not "remember precisely what [he] was asked about this point."[498] Given these circumstances, the Tribunal prefers the evidence of Kleinfeld that Avidan stated that I.S. Touré was not related to the President's wife and considers that this must have been a reference to Mme. Touré.

554.    Based on this evidence, the Tribunal finds that Avidan provided false information about the relationship between I.S. Touré and Mme. Touré. Avidan incorrectly told Vale that I.S. Touré was not related to the former President's wife or to any Government Official. This representation was false and misleading.

---

[495] Kleinfeld First WS, paragraph 35.
[496] Avidan First WS, paragraph 149.3.
[497] Avidan First WS, paragraph 149.3.
[498] Avidan First WS, paragraph 149.3.

*__BSGR's representation that it was not involved in the Government of Guinea's decision to withdraw Rio Tinto's mining rights__*

555.   In the Compliance Due Diligence Questionnaire, Vale asked BSGR "[w]hat involvement (if any) has the BSG Group, directly or indirectly, had in the circumstances surrounding the decision of the Government of Guinea to seize the rights that Rio Tinto previously held to the North Block of the Simandou Project?"[499]

556.   BSGR responded that "BSGR Guinea had no involvement directly or indirectly in any of the circumstances surrounding the decision, the Government held their own inter-ministerial committee, and it was passed in the ministers' cabinet and was ratified by Presidential decree."[500]

557.   With regard to the process by which BSGR obtained the concessions for Simandou Blocks 1 and 2, BSGR stated in the Compliance Due Diligence answers that "BSGR Guinea applied in writing for the exploration licences for Simandou Blocks 1 and 2 in accordance with the Mining Code of Guinea. BSGR Guinea was awarded the exploration licences for Blocks 1 and 2 in December 2008 in accordance with the Mining Code."[501]

558.   Avidan told the Clifford Chance lawyers during the pre-contractual interviews on 8 April 2010 that: "neither BSGR nor anyone acting on its behalf had interceded with the government officials in Guinea in an effort to get the Rio Tinto concession revoked."[502]

559.   Vale alleges that the representations above were false as BSGR had lobbied the GoG to ensure that, when Rio Tinto's rights were revoked, the rights would be granted to BSGR.[503] Vale's allegation is that BSGR's answers omitted key information – BSGR's version of events was "not the whole story: far from being a passive bystander, BSGR actively lobbied the GoG to revoke Rio Tinto's rights, and more important, engaged in bribery to ensure that it would be the one awarded with research permits to the area once it became available."[504]

560.   As set out in the Factual Background section of this Award, it is evident that BSGR had been interested in Blocks 1 and 2 from shortly after its entry into Guinea. The Tribunal recalls the following facts:

560.1.   The MoU between the GoG and BSGR signed in February 2006 specifically included Blocks 1 and 2 in the areas subject to the MoU (see Appendix 1 of the MoU). Avidan gave evidence that he believed the MoU granted BSGR a right of first refusal over Blocks 1 and 2 if they became available.[505]

560.2.   The BSGR-Pentler Milestone Agreement with Pentler (February 2006) included milestones and success fees related to obtaining permits over Blocks 1 and 2.

---

[499] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question III.E, **C-30**.
[500] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question III.E, **C-30**.
[501] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question III.F, **C-30**.
[502] Kleinfeld First WS, paragraph 30.
[503] Vale's Statement of Reply, paragraph 860.
[504] Vale's Statement of Reply, paragraph 694.
[505] Avidan First WS, paragraph 68.

560.3.   The Pentler-Bah and Pentler-Daou Milestone Agreements (February 2006) also contained milestones and success fees related to BSGR obtaining permits for Blocks 1 and 2.

560.4.   In December 2006, representatives of BSGR and the CPDM allegedly used the Presidential helicopter to visit areas of the Simandou that (at the time) were subject to Rio Tinto's exploration permits.

560.5.   From mid-2007, BSGR began to lobby the Government to grant BSGR mining rights to Simandou Blocks 1 and 2. In July 2007 and early 2008 BSGR allegedly signed an agreement with Mme. Touré to gain her assistance in obtaining these rights. Steinmetz flew to Guinea in February 2008 to meet with President Conté to discuss Blocks 1 and 2. Blocks 1 and 2 were subject to permits granted to Rio Tinto throughout this period.

560.6.   In April 2008, Avidan and Steinmetz met with the President (and Mme. Touré) to discuss the revocation of Rio Tinto's mining rights.[506] During this meeting, the President instructed relevant members of the Government that he wanted Rio Tinto's mining rights reviewed. Following a second meeting with Avidan, the President ordered that a Presidential decree revoking Rio Tinto's mining concession be prepared.[507] Avidan also attended meetings with Government officials, including the President's Secretary General, Mamady Sam Soumah ("**Soumah**"), at which the revocation of Rio Tinto's rights was discussed.[508]

560.7.   Fofana, consultant for BSGR in 2008-2009, also lobbied Government officials on BSGR's behalf. He was close friends with Nabé and Thiam who both held the position of Minister of Mines at different times between 2008-2010. Nabé said Fofana called him to discuss the granting of permits to BSGR.[509]

561.   Avidan said in his witness statement in this arbitration that BSGR wanted to position itself to ensure that it received the permits for Blocks 1 and 2 if they were revoked from Rio Tinto. He stated:

When I learnt about the local community's frustration with Rio Tinto, I was even more convinced that these exploration areas would become available one day. BSGR therefore prepared to apply for the exploration permits. We decided to focus on blocks I and 2. We had started the preparation almost a whole year before they actually became available in 2008. It seemed that there was enough chance that Rio Tinto would lose its permits to warrant us investing the time and limited expense in getting ourselves ready.

Whilst we did not advertise the fact that we were doing this, I did not keep it quiet either and would mention our interest in meetings I had with people influential in the industry and officials. In my regular meetings with the Minister of Mines, the President and the Prime Minister, I repeatedly explained the work that we were doing in Simandou North and South, and said that if Rio Tinto's blocks came up we would like to apply for them. Indeed, from late 2007, until he died in December 2008, I saw President Conte about seven or eight times - about once every couple of months - so that BSGR was always on his radar. I told Mr Struik that I

[506] Avidan First WS, paragraph 91.
[507] Vale's Statement of Case, paragraphs 163-164.
[508] Avidan First WS, paragraph 91.
[509] Nabé WS, paragraph 20.

was convinced that the blocks were going to be taken away from Rio Tinto and that I was going to prioritise conversations about blocks 1 and 2 with people of influence. I told Mr Steinmetz this too. By doing this, I hoped to keep BSGR foremost in the decision-makers' minds when the time came to make the application [...].[510]

562.    In the Tribunal's view, the evidence indicates that the influence of BSGR (and its supporters) on the ailing President was considerable. Senior officials – including the Prime Minister and the Minister of Mines – who were not receptive to BSGR's positioning with regard to Blocks 1 and 2 were removed by the President. Prime Minister Souaré, who was newly appointed in September 2008, noted the unusual level of interference by the Presidency in Ministerial business in relation to Blocks 1 and 2.[511]

563.    During the February 2017 arbitral hearing, former Minister of Mines, Louncény Nabé, gave evidence that the decision to retrocede Blocks 1 and 2 from Rio Tinto and to grant permits to BSGR was made by the Council of Ministers pursuant to the President's instruction. He said, "[t]he council took the decision by following the wish that the President had already expressed ... The council would not have taken that decision at all if the instruction had not been given by the President."[512]

564.    Nabé also said that he was summoned by the President to a meeting in September 2008 where he was told to "act quickly" with respect to the retrocession of part of Rio Tinto's area at Simandou.[513] Mme. Touré was also present at the meeting.[514] Nabé said that he was told to "hurry up" and grant the permits for Simandou Blocks 1 and 2 to BSGR as the President was becoming impatient.[515]

565.    Nabé also confirmed that, in his view, Mme. Touré and I.S. Touré favoured BSGR's interests and that they had a "definite impact" on the President's decisions in relation to these matters.[516] However, Nabé stated that he had no knowledge about the payment of any bribes, nor had he heard rumours that such bribes were paid.

566.    The Tribunal considers – also taking into account that Minister Nabé was not cross-examined by BSGR due to its failure to appear at the hearing – that Minister Nabé's evidence is reliable and truthful, and consistent with the evidence referred to above. In the Tribunal's view, the evidence establishes that BSGR decided at an early stage of its Guinea operations that it wished to obtain permits for Blocks 1 and 2. BSGR lobbied the Government to ensure that, if the rights were revoked from Rio Tinto, the Government would grant permits for these areas to BSGR. This appears to have been a key intention of the MoU signed in February 2006 with the GoG.

567.    BSGR and Mme. Touré met with the President on a number of occasions to press BSGR's position with regard to Blocks 1 and 2. These meetings impacted upon the way events unfolded. Indeed, in direct connection with these meetings, the President issued direct instructions for Rio Tinto's permits to be revoked and for BSGR to be granted permits for Blocks 1 and 2. Ultimately, the Government made Rio Tinto retrocede Blocks

---

[510] Avidan First WS, paragraphs 62-63.
[511] Souaré First WS, paragraph 40.
[512] Transcript, Merits Hearing, Day 2, p. 33, line 25 – p. 34, line 2 and p. 34, lines 6-7.
[513] Nabé WS, paragraphs 8-9.
[514] See Vale's Statement of Reply, paragraph 373.
[515] Nabé WS, paragraph 17.
[516] Transcript, Merits Hearing, Day 2, p. 35, lines 9-23.

1 and 2, rather than simply revoking all of its concessions. According to Nabé, this was a compromise position designed to keep the President happy.

568.    Leaving aside for later consideration the issue of whether any corruption occurred, the Tribunal finds that the facts demonstrate that BSGR's statement that it had no involvement – direct or indirect – in the GoG's decision to revoke Rio Tinto's rights was false and misleading. This is also the case with BSGR's description of the process by which it was granted the exploration licence for Blocks 1 and 2. BSGR lobbied for the revocation of Rio Tinto's rights and for BSGR to be granted those rights instead. The meetings in 2008 during which the President issued various instructions to his Secretary-General regarding what should happen with Simandou Blocks 1 and 2 are evidence of, at the very least, an indirect influence or involvement upon the circumstances surrounding Rio Tinto's loss of its mining rights. This information should have been disclosed to Vale in response to the Compliance Due Diligence Questionnaire.

569.    Based on the above, the Tribunal finds that the answers provided by BSGR to the due diligence questions which indicated that it was not involved in the GoG's decision to revoke Rio Tinto's concessions, were misleading and false.

### *BSGR's representation that it had no financial relationships with Government Officials or their spouses and had not made any payments to Government Officials in connection with obtaining the mining rights*

570.    The Compliance Due Diligence Questionnaire asked BSGR to disclose any "business or financial relationship, directly or indirectly, between BSG Group and any Guinean Government Official or the spouse ... of a Government Official". BSGR responded "[n]one whatsoever".[517]

571.    Leaving aside for the moment the allegations of corruption, the issue before the Tribunal here is whether there was any direct or indirect business or financial relationship between the BSG Group and Mme. Touré – President Conté's fourth wife.

572.    BSGR has attempted to downplay any such relationship, stating that Pentler had a business relationship with Mme. Touré that was unconnected to BSGR. Avidan suggested that the business venture between Pentler and Mme. Touré concerned the importation of chickens.[518]

573.    Noy stated in his First Witness Statement that:

> Pentler had business relations with Mamadie Touré and later with her company, Matinda, in consumer goods, foods, pharmaceuticals and mining. Mamadie Touré was a businesswoman, whose company had been granted mining permits of its own. The business Pentler conducted with Mamadie Touré and Matinda was unrelated to BSGR. It was also unconnected to the agreement we had reached with her in February 2006, in which we granted her an economic interest in Pentler. She was granted an interest following our local partners' agreement with her.[519]

574.    The Tribunal considers that the evidence does not support BSGR's position that it had no business or financial relationship whatsoever with Mme. Touré.

---

[517] Compliance Due Diligence Questionnaire for Project Hills, 29 March 2010, Question III.C, **C-30**.
[518] Avidan First WS, paragraph 45.
[519] Noy First WS, paragraph 8.

574.1.    The Tribunal has been provided with copies of several contracts between Pentler / BSGR and Mme. Touré (or her company Matinda) which relate to the Simandou project. These contracts are:

574.1.1.    The MoU dated 20 February 2006[520] between Pentler and Mme. Touré, which granted her a 5% interest in BSGR Guinea BVI and thereby an indirect interest in BSGR Guinea. It was agreed that the interest would be created through granting Mme. Touré a shareholding in Pentler. The MoU stated that it was BSGR that proposed granting this interest to Mme. Touré and that she was "a local partner" of BSGR Guinea BVI. The MoU was reviewed by Merloni-Horemans (Director of BSGR).[521]

574.1.2.    Two Engagement Letters dated 21 July 2006 between Pentler and Mme. Touré concerning her assistance in obtaining bauxite permits for BSGR Guinea. These two Engagement Letters both stated:

The company BSGR Guinea contacted the Guinean authorities with the aim of establishing a partnership for the development and use of part of the SIMANDOU iron deposits.

Within the framework of this project, BSGR Guinea submitted a proposal to the authorities allowing the Republic of Guinea a 15% shareholding and a 5% shareholding for Mrs. Mamadie TOURE as a local partner. To this end, the company BSGR Guinea along with the Republic of Guinea shall create a partially state-owned limited company named Compagnie Minière de SIMANDOU.

In order to incorporate the shareholding of Mrs. Mamadie TOURE, the company BSGR Guinea shall transfer 17.65% of its capital to the company Pentler Holdings Ltd, 33.30% of the capital of which shall be allocated to Mrs. Mamadie TOURE ...

It is understood that the procurement of these exploration permits to the company BSGR Guinea shall entail de facto the shareholding of Mrs. Mamadie Touré in this project, through her free shareholding of 33.30% stipulated under the terms of the Memorandum of Understanding between Mrs. Mamadie Touré, on one hand, and the company Pentler Holdings Ltd, on the other hand, dated February 20, 2006.[522]

574.1.3.    Memorandum of Understanding between Matinda and BSGR Guinea dated 20 June 2007, which provided for the transfer of 5% interest in BSGR Guinea to Matinda in return for assistance in obtaining mining rights. BSGR has alleged that this agreement is a forgery.[523]

574.1.4.    Commission Contract dated 27 February 2008 between Matinda and BSGR, pursuant to which BSGR undertook to pay a USD 4 million

---

[520] Touré MoU, 20 February 2006, pp. 223-224, **C-6**.
[521] Email from Karine (Noy's assistant) to S. Merloni-Horemans, 15 February 2006, **C-344**.
[522] Engagement Letter, 21 July 2006, pp. 226-229, **C-6**; Engagement Letter, 21 July 2006, pp. 231-232, **C-6**.
[523] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.

commission for assistance in obtaining the Simandou Blocks 1 and 2 mining rights. This agreement provided that USD 2 million would be paid to Matinda and the remaining USD 2 million would be paid to others who assisted. BSGR has alleged that this agreement is a forgery.[524]

574.1.5.    Memorandum of Understanding between Matinda and BSGR Guinea BVI dated 28 February 2008, which granted Matinda a 5% interest in Simandou Blocks 1 and 2. BSGR has alleged that this agreement is a forgery.[525]

574.1.6.    An untitled contract between Mme. Touré and Pentler dated 8 July 2010, which referred directly to the Simandou project in Guinea. Pentler undertook to pay Mme. Touré an additional USD 5 million.[526] Noy has claimed that this contract is a forgery.[527]

574.1.7.    An untitled agreement between Pentler and Matinda dated 3 August 2010,[528] pursuant to which Pentler agreed to pay Mme. Touré USD 5 million in return for Mme. Touré not using the agreement against Pentler and taking "full responsibility for all actions taken in Guinea by any third party against Pentler."

574.1.8.    An undated agreement between Pentler and Matinda/Mme. Touré, whereby Pentler agreed to pay Matinda USD 3.1 million for its contribution to Pentler's activities in Guinea. Matinda undertakes to keep the agreement confidential and not to contact any of the parties with which Pentler collaborated.[529] Under that agreement Matinda withdrew all undertakings and obligations contracted with Pentler "and its business partners". Matinda also agreed not to use "these documents" in relation to any third party and to take responsibility for any actions against Pentler. In this contract, Pentler also thanks Matinda for its collaboration and support since 2005.

574.2.    Mme. Touré held a 33.3% interest in Pentler which held a 17.65% interest in BSGR Guinea BVI (the 100% owner of BSGR Guinea). In 2010, Pentler paid Mme. Touré over USD 10 million following the share buyback whereby the interest in BSGR Guinea BVI was returned to BSGR Steel.[530]

574.3.    There is a dispute between the Parties as to the authenticity of the three contracts allegedly signed by Mme. Touré and BSGR in July 2007 and February 2008 and one agreement signed with Pentler. However, even if these agreements are forgeries (and the Tribunal makes no finding on their

---

[524] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.
[525] BSGR's Statement of Defence, paragraphs 11 and 218; BSGR's Statement of Rejoinder, paragraph 121.
[526] Untitled Agreement between Mme. Touré and Pentler, 8 July 2010, p. 234, **C-6**.
[527] Noy First WS, paragraph 80.
[528] Untitled Agreement between Mme. Touré and Pentler, 3 August 2010, pp. 236-237, **C-6**.
[529] Undated Agreement between Pentler and Matinda/Mamadie Touré, pp. 239-240, **C-6**.
[530] Noy First WS, paragraph 72.

authenticity here), there is considerable evidence of a financial or business relationship between BSG entities and Mme. Touré apart from these allegedly forged agreements.

574.4.   As described in the Factual Background,[531] Avidan met Mme. Touré on multiple occasions to discuss the Simandou project. Mme. Touré also attended meetings with Avidan and President Conté where the revocation of Rio Tinto's rights was discussed. It is also evident that Mme. Touré helped BSGR obtain bauxite permits in Guinea in April 2006.[532]

574.5.   It is also evident from the above contracts that Pentler and Mme. Touré collaborated closely on Pentler's activities in Guinea, despite Noy's repeated assertions in his Witness Statement that Mme. Touré played no role at all in obtaining the mining permits for BSGR. The facts simply do not support Noy's account of Mme. Touré's involvement (or lack of it) in the Simandou project.

574.6.   Former Ministers Nabé and Souaré gave evidence for Vale that Mme. Touré advocated for BSGR to her husband, President Conté, who was clearly influenced by her views. Nabé added that when I.S. Touré (BSGR's employee) would visit the Ministry of Mines to "advocate for the granting of Simandou permits to" BSGR, "[h]e would introduce himself as the brother of the President's wife".[533]

574.7.   The transcript of the conversation between Cilins and Mme. Touré recorded by the FBI in 2013, together with the evidence provided by Peter Kilpatrick (Special Agent, FBI) in the Complaint submitted to the New York District Court (Southern District), reveals that Cilins offered Mme. Touré a considerable sum of money to destroy certain documents – including the three contracts of February and July 2008 between Matinda and BSGR, which BSGR alleges are forgeries.[534] Cilins states expressly that the money was coming from "Beny" and that Cilins was delivering the message from "Beny".[535]

575.   Aside from the contested 20 June 2007 contract, none of the agreements noted above were entered into directly by members of the BSG Group, but they all concerned (at least indirectly) BSGR Guinea and the assistance provided by Mme. Touré to secure the mining rights held by BSGR Guinea. Mme. Touré was an indirect owner of BSGR Guinea for a period of time and was called "a local partner".

576.   It is clear to the Tribunal that Mme. Touré had a business/financial interest in the BSG Group and eventually received a third of the money that was paid to Pentler under the share buyback arrangement, as compensation for her interest in BSGR Guinea BVI. She was involved in many key meetings, and it cannot be seriously maintained that she had

---

[531] See Sections III.G to III.I of this Award. See also Mme. Touré's description of the meetings she attended with Avidan in Mme. Touré's Written Statement to the U.S. authorities, 2 December 2013, pp. 36-41, **C-6**.

[532] Email chain between Y. Tchelet, R. Oron et al re: Invoice, 10-15 May 2006, **R-179**; Struik First WS, paragraph 48; Engagement Letter, 21 July 2006, pp. 226-229, **C-6**; Engagement Letter, 21 July 2006, pp. 231-232, **C-6**; Vale's Statement of Reply, paragraphs 405-407.

[533] Nabé WS, paragraph 7.

[534] See USA v. Cilins, Complaint, Dkt. No. 1, 15 April 2013, paragraph 17, **C-8**.

[535] USA v. Cilins, Complaint, Dkt. No. 1, 15 April 2013, paragraph 22(a) and p. 134, **C-8**.

no business or financial relationship with BSGR – including BSGR Guinea, the local company holding the mining rights.

577. The Compliance Due Diligence Questionnaire asked about direct and indirect relationships with Government Officials or their spouses. It is the Tribunal's view that some of the above contracts individually or at least in aggregate constitute clear evidence of an indirect business and/or financial relationship between BSGR and Mme. Touré that should have been disclosed by BSGR.

578. In view of the above facts, the Tribunal finds that BSGR's representation that the BSG Group had no direct or indirect relationship (business or financial) with any Government Official or their spouse was false and misleading.

### *BSGR's representation that it had not engaged in bribery or corruption*

579. BSGR represented to Vale in section VI of its Compliance Due Diligence Questionnaire that it did not engage in bribery or corruption:

> In regard to the Simandou Project and Project Hill, the BSG Group has not and will not, and does not know or have reason to know that any of its directors, employees, shareholders, UBOs or Consultants have, or in the future, will, pay, offer, promise, or authorize the payment of money or anything of value, directly or indirectly, to any Government Officials while knowing or having reason to know that any portion of such exchange is for the purpose of:

> (a)   influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist the BSG Group, Vale S.A. or any other party in obtaining or retaining business, or directing business to any third party; NONE WHATSOEVER

> (b)   securing an improper advantage; NONE WHATSOEVER

> (c)   inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Authority in order to assist the BSG Group, Vale S.A. or any other party in obtaining or retaining business, or directing business to any third party; or NONE WHATSOEVER

> (d)   providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s). NONE WHATSOEVER[536]

580. This representation was also made in section VI of the Supplementary Compliance Due Diligence Questionnaire; section III.A. of the Compliance and Supplementary Compliance Due Diligence Questionnaires; and Steinmetz's and David Clark's anti-bribery certificates dated 9 April 2010 and 30 April 2010 respectively, albeit with minor differences which are inconsequential to the Tribunal's analysis in this section.

581. Vale alleges that this representation was false because BSGR had bribed:

581.1.   Mme. Touré;

581.2.   Mahmoud Thiam; and

---

[536] See also Compliance Due Diligence Questionnaire, section III.A, p. 7, **C-30**.

581.3.    President Conté.

582.    The Tribunal will deal with each of these allegations separately.

*i.    Mme. Touré*

583.    The wording of BSGR's anti-bribery representations makes it clear that, to establish the falsity of BSGR's anti-bribery representations in respect of Mme. Touré, Vale must show that Mme. Touré was a "Government Official" within the meaning of BSGR's representations at the material time. If she was, Vale must then show that:

583.1.    the BSG Group (a) paid (or authorised the payment of) or offered (or promised) money or anything of value, directly or indirectly, to Mme. Touré; or (b) knew or had reason to know that any of its directors, employees, shareholders, ultimate beneficial owners or Consultants paid (or authorised the payment of) or offered (or promised) money or anything of value, directly or indirectly, to Mme. Touré (the "**First Limb**");

583.2.    such payment or offer was for the purpose of achieving one of the four aims referred to in BSGR's anti-bribery representations; (the "**Second Limb**"); and

583.3.    BSGR knew that such exchange was for the purpose of achieving one of the four aims in the subsections in BSGR's anti-bribery representations (the "**Third Limb**").

**Whether Mme. Touré was a Government Official**

584.    The Tribunal begins by observing that the term "Government Official" is defined in BSGR's representations as:

(i)    an employee, officer or representative of, or any person otherwise acting in an official capacity for or on behalf of, (a) a national government, political subdivision thereof, or local jurisdiction therein; (b) an instrumentality, board, commission, court or agency, whether civilian or military, of any of the above, however constituted; (c) a government-owned/government-controlled association, organisation, business or enterprise; or (d) a political party (collectively, a "Government Authority");

(ii)    a legislative, administrative or judicial official, regardless of whether elected or appointed;

(iii)    an officer or individual who holds a position in a political party;

(iv)    a candidate for political office;

(v)    an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or any of its agencies; or

(vi)    an officer or employee of a supra-national organisation (e.g., World Bank, United Nations, International Monetary Fund, OECD).[537]

585.    Vale argues that that Mme. Touré fell within category (v) ("an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or

---

[537] Compliance Due Diligence Questionnaire, section II.D, p. 3, **C-30**.

any of its agencies") because her "marriage to President Conté, influence on government ministers and the President, and ceremonial role in representing the [GoG], made her a Government Official" within this category.[538]

586.    The Tribunal considers that there is no proof that Mme. Touré held any official position within the GoG or other appointed or inherited position. It is true that the Tribunal found that Mme. Touré was President Conté's wife, but the mere spousal relationship does not confer upon her an official, appointed or inherited position.

587.    Nevertheless, the Tribunal notes that Mme. Touré attended a reception hosted by BSGR on 19 September 2006 to mark the occasion of the opening of BSGR's Conakry office.[539] The Tribunal is persuaded that Mme. Touré was performing a *ceremonial* function for the GoG within the meaning of category (v). In the Tribunal's view, for category (v) to bite, it is not necessary that she was representing the GoG in the sense of being authorised to make commitments on behalf of the Republic of Guinea. It is sufficient that she attended a public ceremony, not in a private capacity as a businesswoman, but in the position of the spouse of the Head of State endorsing a foreign company investing in the country and, in this case, BSGR's investments in Guinea. She had therefore performed a ceremonial function in this capacity and was a "Government Official". The Tribunal's finding is corroborated by a further video recording of a ceremony of the fiftieth anniversary of independence of the Republic of Guinea[540] held in Dubréka, where Mme. Touré clearly performed a ceremonial function as the spouse of the Head of State, including laying a wreath on the local monument for martyrs. Moreover, Mme. Touré was issued a diplomatic passport, which identified her as the wife of the President of Guinea.[541]

588.    The Tribunal also notes that the due diligence definition of a "Government Official" is broader than that contained in the FCPA. It bears repeating the definition in the Compliance Due Diligence Questionnaire quoted above:

(i)    an employee, officer or representative of, or any person otherwise acting in an official capacity for or on behalf of, (a) a national government, political subdivision thereof, or local jurisdiction therein; (b) an instrumentality, board, commission, court or agency, whether civilian or military, of any of the above, however constituted; (c) a government-owned/government-controlled association, organisation, business or enterprise; or (d) a political party (collectively, a "Government Authority");

(ii)    a legislative, administrative or judicial official, regardless of whether elected or appointed;

(iii)    an officer or individual who holds a position in a political party;

---

[538] Vale's Statement of Reply, paragraph 26(c); Vale's Pre-Hearing Written Submissions, paragraph 17(c).
[539] Presentation by BSGR Guinea BVI to the Minister of Mines, Dr Ousmane Sylla, 19 September 2006, **R-26**; BSGR's Chronicle of Events and Overview of BSGR's Iron Ore Investment in Guinea in Response to the Technical Committee, 26 December 2012, paragraph 45, p. 12, **C-23**; Global Witness Video, "BSGR and the former Guinean President's wife," September 2008, **C-99**; Vale's Statement of Case, paragraph 157; BSGR's Statement of Defence, paragraph 51; Vale's Statement of Reply, paragraph 360.
[540] Video of the 50th Anniversary Ceremony of the Independence of Dubréka, 2 October 2008, **C-695**.
[541] Diplomatic Passport of M. Touré, **C-75**.

(iv)   a candidate for political office;

(v)    an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or any of its agencies; or

(vi)   an officer or employee of a supra-national organisation (e.g., World Bank, United Nations, International Monetary Fund, OECD).[542]

589.   By contrast, the FCPA has a shorter and more open-ended definition of "Government Official" (Section 30A(f)(1)(A) of the Exchange Act, 15 U.S.C. § 78dd-1(f)(1)(A); 15 U.S.C. §§ 78dd-2(h)(2)(A), 78dd-3(f)(2)(A), CL-76, p. 29 and footnote 112):

> any officer or employee of a foreign government or any department, agency, or instrumentality thereof, or of a public international organization, or any person acting in an official capacity for or on behalf of any such government or department, agency, or instrumentality, or for or on behalf of any such public international organization.

590.   The difference between the Compliance Due Diligence Questionnaire definition and the FCPA definition reinforces the Tribunal's view that the addition of a ceremonial function by the Parties in the Questionnaire's definition was deliberate, and ought to be given full effect. The Tribunal therefore concludes that Mme. Touré held a ceremonial position in her capacity as the spouse of the Head of State within the meaning of category (v) and finds that she was a "Government Official".

**The First Limb**

591.   There are two ways by which Vale can satisfy the First Limb.[543] The first is to show that the BSG Group itself paid (or authorised the payment of) or offered (or promised) money or anything of value, directly or indirectly, to Mme. Touré. The second is to show that the BSG Group knew or had reason to know that any of its directors, employees, shareholders, ultimate beneficial owners or Consultants paid (or authorised the payment of) or offered (or promised) money or anything of value, directly or indirectly, to Mme. Touré.

592.   The Tribunal proceeds to analyse if the BSG Group itself had paid or offered benefits to Mme. Touré (i.e. the first method of fulfilling the First Limb), noting that the BSG Group was defined as BSGR Guernsey and BSGR Guinea and two other related companies in the Compliance Due Diligence Questionnaire, and was later broadened to include BSGR and two more related companies in the Supplemental Compliance Due Diligence Questionnaire (so BSGR's conduct will also be scrutinised in the evidentiary analysis below). If Vale fails to satisfy the First Limb through the first method, the Tribunal will examine if Vale fulfils the First Limb through the second method.

593.   Vale argues that BSGR offered benefits to Mme. Touré, and its central case theory can be broken down into the following six episodes.

---

[542] Compliance Due Diligence Questionnaire, section II.D, p. 3, **C-30**.

[543] Under the First Limb, Vale must show that the BSG Group (a) paid (or authorised the payment of) or offered (or promised) money or anything of value, directly or indirectly, to Mme. Touré; or (b) knew or had reason to know that any of its directors, employees, shareholders, ultimate beneficial owners or Consultants paid (or authorised the payment of) or offered (or promised) money or anything of value, directly or indirectly, to Mme. Touré. See paragraph 583.1.

594.    First,[544] in 2005 I.S. Touré introduced Cilins to Mme. Touré. Cilins told Mme. Touré that BSGR wanted to obtain rights to iron ore deposits, asked her to put BSGR in touch with President Conté and told her that USD 12 million would be distributed to Guineans (including her) if BSGR obtained the mining rights.

595.    Second,[545] in 2006 BSGR hatched a plan to interpose an intermediary (Pentler) between BSGR and Mme. Touré so that Pentler could be used to grant shares in BSGR Guinea BVI to Mme. Touré. To carry out that scheme, Onyx sold Pentler to Cilins, Noy and Lev Ran on 14 February 2006, and Pentler executed powers of attorney in favour of Noy and Lev Ran. BSGR Guinea BVI then entered into a Milestone Agreement with Pentler on 14 February 2006 under which Pentler would receive 17.65% of the shares in BSGR Guinea BVI and be paid milestone payments. Pentler then entered into a MoU with Mme. Touré on 20 February 2006 (the Touré MoU),[546] which promised her a 5% interest in BSGR Guinea BVI, by giving to her a 33.3% interest in Pentler (which would own 17.65% interest in BSGR Guinea BVI).

596.    Third,[547] subsequent to the Touré MoU, Mme. Touré helped BSGR to obtain exploration permits for bauxite in Northern Guinea. Pentler entered into two engagement letters with Mme. Touré on 21 July 2006, noting that BSGR Guinea BVI had obtained these bauxite permits and stating that this entitled Mme. Touré to shares in this bauxite project through her 33.3% share stipulated under the Touré MoU.[548]

597.    Fourth,[549] Pentler's involvement in BSGR's Guinean operations ceased towards the end of 2006. BSGR started to deal directly with Mme. Touré. BSGR obtained exploration permits for uranium on 28 February 2007. Mme. Touré wanted reassurance that her shareholding interest remained secure, so on 20 June 2007, BSGR Guinea entered into a memorandum of understanding with Matinda, noting the procurement of the uranium permits and accepting the transfer of 5% of its shares to Matinda.[550]

598.    Fifth,[551] over the course of 2007, relations between BSGR and Pentler deteriorated. BSGR Steel and Pentler therefore entered into a Share Purchase Agreement,[552] under which BSGR Steel purchased Pentler's 17.65% share in BSGR Guinea BVI for USD 22 million. This would cut out Mme. Touré's indirect shareholding in BSGR entities, so it was necessary for new contracts to be executed to retain her shareholding. On 28 February 2008, Matinda and "BSG Resources Guinée" entered into a memorandum of understanding, under which "BSG Resources Guinée" undertook to give a 5% shareholding in Simandou Blocks 1 and 2 to Matinda.[553] On 27 February 2008, Matinda and "BSG Resources" executed a commission contract, under which "BSG Resources" undertook to pay Matinda (and others) USD 4 million as commission for assistance in

---

[544] Vale's Statement of Case, paragraph 141; Vale's Statement of Reply, paragraph 429.
[545] Vale's Statement of Reply, paragraphs 383-410.
[546] Touré MoU, 20 February 2006, pp. 223-224, **C-6**.
[547] Vale's Statement of Reply, paragraphs 411-417.
[548] Engagement Letter, 21 July 2006, pp. 226-229, **C-6**; Engagement Letter, 21 July 2006, pp. 231-232, **C-6**.
[549] Vale's Statement of Reply, paragraphs 418-428.
[550] Memorandum of Understanding between BSGR and Matinda, 20 September 2007, **R-234**.
[551] Vale's Statement of Reply, paragraphs 418-428.
[552] Share Purchase Agreement between BSGR Steel and Pentler, 24 March 2008, **R-28**.
[553] Memorandum of Understanding, 28 February 2008, **R-129**.

obtaining the Simandou Blocks 1 and 2 mining rights.[554] The contract stated that USD 2 million would be paid to Matinda and the remaining USD 2 million would be paid to others who had assisted in this undertaking.

599.    Sixth,[555] subsequent to the execution of the Joint Venture Agreements, Pentler signed two agreements on BSGR's instructions with Mme. Touré and Matinda on 8 July 2010 to end its relationship with Mme. Touré. In one agreement, Pentler undertook to pay USD 5.5 million for Matinda's "participation in all activities conducted in Guinea".[556] In the other agreement, Pentler undertook to pay an additional USD 5 million "[s]ubject to the proper implementation and functioning and the next stages of the operation conducted by [Pentler's] partners on the Simandu [sic] project" (i.e. a conditional agreement).[557] However, these contracts contained references to Simandou which (if discovered) might expose BSGR, so Mme. Touré, Matinda and Pentler executed two replacement contracts on 3 August 2010[558] that removed the references. Pursuant to the replacement contract for the USD 5.5 million, Mme. Touré signed a declaration confirming that she had received USD 2.4 million. Pentler also signed an agreement with Mme. Touré and Matinda, promising to pay them USD 3.1 million.[559]

600.    The question is whether these episodes demonstrate that BSGR (or other entity in the BSG Group) did offer benefits to Mme. Touré. The Tribunal's view is that the first, third and fourth episodes clearly do not for the following reasons.

600.1.    With respect to the first episode, the only evidence which Vale adduces in support of this meeting is a declaration by Mme. Touré dated 2 December 2013, which was appended to the Technical Committee's Report.[560] Mme. Touré has not been produced in this arbitration for cross-examination so it is difficult to assess the veracity of her statement. It is arguable that her statement was made against her own interest and should be given weight but, even if that is taken into account, the declaration is still insufficient. The alleged fact took place over a decade ago in 2005, so the accuracy of Mme. Touré's recollection is critical and can only be tested by cross-examination before the Tribunal.

600.2.    In relation to the third and fourth episodes, the contracts and circumstances surrounding the bauxite and uranium permits are irrelevant because they do not concern the Simandou project for iron ore, to which BSGR confined the scope of its anti-bribery representations.

601.    This leaves the Tribunal with the second, fifth and sixth episodes, each of which will now be analysed.

602.    With regard to the second episode, the Tribunal finds that the evidence sufficiently shows that BSGR interposed an intermediary (Pentler) between itself and Mme. Touré so that

---

[554] Commission Agreement, 27 February 2008, **R-128**.
[555] Vale's Statement of Reply, paragraphs 429-437.
[556] Contract between Matinda & Co. Ltd and Pentler, 8 July 2010, **C-563**.
[557] Untitled Agreement between Mme. Touré and Pentler, 8 July 2010, p. 234, **C-6**.
[558] Agreement between Matinda & Co Limited and Pentler, 3 August 2010, **R-151**; Untitled Agreement between Mme. Touré and Pentler, 3 August 2010, pp. 236-237, **C-6**.
[559] Undated Agreement between Pentler and Matinda/Mamadie Touré, pp. 239-240, **C-6**; Undated Statement of Mme. Touré, p. 244, **C-6**.
[560] Recommendation and Report of the Technical Committee, 21 March 2014, p. 37, paragraph 8, **C-6**.

Pentler could be used to grant shares in BSGR Guinea BVI to Mme. Touré. The evidence shows that Merloni-Horemans (a director of BSGR) was not only involved in the sale of Pentler to Cilins, Noy and Lev Ran[561] and the execution of the BSGR-Pentler Milestone Agreement,[562] but also in reviewing the Touré MoU. In an email sent from Noy's assistant, Karine, to Merloni-Horemans, Karine said "As per you[r] discussion with [Noy] please find attached both Protocoles d'Accord", attaching drafts of both the Pentler-Bah Milestone Agreement and the Touré MoU.[563] This is a clear sign of her involvement in the review of the Touré MoU.

603. Merloni-Horemans' explanation is that the original signature block provided that Margali Management Corporation (a former director of Pentler) would sign on behalf of Pentler, which was unworkable because Margali Management Corporation had resigned as director, so her discussions with Noy focused on replacing Margali Management Corporation with Lev Ran, who was authorised to enter into the contracts on behalf of Pentler. She maintains that she was not involved in reviewing the Touré MoU.[564] But the Tribunal is unpersuaded by Merloni-Horemans' explanation. It is true that there is documentary evidence that the amendments to the draft Pentler-Bah Milestone Agreement (following Merloni-Horemans' discussions with Noy) were limited to Pentler's signature block.[565] But there is no similar documentary proof that the amendments proposed by Merloni-Horemans to the Touré MoU were likewise limited to Pentler's signature block.[566] In the absence of such proof, and bearing in mind that Merloni-Horemans herself has admitted that she is unable to recall her discussions with Noy (although she denies that they concerned the substantive content of the drafts),[567] the Tribunal finds that Merloni-Horemans was involved in reviewing the substance of the Touré MoU on behalf of BSGR. There is simply no compelling evidence satisfactory for the Tribunal to believe otherwise.

604. Merloni-Horemans' involvement in all stages of the second episode of Vale's case theory is cogent evidence that BSGR, the company of which she was a director, intentionally procured the sale of Pentler and entered into the BSGR-Pentler Milestone Agreement so as to set up an intermediary that could then effect payments to Mme. Touré in accordance with BSGR's wishes. On this basis, even though the Touré MoU was signed by Pentler and Mme. Touré, the First Limb was nonetheless fulfilled because BSGR (as a member of the BSG Group) had indirectly offered (or authorised the offer of) shares to Mme. Touré. Alternatively, it can be concluded that BSGR knew or had reason to know that Pentler (its Consultant) offered shares to Mme. Touré, fulfilling the First Limb via the second method.

---

[561] Merloni-Horemans First WS, paragraph 15; Emails between S. Merloni-Horemans and M. Noy, 14 February 2006, **C-331**; Emails between S. Merloni-Horemans and Y. Tchelet, 13 February 2006, **C-332**.

[562] Merloni-Horemans First WS, paragraph 27; Email from S. Merloni-Horemans to M. Noy, 13 February 2006, **C-335**.

[563] Email from Karine (assistant to Noy) to S. Merloni-Horemans, 15 February 2006 (attaching draft Memorandum of Understanding between Pentler, I.S. Touré, and Bah and draft Memorandum of Understanding between Pentler and Mme Touré) **C-344**.

[564] Merloni-Horemans First WS, paragraphs 5-6. See also Noy Second WS, paragraph 10.

[565] Emails between S. Merloni-Horemans & Karine (assistant to Noy), 15 February 2006, **C-341**; Email from Karine (assistant to Noy) to S Merloni-Horemans, 15 February 2006, **C-343**.

[566] Email from Karine (assistant to Noy) to S. Merloni-Horemans, 15 February 2006 (attaching draft Memorandum of Understanding between Pentler, I.S. Touré, and Bah and draft Memorandum of Understanding between Pentler and Mme Touré) **C-344**.

[567] Merloni-Horemans Second WS, paragraph 5.

605.   The Tribunal turns to the fifth episode of Vale's case theory. In this episode, Vale relies on Mme. Touré's declaration appended to the Technical Committee's Report which alleged the following events.

> At the beginning of 2008, Asher Avidan and Issiaga Bangoura came to meet me at the President's house in Dubréka. Avidan really wanted my help to secure blocks 1 and 2, and he told me that BSGR needed new contracts because Struik was no longer manager of BSGR in Guinea (although he subsequently came back). At this meeting, Avidan called Beny Steinmetz and put the phone on speaker so that I could hear the voice of Steinmetz. I recognized his voice, and Steinmetz told them to give me what I wanted. I continued to refuse to sign the contracts and I dismissed Avidan and Bangoura.

> The next day, Issiaga Bangoura brought two draft contracts to my house in Dubréka. I told him to leave them. I read them carefully, and I made some changes. The following day, I called Bangoura asking him to come by and take the amended contracts. He did. He returned the next day with two typed contracts, none of which had been signed by Asher Avidan. I told him they should be signed and bear the stamp of BSGR, otherwise I would not sign them. When he returned with the contracts signed and stamped, I signed them both.[568]

606.   Vale claims the result was that two contracts were signed with Matinda, one on 27 February 2008, under which "BSG Resources" (as party) undertook to pay USD 4 million as commission for assistance in obtaining the mining rights in Simandou Blocks 1 and 2, and another dated 28 February 2008 under which "BSG Resources Guinée" (as party) agreed that "BSG Resources" undertook to give a 5% shareholding in Simandou Blocks 1 and 2 to Matinda. Vale adduces documentary proof of the two contracts.[569] BSGR argues that that the two contracts were forged, which (if proven) would suffice to dispose of this episode of Vale's case theory.

607.   The Tribunal observes that Avidan's signatures on the contracts resemble his signatures on his witness statements in this arbitration, and that both contracts bear the stamp of the BSGR Chief Operating Officer. However, Avidan has said that he was in Israel at the time the contracts were allegedly signed in Conakry, which is supported by two pieces of evidence provided to the Tribunal. One document is a ledger of Avidan's flight history recorded by BSGR's travel agent, Diesenhaus Unitours, which indicates that Avidan flew from Conakry to Tel Aviv on 17 February 2008 and returned on 23 April 2008,[570] and another ledger titled "Expenses of Conakry Head Office, February 2008" that indicates an entry "Rent a car, travel charges in Israel, Asher" dated 27 February 2008.[571]

608.   Vale relies on three entries in the same ledger titled "Expenses of Conakry Head Office, February 2008" to prove that Avidan visited Mme. Touré in February 2008. The first entry dated 22 February 2008 refers to "Different expenses for the visit of delegation, Toure". The second dated 26 February 2008 records USD 1,000 for "Salary of Issiaga Bangoura

---

[568] Recommendation and Report of the Technical Committee, 21 March 2014, p. 38, paragraphs 18-19, **C-6**.
[569] Memorandum of Understanding, 28 February 2008, **R-129**; Commission Agreement, 27 February 2008, **R-128**.
[570] Diesenhaus Unitours' records of flights taken by Asher Avidan in 2008, **R-296**.
[571] Expenses of Conakry Head Office, February 2008, **C-346**.

(Benjamin)". The third dated 28 February 2008 identifies expenses for "Copy of documents, making of stamps".[572]

609.    The Tribunal has reviewed this evidence in detail, but finds the evidence to be contradictory and inconclusive as to the validity of the contracts. For example, Avidan's flight history shows him to be in Tel Aviv up until 23 April 2008. However, in his written evidence Avidan said that he and Steinmetz met with President Conté in April 2008.[573] This is consistent with Steinmetz's evidence.[574] According to Steinmetz's travel information (including his stamped passport), Steinmetz was in Guinea on 9-11 April 2008 and therefore the meeting must have taken place on one of these dates.[575] Steinmetz's travel documentation indicates he was also in Guinea in February and May 2008, but Avidan appears to have also been out of the country on these dates. The Tribunal is simply unable to reconcile this evidence. Moreover, Avidan's travel record appears to be incomplete as it shows that he returned to Conakry (from Israel) on 28 November 2008, but the next entry is a flight from Tel Aviv to Paris on 14 December, with no indication of how or when Avidan travelled from Conakry to Tel Aviv. The Tribunal is unable to reach any conclusion, based on this evidence, as to Avidan's whereabouts on or about 27-28 February 2008.

610.    Similarly, the expenses ledger does not provide any evidence as to Avidan's location on these dates. While the ledger includes an entry on 27 February 2008 for rental car costs in Israel claimed by Avidan, the Tribunal does not consider that this provides any indication of when the rental actually took place. For example, the ledger also indicates expenses of Avidan incurred in Paris and Israel which are recorded on 12 February 2008 – a date on which (according to his travel records) he was in Guinea, not Paris. This indicates that the date on which an expense is recorded in the ledger is not necessarily the date on which that expense was incurred by the person making the claim. The Tribunal therefore finds that the car rental entry on 27 February 2008 does not prove that Avidan was in Israel on that date or that he rented a car on that specific date. It is therefore of little probative value.

611.    In sum, therefore, the evidence presented by BSGR in support of its case theory that the contracts are fraudulent is at best inconclusive as to the physical location of Avidan on or around 27-28 February 2008.

612.    Equally, the evidence cited by Vale in support of its case theory is inconclusive. The Tribunal is unpersuaded that the three entries in the expense ledger referred to by Vale show that Avidan visited Mme. Touré in February 2008. The first entry only refers to "Toure". Avidan says that this ambiguous reference is likely to be a reference to I.S. Touré, who frequently accompanied Avidan on delegations to local villages.[576] Indeed, there are other references in the ledger to the organisation of ceremonies, concerts and meals for these delegations. It would not make sense for BSGR to organise such matters simply to get Mme. Touré to sign the contracts. Moreover, it is also unlikely that a company would record the name of the person being bribed in its expenses report.

---

[572] Expenses of Conakry Head Office, February 2008, **C-346**.
[573] Avidan First WS, paragraph 91.
[574] Steinmetz First WS, paragraph 30.
[575] Benjamin Steinmetz passports and flight documents, **R-115**.
[576] Avidan Second WS, paragraph 20.1.

613.    As regards the second entry, the Tribunal does not find the payment of USD 1,000 to Bangoura to be particularly suspicious. In fact, the ledger identifies that Bangoura was paid monthly sums of USD 1,000 from December 2007, indicating that it was indeed a monthly salary. Finally, as regards the third entry, the Tribunal considers that the reference to "Copy of documents, making stamps" lacks sufficient specificity to provide conclusive proof of the validity of the contracts, especially given the doubt that exists over Avidan's whereabouts. Although it would be a remarkable coincidence, the entry could just be referring to a generic administrative expense. Vale points out that 28 February 2008 was the only day in that month that this expense was recorded, but even so, this is not a fact of sufficiently significant probative value to allow (without other supporting evidence) a finding that the contracts were not forgeries.

614.    Vale also points out that Cilins confessed to asking Mme. Touré to destroy documents that were relevant to the U.S. Grand Jury proceedings and argues that he would not have offered money to Mme. Touré to destroy the documents if they were forgeries and would have reported the forgeries to the police.[577] However, while Cilins referred to documents bearing the dates 27 and 28 February,[578] the precise nature of these documents is not clear. Cilins did not provide any evidence in this arbitration on this point or attend the hearing for cross-examination. As previously noted, Mme. Touré has not provided any evidence before this Tribunal. Consequently, the Tribunal finds that Cilins' reference to documents to be destroyed is too vague to support a finding that the contracts of 27 and 28 February 2008 were not forgeries.

615.    In sum, the Tribunal finds the evidence before it insufficient to prove whether or not the contracts of 27 and 28 February 2008 were forgeries. The Tribunal therefore makes no finding as to the validity of the contracts and therefore that the fifth episode cannot be relied upon as a ground for misrepresentation.

616.    The Tribunal turns to the last episode of Vale's case theory. Vale avers that Pentler signed two contracts on BSGR's instructions with Mme. Touré and Matinda on 8 July 2010 in Sierra Leone to end its relationship with her,[579] before it signed replacement contracts on 3 August 2010 to remove the references to Simandou in the 8 July 2010 contracts.[580] Vale claims that, pursuant to one of the replacement contracts which promised USD 5.5 million to Mme. Touré, Mme. Touré signed a declaration confirming that she had received USD 2.4 million, and Pentler signed a new contract with Mme. Touré and Matinda, agreeing to pay USD 3.1 million.[581]

617.    BSGR admits that Pentler signed the contracts on 3 August 2010, and that Mme. Touré executed a declaration and Pentler signed another contract for USD 3.1 million pursuant to the 3 August 2010 contracts. But BSGR denies Vale's case theory by arguing that the 8 July 2010 contract promising USD 5 million (the "**8 July USD 5 million contract**") (which contains Noy's signature) is a forgery. BSGR has adduced witness testimony from

---

[577] Transcript, Educatory Hearing, Day 2, p. 19, lines 5-13.
[578] Transcript of Call between Cilins and Mme. Touré, p.153, **C-6**.
[579] Contract between Matinda & Co. Ltd and Pentler, 8 July 2010, **C-563**; Untitled Agreement between Mme. Touré and Pentler, 8 July 2010, p. 234, **C-6**.
[580] Agreement between Matinda & Co Limited and Pentler, 3 August 2010, **R-151**; Untitled Agreement between Mme. Touré and Pentler, 3 August 2010, pp. 236-237, **C-6**.
[581] Undated Agreement between Pentler and Matinda/Mamadie Touré, pp. 239-240, **C-6**; Statement of Mme. Touré, p. 244, **C-6**.

Noy that he did not sign this contract,[582] and argues that Mme. Touré had simply taken the 3 August 2010 contract and manipulated it to refer to Simandou to implicate BSGR. As regards the second 8 July 2010 contract, BSGR does not express a clear view on it, and simply states that the document evidencing this contract is only a translation and it was not entered into by Noy.

618. The Tribunal accepts Vale's case theory that Pentler signed two contracts on 8 July 2010 with Mme. Touré and Matinda, before it signed replacement contracts on 3 August 2010 to remove the references to Simandou in the 8 July 2010 contracts. The allegation that the 8 July USD 5 million contract was forged is not credible in the light of the other 8 July 2010 contract (the "**8 July USD 5.5 million contract**"), the authenticity of which BSGR has not denied. This is unsurprising because the 8 July USD 5.5 million contract was produced by BSGR in this arbitration. The 8 July USD 5.5 million contract mirrors the terms of one of the 3 August 2010 contracts, as does the 8 July USD 5 million contract in respect of the other 3 August 2010 contract, save that the references to Simandou were removed. This is a clear indication that the 8 July contracts are both authentic, confirming Vale's case theory that they were amended to remove the Simandou references.

619. If Pentler signed these contracts, did BSGR authorise or know about the signing? On a balance of probabilities, the Tribunal finds that the evidence is insufficient to show that BSGR knew of or authorised the signing. Consider Vale's case theory. Vale points out that Mme. Touré's lawyer sent a letter to BSGR on 8 June 2010, attaching the February 2008 contracts and demanding that BSGR perform those contracts.[583] Unusually, three days later after BSGR's denial on 20 June 2010,[584] Mme. Touré's lawyer sent a letter to retract the allegations in the 8 June letter and to tender an apology.[585] A month after that, the 8 July 2010 contracts were signed and on 16 July 2010, BSGR agreed to pay USD 4.5 million to Pentler.[586] On 22 and 27 July 2010, Pentler transferred USD 149,970 and USD 100,000 to Mme. Touré respectively.[587] On 30 July 2010, another letter was sent by Mme. Touré's lawyer, confirming the retraction again.[588] On 3 August 2010, the replacement contracts were signed and, two days later, BSGR transferred USD 3 million to Pentler pursuant to the USD 4.5 million agreement.[589] Pentler transferred USD 149,970 to Mme. Touré on the same day.[590] Vale's case is that these events occurred within such a short span of time that they cannot be coincidental, and are indicators that BSGR instructed Pentler (following Mme. Touré's letter) to enter into the contracts to

---

[582] Noy First WS, paragraphs 81-82.
[583] Letter from N. Moussi to BSGR, 8 June 2010, **R-55**.
[584] Letter from BSGR Guinea to Nassif Moussi, 20 June 2010, **R-56**.
[585] Letter from N. Moussi to BSGR, 23 June 2010, **R-57**.
[586] Annotated Milestone Agreement, 16 July 2010, **R-113**; Noy First WS, paragraph 99; Steinmetz First WS, paragraphs 50-51.
[587] *USA v. Cilins*, Government's Mem. In Supp. of Detention Pending Trial, Dkt. No. 13, 6 June 2013, p. 13, **C-109**; *USA v. Cilins*, Government's Sentencing Mem, Dkt. No. 69, 18 July 2014, p. 4, **C-111**; Cheque number 96 dated 27 July 2010, p. 191, **C-6**.
[588] Letter from N. Moussi to BSGR, 30 July 2010, **R-130**.
[589] Payment from Windpoint Overseas to Pentler, 5 August 2010, p. 1, **R-211**; Payment from BSGR Limited to Windpoint Overseas Limited for USD 3 million, 5 August 2010, **C-484**; Payment Instructions for Windpoint Overseas to Pay USD 3 million to Pentler Holdings Limited on 5 August 2010, **C-497**; Windpoint Overseas Limited's Bank Statements for the Period 1 August 2010 to 31 August 2010, **C-480**.
[590] *USA v. Cilins*, Government's Mem. In Supp. of Detention Pending Trial, Dkt. No. 13, 6 June 2013, p. 13, **C-109**; *USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, p. 4, **C-111**; Cheque number 97 dated 5 August 2010, p. 192, **C-6**.

silence her, leading to her retraction and explaining Pentler's subsequent entry into these
contracts.

620. There are two reasons why Vale's case theory is problematic.

621. First, on 15 July 2010 Merloni-Horemans (on behalf of BSGR Steel) wrote to Noy (on
behalf of Pentler) to complain about the 8 June letter and stated that BSGR had no
knowledge of the false allegations contained in that letter and demanded from Noy a
written explanation of the allegations in that letter.[591] On 3 August 2010, Noy replied to
apologise that BSGR had received that letter, stated that Pentler had dealt with Matinda
since 2005, and urged BSGR to ignore the contents of the letter.[592] This correspondence
seems to run counter to the theory that BSGR appreciated what Mme. Touré was doing
and had instructed Pentler to enter into the July and August contracts. Vale's explanation
is that this correspondence was a mere cover up,[593] but this is hardly persuasive.

622. Second, BSGR's agreement to pay Pentler USD 4.5 million was based on Pentler's
achievement of certain milestones in the BSGR-Pentler Milestone Agreement, which
mirrored the milestones in the Pentler-Bah Milestone Agreement and the Pentler-Daou
Milestone Agreement.[594] Payments made under the BSGR-Pentler Milestone Agreement
would therefore be meant for Bah, Daou and I.S. Touré and not for Mme. Touré. The
Amendment Protocol dated 20 February 2006, which BSGR says assigned the rights
under the Pentler-Bah contract to Mme. Touré, does not in fact purport to assign these
rights, and merely states in ambiguous terms that Pentler "shall now be bound to
MATINDA" when Matinda was not even a party to this agreement.[595]

623. For the above reasons, the Tribunal finds that the evidence is insufficient to show that
BSGR knew of or authorised the signing of the July or August 2010 contracts. In coming
to this conclusion the Tribunal has considered the opinion of Dr Shi (Vale's expert) that
there exists a *prima facie* link between a USD 3 million payment made by BSGR to
Pentler under the Milestone Agreement[596] and payments made by Pentler to Mme. Touré
of around USD 150,000 on the same date (and earlier payment to Mme. Touré of around
USD 250,000, paid just after BSGR had agreed to the additional Milestone payment).[597]
Nothing in Dr Shi's analysis provides any conclusive evidence (and nor does Dr Shi
purport to draw any final conclusions) as to whether BSGR did or did not know about the
July or August 2010 agreements between Pentler and Mme. Touré. Dr Shi simply
speculates that a *prima facie* link exists, but without further evidence this is insufficient to
draw any conclusions on the issue.

624. Vale insists that Noy was acting on BSGR's behalf when he entered into the July and
August 2010 contracts, pointing out that Noy received a visa as a "consultant" to Koidu
(BSGR's diamond mining operation in Sierra Leone), which he obtained with the help of

---

[591] D. Pollak's Internal Audit File, 21 May 2012, p. 157, **C-244**.
[592] D. Pollak's Internal Audit File, 21 May 2012, p. 158, **C-244**.
[593] Vale's Statement of Reply, paragraphs 459, 461.
[594] Annotated Milestone Agreement, 16 July 2010, **R-113**. Vale accepts that this agreement was
based on the milestone schedule in the BSGR-Pentler Milestone Agreement: see Vale's Statement of
Reply, paragraphs 76, 148; Transcript, Merits Hearing, Day 1, p. 106, line 21 – p. 108, line 15.
[595] Amendment to the Agreement Protocol between Pentler, A. Bah and I.S. Touré, 20 February 2006
**R-150**.
[596] See Annotated Milestone Agreement, 16 July 2010, **R-113**.
[597] Oxera Report, paragraphs 24-34.

Saada (the Director of Steinmetz Diamond Group), and claiming that Noy's trip was sponsored by BSGR. But the email chain on which Vale relies simply shows Noy requesting Saada to help with his visa application on 6 July 2010, which Saada forwarded to his secretary to process the application.[598] The application succeeded on the same day and the secretary forwarded it to Saada for his onward transmission to Noy.[599] Saada attests that it was common practice that "we arrange visas on a regular basis for staff members and for friends of people within the company" (including Noy who mixed in the same circles as Saada did) and recounts that this was "an entirely routine and unmemorable administrative event".[600] The Tribunal considers Saada's testimony to be believable on this factual point, and finds that the Noy-Saada email chain does not show that Noy was acting on BSGR's behalf.

625. The Tribunal concludes that there is insufficient evidence that BSGR knew of or authorised Pentler to sign the July and August 2010 contracts. It follows that the sixth episode of Vale's case theory does not satisfy the First Limb, whether through the first or second method.

**The Second Limb**

626. The Tribunal has so far found that the second of the six episodes satisfies the First Limb. The next question is whether that episode fulfils the Second Limb, i.e. whether the offer of monies under the second episode was for the purpose of achieving one of the four aims referred to in BSGR's anti-bribery representations.[601]

627. Vale's case theory is that the purpose of the offer of shares to Mme. Touré under the Touré MoU via the interposition of Pentler was to secure her assistance in influencing President Conté to grant the mining rights to BSGR. The first issue is whether BSGR's offer was indeed for such a purpose. If it was, the second issue is whether this falls under one of the four stated aims in BSGR's representations.

628. On the first issue, Vale provides an extensive case theory of how Mme. Touré sought to influence her husband from late 2005 (prior to the Touré MoU) all the way until September 2008. The case theory is set out in its Statement of Case and Statement of Reply and will not be repeated here. The Tribunal will simply set out its findings on Vale's case theory as follows.

628.1. **Late 2005 meeting.** The Tribunal accepts the witness testimony of Souaré[602] (who was Minister of Mines from March 2005 to April 2006) that (a) a meeting took place in November or December 2005 between at least Cilins, President Conté and Mme. Touré at the presidential palace; (b) President Conté called in Souaré to introduce Cilins to him, order him to assess how they could incorporate BSGR into the GoG's plans for Simandou and instructed him to return with a solution and; (c) Souaré subsequently told BSGR to apply for exploration permits in areas which were not already subject to permits.[603] The Tribunal accepts Souaré's inference of the meeting's context that BSGR had

---

[598] Emails between M. Noy, P. Saada and L. Foh of Koidu, 6 July 2010, **C-564**.
[599] M. Noy Visa to Sierra Leone, valid 7 July 2010 to 7 September 2010, **C-565**.
[600] Saada Second WS, paragraphs 14-15.
[601] See paragraph 583.2.
[602] Souaré WS, paragraphs 8-10.
[603] Souaré WS, paragraph 17.

approached Mme. Touré, and she had asked President Conté to help them.[604] BSGR has not adduced any sufficient evidence to rebut Souaré's testimony, apart from Struik's attestation that he was not aware of any meetings that Mme. Touré had organised on BSGR's behalf with President Conté.[605]

628.2.   **February 2006 meeting and follow-up meeting.** The Tribunal finds that, after BSGR obtained the exploration permits in Simandou North and South, a meeting took place again in February 2006 at the presidential palace between Noy, Cilins, Oron, Saada, I.S. Touré, President Conté and Mme. Touré on the basis of the testimonies of Noy and Saada.[606] The Tribunal finds that Vale has failed to provide sufficient proof that Steinmetz and Struik were also present at the meeting, the only evidence being Mme. Touré's declaration attached to the Technical Committee's Report which has not been tested in this arbitration.[607] The Tribunal also finds that Vale has failed to provide sufficient evidence that this meeting was convened for BSGR to bring "the money" (which seems to be referring to the USD 12 million alluded to in paragraph 594 above that BSGR allegedly promised), or organised by Mme. Touré, in the light of Noy's and Saada's testimony that the meeting was for BSGR to be presented formally to President Conté.[608] The Tribunal also finds that there is insufficient evidence of a follow up meeting in Dubréka the next day (which BSGR and its witnesses vehemently deny[609]), during which Steinmetz allegedly thanked Mme. Touré for her help in obtaining the exploration permits in Simandou North and South and requested her assistance to obtain Simandou Blocks 1 and 2 (over which Rio Tinto held exploration permits at the time), in exchange for 5% shareholding. Vale only adduces Mme. Touré's declaration appended to the Technical Committee Report which has not been tested in this arbitration.[610]

628.3.   **August 2007 to December 2007 meetings.**

628.3.1.   The Tribunal finds that BSGR then conducted exploration activities between mid-2006 and mid-2007 on Simandou North and South. By the end of that period, it became clear that the drilling results in Simandou North were unfavourable.

628.3.2.   The Tribunal accepts Kanté's testimony[611] (which is corroborated by an email from Avidan to Steinmetz dated 18 September 2007[612]) that, in view of the drilling results, Avidan and I.S. Touré visited Kanté (who was Minister of Mines from March 2007 to August 2008) in

---

[604] Souaré WS, paragraph 10.
[605] Struik First WS, paragraph 104.
[606] Noy First WS, paragraphs 44-46.4; Saada First WS, paragraph 6; Saada Second WS, paragraph 10.
[607] Report of the Technical Committee, 21 March 2014, p. 37, paragraph 13, **C-6**.
[608] Noy First WS, paragraphs 44-46.4; Saada First WS, paragraph 6; Saada Second WS, paragraph 10.
[609] BSGR's Statement of Rejoinder, paragraph 103; Steinmetz First WS, paragraph 59; Avidan First WS, paragraph 90; Noy First WS, paragraph 46.5; Saada First WS, paragraph 7; Struik First WS, paragraph 106.
[610] Report of the Technical Committee, 21 March 2014, p. 37, paragraph 14, **C-6**; Vale's Statement of Case, paragraph 145; Vale's Statement of Reply, paragraphs 353-355.
[611] Kanté WS, paragraphs 11-20.
[612] Emails between A. Avidan, B. Steinmetz, M. Struik and P. Saada, 18 September 2007, **C-330**.

August 2007 to express BSGR's continued interest in Simandou Blocks 1 and 2. Kanté replied that BSGR should focus on developing Simandou South instead of fixating on areas occupied by another company.

628.3.3.   The Tribunal accepts Kanté's testimony[613] that, in August 2007 after the meeting in paragraph 628.3.2 above, President Conté summoned Kanté to a meeting with Avidan and I.S. Touré (and Avidan said he was there to talk about his problem). The Tribunal agrees with Kanté's inference that Avidan and I.S. Touré had gone to President Conté directly because they were not satisfied with the answer given by Kanté at the earlier August 2007 meeting. The Tribunal also accepts Kanté's testimony that he advised President Conté that BSGR needed to prove itself regarding Simandou North and South and, in any event, Rio Tinto already held the mining rights to Simandou Blocks 1 to 4. After consideration, President Conté told Kanté to make the decisions that served Guinea's interests best. Avidan and I.S. Touré, however, were undeterred and went to Kanté's office after that to insist on the withdrawal of Rio Tinto's mining rights, which Kanté resisted.

628.3.4.   The Tribunal accepts Kanté's testimony[614] (which is corroborated by Avidan's and Struik's testimony[615]) that, in December 2007, President Conté summoned Kanté to a meeting with Mme. Touré and Kouyaté (the then Prime Minister) to seek his explanation of BSGR's situation again, and Kanté did so by educating President Conté about BSGR's own slow progress in Simandou North and South, and explaining why the GoG had no reason to grant BSGR additional areas. Kanté's explanation led President Conté to turn towards Mme. Touré and say, "I had told you to stay out of these mining problems". No orders were given by President Conté at the end of the meeting.

628.3.5.   The Tribunal accepts Kanté's testimony[616] that, the next day after the December 2007 meeting, Kouyaté summoned Kanté to his office where Mme. Touré was present to tell him "this is the President's fourth wife, we have to find a solution to her problem", to which Kanté replied that Rio Tinto's concession could only be withdrawn by Presidential decree and that he could not grant exploration permits to another company for an area that was subject to a mining concession. Kouyaté then turned to Mme. Touré and said, "see, this is what I was telling you about him."

628.4.   **April 2008 – May 2008 meetings**. The Tribunal accepts Avidan and Steinmetz's testimony[617] that in April 2008, a meeting took place between Avidan, Steinmetz, President Conté and Mme. Touré, during which President

---

[613] Kanté WS, paragraphs 22-29; Transcript, Merits Hearing, Day 2, p. 3, lines 8-16.
[614] Kanté WS, paragraphs 30-34.
[615] Avidan First WS, paragraph 101; Struik First WS, paragraphs 112-114.
[616] Kanté WS, paragraphs 35-37.
[617] Avidan First WS, paragraphs 91-92; Steinmetz First WS, paragraphs 30, 58.

Conté summoned Soumah (then Secretary General) to instruct him to review Rio Tinto's mining rights, followed by further separate meetings with Soumah and Kouyaté (and Avidan testifies that Kouyaté seemed "less keen" on taking Rio Tinto's rights away during those meetings). In view of this meeting, the Tribunal finds Vale's assertion[618] (that a second meeting took place in May 2008 between President Conté, Mme. Touré and Avidan, where President Conté ordered Soumah to prepare a Presidential decree to revoke Rio Tinto's mining rights) to be believable. The Tribunal also notes that Kouyaté was dismissed on 22 May 2008,[619] that Soumah's first notification to Rio Tinto of the GoG's withdrawal of its mining rights was dated 22 May 2008,[620] and that there is evidence that Kouyaté takes the view that he was dismissed because he refused to give Rio Tinto's mining rights to BSGR.[621] The Tribunal notes that, on 28 July 2008, President Conté formally revoked Rio Tinto's mining concessions and permitting Rio Tinto to retain only 50% of the area in accordance with the Mining Code,[622] and that, in August 2008, BSGR Guinea submitted an application for Simandou Blocks 1 to 3.[623]

628.5.    **September 2008 meeting.** The Tribunal accepts the testimony of Nabé[624] (who replaced Kanté as Minister of Mines on 27 August 2008 after Kanté's dismissal[625]) that, in September 2008, President Conté summoned Nabé to a meeting in his office when Souaré (the Prime Minister from 20 May 2008) and Mme. Touré were also present. President Conté told Souaré and Nabé that "If [Rio Tinto] do not comply [with the 50% retrocession], we must drive them out" and told them to act quickly. The Tribunal notes Nabé's understanding that "Mme. Touré was putting pressure on her husband on behalf of BSGR concerning Simandou, just like her brother was. The President was impatient. [...] the goal was to withdraw some of Rio Tinto's rights to give them to BSGR." Nabé has testified, that during this period, meetings continued to be held with Avidan and I.S. Touré and President Conté continued to issue orders to Nabé regarding the retrocession of Rio Tinto's rights.

628.6.    The Tribunal notes that, on 4 December 2008, the Council of Ministers decided to retrocede Simandou Blocks 1 and 2 from Simfer (Rio Tinto's subsidary) and issue exploration permits over them to BSGR Guinea.[626]

---

[618] Vale's Statement of Case, paragraphs 163-164; Vale's Statement of Reply, paragraphs 370-371.
[619] Guinée Information, "Ahmed Tidiane Souaré, le dernier premier ministre du Général Lansana Conté répond aux accusations de son prédécesseur Lansana Kouyaté", 15 May 2014, p. 3, **C-77**.
[620] Email from M. Berkner of Skadden Arps to M. Gordon of Clifford Chance *et al.*, 9 April 2010, **C-47**.
[621] Guinée Information, "Ahmed Tidiane Souaré, le dernier premier ministre du Général Lansana Conté répond aux accusations de son prédécesseur Lansana Kouyaté", 15 May 2014, p. 3, **C-77**.
[622] Decree No. D/2008/041/PRG/SGG, 28 July 2008, **C-27**; *see also* Letter from S. Mamady Soumah to CEO of Simfer S.A, 30 July 2008, **C-26**.
[623] Letter from A. Avidan to L. Nabé, 5 August 2008, **C-29**.
[624] Nabé WS, paragraphs 6-22.
[625] Transcript, Merits Hearing, Day 2, p. 18, lines 7-9; Nabé WS, paragraph 5.
[626] Nabé WS, paragraph 21; Transcript, Merits Hearing, Day 2, p. 31, lines 3-10. Nabé sent Simfer a retrocession plan for Simandou Blocks 1 and 2 to be retroceded the same day: Email from M. Berkner of Skadden Arps to M. Gordon of Clifford Chance *et al.*, 9 April 2010, **C-47**. Nabé issued a decree granting BSGR Guinea exploration permits in the same Blocks: Decree No. 2008/4980/MMG/SGG issued by Nabé, 9 December 2008, **C-31**.

629.    Based on these findings, the Tribunal finds that the facts show on a balance of probabilities that Mme. Touré had exercised influence on President Conté in his decision-making from late 2005 to September 2008. Critically, Kanté's testimony paints the narrative in 2007 that, after BSGR learned the drilling results in Simandou North were not propitious, Avidan and I.S. Touré tried to convince Kanté to grant Rio Tinto's mining rights to BSGR. When those attempts failed, Avidan and I.S. Touré approached President Conté directly, who approached Kanté and heard his advice, and chose not to follow up on Avidan and I.S. Touré's requests. Avidan and I.S. Touré were undeterred, and they turned to Mme. Touré for assistance, who tried to persuade President Conté to grant the rights to BSGR. President Conté sought Kanté's advice once more and, when Kanté repeated his views, President Conté rebuked Mme. Touré for meddling. Mme. Touré then tried to convince Kouyaté to award the rights to BSGR, to which Kouyaté must have reluctantly obliged because he would have anticipated what Kanté would say. And when Kanté advised against giving BSGR the rights once more, Kouyaté said to Mme. Touré: "see, this is what I was telling you about him". In short, 2007 was a year of multiple failed attempts.

630.    But the turning point came when Avidan and I.S. Touré approached Kanté once more after the last meeting with President Conté. This time, Kanté advised that Rio Tinto's mining concessions could only be revoked by Presidential decree. This must have galvanised Avidan and I.S. Touré to find ways to persuade President Conté to issue this decree. And they must have succeeded, because in April–May 2008, President Conté summoned Soumah to instruct him to review Rio Tinto's mining rights and prepare a decree to revoke those rights.

631.    The evidence also indicates that Mme. Touré assisted in influencing President Conté's decision to revoke Rio Tinto's rights and give them to BSGR. Avidan met Mme. Touré as recently as February 2008, consistent with the narrative that Avidan had given instructions to her from December 2007 onwards.[627] Mme. Touré was present at all the 2008 meetings when this was not normal practice.[628] Nabé testified that Mme. Touré's conduct at the September 2008 meeting indicated that she was exerting influence on Conté.[629] This is all evidence that Mme. Touré assisted in influencing President Conté's decision.

632.    It is also not surprising that President Conté succumbed to Mme. Touré's influence. He was critically ill from August 2008 onwards,[630] and prior to August 2008, Souaré attests that President Conté was already in a condition which rendered him susceptible to being used by "those who were working with him and had done so for many years".[631]

---

[627] This is corroborated by Avidan's admission that he met Mme. Touré four or five times between September 2006 and February 2008: Avidan First WS, paragraph 43.
[628] Transcript, Merits Hearing, Day 2, p. 38, line 17 – p. 39, line 14. The view that it was unusual for the President's wife to attend meetings is shared by Souaré (Transcript, Merits Hearing, Day 1, p. 224, line 17 – p. 25, line 5) and Kanté (Transcript, Merits Hearing, Day 2, p. 27, line 5 – p. 28, line 3) in respect of other meetings.
[629] Nabé WS, paragraphs 8-9; Transcript, Merits Hearing, Day 2, p. 31, line 18 – p. 32, line 7. More generally, Nabé and Souaré testify that Mme. Touré asserted influence on Conté: Transcript, Merits Hearing, Day 1, p. 228, line 19 – p. 229, line 20; Transcript, Merits Hearing, Day 2, p. 35, lines 16-22 and p. 38, lines 1-4.
[630] Transcript, Merits Hearing, Day 2, p. 26, lines 4-13.
[631] Transcript, Merits Hearing, Day 1, p. 231, lines 5-12.

633.    The result of Mme. Touré's influence was that President Conté dismissed both Kouyaté (as Prime Minister) and Kanté (as Minister of Mines) because they both opposed the transfer of the mining rights from Rio Tinto to BSGR.[632] When Nabé was appointed as Minister of Mines, President Conté hurried Nabé with respect to the grant of rights to BSGR,[633] notwithstanding that the revocation and grant of rights in Simandou Blocks 1 and 2 were separate issues that could be treated separately,[634] and that Souaré and Nabé had both expressed misgivings about President Conté's decisions.[635] The Council of Ministers implemented President Conté's wish of revoking Rio Tinto's rights and giving them to BSGR on the same day (4 December 2008).[636]

634.    In summary, the witness testimonies from Souaré, Kanté and Nabé and the surrounding evidence constitute clear and convincing evidence that Mme. Touré did in fact exercise influence on President Conté in his decision-making in relation to Simandou from late 2005 to September 2008. Coupled with the fact that BSGR authorised the Touré MoU, the witness testimonies lead this Tribunal to find that the Touré MoU was executed to secure Mme. Touré's assistance in influencing President Conté. At the very least, BSGR had reason to know that this was the Touré MoU's purpose. BSGR argues that the Touré MoU was "entered into following an agreement between Ms Touré and Pentler's local partners"[637] (i.e. an assignment by Bah and I.S. Touré of their own shares in BSGR Guinea BVI to Mme. Touré) and was not for securing Mme. Touré's assistance, but this argument is far-fetched. BSGR has not provided any explanation for why Bah and I.S. Touré would want to assign such a significant interest to her, and simply relies on Noy's testimony that Bah and I.S. Touré are "grown men and it was not for us to question their business deals".[638]

635.    Having found that the Touré MoU was executed to secure Mme. Touré's assistance in influencing President Conté, the next issue is whether this falls under one of the four stated aims in BSGR's representations. The Tribunal is satisfied that it falls at least under the third stated aim, namely that the offer of shares to Mme. Touré was for the purpose of securing an "improper advantage", the impropriety arising from exercising influence on the decision-making of another Government Official, President Conté. The Tribunal finds that the Vale has satisfied the Second Limb.

**The Third Limb**

636.    As regards the Third Limb, the test is whether BSGR <u>knew</u> that the offer of shares under the Touré MoU was for the purpose of securing an improper advantage,[639] namely to secure Mme. Touré's assistance in influencing President Conté. Having found that BSGR authorised (or at least knew of) the Touré MoU, the Tribunal considers that there can be no other legitimate purpose which the Touré MoU served. On that premise, BSGR must have known the real purpose of the Touré MoU. Indeed, based on the findings in the

---

[632] Guinée Information, "Ahmed Tidiane Souaré, le dernier premier ministre du Général Lansana Conté répond aux accusations de son prédécesseur Lansana Kouyaté", 15 May 2014, p. 3, **C-77**; Transcript, Merits Hearing, Day 2, p. 23, line 3 – p. 24, line 10.

[633] Nabé WS, paragraph 17; Transcript, Merits Hearing, Day 2, p. 32, line 24 – p. 34, line 6.

[634] Kanté WS, paragraph 41; Transcript, Merits Hearing, Day 2, p. 24, lines 18-21.

[635] Nabé WS, paragraph 10; Transcript, Merits Hearing, Day 2, p. 37, lines 3-25.

[636] Transcript, Merits Hearing, Day 2, p. 32, lines 11-23.

[637] BSGR's Statement of Defence, paragraph 218(iii).

[638] Noy First WS, paragraph 60.2.

[639] See paragraph 583.3.

Tribunal's analysis of the Second Limb, Avidan (CEO of BSGR Guinea) was closely involved in BSGR's journey towards its ultimate aim of procuring the exploration permits in Simandou Blocks 1 and 2.

637.    The Tribunal finds that BSGR knew that the offer of shares under the Touré MoU was for the purpose of securing Mme. Touré's assistance in influencing President Conté, and concludes that BSGR made a false representation in declaring that there had not been any bribery of Mme. Touré.

**The Mebiame Issue**

638.    A final issue must now be dealt with before the Tribunal can proceed to Vale's bribery claim involving Thiam. On 31 October 2016, BSGR filed a memorial on a U.S. criminal complaint dated 12 August 2016 against Mebiame, explaining the relevance of the complaint to the issues in this arbitration. One main issue to which the complaint was said to be relevant to was Vale's bribery claim against Mme. Touré. However, the Tribunal has reviewed BSGR's submissions and the supporting evidence (as well as Vale's reply submissions dated 14 November 2016) and finds that this evidence does not affect the Tribunal's reasoning for its findings on BSGR's bribery of Mme. Touré. The Tribunal will now explain its reasoning in the passages below.

639.    BSGR's central argument is that VBG's mining rights were revoked because President Conté was bribed to do so, and not because BSGR had obtained the rights by bribery in the first place. To support this argument, BSGR relies on the following case theory.

639.1.    After Vale and BSGR entered into the Joint Venture Agreements in April 2010, Mebiame negotiated from June 2010 to June 2012 with Conté and other Guinean government officials for mining rights, including VBG's mining rights, on behalf of an individual named Walter Hennig, a wealthy South African, and his company, Palladino Holdings ("**Palladino**"). In exchange, Mebiame and Hennig assisted Conté to be elected as President in late 2010.[640]

639.2.    After the election, Mebiame and Hennig helped redraft the Guinean mining code (which provided for a review of all mining rights),[641] and draft letters to existing holders of mining rights (including VBG) to inform them that there were legal issues with their mining rights.[642] Mebiame helped Conté set up SOGUIPAMI, a state-owned mining company that would take a minimum 15% share of all companies granted mining rights under the new Guinean mining code.[643]

639.3.    Discussions followed between Hennig and Och-Ziff Capital Management Group ("**Och-Ziff**"), a large US hedge fund, on how to reward Mebiame and themselves. Hennig sought help from Och-Ziff, and together they conceived a plan whereby Hennig would buy 31.5 million shares in an unnamed London-based oil and gas company from an unnamed South African conglomerate for USD 25 million, and then resell 18.5 million of those shares to a company called

---

[640] BSGR's Memorial on the Mebiame Issue, paragraphs 12, 36, 38.
[641] BSGR's Memorial on the Mebiame Issue, paragraphs 43-45.
[642] BSGR's Memorial on the Mebiame Issue, paragraphs 46-49.
[643] BSGR's Memorial on the Mebiame Issue, paragraphs 36-37, 41-42. See also Decree D/2001/1218[ ]/PRG/SGG, 11 August 2011, Arts. 3 and 9, **R-70**; and Mining Code 2011, 9 September 2011, Art. 150, **R-71**.

African Global Capital II (which was a portfolio company of Africa Management Limited, a joint venture between Palladino and Och-Ziff) for USD 77 million.[644] Out of this USD 52 million, USD 25 million would be paid to Guinean government officials (including Condé) via a loan from Palladino, USD 1 million to Mebiame, USD 2.1 million to Och-Ziff to satisfy an outstanding debt and the rest to Hennig.[645]

639.4.    The loan from Palladino was "designed to be defaulted upon", so as to result in Palladino gaining at least a 49% stake in SOGUIPAMI. However, the partnership with SOGUIPAMI did not eventuate because of negative press reports indicating that the partnership was corrupt.[646]

639.5.    In or around August 2011, Mebiame's associates met with Condé and the then Minister of Mines in several meetings. Mebiame and Hennig had concerns that Condé was not keeping his side of the deal, so a new team made clear to him that this deal was not optional.[647]

639.6.    Vale acquiesced in Condé's subsequent corrupt decision to strip VBG of its mining rights.[648]

639.7.    Mebiame also paid other sums to Condé and other Guinean government officials from 2010 (prior to Condé's election) to 2012.[649]

640.    The Tribunal finds that the evidence given by BSGR is insufficient to prove its case theory. All that BSGR has produced is (1) the U.S. criminal complaint against Mebiame;[650] (2) a letter from the U.S. DOJ to the U.S. Magistrate Judge seeking an order of detention against Mebiame as well as the corresponding order;[651] (3) an order by the U.S. Magistrate Judge allowing Mebiame to enter into plea negotiations with the U.S. authorities;[652] (4) a U.S. Cease and Desist Order against Och-Ziff;[653] (5) an email chain from Pedro Rodrigues of Vale to a person named Marcio Senne dated 29 September 2011;[654] and (6) certain press articles.[655] The totality of this evidence is insufficient for the following reasons.

---

[644] BSGR's Memorial on the Mebiame Issue, paragraphs 61-63.
[645] BSGR's Memorial on the Mebiame Issue, paragraphs 64-65.
[646] BSGR's Memorial on the Mebiame Issue, paragraph 65.
[647] BSGR's Memorial on the Mebiame Issue, paragraphs 56-69.
[648] BSGR's Memorial on the Mebiame Issue, paragraphs 71-85.
[649] BSGR's Memorial on the Mebiame Issue, paragraphs 50-55.
[650] USA v. Samuel Mebiame, Dkt. No. 1, Complaint, 12 August 2016, **R-403**.
[651] *United States v. Samuel Mebiame, Dkt. 6*, Letter to Judge Tiscione, 16 August 2016, **R-409**; *United States v. Samuel Mebiame, Dkt. 5*, Order of Detention, 16 August 2016, **R-410**.
[652] *United States v. Samuel Mebiame, Dkt. 10*, Order, 1 September 2016, **R-411**.
[653] *USA Securities and Exchange Commission – Och Ziff Capital Management Group LLC, OZ Management LP, Daniel S. Och, and Joel M. Frank* – Cease and Desist Order, 29 September 2016, **R-405**.
[654] Email chain Pedro Rodrigues to Marcio Senne, Re: "Soros dinner on Wednesday Sept 21, in New York", 29 September 2011, **R-414**.
[655] PR Newswire, "Mvelaphanda Holdings, Och-Ziff and Palladino Create Joint Venture to Focus on Natural Resources in Africa", 29 January 2008, **R-404**; New York Times, "Och-Ziff Said to Be Tied to Gabonese Fixer in Bribery Case", 16 August 2016, **R-406**; The Financial Times, "US seeks scalps in Och-Ziff bribery investigation", 12 September 2016, **R-407**; Africa Confidential, "Feds grab middleman", 26 August 2016, **R-412**; Africa Energy Intelligence "The Och-Ziff equity fund's double

640.1.   As regards (1)-(3), these documents are not even court judgments and, in any event, it is difficult to assess the weight to be given to them without examining the evidence on which they were based.

640.2.   As regards (5), the sender has not been called as a witness in this arbitration. In any event, BSGR relies on this document only for the limited purpose of proving the attendees at a meeting on 21 September 2011 at George Soros' home other than Vale's representatives.

640.3.   As regards (6), these articles are simply hearsay evidence which do not carry very much weight in the circumstances.

640.4.   The only document which might carry some little weight is the U.S. Cease and Desist Order against Och-Ziff because it contains *findings* by the U.S. Securities and Exchange Commission against Och-Ziff based on Och-Ziff's offer of settlement, which could be regarded as an admission. But even so, BSGR relies on this document only to prove certain parts of its case theory, so the probative value of this document is also limited. In particular, it does not help to establish the causative link between Mebiame's alleged bribes and the GoG's subsequent revocation of VBG's mining rights.

641.   Quite apart from the issue of the evidentiary basis for BSGR's case theory, there are also inherent difficulties in BSGR's case theory. First, if the deal was simply that Mebiame would assist Condé's election in exchange for VBG's mining rights, the question arises why, *after providing such assistance*, Mebiame continued to pay monies to Condé, and Palladino extended the loan to the Guinean government. Second, even if the plan was that Palladino would obtain a 49% stake in SOGUIPAMI, BSGR does not clearly explain *how* this meant Palladino would thereby have a stake in VBG's mining rights (or how this was a necessary step towards getting a stake). Indeed, as Vale correctly points out,[656] neither the criminal complaint against Mebiame nor the U.S. Cease and Desist Order against Och-Ziff even mentions Simandou, Zogota or either of the Parties. There is not even any evidence that VBG's mining rights were subsequently given to Palladino, Hennig or Mebiame.

642.   Finally, and most importantly, even if Condé had been bribed to revoke VBG's mining rights and to allow Palladino to have a stake in those rights, it does not follow (or imply strongly) that BSGR originally obtained those rights by lawful means. The Tribunal's finding that BSGR obtained those rights corruptly in 2008 was primarily based on the evidence regarding the period up to the granting of the mining rights, and the evidence adduced in support of BSGR's case theory from 2010 onwards does not affect the Tribunal's findings on the factual narrative from 2005 to 2008.

---

entry bookkeeping", 18 October 2016, **R-413**; BD Live, "Cape tycoon linked to mining bribery", 18 August 2016, **R-415**; Bloomberg, "US Case Into Fixer for Och-Ziff Venture Gets Support in Guinea", 18 August 2016, **R-416**.
[656] Vale's Reply Submission on the Mebiame Issue, paragraph 13.

### ii.    Mahmoud Thiam – Former Minister of Mines

643.   Vale argues that Thiam assisted BSGR in the following six ways.

643.1.   Thiam worked to secure BSGR's rights to Simandou Blocks 1 and 2 amidst Rio Tinto's challenges to the legitimacy of those rights;[657]

643.2.   Thiam assisted in BSGR's search for a potential joint venture partner;[658]

643.3.   Thiam induced Vale into participating in the joint venture by providing Vale with false assurances as to the validity of BSGR's rights to Simandou Blocks 1 and 2;[659]

643.4.   Thiam assisted in BSGR's press strategy;[660]

643.5.   Thiam used his niece to distribute monies to other parties for the purposes of advancing BSGR's position in Guinea;[661] and

643.6.   Thiam assisted BSGR in responding to blackmail attempts and crafting responses to the Technical Committee's allegations of bribery.[662]

644.   Vale argues that BSGR rewarded Thiam for his assistance in the following four ways.

644.1.   BSGR paid Thiam USD 8,017.60 in January 2009, USD 4,680 in May 2009 and USD 10,744.66 in November 2009.[663]

644.2.   BSGR paid money to Thiam to enable him to buy a property at 771 Duell Road, New York in November 2010.[664]

644.3.   BSGR paid money to Thiam to enable him to purchase a property at 170 East End Avenue, New York in October 2009.[665]

644.4.   BSGR paid Thiam for his consultancy services to BSGR in 2012, after his tenure as Minister of Mines, and other negotiation efforts.[666]

645.   There is no question that Thiam was a Government Official at all material times. The Tribunal will thus examine whether Vale has satisfied the Three Limbs (applied *mutatis mutandis*) as described in paragraph 583 above.

**The First Limb**

---

[657] Vale's Statement of Reply, paragraphs 518-523.
[658] Vale's Statement of Reply, paragraphs 524-529.
[659] Vale's Statement of Reply, paragraphs 531-532.
[660] Vale's Statement of Reply, paragraph 530.
[661] Vale's Statement of Reply, paragraphs 533-535.
[662] Vale's Statement of Reply, paragraphs 536-541.
[663] Vale's Statement of Reply, paragraphs 543-545.
[664] Vale's Statement of Case, paragraph 172; Vale's Statement of Reply, paragraphs 546-552.
[665] Vale's Statement of Case, paragraph 172.
[666] Vale's Statement of Reply, paragraphs 553-560.

646.    Vale does not adduce evidence of BSGR's offer of money to Thiam. Instead, Vale adduces evidence of BSGR's payments to Thiam, dividing them into the following four categories already mentioned above.

646.1.    BSGR's payments to Thiam of USD 8,017.60 in January 2009, USD 4,680 in May 2009 and USD 10,744.66 in November 2009.[667]

646.2.    BSGR's payments to Thiam to enable him to buy a property at 771 Duell Road, New York in November 2010.[668]

646.3.    BSGR's payments to Thiam to enable him to purchase a property at 170 East End Avenue, New York in October 2009.[669]

646.4.    BSGR's payments to Thiam for his consultancy services to BSGR in 2012, after his tenure as Minister of Mines, and other post-tenure negotiation efforts.[670]

647.    The Tribunal will deal with each category in turn.

First category

648.    As regards the first category of payments to Thiam in January, May and November 2009, the Tribunal has reviewed the documentary evidence and finds that BSGR paid the sum of USD 8,017.60 in January 2009 to Thiam. However, as regards the other two payments in May and November 2009, the Tribunal observes that the documentary evidence shows that these payments were made to BSGR's travel agent, Diesenhaus Unitours, rather than Thiam, and accordingly finds that no such payments were made to Thiam. Nevertheless, the Tribunal finds that the May and November 2009 payments were reimbursements for Thiam's flight costs in April and September 2009. The Tribunal therefore finds that BSGR has conferred a "thing of value" within the meaning of BSGR's anti-bribery representations to Thiam, being his flights in April and September 2009.

Second category

649.    As regards the second category of payments for the purchase of 771 Duell Road, New York, Vale alleged that there was a Mozambican company called Sociedade Saboiera De Nacala, LDA ("Sociedade")[671] whose registered address was one of Thiam's apartments at 340 East 64th Street, #14H, New York.[672] The agent of Sociedade was Aquil Rajahussen, Thiam's friend.[673] Pursuant to an arrangement with Thiam, Rajahussen consented on behalf of Sociedade to purchase the property at 771 Duell Road by a deed dated 13 November 2010,[674] and arranged for Sociedade to lease the property to Thiam.[675] These arrangements show that Thiam exercised actual control over the

---

[667] Vale's Statement of Reply, paragraphs 543-545.
[668] Vale's Statement of Case, paragraph 172; Vale's Statement of Reply, paragraphs 546-552.
[669] Vale's Statement of Case, paragraph 172.
[670] Vale's Statement of Reply, paragraphs 553-560.
[671] Vale's Statement of Reply, paragraph 549.
[672] Bargain and Sale Deed, 25 August 1998, C-105; Vale's Statement of Reply, paragraph 549.
[673] Vale's Statement of Reply, paragraph 549.
[674] Bargain and Sale Deed, 13 November 2010, C-103; Vale's Statement of Reply, paragraph 549.
[675] Email from McGregor to Rajahussen, 7 January 2011, C-637; Vale's Statement of Reply, paragraph 550.

purchase and was the real owner.[676] Thiam was therefore concealing the fact of the control over the property when he claimed in his first witness statement that the property was purchased by Rajahussen, who simply leased the property to Thiam as a *vacation home*, and that the property was not purchased by or for Thiam and had never belonged to Thiam.[677]

650.    Vale alleged that Sociedade purchased the property using funds from BSGR.[678] According to Vale, Rajahussen was involved in a coal business and was dissatisfied with his business partner at the time.[679] Rajahussen therefore needed a serious investor, and Thiam brought this investment opportunity to Steinmetz's attention, who expressed interest and agreed to pay a non-refundable amount for an exclusive opportunity to conduct due diligence.[680] In an email from Thiam to Rajahussen on 15 November 2011, Thiam said: "B would agree to pay a non-refundable amount to view the data exclusively, knowing that the funds were to go to [Thiam]" and that Thiam and Rajahussen agreed to use this "agreement between [Rajahussen] and B to transfer [Thiam's] funds to [Rajahussen]" so that "[Rajahussen] would purchase the house and hold in [Thiam's] name".[681]

651.    The Tribunal considers that this email amounts to a statement against self-interest because Thiam was effectively admitting that he and Rajahussen had agreed to use BSGR's due diligence payment to fund the purchase of 771 Duell Road. Thiam did not address this self-incriminating email in his second witness statement, although he had the opportunity to do so. In view of these circumstances, the Tribunal finds that the email sufficiently proves that BSGR's due diligence payment (which amounted to USD 5,000,000, according to BSGR's evidence[682]) did eventually go to Thiam, and that at least a part of this money was used to fund the purchase of 771 Duell Road (whether fully or partially). Based on this finding that BSGR's payment went to Thiam, the Tribunal finds that this sufficiently establishes the First Limb, irrespective of whether Thiam was the "real owner" of 771 Duell Road as Vale alleges.

652.    BSGR points out that Thiam has been convicted before the District Court for the Southern District of New York for charges relating to his acceptance of bribes of USD 8,500,000 from senior officers of a Chinese conglomerate in exchange for his assistance in securing mining rights for the conglomerate in Guinea.[683] BSGR argues that the FBI established in this trial "that Mr Thiam purchased this [771 Duell Road property] from

---

[676] Vale's Statement of Reply, paragraph 550.

[677] Thiam First WS, paragraph 131; Vale's Statement of Reply, paragraphs 547, 552; Email from F. Thiam to M. Thiam, 1 March 2013, **C-638**.

[678] Email from M. Thiam to Rajahussen, 15 November 2011, **C-636**; Statement of Reply, paragraph 551.

[679] Email from M. Thiam to Rajahussen, 15 November 2011, **C-636**; Vale Statement of Reply, paragraph 551.

[680] Email from M. Thiam to Rajahussen, 15 November 2011, **C-636**; Vale Statement of Reply, paragraph 551.

[681] Email from M. Thiam to Rajahussen, 15 November 2011, **C-636**; Vale Statement of Reply, paragraph 551.

[682] BSGR Board Information Sheet, 14 November 2010, **R-263**.

[683] Letter from BSGR to the Tribunal dated 9 June 2017, p. 2; *USA v. Thiam*, Criminal Complaint, Dkt. No. 1, 12 December 2016, **C-828**, *USA v. Thiam*, Trial Transcript, Dkt. No. 114, 1 May 2017, **C-833**; *USA v. Thiam*, Trial Transcript, Dkt. No. 116, 2 May 2017, **C-834**; *USA v. Thiam*, Trial Transcript, Dkt. No. 118, 3 May 2017, **C-835**.

funds provided by the Chinese company, not BSGR".[684] However, leaving aside the issue of the evidential value of foreign convictions in this arbitration, the Tribunal understands that the prosecution's case in that case (which the jury accepted) was simply that Thiam paid a part of the property's purchase price (USD 375,000 of USD 3,750,000) using bribe monies from the Chinese conglomerate. This is plainly clear from two sources. First, the criminal complaint alleged that:

> On or about November 12, 2010, THIAM also transferred **$375,000** from the Thiam Hong Kong Account to a company based in Kuala Lumpur, Malaysia (the "Malaysia Company"). As set forth below, I believe that THIAM made this transfer for the purpose of reimbursing an associate of THIAM's who agreed to assist THIAM's concealment of the bribe proceeds in the Thiam Hong Kong Account to fund, **in part**, the $3,750,000 purchase of THIAM's Dutchess County Estate.[685]

653. Second, the prosecution argued in its closing submissions that:

> [...] you see the ledger here that describes the $375,000 credit that came in through the Pacific Inter-Link account and the $375,000 debit that was related to the payment to McGregor [allegedly Thiam's attorney]. And then, of course, McGregor closes on the property in Dutchess County, **using that $375,000 as a deposit**, and the company nominally, in name, that owns the house at this point is [Sociedade Saboeira de Nacala].[686]

654. So it is not true to claim that the prosecution's case was that the entire *purchase price* was funded by the Chinese conglomerate. The Tribunal therefore holds that, even if Thiam's conviction were to be considered as proof of the facts found in that case, the facts so found do not rule out the possibility of BSGR's payments being used to fund the remainder of the purchase price of the 771 Duell Road property.

655. In sum, the Tribunal finds that at least part of BSGR's due diligence payment was used to pay the purchase price of the 771 Duell Road property. The Tribunal makes no finding at this juncture on whether BSGR knew that its payment would go to Thiam for the purposes of funding the 771 Duell Road property, being a question that will only be dealt with in the analysis of the third category.

Third category

656. As regards the third category of payments for the purchase of 170 East End Avenue, New York, Vale has not adduced evidence of the actual payments from BSGR to Thiam, which Thiam used to fund his purchase of an apartment at 170 East End Avenue in New York.[687] Vale only adduces evidence of Thiam's USD 1.52 million purchase of the apartment,[688] and claims that this was funded by BSGR's bribes. However, the Tribunal accepts Thiam's testimony that Thiam paid USD 1,300,000 of the consideration by October 2006, over two years before his appointment as Minister of Mines, using his earnings as a banker, so that was highly unlikely to have been funded by monies from

---

[684] Letter from BSGR to the Tribunal dated 9 June 2017, p. 2.
[685] *USA v. Thiam*, Criminal Complaint, Dkt. No. 1, 12 December 2016, ¶ 16(h) (emphasis added), **C-828**.
[686] *USA v. Thiam*, Trial Transcript, Dkt. No. 116, 2 May 2017, 168:15-168:20 (emphasis added), **C-834**.
[687] Vale's Statement of Case, paragraph 172.
[688] Bargain and Sale Deed for 170 East End Avenue, 20 October 2009, p. 12, **C-107**; Mortgage for 170 East End Avenue, dated 14 November 2012, **C-108**.

BSGR.[689] As regards the remainder of the consideration which Thiam said that he paid while he was Minister of Mines using his own money,[690] the Tribunal finds that there is no evidence to show or even suggest that the remainder was funded by BSGR's monies. Indeed, Thiam has testified that he was a banker at Merrill and UBS prior to his appointment as Minister of Mines,[691] which coheres with BSGR's claim that the purchase of the property was self-funded.

Fourth category

657. As regards the fourth category, Vale alleges that BSGR paid Thiam for providing certain consultancy services to BSGR in 2012.[692] Vale alleges that BSGR paid monies to entities controlled by Corchia (including Crown Capital and Securiport), which paid Thiam & Co. in turn,[693] for Thiam's involvement in finding an investor in 2012 on BSGR's behalf which would be interested to purchase BSGR's 49% shareholding in VBG Guernsey.[694] However, the Tribunal considers that any such payments from BSGR to Thiam would be irrelevant to the analysis of the First Limb, because they would be payments for services provided by Thiam *after* his ministerial tenure. The Tribunal agrees with BSGR that "Thiam's actions after his tenure as Minister of Mines [do not constitute] evidence that he was paid bribes".[695]

658. The Tribunal concludes that the First Limb is satisfied on the basis of the first and second categories of payments, i.e. BSGR's payment to Thiam in January 2009 and BSGR's flight reimbursements in May and November 2009, as well as BSGR's payments to Thiam for the purchase of 771 Duell Road. The Tribunal must now consider whether these payments were designed to achieve one of the four aims in BSGR's anti-bribery representations.

**The Second Limb**

659. Vale has consistently maintained that BSGR's payments to Thiam were rewards for the six forms of assistance provided by Thiam to BSGR, as stated in paragraph 643 above.[696] The first question is whether the payments were in exchange for those six forms of assistance. The second question is, assuming the first question is answered in the affirmative, whether this shows that the payments were for the purpose of achieving one of the four stated aims in BSGR's representations, namely:

(a)    influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist the BSG Group, Vale S.A. or any other party in obtaining or retaining business, or directing business to any third party; [...]

(b)    securing an improper advantage; [...]

---

[689] BSGR's Statement of Rejoinder, paragraph 174; Thiam First WS, paragraphs 126-130.
[690] BSGR's Statement of Rejoinder, paragraph 174; Thiam First WS, paragraphs 126-130.
[691] BSGR's Statement of Defence, paragraphs 12, 199; Thiam First WS, paragraphs 10, 125-132.
[692] Vale's Statement of Reply, paragraphs 553-555.
[693] Vale's Statement of Reply, paragraph 560.
[694] Vale's Statement of Reply, paragraphs 556-559.
[695] BSGR's Statement of Rejoinder, paragraph 170.
[696] Vale's Statement of Reply, paragraph 507; Vale's Statement of Case, paragraph 172.

(c)    inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Authority in order to assist the BSG Group, Vale S.A. or any other party in obtaining or retaining business, or directing business to any third party; or [...]

(d)    providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s). [...][697]

*The first question: whether the payments were in exchange for the six forms of assistance*

660.    With regard to BSGR's payment that funded the purchase of 771 Duell Road, BSGR adduces evidence that it made this payment in exchange for an exclusive right to conduct due diligence in relation to a potential acquisition of a major stake in a coal opportunity in Mozambique.[698] Vale has not given any evidence to cast doubt on this, so it has not discharged its burden of proof that this payment was in exchange for the six forms of assistance described above.

661.    As regards the three payments in 2009, the Tribunal agrees with BSGR that these were reimbursements for flight costs in relation to work that BSGR was doing with Thiam.[699] The third payment for instance was to reimburse Thiam for his September 2009 flight to Israel and Hong Kong in relation to "BSGR's then negotiations in China with [China Investment Corporation] and/or Baosteel."[700] It is true that the first payment was not for Thiam's flight but for Fofana's flight in December 2008, but the background facts have been adequately explained by BSGR. The background was that, prior to Thiam's appointment, many mining companies sought to hold introductory meetings with Thiam, including BSGR. Thiam acquiesced to BSGR's request (as he did for other companies) but requested for Fofana's presence (BSGR's advisor) as Thiam was not familiar with BSGR and wanted to receive an opinion from another professional whom he trusted and could vouch for BSGR's promises. Thiam paid for his and Fofana's return flight tickets from Conakry to Washington, and BSGR reimbursed Thiam for Fofana's ticket because Fofana was advisor to BSGR.[701] So the upshot is that BSGR was merely reimbursing its *own advisor*, Fofana, for his ticket, for which Thiam happened to pay first, and that is why the payment was made to Thiam. No evidence has been adduced by Vale to counter Thiam's version of these facts.

662.    But although the Tribunal finds that these payments were for business-related flight costs, this does not rule out the possibility that these payments were in exchange for one the six alleged forms of assistance by Thiam. If it can be shown that the nature of the work done by Thiam (for which his flight expenses were reimbursed) fell under one of the six forms of assistance, and that Thiam would not have done the work had these expenses not been reimbursed, it stands to reason that these payments were ultimately in exchange for one of those forms of assistance.

---

[697] Compliance Due Diligence Questionnaire, section IV, p. 7, **C-30**.
[698] BSGR Board Information Sheet dated 14 November 2010, R-263; BSGR's Statement of Rejoinder, paragraphs 167, 169(1).
[699] BSGR's Statement of Rejoinder, paragraph 165; Tchelet First WS, paragraph 45.
[700] Tchelet First WS, paragraph 45.
[701] Thiam Second WS, paragraphs 30-31; BSGR's Statement of Rejoinder paragraph 145(2).

663.    Applying this principle, the Tribunal finds that there is insufficient proof that the payments were <u>in exchange for</u> any of the six forms of assistance. In particular, there is no proof they were in exchange for Thiam's involvement in the negotiations with potential joint venture partners, including China Investment Corporation,[702] the Libyan Investment Authority,[703] Baosteel[704] and Alabbar.[705] It is true that Thiam was involved in these negotiations (a fact that BSGR does not deny) and that the flights for which he was reimbursed enabled him to participate in these negotiations. But there is no proof that Thiam only agreed to join the negotiations *if* his expenses were paid, or (to put it another way) that he would not have paid for his own flight to participate in the negotiations had BSGR not decided to reimburse him. Indeed, Thiam testifies that the GoG had an interest in participating in the negotiations, which was that it would give the GoG the opportunity to ensure its aims were met by the joint venture.[706] Thiam also points out that Article 62 of the Mining Code makes any joint venture agreement contingent on the approval of the Minister of Mines.[707] So there is a real possibility that Thiam would have made himself present at the negotiations *irrespective* of whether his flights were reimbursed.

*The second question: whether the payments were made to achieve one of the four aims*

664.    Even if BSGR made the payments in exchange for Thiam's involvement in the negotiations, they were not made to achieve any of the four aims in BSGR's representations. In particular, they were not for the purpose of "influencing any act or decision of [Thiam] in [his] official capacity [...] in order to assist the BSG Group, Vale S.A. or any other party in obtaining or retaining business". First, the "thing of value"[708] given to Thiam was not actually money (since the sums were paid to reimburse his flights), but rather flight experiences and the ancillary benefits of visiting foreign countries, which are arguably not "things of value" to Thiam at all since they were flights for business and not leisure. Second and more important, Vale has not adduced sufficient evidence to contradict Thiam's testimony that his role in the negotiations was limited to providing "appropriate assistance to the parties in reaching agreement" (as he did in the negotiations for another joint venture between two investors, Bellzone and China International Fund (which are unrelated to BSGR and Vale), during which Thiam says he "effectively became a mediator"),[709] as opposed to promoting BSGR's interests actively in the negotiations. The emails between Thiam and the potential joint venture partners on which Vale relies[710] do not discredit Thiam's testimony. At worst, it can be said that Thiam promoted the GoG's interests in kickstarting the development of Simandou by assisting in the search for reliable joint venture partners so as to reap the economic benefits, and that the GoG's interests overlapped with BSGR's interests. His limited role was seen again during BSGR's negotiations with Vale, where his involvement was limited

---

[702] Vale's Statement of Reply, paragraphs 525-526.
[703] Avidan First WS, paragraph 137; Struik First WS, paragraph 134; Thiam First WS, paragraphs 76-77; BSGR's Statement of Defence, paragraph 92; Vale's Statement of Reply, paragraph 527.
[704] Vale's Statement of Reply, paragraph 528.
[705] Vale's Statement of Reply, paragraph 528.
[706] Thiam Second WS, paragraph 15.
[707] Thiam Second WS, paragraph 15.
[708] This term is used in BSGR's representations: *see* Compliance Due Diligence Questionnaire, section IV, p. 7, **C-30**.
[709] Thiam Second WS, paragraph 15.
[710] Emails between Minister Thiam, A. Avidan and A. Rocos dated 15 July 2009, **C-620**; Email from A. Rocos to B. Steinmetz and Minister Thiam dated 27 July 2009, **C-621**; Email from B. Steinmetz to Minister Thiam dated 4 January 2010, **C-622**; Emails between Minister Thiam and B. Steinmetz dated 30 December 2009, **C-623**; Email from M. Alabbar to Minister Thiam dated 1 August 2010, **C-624**.

to (a) participating in a conference call with Vale and BSGR to confirm that BSGR had the legal rights to Simandou Blocks 1 and 2 and (b) restating his confirmation in a letter to Vale on 19 March 2010.[711] This only illustrates that Thiam participated in the negotiations as a representative of the GoG's interests rather than BSGR's interests, just as he had done in BSGR's previous negotiations.

665.    Two consequences follow from Thiam's limited involvement. One, it follows that Thiam did not "assist the BSG Group [...] in obtaining or retaining business", since his limited role would not have that effect. Two, the payments to Thiam for his limited involvement would arguably not be considered as bribery under §78dd-1(a) of the FCPA, after which BSGR's anti-bribery representations were modelled. §78dd-1(c) states that one affirmative defence against an allegation of bribery is where:

> the payment, gift, offer, or promise of anything of value that was made, was a reasonable and bona fide expenditure, such as travel and lodging expenses, incurred by or on behalf of a foreign official, party, party official, or candidate and was directly related to-- (A) the promotion, demonstration, or explanation of products or services; [...]

666.    The clear purpose of this section is to exclude reimbursements for accommodation and flights for government officials from the definition of bribery where the purpose of the visit is to introduce the government official to the business of an entity. In this case, the purpose of reimbursing Thiam's flight can be said to be to introduce Thiam to the business and key personnel of potential joint venture partners, so as to enable Thiam and the GoG to make a more informed decision on whether to approve the finalised joint venture agreement in accordance with Article 62 of the Mining Code. Vale itself had paid for Thiam's hotel on a trip to Carajás and placed its private jet at Thiam's disposal in May 2010, so that Thiam could view what Vale had achieved in its iron ore mine in Carajás.[712] The upshot is that the payments for Thiam's involvement in the negotiations would not count as bribery under the FCPA in the light of the affirmative defence, and they should not be regarded as bribery under BSGR's representations.

*Conclusion on Second Limb and relevance of USA v. Thiam proceedings*

667.    For the reasons stated above, the Tribunal finds that there is insufficient evidence that BSGR's payments were in exchange for any of the six forms of assistance from Thiam, or that, even if they were in exchange for Thiam's assistance in BSGR's negotiations, they were made to achieve one of the four stated aims in BSGR's representations. The Tribunal accordingly dismisses Vale's allegation that BSGR bribed Thiam in breach of BSGR's anti-bribery representations.

668.    The Tribunal concludes with a final word on the relevance of the *USA v. Thiam* proceedings. The Parties adduced evidence of the U.S. criminal proceedings against Thiam for allegedly accepting bribes from an unrelated Chinese conglomerate. The Parties draw diametrically opposite conclusions on the relevance of those proceedings to the issues in this arbitration. On the one hand, Vale argues that Thiam's admission of his

---

[711] Monteiro First WS, paragraphs 16-17; Monteiro Second WS, paragraph 24; Agnelli WS, paragraph 15; Thiam First WS, paragraph 80; Letter from Thiam to Ledsham dated 19 March 2010, **C-49**; Vale's Statement of Case, paragraph 74; Vale's Statement of Reply, paragraph 531.
[712] Email from B. Amadou to Etchart, Alves and others dated 24 May 2010, **R-262**; BSGR's Statement of Rejoinder, paragraph 165; Thiam First WS, paragraph 87.3; Thiam Second WS, paragraph 27.

repeated lies to banks and U.S. governmental agencies about taking bribes "go[es] directly to his credibility as a witness in this arbitration".[713] On the other hand, BSGR argues that the criminal proceedings support BSGR's case in this arbitration, because first of all, Thiam's "alleged corrupt scheme with Chinese interests – which he still denies – would have negatively impacted BSGR",[714] given that the award of investment rights to the Chinese conglomerate included the "near total control of Guinea's valuable mining sector",[715] and secondly, the FBI did not discover any evidence of BSGR's bribery despite its scrupulous examination of the evidence before it.[716]

669.    The Tribunal finds that the *USA v. Thiam* criminal proceedings do not affect the Tribunal's conclusions in its analysis above. The Tribunal has found that there is insufficient evidence that BSGR's payments were in exchange for the six forms of assistance, let alone that they were made to fulfil one of the four corrupt aims in BSGR's representations. The criminal proceedings, which solely concern Thiam's alleged acceptance of bribes from an unrelated Chinese conglomerate, do not change this fact of insufficiency of evidence, no matter how gravely Thiam's testimony and conviction in those criminal proceedings taint his credibility as a witness for BSGR.

### *iii.*    President Conté

670.    Vale alleges the following events.

670.1.    In 2005, during a meeting between Oron, Cilins, I.S. Touré and President Conté, Oron gave President Conté a gold watch inlaid with "Steinmetz" diamonds, which had an approximate value of USD 60,000.[717] To support this claim, Vale relied on the Technical Committee's Notification Letter dated 30 October 2012, which made this allegation.[718]

670.2.    In 2006, after the signing of the Memorandum of Understanding between Guinea and BSGR Guinea BVI on 20 February 2006, a ceremony was televised featuring Souaré (who was Minister of Mines), Oron and Cilins. During the ceremony, Oron gave Souaré a miniature Formula 1 car encrusted with gold and diamonds, which Souaré gave to President Conté.[719] In support, Vale relies on witness statements from Struik,[720] Souaré,[721] Steinmetz[722] and BSGR,[723] all of which Vale regards as admissions. Vale points out[724] there are discrepancies between the testimonies of BSGR's witnesses on whether the watch was

---

[713] Letter from Vale to the Tribunal dated 26 May 2017, p. 3; see also Letter from Vale to the Tribunal dated 16 June 2017, pp. 2-3.
[714] Letter from BSGR to the Tribunal dated 9 June 2017, p. 2 (emphasis in original).
[715] Letter from BSGR to the Tribunal dated 9 June 2017, p. 2.
[716] Letter from BSGR to the Tribunal dated 9 June 2017, pp. 3-4; see also *USA v. Thiam*, Transcript of FBI's interview with Thiam, 13 December 2016, **R-524**.
[717] Vale's Statement of Case, paragraph 144; Vale's Statement of Reply, paragraphs 351, 632(b), 1005.
[718] Notification Letter, paragraph II.8, p. 5, **C-5**.
[719] Vale's Statement of Case, paragraph 144; Vale's Statement of Reply, paragraphs 357, 632(c), 1005.
[720] Struik First WS, paragraph 36.
[721] Souaré WS, paragraph 28.
[722] Steinmetz First WS, paragraph 61.
[723] BSGR's Statement of Defence, paragraph 47. *See also* Notification Letter, paragraph II.7, p. 5, **C-5**.
[724] Vale's Statement of Reply, fns. 896, 1652.

encrusted with gold (as Struik[725] and Avidan[726] claim) or diamonds (as Steinmetz claims[727]).

670.3. In 2006, during a meeting with President Conté to discuss the development of the project, Struik gave President Conté another miniature car.[728] Vale relies on a few passages from Struik's first witness statement[729] and Souaré's first witness statement,[730] which Vale regards as admissions.

671.    Vale argues that "[t]hese show that BSGR bribed the President in relation to its obtaining Guinean mining rights."[731]

672.    As regards the gold watch, the Tribunal finds there is insufficient evidence to prove that Oron gave a gold watch to President Conté. This is because the Technical Committee's Notification Letter on which Vale relies contains nothing more than a list of bare allegations by the Technical Committee against BSGR. The Tribunal also notes that the gold watch allegation in the Notification Letter did not culminate in any finding (or indeed any discussion) on this matter in the Technical Committee's Report. This only weakens the evidentiary value of the Notification Letter.

673.    With regard to the two miniature cars, the Tribunal finds that Oron gave a miniature car to Souaré in a 2006 televised ceremony, and that Souaré gave that miniature car to President Conté in turn, based on the corroborating testimonies by Struik, Souaré, Steinmetz and BSGR. The Tribunal also finds that Struik gave President Conté another miniature car in a 2006 meeting regarding BSGR's Simandou project, based on Struik's admission that he "gave [President Conté] our company gift, a miniature golden replica of a Formula One car, the same we had given to the Minister of Mines before."[732]

674.    While the Tribunal finds that Oron (through Souaré) and Struik gave miniature cars to President Conté, the Tribunal is unpersuaded that these cars constitute clear evidence of bribery. Steinmetz testifies that these cars are marketing devices that had BSGR's name engraved on them and only cost a few hundred dollars to make, and it is unlikely for any company to bribe government officials using a relatively cheap marketing device that has the company's name on it, let alone at a publicly televised ceremony.[733] Avidan confirms that these cars are simply corporate gifts, and even unabashedly attests that the two cars may not be the only ones as Avidan has also "[given] ministers [...] in total six small golden model cars".[734] Struik confirms that these are simply corporate gifts.[735] In the light of these testimonies, the Tribunal finds that these were gifts made for felicitous occasions,

---

[725] Struik First WS, paragraph 36.
[726] Avidan First WS, paragraph 117.
[727] Steinmetz First WS, paragraph 61.
[728] Vale's Statement of Reply, paragraphs 357, 632(c), 1005.
[729] Struik First WS, paragraph 111.
[730] Souaré WS, paragraph 28. Vale originally alleged that another meeting took place between February and July 2008 between President Conté, Steinmetz, Struik and Cilins, during which Steinmetz gave President Conté a miniature car as well: Vale's Statement of Case, paragraph 161. However, Steinmetz denied the meeting in 2008 took place: Steinmetz First WS, paragraph 61.
[731] Vale's Statement of Reply, paragraph 1005.
[732] Struik First WS, paragraph 111.
[733] Steinmetz First WS, paragraph 61.
[734] Avidan First WS, paragraph 117.
[735] Struik First WS, paragraphs 36, 111.

and that there is no evidence to show that they were given for the purpose of achieving one of the four improper aims in BSGR's representations.

675.   On this basis, the Tribunal dismisses Vale's allegation that BSGR bribed President Conté in breach of its anti-bribery representations.

Summary as to whether BSGR made false statements during the due diligence process

676.   In summary, and based on the analysis above, the Tribunal finds that BSGR made false or misleading statements in its responses to a number of questions asked by Vale during the due diligence process. These false or misleading statements arise out of the following ten circumstances.

676.1.   BSGR's failure to disclose all consultants and agents – including Pentler, Cilins, Boutros and Fofana.

676.2.   BSGR's failure to disclose agreements with consultants and agents.

676.3.   BSGR's failure to disclose all relevant documents and information relating to the shareholder structure of BSGR Guernsey and its subsidiaries in relation to the share purchase agreement between BSGR Guinea BVI and BSGR Guernsey regarding the shares in BSGR Guinea.

676.4.   BSGR's failure to disclose all agreements between the shareholders of BSGR Guernsey and any of its subsidiaries, as well as all agreements relating to the share capital or ownership, control, management or operation of a Group Company in relation to the share purchase agreement between BSGR Guinea BVI and BSGR Guernsey regarding the shares in BSGR Guinea.

676.5.   BSGR's failure to disclose the pending disputes with Bah and Camara.

676.6.   BSGR's representation that no personnel or shareholders of BSGR or their immediate family were Government Officials with regard to the relationship between I.S. Touré, an employee of BSGR Guinea and Mme. Touré.

676.7.   Avidan's representation that I.S. Touré and Mme. Touré were not related.

676.8.   BSGR's misleading description of its role in the GoG's decision to withdraw Rio Tinto's mining rights.

676.9.   BSGR's failure to disclose financial and business connections to Mme. Touré / Matinda.

676.10.   BSGR's representation that it had not engaged in bribery or corruption in relation to benefits granted to Mme. Touré.

3.    **BSGR knew that its representations were false**

677.    In addition to demonstrating that certain representations were false, Vale must prove that BSGR knew they were false. This is primarily an evidentiary question – can BSGR, based on all the evidence, be said to have known that its representations were false?

678.    In support of its argument that BSGR knew that the representations were false, Vale states:[736]

> BSGR knew that its representations were false. In many cases, BSGR was dealing with the very subject-matter of the representations at the same time as, in its parallel negotiations with Vale, it professed to have no knowledge of any such matters.

679.    Conversely, BSGR contends that "[s]howing that a statement was false (which is what Vale rely on […]) is not sufficient. […] one cannot fill the gap by saying that if it is false, the person making the statement must have known that to be the case. That is both a logical *non sequitur* and a legal nonsense".[737]

680.    The false or misleading statements made by BSGR during the due diligence phase are set out at paragraph 676 above. The Tribunal sets out below the factual circumstances and evidence that it considers relevant to the analysis of whether BSGR knew that the information provided in response to these questions was false.

681.    The most telling fact in relation to BSGR's knowledge is its decision not only to refrain from disclosing the role that Pentler and its principals played in securing the mining licences, but also to withhold disclosure of the relationship between Mme. Touré and Pentler, as BSGR's Consultant. As set out in paragraph 492 above, the Tribunal has found that, due to BSGR's failure to provide any corroborating evidence (including a statement from Mr Hatchard) to support its assertion that Skadden Arps advised it that there was no need to disclose the role of Pentler in response to the due diligence questionnaires, no such advice was provided.

682.    In the Tribunal's view, the following points are telling.

682.1.    BSGR restructured its holding companies prior to seeking a joint venture partner. That restructure resulted in all companies with formal ties to Pentler being removed from the ownership structure.

682.2.    BSGR proposed amendments to the definition of BSG Group which meant that companies with ties to Pentler fell outside the definition.

682.3.    BSGR deliberately chose not to disclose to Vale the existence of Pentler, or its role in assisting BSGR to obtain the mining licences, during the due diligence process (see paragraph 693 below).

682.4.    When Vale asked broader due diligence questions that would have encompassed those companies in the BSG Group with ties to Pentler, BSGR immediately restructured and moved those companies to a separate part of the

---

[736] Vale's Pre-Hearing Written Submissions, paragraph 191.
[737] BSGR's Statement of Rejoinder, paragraph 332.

business, with the result that they were not caught within the more expansive questions.

683.    The two companies with the closest ties to Pentler were BSGR Steel and BSGR Guinea BVI. Pentler held shares in BSGR BVI Guinea. As indicated in Section III above, these two companies were removed from BSGR Guinea's ownership chain in 2009 as follows. As a convenient point of reference, the Tribunal has, based on uncontroversial facts in the record, prepared the following diagram showing the effect of the restructuring in 2009 and, for reasons of clarity, is repeated here.

**Pre-February 2009:**                              **Post-February 2009:**





684.    Vale alleges that BSGR's restructuring in 2009 to remove BSGR Steel and BSGR Guinea BVI from the Simandou project was a deliberate attempt to hide the relationship with Pentler. Conversely, BSGR states that the restructuring was designed with good governance in mind:

> BSGR decided that it would be advantageous for the holding company of the Guinea project to be a Guernsey company rather than a BVI company, to ensure that the holding company was subject to the same high level of corporate governance as the parent company (which was already incorporated in Guernsey). This was designed to give comfort to potential investors.[738]

685.    While both explanations are plausible on their face, when Vale widened the scope of its due diligence in March 2010 to include all subsidiaries of BSGR (and thus BSGR Steel and BSGR Guinea BVI), BSGR once again restructured. This time, BSGR transferred BSGR Steel and BSGR Guinea BVI to BSG Metals and Mining – a subsidiary of Nysco (BSGR's parent), but not directly connected to BSGR. A diagram depicting the

---

[738] BSGR's Statement of Rejoinder, paragraph 64.

restructuring in March 2010 has been created by the Tribunal (based on uncontroversial fact) and is reproduced below.

**Restructuring in March 2010:**



686.  This restructuring meant that BSGR Steel and BSGR Guinea BVI (companies that had contracted with Pentler) were no longer directly linked to BSGR and were therefore not caught by the broader definition of "Group Company" that Vale insisted upon in its follow-up due diligence questions. This transfer occurred immediately after Vale broadened the scope of the due diligence questions. No explanation has been provided by BSGR for this restructuring.

687.  These factors cannot be a coincidence. In the Tribunal's view, the lengths to which BSGR went in order to conceal the role of Pentler strongly supports a finding that BSGR wished to ensure that Vale remained ignorant of Pentler and its dealings with various contacts who had assisted BSGR Guinea in obtaining the mining rights.

688.  BSGR points out that not all facts regarding Pentler or its role were concealed. A reference to the USD 22 million payment to Pentler for the buyback of its shares in BSGR Guinea BVI was contained in one of the financial documents disclosed in the data room. It was said to be a payment for "goodwill on acquisition."[739] Vale understood that this referred to a payment made to a minority shareholder. According to Monteiro (Vale's witness), when he queried this payment, Tchelet told him that:

---

[739] Statement of Financial Affairs for BSG Resources (Guinea) Limited (Guernsey) for Period Ended 31 December 2009 and Letter from Ernst &Young, December 2009 / February 2010, p. 9, **C-290**.

> The minority shareholder was not an external third party but rather was a company within the Balda Group that provided services for BSGR in Guinea, as did other group companies. He claimed that the affiliated entity received the shares in the first place simply for tax planning purposes and that the buy-out in April 2009 was likewise to optimize tax planning. I also had discussions with Dag Cramer regarding the buy-out and he, like Mr. Tchelet, told me that the entire transaction was internal to the Balda Group and was for tax-planning purposes.[740]

689.    Conversely, Tchelet stated in his First Witness Statement that:

> The focus of the questions Mr Monteiro asked me, was why there had been a change in the company structure in April 2009. I explained that previously there was a minority shareholder in BSGR Guinea BVI and that subsequently there was a buy out of the minority partner in 2008 and that in accordance with the corporate governance and accounting policy of BSGR, the structure was amended such that the subsidiary BSGR Guernsey was incorporated and managed in Guernsey under the auspices of the BSGR Head Office in Guernsey. This was the extent of the questions I was asked by Mr Monteiro. I was not asked the identity of the minority shareholder or any further questions in this regard.[741]

690.    Tchelet did not attend the February 2017 Hearing for a cross-examination on his witness statements. On the other hand, Monteiro attended the hearing and was asked questions by the Tribunal about the USD 22 million payment. He said:

> Then, the first time we met Mr Tchelet was here in London, and when we met him, we went through with him some documentation that was provided in part of the due diligence and asked him directly: what was the transaction about? And based on the organisation chart that they provided to us, he was explaining that that transaction was a transaction with a related party. Not only him, but also Mr Cramer mentioned that was the way they did tax planning to avoid the Guinean risk of bringing money to Guinea. So, also, they were using different entities that were providing services but, again, related parties always, all entities under the Balda Foundation.[742]

691.    Monteiro confirmed that, at that stage, he had never heard of Pentler or seen any reference to it.[743] He therefore did not know how to ask questions about that entity.

692.    The Tribunal accepts Monteiro's evidence and finds his account to be consistent with BSGR's efforts to conceal the existence of Pentler as described above. Moreover, it would be most surprising if, as Tchelet suggested, Monteiro asked questions about the USD 22 million goodwill payment, but never asked to whom the payment was made. Even if Tchelet is correct that the focus of the questions was on the restructuring and not the identity of the minority shareholder, it would still be expected that Tchelet would have mentioned the name of that minority shareholder when describing the restructuring and buyback process. The fact that he did not do so lends credibility to Monteiro's account and the conclusion that BSGR did not wish Vale to know of the role that Pentler played in obtaining the mining rights.

693.    BSGR itself admits that it chose not to disclose the role of Pentler when responding to due diligence questions based on legal advice. The decision not to disclose Pentler was therefore a conscious one. The advice allegedly provided by Skadden Arps has already

---

[740] Monteiro Second WS, paragraph 12.
[741] Tchelet First WS, paragraph 86.
[742] Transcript, Merits Hearing, Day 2, p. 83 line 16 – p. 84 line 3 (Monteiro).
[743] Monteiro Second WS, paragraph 14.

been discussed at paragraphs 480–492 above and the Tribunal does not propose to discuss it again here. The primary point is that, according to BSGR, it did not forget to disclose the role of Pentler and its principals, it made the deliberate decision on alleged legal advice not to do so. The legal advice explanation has already been examined and rejected as unproven.

694.    The concealment of Pentler is highly relevant to several misleading representations.

694.1.    The disclosure of Cilins or Pentler as agents or consultants would have led to further investigation of their role, as would the disclosure of agreements between BSG Group entities and Pentler.

694.2.    The disclosure of the pending dispute with Bah would have revealed the Pentler-Bah Milestone Agreement and the indemnities provided by Pentler to BSGR and would have likely prompted further investigation.

694.3.    The Tribunal also found a misrepresentation regarding the share structure based on the share purchase agreement regarding the transfer of shares in BSGR Guinea from BSGR Guinea BVI to BSGR Guernsey. The Tribunal notes that this would likely have led Vale to discover the restructuring that took place and – potentially – the shareholding that Pentler held in BSGR Guinea BVI until 2008.

694.4.    An accurate description of BSGR's involvement in the GoG's decision to withdraw Rio Tinto's mining rights would likely have revealed the role played by Pentler as BSGR's agent and consultant.

694.5.    BSGR's business relationship with Mme. Touré included her indirect interest in BSGR Guinea which was held through Pentler.

694.6.    The disclosure of the Pentler connection would also have revealed the connection between BSGR and Mme. Touré and raised red flags with Vale in relation to any role the President's wife might have played in the procurement of the mining rights.

695.    In relation to the ten misrepresentations listed at paragraph 676 and based on the circumstances described in the preceding paragraph 694, the Tribunal considers that they individually or in any event in aggregate establish a pattern of conduct designed to hide the roles that Pentler and Mme. Touré played in the procurement of the mining rights and the large amounts of compensation that the Pentler principals and Mme. Touré received or expected to receive. This conclusion also applies to the equally large amounts paid to I.S. Touré, Bah and Daou. This pattern, in the opinion of the Tribunal, is more than sufficient for it to conclude that BSGR knew that its representations were false.

696.    The Tribunal recalls that, with regard to one representation, BSGR stated that it made a mistake in its disclosure – the failure to disclose Fofana as a consultant. Avidan said that it did not occur to him to disclose Fofana's role, as he considered Fofana to be a "friend" by 2010 even though he was still providing advice (Fofana had previously been paid as a consultant).[744] Without making any determination as to the truthfulness of Avidan's

_____

[744] Avidan First WS, paragraphs 150-151; Avidan Second WS, paragraphs 21-22.

written evidence (Avidan did not present himself for cross-examination), the Tribunal observes that the FCPA due diligence was a serious and extensive exercise undertaken by a team of specialised lawyers from an international law firm. Vale would have expected BSGR to investigate fully before providing its answers. Simply relying on one person's recollection or understanding is not sufficient. The fact that negotiations were expeditious, as BSGR points out, does not excuse BSGR from making proper enquiries before answering due diligence questions.

697.    In the Tribunal's view, the factual evidence discussed above strongly supports the conclusion that BSGR deliberately concealed Pentler and the role it had played. On this basis, the Tribunal finds that BSGR knew that the relevant representations it had made to Vale during the due diligence process (listed in paragraph 676 above) were false and misleading. The Tribunal finds that BSGR knew that it had made false representations.

(a)    **_BSGR's liability for statements made by "external advisors"_**

698.    The issue of liability for statements made by "external advisors" was first raised by BSGR in paragraph 247 of BSGR's Statement of Defence, made with reference to the role of Steinmetz as "external advisor to BSGR / the Balda Foundation".[745] While maintaining that Steinmetz's statements were true, BSGR suggests that Steinmetz's statements are fundamentally irrelevant since BSGR could not be "vicariously liable for statements made by external advisors."[746]

699.    Vale makes three arguments in response.

699.1.    First, Vale points out that "[w]here a misrepresentation is made by a third party, but the principal has knowledge or notice of the representation at the time of contract, then the representee [...] can avoid the contract".[747] BSGR could hardly disclaim knowledge of Steinmetz's representations or argue that he was acting entirely independently of BSGR. Vale says that this logic extends even to representations made by parties other than Steinmetz, given BSGR's integral involvement in the negotiation process[748] and the fact that BSGR has not disavowed its knowledge of those representations.

699.2.    Second, Vale argues that BSGR should be bound by the representations from its agents due to the doctrine of actual and ostensible authority. This doctrine applies _even if BSGR were truly in the dark regarding its agent's representations_. Thus, representations by David Clark (the then Director and Group Treasurer of BSGR Guinea), Avidan (then Executive Officer & Chief Executive Officer of BSGR Guinea) or Steinmetz (the eponymous founder and ultimate controlling shareholder of BSGR) would bind BSGR.

---

[745] Framework Agreement, clause 1.8, **C-1**.
[746] BSGR's Statement of Defence, paragraph 247.
[747] Vale's Pre-Hearing Written Submissions, paragraph 263, relying on J Cartwright, _Misrepresentation, Mistake and Non-Disclosure_ (3rd edn, Sweet & Maxwell 2012) [4-75], **CL-124**, which states: "The courts have accepted that the representee may avoid the contract on the basis of a misrepresentation made by a third party where the other party has knowledge of it at the time of the contract."
[748] Vale's Pre-Hearing Written Submissions, paragraph 263.

699.3.    Last, Vale argues that BSGR would also be caught by the doctrine of vicarious liability:

699.3.1.    BSGR would be vicariously liable for its employees where the unlawful conduct was "closely connected" with the employment;[749] and

699.3.2.    BSGR would be vicariously liable for non-employees as it was fair, just and reasonable to impose vicarious liability on BSGR in the circumstances of the case based on the following factors:

699.3.2.1.    the tort would have been committed as a result of activity being taken by the tortfeasor on behalf of the defendant;

699.3.2.2.    the tortfeasor's activity is likely to be part of the business activity of the defendant; and

699.3.2.3.    the defendant, by employing the tortfeasor to carry on the activity, will have created the risk of the tort committed by the tortfeasor.

700.    Having carefully considered the evidence and the factual circumstances discussed throughout this Award, including (i) the precontractual Anti-Bribery Certification of Steinmetz;[750] (ii) Section 1.8 of the Framework Agreement attributing Steinmetz's awareness to BSGR and BSGR Guernsey; and (iii) the first and second witness statements of Steinmetz, the Tribunal agrees with Vale that BSGR cannot avoid liability for statements made by Steinmetz on the basis that he is simply an "external advisor" to BSGR. BSGR has not (and simply cannot) make a credible argument that it was unaware of Steinmetz's representations. Therefore, the Tribunal finds that BSGR is liable for statements made by Steinmetz as an external advisor. Having reached this finding, it is unnecessary for the Tribunal to consider the rest of Vale's arguments in this Section.

(b)    ***BSGR would not be liable if its agents had no knowledge that the misrepresentations were false, but the facts simply do not fall within this category***

701.    BSGR's other legal argument, raised at paragraphs 333 to 339 of BSGR's Statement of Rejoinder, is that there can be no liability where an agent of BSGR (including its directors or employees) makes statements which he or she did not know were false, even if others in BSGR had such knowledge. BSGR argues that "Vale's attempt to attribute knowledge across the BSGR organisation is wrong in law and principle."[751]

702.    *Clerk & Lindsell* state that:

Where a false representation has been made innocently by an agent acting within his authority, the mere fact that the principal knows the facts which render the representation false will not make the latter liable if he has not expressly

---

[749] *Mohamud v WM Morison Supermarkets* [2016] UKSC 11, **CL-135**.
[750] Anti-Bribery Certification of Beny Steinmetz, 9 April 2010, **C-3**.
[751] BSGR's Statement of Rejoinder, paragraph 333.

> authorised the representation or deliberately concealed facts from the agent with a view to the claimant being misled.[752]

703. BSGR provides no detail on which agents or which representations would be affected by the application of this principle.

704. Vale replies that a claim in deceit is available where responsibility and knowledge is shared among several servants and agents.[753] This is based on paragraph 8.14 of *Spencer, Bower & Handley on Actionable Misrepresentation*, which cites Singleton LJ in *Armstrong v Strain* [1952] 1 KB 232, 244 (CA) in turn as follows:

> Difficulties may arise in a claim against a company which can only speak or act through its agents or officers, but if an officer of a company... represents that which is untrue when many other officers of the company know the true facts, it may well be found that he made the representation without belief in its truth...[754]

705. Vale further submits that, even based on BSGR's own authorities, BSGR would still be liable for the honest representations of an (honest) agent who lacked knowledge of the facts if:[755]

705.1. BSGR knew that the representation was untrue but expressly authorised it to be made;[756] or

705.2. BSGR deliberately engaged an agent, from whom BSGR concealed facts in the expectation that, as a result of ignorance, the latter would give false information to Vale.[757]

706. Lastly, Vale argues that the facts simply cannot support any suggestion that the parties making the representations on BSGR's behalf did not have knowledge to which BSGR was privy.[758] This is because the principals, directors and officers of BSGR making the representations to Vale were the very individuals who were at the forefront of BSGR's operations in the field, and must be expected to have had the relevant knowledge. Given that a company's knowledge is deemed to be held collectively by its employees, directors and officers,[759] it is implausible for BSGR to suggest that the particular employee, director or officer making the representation was unaware that the representations were false when BSGR (meaning the other employees, directors or officers) knew the representations were false.

707. The Tribunal considers that there is no evidential basis in the present case for applying the legal principles advanced in the abstract by BSGR in paragraphs 333–339 of its Statement of Rejoinder. Most of the representations discussed above were made in the

---

[752] M Jones, A Dugdale and M Simpson (eds), *Clerk & Lindsell on Torts* (21st edn, Sweet & Maxwell 2014) [18-27], **RL-40**.
[753] Vale's Pre-Hearing Written Submissions, paragraph 272.
[754] KR Handley, *Spencer Bower & Handley: Actionable Misrepresentation* (5th edn, LexisNexis 2014) [8.14], **CL-123**.
[755] Vale's Pre-Hearing Written Submissions, paragraph 274.
[756] HG Beale (ed), *Chitty on Contracts*, vol 1 (32nd edn, Sweet & Maxwell 2015) [7-053], **RL-30**.
[757] M Jones, A Dugdale and M Simpson (eds), *Clerk & Lindsell on Torts* (21st edn, Sweet & Maxwell 2014) [18-28], **RL-40**.
[758] Vale's Pre-Hearing Written Submissions, paragraph 276.
[759] *Meridian Global Funds Management Asia Ltd v Securities Commission* [1995] 2 AC 500 (PC), **CL-138**.

Due Diligence Questionnaires which were answered on behalf of the BSG Group. David Clark signed the two Compliance Due Diligence Questionnaires as being true and correct. Importantly, the certification notes that inquiries were made of all relevant companies and their officers.[760]

708.    In his written evidence, Clark states that he signed the Questionnaires in his capacity as a director, but they were "completed by those who were best placed to answer the questions".[761] In particular, key personnel such as Avidan, Tchelet and Struik were consulted. Leaving aside Vale's argument that a company's knowledge is deemed to be held collectively by their employees, directors and officers,[762] the evidence supports the contention that these people, who effectively ran BSGR in Guinea, knew the relevant facts relating to Pentler, Cilins and Mme. Touré, and the way in which mining permits were obtained. Of course, the primary defence advanced by BSGR is not that these people did not know all of the relevant facts and therefore had honestly misrepresented this situation as "agents" of BSGR – BSGR maintains its position that the information provided in the Due Diligence Questionnaires was true and correct.

709.    As the Tribunal noted earlier, the only representation which BSGR admits is incorrect relates to BSGR's failure to disclose the consulting role played by Fofana. The Tribunal now considers whether the principle that BSGR cannot be liable if an agent had no knowledge that the representation was false has any application here.

710.    Avidan does not suggest that he failed to disclose Fofana's consulting role because he was unaware of it. He simply says that it did not occur to him to disclose the work performed by Fofana. The Tribunal finds Avidan's explanation as to why the role of Fofana – whom BSGR does agree was a consultant – was not disclosed to be unconvincing on its face. Avidan said in his second witness statement:

> I have already addressed Mr Fofana's role at paragraphs 150-151 of Avidan-1. Vale alleges that it is "implausible that [I] simply forgot about [Fofana] during the Project Hills negotiations." I did not say in Avidan-1 that I forgot about Fofana; I said that "I never considered Mr Fofana to be a consultant and it never occurred to me that he should be disclosed." This is true.
>
> During the due diligence period, Yossie had carriage of the Due Diligence Questionnaires. When Yossie asked me about BSGR's consultants during the Project Hills negotiation, I understood this to mean BSGR's current consultants. By then, Fofana had become a friend. For example, when he commented on the terms of the Convention de Base in December 2009 and advised BSGR in relation to press articles which had been published in February 2010, he was not paid for his advice. This was simply the counsel of a trusted friend who understood local politics. It never occurred to me at the time that Fofana was a current consultant who should be disclosed.[763]

711.    The Tribunal is unconvinced by Avidan's explanation that he had interpreted the question to mean only current consultants or that he now thought of Fofana as a "friend" rather than a consultant. Neither Avidan, Tchelet nor Clark attended the February 2017 Hearing in person to provide any further oral explanation of the nature of the inquiries made to verify that all consultants had been captured in the answers to the due diligence

---

[760] Supplemental Compliance Due Diligence Questionnaire for Project Hills, 2 April 2010, p. 8, **C-43**.
[761] Clark First WS, paragraph 45.
[762] Vale's Pre-Hearing Written Submissions, paragraph 275.
[763] Avidan Second WS, paragraphs 21-22.

questionnaires. In any case, this is not a situation where Avidan had no knowledge of Fofana's consulting, and therefore a failure to disclose it could be excused under the legal principle expressed by BSGR.

712.   The Tribunal finds that the proposition that BSGR would not be liable if its agents had no knowledge that the misrepresentations were false is not applicable to the facts of this case. Moreover, the Tribunal agrees with Vale that, on the facts of the present case, there is no realistic possibility that those making representations on behalf of BSGR were not aware of all relevant facts. They were all senior members of BSGR's management – including Steinmetz even though his official role was as an "advisor".

### 4.   BSGR intended that Vale should act in reliance on its representation

713.   It is common ground between the Parties that the finding of a fraudulent misrepresentation gives rise to a rebuttable presumption that BSGR intended Vale to rely on the false representation.[764]

714.   In its Statement of Rejoinder, BSGR argues that the mere fact that the contract, if concluded, would have been a lucrative one for BSGR, did not mean that "it can be presumed that the defendant intended the claimant to rely on the misrepresentation",[765] pointing out that Vale has not been able to cite any cases to that effect. BSGR then distinguishes the cases cited by Vale in paragraphs 914 to 915 of Vale's Statement of Reply on the basis that those cases concerned the representee's reliance, rather than the representor's intention to cause reliance.

715.   In its Pre-Hearing Written Submissions,[766] Vale then noted that Lord Clarke in the UK Supreme Court had opined that "the authorities seem to me to support the conclusion that it is very difficult to rebut the presumption [that the fraudulent representor intended the representee to rely on it].[767]

716.   The Tribunal's view is that BSGR's submissions do not evince any attempt to rebut the presumption. Instead, after rebutting the cases cited in paragraphs 914 to 915 of Vale's Statement of Reply, BSGR's position reverts to saying that Vale "cannot show that there was any intent by BSGR to deceive Vale for the same reasons it cannot prove knowledge of the falsity of the statements. The due diligence was conducted speedily by BSGR, but in good faith and in reliance on legal advice".[768] However, given that BSGR has already accepted that the burden of proof shifts to BSGR once fraudulent misrepresentation is proved,[769] it is difficult to understand why BSGR still couches its statements as if the onus were still on Vale rather than seeking to satisfy its own burden of proof.

717.   One possibility is that BSGR was working on the presumption that Vale would not be able to show that BSGR knew that its representations were false, in which case it would follow that BSGR would not have intended Vale to rely on the false representations. However, these arguments go towards the prior element (knowledge that the representations were

---

[764] BSGR's Statement of Defence, paragraph 248(ii); Vale's Pre-Hearing Written Submissions, paragraph 289.
[765] BSGR's Statement of Rejoinder, paragraph 375.
[766] Vale's Pre-Hearing Written Submissions, paragraph 290.
[767] *Hayward v Zurich Insurance Co Plc* [2016] UKSC 48 [37], **CL-139**.
[768] BSGR's Statement of Rejoinder, paragraph 387.
[769] BSGR's Statement of Rejoinder, paragraph 377.

false) and the Tribunal has already found at paragraphs 677 to 712 above that BSGR did in fact know that its representations were false so, to the extent that this was BSGR's argument, it cannot stand.

718.    The other possibility is that BSGR is implicitly arguing that it has satisfied its burden of proof because it has shown that the due diligence was conducted in good faith and in reliance on legal advice. However, the Tribunal cannot see how, given that the Tribunal has found that BSGR knowingly made false representations to Vale, BSGR did not intend that Vale would rely on them. In short, BSGR has not raised any exceptional circumstances to rebut the strong presumption against it, and the Tribunal is compelled to find that BSGR must have intended Vale to rely on each of the ten misrepresentations referred to above at paragraph 676 that have been identified by the Tribunal.

719.    The Tribunal finds the following facts significant in arriving at its final conclusions on BSGR's intentions to deceive.

719.1.    BSGR repeatedly failed to disclose highly relevant information when it was evident that it should have been disclosed to Vale and/or its due diligence advisers, Clifford Chance.

719.2.    BSGR deliberately restructured the BSG Group in order to avoid disclosure obligations which, if complied with, would have revealed certain "red flags" of corruption.

719.3.    BSGR has failed to give any credible reasons for its non-disclosure.

720.    Having regard to all these circumstances, the Tribunal concludes that BSGR intended that Vale should act in reliance on BSGR's false and misleading representations in order to benefit from this intended joint venture.

**5.    Vale acted in reliance on the representations and suffered loss**

**(a)    _Reliance_**

721.    Regarding reliance, _Clerk & Lindsell_ state as follows:

> To entitle a claimant to succeed in an action in deceit, he must show that he acted in reliance on the defendant's misrepresentation. If he would have done the same thing even in the absence of it, he will fail. What is relevant here is what the claimant would have done had no representation at all been made.[770]

722.    While Vale had previously submitted that the Tribunal should determine reliance based on what Vale would have done had BSGR told the truth when it made the representations, it appears that Vale is not against the formulation ("what the claimant would have done had no representation at all been made") described by _Clerk & Lindsell_ and submitted by BSGR.[771]

---

[770] M Jones, A Dugdale and M Simpson (eds), _Clerk & Lindsell on Torts_ (21st edn, Sweet & Maxwell 2014) [18-34], **CL-6.**
[771] Vale's Pre-Hearing Written Submissions, paragraph 293.

723.    BSGR further notes that "a person to whom a misrepresentation is made is not deceived if he actually knows the truth".[772] This is of general application, but BSGR specifically mentions that this means that "Vale cannot establish an actionable misrepresentation in relation to Avidan's statement that I.S. Touré was not related to the former President of Guinea or his wife [because] Vale knew that I.S. Touré was related to Mme. Touré (whom Vale believed to have been President Conte's wife)".[773] BSGR supports its position with reference to the Nardello Report, a report commissioned by Clifford Chance during the Project Hills negotiations. The Nardello report states:

> A further report states that BSGR Guinea was *close to the Conte clan*". Ibrahima Sory Touré, in charge of external relations for BSGR in Guinea, is a brother of Mamadie Conté, the 4[th] wife of the late President. Asher Avidan, country manager for BSGR, who has worked for Israeli foreign affairs and defence ministries in the past, was reportedly working with Ibrahima Sory Touré to "*manage the transition*" of its development at Simandou.[774]

724.    Vale responds that it specifically confronted BSGR with this allegation, and BSGR denied it.[775] However, the first witness statement of George Kleinfeld (on which Vale relies for this assertion) is not so clear. Kleinfeld does not refer to the Nardello Report in his evidence or say that he specifically asked Avidan to refute the Nardello Report. This is clear from the following paragraph in Kleinfield's first witness statement:

> Specifically, I asked during the interview about the BSGR employee in Guinea, Ibrahima Sory Touré, who handled public relations in-house, and whether he had any family ties to any government official. In response, Avidan volunteered that their public relations consultant in Guinea, who has the last name of "Touré," was not related to the former president of Guinea or his wife. Avidan said that he may have been from the same village as one of the former presidents, but to his knowledge, the employee is not related to anyone in the Government. Avidan said that Touré is a common name in the country.[776]

725.    Vale also relies on the evidence contained in the second witness statement of Ricardo Saad ("Saad") (former CEO of VBG Guinea) when stating:

> Avidan also claims that he told Ricardo Saad, who ran VBG for Vale, that I.S. Touré and Mme Touré were related, but that Saad took no action. However, Avidan "never mentioned I.S. Touré's family connection to Mamadie Touré" until I.S. Touré resigned from VBG on 31 August 2011, long after the deal with Vale in April 2010.[777]

726.    While the Tribunal accepts Saad's evidence that he was not aware of the connection between I.S. Touré and Mme. Touré, the Tribunal considers that the Nardello Report was clear as to the link between the siblings. Clifford Chance was therefore aware, at the very least, that it had conflicting reports as to the relationship between the two Tourés. Vale's suggestion that it accepted Avidan's assertions at face value over the Nardello Report is unconvincing. The Tribunal therefore accepts BSGR's assertion that Vale cannot rely on Avidan's statement that I.S. Touré was not related to Mme. Touré.

---

[772] BSGR's Statement of Rejoinder, paragraph 389.
[773] BSGR's Statement of Rejoinder, paragraph 389.
[774] Nardello Report, undated, paragraph 4.4.2.7, **R-369**.
[775] Vale's Statement of Rejoinder on Counterclaims, footnote 8.
[776] Kleinfeld First WS, paragraph 35.
[777] Vale's Statement of Reply, paragraph 499; Saad Second WS, paragraphs 42-43.

727.   BSGR asserts that Vale was also aware of Cilins' connection to BSGR as a result of a brief (chance) meeting between Etchart (of Vale) and Cilins in August 2006. They met during a monthly meeting called by the Minister of Mines in order to brief industry participants on recent developments. Etchart described the meeting as follows.

> As the attendees were leaving the room when the meeting ended, Marc Struik, a BSGR director, approached us, and Marco Monteiro made the introductions. Struik was with two or three people who also presented themselves as BSGR employees. One was introduced as country operations manager and another one introduced himself to me as Frédéric Cilins, and said he was working for BSGR. This conversation was brief and not very substantive; Struik was interested in learning about developments of Vale's bauxite projects in Guinea. Although Struik was based in Johannesburg, as was I, this was the first time I had met him. This was the one and only time I met with Cilins in person.[778]

728.   The Tribunal considers that there is nothing that Vale could have gleaned from this conversation, other than that BSGR had once employed a person in Guinea called Frédéric Cilins. There is no suggestion that Vale could have known of the role of Pentler or would have had suspicions aroused because Cilins was not disclosed as a consultant or agent.

729.   BSGR alleges that there was a second meeting between Etchart and Cilins in Paris where Etchart was told about Pentler.[779] During the February 2017 Hearing, Etchart denied any such meeting took place.

> Q:   BSGR, in their case, have suggested that there was another meeting in Paris, in January of 2007, when Mr Cilins told you about Pentler?
>
> A:   I saw that, but I don't -- I don't agree with that.[780]

730.   Based on BSGR's allegation and Etchart's flat denial during examination at the February 2017 Hearing, the Tribunal does not accept BSGR's allegation. BSGR bore the burden to prove its allegation and did not discharge that burden. It defaulted on appearing at the February 2017 Hearing and did not avail itself of the opportunity to cross-examine Etchart. Echart's oral evidence at the February 2017 Hearing is consistent with his second witness statement where he testified as follows.

> At no time did we discuss Mr. Cilins's role with BSGR or the work he performed for them in Guinea. Nor did Mr. Cilins ever mention Michael Noy, Avraham Lev Ran, or Pentler Holdings to me. I never knew anything about the role he played in helping BSGR obtain the rights to Simandou Blocks 1 and 2, which happened later. By the time of the Project Hills negotiations, I had not had contact with Mr. Cilins for years and may have forgotten his connection to BSGR altogether, although I have been reminded of it as a result of this dispute.[781]

731.   Regardless of these brief interactions, the Tribunal considers that the evidence does not support BSGR's contention that Vale was aware of all relevant facts and did not rely on BSGR's representations in the due diligence questionnaires. The Tribunal is satisfied that Vale did not know that Cilins, Pentler, Boutros or Fofana were agents or consultants for BSGR, or was aware of the role that Pentler and its principals played in obtaining mining

---

[778] Etchart First WS, paragraph 14.
[779] Noy Second WS, paragraph 33; **R-341**.
[780] Transcript, Merits Hearing, Day 2, p. 73 lines 19-22.
[781] Etchart Second WS, paragraph 18.