**EXHIBIT C-3**

licences on behalf of BSGR Guinea. Nor was it aware of Mme. Touré's involvement with Pentler and her role regarding the granting of mining rights to BSGR Guinea.

732.    BSGR also relies on *Halsbury's Laws of England* for the proposition that "where the representation is fairly capable of two or more constructions, in one of which it would be false and in the other or others true, it is for the representee to allege and prove in which of its possible meanings he understood it, and, so understanding, was induced by it to alter his position".[782] No elaboration was given on how this proposition was to be applied on the facts, and it does not appear to have been directly contested by Vale. Nevertheless, the Tribunal has borne this in mind when making its evidentiary findings.

733.    Finally, BSGR argues that Vale cannot claim reliance on BSGR's representations because they have been excluded by Section 17.3(b) of the Shareholders Agreement (and Section 16.3(b) of the Framework Agreement which is to the same effect).[783] Though this argument was presented under the topic of reliance, in the Tribunal's opinion, the effect of Section 17.3(b) of the Shareholders Agreement, even if BSGR is correct, is more aptly categorised as a contractual estoppel which bars Vale from claiming reliance, rather than an argument going towards the fact of Vale's reliance. This will thus be dealt with separately at paragraphs 743 to 755 below.

734.    The Tribunal accepts that during the due diligence process, Vale made numerous attempts to verify whether BSGR retained the services of any third parties in its efforts to obtain mining rights in Guinea. In the Tribunal's view, this investigation was a genuine attempt to uncover any "red flags" of corruption that may have existed.

735.    BSGR alleges that Vale would have entered into the joint venture regardless of whether BSGR provided the requisite FCPA comfort, as Vale was intent on entering Simandou.[784] However, in its Pre-Hearing Written Submissions, Vale submitted that:

> If Vale had been informed, as it should have been, of BSGR's association and dealings with, and actual or promised payments to, Pentler and its principals, as well as Boutros, Fofana, and of course Mamadie Touré, this would have rung klaxon-like alarm bells. Vale would have recognised the implications and the risks would have been unacceptable.[785]

736.    In addition, Roger Agnelli (Vale's former President and Chief Executive Officer) testified that:

> I knew from my team that extensive due diligence was conducted to ensure that BSGR had not used corrupt means or bribery to get its Mining Rights. I also knew that BSGR made representations to that effect and that Mr Steinmetz himself had signed certifications confirming that BSGR had not used any bribery or corruption to get Mining Rights in Guinea.
>
> This confirmation was absolutely critical to Vale doing the deal [...] in the end, given BSGR's assurances and certifications that their Mining Rights were clean and legitimate, we did the deal. Without those assurances, Vale was ready to

---

[782] Lord Mackay of Clashfern (ed), *Halsbury's Laws of England*, vol 76 (5th edn, LexisNexis 2013) [772], **RL-76**, cited at BSGR's Statement of Rejoinder, paragraph 400.
[783] BSGR's Statement of Rejoinder, paragraph 401.
[784] BSGR's Statement of Rejoinder, paragraph 211-239, 415; BSGR's Statement of Defence, paragraph 251.
[785] Vale's Pre-Hearing Written Submissions, paragraph 297.

walk away rather than expose ourselves to the reputational risk and exposure of
paying USD 500 million for rights, and potentially up to USD 2 billion more, that
were not legitimate. Any suggestion that we would have just ignored that risk
and made a deal with a corrupt partner is a fantasy.[786]

737.    During the February 2017 Hearing, Jonathan Kelly (Counsel for Vale) also submitted that:

the idea that Vale with its FCPA responsibilities, with its personal and
professional business reputation and franchises, with the amount that it was
committing in the order of USD 2.5 billion under this transaction, that it would
have invested in a country that is somewhere in the 150s in the Transparency
International Index is just totally implausible. It only has to be stated to be
known to be wrong, but that seems to be their position.[787]

738.    The Tribunal is satisfied that Vale undertook a thorough and complete FCPA due
diligence exercise. Vale engaged FCPA specialists from Clifford Chance to undertake the
due diligence. It required a personal anti-corruption affidavit from Steinmetz and Clark on
behalf of BSGR. It asked follow-up due diligence questions and investigated further into
issues that had – at times – been narrowed by BSGR. Vale is a public company with
considerable reputational risk. It is true that the joint venture deal was negotiated quickly,
but there is nothing about the due diligence process that suggests it was not thorough,
despite the speed of negotiation of the commercial deal. Moreover, Vale's desire to be
involved in mining in the Simandou area, to preclude its competitor Rio Tinto from re-
entering Blocks 1 and 2 and to develop with BSGR a unique world class asset does not,
of itself, indicate it would have entered the joint venture, had question marks remained
regarding the legality of the mining concessions. Motive alone for entering a high-risk
country such as Guinea because of its high upside potential does not suffice; there is just
no evidence that Vale was aware that the mining rights were obtained by BSGR by
paying substantial amounts of money or granting other benefits to Pentler and its
principals or indirectly to Mme. Touré and – under the Pentler-Bah and Pentler-Daou
Milestone Agreements to I.S. Touré, Bah and Daou. Moreover, Vale's business
objectives for entering the iron ore sector in Guinea must be balanced against its
reputational risk referred to above, but also against its duties as a listed company
towards its shareholders and its regulatory risks, particularly under the FCPA.
Considering its FCPA compliance efforts, the Tribunal is convinced that Vale was fully
aware of its reputational, corporate and regulatory risks in entering into the iron ore sector
in Guinea and, absent any evidence to the contrary, managed these risks properly and
would have been alarmed if BSGR had made the required disclosures. The Tribunal
considers that it is much more probable than not, and indeed highly likely, if not certain,
that Vale – as a large, publicly-listed company whose shares are traded on the Sao Paulo
and New York Stock Exchanges (amongst others) – would then have engaged in
thorough investigations and, faced with a situation where substantial amounts of money
or benefits had been paid or granted or were to be paid or granted to Pentler, its
principals, Mme. Touré, I.S. Touré, Bah and Daou, would have walked away from the
venture.

739.    The Tribunal finds that, with the exception of the oral representation made by Avidan as
to the relationship between I.S. Touré and Mme. Touré, the evidence strongly supports
the conclusion that Vale relied on the representations made during the FCPA due

---

[786] Agnelli First WS, paragraphs 16-17.
[787] Transcript, Merits Hearing, Day 1, p.150 lines 7-15.

diligence process and would not have entered into the joint venture had it not been satisfied as to the outcome of this process.

740.    In particular, the Tribunal finds that the false and misleading representations listed below were relied upon by Vale as revealing no "red flags" of bribery, corruption or other improper conduct:

740.1.    that BSGR had named all consultants, agents and intermediaries involved in obtaining the mining concessions in Guinea;

740.2.    that BSGR had disclosed all agreements with consultants, agents and intermediaries;

740.3.    that BSGR had disclosed all agreements regarding the corporate structure of BSGR Guernsey and BSGR Guinea;

740.4.    that BSGR had disclosed all relevant pending disputes;

740.5.    that BSGR had accurately described its involvement in the GoG's decision to revoke Rio Tinto's mining rights; and

740.6.    that BSGR had no financial or business relationship with any Government Officials or their spouses.

**(b)    *Loss***

741.    It is undisputed that Vale has suffered a loss of at least the initial consideration of USD 500 million it paid to BSGR.[788] However, BSGR has raised several arguments based on causation and an alleged failure on Vale's part to mitigate the damage it has suffered. These points will be dealt with in the section on damages for fraudulent misrepresentation below. At this juncture, it is sufficient to say that the Tribunal finds that Vale acted in reliance on BSGR's representations and suffered loss as a result.

742.    Based on all of the above, the Tribunal concludes, subject to BSGR's contractual estoppel defence discussed below, that on nine counts (the ten misrepresentations in paragraph 676 above less the misrepresentation regarding I.S. Touré being the half-brother of Mme. Touré), BSGR engaged in fraudulent misrepresentations of which it had knowledge and which BSGR intended to cause Vale to enter into the Framework Agreement and the SHA and on which Vale relied in entering these agreements and suffered loss as a consequence. BSGR is thus liable to Vale on account of these fraudulent misrepresentations.

**C.    BSGR's contractual estoppel defence**

743.    BSGR argues that Vale is barred by Section 17.3(b) of the SHA (and Section 16.3(b) of the Framework Agreement) from now claiming reliance on BSGR's misrepresentations. Since Section 16.3(b) of the Framework Agreement has the same effect as Section 17.3(b) of the SHA,[789] the Tribunal will take the same approach as the Parties by focusing on the latter, though the conclusions reached would be equally applicable to the

---

[788] BSGR's Statement of Defence, paragraphs 258-259.
[789] BSGR's Statement of Rejoinder, paragraph 401.

former. Vale refers to Section 17.3(a) of the SHA in its response, and so it is worth setting out Section 17.3(a)-(b) in full:

### 17.3 Entire Agreement

(a)     Without prejudice to the Framework Agreement and the Ancillary Agreements, this Agreement constitutes the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and none of the Parties has entered into this Agreement in reliance upon any representation, warranty or undertaking by or on behalf of any other Party which is not expressly set out herein or therein or in the BSGR ABL Certificate **provided that** this Section 17.3(a) shall not exclude any liability for fraudulent misrepresentation.

(b)     Without prejudice to the Framework Agreement, the Ancillary Agreements and the BSGR ABL Certificate, this Agreement supersedes any or all prior agreements, understandings, arrangements, promises, representations, warranties and/or contracts of any form or nature whatsoever, whether oral or in writing and whether explicit or implicit, which may have been entered into prior to the date hereof between the Parties or on their behalf as to the subject matter of this Agreement, including, without limitation, the Memorandum of Understanding dated 19 March 2010.

744.     BSGR argues that Section 17.3(b) of the SHA "excludes reliance on any alleged representation, as made clear in *Peekay Intermark Ltd v Australia & New Zealand Banking Group Ltd* [2006] EWCA Civ 386".[790] In this case, Moore-Bick J opined that "[he could] see no reason in principle why it should not be possible for parties to an agreement to give up any right to assert that they were induced to enter into it by misrepresentation, provided that they make their intention clear, or why a clause of that kind, if properly drafted, should not give rise to a contractual estoppel".[791] This has been acknowledged by Cartwright[792] and in other cases.[793]

745.     Further, while BSGR accepts that "it is generally accepted that a contract cannot exclude liability for fraud",[794] BSGR points out that this proposition should be limited to the "far narrower" proposition that a party cannot by a term in the contract exclude liability for *his own* fraud. This is confirmed by *Chitty on Contracts*, which states as follows.

At common law a person could not contract out of liability for fraud inducing the making of a contract with him, at least where the fraud was his own. It is, however, possible that he could do so where the fraud was that of his employees or agents [...].[795]

746.     For its part, Vale argues that Section 17.3(a) of the SHA is fatal to BSGR's argument that Section 17.3(b) applies to fraudulent misrepresentation claims because it explicitly

[790] BSGR's Statement of Rejoinder, paragraph 401; BSGR's Statement of Defence, paragraphs 205-251.

[791] *Peekay Intermark Ltd v Australia & New Zealand Banking Group Ltd* [2006] EWCA Civ 386 [57], **RL-116**.

[792] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [9-03], **RL-21.8**.

[793] E.g. *Springwell Navigation Corp v JP Morgan Chase Bank* [2010] 2 CLC 705, **RL-134**; *EA Grimstead & Son Ltd v McGarrigan* [1999] All ER (D) 1163, **RL-56**; *Watford Electronics Ltd v Sanderson CFL Ltd* (2001) 3 TCLR 14, **RL-142**; and *Trident Turboprop (Dublin) Ltd v First Flight Couriers Ltd* [2008] EWHC 1686, **RL-140**.

[794] BSGR's Statement of Defence, paragraph 250.

[795] HG Beale (ed), *Chitty on Contracts*, vol 1 (32nd edn, Sweet & Maxwell 2015) [7-143], **RL-34**.

addresses (and excludes from the operation of the clause) liability for such claims.[796] From a plain reading of Section 17.3 in its entirety (meaning both Section 17.3(a) and 17.3(b)), Section 17.3(a) was meant to be the non-reliance clause ("none of the parties has entered into this agreement in reliance upon any representation") while Section 17.3(b) concerns supersession. Since claims for fraudulent misrepresentation are expressly permitted under Section 17.3(a) of the SHA, there can be no argument that Vale is barred from bringing its fraudulent misrepresentation claim due to Section 17.3(b) of the Shareholders Agreement.

747.    By contrast, Vale submits that Section 17.3(b) is simply designed to prevent the Parties from asserting contractual rights based on previous drafts of the SHA that are not expressly incorporated into the executed version of the SHA. Accordingly, it has nothing to do with Vale's misrepresentation claims at all, and the cases concerning supersession clauses cited by BSGR are completely irrelevant.

748.    Alternatively, Vale argues that, even if one were to disregard Section 17.3(a), the language in Section 17.3(b) is not capable of excluding liability for misrepresentation under English law.[797] This is based on the Court of Appeal's ruling in *AXA Sun Life Services plc v Campbell Martin Ltd and others* [2011] EWCA Civ 133 ("*AXA Sun Life Services plc*") where Rix LJ ruled that clear and unequivocal wording is required to preclude misrepresentations.

749.    BSGR responds to Vale's alternative argument by seeking to distinguish *AXA Sun Life Services plc* in the following ways.

749.1.    Rix LJ's reasoning was that the wording used in the clause as a whole indicated that it was concerned only with contractual agreements between the parties. The clauses in the present case refer not only to representations, but also "understandings" and "arrangements" which were not in the clause in AXA. The inclusion of those words plainly extends to matters which do not amount to a prior contractual agreement between the Parties.

749.2.    It was important to Rix LJ's reasoning that the clause contained another operative part, the "entire agreement" provision, whose purpose, he said, was obviously only to define the scope of any contract. Section 17.3(b) of the SHA and Section 16.3(b) of the Framework Agreement contain no such provision.

749.3.    A decision in which a provision similar to Section 17.3(b) was implicitly interpreted by a court to exclude liability for non-contractual misrepresentations is *MAN Nutzgahrzeuge AG v Freightliner Ltd* (HC).[798] The clause there being interpreted provided that the agreement superseded all prior agreements, understandings, negotiations and discussions, whether oral or written, of the parties. Like Section 17.3(b), this clause included reference to matters which fell short of contractual relationships. Moore-Bick J said (at paragraph 128) that the clause was intended to make it clear that the agreement contains the definitive statement of the parties' rights and liabilities arising out of the negotiations. Although a proviso at the end of the clause specifically preserved the right to

---

[796] Vale's Pre-Hearing Written Submissions, paragraph 308.
[797] Vale's Pre-Hearing Written Submissions, paragraph 312.
[798] *MAN Nutzgahrzeuge AG v Freightliner Ltd* [2005] EWHC 2347 (Comm), **RL-97**.

bring an action for fraudulent misrepresentation, it was clear that Moore-Bick J considered the clause generally effective to exclude liability for other types of tortious misrepresentation.

750.    Having carefully considered the Parties' arguments, the Tribunal rejects BSGR's contention that Vale is contractually estopped from claiming that it relied on BSGR's misrepresentations.

751.    Since Section 17.3(a) of the SHA expressly permits Vale to bring claims for fraudulent misrepresentation, the question is whether, on a proper interpretation of Section 17.3(b), this provision has the effect of excluding claims for fraudulent misrepresentation notwithstanding Section 17.3(a). In the Tribunal's view, this simply cannot be. It is important to remember that the meaning of Section 17.3(b) is a matter of construction and would "[depend] on the precise words of the clause and indeed of the Agreement as a whole.[799] To hold that Section 17.3(b) precludes claims for fraudulent misrepresentation would be to nullify the express permission granted in Section 17.3(a), which would be contrary to the principle that, in construing a contract, all parts of it must be given effect where possible, and no part of it should be treated as inoperative or surplus. This alone would be sufficient for the Tribunal to reject BSGR's arguments on contractual estoppel.

752.    However, even if Section 17.3(a) did not exist, the Tribunal does not agree that the effect of Section 17.3(b) is to prevent Vale from claiming reliance on BSGR's misrepresentations. As Vale argues, the effect of a supersession clause is to "prevent the parties from asserting contractual rights based on the MoU, or previous drafts of the SHA, that are not expressly incorporated into the execution version of the SHA."[800] In the context of representations, Section 17.3(b) ensures that the terms of the executed version of the SHA would *supersede* representations, but only "as to the subject matter of this Agreement".[801] In fact, as Burnton LJ in *AXA Sun Life Insurance plc* opined:

> [There is] difficulty in seeing how a written agreement can "supersede" a representation that does not relate to the terms of the agreement. Thus I think that a representation by AXA such as "We are the largest insurance company in the country", if false and relied upon, is not superseded by the clause.[802]

753.    Thus Section 17.3(b), being a clause on supersession, is solely concerned with defining the terms of the contract and has nothing to do with misrepresentations. BSGR's attempts to distinguish *AXA Sun Life Insurance plc* are of no assistance to it. By over-emphasising the minor differences between *AXA Sun Life Insurance plc* and this case, BSGR misses the point. The crux of the matter was stated by Rix LJ in *AXA Sun Life Insurance plc*:

> No doubt all such cases are only authority for each clause's particular wording: nevertheless it seems to me that there are certain themes which deserve recognition. Among them is that the exclusion of liability for misrepresentation has to be clearly stated. It can be done by clauses which state the parties' agreement that there have been no representations made; or that there has been no reliance on any representations; or by an express exclusion of liability for misrepresentation. However, *save in such context, and particularly where the*

---

[799] *AXA Sun Life Services plc v Campbell Martin Ltd and others* [2011] EWCA Civ 133 [35], **CL-56**.
[800] Vale's Pre-Hearing Written Submissions, paragraph 310.
[801] SHA, Section 17.3(b).
[802] *AXA Sun Life Services plc v Campbell Martin Ltd and others* [2011] EWCA Civ 133 [36], **CL-56**.

*word "representations" takes its place alongside other words expressive of contractual obligation, talk of the parties' contract superseding such prior agreement will not by itself absolve a party of misrepresentation where its ingredients can be proved.*[803]

754. In this case, the word "representations" does take its place alongside other words which are clearly expressive of contractual obligation ("agreements, promises, representations, warranties and/or contracts of any form or nature whatsoever"[804]). The fact that Section 17.3(b) of the SHA includes references to the terms "understandings" and "arrangements" is neither here nor there. While "understandings" and "arrangements" may not amount to prior contractual agreements, neither do "promises" and "representations" (which were also present in *AXA Sun Life Insurance plc*) which have not crystallised into contractual terms. In any event, it is clear that the presence of "words expressive of contractual obligations" was not crucial to Rix LJ's reasoning – the presence of such words did not form the basis for his conclusion that the clause at issue did not exclude misrepresentation, but only made the real bases "particularly" persuasive.

755. On the facts of this case, not only is Section 17.3(b) of the SHA not "[a clause] which state[s] the parties' agreement that there have been no representations made; or that there has been no reliance on any representations; or [...] an express exclusion of liability for misrepresentation",[805] Section 17.3(a) expressly permits Vale to bring an action for fraudulent misrepresentation. The Tribunal accordingly dismisses BSGR's contractual estoppel defence.

---

[803] *AXA Sun Life Services plc v Campbell Martin Ltd and others* [2011] EWCA Civ 133 [94] (emphasis added), **CL-56**.
[804] SHA, Section 17.3(a).
[805] *AXA Sun Life Services plc v Campbell Martin Ltd and others* [2011] EWCA Civ 133 [94], **CL-56**.

## VII.    BREACH OF WARRANTIES

### A.    Analysis of applicable legal principles

#### 1.    <u>Liability for breach of warranty</u>

756.    Even if the Tribunal is wrong to hold that BSGR is liable for fraudulent misrepresentation, the Tribunal would still hold BSGR liable to Vale for breach of warranty. This section deals with breach of warranty, starting with some preliminary or general issues.

#### 2.    <u>BSGR's interpretation of "knowledge" as referring to "actual knowledge (or the equivalent) by a defined group of BSGR people" is wrong</u>

757.    A number of the warranties discussed below refer to BSGR's knowledge, using phrases such as "so far as BSGR is aware." BSGR argues that this means actual knowledge (or the equivalent) by a defined group of BSGR personnel in Section 1.8 of the Framework Agreement, which states:

> A reference in this Agreement to "so far as BSGR is aware", "so far as any BSGR Guinea Group Company is aware" or "to the knowledge of any BSGR Guinea Group Company" or any similar reference shall be construed as the **actual knowledge as at the date of this Agreement** of Yossie Tchelet, Marc Struik, Asher Avidan and David Clark of BSGR, David Barnett (in his capacity as an external advisor) and Benjamin Steinmetz (in his capacity as an external advisor to BSGR/the Balda Foundation) (the "BSGR Principals"), **together with such knowledge as the BSGR Principals should have had, taken into consideration their office and respective duties, had they each made all reasonable enquiry in relation to the matter in question as at the date of this Agreement.**[806]

758.    Vale, for its part, points out that BSGR's reading of the phrase "so far as BSGR is aware" misses out the second limb of Section 1.8 of the Framework Agreement, which is that the phrase includes "such knowledge as the BSGR Principals should have had, taking into consideration their office and respective duties, had they each made all reasonable enquiry in relation to the matter in question as at the date of this Agreement."[807]

759.    The Tribunal agrees with Vale, and this forms the basis for the analysis that follows. This implies that, for the purposes of the Framework Agreement and pursuant to the definitions of that Agreement in its Schedule 1:

759.1.    "BSGR" means BSGR,

759.2.    "BSGR Advisory Company" means any and each of BSGR Treasury Services Limited, Resources Advisory Services Limited and Onyx Financial Advisors Limited;

759.3.    "BSGR Group" means BSGR and its affiliates from time to time excluding with effect from completion any BSGR Guinea Group Company;

---

[806] Framework Agreement, Section 1.8 (emphasis added); BSGR's Statement of Defence, paragraph 275.
[807] Vale's Pre-Hearing Written Submissions, paragraph 371.

759.4.   "BSGR Guinea" means BSGR Guernsey; and

759.5.   "BSGR Guinea Group Company" means, to the extent relevant for these proceedings, any and each of BSGR Guernsey and BSGR Guinea.

**B.   Has there been a breach of warranty?**

760.   BSGR gave a number of warranties in the Framework Agreement and the SHA which Vale alleges were breached, based on the same facts as those supporting the misrepresentation allegations above. The warranties under the Framework Agreement are to be found in Schedule 4 of the Framework Agreement; the warranties contained in the SHA are situated in Schedule 3. The seven relevant warranties will be discussed in turn and the Tribunal will conclude that four of these warranties have been breached. The relevant seven warranties are as follows:

760.1.   Section 2.1 of Schedule 4 to the Framework Agreement: "The information in [the] [Framework] Agreement, Disclosure Bundle and Disclosure Letter is accurate in all material respects".

760.2.   Section 3.1 of Schedule 4 to the Framework Agreement: "The business of each BSGR Guinea Group Company has been carried out in compliance with all Applicable Law".

760.3.   Section 3.2 of Schedule 4 to the Framework Agreement: "no BSGR Guinea Group Company is aware of the existence of circumstances which represent a real threat that any Relevant Permit [...] is likely to be revoked".

760.4.   Section 3.5 of Schedule 4 to the Framework Agreement: No corrupt payment was made to a Government Official.

760.5.   Section 3.6 of Schedule 4 to the Framework Agreement: No violation of the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions was committed.

760.6.   Section 4.2 of Schedule 4 to the Framework Agreement: "No litigation [or other proceedings] are threatened or pending by or against any BSGR Guinea Group Company [...] which would adversely affect any BSGR Guinea Group Company in the performance of its obligations under [the] [Framework] Agreement".

760.7.   Anti-corruption warranties contained in Section 16.1 and Schedule 3 to the SHA.

761.   As the facts and matters regarding the warranties by and large overlap with those regarding the fraudulent misrepresentation claims, the Tribunal – using the same approach adopted by the Parties in relation thereto (see Vale's Statement of Reply, paragraph 976) – will rely on such facts and matters without repeating them and just cross-reference them. Any such facts and matters are deemed to be incorporated into this section of the Award.

**1.   Section 2.1 of Schedule 4**

762.   Section 2 contains BSGR's warranties on "Information". Section 2.1 of Schedule 4 to the Framework Agreement provides:

> So far as BSGR is aware, the information set out in this Agreement, the Disclosure Bundle and the Disclosure Letter is accurate in all material respects and is not misleading. The documents contained in the Disclosure Bundle were collected in good faith for the purpose of providing a description of the material areas of the BSGR Guinea Group's business as at the date of this Agreement. So far as BSGR is aware, no document or other information, which would otherwise have been material to the business of the members of the BSGR Guinea Group and is in the possession or under the control of the BSGR Group has been knowingly withheld or fraudulently concealed from the Disclosure Bundle.[808]

763.    Vale alleges that this broad warranty has been breached while BSGR alleges that it is superseded by more specific warranties regarding compliance with anti-bribery legislation discussed further below. The plain language of Section 2.1 and its non-exclusion or non-references to specific warranties confirms Vale's interpretation.

764.    Vale relies primarily on the non-disclosure of the Pentler-related contracts and documents. For the reasons already given in section VI.B.2 of this Award regarding fraudulent misrepresentations of the non-existence of contracts with consultants, the Tribunal finds that BSGR breached Section 2.1. There was no disclosure in all material respects, given the relevance of these documents for the due diligence process.

### 2.    Section 3.1 of Schedule 4

765.    Section 3.1 of Schedule 4 to the Framework Agreement is included in the "Regulatory Matters" part of BSGR's warranties and relate to the business of BSGR Guernsey and BSGR Guinea operating in compliance with applicable law.

766.    Section 3.1 of Schedule 4 provides:

> The businesses of each BSGR Guinea Group Company have been carried on and are being carried on in compliance with all Applicable Law and in compliance with all constitutional documents of such BSGR Guinea Group Company and there has been and there is at the date of this Agreement no investigation or enquiry by, or order, decree or judgment of, any Governmental Entity outstanding or, to the knowledge of any BSGR Guinea Group Company, threatened against any BSGR Guinea Group Company, nor any notice or other communication from any Governmental Entity with respect to any alleged violation or failure to comply with any such Applicable Law that would prevent any BSGR Guinea Group Company from performing its obligations under this Agreement and/or any Ancillary Agreement to which it is a party.[809]

767.    "Applicable Law", in relation to any person, property, transaction or event, is defined as "(i) all applicable provisions of laws, statutes, ordinances, rules, regulations, directives, guidelines and orders of any Governmental Entity; and (ii) the terms of all judgments, orders, awards and decrees issued by any Governmental Entity, in each case, by which such person is bound or submits or having application to the property, transaction or event in question."[810]

768.    Vale asserts that BSGR's acts of bribery and corruption amounted to a violation of Guinean law (an Applicable Law) in breach of Section 3.1, relying on the Technical Committee's finding that BSGR obtained the mining rights via corrupt practices in

---

[808] Framework Agreement, Schedule 4, Section 2.1, **C-1**.
[809] Framework Agreement, Schedule 4, Section 3.1, **C-1**.
[810] Framework Agreement, Schedule 1, **C-1**.

violation of the mining code of Guinea.[811] This assertion is contested by BSGR, which argues that Vale has not pinpointed the particular legal provision in Guinean law which BSGR allegedly breached, and that the Technical Committee's Report is inadmissible in any event.[812] The Tribunal finds that, while the Technical Committee's Report is admissible, it is not sufficient evidence of a breach of Guinean law. The Tribunal is required to make its own findings on Guinean law, and it is not able to do so because Vale has not identified the specific provision in the Guinean mining code or other Guinean law that BSGR allegedly violated, let alone explain how that provision was breached. Vale argues in the alternative that the Applicable Law which had been breached is the FCPA,[813] but does not explain how the FCPA applies to BSGR (a Guernsey company) and how BSGR had violated the FCPA. The Tribunal finds in the light of the above that a breach of Section 3.1 has not been established.

### 3.    Section 3.2 of Schedule 4

769.    Section 3.2 of Schedule 4 is also part of the "Regulatory Matters" section of BSGR's warranties. The relevant part of Section 3.2 provides:

> As of the date of this Agreement, no BSGR Guinea Group Company is aware of the existence of circumstances which represent a real threat that any Relevant Permit (including any Exploration Permit, the Mining Concession and the Basic Agreement) is likely to be revoked or restricted or amended in such a manner which is materially prejudicial to the interests of a BSGR Guinea Group Company.[814]

770.    Vale asserts that this warranty should be construed broadly to refer to circumstances which represent a real threat to BSGR's mining rights while BSGR interprets this warranty strictly to require proof of an actual threat to the mining rights. The plain language of the warranty, in the Tribunal's opinion, confirms Vale's broad interpretation as it relates to "the existence of circumstances which represent a real threat that any Relevant Permit [...] is likely to be revoked or restricted or amended". An actual or imminent threat to the relevant mining rights is thus not required and the knowledge of circumstances which represent a threat is sufficient.

771.    It follows from the Tribunal's discussion and analysis in section VI of this Award that substantial benefits were paid or granted by BSGR entities to Pentler, and its principals, Mme. Touré, I.S. Touré, Bah and Daou. If these payments or grants had been discovered, they would have exposed the mining rights of BSGR Guinea to revocation, restriction or amendment which would have been materially prejudicial to the interests of BSGR Guinea and BSGR Guernsey. For the reasons adopted in section VI.B.3 of this Award, BSGR cannot plead that no relevant person within a BSGR entity or no relevant BSGR entity had knowledge of such exposure. The Tribunal concludes that BSGR breached this warranty as circumstances did exist at the material time which threatened the mining rights and exposed them to cancellation, restriction or amendment.

---

[811] Vale's Statement of Reply, paragraph 991; Vale's Statement of Case, paragraph 300.
[812] BSGR's Statement of Rejoinder, paragraph 471; BSGR's Statement of Defence, paragraph 280.
[813] Vale's Pre-Hearing Written Submissions, paragraph 374.
[814] Framework Agreement, Schedule 4, Section 3.2, C-1.

4.    **Section 3.5 of Schedule 4**

772.    Section 3.5 of Schedule 4 also pertains to "Regulatory Matters" and BSGR's warranties in relation thereto. Section 3.5 of Schedule 4 provides as follows:

> In regard to the operations of the BSGR Guinea Group and all matters governed by this Agreement, none of BSGR nor any BSGR Guinea Group Company nor any BSGR Advisory Company nor any of their respective agents have paid, offered, promised, or authorised the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to know that any portion of such exchange is for the purpose of:
>
> (a)    corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSGR, any BSGR Guinea Group Company, any BSGR Advisory Company or any other person in obtaining or retaining business, or directing business to any third party;
>
> (b)    securing an improper advantage;
>
> (c)    corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Entity in order to assist BSGR, any BSGR Guinea Group Company or any other person in obtaining or retaining business, or directing business to any third party; or
>
> (d)    providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s),
>
> and no agent of any BSGR Guinea Group Company has done or procured or induced any person to do any of the foregoing.[815]

773.    The Parties' arguments regarding this warranty overlap with those made in relation to fraudulent misrepresentations, which are incorporated herein as well as the Tribunal's discussion and analysis in section VI of this Award, in particular with respect to payments or grants of benefits to Government Officials. The Tribunal has found insufficient evidence of such payments or grants in relation to Thiam and President Conté, but has found that payments or grants to Mme. Touré qualified as bribes under the relevant representation. On this basis, the Tribunal finds that the payments to Mme. Touré breached Section 3.5 of Schedule 4 to the Framework Agreement.

5.    **Section 3.6 of Schedule 4**

774.    Section 3.6 of Schedule 4 also deals with BSGR's warranties for "Regulatory Matters". Section 3.6 of Schedule 4 provides as follows:

> In connection with this Agreement, and any Ancillary Agreements, and (where relevant) their respective obligations thereunder, no BSGR Guinea Group Company nor any BSGR Advisory Company nor any of their agents:
>
> (a)    has taken any action, directly or indirectly, that has resulted or would result in a violation of any applicable laws implementing the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions (the "OECD Convention") or any similar laws or regulations to which any BSGR Guinea Group Company, any BSGR Advisory Company or any of their respective agents is subject; or

---

[815] Framework Agreement, Schedule 4, Section 3.5, **C-1**.

(b)   have paid, offered, promised, or authorized the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to know that any portion of such exchange is for the purpose of:

(i)   corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSGR, any BSGR Guinea Group Company, any BSGR Advisory Company or any other person in obtaining or retaining business, or directing business to any third party;

(ii)   securing an improper advantage;

(iii)   corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Entity in order to assist BSGR, any BSGR Guinea Group Company or any other person in obtaining or retaining business, or directing business to any third party; or

(iv)   providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s),

and no agent of any BSGR Guinea Group Company has done or procured or induced any person to do any of the foregoing.[816]

775.   Vale argues that BSGR's bribery and corruption triggers the application of Section 3.6. Conversely, BSGR submits that Vale has failed to plead the violation of any applicable laws implementing the OECD Convention on which it relies. The wording of Sections 3.5 and 3.6 are very similar, but their introductions differ. While Section 3.5 refers to the operation of BSGR Guinea and BSGR Guernsey and all matters governed by the Framework Agreement and covers bribes and corruption in relation to the mining rights, Section 3.6 relates to the Framework Agreement and any Ancillary Agreements[817] and, where relevant, the respective obligations thereunder. As Vale's arguments relate to the mining rights (and thus the operations of BSGR Guinea) and not to bribes or corruption in relation to the Framework Agreement and the Ancillary Agreements, the Tribunal considers that Section 3.6 is inapplicable to the case at hand, and that there was no breach of warranty of BSGR regarding Section 3.6.

### 6.   Section 4.2 of Schedule 4

776.   Section 4 of Schedule 4 to the Framework Agreement contains BSGR's warranties in relation to litigation. Section 4.2 of Schedule 4 provides as follows:

No litigation, arbitration or administrative proceedings are threatened or pending by or against any BSGR Guinea Group Company where, in each case, or in aggregate, the negative resolution of which would adversely affect any BSGR Guinea Group Company in the performance of its obligations under this Agreement and/or any Ancillary Agreement and/or the Basic Agreement to which

---

[816] Framework Agreement, Schedule 4, Section 3.6, **C-1**.

[817] Schedule 1 to the Framework Agreement defines Ancillary Agreements as "the Shareholders' Agreement, the Off-take Term Sheet, the Off-take Agreement, the Vale Loan and the Vale Loan Term Sheet and any technical services agreement entered into by any member of the BSGR Guinea Group with any member of either Party's Group as contemplated by Section 5.6 and any agreement entered into by any member of the BSGR Guinea Group with any member of either Party's Group as contemplated by Section 5.8, or any of them."

it is a party and to the knowledge of BSGR no fact or circumstance exists which may give rise to any such litigation, arbitration or proceedings.[818]

777.    In section VI.B.2 of this Award, the Tribunal has discussed Vale's allegation that BSGR made misrepresentations regarding pending or threatened litigation and proceedings. The Tribunal has concluded that BSGR falsely misrepresented that there was none as it should have disclosed the potential disputes with Camara and Bah in its answers to Question 9.1 of the Legal Due Diligence Questionnaire. The Tribunal's discussion, analysis and conclusion are deemed incorporated into this section of the Award. The Tribunal also considers that the litigation threatened by Bah might have adversely affected BSGR Guinea, the Framework Agreement and the Base Convention as it might have exposed BSGR, BSGR Guinea and its affiliates to allegations of corruption. The Tribunal thus concludes that BSGR breached Section 4.2 of Schedule 4 to the Framework Agreement.

### 7.    Section 16.1 and Schedule 3 of the SHA

778.    Vale also alleges that BSGR breached warranties in the SHA, namely Section 16.1 of the SHA and Schedule 3(a), (b) and (d) to the SHA.

779.    Section 16.1 of the SHA, headed "No Bribery", provides:

Neither the Company nor any of the Parties know or have reason to believe that the Company or any other member of the BSGR Guinea Group or any of their respective Agents will pay, offer, promise, or authorize the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to believe that any portion of such exchange is for the purpose of:

(a)    corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist the Company or any other person in obtaining or retaining business, or directing business to any third party;

(b)    securing an improper advantage;

(c)    corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Government Authority in order to assist the Company or any other person in obtaining or retaining business, or directing business to any third party; or

(d)    providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s).[819]

780.    Under Section 16.2 of the SHA, Vale, BSGR and BSGR Guernsey covenanted that they would comply with their respective obligations in Schedule 3 to the SHA. Schedule 3(a), (b) and (d), headed "Bribery Compliance Provisions", to the SHA provide:

(a)    The Parties shall require, and take no action to impair or impede that, the Company and each other member of the BSGR Guinea Group will remain in full compliance with Anti-Bribery Laws and with Applicable Sanctions Laws and Regulations.

---

[818] Framework Agreement, Schedule 4, Section 4.2, **C-1**.
[819] SHA, Section 16.1, **C-2**.

(b)    The Parties shall use all reasonable efforts to ensure that no member of their respective Groups and none of their directors, officers, employees nor anyone acting on their behalf (whether as an agent, in an advisory capacity or otherwise) shall, directly or indirectly, take any action or engage in any activity to promote the business activities and interests of, or to secure an advantage for, or act, or purport to act or hold themselves out as acting on behalf of, the BSGR Guinea Group and/or the Project with respect to any Government Authority or Government Official, without having obtained the prior approval of the Board (and the Board shall consider any such request for approval in accordance with the Compliance Program); and the relevant Party shall be liable for any breach of this paragraph (b) of this Schedule 3 by it or a member of its Group or any director, officer, employee or any other person acting on behalf of it or any member of its Group.

[...]

(d)    In connection with this Agreement, and any Ancillary Agreements, and (where relevant) their respective obligations thereunder, (i) the Parties shall use all reasonable efforts to ensure that no BSGR Guinea Group company nor any of its Agents will take any action, directly or indirectly, that would result in a violation of any applicable laws implementing the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions (the "OECD Convention") or any similar laws or regulations to which any BSGR Guinea Group company or any of its Agents is subject; (ii) BSGR shall use all reasonable efforts to ensure that no BSGR Advisory Company nor any of its Agents will take any action, directly or indirectly, that would result in a violation of any applicable laws implementing the OECD Convention or any similar laws or regulations to which any BSGR Advisory Company or any of its Agents is subject and (iii) Vale shall use all reasonable efforts to ensure that none of its Agents will take any action, directly or indirectly, that would result in a violation of any applicable laws implementing the OECD Convention or any similar laws or regulations to which any Agent of Vale is subject.[820]

781.    Both Parties agree that these warranties relate to future conduct.

782.    Vale argues that BSGR is in breach of those provisions because "BSGR's corrupt activities continued after the SHA was executed, including through the activities of Noy, Lev Ran, and Cilins, and in breach of the express terms of the relevant warranties."[821]

783.    BSGR, on the other hand, contends that there was no bribery after that date because:

783.1.    Any contact between Mr Noy, Mr Lev Ran and Mr Cilins, and Mme Touré was (says Noy) for their legitimate business. More importantly, it had nothing to do with BSGR;[822] and

783.2.    No payments could have been made following the entry into the SHA for the purpose of influencing the act of a Government Official in relation to the mining rights. By that time, the mining rights had been granted pursuant to the Base Convention of 16 December 2009 and the Mining Concession of 19 March 2010, so there was nothing to influence.[823]

---

[820] SHA, Schedule 3, Sections 3(a), 3(b), 3(d), **C-2.**
[821] Vale's Statement of Reply, paragraph 1021.
[822] BSGR's Statement of Defence, paragraph 299.
[823] BSGR's Statement of Defence, paragraph 300.

784.    The SHA was concluded on 30 April 2010. The issue is thus whether Section 16.1 of the SHA and Schedule 3(a), (b) or (d) to the SHA were breached after such date. Section 16.1 is similarly drafted as the due diligence representation in Section VI of the Compliance Due Diligence Questionnaire as referred to in paragraph 579 of this Award. The term "Parties" in Section 16.1 of the SHA refers to BSGR and Vale, and the term "Company" or "BSGR Guinea" refers to BSG Resources (Guinea) Limited or the BSGR Guernsey entity (Schedule 1 SHA referring to the Preamble of the SHA). Pursuant to the same Schedule 1, "BSGR Guinea Group" means BSGR Guernsey together with its subsidiaries (including BSGR Guinea) and "agents" is defined with respect to an entity as its directors, officers, employees and any other persons for whose acts it may be vicariously liable and anyone acting on its behalf.

785.    In two respects, Section 16.1 of the SHA differs from the Due Diligence Questionnaires. First, BSGR is now a party to the anti-bribery covenant and secondly, the personal scope extends to agents and not to consultants. The latter is less relevant in relation to Pentler and Cilins, as the Tribunal has already found that Pentler and Cilins acted as agents of BSGR, BSGR Guernsey and BSGR Guinea and had to be disclosed at the occasion of the due diligence investigation (see section VI.B.2 of this Award).

786.    In addition, the Tribunal found that Mme. Touré was a Government Official for the purposes of the answers to the Due Diligence Questionnaire. However, on 30 April 2010 when the SHA was concluded, President Conté (who had died on 22 December 2008) was no longer the President and Mme. Touré was exiled to Sierra Leone. She moved to the United States in 2010. On 30 April 2010, she no longer performed ceremonial functions as her husband had died sixteen months earlier, which raises the question of whether benefits, if any, given to a former Governmental Official may qualify as bribes under Section 16.1 of the SHA. Schedule 1 to the SHA, in this respect, contains the same definition as the one used for purposes of the due diligence:

> **Government Official** means (i) an employee, officer or representative of, or any person otherwise acting in an official capacity for or on behalf of a Government Authority; (ii) a legislative, administrative, or judicial official, regardless of whether elected or appointed; (iii) an officer of, or individual who holds a position in, a political party; (iv) a candidate for political office; (v) an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or any of its agencies; or (vi) an officer or employee of a supranational organization (including, without limitation, World Bank, United Nations, International Monetary Fund and OECD).[824]

787.    The Tribunal considers that Sections 16.1(b) and (d) of the SHA also contemplate benefits granted to a former Government Official if the consideration for such benefits relates to efforts of such Government Official in the past. This is clear from a plain reading of Sections 16.1(b) and (d), which provide:

> Neither the Company nor any of the Parties know or have reason to believe that the Company or any other member of the BSGR Guinea Group or any of their respective Agents will pay, offer, promise, or authorize the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to believe that any portion of such exchange is for the purpose of:
>
> (a)    [...]

---

[824] SHA, Schedule 1, **C-2**.

    (b)    securing an improper advantage;

    (c)    [...]; or

    (d)    providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s).[825]

788.    Sections 16.1(b) and (d) relate to future benefits to secure an improper advantage and/or to provide an unlawful personal benefit and are not restricted to future acts or omissions of a Government Official. On a plain reading of the provisions quoted, any benefits given to Mme. Touré after the SHA was concluded to compensate for past services would fall within the scope of Sections 16.1(b) and (d) of the SHA.

789.    In addition, for the reasons explained in the paragraph above, the Tribunal considers that Sections 16.1(b) and (d) do not (in principle) exclude payments made after the conclusion of the SHA pursuant to threats of economic extortion related to bribes paid when a person was still a Government Official. In cases where payments are made to silence the extorter to forestall the disclosure of the bribes and to avoid the reputational, legal or contractual consequences of such disclosure, the Tribunal considers that benefits granted pursuant to threats of economic extortion would also fall within the scope of Sections 16.1(b) and (d).

790.    Vale complains about the following post-SHA payments which have been reviewed by the Tribunal:

790.1.    USD 149,970 on 21 July 2010:[826] a bank record in the U.S. criminal proceedings against Cilins indicates a payment by Lev Ran from an account in Israel to an account in Florida belonging to Mme. Touré.

790.2.    USD 100,000 on 27 July 2010:[827] a bank record in the US criminal proceedings against Cilins indicates his payment to Mme. Touré; a copy of the cheque is included in **C-6**, p. 191.

790.3.    USD 50,000[828] and USD 99,970[829] on 5 August 2010: a bank record in the US criminal proceedings against Cilins indicates his payment to Mme. Touré and the cheque at **C-6**, p. 192; a bank record in the US criminal proceedings against Cilins indicates the second payment as having been made by Lev Ran to an account in Florida belonging to Mme. Touré.

---

[825] SHA, Section 16.1, **C-2**.
[826] *USA v. Cilins*, Government's Mem. In Supp. of Detention Pending Trial, Dkt. No. 13, 6 June 2013, p.13, **C-109**; *USA v. Cilins*, Detention Hr'g Tr. At 38:1-5, Dkt. No. 79, 3 July 2013, **C-110**; *USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, p. 3, **C-111**; *USA v. Touré Properties*, Complaint, paragraph 25, Dkt. No. 1, 21 November 2014, **C-76**.
[827] Cheque number 96 dated 27 July 2010, p. 191, **C-6**; Cheque number 97 dated 5 August 2010, p. 192, **C-6**; *see also USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, p. 3, **C-111**; *USA v. Touré Properties*, Complaint, paragraph 25, Dkt. No. 1, 21 November 2014, **C-76**.
[828] Cheque number 96 dated 27 July 2010, p. 191, **C-6**; Cheque number 97 dated 5 August 2010, p. 192, **C-6**; *USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, p. 3, **C-111**; *USA v. Cilins*, Detention Hearing Transcript, 39:3-7, Dkt. No. 79, 3 July 2013, **C-110**; *USA v. Touré Properties*, Complaint, paragraph 25, Dkt. No. 1, 21 November 2014, **C-76**.
[829] *USA v. Cilins*, Government's Mem. In Supp. of Detention Pending Trial, Dkt. No. 13, 6 June 2013, p. 13, **C-109**; *USA v. Cilins*, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, p. 4, **C-111**; *USA v. Touré Properties*, Complaint, paragraph 25, Dkt. No. 1, 21 November 2014, **C-76**.

790.4.  Pentler and Mme. Touré allegedly signed an agreement on 8 July 2010 whereby Mme. Touré would receive USD 5 million from Pentler. The payment was subject to the "proper implementation and functioning and the next stages of the operation conducted by our partners on the Simandou project in Guinea."[830] Of the five agreements detailed hereafter, there are two agreements that reference the Simandou project by name: one is referred to in this subparagraph and the other is referred to in the next subparagraph. BSGR alleges (based on Noy's written evidence) that this agreement is a forgery.[831] The Tribunal has found at paragraph 618 above that this agreement was not forged.

790.5.  On the same date, Mme. Touré and Pentler appear to have entered into another contract. The Tribunal has been provided with a translation of this contract (which was disclosed by BSGR during the arbitration) but it has not seen the original.[832] Its terms are similar to those in the undated agreement described below at paragraph 790.8, but the amount to be paid was USD 5.5 million. The contract also specifically states that Mme. Touré "agree to delivery [sic] all the originals & copies of the documents and agreements signed with the company Pentler Holdings Ltd. & its partners with regard to the SIMONDOU project in Guinea".

790.6.  On 3 August 2010, Mme. Touré and Pentler signed an agreement under which she would receive an "extra sum" of USD 5 million over the next four years following the successful completion of the next stages of Pentler's activities in Guinea.[833] Matinda agreed to "refrain from making use of this document [...] against company Pentler and/or its partners and/or its associates in Guinea." Mme. Touré agreed to take responsibility for "all actions taken in Guinea by any third party against Pentler and/or its associates".

790.7.  Yet another agreement also signed on 3 August 2010, provided that Mme Touré would receive the sum of USD 5.5 million for her "participation in all activities conducted in Guinea."[834] Noy gave evidence that the two agreements of 3 August 2010 (which totalled USD 10.5 million) provided Mme. Touré with her share of the buyback money paid to Pentler by BSGR for the shares in BSGR Guinea BVI (i.e., 33% of USD 30 million).[835] In reviewing these two contracts and, on the basis of Noy's evidence, the Tribunal finds that there were indeed two contracts dated 3 August 2010 by which Pentler conferred benefits for an amount of USD 10.5 million to Mme. Touré.

790.8.  An undated "Agreement" that references Pentler's role in Guinea as "advisor and business provider" in the commercial, mining and medical fields and the contribution Matinda has made to Pentler's success in those areas. In recognition of that contribution, Matinda would receive USD 3.1 million. Noy explained that this was the balance of the 5.5 million initially promised (2.4 million of which had already been paid).[836] This agreement also guarantees the

---

[830] Untitled Agreement between Mme. Touré and Pentler, 8 July 2010, p. 234, **C-6**.
[831] Noy First WS, paragraph 80.
[832] Contract between Matinda & Co. Ltd and Pentler, 8 July 2010, **C-563**.
[833] Untitled Agreement between Mme. Touré and Pentler, 3 August 2010, pp. 236-37, **C-6**.
[834] Contract between Pentler and Mme. Touré / Matinda, 3 August 2010, **R-151**.
[835] Noy First WS, paragraph 74.
[836] Noy First WS, paragraph 77.

"absolute confidentiality" of all common business conducted in Guinea and that Matinda will not contact any of the Guinean companies with which they had collaborated. The Agreement also formally terminates all previous contracts and obligations between the two parties. Finally, Matinda undertook responsibility for any "complaints, actions, concerns or any other requests" filed by Guinean institutions against Pentler.[837] To these points can be added a statement confirming that Matinda had received USD 2.4 million from Pentler pursuant to a "collaboration agreement" signed in 2005.[838] Although the contract and the statement are not signed and the original, likely to be in the French language, has not been submitted, the Tribunal finds, in combination with Noy's first witness statement, that payments were made or benefits granted pursuant to this agreement.

790.9.   In 2011, Cilins transferred more than USD 3.6 million from a bank account in Israel to a title company in the United States,[839] which might have been used to make further payments to Mme. Touré. Vale provided a bank record for a wire transfer of (i) USD 400,000 on 12 April, 2011;[840] (ii) USD 709,600 on 12 May 2011;[841] (iii) USD 2,211,000 on 12 September 2011;[842] and (iv) USD 295,220 on 7 November 2011.[843] The bank records indicate that the wire transfers came from Cilins, but have been redacted so that the beneficiary of the payments is unclear. Hence, there is insufficient evidence for the Tribunal to base any finding on it.

790.10.   In 2012, Cilins transferred more than USD 100,000 from the same bank account in Israel to the same title company in the United States.[844] The Claimant provided a bank record for a wire transfer of USD 25,000 on 14 May 2012[845] and of USD 78,000 on 24 May 2012.[846] For the same reason as in the previous sub-paragraph, the Tribunal is unable to make any findings on these transfers without clear evidence of the identity of the recipient.

791.   Based on the findings in subparagraphs 790.1–790.10 above, the Tribunal concludes that payments were made after the conclusion of the SHA by Cilins to Mme. Touré. The Tribunal also concludes that some of these payments related to Simandou, as Simandou is specifically mentioned in some agreements. The Tribunal also considers that Noy's statement that some of the agreements were not related to Simandou but to other past Guinean business ventures of Mme. Touré is not credible in view of the evidence accepted. In addition, the Tribunal finds that these payments relate to past services from Mme. Touré, before she was exiled to Sierra Leone and moved to the U.S.

792.   However, for the reasons at paragraphs 619 – 625 above, the Tribunal is not convinced that, on a balance of probabilities, BSGR authorised or knew about the relevant contracts

---

[837] Undated Agreement between Pentler and Matinda/Mamadie Touré, pp. 239-240, **C-6.**
[838] Undated Statement of Mme. Touré, p. 244, **C-6.**
[839] USA v. Cilins, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, pp. 3-4, 38-41, **C-111.**
[840] **C-111** p. 38.
[841] **C-111**, p. 39.
[842] **C-111**, p. 40.
[843] **C-111**, p. 41.
[844] USA v. Cilins, Government's Sentencing Mem., Dkt. No. 69, 18 July 2014, pp. 3-4, 42-43, **C-111.**
[845] **C-111**, p. 42.
[846] **C-111**, p. 43.

and the payments to bring these within the scope of Section 16.1(b) and/or 16.1(d) of the SHA. The Tribunal is, thus, notwithstanding the suspicious nature of these contracts and payments, not able to make a finding that BSGR breached Sections 16.1(b) and 16.1(d) of the SHA and has paid bribes to Mme. Touré post SHA.

793.    The Tribunal now turns to examine whether BSGR and/or BSGR Guernsey breached the bribery compliance covenants of Schedule 3 to the SHA of (1) ensuring that they complied with anti-bribery laws (Schedule 3(a)); (2) not contacting a Government Authority or Government Official without prior Board approval (Schedule 3(c)) and (3) not violating the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions or any similar laws or regulations (Schedule 3(d)).

794.    Under Schedule 3(a), BSGR and BSGR Guernsey undertook to require and to take no action to impair or impede that BSGR Guinea and BSGR Guernsey will remain in full compliance with Anti-Bribery Laws. "Anti-Bribery Laws" is defined in Schedule 1 to the SHA as "the US Foreign Corrupt Practices Act, 15 U.S.C. §78-dd-1, et seq., as amended (the "FCPA") and any anti-bribery law, anti-corruption law, conflict of interest law, or any other applicable law, rule or regulation of similar purpose and effect applicable to the Parties hereto or the BSGR Guinea Group". Vale simply argues that BSGR's corrupt acts after the execution of the SHA amounted to a breach of such Anti-Bribery Laws, without specifying which particular Anti-Bribery Laws were breached and, as regards the FCPA, how the FCPA was breached. The Tribunal accordingly finds that a breach of Schedule 3(a) has not been established.

795.    Under Schedule 3(b), BSGR and BSGR Guernsey undertook to:

> use all reasonable efforts to ensure that no member of their respective Groups and none of their directors, officers, employees nor anyone acting on their behalf (whether as an agent, in an advisory capacity or otherwise) shall, directly or indirectly, take any action or engage in any activity to promote the business activities and interests of, or to secure an advantage for, or act, or purport to act or hold themselves out as acting on behalf of, the BSGR Guinea Group and/or the Project with respect to any Government Authority or Government Official, without having obtained the prior approval of the [board of directors of BSGR Guernsey] (and the [board of directors of BSGR Guernsey] shall consider any such request for approval in accordance with the Compliance Program); and the relevant Party shall be liable for any breach of this paragraph (b) of this Schedule 3 by it or a member of its Group or any director, officer, employee or any other person acting on behalf of it or any member of its Group.[847]

796.    For the reasons above related to absence of sufficient evidence that BSGR authorized or knew about the payments by Pentler and Cilins to Mme. Touré post SHA, no breach of Schedule 3(b) to the SHA can be established.

797.    Under Schedule 3(d), BSGR and BSGR Guernsey undertook in connection with the SHA to:

> use all reasonable efforts to ensure that no BSGR Guinea Group company nor any of its Agents will take any action, directly or indirectly, that would result in a violation of any applicable laws implementing the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions (the "OECD

---

[847] SHA, Schedule 3, Sections 3(b), **C-2**.

Convention") or any similar laws or regulations to which any BSGR Guinea Group company or any of its Agents is subject; [...].[848]

798.    BSGR also undertook under Schedule 3(d) to:

use all reasonable efforts to ensure that no BSGR Advisory Company nor any of its Agents will take any action, directly or indirectly, that would result in a violation of any applicable laws implementing the OECD Convention or any similar laws or regulations to which any BSGR Advisory Company or any of its Agents is subject [...].[849]

799.    Vale has not identified the "applicable laws implementing the OECD Convention [...] or any similar laws or regulations to which any BSGR Guinea Group company or any of its Agents is subject" that BSGR allegedly breached, apart from the FCPA. Vale however has not sufficiently briefed the Tribunal on how the FCPA has been breached by BSGR. The Tribunal therefore finds that a breach of Schedule 3(d) has not been established.

---

[848] SHA, Schedule 3, Sections 3(d), **C-2**.
[849] SHA, Schedule 3, Sections 3(d), **C-2**.

## VIII.    FRUSTRATION

### A.    Introduction

800.    As with the discussion on breach of warranties, since the Tribunal has found that Vale has been successful in its misrepresentation claim, the result of Vale's claim for frustration is academic. Nevertheless, for the sake of completeness, the Tribunal sets out its discussion below.

801.    The Parties cite the following five propositions in *J. Lauritzen A/S v Wijsmuller B.V. (The Super Servant Two)* [1990] 1 Lloyd's Rep 1 (CA) (*"**Super Servant Two**"*) to set out the doctrine of frustration.

> 1.    The doctrine of frustration was evolved to mitigate the rigour of the common law's insistence on literal performance of absolute promises […]. The object of the doctrine was to give effect to the demands of justice, to achieve a just and reasonable result, to do what is reasonable and fair, as an expedient to escape from injustice where such would result from enforcement of a contract in its literal terms after a significant change in circumstances […].

> 2.    Since the effect of frustration is to kill the contract and discharge the parties from further liability under it, the doctrine is not to be lightly invoked, must be kept within very narrow limits and ought not to be extended […].

> 3.    Frustration brings the contract to an end forthwith, without more and automatically […].

> 4.    The essence of frustration is that it should not be due to the act or election of the party seeking to rely on it […]. A frustrating event must be some outside event or extraneous change of situation […].

> 5.    A frustrating event must take place without blame or fault on the side of the party seeking to rely on it […].[850]

802.    BSGR also cites the following passage in *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675 (HL) (*"**National Carriers**"*) to shed further light on the doctrine of frustration.

> Frustration of a contract takes place where there supervenes an event (without default of either party and for which the contract makes no sufficient provision) which so significantly changes the nature (not merely the expense or onerousness) of the outstanding contractual rights and/or obligations from what the parties could reasonably have contemplated at the time of its execution that it would be unjust to hold them to the literal sense of its stipulations in the new circumstances; in such case the law declares both parties to be discharged from further performance.[851]

---

[850] *J. Lauritzen AS v Wijsmuller BV (The Super Servant Two)* [1990] 1 Lloyd's Rep 1, 8 (CA), **CL-17**.
[851] *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, 700, **RL-47**.

803.   In this case, Vale has submitted that the revocation of the mining rights by the GoG constituted a supervening event which made it commercially impossible for the Parties to perform their obligations under the Joint Venture Agreements.[852]

804.   The Tribunal is tasked to analyse Vale's frustration claim. But before it does so, the Tribunal will first address a preliminary issue which BSGR has raised to assert that the frustration claim stands or falls by Vale's corruption claim, and which the Tribunal considers is apposite to discuss at the outset.

## B.    Preliminary Issue: whether frustration is "parasitic" on other heads of claim

805.   BSGR argues that Vale's frustration claim is "parasitic on the bribery claims", in the sense that "If Vale fails to make out its case on bribery and corruption, then this frustration claim also fails because it is pleaded solely on the basis of that conduct."[853] According to BSGR, "if Vale cannot prove that BSGR engaged in bribery, then it fails in its argument that the present situation is not covered by the Joint Venture Agreements' force majeure clauses. If force majeure clauses apply, then the joint venture agreements cannot have been frustrated."[854]

806.   Vale's response is that the legal analysis for frustration is distinct from the legal analyses for deceit and breach of warranty. The legal analysis for frustration does not require Vale to show that "bribery took place or even that any of the underlying allegations against BSGR that formed the basis of the revocation of the Mining Rights were true".[855] The legal analysis only requires Vale to show that the frustrating event was of such a nature that performance of the contract could not continue (through no fault of Vale) and that the event was one to which the *force majeure* clause did not apply.[856] This latter assessment only requires, for example, a decision as to whether the frustrating event was for reasons "connected to any direct or indirect action by [BSGR]".[857] Vale therefore argues that BSGR is incorrect to say that the frustration claim is parasitic on the bribery claims.[858]

807.   The Tribunal begins its discussion by observing that the analysis of frustration consists of three key stages. The first examines if the doctrine of frustration has been excluded by an express contractual term. The second examines if the doctrine of frustration has been precluded in the alternative by the bar of foreseeability (see section VIII.D of the Award below). If the analysis overcomes both bars, the analysis proceeds to the third stage, which applies the doctrine of frustration to determine if a supervening event has occurred which rendered further performance impossible. This is the basic structure of any legal analysis of frustration, and the Tribunal is required to proceed in accordance with this structure.

808.   The Tribunal next observes that, of these three stages, the second and third stages do not require the Tribunal to make findings on the allegations against BSGR regarding

---

[852] Vale's Statement of Case, paragraph 310; Vale's Pre-Hearing Written Submissions, paragraph 310.
[853] BSGR's Statement of Defence, paragraphs 311, 317, 319.
[854] BSGR's Statement of Rejoinder, paragraph 514.
[855] Vale's Pre-Hearing Written Submissions, paragraph 394.
[856] Vale's Pre-Hearing Written Submissions, paragraph 394; Vale's Statement of Reply, paragraph 1031.
[857] Vale's Statement of Reply, paragraph 1032.
[858] Vale's Statement of Reply, paragraph 1030; Vale's Pre-Hearing Written Submissions, paragraph 393.

bribery or non-disclosure. The issues of whether the revocation of the mining rights in this case was foreseen or foreseeable, and whether the revocation constituted a frustrating event, are matters which do not require the Tribunal to ascertain the veracity of Vale's allegations that BSGR had committed bribery and corruption.

809. By contrast, as regards the first stage, the Tribunal notes Vale's position that the *force majeure* clause in the Joint Venture Agreements does not exclude the doctrine of frustration. The Tribunal notes that one of Vale's supporting arguments is that the revocation of mining rights in this case is not an event to which the *force majeure* clause applies. In particular, the Tribunal notes Vale's argument that the *force majeure* clause only covers revocations of mining rights "for reasons which are beyond the control of the Parties and are not otherwise connected to any direct or indirect action by either Party against or in violation of any of the Basic Agreement, the Mining Concession and the Guinea Exploration Permits, as the case may be",[859] and does not cover the revocation in this case, which was the result of BSGR's bribery and which was thus connected to BSGR's actions. In other words, at the first stage, it must be determined whether *force majeure* was self-induced. This is an argument which requires the Tribunal to determine Vale's bribery allegations against BSGR. This implicates that the first stage would stand or fall by the Tribunal's findings on corruption.

810. But the assumption of Vale's argument is that the Tribunal is required to address this argument, and in this case the Tribunal is not so required. The reason to conclude that the *force majeure* clause does not exclude the doctrine of frustration is that the *force majeure* clause does not make full and complete provision for the events which it purports to apply to. The Tribunal refers to paragraphs 820–825 of the Award, which explain the point more fully. What is important to conclude for now is that there is no merit in BSGR's argument that the frustration claim is parasitic on Vale's claims of bribery and corruption *in this case*, because the *force majeure* clause does not make full and complete provision for the events which it purports to apply to and, hence, does not exclude the application of the doctrine of frustration.

811. BSGR's preliminary objection is accordingly dismissed. The Tribunal will begin its analysis of the frustration claim, starting with the issue of whether the doctrine of frustration has been excluded by an express contractual term.

## C.    Bar I: *Force majeure* clause

812. The Parties are agreed that the applicability of the doctrine of frustration would ordinarily be precluded if the parties made express provision in their contract for the consequence of the particular event that has occurred.[860] The issue is therefore whether the revocation of the mining rights, even if it were to amount to a supervening event for the purposes of the common law doctrine of frustration, was nevertheless an event for which the Parties had made express provision, so as to preclude the operation of the common law doctrine of frustration.

---

[859] Framework Agreement, Section 12.6(b)(iv). A similar phrasing is also used in Section 12.6(b)(v) of the Framework Agreement, which provides for the "implementation of any action without either Party having had any direct or indirect involvement in causing the implementation of such action, which materially and adversely affects the rights granted to ProjectCo under the Basic Agreement, the Mining Concession and/or any of the Guinea Exploration Permits."

[860] Vale's Statement of Case, paragraph 320; BSGR's Statement of Defence, paragraph 315.

813.    The Framework Agreement contains a *force majeure* clause in Section 12.6, which provides for the suspension of each Party's obligations under the Framework Agreement and obliges the Parties to "cooperate in good faith with a view to reaching a mutually viable solution to the Force Majeure Event" in the event that a Force Majeure Event (as defined in Section 12.6) is reasonably determined by Vale to have occurred. Section 12.6 states as follows.

(a)    Without prejudice to the operation of Section 5.2, if, during the time in which this Agreement is in force, the circumstances under which it was concluded are fundamentally changed such as to have a material adverse impact on the Project as a result of events or circumstances as specified in Section 12.6(b) below which are outside of the control of Vale (a "Force Majeure Event"), either Party may propose appropriate revisions to this Agreement, and both Parties will endeavor to find a mutually acceptable solution. Each Party acknowledges that a spirit of mutual co-operation and long term goodwill underlies this Agreement and agrees that in the event that unforeseen hardships arise affecting either Party, the Parties shall meet promptly and in good faith with a view to attempting to find a mutually acceptable means of alleviating such hardship.

(b)    A Force Majeure Event shall be:

(i)    (A) a natural catastrophe or cataclysm; (B) revolution, military or political coup, regime change, civil disturbance, act of terrorism, sabotage, vandalism or the threat of any such act; (C) an act of God, natural disasters such as lightning, flood, fire, storm, earthquakes and lack of water arising from environmental problems or weather; (D) chemical contamination; (E) an event or circumstance resulting in it becoming impossible, unsafe or not economically viable to access the Concession Areas to the extent required or to export iron ore from any of the Concession Areas to any other area within or outside of Guinea or Liberia, including, for the avoidance of doubt, extensive damage to any part of the infrastructure that forms part of the Liberian Transport Solution; (F) unforeseeable geological, environmental or ground (including ground water) conditions affecting the construction of all or some of the works relating to the Project; and/or (G) breakdown, inoperability, failure or partial failure of any part of the energy source required to run any key component of the Project, in each case, such that the development, exploitation or continued operation of the Project is not reasonably practicable or commercially viable;

(ii)    a major financial and/or economic crisis, either worldwide or in major market(s) that could reasonably be expected to materially and adversely affect or alter the iron ore demand from customers and downstream industries and/or inventory levels;

(iii)    the price for the target guaranteed specification of iron ore calculated in accordance with the Off-take Term Sheet (or the Off-take Agreement) being less than $27 per metric tonne on an ex-works mine basis for a continuous period of not less than 60 days;

(iv)    the revocation, annulment or materially adverse restriction of the Basic Agreement, the Mining Concession or any of the Guinea Exploration Permits for reasons which are beyond the control of the Parties and are not otherwise connected to any direct or indirect action by either Party against or in violation of any of the Basic Agreement, the Mining Concession and the Guinea Exploration Permits, as the case may be; or

(v) the implementation of any action, without either Party having had any direct or indirect involvement in causing the implementation of such action, which materially and adversely affects the rights granted to ProjectCo under the Basic Agreement, the Mining Concession and/or any of the Guinea Exploration Permits.

(c) Without prejudice to the operation of Section 5.2, in the event that Vale reasonably determines that a Force Majeure Event has occurred then:

(i) Vale shall notify BSGR and BSGR Guinea of its determination of the occurrence of a Force Majeure Event within 10 Business Days of such determination;

(ii) Vale and each member of its Group shall, with effect on and from the date of such determination, not be required to satisfy any of its or their payment or other obligations that have not then already fallen due for payment or performance in accordance with their respective terms under this Agreement (including, without limitation, Vale's obligations to pay the First Deferred Consideration, the Second Deferred Consideration and/or the Additional Consideration pursuant to Section 3; Vale's obligation to fund the Feasibility Study; and any obligations of the lender under the Vale Loan to provide funding pursuant to the terms of the Vale Loan, as applicable) and the Parties agree and shall, to the fullest extent they are able to do so, procure that BSGR Guinea and its subsidiaries shall not make payments of dividends or other distributions without the prior approval of Vale, so that such payments and/or obligations shall be suspended, in all such cases, for such period as Vale reasonably and in good faith determines that a Force Majeure Event is continuing;

(iii) the Parties will continue to cooperate in good faith with a view to reaching a mutually viable solution to the Force Majeure Event; and

(iv) if the Force Majeure Event is of a type as contemplated in section 12.6(b)(ii) or (iii) above, it is the current intention of Vale that, in determining the course of action (if any) to be adopted in respect of the Project in response to such Force Majeure Event, it would make its assessment by reference to criteria which are not materially more onerous than those applicable to other comparable projects of Vale and its Affiliates and after having regard to all applicable factors and circumstances (including, without limitation, the quality and quantity of the iron ore produced or expected to be produced by the Project) and the prevailing and anticipated market conditions at that time.

814. The provisions of Section 12.6 are extended to the Shareholders' Agreement. Section 15.1 of the Shareholders' Agreement provides as follows.

The Parties agree that if a Force Majeure Event occurs, the provisions of Section 12.6 of the Framework Agreement shall apply to this Agreement mutatis mutandis with respect to the suspension of the payment of dividends or other distributions by the Company or any of its subsidiaries and of the obligations of the Parties as well as those of the Company or any of its subsidiaries hereunder which are not capable of performance as a result of such Force Majeure Event.

815. Vale argues that Section 12.6 does not exclude the doctrine of frustration in the present case for the following reasons.

816.   First, Vale argues that the operative part of the *force majeure* clause (Section 12.6(c)) is only triggered "in the event that Vale reasonably determines that a Force Majeure Event has occurred." This operative part allows Vale to notify BSGR of a Force Majeure Event, suspend any payment obligations and try to reach a mutually viable solution with BSGR. It is a one-sided clause written in Vale's favour, and does not explain what should happen to BSGR's obligations. BSGR cannot rely on this right to exclude the doctrine of frustration, because BSGR could never have used this clause to trigger the operative part.[861]

817.   Second, Vale argues that the *force majeure* clause "does not adequately provide for the revocation of the mining rights from VBG caused by BSGR's bribery". Section 12.6(a) only encouraged the Parties to "propose appropriate revisions" to the Framework Agreement, "endeavour to find a mutually acceptable solution" and to "meet promptly and in good faith with a view to attempting to find a mutually acceptable means of alleviating such hardship." If Section 12.6(c) worked in BSGR's favour (and according to Vale's first argument, it does not), it would only provide for the Parties to negotiate to attempt to reach a mutually viable solution. The effect of these Sections is that, if a revocation occurs, the lawyers are to sort it out. For example, it is contemplated that it could be sorted out if licenses were revoked pending an increase in licence fees and the Parties had to allocate the burden of that increase.[862] But the supervening event in this case (the revocation of the mining rights) would be a catastrophic event which would irrevocably strip VBG's rights from it, so that there would be no possible mutually acceptable solution that the lawyers could sort out.[863] The authorities in the UK, the US, Switzerland, Guinea, and Guernsey were investigating the allegations of corruption against BSGR.[864] BSGR's argument that President Condé and George Soros orchestrated a conspiracy, if proven, would only show that there was no way to reach a resolution.[865] VBG was disqualified from any substitute licence following the revocation, and there is no prospect of VBG developing the project since the revocation.[866] In view of the fact that there is no time limit on the Parties' obligation to find a mutually acceptable solution in Section 12.6,[867] Vale argues that the revocation is an event from which the mechanism of the *force majeure* clause could not rescue the Parties. In these circumstances, the doctrine of frustration applies.[868]

818.   Third, Vale submits that the revocation of the mining rights does not fall within the definition of a "Force Majeure Event". In particular:

818.1.   The revocation does not fall within the ambit of Sections 12.6(b)(iv) and 12.6(b)(v), because the revocation did not take place "for reasons which are beyond the control of the Parties and are not otherwise connected to any direct or indirect action by either Party" or "without either Party having had any direct or indirect involvement in causing [it]." On the contrary, Vale has shown that

---

[861] Vale's Pre-Hearing Written Submissions, paragraph 396.
[862] Vale's Pre-Hearing Written Submissions, paragraph 397.
[863] Vale's Pre-Hearing Written Submissions, paragraph 400(a).
[864] Vale's Pre-Hearing Written Submissions, paragraph 400(b).
[865] Vale's Pre-Hearing Written Submissions, paragraph 400(c).
[866] Vale's Pre-Hearing Written Submissions, paragraphs 400(d), 402; Statement of Case, paragraph 323.
[867] Vale's Pre-Hearing Written Submissions, paragraph 398.
[868] Vale's Pre-Hearing Written Submissions, paragraphs 401-402.

BSGR had engaged in corruption which caused the revocation.[869] Moreover, if Sections 12.6(b)(iv) and (v) covered revocations unconnected to the Parties' actions, the natural reading of the Framework Agreement would be that all other Sections are not intended to refer to revocations which are connected to the Parties' actions.[870]

818.2.    The revocation does not fall within the ambit of Section 12.6(b)(i)(B). The election of President Condé could hardly be described as a political upheaval, which was an implied feature of a "regime change". In any event, "it is not the 'regime change' that caused the revocation of the mining rights and the frustration of the contract, but BSGR's corrupt acts".[871] Furthermore, the slew of political events which took place in Guinea from the death of President Conté to the election of President Condé could not collectively be regarded as a "regime change", because this "stretches past breaking point the meaning of the phrase 'Force Majeure Event.'"[872] The surrounding language of Section 12.6(b)(i)(B) shows that the Parties did not intend a string of events to fall within the meaning of a "regime change": "revolution, military or political coup ... civil disturbance, act of terrorism, sabotage, vandalism or the threat of any such act." All of these other terms envisaged a sudden event, not a six-year sequence of events.[873]

818.3.    The revocation does not fall within the ambit of Section 12.6(b)(i)(E), in that the revocation is not "an event or circumstance resulting in it becoming impossible, unsafe or not economically viable to access the Concession Areas."[874] First, the revocation of mining rights is already covered elsewhere in Section 12.6(b)(iv), and is impliedly excluded from this terminology.[875] Second, the type of event or circumstance that would render it impossible, unsafe or not economically viable is clearly intended to refer to infrastructural problems so that reaching Simandou became physically or economically impossible. This explains the further language in the same Section: "including, for the avoidance of doubt, extensive damage to any part of the infrastructure that forms part of the Liberian Transport Solution."[876]

819.    BSGR has not furnished any argument in response to Vale's first and second arguments. BSGR only argues that the revocation of the mining rights constituted a Force Majeure Event within the meaning of Sections 12.6(b)(iv), 12.6(b)(i)(B); and 12.6(b)(i)(E).[877]

819.1.    As regards Section 12.6(b)(iv), BSGR argues that the reason for the revocation was "beyond the control of the parties" and was "not otherwise connected to any direct or indirect action by [BSGR] against or in violation of any of the Basic

---

[869] Vale's Statement of Case, paragraphs 321-322; Vale's Statement of Reply, paragraph 1034; Vale's Pre-Hearing Written Submissions, paragraph 404.
[870] Vale's Statement of Reply, paragraph 1035(a).
[871] Vale's Statement of Reply, paragraph 1035(b).
[872] Vale's Pre-Hearing Written Submissions, paragraph 406.
[873] Vale's Pre-Hearing Written Submissions, paragraph 408.
[874] Vale's Statement of Reply, paragraph 1035(c).
[875] Vale's Pre-Hearing Written Submissions, paragraph 409.
[876] Vale's Statement of Reply, paragraph 1035(c); Vale's Pre-Hearing Written Submissions, paragraph 408.
[877] BSGR's Statement of Defence paragraph 320; BSGR's Statement of Rejoinder, paragraphs 515-519. BSGR seemed also to rely on Section 12.6(b)(v) in its Statement of Defence at paragraph 320. However, BSGR did not invoke Section 12.6(b)(v) in its subsequent pleadings.

Agreement, the Mining Concession and the Guinea Exploration Permits" within the meaning of Section 12.6(iv). The basis for this was that, even if BSGR did engage in bribery, that bribery did not cause the revocation as "President Condé was determined to get BSGR out of Simandou regardless of any wrongdoing on its part. The result is that the reason for the revocation was not within the control of either of the parties, and was unconnected with any action that violates the terms on which the mining rights had been granted."[878] BSGR therefore argues that the revocation constitutes a Force Majeure Event under Section 12.6(iv).

819.2. As regards Section 12.6(b)(i)(B), BSGR argues that there have been several regime changes between the time the mining rights were granted and the time they were revoked, which involved a political upheaval.[879] In particular, the election which brought President Condé into power was marked by a high degree of political upheaval.[880] This was the regime change which brought about the revocation of the mining rights, part and parcel of which was President Condé's abolition of the 1995 Mining Code, his hostility to those granted mining rights under the previous regime and his reallocation of those rights to pay off debts which he had incurred in bringing about the regime change.[881]

819.3. Finally, as regards Section 12.6(b)(i)(E), BSGR argues that the revocation of the mining rights "makes it practically impossible for either BSGR or Vale to visit the Concession Areas. Nothing in the terms of the force majeure clause supports the interpretation Vale would give to this clause, namely that it applies only to problems with infrastructure."[882]

820.   In the Tribunal's view, the question is whether the contract has excluded the operation of the doctrine of frustration in the present case. The answer to this depends on whether the contract has made *full and complete provision* for the frustrating event in question, so as to exclude frustration. This is clear from *National Carriers*, in which the UK House of Lords held that the doctrine of frustration would continue to operate if "the contract makes no *sufficient* provision".[883]

821.   In this respect, the Tribunal considers that Vale's first argument misses the point, because it does not seek to demonstrate that the contract has made full and complete provision. It only seeks to point out that the *force majeure* clause is structured in a way that only allows *Vale* to trigger the suspension under the express terms of the contract. In other words, all it does is to demonstrate how the *force majeure* clause works. The Tribunal is therefore unable to see how this has any bearing on the issue of whether the doctrine of frustration has been excluded by the terms of the contract.

822.   With regard to Vale's second argument, the Tribunal understands the argument to be that adhering to the mechanism of the *force majeure* clause would be a futile exercise for two reasons. One is that there is no prospect of the Parties reaching a mutually viable solution (in accordance with the provisions of the *force majeure* clause), and the other is that the *force majeure* clause neither imposes a time limit on the obligation to cooperate

---

[878] BSGR's Statement of Rejoinder, paragraph 516.
[879] BSGR's Statement of Rejoinder, paragraph 517.
[880] BSGR's Statement of Rejoinder, paragraph 518.
[881] BSGR's Statement of Rejoinder, paragraph 518.
[882] BSGR's Statement of Rejoinder, paragraph 519.
[883] *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, 700 (emphasis added), **RL-47**.

in good faith, nor provides for the scenario where the Parties are unable to reach a solution. Vale concludes that "the clause does not provide a real contractual mechanism to deal with the event and does not allocate the risk of the event in case the situation is not one that the lawyers can sort out."[884]

823.   The Tribunal might have been persuaded that a *force majeure* clause, *which only imposes a bare obligation on the parties to cooperate with a view to finding a mutually viable solution*, would not constitute a full and complete provision. However, the clause in this case does not only impose such an obligation, but also imposes a *suspension* on future performance of the Framework Agreement. For this reason, the suspension effect must also be taken into account (in addition to the obligation to co-operate) when deciding if the *force majeure* clause constitutes a full and complete provision to cover the supervening event.

824.   In this case, if the *force majeure* clause provided for the suspension of the obligations of *both Parties* under the Framework Agreement, the contract would probably be deemed to have made full and complete provision. The Parties would be taken to have intended the loss to lie where it falls if the Parties were to attempt to co-operate but were unable to reach a viable solution. But the situation here is not comparable, because the *force majeure* clause only provides for the suspension of *Vale's* obligations and does not provide for the suspension of *BSGR's* obligations. Section 12.6(c)(ii) of the Framework Agreement states that "Vale and each member of its Group shall, with effect on and from the date of such determination, not be required to satisfy any of its or their payment or other obligations that have not then already fallen due for payment or performance in accordance with their respective terms under this Agreement", but does not deal with BSGR's obligations. This means that BSGR's obligations under the Joint Venture Agreements will continue to operate, even upon the occurrence of a supervening event to which Section 12.6 applies.

825.   In view of this omission, the Tribunal considers that the Framework Agreement does not provide for all the effects of the supervening event on the obligations of the Parties. So even if the revocation of the mining rights had been an event to which the *force majeure* clause applied, the *force majeure* clause could not be considered to have excluded the doctrine of frustration, because it did not make full and complete provision for the revocation. On this basis, the Tribunal holds that the *force majeure* clause does not exclude the doctrine of frustration, and it is open for the Tribunal to apply the doctrine of frustration to the facts of this case. In view of this conclusion, the Tribunal considers that it is unnecessary to address Vale's third argument (that the revocation was an event to which the *force majeure* clause does not apply) and BSGR's arguments in response.

## D.   Bar II: Foreseeability

826.   BSGR argues that there is a requirement that the event is *unforeseeable* for frustration to operate, which is separate and distinct from the requirement the contract makes insufficient provision for the supervening event.[885] So if the Parties would have seen the supervening event as a possibility (and accepted that as a risk of entering into the

---

[884] Vale's Pre-Hearing Written Submissions, paragraph 399.
[885] BSGR's Statement of Rejoinder, paragraph 521.

contract), the doctrine of frustration would be precluded, and Vale would not be able to rely on it.[886]

827.    BSGR relies on two authorities to support this view. The first is a passage from *Chitty on Contracts*.[887]

> [T]he fact that the parties have foreseen the event but not made any provision for it in their contract will usually, but not necessarily, prevent the doctrine of frustration from applying when the event occurs.[888]

828.    The second is a passage from *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, 700 (HL).[889]

> Frustration of a contract takes place where there intervenes an event (without default of either party and for which the contract makes no sufficient provision) which so significantly changes the nature [...] of the outstanding contractual rights and/or obligations from what the parties could reasonably have contemplated at the time of its execution that it would be unjust to hold them to the literal sense of its stipulations in the new circumstances; in such case the law declares both parties to be discharged from further performance.[890]

829.    On this footing, BSGR argues that it was foreseeable that a subsequent Guinean President might expropriate the mining rights, and that it was a risk which both Parties had taken in contracting for those rights.[891] Expropriation of the mining rights was foreseeable, because the mining rights "were rooted in a country with a significant history of political upheaval, ethnic tension and violence."[892]

830.    In addition, BSGR relies on paragraph 21 of Etchart's first witness statement to argue that Etchart had "candidly admitting that Vale was aware of (and went ahead in spite of) the risks of mining operations in a country such as Guinea".[893] BSGR argues that, in the context of Vale's admission that Guinea was a country "that has been governed by a series of dictators for almost all of its existence, has suffered multiple coups, and was recently involved in lengthy civil wars in neighbouring countries",[894] Vale can no longer realistically assert that "only one year later, when the [Joint Venture Agreements] were signed, the political situation would have so radically stabilised and moderated that the chance of expropriation would have evaporated."[895]

831.    BSGR also argues that the prospect of there being corruption or bribery was expressly addressed in the Joint Venture Agreements in the ABL Solution, which provides a detailed procedure for dealing with such matters.[896]

---

[886] BSGR's Statement of Defence, paragraph 316.
[887] BSGR's Statement of Defence, paragraph 315.
[888] HG Beale (ed), *Chitty on Contracts*, vol 1 (32nd edn, Sweet & Maxwell 2015) [23-059], **CL-36**.
[889] BSGR's Statement of Rejoinder, paragraph 520.
[890] *National Carriers Ltd v Panalpina (Northern) Ltd* [1981] AC 675, 700, **RL-47**.
[891] BSGR's Statement of Defence, paragraph 321.
[892] BSGR's Statement of Rejoinder, paragraph 522.
[893] BSGR's Statement of Defence, paragraph 321.
[894] BSGR's Statement of Rejoinder, paragraph 523. BSGR cited Statement of Case, paragraphs 18-20.
[895] BSGR's Statement of Rejoinder, paragraph 523.
[896] BSGR's Statement of Defence, paragraph 320(iii).

832.    Vale disagrees with BSGR's contention that foreseeability is a bar to frustration. Vale's view is that "a contract may be discharged by frustration even though the parties foresaw or ought to have foreseen the frustrating event", and that "[t]he key element is not whether an event was foreseen or in the contemplation of the parties, but whether it was provided for in the contract."[897] In support, Vale relies primarily on the following passage from The Eugenia [1964] 2 QB 226, 239 (CA).[898]

> It has frequently been said that the doctrine of frustration only applies when the new situation is 'unforeseen' or 'unexpected' or 'uncontemplated,' as if that were an essential feature. But it is not so. The only thing that is essential is that the parties should have made no provision for it in their contract. The only relevance of it being 'unforeseen' is this: If the parties did not foresee the kind of thing happening, you can readily infer they have made no provision for it: whereas, if they did foresee it, you would expect them to make provision for it.[899]

833.    As regards BSGR's quotation of Chitty on Contracts, Vale emphasises that the quotation specifically says that foreseeability "will usually, ***but not necessarily***, prevent the doctrine of frustration".[900] BSGR also cites a paragraph from Treitel's Frustration and Force Majeure to argue that "There is only a prima facie inference that a foreseen or readily foreseeable event will preclude the doctrine of frustration. Depending on the circumstances, the event can be readily foreseeable, actually foreseen and even provided for in the contract but the doctrine of frustration can still apply."[901]

834.    Even if it is accepted that foreseeability is a separate bar to frustration, Vale argues that the revocation of the mining rights was not foreseeable.

834.1.    First, in relation to the quotation from Etchart's witness statement, Vale asserts that BSGR has taken the quote out of context.[902] Etchart is describing the political instability in 2009 to make the point that only an agreement with the government conferring actual mining rights would carry "sufficient weight to overcome the naturally high sovereign risk in Africa."[903] Etchart is explaining his view that the mining rights were only secured when the basic agreement with the GoG was executed.[904] Indeed, in his second witness statement, Etchart says that this agreement "significantly decreased the risk of the rights being lost, absent some wrongdoing by their holder."[905] Etchart makes it clear in his second witness statement that "it certainly never occurred to me that BSGR's mining rights would be revoked because of wrongdoing by BSGR itself".[906]

834.2.    Second, in relation to the ABL Solution, Vale submits that the contemplation of allegations being made regarding bribery and corruption is not the same as the contemplation of the complete revocation of the mining rights, owing to BSGR's corrupt actions.[907] Indeed, the ABL Solution does not provide a viable

---

[897] Vale's Statement of Reply, paragraph 1037.
[898] Vale's Statement of Reply, paragraph 1037.
[899] The Eugenia [1964] 2 QB 226, 239 (CA), **CL-64.**
[900] Vale's Pre-Hearing Written Submissions, paragraph 411 (emphasis added).
[901] Vale's Pre-Hearing Written Submissions, paragraph 411.
[902] BSGR's Statement of Rejoinder, paragraph 1038.
[903] BSGR's Statement of Rejoinder, paragraph 1039; Etchart First WS, paragraph 21.
[904] BSGR's Statement of Rejoinder, paragraph 1039.
[905] BSGR's Statement of Rejoinder, paragraph 1039; Etchart Second WS, paragraph 22.
[906] BSGR's Statement of Rejoinder, paragraph 1040; Etchart Second WS, paragraph 23.
[907] Vale's Statement of Reply, paragraph 1036.

contractual framework for a situation where the mining rights are revoked: "The 'exit strategy' in the ABL Solution necessitated a buyer buying out the Parties, but no buyer could have been found for a worthless project with no underlying mining rights."[908]

835.    The Tribunal agrees with BSGR that there is a "foreseeability" bar to frustration, which is separate from the "express contractual provision" bar that was discussed in section VIII.C. of the Award above. The implication is that, even if there is no express contractual provision to cover the supervening event, the doctrine of frustration may nevertheless be precluded by this "foreseeability" bar if the requirements of this bar are fulfilled. But the question then arises as to what these requirements are, and on this issue, the Tribunal is not persuaded by BSGR's view that the sole criterion is that the event was "foreseeable". This cannot be the case, because foreseeability only justifies a *prima facie* inference that the risk of the frustrating event has already been assumed by the parties, so as to preclude the operation of the doctrine of frustration. This *prima facie* inference may therefore be excluded by other relevant factors, including evidence that the parties had intended otherwise. The Tribunal is entitled to take these factors into account when determining if the *prima facie* inference is excluded.

836.    But there is no need for the Tribunal to commence a balancing exercise of these factors, because the facts of this case indicate that the revocation of the mining rights was not a foreseeable event in the first place. The Tribunal agrees with Vale that the quotation from Etchart's witness statement was taken out of context, and that the quotation does not prove that the revocation was a foreseeable event. The Tribunal agrees with Vale's view that the ABL Solution may show that the parties had contemplated the possibility of allegations of bribery but does not show that the parties had contemplated the revocation of mining rights. The Tribunal considers that the (general) political climate in Guinea is not sufficient proof that the (specific) occasion of the revocation of the mining rights was a foreseeable event.

837.    The Tribunal accordingly holds that the doctrine of frustration is not precluded by the bar of foreseeability.

### E.    Application of the doctrine of frustration

838.    Vale argues "The revocation of VBG Guinea's Mining Rights in respect of the Concession Areas (which is an indisputable fact) has made it commercially impossible for the parties to perform their obligations under the [Joint Venture Agreements]" and that "the [Joint Venture Agreements] have been frustrated".[909] Vale asserts that the revocation of the mining rights "made it commercially impossible for the parties to perform their obligations under the [Joint Venture Agreements]", and that the revocation "both 'defeat[ed] the practical purpose' of the joint venture and [made] it 'manifestly incapable of performance.'"[910] Vale draws a comparison between this case and *BP Exploration Co. (Libya) Ltd. v Hunt (No. 2)* [1983] 2 AC 352 (HL), where the UK House of Lords ruled that the expropriation of an oil concession by the Libyan government amounted to a

---

[908] Vale's Statement of Reply, paragraph 1036; Vale's Pre-Hearing Written Submissions, paragraph 412.
[909] Vale's Statement of Case, paragraph 310-311.
[910] Vale's Statement of Case, paragraph 315.

frustrating event.[911] Vale emphasises that the revocation was not attributable to any conduct, act or omission on the part of Vale, pointing out "the Technical Committee found in its Report that the evidence showed no wrongdoing by Vale."[912]

839.    BSGR's only argument in response is that:

> In *BP Exploration Co (Libya) Ltd v Hunt (No. 2)* [1981] 1 WLR 232 (appeal to HL dismissed [1983] 2 AC 352), the court was concerned with expropriation of an oil concession by the Libyan government (for which the state had paid compensation). It was an external event brought about through no default of the parties and fell squarely within the doctrine of frustration (and there was no appeal against that finding). Vale's reliance on that case is misplaced. In that case, there were no allegations of fraud (or any wrongdoing) by the defendant. Here, Vale's frustration case is dependent on it making out fraud and *BP v Hunt* says nothing about that situation.[913]

840.    Having considered the Parties' submissions, the Tribunal agrees with Vale that the revocation of the mining rights by the GoG amounted to a frustrating event. The revocation led to the unavailability (if not the destruction) of the subject matter of the Joint Venture Agreements, which is the legal right to commence mining activities in Zogota as well as the legal right to commence exploration activities of Simandou Blocks 1 and 2. These two legal rights form the subject matter of the Joint Venture Agreements, the unavailability or destruction of which would render the performance of the Joint Venture Agreements (which oblige Vale and BSGR to "pursue the development of the Project"[914]) wholly impossible. The Tribunal's view is fortified by the English case of *BP Exploration Co. (Libya) Ltd. v Hunt (No. 2)* [1983] 2 AC 352 (HL), which makes it manifestly clear that revocations of permits by governments can amount to frustrating events which discharge the parties from further performance of the contract.

841.    BSGR's counterargument seems to be that there is no frustrating event if that event arose from the fault (or default) of one party. The revocation would not amount to a frustrating event if Vale successfully establishes that the revocation was the result of BSGR's bribes.

842.    If that is BSGR's counterargument, the Tribunal disagrees. When a frustrating event occurs without the fault or default of any party, the contract is automatically discharged, and either party may rely on the frustrating event to establish that automatic discharge. But when a frustrating event occurs by reason of the fault or default of one party, that party will not be allowed to rely upon the self-induced frustrating event (as supported by the fifth proposition in *The Super Servant Two*), although the other party will be allowed to rely on it. In such an exceptional situation, discharge does not occur automatically, but only takes place upon the election of the innocent party.

843.    In the present case, it does not matter whether the revocation was due to BSGR's fault. If it was due to neither Party's fault, either Party (including Vale) would be entitled to rely on the revocation to show the Joint Venture Agreements have automatically been discharged; if the revocation was due to BSGR's bribery, Vale as the innocent Party

---

[911] Vale's Statement of Case, paragraphs 316-317; *B.P. Exploration Co. (Libya) Ltd. v Hunt (No. 2)* [1983] 2 AC 352 (HL), **CL-3**.
[912] Vale's Statement of Case, paragraphs 318-319.
[913] BSGR's Statement of Defence, paragraph 317.
[914] Framework Agreement, Section 7; *see also* SHA, Section 3.1 and Section 5.1.

would still be entitled to rely on the frustrating event (and such reliance would serve to trigger the discharge of the Joint Venture Agreements). So there is no merit in BSGR's argument that a supervening event ceases to be one if it is established that the event arose from BSGR's fault. BSGR would not be able to rely on such an event; but Vale as the innocent Party most certainly would.

844.    The Tribunal holds that, applying the doctrine of frustration to the facts of this case, the revocation of the mining rights constituted a frustrating event which discharged the Parties from the performance of their obligations under the Joint Venture Agreements which had not yet arisen at the time of discharge.

845.    However, for the reasons set out in paragraph 982 below, the Tribunal has no need to make any substantive order for specific relief following its findings in paragraphs 838-844 above.

## IX.   REFLECTIVE LOSS

846.    The Tribunal has found so far that:

    846.1.    BSGR is liable for fraudulent misrepresentation;

    846.2.    BSGR is liable for breach of warranties; and

    846.3.    the elements of frustration have duly been established.

847.    However, before the Tribunal turns to the issue of remedies, the Tribunal wishes to address a preliminary matter which was raised by the Tribunal and dealt with by Vale at some length during the February 2017 Hearing – the issue of reflective loss.

## A.    The Parties' Positions

848.    Vale claims in this arbitration that it is entitled to the following heads of damages under deceit or breach of warranties which amount to **USD 1,446,618,523** in total.

    848.1.    **Initial Consideration.** Section 3(a) of the Framework Agreement obliged Vale to pay (or procure Vale's subsidiary to pay) USD 500,000,000 to BSGR as "Initial Consideration" (defined under the Framework Agreement) for the purchase of 51% of the shares in BSGR Guernsey from BSGR.[915] Vale claims that, pursuant to Section 3(a), Vale International transferred USD 500,000,000 to BSGR by wire transfer on 30 April 2010.[916] Vale now claims it is entitled to this **USD 500,000,000** from BSGR.

    848.2.    **Feasibility Study Funding.** Section 6.1 of the Framework Agreement required Vale to fund (or procure one of its subsidiaries to fund) a feasibility study in respect of Simandou Blocks 1 and 2. Vale claims this was ultimately funded by Vale GmbH and Vale International[917] in the amount of USD 85,365,652.[918] Vale now claims it is entitled to this **USD 85,365,652** from BSGR.

    848.3.    **Loan.** Section 6.3 of the Framework Agreement obliged Vale to lend (or procure one of Vale's subsidiaries to lend) money to VBG Guinea, VBG Guernsey, VBG Liberia and VBG BVI. Vale argues that, pursuant to Section 6.3, Vale International lent money between 2010 and 2015 to VBG Guinea, VBG Liberia and VBG Logistics, all of which issued promissory notes to Vale International to acknowledge their indebtedness. Vale argues that the outstanding amount under the promissory notes is USD 780,734,781 (comprising the outstanding principal of USD 581,197,104 and the outstanding sum of simple interest accrued of USD 199,537,678 up to 28 April 2014). Vale now claims it is entitled to this **USD 780,734,781** from BSGR (the "**Outstanding Loan Amount**").

---

[915] The shares in VBG were held by Vale's direct subsidiary company, Vale GmbH (see Transcript, Merits Hearing, Day 3, p. 72, lines 7-11).
[916] Vale's Statement of Reply, paragraph 935(a); Oxera Report, paragraphs 52-56.
[917] Transcript, Merits Hearing, Day 1, p. 201, lines 24-25 and p. 202, line 1-4; Day 3, p. 86, lines 3-18 and p. 91, lines 6-13.
[918] Vale's Statement of Reply, paragraph 935(c); Oxera Report, paragraph 8.

848.4.    **Internal costs.** Vale claims that it is entitled to additional costs of **USD 80,518,090** which Vale incurred outside of Guinea and Liberia during 2010 to 2013 to operate the joint venture.[919]

849.    In its Statement of Defence, BSGR argued that Vale was not entitled to recover at least the sum of **USD 1,097,805** (which forms part of the Internal Costs of **USD 80,518,090**), because the **USD 1,097,805** was a sum "that 'Vale Intl' (not the present Vale Claimant) paid for R&D work by an employee based in Switzerland. Money spent by a different Vale company to the claimant in these proceedings is not recoverable".[920] BSGR cited *Peterson Farms v C&M Farming Ltd* [2004] EWHC 121 (Comm) in support.[921]

850.    In its Statement of Reply, Vale responded that it was not seeking to extend the arbitration clause in the Joint Venture Agreements to cover claims by a non-party such as Vale International (a wholly-owned indirect subsidiary of Vale). For this reason, "the issue in these proceedings cannot conceivably be one of jurisdiction, as BSGR suggests, but simply whether Vale can recover as lost expenditures disbursements incurred by Vale International on Vale's behalf and at Vale's direction."[922] Framed as such, Vale argued that the answer is yes for two reasons. First, "[t]he parties expressly agreed that Vale may rely upon other members of its group of companies to perform its obligations under the [Joint Venture Agreements], including to make payments in furtherance thereon". Second, English law allowed for such recovery, as evidenced by *George Fischer (Great Britain) Ltd v Multi-Construction Ltd* [1995] BCC 310, an English Court of Appeal case in which the parent company was awarded recovery for the losses suffered by its subsidiary.[923] In this connection, Vale contested the relevance of *Peterson Farms* on the basis that the issue in *Peterson Farms* was entirely different, being whether the claimant could recover damages suffered by entities belonging to its group of companies that were not parties to the arbitration agreement. The Court of Appeal partially set aside the award for want of jurisdiction because the arbitral tribunal did not consider whether the claimant was entitled to recover those damages under the applicable Arkansas *lex causae*.[924]

851.    In its Statement of Rejoinder, BSGR challenged Vale's reliance on *George Fischer* as authority for the proposition that losses suffered by a subsidiary might be recovered by the parent company. BSGR argued that this mischaracterised the decision in *George Fischer* as the issue which the Court of Appeal decided was whether "a shareholder in a company [was] entitled to recover damages for a diminution in the value of its shareholding in the company or in the distribution by way of dividends or otherwise of profits of the company, where such diminution results from loss inflicted on the company by the defendant's breach of its contract with the plaintiff". It was only in this capacity that a parent company was able to recover for losses primarily suffered by the subsidiary, so unless Vale was able to show a diminution in the share price of Vale International, or a diminution of its dividends in Vale International, as a consequence of a Swiss-based

---

[919] Vale's Statement of Case, paragraph 128; Oxera Report, paragraphs 104-130.
[920] BSGR's Statement of Defence, paragraph 268(i).
[921] *Peterson Farms v C&M Farming Ltd* [2004] EWHC 121 (Comm), **RL-45**.
[922] Vale's Statement of Reply, paragraph 964.
[923] Vale's Statement of Reply, paragraph 965.
[924] Vale's Statement of Reply, paragraph 966. Vale reiterates these arguments in its Pre-Hearing Written Submissions, paragraphs 353-355.

employee being made available for work on the joint venture, *George Fischer* did not assist Vale.[925]

852.   On the first day of the February 2017 Hearing, the Tribunal noted that the issue was not confined to the **USD 1,097,805** relating to the Swiss employee but extended to other amounts provided by Vale International, including the Outstanding Loan Amount.[926] Vale's counsel clarified at the Hearing that the Initial Consideration was funded through Vale International and the Tribunal learned that the Feasibility Study was also funded by the subsidiary company (although the Internal Costs were incurred by Vale).[927] The Tribunal therefore asked Vale if it was claiming reflective loss and, if so, whether this was allowed under English law.[928]

853.   In response, on the third day of the February 2017 Hearing, Vale's counsel provided oral submissions on reflective loss, arguing that the rule was inapplicable to the present case. Vale claimed its loss consisted in the diminution of the value of its shares in Vale International[929] and provided reasons why such loss was recoverable under English law relying on case law referred to below.[930] In the course of its submissions, Vale said the onus was on the defendant to raise the issue of reflective loss as a defence, and BSGR had not raised this issue in the arbitration.[931] In other words, the burden fell on BSGR as defendant to prove that recovery was barred by the rule against reflective loss, and BSGR did not satisfy that burden. Vale also submitted that the present circumstances did not amount to a claim for reflective loss in any case, so the rule was inapplicable on the facts. Consequently, according to Vale, the reflective loss issue was on the "fringes of the debate between the parties".[932]

854.   The transcript of the February 2017 Hearing was provided to BSGR. No further comment was received from either Party in relation to the rule against reflective loss. The Tribunal wishes to put it on the record that it is satisfied that BSGR had the clear opportunity to challenge Vale's damages claim on grounds of reflective loss, and it has not availed itself of this opportunity (aside from the Swiss employee costs). The transcripts were provided to BSGR daily, and a simple reading of the transcripts would have shown that the reflective loss issue had been raised by the Tribunal and counsel for Vale had correctly stated that the rule against reflective loss had not been invoked by BSGR. Had BSGR sought leave to raise the reflective loss issue, the Tribunal would in all likelihood have granted leave. However, BSGR chose not to do so.

855.   In summary, the Tribunal recalls the following.

---

[925] BSGR's Statement of Rejoinder, paragraph 459-461.
[926] Transcript, Merits Hearing, Day 1, p. 198, line 17 – p. 201, line 7.
[927] Transcript, Merits Hearing, Day 1, p. 201, line 13 – p. 202, line 5. See also Vale's Statement of Reply, footnote 2368; Vale's Pre-Hearing Written Submissions, footnote 757.
[928] Transcript, Merits Hearing, Day 1, p. 201, lines 8-11; p. 202, lines 6-18.
[929] Transcript, Merits Hearing, Day 3, p. 8, lines 13-18; p. 9, lines 16-23. The Tribunal understands Vale's argument extends to Vale International's contributions to the *Feasibility Study Funding* (and not just the Initial Consideration and the Loan).
[930] Transcript, Merits Hearing, Day 3, p. 19, line 3 – p. 29, line 18.
[931] Transcript, Merits Hearing, Day 3 p. 27, lines 3-9; p. 18, line 12 – p. 19, line 2 and p. 20, lines 4-25.
[932] Transcript, Merits Hearing, Day 3 p. 18, lines 11-12.

855.1.   Although BSGR did not use the term "reflective loss", the rule was raised by BSGR in relation to the costs incurred by Vale International connected to the provision of the Swiss employee (**USD 1,097,805**).

855.2.   On its own accord, the Tribunal raised the possibility that the doctrine might apply to other parts of Vale's damages claim.

855.3.   Vale provided its submissions as to why the reflective loss doctrine did not apply to the present case, including that BSGR had not raised the issue as a defence, nor did it apply to amend its defence to raise a formal objection to Vale's claims for losses described above.

855.4.   BSGR did not make any further submissions on the issue and did not pursue a reflective loss argument in relation to other heads of damages.

## B.    The Rule Against Reflective Loss

856.    Before addressing the facts of this case, the Tribunal briefly outlines the law on reflective loss.

857.    The rule against reflective loss in English law can be traced back to the English Court of Appeal case of *Prudential Assurance v Newman Industries* [1982] Ch 204 ("**Prudential Assurance**"), which explained the rule in the following terms.

> [...] what [the shareholder] cannot do is to recover damages merely because the company in which he is interested has suffered damage. **He cannot recover a sum equal to the diminution in the market value of his shares, or equal to the likely diminution in dividend, because such a loss is merely a reflection of the loss suffered by the company.** The shareholder does not suffer any personal loss. His only loss is through the company, in the diminution of the value of the net assets of the company, in which he has (say) a 3 per cent. shareholding. The plaintiff's shares are merely a right of participation in the company on the terms of the articles of association. The shares themselves, his right of participation, are not directly affected by the wrongdoing. The plaintiff still holds all the shares as his own absolutely unencumbered property. The deceit practised upon the plaintiff does not affect the shares; it merely enables the defendant to rob the company. A simple illustration will prove the logic of this approach. Suppose that the sole asset of a company is a cash box containing £100,000. The company has an issued share capital of 100 shares, of which 99 are held by the plaintiff. The plaintiff holds the key of the cash box. The defendant by a fraudulent misrepresentation persuades the plaintiff to part with the key. The defendant then robs the company of all its money. The effect of the fraud and the subsequent robbery, assuming that the defendant successfully flees with his plunder, is (i) to denude the company of all its assets; and (ii) to reduce the sale value of the plaintiff's shares from a figure approaching £100,000 to nil. **There are two wrongs, the deceit practised on the plaintiff and the robbery of the company. But the deceit on the plaintiff causes the plaintiff no loss which is separate and distinct from the loss to the company. The deceit was merely a step in the robbery. The plaintiff obviously cannot recover personally some £100,000 damages in addition to the £100,000 damages recoverable by the company.**[933]

858.    The rule against reflective loss was briefly doubted by the New Zealand Court of Appeal in *Christensen v Scott* [1996] 1 NZLR 273 and the English Court of Appeal in *Barings plc*

---

[933] *Prudential Assurance v Newman Industries* [1982] Ch 204, 222-223 (CA) (emphasis added).

*(in administration) v Coopers* [1997] 1 BCLC 427. However, these cases were disapproved of by the English House of Lords in *Johnson v Gore Wood* [2002] 2 AC 1 (HL) ("***Johnson***"), and the rule against reflective loss was roundly endorsed. Today, the modern authoritative statement of the rule against reflective loss may be found in a passage in Lord Bingham's judgment in *Johnson*, the full text of which is set out below.

> 1) Where a company suffers loss caused by a breach of duty owed to it, only the company may sue in respect of that loss. No action lies at the suit of a shareholder suing in that capacity and no other to make good a diminution in the value of the shareholder's shareholding where that merely reflects the loss suffered by the company. A claim will not lie by a shareholder to make good a loss which would be made good if the company's assets were replenished through action against the party responsible for the loss, even if the company, acting through its constitutional organs, has declined or failed to make good that loss. So much is clear from *Prudential*, particularly at pages 222-3, *Heron International*, particularly at pages 261-2, *George Fischer*, particularly at pages 266 and 270-271, *Gerber* and *Stein v. Blake*, particularly at pages 726-729.

> 2) Where a company suffers loss but has no cause of action to sue to recover that loss, the shareholder in the company may sue in respect of it (if the shareholder has a cause of action to do so), even though the loss is a diminution in the value of the shareholding. This is supported by *Lee v. Sheard*, at pages 195-6, *George Fischer* and *Gerber*.

> 3) Where a company suffers loss caused by a breach of duty to it, and a shareholder suffers a loss separate and distinct from that suffered by the company caused by breach of a duty independently owed to the shareholder, each may sue to recover the loss caused to it by breach of the duty owed to it but neither may recover loss caused to the other by breach of the duty owed to that other. I take this to be the effect of *Lee v. Sheard*, at pages 195-6, *Heron International*, particularly at page 262, *R. P. Howard*, particularly at page 123, *Gerber* and *Stein v. Blake*, particularly at page 726. I do not think the observations of Leggatt L.J. in *Barings* at p. 435B and of the Court of Appeal of New Zealand in *Christensen v. Scott* at page 280, lines 25-35, can be reconciled with this statement of principle.[934]

859. *Johnson* also explained that the rationale for the rule against reflective loss was twofold: first, it precluded the prospect of double recovery and second, it protected the interests of the creditors and other shareholders (if any) of the company. In the words of Lord Millett:

> If the shareholder is allowed to recover in respect of such loss, then either there will be double recovery at the expense of the defendant or the shareholder will recover at the expense of the company and its creditors and other shareholders. Neither course can be permitted. This is a matter of principle; there is no discretion involved. Justice to the defendant requires the exclusion of one claim or the other; protection of the interests of the company's creditors requires that it is the company which is allowed to recover to the exclusion of the shareholder.[935]

860. The upshot of the above is that, under English law today, a shareholder is precluded from pursuing its cause of action to recover its loss if (a) the company (in which the shareholder holds shares) has its own cause of action ("**Criterion A**") and (b) the company's cause of action has resulted in loss to the company which reflect the shareholder's loss ("**Criterion B**"). The test for Criterion B is whether or not the

---

[934] *Johnson v Gore Wood & Co* [2002] 2 AC 1, 35-36 (HL).
[935] *Johnson v Gore Wood & Co* [2002] 2 AC 1, 62 (HL).

shareholder's loss would be made good if the company were to enforce its own rights against the responsible party.

861.     The Tribunal notes that Vale (through its counsel, Mr Jonathan Kelly) accepted a formulation which is identical in substance to this restatement as an accurate summary of the rule against reflective loss:

> What Lord Bingham -- and I can give you a summary of what Lord Bingham says in the Johnson case. I am sure the Tribunal will be familiar with it, but for the record, the reflective loss principle is that a shareholder in a company can't bring a claim for loss where (i) the company itself has a claim, (ii) all loss to the shareholder is caused by the wrong done to the company and, (iii) all of the shareholders' loss would be made good if the company's assets were replenished through action against the party responsible.[936]

## C.     Was the burden on BSGR to raise the issue of reflective loss?

862.     While BSGR raised the issue of Vale's ability to recover the costs incurred by Vale International in relation to the Swiss employee provided to VBG, it is clear from the written submissions that BSGR did not raise the issue of reflective loss more generally, and did not specifically plead that this rule prevents Vale from recovering the Initial Consideration, the Outstanding Loan Amount or the Feasibility Study Funding.

863.     When the Tribunal raised the issue of reflective loss at the February 2017 Hearing and engaged with Counsel for Vale on the issue, Counsel for Vale submitted that the burden fell on BSGR to raise the issue and it had not done so (at least apart from the **USD 1,097,805**). Counsel for Vale said:

> One might expect [...] that if BSGR were going to raise such an issue, then they would have raised it. There are a series of cases, Johnson v Gore Wood is the leading House of Lords case; Prudential Assurance is a Court of Appeal case and there have been subsequent cases on reflective loss, none of which are in this record or one of which have ever been raised by BSGR, which is why I say the Tribunal reference to reflective loss, on Monday, was the first time -- to our knowledge -- those words have been used in this arbitration.

> [...]

> The second point -- which I alluded to earlier in my submissions -- is that the onus is on the defendant to raise this as a defence.

> Now, we would say, even accepting, Mr Chairman, your description, for these purposes, of the issue as being on the table, that is very far away from BSGR having raised a defence.[937]

864.     The English Court of Appeal in *Shaker v Al-Bedrawi* [2002] EWCA Civ 1452 ("*Shaker*") supports Vale's position. In that case, the Court held that the burden lay on the defendant to show that the rule against reflective loss applied to bar the plaintiff's *prima facie* claim. Peter Gibson LJ for the Court stated:

> As the Prudential principle is an exclusionary rule denying a claimant what otherwise would be his right to sue, the onus must be on the defendants to establish its applicability.[938]

---

[936] Transcript, Merits Hearing, Day 3, p. 23, lines 8-17.
[937] Transcript, Merits Hearing, Day 3, p. 19, lines 4-16 and p. 27, lines 3-9.

865.   This reasoning is consistent with *Barnett v Creggy* [2014] EWHC 3080 (Ch), in which David Richards J barred the defendant from raising the rule against reflective loss because it had not been pleaded and was only raised after evidence had been called.

866.   In the present case, the Tribunal is satisfied that BSGR has properly raised the issue of reflective loss in relation to the **USD 1,097,805** claimed for the Swiss employee costs, but has not done so in relation to the other heads of damages claimed. BSGR chose not to raise a reflective loss argument in relation to other amounts claimed by Vale despite the Tribunal raising the issue during the February 2017 Hearing.

867.   The Tribunal accepts Vale's submission, which is consistent with the *Shaker* case, that the onus is on BSGR to raise the rule against reflective loss and to prove the application of the doctrine to the facts. As noted above, BSGR had an opportunity to raise the issue had it wished to do so – both before and after the February 2017 Hearing. BSGR chose not to raise the issue of reflective loss other than in relation to the employee costs.

868.   The above however is not the end of the matter. Irrespective of a Tribunal's power to raise legal arguments on its own motion or to expand upon a legal argument raised by a party provided due process is respected, the Tribunal recalls that BSGR by and large chose not to participate in the present arbitration from the September 2016 Hearing onwards. The Tribunal considers that it was wholly appropriate, given such default, for the Tribunal to raise the issue of reflective loss at the February 2017 Hearing, as a defence of reflective loss follows from the basic rule of company law regarding separate legal personality. Given BSGR's default, including the fact that it failed to respond in writing to the reflective loss discussion at the February 2017 Hearing although it had received the hearing transcripts, the Tribunal inclines to the view that BSGR, save for the costs of the Swiss employee, has waived its right to invoke the principle or is estopped from raising it. However, the Tribunal will, out of an abundance of caution, examine the reflective loss issue.

869.   Reflective loss, however, cannot be applied in an isolated manner and needs to be tested against the specific circumstances of the case and the contractual arrangements applicable between the parties. As the Tribunal will discuss in the next section, a share purchase agreement concluded between the Parties on 13 March 2015 sheds new light on the applicability of the rule against reflective loss and implies that Vale's prayers for relief in this arbitration are not barred by the application of the rule.

**D.   Application of the Rule Against Reflective Loss to the Facts – the Effect of the Share Purchase Deed of 13 March 2015 on any Application of the Rule Against Reflective Loss**

870.   In the light of the conclusion above, the Tribunal now considers whether any damages or costs can be claimed by Vale even though these were incurred by Vale International or any other Vale subsidiary.

---

[938] *Shaker v Al-Bedrawi* [2002] EWCA Civ 1452 [83].

871.    As noted in paragraph 860 above, there are two criteria for the rule against reflective loss which must be made out for the doctrine to prevent recovery of a loss by a parent company. The first is that the subsidiary must have a cause of action against the defendant available to it to recover that loss. With regard to the costs of **USD 1,097,805** incurred by Vale International in relation to its Swiss-based employee, the Tribunal finds that there is no evidence that Vale International has any cause of action to claim back this sum from BSGR or VBG. The Swiss employee was provided to VBG in satisfaction of Vale's obligations under the Joint Venture Agreements. Vale procured the secondment of the employee so as to comply with its joint venture obligations under the Framework Agreement. The claim for these costs forms part of the damages claim following rescission (or termination) of the Framework Agreement. There is no evidence that Vale International has separate arrangements or any agreement or relationship with BSGR or VBG which could provide a direct cause of action of Vale International to pursue to recover the losses related to that employee. Therefore, this first criterion has not been satisfied, and the rule against reflective loss does not operate to bar recovery of the employee-related costs by Vale.

872.    The lack of cause of action regarding the employee costs can be contrasted with the cause of action that Vale International might have against VBG in relation to the Outstanding Loan Amount. Although the Tribunal has found that BSGR failed to plead reflective loss in relation the other heads to loss claimed by Vale (including the Outstanding Loan Amount), the Tribunal observes that the Parties have (in any event) entered into an agreement that preserves Vale's right to pursue these claims. The specifics of that agreement are as follows.

872.1.    Vale, BSGR and VBG Guernsey entered into a Share Purchase Deed on 13 March 2015,[939] under which Vale agreed to procure Vale GmbH to sell its shares in VBG Guernsey (51% participation) to BSGR for USD 1. Under Clause 6.1 of the Share Purchase Deed, the Parties and VBG Guernsey terminated the Joint Venture Agreements, subject to Vale's right to pursue its claims in this arbitration. Clause 6.2 of the Share Purchase Deed specifically preserves Vale's right to pursue claims against BSGR in this arbitration for:

872.1.1.    the "VBG Debt" (defined as the loans made by Vale International to VBG subject to the promissory notes, including any claim for damages based on the loss caused by the non-repayment of VBG Debt and interest thereon);

872.1.2.    the "Vale Expenditures", defined as the aggregate of all expenditures made by Vale in connection with the activities and assets of VBG; and

872.1.3.    the payment made by Vale to BSGR pursuant to the Joint Venture Agreements.

872.2.    Clause 6.3 of the Share Purchase Deed states: "Vale and its Affiliates shall not be entitled to make any claim whatsoever against BSGR and/or any of its Affiliates in respect of the VBG Debt other than as part of the LCIA Arbitration, in which case the reservation of rights set forth in Clause 6.2 shall be applicable."

---

[939] Share Purchase Deed between Vale, BSGR and VBG Guernsey dated 13 March 2015, **C-487**.

872.3.   Also on 13 March 2015, Vale International and the four VBG companies that had issued promissory notes to Vale International entered into an Amendment Agreement so as to amend the terms of the Promissory Notes. As explained in paragraph 848.3 above, these Promissory Notes were issued by various VBG companies to Vale International in relation to the loans that form a significant portion to Vale's damages claim in this arbitration. The Amendment Agreement acknowledges Vale's claim against BSGR for the VBG Debt and preserves that claim in Clause 6.3 as follows.

(a)   The provisions of this Deed shall not affect, shall be without prejudice to and shall be without restriction on the assertion or prosecution of any claims or counter-claims that have been or may in the future be made in the LCIA Arbitration between Vale and BSGR and in particular, shall not preclude Vale from making any claim in the LCIA Arbitration, including but not limited to any claim based on the VBG Debt (including without limitation any claim for damages based on the loss caused by non-repayment of the VBG Debt and interest thereon that has accrued through 29 April 2014 or that would have accrued thereafter).

(b)   For the avoidance of doubt, following completion of the Share Transfer, and the execution of this Deed, none of the fact or content of the parties' negotiations, the Share Transfer, the termination of the Joint Venture Agreement and Shareholder's Agreement, nor the execution of this Deed shall be used as a defence (whether by way of an alleged affirmation, waiver, release or otherwise) by BSGR to any claim against BSGR and its Affiliates in the LCIA Arbitration or to bar, limit or affect in any way any such claim in the LCIA Arbitration (including, without limitation any claim for damages, rescission of the Joint Venture Agreement or Shareholders' Agreement or any other claim whatsoever) and Vale and its Affiliates shall not be entitled to make any claim whatsoever against BSGR and/or any of its Affiliates in respect of the VBG Debt other than (i) as part of the LCIA Arbitration, in which case the reservation of rights set forth in the preceding paragraph shall be applicable, or (ii) based on the terms of this Deed or the Amended Promissory Notes.[940]

873.   The Tribunal observes that these Agreements were entered into after the commencement of this Arbitration and after Vale had filed its Statement of Case which set out the damages claimed, but before BSGR filed its Statement of Defence. The Agreements acknowledge Vale's right to pursue the damages claimed in this arbitration, despite the fact that some of the funds were provided by Vale International. The damages in this arbitration include – as is specifically acknowledged in these 2015 Agreements – the VBG Debt (or Outstanding Loan Amount, as defined in this Award) which makes up around half of Vale's damages claim. These Agreements did not limit claims in this arbitration to the VBG Debt as is clear from the wording "including but not limited to". Therefore, claims related to costs made by Vale's subsidiaries may also be considered in this arbitration. Section 6.1 of the Framework Agreement required Vale to fund (or procure one of its subsidiaries to fund) a feasibility study in respect of Simandou Blocks 1 and 2. Vale claims this was ultimately funded by Vale GmbH and Vale International in the

---

[940] Amendment Agreement relating to Certain Promissory Notes Issued by the VBG Subsidiaries dated 13 March 2015, Clause 6.3, **C-521**.

amount of USD 85,365,652 and seeks reimbursement, which has not been contested by BSGR. These costs may thus be considered Vale Expenditures without violating the rule against reflective loss.

874.   BSGR's decision not to pursue a reflective loss argument aside from in relation to the Swiss employee costs is likely explained by these Agreements, which expressly allow Vale to pursue these heads of loss in this arbitration. The only decision left for the Tribunal is thus whether the costs for the Swiss employee qualify as Vale Expenditures. BSGR has contested only these costs on account of reflective loss while the question here is whether there is a contractual arrangement under which Vale could procure services from a subsidiary. As the Framework Agreement contained many provisions regarding the performance of the Parties' obligations thereunder, including participation of their respective subsidiaries, as already indicated above regarding the Feasibility Study but also as demonstrated by Section 7 providing that each of BSGR and Vale shall, and shall procure that its Affiliates shall, co-operate in good faith to promote the success of BSGR Guinea and develop the Project in the most efficient and expeditious manner possible, the Tribunal also holds that the expenses for the Swiss employee are not barred by the rule against reflective loss. It also notes that this issue is not one of jurisdiction as Vale is not claiming on behalf of Vale International as a non-party to the arbitration but is claiming its own loss which is a substantive issue.

## E.   Tribunal's Conclusion

875.   The Tribunal concludes as follows.

875.1.   BSGR had a duty to plead the issue of reflective loss if it wished to rely on that defence to answer to any part of Vale's claims.

875.2.   BSGR raised the issue only in relation to the Swiss employee costs.

875.3.   The rule against reflective loss does not prevent Vale from claiming the Swiss employee costs, as the Framework Agreement provided for the participation of subsidiaries in the conduct of the business of the joint venture.

875.4.   In any event, BSGR has directly acknowledged the ability of Vale to pursue losses incurred by Vale international or Vale GmbH in this arbitration – including the Outstanding Loan Amount and Vale Expenditures by entering into the Share Purchase Deed of 13 March 2015.

876.   The Tribunal finds that the rule against reflective loss is not applicable in the present circumstances and now turns to consider the relief requested by Vale.

## X.    REMEDIES

877. The Tribunal concluded at the end of Section IX that Vale is not precluded by the rule against reflective loss to pursue any of its heads of damages. The next task for the Tribunal is to determine the remedies to which Vale is entitled. But before the Tribunal addresses this matter, there is an antecedent question of cumulative remedies which was raised by BSGR in its Statement of Defence. This is an important issue which warrants the Tribunal's attention before considering each remedy claimed by Vale.

### A.    Cumulative remedies

#### 1.    Chronological history of pleadings

878. In its Request for Arbitration, Vale requested the Tribunal to grant the following relief.

> Relief for Fraudulent Misrepresentation
> a.    Rescission of the Framework Agreement and the Shareholders' Agreement;
> b.    Damages in the sum of approximately $1.25 billion for fraudulent misrepresentation in respect of the misrepresentations set forth in Section III.C, above, of whatever nature in an amount to be determined in the course of this arbitration, as well as interest on such sum at an appropriate rate;
>
> and/or
>
> Relief for Frustration
> c.    A declaration that the Framework Agreement and Shareholders' Agreement are discharged by frustration;
> d.    Recovery of monies paid by Vale under the Framework Agreement and Shareholders' Agreement, as well as interest on such sum at an appropriate rate;
>
> and/or
>
> Relief for Breach of Warranty
> e.    An award of damages for breach of contract in respect of all losses and costs caused to Vale in respect of the breaches set forth in Section III.D, above, of whatever nature in an amount to be determined in the course of this arbitration, as well as interest on such sum at an appropriate rate;[941]

879. In its Statement of Case, Vale made the same requests, albeit in a slightly different order.

> Relief for fraudulent misrepresentation
> a.    Rescission of the Framework Agreement and the Shareholders' Agreement; and
> b.    Damages in the sum of approximately USD 1.45 billion for fraudulent misrepresentation in respect of the misrepresentations, of whatever nature in an amount to be determined in the course of this arbitration, as well as interest on such sum at an appropriate rate; or
>
> Relief for breach of warranty
> c.    An award of damages for breach of contract in respect of all losses and costs caused to Vale in respect of the breaches, of approximately USD 1.45 billion, as well as interest on such sum at an appropriate rate; or
>
> Relief for frustration

---

[941] Vale's Request for Arbitration, paragraph 49.

d. A declaration that the Framework Agreement and Shareholders' Agreement are discharged by frustration; and

e. Recovery of approximately USD 1.45 billion paid by Vale under the Framework Agreement and Shareholders' Agreement, as well as interest on such sum at an appropriate rate.[942]

880. In its Statement of Defence, BSGR argued that "[a] claimant cannot obtain rescission or an award of damages in deceit and an award of damages for breach of contract: he must elect."[943] To support BSGR's argument, BSGR cited two excerpts from *Misrepresentation, Mistake and Non-Disclosure*.

880.1. Paragraph 5-04 states: "it will generally not be possible for [a claimant] to obtain an award of damages in deceit concurrently with an award of damages for breach of contract: although his claim may be made in the alternative, in the end he must elect which basis of loss to assert."[944]

880.2. Paragraph 2-13 states: "Rescission cannot be awarded with any remedy which presupposes that the contract remains in place beyond its formation: damages for breach of contract cannot therefore be awarded if the contract is rescinded, since the obligation to pay damages under the contract requires the continued existence of the contract".[945]

881. In its Statement of Reply, Vale responded that:

> Contrary to BSGR's suggestion, it does not seek cumulative remedies, but remedies that are alternative to each other. BSGR's assertion that 'Vale cannot obtain rescission or an award of damages in deceit and an award of damages for breach of contract' is therefore wholly misguided. Vale's entitlement to be awarded lost expenditures totalling USD 1.45 billion, plus interest, arises under each and every one of the causes of actions Vale asserts in these proceedings. It is therefore only to the extent that Vale is not awarded the USD 1.45 billion it claims under the tort of deceit that Vale claims USD 1.45 billion as a result of BSGR's breach of warranty.[946]

882. Vale's prayers for relief in its Statement of Reply are substantially in the same form as its prayers in its Statement of Case.[947] As indicated in paragraph 296 above, this is also how Vale explained its prayers for relief at the September 2016 Hearing in answer to a question of the Chairman of the Tribunal.

## 2.    Tribunal's decision

883. The Tribunal agrees with BSGR that the remedies of rescission and damages for deceit on the one hand and the remedy of damages for breach of warranties on the other hand are alternative and inconsistent remedies which cannot both be awarded to Vale, even if Vale limits its claim under breach of warranties to those sums which it is unable to claim

---

[942] Vale's Statement of Case, paragraph 333.

[943] Paragraph 254 of BSGR's Statement of Defence

[944] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [5-04], **RL-37**.

[945] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [2-13], **RL-37**.

[946] Vale's Statement of Reply, paragraph 1022. Vale's Pre-Hearing Written Submissions, paragraph 379.

[947] Vale's Statement of Reply, paragraph 1097.

under deceit. To understand why this is the case, there needs to be a clear understanding of the concept of rescission and the distinct measures of damages which apply to deceit and contractual breaches.

884.    Rescission refers to the process of extinguishing the contract *ab initio* so as to impose the obligation on each party to make restitution as regards assets which he had received from the other party. The objective of rescission is to restore the parties to the *status quo ante*, i.e. their original positions before their entering into the contract as regards their rights and obligations under the contract. Once a contract is rescinded, the contract is treated as never having come into existence. The concept of rescission is further elaborated on in paragraphs 896–899 below.

885.    The function of damages for fraudulent misrepresentation is to compensate the claimant for his *reliance loss*. In other words, the function is to place the claimant in the position he would have been in had the defendant not made the fraudulent misrepresentation in the first place, and had the claimant not entered into the contract in reliance on that fraudulent misrepresentation. For this simple reason, the primary method of measuring damages for fraudulent misrepresentation is to calculate the total sum of the claimant's expenditures which he incurred *in reliance on the fraudulent representation*. The measure of damages in deceit is further elaborated on in paragraphs 926–928 below.

886.    The function of damages for contractual breaches is to compensate the claimant for his *expectation loss*. Put simply, the function is to place the claimant in the position he would have been in *had the contract been performed*. In line with this function, English law permits the claimant to calculate damages for breach of contract in one of two primary ways. The first is to calculate the value of the benefits which the claimant would have gained had the contractual term in question been performed. This is a true measurement of the claimant's expectation loss. The second is to calculate the expenditures incurred by the claimant in reliance on his expectation of the defendant's fulfilment of the contractual term in question, *subject to the limit that* the claimant is not allowed to claim expenditures beyond such value which would *place the claimant in a better position than if the contract had been performed*. This is a measurement of the claimant's reliance loss, which the law permits the claimant to claim in acknowledgement of the evidentiary difficulties which claimants sometimes face in proving expectation losses, but on which the law imposes the limitation that the award cannot place the claimant in a better position than if the contract had been performed, so as to uphold the basic principle that contractual damages are purposed to compensate expectation losses and nothing more.

887.    The consequence of the above is twofold.

887.1.    It is not possible to award rescission on the one hand and contractual damages on the other. The Tribunal agrees with Cartwright's explanation that "Rescission cannot be awarded with any remedy which presupposes that the contract remains in place beyond its formation: damages for breach of contract cannot therefore be awarded if the contract is rescinded, since the obligation to pay damages under the contract requires the continued existence of the contract".[948]

---

[948] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [2-13], **RL-37**.

887.2.   Even if rescission is not awarded, it is not possible to award damages for deceit and then award contractual damages for those parts of the claim which were unsuccessful under deceit. Cartwright explains that "Damages on inconsistent measures cannot normally be awarded together, and so an award of both contract measure and tort measure damages would be impossible, since it would give the claimant both his financial equivalent of performance, and at the same time a financial release from the transaction which he entered in reliance on the misrepresentation."[949] This is why the House of Lords cited *Treitel* in *Smith New Court Securities Ltd. v Citibank N.A.* [1997] AC 254, 282, who advised that a claimant should pursue the remedy he viewed to be most advantageous to him financially, which in turn depended on whether or not the bargain was good: "If the plaintiff's bargain would have been a bad one, even on the assumption that the representation was true, he will do best under the tortious measure. If, on the assumption that the representation was true, his bargain would have been a good one, he will do best under the first contractual measure (under which he may recover something even if the actual value of what he has recovered is greater than the price)."[950]

888.   The situation is different in relation to rescission on the one hand and damages for deceit on the other. Here, the two remedies are consistent, because they both function to put the claimant in the position he would have been in had he not entered into the contract. In fact, it is quite common for claimants to seek rescission and to supplement that with damages to cover all other wasted expenditures which would not be covered by rescission. The Parties acknowledge that a successful claim in deceit entitles the claimant to rescission, damages or both.[951]

889.   Vale is no doubt perfectly entitled to present one contractual cause of action and another tortious cause of action and to state its order of preference, so that if one cause of action fails, the claimant will still have another cause of action to fall back on which the Tribunal will have the opportunity to determine. But if it turns out that both causes of action succeed, Vale will not be entitled to ask the Tribunal to award damages for both causes of action in full, because that will give rise to double recovery. Even if Vale only seeks contractual damages in respect of those remaining parts of the claim which are not successful under the tortious cause of action, Vale is not entitled to do so because, even though there is no double recovery, the remedies are still inconsistent in view of the fact that the function of damages for contract and damages for deceit are fundamentally at odds with each other, one being to put the claimant in the position he would have been in had the contract been performed, and another to put the claimant in the position he would have been in had the tort not been committed and the claimant not entered into the contract. For this reason, Vale is obliged to elect between the remedies for tort and contract. It cannot split its claim to ask for both.

890.   This leads the Tribunal to the next question: has Vale made that election in this arbitration? Having perused the Parties' pleadings and submissions, the Tribunal finds that the answer is yes. Vale has consistently taken the position in this arbitration that it is

---

[949] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [2-13], **RL-37**.
[950] *Smith New Court Securities Ltd. v Citibank N.A.* [1997] AC 254, 282, **RL-126**.
[951] Vale's Statement of Case, paragraphs 287 – 293; BSGR's Statement of Defence, paragraphs 254 – 255.

seeking rescission and damages for tort as its primary claim in its prayers for relief. When BSGR pointed out in its Statement of Defence that "[a] claimant cannot obtain rescission or an award of damages in deceit and an award of damages for breach of contract",[952] Vale clarified that it is "only to the extent that Vale is not awarded the USD 1.45 billion it claims under the tort of deceit that Vale claims USD 1.45 billion as a result of BSGR's breach of warranty."[953] It is therefore clear that Vale has elected the remedies of rescission and damages for deceit as its primary prayer for relief as confirmed in paragraph 296 above.

891.   In conclusion, the remedies for fraudulent misrepresentation on the one hand and the remedy of damages for breach of contract on the other hand are inconsistent and it will not be possible for Vale to seek both remedies. This is even if Vale limits its claim to contractual damages to sums which Vale is not successful in claiming under deceit. Vale is required to make an election, and a review of Vale's pleadings shows that Vale has consistently elected the option of remedies for deceit as its primary prayer for relief. The Tribunal will therefore constrain its analysis to the remedies for deceit. It has not been requested and does not see a reason to analyse the remedies for breach of warranties.

## B.   Remedies for Fraudulent Misrepresentation

892.   A successful claim for fraudulent misrepresentation will entitle the claimant to (1) rescission, (2) damages or (3) both. The Parties are agreed that English law entitles the claimant to any of these three options.[954]

893.   In this arbitration, Vale has elected the third option by seeking rescission and damages.

893.1.   Vale seeks rescission of the Joint Venture Agreements.[955] Vale claims rescission will also enable Vale to "obtain from BSGR restitution of the disbursements and expenditures made thereunder, totalling [**USD 1,446,618,523**]".[956]

893.2.   Vale seeks damages for losses suffered as a result of BSGR's deceit.[957] According to Vale's quantification, Vale has suffered and is entitled to damages of **USD 1,446,618,523**.

894.   To recall, the claimed sum of **USD 1,446,618,523** (which Vale seeks under rescission and damages in the alternative) consists of:

894.1.   the Initial Consideration paid by Vale International to BSGR on 30 April 2010, totalling **USD 500,000,000**;[958]

894.2.   the Outstanding Loan Amount of the Loan which Vale International lent to BSGR Guinea under the promissory notes from 2010 to 2013, totalling **USD**

---

[952] BSGR's Statement of Defence, paragraph 254.
[953] Vale's Statement of Reply, paragraph 1022.
[954] Vale's Statement of Case, paragraphs 287–293; BSGR's Statement of Defence, paragraphs 254–255.
[955] Vale's Statement of Case, paragraphs 287–289.
[956] Vale's Statement of Reply, paragraph 941; Vale's Pre-Hearing Written Submissions, paragraph 325.
[957] Vale's Statement of Case, paragraphs 290–293.
[958] Statement of Reply, paragraph 935(a); Oxera Report, paragraphs 52-56.

**780,734,781** (comprising the outstanding principal sum of USD 581,197,104 and the interest sum of USD 199,537,678 accrued up to 29 April 2014);

894.3.  the Feasibility Study Funding, i.e. the expenditures incurred by Vale International and Vale GmbH[959] in connection with the preparation of the Simandou Feasibility Study from 2010 to 2015, totalling **USD 85,365,652;**[960] and

894.4.  Vale's Internal Costs, i.e. the personnel, travel, services, and other costs incurred by Vale to support the joint venture's operations outside of Guinea from 2010 to 2013, totalling **USD 80,518,090.**[961]

895.  Vale's prayers for rescission and damages will be considered in turn.

## 1.  Rescission

### General principles

896.  The Tribunal begins its analysis by laying down the concept of rescission and the general principles that govern rescission, as informed by the authorities submitted by the Parties, so as to provide the context within which the Parties' arguments are taking place.

897.  If the defect is fraudulent misrepresentation which affects the innocent party's consent and thus the formation of the contract, the defect entitles the innocent party to extinguish the contract ab initio, obliging each party to return property which it had received from the other party. This is known as rescission, and its purpose is to restore the parties to the status quo ante as regards the rights and obligations which were created by the contract. By contrast, if the defect only relates to the performance of the contract, such as breach of contract or frustration, then the victim party is only entitled to terminate de futuro, so that the parties are only absolved of their unaccrued, executory obligations under the contract, and rights and obligations which have unconditionally accrued prior to termination remain enforceable. This is known as termination, and it is a distinct concept from rescission.

898.  Within the field of rescission, there are two forms of rescission: common law and equitable rescission. The chief distinction between the two forms is the process by which rescission takes place. Common law rescission takes place upon the claimant's election to rescind. The role of the tribunal would only be to pronounce upon the effectiveness of that election and to give effect to its consequences by awarding judgment on claims and cross-claims for the restitution of benefits that have passed under the contract. By contrast, equitable rescission takes place by way of a tribunal's order. A party would ask the tribunal to order rescission, and (if satisfied) the tribunal would make the necessary orders to implement the rescission, and typically on condition that the requesting party make counter restitution for any benefits he received from the other party under the contract.

899.  A common bar that applies to both forms of rescission is "restitutio in integrum impossible", the burden of proof of which falls on the defendant. However, the way in

---

[959] Transcript, Merits Hearing, Day 1, p. 201, lines 24-25 and p. 202, lines 1–4; Transcript, Merits Hearing, Day 3, p. 86, lines 3–18 and p. 91, lines 6–13.
[960] Statement of Reply, paragraph 935(c); Oxera Report, paragraph 8.
[961] Statement of Case, paragraph 128; Oxera Report, paragraphs 104-130.

which this bar is applied differs between the two forms. Common law rescission requires it to be possible for the parties to be restored to the exact same position they were in before the contract was made, otherwise the claimant's election to rescind is ineffective. By contrast, equity's concern is to achieve a practically just result, so equitable rescission only requires it to be possible to place the parties in as good a position as they were in before (i.e. substantial *restitutio in integrum*). The tribunal is empowered to achieve this result by directing accounts to be taken, balances to be struck and adjustments to be made, all of which are impossible at common law. For example, deterioration of an asset which the claimant had received from the defendant would bar common law rescission but not equitable rescission because the tribunal is permitted to order compensation by allowance. An equitable allowance may be accorded to the defendant for its work and skill if the tribunal is of the view that this would do substantial justice. This difference in application means in practice that the bar of *restitutio in integrum* impossible is easier to establish for common law rescission than for equitable rescission.

### *Vale's claim*

900.    Since its Request for Arbitration, Vale has consistently requested the Tribunal to "grant" rescission: see paragraph 878-882 of this Award.

901.    However, as noted above, after Vale filed its Statement of Case on 30 January 2015, an unusual turn of events occurred on 13 March 2015 when this arbitration was active, and which is relevant to the issue of rescission. Vale, BSGR and VBG Guernsey entered into a Share Purchase Deed[962] under which they agreed to two important matters.

902.    First, they agreed that BSGR would "purchase" the 51% shares in VBG Guernsey for USD 1.

    902.1.    Clause 2 provides: "At Completion, on the terms and subject to the conditions of this Deed, Vale shall procure the sale of the Shares by Vale GmbH, and BSGR shall buy the Shares free from all Encumbrances."

    902.2.    Clause 3 provides: "The purchase price for the Shares and for the mutual waivers referred to herein is USD 1.00, which Vale acknowledges has been paid by BSGR in cash on the date of this Deed."

    902.3.    Clause 4 contains the usual terms for completion, including the delivery of a duly executed instrument of transfer for the shares and payment of USD 1.00 to Vale in cash on completion date.

903.    Second, they agreed to "terminate" the Joint Venture Agreements, subject to a number of conditions. The full text of Clause 6 is set out below.

    6.    **CLAIMS BETWEEN VALE AND BSGR**

    **Termination of Agreements**

    6.1    Subject to Clause 6.2 and 6.3, the Vale Investment Agreements[963] (and all rights and obligations thereunder, including, for the avoidance of doubt,

---

[962] Share Purchase Deed between Vale, BSGR and VBG Guernsey dated 13 March 2015, **C-487**.
[963] This refers to the Framework Agreement and the SHA: Section 1.1 of the Share Purchase Deed.

any rights which are stated as surviving termination) shall terminate with immediate effect upon Completion; provided, however, that (as contemplated by Section 6.2) nothing in this Section 6.1 shall be deemed to affect any claims between Vale and BSGR that have been or may be brought in the LCIA Arbitration in relation to events that occurred prior to the Completion Date.

**Claims between Vale and BSGR**

6.2     The provisions of the Vale Exit Agreements[964] shall not affect, shall be without prejudice to and shall be without restriction on the assertion or prosecution of any claims or counter-claims that have been or may in the future be made in the LCIA Arbitration between Vale and BSGR and in particular, shall not preclude Vale from making any claim in the LCIA Arbitration, including but not limited to any claim based on:

(a)     the VBG Debt (including any claim for damages based on the loss caused by the non-repayment of VBG Debt and interest thereon that has accrued through 29 April 2014 or that would have, notwithstanding the Vale Debt Amendment Agreement, accrued thereafter);

(b)     the Vale Expenditures; and

(c)     the payment made by Vale to BSGR pursuant to the Vale Investment Agreements.[965]

6.3     For the avoidance of doubt, following Completion: (i) none of the fact or content of the parties' negotiations, nor the transactions contemplated by the Vale Exit Agreements shall be used as a defence (whether by way of an alleged affirmation, waiver, release or otherwise) by BSGR to any claim against BSGR and its Affiliates in the LCIA Arbitration or to bar, limit or affect in any way any such claim in the LCIA Arbitration (including, without limitation any claim for damages, rescission of the Vale Investment Agreements or any other claim whatsoever); and (ii) Vale and its Affiliates shall not be entitled to make any claim whatsoever against BSGR and/or any of its Affiliates in respect of the VBG Debt other than as part of the LCIA Arbitration, in which case the reservation of rights set forth in Clause 6.2 shall be applicable, or based on the terms of the Vale Debt Amendment Agreement.

904.    At the February 2017 Hearing, the following exchange took place on Day 1.

MR HWANG:      I am not sure who should answer this, but Vale is claiming damages -- sorry. First of all, under the misrepresentation claim, Vale is claiming that the relevant agreements be rescinded; does that mean to say it has not been rescinded so far?

MR KELLY:        It is slightly complicated. The position was –

MR HWANG:      It is not really explained in your Statement of Claim, so I am a bit puzzled by it.

MR KELLY:        Yes, the position -- because in the Statement of Claim they had not been rescinded as at that date. What subsequently

---

[964] This refers to the Share Purchase Deed (**C-487**) and the Vale Debt Amendment Agreement (**C-521**): Section 1.1 of the Share Purchase Deed.
[965] Share Purchase Deed, Clauses 6.1 –6.3, **C-487**.

|  |  |
|---|---|
|  | happened was that Vale returned the 51% shareholding to BSGR for a nominal consideration in March 2015, I think it was. 29th March 2015. At that point, the parties agreed that transaction would be entirely without prejudice to their positions in this arbitration. |
| MR HWANG: | Except then there is no rescission, is there, because the passing of Title has been reversed? |
| MR KELLY: | Well, that's why we disagree with their proposition that you couldn't be restored to your previous positions, because we say that's exactly what has happened. The rescission goes to whether the contract still had any force prior to that transaction, because the transaction, as I say, was without prejudice to that. |
| CHAIRMAN: | Are you still seeking a declaration of rescission? |
| MR KELLY: | **Well, what we do seek is relief to the extent that they continue to claim it from any further obligations under the transaction documents and so if there's a residual life in those documents -- in those contracts from before March 2015, we seek.** |
| MR HWANG: | But do you have an amended statement of relief somewhere? |
| MR KELLY: | We don't, but we can certainly -- I think we have covered or alluded to -- |
| CHAIRMAN: | What does your reply say, at the end of the prayer for relief? |
| MR KELLY: | I think it is covered in our pre-hearing brief from recollection, but I can check that. |
| MR HWANG: | Moving on, then your contractual claim is just a pure claim for damages, as a result of the breach of warranty. Again, you don't claim that the contract has been repudiated and therefore terminated.   So   neither   have   you   rescinded   the misrepresentation, nor have you terminated for breach. So, theoretically, you are having an existing contract. All you are asking for is damages. When you calculate damages and the contract is still alive, you know, it is calculated on a different basis. So we need to know whether or not your client's position is that the contract, for whatever reason, is now at an end. Therefore you are totalling up your entire loss, as opposed to the losses suffered so far without prejudice to any further claims for losses. |
| MR KELLY: | The former is our position. The contract is dead. |
| MR HWANG: | You have to rationalise that, I think, for us. On what basis do you say the contract has come to an end? |
| CHAIRMAN: | Doesn't the reply say in case of fraudulent misrepresentation, you can request either rescission or damages or both, and that you are seeking both. |
| MR KELLY: | Yes, it does. |
| MR HWANG: | Yes, but -- |

CHAIRMAN:        You are seeking declaration of rescission and damages.

MR HWANG:        For misrepresentation is either fraud or nothing; right? You are not making any intermediate claim for negligent misrepresentation.

MR KELLY:        Correct.[966]

905.    On Day 3 of the February 2017 Hearing, the following exchange took place:

MR KELLY:        I am just conscious of time, Mr Chairman. I mentioned that I would just like to finish off on rescission. I can put this fairly briefly. There are documents but I don't think I need to trouble the Tribunal with them.

The reason that we claim rescission is that there is a five-year period at present which -- during which the Framework Agreement and the Shareholders' Agreement subsisted. That five-year period went from 30 April 2010 to 29 April 2015.

In 2015 Vale and BSGR agreed to terminate the Shareholders' Agreement and the Framework Agreement. They agreed to do so for their own perfectly sensible, self-interested reasons.

On BSGR's side, BSGR wished to be able to pursue the Government of Guinea, which it needed the Joint Venture company to do in its ICSID arbitration. It could not do so as a 49% shareholder, because Vale did not want to pursue the Government of Guinea.

On Vale's side, **Vale -- for reasons that we would say are obvious -- did not want to be associated with BSGR any longer as a matter of principle and, as a matter of practice, continued to be responsible for all the operating costs and everything you have heard about for as long as it was the 51% shareholder, so the parties agreed to tear up the agreements.** They did so expressly without prejudice to both parties' positions in this arbitration. Perhaps it's an abundance of caution and perhaps BSGR would say, "Well, we are forward-looking. We are not going to go back and worry about that five-year period", but **where that leaves us is with a series of contracts and obligations that, certainly in this arbitration, have been argued to give rise to continuing obligations on the part of Vale, hard obligation in some cases. There's a claim for several hundred million dollars, $680 million I believe, from BSGR in the counterclaim to Vale, which is one of the future payments. Also, claims, as we know, in the counterclaim based on what we would say are softer obligations, such as the provision that requires both parties to promote best interests of VBG and cooperate in good faith.**

**So the reason we seek rescission is because, as we are entitled to under the remedies for fraud, that will be rescission ab initio and we would never want there to be any suggest that there were -- still less there are or may in the future be -- obligations on the part of Vale S.A. under**

---

[966] Transcript, Merits Hearing, Day 1, p. 197, line 2 – p. 199, line 22 (emphasis added).

**the Framework Agreement or Shareholders' Agreement.** I wouldn't propose to say anything --

MR HWANG:  Is there a formal defence from them on this point?

MR KELLY:  Sorry?

MR HWANG:  What is defence of BSGR to the specific relief of rescission?

MR KELLY:  They have two defences. The first defence is that the parties cannot be restored restitutio in integrum. We say that simply does not fly, because what we are doing, and what we have done, is we have given back to them the very same shares that they sold to us. We sold back to them the 51%. They seek to counter that --

MR HWANG:  There is a difference between giving and selling; what is it? Did you give or did you sell?

MR KELLY:  We sold for USD 1. We would have given it back if there had not been a consideration issue underneath, but as it was I think we received a dollar for it -- probably more than it was worth, to be honest. The second point that they make is that they would be unjustifiably worse off as a result of our giving or conveying back to them these shares. We say that also does not fly for the very obvious reason that, under this hypothesis, the reason they are in an unjustifiably worse position -- if they are -- is entirely their own misconduct. Sorry, if I could just finish on that, Dr Hwang. We would not even necessarily say they are in an unjustifiably worse position, because they sold us an asset that was inherently flawed at the time. We are simply returning that asset to them and asking for all our money back.

MR HWANG:  They have not raised the issue of lapse of time?

MR KELLY:  No.[967]

906.    The Tribunal takes the view that it is not the Tribunal's business to inquire into the strategic reasons why Vale has continued seeking rescission after the Share Purchase Deed was concluded on 13 March 2015 which terminated the Framework Agreement and the SHA. The Tribunal takes the position that its only task is to determine whether Vale is entitled to rescission (as requested by Vale) in view of the fact that the Share Purchase Deed did not prejudice Vale's position in the present arbitration and the remedies it was seeking herein.

907.    The Tribunal understands Vale's position to be that it is seeking *equitable* rescission, based on the wording of Vale's pleadings. Vale has repeatedly requested the Tribunal to "grant" rescission and has not asked the Tribunal to declare the effectiveness of any prior election by Vale to rescind the Joint Venture Agreements. On this footing, the Tribunal will apply the principles which are applicable to equitable rescission.

908.    Vale is *prima facie* entitled to equitable rescission because the Tribunal has found that BSGR is liable for fraudulent misrepresentation (which is a ground for equitable rescission). The next question is whether BSGR has satisfied its burden to prove one of

---

[967] Transcript, Merits Hearing, Day 3, p. 38, line 17 -- p. 41, line 24 (emphasis added).

the bars to rescission. In this regard, BSGR argues that the bar of *restitutio in integrum* impossible applies in this case.[968]

909. It has already been noted at paragraph 899 above that the way in which this bar is applied differs between common law rescission and equitable rescission. But insofar as equitable rescission is concerned, it is accepted that there are at least two ways to establish this bar. The first is to show that the asset has been altered to such an extent as to have changed in nature. The second is to show that the defendant would be unjustifiably prejudiced upon rescission. Both of these grounds are now relied upon by BSGR.[969] The Tribunal will deal with each ground in turn.

### *The "alteration of nature of asset" argument*

910. BSGR cites at least three authorities with respect to alteration of nature of assets:

910.1. *Misrepresentation, Mistake and Non-Disclosure*: "The most common circumstances in which the courts have found rescission barred are where restitution is impossible because the property cannot be returned—either at all, or because even though it appears still possible to return the property, its essential character has changed since the time it was transferred under the contract."[970]

910.2. *Chitty on Contracts*: "it is impossible to make substantial restitution of property transferred under the contract if it has altered its character."[971]

910.3. *Halsbury's Laws of England*: "If the representor can show that the representee received under the contract anything which, whether a thing in possession or a thing in action, was on its acquisition capable of being specifically retransferred, and which the representee has [...] so dealt with as to produce an entire alteration of its physical, commercial or legal character, quality or substance, as distinct from mere depreciation, decay or deterioration in the ordinary course of events, the plea is valid [...]."[972]

911. BSGR avers that the GoG's cancellation of the mining rights fundamentally altered the nature of the shares in BSGR Guernsey, so that rescission is no longer possible:

> The joint venture project has so fundamentally changed its character that restitutio in integrum is impossible. The joint venture's only asset of worth was the mining rights. This was the very essence of the joint venture, and the reason for both Vale and BSGR participating in it. The cancellation of the mining rights renders the joint venture devoid of purpose, substance and value: it is, effectively, an empty shell. If Vale were to return its shareholding in the joint venture to BSGR, it would be returning something of an entirely different nature to that which was granted to it by BSGR. It is irrefutable that BSGR would be receiving

---

[968] BSGR's Statement of Defence, paragraph 257; BSGR's Statement of Rejoinder, paragraphs 427–428.

[969] BSGR's Statement of Defence, paragraph 257; of BSGR's Rejoinder, paragraphs 427–428.

[970] J Cartwright, *Misrepresentation, Mistake and Non-Disclosure* (3rd edn, Sweet & Maxwell 2012) [4-57], **RL-37**.

[971] HG Beale (ed), *Chitty on Contracts*, vol 1 (32nd edn, Sweet & Maxwell 2015) [7-125], **RL-33**.

[972] Lord Mackay of Clashfern (ed), *Halsbury's Laws of England*, vol 76 (5th edn, LexisNexis 2013) [829], **RL-79**.

back property in an entirely different condition to that in which he received it. In this situation, rescission is not available.[973]

912. Vale contends that the fact that Vale had already returned to BSGR the shares in BSGR Guernsey shows that *restitutio in integrum* is possible:

> rescission is not impossible: Vale has already returned to BSGR the 51% interest in the joint venture acquired under the [Joint Venture Agreements] and now seeks restitution of all disbursements and expenditures it made under the [Joint Venture Agreements]. BSGR's restitution to Vale of the foregoing sums constitutes *restitutio in integrum*.[974]

913. The Tribunal is not convinced by Vale's argument that the Share Purchase Deed (which returned the shares to BSGR) demonstrates the possibility of restitution as it was without prejudice to the Parties' positions in this arbitration. However, the Tribunal is satisfied that *restitutio in integrum* is possible because the assets in question are simply shares in BSGR Guernsey. The Joint Venture Agreements involve a simple sale of shares in BSGR Guernsey from BSGR to Vale. The loss of the mining rights may affect the *value* of the shareholding, but it does not alter the essential *identity* of the assets at issue, namely as *shares* in BSGR Guernsey. So there has been no fundamental alteration of the character of the shares in BSGR Guernsey which renders *restitutio in integrum* impossible.

914. The cancellation of the mining rights merely leads to the deterioration of the value of the shares, which is not sufficient to show impossibility of rescission. For such situations, the remedy for the defendant is to request for compensation on account of deterioration. But to obtain this remedy, the defendant must show that any such deterioration was due to the fault of the claimant. On the facts, the Tribunal finds that there is no proof that any deterioration of the value of the shares was due to Vale's fault. The Tribunal accordingly concludes that, if rescission is ordered, the Tribunal will not order compensation for such deterioration.

915. The Tribunal finds that the cancellation of the mining rights did not alter the nature of the shares in BSGR Guernsey so as to establish the bar of *restitutio in integrum* impossible.

### *The "unjustifiably worse position" argument*

916. A change of circumstances will only bar equitable rescission if the defendant would be *unjustifiably* prejudiced upon rescission. There is no single test for whether any particular prejudice would be justifiable, and the question is one of degree and each case must be considered on its facts. On the other hand, three factors that are often referred to are (1) the wrongfulness of the defendant's conduct; (2) the extent of any delay on the part of the innocent party in asserting his rights; and (3) the reversibility of the prejudice. In respect of (1), the general principle is that a wrongdoer is not entitled to complain that he would be unjustifiably prejudiced by reason of steps which *he* has taken in reliance on the validity of the contract. In respect of (2), prejudicial changes of circumstances that occur after the innocent party has sufficiently learnt the facts entitle him to rescind will usually bar rescission, even in cases of fraud. Finally, as regards (3), the only changes of circumstances that will bar rescission are those that are irreversible. So if the defendant

---

[973] BSGR's Rejoinder, paragraph 427.
[974] Vale's Pre-Hearing Written Submissions, paragraph 319.

can avoid any detriment by rearranging his affairs or pursuing any course of action, then there is no bar. This is the background of legal principles against which the Parties' arguments below are taking place.

917.    BSGR argues that:

> Rescission is also not possible because it would put BSGR in an unjustifiably worse position than it was in before the contracts with Vale were entered into. Like Vale, BSGR has lost an interest in very valuable rights in Simandou, and has lost the substantial amounts spent in obtaining those rights and developing its project. If BSGR were required not only to bear those losses, but to return the amounts Vale paid to it under the contracts in return for a worthless shareholding in a joint venture agreement, with no valuable assets, then BSGR would be in a significantly worse position than it was before the contract was entered into. It would effectively be deprived both of the benefits it obtained under the contract, and of its property before the contract was entered into.[975]

918.    Vale denies that restitution would place BSGR in an unjustifiably worse position for the following reasons.

918.1.    Rescission would place BSGR in exactly the same position had the Joint Venture Agreements not been entered into, because BSGR had no valid and legal claim to the mining rights it obtained through bribery and corruption in the first place prior to the execution of the Joint Venture Agreements.[976]

918.2.    It was BSGR's own corruption which caused the mining rights to be revoked.[977]

918.3.    Even if there is no corruption, and BSGR thinks it has been unfairly deprived of the mining rights by the GoG, BSGR has the option to pursue its claim to these rights against the GoG (as it is doing), as would be the case had the Joint Venture Agreements not been executed.[978]

918.4.    BSGR cannot set up its own wrong as a reason for the Tribunal not to order relief against it.[979]

919.    The Tribunal finds that rescission would not place BSGR in an unjustifiably worse position. BSGR relies on the GoG's revocation to argue that rescission would, but the Tribunal has found that BSGR made fraudulent misrepresentations on bribery, which indicates that the GoG's revocation was justified, and BSGR cannot rely on its own wrongdoing to oppose restitution. Even if BSGR did not commit bribery, and the GoG's revocation had no factual basis, BSGR can pursue its claim to the mining rights against the GoG, so any prejudice arising from restitution would be reversible. Indeed, BSGR has already commenced ICSID proceedings against Guinea for the alleged wrongful revocation of the mining rights.

---

[975] BSGR's Statement of Rejoinder, paragraph 428.
[976] Vale's Pre-Hearing Written Submissions, paragraphs 320–321.
[977] Vale's Pre-Hearing Written Submissions, paragraph 322.
[978] Vale's Pre-Hearing Written Submissions, paragraph 320.
[979] Vale's Pre-Hearing Written Submissions, paragraphs 323-324, citing *Spence v Crawford* [1939] SLT 305, 312, **RL-44**.

### *Conclusion*

920.   The Tribunal holds that BSGR has not fulfilled its burden to establish the bar of *restitutio in integrum* impossible, and that Vale is entitled to equitable rescission of the Joint Venture Agreements.

921.   In considering the orders to make to achieve *restitutio in integrum*, the Tribunal recalls that the objective of rescission is to place the Parties in their original positions as far as possible by ordering each side to return the benefits it had received from the other side. In this connection, the Tribunal notes that rescission only envisages the return of benefits which one party transferred to the other party, and does not envisage the return of benefits that one party originally transferred to a third party.

922.   In this case, Vale claims the return of (1) the Initial Consideration; (2) the Outstanding Loan Amount; (3) the Feasibility Study Funding; and (4) Internal Costs. The Tribunal considers that the first three heads cannot be claimed under rescission, and the Tribunal cannot order BSGR to pay these sums to Vale as part of its rescission order, because they do not involve transfers of money *from Vale* but involved transfers of money *from Vale's subsidiaries*:

   922.1.   The Initial Consideration was paid *by Vale International* to BSGR.

   922.2.   The principal sum of the Outstanding Loan Amount - under Section 6.3 of the Framework Agreement – was paid by Vale International to VBG Guinea, VBG Guernsey, VBG Liberia and VBG BVI pursuant to an obligation of Vale to lend or procure that a member of its Group so lend.

   922.3.   Pursuant to Section 5.1(b) of the Framework Agreement under which Vale was to undertake the Feasibility Study on behalf of VBG, the Feasibility Study Funding was paid *by Vale International and Vale GmbH*, and in any event were *not payments to BSGR.*

923.   The Tribunal also considers that the fourth head of Internal Costs cannot be claimed under rescission because, although the Internal Costs were paid by Vale, the recipient of these payments was *not BSGR*.

924.   Accordingly, the Tribunal must next consider if these sums can be claimed as damages for fraudulent misrepresentation.

### 2.   **Damages**

925.   Having found that Vale is entitled to equitable rescission, but that such rescission will not entitle Vale to any component of its USD **1,446,618,523** claim, the Tribunal must now consider Vale's damages claim to determine if Vale is entitled to the various components of its USD **1,446,618,523** claim as damages for fraudulent misrepresentation. But before the Tribunal delves into its analysis, the Tribunal will first explain how damages are measured for fraudulent misrepresentation.

### *General principles: measure of damages for fraudulent misrepresentation*

926.   **Function and measure of damages.** The function of damages for deceit is to compensate the claimant for his *reliance loss*. In other words, the function is to place the

claimant in the position he would have been in had the defendant not committed the fraudulent misrepresentation in the first place, and had the claimant not entered into the contract in reliance on that misrepresentation. For this reason, the primary method for measuring damages for deceit is to calculate <u>the total sum of the claimant's expenditures which he incurred *in reliance on the fraudulent representation*</u>, giving credit for any benefits received by the claimant.

927.  **Not subject to remoteness.** The measure of damages is the *total sum* of the claimant's expenditures, which means to say that damages for fraudulent misrepresentation are not subject to the ordinary rules of remoteness for tort. This is why the House of Lords held in *Smith New Court Securities Ltd v Scrimgeour Vickers (Asset Management) Ltd.* [1997] AC 254, 267 (HL) that the defendant is bound to make reparation for *all* the damage directly flowing from the claimant's reliance on the transaction, and that such damage need not have been foreseeable.[980]

928.  **Subject to mitigation.** On the other hand, as accepted by the House of Lords in *Smith New Court*, the measure of damages is subject to the rules of mitigation of losses. There are three such rules. (1) The claimant cannot recover damages for any part of his loss consequent upon the defendant's breach that the claimant could have avoided by taking reasonable steps. (2) If the claimant in fact avoids or mitigates his loss consequent upon the defendant's breach, he cannot recover for such avoided loss, even though the steps he took were more than could be reasonably required of him under (1). (3) Where the claimant incurs loss or expense in the course of taking reasonable steps to mitigate the loss resulting from the defendant's breach, the claimant may recover this further loss or expense from the defendant.

929.  The Parties do not disagree over these generally accepted principles of law.[981]

930.  The Tribunal will now proceed to analyse Vale's damages claim. First, the Tribunal will examine if Vale's evidence proves that Vale incurred the expenditures which it now claims. If the evidence does so prove, the Tribunal will then address the various legal arguments made by BSGR in relation to Vale's claim for damages.

### *Vale's claim*

931.  Vale claims that it is entitled to damages of USD 1,446,618,523 for its lost expenditures in the course of the joint venture. The USD 1,446,618,523 claim comprises the same items of (1) Initial Consideration; (2) Outstanding Loan Amount; (3) Simandou Feasibility Study Funding; and (4) Internal Costs, as detailed in paragraph 894 above.

932.  The breakdown of the sum of USD 1,446,618,523 is as follows and its four heads will be discussed further below:

932.1.  The Initial Consideration paid by Vale International to BSGR on 30 April 2010, totalling USD 500,000,000.

932.2.  The Outstanding Loan Amount of the Loan which Vale International lent to BSGR Guinea under the promissory notes from 2010 to 2013, totalling USD

---

[980] *Smith New Court Securities Ltd. v Citibank N.A.* [1997] AC 254, 267, **RL-126**.
[981] Vale's Statement of Case, paragraphs 290–293; BSGR's Statement of Defence, paragraph 260; Vale's Statement of Reply, paragraph 942.

780,734,781 (comprising the outstanding principal sum of USD 581,197,104 and the interest sum of USD 199,537,678 accrued up to 29 April 2014).

932.3.    The Feasibility Study Funding, i.e. the expenditures incurred by Vale International and Vale GmbH in connection with the preparation of the Simandou Feasibility Study from 2010 to 2015, totalling USD 85,365,652.

932.4.    Vale's Internal Costs, i.e. the personnel, travel, services, and other costs incurred by Vale to support the joint venture's operations outside of Guinea from 2010 to 2013, totalling USD 80,518,090.

933.    Pursuant to Section 3(a) of the Framework Agreement, the Initial Consideration of USD 500,000,000 was to be paid at Completion, which took place on 30 April 2010, and records of wire transfers have been submitted at Exhibit C-212. The Tribunal finds that payment of this amount is proven.

934.    The second head of damages totalling USD 780,734,781 corresponds to the alleged Outstanding Loan Amount of the Loan which Vale International lent to BSGR Guinea, VBG Logistics and VBG Liberia under the promissory notes from 2010 to 2013. Exhibit C-69 (revised) contains a 111-page document starting with a spreadsheet indicating the promise, the promisor, the date of the promissory note, its currency, the principal amount of the promissory note, the interest accrued until 29 April 2014 and the amount of principal and interest accrued. It also contains the repayments made and the outstanding balance. All promissory notes are issued to Vale International and expressed in USD and confirm the outstanding balance of principal sums of USD 581,197,103.53 (rounded up by Vale to USD 581,197,104) and the interest sum of USD 199,537,677.83 (rounded up by Vale to USD 199,537,678) accrued up to 29 April 2014. The total amount is thus USD 780,734,781.36 (rounded down by Vale to USD 780,734,781). The promisors under the promissory notes are VBG Guinea, VBG Logistics and VBG Liberia, the latter two being Liberian subsidiaries of VBG Guernsey. VBG Logistics was funded by Vale International for the development of the Liberian railway and port and VBG Liberia to explore other potential mineral deposits in Liberia, which in the end never materialised. The promissory notes are attached to the spreadsheet at pages 4–111 of Exhibit C-69 (revised). On the basis of the above, the Tribunal finds that the promissory notes and their amounts have been proven. Whether any of these amounts are to be awarded will be discussed in the following section.

935.    The third head of damages is for a total of USD 85,365,652 regarding the Feasibility Study Funding, i.e. the expenditures incurred by Vale International and Vale GmbH in connection with the preparation of the Simandou Feasibility Study from 2010 to 2015. Vale in this respect relies on the expert report of Dr Min Shi of Oxera dated 24 March 2016 filed with its Statement of Reply. Dr Min Shi was examined at the February 2017 Hearing and the Tribunal found her a competent and credible expert. Dr Shi reports in her expert report at paragraphs 96 ff. that she extracted 854 entries from the AP_Guine and Base Exec spreadsheets which record VBG Guinea's expenditures respectively for the period 2010-2013 and for 2014, related to the Simandou Feasibility Study. She reviewed all of these entries with the underlying supporting documents and found that an amount of USD 73,000,000 was verified to be correct and that an amount of USD 12,400,000 regarding 235 entries had no supporting documents which she attributed to documents destroyed as a result of a fire at a Vale facility in Brazil in 2014, documents seized by the GoG in early 2013 or documents located in the Conakry office of BSGR Guinea to which

Vale no longer has access. She then compared the total amounts of Feasibility Study Expenditures with the information related thereto in the information provided to the VBG Guernsey's board of directors on 14 June 2011, 6 September 2011, 19 December 2011, 18 April 2012 and 10 July 2012 (respectively C-440, C-441, C-443, C-444 and C-445). Dr Shi concluded that the Joint Venture's record of expenditures relating to the Simandou Feasibility Study at USD 85.4 million was accurate. On the basis of the full review of all entries claimed by Vale regarding the Feasibility Study and the full review of supporting documents available, the Tribunal considers that an amount of USD 73,000,000 is sufficiently verified and can be accepted as having been spent by Vale on the Feasibility Study. The remainder amounting to USD 12,400,000 are not supported by documentary evidence, and Vale's explanation is that they were either destroyed by a fire in Brazil in 2014, seized by the GoG in early 2013, or are located in the Conakry office to which Vale no longer has access. Nonetheless, the Tribunal accepts the USD 12,400,000 because this was a sum which was reported to VBG Guernsey's board of directors. Hence, the Tribunal accepts a total amount of USD 85,365,652 regarding the Feasibility Study Funding as Vale Expenditures. This amount, however, is still to be tested against BSGR's defences as further elaborated below.

936. The fourth head of damages is for a total of USD 80,518,090 allegedly representing Vale's Internal Costs, i.e. the personnel, travel, services, and other costs incurred by Vale to support VBG Guernsey's operations outside of Guinea from 2010 to 2013. These costs relate to (1) Vale's personnel working in Brazil on the project (including salaries, incentives, hardship and mobility premiums, social security taxes, etc.), (2) Vale's office in Belo Horizonte, Brazil, where teams not working on the ground in Guinea, such the Procurement and Engineering teams, were based, (3) services contracted in Brazil on behalf of the project, and (4) travel expenses.[982] Once again, Vale relies on the expert report of Dr Min Shi of Oxera. Dr Shi reports in her expert report at paragraphs 104 ff. that Vale had created a special cost accountancy centre to which all expenditures related to the joint venture project were charged. These costs were USD 44.8 million for personnel, USD 20.2 million for travel, USD 15 million for services and USD 0.5 million for other expenses. She also reported that there were no invoices for personnel charges, or travel expenses using Vale's own aircrafts for the period 2011–2012 at USD 15.4 million. Further, receipts for the remainder of travel expenses including travel incidents at USD 4.8 million had not been kept. As to costs for services, she concluded that these costs – totalling 16,147 entries in the joint venture's records – were consistent with or lower than the amounts in the supporting documents. She could not verify or cross check costs categorised as "Other".

937. On the basis of the above evidence, the Tribunal accepts the amounts for services as sufficiently supported by underlying documents.

938. It also accepts the amounts for personnel on the basis of Dr Shi's review of the number of employees who had worked on the Simandou project for each month between 2010 and 2014, the position of each employee and the midpoint of monthly salaries for each category of employee and the social security contributions payable on these amounts.

939. It also accepts USD 15.4 million as the costs of the use of Vale's aircraft in 2011–2012 as Dr Shi reviewed these expenses regarding transporting 2,834 passengers at an average cost of USD 5,425 per flight from Belo Horizonte to Guinea compared to an average

---

[982] Vale's Statement of Case, paragraph 128.

business class ticket of USD 4,000. The Tribunal considers that these expenses are sufficiently substantiated and reasonable. Although no supporting documents are available for other travel expenses, the Tribunal is prepared to accept this amount of USD 4.8 million as reasonable, considering that the international costs were reported to the VBG Guernsey's board of directors without apparent objection.[983]

940.    On the other hand, the Tribunal cannot accept other expenses at USD 0.5 million as no explanation has been given as to the nature of these expenses and Dr Shi also could not verify them.

941.    Having found that the evidence proves that Vale incurred the expenditures it claims, save for the USD 0.5 million categorized as other expenditures, the Tribunal must next address BSGR's legal arguments in relation to Vale's damages claim. BSGR makes one general argument against Vale's claim and several specific arguments against individual items in Vale's claim for damages. The Tribunal will first deal with BSGR's general argument before it deals with the specific arguments.

### *General argument: Vale's losses were directly caused by BSGR*

942.    BSGR's general argument is that, even if BSGR committed fraudulent misrepresentation, Vale's losses were not directly caused by BSGR's fraudulent misrepresentation.[984] BSGR argues that any losses suffered by Vale were in fact caused by:[985]

942.1.    The GoG's cancellation of the mining rights, which would have happened irrespective of whether BSGR had engaged in bribery; or

942.2.    The slump in the value of iron ore, rendering the project unprofitable.

943.    Vale responds with the following points.

943.1.    First, the involvement or intrusion by the GoG in State-granted and supervised mining licences is *not* a separate or unrelated feature of the transaction between Vale and BSGR.[986]

943.2.    Second, although BSGR claims to have been the victim of improper conduct, this cannot relieve BSGR of its liability to Vale, otherwise BSGR would be able to keep Vale's USD 500 million, avoid any responsibility for the USD 1 billion invested by Vale and walk away having made a windfall from its own fraudulent conduct.[987]

---

[983] VBG Presentation to the Board, June 2011, **C-440**; VBG Presentation to the Board, September 2011, **C-441**; VBG Presentation to the Board, October 2011, **C-442**; VBG Presentation to the Board, December 2011, **C-443**; VBG Presentation to the Board, April 2012, **C-444**; VBG Presentation to the Board, July 2012, **C-445**; VBG Reporting Pack, October 2011, **C-446**; VBG Reporting Pack, December 2011, **C-447**; VBG Reporting Pack, April 2012, **C-448**; VBG Reporting Pack, July 2012, **C-449**.
[984] BSGR's Statement of Rejoinder, paragraphs 429–437.
[985] BSGR's Statement of Rejoinder, paragraph 436.
[986] Vale's Pre-Hearing Written Submissions, paragraph 336.
[987] Vale's Pre-Hearing Written Submissions, paragraphs 338–339.

943.3.    Third, BSGR's position is offensive to public policy under English law,[988] which dictates that a tribunal should be flexible to ensure that the victim should obtain full compensation for the wrong suffered.

944.    As the Tribunal has explained at paragraph 926 of this Award, the claimant is entitled to all expenditures which he had incurred *in reliance* on the defendant's representation. So when the question arises as to the causative link between the tort of deceit and the losses suffered, the law only asks one question: did the claimant incur those losses *in reliance* on the defendant's representation? Once it is shown that the claimant did so rely, the causative link is established, and the loss is taken to have directly flowed from the deceit. BSGR may claim that there was a slump in iron ore value, or an intervening act in the form of the GoG's revocation of the mining rights, but these arguments are wholly immaterial. All that matters is whether Vale incurred these losses *in reliance* on BSGR's deceit for the purpose of establishing the causative link. Framed as such, this must be answered in the affirmative. The Tribunal has found at paragraph 742 above that Vale relied on BSGR's deceit to enter into the Framework Agreement and the SHA and suffered loss as a result.

### Specific arguments relating to individual items in Vale's breakdown

945.    In the context of damages, BSGR makes several arguments contesting specific items in Vale's breakdown.

#### i.    Feasibility Study Funding

946.    BSGR argues that "Vale has not proven that it cannot get any value from the Feasibility Study and the other expenditures by the joint venture project, if it were to obtain rights to the Simandou Concession in the future or if it were to obtain other mining rights in Guinea".[989] In doing so, BSGR notes that Vale has provided a witness statement from Saad attesting to the uselessness of the Feasibility Study, but says that Saad's assertions in his testimony are "self-serving and unsupported".

947.    Vale argues that BSGR's contention is wholly speculative because it rests upon what Vale might or might not do in the future and should fail for this reason alone.[990] Further, Vale points out that, since BSGR now wholly owns the former joint venture, the benefits of any money spent on the joint venture now vest solely in BSGR. Lastly, Vale stands by Saad's testimony that the Simandou Feasibility Study has no value because it is out-of-date and would need to be revised and reassessed before it can be used by any future-rights-holder.

948.    The Tribunal agrees with Vale that there is no remaining value in the Feasibility Study for Vale after the termination of the Framework Agreement and the SHA. The record does not provide any clue as to what Vale might do in relation to the Concession Areas in respect of which the mining rights were revoked. The Tribunal therefore rejects BSGR's argument as unsubstantiated and conjectural.

---

[988] Vale's Pre-Hearing Written Submissions, paragraphs 340–343.
[989] BSGR's Statement of Rejoinder, paragraph 454.
[990] Vale's Pre-Hearing Written Submissions, paragraph 346.

### ii.   Vale's Internal Costs

949.   BSGR objects to Vale's claim for personnel, travel, services and other costs which Vale incurred in Brazil in relation to the Simandou project on the basis that Vale's evidence is insufficiently detailed to allow the Tribunal to identify:

949.1.   what Vale company incurred which costs;

949.2.   what each amount claimed relates to, and that it was an expense caused directly by Vale's entry into the joint venture;

949.3.   the steps taken by Vale to mitigate its losses; and

949.4.   that the employees in Brazil were engaged solely in relation to the Simandou project and did not undertake other work for Vale.

950.   BSGR also criticises Vale for relying "on a single witness statement, irregular submissions presented to the joint venture board, and a report commissioned by [Vale]", instead of more specific, detailed and reliable documents such as "employment contracts, timesheets, travel requisition forms, and employee reports". [991] BSGR requests the Tribunal to draw adverse inferences from Vale's failure to present this evidence.

951.   In response, Vale reasserts that it is entitled to recover this head of costs and that the costs related to the Vale employees allocated to the joint venture were incurred directly by Vale, and were regularly discussed between Vale and the joint venture, and were regularly reported to the board of the joint venture, including BSGR's representatives. [992]

952.   The Tribunal refers to its discussion on Internal Costs above at paragraphs 936–940. Save for the USD 0.5 million, the Tribunal considers that the Internal Costs have been sufficiently substantiated and proven and can be awarded.

### iii.   Outstanding Loan Amount – the principal

953.   BSGR argues that Vale cannot claim for the sums loaned to the joint venture because the sums were "spent on things such as capital equipment which has a value and for which credit must be given". [993] So until Vale provides a more detailed breakdown of what those sums were spent on, what the current value of any assets purchased were, and what efforts were taken to mitigate Vale's losses by selling any asset, "Vale will have failed to prove its losses" [994] and BSGR invites the Tribunal to draw adverse inferences against Vale for its failure to produce evidence concerning the value and dealings with capital equipment when that evidence is in Vale's control. [995]

954.   Vale makes the following arguments in response.

954.1.   BSGR's argument neglects that the capital equipment acquired through the Loan "belongs to the joint venture, which is now wholly-owned by BSGR.

---

[991] BSGR's Statement of Rejoinder, paragraph 458.
[992] Vale's Pre-Hearing Written Submissions, paragraph 352.
[993] BSGR's Statement of Defence, paragraph 266(iii).
[994] BSGR's Statement of Defence, paragraph 266(iii).
[995] BSGR's Statement of Defence, paragraph 266(iii).

Accordingly, even assuming *arguendo* the assets that were purchased through the loan had a residual value, that value is with BSGR, not Vale."[996] BSGR's assertion also "overlooks that it was not Vale, but the joint venture and its subsidiaries, that used the proceeds of the shareholder loan."[997]

954.2.   BSGR must have had knowledge of the loan amount since the process of issuing promissory notes required the joint venture to provide BSGR with breakdowns of the expenses that would be funded through the loans in order to obtain BSGR's consent.[998] This is backed up by a significant body of other evidence, which shows that BSGR was fully aware of and regularly approved the joint venture's expenditures that were being funded by Vale through the Loans.[999]

954.3.   BSGR's claim to ignorance "conveniently overlooks that Vale agreed, in reliance on BSGR's fraudulent misrepresentations, to fund the joint venture's operations through the shareholder loan, the terms of which were memorialized in the [Joint Venture Agreements]."[1000]

954.4.   BSGR has never asserted in the nearly four years of operations of its joint venture with Vale that Vale breached its funding commitments under the Joint Venture Agreements and cannot do so now.[1001]

955.   Pursuant to Section 6.3 of the Framework Agreement, Vale International through promissory notes financed the amounts necessary to comply with the Business Plan and transferred money to VBG Guinea, VBG Logistics and VBG Liberia, resulting in an outstanding principal sum of USD 581,197,104, which the Tribunal has accepted at paragraph 934 above. BSGR does not contest that these amounts were received and used by VBG Guinea, VBG Logistics and VBG Liberia on capital and other expenditures.[1002] This is confirmed by Dr Shi's expert report at paragraphs 65 ff. showing expenditures over the period 2010–2014 of USD 583.1 million. BSGR's essential argument is that the residual value of capital equipment is to be accounted for, and needs to be deducted from the outstanding loan balance. Vale deducted USD 600,000 on the 24 July 2014 promissory note[1003] and USD 1,677,896 from the 7 June 2010 promissory note on account of the proceeds from auctions of VGB Guinea equipment[1004] related to the balance of the proceeds of the auction at USD 4.5 million less expenses including USD 1.3 million per year storage costs. The deductions are also reflected in the net amount of the outstanding principal of the promissory notes at USD 581,197,103.53, the quantification of which has already been accepted by the Tribunal.

---

[996] Vale's Statement of Reply, paragraph 953.
[997] Vale's Statement of Reply, paragraph 953.
[998] Vale's Pre-Hearing Written Submissions, paragraph 347.
[999] Vale's Pre-Hearing Written Submissions, paragraph 347.
[1000] Vale's Pre-Hearing Written Submissions, paragraph 348.
[1001] Vale's Pre-Hearing Written Submissions, paragraph 349.
[1002] Transcript, Merits Hearing, Day 2 p. 120, lines 8-22.
[1003] Promissory Notes Partial Payment Agreement dated 24 July 2014, p. 13, **C-468**; Phase I, Trans-Guinean Railway and Simandou Feasibility Study Expenditures, Tab "Base Exec.", row 672, **C-482**. The principal amount for the promissory notes dated 7 June 2010 and 24 July 2014 is USD 2,0750,000.00 and USD 600,000.00 respectively. See VBG Guinea, VBG Liberia and VBG Logistics' Promissory Notes (Updated), p. 1 – 3, **C-69 (revised)**.
[1004] Transcript, Merits Hearing, Day 1, p. 189, line 15 – p. 190, line 5.

956.   The Tribunal rejects BSGR's defences in relation to deductions to be made regarding the outstanding principal of the promissory notes. First, any residual value of assets bought with the proceeds of the promissory notes lie with VBG, VBG Logistics and VBG Liberia and not with Vale, which is entitled to repayment of the outstanding principal. Second, the Board of VBG, including BSGR's representatives, in its meeting dated 31 January 2013 approved of the sale of the assets:

> **5.   Sale of VBG Guinea Assets**
>
> A summary of assets and e-mail correspondence were tabled in relation to the sale of VBG Guinea equipment and machinery to Vale and/or to third parties, in light of the demobilisation of operations on the project site. After due discussion it was agreed to ratify the approval of the sale of the equipment and machinery.[1005]

957.   The Tribunal thus finds that Vale's failure to furnish particulars of the capital bought, the capital sold, and the current value of the remaining capital does not prevent Vale from claiming the sums owing under the Loan. The capital equipment was purchased *by VBG Guinea* using the sums loaned by Vale. The owner of the capital equipment was never Vale but was always (and continues to be) VBG Guinea. Vale therefore did not derive any benefit from the purchase of this capital equipment. Accordingly, Vale is not required to give credit to the value of any remaining capital equipment.

958.   The Tribunal therefore rejects BSGR's invitation to draw an adverse inference from Vale's failure to furnish the abovementioned particulars.

> *iv.*    *Outstanding Loan Amount – contractual simple interest of 16%*

959.   The last of BSGR's specific objections to Vale's claim for damages relates to interest on the amounts loaned by Vale to the joint venture.

960.   Vale first claimed interest on the amounts loaned to the joint venture in its Statement of Case.[1006]

961.   BSGR then argued that Vale was not entitled to recover interest on its Loan because that would entail compensating Vale for "loss of bargain damages [...] that it would have received had the transaction gone ahead".[1007]

962.   Vale then submitted its Statement of Reply, in which it disagreed with BSGR on the basis that the interest accrued on the Loan is "payable on demand" and unrelated to any profits that the joint venture would earn. Vale further cited *Black v Davies* [2015] EWCA Civ 531 in support to argue that, since the Court ruled that interest income directly linked to a fraudulent misrepresentation must be compensated, it would apply *a fortiori* where the interest sought was specifically contemplated in the Loan.[1008]

963.   This was followed by BSGR's Statement of Rejoinder, in which BSGR argued that Vale had mischaracterised the case of *Black v Davies* (CA) and was not entitled to "compound interest on any sum to which it is entitled". According to BSGR, *Black v Davies* (CA)

---

[1005] VBG Board Minutes dated January 2013, **C-466**.
[1006] Vale's Statement of Case, paragraph 126.
[1007] BSGR's Statement of Defence, paragraph 266(ii).
[1008] Vale's Statement of Reply, paragraph 952, citing *Black v Davies* [2015] EWCA Civ 531, **CL-87**.

simply stood for the proposition that the Tribunal had an equitable jurisdiction to award interest on damages for monies that were obtained by fraud.[1009] Therefore, Vale's claim for compound interest was unsustainable other than the sum of USD 500 million paid to BSGR under the Joint Venture Agreements.

964.    Vale seems to have accepted BSGR's point relating to *Black v Davies* (CA) because it has not made any mention of the case in subsequent submissions. However, Vale continues to maintain that the fact that the interest accrued on the shareholder's loan is "payable on demand" means that interest is payable to Vale.

965.    The situation in this case is that the promissory notes provide for simple interest of 16% on the principal owing under the promissory notes. According to Vale, the total sum of the accrued simple interest is USD 199,537,678, which Vale includes as part of its claim. The question is whether Vale can claim the interest as damages for the tort of deceit.

966.    The Tribunal begins its analysis by returning to its discussion in paragraphs 926–928. The measure of damages for the tort of deceit is the loss directly flowing from the claimant's reliance on the defendant's representation. The "reliance" measure is designed to put the claimant in the position he would have been in had the defendant not made the representation, and had the claimant not entered into the loan agreement as a result. The consequence is that the claimant is entitled in principle to damages for losses denoting the interest which the principal *would have generated elsewhere* had the claimant not entered into the loan agreement. Conversely, the claimant is not entitled to claim the interest at the contractual rate of the loan agreement, because this denotes the loss which the claimant would not have suffered had the loan agreement been performed.

967.    This is the point made by *Chitty on Contracts* when it explains that "damages for fraud will not compensate the claimant for loss of bargain but may cover loss caused by passing up other profitable opportunities".[1010]

968.    So the task for Vale is to provide evidence of how much interest the principal would have generated elsewhere had Vale not loaned the principal to BSGR. If Vale fails to furnish such evidence, the law will not assume that Vale incurred losses of such a nature.

969.    In this case, Vale only claims the simple interest accrued at the rate stipulated in the promissory notes. The Tribunal finds that Vale is not entitled to claim this amount because it denotes the loss which the claimant would not have suffered had the contract been performed. The Tribunal accordingly holds that Vale is not entitled to the simple interest of USD 199,537,678. As to whether Vale has provided sufficient evidence to prove the interest which the principal would have generated elsewhere had it not been transferred to BSGR Guinea, the Tribunal further holds that Vale has failed to provide any evidence on this matter.

970.    Vale relies on *Black v Davies* (CA) to support its claim to the interest of USD 199,537,678. However, the Tribunal is unable to appreciate the relevance of that case to this matter. The issue in *Black v Davies* was whether the court had jurisdiction to award compound interest <u>on damages</u>, which raises the question of whether the court ought to exercise its statutory discretion to impose interest *on the damages awarded*. This is different from the

---

[1009] BSGR's Statement of Rejoinder, paragraph 464.
[1010] HG Beale (ed), *Chitty on Contracts*, vol 1 (31st edn, Sweet & Maxwell 2012) [6-057], **RL-38**.

issue in this case of whether the claimant is entitled to interest <u>as damages</u>, which raises the question of whether the court ought to award interest as part of the damages claim.

971.    In view of the above, the Tribunal rejects Vale's contention that *Black v Davies* supports Vale's claim to the interest of USD 199,537,678 accrued under the promissory notes.

972.    The above does not imply that Vale cannot obtain any interest on the amount of the principal due under the promissory notes at all. The Tribunal will return to this issue in the section of the Award on interest.

### *Mitigation of losses*

973.    *McGregor on Damages* states:

> The extent of the damage resulting from the wrongful act, whether tort or breach of contract, can often be considerably lessened by well-advised action on the part of the person wronged. In such circumstances the law requires him to take all reasonable steps to mitigate the loss consequent on the defendant's wrong, and refuses to allow him damages in respect of any part of the loss which is due to his neglect to take such steps. **Even persons against whom wrongs have been committed are not entitled to sit back and suffer loss which could be avoided by reasonable efforts [...].**[1011] (emphasis added)

974.    BSGR alleges that Vale has not sufficiently mitigated its losses in the following ways.[1012]

974.1.    Vale failed to follow the ABL Solution, which required it *inter alia* to assist in efforts against the GoG's unlawful expropriation.

974.2.    Vale did not join BSGR in seeking to rebut the Technical Committee's allegations, but was apparently negotiating with the GoG to take the rights once they had been expropriated.

974.3.    Vale refused to authorise VBG to join the ICSID case.

974.4.    Vale has not provided evidence of the steps taken to mitigate its loss.

975.    Vale makes three points in reply.

975.1.    A claimant's duty to mitigate loss only extends to "reasonable steps to mitigate the loss consequent on the breach".[1013]

975.2.    There is no requirement "to do anything other than in the ordinary course of business".[1014]

975.3.    The onus is on BSGR to discharge its burden of proving that Vale has failed to mitigate its loss.[1015]

---

[1011] H McGregor, *McGregor on Damages* (19th edn, Sweet & Maxwell 2015) [9-014], **RL-104**.
[1012] BSGR's Statement of Defence, paragraph 269.
[1013] Vale's Pre-Hearing Written Submissions, paragraph 356.
[1014] Vale's Pre-Hearing Written Submissions, paragraph 356.
[1015] Vale's Pre-Hearing Written Submissions, paragraph 356.

976.   Vale further points out that it *has* in fact taken steps to mitigate its losses, albeit not the steps that BSGR wished it to take. These include: (a) phasing out staff; (b) terminating contracts with its suppliers; (c) moving equipment to secure facilities in Guinea; and (d) retaining heavy equipment and machinery in storage in the Netherlands. These measures, Vale submits, are sufficient to satisfy Vale's obligations under English law.

977.   Vale rebuts BSGR's points as follows.

977.1.   The ABL Solution is not Vale's exclusive remedy for an ABL breach. It is a contractual alternative which Vale had the option to exercise. Hence, the ABL solution is simply an additional contractual mechanism over and above the other remedies which would be available to it.[1016]

977.2.   Vale was under no obligation to join BSGR in attempting to rebut the Technical Committee's allegations. Under the SHA, Vale was not required to "take any action which in its reasonable view would be materially detrimental to the interests of its Group". Vale believed in good faith that the joint venture's interests would best be protected by co-operating with and providing a full response to the Technical Committee.[1017]

977.3.   It was absurd for BSGR to expect Vale to authorise VBG Guinea, when it was still under Vale's control, to join in the ICSID proceedings. This would be tantamount to having Vale take a false position in defence of BSGR's bribery and corruption. The ICSID claim is meritless, and it would serve no purpose to allow VBG Guinea to join it.[1018]

978.   The Tribunal agrees with Vale that the burden falls on BSGR to prove that Vale did not mitigate its losses. The Tribunal then has to address the three specific instances mentioned above where BSGR complains of Vale's failure to mitigate its losses.

978.1.   First, as regards the ABL solution under which there was an exit for Vale from the joint venture in the case of anti-bribery allegations or investigations, the Tribunal agrees with Vale that this was an option for Vale and not an obligation. It was an additional safeguard for Vale to be capable of avoiding or mitigating FCPA exposure, but did not imply that it could not exercise other courses of action such as commencing arbitral proceedings to protect its interests as it has done in the present case.

978.2.   Second, faced with allegations regarding bribery in procuring mining rights allegedly paid by its joint venture partner prior to the conclusion of the joint venture, it was – in the opinion of the Tribunal – at the time of the start of the investigations by the Technical Committee (and, thus, without the perspective of what transpired later as corroborated by the findings of corruption in this Award to avoid hindsight bias) an acceptable course of action by Vale to stand by and to have BSGR alone do the heavy lifting to convince the Technical Committee that the mining rights had been procured lawfully, and that no bribes had been paid. This is further confirmed by the fact that Vale made substantial efforts in

---

[1016] Vale's Pre-Hearing Written Submissions, paragraph 360.
[1017] Vale's Pre-Hearing Written Submissions, paragraph 361.
[1018] Vale's Pre-Hearing Written Submissions, paragraph 362.

the due diligence and the Joint Venture Agreements to ensure that its investment in the joint venture was compliant with the FCPA as well as other anti-bribery laws.

978.3.    Third, the reasons above also apply in relation to Vale's refusal to join the ICSID proceedings as the majority-controlling shareholder of VBG Guinea. In this respect, the Tribunal also considers that it was acceptable for Vale not to antagonise the GoG and instead to avoid escalating a dispute with the GoG – in the interests of VBG Guinea, the protection of its investment in the project and future relationships with the GoG – in refusing to have VBG Guinea join the ICSID proceedings regarding a problem that was pre-joint venture and was basically BSGR's problem.

979.    The Tribunal therefore rejects BSGR's argument that Vale was obliged to present a united front with BSGR against the GoG in order to mitigate its losses. Vale has adduced evidence that it believed in good faith that the allegation that BSGR had been involved in bribery and corruption had merit or, at least, was not meritless. Given that the Tribunal has confirmed BSGR's corruption in its findings, there is no indication that Vale had reason to believe otherwise. To hold that Vale should have supported BSGR in its defence of a position that Vale knew or had reason to believe to be false is plainly beyond the scope of reasonable mitigation. Vale cannot be faulted for not supporting BSGR in its legal travails.

### 3.    Conclusion

980.    The Tribunal concludes from its analysis above as follows.

980.1.    As regards rescission, Vale is entitled to rescission of the Joint Venture Agreements.

980.2.    As regards damages in deceit:

980.2.1.    Vale is entitled to damages for:

980.2.1.1.    the Initial Consideration of **USD 500,000,000**;

980.2.1.2.    the Feasibility Study Funding of **USD 85,365,652**;

980.2.1.3.    the Internal Costs of **USD 80,518,090** less USD 500,000 for costs categorised as other expenses (see paragraph 940) and

980.2.1.4.    the principal of **USD 581,197,104** under the Outstanding Loan Amount.

980.2.2.    Vale is precluded from claiming the interest sum of **USD 199,537,678** under the Outstanding Loan Amount for the reasons set out by the Tribunal in paragraphs 969–972.

### C.   Remedies for Breach of Warranty

981.   As Vale elected the remedies for deceit over contractual remedies, and the remedies for deceit completely pre-empt contractual remedies, Vale is not entitled to claim the interest sum of USD **199,537,678** under the Outstanding Loan Amount under a contractual cause of action in relation to that part of its claims which was unsuccessful in deceit.

### D.   Remedies for Frustration

982.   Vale elected the remedies for deceit, including the remedy of rescission. The Tribunal's view is that rescission is inconsistent with the remedies for frustration, because if a contract is rescinded *ab initio*, the result is that there would no longer be any contract to frustrate in the first place. The correct conclusion is therefore that Vale is no longer entitled to remedies under frustration by virtue of its election of remedies for deceit and the Tribunal's conclusion is that Vale is entitled to equitable rescission on the facts of this case.

### E.   Interest

983.   Finally, Vale claims compound interest on each of the items that comprise its USD 1.45 billion claim pursuant to Section 49(3) and 49(4) of the English Arbitration Act 1996, which provides:

> (3)   The tribunal may award simple or compound interest from such dates, at such rates and with such rests as it considers meets the justice of the case—
>
> > (a)   on the whole or part of any amount awarded by the tribunal, in respect of any period up to the date of the award;
> >
> > (b)   on the whole or part of any amount claimed in the arbitration and outstanding at the commencement of the arbitral proceedings but paid before the award was made, in respect of any period up to the date of payment.
>
> (4)   The tribunal may award simple or compound interest from the date of the award (or any later date) until payment, at such rates and with such rests as it considers meets the justice of the case, on the outstanding amount of any award (including any award of interest under subsection (3) and any award as to costs).

984.   Vale submits that the circumstances of the case are such that "an award of pre- and post-award compound interest would be just and proper in this case".[1019]

985.   In view of Vale's request based on Section 49(3) and 49(4) of the English Arbitration Act 1996, the Tribunal considers that it meets the justice of the case to award both pre- and post-award interest on any amounts due by BSGR to Vale.

986.   As regards pre-award interest, the Tribunal recalls that any amount due is on the basis of damages as a remedy for deceit where such damages are to compensate for reliance losses. The objective of damages for deceit is to place the innocent party in the same position as he was in prior to the execution of the contract. As regards damages for the

---

[1019] Vale's Pre-Hearing Written Submissions, paragraph 365.

loss of the use of money, any interest on damages would be to reflect the loss of capital income and any amounts invested which could have been earned in the absence of the contract. The Tribunal considers that Vale would likely have invested such amounts in its business and that simple interest is to be preferred for that reason. Absent further information as to Vale's cost of capital, the Tribunal considers that simple interest at LIBOR USD 3-month rates plus 7% is an appropriate pre-award interest rate as of the following out-of-pocket dates:

986.1.   as from 30 April 2010 for the Initial Consideration of USD 500,000,000 paid on that date;

986.2.   as from the respective dates of the promissory notes as indicated for each promissory note on pages 1–3 of Exhibit C-69 (revised), taking into account the deductions on the promissory notes issued on 7 June 2010 and 24 July 2014;

986.3.   as of 1 December 2011, for the Feasibility Study expenditures of USD 85,365,652 discussed in paragraph 935 above based on Figure 8 of Dr Shi's report which the Tribunal considers an approximate assessment of the average time any such expenditures constituted an out-of-pocket expense:

**Figure 8 – Comparison of FS Expenditure Schedule and the amounts reported to the Joint Venture's Board of Directors (US$ million)**



Note: Board papers sometimes contain information on expenditures at several points in time. Where information on expenditures at a specific point in time is presented in multiple sets of Board papers, I show the information in the latest Board papers.

Source: Phase I, Trans-Guinean Railway and Simandou Feasibility Study Expenditures (Exhibit C-482).

and

986.4.   as of 1 December 2011 for Vale's Internal Costs of USD 80,518,090 (less USD 500,000 for other costs) discussed in paragraph 936-940 above based on Figure 9 of Dr. Shi's report which the Tribunal considers an approximate assessment of the average time any such expenditures constituted an out-of-pocket expense:

Figure 9 – Joint Venture's record of Vale's internal costs (US$ million)



Note: Board papers sometimes contain information on expenditures at several points in time. Where information on expenditures at a specific point in time is presented in multiple sets of Board papers, I show the information in the latest Board papers.

Source: Internal Costs (Exhibit C-483).

987.    As regards post-award interest, the Tribunal considers it appropriate to compound interest on the unpaid amount so as to incentivize the Respondent to settle its just dues within a reasonable time period. Since post-award interest does not reflect reliance loss, but loss as a result of late payment under the Award, an interest rate that corresponds more closely to market rates for financial instruments is appropriate. The Tribunal therefore sets the post-award interest rate at the market rate of LIBOR USD 3-month rates plus 5%, compounded on each anniversary of this Award on any sums due under this Award that remain unpaid.

## XI.   COSTS

988.   Each Party has requested for an order that the other Party bear its costs of legal representation including counsel's fees and expenses as well as the LCIA administrative expenses and the fees and expenses of the arbitrators.

989.   The total amount of the costs of the arbitration (other than the legal or other costs incurred by the Parties themselves) have been determined by the LCIA Court, pursuant to Article 28.1 of the LCIA Rules, to be as follows:

| | | | |
|---|---|---|---|
| 989.1. | Registration fee | GBP | 1,750.00 |
| 989.2. | LCIA's administrative charges | GBP | 112,652.78 |
| 989.3. | Tribunal's fees and expenses | GBP | 1,590,435.39 |
| 989.4. | Division's fees and expenses | GBP | 159,751.90 |
| 989.5. | Total costs of arbitration | GBP | 1,864,590.07 |

990.   Vale has lodged a registration fee and deposits amounting to GBP 1,429,540.61, including interest accrued. BSGR has lodged deposits amounting to GBP 435,049.46, including interest accrued. Total funds lodged by the Parties as advances on costs to the LCIA therefore amount to GBP 1,864,590.07 which has been applied to the costs of the arbitration, as specified at paragraph 989 above.

991.   By virtue of Article 28.3 of the LCIA Rules, the Tribunal has the power in its award to order that all, or part, of the costs incurred by a party be paid by another party, and shall determine and fix the amount of each item comprising such costs on such reasonable basis as it thinks fit. Pursuant to Article 28.4 of the LCIA Rules, the Tribunal shall make its orders on arbitration and party costs on the general principle that the costs should reflect the parties' relative success and failure in the arbitration, except where it appears to the Tribunal that in the particular circumstances this general approach is inappropriate. On the basis of the Tribunal's discretionary powers under the above provisions, the Tribunal shall allocate both the costs of the arbitration fixed by the LCIA Court as well as the Parties' legal costs in the proportions mentioned below.

992.   Vale by and large has prevailed on the substantive issues decided in this Award regarding fraudulent misrepresentation, breach of warranties and frustration of contract as well as the remedies of rescission and damages regarding deceit. The Tribunal considers the starting point to be that BSGR (in view of the findings of the Tribunal regarding bribery) should bear the entirety of the costs of the arbitration as determined by the LCIA Court in the amount of GBP 1,864,590.07. Vale has contributed GBP 1,429,540.61.

993.   The Tribunal considers that one qualification is to be made to the above as BSGR prevailed in relation to a challenge to the former Chairman of the Tribunal before the LCIA Division. As there have been two challenge proceedings before the LCIA Division involving in total five arbitrators (the first proceedings against the full tribunal of three

arbitrators and the second against the two arbitrators), BSGR will not be ordered to reimburse Claimant for the full costs of the arbitration as set out above but 10% of the total costs of the LCIA Division will be borne by Vale. The total fees of the LCIA Division amounted to GBP 157,972.50 and its expenses to GBP 1,779.40. BSGR will thus be ordered to reimburse Vale for the total costs of the arbitration at GBP 1,864,590.07, less BSGR's advances of GBP 435,049.46 including interest accrued thereon but less 10% of the LCIA Division's fees at GBP 157,972.50 and its expenses at GBP 1,779.40 (or GBP 15,975.19). Thus, BSGR will be ordered to pay to Vale a total amount of GBP 1,413,565.42 on account of the costs of the arbitration.

994. In addition, and based on the above, the Tribunal considers that BSGR also has to contribute to the costs of legal representation of Vale which amount to USD 20,834,491.05 which the Tribunal considers to be reasonable given the immense amount of work on this complex case, its procedural complications and the extensive evidence gathering that was required. On the other hand, compared to BSGR's costs of legal representation at GBP 5,709,839.21 (GBP 6,143,680.35 less GBP 435,049.46 paid to the LCIA), Vale's costs almost treble those of BSGR. In exercising its discretion, the Tribunal considers that it is reasonable and fair – given the outcome of the case and its constituent parts and the findings of the Tribunal regarding bribery – that BSGR must compensate Vale for the costs of its legal representation and ancillary costs in relation that legal representation for an amount of USD 16 million as the currency in which they were primarily incurred.

995. As Vale also seeks interest on any costs order, the Tribunal, for the reasons given in the interest part of this Award, will order BSGR to pay interest on the costs awarded at a rate of LIBOR USD 3-month rates plus 5% compounded annually from the date of this Award until full payment.

## XII.   SUMMARY OF FINDINGS

996.   For all the foregoing reasons and rejecting all submissions to the contrary, the Tribunal will rescind, on account of fraudulent misrepresentation by BSGR, the Framework Agreement and the SHA and award damages to Vale for a total amount of **USD 1,246,580,846**, with interest as determined in paragraphs 986 and 987, subdivided as follows:

| | | | |
|---|---|---|---|
| 996.1. | Initial Consideration | USD | 500,000,000 |
| 996.2. | Vale Loan | USD | 581,197,104 |
| 996.3. | Feasibility Study | USD | 85,365,652 |
| 996.4. | Internal Costs | USD | 80,018,090 |

997.   BSGR will also be ordered to account for the costs of the arbitration save for 10% of the fees and expenses of the LCIA Division and to reimburse USD 16,000,000 for Vale's cost of legal representation and other costs related to the present proceedings.

998.   Having come to the end of this Award, the Tribunal considers it appropriate to provide a bird eye's view of the proceedings and of its Award.

999.   As regards the proceedings, it is regrettable that the Tribunal, as of the September 2016 Hearing, did not have the benefit of BSGR's participation. In discharging its duties, it attempted at all times to be mindful of BSGR's interests, both procedurally and as to substance. During the September 2016 Hearing and the February 2017 Hearing, it attempted to have BSGR's views heard in its exchanges with Vale's Counsel and in examining Vale's witnesses and Vale's expert. In reading the transcripts of those hearings, the Tribunal is satisfied that it did what was reasonably possible without losing its impartiality and acting as BSGR's counsel. In preparing this Award and during its deliberations, the Tribunal critically and comprehensively reviewed the file, particularly BSGR's submissions, fact exhibits, legal authorities, witness statements and expert report.

1000.   While the Tribunal regrets that the calendar of Mr. Wolfson QC initially indicated that he would not have been available to appear on first few days of the three weeks scheduled for the Merits Hearing (although it transpired that his previous commitments changed and he was in fact available on these dates[1020]), the Tribunal decided to proceed with the Merits Hearing on the planned dates as suitable alternative dates were not readily available and BSGR had available to it many other lawyers, including other barristers, that could have been briefed in the available time before the Hearing. As a result, at the end of these proceedings and, having reviewed Procedural Orders Nos. 17, 18 and 19 again, it is satisfied that the decisions in these procedural orders were appropriate in the circumstances and sufficient to preserve BSGR's due process rights.

1001.   As regards the ICSID proceedings which the Tribunal assumes are still pending but which may be withdrawn shortly as a result of a reported settlement between BSGR and

---

[1020] See Transcript, Merits Hearing, Day 1: p.239, lines: 6-14.

the GoG, the Tribunal reiterates that they involve different parties and involve not only different causes of action but also operate at the level of public international law regarding alleged breaches of investor protection under a Bilateral Investment Treaty. As the present proceedings and the ICSID proceedings had different timetables, it was difficult to coordinate both proceedings. It was also not necessary to do so as there is no *lis pendens* principle between tribunals belonging to different legal regimes or a risk of conflicting decisions based on rules of claim or issue preclusion.

1002. As regards substance, Vale presented its case as one of bribery and corruption initially, but gradually qualified its narrative to emphasise that its claim was not dependent on proving bribery and could succeed by proving fraudulent misrepresentation and breach of warranties on matters which, would have raised "red flags" if disclosed. Vale's narrative of an innocent party being induced by its partner BSGR to invest large amounts of money when its partner had bribed local officials in Guinea and hidden these corrupt practices through obscure intermediaries and opaque BSG Group business structures could have been avoided by the Tribunal without making inquiries and findings on bribery. The Tribunal chose not to do so in order to give justice to the case in view of Vale's narrative as well as BSGR's narrative that it was an innocent investor affected by policies of the newly-elected President of the Republic of Guinea intending to revisit existing investments by false pretexts of bribery under the former government. A central plank of BSGR's case was, thus, that it had not engaged in bribery in procuring its mining rights, and this plank needed to be addressed by this Tribunal.

1003. There is another reason for the Tribunal not to avoid looking into bribery allegations. The Tribunal considers that it is not the task of arbitral tribunals to be engaged in fights against corruption but also not to accept bribery as a fact of life in some countries and keep eyes shut when faced with allegations of corruption. It considers that a middle course can be found in view of the limited evidentiary and coercive powers in private commercial arbitration and the uphill task of establishing corruption which by its very nature is secretive and hidden. While the Tribunal did make findings of bribery in the present case, its findings are limited to those individuals and companies where the Tribunal felt comfortable that it could make such findings. There may be more individuals or companies that were involved in corrupt practices regarding BSGR procuring its mining rights in Guinea, but the Tribunal considers that it was not its task to investigate private corruption by local businessmen, to inquire into the question whether certain payments made were genuine compensation for advisory, consulting or other services, or whether they encompassed monies to bribe Guinean government officials. Nor was it the Tribunal's duty to look further into BSGR companies to identify which entity or individual had knowledge or participated in bribing schemes or to look upstream of BSGR whether its parents, the Balda Foundation or Steinmetz or any other individual should be accountable for bribery. The Tribunal did not make findings in relation thereto as this was not possible or necessary for the disposition of the case and to do justice to Vale's prayers for relief and BSGR's defences thereto.

## XIII.   DISPOSITIF

1004. For all of the foregoing reasons and rejecting all submissions to the contrary, the Tribunal hereby **FINDS** (paragraph 676) that the Claimant has established its case alleging fraudulent misrepresentation. All other causes of action by Vale are hereby dismissed.

1005. As a consequence of its finding in paragraph 1004, the Tribunal hereby **ORDERS AND AWARDS** the following relief:

1005.1. The Tribunal hereby rescinds the Framework Agreement and the SHA on account of fraudulent misrepresentation (paragraph 920).

1005.2. The Tribunal orders BSGR to pay forthwith to Vale damages of USD 1,246,580,846 on account of fraudulent misrepresentation (paragraph 980).

1005.3. The Tribunal orders BSGR to pay forthwith to Vale simple pre-award interest at LIBOR USD 3-month rates plus 7% from the following dates to the date of this Award (paragraph 986):

1005.3.1. from 30 April 2010 for the Initial Consideration of USD 500,000,000;

1005.3.2. from the date of issuance of each of the promissory notes as indicated for each promissory note on pp. 1–3 of Exhibit C-69 (revised), taking into account the deductions on the promissory notes issued on 7 June 2010 and 24 July 2014 (paragraph 955);

1005.3.3. from 1 December 2011 for the Feasibility Study expenditures of USD 85,365,652; and

1005.3.4. from 1 December 2011 for Vale's Internal Costs of USD 80,018,090.

1005.4. The Tribunal orders BSGR to pay to Vale post-award interest at LIBOR USD 3 month rates plus 5% on all amounts due under this Award from the date of this Award until the date of full payment, with all unpaid sums to be compounded on each anniversary of the date of this Award (paragraph 987).

1005.5. As regards costs and expenses, the Tribunal orders BSGR to pay to Vale (a) GBP 1,413,565.42 being the total costs of arbitration less the deposits made by BSGR (including interest) and 10% of the fees and expenses of the LCIA's Division that is to be borne by Vale (as set out in paragraph 993), and (b) USD 16,000,000 for Claimant's costs of legal representation and other related costs (including expert fees), plus interest on any such amounts at a yearly compounded rate of LIBOR USD 3-month plus 5%  from the date of this Award until full payment (paragraphs 994-995).

1005.6. Each interest award above shall continue to be binding and effective until full payment of the principal sum awarded above (as well as compounded interest on such principal sum where applicable).

Award signed by the Tribunal:

London, _4_ of ___*April*___ , _2019_

_____

Filip De Ly

Chairman

_____                    _____

Sir David A.R. Williams, QC                                    Michael Hwang, SC

Co-arbitrator                                                        Co-arbitrator

**AWARD 4 APRIL 2019**

## APPENDIX – CHART OF KEY INDIVIDUALS

