CLEARY GOTTLIEB STEEN & HAMILTON LLP
Jonathan I. Blackman
Jeffrey A. Rosenthal
Lisa M. Schweitzer
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to Vale S.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BSG RESOURCES LIMITED (in administration),<br><br>    Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 19-11845 (SHL) |

**DECLARATION OF JONATHAN BARCLAY IN SUPPORT OF OPPOSITION TO**
**JOINT ADMINISTRATORS' MOTION TO SEAL PURSUANT TO**
**11 U.S.C. §§ 107(b) AND FED. R. BANKR. P. 9018 FOR AUTHORITY TO**
**FILE AND MAINTAIN CONFIDENTIAL INFORMATION UNDER SEAL**

    I, Jonathan Barclay, pursuant to 28 U.S.C. § 1746 hereby declare under penalty of

perjury under the laws of the Unites States of America as follows:

    1.   I am a partner at the firm Bedell Cristin Guernsey Partnership.  I qualified as an

English barrister in 1999 and as an Advocate of the Royal Court of Guernsey in 2006.  My

practice concentrates on the contentious aspects of financial services law and regulation,

including the area of corporate insolvency.  I submit this Declaration in support of Vale

S.A.'s *Opposition to Joint Administrators' Motion to Seal Pursuant to 11 U.S.C. §§ 107(b)*

*and Fed. R. Bankr. P. 9018 for Authority to File and Maintain Confidential Information*

*Under Seal* ("Opp. Motion to Seal").  In support thereof, I respectfully state as follows:

    2.   I have had an opportunity to consider the Declaration of Mathew Newman dated

June 6, 2019. Advocate Newman advances a series of points at paragraphs 7 to 10 of his Declaration which touch on the Royal Court's discretionary power to make privacy orders. *See Declaration of Mathew Newman in Support of the Joint Administrator's Motion to Seal* (ECF No. 17) ("Newman Declaration").

3.    I agree with Advocate Newman that the default position before the Royal Court is that all proceedings must be in public. There is a Practice Direction (No. 2 of 2000) to this effect. There are a small number of exceptions to this general rule. The relevant exception in this matter is "in any case in which Counsel or a party to the proceedings can satisfy the Court that proceedings should be held in camera. Separate applications in that regard should be made to the Court, in advance where possible." *See* Practice Direction (No. 2 of 2000) attached as Exhibit 1 hereto.

4. In IFS Investments v Manor Park (Guernsey) Limited and Others (Guernsey Judgment 13 of 2004 ), attached as Exhibit 2 hereto, Day LB confirmed that in Guernsey the principle of open justice is and always has been a fundamental principle of administration of justice in this jurisdiction. Exhibit 2 ¶ 21. The learned Judge approved Scott v Scott [1913] AC 417 which is the leading authority on the issue of privacy in England. He expressed the view that "in simple terms, legal principle required that justice must be done in public, but that where justice itself would be thus frustrated privacy should prevail, but only to the extent necessary." Exhibit 2 ¶ 39.

5.    The IFS Investments case remains the lead authority on the general privacy jurisdiction in Guernsey proceedings. The dictum reproduced above was applied by the Bailiff in Esquire Realty Holdings Limited [2014 GLR 77] (the administration application identified by Advocate Newman), attached as Exhibit 3 hereto, in coming to the conclusion

that the particular administration application "was a classic case of where justice could be frustrated if the hearing were held in public." Exhibit 3 ¶ 35.

6.   I therefore respectfully agree that the general rule in Guernsey is that proceedings are conducted in public and that this general rule is applicable in administration applications. A discretion to order privacy undoubtedly exists but is exceptional in nature and to be exercised only so far as necessary. If an exception to the general rule is sought, the burden lies on the applicant for privacy to demonstrate that the relevant test is met.

7. The application of these principles can be seen in Esquire Realty Holdings, in which I (like Advocate Newman) appeared. In accordance with Practice Direction No. 2 of 2000, the administration application had been preceded by a separate application for privacy, which was moved for by my partner Advocate Alasdair Davidson. The reasons which persuaded the Court to order privacy were not, however, quite as stated by Advocate Newman in paragraph 8 of his Declaration. The application concerned, ultimately, a network of specialist adult and children's care homes throughout the United Kingdom whose future, subject to obtaining the necessary administration order, would be secured by means of a pre-packaged sale. According to the Bailiff's public judgment, affidavit evidence "outlined the perilous financial position of the group of companies and the risk to operations of the group if other creditors of group companies, including service providers, became aware of the situation. There would be a risk of disruption of care services provided to the vulnerable adults and children who are looked after by the group. In particular, there was a real risk of distress being caused to such persons and to their families if they were to worry that they could be rendered homeless. **The concerns for the welfare of the vulnerable adults and children** persuaded the Bailiff to order that the Application remain confidential

3

until such time as it were granted, or further order." Exhibit 3 ¶¶ 31-32 (emphasis added).

8. It should be noted that, in the Esquire Realty Holdings matter, privacy was extended for a very short period and the reasons for making a privacy order were, in accordance with principles of open justice, made public. The preliminary application for privacy was granted on April 4, 2014; the administration application itself was heard on April 16, 2014; and in the course of determining that application the Court directed that the making of the administration order should not be public until 9:00 am the following day (thereby permitting a pre-packaged sale of the care home business to conclude before the proceedings became public). Although paragraph 35 of the judgment identified that "there is certain sensitive and confidential evidence in the affidavits produced to the Court which the Court orders shall remain private," the formal order, or Act of Court, when it was sealed (the draft order having been settled by Counsel following judgment), recorded the extension of privacy restrictions to 9:00 am on April 17, 2014 only. Having consulted my notes, I see that at the conclusion of the hearing on April 16, 2014 my colleague Advocate Davidson had applied orally for the court file to remain sealed, citing the commercially sensitive nature of some of the contents of the affidavits. That order was not made. Instead, the original affidavits were returned to my firm, to be held to the Court's order. To my knowledge there is no reason why an interested person could not make a request for access to the affidavits, which request would then (I expect) be referred to and considered by a judge.

9. I am not privy to the reasons given by the Royal Court for its decision to order privacy in either the Elli Investments Limited case referred to by Advocate Newman or the BSG Resources Limited administration, as in neither case has there been a public judgment. Paragraph 8 of the Newman Declaration states that the Royal Court agreed to seal the court

file relating to BSG Resources Limited for "exactly those reasons" but it is not at all clear, with due respect, what reasons are referred to.

10. In my opinion, however, if any of those cases turned on any principle which was different to the principle stated in IFS Investments and therefore underpinning Esquire Realty Holdings, this would be a significant development for this jurisdiction and I would expect an appropriately anonymized or redacted reasoned judgment to have been published. The fact that no relevant judgment has been published subsequently to Esquire Realty Holdings leads me to conclude that the principle stated in IFS Investments remains good authority. Consequently, in my view, the unexplained sealing of the entire court file in the BSG Resources Limited administration is *prima facie* a serious departure from the established principle that privacy should be ordered only, and only so far as is necessary, to prevent justice being frustrated. This apparent serious departure from fundamental principles is not explained by any of the potential justifications for privacy canvassed in the Newman Declaration, because there is no way of knowing which (if any) of them may have applied to the specific case in question, or what the judge's conclusions might have been.

11. I add that administration applications are relatively rare in Guernsey. Administration applications conducted *in camera* are rarer still. I am aware of only four such cases having been conducted in private since the commencement of the Companies (Guernsey) Law, 2008, which is the current statute governing corporate insolvency, being those applications referenced above plus one other whose existence is now in the public domain. I would not be able to support the propositions that the discretion had been exercised "many times" in the Royal Court, Newman Declaration ¶ 8, or that there are any generic types of material an Advocate would expect to remain sealed on the court file due to

commercial sensitivity, Newman Declaration ¶ 10. In my opinion, there are no legal grounds for anyone to expect that information tendered to the Royal Court within the insolvency jurisdiction will remain private, merely because it is believed to be commercially sensitive. More is required.

12. In summary, my opinion is that each application for privacy in Guernsey must turn on its own particular facts; the applicant for privacy must demonstrate that justice would be frustrated if privacy were not granted; and even if that test is satisfied the court will extend privacy only so far and only for so long as is strictly necessary to protect the ends of justice. In my view, principles of open justice require that the reasons for decisions to order privacy should themselves be published, if necessary in anonymized or redacted form, as soon as may be consistent with the objective of preventing the frustration of justice. There is no presumption that any particular category of information or type of document will require privacy if tendered in insolvency proceedings, any more than there is in any other type of public proceedings. Orders for privacy are very much the exception rather than the rule and require appropriately cogent grounds to be supportable. Commercial sensitivity of a category of documents is not, without more, a sufficient consideration, as authority requires the Court to consider the ends of public justice rather than private or commercial convenience.

13. There is nothing in the Newman Declaration that enables me to conclude that the judge in the case of BSG Resources Limited was correctly directed as to the proper scope of his discretion to make a privacy order or that the discretion has been regularly exercised having regard to the facts of the case. It would be impossible to reach such a conclusion without seeing a reasoned judgment on the privacy issue or a transcript of the

privacy hearing.

I certify pursuant to 28 U.S.C. § 1746 under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 11, 2019
     St Peter Port, Guernsey

_____
Jonathan Barclay

# Exhibit 1

K. H. TOUGH
HER MAJESTY'S GREFFIER

REGISTRAR GENERAL
OF
BIRTHS
MARRIAGES AND DEATHS

TELEPHONE (01481) 725277
FACSIMILE (01481) 715037

*Greffe,*

*Royal Court,*

*Guernsey,*

*GY1 2PB.*

### PRACTICE DIRECTION No. 2 of 2000

11th August 2000

### SITTINGS OF THE ROYAL COURT TO BE OPEN TO MEMBERS OF THE PUBLIC

I am directed by the Deputy Bailiff after consultation with the Bailiff, to issue the following Practice Direction.

With effect from Monday 14th August 2000, the general principle will be that all sittings of the Royal Court will be open to members of the public. The exceptions to that general principle will be :-

(a)  Sittings in the Matrimonial Causes Division;

(b)  *Ex Parte* applications for Arrests and Injunctions; and

(c)  In any case in which Counsel or a party to the proceedings can satisfy the Court that proceedings should be held in camera. Separate applications in that regard should be made to the Court, in advance where possible.

Robes as at present will continue to be worn only when the Court is sitting with Jurats or for Judicial Separations.

D. R. Dorey
Her Majesty's Deputy Greffier

# Exhibit 2

Guernsey Judgment 13/2004 – IFS Investments Ltd v Manor Park (Guernsey) Ltd et al

| Judgment 13 / 2004 | IFS Investments Ltd. v Manor Park (Guernsey) Ltd., Manor Park Guaranteed Investment Funds Ltd., Williams and Dinning – Royal Court - (Civil Action file 817) 22nd April 2004. |
|---|---|

**Tort – injunction proceedings – allegation of conspiracy etc. – application that certain interlocutory matters be heard in private – open justice a fundamental principle – circumstances in which a restriction on disclosure may be appropriate – application dismissed.**

## IN THE ROYAL COURT OF THE ISLAND OF GUERNSEY

The 22nd day of April, 2004 before Andrew Christopher King Day, Esquire, C. B. E. Lieutenant Bailiff; sitting alone

IFS INVESTMENTS LIMITED

Plaintiff

v

MANOR PARK (GUERNSEY) LIMITED

First Defendant

MANOR PARK GUARANTEED INVESTMENT FUNDS LIMITED

Second Defendant

ALAN WILLIAMS

Third Defendant

GILLIAN SARAH DINNING

Fourth Defendant

WHEREAS on 13th April, 2004 the Lieutenant Bailiff considered the Fourth Defendant's application that certain Interlocutory matters in litigation be heard in private and heard thereon Advocates R. J. Collas and P. T. R. Ferbrache Counsel for the Fourth Defendant and Plaintiff respectively.

The Bailiff this day handed down judgment in the terms attached hereto and

1.    DISMISSED the application

2.    AWARDED costs to the Plaintiff on the standard recoverable basis.

S.M.D. ROSS
Her Majesty's Deputy Greffier

**Approved Judgment**

22nd April 2004

## IN THE ROYAL COURT OF GUERNSEY

### ORDINARY DIVISION

| | | |
|---|---|---|
| Between: | **IFS INVESTMENTS LIMITED** | **Plaintiff** |
| | v | |
| | **MANOR PARK (GUERNSEY) LIMITED** | **First Defendant** |
| | **MANOR PARK GUARANTEED INVESTMENT FUNDS LIMITED** | **Second Defendant** |
| | **ALAN WILLIAMS** | **Third Defendant** |
| | **GILLIAN SARAH DINNING** | **Fourth Defendant** |

Judgment of Day L.B. on the Fourth Defendant's application that certain interlocutory matters in this litigation be heard in private.

Advocate R.J. Collas appeared for the Fourth Defendant.
Advocate P.T.R. Ferbrache appeared for the Plaintiff.

Hearing date: 13th April, 2004
Judgment handed down: 22nd April, 2004

**Cases referred to:**

Scott (otherwise Morgan) v Scott [1913] AC 417

R v. Legal Aid Board, ex p Kaim Todner (a firm) [1998] 3 WLR 925

Jersey Evening Post Ltd. v. Thani [2002] JLR 542

G v. A [2000] JLR 56

Attorney General v. Leveller Magazine Ltd. [1979] AC 440

P, ex parte   The Times 31st March 1998; Court of Appeal (Civil Division)
             Transcript No. 431 of 1998, CA

## A.    Background

1.    The Plaintiff, a company incorporated in Guernsey (on 22nd March 2002) and duly authorised to carry on restricted activities in connection with investment funds, provides, amongst administrative and other services, a guaranteed fund service to institutional

clients.  The Second Defendant carries on business as an investment company and in particular operates an "umbrella" fund ("the MP Fund") consisting of a number of sub-funds.  The First Defendant provides management services to the MP Fund (in effect the Second Defendant).  Both of these companies are again incorporated in Guernsey and have as a director the Third Defendant, who is the ultimate beneficial owner of the First Defendant and the principal controller of the Manor Park group of companies.  The Fourth Defendant is a Guernsey Advocate and partner in the firm of Carey Olsen.  At the material times she was the legal advisor to the other three Defendants.

2.      On the 1st June 2001 International Fund Services (Guernsey) Ltd. ("IFSG"), at that date called FnP Fund Services Ltd., entered into a Distributor Agreement with the First and Second Defendants to provide services in relation to the latter, and at the same time entered into an Administrative Agreement with the First Defendant in respect of the Second Defendant.  IFSG was specifically incorporated in Guernsey (on the 23rd February, 2001) for those purposes and is related to the Plaintiff, a loose description intended solely to indicate there are those with an interest in both.

3.      To state the matter starkly, by the summer of 2003 the First and Second Defendants had fallen out with the Plaintiff, IFSG, and four individuals, particularly in relation to the activities of another fund, the Acumen Guaranteed Fund.  The first two Defendants instituted injunctive proceedings on the 25th July, 2003, against the Plaintiff and the five other connected parties, seeking to restrain the use and disclosure of information which they alleged to be confidential to those two Defendants and thus in breach of the 2001 Agreements.  Undertakings were given by both sides, the litigation was "fast-tracked" for full hearing in November, but in the event was settled by the signing, on the 7th November 2003, of a Settlement Agreement between all the interested parties.  That Agreement was stated to be in full and final settlement of the litigation and all other claims and disputes between the parties (save in certain limited circumstances which are irrelevant for present purposes).  In effect, in matrimonial parlance, a clean break was effected between the two sides, all commercial relations were severed and each was free to go their respective ways, with the terms of that Agreement, inter alia, to be kept confidential unless otherwise agreed.

4.      Peace did not break out for long.  The relevant events between early November, 2003, and the end of January, 2004, and the participation and role of various players therein, may well be the subject of much future evidence and argument.  I therefore tread circumspectly, but I think I can sufficiently summarise the main features of events in this way.

5.      The Plaintiff has entered into, and as I understand it is currently engaged in, commercial dealings with Norwich Union International Ltd. ("NUIL") a company based in

Dublin, in relation to the launch of an open ended fund which could be sold as one of NUIL's products. That, on the face of it and all other things being equal, would appear to be an unobjectionable relationship provided, perhaps, it commenced after the completion of the Settlement Agreement on the 7th November, 2003.

6.    However, the Third Defendant alleges that since that date he has learnt that contact was established between the Plaintiff and NUIL back in the summer of 2003 and therefore the First and Second Defendants might have justified grounds of complaint. Namely, that such contact would have been in breach of the 2001 agreements (which were then still extant), that it might have been in breach of undertakings given to the Royal Court in July, and thereafter, 2003, and that, if such contact had been made between those two parties, then the disclosure obligations of the Plaintiff in the 2003 substantive proceedings should have revealed that fact. Moreover, there might also have been a breach of the terms of the Settlement Agreement itself.

7.    Certainly there has been contact between the Third Defendant and NUIL on this matter, upon which he has also sought advice from the Fourth Defendant; and on the 16th January, 2004, there was what would appear to have been a lengthy telephone conversation between, principally, the Fourth Defendant, as advocate of the other three Defendants, and officers and/or advisors of NUIL, which was followed up by a letter of the 26th January from Carey Olsen to NUIL. The thrust of the Fourth Defendant's advice to NUIL was that, on the basis of certain clearly set out assumptions (the accuracy of which NUIL would have the knowledge to assess) certain legal consequences would follow so as to justify, in her opinion, full complaint by the First and Second Defendants as to the activities of the Plaintiff.

8.    For its part the Plaintiff asserts that the contacts and communications with NUIL on the part of the Third Defendant, and other colleagues of the First and Second Defendants, were maliciously motivated, seeking to interfere unlawfully with proper business relations between the Plaintiff and NUIL. In the event, on the 26th January, 2004, the Plaintiff made application to the Court for injunctive relief, both mandatory and prohibitory, against the first two Defendants alone. The relief sought consisted, firstly, of the provision of a "letter of comfort" to be sent to NUIL to the effect that the First and Second Defendants did not have cause for complaint against the Plaintiff in respect of its contacts and relationship with NUIL and would not be taking any legal action in that regard. Thus NUIL would be given the "green light" to continue and finalise its business relations with the Plaintiff, vital to the latter, which otherwise NUIL was reluctant to do because of the potential damage which these allegations might cause (to the fund and thus NUIL). Secondly, the Plaintiff sought to restrain any unlawful interference by the First and Second Defendants in business relations between the Plaintiff and NUIL.

9.      As a consequence of a direction from the Deputy Bailiff, the Fourth and Third Defendants filed affidavits, in the case of the Fourth Defendant on the 5th February in which she provided a full statement with regard to her telephone communication with NUIL of the 16th January, 2004, and her firm's file note thereon.  At this time, also, she and her firm ceased to act in these disputes for the Manor Park interests.  In due course when the matter came before him on the 10th February, the Bailiff ordered that the proceedings should be formally, and he considered properly, instituted by the filing of a Cause in the Ordinary Court, as what was being sought was an injunction of a permanent nature and not one of an interim kind pending other substantive proceedings.  Those substantive proceedings were instituted, I understand, on the 12th February and the Cause formally filed in Court on the 5th March, 2004.

10.     There are now four named Defendants against whom damages in the sum of €32 m are claimed, as also injunctive relief of both a mandatory and prohibitory nature similar to that sought in the injunctive proceedings instituted at the end of January, 2004 against the first two Defendants alone.  Further, the Plaintiff seeks a declaration from the Court that it may continue its business as a consultant providing a guaranteed fund service to institutions without the unlawful intervention of the Defendants, and in particular its proposed business with NUIL, and that in carrying on its proposed business with NUIL it will be acting lawfully and not in breach of the Settlement Agreement.

11.     It is, I think, necessary, or at least helpful, to summarise briefly the complaints and allegations made against the Defendants in the substantive proceedings, being the basis upon which the damages and injunctive and declaratory relief are being sought.  Firstly (para. 26), the First and Second Defendants (together with their consultant) are alleged wrongfully and maliciously to have conspired and combined together with intent to injure the Plaintiff and so cause loss to him on or around the 7th November, 2003.  No further details of that allegation are provided at this stage.  Secondly (para. 27), it is alleged against all four Defendants that in furtherance of the alleged conspiracy of the 7th November or thereabouts they have, since that date, falsely and maliciously undertaken actions by which the Plaintiff has been injured or is likely to be injured – particulars thereafter being provided, though with no specific allegations in regard to the Fourth Defendant.  Thirdly (para. 29), it is alleged against the First and Second Defendants that, having become aware on the 24th December, 2003, of the prospective "fund" agreement between the Plaintiff and NUIL they thereafter have wrongly conspired and combined together with intent to injure the Plaintiff and/or cause loss to it.  Fourthly (para. 30), it is alleged against all four Defendants that between the 24th December, 2003, and the 26th January, 2004, they falsely and maliciously undertook actions by which the Plaintiff was injured.  Particulars of that allegation are then provided, being allegations generally against

the Defendants that in twelve separate ways they have made representations to NUIL which were false and without foundation in fact and to their knowledge. Fifthly (para. 32), it is alleged against all the Defendants that the particulars of the two conspiracies, either together or individually, amount to unlawful interference with the business interests of the Plaintiff, with intent to injure the Plaintiff, which has caused loss and continues to do so. In addition, it is alleged against all the Defendants that they have defamed the Plaintiff, though no further details whatsoever are provided.

12.     Thus by these unlawful acts and conspiracies, as the Plaintiff alleges, the launch of the new fund, which was to be effectively, and lawfully, the joint venture of NUIL and the Plaintiff has been frustrated, so far; and unless satisfactory comfort is given to NUIL, which has not been forthcoming from the Defendants, then the launch will be cancelled, and the Plaintiff will not receive the fees which would have been otherwise payable to it in the estimated sum over a ten-year period of €32 m.

13.     I would make the neutral observation that the Plaintiff and the first three Defendants are business competitors, who may both be seeking the favour of NUIL and for that reason are both crying "foul". The stakes are high.

14.     On the 5th March the Cause was placed on the pleading list with regard to the First and the Second Defendants, and leave was obtained to serve the Third Defendant out of the jurisdiction (he is resident in Scotland), and placed on the pleading list against him on the 28th March.

**B.    The Fourth Defendant's current application**

15.     On the same date and at the same sitting of this Court, the Fourth Defendant filed three separate applications. The first of these seeks to recuse Ozannes from continuing to act for the Plaintiff, on grounds to which I need not refer ("the rescusation proceedings")The second application, brought pursuant to Rules 34 and 36 of the Royal Court Civil Rules 1989, is for an order that the proceedings instituted by the Plaintiff against the Fourth Defendant be struck out and/or amended and/or that she cease to be a party, again on grounds to which I need not refer ("the strike-out application"). The third application, of which I am presently seized ("the privacy application"), seeks:-

> "an Order that the application brought by her pursuant to Rules 34 and 36 of the Royal Court Civil Rules 1989 be heard by the Royal Court in private before the proceedings instituted by IFS Investments Limited against Manor Park (Guernsey) Limited, Manor Park guaranteed Investment Funds Limited, Alan Williams and Adv

*Dinning are tabled in public court, in the circumstances set out in the supporting affidavit of Adv Dinning.".*

16.     Without, I trust, doing any injustice to the Fourth Defendant, her affidavit basically relates to the irreparable damage to her professional standing and career which publication of the substantive allegations against her now would cause.

17.     Originally, in written skeleton argument, the submission was advanced that if the strike out application was successful then the allegations against the Fourth Defendant contained in the Cause – the matters to be struck out – should never see the light of day. She was concerned that if the Cause was tabled in public against her, as it would be in normal course, the detriment to her reputation by any potential publicity – bearing in mind the seriousness of the allegations made against her which go to the very heart of legal professional conduct – could never be remedied if this Court subsequently determined that she had no case to answer or otherwise the action against her should be struck out.  Mr. Collas helpfully clarified in argument, and very much refined, exactly what his client was seeking by means of the privacy application.

18.     It was now accepted by the Fourth Defendant that, whatever the result, any decision with regard to her strike-out application must then become a matter of public record, which in turn would mean that the contents of the Cause itself against her would also be made public (otherwise that decision could lack clarity).  So the purpose, and therefore ultimate effect, of the privacy application was merely to delay publication of the allegations against her as identified in the Cause so that they could be simultaneously viewed in the light of any decision on her strike-out application.  This application was therefore as simple and as limited as that.  It was a matter of timing.

19.     Because of the initial stance adopted by the Fourth Defendant, it seemed to me that the strength of her case regarding a strike out might be relevant to this application itself. Hence in argument I raised the issue with Counsel, Mr. Collas suggesting that that issue might indeed be a relevant one for my determination of this matter, with Advocate Ferbrache, rightly, reminding me of the height of the hurdle which had to be surmounted by a defendant to achieve the striking out of proceedings at this stage of a case (referring me to the appropriate passages of the White Book 1999 relating to the former English rules comparable to our Rule 36).  In the event, it was and is not necessary to explore this aspect of the case in any greater depth.

20.     Similarly it has not been and is not necessary to examine other original submissions of Mr. Collas that the allegations against his client had not been properly particularised in the Cause, that they were so vague as to cause speculation that his client had done something

even more serious than in fact alleged in the Cause, and that, in the light of the information currently available with regard to whether NUIL would proceed with its new fund or not, it could well be that damages were excessively inflated in the Cause, and indeed that causation as between the alleged torts and the alleged monetary damages was not established

## C.  Legal principles

21.    In Guernsey (as apparently also in Jersey) the principle of open justice has not yet found statutory expression.  In my view that is unnecessary, as it is and always has been a fundamental principle of our administration of justice.  Apart from one or two statutory provisions which require proceedings be held in private (for example, criminal committal proceedings before the Magistrate), there a number of matters where the Royal Court in the exercise of its inherent jurisdiction conducts hearings in private; for example, cases concerning children or incapables, matrimonial or trust matters and *ex parte* injunction applications.  Apart from such well founded and accepted exceptions, the fundamental principle is unfailingly applied (though a few years ago there was some confusion as to whether general interlocutory matters were held in private or in public).  Counsel have not referred me to, nor am I aware of, any Guernsey cases which provide assistance, certainly not of authority binding upon me, as to when exceptions to the basic principle may be appropriate.  I have, however, been helpfully referred to two English and two Jersey cases, the former of which are of particularly persuasive authority not least because they have also guided the Jersey courts in their decisions.

22.    The leading English case is that of Scott._  As Lord Woolf MR stated in Kaim Todner (at p. 933 D) *"...it is always necessary to start with the guidance given by the House of Lords in Scott...".*  The basic principle was authoritatively stated by Viscount Haldane LC as follows (p. 437):-

*"...While the broad principle is that the Courts of this country must, as between parties, administer justice in public, this principle is subject to apparent exceptions, such as those to which I have referred (*wards, lunatics and litigation as to a secret process).  But the exceptions are themselves the outcome of a yet more fundamental principle that the chief objects of the Courts of justice must be to secure that justice is done.  In the two cases of wards of Court and of lunatics the Court is really sitting primarily to guard the interests of the ward or the lunatic.  Its jurisdiction is in this respect parental and administrative, and disposal of controverted questions is an incident only in the jurisdiction.  It may often be necessary, in order to attain its primary object, that the Court should exclude the public.  The broad principle which ordinarily governs it therefore yields to the paramount duty, which is the care of the*

*ward or the lunatic.  The other case referred to, that of litigation as to a secret process, where the effect of publicity would be to destroy the subject-matter, illustrates a class which stands on a different footing.  There it may well be that justice could not be done at all if it had to be done in public.  As the paramount object must always be to do justice, the general rule as to publicity, after all only the means to an end, must accordingly yield.  But the burden lies on those seeking to displace its application in the particular case to make out that the ordinary rule must as of necessity be superseded by this paramount consideration.  The question is by no means one which, consistently with the spirit of our jurisprudence, can be dealt with by the judge as resting in his mere discretion as to what is expedient.  The latter must treat it as one of principle, and as turning, not on convenience, but on necessity.".*

23.    To which should be added, again on the advice of Lord Woolf (at p. 933 G), the comment of Earl Loreburn (at p.446 in Scott) on the exceptions to the general rule that justice must be done publicly:-

*"It would be impossible to enumerate or anticipate all possible contingencies, but in all cases where the public has been excluded with an admitted propriety the underlying principle as it seems to me, is that the administration of justice would be rendered impracticable by their presence whether because the case would not be effectively tried, or the parties entitled to justice would be reasonably deterred from seeking it at the hands of the court.".*

24.    I should also cite a short passage from the speech of Lord Diplock in Leveller Magazine (a case concerned with the power to permit a witness to remain anonymous), as again enjoined by Lord Woolf MR.  Lord Diplock stated (at pp. 843 – 844):-

*"However, since the purpose of the general rule is to serve the ends of justice it may be necessary to depart from it where the nature or circumstances of the particular proceeding are such that the application of the general rule in its entirety would frustrate or render impracticable the administration of justice or would damage some other public interest for whose protection Parliament has made some statutory derogation from the rule.".*

25.    In Kaim Todner, a case concerned with a solicitor's application for anonymity, the facts, as stated in the head note, were as follows:-

*"The Legal Aid Board informed the applicants, a firm of solicitors, that the legal aid franchise at two of their offices was to be terminated following allegations of dishonesty by former employees.  The applicants sought leave to apply for judicial*

*review of that decision and applied for an order under section 11 of the Contempt of Court Act 1981 forbidding the disclosure of their identity in the proceedings on the ground that they would be caused incalculable damage if the reasons on which the board relied for cancelling their franchise were to be made public. The judge granted the applicants leave to apply for judicial review but refused to make an order affording them anonymity. The applicants appealed and, at the start of the appeal, made a further application for anonymity in respect of the appeal whatever its outcome, indicating that if such an order were not made they would withdraw the appeal or consent to its dismissal. The Court of Appeal refused to make the order and indicated that it would not consent to the withdrawal of the appeal.".* The appeal was dismissed.

26.     Lord Woolf MR stated nine matters which should guide the general approach as to whether exceptions should or should not be made in particular cases to the principle that justice must be done publicly (see pp. 933 – 935). I propose to précis or cite those nine principles, which partly relate, inevitably in view of the facts of that case, to the particular situation of solicitors.

27.     There can be no justification for singling out the legal profession for special treatment.

28.     The facts in that case did not fall within any of the four specific situations identified in section 12 of the Administration of Justice Act, 1960, where publication of information relating to proceedings for a court sitting in private is given statutory protection; thus any protection against identification of a party must depend upon some exception to the general principle that all proceedings should be conducted in public. Lord Woolf MR then proceeded to refer to the cases of Scott and Leveller Magazine and the speeches of their Lordships, which I have already cited, and the principles enunciated.

29.     Whilst the limits to the exceptions to the general principle should *"not depend on the individual discretion of the judge"* (as per Viscount Haldane LC in Scott), there are an immense variety of situations in which it is appropriate to restrict the general rule. These situations depend very much on their individual circumstances. So, if a judge adopts a correct approach in determining any particular application, the Court of Appeal will not interfere with the decision of a judge on an issue of this nature.

30.     The importance of not making an order, even where both sides agree that an inroad should be made on the general rule, if the case is not one where the interests of justice require an exception, has been overlooked. Here the comment of Sir Christopher Staughton in *ex-parte P* is relevant. His Lordship stated: *"when both sides agreed that information should be kept from the public that is when the Court had to be most vigilant.".*

31.    The need to be vigilant, Lord Woolf MR advised, arises from a natural tendency for the general principle to be eroded and for exceptions to grow by accretion as the exceptions are applied by analogy to existing cases.  This is the reason it is so important not to forget why proceedings are required to be subjected to the full glare of a public hearing.  It is necessary because the public nature of the proceedings deters inappropriate behaviour on the part of the Court.  It also maintains the public's confidence in the administration of justice.  It enables the public to know that justice is being administered impartially.  It can result in evidence becoming available which would not become available if the proceedings were conducted behind closed doors or with one or more of the parties' or witnesses' identity concealed.  It makes uninformed and inaccurate comment about the proceedings less likely.  If secrecy is restricted to those situations where justice would be frustrated if the cloak of anonymity is not provided, this reduces the risk of the sanction of contempt having to be invoked, with the expense and the interference with the administration of justice which this can involve.

32.    Lord Woolf then identifies the situations which, in that jurisdiction, by statutory provision (s 12 of the Administration of Justice Act, 1960) are candidates for special protection (see also para. 25 above).

33.    It is appropriate to take into account the extent of the interference with the general rule which is involved in any application for protection from disclosure.  Thus interference for a limited period is less objectionable than a restriction on disclosure which is permanent.  A restriction limited only to the identity of a witness or a party is similarly less objectionable than restriction which involves the proceedings being conducted in whole or in part behind closed doors.

34.    The nature of the proceedings is also relevant.

35.    Whilst a distinction can be made depending upon whether what is being sought is anonymity for a plaintiff, a defendant or a third party, in general they have to accept the consequences of being involved in litigation.

36.    There can, however, be situations where a party or witness can reasonably require protection, for example, victims of rape and blackmail.  Outside such well-established cases, the reasonableness of the claim for protection is important.  Although the foundation of the exceptions is the need to avoid frustrating the ability of the courts to do justice, there must be some objective foundation for the claim which is being made.

37.    The two further cases to which Counsel referred me, and which are helpful, are decisions of the Royal Court of Jersey, namely Jersey Evening Post and GvA, the reasoning of the judgment in the latter being followed in the former.  In G v. A the Court

emphasised that the question to be asked was whether the paramount objective of securing that justice was done could not be obtained if the *in camera* order were not made. That question turned on necessity not convenience (reiterating the statement of Viscount Haldane in Scott to which I have already referred). The potential embarrassment or the preference of the parties was not a sufficient reason to justify a hearing in private. These principles were also substantially in accordance with Article 6 of the European Convention on Human Rights. For completeness, I would add that G. had instituted proceedings against the estate of her former doctor, whom she alleged had prescribed anabolic steroids to her over a number of years causing extensive adverse physical and mental side-effects, particularly certain phobias. She submitted that if proceedings were conducted in public her phobias would increase in severity and such aggravation of her condition would not be reflected in her damages if she succeeded in the action. The Royal Court of Jersey not only agreed with that submission but held that her condition could also affect the proper evaluation of liability and causation. The case was ordered to be heard in private.

38.     Finally, for what it is worth it appears to me that under the CPR 1998 the provisions in England and Wales relating to hearings in private, as exceptions to the general rule, are effectively, as Mr. Ferbrache submitted, a distillation of previous practice and existing legal principle, the roots of which are to be found in Scott.

39.     I expressed the view, with which Counsel concurred, that, in simple terms, legal principle required that justice must be done in public, but that where justice itself would be thus frustrated, privacy should prevail, but only to the extent necessary.

**D.   Conclusions**

40.     I preface my conclusion by making certain observations.

41.     Advocate Collas, in his very helpful introduction to the background to this privacy application, referred me to correspondence, encompassing the period 20th January to 1st April, 2004, which had been exchanged by, initially, Carey Olsen and Ozannes and then Collas Day and Ozannes, together with a short exchange of correspondence, between Collas Day and A. and L. Goodbody the NUIL's solicitors in Dublin. I do not intend to refer to the details of that correspondence, as I do not consider the details assist me. In that sense I concur with the description of Advocate Ferbrache that that correspondence was irrelevant. However, I specifically take note of one theme of the correspondence with Ozannes, from which, Mr. Collas submitted, I could draw certain inferences, namely that the Plaintiff was seeking to bring pressure on the Fourth Defendant by the threat of being publicly exposed to litigation, to persuade her former clients to produce for NUIL what was requested; an argument obviously rejected by Mr. Ferbrache..

42.     I further note the contrasting allegation being made by the Plaintiff against the Fourth Defendant and Carey Olsen as to the potential financial advantages which might accrue to the latter's "in-house" trust company as administrators, both future or present, of the MP Fund, as also the potential competition between the Plaintiff and the First and Second Defendants for the NUIL business connection.

43.     I suspect there may be other undercurrents to this litigation, which could add to the acrimony, but I do not intend to elaborate on them because at the moment they are exactly that, tentative suspicions and no more.

44.     The allegations made against all four Defendants, as stated in the Cause, are grave. I have already identified them. They include allegations, with regard to the Plaintiff, of false and malicious actions at various periods of time, of wrongful conspiracy with intent to injure or cause loss, of deliberate false representations, of unlawful interference with business interests, and that the Defendants will continue so to act unless otherwise restrained by the Court. Such allegations go to the very heart of any person's integrity.

45.     The seriousness of such attacks is exacerbated when the object of such allegations is not only a professional lawyer but one seeking to establish a reputation in a small community in which the commercial business sector forms an unusually large element. I respect the force of Mr. Collas' argument with regard to the position of the Fourth Defendant in those circumstances, and understand accordingly her desire to be afforded protection by this Court.

46.     Mr. Collas rightly concedes that lawyers could not be afforded any greater protection than other professionals in this small community.

47.     What was being sought was a limited interference with the general rule against privacy, which would only last until the conclusion of the strike out application.    That, Mr. Collas argued, was not a matter of convenience, but was one of necessity in order to provide the fair protection to which his client was entitled; it was that which justice required.    For his part, Mr. Ferbrache submitted, in summary, that there was no justification for making any exception in this case to the general rule.

48.     I very much bear in mind the guidance given by Lord Woolf MR in Kaim Todner, and his citation from the judgment from Sir Christopher Staughton in *ex parte P*, that it is important to remember not only that proceedings are required, as the general principle, to be subjected to the full glare of a public hearing, but the reasons why that is so. The burden must be on the Fourth Defendant to persuade me, to the normal civil standard, that it would be right in the circumstances of this case to grant her application. In one sense, it might be said that her application, as now refined, is somewhat much ado about nothing

very much, from whatever angle it is viewed.  That would be both unkind and unfair. There was nothing improper about bringing the application which has been sensibly and moderately argued by Mr. Collas.

49.    Nevertheless, I am not persuaded that this application should be granted.  The true test must be whether justice can only be served in this case if the strike out application is heard in private, which must be a matter of necessity not of convenience.  I can see no reason why justice requires that the public should be excluded from hearing argument on the strike out application, when they will have in any event the opportunity to read the full decision on it.  This claim for protection is not, viewed objectively, founded in reason, which it has to be to succeed.

50.    The normal course, and the protection afforded therein to parties and witnesses, is stated by Lord Woolf MR (at p. 935 E) as follows:-

> *"In general, however, parties and witnesses have to accept the embarrassment and damage to their reputation and the possible consequential loss which can be inherent in being involved in litigation.  The protection to which they are entitled is normally provided by a judgment delivered in public which will refute unfounded allegations. Any other approach would result in wholly unacceptable inroads on the general rule."*.

51.    To allow this application would, in my view, be such an unacceptable inroad; it would be an unjustified exception with the danger of being quoted by analogy in other cases not least involving other professional defendant litigants.  One might also pose the question as to why professional persons should be placed in any separate category to those who are not in such a privileged position in society.  Being the target for slings and arrows has to be accepted as being part and parcel of professional life, to be balanced against the undoubted benefits which it also brings.  Rejecting this application, in my opinion, would in no way frustrate the Court's ability to do justice in this case.

52.    The application is dismissed.

53.    Notwithstanding that, in the event, the issues in this case fell within a narrow compass, I felt it desirable to address them at length, not only out of regard to the parties and their Counsel, but also because, as far as I am aware, this is the first time that the Royal Court has had to pronounce in this way upon the fundamental issue of the public nature of justice.

# Exhibit 3

## [2014 GLR 77]

## IN THE MATTER OF ESQUIRE REALTY HOLDINGS LIMITED

ROYAL COURT (Collas, Bailiff and Jurats): April 17th, 2013

*Bankruptcy and Insolvency—pre-pack administrations—guidance—"SIP 16" reports of great assistance to court and should be produced in pre-pack administration order cases, though not required by statute, unless overwhelming reasons not to*

*Civil Procedure—hearing—hearing in private—application for administration order may be heard in private, court files sealed, title and text anonymized and administration order not published if disclosure of precarious financial position of company risks its operations if other creditors become aware, potentially causes disruption and distress to those in company's care*

A bank applied for an order to place Esquire Realty Holdings Ltd. into administration.

Esquire Realty Holdings was part of the European Care Group, which provided care homes for children and vulnerable adults. The group had been in financial difficulty since 2010 and, in 2012, an inter-creditor agreement was executed giving certain "new lenders" priority ranking in the event of the company's insolvency, so that only those creditors would receive any benefit from the first £158m. recovered.

By 2014, the company was in default on its financing agreements and the new lenders demanded that the full sum owed to them (nearly £300m.) be repaid. The company confirmed that it could not meet this demand and that the total sum it owed was far in excess of the total value of the assets of the group. Evidence of offers to purchase the business and valuations of it demonstrated that a larger amount could be realized from a sale of the assets of the company if it were in administration than if it were being wound up.

The bank, on behalf of the new lenders, applied for an order placing the company into administration on the basis that (a) the company was insolvent, in that was unable to pay its debts and the value of its assets was significantly less than its liabilities; (b) an administration order would achieve a more advantageous realization of the company's assets than would be effected on winding up; and (c) an administration order was also in the interests of the other stakeholders (employees and service users), in

that that the group's operations could therefore continue with minimum disruption.

The company supported the application.

**Held**, granting the application:

(1) The application for an order placing the company into administration would be granted. The court was satisfied, as required by s.374 of the Companies (Guernsey) Law 2008, that (a) the company was unable to pay its debts as they fell due and that the value of its assets was less than the total of its liabilities, thus failing the solvency test under s.527 of the Companies (Guernsey) Law 2008; and (b) that an administration order would produce a better realization of the company's assets than a winding-up order. The higher offer to purchase the assets under the proposed arrangement (compared with offers based on the company being wound up) was advantageous to the two new lenders, who would be repaid, albeit in part, from the sums recovered, and was no worse an outcome for the other creditors who were realistically not going to receive any benefit at all from what was recovered. The discretion of the court to make an administration order would be exercised with regard to the other stakeholders, namely the employees and service users. The proposed arrangement would ensure the minimum disruption for these groups by ensuring the continuity of operations for service users and preserving the employment of employees (paras. 21–29).

(2) The application had been heard in private, the court files sealed, the matter given an anonymous heading and the resulting administration order not disclosed to the public until April 17th, 2014 on the basis that the affidavit evidence detailed the precarious financial position of the group and this presented a risk to the group's operations if other creditors became aware of the situation. This could cause disruption in the care the group provided to vulnerable people and distress over fears of being made homeless. Whilst in general, legal principle required justice to be done in public, where justice itself would be frustrated then privacy should prevail, but only to the extent necessary (paras. 30–35).

(3) Whilst it was not a statutory requirement in Guernsey that a "Statement of Insolvency Practice 16" report be produced in pre-pack administration order cases, such reports were of great assistance to the court and it was recommended that, in the absence of overwhelming reasons to the contrary, such reports should in future be produced in similar applications (para. 7).

**Cases cited:**
(1) *Collections Group, In re*, 2013 (2) JLR *N* [2]; [2013]JRC096, referred to.
(2) *DKLL Solicitors* v. *H.M. Revenue & Customs*, [2007] BCC 908; [2008] 1 BCLC 112; [2007] EWHC 2067 (Ch), followed.

(3) *Delphi Trust Ltd., Re,* Isle of Man High Court, Civil-Ch. Div.,
February 4th, 2014, unreported, referred to.

(4) *Halliwells LLP, Re,* [2011] BCC 57; [2011] 1 BCLC 345; [2010]
EWHC 2036 (Ch), referred to.

(5) *IFS Invs. Ltd.* v. *Manor Park Ltd.,* 2003–04 GLR 77, followed.

(6) *Kayley Vending Ltd., Re,* [2009] BCC 578; [2011] 1 BCLC 114;
[2009] EWHC 904 (Ch), referred to.

**Legislation construed:**

Companies (Guernsey) Law 2008, s.374: The relevant terms of this
section are set out at para. 3.

s.527: The relevant terms of this section are set out at para. 5.

*A.M. Davidson* and *J.J. Barclay* for the applicant;
*M.C. Newman* for the company.

1   **COLLAS, BAILIFF:** This is an application under s.374 of the
Companies (Guernsey) Law 2008 (as amended) to place in administration
a Guernsey registered company, Esquire Realty Holdings Ltd. ("the
company"). The application is brought by Lloyds Bank plc in its capacity
as security agent on behalf of certain principal creditors of the company.
The application is one piece in a jigsaw of arrangements designed to
preserve the operations of a large group of companies known as the
European Care Group, which are principally engaged in operating special-
ist adult and children's care homes throughout the United Kingdom, as
well as three specialist children's schools and a resource centre. The
application was supported by the company.

2   The group is structured in two parts, with the operating companies
separated from the companies that own or lease the premises from which
the group operates. The company in question is an intermediate holding
company within the group. It owns the group's property companies
through a number of direct and indirect subsidiaries incorporated in
Guernsey, the British Virgin Islands, England and Wales and Scotland.

3   Section 374 provides as follows (as far as is relevant to the applica-
tion):

"**Administration orders**.

374. (1) Subject to the provisions of this section, if the Court—

(a) is satisfied that a company (or a cell of a protected cell
company) does not satisfy or is likely to become unable to satisfy
the solvency test, and

(b) considers that the making of an order under this section may
achieve one or more of the purposes set out in subsection (3),

79

the Court may make an order under this section (an '**administration order**') in relation to that company (or that cell, as the case may be)."

4   There are two "threshold" matters for the court: (1) to be satisfied that the company fails or is likely to fail the solvency test; and (2) that the grant of an administration order may achieve a more advantageous realization of the company's assets than would be effected on a winding up. The word "may" in the penultimate line of the sub-section means that, if the threshold criteria are satisfied, the court has a discretion whether or not to make an order.

5   The evidence sworn in support of the application seeks to establish that the company fails, or is likely to fail, two aspects of the solvency test as defined in s.527 of the Law. The company satisfies the solvency test if "(a) the company is able to pay its debts as they become due" and "(b) the value of the company's assets is greater than the value of its liabilities."

6   The court has the benefit of the following four affidavits:

(a)   Two affidavits from Andrew Stephen Moore, an Associate Director within the Loans Agency, Commercial Banking client services team at Lloyds Bank plc (the applicant). The applicant is acting in its capacity as a security agent on behalf of the lenders and hedge counterparties who are the principal creditors of the company. The second of his affidavits, sworn yesterday, outlines the developments over the last few days that have led to the application today;

(b)   An affidavit sworn by David Lindsay Manson, a director of the company. Mr. Manson confirmed that the company supports the application; and

(c)   An affidavit sworn by James Robert Toynton, one of the proposed administrators. Mr. Toynton exhibited a draft administrators' disclosure report pursuant to "Statement of Insolvency Practice 16: Pre-packaged Sales in Administrations."

7   There was no statutory requirement for a SIP 16 report in this jurisdiction, but the report was of great assistance to the court and we recommend that in any similar application such a report be produced unless there are overwhelming reasons not to do so. The special concerns and issues which may arise with a pre-pack administration order were considered by the Joint Insolvency Committee in England and Wales in a study of the SIP 16. It is particularly important that the administrators should have regard to the interests of the full body of creditors, especially those who are not represented in the application to court, many, if not all, of whom will be totally unaware of what is proposed. The professionals advising on the arrangements must be mindful of their duties owed to the company and its creditors, not just to the directors and/or principal creditors who may stand to gain from the proposed arrangements.

8   In terms of its statutory duty, the court is required to be satisfied that the requirements of s.374 are met. The court does not expressly approve the detailed arrangements that will follow the making of the order, although, by implication, it may appear to be doing so. Indeed, in the present case, those proposed arrangements are a material factor in the court's considerations. The special risks of a pre-pack administration were considered carefully by the Royal Court of Jersey in *In re Collections Group* (1). We were also referred to guidance given by David Cooke, J., sitting in the Chancery Division of the High Court in *Re Kayley Vending Ltd.* (6), and the decision of Kitchen, J. in *Re Halliwells LLP* (4).

9   In the present application, Advocate Davidson was at pains to point out that the proposed administrators, in their draft SIP 16 report, had carefully considered the position of all creditors, including those who would not benefit from the proposed arrangements. If there were any creditors who were not party to the inter-creditor agreement, they would not stand to benefit from any recovery because the company has no assets other than those over which security has been granted to the principal creditors.

10   As to the discretion which the court must exercise if the threshold criteria in s.374 are met, a helpful decision was given in *DKLL Solicitors v. H.M. Revenue & Customs* (2). Andrew Simmonds, Q.C., sitting as a Judge of the High Court, Chancery Division, held that the court, in the exercise of its discretion, may take account of the interests of the other stakeholders of the company including, in that case, its 50 or so employees.

11   In the present application, the "other stakeholders" would include the employees of the group and those for whom the group provides services. That includes about 5,000 staff and approximately 3,200 service users in 128 facilities, together with, in many cases, their close family members.

12   In the affidavits and the several exhibits thereto, the court has been provided with a large volume of evidence relating to the financial position of the group and of the company in particular.

13   The evidence shows that the group has been experiencing financial difficulties since 2010 as a result of a number of factors, including the poor economic climate, challenging market conditions, difficult trading conditions and a variety of problems which appear to have resulted from the over-expansion of the group's activities at a time when there were inadequate internal financial and management controls and supervision. A financial restructuring took place in 2012 which moved the group's facilities from a bilateral to a syndicated basis.

14   An inter-creditor agreement completed on July 25th, 2012 operates so as to rank liabilities, such that certain liabilities and hedging liabilities

81

held by parties defined in this application as the 'new lenders' have first
priority and rank *pari passu* up to £158m. (plus deferred amounts set out
under the lending arrangements). The broad net effect is that unless a sum
in excess of £158m. is returned, only those creditors will receive any
benefit.

15   The group's present borrowings are not sustainable. The principal
lenders have worked closely with the group (and the company) to
restructure their arrangements. With the assistance of their professional
advisors, they explored all possible options, including a sale of the group's
business, before they concluded that the proposed course of action was the
best way forward as recommended to the court in the application. A
priority for the group has been to continue its operations so as not to cause
distress to the vulnerable children and adults for whom it provides
services and whose welfare has been carefully considered throughout.

16   The agreed sequence of arrangements that will follow the granting of
the application is designed to ensure that residents and their relatives
suffer the minimum of disturbance and disruption. The relevant service
regulators and the Department of Health have been kept informed and are
aware of the group's position.

17   The group has been able to continue trading only as a result of
concessions and indulgences granted by its principal creditors. The court
has received a detailed explanation of the history of the group's borrow-
ings. It is sufficient in this judgment to summarize the present position of
the company.

18   Several events in particular have precipitated today's application:

(a) A cash flow forecast prepared by Mr. Manson on March 28th, 2014
indicated that the group would have a cash shortfall after payment of the
payroll on April 11th, and an increased shortfall following payment of the
payroll on May 11th.

(b) On March 28th, a threat was issued to wind up two UK incorpo-
rated companies within the group unless outstanding rent arrears and
interest of £6.2m. were paid. That threat was postponed, subject to a
standstill agreement which expired on April 16th.

(c) The principal lenders to the group (referred to by Mr. Manson as the
"new lenders") have not renewed the deferral and extension agreements
that expired at 11.59 p.m. on April 14th. That has triggered various events
of default under financing agreements whereby all amounts owed under
what is referred to as the "senior facilities agreement" became immedi-
ately due and payable.

(d) The applicant, on the instructions of the new lenders, has demanded
immediate repayment of £296,302,420.38.

(e) The company has confirmed it cannot meet the demand.

(f) The total liabilities owed to those lenders by the company are approximately £340m., significantly more than the value of the assets of the group.

19   The SIP 16 report confirms that the total debt owed to the financiers of the group amounts to £391.1m.

20   Mr. Manson, a director of the company, advised in para. 32 of his affidavit that—

"it is therefore plain that the company is unable to pay its debts as they fall due. It is also clear from the nature of the offers outlined at paras. 20 to 28 above that the value of the group is significantly less than the value of even just its liabilities of £340m. owed to the lenders and hedge counterparties as set out in para. 10 of the affidavit of Andrew Stephen Moore."

21   In the face of such overwhelming evidence of insolvency, the Jurats have no hesitation in finding that the company fails both limb (a) and limb (b) of the solvency test and therefore the first of the threshold criteria in s.374 of the Law is satisfied.

22   As for the second of the threshold criteria in s.374, the Jurats have received detailed evidence of the steps that were taken, with the assistance of KPMG Corporate Finance LLP, to run a mergers and acquisition process that produced, after negotiations, offers for the business of £57.2m. and £69.8m.

23   Valuations were also obtained from Knight Frank LLP who valued the properties if they had to be sold during a liquidation at £59m. Their valuation assumed the properties would be sold during a 180-day distressed sale period.

24   The proposals that have been agreed, and that will follow the making of an administration order, will result in an offer of £80.1m. to purchase the assets of the group, £70m. of which will be paid in respect of the assets of the company. In paras. 18 and 19 of his affidavit, James Toynton concluded:

"18   In summary, if the company is placed into administration followed by the immediate sale of the business and its assets to Newco, this should lead to an enhanced realization of the company's assets as well as the reduction of the level of claims made against the company. It will also preserve the jobs for those employed by the subsidiaries in the group and lead to minimal disruption to the trading companies of the group.

83

19  Therefore, the proposed administrators are of the view that placing the company into administration and selling the business and the assets of the company to Newco represents the best outcome for all of the creditors of the company as a whole and will achieve the statutory purpose of the administration as set out at s.374(3)(b) of the Companies (Guernsey) Law, 2008 (as amended): a more advantageous realization of the assets of the company than would be effected on a winding-up."

25  Addressing the court's wider discretion as identified in the English judgments cited above, there are only two creditors who stand to benefit from the proposed recovery. They support the application and indeed have instructed the applicant to make the application. Other creditors would not stand to benefit unless there were a recovery of at least £158m., and possibly £168m., taking account of hedging liabilities. That level of debt is so far in excess of the value of the assets of the group that they could not realistically have opposed the making of this application.

26  The other risks associated with pre-pack administration orders have all been adequately addressed in the SIP 16 report.

27  Having reviewed all the evidence produced to the court, the Jurats are satisfied that an administration will achieve a more advantageous realization of the assets of the company than would be effected in a winding-up.

28  Insofar as the court has a residual discretion to take into account the interests of other stakeholders, the court is satisfied that the proposed arrangements will ensure the continuity of the business of the group without disturbance to the care services provided. There will also be continuity of employment for the group's employees.

29  The court approved the appointment of Mr. Toynton of Grant Thornton's Guernsey office and Alastair Paul Beveridge of Zolfo Cooper LLP, London, as the joint administrators on the terms as to their remuneration set out in the application.

30  The Bailiff adds a note to this judgment to explain the order he made on April 4th, 2014 that the application be heard in private; that the court files be sealed; and that the matter be given an anonymized heading, pending further order of the court.

31  The reason for doing so was that affidavit evidence outlined the perilous financial position of the group of companies and the risk to the operations of the group if other creditors of group companies, including service providers, became aware of the situation. There would be a risk of disruption of care services provided to the vulnerable adults and children who are looked after by the group. In particular, there was a real risk of distress being caused to such persons and to their families if they were to worry that they could be rendered homeless.

32   The concerns for the welfare of the vulnerable adults and children persuaded the Bailiff to order that the application remain confidential until such time as it were granted, or further order.

33   He had in mind the magisterial judgment of Day, Lieut. Bailiff in *IFS Invs. Ltd.* v. *Manor Park Ltd.* (5) in which he held (2003–04 GLR 77, at para. 24) "that, in simple terms, legal principle required that justice must be done in public, but that where justice itself would be thus frustrated, privacy should prevail, but only to the extent necessary."

34   He also had regard to the masterly judgment of Deemster Doyle in *Re Delphi Trust Ltd.* (3), in which he reviewed the law in a number of jurisdictions, including Guernsey, and in which he cited the said decision of Day, Lieut. Bailiff.

35   In the Bailiff's judgment, this application was a classic case in which justice could be frustrated if the hearing were held in public. Hence justice requires that the application remain in private, out of the public eye, until such time as an administration order might be granted, at which point it would become public knowledge. However, there is certain sensitive and confidential evidence in the affidavits produced to the court which the court orders shall remain private.

36   For the same reasons, the court also ordered, in the interests of justice, that the making of the administration order shall not be disclosed publicly until 9.00 a.m. on Thursday, April 17th, to enable other proposed arrangements to take place without disruption by parties who might be concerned that the group is insolvent. The court directed that the Registrar of Companies shall be informed of the order as soon as reasonably practicable after 9.00 a.m. on Thursday, April 17th, 2014.

*Application granted.*

85