**<u>EXHIBIT 3</u>**
**Pt. II**

Par contre, la Société pourrait valablement se prévaloir de telles modifications si celles-ci avaient pour effet de réduire ses charges fiscales et/ou douanières.

En outre, la Société bénéficiera de toute clause plus favorable accordée par rapport aux dispositions de la présente Convention qui seraient intégrées dans une convention minière conclue ultérieurement avec une autre société minière exerçant des activités similaires.

## TITRE V : RÉGIME FISCAL ET DOUANIER

## ARTICLE 33 : RÉGIME FISCAL

### 33.1 Impôts, Taxes, Droits, Contributions et Redevances Applicables

La Société, les Investisseurs et Sous-Traitants Directs sont assujettis pendant toute la durée de la présente Convention aux seuls impôts, droits, taxes et redevances suivants, à l'exclusion de tous autres, et ce selon les modalités prévues par la présente Convention :

- Droits et redevances fixes ;
- Redevance superficiaire ;
- Taxe sur les Substances Minières ;
- Impôt sur les bénéfices industriels et commerciaux ;
- Impôt sur le Revenu des Valeurs Mobilières (IRVM) ;
- Versement Forfaitaire ;
- Contribution à la Formation Professionnelle ;
- Taxe unique sur les véhicules ;
- Cotisations de Sécurité Sociale.

À l'exception et dans les limites de ce qui est prévu au présent article, la Société et Sous-Traitants Directs ne seront assujettis à aucun autre droit, impôt, taxe et/ou redevance à caractère fiscal, y compris la taxe sur la valeur ajoutée.

Le calcul et le paiement de tous impôts, droits et taxes incombant à la Société est effectué sur la base des données comptables et opéré en US dollars ($) sauf pour les impôts, taxes et cotisations sociales assis sur les salaires ainsi que pour les retenues à la source sur rémunérations libellées dans une devise autre que le US Dollar, lesquels seront payables en francs guinéens.

Le taux de change applicable aux opérations de conversion en US Dollars des dépenses et charges faites dans une autre devise sera le taux moyen mensuel du

mois considéré tel que publié par la  Banque Centrale de la République de Guinée.

Les taux de change définis ci-dessus seront également applicables pour le calcul de tous redressements ultérieurs, intérêts et pénalités, ainsi que pour tous remboursements d'impôts trop versés.

### 33.2  Droits et redevances fixes – Redevances superficiaires

La Société est assujettie aux droits et redevances fixes ainsi qu'aux redevances superficiaires conformément à la Législation en Vigueur.

### 33.3  Taxe sur les substances minières

La Société sera assujettie à la taxe sur les substances minières selon les modalités suivantes :

### 33.3.1  Assiette

L'assiette de la taxe sur les substances minières est constituée par :

- la valeur FOB du minerai de fer.

### 33.3.2  Taux

Le taux applicable au Minerai de fer concentré (minerai ayant subi un traitement mécanique pour le débarrasser des impuretés afin d'augmenter sa teneur) est de 3,5 % de la valeur FOB.

### 33.3.3  Modalités de paiement

Cette taxe est payable trimestriellement au plus tard le quinze du mois suivant chaque trimestre sur la base des quantités exportées.
Cette taxe est déductible pour le calcul du bénéfice imposable.

### 33.4  Impôt sur les Bénéfices Industriels et Commerciaux

La Société sera assujettie à l'Impôt sur les Bénéfices Industriels et



Commerciaux (BIC), à l'exclusion de tous autres impôts sur les bénéfices, et ce selon les modalités suivantes.

### 33.4.1  Assiette

Le bénéfice imposable est déterminé par application des dispositions du Code Général des Impôts et du Code Minier sous réserve des spécificités prévues dans la présente convention.

### 33.4.2  Taux

En raison de la réalisation du chemin de Fer Conakry – Kankan, le taux de l'Impôt sur les Bénéfices Industriels et Commerciaux applicable au bénéfice net taxable est de trente pour cent (30 %).

### 33.4.3  Allègement fiscal sur l'impôt BIC

Conformément aux dispositions de l'article 143.3 du Code Minier, la société sera exonérée de l'Impôt BIC pour une période de 8 ans à compter de la première production commerciale.

La société bénéficiera de deux années supplémentaires d'exonération, soit 10 ans au total, en raison de l'extension du Chemin de Fer de Kankan à Kérouané.

### 33.4.4  Modalités de paiement

Les modalités de paiement de l'Impôt sur les Bénéfices Industriels et Commerciaux sont celles prévues par le Code Général des Impôts.

### 33.5  Impôt sur le Revenu des Valeurs Mobilières

La société sera assujettie au paiement de l'Impôt sur le Revenu des Valeurs Mobilières (les dividendes, tantièmes, jetons de présence versées par la Société).

### 33.6  Impôts, taxes et cotisations assis sur les salaires

Les salaires versés au personnel de la Société ou de ses Sous-Traitants Directs seront assujettis aux impôts, taxes et cotisations suivants :

- Versement forfaitaire au taux de six pour cent (6%), au titre des salaires versés aux employés de nationalité guinéenne,
- Contribution à la formation au taux de un et demi pour cent (1.5%) pour les salaires versés à ses employés, en Guinée et hors Guinée. Cette contribution ne s'applique pas si la Société dispose de son propre centre de formation permanent en Guinée. Un centre de formation permanent se définit comme étant un endroit où l'on retrouve des salles de classes pour la tenue de cours par un personnel qualifié, visant la formation et le développement de compétences et d'habiletés pour le personnel participant directement aux Opérations Minières,

- Retenue sur les traitements et Salaires (RTS) des nataonaux guinéens par application du barème en vigueur ;
- Retenue sur les traitements et salaires (RTS) sur les salaires des salariés étrangers séjournant plus de cent quatre-vingt-trois (183) jours par Année Civile au taux de à dix pour cent (10%) de la rémunération, étant entendu que les salariés étrangers séjournant moins de cent quatre-vingt-trois (183) jours par Année Civile sont exonérés de cet impôt,
- Cotisations sociales applicables ; étant entendu que les salariés étrangers seront exonérés.

## 33.7 Taxe Unique sur les Véhicules

La Société, ses Investisseurs et Sous-Traitants Directs sont assujettis à la Taxe unique sur les véhicules au taux en vigueur, sauf sur les véhicules et engins de chantier.

## 33.8 Retenues à la Source sur les revenus non salariaux

Les rémunérations versées par la Société ou ses Sous-Traitants Directs à des personnes non établies en Guinée seront passibles d'une retenue à la source libératoire au taux de dix pour cent (10%).

Il est expressément convenu que les intérêts afférents aux prêts bancaires ou autres, contractés par la Société pour le financement du projet seront exonérés de toute retenue à la source.



### 33.9  Taxe sur la Valeur Ajoutée

La Société, les Investisseurs et Sous-Traitants Directs seront exonérés de taxe sur la valeur ajoutée sur les acquisitions de biens et services nécessaires aux Opérations Minières.

Dans l'hypothèse où, nonobstant cette exonération totale de taxe sur la valeur ajoutée, la Société, les Investisseurs et Sous-Traitants Directs viendraient à supporter une telle taxe, ils pourront l'imputer par voie de déduction ou remboursement.

### 33.10  Contribution au développement local

A compter de la Date de Démarrage de la Production Commerciale, la Société sera assujettie à une contribution annuelle au développement local à un taux de 1% du bénéfice brut.

Cette contribution au développement local est déductible pour le calcul du résultat imposable.

### ARTICLE 34 : RÉGIME DOUANIER

Le présent Article s'applique aux importations de la Société et de ses Sous-traitants directs destinées à un usage ayant trait aux activités visées par la Convention.

### 34.1  Taxe sur la valeur ajoutée à l'importation

La Société et ses Sous-Traitants directs seront exonérés de la taxe sur la valeur ajoutée à raison des importations de biens.

### 34.2  Classification des biens d'importation

La Société doit établir et faire agréer par les Ministres en charge des Mines et des Finances, avant le démarrage de ses opérations, les listes des biens à importer selon les catégories suivantes :

a) Catégorie 1 : équipements, matériels, gros outillages, engins et véhicules à l'exception des véhicules de tourisme figurant sur la liste des immobilisations de la Société.

b) Catégorie 2. matières premières et consommables nécessaires à la transformation sur place du Produit Minier en produits finis et semi finis, ainsi que les produits pétroliers servant à la production d'énergie à cet effet.

c) Catégorie 3. matières premières et consommables nécessaires à l'extraction et à la valorisation du Produit Minier .

d) Catégorie 4. carburants, lubrifiants et autres produits pétroliers n'entrant pas dans la transformation du Produit Minier en produits finis ou semi finis.

Ces listes sont révisées périodiquement en fonction de l'évolution des besoins de la Société, des capacités de production nationale et de la disponibilité à temps et des conditions compétitives des produits fabriqués localement.

**34.3  Admission temporaire**

Les équipements, matériels, machines, appareils, véhicules utilitaires, engins, groupes électrogènes destinés à être utilisés temporairement en Guinée pour les besoins du projet seront placés sous le régime de l'admission temporaire en suspension de droits et taxes.

A la fin des travaux de construction, les biens ainsi admis temporairement peuvent être soit réexportés ou mis à la consommation conformément à la règlementation en vigueur.

**34.4  Allégements douaniers en phase de Développement**

A compter de la date de démarrage des travaux de construction, la Société et ses Sous-Traitants directs bénéficieront pour leurs activités liées au projet, de l'exonération des droits et taxes, et redevances de douane sur les biens relevant de la Catégorie 1 ainsi que sur les pièces détachées et les lubrifiants à l'exception de la taxe d'enregistrement au taux de 0,5% de la valeur CAF avec un plafond maximum fixé par la Loi des Finances et de la redevance sur la prestation administrative (RPA).

En cas de revente en République de Guinée de fournitures appartenant à la Catégorie 1, la Société et ses sous-traitants directs deviennent redevables de tous les droits et taxes déterminés par le Service des Douanes sur la base d'une évaluation qui tient compte de la dépréciation intervenue jusqu'au jour de la revente.



### 34.5 Allégements douaniers en phase d'Exploitation, de fermeture et de réhabilitation

Les biens importés appartenant à la Catégorie 2, et destinés à la transformation du Produit Minier en produits finis et semi finis sont exonérées de taxes et droits de douanes.

Les biens importés appartenant à la Catégorie 1 ou à la Catégorie 3 et destinées à l'extraction et à la valorisation du Produit Minier sont taxés à l'importation au taux unique de 5,6% de la valeur FOB de ces biens ainsi qu'à la redevance sur la prestation administrative.

Les carburants à l'exception de l'essence, lubrifiants et autres produits pétroliers importés, appartenant à la Catégorie 4 bénéficient de la structure des prix applicables au secteur minier.

### 34.6 Effets personnels.

Les effets et objets personnels à l'exception des denrées alimentaires et des véhicules privés importés par les employés de la Société et de ses Sous-Traitants sont exonérés de tous droits et taxes.

## TITRE VI : AUTRES DISPOSITIONS FINANCIÈRES

## ARTICLE 35 : PRINCIPES GÉNÉRAUX

La Société doit tenir en République de Guinée une comptabilité en Dollars, conforme au plan comptable OHADA.

Pour chaque exercice fiscal, la Société est tenue de faire certifier par un commissaire aux comptes agréé en Guinée son bilan et ses comptes d'exploitation, et communiquer ses états financiers au Ministre au plus tard le 30 avril de l'exercice suivant.

Aux fins de vérification et d'audit par le personnel autorisé de l'État, la Société doit donner accès aux documents comptables ainsi qu'aux pièces justificatives.





## TITRE VII : DISPOSITIONS DIVERSES ET FINALES

## ARTICLE 36 : RENONCIATION ET RÉSILIATION

### 36.1 Renonciation

La Société peut renoncer à la Concession dans les conditions prévues par le Code Minier.

### 36.2 Retrait

L'État peut, conformément et dans le respect du Code Minier, retirer à la Société la Concession ce qui entraînera la résiliation de la présente Convention.

Outre les hypothèses prévues par le Code Minier, la Concession peut être résiliée si la Société refuse d'exécuter une décision finale résultant d'un arbitrage en vertu de l'article 38 de la présente Convention.

## ARTICLE 37 : CESSION, TRANSFERT ET AMODIATION

Toute cession ou transfert par la Société de tout ou partie de ses droits et obligations résultant de la Concession, ainsi que toute cession directe de plus de cinquante (50%) pour cent des actions de la Société, par vente ou par tout autre procédé entraînant un transfert du contrôle effectif de la Société, est assimilée à une cession et est subordonnée à l'approbation préalable de l'État qui dispose d'un droit de préemption exerçable aux clauses et conditions offertes par l'acquéreur pressenti.

En pareille hypothèse, la Société devra notifier à l'État le projet de cession en mentionnant toutes informations utiles sur celle-ci et notamment le nom du cessionnaire, le prix et les conditions de paiement du prix.

À compter de la date de réception de cette notification, l'État disposera d'un délai de trente (30) jours pour :

    a) soit refuser son agrément à la cession et donc exercer son droit de préemption aux clauses et conditions du projet de cession initiale qui lui aura été notifié,

    b) soit pour agréer la cession et donc renoncer à son droit de préemption, étant entendu que l'État devra notifier sa décision à la Société au plus tard à l'expiration du délai imparti de trente (30) jours et que le défaut de réponse de l'État dans le délai imparti de trente (30) jours vaudra

approbation de la cession projetée et donc renonciation de l'État à utiliser son droit de préemption.

Il est expressément convenu qu'aucune approbation préalable ne sera nécessaire aux opérations de transfert direct ou indirect portant sur les actions d'une société détenant des actions dans la Société.

En outre, toute cession, nantissement ou transfert faits au profit de Sociétés Affiliées est libre si les conditions suivantes sont remplies :

a) la convention de transfert prévoit expressément un engagement du cessionnaire à être lié aux termes et conditions de la présente Convention;

b) le cessionnaire a démontré qu'il possède ou a accès aux ressources techniques, financières et a l'expertise nécessaires pour effectuer les activités liées à la Convention;

c) une copie de la convention de transfert est transmise à l'État; et

d) la convention de transfert a été dûment signée et contient une clause aux termes de laquelle le cessionnaire assume toutes les obligations de la Société, et qu'à défaut de recevoir l'approbation de l'État, la convention de transfert est nulle et sans effet.

## ARTICLE 38: REGLEMENT DES DIFFERENDS

### 38.1    Phase amiable

En cas de différend et/ou de conflit entre les Parties relativement à la présente Convention et/ou la Concession, y compris mais non exclusivement, sa validité, son interprétation, son exécution, son non-respect ou sa résiliation, les Parties s'engagent en premier recours à tenter de résoudre à l'amiable le différend ou le conflit les opposant.

A défaut de règlement amiable dans un délai de cent vingt (120) Jours à compter de la date de réception de la notification envoyée par l'une des Parties à l'autre Partie, du différend ou du conflit les opposant, les dispositions de l'article 38.2 s'appliqueront.

### 38.2    Arbitrage exécutoire

Les Parties conviennent de soumettre à l'arbitrage de la CCI tout différend résultant de ou en relation avec la présente Convention, qui n'aurait pas été réglé

en vertu de l'article 38.1 et ce en application de la Convention pour le règlement d'Arbitrage de cette institution.

De plus, les Parties conviennent de faire toutes les demandes et soumissions au CIRDI ou à la Cour Internationale d'Arbitrage, selon le cas, et d'entreprendre toutes autres actions et de fournir toute information nécessaire pour mettre en place cette procédure d'arbitrage.

À moins que les Parties n'en conviennent autrement, la procédure d'arbitrage se tiendra à Paris (France) et sera conduite en français.

Le nombre d'arbitres sera de trois (3) : un désigné par l'État, un désigné par la Société et le troisième désigné par les deux (2) autres arbitres ainsi choisis.

L'une des Parties peut initier la procédure d'arbitrage en transmettant à l'autre Partie une notification à cet effet comprenant :

a) La référence à la disposition de la présente Convention qui donne lieu au différend;

b) La référence aux titres miniers émis dans le cadre de la présente Convention;

c) La nature du différend qui donne lieu à la réclamation et, le cas échéant, tout montant d'une réclamation en dommages ou d'une indemnité;

d) Les faits donnant lieu à toute réclamation; et

e) Le remède recherché.

La Partie ayant reçu la notification doit répondre dans les trente (30) jours confirmant ou refusant tout ou partie de la réclamation, indiquant la nature et les circonstances, le cas échéant, de toute contre-réclamation. Le défaut de réponse dans les délais alloués tient lieu du refus de cette Partie de concéder à la réclamation et donne suite à la procédure d'arbitrage prévue aux présentes.

Les Parties reconnaissent que la décision rendue suite à un arbitrage en vertu de la présente Convention est exécutoire, définitive et sans appel.

Le fait pour l'une des Parties de ne pas participer aux procédures d'arbitrage n'est pas un motif de rejet de la juridiction du tribunal d'arbitrage ou de sa décision.



Les Parties renoncent expressément à toute objection aux procédures d'arbitrage et à la décision en découlant, sauf si ledit arbitrage ne respecte pas les exigences prévues à la présente Convention.

Les Parties renoncent expressément par les présentes à toute immunité de juridiction et à toute immunité d'exécution, pour elles-mêmes et leurs actifs respectifs (sauf les actifs de l'État exclusivement réservés aux usages diplomatiques), pour les besoins de l'exécution de toute décision ou sentence arbitrale rendue en vertu de la présente Convention.

## ARTICLE 39 : MODIFICATIONS

La présente Convention ne peut être modifiée et/ou amendée en aucune façon, sauf par accord mutuel écrit entre les Parties et mis en vigueur selon les mêmes modalités que celles de la Convention.

## ARTICLE 40 : CONFIDENTIALITÉ

### 40.1 La convention n'est pas confidentielle

La présente Convention n'est pas confidentielle.

Tous les rapports, plans et informations fournis par la Société en vertu de la présente Convention à l'État sont traités comme des documents de nature publique à moins qu'il n'en soit spécifié autrement.

### 40.2 Affaires non – confidentielles

Les affaires suivantes ne sont pas de nature confidentielle, sous réserve qu'une telle divulgation ne soit pas en violation avec toute législation et réglementation boursière sur les sûretés, applicable à la Société :

a) Les quantités annuelles de substances minérales produites provenant de la Concession;

b) Les emplois, incluant les programmes de formation offerts par la Société;

c) Les redevances et le paiement des taxes ayant trait à la Concession, sans le détail des calculs des montants de tels paiements;

d) Les paramètres d'opérations tels que les capacités, les taux de rendement et les taux de récupération des mines et des usines de concentration et les facteurs de dilution;

e) L'information sur le nombre et la fréquence des accidents résultant des Opérations Minières;

f) Le paiement de tout montant ou toute provision de prestation de services en vertu de la convention sur le développement de la communauté locale;

g) Toute information détenue par l'État préalablement à l'obtention par la Société de ladite information, et ayant été divulguée par une autre Personne n'ayant aucune obligation de confidentialité envers la Société.

## 40.3  Confidentialité de l'information

La divulgation d'une information confidentielle doit être faite de manière à garantir la confidentialité de cette information par le destinataire.

Chacune des Parties doit veiller à ce que ses dirigeants sociaux et employés, ainsi que ses actionnaires ou conseillers techniques ou professionnels respectifs, ne divulguent pas d'information considérée confidentielle, et ne fassent pas un usage inapproprié de telle information pour leur propre bénéfice ou le bénéfice de toute autre personne.

## ARTICLE 41 :    FORCE MAJEURE

### 41.1  Cas de force majeure

Aux fins de la présente Convention, force majeure signifie tout événement, acte ou circonstance imprévisible, irrésistible et hors du contrôle ou de la volonté d'une Partie qui entrave ou rend impossible l'exécution par cette Partie de ses obligations.

Sans limiter la portée générale de ce qui précède, les événements suivants peuvent constituer des cas de force majeure :

a) La guerre (déclarée ou non), insurrection armée, troubles civils, blocus, émeutes, sabotage, embargo, grèves, lock-out ou autres actions revendicatives ou autres conflits sociaux;

b) Tout différend en rapport avec les Opérations Minières, avec des personnes qui justifient qu'elles sont affectées de façon significative par les Opérations Minières, tels que  non exclusivement, d'autres détenteurs de titres miniers ou ayant fait application pour un titre minier, des Utilisateurs ou Occupants Fonciers et des membres de

communauté locale, des communautés avoisinantes, des services
gouvernementaux ou des organisations non gouvernementales;

c) Toute catastrophe naturelle, incluant les épidémies, tremblements de
terre, tempêtes, inondations, éruptions volcaniques, tsunami ou autres
intempéries, explosions et incendies;

d) Toutes autres causes ne relevant pas du contrôle de la Partie impliquée
à l'exception de difficultés économiques résultant des fluctuations du
prix du marché.

Les Parties conviennent que l'État ne peut invoquer en sa faveur comme
constituant un cas de force majeure les raisons ou les événements décrits au
paragraphe b.

## 41.2  Conséquence de la force majeure

Lorsque l'une des Parties se trouve objectivement empêchée de remplir l'un ou
quelconque de ses engagements en vertu de la présente Convention et du Code
Minier, en raison d'un cas de force majeure, un tel empêchement ne constitue
pas un manquement à la présente Convention.

## 41.3  Prolongation de la durée de la Convention

Les Parties doivent prolonger le terme de la présente Convention de tout délai
pour lequel un cas de Force Majeure a provoqué la suspension de l'exécution
des engagements en vertu des présentes.

## 41.4  Notification de force majeure

Lorsque l'une ou l'autre des Parties se trouve objectivement empêchée de
remplir l'un ou quelconque de ses engagements en vertu de la présente
Convention en raison de Force Majeure, elle doit :

a) Dans un délai n'excédant pas quinze (15) Jours à compter de la date de
la survenance d'un cas de force majeure, transmettre à l'autre Partie un
avis par courrier recommandé avec accusé de réception ou par toute
autre méthode disponible et rapide, indiquant le cas de force majeure
et les engagements affectés;

b) Prendre les mesures nécessaires, raisonnables et légales pour résoudre
le problème ayant provoqué la force majeure; et

c) Dès l'adoption des mesures invoquées au paragraphe b), aviser l'autre
Partie et prendre toutes les dispositions utiles pour assurer des que

possible la reprise normale de l'exécution des engagements affectés
par la force majeure.

### 41.5  Rencontre entre les Parties

Si les effets provoqués par un événement de force majeure perdurent pour plus
de quinze (15) Jours, les Parties doivent se rencontrer dans les plus brefs délais,
afin d'étudier la situation et s'entendre sur les mesures nécessaires à adopter
pour résoudre le problème ayant provoqué la force majeure.

## ARTICLE 42 :  PRIMAUTÉ DE LA CONVENTION

Les dispositions de la présente Convention constituent l'intégralité des accords
entre les Parties et prévalent sur toute déclaration, représentation, contrat et/ou
convention antérieure, verbale ou écrite, entre les Parties (ou leurs Sociétés
Affiliées ou détenteurs précédents des mêmes droits).

## ARTICLE 43 :  NON-RENONCIATION

Sauf renonciation expresse par écrit, le fait pour une Partie de ne pas exercer en
totalité ou en partie les droits qui lui sont conférés au titre des présentes, ne
constitueront en aucun cas un abandon des droits qu'elle n'a pas exercés.

## ARTICLE 44 :  SUCCESSEURS ET AYANT-DROITS

La présente Convention lie les Parties, leurs successeurs et ayant-droits
respectifs.

## ARTICLE 45 :  FRAIS DE LA CONVENTION

Chacune des Parties doit assumer ses propres frais légaux ou autres charges
encourues dans le cadre de la mise en application de la présente Convention.

## ARTICLE 46 :  NOTIFICATIONS

Toutes notifications, demandes et communications faites par l'une des Parties à
l'autre Partie dans le cadre de la présente Convention devront être faites par écrit
et seront réputées avoir été valablement délivrées si elles ont été remises en
mains propres contre décharge ou envoyées par courrier express, par lettre
recommandée avec accusé de réception, par télégramme ou par télécopie aux
adresses indiquées en tête de la présente Convention.

ARTICLE 47 : LANGUE

Tous les rapports, avis ou autre documentation préparée en application de la présente Convention doivent être en langue française.

ARTICLE 48 : ENREGISTREMENT ET ENTRÉE EN VIGUEUR

Dans les trente (30) Jours de la signature de la présente Convention par toutes les Parties, le Ministre doit en transmettre une copie signée au C.P.D.M. qui procède sans délai à son enregistrement.

La Société n'étant, en application du régime fiscal prévu par la présente convention, pas assujettie aux droits d'enregistrement, aucun droit d'enregistrement ne sera exigible à raison de cette formalité.

En foi de quoi, les Parties ont signé cette Convention en cinq (5) exemplaires, à Conakry le 16 Mars 2009

POUR LA REPUBLIQUE

DE GUINÉE

LE MINISTRE A LA PRÉSIDENCE
CHARGÉ DES MINES ET DE
L'ENERGIE

VISA DU MINISTRE A LA
PRÉSIDENCE    CHARGE
DE L'ECONOMIE ET DES
FINANCES

Monsieur Mahmoud THIAM

Capitaine Mamadou SANDE

POUR BSG RESOURCES
(GUINEA) LIMITED

POUR BSG RESOURCES
(GUINEA) SARL

LE DIRECTEUR

LE DIRECTEUR GENERAL

Marc STRUIK

Asher AVIDAN

Convention de Base pour l'Exploitation
des Gisements de Fer de Zimoto/N'Zérékoré par BSGR

57

## LISTE DES ANNEXES

1) – Les Pouvoirs donnés aux Directeurs pour signer la
Convention,

2) – Concession Minière,

3) – Corridor pour la construction de la ligne de chemin de fer
de Zogota à la  frontière  Libéria,

4) – Annexe Fiscale et Comptable,

5) – Accord  d'Infrastructures,

6) - Accord de Transit au Libéria,

7) – Plan de Gestion Environnementale,

8) – Convention de Développement Communautaire,

9) – Lettre d'engagement en date du 16 Décembre 2009 de la
société à faire 'l'étude comparative d'avantages
socioéconomiques de la construction   du barrage
hydroélectrique  à Frankouné (Kérouané) et  de la
construction du chemin de fer    Kankan. – Kérouané.



58

*Annexe no. 1*

# BSG

## Resources
### Limited

14 December 2009

I, David Michael Clark, confirm on behalf of the board of BSG Resources Limited and its subsidiaries (the " BSGR Group"), a company existing under the laws of the Bailiwick of Guernsey, whose registered offices is situated at West Wing, Frances House, Sir William Place, St. Peter Port, Guernsey GY1 1GX, that:

Mr Asher Avidan (date of birth 26 May 1962) and Mr Marcus Joannes Paulus Maria Struik (date of birth 26 June 1958) are empowered and authorised, jointly or solely, to enter into any necessary arrangements, and sign any related documents, conventions or agreements, involving BSG Resources (Guinea) Limited and/or BSG Resources Guinée SARL with the relevant and appropriate Authorities in Guinea in connection with the BSGR Group's interest and activities in connection with the development and production of Iron Ore, including, but not limited to, the BSGR Group's concessions known as Simandou blocks 1-2 and Simandou South.

For and on behalf of the board



David Michael Clark
Director
BSG Resources Limited



BSGR

**BSG Resources (Guinea) Limited**

Conakry, le 16 Décembre 2009

A

**Monsieur le Ministre des Mines
de l'Energie et de l'Hydraulique
_Conakry_**

Réf : 602/BSGR/2009/mis

Annexe à la
Convention.
16/09

**Objet :** Lettre d'engagement pour Etudes comparatives.

Monsieur,

Faisant suite à notre entretien en date du 16 décembre 2009 tenu dans les locaux de la
primature par rapport à l'examen comparatifs des profils économiques et sociaux entre le
tronçon du chemin de fer   Kankan – Kérouané –  et la réalisation d'un barrage
hydroélectrique de( 60MW) du site de  Faran Kouné dans la préfecture de Kérouané.

Nous avons convenu,  pour la mise en œuvre de notre projet Minier de ZOGOTA,
d'entreprendre avec le Gouvernement Guinéen les études permettant de comparer les
avantages bénéfiques des dits projets.

Par le présent, nous vous confirmons l'engagement de notre société à faire les dites
études dans les délais requis et, nous  vous rassurons que cet engagement s'intègre
dans les accords de notre convention de base pour l'exploitation des gisements de fer de
ZOGOTA.

Veuillez agréer, Monsieur le Ministre, l'expression de notre franche collaboration.

**Marc STRUIK**                                    **Asher AVIDAN**

Directeur                                       Directeur Général
B S G Resources (Guinea) Ltd                    B S G Resources (Guinea)  Sarl.

S.A.R.L.I N° FORMALITE : RCCM/GC-KAL/M2/025.639/2009/ N° ENTREPRISE/RCCM/GC-KAL/013.755A/2006
Siège Social: Villa Andre Toure, Coleah, Corniche  Sud, Commune Matam, Conakry, République de Guinée
Code NIF 033365Y/.6W.  Boîte Postale: 6389, Conakry.  Email

Annexe n° 16

# BSGR

## 8.4   Dates clé

- Avril 2010 - date de début du projet ;

- Mai 2012 - achèvement mécanique de toutes les installations ;

- Mai 2012 - début de la production du minerai ; et

- Mai 2013 - fin de l'accélération à 30 Mtpa.

Le développement du projet de Zogota est indiqué dans un diagramme de Gantt de haut niveau dans le Tableau 8.1.

# REPUBLIC OF GUINEA

## Work– Justice – Solidarity

## MINISTRY OF MINES AND ENERGY

# BASIC AGREEMENT

# BETWEEN

# The Republic of Guinea

# and

# BSG RESOURCES

## FOR THE EXPLOITATION OF THE ZOGOTA / N'ZEREKORE IRON ORE DEPOSITS

**CONAKRY, .....DECEMBER 2009**

# AGREEMENT

## BETWEEN THE UNDERSIGNED:

- The Republic of Guinea, duly represented for the purposes of this agreement by Mr. Mahmoud Thiam, Minister of Mines and Energy,

**OF THE ONE PART,**

- BSG Resources (Guinea) Limited, a company under Guernsey law, whose registered office is at.................... Guernsey, duly represented for the purposes of this agreement by its CEO, Mr. .............,

**OF THE SECOND PART,**

- BSG Resources (Guinea) Ltd, a sole proprietorship limited liability company under Guinean law, registered in the Commercial Register of Guinea under No. RCCM/GC-KAL/013.755A/2006 dated 24.11.2006 amended by declaration No. RCCM/GC-KAL-M2/024.524/2009 dated 20 February 2009, located at the Villa Andre, quartier Coléah, Southern cornice, Conakry, POB 6389, duly mandated and represented by its co-manager, Mr. Asher AVIDAN, hereinafter referred to as "the company"

**OF THE THIRD PART**

## IT HAS BEEN STATED AND AGREED AS FOLLOWS:

### 1. PREAMBLE

- WHEREAS the Republic of Guinea encourages research, prospection, exploitation and valorization of mineral resources in its territory,

- WHEREAS in this light, the country has decided that this valorization could be undertaken by or with the help of investors in order to promote the economic development and the populations' well-being,

- WHEREAS the Mining Code provides that the mineral or fossil substances contained in the subsoil or on the surface, as well as underground waters and geothermal deposits on the territory of the Republic of Guinea and its exclusive economic zone, belong to the State and cannot be the object of any form of private appropriation, save as provided in the Mining Code and the Land Codes. However, holders of operating titles acquire ownership of the substances they extract.

- WHEREAS in this framework, the Republic of Guinea  informed the mining investors of :

  ► the necessity to ensure rational resources exploitation to avoid freezes, mortgages and waste,

  ► the principle that the mining infrastructures (railway and port) located on the national territory belong to the Government as well as any new mining infrastructure that would be implemented,

  ► the necessity to create a mid-term synergy as to the iron ore and bauxite exploitation,  transportation and  evacuation schemes over the whole territory in order to minimize operation and transportation costs and to ensure mining operations,

  ► its commitment to tap mining resources with respect for the environment, in compliance with the World Bank standards.

  ► its commitment to turn mining areas into socio-economic and industrial development centers leading to the implementation of unities meant to transform raw materials into finished and semi-finished products,

- WHEREAS BSG Resources, conforming to the Government's strategy as to the valorization of mining resources, has solicited an iron ore exploration permit at Zogota, in N'Zerekore" prefecture,

- WHEREAS the Republic of Guinea acceded to this request through decrees A/2006/706/MMG/SGG of February 6 2006 granting BSG Resources one (01) iron ore exploration permit, renewed by decree A/2009/1327/PR/MMEH/SGG of June 10 2009,

- WHEREAS the works carried out by BSG Resources Guinea led to the identification of commercially exploitable iron ore deposits, as attested by the feasibility study enclosed to the request for grant of concession addressed to the Minister of Mines and Energy on …………..2009,

- WHEREAS this study has been approved by the Government and that the company fulfills the conditions attached to the grant of the concession,

- WHEREAS in this framework the Government granted, through Decree n°……………….. dated…………………..(See copy in Appendix……), the company BSG Resources a mining lease for a period of twenty five (25) years,  renewable, for the exploitation of the iron ore deposits at Zogota, in N'Zerekore" prefecture,

- WHEREAS BSG Resources wishes to develop the areas at its disposal through the design, funding, development and construction in Guinea of a complex consisting of a mine and its dependencies (plants, storage areas, power stations, lodgings) and of a railway with a nominal production capacity of 30 Mt/y of iron ore,

- WHEREAS BSG Resources nevertheless wished to evacuate the iron ore production stemming from its mining concession through Liberia,

- WHEREAS the company therefore committed to implement a new railway in Guinea that would be connected to the already existing railway in Liberia and to use the railway and port infrastructures located on the territory of the Republic of Liberia,

- WHEREAS the Republic of Guinea acceded to this request for the following reasons:

   ►The Government's willingness to see the iron ore deposits in operation as quickly as possible,
   ► The proximity of the Zogota deposits to the Liberian border,
   ►The request issued by the Guinean Government to the company to rebuild the Conakry-Kankan railway and its potential extension,
   ► The establishment of an economic zone in the South-East of the Republic of Guinea,

- WHEREAS BSG Resources has approved these requests and declares possessing the financial, technical, technological and commercial capacities required for the achievement and exploitation of the project,
- WHEREAS the Government wishes the Project operations to commence as soon as reasonably possible,

The Government and BSG Resources have initiated this basic Agreement whose terms and conditions are defined below:


## SECTION I: GENERAL PROVISIONS

## CLAUSE 1:        DEFINITIONS

Within the framework of the present Agreement, the following expressions and words shall have the meanings hereunder assigned to them or unless otherwise expressly agreed by the parties.

- **"Project assets"**: means the project installations, all property rights, rights, titles or interests already existing or to be created, movable or immovable, tangible or intangible, belonging to the investor or to the company, or put at the disposal of the investor or the company, granted or rent for the benefit of the investor or the company by the Government or by any other third party, as well as all the rights granted to the investor and the company in virtue of the present Agreement or any other contract, including the contracts of the project regarding the design, funding, construction,

development, management, exploitation of the different elements
of the project, including and without limitation, profits and
incomes that will result from the Project and that will be paid or
payable by or to the investor or the company or on their behalf,

- **"Activities referred to in this Agreement"**: generally means the
prospecting activities, development, mining operations, processing,
transportation, exportations, handling, trade, sale of iron ore and
any other activity involved by the project in compliance with the
provisions of the present Agreement,

- **"Year"**: refers to a period of three hundred sixty five (365)
consecutive days,

- **"Calendar year"**: refers to a period covering 12 consecutive
months beginning January 1 and ending December 31,

- **"Authority"**: refers to the Government and its organs of public
power, including notably any ministerial department, territory
administration, body or person acting on behalf of the government,
exercising legislative, executive, administrative or judicial power
or mandated to exercise such powers,

- **"C.P.D.M"**: stands for Centre de Promotion et de Développement
Miniers of the Ministry of Mines and Geology, or its successors
and all the bodies and instrumentalities, which acts as sole liaison
between the Administration and investors,

- **"Land Code"**: refers to the Land Code of the Republic of Guinea
in force at the date of signature,

- **"Mining Code"**: refers to the act ratified by Law L/95/036/CTRN
of 30 June 1995 representing the Mining Code of the Republic of
Guinea including any amendment, modification, supplement or
extension hereof as well as any related application decree,

- **"Employment Law":** of the Republic of Guinea in force at the date of signature,

- **" Mining Concession":** refers to a mining concession granted to the company by the Government in virtue of the effective Mining Code and the conditions stipulated by the present agreement related to the area covered by the Mining Concession,

- **"Infrastructures contract":** refers to the agreement between the Government and BSGR regarding the design, development and management of the railway running from Zogota to the Liberian border.

- **"Agreement":** refers to the present agreement and its appendices as well as any modification that could be added to it,

- **"Agreement":** refers to the present agreement and its appendices as well as any modification that could be subsequently added to it. The Agreement is sometimes referred to as "this agreement" or "the present agreement".

- **"D.N.M":** stands for National Direction of Mines under the authority of the Ministry of Mines and Geology, its successors and all related bodies and instrumentalities,

- **"Effective Date":** refers to the date on which the present Agreement enters into force,

- **"Failure":** means a breach of any of the provisions of the present Agreement, of any applicable law, or of any condition set out in the prospecting permit or in the mining concession located within the territory covered by this Agreement,

- **"Pre-operation expenses":** means the expenses and costs incurred for the benefit of or within the territory covered by the Agreement within the framework of the Prospecting Permit granted to the Company and of the investments for the development of the

project. These costs include: the expenses incurred within the territory covered by the Agreement – including those incurred within the framework of the prospecting activities, pre-feasibility studies, feasibility studies, delimitation of mineral reserves areas, mine and infrastructure, the development and construction costs prior to the extraction, processing, transportation preceding the first commercial production.

- **"Development":** means the prospecting operations and the works entailed by the opening of the mine, the mining of iron ore, processing activities, and also includes the construction and commissioning of the necessary infrastructures and installations, such as road construction, communication infrastructures, power installations as well as water processing equipment and facilities,

- **"Decree related to the Mining Concession":** refers to the Decree issued by the President of the Republic granting the Company a Mining Concession,

- **"World Bank Directives":** refers to the protection standards and environmental policy of the World Bank,

- **"GOVERNMENT":** means the Republic of Guinea represented by the Minister of Mines and Geology,

- **"Feasibility Study":** means a comprehensive study conducted by or for the company to determine the feasibility of operating an iron ore deposit within the territory covered by the Agreement,

- **"Mining Exploitation":** means the operations and works related to the technical and economic use of Mineral Substances, including mine development, extraction and processing activities,

- **"Force Majeure":** has the meaning defined in clause 41 of the present Agreement,

- **"Guinea":** refers to the Republic of Guinea,

- **"Taxes"**: means the taxes, fees, stamp duties, patent and license fees applied in the Republic of Guinea,

- **"Investor"**: means BSG Resources (Guinea) Limited, a company under Guernsey law, whose registered office is in Guernsey,

- **"Days"** : Refers to consecutive calendar days, without adjustments for official closures, holiday days or any other interruption to the calendar;

- **"Current Legislation"**: Refers to all the valid legislative and regulatory texts of the Republic of Guinea (laws, Regulations, Decrees, Orders, Decisions, Instructions, jurisprudence etc);

- **"Applicable Law"**: Refers to the Mining Code and other laws, regulations and decrees, and any other legislative instrument of Guinean law, including rules, regulations, resolutions or other directives or standards that require compliance, published officially, having the force of law, and in effect at the time of their application;

- **"Ore Concentrate"**: Refers to raw iron ore that has been processed to remove impurities to increase the content of the ore;

- **"Minister"**: Refers to the Minister appointed by the President of Guinea and responsible for the Ministry of Mines and Geology, responsible for the regulation of activities of Prospecting, development and operations of mineral substances;

- **"Processing Operations"**: Refers to the operations and works carried out in order to improve the quality of the extracted ore;

- **"Mining Operations"**: Refers to all the operations and works carried out as part of Mining Work, including Prospecting Activities for Mineral Substances;

- **"Parties"** means the Government, Investors and the Company, and **"Party"** means the Government or the Investors or the Company;

- **"Operating Perimeter"**: Means that part of the Contractual Area in which the workable deposits are located;

- **"Person"**: Refers to any person or body, a company or any other form of corporate entity;

- **"Commercial Production"**: Refers to commercial production as defined in clause 15.3 of this Agreement;

- **"Project"**: Refers to the activities of working the iron ore Zogota in the N'Zérékoré prefecture, including production, transportation, shipping and marketing of the Zogota iron ore by the Company, as well as the rebuilding of the Conakry – Kankan railway, as described in its different phases in clause 10 of this Agreement;

- **"Reports"**: Refers to every report required under the Mining Code and this Agreement, as well as every report, study, analysis or interpretation that is geological, geophysical, technical, financial, economic and marketing, prepared by or on behalf of the Company within the Territory Stipulated by the Agreement, concerning Prospecting, Development and Mining Operations Activities, which the Company must submit;

- **"Tax and Customs Regime"**: Refers to the tax and customs regime applicable in accordance with the provisions of this Agreement, as defined in clause 33;

- **"Company"**: BSG Resources (Guinea) SARL, a Sole Proprietorship Limited Company under Guinean law, registered in the Guinean Commercial Registry under No. RCCM/GC-KAL/013.755A/2006 on November 24, 2006, modified by declaration No. RCCM/GC-KAL-M2/024.524/2009 on February 20, 2009;

- **"Affiliated Company"**:  Refers to any company that controls or is controlled, whether directly or indirectly, by the investor or a company that controls or is controlled, whether directly or indirectly, by a company or entity that itself controls, whether directly or indirectly, the investor; "Control" refers to the direct or indirect ownership by a company or any other entity of at least fifty percent (50%) of the shares providing a majority of the voting rights at the general meeting of another company or entity, or a holding providing  authority to determine policy and management;

- **"Direct Subcontractors"**: Means the operators, bidders, entrepreneurs, suppliers and other persons working exclusively on the Project;

- **"Project Territory"**: refers to everything within the operations perimeter, the land occupied by infrastructure works and marked on the maps attached as appendices to this Agreement;

-   **"Territory Stipulated by the Agreement"**: Refers to the territory
    stipulated in this Agreement as described in Appendix B, including
    any modification or enlargement granted in accordance with the
    provisions of the Mining Code, but excluding any part of such
    territory that, if applicable, has been waived by the Company in
    accordance with the provisions of this Agreement and the Mining
    Code;

-   **"Third party"**: Refers to a Person apart from the Government, the
    Company, a Person that is part of the Company, an Affiliated
    Company to any Person that is part of the Company, an Operator, a
    Subcontractor or any Party to this Agreement;

-   **"Land User or Occupier"**: Refers to any Person that occupies or
    uses in law that is in effective or by common law a piece of land
    located within the Territory Stipulated by the Mining Agreement
    and in project areas outside the Concession territory;

## CLAUSE 2:           INTERPRETATION

In this Basic Agreement and unless the context dictates otherwise:

-   The singular includes the plural and the masculine the feminine and
    vice versa;

-   The table of contents and the organization of this Agreement into
    sections, clauses, paragraphs is only for the purpose of making
    reading easier and in no way affects its interpretation.

-    Any reference to the law or to any other legislation includes any amendment, modification, addition or law that replaces it, subject to application of the stabilization clause.

-    In the event of any uncertainty concerning any description of a perimeter or zone by geographic coordinates, geographic maps or sketch map, only the geographic coordinates shall be valid;

-    Any reference to a Party includes the successors of this Party or any other authorized successor;

Those terms in this Basic Agreement that are not defined shall have the meaning accorded them in the Mining Code.

## CLAUSE 3:    APPENDICES

The attached appendices are an integral part of this Agreement.

## CLAUSE 4:        PURPOSE OF THE AGREEMENT

In accordance with Article 11 of the Mining Code, the purpose of this Agreement is to define the rights and obligations of the Parties and the general economic, legal, administrative, financial, fiscal, customs and excise, mining, environmental, social, transport and shipping conditions according to which the Parties undertake to carry out the Project for working the iron deposits at Zogota in the N'Zérékoré prefecture.

To this end it consists of:

(i)     For BSG Resources to design, finance, develop and operate an iron
        ore mine within the area of the Concession; transportation of the
        iron ore by railway over Guinean and Liberian territory; shipping
        the ore from the port of Buchanan in Liberia.

(ii)    For the Government, to grant the facilities and guarantees that it
        agrees to subscribe for BSG Resources to facilitate carrying out the
        Project (mine, accessories and subsidiaries, and the railway lines).

(iii)   For the Parties, to define the consequences of possible non-
        compliance with their respective undertakings under the terms of
        this Agreement.

## CLAUSE 5:    APPLICABLE LAW

This Agreement is governed by the Applicable Laws of the Republic of
Guinea.

However, in the event of a contradiction and/or difference between Current
Legislation and the provisions of this Agreement, the latter shall take
precedence.

## CLAUSE 6:    GENERAL WARRANTIES

Each of the Parties declares and warrants:

-       That it is duly authorized to enter into this Agreement and to have
        obtained all the required authorizations to this end under its
        applicable law,

- That it is capable of meeting all the obligations arising therefrom.


**CLAUSE 7:    UNDERTAKING OF GOOD FAITH**

Both of the Parties undertake to comply with the terms and conditions stated herein and to act in good faith in the fulfillment of its obligations throughout the period of the Agreement.


**CLAUSE 8:    MINING CONCESSION**

The Mining Concession granted under Order No. ........... shall be executed in accordance with the provisions of the Mining Code and this Agreement.


**CLAUSE 9:    EFFECTIVE DATE – PERIOD**

In accordance with the provisions of the Mining Code, the effective date of this Convention shall be its approval by order and shall remain in force throughout the validity period of the Concession.


**CLAUSE 10:  DESCRIPTION OF PROJECT**

The project involves:


- The working, transportation, exporting and marketing of the iron ore;
- The rebuilding of a railway line Conakry – Kankan;


**10.1 Phase I: Zogota**

The Company shall provide the facilities and equipment required to work, transport, store and ship an amount of thirty (30) million tons of iron ore annually for fifteen (15) years from the Date of First Commercial Production.


The Company shall provide:

a) An open cast iron ore mine at Zogota in the prefecture of N'Zérékoré;
b) An industrial area at Zogota that shall include:


- Storage and loading areas,
- Workshops,
- A railway line in Guinea 102 km long,
- A railway depot,
- Facilities and equipment,
- Electrical power station with output of ….. MW,
- Offices,
- A water treatment station,
- A residential area;
- A hospital for employees.


c) A port area in Buchanan, Republic of Liberia, which shall include:
  - Storage and loading areas,
  - Workshops,
  - Offices,
  - A residential area.


d) The Conakry – Kankan railroad.


**10.2   Phase II: Blocks 1 and 2 Simandou Kérouané**


At this stage the Company undertakes to create the following elements:

- Two iron ore mines,
- Industrial facilities and equipment,
- Suitable railway infrastructure required for removing the iron ore.
- A residential area at Kérouané,
- Extension of equipment and installations to the port of Buchanan.

For Phase II the Company shall present the Government with a feasibility study within 24 months from date of signature of this Agreement.

The conclusions and terms of this study will facilitate defining the terms for the grant of the Mining Concession between the Parties, the terms of operation and shipping from these two Blocks.

**CLAUSE 11:  ZOGOTA INVESTMENTS**

The Company undertakes to invest as part of this Agreement the sum of USD 2,542,000,000 to carry out the project, broken down as follows:

| | |
|---|---|
| Mines | USD 243,000,000 |
| Industrial facilities and equipment, | USD 496,000,000 |
| Residential areas and hospital | USD 71,000,000 |
| Railway and rolling stock | USD 845,000,000 |
| Port | USD 463,000,000 |
| Contingency (20%) | USD 424,000,000 |

**CLAUSE 12:  CONAKRY – KANKAN - KÉROUANÉ RAILWAY**

The Company undertakes to rebuild this railway and will submit the feasibility study to the Government for approval. The cost of this reconstruction is budgeted at USD 1 billion (1,000,000,000) plus 20% for contingencies.

The Company undertakes to build 50% of this railway during the first phase of the project.

The Government undertakes to grant a full exemption from duties, taxes and fees on all the goods, materials, equipment and services required for creating this infrastructure.

## SECTION II: PROJECT DEVELOPMENT

## CLAUSE 13:  PROSPECTING WORKS

In accordance with the provisions of Article 41 of the Mining Code, the Company can carry out prospecting works within the Concession Perimeter.

All scientific research, studies, interpretations, logs of core samples or cuttings carried out as part of the prospecting works shall be carried out under the Company's direct supervision (or of a Subcontractor), by a

geologist, geophysicist, geochemist, engineer or technician with the required skills.

In the event that the Company demonstrates economically exploitable mineral substances other than iron ore, it must inform the Minister for Mines. In this event the Company shall have the right of first refusal and operating terms shall be defined in another agreement.

## CLAUSE 14: DEVELOPMENT WORKS

**14.1** The Company shall carry out all the component parts of the project in accordance with a time chart that is appended to the Agreement.

**14.2 Required conditions for the development works**

The development works shall commence following completion of the following actions:

*a)* Provision by the Government to the Company of the required authorizations to build a railway line in order to facilitate the removal of the Mining Produce;

b) Approval by the Minister for the Environment of the survey and plan for environmental and social management as required by Article 26.1 below;

*c)* Conclusion of the community development agreement as required in clause 25 below, approved by the competent authorities;

d) Acquisition, compensation and/or settlement of all land rights and/or claims arising from third parties in respect of the mining Concession and of expropriations for the railway line in the Republic of Guinea;

e) Notification to the Minister of Mines informing of the date of start up of the project's development activities.

## CLAUSE 15: OPERATIONS

### 15.1 Mining operations

The Company undertakes to carry out its mining operations in accordance with accepted engineering practice, under safe conditions, and in compliance with international standards and practices that are usual in the mining industry.

### 15.2 Start of Operations

The Company undertakes to start mining operations at the latest by May 31, 2012.

In the event that the Company is unable to comply with the deadline of May 31, 2012 referred to above, it must inform the Government and provide the necessary justifications. The Government undertakes to grant it, subject to a duly supported request, an extension of the said deadline for a maximum period of six (6) months.

In the case of failure to start the operations of the Mining Produce within the aforementioned period that has possibly been extended, the Government may revoke the Mining Concession in accordance with the provisions of the Mining Code.

The Company must inform the Minister of its start up program for operations, transportation and shipping of the iron ore within a minimum period of thirty (30) days.

## 15.3 First Commercial Production

The start up of commercial iron ore production shall not take effect until a threshold of stocks at the mine and the port allow for shipping 25,000 tons per day for a consecutive period of 30 days.

If the Company does not achieve this production rate, but it exports successively a quantity of more than 20,000 tons per day for over 60 days, this production shall be deemed as being commercial.

## 15.4 Works required during the operations period

### 15.4.1 Works schedule

The Company must submit to the Minister for informational purposes a works program, including:

- Forecast quantities from operations to transportation,
- Operational methods,
- Work accident statistics,
- System (standard) adopted for safety and hygiene,
- The Monitoring program for the environmental management plan.

### 15.4.2  Notice of changes

The Company must inform the Minister as soon as possible of any major change in its Mining Operations (change in operational method, change to the production program, and of safety standards).

### 15.4.3  Cessation of operations

If the Company is unable to maintain the Commercial Production of the Mining Produce for a period of eighteen (18) consecutive months, the Company will be deemed to not have met the requirements of the minimum works program and the Government may revoke the Concession in accordance with the provisions of the Mining Code.

### 15.4.4 Extension (Expansion or change to facilities)

The Company shall inform the Minister for Mines of any program for extension and expansion of its facilities in order to increase production.

### CLAUSE 16:  INFRASTRUCTURE

### 16.1 Railways

### 16.1.1 Zogota – Sanniquellie Mining Railway

It is expressly agreed that the Government shall be the owner of the railway irrespective of its method of financing. The railway line of 102 km that will be constructed in Guinean territory outside of the Concession Perimeter shall be subject to a usage fee.

The Company shall carry out the surveys, finance and construct the railway line and provide for its operation and maintenance. The Company shall allocate the agreed fees for use of the railway as a repayment for the investment it will have made.

After complete repayment of the loans, the Company shall continue to provide maintenance of the railway and shall pay the Government fees for use of the railway. These fees shall be fixed according to the same principles as those used in similar infrastructure used under the same conditions in the Republic of Guinea.

The Government guarantees the Company right of access and of priority use of the railway line that will be built on Guinean territory from Zogota to the Liberian border. Use of this railway by a third party shall be with the agreement of the Company and may under no circumstances interfere with the Company's activities.

The Government warrants that it will grant the Company all the required authorizations to occupy the lands as part of building the railway.

The terms for design, financing, construction, operation and maintenance of the railway shall be specified by agreement between the Government and the Company.

### 16.1.2 Railway in Liberia

BSG Resources shall provide the Guinean Government with the information, terms and warranties resulting from the agreements with the Liberian Government in respect of the renovation, use and maintenance of the railway line on Liberian territory.

### 16.1.3 State support

As part of bilateral cooperation and regional agreements, in particular the
Mano River Union, the Government undertakes to obtain from the Liberian
Government an agreement on the use of the railway line in Liberian
territory, of the port area and the residential area in Buchanan.

### 16.1.4  Access to existing public infrastructure

The State undertakes that Company shall have access and will be able to use
the roads, bridges, airfields, installations, transport-related installations, as
well as pipes for water, electricity and communications, set up or organized
by any body or entity owned or controlled by the Company, with the
exception of the armed forces, without having to pay fees greater than
those paid by companies with identical activities to those of the Company.

The Company is obliged to make suitable road infrastructure (with surfacing)
in the project development area to avoid pollution that is dangerous for the
health of the population.

### 16.2 Development and Maintenance of the Infrastructure

**16.2.1** Subject to compliance with the Applicable Law, the Company can
build, use, improve and maintain any infrastructure, including roads, bridges,
airfields, port or rail installations, and transport-related installations, as well
as electrical power stations, telephone and other communications lines,
pipelines, water pipes or other networks or installations necessary for the
Mining Operations.

At the Company's request, the Government and the Company must analyse
such infrastructure or other requirements related to the Mining Operations,
including but not limited to energy and transportation requirements with a

view to entering into a fair agreement for the sharing of costs and profits from such infrastructure.

Notwithstanding the foregoing, no construction may take place in the following places:

a) Any territory, apart from that of the Mining Concession, belonging to the Government, without the agreement of the Minister for Mines, such agreement arising from checking with the competent authorities;

b) Any area that is part of a Mining Concession or of a prospecting permit not covered by this Agreement or other activities without advising the Minister for Mines in wiring in advance, who will take the necessary measures with the authorities in question and the holders of mining rights to facilitate carrying out the planned infrastructure.

### 16.2.2 Construction within the Concession

Subject to the provisions of the Mining Code in respect of closed, protected or out of bounds areas and subject to the terms stated herein, the Company holds the following rights in addition to those granted it by the Concession and this Agreement:

a) Exclusive right of entry and occupation of the Concession, following termination of the rights and compensation of the Land Users or Occupiers;

b) Subject to the rights of every third party, Land Users and/or Occupiers and to the provisions of the Applicable Law, the right to use and construct on the Concession roads, railways, pipes, pipelines, sewers, drains, electrical transport lines or other similar

installations required for the activities that are the subject of the
Agreement.

To this end no prior approval is required by the Company in order to build
roads, bridges, railway lines, pits, sewers, pipelines, electrical lines or any
other installations required for the Mining Operations within the area of its
Concession.

The Minister may require changes in order to limit or eliminate any danger
to the health, safety or well being of the employees or of the public, or any
negative effect on the environment that results from constructing
infrastructure as a result of this paragraph.

### 16.2.3  Construction outside the Perimeter of the Mining Concession

The Government warrants the Company that it can create infrastructure
outside of the Perimeter of the Mining Concession. To this end the
Government grants it the suitable area to carry out the said infrastructure
and industrial installations.

### 16.4 Company's Priority of Use

The Company shall have priority for use of any infrastructure that it will have
built.

The Company may limit or prohibit access to roads located within the
Concession, if such access might pose a danger for users or staff, for reasons
of interference with or obstruction of the Mining Operations.

**16.5 Third party rights to grazing and cultivation**

In the exercise of the rights awarded it under this Agreement, the Company must take account of and minimize the impact on the rights of Third Parties, Land Users and/or Occupiers that exist at the Effective Date of the Agreement (fishing, grazing, word cutting and agriculture rights or rights of way).

The Company can grant Land Users and/or Occupiers within the Concession grazing rights or the possibility of cultivation, subject to the pursuit of these occupations not interfering with the Mining Operations.

**16.6 Compensation for Land Users or Occupiers**

If the Company deems the presence of the Land Users or Occupiers to be incompatible with its Mining Operations in the Concession, it must compensate these Land Users or Occupiers present prior to actual commencement of the construction works and/or relocate them.

In such a case the Company must cooperate with the Government's specialist departments in the choice of new localities for relocation and setting the compensation to pay these Land Users or Occupiers, for any relocation or loss of usage (land title, home, crops).

The aforementioned compensation must match the amount required for relocating and resettling the said Land Users or Occupiers prior to the actual commencement of works, in a place and under conditions at least similar to those that prevailed until prior to the upheaval. Compensation must include fair market value for all loss of crops, moving costs, costs related to creating

new rights of way, access and use, and any other expense arising from such
relocation.

If the Land Users or Occupiers there prior to the actual commencement of
the works accept relocation to a new place instead of, whether in whole or
in part, financial compensation, the Company in coordination with the
Government's specialist departments must carry out their relocation.

As part of the relocation the Company must rebuild on the new site
improved homes that take account of the life style of the rural occupants.

In the case of land users, the Company must prepare new areas for these
users to improve their activities.

The Company shall present the Government the map of areas that will
be affected by the project activities prior to initiating removal and
relocation surveys. The conclusions of this survey as approved by the
Government shall be publicized widely among the authorities and
populations in question.

The Government and Company shall set up a management structure for
this operation that will act to monitor the sustainable development plan
that will be drawn up.

## 16.7 Cooperation in the event of disputes

The Company can take advantage of all the rights provided for in this
Agreement. The Minister undertakes to cooperate with the Company in the
event of difficulties or the interference of third parties, in order to settle any
dispute.

## SECTION III : MARKETING

## CLAUSE 17:  SALE OF MINING PRODUCE

### 17.1 Arm's length prices

The Company undertakes to sell the Mining Products from the Concession
under arm's length conditions.

### 17.2 Government's access to the Mining Produce

At the latest by the end of the first half of a Calendar Year, the Government
may request the Company to enter into a purchase contract for the
following calendar year for a percentage of the total production of Mining
Produce from the Concession.

The Company must examine this request and offer a contract at the same
market financial terms for quantities and periods similar to those in supply
contracts it would have entered into with its clients.

The Government expressly agrees that the Company is under no obligation
to sell it Mining Produce if at the time of receipt of the Government's
request, it is bound by long-term supply contracts that do not allow it satisfy
such a request.

### 17.3 Notice of Sale to an Affiliated Company

If the Mining Produce is sold to an Affiliated Company, the Company must
within fifteen (15) Days following such sale inform the Minister and provide

him with all the information, data, sales contract and receipts used to
calculated the prices, discounts and commissions involved in such a sale. The
Government shall treat this information as confidential.

## 17.4 Verification of Mining Produce sales

The Minister is authorized to inspect and verify all sales transactions of
Mining Produce, including their terms and the conditions for fulfilling them.

If at the end of these inspections and/or verifications, the Minister considers
that the sales transactions of Mining Produce do not reflect their fair market
value, he will notify the Company of his opinion and provide it with all
supporting documents.

Within fifteen (15) Days following receipt of such a notice, the Company
must submit documentation proving that the amounts paid for sales or
other disposals of the Mining Produce were their fair market value. The
Government shall treat this information as confidential.

Within a period of thirty (30) Days from receipt of the notice and unless
there has been an agreement between the Parties within this time the
Parties must meet in order to try to settle the disagreement in respect of
the sales of Mining Produce, and to agree on the fair market value for the
period in question.

If the Parties cannot agree within ten (10) days from their meeting, one of
the Parties may refer the dispute to an independent expert in order to
determine the fair market value.

The onus of proof is on the Company, which must show that the value
received was the fair market value during the period in question.

At the end of this process and if applicable the Company shall pay forthwith
the taxes and duties that had thus been evaded.

## CLAUSE 18:  MAINTENANCE AND INSPECTION

### 18.1 Maintenance of equipment and of the weighing system

The Company must maintain in good working condition all the equipment
and other assets used in the Mining Operations, including the weighing
systems.

The Company must have a weighing system that complies with international
standards accepted in the mining industry.

### 18.2 Method to determine the quantities of Mining Produce

The method for weighing Mining Produce is subject to the Minister's
approval.

Such approval should be forthcoming within a period of thirty (30) days from
date of receipt of the request submitted by the Company; it is understood
that no reply within this time constitutes acceptance by the Government of
the method selected by the Company.

The Minister may from time to time and with reasonable prior notice test or examine the weighing system.

The Company may not modify the weighing method it uses in any way or change the instruments, equipment or other facilities used for this purpose without the prior, written approval of the Minister.

## 18.3 Faults in the weighing instruments

Any fault or other problem with the weighing instrument or method for the Mining Produce must be corrected forthwith.

Excepting notification to the contrary by the Minister, any fault or problem with the instrument or method is presumed to have taken place for the last three (3) months or since the last test or examination of the equipment, which ever is the longer.

Any payment to the Government resulting from the weighing of Mining Produce must be adjusted to take into account the fault or problem for the presumed period.

## 18.4 Access and inspection by the Government

Duly authorized representatives of the Government holding a movement order issued or stamped by the Minister for Mines can during the Company's normal working hours enter the locations in order to inspect, examine, check or carry out an audit of all the assets, accounts, registers, equipment, instruments, data concerning mineral substances and other information related to the Mining Operations in Guinea and Liberia.

**18.5 Inspection costs**

Inspection and travel expenses shall be considered an operating expense.

In order to ensure the effective implementation of the rights of inspection, observation, verification and auditing by the Government, the Company must provide the Government's duly authorized representatives, free of charge, all reasonable assistance, access to its employees and representatives, and access to its facilities in the way usually available within the Company.

**CLAUSE 19:  INFORMATION AND REPORTS**

**19.1 Maintaining files and reports**

Throughout the entire period of this Agreement and in accordance with the Mining Code, the Company must prepare and maintain, in French, comprehensive files and reports that are transparent, precise and up to date concerning the activities covered by the Agreement.

Activity reports required by the Mining Code shall be prepared in five (5) copies and submitted to the CPDM, which will distribute them to the technical departments.

Files, reports and/or data concerning ores, with the exception of drilling samples, must be maintained in electronic format in the Republic of Guinea.

In addition the Company must submit its reports in the required form in order to satisfy the Government in the application of the Transparency Initiative of the Mining Industries (ITIE).

## 19.2 Samples to be retained

In accordance with the Mining Code and its rules, orders and regulations, the Company must maintain fractional samples, or as is the case, drilling samples, Ore Concentrates, monthly composites from the drilling, and samples of ore tailings.

## 19.3 Export of samples

Export of samples must be carried out in accordance with the provisions of the Mining Code and its rules, orders and regulations.

## 19.4 Report on annual expenses

The Company must submit to the competent authorities not later than the 30 April each calendar year all its financial statements.

## 19. 5. Annual report on the community development agreement

Not later than the 30 April each calendar year the Company shall send the competent authorities am annual report on execution of the community development agreement, which must contain the following information:

a) A qualitative assessment whether or not the targets of the agreement have been achieved;

b) If applicable, the proof and approaches that will be taken to achieve the targets in the future;

c) A detailed list of every amount spent by the Company for the local community development agreement;

d) Any recurrent problem with the local community; and

e) Progress achieved in respect of closing down the mine.


## SECTION IV : COMPANY'S UNDERTAKINGS


## CLAUSE 21:  COMPANY'S OBLIGATIONS AND WARRANTIES

### 21.1 Declarations and Warranties

The Company declares and warrants to the Government that at date of signature of this Agreement and throughout its duration:

a) Any information provided to the Government by the Company to conclude this Agreement contains no false declaration and/or any intentional omission.

b) The Company is a body duly constituted as a company under Guinean law in accordance with the uniform document concerning the rights of commercial companies and the Economic Interest Group (GIE) dated April 17, 1997, adopted as part of the OHADA treaty and declares that it is duly organized and exists subject to the laws and regulations in force in the Republic of Guinea.

c) The Company has the powers and authority required to own and operate its assets at the sites where they are currently held or operated, and to carry out its activities at the places where they are being carried out. There is no current action, claim, enquiry, arbitration procedure or other involving the Company or any

order, decision, injunction, decree or judgment against the
Company.

d) The Company has or has access to, and shall make use of at the
right time, all the necessary financial, technical, managerial and
technology skills to meet its obligations and targets as stipulated
in this Agreement, subject to clause 43 of this Agreement.

e) The Company has the necessary powers and authority to sign this
Agreement and to meet the obligations arising therefrom.

## 21.2 Company's obligations

### 21.2.1 Financing

#### 21.2.1.1 Fund raising

The Investor and the Company undertake to provide the Government with a
financing plan for the project within three (3) months of the agreement on
the terms of financing.

#### 21.2.1.2 Possible changes to facilitate the financing

In order that the Company should obtain the financing necessary for the
operations covered by this Agreement, the Government undertakes to
consider favorably any request for an amendment, interpretation or
application of the terms of the Agreement that could be made.

#### 21.2.1.3 Reporting Requirement

Any loan or other financing transaction of the Mining Operations from an
Affiliated Company must be declared to the Minister, and all documentation

referring thereto must be submitted within sixty (60) Days following the effective date of such commitments.

## 21.2.2  Construction of the Mine

The Company undertakes to construct in accordance with the Time Chart attached in the Appendix an open cast mine together with the related infrastructure and equipment required to extract the Mining Produce from the Concession, with an initial production capacity of thirty (30) million tons per annum at the latest 24 months after the Effective Date of this Agreement and the Concession.

## 21.2.3  Construction of a Factory for Processing Magnetite Ores

At the latest at the end of the fifth Year following the Date of First Commercial Production of Mining Produce, the Company shall present the Government with a feasibility study for the construction of a factory for processing magnetite ores.

On the assumption that the conclusions of the feasibility study will be positive, the Parties will come together in order to set the terms for carrying out this investment.

In the event that study submitted by the Company is negative, the Government reserves the right to award a permit to a third party for working and processing the magnetite deposits.

## 21.2.4 Construction of a Steel Mill

Ten (10) years after the date of the first commercial production the Parties shall come together to decide on the construction if a steel mill in the Republic of Guinea.

In the event that the Company does not commit to build a steel mill, the Government can find a strategic partner to do so. Under these conditions, the Company shall negotiate with the Government and with its partner a contract for the supply of iron ore at market conditions.

## CLAUSE 22:  COMPANY'S RIGHTS

### 22.1 Company's Rights

Subject to the specific provisions in this Agreement and/or the Mining Code, the Company shall enjoy the rights conferred on it under this Agreement, the Mining Code and the Concession.

Without derogating from the generality of the foregoing, these rights include inter alia:

a)  The exclusive right to carry out the Mining Operations;

b)  The right to freely arrange its assets and to organize the business as it sees fit;

c)  Freedom to recruit and dismiss, in accordance with Current Legislation in the Republic of Guinea;

d) Free circulation in the Republic of Guinea of its staff, assets and products;

e) Unrestricted importation of goods and services, including insurance and the funds required for the Mining Operations;

f) Freedom to export and sell the Mining Produce from the Concession on the international and/or domestic market;

g) The right to transport or have transported the Mining Produce to a storage, processing or loading location;

h) The right to benefit from any agreement entered into between the Government and other Governments to facilitate the transport of the Mining Produce over the territory of these Governments;

i) Freedom to set up in Guinea processing plants and iron ore processing;

j) The right to acquire, use and operate any means of communication, any type of aircraft or other means of transport as well as the auxiliary facilities or equipment required for the Mining Operations;

k) Freedom to carry out large-scale sampling and attempts at processing the Mining Produce from the Concession in order to determine the mining potential;

l) Freedom to take, take out and export reasonable quantities, specimens or samples as part of the Prospecting Activities.

## CLAUSE 23: EMPLOYMENT OF STAFF

**23.1 Compliance with the work standards in the Republic of Guinea**

As part of the employment of staff the Company must comply with the provisions of the Labor Code and the Social Security Code in force in the Republic of Guinea.

In addition and in accordance with the practices in the international mining industry, the Company shall set up an effective system of prevention and medical treatment of work accidents and occupational health hazards.

The Company shall take out an adequate insurance policy to cover the cost of treatment for occupational health hazards and work accidents.

## 23.2 Employment of Guinean Staff

From the start up of the Mining Operations, the Company must:
   a) Employ only Guinean staff for works not requiring qualifications;

   b) Give priority to the employment of qualified Guinean staff for the requirements of the Mining Operations;

   c) Contribute to the training of this staff with a view to providing access to all employment as a qualified worker, supervisor, manager and Director.

## Employment of Guinean Staff in Liberia

As part of bilateral cooperation and regional agreements, in particular the Mano River Union, the Government undertakes to set up with the Liberian Government agreements defining the terms of residence and work of Guineans in Liberia as part of this project. These documents will be appended to this Agreement.

## 23.4 Management Careers for Guineans

At the end of each Year the Company shall draw up an agreement with the Minister a recruitment plan for Guinean staff for the coming years in order to arrive at an increasingly larger participation by Guinean staff in the Mining Operations in Guinea and Liberia, it being understood that five (5) years following the Date of First Commercial Production, Guinean employees must represent 90% of the Company's workforce.

The Company undertakes to set up a career plan for employees with positions of responsibility.

### 23.5 Employment of Expatriate Staff

The Company may employ a reasonable number of expatriate workers who have a specialty, skills or special knowledge.

At the Company's request and after having submitted the required supporting documents, the Government undertakes to grant expatriate staff the required authorizations, including entry visas and residency rights, work permits and any other permit required by law.

### CLAUSE 24:  SUBCONTRACTING

### 24.1 Subcontracting

The Company may subcontract the carrying out of all or part of the Mining Operations, but subject to any provisions to the contrary in this Agreement, shall remain responsible to the Government for the execution of its obligations under the terms of the said Agreement and Concession.

It is expressly agreed that to carry out subcontracted Mining Operations, the said direct subcontractors shall benefit in particular from the

provisions concerning taxes and customs and excise in the Agreement
that are applicable to Subcontractors of the Company.

Not later than thirty (30) days from the signature of any subcontracting
contract the Company shall supply the Government with a certificate
including the following information:

a) Name and address of the subcontractor,
b) Purpose of the contract,
c) Start date and estimated period of contract,
**d)** Estimated contractual revenues.

## 24.2 Payment to Affiliated Companies

Any payment to an Affiliated Company for the execution of services or
the purchase of merchandise related to or regarding the Mining
Operations, must be documented, reasonable and competitive in terms
of price as though it was carried out without any form of dependency.

The amount invoiced to the Company must not be higher than that
charged by third parties for similar services and goods.

## 24.3 Preference for Guinean goods and services

The Company and the companies working on its behalf must grant
priority to Guinean companies for all contracts especially for purchases,
construction, supply or provision of services, including contracts for
shipping, insurance and transportation of merchandise, on condition
that they offer at least equivalent prices, quantities, quality and delivery
times.

For any contract for a value of more than USD one hundred thousand
(100,000), the Company shall select its subcontractors by tender or by
any other method used in the international mining industry.

## CLAUSE 25:  FREIGHT AND MARITIME TRANSPORT

The Company undertakes to reserve to the Government of the Republic
of Guinea the right to load the exported tonnage, up to a maximum
proportion of 50% on boats flying the Guinean flag or similar and/or
chartered by the Guinean Government on the international freight
market, on express condition that such ships comply with suitable
seaworthiness standards and that the prices are competitive on the
international maritime freight market.

## CLAUSE 26:        AGREEMENT ON DEVELOPMENT OF LOCAL
COMMUNITIES

In order to promote the economic and social development of local
communities, the Company undertakes to enter into Development
Agreements as part of the local development plans (PDL).

### 26.1 Provisions of the local community development agreement

The agreement on the development of local communities has been
negotiated between the Company and the official representatives of the
local communities, and must include at least the following provisions:

1. The Persons representing the various parties for the purpose of the
local community development agreement;

2. The obligations of the Company towards the local communities,
   including in particular:

a) The economic or social undertakings that must be made in respect of sustainable development of the local communities;

b) The setting up of activities, aid and resources to create a self-sufficient community by the promotion and diversification of revenue generating activities;

c) The organization of periodic consultancy sessions with the local community in respect of drawing up a plan for the closure of the Mining Operations, in order to prepare that community for the prospective closure of the mine;

3. The obligations of the local communities towards the Company;

4. The terms of the local community development agreement must be revised every five (5) Calendar Years;

5. The framework for monitoring meetings and procedures between the Company and the local communities and the means planned to get the local communities to take part in planning, implementation, management and monitoring activities; and

6. A declaration whereby the Company and the local community undertake to solve any dispute concerning the local community development agreement through their respective representatives, and failing an agreement, the right to refer the dispute to the competent authorities, whose decision shall be final.

**26.2 Obligation to respect local traditions**

The Company must pay attention to the rights, customs and traditions of the local community when drawing up the local community development agreement.

**26.3 Approval of the Local Community Development Agreement**

The local community development agreement, after having been duly
signed and approved by the representatives of the Company and the
local communities, shall be submitted to the Ministers for Mines and for
Local Communities for approval.

The Ministers must approve the said agreement within thirty (30)
working Days following its receipt at their offices, stating that it complies
with the requirements in the foregoing paragraphs.

Any refusal to approve by the Ministers must be sent in writing to the
representatives of the Company and of the local communities stating the
specific reasons and the way that should be considered to correct the
situation.

The Company cannot undertake the Development of the Concession
before having received the prior approval for the local community
development agreement.

## CLAUSE 27:       PROTECTION OF THE ENVIRONMENT AND
REHABILITATION OF THE MINING SITES

Throughout the entire validity period of the Agreement, the Company
undertakes to conduct the Mining Operations while taking care to
minimize, manage and limit the impact on the environment.

### 27.1 Environmental impact study

In accordance with the provisions of clause 13 of this Agreement,
commencement of development works is subordinated to the approval
of the Minister for the Environment of the environmental impact study
and an environmental management plan prepared by the Company.

The Company must submit the study and the plan, in a single or two separate documents, to the Minister for the Environment in five (5) copies.

The study and the plan, using quantifiable criteria, must contain the data and analysis reflecting best international practice as recognized in the mining sector, and must include the following information:

a) Identification of probable major human and natural environmental impacts, including pollution;

b) General targets in respect of each major environmental impact;

c) Detailed targets in respect of each major environmental impact and the means to reduce such an impact;

d) Means to achieve the general and detailed environmental targets;

e) Implementation schedule;

f) Forecast budget and timetable to achieve the environmental targets;

g) Ongoing rehabilitation program for the Concession and estimated annual costs;

h) Final program for gradual rehabilitation for the Concession and estimated costs;

i) Estimated costs for the final program for gradual rehabilitation, taking into account each Year of operations of the Concession, in the event that the final rehabilitation has to take place during a Year in which operating activities cease.

j) As required, this plan shall be updated by the Company and sent to the Government as soon as possible.

**27.2 Cultural Heritage**

In the event of the discovery of an archeological site during the Mining Operations, the Company shall update the elements of the national cultural heritage, both fixed and movable. It undertakes not to move or destroy this site or parts thereof and to inform the Government immediately.

### 27.3 Emergency measures

In the event of an emergency or exceptional circumstances, the Company is obliged to take the necessary immediate and appropriate measures.

For the purposes of this Agreement "an emergency" or "exceptional circumstances" are considered to be any situation or event, actual or imminent, whether resulting from a natural occurrence or caused by man, that might involve the death, wounds or bodily harm to any person, damages to property or to natural resources, if immediate action is not taken.

### 27.4 Company's responsibility in the event of a claim

The Company must keep the Government informed of any claim or justified debt related to the activities covered by this Agreement, as well as any legal action or dispute arising from accidents or bodily harm or damage to goods caused or occurring with the framework of the Mining Operations. The Company undertakes to compensate the Government for any expense related to such a claim, debt, action or dispute.

### CLAUSE 28:  CLOSING DOWN AND REHABILITATION

### 28.1 Obligations during the close down phase and rehabilitation

The Company must comply with its obligations for closing down and rehabilitation of the mining sites, as stipulated in the Mining Code, the Environmental Code and this Agreement.

## 28.2 Rehabilitation of the area defined in the prospecting permit

The Company is obliged to reinstate the sites and locations affected by its prospecting works and to put the affected sites and locations into a state reasonably similar to how they were prior to carrying out of the said works.

## 28.3 Rehabilitation of the Concession

Prior to expiry of the Concession the Company is obliged to reinstate the sites and locations affected in accordance with the environmental and social management plan stipulated in this clause.

## 28.4 Closing of the mine

## 28.4.1  Notice of closure

The Company must inform the Minister of its intention to close down the mine located at the Concession at least six (6) months before the scheduled closure date.

## 28.4.2  Closure plan

In cooperation with the Ministry of Mines and the local community, the Company must draw up a closure plan for the Mining Operations that prepares the community for a prospective cessation of activities. This plan must supplement the local community development agreement.

### 28.4.3  Orderly close down

The Company shall take all steps to handle the close down of the mine gradually, in an orderly and planned fashion in order to prepare the community for prospective cessation of activities.

### 28.4.4  Arrangements for movable and fixed assets

Subject to the Government exercising its option available to it in accordance with clause 56 of the Mining Code, the Company must dispose of its entire moveable and fixed assets at the closure of the mine, it being understand that moveable and fixed assets not removed must be demolished and the site restored.

### 28.4.5 Obligation to render the site safe

Prior to expiry of the Concession, the Company must render safe the site affected by its activities under this Agreement in order to ensure the safety of the public and of future Land Users or Occupiers.

To this end, the Company must:

a) Permanently seal all the mine shafts including access and ventilation shafts, if applicable;
b) Remove all electricity transport lines intended for the sole usage of the Company;
c) Level all steep slopes, shafts on a slope and precipices created by the Mining Operations in order to render them safe, and when necessary to close off precipices to avoid any fall, and put up warning signs as necessary;

d) Render safe and reinforce all dams, concentrations of residue and
cuttings to avoid any collapse.

**28.5 First demand bank guarantee**

In order to guarantee its obligation of rehabilitation of the Concession
site, the Company must provide the Government with a first demand
bank guarantee, presented by a bank with sufficient financial resources.

The level of this guarantee shall be:

- Initially set in relation to the environmental management plan
stipulated in clause 26 of this Agreement,

- Then updated annually in line with the said environmental
management plan and, if applicable, with the rehabilitation works
carried out by the Company.

This guarantee can only be called upon at the expiry of the Concession.

## SECTION V: WARRANTIES GIVEN BY THE GOVERNMENT

**CLAUSE 29:    DECLARATIONS AND WARRANTIES OF THE
GOVERNMENT**

The Government declares and warrants to the Company that at date of
signature of this Agreement:

a) The Minister acts as the duly authorized representative of the
Government and has the necessary powers and authority to sign
this Agreement;

b) There are no mining rights, no request for mining rights, claim, option agreement, lease, license, operating contract or any other restriction that could affect the Concession governed by this Agreement or the Company's rights as stipulated herein. The Government is unaware if the existence of any notice, objection or other pending legal action or dispute in respect of the Concession in any manner whatsoever. The Concession governed by this Agreement is free of any closed zone as defined in the Mining Code.

c) Prior to the signature of this Agreement, the Government satisfied itself that the Company has all the qualifications necessary, as defined in the Mining Code, and that there is nothing to prevent the granting of a Concession and the signature of this Agreement.

d) Signature by the Government on this Agreement and the execution of the obligations arising, are not in violation of any law, regulation, decree or order of any national or local authority or of any ruling handed down by a Guinean court.

e) The Government shall ensure that the administrative authorities provide the Company with all assistance necessary and provide it with all the permits necessary for the Mining Operations as stipulated in the applicable Guinean law.

f) The Company shall be entitled to proceed, with the cooperation of the Authorities, to any registrations that might be deemed necessary to better protect its rights it has been granted by the Government under this Agreement;

The Government undertakes to facilitate all administrative steps and procedures by all appropriate means in accordance with the Applicable Law and to provide all reasonable assistance that will be needed for carrying out the Project, and in particular:

(i)    For all works concerning construction, development, operations and enhancement of the iron ore that the Company might undertake as part of this Agreement;

(ii)    For the design, development, financing, construction, ownership, operation and maintenance of the Project Installations and access to the Existing Infrastructure and their use under this Agreement;

(iii)    For the execution of its obligations that appear in this Agreement, including but not limited to, by transferring to the Company in accordance with applicable legislation all land reasonably required **by the Investor** for the design, development, financing, construction, ownership, operation and maintenance of the Project Installations.

## CLAUSE 30:        FOREIGN EXCHANGE RULES – TRANSFER GUARANTEE

The Government warrants the Company that it can freely:

a)  Open and operate in Guinea and abroad any bank accounts, in any currencies, it being understood that the Company has one or several bank accounts in Guinea duly provided with funds to make local payments (salaries, local suppliers etc),

b)  Take out loans abroad in any currency,

c)  Transfer abroad funds, dividends and income from capital invested, as well as income from the liquidation or sale of their credits or corporate assets.

In return the Company undertakes to provide the Government:

-      Within fifteen (15) days of opening them, the details of each bank account opened abroad,

- Within fifteen (15) days of each quarter, a copy of the bank
  statements for the previous quarter of the bank accounts opened
  abroad.

In addition, the Government warrants to foreign staff employed by the
Company and living in the Republic of Guinea free conversion and free
transfer to their countries of origin, savings made on the salaries or
other items of remuneration they were due, subject to all taxes having
been paid in accordance with the provisions of Current Legislation and
this Agreement.

**CLAUSE 31: EXPROPRIATION -NATIONALIZATION**

In the event of the expropriation or nationalization of the Company or
any part of its assets, the Government shall pay fair and equitable
compensation based on the market value of the Mining Operations at
the date of the expropriation or nationalization.

**CLAUSE 32:        STABILIZATION PERIOD**

The Government warrants the Company from the date of grant of the
Concession and throughout its full duration the stabilization of Current
Legislation and of all provisions, particularly fiscal and concerning
customs and excise, stipulated in this Agreement.

Accordingly, all changes to Current legislation, particularly fiscal and/or
concerning customs and excise, after the date of grant of the Concession
that would as a result increase, whether directly or indirectly, the
Company's tax and/or customs and excise charges would not be
applicable for it.

On the other hand, the Company may validly take advantage of such
changes if their effect is to reduce its tax and/or customs and excise
charges.

In addition, the Company shall benefit from any more favorable clause granted in respect of the provisions of this Agreement that will be included in a mining agreement concluded at a later date with another mining company carrying out similar activities.

## SECTION V TAX AND CUSTOMS SYSTEM

**CLAUSE 33:  TAX REGIME**

**33.1 Applicable Taxes, Duties, Contributions and Fees**

The Company, the Investors and Direct Subcontractors are subject throughout the period of this Agreement only to following taxes, duties and fees, to the exclusion of any others, in accordance with the terms stipulated in this Agreement:

- Fixed duties and fees:
- Land fees;
- Tax on Mining Substances;
- Tax on industrial and commercial profits;
- Tax on Income from Securities (IRVM);
- Lump Sum;
- Professional Training Levy;
- Single tax on vehicles;
- Social Security payments.

With the exception of and limited to what is stated in this clause, the Company and Direct Subcontractors shall not be subject to any duty, tax and/or fee of a taxation nature, including value added tax.

The calculation and payment of all taxes and duties incumbent on the Company is made on the basis of accounting data and is done in US dollars ($), except for taxes and social security payments assessed on salaries and withholdings at source on payments denominated in a currency other than the US dollar, which shall be payable in Guinean francs.

The applicable rate of exchange for conversion transactions in US dollars for expenses and charges in another currency shall be the average monthly rate of exchange for the month in question as published by the Central Bank of the Republic of Guinea.

The exchange rates defined above shall also be applicable for the calculation of all later back payments, interest charges and penalties, and for all repayments of overpayment of taxes.

**33.2 Fixed duties and fees – Land fees**

The Company is liable for fixed duties and fees as well as for land fees in accordance with Current Legislation.

**33.3 Tax on mining substances**

The Company shall be liable for the tax on mining substances according to the following terms:

**33.3.1  Base**

The tax base for mining substances is made up of:

-      The FOB value of the iron ore.

### 33.3.2  Rates

The applicable rate for **concentrated iron ore** (ore that has undergone mechanical processing to remove impurities in order to increase its content) is 3.5% of the FOB value.

### 33.3.3  Terms of payment

This tax is payable quarterly, at the latest on the fifteenth of the month following each quarter, based upon quantities exported.
This tax is deductible for the calculation of taxable profits.

### 33.4 Tax on Industrial and Commercial Profits

The Company shall be liable for Tax on Industrial and Commercial Profits (BIC), to the exclusion of all other taxes on profits, according to the following terms.

### 33.41 Base

Taxable profit is determined by application of the provisions of the General Tax Code and the Mining Code, subject to special provisions stated in this Agreement.

### 33.4.2  Rate

On account of the building of the Conakry – Kankan railway, the rate for the Tax on Industrial and Commercial Profits applicable to the net taxable profit shall be thirty percent (30%).

### 33.4.3 Tax relief on Industrial and Commercial Profits

In accordance with the provisions of Article 143.3 of the Mining Code, the Company shall be exempted from the Tax on Industrial and Commercial Profits for a period of 8 years from the first commercial production.

The Company shall benefit from a further two years of exemption, being 10 years in all, for the extension of the railway from Kankan to Kérouané.

### 33.4.4 Terms of payment

Terms of payment for the Tax on Industrial and Commercial Profits are as stipulated in the General Tax Code.

### 33.5 Tax on Income from Securities

The Company shall be liable for payment for the Tax on Income from Securities (dividends, royalties, directors' fees paid by the Company).

### 33.6 Taxes and contributions assessed on salaries

Salaries paid to employees of the Company or its Direct Subcontractors shall be liable to the following taxes and contributions:

- Lump sum payment at rate of six percent (6%) for salaries paid to employees with Guinean nationality,
- Training levy at the rate of one and a half percent (1.5%) for salaries paid to its employees in Guinea and outside it. This levy shall not apply if the Company will have its own, permanent training center in Guinea. A permanent training center is defined as being a place where there are classrooms to hold

courses by qualified staff, for the training and development of the skills of staff taking part directly in the Mining Operations,

- Withholding on Salary Payments (RTS) of Guinean nationals by application of the current scale;

- Withholding on Salary Payments (RTS) of foreign employees residing more than one hundred and eighty-three (183) days in the Calendar Years at a rate of ten percent (10%) of the remuneration, it being understood that foreign employees residing less than one hundred and eighty-three (183) days in the Calendar Years are exempt from this tax,

- Applicable social contributions, it being understood that foreign employees are exempt.

## 33.7 Single Tax on Vehicles

The Company, its Investors and Direct Subcontractors are liable for the Single Tax on Vehicles at the currently applicable rate, excluding for worksite vehicles and machines.

## 33.8 Withholding at Source of non-salary income

Payments made by the Company or its Direct Subcontractors to Persons not resident in Guinea shall be liable to a withholding at source in full discharge of ten percent (10%).

It is expressly agreed that interest on bank or other loans contracted by the Company for the financing of the Project shall be exempt from any withholding at source.

## 33.9 Value Added Tax

The Company, Investors and Direct Subcontractors shall be exempt from value added tax on the purchase of goods and services necessary for the Mining Operations.

In the event that, notwithstanding this total exemption on Value Added Tax, the Company, Investors or Direct Subcontractors pay such a tax, they can deduct it either as a deduction or repayment.

**33.10 Local development levy**

From the Start Date of Commercial Production the Company shall be liable to an annual levy for local development at a rate of 1% of gross profits.

This local development levy is deductible for the calculation of taxable profits.

**CLAUSE 34: CUSTOMS REGIME**

This clause applies to direct imports by the Company and its Direct Subcontractors intended for use in connection with the activities under this Agreement.

**34.1 Value Added Tax on imports**

The Company and its Direct Subcontractors shall be exempt from value added tax on the import of goods.

**34.2 Classification of imported goods**

The Company must draw up and have approved by the Ministers of Mines and of Finance, prior to the start of operations, lists of goods to be imported, according to the following categories:

a) Category 1: equipment, heavy tools, machines and vehicles except vehicles for tourism that appear in the Company's assets register.

b) Category 2: raw materials and consumables required for on site processing of the Mining Produce into finished and semi-finished products, as well as oil products used in the production of energy.

c) Category 3: raw materials and consumables required for the extraction and enhancement of the Mining Produce.

d) Category 4: fuels, lubricants and other oil products not used in processing the Mining Produce into finished or semi-finished products.

These lists are revised periodically based upon changes in the Company's needs, the national production capacity and the availability on time and on competitive terms of products manufactured locally.

## 34.3 Temporary admission

Equipment, machines, instruments, utility vehicles, and generators intended to be used temporarily in Guinea for the requirements of the project shall be treated as temporary admissions, with suspension of duties and taxes.

For the purposes of the construction works, goods thus admitted temporarily can either be re-exported or consumed in accordance with current regulations.

## 34.4 Customs relief in the Development phase

From the start date of the construction works, the Company and its
Direct Subcontractors shall benefit for their project related activities
from exemption of duties and taxes, and customs fees on goods in
Category 1 as well as on spare parts and lubricants, with the exception of
the registration tax at the rate of 0.5% of the CIF value with a maximum
ceiling fixed by the Finances Law and the fee on administrative services
(RPA).

In the event of the resale within the Republic of Guinea of items
belonging to Category 1, the Company and its Direct Subcontractors
become liable for all the duties and taxes as determined by the Customs
Service based on an assessment that takes into account the depreciation
that had occurred up until the date of resale.

## 34.5 Customs relief during the Operations phase, closure and rehabilitation

Imported goods in Category 2 intended for the processing of the Mining
Produce into finished and semi-finished products are exempt from taxes
and customs duties.

Imported goods in Category 1 or Category 3 intended for the extraction
and enhancement of the Mining Produce are taxed upon importation at
a single rate of 5.6% of the FOB value of these goods as well as the fee
on administrative services.

Fuels except petrol, lubricants and other imported oil products
belonging to Category 4 enjoy the price structure applicable to the
mining sector.

## 34.6 Personal effects

The personal effects and items with the exception of foodstuffs and
private vehicles imported by employees of the Company and its Direct
Subcontractors are exempt from all duties and taxes.

## SECTION VI: OTHER FINANCIAL PROVISIONS

### CLAUSE 35: GENERAL PRINCIPLES

In the Republic of Guinea the Company must keep its accounts in dollars,
in accordance with the accounting program of OHADA.

Each tax year the Company must have its balance sheet and income
statement certified by a Guinean CPA, and submit its financial
statements to the Minister not later than April 30 of the following year.

For the purposes of verification and audit by the authorized personnel of
the Government, the Company must provide access to its accounting
documents and the supporting documentation.

## SECTION VII: SUNDRY AND FINAL PROVISIONS

### CLAUSE 36: WAIVER AND TERMINATION

**36.1 Waiver**

The Company may waive the Concession in accordance with the terms
stipulated in the Mining Code.

**36.2 Cancellation**

The Government, in accordance with the Mining Code, can cancel the
Company's Concession, which involves termination of this Agreement.

Apart from the situations stated in the Mining Code, the Concession can
be terminated if the Company refuses to carry out a final decision in
arbitration in accordance with clause 38 of this Agreement.

**CLAUSE 37:  SALE, TRANSFER AND LEASE**

Any sale or transfer by the Company of all or part of its rights and
obligations arising from the Concession, as well as any direct sale of over
fifty percent (50%) of the Company's shares, by sale or by any other
method involving transfer of effective control of the Company, is
deemed equal to a sale and is subordinated to the prior approval of the
Government, which holds a right of preemption exercisable at the terms
offered by the would-be purchaser.

In the same situation the Company must inform the Government of the
planned sale, stating all available information, and in particular the
name of the purchaser, the price and the payment terms.

From date of receipt of this notification the Government has a period of
thirty (30) days to:

a) Either withhold its approval of the sale and thus exercise its
right of preemption according to the terms of the initial
planned sale of which it had been notified,

b) Or approve the sale and thereby waive its right of preemption,
it being understood that the Government must notify the
Company of its decision at the latest at the end of the period of
thirty (30) days and the absence of a response from the
Government within the thirty (30) day period will mean

approval of the proposed sale and thus a waiver by the
Government of its right of preemption.

It is expressly agreed that no prior approval shall be necessary for direct
or indirect transfer transactions concerning the actions of a company
holding shares in the Company.

In addition, any sale, pledge or transfer made in the interest of an
Affiliated Company is free if the following conditions are met:

a) The transfer agreement specifically states a commitment by
the transferee to be bound by the terms and conditions of this
Agreement;

b) The transferee has demonstrated that it has or has access to
the technical and financial resources and the skills necessary to
carry out the activities under this Agreement;

c) A copy of the transfer agreement is sent to the Government,
and

d) The transfer agreement is duly signed and contains a clause by
which the transferee assumes all the Company's obligations,
and that if it does not receive the Government's approval the
transfer agreement shall be null and void.

## CLAUSE 38: SETTLEMENT OF DISPUTES

### 38.1 Out of court phase

In the event of a dispute and/or conflict between the Parties in respect
of this Agreement and/or the Concession, including but not limited to its
validity, interpretation, execution, non-compliance or termination, the
Parties undertake in the first instance to try to resolve the dispute or
conflict between them out of court.

Failing an out of court settlement within a period of one hundred and
twenty (120) Days from the date of receipt of the notice sent by one

Party to the other of the dispute or conflict between them, the
provisions of clause 38.2 shall apply.

## 38.2   Binding arbitration

The Parties agree to submit to the arbitration of the ICC any dispute
arising from or related to this Agreement that has not be resolved under
clause 38.1, using the Arbitration Convention of this institution.

In addition, the Parties agree to make all requests and submissions to
the ICSID or to the International Arbitration Court, depending upon the
case, and to undertake any other actions supply all information required
to set up arbitration proceedings.

Unless the Parties have agreed otherwise, the arbitration procedure
shall take place in Paris (France) and shall be conducted in French.

Thjere shall be three (3) arbitrators: one appointed by the Government,
one appointed by the Company, and the third appointed by the two (2)
arbitrators already chosen.

One of the Parties can start the arbitration process by sending the other
Party a notice to that effect, including:

   a) Reference to the provision in this Agreement that has led to
      the dispute;
   b) Reference to the mining rights issued as part of this
      Agreement:
   c) The nature of the dispute that has led to the complaint and, if
      applicable, any sum of the complaint for damages or
      compensation;
   d) The facts that cause any complaint, and
   e) The remedy sought.

The Party that receives the notification must reply within thirty (30) Days, confirming or rejecting the compaliant in whole or in part, and if applicable stating the nature and circumstances of any counter-complaint. Failure to reply within the period allocated is considered a refusal by this Party to accept the complaint and leads to the arbitration process provided for in this Agreement.

The Parties recognize that the decision handed down following arbitration under this Agreement is binding, final and without appeal.

That fact that one of the Parties does not take part in the arbitration proceedings is not a reason to reject the arbitration tribunal's jurisdiction or its decision.

The Parties expressly waive any objections to arbitration procedures and the decision arising therefrom, unless the said arbitration does not comply with requirements stipulated in this Agreement.

The Parties hereby expressly waive any immunity of jurisdiction and any immunity of execution, for themselves and their respective employees (except those of the Government exclusively reserved for diplomatic work), for the requirements of executing any decision or judgment handed down in respect of this Agreement.

## CLAUSE 39: CHANGES

This Agreement cannot be changed and/or amended in any manner, unless by mutual written agreement between the Parties and entry into effect in accordance with the same terms as those of this Agreement.

## CLAUSE 40: CONFIDENTIALITY

## 40.1 The Agreement is not confidential

This Agreement is not confidential

All the reports, plans and information provided by the Company under this Agreement to the Government shall be treated as public documents unless specified otherwise.

## 40.2 Non-confidential matters

The following matters are not confidential, subject to a disclosure not being a violation of any legislation or stock exchange rules governing securities, applicable to the Company:

a) The annual quantities of mineral substances produced coming from the Concession;
b) Employment, including training programs offered by the Company;
c) Fees and payment of taxes related to the Concession, without the details of the calculations of the amounts of such payments;
d) Operating parameters, such as capacities, yield rates and recovery rates of the mines and the concentration plants and the dilution factors;
e) Information about the number and frequency of accidents arising from the Mining Operations;
f) The payment of any amount or any provision of services under the local community development agreement;
g) Any information held by the Government prior to the Company obtaining that information, and having been disclosed by someone not having any obligation of confidentiality towards the Company.

## 40.3 Confidentiality of information

The disclosure of confidential information must be done in such a way as
to ensure the confidentiality of this information by the recipient.

Each of the Parties must ensure that their respective directors,
employees, as well as its shareholders, technical and professional
consultants do not disclose information considered confidential, and do
not make inappropriate use of such information for their own benefit or
the benefit of any other Person.

### CLAUSE 41: FORCE MAJEURE

### 41.1 Case of force majeure

For the purposes of this Agreement, force majeure means any event, act
or circumstance that is unforeseeable, cannot be resisted and is beyond
the control or wishes of a Party for whom the execution of its obligations
by this Party is restricted or rendered impossible.

Without derogating from the generality of the foregoing, the following
events can constitute a case of force majeure:

a) War (whether declared or not), armed insurrection, civil
   unrest, blockade, riots, sabotage, embargo, strikes, lock-out or
   other protest actions or forms of labor disputes;
b) Any dispute in connection with the Mining Operations, with
   Persons who prove they have been significantly affected by the
   Mining Operations, including but not limited to other holders
   of mining rights, Land Users or Occupiers and members of the
   local community, neighboring communities, government
   departments or non-governmental organizations (NGO);
c) Any natural catastrophe, including epidemics, earthquakes,
   storms, floods, volcanic eruptions, tsunami or other severe
   weather issues, explosions and fires;

d) Any other cause outside the control of the Party in question
with the exception of economic problems that are the result of
fluctuations in market prices.

The Parties agree that the Government cannot claim in its favor that the
reasons or events listed in paragraph b constitute a case of force
majeure.

## 41.2 Consequences of force majeure

When one of the Parties finds itself objectively prevented from fulfilling
one or several of its undertakings under this Agreement and the Mining
Code on account of a case of force majeure, such an impediment does
not constitute a breach of this Agreement.

## 41.3 Extension of the Agreement period

The Parties must extend the period of this Agreement for any period for
which a case of force majeure caused the suspension of the execution of
the undertakings under this Agreement.

## 41.4 Notification of force majeure

When one or other of the Parties finds itself objectively prevented from
fulfilling one or several of its undertakings under this Agreement on
account of force majeure, it must:

a) Within not more than fifteen (15) Days from the date of
occurrence of a major case of force majeure send the other
Party notice by registered mail or by any other available and
rapid method, stating the case of force majeure and the
undertakings affected;

b) Take the necessary, reasonable and legal measures to solve the
problem that caused the force majeure; and

c) Having adopted the steps referred to in paragraph b), notify the other Party and take all necessary steps to ensure the earliest possible return to normal execution of the undertakings affected by force majeure.

### 41.5 Meeting between the Parties

If the effects of an event of force majeure last longer than fifteen (15) Days, the Parties must meet as soon as possible to study the situation and to agree upon the necessary measures to be taken to solve the problem that caused the force majeure.

### CLAUSE 42: PRECEDENCE OF THE AGREEMENT

The provisions of this Agreement represent the entire agreement between the Parties and take precedence over any prior declaration, representation, contract and/or agreement, whether verbal or in writing, between the Parties (or their Affiliated Companies or prior holders of the same rights).

### CLAUSE 43: NON-WAIVER

Unless by express, written waiver, if one Party does not exercise all or part of its rights conferred upon it by this Agreement, shall under no circumstances constitute a case of waiver of the unexercised rights.

### CLAUSE 44: SUCCESSORS AND BENEFICIARIES

This Agreement ties the Parties and their respective successors and beneficiaries.

### CLAUSE 45: COSTS OF THE AGREEMENT

Each of the Parties must assume its own legal expenses or other costs incurred as part of setting up this Agreement.

**CLAUSE 46: NOTICES**

All notices, demands and communications made by one of the Parties to
the other as part of this Agreement shall be in writing and shall be
deemed to have been validly delivered if they are handed over
personally in return for a receipt or sent by express mail, by registered
mail, telegram or fax to the addresses stated at the beginning of this
Agreement.

**CLAUSE 47: LANGUAGE**

All reports, notices and other documentation prepared in application of
this Agreement must be in French.

**CLAUSE 48: REGISTATION AND ENTRY INTO EFFECT**

Within thirty (3) Days from signature of this Agreement by all the
Parties, the Minister must sent a signed copy to the CPDM, which shall
register it without delay.

In application of the tax system stipulated in this Agreement, and the
Company not being subject to registration duty, no registration duty
shall due payable for this formality.

In witness whereof the Parties have signed this Agreement in five (5)
copies in Conakry on              2009

**FOR THE REPUBLIC OF GUINEA**

**THE MINISTER**
**FOR MINES  AND ENERGY**

**STAMP OF THE MINISTER**
**OF THE ECONOMY AND**
**FINANCES**

**Mr. Mahmoud Thiam**

**Captain Mamadou Sande**

**For BSG Resources**
**(Guinea) Limited**

**For BSG Resources**
**(Guinea) SARL**

**DIRECTOR**

**Marc Struik**

-

**CHIEF EXECUTIVE**

**7Asher Avidan**