**EXHIBIT 4**

**CONFORMED COPY**

BSG RESOURCES LIMITED

and

VALE S.A.

_____

JOINT VENTURE FRAMEWORK AGREEMENT

_____

Dated: 30 April 2010

## TABLE OF CONTENTS

Page

Section 1.      Definitions; Interpretation.................................................................................2

1.1        Definitions...................................................................................................2
1.2        Sections and Schedules ..............................................................................2
1.3        Headings .....................................................................................................2
1.4        Other Provisions Relative to Terms ...........................................................2
1.5        Agreed Form ...............................................................................................2
1.6        BSGR Warranties Exchange Rate ..............................................................2
1.7        BSGR Limitations Exchange Rate..............................................................3
1.8        BSGR Awareness........................................................................................3

Section 2.      Sale and Purchase of the Sale Shares...................................................................3

2.1        Sale and Purchase ......................................................................................3
2.2        Designation ................................................................................................3

Section 3.      Purchase Price .......................................................................................................4

Section 4.      Completion.............................................................................................................5

4.1        Completion..................................................................................................5
4.2        Completion Deliveries ...............................................................................5
4.3        Intentionally omitted...................................................................................8
4.4        Intentionally omitted...................................................................................8
4.5        Intentionally omitted...................................................................................8
4.6        Creation of Deferred Shares.......................................................................8
4.7        Bank Mandates/Other Officers ..................................................................8
4.8        Change of Name .........................................................................................8

Section 5.      Post Completion Undertakings ..............................................................................8

5.1        Feasibility Study ........................................................................................8
5.2        Feasibility Study Interruption Circumstances............................................9
5.3        Feasibility Study Interruption Notices .....................................................10
5.4        Failure to Complete or Approve the Feasibility Study .............................10
5.5        Liberian Transport Solution .....................................................................11
5.6        Technical Services Agreement ..................................................................12
5.7        Development of Liberia ProjectCo ...........................................................12
5.8        Off-take of Minerals .................................................................................13
5.9        Tax and Corporate Restructuring...............................................................13

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between
BSG Resources Limited and Vale S.A.

5.10        Off-take Agreement ....................................................................................13
5.11        Compliance with Ancillary Agreements.....................................................14
5.12        FCPA Provisions .........................................................................................14

Section 6.     Funding ........................................................................................................14

6.1         Funding of Feasibility Study.......................................................................14
6.2         Project Financing ........................................................................................15
6.3         Vale Loan ....................................................................................................15
6.4         Repayments of Vale Loan ...........................................................................15

Section 7.     Conduct of Business ...................................................................................16

Section 8.     Warranties ...................................................................................................16

8.1         BSGR Warranties.........................................................................................16
8.2         Vale Warranties ...........................................................................................17
8.3         Non-pursuit of Claims.................................................................................17
8.4         Guernsey Loan Indemnity ...........................................................................17

Section 9.     Tax Covenant ..............................................................................................17

Section 10.    Vale's Remedies ..........................................................................................18

10.1        Basis of Claims for Breach of Indemnity Warranties .................................18
10.2        Set-off of Claims .........................................................................................18

Section 11.    Third Party Claims ......................................................................................19

Section 12.    Payments .....................................................................................................20

12.1        Payments to BSGR ......................................................................................20
12.2        Payments to BSGR Guinea..........................................................................20
12.3        Payment to Vale ..........................................................................................21
12.4        Method of Payment......................................................................................21
12.5        Interest.........................................................................................................21
12.6        Force Majeure .............................................................................................21
12.7        Gross-up on Payments .................................................................................24

Section 13.    Non Solicitation and Non Competition........................................................24

13.1        Non Solicitation Covenant...........................................................................24
13.2        Non Competition Covenant and Referral of Opportunities .........................25
13.3        Pursuit of New Business Opportunities .......................................................25
13.4        Exceptions to Non Competition Covenant. .................................................25

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between
BSG Resources Limited and Vale S.A.

13.5        Acknowledgement Relating to Restrictions..........................................................26

Section 14.    Announcements.....................................................................................................26

Section 15.    Confidentiality .....................................................................................................26

15.1        Confidentiality Obligation ..................................................................................26
15.2        Exceptions..............................................................................................................27
15.3        Disclosure to Representatives ............................................................................28
15.4        Effect on Termination .........................................................................................28
15.5        Confidentiality Agreement..................................................................................28

Section 16.    Miscellaneous ......................................................................................................28

16.1        Costs......................................................................................................................28
16.2        Notices ..................................................................................................................28
16.3        Entire Agreement ...............................................................................................30
16.4        Assignment ..........................................................................................................30
16.5        Waiver of Rights .................................................................................................31
16.6        Amendments .......................................................................................................31
16.7        Invalidity ..............................................................................................................31
16.8        No Partnership or Agency..................................................................................31
16.9        Conflict With Constitutional Documents........................................................32
16.10       Governing Law; Arbitration. ............................................................................32
16.11       Further Assurances.............................................................................................34
16.12       Contracts (Rights of Third Parties) Act 1999 .................................................34
16.13       Remedies..............................................................................................................34
16.14       Effect of Completion...........................................................................................35
16.15       Counterparts........................................................................................................35

Schedule 1 - Defined Terms
Schedule 2 - Form of Off-take Term Sheet
Schedule 3 - Form of Vale Loan Term Sheet
Schedule 4 - BSGR Warranties
Schedule 5 - Limitations on Liability
Schedule 6 - Vale Warranties
Schedule 7 - BSGR Guinea Group
Schedule 8 - Liberian Transport Solution
Schedule 9 - Feasibility Study
Schedule 10 - Tax Covenant

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between
BSG Resources Limited and Vale S.A.

<u>JOINT VENTURE FRAMEWORK AGREEMENT</u>

THIS JOINT VENTURE FRAMEWORK AGREEMENT (this "**Agreement**") is made on 30 April 2010

BETWEEN:

(1)     BSG RESOURCES LIMITED, a company registered under the laws of Guernsey with registered number 46565, with its principal office in West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX ("**BSGR**"); and

(2)     VALE S.A., a company registered under the laws of Brazil, with its principal office in Av. Graça Aranha, 26, 20.300-900, Rio de Janerio, RJ, Brasil ("**Vale**" and, together with BSGR, the "**Parties**").

<u>RECITALS</u>

(A)     BSGR owns directly 100% of the issued share capital of BSG Resources (Guinea) Limited, a company registered under the laws of Guernsey ("**BSGR Guinea**"), which in turn owns directly 100% of the issued share capital of each of BSG Resources (Guinea) S.à r.l., a company registered under the laws of the Republic of Guinea ("**ProjectCo**"), and BSG Resources (Liberia) Limited, a company registered under the laws of the British Virgin Islands ("**Liberia HoldCo**"). Liberia HoldCo in turn owns directly 100% of the issued share capital of BSGR (Liberia) Limited, a company registered under the laws of the Republic of Liberia ("**Liberia ProjectCo**").  Further details regarding BSGR Guinea, ProjectCo, Liberia HoldCo and Liberia ProjectCo are contained in Schedule 7.

(B)     ProjectCo and Liberia ProjectCo, as applicable, hold the Exploration Permits and the Mining Concession and ProjectCo is engaged in the development of the Project.

(C)     On the terms and subject to the conditions of this Agreement (i) BSGR will sell and Vale will purchase in consideration for the Purchase Price ordinary shares representing 51% of BSGR Guinea's issued share capital; and (ii) the Parties will cooperate to develop the Project and provide the funds necessary for such purpose.

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants and agreements set forth herein, the Parties agree as follows:

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Section 1.        Definitions; Interpretation**

1.1        <u>Definitions</u>. Capitalized terms not otherwise defined in this Agreement shall have the meaning set forth in Schedule 1.

1.2        <u>Sections and Schedules</u>. Except where the context otherwise requires, references to Sections and Schedules are to Sections of, or Schedules to, this Agreement. The Schedules form part of this Agreement.

1.3        <u>Headings</u>. Headings are inserted for convenience only and shall not affect the construction of this Agreement or the Schedules hereto.

1.4        <u>Other Provisions Relative to Terms</u>. In this Agreement, general words shall not be given a restrictive meaning by reason of their being preceded or followed by words indicating a particular class or examples of acts, matters or things. Words importing the singular shall include the plural and vice versa and words importing any gender shall include all other genders and references to persons shall include individuals, firms, corporations, other bodies corporate, partnerships, unincorporated associations, employee representative bodies, governments, states and agencies of a state. A reference to any other document in this Agreement (other than a document referred to in the Disclosure Letter) is a reference to that other document as amended, varied or supplemented (other than in breach of this Agreement) at any time. References in this Agreement to statutory provisions shall be construed as references to those provisions as respectively amended, consolidated, extended or re-enacted from time to time and any orders, regulations, instruments or other subordinate legislation made from time to time under the statute concerned.  References to a "day" shall mean a period of 24 hours running from midnight to midnight.  References to a liability under, pursuant to or arising out of (or any analogous expression) any agreement, contract, deed or other instrument includes a reference to contingent liability under, pursuant to or arising out of (or any analogous expression) that agreement, contract, deed or other instrument.  Reference to a party being liable to another party, or to liability, includes, but is not limited to, any liability in equity, contract or tort (including negligence).  References to any English legal term for any action, remedy, method of judicial proceeding, legal document, legal status, court, official or any legal concept or thing shall in respect of any jurisdiction other than England be deemed to mean what most nearly approximates in that jurisdiction to the English legal term and to any English statute shall be construed so as to mean equivalent or analogous laws of any other jurisdiction.

1.5        <u>Agreed Form</u>. A reference in this Agreement to a document in the "**agreed form**" is a reference to a document in a form approved and, for the purposes of identification, initialed by or on behalf of Vale and BSGR.

1.6        <u>BSGR Warranties Exchange Rate</u>. Any monetary sum to be taken into account for the purposes of any BSGR Warranty where that sum is expressed in a currency other than dollars

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

shall be translated into dollars at the Exchange Rate on the day immediately prior to the date of this Agreement (or, if such date is not a Business Day, on the Business Day immediately preceding such day).

1.7    BSGR Limitations Exchange Rate. Where it is necessary to determine whether a monetary limit or threshold referred to in Schedule 5 has been reached or exceeded and the value of the Claim is expressed in a currency other than dollars, the value of that Claim shall be translated into dollars at the Exchange Rate on the date of receipt by BSGR of written notification from or on behalf of Vale in accordance with the provisions of this Agreement of the existence of such Claim (or, if such day is not a Business Day, on the Business Day immediately preceding such day).  The amount of any sum payable by BSGR in discharge or settlement of such Claim shall be converted into dollars (where such amount is expressed in a currency other than dollars) at the Exchange Rate on the date of such amount being agreed or finally determined ("**Settlement Date**"), provided always that any such sum shall continue to be payable even if after conversion into dollars the relevant sum at the Settlement Date would be below a relevant monetary limit or threshold referred to in Schedule 5.

1.8    BSGR Awareness. A reference in this Agreement to "*so far as BSGR is aware*", "*so far as any BSGR Guinea Group Company is aware*" or "*to the knowledge of any BSGR Guinea Group Company*" or any similar reference shall be construed as the actual knowledge as at the date of this Agreement of Yossie Tchelet, Marc Struik, Asher Avidan and David Clark of BSGR, David Barnett (in his capacity as an external advisor) and Benjamin Steinmetz (in his capacity as an external advisor to BSGR/the Balda Foundation) (the "**BSGR Principals**"), together with such knowledge as the BSGR Principals should have had, taking into consideration their office and respective duties, had they each made all reasonable enquiry in relation to the matter in question as at the date of this Agreement.

## Section 2.    Sale and Purchase of the Sale Shares

2.1    Sale and Purchase. On the terms and subject to the conditions of this Agreement, at Completion BSGR shall sell and transfer and Vale shall purchase, or procure that a wholly-owned subsidiary of Vale shall purchase, for the Purchase Price, all of the Sale Shares free and clear of all Encumbrances. Full title to, and legal and beneficial ownership of, all of the Sale Shares, together with all rights and benefits attaching to them, shall pass to Vale or its nominated subsidiary upon Completion.

2.2    Designation. Vale shall have the right to designate a wholly-owned subsidiary to purchase the Sale Shares as set out in Section 2.1 by written notice to BSGR to be received no later than the Completion Date, provided that Vale shall remain responsible for its obligations hereunder and shall procure that such wholly-owned subsidiary complies with the provisions of this Agreement, as applicable.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Section 3.        Purchase Price**

The consideration for the Sale Shares shall be the Initial Consideration and, to the extent that they become due and payable in accordance with the terms of this Section 3, the First Deferred Consideration and the Second Deferred Consideration (together, the "**Purchase Price**"), which Vale shall pay to BSGR in the manner prescribed by Section 12 as follows:

(a)    the "**Initial Consideration**" shall be $500,000,000 and shall be paid at Completion;

(b)    the "**First Deferred Consideration**" shall be $500,000,000 and shall be payable in the event that the Liberian Transport Solution Effective Date occurs prior to the Second Deferred Consideration Trigger Date, such amount to be paid on the date (if any) that is 10 Business Days following the later of (1) the Liberian Transport Solution Effective Date and (2) 1 January 2011, provided that the Liberian Transport Solution Effective Date shall have occurred prior to 1 January 2011 and provided always that Vale's obligation to pay the First Deferred Consideration to BSGR shall automatically terminate on the BSGR Subscription Trigger Date (if any); and

(c)    the "**Second Deferred Consideration**" shall be either (1) $1,500,000,000 if the First Deferred Consideration has been paid prior to the payment of the Second Deferred Consideration (or, if the Second Deferred Consideration is paid in more than one installment, prior to the payment of the final installment of such Second Deferred Consideration) or (2) $2,000,000,000 if the First Deferred Consideration has not been paid prior to the payment of the Second Deferred Consideration (or, if the Second Deferred Consideration is paid in more than one installment, prior to the payment of the final installment of such Second Deferred Consideration), and, to the extent it becomes payable in accordance with the terms of this Agreement, shall be paid according to the following timetable:

(i)    **if the Simandou Construction Date occurs before (I) the Second Deferred Consideration Trigger Date and (II) the BSGR Subscription Trigger Date**: (A) $1,000,000,000 on the date that is 10 Business Days following the Simandou Construction Date (the "**Simandou Construction Second Deferred Consideration**"), and (B) (x) $500,000,000 if the First Deferred Consideration has previously been paid or (y) $1,000,000,000 if the First Deferred Consideration has not previously been paid, in either case, as applicable, on the date (if any) that is 10 Business Days following the Second Deferred Consideration Trigger Date provided always that if the BSGR Subscription Trigger Date has occurred prior to the

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

Simandou Construction Date, none of the amounts referred to in this Section 3(c)(i) shall become payable; or

(ii)    **if the Simandou Construction Date has not occurred prior to the Second Deferred Consideration Trigger Date**: an amount equal to the Second Deferred Consideration (whichever the amount of the Second Deferred Consideration as determined above) on the date (if any) that is 10 Business Days following the Second Deferred Consideration Trigger Date,

provided that, if each of the First Deferred Consideration and the Second Deferred Consideration becomes due and payable in accordance with the terms of this Section 3, the total Purchase Price shall be equal to $2,500,000,000.

The Parties also agree that, to the extent it becomes due and payable in accordance with the terms of this paragraph, Vale shall pay to BSGR in the manner prescribed by Section 12, $180,000,000 on the date that is 10 Business Days following 27 December 2012 provided that on 27 December 2012 any member or members of the BSGR Guinea Group are the only companies with rights of passage from Guinea to Liberia for the export of iron ore from the coast of Liberia (the "**Additional Consideration**"), provided always that Vale's obligation to pay the Additional Consideration shall automatically terminate with immediate effect if the BSGR Subscription Trigger Date has occurred prior to 27 December 2012.

**Section 4.    Completion**

4.1    <u>Completion</u>. Completion of the sale and purchase of the Sale Shares ("**Completion**") shall take place immediately following the execution of this Agreement, such date being the Completion Date (the "**Completion Date**").

4.2    <u>Completion Deliveries</u>. Completion shall not be deemed to have taken place unless and until all of the actions and deliveries set forth below shall have been taken or delivered:

(a)    *Sale and Purchase*.  At Completion:

(i)    Vale shall pay to BSGR the Initial Consideration; and

(ii)    BSGR shall deliver to Vale certificates for the Sale Shares, together with a share transfer form, duly and validly executed by BSGR and sufficient to vest in Vale (or such member of its Group as it has designated pursuant to Section 2.2) full and valid title to the Sale Shares, free and clear of all Encumbrances.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(b)    *Ancillary Agreements (BSGR)*. At or by Completion, BSGR shall enter into and cause that BSGR Guinea shall enter into, or, as applicable, initial as an agreed form document the following:

    (i)    the Shareholders' Agreement relating to BSGR Guinea of even date herewith and made between BSGR, Vale and BSGR Guinea (the "**Shareholders' Agreement**");

    (ii)    the Off-take term sheet in the form attached as Schedule 2 (the "**Off-take Term Sheet**"); and

    (iii)    the Vale Loan Term Sheet.

(c)    *Ancillary Agreements (Vale)*.  At Completion, Vale shall enter into, or, as applicable, initial as an agreed form document the following:

    (i)    the Shareholders' Agreement;

    (ii)    the Off-take Term Sheet; and

    (iii)    the Vale Loan Term Sheet.

(d)    *Corporate Approvals (BSGR)*.  At Completion, BSGR shall procure that a general meeting of BSGR Guinea and the Board shall approve such resolutions and take such other actions as are necessary to ensure that:

    (i)    the agreed form constitutional documents for BSGR Guinea are adopted, reflecting certain matters set out in the Shareholders' Agreement (the "**Constitutional Documents**");

    (ii)    new share certificates in relation to the Sale Shares are issued in the name of Vale or its nominated subsidiary;

    (iii)    the transfer of the Sale Shares from BSGR to Vale (or such member of its Group as it has designated pursuant to Section 2.2) is approved and Vale's name (or the name of such member of its Group as it has designated pursuant to Section 2.2) is entered in the members' register of BSGR Guinea in respect of the Sale Shares;

    (iv)    with effect from Completion, Sandra Merloni-Horemans, Asher Avidan and Marcus Struik resign from the Board;

    (v)    with effect on and from Completion, Lucio Cavalli, Eduardo Etchart and José André de Castro Alves are appointed as general managers (*gérant*) of ProjectCo;

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(vi)     with effect on and from Completion, Lucio Cavalli, Eduardo Etchart and José André de Castro Alves are appointed to the Board and designated as Vale Directors (as defined in the Shareholders' Agreement) and Dag Cramer is appointed to the Board and designated as a BSGR Director (as defined in the Shareholders' Agreement); and

(vii)    with effect from Completion, David Clark is re-designated as a BSGR Director (as defined in the Shareholders' Agreement).

(e)      *Corporate Documents (BSGR).* At Completion BSGR shall deliver or cause the delivery to Vale of:

(i)     as evidence of the authority of each person executing a document referred to in this Section 4 on behalf of BSGR or a BSGR Guinea Group Company:

(A)     a copy of an extract from the minutes of duly held meetings of the directors of BSGR and each relevant BSGR Guinea Group Company (or a duly constituted committee thereof) authorizing the execution by BSGR or the relevant BSGR Guinea Group Company (as applicable) of the relevant document(s) and, where such execution is authorized by a committee of the board of directors of BSGR or the relevant BSGR Guinea Group Company (as applicable), a copy of the minutes of a duly held meeting of the directors constituting such committee or the relevant extract thereof; or

(B)     a copy of the power of attorney conferring the authority,

in each case certified to be a true copy by a director or the secretary of BSGR or the relevant BSGR Guinea Group Company (as applicable);

(ii)    as evidence of full legal title in the Sale Shares passing to Vale or its nominated subsidiary, a certified copy of an updated register of members of BSGR Guinea that reflects Vale's or its nominated subsidiary's ownership of the Sale Shares; and

(iii)   duly executed resignation letters from Sandra Merloni-Horemans, Asher Avidan and Marcus Struik resigning their positions as directors of BSGR Guinea in the agreed form expressed to take effect from Completion.

(f)      *Corporate Documents (Vale).* At Completion Vale shall deliver or cause the delivery to BSGR of, as evidence of the authority of each

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

person executing a document referred to in this Section 4 on behalf of Vale or Vale International S.A. or the relevant member of the Vale Group a copy of a confirmation from a senior officer of Vale that the board of directors of Vale (or a duly constituted committee of the board) has authorized the execution of the relevant documents by Vale and/or other relevant members of the Vale Group.

4.3    Intentionally omitted.

4.4    Intentionally omitted.

4.5    Intentionally omitted.

4.6    <u>Creation of Deferred Shares</u>. On or as soon as is reasonably practicable after Completion, each Party shall procure that BSGR Guinea shall take all necessary steps to create a class of Deferred Shares, having the rights as set out in the agreed form Deferred Share rights document, and to make such changes to its Articles as may be reasonably necessary or appropriate to reflect the creation of the Deferred Shares.

4.7    <u>Bank Mandates/Other Officers</u>.  The Parties agree to use all reasonable efforts to cause or to procure that on or as soon as is reasonably practicable after Completion, BSGR Guinea and any other relevant member of the BSGR Guinea Group replaces, removes and/or appoints such officers (including, without limitation, directors, *gérants*, general managers or company secretaries), officials and auditors and makes such amendments to the bank mandates of BSGR Guinea and/or such member of the BSGR Guinea Group as Vale may reasonably require.

4.8    <u>Change of Name</u>.  The Parties agree to use all reasonable efforts to procure that the name of BSGR Guinea shall be changed to VBG – Vale BSGR Limited, the name of ProjectCo shall be changed to VBG – Vale BSGR Guinea Limited, the name of Liberia HoldCo shall be changed to VBG – Vale BSGR BVI Limited and the name of Liberia ProjectCo shall be changed to VBG – Vale BSGR Liberia Limited as soon as is reasonably practicable following Completion.

**Section 5.    Post Completion Undertakings**

5.1    <u>Feasibility Study</u>. The Parties acknowledge that it is necessary to conduct and complete the Feasibility Study to assess the viability of the Project as follows:

(a)    each Party shall use its reasonable efforts, including in its capacity as a shareholder of BSGR Guinea, so far as it lawfully can, to ensure compliance by ProjectCo with its obligations under the Basic Agreement;

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(b)     each Party shall procure that ProjectCo shall appoint Vale to undertake the Feasibility Study on its behalf within the Feasibility Study Period and that ProjectCo shall provide quarterly updates on the status and progress of the Feasibility Study to the Board of BSGR Guinea and to BSGR;

(c)     within 10 Business Days of the date of completion of the Feasibility Study, Vale shall deliver an irrevocable notice to BSGR Guinea and BSGR confirming that the Feasibility Study has been completed and the date on which the Feasibility Study was completed (such date being, the "**Feasibility Study Completion Date**"); and

(d)     by no later than 60 days after the Feasibility Study Completion Date (the "**Feasibility Study Approval Date**"), Vale shall confirm to BSGR Guinea and BSGR whether or not the Feasibility Study has been approved by Vale, such approval to be at its sole discretion.

5.2     <u>Feasibility Study Interruption Circumstances</u>. If, at any time during the Feasibility Study Period:

(a)     a Force Majeure Event occurs or factors which are not within the sole control of Vale prevent Vale from continuing to undertake and complete the Feasibility Study by the Feasibility Study Period Expiry Date (any such event or factors comprising "**Feasibility Study Interruption Circumstances**"), Vale shall deliver a notice to BSGR and BSGR Guinea within 10 Business Days of Vale having reasonably determined that such an event has occurred or is occurring or such factors have arisen (a "**Feasibility Study Interruption Notice**") advising them of the nature of such event or factors and the date upon which such event or factors first occurred (the "**Feasibility Study Interruption Date**");

(b)     following the service of a Feasibility Study Interruption Notice, the Feasibility Study Period shall be suspended with effect on and from the Feasibility Study Interruption Date identified in such Feasibility Study Interruption Notice and the Parties shall meet promptly and in good faith with a view to finding a mutually acceptable solution to enable Vale to recommence work on the Feasibility Study in such a manner as would enable Vale to complete the Feasibility Study prior to the Feasibility Study Period Expiry Date (a "**Feasibility Study Interruption Solution**");

(c)     within 10 Business Days of the earlier of (i) the date on which the Feasibility Study Interruption Circumstances in relation to which a Feasibility Study Interruption Notice has previously been delivered under

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

Section 5.2(a) cease to exist or apply; and (ii) the date (if any) on which the Parties agree a Feasibility Study Interruption Solution to the Feasibility Study Interruption Circumstances in relation to which a Feasibility Study Interruption Notice has previously been delivered under Section 5.2(a), and provided that, in either such case, no other intervening or supervening Feasibility Study Interruption Circumstances have arisen and are continuing at such time, Vale shall deliver a notice to BSGR and BSGR Guinea advising them of the earliest practicable date (consistent with the relevant Feasibility Study Interruption Solution, if any) on which work to complete the Feasibility Study can recommence (or, if work to complete the Feasibility Study has already recommenced, the date on which such work recommenced) (such date of recommencement being, the "**Feasibility Study Continuation Date**"); and

(d)    the Feasibility Study Period shall recommence with effect from the Feasibility Study Continuation Date and, accordingly, the Feasibility Study Period Expiry Date shall be extended by the number of days elapsed from and including the Feasibility Study Interruption Date to but excluding the Feasibility Study Continuation Date and the notice specifying the Feasibility Study Continuation Date shall also specify the date of the Feasibility Study Period Expiry Date as so extended.

5.3    <u>Feasibility Study Interruption Notices</u>. Vale shall be permitted to serve a Feasibility Study Interruption Notice in accordance with Section 5.2 on more than one occasion during the Feasibility Study Period (whether in respect of different or a repetition of the same Feasibility Study Interruption Circumstances) and on each such occasion the Feasibility Study Period shall be suspended and, subject to determination of a Feasibility Study Continuation Date, the Feasibility Study Period Expiry Date extended accordingly.

5.4    <u>Failure to Complete or Approve the Feasibility Study</u>. Subject to the provisions of Section 12.6, if: (i) the Feasibility Study is not completed on or prior to the Feasibility Study Period Expiry Date due to factors within the sole control of Vale; or (ii) in circumstances where the Feasibility Study is completed on or prior to the Feasibility Study Period Expiry Date, Vale does not confirm approval of the Feasibility Study on or prior to the Feasibility Study Approval Date then:

(a)    BSGR shall subscribe to such additional Ordinary Shares of BSGR Guinea at a price per share equal to their par value, such that upon completion of such subscription, Vale shall hold Ordinary Shares comprising the Acquired Ownership Interest (the "**BSGR Subscription**");

(b)    BSGR shall undertake the BSGR Subscription at any time within the period commencing on the BSGR Subscription Trigger Date and ending

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

on the date falling 10 Business Days thereafter, by delivering an irrevocable notice in writing to Vale and BSGR Guinea, provided that the BSGR Subscription may only be exercised once and in whole;

(c)    the BSGR Subscription shall be completed on the Business Day next following the date on which a notice is served by BSGR under paragraph (b) above; on completion, BSGR shall pay to BSGR Guinea the subscription price of the Ordinary Shares it shall have subscribed for and BSGR Guinea shall issue and allot to BSGR such Ordinary Shares, free and clear of all Encumbrances, and thereupon deliver to BSGR executed share certificates in respect of such Ordinary Shares; and

(d)    BSGR Guinea shall have the right, without any liability or penalty (except for accrued liabilities), to terminate the Off-take Agreement and/or any technical services agreement(s) which may have been entered into as contemplated in Section 5.6 by serving notice on Vale or any of Vale's Affiliates which is a party to any such agreement within 30 Business Days of completion of the BSGR Subscription,

provided, further, that Vale undertakes to take all action and execute all documents and/or instruments as is reasonably necessary or appropriate for the BSGR Subscription to be completed in accordance with this Section 5.4.

For the purposes of this Agreement, the "**BSGR Subscription Trigger Date**" shall mean:

(a)    in the event that the Feasibility Study is not completed on or prior to the Feasibility Study Period Expiry Date due to factors within the sole control of Vale, the first Business Day next following the Feasibility Study Period Expiry Date; or

(b)    in the event that the Feasibility Study is completed on or prior to the Feasibility Study Period Expiry Date and Vale does not confirm approval of the Feasibility Study on or prior to the Feasibility Study Approval Date, the first Business Day next following the Feasibility Study Approval Date (or such earlier date (if any) on which Vale confirms to BSGR Guinea and BSGR that the Feasibility Study has not been approved by Vale).

5.5    <u>Liberian Transport Solution</u>. The Parties acknowledge that the Project would benefit from an agreement regarding an economically, technically and legally viable logistic solution for the transportation of iron ore from the relevant Concession Areas through Liberia to the loading point for shipping (or other form of dispatch), as well as for the construction of all necessary

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

facilities (including railway and port facilities) required in connection with such a solution (together the "**Liberian Transport Solution**").

The "**Liberian Transport Solution Effective Date**" shall be the earlier of the date on which (i) the Parties confirm in writing that they have reached an agreement on the Liberian Transport Solution for the purposes of this Section 5.5; (ii) BSGR Guinea and/or ProjectCo (and/or any other member of the BSGR Guinea Group) enters into legally binding agreements (each such agreement, a "**Relevant Liberian Agreement**") with such of the Liberian Government; the Liberian railway concessionaire; the Buchanan port concessionaire; and any other relevant Government Entities in Liberia as are sufficient to Vale's satisfaction to permit the export of at least 15,000,000 metric tonnes per annum of iron ore produced at the Zogota mine through Liberia to the Buchanan port facilities and to export such iron ore from the Buchanan port facilities; (iii) the BSGR Guinea Group has the *de facto* ability to export at least 15,000,000 metric tonnes per annum of iron ore produced at the Zogota mine through Liberia by rail to the Buchanan port facilities and from such port facilities; or (iv) the Liberian Transport Solution Construction Works commence.

Vale shall be entitled to reach its decision regarding whether it agrees that a given potential Liberian Transport Solution is consistent with the Business Plan and is economically, technically and legally viable in its sole discretion. In reaching its decision, Vale shall be entitled to look not just to the feasibility and anticipated cost of that solution, but shall, *inter alia*, be entitled to determine whether the solution is satisfactory from the perspective of Vale's corporate values and policies, including in relation to the environment, and the key issues identified in Schedule 8. BSGR agrees that discussions with each of the Liberian railway concessionaire, the Buchanan port concessionaire and relevant Governmental Entities in relation to the definition and confirmation of the Liberian Transport Solution will be conducted with the full involvement of and consent of Vale. To this end, BSGR shall procure that Vale receives reasonable advance notice of any meetings being held with such parties and has the right to attend such meetings. BSGR shall procure that Vale receives copies of all correspondence from such parties in relation to the Liberian Transport Solution and discussions relating thereto received by any member of the BSGR Group. Vale shall have a prior right of approval (acting reasonably) in relation to any proposals to be submitted, issues to be discussed, or agreements to be reached with third parties (including Government Entities where applicable) in relation to the Liberian Transport Solution.

5.6    <u>Technical Services Agreement</u>. Following Completion, the Parties shall discuss in good faith and use all other commercially reasonable efforts with a view to agreeing appropriate technical services agreements with BSGR Guinea or any of its subsidiaries in respect of the Project.

5.7    <u>Development of Liberia ProjectCo</u>. The Parties shall agree in good faith the actions, if any, they shall, in their capacity as shareholders of BSGR Guinea, cause Liberia ProjectCo to undertake in relation to the Liberia Exploration Permits and how those actions shall be funded and otherwise supported and directed by each of them and/or BSGR Guinea. The Parties acknowledge that any such funding may be based on a different arrangement to the funding of the Feasibility Study and/or the Project. The Parties acknowledge that the potential opportunities

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

presented by the Liberia Exploration Permits must not materially distract either of them from their respective obligations in respect of the Project, even if this entails ultimately surrendering the Liberia Exploration Permits or transferring them to another company.

5.8    <u>Off-take of Minerals</u>. If either (i) the opportunities under any or all of the Liberia Exploration Permits are pursued and Liberia ProjectCo or another Affiliate of BSGR Guinea undertakes commercial production of iron ore or other mineral products from the areas to which the Liberia Exploration Permits relate; and/or (ii) commercial production of any mineral other than iron ore is undertaken by any member of the BSGR Group or any Affiliate of BSGR Guinea in relation to any of the Concession Areas, Vale shall, directly or through one of its Affiliates, have the right, in relation to each mineral product separately and each country of production separately (such right exercisable at Vale's sole discretion by written notice to BSGR Guinea delivered at any time prior to the date which is 6 months before the date on which BSGR Guinea determines that commercial production of such mineral in such country will commence), to purchase and off-take 100 per cent. of the output of such mineral from such country FOB (Incoterms 2000) at a nominated port in the Republic of Liberia (or such other location as Vale may agree) for a period of up to the full duration of commercial production of such mineral in such country.  Unless the Parties agree otherwise, any such off-take shall be concluded on arm's length commercial terms based on international market practice for the sale and purchase of the relevant mineral products.  In the event that the BSGR Subscription Trigger Date shall occur, BSGR Guinea shall have the right, without any liability or penalty (except for accrued liabilities), to terminate any agreements entered into as contemplated in this Section 5.8.

5.9    <u>Tax and Corporate Restructuring</u>. The Parties shall discuss in good faith and use all other commercially reasonable efforts with a view to agreeing the optimal tax structure for the Liberian Transport Solution and the future development of the Project and an appropriate corporate/corporate governance structure (consistent with the Shareholders' Agreement) for the BSGR Guinea Group Companies (including, without limitation, the conversion of ProjectCo from an S.à r.l. to an S.A.) and shall procure that any corporate restructurings required to achieve such optimal tax and/or appropriate corporate/corporate governance structure as may be agreed between the Parties are implemented by or in respect of the relevant member of the BSGR Guinea Group at the appropriate time.

5.10    <u>Off-take Agreement</u>.  Following Completion, the Parties shall discuss in good faith and use all other commercially reasonable efforts with a view to agreeing the form of the Off-take Agreement.  The Parties agree that the final form of the Off-take Agreement (i) shall be consistent with the provisions of the Off-take Term Sheet, including as to risk allocation and pricing and the size of the "Marketing Cost Adjustment" (as that term is used in the Off-take Term Sheet); (ii) shall follow the form of Vale's contracts for arm's length (non-short term) sales of iron ore to third parties if the Parties are unable to agree a position between themselves; and (iii) shall be designed so as to ensure that, in case of default by a party to the Off-take Agreement, reasonable (taking into account the extent and impact of the breach and the relationship between the parties thereto) cure periods must have expired and senior managers of the shareholders of BSGR Guinea must have consulted concerning the breach and how it should be cured prior to

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

any right to terminate arising thereunder (regardless of which party to the Off-take Agreement is in breach). This Section 5.10 reflects the Parties mutual intention that the Off-take Agreement is intended to be capable of remaining in full force and effect throughout the entire period of commercial production of the iron ore mines in the Concession Areas subject to Section 5.4(d).

5.11    Compliance with Ancillary Agreements.  Where any member of the Vale Group (other than Vale or any member of the BSGR Guinea Group) has entered into any of the Off-take Agreement, the Vale Loan or any agreement or agreements as contemplated in Section 5.6 of this Agreement, Vale shall be responsible for such member of the Vale Group's compliance with all the provisions of the agreement into which such member has entered.

5.12    FCPA Provisions.  The Parties agree to give effect to the provisions of Schedule 4 to the Shareholders' Agreement in accordance with its terms.

**Section 6.       Funding**

6.1    Funding of Feasibility Study. Vale shall provide (or shall procure that one of its Affiliates provides) funding for the Feasibility Study, such funding to be provided in such amounts and at such times as determined by Vale in its sole discretion consistent with the Business Plan, provided that under no circumstances will BSGR be required to fund any of the costs and/or expenses required to carry out the Feasibility Study. Vale (or one of its Affiliates) shall provide such funding from time to time by subscribing for Deferred Shares in accordance with the following provisions:

(a)    the Parties shall procure that BSGR Guinea delivers notices to Vale from time to time in the period between the Completion Date and the date on which the Feasibility Study is completed which shall each specify (each such notice, a "**Subscription Notice**"):

(i)    the amount then required to fund the Feasibility Study (the "**Funding Amount**");

(ii)    the number of Deferred Shares to be subscribed for by Vale corresponding to the Funding Amount, assuming a subscription price per Deferred Share of $1,000; and

(iii)    the date on which such subscription of Deferred Shares is to occur (which shall be at least 10 Business Days, but not more than 30 Business Days, from and including the date of delivery of such Subscription Notice); and

(b)    on the date referred to in (a)(iii) above as specified in any Subscription Notice, BSGR Guinea shall issue and allot to Vale (or its Affiliate), and Vale (or its Affiliate) shall subscribe in consideration for the Funding

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

Amount specified in such Subscription Notice, the number of Deferred Shares then to be issued as specified in such Subscription Notice, free and clear of all Encumbrances, and thereupon BSGR Guinea shall enter Vale (or its Affiliate) in the register of members of BSGR Guinea and deliver to Vale (or its Affiliate) executed certificates for such Deferred Shares.

6.2    Project Financing. Each Party agrees to use its reasonable efforts, including in its capacity as a shareholder of BSGR Guinea, so far as it lawfully can, to cause that financing for the Project from third party providers, consistent with the Business Plan, is obtained on commercially viable terms at market rates, as determined by the Board acting reasonably (the "**Project Financing**").  In the period between the Completion Date and the date on which all amounts outstanding under the Vale Loan have been repaid, the Board shall, consistent with its fiduciary duties, undertake on an annual basis a review of the availability of Project Financing (including, if applicable, to refinance the Vale Loan), provided always that nothing in this Section shall require any member of the BSGR Guinea Group to incur any material expenditure in connection with undertaking any such annual review.

6.3    Vale Loan. Unless and until Project Financing has been secured as contemplated in Section 6.2 (including (if applicable) to refinance the Vale Loan) or if the Project Financing is not obtained in time for BSGR Guinea to ensure material compliance with actions to be taken pursuant to the Business Plan or is obtained in an amount lower than that required for the purposes of implementing the actions to be taken pursuant to the Business Plan, Vale shall (or shall procure that a member of its Group shall) lend to ProjectCo (or another BSGR Guinea Group Company) the amounts necessary to comply with the Business Plan pursuant to the Vale Loan.

6.4    Repayments of Vale Loan. Without prejudice to the provisions contained in the Shareholders' Agreement under Sections 7 (Share Transfers) and 9 (Consequences of Transfers) respectively, each of the Parties (so far as it is legally able as a shareholder of BSGR Guinea) will, and will take all necessary steps to ensure that BSGR Guinea will, procure that, in the period commencing on the Date of First Commercial Production and ending on the date on which no amounts of principal (including capitalized interest) remain outstanding under the Vale Loan:

(a)    prior to declaring any dividend or other distribution, ProjectCo (and any other borrower from time to time under the Vale Loan) will first ensure that any accrued but unpaid interest on the Vale Loan (if any) is paid in full and, subject to such payment having been made, the maximum amount of the dividends or other distributions which ProjectCo and each other member of the BSGR Guinea Group (other than Liberia Holdco and Liberia ProjectCo) would be permitted to declare at such time out of their respective distributable profits and in accordance with Applicable Law (but, for the avoidance of doubt, not including any amount constituting part of the capital of ProjectCo or such other member of the BSGR Guinea Group (other than Liberia Holdco and Liberia ProjectCo)) shall be

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

determined (the aggregate of such maximum amounts being the "**Permissible Dividend Amount**"); and

(b)    subject always to having complied with their obligations under section 6.4(a), ProjectCo and each other borrower from time to time under the Vale Loan shall together apply in aggregate an amount equal to the Loan Repayment Amount in or towards repayment of the aggregate principal amount (including capitalized interest) then outstanding under the Vale Loan such repayments to be made at least once in any calendar year, provided that an amount equal to but not more than the Loan Repayment Amount (excluding for this purpose any Liberian Dividends) shall be treated as available to support and finance, at the same time as any such repayment in respect of the Vale Loan, the payment by BSGR Guinea of a dividend in an amount equal to the BSGR Dividend Amount. The Parties agree to (i) use all commercially reasonable efforts with a view to establishing the optimal structure and arrangements to enable BSGR Guinea to pay any such dividends in a manner that minimizes or avoids any withholding tax cost to any member of the BSGR Guinea Group on any dividend or other distribution paid or any interest on any loan made in order to create a distributable profit or to ensure there is sufficient cash within BSGR Guinea for the purpose of paying the BSGR Dividend Amount and (ii) permit the payment of dividends by BSGR Guinea for this purpose out of any distributable profits or, where so required for the purposes of paragraph (i), reserves whether or not the same constitute part of the capital of BSGR Guinea and (iii) cause such dividends to be declared apportioned and paid to the holders of Ordinary Shares pro rata according to the amounts paid up on such shares.

## Section 7.    Conduct of Business

As of the Completion Date, each of BSGR and Vale agrees to promote the best interests of BSGR Guinea and pursue the development of the Project in accordance with the principles set forth in the Business Plan with the aim of maximizing production on an economically viable basis, profits and distributions to shareholders consistent with the Business Plan and the requirement under Section 3.3 of the Shareholders' Agreement to take account of the Dividend Reserve Amount. Each of BSGR and Vale shall, and shall procure that its Affiliates shall, co-operate in good faith to promote the success of BSGR Guinea and develop the Project in the most efficient and expeditious manner possible, provided that nothing in this Section shall require any Party or any member of its Group to breach any contract to which it is currently a party or do anything that would make any such Party or any member of that Party's Group breach any Applicable Law or incur any liability (including in tort).

## Section 8.    Warranties

8.1    <u>BSGR Warranties</u>. BSGR warrants to Vale as at the date of this Agreement that the warranties contained in Schedule 4 (the "**BSGR Warranties**") are true, accurate and not

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

misleading. The BSGR Warranties are given subject to the limitations set out in Schedule 5 but only to the extent provided in Schedule 5. Unless expressly provided in this Agreement, the BSGR Warranties shall be separate and independent and shall not be limited by reference to any other section or anything in this Agreement.

8.2    <u>Vale Warranties</u>. Vale warrants to BSGR as at the date of this Agreement that the warranties contained in Schedule 6 (the "**Vale Warranties**") are true, accurate and not misleading. Unless expressly provided in this Agreement, the Vale Warranties shall be separate and independent and shall not be limited by reference to any other section or anything in this Agreement.

8.3    <u>Non-pursuit of Claims</u>. BSGR undertakes to Vale and to each person referred to in this Section 8.3 that, except in the case of fraud, it will not make any claim against any BSGR Guinea Group Company or any of their respective directors, officers, employees or agents or any adviser of any BSGR Guinea Group Company (in such capacity), on whom BSGR may have relied in agreeing to any term of this Agreement and/or any of the Ancillary Agreements, which it may have in respect of a misrepresentation, inaccuracy or omission in or from information or advice provided by any such person for the purpose of assisting BSGR to make a representation, give a BSGR Warranty or prepare the Disclosure Letter. Each BSGR Guinea Group Company and any such director, officer, employee, agent or adviser of any BSGR Guinea Group Company may enforce the terms of this Section 8.3 subject to and in accordance with the provisions of the Contracts (Rights of Third Parties) Act 1999.

8.4    <u>Guernsey Loan Indemnity</u>. BSGR hereby undertakes to indemnify and hold harmless Vale (for itself and as agent or trustee for each member of the Vale Group) or, if Vale so elects as contemplated in Section 10.1 (*mutatis mutandis*), the relevant member of the BSGR Guinea Group against any and all Losses suffered or incurred by Vale (or any member of its Group including, without limitation, the BSGR Guinea Group) in connection with the failure by any member of the BSGR Group to obtain consent from the Guernsey Financial Services Commission, in accordance with the Control of Borrowing (Bailiwick of Guernsey) Ordinances, 1959, as amended, in respect of any and all amounts borrowed prior to the date of this Agreement by any relevant member of the BSGR Guinea Group and which are the subject of the exchange of letters dated 6 and 7 April 2010 respectively between Carey Olsen and the Guernsey Financial Services Commission (copies of which are contained in the Disclosure Bundle at Section 7 (tab 41)).

**Section 9.    Tax Covenant**

In consideration of the Purchase Price and the mutual rights and obligations in this Agreement the Parties agree that the Tax Covenant in Schedule 10 shall apply from Completion.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Section 10.    Vale's Remedies**

10.1    <u>Basis of Claims for Breach of Indemnity Warranties</u>. In the event there is an Indemnity Warranty Claim, BSGR shall pay on demand (at Vale's election) either:

      (a)    to Vale, the amount of the relevant Loss to Vale, including the aggregate reduction caused in the value of the Sale Shares; or

      (b)    to the relevant member(s) of the BSGR Guinea Group, the amount of the relevant Loss to the BSGR Guinea Group, including the reduction caused in the value of any asset of the BSGR Guinea Group or, as the case may be, the amount of any new or increased liability (in the latter case limited to the increase) of the BSGR Guinea Group,

provided, however, that the limitations set out in Schedule 5 shall apply to a Claim for breach of an Indemnity Warranty to the extent expressly stated therein; provided, further, that, where Vale has elected that payment shall be made to a member of the BSGR Guinea Group, Vale shall have the right to enforce on behalf of the relevant member of the BSGR Guinea Group the provisions of this Agreement which relate to Indemnity Warranty Claims.

10.2    <u>Set-off of Claims</u>. If, at the time at which Vale is required pursuant to Section 3 to pay the First Deferred Consideration, the Second Deferred Consideration or the Additional Consideration and/or the time at which BSGR Guinea would declare a dividend in accordance with Section 3.3 of the Shareholders' Agreement, BSGR is liable to pay any amount or amounts to Vale (or, if Vale has so elected in accordance with Section 10.1, to a member of the BSGR Guinea Group) under or pursuant to a Substantiated Claim (an "**Unpaid Amount**") then, without prejudice to Vale exercising its general rights of enforcement available at law, Vale may, in full satisfaction of or, as applicable, in reducing such Unpaid Amount, (at Vale's election and upon notice to BSGR (copied to BSGR Guinea)) deduct (and, where Vale has elected in accordance with Section 10.1 that payment shall be made to a member of the BSGR Guinea Group, shall pay to such member of the BSGR Guinea Group) such Unpaid Amount (only once with respect to the amount thereof) from:

      (a)    the amount payable in respect of the First Deferred Consideration, the Second Deferred Consideration or the Additional Consideration (as the case may be) and, to the extent that the amount of the First Deferred Consideration, the Second Deferred Consideration or the Additional Consideration (as the case may be) exceeds the Unpaid Amount, payment by Vale to BSGR of the net amount shall constitute a full and sufficient discharge of the obligation to pay the First Deferred Consideration, the Second Deferred Consideration or the Additional Consideration (as the case may be) and, to the extent that the amount of the Unpaid Amount exceeds the First Deferred Consideration, the Second Deferred Consideration or the Additional Consideration (as the case may be), such deduction shall constitute a full and sufficient discharge of Vale's

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

obligation to pay the First Deferred Consideration, the Second Deferred Consideration or the Additional Consideration (as the case may be) and a pro-tanto reduction in the Unpaid Amount; and/or

(b)     the amount of any dividend (or other distribution) which would otherwise be payable by BSGR Guinea to BSGR (from time to time) and BSGR hereby irrevocably agrees to waive its entitlement to such dividend or other distribution in such circumstances to the extent of the Unpaid Amount and undertakes to irrevocably instruct and direct BSGR Guinea to pay to Vale such amounts out of such dividend or distribution entitlement as are necessary to satisfy or reduce the amount of such Unpaid Amount,

## Section 11.    Third Party Claims

If Vale becomes aware, following Completion, of any claim by a third party (a "**Third Party Claim**"), or of any other matter or circumstance, which will or is reasonably likely to result in a Guernsey Loan Indemnity Claim, Warranty Claim or an Indemnity Warranty Claim other than a Tax Claim being made, subject always to the general obligations to mitigate provided for by Section 3.4 of Schedule 5, Vale shall and, where applicable, shall procure that any member of the Vale Group shall:

(a)     promptly (and in any event within 15 Business Days of becoming aware of it) give notice of the Third Party Claim or other matter or circumstance to BSGR;

(b)     upon reasonable prior notice and to the extent that BSGR does not already have such access as a shareholder in BSGR Guinea and/or through its BSGR Directors, provide to BSGR and its representatives reasonable access to premises and personnel and to relevant assets, documents and records within the power or control of BSGR Guinea or any member of the BSGR Guinea Group, in each case, to the extent that such is reasonably necessary for the purposes of investigating the matter, provided in each case that:

(i)     to do so would not be materially prejudicial or detrimental to the promotion of the best interests of BSGR Guinea and the development of the Project or the business undertaken by any member of the Vale Group; and

(ii)     any such documents and records (i) do not constitute internal memoranda of a member of the Vale Group relating to the merits or conduct of such matter or claim (rather than the factual circumstances underlying such matter or claim); (ii) are not subject to legal privilege; (iii) do not constitute commercially sensitive or confidential information of Vale

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(rather than the BSGR Guinea Group); and (iv) are not subject to any other confidentiality restrictions;

(c)     not admit liability or make any agreement or compromise in relation to the Third Party Claim unless either (i) such admission, agreement or compromise results in no liability on BSGR (whether to the Third Party or otherwise); or (ii) BSGR gives its prior written consent (such consent not to be unreasonably withheld or delayed) to such admission, agreement or compromise; and

(d)     (subject to Vale (for itself and as agent or trustee for each BSGR Guinea Group Company and each other member of the Vale Group) being indemnified by BSGR on demand against all costs reasonably incurred by Vale, any BSGR Guinea Group Company or any other member of the Vale Group in respect of that Third Party Claim) ensure that it shall:

(i)     not enter into any settlement in respect of any such Third Party Claim unless either (i) such settlement results in no liability on BSGR (whether to the third party or otherwise); or (ii) BSGR gives its prior written consent (such consent not to be unreasonably withheld or delayed) to such settlement; and

(ii)     provide such information and assistance as BSGR may reasonably require in connection with the preparation for and conduct of any proceedings and/or negotiations relating to the Third Party Claim,

provided, in each case, that to do so would not be materially prejudicial or detrimental to the promotion of the best interests of Vale, BSGR Guinea or the other members of the BSGR Guinea Group (as the case may be) and the development of the Project or the business undertaken by any member of the Vale Group or the BSGR Guinea Group.

## Section 12.    Payments

12.1    Payments to BSGR. Any payment to be made to BSGR pursuant to this Agreement by Vale shall be made to BSGR's Bank Account (or to such other bank account as may be notified in writing by BSGR to Vale not less than 10 Business Days prior to the date on which the relevant payment is due to be made).

12.2    Payments to BSGR Guinea.  Any payment to be made to BSGR Guinea pursuant to this Agreement by Vale shall be made to BSGR Guinea's Bank Account (or to such other bank account as may be notified in writing by BSGR Guinea to the Parties not less than 10 Business Days prior to the date on which the relevant payment is due to be made).

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

12.3    Payment to Vale. Any payment to be made to Vale pursuant to this Agreement by either BSGR or BSGR Guinea shall be made to the bank account Vale shall have notified to BSGR or BSGR Guinea from time to time for the purpose of the relevant payment.

12.4    Method of Payment. Payments under Section 12.1, 12.2 and 12.3 shall be made in immediately available cleared funds in $ by electronic transfer of funds for value on the due date for payment. Receipt of the amount due shall be an effective discharge of the relevant payment obligation.

12.5    Interest. If any sum due for payment in accordance with this Agreement is not paid on the due date for payment, the person in default shall pay Default Interest on that sum from but excluding the due date to and including the date of actual payment calculated and accrued on a daily basis save that Default Interest shall not be payable where the Initial Consideration is received on the Business Day next following the Completion Date.

12.6    Force Majeure.

(a)    Without prejudice to the operation of Section 5.2, if, during the time in which this Agreement is in force, the circumstances under which it was concluded are fundamentally changed such as to have a material adverse impact on the Project as a result of events or circumstances as specified in Section 12.6(b) below which are outside of the control of Vale (a "**Force Majeure Event**"), either Party may propose appropriate revisions to this Agreement, and both Parties will endeavor to find a mutually acceptable solution.  Each Party acknowledges that a spirit of mutual co-operation and long term goodwill underlies this Agreement and agrees that in the event that unforeseen hardships arise affecting either Party, the Parties shall meet promptly and in good faith with a view to attempting to find a mutually acceptable means of alleviating such hardship.

(b)    A Force Majeure Event shall be:

(i)    (A) a natural catastrophe or cataclysm; (B) revolution, military or political coup, regime change, civil disturbance, act of terrorism, sabotage, vandalism or the threat of any such act; (C) an act of God, natural disasters such as lightning, flood, fire, storm, earthquakes and lack of water arising from environmental problems or weather; (D) chemical contamination; (E) an event or circumstance resulting in it becoming impossible, unsafe or not economically viable to access the Concession Areas to the extent required or to export iron ore from any of the Concession Areas to any other

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

area within or outside of Guinea or Liberia, including, for the avoidance of doubt, extensive damage to any part of the infrastructure that forms part of the Liberian Transport Solution; (F) unforeseeable geological, environmental or ground (including ground water) conditions affecting the construction of all or some of the works relating to the Project; and/or (G) breakdown, inoperability, failure or partial failure of any part of the energy source required to run any key component of the Project,

in each case, such that the development, exploitation or continued operation of the Project is not reasonably practicable or commercially viable;

(ii)    a major financial and/or economic crisis, either worldwide or in major market(s) that could reasonably be expected to materially and adversely affect or alter the iron ore demand from customers and downstream industries and/or inventory levels;

(iii)   the price for the target guaranteed specification of iron ore calculated in accordance with the Off-take Term Sheet (or the Off-take Agreement) being less than $27 per metric tonne on an ex-works mine basis for a continuous period of not less than 60 days;

(iv)    the revocation, annulment or materially adverse restriction of the Basic Agreement, the Mining Concession or any of the Guinea Exploration Permits for reasons which are beyond the control of the Parties and are not otherwise connected to any direct or indirect action by either Party against or in violation of any of the Basic Agreement, the Mining Concession and the Guinea Exploration Permits, as the case may be; or

(v)     the implementation of any action, without either Party having had any direct or indirect involvement in causing the implementation of such action, which materially and adversely affects the rights granted to ProjectCo under the Basic Agreement, the Mining Concession and/or any of the Guinea Exploration Permits.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(c)     Without prejudice to the operation of Section 5.2, in the event that Vale reasonably determines that a Force Majeure Event has occurred then:

(i)     Vale shall notify BSGR and BSGR Guinea of its determination of the occurrence of a Force Majeure Event within 10 Business Days of such determination;

(ii)    Vale and each member of its Group shall, with effect on and from the date of such determination, not be required to satisfy any of its or their payment or other obligations that have not then already fallen due for payment or performance in accordance with their respective terms under this Agreement (including, without limitation, Vale's obligations to pay the First Deferred Consideration, the Second Deferred Consideration and/or the Additional Consideration pursuant to Section 3; Vale's obligation to fund the Feasibility Study; and any obligations of the lender under the Vale Loan to provide funding pursuant to the terms of the Vale Loan, as applicable) and the Parties agree and shall, to the fullest extent they are able to do so, procure that BSGR Guinea and its subsidiaries shall not make payments of dividends or other distributions without the prior approval of Vale, so that such payments and/or obligations shall be suspended, in all such cases, for such period as Vale reasonably and in good faith determines that a Force Majeure Event is continuing;

(iii)   the Parties will continue to cooperate in good faith with a view to reaching a mutually viable solution to the Force Majeure Event; and

(iv)    if the Force Majeure Event is of a type as contemplated in section 12.6(b)(ii) or (iii) above, it is the current intention of Vale that, in determining the course of action (if any) to be adopted in respect of the Project in response to such Force Majeure Event, it would make its assessment by reference to criteria which are not materially more onerous than those applicable to other comparable projects of Vale and its Affiliates and after having regard to all applicable factors and circumstances (including, without limitation, the quality and quantity of the iron ore produced or expected to be produced by the Project) and the prevailing and anticipated market conditions at that time.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

12.7    <u>Gross-up on Payments</u>. In the event that, in relation to any payment due by BSGR to Vale or any member of its Group in respect of a Claim under this Agreement: (i) BSGR (or any member of its Group) is required by Applicable Law to make a deduction, retention or withholding from such payment; or (ii) Vale or any member of its Group will be or has been subject to Tax in respect of such payment, then the sum due by BSGR shall be increased to the extent necessary to ensure that Vale (or the relevant member of its Group) receives and retains a net sum equal to the sum it would have received had no such deduction, retention or withholding been made and/or the payment had not been subject to Tax.

## Section 13.    Non Solicitation and Non Competition

13.1    <u>Non Solicitation Covenant</u>. Each Party covenants with the other (for itself and as agent or trustee for each member of its Group) that neither it nor any member of its Group shall, directly or indirectly, in the period commencing on the date of this Agreement and ending on the date falling 24 months after the date on which one of the Parties or any of its Affiliates ceases to be a shareholder in BSGR Guinea:

(a)    employ or offer to employ, or enter into a contract for the services of, any individual who is or was, at any time during the preceding 6 months, an employee holding an executive or managerial position with, or an officer of, any BSGR Guinea Group Company or any company in the other Party's Group (the "**Key Employees**") or entice, solicit or procure any such person to leave the employment within the BSGR Guinea Group or such other Party's Group (or attempt to do so) whether or not that person would commit any breach of contract in leaving such employment; or

(b)    procure or facilitate the making of any such offer or attempt by any other person,

provided, however, that the following shall not constitute a breach of this Section 13.1:

(i)    the placing of an advertisement of a post available to a member of the public generally and the recruitment of a person through an employment agency and, in each case, the subsequent employment of such person, provided that no company in either Party's Group, or any of their respective officers and employees, encourages or advises such agency to approach any Key Employee; and/or

(ii)    the employment by any member of either Party's Group of a Key Employee who was an employee of a BSGR Guinea Group Company and, prior to such employment, had been employed by a member of such Party's Group.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

13.2    <u>Non Competition Covenant and Referral of Opportunities</u>. Each Party covenants with the other (for itself and as agent or trustee for each member of its Group) that, subject to Section 13.4, in the period commencing on the date of this Agreement and ending on the date on which one of the Parties and/or one of its Affiliates cease to be shareholder(s) in BSGR Guinea:

(a)    it shall, and shall ensure that each member of its Group shall, abstain from undertaking any action in Guinea or Liberia in connection with the mining of iron ore, which is in direct competition with any of the activities that form part of the Project and may cause damage or hindrance to the Project; and

(b)    BSGR Guinea shall be its respective Group's exclusive vehicle for the pursuit of business opportunities in connection with the mining of iron ore within the Republic of Guinea and Liberia ("**Relevant Business Opportunities**") and accordingly, (to the extent not prohibited by confidentiality obligations), each Party will refer any Relevant Business Opportunity to the Board and, to the extent available to it (or any member of its Group) on a basis which permits such disclosure, provide to the Board all information and data reasonably necessary to assess the viability of the proposition.

13.3    <u>Pursuit of New Business Opportunities</u>. To the extent that the Board decides to pursue any Relevant Business Opportunity, such Relevant Business Opportunity will be pursued based on the principles set forth in this Agreement and the Ancillary Agreements.

13.4    <u>Exceptions to Non Competition Covenant.</u> The restrictions contained in Section 13.2 shall not restrict or prohibit either of the Parties or member of their respective Groups from:

(a)    acquiring in a single transaction or series of related transactions or entering into a joint venture or equivalent transaction with any one or more companies and/or businesses whose activities include carrying on or being engaged in a business which is in direct competition with any of the activities that form part of the Project and may cause damage or hindrance to the Project (a "**Competing Business**"), provided that the principal purpose of such acquisition is not the acquisition of control over a Competing Business; or

(b)    pursuing a Relevant Business Opportunity which has previously been referred to the Board pursuant to Section 13.2(b) by such party and in relation to which the Board has not notified the relevant Party within 20 Business Days of such referral that it intends to pursue such Relevant Business Opportunity provided that, in the case of a Relevant Business Opportunity referred to the Board by Vale, Vale may not pursue any such Business Opportunity unless at least one of the BSGR Directors, acting in

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

a commercially reasonable manner consistent with his/her fiduciary duties in determining whether or not BSGR Guinea has the capability (including, without limitation, in terms of financing and resources) to pursue such opportunity in the near term, has voted in favor of a resolution of the Board not to pursue such Relevant Business Opportunity.

13.5    <u>Acknowledgement Relating to Restrictions.</u> Each of the Parties acknowledges that the duration, extent and application of the restrictions in this Section 13 are no greater than is reasonable and necessary for the protection of the interests of the BSGR Guinea Group and the other Party's Group but that, if any such restriction shall be adjudged by any court or authority of competent jurisdiction to be void or unenforceable but would be valid if part of the wording thereof were to be deleted and/or the period thereof were to be reduced and/or the area dealt with thereby were to be reduced, such restriction shall apply within the jurisdiction of that court or authority with such modifications as are necessary to make it valid and effective.

**Section 14.    Announcements**

Neither Party (nor any of their respective Affiliates) shall make any reference to, announcement of or issue any circular or other communication in connection with the existence or subject matter of this Agreement (or any other agreement contemplated herein) without the prior written approval of the other Party (such approval not to be unreasonably withheld or delayed). This restriction shall not apply to the extent that such announcement or other communication is required by Applicable Law, including by any stock exchange with competent jurisdiction. If this exception applies, to the extent practicable not prohibited by Applicable Law, the Party making the announcement or other communication shall use its reasonable efforts to consult with the other Party in advance as to its form, content and timing.  If it is not practicable to consult in advance of making such announcement or issuing such communication (or such consultation would have been prohibited), the Party making the announcement or other communication shall notify the other Party as soon as practicable after having made the announcement or other communication.

**Section 15.    Confidentiality**

15.1    <u>Confidentiality Obligation</u>.  For the purposes of this Section 15:

(a)    "**Confidential Information**" means:

(i)    (in relation to the obligations of Vale) any information received or held by Vale (or any of its Representatives) relating to BSGR or the BSGR Group; or

(ii)    (in relation to the obligations of BSGR) any information received or held by BSGR (or any of its Representatives) relating to Vale or the Vale Group; and

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(iii)      information relating to the provisions of, negotiations leading to, and any claim or potential claim under this Agreement and the other agreements contemplated herein,

and includes written information and information transferred or obtained orally, visually, electronically or by any other means; and

(b)      "**Representatives**" means: (i) in relation to BSGR, to the extent that they are involved in the transaction contemplated by this Agreement, its respective Affiliates and the directors, officers, employees, agents, advisers, lending banks, accountants and consultants of BSGR and/or of its respective Affiliates; (ii) in relation to Vale, to the extent that they are involved in the transaction contemplated herein, directors, officers, employees, agents, consultants, contractors, advisers (including, without limitation, attorneys, accountants, consultants, bankers and financial advisers), potential providers of finance (whether equity or debt), Affiliates and persons who hold the aforementioned roles in relation to Affiliates.

Each Party shall (and shall ensure that each of its Representatives shall) maintain Confidential Information in confidence and not disclose Confidential Information to any person except (i) as permitted under Section 15.2 or (ii) as the other Party approves in writing.

15.2    <u>Exceptions</u>. Section 15.1 shall not prevent disclosure by a Party or its Representatives to the extent such Party can demonstrate that such:

(a)      disclosure is required by law, or by the rules, regulations or requirements of any stock exchange or any regulatory or other supervisory body or Governmental Entity or authority (including tax authority) having applicable jurisdiction (provided that, to the extent practicable not prohibited by Applicable Law, the disclosing Party shall first inform the other Party of its intention to disclose such information and take into account the reasonable comments of the other Party);

(b)      subject to Applicable Law, disclosure is of Confidential Information which was lawfully in the possession of that Party or any of its Representatives (in either case as evidenced by written records) without any obligation of secrecy prior to its being received or held;

(c)      subject to Applicable Law, disclosure is of Confidential Information which has previously become publicly available other than through that Party's action (or that of its Representatives) in breach of this Agreement; or

(d)      subject to Applicable Law, disclosure is required for the purpose of any arbitral, judicial or regulatory proceedings arising out of this Agreement (or any other Ancillary Agreement).

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

15.3    <u>Disclosure to Representatives</u>. Each Party may disclose Confidential Information to its Representatives, and undertakes that it (and its Affiliates) shall only disclose Confidential Information to its Representatives if: (i) it is reasonably required for purposes connected with this Agreement or the Project and only if its Representatives are informed of the confidential nature of the Confidential Information; or (ii) these Representatives agree to comply with the confidentiality obligations contained in this Section 15 as if a party hereto.

15.4    <u>Effect on Termination</u>. If this Agreement is terminated, either Party shall as soon as practicable on request by the other Party:

      (a)    return all written documents and other materials relating to the other Party's Group or this Agreement (including any Confidential Information), without keeping any copies thereof;

      (b)    destroy all information or other documents derived from such Confidential Information; and

      (c)    so far as it is practicable to do so, expunge such Confidential Information from any computer, word processor or other device,

provided that a Party shall be permitted to retain copies of Confidential Information that is contained in the archived computer system back-up in accordance with its security and/or disaster recovery procedures and may retain such copies (in whatever form) as are required to be retained for the purpose of compliance with, and only for so long as required by, any Applicable Law or Governmental Entity, or for legal and compliance purposes in accordance with its document retention policies in effect from time to time.

15.5    <u>Confidentiality Agreement</u>. The Confidentiality Agreement is hereby terminated immediately following the execution of this Agreement.

## Section 16.    Miscellaneous

16.1    <u>Costs</u>.

Each of the Parties shall pay its own costs and expenses in relation to the preparation and signing of this Agreement and to the implementation of the transactions contemplated by this Agreement.

16.2    <u>Notices</u>.

      (a)    *Address of notices*.  Any notice or other communication to be given hereunder shall refer to this Agreement and shall either be delivered by hand or sent by first class post, airmail or facsimile transmission (provided that, in the case of facsimile transmission, confirmation of its error-free transmission has been received by the sender's facsimile machine) as follows:

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

if to **BSGR**:

Address:      West Wing, Frances House, Sir William Place, St Peter Port, Guernsey (GY1 1GX)

Fax No:      +44.1481.812020

Addressed for the attention of:  David Clark

With a copy to:

**Skadden, Arps, Slate, Meagher & Flom (UK) LLP**

Address:      40 Bank Street, Canary Wharf, London (E14 5DS)

Fax No:      +44.20.7072.7070

Addressed for the attention of:  Michael Hatchard and Michal Berkner

if to **Vale**:

Address:      Rua Sapucaí, 383 – 7th Floor
Belo Horizonte, MG 30150-904

Fax No:      +55.31.3279.5598

Addressed for the attention of: Eduardo Ledsham

With a copy to:

**Vale**

Address:      Av. Graça Aranha, 26-15th Floor, Rio de Janeiro, RJ, Brazil 20030-900

Fax No:      +55.21.3814.9921

Addressed for the attention of:  General Counsel

With a copy to:

**Clifford Chance LLP**

Address:      10 Upper Bank Street, London E14 5JJ

Fax No:      +44.20.7006.5555

Addressed for the attention of: Anthony Oldfield and David Pudge

(b)    *Deemed served*.  All notices given in accordance with this Section 16.2 shall be deemed to have been served as follows:

    (i)    if delivered by hand, when left at the address listed at 16.2(a) (as applicable);

    (ii)    if sent by air mail, six (6) Business Days after it was posted; and

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

        (iii)      if communicated by facsimile when confirmation of its error-free transmission has been recorded, by the sender's facsimile machine;

provided, however, that where, in the case of delivery by hand or transmission by facsimile, such delivery occurs after 6 p.m. (which for notices to Vale, shall be by reference to Rio de Janeiro time, and for notices to BSGR, shall be by reference to Guernsey time) on a Business Day or at any time on a day which is not a Business Day, service shall be deemed to occur at 9 a.m. (which for notices to Vale, shall be by reference to Rio de Janeiro time, and for notices to BSGR, shall be by reference to Guernsey time) on the next following Business Day.

16.3    Entire Agreement.

    (a)    This Agreement and the Ancillary Agreements, from the date that each of the Ancillary Agreements shall have been executed, constitute the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and none of the Parties has entered into this Agreement in reliance upon any representation, warranty or undertaking by or on behalf of any other Party which is not expressly set out herein or therein provided that this Section 16.3(a) shall not exclude any liability for fraudulent misrepresentation.

    (b)    This Agreement and the Ancillary Agreements supersede any or all prior agreements, understandings, arrangements, promises, representations, warranties and/or contracts of any form or nature whatsoever, whether oral or in writing and whether explicit or implicit, which may have been entered into prior to the date hereof between the Parties or on their behalf as to the subject matter of this Agreement and the Ancillary Agreements including, without limitation, the Memorandum of Understanding dated 19 March 2010.

16.4    Assignment.

    (a)    This Agreement shall be binding on and inure to the benefit of the Parties and their successors and permitted assigns.  Except as expressly provided in this Agreement and as set out below in sub-clause (b), neither Party may assign or transfer all or any part of its rights or obligations under this Agreement nor any benefit arising under or out of this Agreement without the prior written consent of the other Party (which shall not be unreasonably denied or withheld); provided that each Party shall remain liable for its obligations under this Agreement notwithstanding any such assignment and, save to the extent that such assignee is a wholly-owned subsidiary of Vale designated by Vale pursuant to Section 2.2, any such assignee shall be required to sign a deed of adherence to the Shareholders' Agreement.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

    (b)      Vale or any other member of the Vale Group may, without the consent of BSGR, assign or transfer to any other member of the Vale Group all or any part of its rights or obligations or any benefit arising under or out of this Agreement provided always that Vale shall procure that any such other member of the Vale Group which is a direct or indirect assignee or transferee of all or any part of Vale's rights or obligations or benefits hereunder complies with such rights and obligations under this Agreement, as applicable.

16.5    <u>Waiver of Rights</u>. No waiver by a Party of a delay or failure or failures by the other Party to perform any provision of this Agreement shall operate or be construed as a waiver in respect of any other or further failure whether of a like or different character.  No single or partial exercise of a right or remedy provided by this Agreement or by law prevents further exercise of the right or remedy or the exercise of another right or remedy under this Agreement or at law.

16.6    <u>Amendments</u>. This Agreement may be amended only by an instrument in writing signed by duly authorized representatives of each of the Parties.

16.7    <u>Invalidity</u>. If any of the provisions of this Agreement is or becomes invalid, illegal or unenforceable under the laws of any jurisdiction:

    (a)      the validity, legality or enforceability of the remaining provisions of this Agreement in that jurisdiction shall not in any way be affected or impaired; and

    (b)      the validity, legality or enforceability of such provision or the remaining provisions of this Agreement under the laws of any other jurisdiction shall not in any way be affected or impaired.  Notwithstanding the foregoing, the Parties shall thereupon negotiate in good faith in order to agree the terms of a mutually satisfactory provision, achieving so nearly as possible the same commercial effect, to be substituted for the provision so found to be void or unenforceable.

16.8    <u>No Partnership or Agency</u>. Nothing in this Agreement (or any of the arrangements contemplated hereby) shall be deemed to constitute a partnership between the Parties nor, save as may be expressly set out herein, constitute any Party as the agent of the other Party for any purpose.  In addition, no Party shall enter into contracts with third parties as agent for any BSGR Guinea Group Company or for the other Party nor shall any Party describe itself as agent as aforesaid or in any way hold itself out as being an agent as aforesaid.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

16.9    <u>Conflict With Constitutional Documents</u>. If there is any conflict or inconsistency between the provisions of this Agreement and the Constitutional Documents or the articles of association (or equivalent documents) of any BSGR Guinea Group Company, subject to Applicable Law, this Agreement shall prevail as between the Parties *inter se* and between each Party and the relevant BSGR Guinea Group Company and be applied in priority.  The Parties shall exercise all voting and other rights and powers available to them so as to give effect to the provisions of this Agreement. If requested to do so by any Party, the other Party shall procure that the Constitutional Documents or the articles of association (or equivalent documents) of any BSGR Guinea Group Company are amended or the relevant provisions of such are waived, suspended or disqualified so as to accord with and give effect to the provisions of this Agreement, subject to Applicable Law.

16.10    <u>Governing Law; Arbitration</u>.

(a)    This Agreement is governed by English law.  The Parties agree that all disputes arising out of or in connection with this Agreement, or with its negotiation, legal validity or enforceability, or with its consequences, whether the alleged liability shall be said to arise under the law of England or under the law of some other country, and whether the same shall be regarded as contractual claims or not, shall be exclusively governed by and determined only in accordance with English law.

(b)    Any dispute, controversy or claim arising between any of the Parties to this Agreement out of or in connection with this Agreement, including any question regarding the existence, validity, or termination of this Agreement, shall be referred to and finally resolved by arbitration under the Rules of Arbitration of the London Court of International Arbitration (the "**LCIA Rules**"), which Rules are deemed to be incorporated by reference into this Section 16.10. There shall be three arbitrators, and the Parties agree that one arbitrator shall be nominated by each Party to the arbitration for appointment by the LCIA Court in accordance with the LCIA Rules. The third arbitrator, who shall act as the chairman of the tribunal, shall be nominated by agreement of the two Party-nominated arbitrators within 14 days of the confirmation of the appointment of the second arbitrator, or in default of such agreement, appointed by the LCIA Court.  The seat or place of arbitration shall be London, England.  The language to be used in the arbitral proceedings shall be English.  The award shall be final and binding on the parties to the arbitration and may be entered and enforced in any court having jurisdiction.  Any request for arbitration shall be served on the other party pursuant to the notice provision in Section 16.2 of this Agreement.

(c)    In order to facilitate the comprehensive resolution of related disputes, and upon request of any party to an arbitration pursuant to this Section 16.10, an arbitral tribunal may, within 90 days of its appointment, consolidate the arbitration proceedings before it with any other arbitration proceedings or

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

proposed arbitration proceedings involving the Parties.   An arbitral tribunal shall not consolidate such arbitration proceedings unless it determines that (i) there are issues of fact or law common to the arbitrations in question so that a consolidated proceeding would be more efficient than separate proceedings and (ii) no party to the proceedings sought to be consolidated would be materially prejudiced as a result of such consolidation for any reason, including (a) a failure to have an equal say in the formation of the arbitral tribunal which would hear the consolidated proceedings, (b) a failure to be heard on the issue of consolidation or (c) undue delay.   Unless the parties to the proceedings sought to be consolidated agree otherwise, the arbitral tribunal first formed shall determine the disputes arising in the consolidated proceedings.   In the event of different rulings on the question of consolidation by differently constituted arbitral tribunals formed pursuant to this Section 16.10, there shall be no consolidation of proceedings unless all of the parties to the proceedings sought to be consolidated agree otherwise.

(d)    By agreeing to arbitration in accordance with this Section 16.10, the Parties do not intend to deprive any competent court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment or other order in aid of the arbitration proceedings or the enforcement of any award.   The arbitral tribunal shall have full authority to order a Party to seek modification or vacation of any order issued by a national court, and to award damages or give other appropriate relief for the failure of any Party to respect the arbitral tribunal's orders to that effect.

(e)    The Parties hereby waive their rights to apply or appeal under Sections 45 and 69 of the Arbitration Act 1996.

(f)    To the extent that any Party hereto (including permitted assignees of any Party's rights or obligations under the Agreement) may be entitled, in any jurisdiction, to claim for itself or its revenues, assets or properties, sovereign immunity from service of process, from suit, from the jurisdiction of any court, from attachment prior to judgment, from attachment in aid of execution of an arbitral award or judgment (interlocutory or final), or from any other legal process, and to the extent that, in any such jurisdiction there may be attributed such a sovereign immunity (whether claimed or not), each Party hereto hereby irrevocably agrees, to the extent permitted by law, not to claim, and hereby irrevocably waives generally, to the extent permitted by law, such sovereign immunity.

(g)    Vale hereby confirms that it has irrevocably appointed TMF Corporate Services Limited at its registered office for the time being, being at the date hereof Pellipar House, 1st floor, 9 Cloak Lane, London, EC4R 2RU as its authorized agent for service of process in England of the kind described in Section 16.10(b) above.   If for any reason Vale does not have such an

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

agent in England, it will promptly appoint a substitute process agent and notify BSGR of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

(h)     BSGR hereby confirms that it has irrevocably appointed BSG Management Services Limited, a company registered in England and Wales with registered no. 05459227 at its registered office for the time being, being at the date hereof Level 3, 7 Old Park Lane, London, W1K 1QR as its authorized agent for service of process in England of the kind described in Section 16.10(b) above. If for any reason BSGR does not have such an agent in England, it will promptly appoint a substitute process agent and notify Vale of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

16.11   Further Assurances. Upon request, each Party shall from time to time take such actions and execute such further documents as may be deemed reasonably necessary by any Party to carry out, evidence and confirm their rights and the intended purpose of this Agreement. Where any obligation pursuant to this Agreement is expressed to be undertaken or assumed by any Party, subject to Applicable Laws and the requirement to comply with any fiduciary duties applicable to the directors (or equivalent officers) of such other person, such obligation shall be construed as requiring the Party concerned to exercise all rights and powers of control over the affairs of any other person which that Party is able to exercise (whether directly or indirectly) in order to procure performance of that obligation. Where any obligation pursuant to this Agreement is expressed to be undertaken or assumed by the Board or any individual member of the Board, subject to Applicable Laws and the requirement to comply with any fiduciary duties applicable to such member(s) of the Board, such obligation shall be construed as requiring the Parties or (as the case may be) the Party that designated the relevant member of the Board to take all necessary steps in order to procure performance of such obligation.

16.12   Contracts (Rights of Third Parties) Act 1999. Save where specifically provided herein, the Contracts (Rights of Third Parties) Act 1999 shall not apply to this Agreement and no person other than the Parties to this Agreement shall have any rights under it nor shall it be enforceable by any person other than the Parties to it. Where, pursuant to the terms of this Agreement, a third party has been expressly granted rights under the Contracts (Rights of Third Parties) Act 1999, the consent of such third party shall not be required for the variation of this Agreement or the waiver of any provision in it.

16.13   Remedies. Unless otherwise stated in this Agreement or the Shareholders' Agreement, each Party's only remedy in respect of a breach of any provision of this Agreement or any misrepresentation (other than fraudulent misrepresentation) in connection with the subject matter of this Agreement is in damages or a claim for injunctive or equitable relief. Accordingly, neither Party shall have any right to terminate or rescind this Agreement in the event of a breach of this Agreement or negligent or innocent misrepresentation by the other Party, provided that this Section 16.13 shall not exclude any liability for fraudulent misrepresentation.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

16.14  <u>Effect of Completion.</u> Except to the extent that they have been performed and except where this Agreement provides otherwise, the obligations contained in this Agreement remain in force after Completion.

16.15  <u>Counterparts.</u> This Agreement may be entered into in any number of counterparts and by the Parties on separate counterparts, each of which when so executed and delivered shall be an original, but all counterparts shall together constitute one and the same instrument.

*[The remainder of this page is intentionally left blank]*

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**AS WITNESS** this Agreement has been signed by the duly authorized representatives of the Parties the day and year first before written.

**BSG RESOURCES LIMITED**

By: David Clark

_____
    Name: David Clark
    Title: Director

**VALE S.A.**

By: Roger Agnelli

_____
    Name: Roger Agnelli
    Title: CEO of Vale S.A.


By: Carlos Martins

_____
    Name: Carlos Martins
    Title: Executive Director

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

## SCHEDULE 1

**DEFINED TERMS**

**Acquired Ownership Interest** means the number of shares in the issued share capital of BSGR Guinea as corresponds to the portion of the Sale Shares that reflects the proportion which the aggregate amount of the Initial Consideration, the First Deferred Consideration and the Second Deferred Consideration paid by Vale pursuant to Section 3 prior to the relevant date for determining the Acquired Ownership Interest bears to $2,500,000,000, and in the event that such calculation results in an entitlement to a holding of a fraction of a share, such fraction shall be rounded to the nearest whole number. Column (2) of the below table sets out the Acquired Ownership Interest which Vale would hold as a result of paying the relevant elements of the Purchase Price as shown in column (1).

| (1)<br>Amount of Purchase Price paid | (2)<br>Acquired Ownership Interest (Ordinary Shares representing the proportion of BSGR Guinea's total issued share capital set out below) |
|---|---|
| Initial Consideration | 10.2% |
| Initial Consideration plus First Deferred Consideration | 20.4% |
| Initial Consideration plus Simandou Construction Second Deferred Consideration | 30.6% |
| Initial Consideration plus First Deferred Consideration plus Simandou Construction Second Deferred Consideration | 40.8% |

**Additional Consideration** has the meaning given in Section 3.

**Affiliate** means, in relation to a specified person, any family relation of such person, any person directly or indirectly Controlling, Controlled by or under direct or indirect common Control with the specified person and shall also include any person who is a director or officer of the specified person or beneficial owner of at least 50% (fifty per cent.) of any class of the then issued share capital of the specified person, and in the case of either Party shall include their respective subsidiaries.

**agents** has the meaning given in Section 3.7(a) of Schedule 4, Part B.

**agreed form** has the meaning given in Section 1.5.

**Agreement** has the meaning given in the Preamble.

**Ancillary Agreements** means the Shareholders' Agreement, the Off-take Term Sheet, the Off-take Agreement, the Vale Loan and the Vale Loan Term Sheet and any technical services agreement entered into by any member of the BSGR Guinea Group with any member of either Party's Group as contemplated by Section 5.6 and any agreement entered into by any member of

the BSGR Guinea Group with any member of either Party's Group as contemplated by Section 5.8, or any of them.

**Anti-Bribery Laws** has the meaning given in the Shareholders' Agreement.

**Applicable Law** means, in relation to any person, property, transaction or event, (i) all applicable provisions of laws, statutes, ordinances, rules, regulations, directives, guidelines and orders of any Governmental Entity; and (ii) the terms of all judgments, orders, awards and decrees issued by any Governmental Entity, in each case, by which such person is bound or submits or having application to the property, transaction or event in question.

**Applicable Sanctions Laws** has the meaning given in Section 3.4 of Schedule 4, Part B.

**Articles** means the Articles of Incorporation of BSGR Guinea, as amended from time to time.

**Basic Agreement** means the Basic Agreement entered into amongst the Republic of Guinea, BSGR Guinea and ProjectCo, dated 16 December 2009, as ratified by Ordonnance No. 003/PRG/CNDD/SGG/2010, dated 19 March 2010.

**Board** means the board of directors of BSGR Guinea.

**BSGR** has the meaning given in the Preamble.

**BSGR Accounts** means BSGR's annual accounts for the financial year ended on 31 December 2008 which are included in the Disclosure Bundle at Section 1X (tab 6).

**BSGR Advisory Company** means any and each of BSGR Treasury Services Limited, Resources Advisory Services Limited and Onyx Financial Advisors Limited.

**BSGR's Bank Account** means an account held at JPMorgan Chase Bank, N.A. New York (CHASUS33) under direct SWIFT advice to JPMorgan Chase Bank, N.A., CHASGB2L for the account of JPMorgan Chase Bank, N.A. (CHASGB2L) with account number 0010962009 for further credit to the Ultimate Beneficiary BSG Resources Limited with the account number being 40867501 and the IBAN being GB76CHAS60924240867501.

**BSGR Directors** has the meaning given in the Shareholders' Agreement.

**BSGR Dividend Amount** means an amount equal to (but not exceeding) the Loan Repayment Amount subject only to the reduction of such amount by the amount of (i) any tax that is required to be withheld in respect of any dividend or other distribution paid or (ii) any interest on any loan made, in either case, by ProjectCo or any other member of the BSGR Guinea Group (other than Liberia HoldCo or Liberia ProjectCo) in order to create a distributable profit or to ensure there is sufficient cash within BSGR Guinea for the purpose of paying the dividend contemplated in Section 6.4.

**BSGR Group** means BSGR and its Affiliates from time to time but, for the avoidance of doubt, excluding with effect from Completion any BSGR Guinea Group Company.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**BSGR Guinea** has the meaning given in Recital (A).

**BSGR Guinea Accounts** means the "Statements of Financial Affairs" of BSGR Guinea as of 31 December 2009 which are included in the Disclosure Bundle at Section 1F (tab 1).

**BSGR Guinea Accounts Date** means 31 December 2009.

**BSGR Guinea Group** means BSGR Guinea, ProjectCo, Liberia HoldCo and Liberia ProjectCo and **BSGR Guinea Group Company** means any and each of these companies.

**BSGR Guinea's Bank Account** means the bank account of BSGR Guinea notified, from time to time, for the purpose of a payment to BSGR Guinea under this Agreement.

**BSGR Principals** has the meaning given in Section 1.8.

**BSGR Subscription** has the meaning given in Section 5.4(a).

**BSGR Subscription Trigger Date** has the meaning given in Section 5.4.

**BSGR Warranties** has the meaning given in Section 8.1.

**Business Day** means a day other than a Saturday or Sunday or public holiday in England and Wales, the United States or Brazil on which banks are open in London, New York and Rio de Janeiro for general commercial business.

**Business Plan** has the meaning given in the Shareholders' Agreement.

**Claim** means a Warranty Claim, Indemnity Warranty Claim, Tax Claim or Guernsey Loan Indemnity Claim.

**Competing Business** has the meaning given in Section 13.4(a).

**Completion** has the meaning given in Section 4.1.

**Completion Date** has the meaning given in Section 4.1.

**Concession Areas** means:

> (a)     the area that is the subject of the Mining Concession (the "**Zogota Concession Area**");

> (b)     the area which is the subject of the mineral exploration permit granted under decree no. A 2008/I-4980/MMG/SGG, dated 9 December 2008 and registered in the Centre de Promotion et de Développement Miniers under number A 2008/132/DIGM/CPDM (the "**Simandou Concession Area**"); and

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(c)    the area which is the subject of the mineral exploration permit granted under decree no. A 2009/1327/PR/MMEH/SGG, dated 10 June 2009 and registered in the Centre de Promotion et de Développement Miniers under number A 2009/124/DIGM/CPDM.

**Confidential Information** has the meaning given in Section 15.1(a).

**Confidentiality Agreement** means the agreement relating to certain confidential information between BSGR and Vale South Africa (PTY) Ltd dated 22 February 2010.

**Constitutional Documents** has the meaning given in Section 4.2(d)(i).

**Control** means in respect of an entity, the capacity (other than through the exercise of minority rights under the Shareholders' Agreement) to direct or cause the direction of the management and policies of such entity, directly or indirectly, whether through the ownership of voting securities, by agreement, as trustee or executor, or otherwise, and the terms **Controlling** and **Controlled by** shall be construed accordingly.

**Date of First Commercial Production** means the date on which first commercial production occurs as determined in accordance with the Basic Agreement.

**Debt Free Warranty** means the statement set out in Section 7.1 of Schedule 4, Part B.

**Default Interest** means interest at LIBOR plus 3 per cent.

**Deferred Shares** has the meaning given in the Shareholders' Agreement.

**Disclosure Bundle** means the disclosure bundle prepared by BSGR for Project Hills and annexed to the Disclosure Letter.

**Disclosure Letter** means the letter from BSGR to Vale executed and delivered immediately before the signing of this Agreement.

**Disputed Tax Claim** shall have the meaning given in Section 3.3(a) of Schedule 10.

**Dividend Reserve Amount** has the meaning given in the Shareholders' Agreement.

**Employee Benefits** means all agreements and other commitments, whether of an individual or collective nature and including commitments based on works custom, regarding employee benefits such as anniversary, holiday or jubilee payments, bonus, profit participation or other variable remuneration elements, and stock options, stock appreciation rights or similar rights, other than pensions, granted by any member of the BSGR Guinea Group.

**Encumbrance** means any mortgage, security interest, charge, pledge, lien, right of pre-emption, right of first refusal, third party right, option or other encumbrance whatsoever (including, without limitation, a title transfer or retention arrangement) having similar effect.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Event** means an event, act, transaction or omission, including, without limitation, a receipt or accrual of income or gains, distribution, failure to distribute, acquisition, disposal, transfer, payment, loan or advance.

**Exchange Rate** means, with respect to any particular currency or currencies for a particular day, the closing midpoint spot rate of exchange in New York City, New York for such currency into dollars on such date as reported in The Wall Street Journal which is first published thereafter or, where no such rate is so reported in respect of that currency for such date, at the rate quoted by Citibank, N.A. (or its successor) in New York City, New York as at the close of business in New York City, New York on such date.

**Exploration Permits** means (i) the Guinea Exploration Permits and (ii) the Liberia Exploration Permits.

**FCPA Warranties** means the statements set out in Part B, Sections 3.4 to 3.7 (inclusive) and 8.3 (but only to the extent that a Claim thereunder relates to a breach of Anti-Bribery Laws) of Schedule 4.

**Feasibility Study** means the feasibility study in respect of the Zogota Concession Area and Blocks 1 and 2 of the Simandou Concession Area and the Project to be conducted and completed by ProjectCo based on the parameters and standards set out in Schedule 9.

**Feasibility Study Approval Date** has the meaning given in Section 5.1(d).

**Feasibility Study Completion Date** has the meaning given in Section 5.1(c).

**Feasibility Study Continuation Date** has the meaning given in Section 5.2(c).

**Feasibility Study Interruption Circumstances** has the meaning given in Section 5.2(b).

**Feasibility Study Interruption Date** has the meaning given in Section 5.2(b).

**Feasibility Study Interruption Notice** has the meaning given in Section 5.2(b).

**Feasibility Study Interruption Solution** has the meaning given in Section 5.2(b).

**Feasibility Study Period** means, subject to Sections 5.2 and 5.3, the period of two years commencing on the Completion Date or, if, prior to the expiry of such period, Vale in its sole discretion serves a notice in writing on BSGR electing to extend such period (an "**Extension Notice**"), the period of three years commencing on the Completion Date. For the avoidance of doubt, the service of any Feasibility Study Interruption Notice or notification of a Feasibility Study Continuation Date, in each case, pursuant to and in accordance with the terms of Section 5.2 shall not constitute an Extension Notice.

**Feasibility Study Period Expiry Date** means the final date of the Feasibility Study Period, as such date may be extended from time to time by an Extension Notice or in accordance with Sections 5.2 and 5.3.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**First Deferred Consideration** has the meaning given in Section 3(b).

**Force Majeure Event** has the meaning given in Section 12.6.

**Funding Amount** has the meaning given in Section 6.1(a)(i).

**Governmental Entity** means (i) a national government, political subdivision thereof, or local jurisdiction therein; (ii) an instrumentality, board, commission, court or agency, whether civilian or military, of any of the above or with jurisdiction in the same legal jurisdiction of any of the above, however constituted; or (iii) a government-owned/government-controlled association, organization, business or enterprise.

**Government Official** has the meaning given in Section 3.7(b) of Schedule 4, Part B.

**Group** means in respect of an entity that entity and its Affiliates from time to time.

**Guernsey Loan Indemnity Claim** means a claim under Section 8.4.

**Guinea Exploration Permits** means (i) the mineral exploration permit granted under decree no. A 2008/I-4980/MMG/SGG, dated 9 December 2008 and registered in the Centre de Promotion et de Développement Miniers under number A 2008/132/DIGM/CPDM and (ii) the mineral exploration permit granted under decree no. A 2009/1327/PR/MMEH/SGG, dated 10 June 2009 and registered in the Centre de Promotion et de Développement Miniers under number A 2009/124/DIGM/CPDM.

**Indebtedness** means with respect to any person (i) all indebtedness of such person for borrowed money, (ii) all obligations of such person evidenced by notes, bonds or similar instruments, (iii) all indebtedness created under any conditional sale or other title retention agreement, (iv) all obligations of such person as lessee under leases that have been or should be recorded as capital leases, (v) all obligations of such person under acceptance, letter of credit or similar facilities, (vi) all obligations of such person to purchase, redeem, retire or otherwise acquire for value any equity interests of such person, (vii) all obligations of such person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of business), (viii) all obligations of such person in respect of interest rate swaps, caps or collar agreements or similar arrangements, and (ix) all indebtedness of others referred to in clauses (i) through (viii) above guaranteed directly or indirectly in any manner by such person or secured by any Encumbrance on the property of such person.

**Indemnity Warranty** means a statement contained in Sections 3.2, 3.4 to 3.7 (inclusive), 7.1, 8.3 (but only to the extent that a Claim thereunder relates to a breach of Anti-Bribery Laws) or 12 of Schedule 4.

**Indemnity Warranty Claim** means a claim by Vale for breach of an Indemnity Warranty.

**Initial Consideration** has the meaning given in Section 3(a).

**issued share capital** or any equivalent expression means with respect to BSGR Guinea the aggregate number of Ordinary Shares outstanding from time to time, excluding Deferred Shares.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Key Employees** has the meaning given in Section 13.1(a).

**LCIA Rules** has the meaning given in Section 16.10(b).

**Liberia Exploration Permits** means the following mining exploration licenses in the territory of Liberia: (i) MEL 12006 (known as Zezia Range) issued on 10 September 2008 by the Government of Liberia, (ii) MEL 12007 (known as St John's River South) issued on 28 November 2008 by the Government of Liberia, and (iii) MEL 12008 (known as St John's River East) issued on 28 November 2008 by the Government of Liberia.

**Liberia Group Transfer** means the transaction whereby Liberia Holdco became a direct subsidiary and Liberia ProjectCo became an indirect subsidiary of BSGR Guinea.

**Liberia HoldCo** has the meaning given in Recital (A).

**Liberia HoldCo Accounts** means the annual accounts of Liberia HoldCo for the financial year ending on 31 December 2009 which are included in the Disclosure Bundle at Section 7 (tab 38).

**Liberia ProjectCo** has the meaning given in Recital (A).

**Liberian Dividends** means any dividend or other distribution representing distributable profits derived from Liberia ProjectCo or Liberia HoldCo with respect to the exploitation of the Liberia Exploration Permits.

**Liberian Transport Solution** has the meaning given in Section 5.5.

**Liberian Transport Solution Construction Works** means the construction or installation by or on behalf of any member of the BSGR Guinea Group of port facilities in Liberia (other than at Buchanan) for the export of at least 50 million metric tonnes per annum of iron ore or rail facilities in Liberia (other than in relation to any rail facilities in existence as at the date of this Agreement) for the transportation of at least 50 million metric tonnes per annum of iron ore.

**Liberian Transport Solution Effective Date** has the meaning given in Section 5.5.

**LIBOR** means the display rate per annum of the offered quotation for deposits in $ for a period of one month which appears on the appropriate page of the Reuters Screen (or such other page as the parties may agree) at or about 11.00 a.m. London time on the date on which payment of the sum under this Agreement or any Ancillary Agreement was due but not paid.

**Loan Repayment Amount** means the lesser of:

(a)     the amount which is equal to 50 per cent. of the amount which is calculated by deducting the Dividend Reserve Amount from the Permissible Dividend Amount; and

(b)     the amount which is equal to the sum of the principal amount and any capitalised interest then outstanding under the Vale Loan.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Losses** means any and all losses, liabilities, costs (including legal costs), claims, demands, expenses (including Tax) and/or damages (but excluding any such amounts if and to the extent that they would comprise a claim for any punitive, special, indirect or consequential loss, loss of profit or loss of revenue (save where such loss of revenue relates to a contract entered into by any member of the BSGR Guinea Group prior to Completion and in respect of only loss of revenue prior to Completion) or incidental damage or for any loss of goodwill or possible business before or after Completion, whether actual or prospective ("**Excluded Losses**")); provided that no Excluded Loss shall have the effect of limiting or excluding the ability to recover in respect of any other head of Loss other than Excluded Losses in respect of any relevant claim or breach and **Loss** shall be construed accordingly.

**Management Accounts** means the "Statement of Financial Affairs" of the BSGR Guinea Group as of 31 March 2010 which are included in the Disclosure Bundle at Section 7 (tab 33).

**Mining Concession** means the mining concession granted to ProjectCo by decree no. D2010/024/PRG/CNDD/SGG, dated 19 March 2010, following the Basic Agreement.

**OECD Convention** has the meaning given in Section 3.6 of Schedule 4, Part B.

**Off-take Agreement** means the agreement in the form to be finalized and executed pursuant to Section 5.10 of this Agreement between ProjectCo and Vale International S.A. in respect of the sale and purchase of the entire output of iron ore of the mines in the Concession Areas.

**Off-take Term Sheet** has the meaning given in Section 4.2(b)(ii).

**Ordinary Shares** means ordinary shares of $1.00 each in the capital of BSGR Guinea.

**Parties** has the meaning given in the Preamble.

**Permissible Dividend Amount** has the meaning given in Section 6.4(a).

**Project** means the (i) designing, financing, development and operation by ProjectCo of (i) iron ore mines within the Concession Areas (any such iron ore mine having an intended annual production of 50 million dry metric tonnes of iron ore product per calendar year),  (ii) transportation and export of these minerals by railway or otherwise; and (iii) related infrastructure, facilities and activities.

**ProjectCo** has the meaning given in Recital (A).

**ProjectCo Accounts** means the annual accounts of ProjectCo for the financial year ending on 31 December 2009 which are included in the Disclosure Bundle at Section 7 (tab 34).

**Project Financing** has the meaning given in Section 6.2.

**Properties** means the immovable property referred to in Section 7 (tab 25) of the Disclosure Letter.

**Purchase Price** has the meaning given in Section 3.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Relevant Business Opportunities** has the meaning given in Section 13.2(b).

**Relevant Ownership Percentage** means the percentage amount which the issued share capital of BSGR Guinea held by Vale (or any of its Affiliates) at such time bears to the total issued share capital of BSGR Guinea at such time.

**Representatives** has the meaning given in Section 15.1(b).

**Royalties Agreement** means the Royalty and Technical Advisory Agreement in respect of the Project between ProjectCo and BSGR.

**Sale Shares** means 51 Ordinary Shares.

**Second Deferred Consideration** has the meaning given in Section 3(c).

**Second Deferred Consideration Trigger Date** means the date (if any) on which Vale confirms to BSGR pursuant to Section 5.1(d) that the Feasibility Study has been approved.

**Shareholders' Agreement** has the meaning given in Section 4.2(b)(i).

**Simandou Construction Date** means the date (if any) on which any construction or installation works by or on behalf of any member of the BSGR Guinea Group commence for the purpose of mining or processing activities in the Simandou Concession Area, including the construction or installation of rail facilities, in relation to an industrial scale project for the production of at least 25,000,000 metric tonnes of iron ore per annum ("**Simandou Construction Works**") provided that:

<ol type="a">
<li>the undertaking of investigations, surveys or tests to determine the viability of the mine or any such project; and</li>

<li>the construction or installation of roads or other elements of infrastructure which are intended to support or which are ancillary to any Simandou Construction Works,</li>
</ol>

shall, in each case, not comprise Simandou Construction Works.

**Simandou Construction Second Deferred Consideration** has the meaning given in Section 3(c).

**Subscription Notice** has the meaning given in Section 6.1(a).

**Substantiated Claim** means a Claim for which BSGR is liable under this Agreement and in respect of which (i) liability for such Claim has been accepted or admitted in writing by BSGR; or (ii) the Claim has been determined in favor of Vale pursuant to Section 16.10 or otherwise.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Tax** or **Taxation** means all governmental, state, community, local, municipal or regional taxes, levies, imposts, duties, charges, deductions, withholdings and social security contributions of any kind arising in any part of the world including, without limitation:

    (a)    corporation tax, income tax, capital or chargeable gains tax, inheritance tax, value added tax, national insurance contributions, social security contributions, capital duty, tax on real property, dwellings profits tax, stamp duty, stamp duty reserve tax, stamp duty land tax, document duty, transfer taxes, insurance premium tax, landfill tax, climate change levy, aggregates levy, withholdings, retentions and deductions in respect of tax, duties of customs and excise and all taxes on gross and net income, profits or gains, receipts, sales, use, occupation, franchise, added value, personal property or net worth; and

    (b)    all penalties, charges, costs and interest included in or relating to any tax,

in all cases, wherever and whenever imposed and regardless of whether such taxes, penalties, charges, costs and interest are directly or primarily chargeable against or attributable to any party and regardless of whether any such party has or may have any right of reimbursement against any other person.

**Tax Authority** means any revenue, customs or fiscal governmental, state, local, community, municipal or regional authority, body or person anywhere in the world competent to impose or collect Tax.

**Tax Claim** means any claim by Vale:

    (a)    under or for breach of the provisions of Section 8.1 as a result of a breach of a Tax Warranty; or

    (b)    under Schedule 10.

**Tax Warranty** means a statement contained in Section 17 of Schedule 4, Part B.

**Third Party Claim** has the meaning given in Section 11.

**Title Warranty** means the statement set out in Part A, Section 1.2 of Schedule 4.

**United States or US** means the contiguous United States of America, including the District of Columbia, the states of Alaska and Hawaii, and all off-shore U.S. territories and possessions, such as Puerto Rico.

**Unpaid Amount** has the meaning given in Section 10.2.

**USD or $** means the currency of the United States.

**Vale** has the meaning given in the Preamble.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Vale Loan** means the loan or loans to be made by Vale (or any member of its Group) to ProjectCo (or any other member of the BSGR Guinea Group), in each case, reflecting the terms of the Vale Loan Term Sheet.

**Vale Loan Term Sheet** means the loan term sheet attached as Schedule 3.

**Vale Warranties** has the meaning given in Section 8.2.

**Warranty Claim** means a claim by Vale under or for breach of the provisions of Section 8.1 as a result of a breach of a BSGR Warranty other than the BSGR Warranties under Sections 3.2, 3.4 to 3.7 (inclusive), 7.1, 8.3 (to the extent that a relevant Claim thereunder is for breach of Anti-Bribery Laws) or 12 of Schedule 4.

**Zogota Feasibility Study** means the existing feasibility study for the Zogota Concession Area integrated by the Basic Agreement included in the Disclosure Bundle at Section 2A (tab 1).

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

## SCHEDULE 2

> *Please note that the terms set out in this summary term sheet (including the attached schedules) do not constitute a contract but rather indicate the basic terms upon which a detailed sale and purchase agreement will be drawn up by Vale to be entered into by the Parties. The term sheet includes only key terms in summary form. For the avoidance of doubt Schedule 1 and Schedule 2 form part of this term sheet.*

### TERM SHEET FOR THE PROPOSED PROJECT HILLS

### GUINEA IRON ORE SALE AND PURCHASE AGREEMENT

### (the "Sale and Purchase Agreement")

1. **Purpose** – the Sale and Purchase Agreement will set out the full terms and conditions upon which the Seller shall sell and deliver and the Buyer shall take delivery and purchase iron ore produced from the Concession Areas[1] by the Buyer.

2. **Parties**

   a.  **"Buyer"** – Vale International S.A.; and

   b.  **"Seller"** – BSG Resources (Guinea) S.à.r.l.,

   Each a **"Party"** and together the **"Parties"**.

3. **Effectiveness and Term** – unless the Parties agree otherwise, the Sale and Purchase Agreement will be effective from the date of signature by both of the Parties.  The Sale and Purchase Agreement shall continue in full force and effect for the duration of commercial production of iron ore from the Concession Areas.

4. **Product** – the Sale and Purchase Agreement relates to the entire iron ore output of the mines in the Concession Areas (the **"Product"**).  For the avoidance of doubt, the Sale and Purchase Agreement does not deal with any by-products of iron ore production.

---

[1] "**Concession Areas**" shall have the meaning given to that term in the Joint Venture Framework Agreement between BSG Resources Limited and Vale S.A. (the "**Framework Agreement**").

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

5. **Quality** – the Sale and Purchase Agreement will provide for a detailed specification for the Product, including a target specification and an acceptable range of quality for Product from each mine to be delivered by the Seller to the Buyer. The final specification for each mine can only be produced following the detailed feasibility study for such mine. As such, the Sale and Purchase Agreement will initially set out the procedure by which the specification shall be determined for each mine (or where applicable based on a blend of output from more than one mine). The Sale and Purchase Agreement will set out detailed procedures for determining quality and for resolving any disputes regarding quality of a given shipment, which will be subject to binding determination by an expert.

6. **Sale and Purchase Obligation** – the Seller agrees to sell the Product to the Buyer and to deliver it to the identified delivery point (which will be at the port of Buchanan and/or at the port of Didia when this has been built and commissioned, or such other delivery point as the Parties may agree from time to time) and the Buyer agrees to buy and take delivery of the Product - in each case, subject to detailed provisions relating to quantities, scheduling of deliveries and quality of Product. For a summary of the risk allocation that will apply in relation to these matters see Schedule 1 to this term sheet.

7. **Delivery** – shipments of Product will be delivered on an FOB basis at the relevant delivery point in accordance with INCOTERMS 2000. Title and risk of loss with respect to any shipment of Product will pass at the ship's rail at the loading port in accordance with INCOTERMS 2000. The Sale and Purchase Agreement will contain detailed provisions for scheduling shipments in each contract year and for coordinating delivery dates and vessel timings.

8. **Failure of Seller to supply/failure of Buyer to take delivery** – for a summary of the consequences of a failure by the Seller or the Buyer to perform their respective obligations in relation to the supply, sale, delivery and purchase of Product whether by reason of Force Majeure or default see Schedule 1 to this term sheet. For the avoidance of doubt, the only rights that the Seller shall have to sell any of the Product to a third party during the term of the Sale and Purchase Agreement are those rights identified in Schedule 1 to this term sheet.

9. **Consequences of delays in supply/taking delivery** – for a summary of the consequences of delay by either the Seller or the Buyer in relation to a given shipment see Schedule 1 to this term sheet.

10. **Price** – the Sale and Purchase Agreement will contain detailed provisions for determining the price of each shipment, including the price adjustment for quality of supply that is below the target specification. The Sale and Purchase Agreement will contain a detailed provision explaining how to determine price if any relevant reference price necessary for the purposes of calculating the Actual Contract Price (as defined in Schedule 2) disappears or is otherwise unavailable, or the calculation of such reference price materially changes over time. Schedule 2 to this term sheet sets out the detailed mechanism for calculation of the Actual Contract Price.

11. **Payment** – the Sale and Purchase Agreement will contain standard payment terms for an agreement such as this. Schedule 1 to this term sheet sets out details of the consequences of payment defaults and the resolution of payment disputes. All payments will be in US$ unless the Sale and Purchase Agreement specifies otherwise.

12. **Exclusive Marketing** - the Sale and Purchase Agreement makes the Buyer solely and exclusively responsible for marketing and selling the Product to end customers. Except when necessary to enable the Seller to exercise its right to sell any part of the Product to third parties, which

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

right arises solely in the circumstances expressly provided in this term sheet, the Seller shall not market the Product or discuss pricing, quantities or other sale terms of the Product with any third party without first obtaining the prior written consent of the Buyer and the Buyer shall be entitled to attend all such discussions.  The Seller shall promptly refer all bids, offers and enquiries received by it or any its Affiliates from prospective purchasers to the Buyer.

13. **Taxes** – the Sale and Purchase Agreement will provide for a clear allocation of responsibility for payment of taxes, levies, duties, imposts and like charges (**"Taxes"**) – for further details see Schedule 1 to this term sheet.

14. **Consents** – each Party will be responsible for obtaining and maintaining in force the consents, licences, authorisations and permissions (**"Consents"**) that it requires to perform its obligations under the Sale and Purchase Agreement – for further details see Schedule 1 to this term sheet.  The Seller will, at the request of the Buyer, use reasonable endeavours to assist the Buyer to identify, obtain and maintain and Consents it may require in the Republic of Guinea or the Republic of Liberia.

15. **Force Majeure** – the Sale and Purchase Agreement will contain standard provisions relating to Force Majeure – for further details of certain consequences of Force Majeure see Schedule 1 to this term sheet.

16. **Disputes** – the Sale and Purchase Agreement will provide for resolution of disputes by expert or by arbitration depending upon the nature of the dispute in question.

17. **Changes in Circumstances** – the Sale and Purchase Agreement is expected to be in force for several decades and therefore it is appropriate for either Party to be able to raise and require discussion by the Parties of how to take into account material changes in circumstances – for further details see Schedule 1 to this term sheet.

18. **Governing Law** – the Sale and Purchase Agreement and any dispute or claim (including any non-contractual dispute or claim) arising out of or in connection with it or its subject matter shall be governed by, and construed in accordance with, English law.

19. **Limitations of Liability and Exclusive Remedies** – the Sale and Purchase Agreement will contain standard provisions relating to limitations of liability of each of the Parties arising under and/or in connection with the Sale and Purchase Agreement and in respect of the exclusive remedies available to the Parties in case of defaults. See Schedule 1 for more details of limitations of liability.

20. **Liability for Contractors and Agents** – each Party shall be liable for the actions and omissions of any person to whom it sub-contracts any part of its obligations under the Sale and Purchase Agreement or who it uses to provide a service (e.g. operation of a mine or railway) in relation to the performance of this Sale and Purchase Agreement as if the act and omissions of such person were the acts and omissions of the Party in question.

21. **Indemnities** – the Sale and Purchase Agreement will contain the indemnities identified in Schedule 1 to this term sheet.  In addition, depending upon the nature and scope insurances intended to be taken out by each Party it may be appropriate to include mutual hold harmless indemnities in relation to damage to property and personal injuries that one Party causes to another.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

22. **Warranties –** the Sale and Purchase Agreement will contain standard warranties from each Party in relation to due authorisation, etc.  The Seller will give a warranty of good and marketable title to the Products sold and that the Products are free of liens, but there will be no implied or express warranties in relation to the fitness for purpose or other characteristics of the Products.

23. **Miscellaneous/General** – the Sale and Purchase Agreement will contain typical "boilerplate" provisions for an agreement of this nature (for example, but without limitation:  no partnership created by the Agreement; exclusion of third party contractual rights; assignment provisions; and further assurance)

24. **Exclusion of Uniform Law on Sales, etc**. - the Uniform Law on Sales and the Uniform Law on Formation to which effect is given by the Uniform Laws on International Sales Act 1967, the United Nations Convention on International Sales of Goods of 1980 and the United Nations Convention on Prescription (Limitation) in the International Sales of Goods of 1974 and the amending Protocol of 1980 shall not apply to this Contract

UK-2421081-v8

95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**SCHEDULE 1**

**Guinea Iron Ore Sale and Purchase Agreement – Risk Matrix[2]**

| No. | Risk/issue | Solution |
|---|---|---|
| **Commissioning Output and Commencement of Commercial Output** | | |
| 1. | What to do with Commissioning output? | Commissioning output should be stockpiled, and then blended with iron ore produced during commercial production for sale to final customers. As such, there will be no iron ore purchase prior to the commencement of commercial production. |
| 2. | What if commercial production is behind schedule/ahead of schedule? | No liability for Seller for late commencement of commercial production, equally no bonus for early commencement of commercial production. |
| | | Buyer will offtake output once commercial production commences and Seller is able to make deliveries at the designated delivery point, regardless of whether early or late, with Seller to provide a period of notice of start date. |
| **How to deal with multiple mines/iron ore specifications and Quality Issues Generally** | | |
| 3. | Iron ore is being developed in relation to a number of different mines in Guinea with different product specifications and different development timelines – will they be covered by one contract or multiple contracts? | A single contract covering all iron ore production from the Guinea mines is proposed. |
| | | The product specification for each mine will be drawn up separately taking into account the characteristics of the mine, but the same pricing formula will apply to output from all resources (i.e. the single pricing formulation will be capable of applying to a range of iron ore product specifications). |
| | | In due course, there may be blending of product across mines to produce a single blended product specification. |

---

[2] Note this table does not attempt to identify and allocate every risk that will be addressed in the arm's length sale and purchase agreement – but it does attenmpt to identify some of the key risks that were highlighted during the discussions between Vale International and BSGR

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

| No. | Risk/issue | Solution |
|---|---|---|
| 4. | What is Seller's obligation re-specification of product? | For each mine there will be a target specification. This may need to be varied over time to reflect the exploitation of different parts of the resource at each site.<br><br>Seller will be obliged to use reasonable endeavours to achieve target product specification, and in any case to supply within a stated acceptable range of specification.<br><br>If a given shipment is outside of the target specification but within acceptable specification range, then the Buyer must take delivery and automatic price adjustment for quality applies.<br><br>If a given shipment is outside of acceptable range of specification, then the Buyer will have a right to reject and Seller will indemnify Buyer for any Buyer out of pocket costs, including in relation to vessels (whether Vale or non Vale) and any penalties/charges under Buyer's third party contracts. Indemnity is capped at value of shipment (based on price of target specification). Seller's risk is mitigated by Seller checking specification at the mine.<br><br>If Buyer knowingly accepts out of specification shipment the only impact is a price adjustment based on the pricing formula. |
| 5. | How to deal with variation of ore specification over time? | Contracts will permit adjustment of target specification to take account of different ore bodies being developed over time and any differences between feasibility study results and actual ore body results in commercial production. |
| 6. | Resolution of disputes as to quality of any shipment. | Resolved by expert determination to allow rapid resolution of invoicing and liability issues. |
| 7. | Are there any warranties as to quality? | No express or implied warranties as to merchantability or fitness for a particular purpose.<br><br>There will be an express warranty that deliveries are made free from liens |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

| No. | Risk/issue | Solution |
|---|---|---|
| | | and that Product is sold with good title. |
| **Quantity Issues Generally including impact of FM and default** | | |
| 8. | Defining the annual contract quantity. | The annual contract quantity for a given contract year shall be determined in advance of the start of that contract year, based on the anticipated production schedule, which shall reflect the level of anticipated market demand agreed by the Buyer and the Seller for each separate specification of Product and any physical constraints at the mines. The agreement will set out the detailed procedure for determining the annual contract quantity. |
| 9. | Buyer's ability to vary shipment size within each contract year. | The agreement will provide for a target number of shipments per calendar year to achieve the annual contract quantity and, subject to meeting the annual contract quantity, Buyer will have the ability to modulate shipment size within defined parameters to help it to match supply to demand within the contract year.<br><br>Individual shipments will have a tolerance of +/- 10% for vessel trimming. |
| 10. | Not Used | Not Used |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

| No. | Risk/issue | Solution |
|-----|------------|----------|
| **11.** | Shipments are interrupted due to Seller FM of Buyer FM. | Sale and Purchase Agreement will contain market standard FM definition and structure for claiming FM by either party.<br><br>If a claim of FM < 3 months, then each party has a reasonable endeavours obligation to try to catch up the volume not delivered/purchased due to such FM in same contract year (or the same and the following contract year if cannot be fully accommodated within same contract year).<br><br>If a claim of FM > 3 months, then the party not claiming FM may cancel the volume; if not cancelled, parties have reasonable endeavours obligation to try to catch up the volume not delivered/purchased due to such FM in same contract year (or the same and the following contract year if cannot be fully accommodated within same contract year).<br><br>Annual contract quantity is adjusted to take account of FM and any applicable catch-up.<br><br>Note: wherever such a volume catch-up structure applies in the agreement, the reasonable endeavours obligation for the Buyer entails finding additional customers/markets or increased volume demand from existing customers, it does not require Buyer to substitute project output for output from its other mines or to reduce the sale price in order to sell additional volumes at the expense of its sale margins.  Also, any quantities that are caught up (whether following default or FM are paid for at the price applicable at the date of actual delivery not the date that a shipment was originally due).<br><br>Neither party has a right to terminate due to extended FM.<br><br>Each party bears its own costs/losses due to FM.<br><br>Seller has the right to sell to third parties in case a Buyer claim of FM lasts more than 3 months. |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

| No. | Risk/issue | Solution |
|---|---|---|
| 12. | Shipments are interrupted due to Seller default. | In case where caused by Seller default, Seller will indemnify Buyer for any Buyer out of pocket costs arising due to shipment interruption, including in relation to vessels (whether Vale or non Vale) and any penalties/charges under Buyer's third party contracts.<br><br>Indemnity is capped at value of shipment (based on price as at proposed delivery date of target specification or, if known, actual specification).<br><br>No right of termination provided that indemnity is paid.<br><br>At Buyer's option, each party has a reasonable endeavours obligation to try to catch up the volume lost due to Seller default in same contract year (or same and following contract year if cannot be fully accommodated within same contract year).<br><br>Annual contract quantity shall be adjusted to take account of default and any applicable catch-up. |
| 13. | Buyer fails to take shipments due to Buyer default. | In case where caused by Buyer default, Buyer will indemnify Seller for any Seller out of pocket costs arising due to shipment interruption, including in relation to port and storage costs.<br><br>Indemnity is capped at value of shipment (based on price as at proposed delivery date of target specification or, if known, actual specification).<br><br>No right of termination provided that indemnity is paid.<br><br>Seller has the right to sell to third parties in case of Buyer failing to take shipments due to Buyer default in excess of 3 months duration.<br><br>At Seller's option, each party has an reasonable endeavours obligation to try to catch up the volume lost due to Buyer default in same contract year (or same and following contract year if cannot be fully accommodated within same contract year).<br><br>Annual contract quantity shall be adjusted to take account of default and any applicable catch-up. |

UK-2421081-v8

95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

| No. | Risk/issue | Solution |
|---|---|---|
| **Delay Costs – delays in delivery of shipments** | | |
| 14. | How are deliveries scheduled. | Sale and Purchase Agreement will include a standard administrative procedure for identifying the scheduled date for each shipment, so as to enable determination of delays and allocate responsibility accordingly. |
| 15. | If Seller is late in delivering a shipment other than due to FM. | Seller pays demurrage costs incurred by the Buyer and Buyer's out of pocket costs (e.g. any demurrage charges that are payable by Buyer to a third party where the relevant vessel is a third party vessel) resulting from such delay. |
| 16. | If Buyer is late in taking delivery of a shipment other than due to FM. | Buyer pays Seller any additional storage and port costs resulting from such delay. |
| **Changing Circumstances** | | |
| 17. | Circumstances at some point in the future are fundamentally and materially different from those at the time that the Parties entered the contract. | The Sale and Purchase Agreement will provide for a right for either Party to request that the Parties meet to discuss and attempt to agree any necessary or appropriate changes where circumstances relating to the obligations and benefits of the Parties have fundamentally and materially altered since the date of the Sale and Purchase Agreement. <br><br> Neither Party shall be under any obligation to agree to such changes. |
| **Payment/Non-Payment** | | |
| 18. | Obligation to pay/effect of non-payment. | The Parties are to agree the payment terms that will be included in the Sale and Purchase Agreement, provided that the period within which payment is to be made shall follow Buyer's practice with their clients but shall be no longer than 45 days from delivery.. <br><br> Each invoice to be accompanied by appropriate level of supporting data/documentation (noting that confidentiality may apply to Buyer's third party contracts preventing full disclosure). <br><br> Right to withhold payment in relation to disputed amounts.  Non-disputed amounts to be paid even if part of invoice is disputed. |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

| No. | Risk/issue | Solution |
|---|---|---|
| | | Expert procedure for resolution of disputes shall apply in relation to invoiced amounts. |
| | | Interest to accrue on late payments and withheld disputed payments determined to be correctly payable. |
| | | Non-payment will be a material breach giving rise to right to terminate but only after substantial cure period and escalation of non-payment issue to senior management. |
| | | Non-defaulting party to have a right to suspend its obligations to deliver/purchase during period of non-payment of an undisputed sum.  Any such suspension period ends automatically upon payment. |
| | | Annual contract quantity will be adjusted to take account of period of suspension. |
| | | Seller to have right to sell to third parties during any such period of suspension once the cure period for non-payment has ended. |
| **Taxes** | | |
| 19. | Division of Responsibility for taxes. | There is a clean division of responsibility of each party for payment of taxes. |
| | | Seller is responsible for all taxes on its operations and taxes in country of origin (i.e. Guinea and Liberia) and Buyer is responsible for all taxes on its operations (including any Taxes on its vessels) and taxes outside of the country of origin.  There is no pass through of any such Taxes from one party to the other. |
| | | Each party is responsible for Taxes imposed on its revenue (i.e. corporation tax) without recourse to the other party. |
| | | If for any reason a party pays a tax that is for the account of the other party then the party that pays will be indemnified  by the other party. |
| | | Changes in tax rates are at the risk of the paying party. |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

| No. | Risk/issue | Solution |
|---|---|---|
| | | |
| **Consents/Licences** | | |
| 20. | Obligation to obtain and maintain necessary consents/licences. | Each party to obtain and maintain the Consents required by it to perform its obligations.

Seller is responsible for export licences at port of delivery to Buyer (and export from Guinea/import into Liberia in order to get product to port). |
| **Limits on Liability and Exclusive Remedies** | | |
| 21. | Exclusion of liability for consequential loss.



Are remedies expressly referred to in the agreement the exclusive ones available to the parties? | Standard exclusion of liability of either party for any special, indirect or consequential loss or loss of profit or anticipated profit, loss of sales or turnover, loss or customers, loss of or damage to reputation, loss of revenue, loss of goodwill, loss of opportunity or other special loss or damage consequential loss  shall apply, but this will not prevent recovery of categories of costs expressly set out in the Sale and Purchase Agreement and will not apply to standard exceptions for fraudulent misrepresentation or death or personal injury caused  by negligence.

The Sale and Purchase Agreement will include a standard exclusive remedies clause for a contract of this type. |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**SCHEDULE 2**

**PRICE**

## Summary of Calculation of the purchase price per dry metric ton

All sales under the Agreement will be made on an FOB basis by the Seller to the Buyer.

Consistent with Vale's overall sales strategy it is the intention that all sales by the Buyer to its customers will be made on a CFR basis by reference to a particular unloading port.

For each shipment of Product delivered FOB under the Sale and Purchase Agreement, the Seller shall invoice the Buyer based on the quantity of the shipment and the contract price per dry metric ton applicable respectively to the iron ore fines and any lump ore in that shipment – this will be calculated by reference to the actual average CFR price achieved by the Buyer in that Quarter, less a market based freight adjustment.

For the purposes of this Agreement a **Quarter** shall be a period of 3 calendar months ending on 31 March, 30 June, 30 September and 31 December.
## 1. Calculation of the Actual Contract Price (iron ore fines)
For a given Quarter, x,  the Actual Contract Price per dry metric ton of iron ore fines shall be the higher of the **Adjusted Base Purchase Price** for that period and the **Floor Price** for that period.

## 2. Calculation of the Base Purchase Price (iron ore fines)
**Base Purchase Price$_x$** for iron ore fines means, in respect of any Quarter, x shall be calculated as follows:
(i) If that Quarter is the Quarter in which supplies are first made under this Agreement, the Base Purchase Price for that Quarter will be provisionally calculated based on the tonnage weighted average price per dry metric ton of Carajás iron ore fines supplied CFR to Vale's top 5 Chinese clients (by volume) in the previous Quarter (based on the best information available at the end of that previous Quarter[3]) adjusted for freight (as provided below) to give an FOB Liberia equivalent price. This shall provide provisional Base Purchase Price that will be used for the purpose of invoicing during the Quarter.  As soon as reasonably practicable once the relevant information is available following the end of the Quarter, the Buyer will undertake a reconciliation calculation comparing the provisional Base Purchase Price and the tonnage weighted average FOB Liberia equivalent price based on the

---

[3] Note that not all invoices in relation to the shipments in a given Quarter will have been issued by the end of that Quarter, so the provisional price will be based on the information available at the end of the Quarter not on the full complement of invoices for shipments in that Quarter.  Since it is a provisional price this does not matter because any inaccuracy will be cancelled out by the reconciliation calculation which is only undertaken once full information is available to calculate the actual Base Purchase Price.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

tonnage weighted average CFR price per dry metric ton of iron ore fines supplied by the Seller under the Seller's sale contracts[4] to customers for each unloading port[5] adjusted for freight (as provided below), which shall be the actual Base Purchase Price for that Quarter.  Any difference between the provisional Base Purchase Price that was used for invoicing under this Agreement and the actual Base Purchase Price for the Quarter shall be reflected in a reconciliation payment, which shall be payable within [•] Business Days of such calculation by the Buyer to Seller or by the Seller to the Buyer as necessary.

(ii) In respect of any subsequent Quarter, the Base Purchase Price for the previous Quarter (using the provisional Base Purchase Price for that previous Quarter until such time as the actual Base Purchase Price for that previous Quarter is available) shall be used as a provisional Base Purchase Price that will be used for the purpose of invoicing during the Quarter. As soon as reasonably practicable once the relevant information is available following the end of the Quarter, the Buyer will undertake a reconciliation calculation comparing the provisional Base Purchase Price for that Quarter and the tonnage weighted average FOB Liberia equivalent price based on the tonnage weighted average CFR price per dry metric ton of iron ore fines supplied by the Seller under the Seller's sale contracts to customers for each unloading port adjusted for freight (as provided below), which shall be the actual Base Purchase Price for that Quarter.  Any difference between the provisional Base Purchase Price that was used for invoicing under this Agreement and the actual Base Purchase Price for the Quarter shall be reflected in a reconciliation payment which shall be calculated as soon as reasonably practicable once the information becomes available to the Buyer and which shall be payable within [•] Business Days of such calculation by the Buyer to Seller or by the Seller to the Buyer as necessary.

In each case, the Base Purchase Price shall be calculated by an independent auditor from an internationally recognised auditing company appointed by the Buyer.  The Buyer will not be required to disclose its third party contracts to the Seller (due to confidentiality restrictions) but will be required to disclose them to this independent auditor for them to calculate the relevant average price.

### 3. Calculation of the Freight Adjustment

The Buyer proposes that the freight adjustment required to adjust the tonnage weighted average CFR prices referred to in this Schedule so as produce an FOB equivalent price will calculated in respect of each unloading port on the basis of the **standard freight adjustment** defined below.

**Standard Freight Adjustment** (for Didia port) – for the first Quarter of supply, the weighted average CFR price calculated on the basis of Vale's 5 biggest Chinese clients (by volume) – see 2(i) above – will be adjusted for freight by deducting from this average price the average price spot freight market price per dry metric ton for freight for the previous Quarter for freight between Liberia and the relevant unloading ports.  This will create the provisional Base Purchase Price for the first Quarter.

The provisional Base Purchase Price for every subsequent Quarter will be equal to the actual Base Purchase Price from the immediately previous Quarter - no further standard freight adjustment is required since it has already been applied to produce the actual Base Purchase Price calculation.

The standard freight adjustment for the actual Base Purchase Price for the first Quarter and every subsequent  Quarter will be calculated by deducting

---

[4] For the avoidance of doubt, if a customer of the Buyer takes delivery but fails to pay the full contract price under the relevant supply contract between it and the Buyer, this non-payment is the Buyer's risk and the contract price in the supply contract will continue to apply for the purposes of calculating the Base Purchase Price hereunder.  If the customer fails to take delivery of a shipment then the Buyer will be forced to look for alternative customers.  The sale price under the sale contract for the sale of the shipment to such an alternative customer will in these circumstances be the price that will used be for the purposes of calculating the Base Purchase Price hereunder.

[5] Note that where tonnage weighted average prices per unloading port are referred to in this Schedule these are calculated by first calculating the tonnage weighted average price for each route adjusted for freight and then calculating the average of these tonnage weighted averages to give a single figure.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

from the actual CFR average price calculation applicable to that Quarter the actual average spot freight market price per dry metric ton for freight between Liberia and the relevant unloading ports for that Quarter.

For Products to be delivered from Buchanan, the freight rate to be used as reference for standard freight adjustment shall be the same freight rate agreed by Vale International S.A with the owners of the vessels.

Freight to be paid shall be deemed earned on cargo as taken on board, non-returnable, vessel and/or cargo lost or not lost.

If a published market reference spot freight price per dry metric ton is available for the freight for Liberia to the relevant unloading port, then this will be used for the purposes of the above calculations. If, for whatever reason, no such price is available for the relevant Quarter, the Parties shall use an equivalent freight price based on the Tubarao to unloading port rate, calculated based on shipping parameters, for each unloading port, as follows:
*[Vale to confirm]*

In each case, the freight price per dry metric ton will be calculated using the freight price in US Dollars per metric ton divided by (1 minus % $H_2O$) where **% $H_2O$** is the moisture content of iron ore fines (or lump ore in case of lump ore shipments) in % basis.

## 4. Calculation of the Adjusted Base Purchase Price

For any Quarter, x, the **Adjusted Base Purchase Price$_x$ per dry metric ton of iron ore fines** = **Base Purchase Price$_x$ minus the Marketing Adjustment Amount$_x$ minus any Floor Price Compensation Adjustment Amount$_x$**

## 5. Calculation of the Floor Price

From time to time the Buyer shall have the right to propose a Floor Price that would set a minimum price floor (on a per dry metric ton basis) for all iron ore fines sales under this Agreement (subject to any maximum quantity per calendar year proposed by the Buyer) for a given duration proposed by the Buyer (for example a period of one year or a period of five years). The Floor Price will be calculated based on FOB sales at a Designated Port in Liberia.

In exactly the same way as for sales of iron ore fines, the Buyer shall have the right to a Floor Price that would set a minimum price floor (on a per dry metric ton basis) for all iron ore lump under this Agreement (subject to any maximum quantity per calendar year proposed by the Buyer) for a given duration proposed by the Buyer (for example a period of one year or a period of five years). The Floor Price will be calculated based on FOB sales at a Designated Port in Liberia.

When it proposes any Floor Price (whether for iron ore fines or lump ore) the Buyer shall also specify the % risk fee that would be used to calculate the Floor Price Adjustment Amount if the Seller agrees to accept the proposed Floor Price. The % risk fee is intended to compensate the Buyer for providing the guaranteed floor price to the Seller and the risks arising from that and, as such, the higher the guaranteed Floor Price the higher the % risk fee that the Buyer will propose.

Any Floor Price proposed by the Buyer (whether for iron ore fines or lump ore) shall only apply to sales of iron ore under this Agreement if the Seller agrees to accept the Buyer's proposed Floor Price. Once agreement has been reached on a Floor Price, that Floor Price will apply for the period proposed by the Buyer to all iron ore sales under this Agreement during the proposed period subject to any maximum quantity limit.

For the avoidance of doubt, if there is no Floor Price agreed for a particular Quarter, the Floor Price for that Quarter shall be deemed to be zero.

If the Seller proposes to put in place any price hedge or price support mechanism, the Buyer shall have a right to match any such offer obtained from a third party.

## 7. Calculation of the Floor Price Compensation Adjustment Amount

 For any given Quarter, x, to calculate the Adjusted Base Purchase Price,  the Floor Price Compensation Adjustment Amount for that Quarter shall be equal to the product of the Base Purchase Price for that Quarter and the % risk fee that has been agreed by the Parties in relation to the proposed Floor Price for that Quarter.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

For the avoidance of doubt, if no Floor Price applies to a Quarter the Floor Price Compensation Adjustment Amount shall be zero.

If a Floor Price applies just to a part of a given Quarter, the Floor Price Compensation Amount calculated per (a) and (b) above will be pro rated to reflect the fact that it does not apply to the full Quarter.

### 8. Calculation of the Marketing Adjustment Amount

For any given Quarter, x, to calculate the Adjusted Base Purchase Price the Marketing Adjustment Amount shall be equal to the product of the Base Purchase Price for that Quarter and 4%.

### 9. Calculation of the Actual Contract Price (lump ore)

Exactly the same pricing formula as that which is used to calculate the Actual Contract Price for iron ore fines shall be used to calculate the Actual Contract Price for lump ore, the only difference being that the price per dry metric ton of lump ore will tend to be a different (and higher) price than that applicable for iron ore fines.

The invoice in respect of any given shipment will include an amount payable for the iron ore fines in that shipment and a separate amount payable for the lump ore in that shipment, in each case calculated as specified in this Schedule.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

# SCHEDULE 3

# FORM OF VALE LOAN

## KEY TERMS AND CONDITIONS

*This is a summary of the key terms and conditions of the proposed loan agreement between the Lender ,the Borrower and BSGR Guinea to be entered into in accordance with the Joint Venture Framework Agreement ("JVFA") and the Shareholders' Agreement (the "**Loan Agreement**"). The Loan Parties agree to negotiate the Loan Agreement in good faith and in the spirit of the JVFA and the Shareholders' Agreement.  Where this Schedule is silent, or where it refers to a position in general terms, the final form Loan Agreement will be consistent with the terms of this Schedule and otherwise in accordance with customary terms and conditions for arm's length loan agreements of the nature envisaged by the JVFA to the extent consistent with the terms of, or provisions contemplated by, the JVFA  and/or the Shareholders' Agreement and in the case of any inconsistency, the terms of the JVFA and/or Shareholders' Agreement shall prevail.  Vale may, at its sole option, require the borrower (and any Additional Borrower) to enter into either (a) a single loan agreement based on these key terms and conditions or (b) two identical loan agreements based on these key terms and conditions, with the loans under each agreement being proportional to the respective shareholdings  of Vale and BSGR in BSGR Guinea as at the date that the Loans are entered into references to the facility below should be interpreted accordingly .Unless otherwise defined in this Schedule, defined terms shall have the meaning given in the JVFA.*

(a)  **Parties:**        (1) Vale International S.A.[6] (the "**Lender**");

(2) BSG Resources (Guinea) S.a.r.l. (the "**Borrower**"); and

(3) BSG Resources (Guinea) Limited ("**BSGR Guinea**").

(together, the "**Loan Parties**")

(b)  **Additional Borrowers**:        If Project costs are to be incurred by other subsidiaries of BSGR Guinea, these entities may accede to the Loan Agreement as Additional Borrowers, if Project revenues are earned by any subsidiaries of BSGR Guinea these subsidiaries shall  accede to the Loan Agreement as Additional Borrowers unless the Lender agrees otherwise or such accession would result in a breach of any laws or regulations of any applicable jurisdiction.  In each case such accession shall be by such instrument as the Loan Parties may reasonably agree and subject to provision of a legal opinion of Lenders' counsel in form and substance satisfactory to the Lender acting reasonably in respect of (i) the capacity of the Additional Borrower to accede to and perform its obligations under the

---

[6]    Or such other member of the Vale Group as Vale may nominate.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

Loan Agreement, (ii) any necessary consents (of any governmental, judicial or public body or authority in its jurisdiction of incorporation) relating to such accession and the performance of its obligations under the Loan Agreement having been obtained by the Additional Borrower and (iii) the enforceability of the Loan Agreement against such Additional Borrower upon its accession.    The Lender will be entitled to reimbursement of its reasonable legal costs in relation to any such accession.

(c)    **Funding/Tax Structure**: The Loan Parties shall use commercially reasonable efforts with a view to establishing the optimal tax structure for the implementation and funding of the Vale Loan.

(d)    **Joint and Several Liability:** The Borrower and each Additional Borrower shall be jointly and severally liable for the performance of its respective obligations under the Loan Agreement, unless such joint and several liability would result in a breach of any laws or regulations of any applicable jurisdiction.

(e)    **Type of Facility:**    Term loan facility.

(f)    **Security**:    None.

(g)    **Purpose:**    To provide the funds necessary to permit the Borrower  and any Additional Borrower to comply with the Business Plan, provided that this obligation shall be reduced (dollar for dollar) to the extent of any Project Financing.

(h)    **Loans**:    The Lender shall make Loans available in accordance with the terms and conditions of the Loan Agreement.

(i)    **Amount**:    Up to the Project costs in accordance with the Business Plan, less the (dollar for dollar) amount of any Project Financing.

(j)    **Conditions Precedent**[7]**:**    The following conditions precedent shall apply and shall be the only conditions precedent to the disbursement of

---

[7]    Subject to the Loan Parties' local counsel confirmation/approval.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

each of the Loans (except for item (iii) that shall only be provided as a condition precedent to the first disbursement in respect of the Borrower and each Additional Borrower):

(i)     Borrower (and each Additional Borrower) have obtained any registration or other requirements under the laws of the Republic of Guinea that are required to permit:

  (1)     each of them to enter into the Loan Agreement and the enforceability of all of their respective rights and obligations under the Loan Agreement;

  (2)     the disbursement in question to be made to the Borrower (and/or any Additional Borrower); and

  (3)     any disbursement and any interest (including capitalized interest) to be paid by the Borrower (and each Additional Borrower) to the Lender in US Dollars in accordance with the terms of the Loan Agreement.

(ii)    Borrower (and each Additional Borrower) has opened and maintains in effect a bank account in the Republic of Guinea (or the Republic of Liberia in the case of any Additional Borrower registered in Liberia) into which the Loans will be paid and in which the Borrower (and any Additional Borrower) will hold the loan funds disbursed to it until they are required to meet Project costs[8]. At the Lender's option to the extent that it is possible (and would not result in a breach of any laws or regulations of any applicable jurisdiction) for the Borrower and any Additional Borrower to hold the proceeds of the Loan Agreement offshore in US Dollars they shall do so; to the extent that they are unable to do so, but are able to hold the proceeds of the Loan Agreement onshore in US Dollars until such time as they are needed to pay Project costs (and so doing would not result in a breach of any laws or regulations of any applicable jurisdiction), again they shall do so.

---

[8] Loan Parties' Local counsel to confirm whether US Dollar account can be held by Borrower onshore and, if not, most effective account structure to reduce exposure to local currency fluctuation against US Dollar.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(iii)   The Lender has received in form and substance satisfactory to it a legal opinion from counsel to the Lender with respect to (a) the Loan Agreement being valid, binding and enforceable and (b) the capacity and authority of the Borrower (and each Additional Borrower) to enter into and perform its obligations under the Loan Agreement.

(iv)   No obligation to make disbursements in circumstances where such obligation to disburse is suspended in accordance with the JVFA or Shareholders' Agreement for so long as such suspension of the obligation to disburse is continuing under the JVFA or Shareholders' Agreement or the JVFA or Shareholders' Agreement is terminated.

(v)   No default is continuing under the Loan Agreement or would result from the proposed Loan. All representations under the Loan Agreement are true (or for any disbursement other than the first, all repeating representations under the Loan Agreement are true in all material respects).

(vi)   A disbursement request specifying the requested loan amount and the requested utilization date has been received by the Lender in the form and with the notice period specified in the Loan Agreement.

(vii)   No Insolvency Event (see paragraph (p) below) has occurred and is continuing in relation to the Borrower or any Additional Borrower.

(viii)   No Force Majeure Event is reasonably determined by Vale too have occurred in accordance with Section 12.6 of the JVFA.

(ix)   No Material Adverse Event has occurred and is continuing.

For the purposes of the Loan Agreement "**Material Adverse Event**" shall mean an event or circumstance (or combination thereof) which has or could reasonably be expected to have a material adverse effect on:

- the ability of the Borrower and any Additional Borrower to continue to perform its obligations under the Loan Agreement; or

- the validity or enforceability of the Loan Agreement or the rights or remedies of the Lender under the Loan Agreement.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

Such conditions precedent shall be satisfied to the satisfaction of the Lender acting reasonably.

(k)     **Automatic Termination of funding obligation:**   The obligation of the Lender to lend under the Loan Agreement will automatically terminate (i) in the circumstances provided in Section 9.1 (e) of the Shareholders' Agreement (ii) to the extent envisaged by Section 7.3 of the Shareholders' Agreement (iii) if the Shareholders' Agreement terminates for any reason.

(l)     **Automatic Suspension of funding obligation:**   The obligation of the Lender to lend under the Loan Agreement will automatically be suspended if a Force Majeure Event is reasonably determined by Vale to have occurred and is continuing in accordance with Section 12.6 of the JVFA. The suspension will continue until Vale reasonably and in good faith determines that such Force Majeure Event is no longer continuing.

(m)     **Currency**:     U.S. Dollars, or, at the option of the Lender in the currency in which the Project costs to be funded by a given loan are to be incurred.

(n)     **Representations and Warranties**:  The Loan Agreement will contain customary representations and warranties for an arm's length loan agreement of the nature envisaged by the JVFA and in each case, to the extent consistent with the terms of, or the provisions contemplated by, the JVFA and/or the Shareholders' Agreement.

(o)     **Ranking**:     Without prejudice to Section 9.1 (h) and 9.2 of the Shareholders' Agreement, the Loans under the Loan Agreement will rank senior to all of the Borrower's and each Additional Borrower's other financial indebtedness at any time.

(p)     **Negative Pledge:**  The Loan will include a customary negative pledge provision subject only to exceptions agreed between the Loan Parties**.**

(q)     **Other Positive and Negative Covenants:** The Loan Agreement will contain other customary positive and negative covenants for an arm's length loan agreement of the nature envisaged by the JVFA and, in each case, to the extent consistent with the terms of, or the provisions contemplated by, the JVFA and/or the Shareholders' Agreement.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**(r)** **Dividends and share redemption:** Except as provided for in, or is consistent with the terms of, the JVFA, the Loan Agreement shall not include any restriction on the ability of any member of the Group (as defined below) to:

    (a)    declare, make or pay any dividend, charge, fee or other distribution (or interest on any unpaid divided, charge, fee or other distribution) (whether in cash or in kind) on or in respect of its share capital (or any class of its share capital);

    (b)    repay or distribute any dividend or share premium reserve;

    (c)    pay or allow any member of the Group to pay any fee to or to the order of any of the shareholders of the BSGR Guinea; or

    (d)    redeem, repurchase, decease, or retire or repay any of its share capital or resolve to do so.

**(s)** **Insolvency Event:** Upon the occurrence of an Insolvency Event relating to the Borrower and/or an Additional Borrower the obligation of the Lender to make further Loans shall be terminated and the outstanding amount of the Loans shall be immediately due and payable. For the purposes of the Loan Agreement "**Insolvency Event**" will be defined to cover the normal range of insolvency triggers in an arm's length loan agreement of the nature envisaged by the JVFA and, in each case, to the extent consistent with the terms of, or the provisions contemplated by, the JVFA and/or the Shareholders' Agreement and will be subject to review by local counsel in each jurisdiction in which the Loan Parties (other than the Lenders) are incorporated Guinea and Liberia to confirm that it captures all customary insolvency events at default in relation to those jurisdictions.

(t)    **Repayment**: There shall be no scheduled repayment date for the Loans made under the Loan Agreement, provided that Borrower/Additional Borrowers shall repay the interest and principal due under the Loan Agreement as provided in Section 6.4 of the JVFA as modified by Section 9.1(f) of the Shareholders' Agreement. Any repayment of Loans under the Loan Agreement shall reduce the aggregate outstanding principal amount of the Loans in the order that they were disbursed (i.e. oldest first).

(u)    **Optional Repayment from certain Borrower/Additional Borrower funds**: Lender shall have the right to require the Borrower/Additional Borrower to repay the Loans under the Loan Agreement from and to extent that they receive funds from the following sources:

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

    (i)        Insurance proceeds (net of any Tax payable by the Borrower or any Additional Borrower on such proceeds),unless these are in respect of a liability to a third party and are paid to such third party (less reasonable costs and expenses) unless applied in reinstatements of the relevant loss within a time period to be agreed by the Loan Parties;

    (ii)      Damages (liquidated or otherwise) for delay or breach of contract by third parties and proceeds of claims against third parties (net of any Tax payable by the Borrower or any Additional Borrower on such damages) unless applied in amelioration of the loss resulting directly from the delay or breach of contract by the relevant third party within a time period to be agreed by the Loan Parties; and

    (iii)     Proceeds of sale, lease or transfer of any asset of the Borrower or any Additional Borrower (net of any Tax payable by the Borrower or any Additional Borrower on such proceeds) less any costs and expenses incurred in respect of such sale, lease or transfer, as the case may be,

in each case subject to certain exceptions and de minimis threshold (to be agreed).

  **(v)**    **Voluntary Prepayment and cancellation**:  The Borrower and any Additional Borrower may prepay all or any part of the Loans and cancel the whole or any part of any available Loan, in each case, at any time and without any prepayment fee, cost or premia.  Furthermore, the Loans may be cancelled (without any prepayment fee, cost or premia) in the event of any increased cost/tax gross-up owing to any Lender, provided that such cancellation does not give rise to any cost or liability of Vale under the JVFA or the Shareholders' Agreement.

  **(w)**    **Mandatory Repayment in case of certain Shareholder events:** In case of each of the following events, the Loans shall be repaid by the Borrower and any Additional Borrowers (if and to the extent that any proceeds of such events are received at the level of the Borrower/Additional Borrowers) and/or by BSGR Guinea (if and to the extent that any proceeds of such events are received at the level of BSGR Guinea) from, and in an amount equal to, the sources of funds and to the extent identified in each case below:

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(1)  Upon the events as defined in Section 7.3 of the Shareholders' Agreement; and

(2)  Promptly following receipt of any financial compensation from a Government Entity or insurer in relation to any seizure, expropriation or intervention by such Government Entity of all or any part of the  Borrower and/or any Additional Borrower, or any cancellation or material amendment or de facto nationalization (as the case may be) of all or any material part of the Project or the rights relating thereto, in each case, to the extent of, and in an amount equal to, the compensation received by them (less any reasonable costs associated therewith).

(x)  **Interest Period:**  semi-annual.

(y)  **Interest Payment Date:** The last day of an Interest Period.

(z)  **Interest**: Subject to paragraphs (aa) and (bb) below, Interest shall be paid in arrears, on each Interest Payment Date and shall accrue on the outstanding principal amount of the Loans.  Interest shall accrue from the disbursement of each Loan until the next Interest Payment and on each Interest Payment date thereafter.  The applicable interest rate shall be 16% per annum.

(aa)  **Capitalisation of Interest prior to Date of First Commercial Production:**  During the period prior to the receipt of first revenues from production/sales of iron ore by the Borrower or any Additional Borrower, interest on each Loan due and payable in accordance with the  Loan Agreement, shall not be paid in cash and on each Interest Payment Date shall be capitalised and added to the principal amount of the Loan.

(bb)  **Payment of interest post Date of First Commercial Production:** Following the date of the receipt of first revenues from production/sales of iron ore by the Borrower or any Additional Borrower  interest is to be paid on each Interest Payment Date. To the extent that there are insufficient funds to repay such interest as it falls due, on each Interest Payment Date interest on each Loan shall be capitalised and added to the principal amount of the Loan to which it relates as it accrues.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(cc)     **Costs and Expenses**: Each of the Loan Parties shall pay its own costs and expenses in relation to the preparation, negotiation and signing of the Vale Loan.

(dd)     **Governing Law**: The Loan Agreement and any non-contractual obligations in connection with it shall be governed by English Law with the courts of England having exclusive jurisdiction to settle and dispute arising out of or in connection with the Loan Agreement.

(ee)     **Miscellaneous:** The Loan Agreement shall contain such other provisions as are customary for an arm's length loan agreement of the nature envisaged by the JVFA and also any provisions that are required from the perspective of Guinean and Liberian law to give full force and effect to the Loan Agreement, in each case, as agreed between the Loan Parties.  The Loan Parties agree to negotiate the Loan Agreement in good faith and in the spirit of the  JVFA and the Shareholders' Agreement.

**(ff)**     **Assignments and Transfers:**   Lender may only transfer intra-group (subject to no adverse tax consequences for the Borrowers / Additional Borrowers and provided that the Lender shall procure that the intra-group transferee complies with its obligations under the Loan Agreement in accordance with the JVFA and the Shareholders' Agreement). No assignment, transfer of other disposal by Borrower and/or Additional Borrowers other than as permitted under the JVFA or the Shareholders' Agreement.

**(gg)**     **Amendments, waivers, consents:**   The Loan Agreement may not be amended, waived or varied in any other way unless approved in writing by the Parties to the JVFA.

(hh)     **Fees:**   There shall be no upfront, ongoing or other financing fees, cost and expenses (other than those expressly referred to in these Key Terms and Conditions) payable to the Lenders (or any other party) under or in connection with the Loan Agreement and/or the Loans.

(ii)     **Borrower's/Additional Borrower's Counsel:**   The Borrowers/Additional Borrowers will be represented by independent, internationally recognised counsel (with financing expertise), in relation to the preparation, negotiation, execution and administration of the Loan Agreement and all matters relating thereto.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

# SCHEDULE 4

# BSGR WARRANTIES

## Part A

## Section 1.    Group Structure and Corporate Matters

1.1    Each of BSGR, BSGR Guinea, ProjectCo, Liberia HoldCo and Liberia ProjectCo is validly incorporated, in existence and duly registered under the laws of its jurisdiction of incorporation and has full power and authority required under its constitutional documents to enter into this Agreement and, where applicable, each of the Ancillary Agreements to which it is a party and to conduct its business as conducted at the date of this Agreement.

1.2    BSGR is the sole shareholder of BSGR Guinea and holds full and valid legal and beneficial title to the shares of BSGR Guinea, free from Encumbrances. BSGR Guinea is the sole shareholder of ProjectCo and Liberia HoldCo and holds full and valid legal and, where such concept is recognized under applicable law, beneficial title to the shares of ProjectCo and Liberia HoldCo, free from Encumbrances. Liberia HoldCo is the sole shareholder of Liberia ProjectCo and holds full and valid legal title and, where such concept is recognized under applicable law, beneficial title to the shares of Liberia ProjectCo, free from Encumbrances.

1.3    The shares held by BSGR in BSGR Guinea, by BSGR Guinea in ProjectCo and Liberia HoldCo and by Liberia HoldCo in Liberia ProjectCo have been validly issued and allotted in accordance with Applicable Law, are fully paid up and each of these shareholdings represents all of the shares in issue for each respective company.

1.4    There is no agreement or commitment outstanding, which calls for the allotment, issue or transfer of, or accords to any person the right to call for the allotment, issue or transfer of, any shares or certificates or debentures in or securities of BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo.

1.5    The information relating to each member of the BSGR Guinea Group set out in Schedule 7 is true, accurate and complete as to the category of information referred to therein.

1.6    There are no outstanding (i) securities of BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo convertible into or exchangeable for shares of capital stock or voting securities or ownership interests in BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo respectively, (ii) options, warrants, rights or other agreements or commitments to acquire from BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo or obligations of BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo to issue, any capital stock, voting securities or other ownership interests in (or securities convertible into or exchangeable for capital stock or voting securities or other ownership interests in) BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo respectively, or (iii) obligations of BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo to grant, extend or enter into any subscription, warrant, right, convertible or exchangeable security or other similar agreement or commitment relating to the issuance of any

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

capital stock, voting securities or other ownership interests in BSGR Guinea, ProjectCo, Liberia HoldCo or Liberia ProjectCo respectively.

1.7     There are no subsidiaries of BSGR Guinea (direct or indirect) other than ProjectCo, Liberia HoldCo and Liberia ProjectCo.

1.8     BSGR and each BSGR Guinea Group Company has obtained all corporate authorizations and all other governmental, statutory, regulatory or other consents and authorizations required to empower it to enter into and perform its obligations under this Agreement and/or any Ancillary Agreement to which it is a party where failure to obtain them would adversely affect its ability to enter into and perform its obligations under this Agreement and/or any Ancillary Agreement to which it is a party and such agreements constitute valid and binding obligations of each such party.

1.9     Entry into and performance by BSGR and each BSGR Guinea Group Company of this Agreement and/or any Ancillary Agreement to which it is a party will not (i) breach any provision of its memorandum and articles of association, by-laws or equivalent constitutional documents or (ii) result in a breach of any laws or regulations in its jurisdiction of incorporation or of any order, decree or judgment of any court or any Governmental Entity, where any such breach would materially adversely affect its ability to enter into or perform its obligations under this Agreement and/or any Ancillary Agreement to which it is a party.

1.10    Neither BSGR nor any BSGR Guinea Group Company is insolvent or bankrupt under the laws of its jurisdiction of incorporation, unable to pay its debts as they fall due or has proposed or is liable to any arrangement (whether by court process or otherwise) under which its creditors (or any group of them) would receive less than the amounts due to them.  There are no proceedings in relation to any compromise or arrangement with creditors or any winding up, bankruptcy, désastre or insolvency proceedings concerning BSGR or any BSGR Guinea Group Company and no events have occurred which would justify such proceedings.  No steps have been taken to enforce any security over any assets of any BSGR or any BSGR Guinea Group Company and no event has occurred to give the right to enforce such security. BSGR and BSGR Guinea each satisfy the solvency test under Guernsey Law at the date of this Agreement and will not become unable to satisfy such solvency test as a result of entering into this Agreement.

1.11    The BSGR Accounts provided a true and fair view as at 31 December 2008 of the state of affairs of BSGR and its assets and liabilities as at 31 December 2008.

1.12    If consolidated accounts were to be prepared for BSGR showing the state of affairs of BSGR and its assets and liabilities as at the date of this Agreement on a basis consistent with the preparation of the BSGR Accounts, the net assets of BSGR which are not subject to any Encumbrance would exceed $700,000,000.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Part B**

**Section 2.        Information**

2.1      So far as BSGR is aware, the information set out in this Agreement, the Disclosure Bundle and the Disclosure Letter is accurate in all material respects and is not misleading.  The documents contained in the Disclosure Bundle were collected in good faith for the purpose of providing a description of the material areas of the BSGR Guinea Group's business as at the date of this Agreement.  So far as BSGR is aware, no document or other information, which would otherwise have been material to the business of the members of the BSGR Guinea Group and is in the possession or under the control of the BSGR Group has been knowingly withheld or fraudulently concealed from the Disclosure Bundle.

2.2      The Zogota Feasibility Study has been diligently prepared in accordance with the scope of work and on the basis of the assumptions referred to therein and reflects the expectations of BSGR and the directors of BSGR Guinea as to the matters referred to therein and such expectations are honestly and reasonably held provided that no warranty is given as to the ultimate outcome.

**Section 3.        Regulatory Matters**

3.1      The businesses of each BSGR Guinea Group Company have been carried on and are being carried on in compliance with all Applicable Law and in compliance with all constitutional documents of such BSGR Guinea Group Company and there has been and there is at the date of this Agreement no investigation or enquiry by, or order, decree or judgment of, any Governmental Entity outstanding or, to the knowledge of any BSGR Guinea Group Company, threatened against any BSGR Guinea Group Company, nor any notice or other communication from any Governmental Entity with respect to any alleged violation and/or failure to comply with any such Applicable Law that would prevent any BSGR Guinea Group Company from performing its obligations under this Agreement and/or any Ancillary Agreement to which it is a party.

3.2      Each BSGR Guinea Group Company has all necessary permissions, consents and approvals to carry on the activities that it is currently carrying on (each a "**Relevant Permit**"). Liberia ProjectCo holds the Liberia Exploration Permits and ProjectCo holds the Guinea Exploration Permits and the Mining Concession, which are valid and enforceable as at the date of this Agreement according to their respective terms. ProjectCo is a party to the Basic Agreement which is valid and enforceable as at the date of this Agreement according to its terms. As of the date of this Agreement, no notice has been received by a BSGR Guinea Group Company from any Governmental Entity that any Relevant Permit (including any Exploration Permit, the Mining Concession and the Basic Agreement) is to be revoked or restricted or amended in such a manner which is prejudicial to the interests of a BSGR Guinea Group Company. As of the date of this Agreement, no BSGR Guinea Group Company is aware of the existence of circumstances which represent a real threat that any Relevant Permit (including any Exploration Permit, the Mining Concession and the Basic Agreement) is likely to be revoked or restricted or amended in such a manner which is materially prejudicial to the interests of a BSGR Guinea Group Company.  True and complete copies of the Exploration Permits, the Mining

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

Concession and the Basic Agreement are attached to the Disclosure Letter at Section 3 and no other amendments, modifications, waivers or supplements (in whole or in part) have been made to any of the Exploration Permits or the Mining Concession at any time.

3.3      Each BSGR Guinea Group Company has at all times complied in all material respects with all applicable laws and regulations regulating data protection, privacy or the recording, monitoring or interception of communications in any jurisdiction in which data is managed or processed.

3.4      Each BSGR Guinea Group Company and each BSGR Advisory Company has since the date of its incorporation been and is in compliance with any applicable export control and economic sanctions laws and regulations of the US and other jurisdictions in which it operates or to which it is subject ("**Applicable Sanctions Laws**"), including without limitation the US Export Administration Regulations and the US International Traffic in Arms Regulations, the US Department of Treasury and the Office of Foreign Asset Control's economic sanctions regulations.

3.5      In regard to the operations of the BSGR Guinea Group and all matters governed by this Agreement, none of BSGR nor any BSGR Guinea Group Company nor any BSGR Advisory Company nor any of their respective agents have paid, offered, promised, or authorised the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to know that any portion of such exchange is for the purpose of:

        (a)      corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSGR, any BSGR Guinea Group Company, any BSGR Advisory Company or any other person in obtaining or retaining business, or directing business to any third party;

        (b)      securing an improper advantage;

        (c)      corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Entity in order to assist BSGR, any BSGR Guinea Group Company or any other person in obtaining or retaining business, or directing business to any third party; or

        (d)      providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s),

and no agent of any BSGR Guinea Group Company has done or procured or induced any person to do any of the foregoing.

3.6      In connection with this Agreement, and any Ancillary Agreements, and (where relevant) their respective obligations thereunder, no BSGR Guinea Group Company nor any BSGR Advisory Company nor any of their agents:

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(a)     has taken any action, directly or indirectly, that has resulted or would result in a violation of any applicable laws implementing the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions (the "**OECD Convention**") or any similar laws or regulations to which any BSGR Guinea Group Company, any BSGR Advisory Company or any of their respective agents is subject; or

(b)     have paid, offered, promised, or authorized the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to know that any portion of such exchange is for the purpose of:

(i)      corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSGR, any BSGR Guinea Group Company, any BSGR Advisory Company or any other person in obtaining or retaining business, or directing business to any third party;

(ii)     securing an improper advantage;

(iii)    corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Entity in order to assist BSGR, any BSGR Guinea Group Company or any other person in obtaining or retaining business, or directing business to any third party; or

(iv)     providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s),

and no agent of any BSGR Guinea Group Company has done or procured or induced any person to do any of the foregoing.

3.7     For the purposes of this paragraph 3 only:

(a)     "**agents**" means with respect to an entity its directors, officers and employees; persons for whose acts it may be vicariously liable; and anyone acting on its behalf; and

(b)     "**Government Official**" means: (i) an employee, officer or representative of, or any person otherwise acting in an official capacity for or on behalf of a Government Entity; (ii) a legislative, administrative or judicial official, regardless of whether elected or appointed; (iii) an officer of, or individual

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

who holds a position in, a political party; (iv) a candidate for political office; (v) an individual who holds any other official, ceremonial or other appointed or inherited position with a government or any of its agencies; or (vi) an officer or employee of a supra-national organisation (including, without limitation, World Bank, United Nations, International Monetary Fund and OECD).

3.8    Save as disclosed under Section 3 of the Disclosure Letter, consent under the Control of Borrowing (Bailiwick of Guernsey) Ordinance 1959, as amended, was obtained for all Indebtedness incurred and each guarantee given by BSGR Guinea at any time, or the incurring of such Indebtedness or the giving of such guarantee did not require such consent by virtue of falling within an exception or exemption under that ordinance.

## Section 4.    Litigation

4.1    Neither any BSGR Guinea Group Company nor any of their respective directors or officers is a claimant or defendant in or otherwise a party to any litigation, arbitration or administrative proceedings that are in progress. So far as BSGR is aware, no employee of any BSGR Guinea Group Company is a claimant or defendant in or otherwise a party to any litigation, arbitration or administrative proceedings that are in progress and which is expected to be material (individually or collectively) to the business of any member of the BSGR Guinea Group.

4.2    No litigation, arbitration or administrative proceedings are threatened or pending by or against any BSGR Guinea Group Company where, in each case, or in aggregate, the negative resolution of which would adversely affect any BSGR Guinea Group Company in the performance of its obligations under this Agreement and/or any Ancillary Agreement and/or the Basic Agreement to which it is a party and to the knowledge of BSGR no fact or circumstance exists which may give rise to any such litigation, arbitration or proceedings.

4.3    There is no outstanding judgment, order, decree, arbitral award or decision of a court, tribunal, arbitrator or Government Entity in Guernsey or the British Virgin Islands against any member of the BSGR Guinea Group or any of their respective directors or officers.  So far as BSGR is aware, there is no outstanding judgment, order, decree, arbitral award or decision of a court, tribunal, arbitrator or Government Entity in any jurisdiction against any member of the BSGR Guinea Group, any of their respective directors or officers or, to the extent that such judgment, order, decree, arbitral award or decision of a court, tribunal, arbitrator or Government Entity is material in the context of the business of the relevant member of the BSGR Guinea Group, any employee of any BSGR Guinea Group Company.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Section 5.        Investigations**

No BSGR Guinea Group Company has received any material written notice or order from any Governmental Entity, and no material administrative or judicial action, suit, investigation, demand, directive, claim, lien, judgment or proceeding has been asserted by any Governmental Entity or, to the knowledge of any BSGR Guinea Group Company is threatened, against any BSGR Guinea Group Company that alleges a violation of, or liability under, any Applicable Law.

**Section 6.        Insurance**

Section 6 of the Disclosure Letter contains a list of each current insurance and indemnity policy in respect of which any of the BSGR Guinea Group Companies has an interest (including any active historic policies which provide cover on a losses occurring basis) and each such policy is a full force and effect as at the date of this Agreement.  No claims have been made or threatened against any BSGR Guinea Group Company under any such policies in the last three years and so far as BSGR is aware no fact or circumstance exists which might give rise to a claim under any such policies.

**Section 7.        Financial matters**

7.1      Save for Indebtedness under the loan agreement between BSGR Guinea (as lender) and ProjectCo (as borrower) referred to in Section 7.3 of the Disclosure Letter, no BSGR Guinea Group Company has any outstanding Indebtedness.

7.2      The BSGR Guinea Accounts provide a true and fair view, on an aggregate basis, of the state of affairs of the BSGR Guinea Group and its assets and liabilities as at the BSGR Guinea Accounts Date and have been prepared in accordance with the principles set out therein which the board of directors of BSGR Guinea deemed appropriate at the time of preparation and, where relevant, in a manner consistent with the consolidated financial statements of BSGR and reviewed by Ernst & Young under "agreed upon procedures" determined in accordance with the International Standard on Related Services 4400.

7.3      The ProjectCo Accounts provide a true and fair view of the state of affairs of ProjectCo and its assets and liabilities as at the BSGR Guinea Accounts Date and have been prepared in accordance with the principles set out therein which the board of directors of ProjectCo deemed appropriate at the time of preparation and, where relevant, in a manner consistent with the consolidated financial statements of BSGR.

7.4      The Liberia HoldCo Accounts provide a true and fair view of the state of affairs of Liberia HoldCo and Liberia ProjectCo on an aggregate basis and their respective assets and liabilities as at the BSGR Guinea Accounts Date and have been prepared in accordance with principles and in a manner, in each case, consistent with the consolidated financial statements of BSGR.

7.5      No accounts showing the state of affairs of Liberia ProjectCo on a stand-alone basis have been prepared.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

7.6    No change in accounting policies has been made in preparing the BSGR Guinea Accounts, the Liberia HoldCo Accounts and/or the ProjectCo Accounts for each of the three financial years of the BSGR Guinea Group ended on the BSGR Guinea Accounts Date, except as stated in the respective accounts for the relevant member of the BSGR Guinea Group for those years.

7.7    As at the BSGR Guinea Accounts Date, no BSGR Guinea Group Company had any liability (whether actual, contingent, unquantified or disputed), including any liability in respect of Taxation, or outstanding capital commitment which was not disclosed or provided for in the BSGR Guinea Accounts, the ProjectCo Accounts or the Liberia HoldCo Accounts (as applicable) to the extent that such disclosure or provision should properly have been made in such accounts in accordance with Applicable Laws and applicable accounting standards.

7.8    No BSGR Guinea Group Company has given or received the benefit of any guarantee of another person's or its obligations (as applicable) which remains undischarged (other than guarantees of the obligations of another BSGR Guinea Group Company).

7.9    Save as specified in Section 7 of the Disclosure Letter, since the BSGR Guinea Accounts Date:

(a)    each BSGR Guinea Group Company has carried on business in the ordinary course without any material interruption or material alteration in its nature, scope and manner;

(b)    no BSGR Guinea Group Company has declared, authorized, paid or made any dividend or other distribution;

(c)    no BSGR Guinea Group Company has issued or agreed to issue any share or loan capital or any other security constituting or giving rise to a right over or convertible into its capital;

(d)    no BSGR Guinea Group Company has repaid any Indebtedness in an amount in excess of $50,000 in advance of its stated maturity;

(e)    no material adverse change in the financial or trading position or prospects of a BSGR Guinea Group Company has occurred;

(f)    no material adverse change has occurred in the assets or liabilities of a BSGR Guinea Group Company, and there has been no material reduction in the value of the net tangible assets of a BSGR Guinea Group Company;

(g)    no BSGR Guinea Group Company has, other than in the usual course of its business:

(1)    assumed or incurred, or agreed to assume or incur, a liability, obligation or expense (actual or contingent);

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(2)     acquired or disposed of, or agreed to acquire or dispose of, an asset;

(3)     entered into any capital commitment; or

(4)     entered into any agreements otherwise than on arm's length commercial terms;

(h)     no BSGR Guinea Group Company has changed its accounting reference period; and

(i)     each BSGR Guinea Group Company's accounting records are up to date, in its possession or under its control and are and have at all times been kept in accordance with the applicable standards.

7.10    The Management Accounts have been properly prepared on a basis consistent with the BSGR Guinea Accounts and provide a fair and accurate view, on an aggregate basis, as at 31 March 2010 of the state of affairs of the BSGR Guinea Group and its assets and liabilities.

## Section 8.    Statutory Books

8.1     The statutory books and other records of each BSGR Guinea Group Company required to be kept by Applicable Law in all relevant jurisdictions are up-to-date and have been maintained in accordance with all such Applicable Law and comprise complete records of all information required to be recorded, in each case in all material respects.

8.2     All such statutory books and other records, together with all documents of title which are necessary for the proper conduct of the business of any BSGR Guinea Group Company are in the possession or under the control of a BSGR Guinea Group Company, as applicable.

8.3     All such statutory books and other records and books of account accurately and fairly reflect the transactions and dispositions by each such BSGR Guinea Group Company of its assets, and each BSGR Guinea Group Company maintains a system of internal accounting controls sufficient to provide reasonable assurances that:

(a)     transactions are executed in accordance with management's general or specific authorization and are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and/or International Accounting Standards to maintain accountability of such assets;

(b)     access to assets is permitted only in accordance with management's general or specific authorization; and

(c)     the recorded accountability for assets is compared with existing assets at reasonable levels and appropriate action is taken with respect to any differences.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Section 9.    Arrangements between the BSGR Group and the BSGR Guinea Group Companies**

9.1    Save as specified in Section 9 and Section 13 of the Disclosure Letter: (i) no contract or arrangement or other commitment is outstanding between any BSGR Guinea Group Company and any member of the BSGR Group (where such member of the BSGR Group is not a BSGR Guinea Group Company); and (ii) no other agreements or arrangements or other commitments exist between any BSGR Guinea Group Company and any member of the BSGR Group (other than a BSGR Guinea Group Company).

9.2    No BSGR Guinea Group Company has agreed to guarantee or provide any security or indemnity in relation to any debt or obligation of any other member of the BSGR Group.

**Section 10.    Assets**

10.1    Each asset included in the BSGR Guinea Accounts, the ProjectCo Accounts, the Liberia HoldCo Accounts or the Liberia ProjectCo Accounts or acquired by any BSGR Guinea Group Company since the BSGR Guinea Accounts Date (other than stock disposed of in the ordinary course of business) and each asset used by the relevant BSGR Guinea Group Company or which is in the reputed ownership of the relevant BSGR Guinea Group Company is:

(a)    legally and beneficially owned solely by the relevant BSGR Guinea Group Company free from any Encumbrance; and

(b)    where capable of possession, in the possession or under the control of the relevant BSGR Guinea Group Company.

10.2    Each BSGR Guinea Group Company owns or has the right to use each of the assets necessary for the effective operation of its business as currently carried on.

**Section 11.    Property**

11.1    Section 11 of the Disclosure Letter contains a complete and accurate list of all Properties, including address and destination, which are occupied and/or used by any BSGR Guinea Group Company, and accurately states the title under which each such Property is so owned, occupied or used (as applicable) and, in respect of Properties occupied under verbal arrangements, all material terms of such occupation.

11.2    All leases or similar agreements relating to the Properties are valid and enforceable according to their respective terms.

11.3    The Properties are held under leases or similar arrangements.  No member of the BSGR Guinea Group owns any property.

11.4    BSGR have provided in the Disclosure Bundle true and complete copies of all written lease agreements in respect of, and other relevant written documents relating to, the right of any member of the BSGR Guinea Group to use the Properties mentioned therein.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Section 12.    Environmental matters**

12.1    For the purposes of this Section 12, the following definitions will apply:

    (a)    **Environment** means:

        (i)    land, including, without limitation, surface land, sub surface strata, sea bed and river bed under water (as defined in paragraph (ii) below) and natural and manmade structures;

        (ii)    water, including, without limitation, coastal and inland waters, surface waters, ground waters and water in drains and sewers;

        (iii)    air, including, without limitation, air inside buildings and in other natural and manmade structures above or below ground; and

        (iv)    any and all living organisms or systems supported by those media, including, without limitation, humans;

    (b)    **Environmental Investigation** means a governmental investigation or inspection relating to Environmental Matters;

    (c)    **Environmental Laws** means all or any international, European, national or local, civil, administrative or criminal law, common law, statutes, statutory instruments, regulations, directives, treaties, statutory guidance, orders, decrees, injunctions, or judgments of a parliamentary government, quasi government, supranational, federal, state or local government, statutory, administrative or regulatory body, court or agency in any part of the world, which relate to Environmental Matters (except in relation to town and country planning or zoning) and which have the force of law and are legally binding on any BSGR Guinea Group Company on or before the date of this Agreement;

    (d)    **Environmental Matters** means:

        (i)    pollution or contamination of the Environment;

        (ii)    the generation, manufacture, processing, handling, storage, distribution, use, treatment, removal, transport, disposal, release, spillage, deposit or discharge of hazardous substance and/or waste;

        (iii)    the exposure of any person or other living organism to hazardous substance and/or waste; or

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

  (iv) the creation of any noise, vibration, radiation, common law or statutory nuisance or other damage to, or material adverse impact on, the Environment;

 (e) **Environmental Permits** means any permit, licence, authorisation, permission, approval, consent or registration, issued or granted to, or required by, any BSGR Guinea Group Company on or before the date of this Agreement pursuant to Environmental Laws; and

 (f) **Hazardous Substance** means a natural or artificial substance, organism, preparation or article which (alone or combined with another substance, preparation or article) is capable of causing significant harm to the Environment, or which is prohibited or restricted under Environmental Law (including, without limitation, any waste).

12.2 So far as BSGR is aware, there have not been over the past 3 years and there are not now any releases or emissions by any BSGR Group Company into the Environment of any Hazardous Substance from or at any of the Properties or resulting from any activities undertaken by any BSGR Guinea Group Company in and around any of the Concession Areas or any land relating to the Liberia Exploration Permits, which releases or emissions constituted or constitute a breach of Environmental Laws or Environmental Permits. So far as BSGR is aware, no BSGR Guinea Group Company has disposed of, stored or kept any Hazardous Substance in or under any of the Properties or in and around any of the Concession Areas or any land relating to the Liberia Exploration Permits in a manner which constituted or constitutes a breach of Environmental Laws or Environmental Permits.

12.3 So far as BSGR is aware, each BSGR Guinea Group Company has obtained, and complied in all material respects with the terms and conditions of, each Environmental Permit.

12.4 Each BSGR Guinea Group Company complies and has complied since their respective dates of incorporation with all applicable Environmental Laws in all material respects, and no BSGR Guinea Group Company has received over the past 12 months any written notification under Environmental Law requiring it, or which is likely to result in a requirement for it, to take or omit to take any action (including, but not limited to, to make good, re-instate, remediate or clean up any land or other waterways).

12.5 There is and has, during the period of two years prior to the date of this Agreement, been no Environmental Investigation concerning any BSGR Guinea Group Company and, so far as BSGR is aware, none is pending or threatened.

## Section 13. Material contracts

13.1 True and complete copies of all contracts material to each BSGR Guinea Group Company and/or their respective businesses are attached to the Disclosure Letter at Section 13 (the "**Material Contracts**"). No Material Contract has been otherwise amended, modified, waived or supplemented (in whole or in part) at any time. Each Material Contract is valid, enforceable and binding in accordance with its terms at the date of this Agreement.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

13.2    No BSGR Guinea Group Company is in material default under any Material Contract and, to the knowledge of each BSGR Guinea Group Company, there are no circumstances likely to give rise to such a default.

13.3    No party with whom any BSGR Guinea Group Company has entered into any Material Contract is in material default under it and, to the knowledge of each BSGR Guinea Group Company, there are no circumstances likely to give rise to such a default.

13.4    Entry into and performance by any BSGR Guinea Group Company of this Agreement and/or any Ancillary Agreement to which it is a party will not result in a material breach of any provision of any Material Contract to which it is a party.

13.5    No BSGR Guinea Group Company is party to any contract which is or creates:

    (a)    an agreement, arrangement or obligation entered into other than in the usual course of its business;

    (b)    an agreement, arrangement or obligation entered into other than by way of a bargain at arm's length and on commercial terms, having regard to the jurisdiction of incorporation of such BSGR Guinea Group Company; or

    (c)    an agreement, arrangement or obligation restricting such BSGR Guinea Group Company's freedom to operate the whole or part of its business or to use or exploit any of its assets.

13.6    No BSGR Guinea Group Company is party to any Material Contract nor has entered into any agreement, option, right of first refusal, right of pre emption, third party right or interest which relates to the sale or distribution of iron ore or any other mineral or similar substance.

13.7    Each document entered into by any BSGR Guinea Group Company relating to the Liberia Group Transfer constitutes valid, binding obligations on the parties thereto in accordance with their terms.

13.8    Other than the Royalties Agreement, no BSGR Guinea Group Company has entered into any royalty, technical services or consultancy agreements under which any BSGR Guinea Group Company has any outstanding obligations.    A true and complete copy of the Royalties Agreement is contained in Section 13 of the Disclosure Letter and no amendments, modifications, waivers or supplements (in whole or in part) to the Royalties Agreement have taken place since its date of execution or effect.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

## Section 14.    Employees

14.1    Section 14 of the Disclosure Letter includes a complete, up to date and accurate list of all employees of each of the BSGR Guinea Group Companies and correctly states for each employee in an anonymized form the department, function/position, date of birth, start of employment, fixed monthly gross salary and applicable Employee Benefits and there are no other material terms applicable to their employment.

14.2    No BSGR Guinea Group Company is aware of any proposal to terminate or circumstances which may lead to the termination of the employment arrangements relating to any employee.

14.3    Each BSGR Guinea Group Company has no outstanding liability for breach or termination of any employment contract or consultancy agreement or any breach of any statutory or regulatory obligations relevant to the relations between it and its current or former directors, employees, workers or consultants.

14.4    No formal trade union, works council or other employee representative body is recognized by any BSGR Guinea Group Company for any purpose whatsoever.

14.5    No BSGR Guinea Group Company has any outstanding pension liabilities nor are there any pension arrangements in place with respect to any employee or director in any BSGR Guinea Group Company.

## Section 15.    Intellectual Property Rights

There are no intellectual property rights which are material to the operation of the business of any member of the BSGR Guinea Group.

## Section 16.    Powers of Attorney

No BSGR Guinea Group Company has given a power of attorney or other authority by which a person may enter into an agreement, arrangement or obligation on such BSGR Guinea Group Company's behalf (other than an authority for a director, other officer or employee to enter into an agreement in the usual course of that person's duties a copy of which is set out at Section 16 of the Disclosure Letter).

## Section 17.    Tax

17.1    Within the last three years, or any shorter period of incorporation as applicable in relation to any BSGR Guinea Group Company, each BSGR Guinea Group Company has paid all material Tax for which it has been or is liable.

17.2    Within the last three years, or any shorter period of incorporation as applicable in relation to any BSGR Guinea Group Company, each BSGR Guinea Group Company has made and

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

accounted to the relevant Tax Authority for any deductions, withholdings or retentions of Tax which it has been or is required by law to make.

17.3    Within the last three years, or any shorter period of incorporation as applicable in relation to any BSGR Guinea Group Company, each BSGR Guinea Group Company has properly and punctually made all material returns, claims, disclaimers, elections, given all material notices and consents, maintained all material records and supplied all other material information in relation to Tax which it has been or is required to make, give, maintain or supply or which were assumed to have been made or submitted in the BSGR Guinea Accounts and all such returns, notices, records and information were complete and accurate in all material respects.

17.4    There is no material dispute and there has not at any time within the last three years, or any shorter period of incorporation as applicable in relation to any BSGR Guinea Group Company, been any material dispute between any BSGR Guinea Group Company and any Tax Authority and none of them is, or has within the last three years or any shorter period of incorporation as applicable in relation to any BSGR Guinea Group Company been, the subject of an investigation by any Tax Authority.

17.5    Each BSGR Guinea Group Company has at all times been resident for any Tax purpose in its country of incorporation and has not at any time been resident for any Tax purpose in any other country.

17.6    Apart from the tax provisions in the Basic Agreement to which this warranty 17.6 does not apply, no Taxation Authority has agreed to operate any special arrangement (being an arrangement which is not based on a strict and detailed application of the relevant legislation) in relation to the affairs of any BSGR Guinea Group Company.

17.7    Under Guernsey's current tax regime, BSGR Guinea is liable to income tax in Guernsey at the company standard rate of zero per cent.

17.8    Each BSGR Guinea Group Company has sufficient records to determine the Tax consequences that would arise on a disposal or realisation of each asset owned by it.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

# SCHEDULE 5

# LIMITATIONS ON LIABILITY

**Section 1.      Time Limits and Notices Applicable to Claims**

1.1      BSGR shall not be liable for any Claim unless it receives from Vale written notice, within 60 days of becoming aware of such Claim, containing reasonably specific details of the Claim, including its nature, a short summary of the relevant facts and Vale's estimate, to the extent estimable (on a without prejudice basis), of the amount of the Claim:

  (a)      in the case of a Warranty Claim (other than a Claim for breach of the provisions of Section 8.1 as a result of a breach of a Tax Warranty) or a Claim for breach of the provisions of Section 8.1 as a result of a breach of an Indemnity Warranty, prior to the date which is 24 months from the Completion Date; and

  (b)      in the case of a Tax Claim, by the date which falls three months after the expiry of the period specified by Applicable Law during which an assessment of that liability to Tax may be issued by the relevant Tax Authority or, if there is no such period, on or before the date which falls seven years after the Completion Date,

provided that there shall be no time limit in case of a Claim for breach of the provisions of Section 8.1 as a result of a breach of the Debt Free Warranty, the Title Warranty or the Guernsey Loan Indemnity Claim.

It is agreed and acknowledged that none of the provisions in this Schedule 5 save for those relating to the giving of notice shall apply to, or limit, a Claim for breach of the Debt Free Warranty or the Title Warranty or a Guernsey Loan Indemnity Claim.

1.2      The purpose of Section 1.1 above is to provide for notification to BSGR that it is facing a Claim. It is not intended to permit it to rely on technical defenses to such Claims on the grounds of insufficiency of notice. Accordingly, no defect in the form of the notice will invalidate the notice or permit BSGR to allege that Vale has not complied with Section 1.1 of this Schedule 5 except as expressly set out below.

  (a)      If BSGR believes that a notice that has been given is defective in that it does not comply with Section 1.1 above, it may give notice thereof to Vale within 28 days of the service of such notice and Vale shall have an additional 28 days (whether or not the period specified in Section 1.1 of this Schedule has expired or would expire during such 28 days) to remedy any defects so identified. If no request for any additional information is made, the notification of such Claim pursuant to Section 1.1 shall be deemed to have been properly served for all purposes in this Agreement.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(b)    A notice given under Section 1.1. of this Schedule, as supplemented by a response made under Section 1.2(a) of this Schedule, shall only be regarded as being insufficient and therefore not properly given if BSGR can satisfy the arbitrator that it could not reasonably have been expected to understand the general nature of the allegation made, provided that a notice shall not be regarded as being insufficient if the form of the notice reasonably reflects the material which was reasonably available to Vale at the time of the notice.

(c)    For the avoidance of doubt, the failure by Vale to reply to a notice under Section 1.2(a) shall not itself invalidate a Claim made hereunder, unless the original notice given by it under Section 1.1 of this Schedule would not itself have been regarded as properly given by reason of Section 1.2(b).

## Section 2.    Financial Limitations Applicable to certain Claims

2.1    BSGR shall not have any liability towards Vale for any Claim (other than a Claim under or for breach of the provisions of Section 8.1 as a result of a breach of the Debt Free Warranty, the Title Warranty or a Guernsey Loan Indemnity Claim):

(a)    unless the amount (or the aggregate amount in respect of two or more claims arising out of the same Event that would otherwise be recoverable from BSGR but for this section 2.1(a) in respect of that claim or those claims) of the liability pursuant to such Claim (but for this Section 2.1 of Schedule 5) exceeds $30,000; and

(b)    unless the aggregate amount of the liability for such Claims, when aggregated with the liability of BSGR in respect all Claims not excluded by Section 2.1(a), exceeds $30,000,000,

in which event Vale shall be entitled to claim the whole amount of such Claims and not merely the excess.

2.2    The aggregate amount of the liability of BSGR for all Claims (other than Tax Claims under Schedule 10, Claims under or for breach of the provisions of Section 8.1 as a result of a breach of the Debt Free Warranty or the Title Warranty or a Guernsey Loan Indemnity Claim) shall not exceed $500,000,000.

## Section 3.    Other Limitations

3.1    Any Claim shall (if it has not been previously satisfied, settled or withdrawn) be deemed to have been withdrawn 12 months after the notice is given pursuant to Section 1 of this Schedule or, in the case of a Claim that is based upon a contingent liability, 12 months after that liability becomes an actual liability, unless, in each case, arbitration in respect of such Claim has been commenced by being referred to arbitration in accordance with Section 16.10. No new

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

Claim may be made in respect of the same facts, matters, events or circumstances giving rise to any such withdrawn Claim.

3.2     BSGR shall not be liable for any Claim (other than a Warranty Claim in respect of a breach of the Title Warranty, the Debt Free Warranty, a Tax Claim under Schedule 10 or a Guernsey Loan Indemnity Claim) if and to the extent that the fact, matter, event or circumstance giving rise to such Claim is fairly disclosed in the Disclosure Letter or any document included in the Disclosure Bundle.

3.3     Save as regards a Tax Claim, if any Claim is based upon a liability which is contingent only, BSGR shall not be liable to pay unless and until such contingent liability gives rise to an obligation to make a payment, provided that this paragraph shall not operate to avoid a claim in respect of such a contingent liability where notice of such claim is given prior to the expiry of the relevant period specified in Section 1.1 above even if such liability shall only become an actual liability after the expiry of such period.

3.4     Nothing in this Schedule 5 or Section 11 restricts or limits the general obligations of Vale or the relevant member of the BSGR Guinea Group at law to mitigate any loss or damage which Vale or the relevant member of the BSGR Guinea Group may suffer in consequence of any breach of the terms of this Agreement or any fact, matter, event or circumstance which can be foreseen to be likely on the balance of probabilities to give rise to a Warranty Claim and it is agreed and acknowledged that this Section 3.4 shall apply *mutatis mutandis* to any Indemnity Warranty Claim.

3.5     BSGR shall not be liable in respect of the amount of any Claim that has been recovered under a policy of insurance (net of any costs of recovery).

3.6     Other than in respect of a Tax Claim, where Vale or any of its Affiliates is entitled to recover (whether by insurance, payment, discount, credit, relief or otherwise) from a third party (other than a member of the BSGR Guinea Group) a sum which indemnifies or compensates them (in whole or in part) in respect of the Loss which is the subject of a Claim, prior to BSGR making any payment hereunder, Vale shall take all reasonable steps or proceedings as BSGR may require (provided that Vale may only be required to appeal against a decision if an opinion has been obtained from a member of Counsel of at least five years call (on which Vale can rely) to the effect that on the balance of probabilities such appeal is likely to be successful) to enforce such right subject to being indemnified to its satisfaction in respect of the costs and expenses in relation to any such actions, and such actions not being prejudicial or detrimental to the promotion of the best interests of the BSGR Guinea Group and the development of the Project or, without prejudice to Section 3.4 above, the business undertaken by any member of the Vale Group.

3.7     Where BSGR has made a payment to Vale or any of its Affiliates in relation to any Claim and Vale or such Affiliate has recovered (whether by insurance, payment, discount, credit, relief or otherwise) from a third party (other than a member of the BSGR Guinea Group) a sum which indemnifies or compensates Vale or such Affiliate to the extent required by this Agreement in respect of the Loss which was the subject of such Claim, Vale shall pay to or cause such Affiliate to pay to BSGR as soon as practicable after receipt of such amount from a third party an amount

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

equal to the lower of (i) the amount BSGR paid to Vale or such Affiliate or (ii) the amount recovered from the third party by Vale or such Affiliate (in each case such amount being net of Taxation and less any reasonable costs of recovery).

3.8    BSGR shall not be liable to make any payment to Vale or any of its Affiliates for a Claim to the extent of any corresponding saving by or net quantifiable financial benefit to Vale or such Affiliate arising directly from the matter(s) giving rise to such Claim, including the amount (if any) by which any Tax for which Vale or such Affiliate would otherwise have been accountable or liable to be assessed is actually reduced or extinguished as a direct result of the matter(s) giving rise to the Claim, provided that the foregoing shall not (i) interfere with the right of any party to arrange its affairs (tax or otherwise) in whatever manner it thinks fit; or (ii) oblige any party to investigate or claim any credit, relief, remission or repayment available to it or the extent, order and manner of any claim.

3.9    BSGR shall not be liable for any Claim if and to the extent it is attributable to, or the amount of such Claim is increased as a result of, any (i) change of Applicable Law (or any change in interpretation of Applicable Law) after the date of this Agreement, (ii) change after the date of this Agreement in the rates of Taxation in force at the date of this Agreement or (ii) change in circumstances (including a Force Majeure Event) after the date hereof, save to the extent that such change in circumstances arises from an act or omission by BSGR or any member of the BSGR Group other than an act or omission required by Applicable Law provided that this Section 3.9 shall not apply to Tax Claims.

3.10    There shall be no entitlement to recover from BSGR damages or obtain payment, reimbursement, restitution or indemnity more than once with respect to the total amount of an individual Loss which Vale is entitled to recover from BSGR in accordance with the provisions of this Agreement.

3.11    With regard to any Claim, BSGR shall have no liability for any loss other than a Loss.

3.12    If a breach of any BSGR Warranty or Indemnity Warranty (other than the Title Warranty or any of the FCPA Warranties) is capable of remedy, there shall be entitlement to compensation in respect of such breach if it is not remedied within 120 days after the date on which notice of such breach is served on BSGR. Without prejudice to its duty to mitigate any Loss, and subject to Vale (for itself and as agent or trustee for each BSGR Guinea Group Company and each member of the Vale Group) being indemnified and held harmless by BSGR on demand against all costs reasonably incurred by Vale, any BSGR Guinea Group Company or any member of the Vale Group in connection with the provision of such assistance, Vale shall provide all reasonable assistance to BSGR to remedy any such breach.

3.13    BSGR shall not be liable for any Claim (other than a Tax Claim under Schedule 10) if and to the extent that, at the date of this Agreement, Daniela Chimisso dos Santos or Alexandre Monteiro Barbosa da Silva:

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(a)     was actually aware of the fact, matter or circumstance giving rise to such Claim and should reasonably have appreciated that such fact, matter or circumstance would give rise to such Claim; and

(b)     the nature of the Losses which result from such Claim should have been reasonably foreseeable by such person.

3.14    BSGR shall not be liable for any Claim (other than a Tax Claim under Schedule 10) if and to the extent that Eduardo Ledsham or, solely in respect of environmental or technical mining matters, Jose Andre Alves was actually aware as at the date of this Agreement of any fact, matter or circumstance which would entitle Vale to bring a Claim immediately following Completion.

3.15    Nothing in this Schedule 5 shall have the effect of limiting or restricting any liability of BSGR in respect of a Claim arising as a result of any fraud or willful concealment on the part of BSGR.

**Section 4.       Limitations exclusive to Environmental Claims**

4.1     For the purposes of this Section 4:

(a)     **Binding Order** means a requirement, notification, decree, order or summons issued by a Governmental Entity in accordance with applicable Environmental Laws and which gives rise to an obligation to take action in respect of the clean-up or remediation of Environmental Matters and to comply with Environmental Laws, a failure to comply with which is likely (on the balance of probabilities) to lead to the relevant Governmental Entity taking enforcement action and/or which may result directly or indirectly in the suspension, withdrawal or foreclosure of the Basic Agreement, the Exploration Permits, the Mining Concession or an Environmental Permit or the full or partial shutdown of activities;

(b)     **Emergency** means, as a result of Environmental Matters, any imminent or immediate risk of, or actual, significant damage or harm to the Environment;

(c)     **Environmental Contamination** means (i) the presence of any Hazardous Substance in any soil, surface water and/or groundwater at any of the Properties, any Concession Area or any areas covered by the Liberia Exploration Permits at any time before or on the Completion Date  ("**Past Contamination**"); and/or (ii) the migration of Past Contamination from any of the Properties, any Concession Area or any areas covered by the

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

Liberia Exploration Permits before or after the Completion Date, and which, in all cases, is capable of causing pollution, harm or damage to the Environment and/or damage to any buildings or other man-made structures or fixtures on, in or below the land; and

(d)    **Reasonable Operator** means a person acting in good faith and exercising a reasonable level of skill and diligence as would reasonably and ordinarily be expected from a major operator engaged in the same type of business under the same or similar circumstances and conditions as contemplated by this Agreement, and any reference to the standard of a Reasonable Operator herein shall be a reference to such degree of skill and diligence as aforesaid,

provided that capitalized terms not defined in this Section 4 shall have the same meaning as attributed to them in Section 12 of Schedule 4.

4.2    BSGR shall only be liable for Losses which arise in connection with Environmental Matters ("**Environmental Losses**") to the extent that the cause of such Environmental Losses (i) arises from the action or omission of a member of the BSGR Group, or the BSGR Guinea Group prior to Completion within the period commencing on 1 April 2006, in relation to Environmental Losses which were caused in Guinea, and 1 April 2008, in relation to Environmental Losses which were caused in Liberia, in each case, ending on Completion, or (ii) existed prior to 1 April 2006, in relation to Environmental Losses which were caused in Guinea, and 1 April 2008, in relation to Environmental Losses which were caused in Liberia, but came to the knowledge of a member of the BSGR Group or the BSGR Guinea Group prior to Completion and which company failed to take such steps as a Reasonable Operator would have done having regard to applicable Environmental Laws.

4.3    BSGR shall have no liability under this Agreement in respect of a Claim for Environmental Losses to the extent that such Environmental Losses have arisen, been increased, or caused as a result of:

(a)    the introduction of any pathway or receptor after Completion which results in Environmental Matters and/or any other Hazardous Substance migrating or causing harm or damage to human health or the Environment in circumstances where it was reasonably foreseeable that such actions would give rise to the Loss in question and Vale or any of its Affiliates was not acting as a Reasonable Operator; and/or

(b)    the carrying-out of any investigation or audit after Completion which is not required to be undertaken (i) under any applicable Environmental

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

Laws, (ii) under formal requirement of a Governmental Entity, (iii) pursuant to any Binding Order, and/or (iv) in an Emergency (unless BSGR has agreed, in writing in advance, to such investigation or audit being carried out (such consent not to be unreasonably withheld or delayed)); and/or

(c)     any, amendment, variation or voluntary replacement of any Environmental Permit after Completion; and/or

(d)     information (in whatever form) voluntarily given after Completion by Vale or any of its Affiliates to a Governmental Entity or third party in circumstances other than: (i) where Vale or any of its Affiliates reasonably believes that there is a reporting requirement under Applicable Laws or any Environmental Permit; (ii) where Vale or any of its Affiliates believes it is prudent to do so to prevent a Loss other than where Vale or such Affiliate was not acting as a Reasonable Operator; (iii) where the information is given as part of a remediation program approved and/or imposed by or under the supervision of a Governmental Entity; (iii) in an Emergency; (iv) where BSGR has previously approved this course of action in writing (such approval not to be unreasonably withheld or delayed); (v) where such information is required to be submitted (or it would be prudent to submit, acting reasonably and with the need to mitigate any actual or potential Losses relating to Environmental Matters) in order to obtain, or procure the amendment, variation, surrender or renewal of, any Environmental Permit; or (vi) where the information has already become publicly available through no fault of Vale or any of its Affiliates.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

## SCHEDULE 6

## VALE WARRANTIES

1.      Vale is validly incorporated, in existence and duly registered under the laws of its jurisdiction of incorporation and has full power and authority required under its constitutional documents to enter into this Agreement and, where applicable, each of the Ancillary Agreements to which it is a party and to conduct its business as conducted at the date of this Agreement.

2.      Vale has obtained all corporate authorizations and all other governmental, statutory, regulatory or other consents and authorizations required to empower it to enter into and perform its obligations under this Agreement and/or any Ancillary Agreement to which it is a party where failure to obtain them would adversely affect its ability to enter into and perform its obligations under this Agreement and/or any Ancillary Agreement to which it is a party and such agreements constitute valid and binding obligations of each such party.

3.      Entry into and performance by Vale of this Agreement and/or any Ancillary Agreement to which it is a party will not (i) breach any provision of its memorandum and articles of association, by-laws or equivalent constitutional documents or (ii) result in a breach of any laws or regulations in its jurisdiction of incorporation or of any order, decree or judgment of any court or any Governmental Entity, where any such breach would adversely affect its ability to enter into or perform its obligations under this Agreement and/or any Ancillary Agreement to which it is a party.

4.      Vale is not insolvent or bankrupt under the laws of its jurisdiction of incorporation, unable to pay its debts as they fall due or has proposed or is liable to any arrangement (whether by court process or otherwise) under which its creditors (or any group of them) would receive less than the amounts due to them.  There are no proceedings in relation to any compromise or arrangement with creditors or any winding up, bankruptcy or insolvency proceedings concerning Vale and no events have occurred which would justify such proceedings.  No steps have been taken to enforce any security over any assets of Vale and no event has occurred to give the right to enforce such security.

5.      In connection with this Agreement, and any Ancillary Agreements, and its obligations thereunder:

5.1     Vale has been and is in compliance with any Applicable Sanctions Laws, including without limitation the US Export Administration Regulations, the US International Traffic in Arms Regulations, the US Department of Treasury and the Office of Foreign Asset Control's economic sanctions regulations;

5.2     with regard to the operations of Vale and all matters governed by this Agreement, neither Vale nor any of its respective directors, officers, employees, persons for whose acts it is vicariously liable or anyone acting on its behalf have paid, offered, promised or authorized the

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to know that any portion of such exchange is for the purpose of:

(a)     corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist Vale or any other person in obtaining or retaining business, or directing business to any third party;

(b)     securing an improper advantage;

(c)     corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Entity in order to assist Vale or any other person in obtaining or retaining business, or directing business to any third party; or

(d)     providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s),

and no such person has done or procured or induced any person to do any of the foregoing; and

5.3     Vale has not taken any action, directly or indirectly, that has resulted in a violation of the FCPA, the OECD Convention or any similar laws or regulations, to which Vale or any of its respective directors, officers, employees, persons for whose acts it is vicariously liable or anyone acting on its behalf is subject.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

## SCHEDULE 7

## BSGR GUINEA GROUP

## BSG RESOURCES (GUINEA) LIMITED

| | | |
|---|---|---|
| 1. | Registered number: | 50001 |
| 2. | Place of incorporation: | Guernsey |
| 3. | Address of registered office: | West Wing, Frances House<br>Sir William Place<br>St Peter Port    Guernsey<br>GY11GX |
| 4. | Type of company: | Private Limited Liability Company |
| 5. | Issued share capital: | 100 ordinary shares of USD 1 each held by BSGR |
| 6. | Directors: | David Clark, Asher Avidan, Sandra Merloni-Horemans, Marcus Struik |
| 7. | Secretary: | Perla Limited |
| 8. | Accounting reference date: | 31 December |
| 9. | Auditors: | Ernst & Young |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

## BSGR (LIBERIA) LIMITED

| | | |
|---|---|---|
| 1. | Registered number: | AL – 59-60-TIN-411625001 |
| 2. | Place of incorporation: | Republic of Liberia |
| 3. | Address of registered office: | PO Box 10-2198<br>Warren Street<br>1000 Monrovia 10<br>Republic of Liberia |
| 4. | Type of company: | Private Limited Liability Company |
| 5. | Authorised share capital: | USD 75,000 |
| 6. | Issued share capital: | 100 ordinary shares representing a total capital of USD 75,000 each held by Liberia HoldCo |
| 7. | Directors: | Iwan Williams |
| 8. | Secretary: | Iwan Williams |
| 9. | Accounting reference date: | 31 December |
| 10. | Auditors: | Ernst & Young |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

## BSG RESOURCES (GUINEA) S.À R.L.

| | | |
|---|---|---|
| 1. | Registered number: | RCCM/GC-KAL-M2/024.524/2009 (previously RCCM/GC-KAL/013.755A/2006) |
| 2. | Place of incorporation: | Republic of Guinea |
| 3. | Address of registered office: | Villa André, Coléah Corniche, C/Matam-Conakry, Republic of Guinea |
| 4. | Type of company: | Private Limited Liability Company |
| 5. | Authorised share capital: | GNF 5,000,000 |
| 6. | Issued share capital: | 500 ordinary shares of 10,000 GNF each held by BSGR Guinea |
| 7. | Directors: | Marcus Struik<br>Asher Avidan |
| 8. | Secretary: | Sandra Merloni - Horemans |
| 9. | Accounting reference date: | 31 December |
| 10. | Auditors: | Ernst & Young |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

## BSG RESOURCES (LIBERIA) LIMITED

| | | |
|---|---|---|
| 1. | Registered number: | 1429525 |
| 2. | Place of incorporation: | British Virgin Islands |
| 3. | Address of registered office: | Akara Building, 24 de Castro Street<br>Wickhams Cay I, Road Town, Tortola<br>British Virgin Islands |
| 4. | Type of company: | Private Limited Liability Company |
| 5. | Authorised share capital: | USD 50,000 |
| 6. | Issued share capital: | 50,000 ordinary shares of USD 1 each held by BSGR Guinea |
| 7. | Directors: | Marcus Struik<br>Margali Management Corp |
| 8. | Secretary: | Sandra Merloni – Horemans |
| 9. | Accounting reference date: | 31 December |
| 10. | Auditors: | Ernst & Young |

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

# SCHEDULE 8

## LIBERIAN TRANSPORT SOLUTION

1.    **Route/Destination** – the Liberian Transport Solution must permit the export by rail of iron ore from the Concession Areas to (i) initially, the port of Buchanan and (ii) subsequently the new port at Didia or any other port agreed by the Parties (collectively (i) and (ii), the "**Designated Ports**").

2.    **Scope of Port Works** – the scope of the works required to upgrade/construct the Designated Ports must have been identified in outline – including extent of dredging and construction of new channels, berths and jetties.

3.    **Quantity** – the Liberian Transport Solution must be capable of permitting the export of iron ore from the Designated Ports in at least the following annual quantities: (i) between 2 and 15 million dry metric tonnes of iron ore per calendar year via the port of Buchanan and (ii) 50 million dry metric tonnes of iron ore per calendar year via Didia port or any other port agreed by the Parties, with scope for increasing this volume without significant additional consent/planning/land requirements up to 80 million dry metric tonnes of iron ore per calendar year.

4.    **Zogota** – acceptable agreements must be reached between the ProjectCo and/or Liberia ProjectCo and each of (i) the Liberian Government, (ii) trans-Liberian railway concessionaire, (iii) the Buchanan Port concessionaire and (iv) the relevant Government Entities in Liberia to ensure that ProjectCo and/or Liberia ProjectCo (as necessary) have the right **to** transport the output of the Zogota mine up to 15 million metric tons per annum of iron ore to the Buchanan Port facilities using the Liberian Corridor (trans-Liberian concession), which includes the existing railway, and to export such iron ore from the Buchanan Port facilities.  These agreements should be in place and capable of implementation before the first output from the Zogota mine and be sufficient to enable the export of the tonnage referred to above throughout the period 2012 to 2016, with an option to continue to use such facilities at the discretion of ProjectCo and Liberia ProjectCo for transportation and export of iron ore post 2016.

5.    **Treaties/Conventions/Legislation** – each of the anticipated agreements and/or treaties, conventions, concessions and/or pieces of legislation required to be granted or entered into or otherwise agreed by or between the Republic of Liberia, the Republic of Guinea (and any regional or local Government Entities) must have been identified.  An indication of the process, timing and scope of such items must have been provided to Vale with sufficient notice to permit Vale to evaluate and take a decision regarding the corporate structure that will be needed to implement the Liberian Transport Solution, together with copies of any communications relating thereto between relevant parties that any member of the BSGR Guinea Group has access to.  Vale will have the right to determine whether the content or proposed content of such agreements and/or treaties, conventions, concessions and/or pieces of legislation will be adequate to support the implementation of

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

the proposed solution for the duration of the life of the relevant mines in the Concession Areas without imposing unacceptable risks on the Project.

6.    **Consents** – the principal consents and authorisations required to implement the Liberian Transport Solution must have been identified along with the granting party, and any critical path timing requirements associated with applying for such consents and authorisations.

7.    **Timetable** – the timetable for implementing the Liberian Transport Solution must have been identified, including critical path items to the extent that this can be constructed from current information. The Buchanan port component of the Liberian Transport Solution will need to be available to the Project within a timescale that enables compliance with the requirements of the Basic Agreement.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

## SCHEDULE 9

## FEASIBILITY STUDY

The Feasibility Study will be carried out in relation to Blocks 1 and 2 of the Simandou Concession Area (see figure 1).

The Feasibility Study will be developed following the principles described by the Front End Loading (FEL) Methodology and will follow the schedule presented in the figure 2.

As the period of time expressed in the Base Agreement for the conclusion of the aforementioned Feasibility Study is very restrictive (December 2011), it was agreed between Vale and BSGR that for Blocks 1 and 2 a FEL1 study will be carried out. Following this strategy will allow ProjectCo to satisfy the Guinea Government's expectations without infringing the deadline specified in the Base Agreement.

However Vale, as agreed with BSGR, will be also conducting a FEL3 study for the area called "The Gaff" which is located in the center-southern portion of Blocks 1 and 2.

FEL is the process by which Vale achieves a detailed definition of a given project during the planning phase, with the purpose of minimizing the risks and maximizing the investor's return. It is an efficient instrument for executive decision driving predictability, accountability, transparency and competitiveness to projects.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**FRONT - END LOADING DEVELOPMENT**

In the FEL1 phase a clear set of deliverables is associated (Attachment 1).

## FEL 1  MAIN ACTIVITIES

This stage aims at identifying, developing and evaluating investment opportunities by means of business attractiveness analysis.

Main FEL 01 activities are:

•   Value creation through the identification of business opportunities in planning, commercial, operations, safety and environment areas, among others.

•   Selection of technology and, in mining projects, campaigns to point out resources /reserves and determine acceptable product specifications.

•   The business plan (also called business case) is done by exploiting to the fullest the identification and characterization of technical alternatives for the project.

•   Preliminary selection of related alternatives in order to eliminate those that do not objectively impart sustainability to the project  or that introduce fatal risks, volume of pointed resources /reserves, technological, social-environmental and political aspects, among others.

Attachment 1 highlights FEL 1 deliverables, for each project management area, as well as, the activity flow chart.

## FEL 3  MAIN ACTIVITIES

The main FEL 03 activities are:

•   Basic engineering development supported by real geology investigations and surveying, geotechnics, hydrogeology, hydrology, topography data, and so on. The objective is to deepen scope detailing level and definition, cost, implementation planning and scheduling as preparation for the project execution phase.

•   Conclusion of the project executive report.

•   The execution plan.

•   The procurement plan.

Attachment 2 highlights FEL 3 deliverables, for each project management area, and their respective minimum number of items to be checked, as well as, the activity flow chart.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.



**Figure 1 – Block 1 and 2 areas**

| Project Blocks Feasibility Study | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Start | End | 2010 | | | | 2011 | | | | 2012 | | | |
| Project Blocks Feasibility Study | Activities | Date | Date | 1 T | 2 T | 3 T | 4 T | 1 T | 2 T | 3 T | 4 T | 1 T | 2 T | 3 T | 4 T |
| | Geology | 01/06/10 | 01/12/10 | | | | | | | | | | | | |
| | Resource Estimation | 01/08/10 | 01/02/11 | | | | | | | | | | | | |
| | Mining Planning | 01/02/11 | 01/04/11 | | | | | | | | | | | | |
| | Processing | 01/10/10 | 01/05/11 | | | | | | | | | | | | |
| | Enginnering & Infrastructure | 01/09/10 | 01/11/11 | | | | | | | | | | | | |
| | Environmental Management | 01/06/10 | 01/11/11 | | | | | | | | | | | | |
| | Economic Evaluation | 01/11/11 | 01/01/12 | | | | | | | | | | | | |
| | Final report | 01/01/12 | 16/02/12 | | | | | | | | | | | | |
| | Guinea Government Protocol | 16/02/12 | 16/03/12 | | | | | | | | | | | | |

**Figure 2 – Feasibility Study Preliminary Schedule - FEL 1**

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between
BSG Resources Limited and Vale S.A.

**ATTACHMENT 1 – FEL 1 Deliverables**

## 1. Planning and Control

1.1. Project definition
    1.1.1.   Business objective's and project objective´s formal statement.
    1.1.2.   Executive report.

1.2. WBS (Work Breakdown Structure)
    1.2.1.   Preliminary scope for several project areas (e.g. mining, logistics, process, etc.).

1.3. Schedule
    1.3.1.   Main milestones.

1.4. CAPEX
    1.4.1.   Preliminary CAPEX definition.
    1.4.2.   Contingency/allowance estimatives considering historical data for similar projects.

## 2. Engineering

2.1. Site conditions
    2.1.1.   Preliminary soil characterization - geotechnical drilling/hydrogeologic, topography, bathymetric evaluation.
    2.1.2.   Environmental conditions preliminary survey - pluviometry, winds, temperature, tides and stream.

2.2. Resources and reserves
    2.2.1.   Geological model assumed based on regional and local geology, geophysical and hole drilling interpretation and comparison with similar deposits.
    2.2.2.   Geotechnical evaluation.
    2.2.3.   Hydrogeological study.
    2.2.4.   Hydrological model.
    2.2.5.   Preliminary mineralogical and technological characterization.

2.3. Mining plan
    2.3.1.   Choice of possible scenario for the mining plan (mining method, geotechnical and technological parameters assumed based on similar operations, preliminary layout with the location of waste stockpiles, preliminary LOM, equipment and infra-structure fleet based on similar operations Mine geometry, sequence of exploitation and preliminary mathematical pit.

2.4. Engeneering
    2.4.1.   Identification and pre-selection of technology and process rules available.
    2.4.2.   Process, utilities and tailings block diagram.
    2.4.3.   Demand estimate and verification of the availability of energy.
    2.4.4.   Preliminary plot plan and general layout.
    2.4.5.   Main equipment´s preliminary list.

## 3. Economic Evaluation and Market

3.1. OPEX
    3.1.1.   Total operating cost based on index or analogies.

3.2. Market analysis
    3.2.1.1.   Product description.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 1 – FEL 1 Deliverables**

    3.3.  Economic evaluation and project feasibility
        3.3.1.   NPV sensitivity´s preliminary analysis (price, cost, taxes, ore grades, logistics, etc).
        3.3.2.   Definition of main feasibility indicators for the business plan (Discounted Pay Back, NPV, IVP, NPV/IVP and IRR), considering the options of scalability and flexibility.

## 4.  Risk Management

    4.1.  Risk analysis

## 5.  Communication Management

    5.1.  External communication
        5.1.1.   Matrix of external stakeholders including: roles, impacts, extent, perception, main interests, etc.
        5.1.2.   Institutional positioning and key messages.
        5.1.3.   Speech alignment with the field team ("speak the same language"), script (speech) update with main Q&A (Questions and Answers).
        5.1.4.   Define communication team´s structure.
        5.1.5.   Definition and execution of social communication program.

    5.2.  Internal communication
        5.2.1.   Project internal communication plan.

## 6.  Health, Safety, Environment and Community

    6.1.  Health and safety legal requirements
        6.1.1.   Identification and analysis of health and safety legal requirements.

    6.2.  Environmental studies and permitting process
        6.2.1.   Definition of the permitting strategy (including political and institutional actions).
        6.2.2.   Socio-environmental characterization and preliminary environmental assessment.

## 7.  Land Management

    7.1.  Right of use of land
        7.1.1.   Preliminary land´s survey required for the project.
        7.1.2.   Mineral research rights.

## 8.  Team and Organizational

    8.1.  Project organizational chart.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 1 – Activity Flowchart**



UK-2421081-v8

95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 1 – Activity Flowchart**



UK-2421081-v8

95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 1 – Activity Flowchart**



UK-2421081-v8                                                                                   95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 2 – FEL 3 Deliverables**

## 1.  Planning and Control

1.1. Project definition

    1.1.1.  Formal update (if applicable) of business objectives and project objectives - with sponsor agreement.

    1.1.2.  Issue the executive report.

1.2. WBS (Work Breakdown Structure)

    1.2.1.  Complete WBS (Work Breakdown Structure) covering the whole project scope, detailed to the 3rd level minimum (physical areas, sub-areas and assets).

1.3. Schedule

    1.3.1.  Complete set of milestones, including permits, major procurement activities, construction, and startup, detailed activities for execution (sufficient to assure the level of control expected).

    1.3.2.  Detailed tie-ins schedule - with operations and maintenance agreement.

    1.3.3.  Resource-loaded schedule with: activities relationship, main activities loaded with real quantities and resources (from basic engineering), activities duration according to productivity indices, procurement activities based on bidding quotes.

    1.3.4.  Critical path review and schedule baseline.

1.4. CAPEX

    1.4.1.  Project accounting plan.

    1.4.2.  References and exchange rates applied royalties and taxes estimate.

    1.4.3.  Cost of equipment based on quotation, cost estimate for each package, including detailed engineering, civil works, erection and assembling, commissioning and startup.

    1.4.4.  Investment definition such as: safety, environmental issues, workforce development, operational and maintenance training, and logistics.

    1.4.5.  Definite estimate for infrastructure (permanent and temporary): access, fueling, workshops, power supply, water supply, IT, telecom, etc.

    1.4.6.  Confidence level used for CAPEX definition based on risk analysis results.

    1.4.7.  Contingency/allowance for final CAPEX.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 2 – FEL 3 Deliverables**

1.5. Physical, economical and financial control structure

1.5.1.  Baseline of the physical-economic schedule, procedures for review and control, budget and contingency work out.

1.5.2.  Structure of the economic-financial control system integrated with the physical schedule, follow up reports and responsibilities.

1.6. Project execution plan (PEP)

1.6.1.  Definite PEP.

1.7. Change management plan

1.7.1.  Change management plan for construction phase.

1.8. Project validation

1.8.1.  Report on project compliance issued by the decision support team.

2. **Engineering**

2.1. Site conditions

2.1.1.  Geotechnical data sufficient for definition of earthmoving quantities, foundations and drainage system.

2.2. Resources and reserves

2.2.1.  Geological model shall be enough to support mine plan, incorporated all data with lateral and depth extension of deposit defined. This model shall include complete drilling data interpretation, mineralogical and metallurgical test work data, mineralization control factor and geological plan defined.

2.2.2.  Final geotechnical model based on detailed discontinuity mapping, geological modeling, considerations about the effect of detonations and the presence of water in discontinuities. Parameters proved by tests on non deformed samples and samples obtained from holes from geotechnical drilling (including geotechnical logging). Strains and stability analysis with adequate degree of definition to subside

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

the mining. And sequencing plan, including risk analysis, structural and rock strain model in 3D, virgin strains determined by geotechnical tests.

2.2.3.  Final hydrogeological model with flow parameters and underground water characterization obtained from wells and monitoring, groundwater level determined from piezometers, water flow analysis and distribution of poro pressure using an appropriate empiric model, clear definition of groundwater flow, including all aquiferous, water levels, porosity, permeability and poro pressure, integration of information from geotechnical model and mining plan. Hydrogeological Monitoring Plan and tests completed.

2.2.4.  Final hydrological model with detailed definition of the area drainage, including differential soil permeability, vegetation, bay shape and inclination, water courses and main effluents, soil conditions during raining periods, concentration period, etc, definition of best alternative for water impounding and treated tailings dam, weathering and alteration regimes, rain precipitation rate and fluviometric data obtained from weather, pluviometrical  stations installed on site, with final statistical analysis of the data obtained, integration of information with geology, geotechnical parameters, mine planning and environment, risk analysis.

2.2.5.  Whole ore for cash flow period classified as, at least, resource measured and indicated, audit on reserves by a third party.

2.2.6.  Execution phase plan, including drilling, sampling, tests, QA/QC and logging.

2.2.7.  Definite mineralogical and technological characterization, including pilot plant and industrial test.


2.3. Mining plan

2.3.1.  Mine plan including: final layout, detailed schedule, environment management plan, mining sequence, monthly plan for the first year, six-months plan for the next four years and a five year plan for the rest of the LOM, closure plan, blasting plan, equipment maintenance strategy, mine drainage plan and safety plan.


2.4. Engineering

2.4.1.  Design criteria for basic design.

2.4.2.  Process detailed description.

2.4.3.  Heat and mass balance, utilities balance and final process flow diagrams.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between
BSG Resources Limited and Vale S.A.

**ATTACHMENT 2 – FEL 3 Deliverables**

2.4.4.  Utility systems and equipment complete specifications, estimate of concrete and/or steel structures, loading and anchoring plan.

2.4.5.  Load and demand studies, short circuit and load flow studies, one-line diagram (general and for each area), ensure power demand compliance.

2.4.6.  Definite drawings and design, plot plan, general layout, mechanical layout including: location of industrial facilities, temporary installations, access, roads, railways, transmission line route, piping routes, IT, automation and telecom networks.

2.4.7.  Piping and instrumentation diagrams (P&ID's).

2.4.8.  List of mechanical, electrical, industrial automation and telecom equipment.

2.4.9.  List of material (piping, mechanical, electrical, industrial automation, telecom), instruments, line and cable list and other special material.

2.4.10. Definite configuration diagrams for control, supervision and telecom systems, including control logic and I/O list.

2.4.11. Final take-off worksheets for each discipline.

2.4.12. Technical request for equipment supply, material, systems, civil works and services, including general specs, technical specs, data sheets, typical details, standards and engineering symbology.

2.4.13. Basic design review by maintenance, operation, construction and safety teams.

2.4.14. Definition of operational cycles, validated by the operation team; definite nameplate capacity and operational performance goals, validated by the operation and maintenance teams.

2.4.15. Scalability and flexibility attributes of the basic design, revised and approved by operation and maintenance teams.

2.4.16. Basic design.

2.5. Maintenance strategy

2.5.1.  Definition of maintenance strategy and spare parts, both validated by the maintenance team.

## 3.  Economic Evaluation and Market

3.1. OPEX

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 2 – FEL 3 Deliverables**

3.1.1.  Definition of complete cost framework. Estimate basis, data sources, exchange and commodities variation handling.

3.1.2.  Operating costs definition based on the complete cost structure, given by calculation spreadsheets (process flowchart,), maintenance cost of main equipment.

3.1.3.  Review the logistic costs and taxes concerning the selected alternative.

3.1.4.  Survey the effects of nominal capacity and availability of the alternative selected on operating costs.

3.2. Market analysis and strategic alignment

3.2.1.  Update market risk analysis.

3.2.2.  Update marketing strategy.

3.2.3.  Update product description.

3.3. Economic evaluation and project feasibility

3.3.1.  Update sensitivity's analysis of NPV.

3.3.2.  Complete feasibility analysis, including ultimate indicators, variation analysis, NPV probability and sensitivity analysis, considering scalability and flexibility options.

## 4.  Procurement

4.1. RFQ´s

4.1.1.  RTs of main equipment and services, main RFQs.

4.2. Procurement plan

4.2.1.  Procurement plan, according the procurement planning handbook, including: project risk management plan, communication plan for bidders, suppliers, contractors (added to project communication plan), package summary, procurement and contracting strategy, criteria for previous qualifying, vendor-list.

## 5.  Risk Management

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 2 – FEL 3 Deliverables**

5.1. Risk analysis

    5.1.1.   Evaluation of project risks.

    5.1.2.   Critical analysis of the risk evaluation.

5.2. Risk management plan

    5.2.1.   Detailed risk management plan for the project life cycle, resulting in an effective elimination of fatal flaws.

5.3. HazOp

    5.3.1.   HazOp.

    5.3.2.   Review standards and operational procedures for basic/detailed design.

    5.3.3.   Structure for operational risks control and monitoring: team, roles and responsibilities, procedures, audits, type of reports, etc.

## 6. Communication Management

6.1. External communication

    6.1.1.   Stakeholder matrix.

    6.1.2.   SWOT analysis.

    6.1.3.   Institutional positioning and key messages.

    6.1.4.   Speech alignment with the field team ("speak the same language"), update Q&A.

    6.1.5.   Update communication team structure.

    6.1.6.   Social communication program - community mobilization plan, communication program for environmental permits.

6.2. Internal communication

    6.2.1.   Stakeholder matrix.

    6.2.2.   Review the project's internal communication plan.

## 7. HSEC (Health, Safety, Environment and Community)

7.1. Health and safety legal requirements

    7.1.1.   Re-evaluation of applicable legislation.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 2 – FEL 3 Deliverables**

7.2. Health and safety management plan

    7.2.1.  Definition of health and safety key performance indicators (KPI's) for execution and operations.

    7.2.2.  Definition of the training program (execution and operations).

    7.2.3.  Complete HazOp - see risk management

    7.2.4.  Definition of health and safety policies for execution phase: corporate safety procedures, need for specific safety procedures for erection, requirements for contracting.

    7.2.5.  Definition of the structure for controlling and monitoring operational risks (team, roles and responsibilities, audit process, reports, etc).

7.3. Environmental studies and permitting process

    7.3.1.  Negotiation of compensatory actions associated with environmental permit.

    7.3.2.  Development of the environmental control plan.

    7.3.3.  Previous license (if applicable), application for installation license.

    7.3.4.  Definition of a specific socio-economical management plan for the project.

    7.3.5.  Environmental management plan for the execution phase.

**8.  Land Management**

8.1. Right of use of land

    8.1.1.  Final documents for land purchase/lease/right of use.

**9.  Team and Organizational**

9.1. Project organizational chart.

    9.1.1.  Project construction team selected.

    9.1.2.  Roles and responsibilities' matrix for execution.

    9.1.3.  Updated project organizational chart.

9.2. Defining the human resources for execution and operation

    9.2.1.  Integrated human resources plan.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 2 – FEL 3 Deliverables**

## 10. General

### 10.1.    Insurance

Insurance plan including values, schedule, responsibilities and scope.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between
BSG Resources Limited and Vale S.A.

**ATTACHMENT 2 – Activity Flowchart**



Project team should include representatives from
key functions:
- Planning and Control;
- Engineering specialists;
- Cost estimating;
- Operations;
- Maintenance;
- Construction Manager
- Representatives from business Unit (mine,
beneficiation, logistics, energy/utilities).

UK-2421081-v8

95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 2 – Activity Flowchart**



UK-2421081-v8

95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 2 – Activity Flowchart**



UK-2421081-v8

95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 2 – Activity Flowchart**



UK-2421081-v8

95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**ATTACHMENT 2 – Activity Flowchart**

The following areas should take part of PEP definition:
- Business
- Strategic planning
- Construction
- Communications
- Social area
- Human resources
- Legal
- Health, Safety and Environmental
- Public Relations



UK-2421081-v8                                                                                      95-40469850

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

# SCHEDULE 10

# TAX COVENANT

**Section 1.        Covenant**


1.1      The Parties agree that BSGR shall pay, in each case, on demand (at Vale's election) either (i) to Vale, an amount equal to the Relevant Ownership Percentage of the aggregate amount of; or (ii) to the relevant BSGR Guinea Group Company, an amount equal to 100 per cent. of the aggregate amount of:

(a)      each relevant BSGR Guinea Group Company's liability for Tax, in each case, which arises:

(i)      in consequence of an Event occurring or being deemed to have occurred on or before Completion; or

(ii)      in respect of or by reference to any income, profits or gains which were, or were deemed to be, earned, accrued or received on or before Completion or in respect of a period ending on or before Completion;

(b)      Tax in respect of which Vale would have been able to make a Claim under this Agreement but which is not payable in consequence of the utilization of any relief arising to a BSGR Guinea Group Company or Vale or a member of the Vale Group after Completion; and

(c)      Tax which (on the basis of the rates prevailing on the date of this Agreement) would have been saved by the relevant BSGR Guinea Group Company but for the loss, reduction, modification or cancellation of a relief shown as an asset in, or otherwise taken into account in, the BSGR Guinea Accounts in consequence of an Event occurring on or before Completion, or the non-availability or non-existence of such a relief,

in each case whether or not such Tax is or would have been chargeable against or attributable to another person and whether or not any amount in respect thereof is recoverable from any other person.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

**Section 2.        Exclusions and Limitations**

2.1        No liability shall arise under Section 1 of this Schedule 10 or under the Tax Warranties to the extent that:

        (a)        such liability to Tax was discharged unconditionally and in full prior to Completion;

        (b)        any relief arising to a BSGR Guinea Group Company as a result of an Event before Completion was available to mitigate or relieve such liability to Tax;

        (c)        provision or reserve for such Event was made in the BSGR Guinea Accounts;

        (d)        such Tax arises or is increased as a result of:

            (i)        a change in Tax rates or in legislation, law, directive or legislative requirement made after Completion; or

            (ii)        change or withdrawal after Completion of any previously published practice or concession of any Tax Authority;

            in either case with retrospective effect;

        (e)        such Tax arises as a result of the terms, conditions and provisions of the Basic Agreement in respect of Tax being breached or deemed to be breached, amended or deemed amended, revoked, invalid or void or deemed revoked, invalid or void, in each case after Completion (whether or not deemed to be before Completion) or being applied after Completion in a manner which would not on any reasonable interpretation of the Basic Agreement as at the date of this Agreement have resulted in such Tax;

        (f)        such Tax would not have arisen but for a voluntary act or transaction carried out by Vale or a BSGR Guinea Group Company after Completion (including those acts or transactions carried out pursuant to this Agreement, the Liberia Exploration Permits, the Guinea Exploration Permits, the Ancillary Agreements, the Basic Agreement, the Material Contracts, the Mining Concession and the Royalties Agreement); or

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

(g)    recovery of such Tax is made under the Warranties or has already been
made under this Schedule 10.


2.2    The exclusions in Section 2.1(a)-(g) of this Schedule 10 shall also operate to limit or
reduce the liability of Vale in respect of claims under the Tax Warranties and in any case when
the provisions of this Schedule 10 conflict with the other provisions of the Agreement which
apply in respect of claims under this Schedule or under the Tax Warranties then the provisions of
this Schedule 10 shall prevail.


**Section 3.    Conduct of Claims**


3.1    BSGR shall be entitled, at its expense, to resist any Tax Claim under this Schedule for
and on behalf and in the name of the relevant BSGR Guinea Group Company which is or could
relate to Tax liability for which BSGR has agreed it will be liable under Section 1 of this
Schedule 10 if the Tax Claim is not successfully defended, subject to the remaining provisions of
this Schedule 10.


3.2    If Vale or a BSGR Guinea Group Company becomes aware of a Tax Claim under this
schedule Vale shall give written details of the relevant matters to BSGR as soon as reasonably
practicable and in any event within 15 Business Days.


3.3    Vale shall (and where relevant, shall procure that the relevant BSGR Guinea Group
Company shall):

(a)    take such action as BSGR may reasonably request in writing to avoid, dispute,
defend, resist, appeal or compromise any Tax Claim (a "**Disputed Tax Claim**"),
subject to BSGR agreeing (to Vale's reasonable satisfaction) to indemnify Vale or
the relevant BSGR Guinea Group Company against the Tax and any costs which
it may reasonably and properly suffer or incur as a result of taking such action;

(b)    make available to BSGR such persons as BSGR may reasonably require and all
such information as may be available and as may reasonably be requested by the
BSGR for avoiding, disputing, resisting, appealing, compromising or contesting
any such Tax Claim; and

(c)    not accept or pay or compromise any such Tax Claim without the BSGR's prior
written consent.


3.4    BSGR shall:

(a)    keep Vale fully informed of all matters relating to the Disputed Tax Claim and
deliver to Vale copies of all correspondence relating to the Disputed Tax Claim;

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between
BSG Resources Limited and Vale S.A.

    (b)    obtain Vale's prior written approval (not to be unreasonably withheld or delayed) to:

        (i)    the appointment of solicitors or other professional advisers; and

        (ii)    the content and sending to a Tax Authority of each communication (written or otherwise) relating to the Disputed Tax Claim; and

    (c)    obtain Vale's prior written approval (not to be unreasonably withheld or delayed) to:

        (i)    the settlement or compromise of the Disputed Tax Claim; and

        (ii)    the agreement of any matter which is likely to affect the amount of the Disputed Tax Claim or the future liability of Vale, BSGR Guinea or a BSGR Guinea Group Company in respect of Tax.

3.5    BSGR's rights under Section 3.1 of this Schedule 10 cease if it fails to comply with any of its obligations under Section 3.4 of this Schedule 10, or it:

    (a)    takes corporate action, or other steps are taken or legal proceedings are started for its winding up, declaration as an désastre, dissolution, administration or re-organisation or for the appointment of a receiver, administrator, trustee or similar officer of it or of any of its assets; or

    (b)    is unable to pay its debts as they fall due, starts negotiations with a creditor with a view to the general readjustment or rescheduling of its indebtedness or makes a general assignment for the benefit of, or a composition with, its creditors.

3.6    BSGR is to pay any required sum under Section 1 of this Schedule 10 on the later of the date five Business Days before the date on which the relevant BSGR Guinea Group Company will finally be liable to pay the Tax (or would have been so liable if such Tax is not payable due to the utilisation of a Relief) in respect of the relevant Tax Claim unless such Tax is required by a Tax Authority to be paid before such time (in which case BSGR shall pay such sum five Business Days before the date on which the relevant BSGR Guinea Group Company is required to pay the Tax), and the date five Business Days following the date on which written notice setting out the amount due is received by BSGR from Vale.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.