## EXHIBIT 6
### Pt. I

[emblem]
TECHNICAL COMMITTEE FOR THE
REVIEW OF MINING TITLES
AND AGREEMENTS

No. 039/CTRTCM/2014

Subject: Transmission of recommendation issued
by the CTRTCM to the Strategic Committee

REPUBLIC OF GUINEA
Work, Justice, Solidarity

Conakry, March 28, 2014

CONFIDENTIAL

*The President*

to

The Chief Executive Officer of
VBG – VALE BSGR GUINEA
Cité Chemin de Fer –Pita Building– 5th Floor
Conakry – Republic of Guinea

Mr. Chief Executive Officer,

Please find enclosed, for your information, the report presented today to the Strategic Committee, by the Technical Committee for the Review of Mining Titles and Agreements (Comité Technique de Revue des Titres et Conventions Miniers - CTRTCM), in accordance with its mandate, after the review of your Mining Titles in the Republic of Guinea. This complete report contains the recommendation of the CTRTCM to the Strategic Committee.

Yours truthfully,

[signature]
Nava TOURÉ
[stamp]
TECHNICAL COMMITTEE FOR THE REVIEW OF MINING
TITLES AND AGREEMENTS
CTRTCM
PRESIDENT

Enclosure: CTRTCM Report to the Strategic Committee

Villa 26, Cité des Nations – B.P. 3301 – Conakry Courriel : ctrtcm@contratsminiersguinee.org

**TECHNICAL COMMITTEE FOR THE REVIEW OF MINING TITLES AND AGREEMENTS**

### RECOMMENDATION CONCERNING THE TITLES AND MINING AGREEMENT HELD BY THE COMPANY VBG

To the attention of the Strategic Committee

3/21/2014

CONFIDENTIAL

To the attention of the Strategic Committee

## SUMMARY

In the mining sector, BSGR obtained the benefit of several mining titles and one mining agreement:

- four exploration permits covering a total area of 2047 square kilometers (km$^2$) in the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A2006/023/DIGM/CPDM according to Ministerial Order No. A2006/706/MMG/SGG of February 6, 2006, which permits were renewed for a total area of 1667 km2 and recorded in the Register of Mining Titles under number A2009/124/DIGM/CPDM CPDM pursuant to Ministerial Order No. A 2009/1327/PR/MMEH/SGG of June 10, 2009;

- three exploration permits covering a total area of 1286 km$^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2006/024/DIGM/CPDM pursuant to Ministerial Order No. 2006/707/MMG/SGG of February 6, 2006;

- one exploration permit on Simandou blocks 1 & 2, covering a total area of 369 km$^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2008/132/DIGM/CPDM pursuant to Ministerial Order No. 72008/4980/MMG/SGG of December 9, 2008.

- one basic agreement dated December 16, 2009, for the granting of a mining concession in the "Zogota" zone, with a total area of 1024 km$^2$ straddling the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A 2010/171/DIGM/CPDM pursuant to Presidential Decree No. D2010/024/PRG/CNDD/SGG of March 19, 2010.

Today, VBG is the holder of the following Mining Titles and mining agreement:

- one exploration permit on Simandou blocks 1 & 2, covering a total area of 369 km$^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2008/132/DIGM/CPDM pursuant to Ministerial Order No. 72008/4980/MMG/SGG of December 9, 2008;

- one basic agreement dated December 16, concerning the "Zogota" zone;

p. 3

- one mining concession concerning the prospection and exploitation of the iron deposits of Zogota, resulting from the transformation of four exploration permits initially granted for the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A 2006/171/DIGM/CPDM pursuant to Presidential Decree No. D2010/024/PRG/CNDD/SGG of March 19, 2010.

Under the Program for the Review of Mining Titles and Agreements, the Technical Committee reviewed the titles and agreement held by VBG in order to make recommendations to the Strategic Committee, in charge of delivering an opinion on these titles and agreement to the competent authorities.

The administrative proceedings carried out by the Technical Committee were organized so as to allow the company holding the mining titles and mining agreement conveniently to present its observations, both orally and in writing.

Especially based on the exhibits obtained in a legal proceeding currently being conducted by American authorities and whose authenticity does not seem doubtful, actually contested only by the minority shareholder of VBG, but without any evidence supporting its position, the Technical Committee considers that the titles and agreement held today by VBG were obtained by corrupt practices, concerning the deposits of Simandou as well as those of Zogota.

In conclusion, and taking into account all of the above, the Technical Committee considers that:

- there is a series of precise and concurring indications, establishing with sufficient certainty the existence of corrupt practices tarnishing the mining titles and mining agreement for the deposit of Simandou, as well as for those of Zogota, granted to BSGR; and

- such corrupt practices render null and void the Mining Titles and the mining agreement currently held by VBG.

Such being the case, the Technical Committee considers that:

- these administrative acts could not create rights for the company that had obtained them, due to the irregularity tarnishing their granting proceedings;

- VBG which, in all events, is the current

holder, may have this irregularity held against it;

- If, based on the information obtained by the Technical Committee, it is likely that the majority shareholder of VBG did not participate in the corrupt practices, this circumstance should not affect at all or even in part the recommendation to be submitted by the Technical Committee to the Strategic Committee, since the validity of a mining title or mining agreement is appreciated intrinsically.

Consequently, the Technical Committee submits the following recommendation to the Strategic Committee:

- to propose to the Minister of Mines to withdraw the exploration permit on Simandou blocks 1 & 2, covering a total area of 369 km$^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2008/132/DIGM/CPDM pursuant to Ministerial Order No. 72008/4980/MMG/SGG of December 9, 2008;

- to propose to the President of the Republic to withdraw the mining concession in the "Zogota" zone, with a total area of 1024 km$^2$ straddling the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A 2010/171/DIGM/CPDM pursuant to Presidential Decree No. D2010/024/PRG/CNDD/SGG of March 19, 2010;

- then, to propose to the Minister of Mines to declare the cancellation of the basic agreement dated December 16, 2009;

- to propose to the competent authorities to order VBG to communicate to the services of the Ministry of Mines all studies, reports, data, results, samples, etc. that would have been realized or obtained in the mining operations of VBG in Guinea;

- to propose to the competent authorities to take all useful measures to exclude VBG, holder of the titles and agreement subject to this recommendation, as well as the companies that originated these corrupt practices, i.e. BSGR and the directly or indirectly affiliated or controlled companies of the BSGR Group, from the proceedings of reattribution of the titles and agreement in question.

p. 5

The Technical Committee for the Review of Mining Titles and Agreements (the "**Technical Committee**");

Having regard to the Constitution;

Having regard to Law L/95/036/CTRN of June 30, 1995, containing the Mining Code of the Republic of Guinea;

Having regard to Law L/2011/006/CNT/2011 of September 9, 2011, concerning the Mining Code of the Republic of Guinea, amended by Law L/2013/053/CNT of April 8, 2013;

Having regard to Decree D/2012/041/PRG/SGG of March 26, 2012 concerning the attributions, composition and operation of the National Mining Commission;

Having regard to Decree D/2012/045/PRG/SGG of March 29, 2012, concerning the methods for implementing a Review Program for Mining Titles and Agreements by the National Mining Commission;

Having regard to Decree D/2013/098/PRG/SGG of May 23, 2013, concerning the methods for implementing a Review Program for Mining Titles and Agreements by the National Mining Commission;

Having regard to the Rules of Procedure of the Technical Committee of September 9, 2013;

Having regard to all the exhibits produced and enclosed with the file, concerning in particular the written proceedings;

After hearing Mr. João Vidoca, representative of VBG, and Messrs. Jean-Yves Garaud, Barthelémy Faye and Sekou Koundiano during the meeting of December 16, 2013 in the presence of Mr. Nava Touré, President, Mr. Ibrahim Camara, Vice President, and Messrs. Saadou Nimaga, Alhassane Camara, Salim Ahmed Halaby, Ousmane Keita, Mamadou Taran Dallo, El Hadj Ibrahima Bodie Baldé, Ibrahima Bodie Baldé, Ibrahima Kalil Kourouma, members, the minutes of this meeting also being attached to the file;

After deliberating during the meeting of March 21, 2014, in the presence of Mr. Nava Touré, President, Mr. Ibrahima Camara, Vice President, and Messrs. Alkhaly Yamoussa Bangoura, Halaby Ahmed Salim, Saadou Nimaga, Mamadou Taran Dallo Ibrahima Kalil Kourouma, Ibrahima Bodie Baldé, El Hadj Ibrahima Baldé, Abdoul Karim Sylla, Ousmane Keita, Morciré Sylla, Seydou Bari Sidibé, members, Sidikiba Kaba and Bangaly Oularé, alternate members,

**Submits the following recommendation to the Strategic Committee.**

\* \*

\*

**p. 6**

1.  Pursuant to the aforementioned laws, the Technical Committee is in charge of submitting recommendations to the Strategic Committee concerning the mining titles and agreements examined during the review process, so that the Strategic Committee would be able to issue an opinion to the Competent Authorities in the name of the National Commission of Mines.

2.  In this framework, the Technical Committee reviewed the mining titles and the mining agreement currently held by VBG on the deposits of Zogota and Simandou;

    -   one exploration permit on Simandou blocks 1 & 2, covering a total area of 369 km$^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2008/132/DIGM/CPDM according to Ministerial Order No. 72008/4980/MMG/SGG of December 9, 2008.

    -   one basic agreement dated December 16, 2009 concerning the "Zogota" zone;

    -   one mining concession concerning the prospection and exploitation of the iron deposits of Zogota, resulting from the transformation of four exploration permits initially granted for the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A 2010/171/DIGM/CPDM according to Presidential Decree No. D2010/024/PRG/CNDD/SGG of March 19, 2010.

3.  The examination of the file in question implies, pursuant to article 3 of the Rules of Procedure, a written phase and an oral phase, guaranteeing the rights of defense, which will be summarized below.

4.  At the end of these proceedings, which were not contested by VBG but only by this company's minority shareholder – BSGR - the Committee considers that the series of indications listed below, gathered by the Technical Committee, and which were not denied during the written and oral proceedings, leads to the reasonable certainty that the mining titles and the mining agreement in question were obtained under conditions vitiating their issuance.

5.  At this stage, the Technical Committee intends to recall three series of elements concerning the nature and perimeter of this recommendation.

6.  First of all, the Technical Committee based itself on the elements of proof in its possession – communicated to VBG and cited in the annex of this report – to prepare the recommendation it submits to the Strategic Committee.

7.  In fact, given the severity and importance of the facts in question, the Technical Committee focused its analysis only on the conditions

p. 7

for obtaining the mining titles and the mining agreement held today by VBG, and does not mention the other defaults of this company on its administrative or tax obligations. These defaults, which in fact could be seen, are also likely to affect the validity of the mining titles and the mining agreement in question.

8. Finally, neither the analysis nor the conclusions of the Technical Committee – consultative administrative instance – prejudge the criminal qualifications that the facts in question would actually be likely to receive in the criminal proceedings conducted in parallel by the competent courts.

9. Consequently, the Technical Committee submits the following recommendation to the Strategic Committee:

- to propose to the Minister of Mines to withdraw the exploration permit on Simandou blocks 1 & 2, covering a total area of 369 km$^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2008/132/DIGM/CPDM pursuant to Ministerial Order No. 72008/4980/MMG/SGG of December 9, 2008;

- to propose to the President of the Republic to withdraw the mining concession on the "Zogota" zone, with a total area of 1024 km$^2$ straddling the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A 2010/171/DIGM/CPDM pursuant to Presidential Decree No. D2010/024/PRG/CNDD/SGG of March 19, 2010;

- then, to propose to the Minister of Mines to declare the cancellation of the basic agreement dated December 16, 2009;

- to propose to the competent authorities to direct VBG to communicate to the services of the Ministry of Mines all studies, reports, data, results, samples, etc. that would have been realized or obtained in the mining operations of VBG in Guinea;

- to propose to the competent authorities to take all useful measures to exclude VBG, holder of the titles and agreement subject to this recommendation, as well as the companies that originated these corrupt practices, i.e. BSGR and the directly or indirectly affiliated or controlled companies of the BSGR Group, from the proceedings of reattribution of the titles and agreement in question.

These various points are developed below.

p. 8

## TITLE I – REMINDER OF THE FACTS AND PROCEEDINGS

10. After a brief reminder of the facts, the Committee will present the main stages of the proceedings it carried out concerning the titles and the agreement currently held by VBG.

### I. THE FACTS

**1.    The origin of the interventions of BSGR with the authorities**

11. The family group Beny Steinmetz Resources Group (**"BSGR Group"**) essentially carried out its activity in the sector of diamond and natural resources.

12. In order to expand its activity in this sector, according to the information in the possession of the Committee, at the beginning of 2000, the BSGR Group decided to invest in the mining sector in the Republic of Guinea.

13. In this context, the BSGR Group used the services of Mr. Frédéric Cilins.

14. The latter, who was experienced in business in the Republic of Guinea and who had already worked for the BSGR Group in other West African countries, served as representative of this entity in the Republic of Guinea starting in 2005. As indicated by Mr. Frédéric Cilins, the essential part of his work consisted of presenting the company and promoting its penetration strength into Guinea.

15. The BSGR Group also resorted to several companies for the development of its activities in Guinea (together **"BSGR"**), especially the companies BSG Resources Limited recorded in Guernsey, BSG Resources (Guinea) Limited, also recorded in Guernsey, and BSG Resources (Guinée) Sarl – a Guinean company fully and exclusively held, at the time of the facts, by BSGR – created to carry the titles and agreements of which the BSGR Group could benefit.

16. Legal representatives of BSGR – successively Mr. Roy Oron, assisted by Mr. Marc Struik then, starting in 2006, Mr. Asher Avidan, director of BSG Resources (Guinée) Sarl – and Mr. Frédéric Cilins, agent of BSGR in Guinea, as explained below, contacted the Guinean authorities in order to indicate to them the wish of the BSGR Group to invest in mines in Guinea.

17. In this framework, Mr. Frédéric Cilins contacted Mr. Ibrahima Sory Touré, journalist, whom he knew, who then introduced Mr. Frédéric Cilins to his half-sister, Mrs. Mamadie Touré.

18. Thus, on September 19, 2006, Mrs. Mamadie Touré was invited, particularly in the company of Messrs. Roy Oron, Marc Struik, Asher Avidan and Frédéric Cilins, to a presentation made by BSGR, obviously as a "public relations" effort.

p. 9

19. In these circumstances, Mr. Beny Steinmetz and the successive representatives of BSGR in Guinea – especially Mr. Asher Avidan and Mr. Frédéric Cilins – asked Mrs. Mamadie Touré several times to intervene with the Head of State, her husband, to make him give all the instructions necessary for mining rights to be attributed to BSGR in the Republic of Guinea.

20. Several meetings were organized, especially by Mrs. Mamadie Touré, during which the representatives of BSGR insisted that the company be given mining rights, first on the Zogota deposits and, afterwards, on Simandou blocks 1 and 2. The representatives of BSGR – including Mr. Beny Steinmetz – attended several of these meetings and, in particular, were able to meet with President Lansana Conté.

21. In exchange, BSGR promised that financial compensation would be paid to the persons who contributed to the favorable outcome of these interventions.

**2.   Granting of mining titles and agreement to BSGR on the deposits of Zogota and Simandou**

22. As of February 2006, BSGR obtained two series of mining titles:

    - four exploration permits covering a total area of 2047 square kilometers ($km^2$) in the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A2006/023/DIGM/CPDM pursuant to Ministerial Order No. A 2006/706/MMG/SGG of February 6, 2006, renewed for a total area of 1667 $km^2$ and recorded in the Register of Mining Titles under number A2009/124/DIGM/CPDM CPDM pursuant to Ministerial Order No. A2009/1327/PR/MMEH/SGG of June 10, 2009; and

    - three exploration permits covering a total area of 1286 $km^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2006/024/DIGM/CPDM pursuant to Ministerial Order No. 2006/707/MMG/SGG of February 6, 2006.

23. After obtaining these titles, BSGR tried to obtain Simandou blocks 1 and 2, at the time held by another company.

24. On July 28, 2008, a presidential decree removed all the rights to Simandou blocks 1 and 2 from the company which held them at the time.

25. A few months later, BSGR was able to obtain the rights to Simandou blocks 1 and 2, i.e. an exploration permit for the Simandou blocks 1 and 2, covering a total area of 369 $km^2$ in the prefecture of Kérouané, recorded in the Register of Mining Titles under number A2008/132/DIGM/CPDM pursuant to Ministerial Order No. 72008/4980/MMG/SGG of December 9, 2008.

p. 10

26. Finally, on December 16, 2009, BSGR executed a basic agreement with the Republic of Guinea which led to the subsequent grant of a mining concession in the "Zogota" zone, with a total area of 1024 km$^2$ in the prefectures of Beyla, Macenta, N'Zérékoré and Yomou, recorded in the Register of Mining Titles under number A2010/171/DIGM/CPDM according to Presidential Decree No. D2010/024/PRG/CNDD/SGG of March 19, 2010.

**3.   Parallel granting of financial advantages and gifts to Mrs. Mamadie Touré and to the authorities.**

27. Previously, then in parallel to granting the mining titles and the mining agreement on the deposits of Zogota and Simandou mentioned above, BSGR offered gifts and granted advantages to Guinean authorities and their direct entourage.

28. Among the more substantial advantages there were, in particular, those offered to Mrs. Mamadie Touré, if we believe documents that:

- either indicate them as explicit compensation for successful interventions to obtain mining titles and the mining agreement;

- or do not indicate such explicit compensation, but are found in a context that demonstrates this link, since the absence of technical or commercial skills of the beneficiary cannot justify otherwise such advantages granted to it by a company that was trying to obtain mining titles.

29. Actually, the interested party herself has expressly recognized the facts in her affidavit dated December 2, 2013.

30. Thus, two series of documents were established in the framework of the intervention of Mrs. Mamadie Touré on behalf of BSGR.

   o   **The commitments undertaken by BSGR**

31. On the one hand, contractual commitments were signed by BSGR – represented by its general director– for the benefit of the company Matinda and Co Limited, where Mrs. Mamadie Touré was apparently the "manager":

- **a memorandum of understanding dated June 20, 2007** between BSGR and Matinda and Co Limited, indicating that *"BSGR Guinée contacted Guinean authorities in order to establish a partnership for the development and the exploitation of part of the iron deposits of Simandou on the one hand, and Matinda and Co Limited SARL so that the latter would assist it with the measures and means allowing to obtain mining exploration permits."* The memorandum of understanding also stipulated that *"such being the case, and [by] joined efforts, by order No.A2007/582/MMG/SGG of February 28, 2007, of the Ministry of Mines and*

10

**p. 11**

192

Geology four mining exploration permits of uranium, covering a total area of 1413 km$^2$, were granted to BSGR Resources Guinée in the Prefectures of Lola and N'Zérékoré." Consequently, "in order to reward the efforts made, BSGR Guinée accepts to transfer 5% of all its shares to Matinda and Co Limited SARL, which accepts";

- **a commission contract executed on February 27, 2008** between BSGR and Matinda and Co Limited– represented by Mrs. Mamadie Touré, "businesswoman in Dubreka"- by which "BSGR Resources undertakes to give a total amount of four million dollars as commission to obtain Simandou blocks 1 and 2 located in the Republic of Guinea and covering the prefectures of Kereouane and Beyla." In addition, "Matinda and Co Limited undertakes, in turn, to take all measures necessary to get the signature from the authorities in order to obtain said blocks for BSGR Resources Guinée." Moreover, it was planned that "BSGR Resources Guinée would consider distributing the above commission as follows: an amount of two (2) million of Matinda and Co Limited, with deduction of US$ one hundred (100) already paid as advance" and that "the rest of the amount will be distributed between the persons of good will who had contributed to the facilitation of the grant of said blocks, in which BSGR Resources Guinée will act upon the quality of the contribution of each party." Finally, "the entire amount will be paid without delay after signing said document";

- **a memorandum of understanding executed on February 28, 2008** between BSGR and Matinda and Co Limited– represented by Mrs. Mamadie Touré, "businesswoman in Dubreka"- by which BSGR Resources Guinée – represented by Mr. Asher Avidan - "undertakes to give [to Matinda and Co Limited] 5% of the shares of Simandou blocks 1 and 2 located in the Republic of Guinea and covering the prefectures of Kérouané and Beyla."

32.   These contracts thus expressly conditioned the payment of significant amounts and participations in the mining rights corresponding to Matinda and Co Limited for BSGR to obtain mining rights, especially in the area of Zogota and Simandou blocks 1 and 2.

    o    **The commitments undertaken by the company Pentler Holdings**

33.   On the other hand, certain contracts or commitments were signed directly for the benefit of Mrs. Mamadie Touré by the company Pentler Holdings, where Mr. Frédéric Cilins was one of the executives:

- **a memorandum of understanding was executed on February 20, 2006** between Pentler Holdings and Mrs. Mamadie Touré. This memorandum of understanding mentioned in particular that BSGR had to transfer 17.65% of its capital to Pentler Holdings. In turn, Pentler Holdings undertook to transfer, free of charge, 33.30% of its capital to Mamadie Touré *"as soon as Compagnie Minière de Simandou was incorporated and had obtained the mining titles needed for the exploitation of the mining area of Simandou, which will be attributed to it by the Republic of Guinea"*;

- **two letters of commitment – legalized on July 21, 2006 – from Pentler Holdings to Mrs. Mamadie Touré were also executed**. The first letter indicates that "*in the framework of the development of its activities in Guinea, BSGR Guinée filed a request for a bauxite exploration permit in the areas of Tougé Nord, Boké and Télémélé Nord (...). It is understood that the issuance of these exploration permits for BSGR Guinée will actually cause Mrs. Mamadie Touré to become a shareholder in this project by the free holding of 33.30% set forth in the terms of the Memorandum of Understanding signed between Mrs. Mamadie Touré, on the one hand, and Pentler Holdings Ltd., on the other hand, dated February 20, 2006.*" The second letter indicates that "*in the framework of the development of its activities in Guinea, BSGR Guinée obtained bauxite exploration permits in the areas of Tougué, Kéniéba, Bafing Makana and Dinguiraye (...). It is understood that the delivery of these exploration permits to BSGR Guinée actually causes Mrs. Mamadie Touré to become a shareholder in this project by the free holding of 33.30% set forth in the terms of the Memorandum of Understanding signed between Mrs. Mamadie Touré, on the one hand, and Pentler Holdings Ltd. on the other hand, dated February 20, 2006.*"

- **a document of commitment of Pentler Holdings towards Mrs. Mamadie Touré signed by both parties was prepared on July 8, 2010,** indicating that "*subject to the good development and correct functioning and the continuation of the operation conducted by our partners in the project of Simandu[sic] in Guinea, Pentler Holdings Ltd. undertakes to pay to Mrs. Mamadie Touré the additional amount of US$5 million, payable in two portions (each payment of US$2.5 million)*";

- **a document of commitment of Pentler Holdings towards Mrs. Mamadie Touré was prepared on August 3, 2010,** indicating that "*subject to the good development and correct functioning conducted by Pentler and its partners in all activities in Guinea (commercial drugs-related, mining-related, etc.), Pentler Holdings Ltd. undertakes to pay to Mrs. Mamadie Touré the*

**p. 13**

194

*additional amount of US$5 million, payable in two portions (each payment of US$2.5 million). The first payment will be made 24 months after signing this document. The second payment of 2.5 million will be made 24 months after the first payment"*;

- **a signed, but undated declaration of Mrs. Mamadie Touré** was also drafted. This document indicated that the interested person, *"representative of the company Matinda & Co. Ltd., hereby declares that she received from Pentler Holdings Ltd. the amount of US$2,400,000 (two million four hundred thousand dollars) as part of our collaboration contract signed in 2005"*;

- **a signed but undated contract apparently terminating the relationships between Pentler Holdings and Mrs. Mamadie Touré** was finally executed. This contract indicated in particular that *"our collaboration contract signed in 2005 has reached its end. Our role of advisor and business finder for all our projects in Guinea in the commercial, mining and medical fields was conducted professionally and with great success. The role of Matinda & Co. Ltd. contributed to the great accomplishment of our mutual business. Following your decision to stop your activities in Guinea, we came to an agreement, as follows: Matinda and Co. Ltd. will receive the amount of 3.1 million for its share of all the activities conducted in Guinea."*

o   **Payments made by Mr. Frédéric Cilins to Mrs. Mamadie Touré**

34.   Finally, the payments to Mrs. Mamadie Touré continued after BSGR obtained the mining titles and the mining agreement. Thus:

- On July 27, 2010, a check for 100,000 U.S. dollars was issued by Mr. Frédéric Cilins to Mrs. Mamadie Touré;

- On August 5, 2010, a check for 50,000 U.S. dollars was issued by Mr. Frédéric Cilins to Mrs. Mamadie Touré.

### 4.   The holding taken in BSGR by Vale

35.   On April 30, 2010 – i.e. less than five months after BSGR obtained the Basic Agreement – the Brazilian company Vale (**"Vale"**), major player in the mining sector, executed a Shareholders' Agreement and a Joint Venture Framework Agreement with BSGR.

36.   This operation precisely consisted of Vale taking a majority holding (51%) in BSGR Resources (Guinea) Limited, a company registered in Guernsey and holding 100% of the capital of BSGR Resources (Guinée) Sarl. BSGR remained shareholder with 49% of BSGR Resources (Guinée) Limited.

37.   After this operation, BSGR Resources (Guinea) Limited took the name "**VBG Guernsey**" and BSGR Resources (Guinée) Sarl took the name VBG – Vale BSGR Guinea ("**VBG**") (together "**VBG**").

38.   The operation thus led to a modification of the capital holding by BSGR Resources (Guinée) Sarl and a change of name of this company, but no transfer of mining titles or mining agreement took place.

39.   Today, VBG is the holder of the mining titles and mining agreement currently under review by the Technical Committee.

**5.   The attempt to destroy certain pieces of evidence**

40.   In March 2013, the American Federal police (the Federal Bureau of Investigation, "FBI") intercepted and taped several conversations, locally and by telephone, between Mr. Frédéric Cilins and several other interlocutors, including Mrs. Mamadie Touré. These recordings were transmitted by the American authorities to the Guinean authorities.

41.   In these conversations, Mr. Frédéric Cilins asked Mrs. Mamadie Touré, in particular, several times, to destroy the copies of the aforementioned contracts.

42.   New payments made by Mr. Frédéric Cilins – who said that he acted on behalf of BSGR and in particular of Mr. Beny Steinmetz - to Mrs. Mamadie Touré were mentioned during these conversations.

43.   Based on these elements, on April 15, 2013 the FBI filed a complaint before the federal criminal court in New York against Mr. Frédéric Cilins, on three counts:
   -   subornation of witness
   -   obstruction of a criminal proceedings;
   -   attempt to destroy exhibits.

44.   The criminal proceedings conducted in the United States of America continue independently from the administrative proceedings conducted by the Technical Committee, a Guinean administrative instance, which is not obligated to stay proceedings on matters coming under the jurisdiction of another State.

p. 15

## II. THE PROCEEDINGS

45.   The proceedings were conducted in several stages.

46.   On October 4, 2011, the Minister of Mines requested VBG, the company holding the mining titles and agreement under review, to send all acts, agreements or conventions linking this Company to the State or other partners.

47.   Afterwards – on November 17, 2011 and December 13, 2011 – the Minister of Mines requested VBG to send a series of information and documents concerning the mining titles and the mining agreement, for which purpose it had sent a detailed questionnaire.

48.   On February 3, 2012, BSGR – minority shareholder of VBG – provided certain information concerning the mining titles and the mining agreement.

49.   On March 1, 2012, BSGR sent to the President of the Republic a letter showing the difficulties in the performance of the basic agreement executed on December 16, 2009.

50.   This phase allowed, in particular, national authorities to examine in detail the mining titles and the mining agreement held by VBG and especially to obtain information on the investment modalities of Vale in the Republic of Guinea.

51.   In the course of this analysis, national authorities were informed about various allegations concerning the conditions and modalities according to which the mining titles and the mining agreement on the deposits of Simandou and Zogota would have been obtained by BSGR.

52.   On October 30, 2012, the Technical Committee sent VBG – the only party to the proceedings in its capacity as holder of the titles in question – a letter containing the aforementioned allegations and asking VBG for its observations.

53.   According to these allegations, the BSGR mining titles and mining agreement in the Republic of Guinea related to the deposits of Zogota and Simandou had been obtained due to the corruption of people close to the President of the Republic, Lansana Conté, and certain members of the Guinean Government.

54.   On November 26, 2012, Vale – shareholder of VBG – indicated that it had no information concerning the facts alleged in the letter of the Technical Committee.

55.   On November 28, 2012, VBG indicated to the Technical Committee that the allegations concerned elements that seemed to have taken place before Vale's investment in Guinea. In the same letter, VBG concluded that, consequently, the investigations of the Committee had to be addressed to BSGR. However, in this

p. 16

letter, VBG indicated that it would cooperate with the investigations of the Committee.

56.    In reply, on December 26, 2012, BSGR, minority shareholder of VBG, provided a legal opinion signed by a French Professor of Law (Professor Denys de Béchillon) and a former Section President at the Conseil d'Etat de France [Council of State, France] (President Daniel Labetoulle) expressing doubts as to the legality of the proceedings. In fact, the minority shareholder of VBG gave incomplete answers to the allegations presented by the Technical Committee.

57.    On December 28, 2012, VBG communicated to the Technical Committee information and documents related to the allegations in question.

58.    On February 15, 2013, the Technical Committee indicated by letter that VBG was the only party to the administrative proceedings and invited this company to complete the answers given on December 28, 2012.

59.    By a letter of February 22, 2013, VBG indicated to the Technical Committee that it had provided in its previous letters all the information this company had in order to answer the questionnaire.

60.    By a letter dated March 4, 2013, BSGR sustained that the Technical Committee could not request new answers to its questions without imposing an "excessive burden." BSGR repeated, on this occasion, its theory that the proceedings were illegal.

61.    On March 15, 2013, BSGR gave some specifications in answer to the questions asked by the Technical Committee, while sustaining that the proceedings were "illegal."

62.    On March 26, 2013, BSGR sent a letter to the Technical Committee in order to contest the good faith of the Technical Committee. In particular, BSGR sustained in its letter that the Guinean authorities worked hard to "*tarnish the reputation of BSGR.*"

63.    On May 7, 2013, the Technical Committee sent to VBG three documents concerning the allegations of which it had been previously notified: a copy of the criminal complaint filed with the American federal criminal courts (with translation into French), a copy of the bill of indictment (with translation into French) and a copy of several contracts related to the facts in question.

64.    VBG, holder of the examined titles and agreement, answered on May 13, 2013, indicating that it had no information on the documents transmitted and that it sent these documents to its minority shareholder, BSGR.

p. 17

65.  In turn, BSGR answered on June 4, 2013 through its counsels. Although this letter was drafted in English, while the official language of the Republic of Guinea and the procedural language is French, the Technical Committee accepted to examine the document. It noted that, in particular, BSGR sustained that the proceedings would be illegal and the documents transmitted would be "crude forgeries," prepared with the help of members of the Government of Republic of Guinea.

66.  Careful to detail even further the rules applicable to the procedure of review of the mining titles and agreements, on September 9, 2013 the Technical Committee adopted Rules of Procedure. These Rules, approved the same day by the Minister of Mines, the President of the Strategic Committee, indicate that, to guarantee the rights of mining companies, written and oral proceedings must be conducted by the Technical Committee.

67.  The written procedure was conducted by the Technical Committee under these conditions.

68.  By a letter of November 1, 2013, the Technical Committee notified VBG of its decision to continue the review proceedings. Thus, in this letter, VBG was asked to specify the answer that had been given on December 26, 2012.

69.  By the same letter of November 1, 2013, the Technical Committee invited the representatives of VBG to a hearing before the Technical Committee on December 10, 2013.

70.  In its letter of November 7, 2013, VBG indicated in particular that it was *"extremely concerned"* by the allegations concerning the conditions for obtaining its mining rights.

71.  By a letter of November 19, 2013, the Technical Committee informed VBG that it would see no impediment, if it deems it useful, for this company to request the presence of representatives of its minority shareholder BSGR at the hearing. In this event, the Technical Committee indicated that it could facilitate the consular formalities for the interested persons, in cooperation with the competent authorities.

72.  On November 25, 2013, VBG answered the previous letter indicating, in particular, that it would be represented in the hearing by Mr. Joao Vidoca, its general director, and he would be assisted by its counsels.

73.  On November 29, 2013, the Technical Committee reminded in a letter to VBG that VBG had the possibility to arrange for the participation of representatives of its minority shareholder, BSGR, in the hearing and, in this regard, it confirmed that the Technical Committee could study special measures to be

taken by the competent authorities to allow the exit and entrance of the interested persons in the national territory.

74.  On December 2, 2013, VBG indicated by letter that it had *"done everything in its power to cooperate with the requests of the Technical Committee"* and that, concerning the alleged corrupt practices, it would have done everything possible to convince BSGR, its minority shareholder, to answer the questions of the Technical Committee.

75.  Since the American authorities had communicated to the Republic of Guinea new elements of proof confirming the allegations sent to it, under the judicial cooperation between the two countries, the Technical Committee decided to send them to VBG on December 4, 2013.

76.  To allow VBG to make observations about these documents in the hearing, the Technical Committee indicated to VBG that it could request a postponement of the hearing until December 18, 2013.

77.  By letter dated December 5, 2013, VBG asked the Technical Committee to postpone the hearing until December 16, 2013.

78.  On December 8, 2013, BSGR sent a new letter to the Technical Committee, affirming that the proceedings carried out by the latter were irregular and indicating that no representative of BSGR would be present in the hearing.

79.  Since the request of VBG for postponement had been accepted by the Technical Committee, the hearing of the VBG representative and its counsels took place on December 16, 2013 in Conakry, in the premises of the Ministry of State in charge of Economy and Finance.

80.  During the hearing, VBG was represented by Mr. Joao Vidoca, general director of VBG, assisted by his counsels, *Maître* Jean-Yves Garaud, Attorney with the Paris Bar, *Maître* Barthélemy, Faye Attorney with the Paris Bar, and *Maître* Sekou Koundiano, Attorney with the Conakry Bar .

81.  This hearing allowed the representative of VBG, assisted by its counsels, to make observations concerning the proceedings and the exhibits transmitted to VBG and to the Technical Committee, and ask the questions he deemed appropriate on the facts in question.

82.  A transcript of the exchanges held in this hearing was sent to VBG on December 23, 2013, giving it a week to make observations on this document.

83.  On December 30, 2013, the Technical Committee received the observations of VBG.

84.  On January 4, 2013, the Technical Committee, sitting in plenary meeting, took cognizance of the observations of VBG and approved the minutes of the transcript of the hearing of December 16, 2013.

p. 19

85.    By a letter of January 16, 2014, BSGR affirmed again, in particular, that the proceedings would be irregular.

86.    On February 6, 2014, the Technical Committee, sitting in plenary session, held a meeting in order to adopt a draft
       recommendation.

87.    In a letter dated February 17, 2014, the Committee answered a letter of BSGR dated January 16, 2014, containing
       certain criticisms on the proceedings followed. In particular, the Committee reminded that it took into account all the
       exchanges with VBG and its minority shareholder – although the latter was not a party to the proceedings – and that
       BSGR was unable to present objective and serious elements demonstrating in particular that the elements of proof
       would be forgeries.

88.    On February 21, 2014, the draft recommendation was submitted for observations to VBG.

89.    On February 25, 2014, the Technical Committee received the first observations from VBG, which requested to be sent
       the "complete report" containing the motivation of the draft recommendation.

90.    In addition, VBG declared itself *"extremely concerned"* in this letter, because the recommendation seemed *"based
       only on actions carried out by BSGR when it was the sole owner of VBG."*

91.    Finally, VBG asked the Technical Committee to start *"discussions"* after receipt of its observations, if it or its minority
       shareholder wanted to do so.

92.    On February 27, 2014, in fact, VBG sent to the Technical Committee a letter in English of the counsel of BSGR –
       accompanied by its translation – in which the latter contested again the regularity of the proceedings and the
       authenticity of the elements of proof.

93.    The President of the Technical Committee gave VBG an answer on all these various points, in a letter of March 7,
       2014.

94.    First of all, it was again pointed out that the review proceedings evaluated only the validity of the administrative acts. If
       the validity of the titles or of the agreement is affected by original defects, a subsequent modification of the
       shareholders of the owner company, which has no incidence on these original defects, cannot be enough to eliminate
       them.

95.    In addition, although there is no obligation from this viewpoint, and in a concern for transparency, the summary of the
       de facto and de jure elements that appear from the elements of proof and which motivate the draft recommendation of
       the Technical Committee was communicated to VBG.

96.   Finally, it was pointed out that, since the proceedings had already been completed, nothing justified a new hearing of
      VBG or its minority shareholder, the latter having actually refused systematically to participate along with VBG in a
      constructive dialogue with the Technical Committee.

97.   On March 13, 2014, VBG sent a letter in answer to the Technical Committee. In this letter, VBG repeated its request
      for a copy of the complete report *"to be made available to it before the Government makes a final decision concerning
      the validity of its mining rights."*

98.   On the other hand, VBG communicated again to the Committee that, according to it, (i) only BSGR would be *"in a
      position to provide an answer on the main points raised in the letter of the Technical Committee,"* that (ii) since Vale
      took the control of VBG, VBG would not have committed any reprehensible act and (iii) VBG agreed to make *"a
      significant investment in Guinea, by investing 700 million of US dollars in this project with funds advanced by Vale."*

99.   Also, on March 13, 2014, the counsel of BSGR sent a letter to the Technical Committee in which it indicated that
      BSGR *"will not be able to submit its answer to the Technical Committee"* within the timeframe given for this purpose.
      In addition, the counsel of BSGR indicated that this company will submit its answer *"before Monday March 21, 2014
      at 5 p.m.,"* i.e. outside of the timeframe established by the Technical Committee.

100.  In answer, it was indicated to VBG that its observations would be analyzed. It was also reminded in this letter that
      VBG – holder of the titles and agreement under review – cannot remain uninvolved in the discussion on the merits that
      started on the validity of the titles and of the agreement.

101.  In addition, it was indicated again that *"the original defects which seem, in the current state of the analysis of the
      Technical Committee, to vitiate the proceedings of granting of the titles and agreements today held by VBG cannot, in
      any case, be eliminated by the mere fact of a change of capital composition of this company after the granting."*

102.  Finally, concerning the observations communicated to the Technical Committee by the counsel of the minority
      shareholder, BSGR, it was reminded for all useful purposes that VBG – the only party to the proceedings – did not
      request an extension of the term for itself.

103.  In all events, it was specified in his letter that the minority shareholder of VBG *"cannot substitute itself to the
      Technical Committee and its President to conduct the proceedings before the Technical Committee."*

104.    After the expiration of the term for filing observations established by the Technical Committee, the latter received,
        through the intermediary of VBG, a letter from the counsel of the minority shareholder of VBG dated March 17, 2014.
        In his letter, the counsel of the minority shareholder of VBG contested again the legality of the proceedings conducted
        by the Technical Committee.

105.    The Technical Committee met on March 21, 2014 to examine the observations received on the draft recommendation.

106.    The Technical Committee noted that the observations made by VBG or its minority shareholder did not contribute any
        new de facto or de jure element justifying a modification of the draft recommendation.

107.    Consequently, the Technical Committee decided to maintain its recommendation, which it submits to the Strategic
        Committee.

## TITLE II – ANALYSIS OF THE CONDITIONS FOR OBTAINING THE MINING TITLES AND THE MINING AGREEMENT

108. Various indications, arising from the various elements of proof available to the Technical Committee, were reported to VBG during the written proceedings and discussed during the oral proceedings.

109. These indications lead to two conclusions, which will be detailed below:

- corrupt practices were carried out to obtain the mining titles and the mining agreement in question (**I**);
- attempts were carried out to destroy certain elements of proof of the corrupt practices in question (**II**).

110. First of all, it must be specified that the indications in question are taken from elements of proof whose authenticity was contested not by VBG, holder of the titles and of the agreement in question and the only party to the proceedings, but by the minority shareholder of this company, BSGR.

111. The Technical Committee, however, overrode this contestation for the following reasons:

- on the one hand, the intrinsic analysis of the elements of proof led to the finding that they support each other, and this articulation does not seem to be the result of a construction or manipulation;

- on the other hand, the holder of the mining titles and of the mining agreement in question – VBG – on its part, did not issue any criticism or expressed any serious doubt during the proceedings. Indeed, this company limited itself, during the written proceedings, to send requests for production of documents or information to its minority shareholder and, during its hearing, to indicate that, since the file was currently examined by the American judicial authorities, in particular, they were better placed to conduct additional investigations;

- finally, although BSGR, minority shareholder of the company holding the titles and the agreement in question, contested in particular the authenticity of the contracts communicated to it by the Technical Committee on May 7, 2013, the same as the documents communicated to VBG on December 4, 2013 and transmitted by it to this company; this criticism was not accompanied by any serious corroborating evidence.

Thus, in order to demonstrate that the contracts communicated to it constituted "forgeries," BSGR limited itself to stating that the numbering of the legal stamps was not in a logical order. Yet, this element does not prove that these contracts would be forgeries; actually, it is specified that the basic agreement held by VBG presents the same characteristic.

p. 23

Equally, the affirmations of BSGR concerning the lack of credibility of the affidavit of Mrs. Mamadie Touré are not supported by any serious corroborating element.

## I.    CORRUPT PRACTICES IN ORDER TO OBTAIN MINING TITLES AND THE MINING AGREEMENT IN QUESTION

112.    It appears from the various elements of proof available to the Technical Committee that the mining titles and the mining agreement in question were granted, at the time of the facts, following corrupt practices used by BSGR with the Guinean authorities in place at the same time.

113.    Thus, several facts seem sufficiently established.

## 1.    It is because Mrs. Mamadie Touré was the wife of the President of the Republic, Lansana Conté, that BSGR contacted her

114.    The fact that Mrs. Mamadie Touré had been, since 2000, the wife of the President of the Republic, Lansana Conté, is not questionable in light of the various elements of proof available to the Technical Committee concerning her.

115.    Thus, several objective elements of proof confirm the declarations of Mrs. Mamadie Touré on this point, especially the diplomatic passport she had, which designated her as "wife PRG" (meaning wife of the President of the Republic of Guinea).

116.    It is because of the closeness of Mrs. Mamadie Touré with President Lansana Conté that the representatives of BSGR – especially Messrs. Roy Oron, Marc Struik, Asher Avidan and Frédéric Cilins – contacted her through her half-brother, Mr. Ibrahima Sory Touré.

117.    Otherwise, at the time of the facts, Mrs. Mamadie Touré did not have any special competence or expertise justifying that a company of the size of BSGR and the BSGR group would have contacted her to obtain her services.

118.    Consequently, the Technical Committee is convinced that the only reason for which BSGR, especially through Mr. Frédéric Cilins, contacted Mrs. Mamadie Touré was that she was likely to exercise an influence on the Head of State, as his wife.

119.    The elements of proof available to the Technical Committee – and which were sent to VBG – show that this influence was real.

120.    In addition, these elements were confirmed by the declarations of Mrs. Mamadie Touré dated December 2, 2013.

2.      **It was in exchange for her intervention with the President of the Republic for BSGR to obtain the mining titles and agreements that Mrs. Mamadie Touré benefitted from various advantages**

121.    Various documents that were available to the Technical Committee and that it was able analyze indicate the following points:

-       Mr. Frédéric Cilins, agent of BSGR, on the one hand, and Messrs. Roy Oron and Marc Struik, then Mr. Asher Avidan, legal representatives of BSGR in Guinea, on the other hand, acted starting in 2005 in the Republic of Guinea on behalf of BSGR, to facilitate the installation of this company in the country and to obtain mining titles for it;

-       As of its installation in Guinea, BSGR introduced, directly through its legal representatives or through Mr. Frédéric Cilins, a systematic policy of giving valuable gifts to Guinean authorities.

-       Above all, the aforementioned representatives of BSGR approached, through her half-brother, Mr. Ibrahima Sory Touré, Mrs. Mamadie Touré, wife of the President of the Republic Lansana Conté, so that she would intervene for BSGR with the Head of the State to grant the company mining rights, especially in the area of Zogota and on Simandou blocks 1 and 2;

-       Several meetings were organized, at the request of BSGR, by Mrs. Mamadie Touré, at her house in Dubréka or in the presidential palace, in particular in order to allow BSGR to present to the Head of the State and the Guinean authorities its wish to obtain mining titles in Guinea.

122.    **First of all,** as of obtaining mining titles in 2006, substantial payments and free rights of participation were received by Mrs. Mamadie Touré, either explicitly in exchange for her intervention in order to obtain mining titles and the mining agreement by BSGR on the deposits of Zogota and Simandou, or under circumstances and according to modalities that establish directly a link between these advantages and BSGR's obtaining mining rights;

        i.      In particular, on June 20, 2007, a memorandum of understanding was executed between BSGR and Matinda and Co Limited, where apparently Mrs. Mamadie Touré is the manager, indicating that, in exchange for the effort made, which allowed BSGR to obtain mining exploration permits on February 28, 2007 in the area of Zogota – in the prefectures of Lola and N'Zérékoré -, this company accepted to transfer 5% of all its shares to Matinda and Co Limited.

**p. 25**

ii.     On February 27, 2008, a commission contract was executed by the same parties, indicating that
        BSGR committed to give four million dollars to Matinda and Co Limited *"as commission"* to
        obtain Simandou blocks 1 and 2;

iii.    On February 28, 2008, a memorandum of understanding was executed between the same parties,
        indicating that BSGR committed to transfer to Matinda and Co Limited 5% of the shares of the
        operating company of Simandou blocks 1 and 2;

iv.     Indeed, on December 9, 2008, a Ministerial Order was issued to deliver to BSGR an exploration
        permit on Simandou blocks 1 and 2 (Ministerial Order No. 72008/4980/MMG/SGG);

v.      The declarations of Mrs. Mamadie Touré confirm the above elements and show, in detail and
        precisely, the conditions in which, in her presence and at her request, instructions were given by the
        President of the Republic to the Minister of Mines to withdraw the mining title on Simandou blocks
        1 and 2 from the company that held it at the time, and grant it to BSGR.

123.    **In fact,** several contracts and commitments were executed directly by Mrs. Mamadie Touré with Pentler Holdings, a
        company where Mr. Frédéric Cilins was one of the executives and which, at the time, obviously acted on behalf of
        BSGR;

        i.      Thus, on February 20, 2006, i.e. soon after obtaining the exploration permit, a memorandum of understanding
                was executed between Pentler Holdings and Mrs. Mamadie Touré, indicating that Pentler Holdings undertook
                to transfer free of charge 33.30% of its capital to Mrs. Mamadie Touré as soon as *"the mining titles needed
                for the exploitation of the mining area of Simandou were obtained"*;

        ii.     By two letters of commitment from Pentler Holdings to Mrs. Mamadie Touré, legalized on July 21, 2006, it
                was agreed that the delivery of the exploration permits on the areas of Tougué, Kéniéba, Bafing Makana and
                Dinguiraye to BSGR would "automatically" entail the free transfer to Mrs. Mamadie Touré of 33.30% of the
                capital of Pentler Holdings;

        iii.    On July 8, 2010, Pentler Holdings committed to pay to Mrs. Mamadie Touré the amount of five million U.S.
                dollars in order to take into account the success of the operations concerning the granting of the mining rights
                of Simandou;

p. 26

iv.   On August 3, 2010, Pentler Holdings also promised to pay to Mrs. Mamadie Touré the amount of five million U.S. dollars in order to take into account the success of the operations conducted in Guinea.

124.   **In addition,** it also appears from signed but undated documents, especially from a declaration of Mrs. Mamadie Touré and a contract apparently terminating the relationships between Pentler Holdings and Mrs. Mamadie Touré, that payments to her were actually considered, then made, by Pentler Holdings.

125.   **Finally,** on July 27, 2010 and August 5, 2010, two checks, respectively for 100,000 and 50,000 U.S. dollars, were issued by Mr. Frédéric Cilins to Mrs. Mamadie Touré, who, in her affidavit, specified indeed that she received several payments from BSGR through Mr. Frédéric Cilins.

126.   **All the above elements form a series of serious and concurring indications, which allow stating that:**

-   Through its legal representatives, including in particular Messrs. Roy Oron and Marc Struik, then, starting from 2006, Mr. Asher Avidan, and its agent in Guinea, Mr. Frédéric Cilins, BSGR contacted Mrs. Mamadie Touré, wife of the President of the Republic Lansana Conté and likely to influence him, for her to intervene with the Head of the State to actually obtain mining titles and mining agreements on the national territory;

-   Mrs. Mamadie Touré used her influence with the Head of the State, especially by organizing meetings with the representatives of BSGR, to motivate him to give instructions to the Minister of the Mines in order that mining titles and mining agreements be actually delivered to BSGR;

-   Due to these repeated interventions of Mrs. Mamadie Touré with Guinean authorities at the request of BSGR, several mining titles and a mining agreement related to the deposits of Zogota and Simandou were actually granted, as of February 2006, to this company which, however, did not have any significant experience in the mining sector concerned by the deposits in question, and therefore allowing to doubt the existence of sufficient technical and financial capacity to succeed in these mining operations, a condition required by the mining law in force;

-   Directly related to these interventions, financial advantages were contractually promised and grated by BSGR to Matinda

and Co Limited, where apparently Mrs. Mamadie Touré was manager (memorandum of understanding of June 20, 2007, commission contract of February 27, 2008, memorandum of understanding of February 28, 2008);

- These contracts are devoid of any ambiguity, establishing expressly a direct link between the significant advantages for Matinda and Co Limited – whose real activity in the "*medical or commercial*" field, as mentioned in the contracts, has not been established – and BSGR obtaining mining rights, especially in Simandou blocks 1 and 2;

- In direct exchange for the aforementioned interventions, financial advantages were also promised and granted to Mrs. Mamadie Touré by Pentler Holdings – obviously acting on behalf of BSGR – especially taking in it a free holding of 33.30% of the capital and, twice, the payment of 5 million U.S. dollars (memorandum of understanding of February 20, 2006, letters of commitments legalized on July 21, 2006, letters of commitment of July 8, 2010 and August 3, 2010, in particular);

- Just as the above, these documents are devoid of any ambiguity, establishing expressly a direct link between the significant advantages for Mrs. Mamadie Touré and BSGR obtaining mining rights in the deposits of Zogota and Simandou blocks 1 and 2;

127. Thus, it results from the above that BSGR obtained the mining titles and the mining agreement in question promising to pay, and indeed paying, several times, directly or indirectly, significant amounts to Mrs. Mamadie Touré, wife of the Head of State, for her to use her influence on behalf of BSGR.

128. Thus, the Technical Committee considers that BSGR obtained the mining titles and the mining agreement currently under review subsequent to corrupt practices.

129. In addition, no other logical and complete interpretation of the aforementioned elements of proof is plausible and, in fact, no such other interpretation has been proposed by the holder of the titles and the agreement in question or by the shareholders of this company, be they majority or minority.

130. Moreover, the Technical Committee vainly asked itself, given the perfectly concurrent character of the indications gathered, about the plausible character of a different analysis: no element of the file allows giving a different interpretation than that of the Technical Committee on the facts in question.

131. Concerning alternative explanations, proposed, as the case may be, by the interested parties, the Technical Committee points out that, under article 3 of the Rules of Procedure, *"in the absence of answer to the questions asked, or in the event of manifestly insufficient answers, the holder is reputed to have agreed with the facts mentioned in the notification, if the entire file cannot reasonably lead to a different conclusion."*

132. In this precise case, the facts stated above were not the subject of plausible explanations from VBG or, communicated through this company, from its shareholder BSGR.

133. Indeed, during the written proceedings as well as the oral proceedings, neither VBG nor its shareholders (Vale or BSGR) proposed any explanation of the various facts.

   o   **During the written proceedings**

- VBG, the company currently holding the mining titles and agreement, and which has two shareholders (BSGR with 49% and Vale with 51%), indicated that it cannot give answers concerning facts prior to the entry of Vale into its capital and therefore, according to its affirmations, systematically transmitted to BSGR the questions and requests of the Technical Committee for information;

- BSGR, in turn, provided imprecise or dilatory answers, and then, when documents were sent to it, limited itself to denying overall facts that were proven, and contesting the authenticity of the exhibits as well as the competence of the Technical Committee, without otherwise supporting its denials.

   Thus, BSGR did not provide any evidence to contest the elements of proof of which this company was notified.

   In addition, although, in turn, Mr. Frédéric Cilins prepared an affidavit, it actually contradicted several of the affirmations of BSGR during these proceedings.

   o   **During the oral proceedings**

- VBG, represented during the hearing by persons who obviously were closer to the majority shareholder than the minority shareholder, indicated that Vale had initiated verifications before acquiring the rights it currently holds in VBG, but that it had not found elements that would lead it to doubt the legality of the mining titles and the mining agreement held at the time by BSGR.

   It gave as an example demonstrating the accomplishment of such steps the fact that, by a letter dated March 19, 2010, VBG had asked the Guinean authorities whether they had any

**p. 29**

knowledge of corrupt practices taking place when the mining titles and mining agreement in question had been delivered.

As to the documents communicated by the Technical Committee and materially establishing the corrupt facts, VBG considered that it was not the best place to appreciate their evidentiary force and scope and that these documents only reinforced the worries it may have felt and the questions it may have had.

So, in substance, VBG did not have any concrete element to bring to the Technical Committee concerning its investigations prior to the time when it had been sent the documents mentioned above, and it affirmed that it could not give any useful explanations when it was in the presence of these documents either.

- BSGR, in turn – it seems, if we believe what VBG says – had been requested several times by the latter to participate in the hearing organized by the Technical Committee. VBG also affirms that it had told BSGR that the Technical Committee was willing to facilitate the consular formalities for the representatives of BSGR who wanted to participate in the hearing. Consequently, BSGR refused to participate in this hearing along with VBG, yet a company in which it is a 49% shareholder.

134. Taking into consideration all of the above, the Technical Committee is convinced that both the mining titles and the mining agreement currently under review were obtained as a result of corrupt practices.

p. 30

## II. THE ATTEMPTS TO DESTROY CERTAIN ELEMENTS OF PROOF

135.   In addition, the Technical Committee finds, in fact, that various elements of proof obtained indicate that:

- since March 2013, Mrs. Mamadie Touré was repeatedly approached by Mr. Frédéric Cilins, who obviously tried to maintain the contact with her and presented himself several times as acting on behalf of BSGR, especially on behalf of Mr. Beny Steinmetz, as he expressly mentioned in a conversation with Mrs. Mamadie Touré on April 11, 2013;

- Mr. Frédéric Cilins asked Mrs. Mamadie Touré several times and especially on March 25, 2013 and April 11, 2013, to destroy contracts signed by her and establishing the remuneration for her intervention with President Lansana Conté for the purpose of the delivery of the mining titles and agreement to BSGR;

- Mr. Frédéric Cilins promised to make new payments to Mrs. Mamadie Touré (especially one million U.S. dollars on April 11, 2013 and "400," i.e. 400,000 U.S. dollars on April 14, 2013); the conversations between these two persons concerned mainly the amount claimed by Mrs. Mamadie Touré.

136.   In addition, the Technical Committee notes  that the attempts to destroy these contracts at the initiative of Mr. Frédéric Cilins, acting on behalf of BSGR, would have been completely irrelevant if these contracts were forgeries, as affirmed by the minority shareholder of VBG. Indeed, the Technical Committee cannot understand the interest of these attempts and the payment of significant amounts to destroy documents which were just "crude forgeries," as affirmed by the minority shareholder of VBG.

137.   Such being the case, the Technical Committee considers that these attempts to destroy evidence referred to in the complaint provide sufficient proof concerning the actions of Mr. Frédéric Cilins who, acting on behalf of BSGR, intended to prevent the discovery of the truth concerning the corrupt facts in question.

138.   On the other hand, there are no consistent and complete alternatives of the aforementioned elements of proof. On this point, the Technical Committee refers to the developments presented in the two previous pages.

139.   In conclusion, and given all of the above, the Technical Committee considers that:

## ANNEX – LIST OF ELEMENTS OF PROOF[1]

- Declaration of Mrs. Mamadie Touré dated December 2, 2013 accompanied by the enclosures referred to in the declaration itself;

- Affidavit of Mr. Frédéric Cilins dated November 26. 2012;

- Written transcript, by bailiff's official report, of the audio recording of conversations between Mr. Frédéric Cilins and in particular Mrs. Mamadie Touré;

- Copy of the checks for 10,000 and 50,000 U.S. dollars signed by Mr. Frédéric Cilins to the order of Mrs. Mamadie Touré, accompanied by the statement of the bank account;

- Invoices of Matinda & Co for the amounts of 998,000 and 2,000 U.S. dollars;

- Criminal complaint filed on April 15, 2013 before the American federal district court;

- Memorandum of understanding executed on June 20, 2007 between BSGR and Matinda & Co;

- Commission contract executed on February 27, 2008 between BSGR (represented by Mr. Asher Avidan) and Matinda & Co;

- Memorandum of understanding executed on February 28, 2008 between BSGR and Matinda & Co;

- Memorandum of understanding executed on February 20, 2006 between Pentler Holdings and Mrs. Mamadie Touré;

- Letters of commitment legalized on July 21, 2006 between Pentler Holdings and Mrs. Mamadie Touré;

- Commitment of Pentler Holdings dated July 8, 2010 to Mrs. Mamadie Touré;

- Commitment of Pentler Holdings dated August 3, 2010 to Mrs. Mamadie Touré;

- Contract and declaration, signed but undated, apparently putting an end to the relationship between Pentler Holdings and Mrs. Mamadie Touré.

---

1 These exhibits are also being kept at the disposal of the members of the Strategic Committee at the headquarters of the Technical Committee.

# Exhibit No. 1

1. My name is Mamadie Touré. I was born in 1982 in Dubréka, Guinea. I normally reside in Jacksonville (Florida), United States of America. I have attached my ID to this statement, in Exhibit 1. (The ID has been edited to hide my address.)

2. I had this statement drawn up in accordance with the obligations arising from my cooperation with the Government of the United States. I sign this statement voluntarily and conscientiously, and I certify the truth and the accuracy of every detail included herein, to the best of my recollection. With the exception of the contracts I have signed with BSGR and Pentler Holdings, and my own bank statements related to the bank accounts that I hold in the United States, I did not have access to any document relating to the events discussed below. In particular, this includes the documents that I left in Sierra Leone and all of the statements of my foreign bank accounts, among other things. Once I receive them, I could add more details and check some things. I understand that this statement may be used in legal proceedings in the Republic of Guinea ("Guinea"), and I authorize such use.

3. I have provided this information in response to specific questions that I was asked. I have recounted below some of the meetings that took place. While other meetings, events and conversations also took place, I have focused on the meetings and events addressed in the questions asked. In addition, as regards the meetings recounted, I have only described parts of these meetings and conversations, in response to the specific questions asked.

4. I met Lansana Conté in 2000, when he was president of Guinea. My father and President Conté had known each other since their service in the army. My older sister used to cook for President Conté, and I met President Conté on one occasion when my sister cooked for him. At the time, I was still living in Dubréka, where the President owned several properties.

5. Shortly after my meeting with the President, the latter asked my father to get me married. In 2000, I became the fourth wife of the President.

6. Following my marriage to the President, I received my own home in Dubréka. I did not live in the same house as the President, but we spent time together at my house in Dubréka and in the President's villa. The President supported me financially. The President and I used to discuss political issues, and I shared with him my thoughts on these topics.

7. I dealt with Beny Steinmetz Group Resources ("BSGR") after Fodé Soumah, who was back then Minister of Youth and Sports, had called me to tell me that an investor wanted to meet me. It was the first time I met Fodé Soumah, although I knew who he was because he knew my family. The next day, Fodé Soumah and other individuals visited me in Dubréka together with Frédéric Cilins. Soumah introduced those present, including Frédéric Cilins, who used to work for Beny Steinmetz and BSGR. Cilins told me BSGR absolutelywanted to operate iron mines.

[initials]

p. 36

8.  Cilins and Soumah said that BSGR wanted to invest in mines in Guinea and asked me to put them in
    touch with my husband. Cilins and Soumah said that if BSGR were to obtain the mining permits, 12
    million dollars would be distributed to Guineans, including ministers and officials, myself included,
    that would be necessary, if the meeting with my husband were successful.

9.  I signed several contracts with BSGR. For example, in 2006, BSGR asked me to sign a document
    titled *Memorandum of Understanding* (the "Memorandum of 2006"), which I signed at home, in
    Dubréka. Cilins brought me the papers to sign and explained to me what it was. I do not recognize
    the signatures of the other persons on the Memorandum of 2006 because it was not signed in my
    presence. The Memorandum of 2006 did not have the stamp of Pentler Holdings affixed at the time I
    signed it. Cilins read to me the contract and I asked him why Pentler Holdings appeared there. Cilins
    told me that Pentler Holdings was acting on behalf of BSGR. I consulted with a lawyer about the
    contract, which I then signed. After my signing of the Memorandum of 2006, a lawyer later returned
    to give me a copy thereof; the document had a signature for Pentler Holdings and the clerk's stamp
    affixed. A true and accurate copy of the original memorandum is attached hereto in Exhibit 2.

10. The President and Cilins met for the first time in a presidential palace in Conakry. I spoke with the
    President so that he agreed with the meeting, and I spoke with the presidential guard so that Cilins
    and the others could enter the office. I personally introduced Cilins to the President, and I explained
    that Cilins represented BSGR and that BSGR was interested in operating mines in Guinea.

11. During the meeting, the President called the Minister of Mines, Ahmed Tidiane Souaré, introduced
    Cilins to Souaré, and ordered Souaré to examine how he could help Cilins and BSGR.

12. After the meeting, BSGR filed a permit application, but the mining permits were not granted
    immediately. Cilins asked me to find out why the permits of BSGR were delayed. I called Souaré to
    talk about it, and BSGR obtained two mining blocks shortly after, and I knew it was the "Simandou
    North and South" blocks.

13. Once BSGR has received the mining rights for Simandou North and South, Cilins and my brother,
    Ibrahima Sory II Touré ("Ibrahima Touré"), both told me that Beny Steinmetz would shortly come to
    Guinea with the money. When Steinmetz arrived, I organized a meeting with the President.
    Steinmetz, Cilins, Michael Noy, Ibrahima Touré, Marc Struik, and Patrick Saada attended the
    meeting. This meeting took place in the courtyard of a palace. The meeting went awry after Cilins
    told the President that BSGR also wanted to buy all the diamonds that the President held personally.

14. At the end of the meeting that went wrong, Steinmetz, Noy, Cilins, Ibrahima Touré, Asher Avidan,
    Saada, Issiaga Bangoura, and Struik went to Dubréka, where they found me at the residence of
    President Conté. Steinmetz asked to see me, and so I met Steinmetz and others. Steinmetz said he
    was glad I had helped BSGR to obtain the permits for Simandou North and South. Steinmetz said he
    needed further assistance with the President to obtain the blocks 1 and 2 of Simandou. Steinmetz has
    offered to give me five percent of the turnover of BSGR in Guinea. He told me that I had to discuss
    the blocks 1 and 2 of Simandou with the President.

2

[initials]

p. 37

15. At the end of the meeting with Steinmetz, Ibrahima Touré gave me USD 200,000. I spoke to President Conté about the 200,000 dollars, and he told me it was my good luck.

16. In September 2006, I attended a reception hosted by BSGR in Guinea to present BSGR to the Guinean officials. Asher Avidan invited me to the reception because if we were seen together, BSGR would be given credibility.

17. On June 20, 2007, I signed another contract titled *Memorandum of Understanding* (the "Memorandum of 2007"). This contract was concluded between BSGR Guinea and my company, Matinda. We signed the contract after BSGR Guinea received the mining rights for the uranium mines. The contract was supposed to transfer five percent of BSGR Guinea to my account. Beny Steinmetz, Marc Struik, Asher Avidan, Patrick Saada, Isiagga [sic] Bangoura and Ibrahima Touré were present when I signed the contract. Marc Struik signed for BSGR Guinea. A lawyer took the document to authenticate it and then gave me a copy. A true and accurate copy of the original Memorandum is attached hereto in Exhibit 3.

18. BSGR still wanted the blocks 1 and 2 of Simandou. At the beginning of 2008, Asher Avidan and Issiaga Bangoura came to meet me at the President's house in Dubréka. Avidan really wanted my help to secure blocks 1 and 2, and he told me that BSGR needed new contracts because Struik was no longer manager of BSGR in Guinea (although he subsequently came back). At this meeting, Avidan called Beny Steinmetz and put the phone on speaker so that I could hear the voice of Steinmetz. I recognized his voice, and Steinmetz told them to give me what I wanted. I continued to refuse to sign the contracts and I dismissed Avidan and Bangoura.

19. The next day, Issiaga Bangoura brought two draft contracts to my house in Dubréka. I told him to leave them. I read them carefully, and I made some changes. The following day, I called Bangoura asking him to come by and take the amended contracts. He did. He returned the next day with two typed contracts, none of which had been signed by Asher Avidan. I told him they should be signed and bear the stamp of BSGR, otherwise I would not sign them. When he returned with the contracts signed and stamped, I signed them both.

20. The contracts were titled *Commission Contract* and *Memorandum of Understanding*. The *Commission Contract* between BSGR and my company, Matinda, stipulated that I was going to be paid two million dollars if BSGR received the blocks 1 and 2. Under the *Memorandum of Understanding,* I was entitled to five percent of the proceeds of the mines of blocks 1 and 2. A true and accurate copy of the *Commission Contract* is attached hereto in Exhibit 4, and a true of the *Memorandum of Understanding* is attached hereto in Exhibit 5.

3

[initials]

p. 38

21. BSGR asked me to tell the President that Rio Tinto was supposed to give two blocks to the Guinean government. The President told me to have BSGR meet with him when I was ready.

22. Thereafter, Beny Steinmetz, Marc Struik, and Frédéric Cilins came to Dubréka because they wanted to meet with President Conté. We went to Brameya to meet the President. The President was very busy, but he accepted the meeting because I had asked him. I remained next to the President during the meeting. Steinmetz gave the President a small car encrusted with diamonds to "greet the president." (Around the same date, I also received one of these cars, and the Minister Souaré received one as well.)

23. Beny Steinmetz told the President that he wanted to develop blocks 1 and 2, and he offered money to the President. The President refused. The President explained to Steinmetz his relationship with my father. The President told Steinmetz that he entrusted me to Steinmetz, meaning that I was there to help BSGR.

24. Later on, I brought Asher Avidan and Ibrahima Touré to a meeting with the President, which I also attended. During this meeting, I asked the President to give the blocks 1 and 2 to BSGR. The President called Mamady Sam Soumah, Secretary-General to the President, and told him to investigate the contract of Rio Tinto and determine whether the two blocks of Rio Tinto should be taken over. Sam Soumah said he would do so.

25. Asher Avidan contacted me later, once the blocks 1 and 2 had not been immediately granted to BSGR. Avidan, the President, and myself met in a presidential palace. During this meeting, the President summoned Sam Soumah. Sam Soumah came with the proposal to share the four blocks among four companies, but the President told Sam Soumah to distribute them between BSGR and Rio Tinto. The President told Sam Soumah to prepare a decree by which blocks 1 and 2 would be confiscated from Rio Tinto.

26. While the decree was pending, before it was signed, I also received two Land Cruisers. The Land Cruisers was delivered by Avidan and another man, and Avidan told me that the Land Cruisers came from Steinmetz. The President told me to keep one Land Cruiser and give the other to his children so they could use it during vacations.

27. Over time, I had received several presents from BSGR. Asher Avidan gave me a necklace which Avidan claimed to have received when he visited Beny Steinmetz in Israel. Later, Avidan gave me a white gold chain adorned with seven diamonds.

28. Around the time of the decree taking away the blocks 1 and 2 from Rio Tinto, Asher Avidan asked me to come to the offices of BSGR. During this meeting, Avidan showed me a bed on which U.S. currency was spread. Avidan told me that there were 1,000,000 U.S. dollars there and they were for me. Avidan then placed the money in a bag and gave it to me.

29. Once the decree confiscating the blocks 1 and 2 from Rio Tinto had taken effect, BSGR and several other companies filed applications for the mining rights for the blocks 1 and 2. BSGR was concerned with the competition with other companies for these blocks. Asher Avidan called me again and asked

4

[initials]

**p. 39**

me to meet with him and the President. I called the President and asked him if we could meet and if Lounceny Nabe, the new Minister of Mines, could attend the meeting. The next day, Avidan, myself and others went to the small palace for a meeting with the President. In the presence of Avidan, the President said that one day I would be expelled from BSGR. Avidan promised the President that this would not happen. The President then called Nabe into the room. The President told Nabe to give the blocks 1 and 2 to BSGR. Nabe said he understood. In early December 2008, the blocks 1 and 2 were granted to BSGR.

30. In December 2008, my husband died and was replaced by a military government. After 40 days of mourning, I was forced to flee to Sierra Leone.

31. After I had spent several months in Freetown, Avidan sent a representative of BSGR to Sierra Leone to give me $50,000 in new money on a beach near Freetown.

32. During the summer of 2009, Issiaga Bangoura came to Freetown in a BSGR company car with a statement which I signed on August 2, 2009. He told me that BSGR no longer wanted me in the company and that I had to sign the document. The statement provided that I would receive $4 million in four installments to finalize my payments with BSGR.

33. Later in 2009 I received an electronic transfer of $998,000 at Rokel Commercial Bank, from an account belonging to Ghassan Boutrous, a Lebanese. Boutrous sold equipment in Guinea and worked for Avidan for the transfer of money in this transaction. I received $2,000 separately, resulting in a total payment of one million dollars.

34. I went to Jacksonville and I used part of the money to buy a house for myself and my family. I then returned to Freetown. While I was there, I received an additional payment of $998,000, which I understood as coming from BSGR.

35. BSGR finally stopped paying me as per the contracts that we had signed. I tried to obtain the payments from BSGR, and I eventually turned to the new Guinean government for their help. I called the Chief of Staff of the army for assistance. He said he would help me if I sent him copies of the contracts I had with BSGR. He also told me that the new Minister of Mines, Mahmoud Thiam, advocated for BSGR in their dispute with me.

36. The Chief of Staff eventually talked to President Konaté about my contracts with BSGR, saying that he had seen them personally. According to the Chief of Staff, President Konaté said that this should not happen to the widow of a president. President Konaté told Thiam that BSGR had to pay what it owed me.

37. After my discussion with the Chief of Staff, Michael Noy and Patrick Saada visited Freetown several times. During a meeting with Noy, he asked me to sign undated documents that put an end to my previous agreements with BSGR, the new documents entering into force instead. Noy told me to

5

[initials]

p. 40

keep these documents secret. The documents stipulated that I had received $2.4 million and that I was to receive $3.1 million more. I signed them. A true and accurate copy of these documents is attached hereto in Exhibit 6.

38. Later on, in July 2010, Michael Noy returned with a new contract according to which I was supposed to receive $5 million in two installments; I signed this contract, too. Finally, in August 2010 he returned with another contract stipulating I would be paid $5 million in two installments over the next four years. Each time he returned, he told me that Beny Steinmetz wanted an amendment in the form or substance of the contract. A true and accurate copy of these documents is attached hereto in Exhibit 7.

39. Over the years, after the signature of these contracts, BSGR transferred money to my accounts in Guinea and Jacksonville (Florida). I understood that the total amount of this money replaced the five percent of the mining rights that I was supposed to hold.

I declare that the above information is true and correct to the best of my recollection.

[hw:] *02/12/2013*                    [signature]

Date                                   Mamadie Touré

STATE OF FLORIDA

COUNTY OF [hw:] *Duval*

Certified (or stated) under oath and signed in my presence today, [hw:] *December 2*, 2013 by Mamadie Touré.

> [stamp:] THOMAS L. DI VITA, II
> Commission # DD 996126
> Expires May 27, 2014
> Bonded Thru Trey [illegible] Insurance 800-385-7019
> [AUTHENTICATION STAMP]          [signature]

Personal knowledge _____ OR ID presented *X*

Identity card presented [handwritten:] *Florida Learner License # T600-540-82-501-O*

[initials]

p. 41

# 1

p. 42



[blank page]

# 2

[illegible stamp]

## MEMORANDUM OF UNDERSTANDING

**By and between the undersigned**

Mrs. Mamadie TOURE, business woman, national of Guinea, residing in Dubreka

party of the first part

And

PENTLER HOLDINGS LTD, with its head office in Akara Building, 24 Castro Street, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands, represented by Mr. Avraham LEV RAN

party of the second part

**Whereas**

The Company named BSGR Guinea approached the Guinean authorities with a view to establishing a partnership for the development and mining of part of the iron deposits of SIMANDOU.

As part of this project, BSGR Guinea submitted to the Guinean authorities a proposal for the grant of a shareholding of 15% to the Republic of Guinea and a shareholding of 5% to Mrs. Mamadie TOURE, as local partner. To this effect, BSGR Guinea will found, together with the Republic of Guinea, a public corporation named Compagnie Minière de SIMANDOU.

In order to integrate the shareholding of Mrs. Mamadie TOURE, BSGR Guinea will transfer 17.65% of its capital to Pentler Holdings Ltd, of which 33.30% of the capital will be allocated to Mrs. Mamadie TOURE.

**It is hereby agreed as follows**

**Article 1:**

Pentler Holdings Ltd undertakes to transfer to Mrs. Mamadie TOURE, for free, a shareholding of 33.30% of its capital, as soon as the Compagnie Minière de SIMANDOU is established and obtains the mining rights for the operation of the mining area of SIMANDOU, which will be granted to it by the Republic of Guinea.

Page 1 of 2

p. 46

[stamp:] Court of 1st Instance of Konakry 2
Republic of Guinea
Chief Clerk
[duty stamp]

**Article 2**

Pentler Holdings Ltd will pay Mrs. Mamadie TOURE dividends for her shareholding of 33.30%, as it does for the other shareholders, after the debts contracted by the Compagnie Minière de SIMANDOU for the operation of the mining area by said company have been repaid and the first dividends have been paid to Pentler Holdings Ltd.

**Article 3**

This Memorandum, which is binding on the parties, enters into force on the date of its signature.

**Signed in Conakry on February 20, 2006**

Drawn up in 2 original copies

Mrs. Mamadie TOURE

[signature]

Pentler Holdings Ltd, represented by Mr. Avraham LEV RAN

[stamp:] **PENTLER HOLDINGS Ltd.**
Akara Building, 24 De Castro Street,          [signature]
Wickhams Cay 1, Road Town,
Tortola, B.V.I.
reg. no. 682814

[stamp:] SEEN FOR THE PHYSICAL
AUTHENTICATION OF THE SIGNATURES
CONAKRY, [hw:] *03/01/06*
CHIEF CLERK

[Stamp:] Court of 1st Instance of Konakry 2
Republic of Guinea
Chief Clerk
[Signature]

Page 2 of 2

**p. 47**

226

[blank page]

# 3

[illegible stamp]
[duty stamp:] REPUBLIC OF GUINEA
DUTY STAMP
1,000 FRANCS
[illegible]

## MEMORANDUM OF UNDERSTANDING

### BY AND BETWEEN THE UNDERSIGNED

**MATINDA AND CO.LIMITED-SARL,** single-member company, hereinafter abbreviated "MACO", with its head office in Dubréka, Republic of Guinea.

Party of the first part

And

**BSGR Ressources Guinée SARL**, company governed by the Guinean law, with its head office in Conakry

Party of the second part

### Whereas

The Company named BSGR Guinea has approached the Guinean authorities to establish a partnership for the development and mining of part of the iron deposits of SIMANDOU on the one hand, and the Company named MATINDA AND CO-LIMITED –SARL so that the latter assists it in the process of obtaining the mining exploration permits.

Thereupon, as a result of joint efforts, by the Order No. A2007/582/MMG/SGG of February 28, 2007 of the Ministry of Mines and Geology, four mining exploration permits for uranium mining covering a total area of 1,413 km$^2$ were granted to BSGR Ressources Guinea in the Prefectures of Lola and N'zérékoré;

Thus, the parties freely agree to the following:

In order to reward the efforts provided, BSGR Guinea agrees to transfer 5% of all its shares to MATINDA AND CO-LIMITED-SARL which accepts the transfer.

This Memorandum, which is binding on the parties, enters into force on the date of its signature.

Signed in Conakry on [hw:] *JUNE 20,* 2007

Drawn up in 2 original copies

**BSGR Ressources Guinée**                   **MATINDA AND CO LIMITED Sarl**
[signature]                                             **Manager**
[hw:] *MANAGING DIRECTOR*                    **Mrs. Mamadie TOURE**
                                                        [signature]

[square stamp:] SEEN FOR THE PHYSICAL
AUTHENTICATION OF THE SIGNATURES
CONAKRY, [hw:] *07/20/07*
CHIEF CLERK

[round stamp:] Court of 1st Instance of Konakry 2
Republic of Guinea
Chief Clerk
[Signature]

**p. 50**

[blank page]

**4**

## COMMISSION CONTRACT

By and between the undersigned:

**BSG Resources**, represented by Mr. ASHER AVIDAN, Operations Manager authorized for the purposes hereof,

And,

**MATINDA AND CO LIMITED,** represented by Mrs. MAMADIE TOURE, business woman in DUBREKA.

**It was agreed as follows:**

### UNDERTAKING

**BSG Resources** undertakes to give a total amount of four million dollars as commission for obtaining the Simandou blocks 1 and 2 , located in the Republic of Guinea and covering the prefectures of KEREOUANE and BEYLA.

**MATINDA AND CO LIMITED** undertakes, on its part, to take all necessary steps to obtain the signature of the authorities for the said blocks in favor of **BSG RESOURCES GUINEA**.
**BSG Resources** intends to divide the commission above as follows:
An amount of two (2) million for **MATINDA AND CO LIMITED** with USD one hundred (100) already paid in advance.

The remainder of the amount will be distributed among the people of goodwill who would have contributed to the facilitation of the granting of said blocks, **BSG Resources Guinea** deciding on the distribution depending on the quality of the contribution of each party.
The full amount will be paid immediately after the signature of said document.
In addition, **BSG Resources undertakes** to complete, in a reasonable time, the educational infrastructures, property of Matinda and co limited in the Republic of Guinea.

### Drawn up in duplicate

Conakry, February 27, 2008

On behalf of BSG Resources Guinea
[signature]
Mr. AVIDAN ASHER
[stamp:] B.S.G.R. Resources Guinea
Operations Manager

On behalf of MATINDA AND CO LIMITED
[signature]
Mrs. MAMADIE TOURE

**p. 53**

5

## MEMORANDUM OF UNDERSTANDING

By and between the undersigned

**BSG Resources Guinea**, represented by Mr. AVIDAN ASHER, Operations Manager,

And,

**MATINDA AND CO. LIMITED,** represented by Mrs. MAMADIE TOURE, business woman in
DUBREKA.

It was agreed as follows:

**BSG Resources undertakes** to give 5% of its shares of Simandou blocks 1 and 2 , located in the
Republic of Guinea and covering the prefectures of kerouané and beyla.

Drawn up in duplicate

Conakry, February 28, 2008

On Behalf of BSG Resources Guinea  
[signature]  
Mr. AVIDAN ASHER  
[stamp:] B.S.G.R Resources Guinea  
Operations Manager

On behalf of MATINDA AND CO LIMITED  
[signature]  
Mrs. MAMADIE TOURE

[blank page]

# 6

## Agreement between:

**Pentler Holdings Ltd.**                              **Matinda & Co. Ltd and**

**Mamadie Touré**

Our collaboration agreement signed in 2005 expired.
Our role as advisor and business provider for all our projects in Guinea in the commercial, mining and
medical fields was successfully and professionally fulfilled.

The role of Matinda & Co. Ltd. has contributed to the great success of our mutual business.
Following your decision to cease your activities in Guinea, we have reached an agreement as follows:

Matinda & Co. Ltd. will receive the amount of $3.1 million for its contribution to all the activities
carried out in Guinea.

The two companies Pentler Holdings Ltd. and Matinda & Co. Ltd., Mrs. Mamadie Toure, her partners
and advisers irrevocably undertake to guarantee absolute confidentiality on all our common business
conducted in Guinea and not to disclose, directly or indirectly, any common business.

Matinda & Co. Ltd., Mrs. Mamadie Toure, her partners and advisers hereby undertake not to publish,
directly or indirectly, any of the contracts signed with a third party, to respect full responsibility for
our activities in Guinea and not to use, directly or indirectly, any document, contract or agreement
signed or not signed, written or oral.

Matinda & Co Ltd hereby undertakes not to contact, directly or indirectly, orally or in writing, any of
the Guinean companies with which we have had collaborations, contracts, verbal or written
agreements; not to resort, directly or indirectly, to legal proceedings without the prior written consent
of Pentler and its associates.

[Initialed:]     *MT*                              *M - LV*

p. 58

237

Matinda & Co. Ltd., Mrs. Mamadie Toure, her partners and advisers hereby withdraw, irrevocably and definitively, without reservations and conditions, any kind of undertaking or obligation contracted with Pentler Holdings Ltd and its business partners.

By signing these documents, Matinda & Co. Ltd. and Mrs. Mamadie Toure certify their irrevocable consent and they irrevocably undertake not to use these documents in relation with a third party.

Matinda & Co. Ltd., Mrs. Mamadie Toure, her partners and advisers undertake to take responsibility for all the complaints, actions, concerns or any other requests filed by Guinean institutions, companies, and individuals against Pentler Holdings Ltd and / or its partners.

Pentler Holding Ltd wants to thank you for this collaboration since 2005 and for all the support that Matinda & Co. Ltd. has given us.

This contract irrevocably supersedes and cancels any written or verbal agreement signed between Matinda & Co. Ltd, Mrs. Mamadie Toure, her partners and advisers, and Pentler Holdings Ltd and/ or its partners or any other entities with which Pentler Holdings Ltd and Matinda & co Ltd were in a business relationship in Guinea during the period 2005-2010.

Signed in Freetown on ....................................

Mrs. Mamadie Toure          Matinda & Co. ltd          Pentler Holdings Ltd.
                                                       [stamp] PENTLER HOLDINGS LTD
[signature]                                            [signature]

Witness[signature] [illegible stamp]

Witness..................................

## Statement

I, Mrs. Mamadie Toure, legal representative of the company named Matinda & Co. Ltd, hereby
declare that I received the amount of USD 2,400,000 (two million four hundred thousand dollars)
from  Pentler Holdings Ltd., according to our collaboration agreement signed in 2005.

Signed in Freetown on ………………………………..

Mrs. Mamadie                                    Matinda & Co. Ltd
Toure

[signature]

Witness [signature]

Witness ………………………………..

7

Subject to the proper implementation and functioning and the next stages of the operation conducted by our partners on the Simandou project in Guinea, the company Pentler Holdings Ltd undertakes to pay an extra sum of 5 million USD to Mrs. Mamadie Touré, payable in two instalments (each instalment of 2.5 million USD).
The definitive dates of these payments shall be communicated a maximum of 48 hours after the date of signature of this document.

Signed in Freetown on [handwritten:] 07/08/2010

Mrs. Mamadie Touré                                          Pentler Holdings Ltd

[signature]                                                        [signature]

Subject to the proper implementation and functioning, and the proper execution of the next stages of the operations conducted by Pentler and its partners in all of its activities in Guinea (commercial, medical, mining, etc.), the company Pentler Holdings Ltd undertakes to pay an extra sum of 5 million USD to Mrs. Mamadie Touré, payable in two instalments (each instalment of 2.5 million USD). The first payment shall be made 24 months after signature of this document. The second payment of 2.5 million shall be made 24 months after the first payment.

The company Matinda & Co. Ltd and Mrs. Mamadie Touré hereby undertake to refrain from making use of this document in any manner, directly or indirectly, and using this document against the company Pentler and/or its partners and/or its associates in Guinea and elsewhere.

Mrs. Mamadie Touré hereby undertakes to take full responsibility for all actions taken in Guinea by any third party against Pentler and/or its associates.

Signed in Freetown on [handwritten:] 08/03/2010

On behalf of Matinda & Co. Ltd
Mrs. Mamadie Touré

[signature]
Pentler Holdings Ltd

p. 63

242

# Exhibit No. 2

[blank page]

p. 65

## Testimony

I, Frédéric Cilins, born on December 15, 1962 in Antibes, of French nationality, certify the accuracy of the following.

BSGR informed me of the allegations made by the Guinean authorities against it and in which my name is mentioned and questioned me about these allegations.

I have worked for years in the field of import-export and international trade. I am constantly looking for business opportunities wherever they arise. In the course of my career, I have done business in many different countries and I have acquired a strong mobility and adaptation capability.

I have been in Africa since the early 2000s, first in Kenya and Uganda, then in Congo, Angola, and finally in West Africa. In Guinea, my work focused in particular on the purchase and resale of pharmaceuticals. In 2005, I learned about the existence of BSGR and I understood the interest it might take in developing mining projects in Guinea.

Having there a possibility to access the BSGR group, I put a lot into analyzing the mining aspects in Guinea and, given my strong local presence, I offered my assistance and cooperation to BSGR.

I quickly realized the importance of the Simandou mountains and the outrage of all Guineans I had met caused by the total inertia of the mining companies present in the country for several years, whose exploration activity had been very limited. Being able to appreciate the responsiveness and dynamism of BSGR due to its smaller size and private nature, I thought that there was an opportunity for both Guinea and BSGR. An advantage in my relationship with BSGR was the fact that I was familiar with the environment, which they were not, as well as being a French speaker, a requirement in Guinea.

Outside Guinea, I worked with BSGR in Liberia, Mali and Sierra Leone on projects that were not always successful.

During the numerous meetings with the Ministry of Mines and the Centre for Mining Promotion and Development (CPDM), I thus presented BSGR and the projects carried out by this group. In particular, I presented the Koidu diamond mine in Sierra Leone, the copper and cobalt mines in the Democratic Republic of Congo (KOV, Kananga and Tilwezembe mines, the Kolwezi processing plant, the electrical refinery in New Luili), the copper and cobalt mines in Zambia (Baluba mines, Muliashi deposit, Chambishi foundry). I also presented the ferronickel mine and plant in Macedonia and Kosovo, and the steelworks in Baku. The group had also been the majority shareholder of AngloVaal Mining in South Africa. I insisted on the technical capabilities of the group, in particular in engineering, where their company named Bateman is one of the leaders in the field and has a strong presence in Africa.

[initials]
000039

p. 66

245

2

I have never tried to hide my cooperation with BSGR. However, I have always specified that I was not an employee of BSGR but an independent agent. But the essential part of my work was to present the company and to promote its strike force.

At my initiative, BSGR thus filed applications for iron ore exploration permits, which it obtained in February 2006 for the areas north and south of Simandou which had never been the subject of exploration nor permit application before. A few months later, it also filed applications and obtained exploration permits for bauxite in the prefectures of Dinghiri, Mali and Koubia. I subsequently assisted BSGR in setting up base in the country which was perhaps secondary but essential and critical. On this occasion I have seen the importance and rapidity of the efforts made by the group to start the operations.

I was obviously taken to meet with President Conté, probably two or three times. I talked to him about BSGR and the work performed by it. During one of our meetings, I brought him a watch as a present. I do not remember the exact value of that watch, but I can certify that it was less than USD 5,000. I had not informed BSGR of my initiative, as it was a local custom seen in Guinea as simple good manners. Guineans call this custom the "kola". In addition, I purchased this watch myself and I also covered all the other costs, and I have never asked BSGR for reimbursement.

The president was not a mining specialist. He was a military man, with a special liking of agriculture. He nevertheless insisted on the importance of Simandou to the country and repeated to me during a meeting that "the Guineans are watching us" and that BSGR had to make every effort.

In general, my contacts within the Guinean administration were very sensitive to the commitment, the reliability and the results of BSGR on field and that in a context where Guinea, whose subsoil contains iron reserves among the most important of all Africa, had never yet been able to extract the least significant amount.

In the early days of my presence in Guinea, i.e. several months before I met BSGR, I had met Mrs. Henriette Conté, wife of the President of the Republic Lansana Conté.

Like other wives of African heads of state, she ran a charity.

For my part, I have never donated pharmaceuticals to this charity or any other organization run by Mrs. Conté or to Mrs. Conté personally. I know, however, that pharmaceutical companies that distributed their products in Guinea might have donated goods to Mrs. Conté's organization. I have never been involved in any capacity whatsoever in these operations, which I believe to have occurred prior to my meeting with her.

During this period I also met Mr. Ibrahim Touré, well-known Guinean journalist who clearly stands out from the others. He told me everything about his country. He introduced me to his half-sister Miss Mamadie Touré, who carried out some import and resale activities in the agro-food sector he thought might

[initials]
000040

p. 67

246

[page repeats]

interest me given my other activities. I met with her several times at her house in Dubréka and I did some business in this sector with her. As far as I remember, she carried out her activity in a personal capacity and not as a company. I have never known her to have any business, let alone accounts outside Guinea. On the occasion of our contacts, Mrs. Touré told me she had a potentially diamantiferous property in the zone of Forecariah and asked if it would be of interest to BSGR. I shared this information with the company, whose geologist, after performing a soil analysis, prepared a mission report unfavorable to the development of the project. BSGR has thus declined Mrs. Touré's offer.

To my knowledge, the relations between BSGR and Mrs. Touré were limited to this possible business opportunity. I have never asked Mrs. Touré to speak in favor of BSGR to anyone and especially not to the president, to whom, as far as I know, she has never been married.

My knowledge of Mrs. Touré, who spoke French badly and seemed not to have any connections to the business community, led me to doubt that she could have any links with the Guinean administration or any influence over it. It seems to me in particular excluded that she ever decided to organize meetings within the Ministry of Mines. In any case, I have never known her to participate in these meetings or in their organization. As far as I understood, it seemed to me that Mrs. Touré was attributed some supernatural powers, products of the African culture, the nature or effects of which remain unknown to me, and which gave her a certain social status. I can confirm that Mrs. Touré has never been present at our meetings with the president or has never even been kept informed of these meetings by me or, to my knowledge, by BSGR, including during the project stage and during the setting up of the appointments.

I am not aware of any gifts or payments made by BSGR to Mrs. Touré. As for myself, whenever I brought her presents, such as for example, a bottle of perfume, it happened of course without informing or reporting to BSGR, because it was part of the "local courtesy" and I wanted to maintain good relations with someone who was part of the local community.

Finally, I certify that I have never made any payments, even more so hidden, to anyone in or outside of Guinea on behalf of BSGR, nor have I taken any payment obligation on its behalf in this regard. During a meeting at the Ministry of Mines in February 2006, in the presence of the press and many officials, Mr. Roy Oron, then CEO of BSGR, officially gave to the Minister a miniature "formula 1" race car. Given the circumstances, I did not consider it was an object of value.

I stopped assisting BSGR Guinea and I left the country in 2006, as I had no pending business there. BSGR had recruited at the time a "Country Manager" in the person of Mr. Asher Avidan.

[signature]                                    [handwritten:] *Drawn up in Antibes*
                                                        *on 11/26/2012*

000041

4

# Exhibit No. 3

> Professional Civil Partnership
> Yann JEZEQUEL
> Christine PINHEIRO
> And Anne-Sophie GRUEL
> Associated Bailiffs
> 44 rue Poliveau
> 75005 PARIS

**SENT LETTER**

[logo] BAILIFF

# CERTIFIED REPORT

## YEAR TWO THOUSAND THIRTEEN, NOVEMBER TWENTY-NINTH

### AT THE REQUEST OF:

**THE GOVERNMENT OF THE REPUBLIC OF GUINEA**, represented by the President of the Republic in office
Address for service located at the law-firm DLA PIPER UK LLP
17 rue Scribe 75009 PARIS

### WHICH STATES:

That it takes high interest in transcribing the phone records and the conversations between Mamadie Touré and Frédéric Cilins.

Which asks me, as a consequence, in order to ensure the protection of its rights, to note all relevant findings and to prepare a report.

### THEREFORE, COMPLYING WITH THIS REQUISITION:

I the undersigned, **Christine PINHEIRO**, bailiff at the Tribunal de Grande Instance of PARIS [Superior Court], residing at 44, rue Poliveau 75005 PARIS,

Hereby certified that I received today, at my office and to my attention, a closed envelope,

### I SAW, RECOGNIZED AND FOUND THE FOLLOWING:

**p. 71**

Professional Civil Partnership
Yann JEZEQUEL
Christine PINHEIRO
And Anne-Sophie GRUEL
Associated Bailiffs
44 rye Poliveau
75005 PARIS

I opened the envelope and I found an USB stick inside it.

I found that this USB stick contains:

- the following folders:



- a draft transcript.

I found that the folders contain audio records.

I have listened to each of the audio files.

I subsequently took note that the transcript on the USB stick is the exact transcript of said recordings and it is reproduced below:

## RECORDING OF A PHONE CALL OF MARCH 15, 2013

Transcript of a phone call between Frédéric Cilins ("FC") and Mamadie Touré ("MT").

**REFERENCES:**

**Folder:  3.15.2013 Call 1 / Device 1**

**File:     2_Out_mama1634_03-15-2013_070354PM.wav**

**0:00:00        BEGINNING OF RECORDING**

FC:  Hello.

MT:  Hello yes Frédéric, good evening.

FC:  Oh, Mamadie.

MT:  [Laughs]

FC:  So you. Incredible. What have you done to me?

MT:  I was upset.

FC:  I have been looking for you - but everything is well, I am well and you, how are you? That's what worries me. How are things going for you?

MT:  I'm fine, I'm fine, I'm fine.

FC:  Everything all right? Oh la la la la. You've disappeared like that. You've disappeared. Everything okay? Is the little one all right? Everyone okay?

MT:  Yes, she's fine.

FC:  Good, all the better. That's good.

MT:  Yes.

FC:  Well, that's good. Well, bah listen, as Cény told you, I'm, I'm here in the United States.

MT:  Mmm mmm.

FC:  So I don't know, sometime next week, whenever you want. You tell me the day that suits you.

MT:  Mmm mmm.

FC:  And then that's it. We'll meet and chat a bit.

MT:  Ok.

1

p. 73

CONFIDENTIAL

FC:  Ok? I don't know, what day is best for you? because I have some stuff to do here and there, this way I know how to organize my time and leave that day free.

MT:  But first, what do you offer me? Before we meet. What have you got for me?

FC:  What do I have for you? You already know what I have for you, I want to see you and talk to you and you - you know, when we left the last time we talked and you told me: "Listen, look into it and see if you can get something right away," and then here we are. It is you who called me on Saturday or Sunday. On Monday I tried to call you because I had a positive response. I tried to call you to tell you that and since then I have not managed to reach you. That's what. Just that - you know, since then I wanted to tell you that. So uh... it was already good news, you know? that you already have something - the thing which you had asked me for in fact. You had told me: "Can we get - if we can get something right away, that's fine, because like that, it allows me to do that, and that, and that." So that's what.

MT:  Ok. So everything is settled now?

FC:  Everything has been settled for a while now, because right after I obtained - I don't remember who I had on the telephone  - but after that I could not reach you, so I left a message. I - well, you know what. You know well. So I don't know how you want to do this, but well we cannot do this over the phone.

MT:  Mmm mmm. [inaudible - sounds of television/radio]

FC:  Ok?

MT:  [inaudible]

FC:  So uh that's all, and then, listen, otherwise nothing more. As for that thing - well I think that anyway, but I learned that the old man is very sick. I did not know that.

MT:  Who - who is very ill?

FC:  The old man there, the boss. He has - I think he has cancer and it's pretty serious.

MT:  Really?

FC:  It's pretty serious. Yeah.

MT:  Really?

FC:  Yeah, yeah. Apparently he has - he has a bad cancer. He has a bad cancer and he's very concerned because he won't last as far as I know.

MT:  [inaudible]

FC:  Ah. Well that's the news - it's something I found out not so long ago. And when I spoke with Cény about it, Cény told me he knew, but I didn't. I thought you also knew. I don't know, or maybe Cény misunderstood, I wouldn't know. In any case, what I'm telling you, that's for sure. What I'm telling you, that's for sure.

MT:  [Inaudible] He is still kicking.

2

CONFIDENTIAL

FC:   Yes, he is - well, until now at least, he is. So far, anyway he is still there. What do you want to do? He is still there. Ok?

MT:   Ok.

FC:   Um... So, look. Do you want me to call you back to set a day? Should I call back - you will think about it and tell me tomorrow what day would be good for you?

MT:   Ok.

FC:   Eh? Will you think about it?

MT:   Ok. Ok.

FC   All right then.

MT:   Do you want me to bring the files or [inaudible]?

FC:   That's up to you. Whatever. If you want to - we must first meet and clarify the details and then we do it. But first we must meet and talk about it.

MT:   Ok.

FC:   So if you want me to uh I can fly in to meet you. As you wish, it is your decision.

MT:   Ok.

FC:   Just decide what is easiest for you and we do it like that.

MT:   Ok. Ok.

FC:   Ok?

MT:   Ok.

FC:   All right then.

MT:   Yeah.

FC:   Good well listen. I wish you a good evening and I'm glad - I'm glad you called me, that we talked and that we are going to see each other. But most of all, what is important is that you tell me the day, because if you want, on Monday that doesn't work for me, but Tuesday is fine with me if you want, I can - we can do that.

MT:   Okay. Tuesday?

FC:   Tuesday if you want, yes.

MT:   Ok.

FC:   That's because I have to look for tickets. I must look for plane tickets and all that. So if you want we'll talk tomorrow morning.

3

CONFIDENTIAL

MT: Okay, I'll think about it.

FC: Think about it and if you want, we'll talk tomorrow morning, not too late, so I can still buy plane tickets.

MT: Ok. what time in the morning?

FC: Ok it works. I don't know, I don't know. I must check the flight schedules and check all that.

MT: Ok. ok

FC: I don't know the schedules there.

MT: Ok.

FC: But I'll check.

MT: Ok.

FC: Ok?

MT: Ok.

FC: All right then. We'll talk tomorrow morning right?

MT: Ok. Thank you.

FC: Well, thank you, good night.

MT: Good night.

FC: Thanks. Ciao ciao. Bye.

**0:06:40   END OF RECORDING**

CONFIDENTIAL

## RECORDING OF A PHONE CALL OF MARCH 16, 2013

Transcript of a phone call between Frédéric Cilins ("FC") and Mamadie Touré ("MT").

**REFERENCES:**

**Folder:  3.16.2013 Call 2 / Device 1**

**File:    4_Out_mama1634_03-16-2013_050315PM.wav**

0:00:00    **BEGINNING OF RECORDING**

FC:    Hello?

MT:    Hello, hello, Frédéric.

FC:    Yes, how are you Mamadie?

MT:    Fine, how are you?

FC:    Fine. Yes, I'm fine, just fine. Okay. Have you received my text message?

MT:    I received it, yes.

FC:    That's it. I can arrive at nine o'clock and I leave at half past three, something like that.

MT:    But unfortunately, Tuesday I don't have the time - I said unfortunately I can't on Tuesday because I have a doctor appointment.

FC:    No, it's fine, we can push it for Wednesday if you want. It's up to you. I was suggesting Tuesday because I can't come on Monday but afterwards, on Tuesday, Wednesday, the day you want.

MT:    I'll call you later to tell you on what day we can meet next week because -

FC:    Ahhh next week, hold on! Next week I'm leaving. I'm leaving on Tuesday the 26th. So uh next week it's going to be complicated.

MT:    You know why? Because [inaudible], I have an appointment with them because I also have to sign the papers with them.

FC:    With what? What market?

MT:    [Panera] market.

FC:    What's that?

5

**CONFIDENTIAL**

MT: [Panera]. I'll see the fish and then the fruits.

FC: Ah okay. And you'll do that in the United States?

MT: Yes. [inaudible] so they should start [inaudible] so if I'm not there to sign, that's not good.

FC: Yes, but what day do you have that? You don't know yet?

MT: That's because I have an appointment with them, too. After the hospital, I have an appointment with them, too. But I don't have an appointment with them on Tuesday anyway.

FC: Do you know yet on what day that will be?

MT: No, I know, but that - it'll take me a while. Because - I'd rather meet with you next week because -

FC: Well yeah. Yeah.

MT: They sent me letters about what to do and there is a lot to be done.

FC: I understand.

MT: Then they have to install something—there's something they install—settle things with the bank and then a lot of stuff. And where to install - which means contracts. For example, contracts with the bank, contracts for payment of the TV and then with the bank, they want to determine where we'll put it and then sign everything.

FC: Okay, okay. But this project, where are you doing it?

MT: I'm doing it in Jacksonville. I told you.

FC: Oh okay. Okay, okay. Well listen, that's good. That's good. And the financing for it, have you found the financing, it's all good?

MT: No, but I told you that. With the little I had, I told you I had to do it. I told you, remember, with the fish and the fruit?

FC: Yes, yes. That's good. And well listen, if you want, otherwise we can push it for the end of the week. If you want, I can come. Because we could - we only have to meet for an hour, an hour and a half or so - it won't take longer than that. So, if you want, if I arrive at nine o'clock in the morning, I can take a cab and then I can meet you somewhere in town, this way you don't have to come to the airport if you want.

MT: Yes, but when you're there, when you're in a meeting, you are focused. Everyone is focused because if you do not focus, the thing [inaudible], it's over. Because even with the people there [inaudible] they will come, sit down, they will cook and

6

**CONFIDENTIAL**

they will see [inaudible]. So he will ask for me to be there. And everyone eats
[inaudible then the call is dropped].

**0:04:38**       **END OF RECORDING**

7

p. 79

CONFIDENTIAL

## RECORDING OF A PHONE CALL OF MARCH 16, 2013

Transcript of a phone call between Frédéric Cilins ("FC") and Mamadie Touré ("MT").

**REFERENCES:**

**Folder:  3.16.2013 Call 2 / Device 1**

**File:    8_Out_mama1634_03-16-2013_051039PM.wav**

0:00:00        **BEGINNING OF RECORDING**

FC:   Hello?

MT:   Hello yes.

FC:   Yes ah I don't know, the phone wasn't working.

MT:   Yes, I had no [inaudible].

FC:   Yes, look, I don't know. You do what you can. As for me, it's that I cannot stay
       later than Tuesday because I have things to do - I have meetings scheduled later in
       Europe and I absolutely have to go back. So if you want, I can come on Saturday,
       Sunday, I don't know. As you wish. Listen, that's all I can say. I'm free on those
       days. It is up to you to choose the day that suits you, okay? Hello?

MT:   You want me to tell you when it's more convenient for me. When it's more
       convenient for me is what I'm telling you.

FC:   So what day? Monday then? Next week, on Monday?

MT:   I cannot tell you exactly if it will be on Monday. Let me check my schedule with
       the girl who is helping me and I'll call you back. Next week.

FC:   Ok. Ah, if you call me back next week, it's too late well because I'm telling you -
       Tuesday, Tuesday night, I'll be on the plane, I cannot change that.

MT:   Why am I telling you this? It's because of my meetings. Like I told you. It's
       because of my meetings.

FC:   I understand. Yes, go ahead.

MT:   If I'm not at the meetings, here it's not like in Guinea. If you don't go to a meeting,
       everything will be lost.

FC:   Yes, yes, yes I understand what you mean. But afterwards if you want, even if you
       have your meeting and all that, you can escape for an hour. If I come - I come to
       see you, for an hour we can talk, it won't be a problem. Right?

8

**p. 80**

CONFIDENTIAL

MT:   How will I escape the meeting? I can't escape. How am I going to escape. No.

FC:   No, but I mean - it's not escaping. I mean, if you're there in Jacksonville, I come to
see you for an hour. Even if you have things to do, you can free yourself for an
hour anyway. That's what I'm saying. Do you understand?

MT:   That's what I was telling you. Did you or didn't you come to see me Frédéric?
Let's tell the truth. You came to find me, I was [inaudible].

FC:   No, but I - that's what I'm saying Mamadie. Listen carefully. What I'm saying is
that I understand you have a lot of meetings and everything. But you cannot tell me
that during a whole week, you cannot give me an hour if I come to see you. You
tell me any day, from what time to what time. I'll plan my time to come. I'm not
saying you should go anywhere, I'm not telling you to do anything. I'm just saying
one hour - you make yourself available for one hour somewhere and you tell me:
"This day, you can make yourself free for an hour?" and I'll leave and I come to
see you. In an entire week, you can certainly find one hour when I can come see
you where you are even if you do not come to the airport and so on. Do you
understand?

MT:   Frédéric, if I tell you I have meetings, you must believe me. It's just like when you
have meetings and you can't - [inaudible]. When you have a meeting, do you
usually say -   that someone they can come tell you [inaudible]. They will take me
for someone who is not responsible.

FC:   No, but you're right. Of course you're right. But I'm telling you, you're not - there
are 24 hours in a day and there are seven days in a week. You are not in meetings
the whole day. There has to be one hour when you can be free so we can talk. Do
you agree? That's what I'm saying.

MT:   Can you understand that I have meetings, I will be tired, I have the child. This is
not easy. I need to think of myself. There is no one who will take care of my child.

FC:   Well listen, you know. There is no problem. I'll let you do as you want. Mamadie,
me, I'll tell you, I will not get on my knees.

MT:   Even my sister who helps me, she has her child who is sick, [inaudible]. He is five
months old. The child is sick today.

FC:   I understand.

MT:   Each time, the child falls ill. You see? She cannot come help me. She has two
children. There is no one to help her. The meetings, [inaudible], it's true sometimes
we leave in the morning and we return at night.

FC:   I understand. Look, I'll let you do as you want, as you can. In any case, if you want
to, I think it will be good for you if we meet. I will not get on my - I can't tell you
more than that. I think it would be a good thing for us to meet, a very good thing
for you because there are good things to do in relation to what I told you. Now, if
you can, you can, if you can't, you can't.

9

CONFIDENTIAL

**CONFIDENTIAL**

What do you want? I cannot tell you more. I will not get on my knees to tell you -

MT: I did not tell you to get on your knees. The reason I tell you [inaudible]. I cannot ignore the people who want to help me here. They do it for me. I'm not paying them.

FC: You know that me too - the reason I want to see you is also to help you. You know that. And we are talking about a lot of money here. Now, as I said, this is not about the week -

[Inaudible - FC MT and talk at the same time]

I'm here until - I'm telling you I'm leaving on Tuesday the 26th in the evening. If we manage to meet before that, it's fine. If we don't, what can I do? I don't know what to tell you.

MT: It's the meetings that did this. It is the secretary [inaudible]. Everyone wants to do their job. [Inaudible] Now, what do you have for me? How much do you have to give me?

FC: No, but it's not how much you have to give me. We talked about it last time. You told me: "For one, can you get a part of it upfront?" The answer is yes. And when - I want us to meet and discuss it, that's all. Do you understand? You told me: "Can you get two, three - can do something upfront and the rest as you say?" So I told you yes. Now, we need to meet. We cannot do this over the phone, it is impossible. So uh if you can, you can. If you can't, you can't. I don't know what to tell you. In any case I can't - my problem is that my flight is on the 26th, I cannot change it. Unfortunately, I cannot really change it because people are waiting for me in Europe and I absolutely have to return to Europe. I cannot change that. So I am free in the morning, afternoon, night, day, whenever you want.

MT: [Inaudible]

FC: I didn't understand what you -

MT: I'm saying I am honest, you will not hang me out to dry and then you're going to [inaudible].

FC: No, no, it's not that this meeting is more important. It's just that the problem is I absolutely have to return on the 26th. I have family matters, I cannot change that. I'm not going to wander around or anything. And besides, Easter is coming, I have family in Italy, I have a lot of stuff going on. If I do not return on the 26th, it will be a big problem for me. So I'm telling you, between now as I'm speaking to you and the 26th, at any moment you tell me: "Frédéric, come on this day at 3am," I'm coming on that day at 3am. I am free all day, every day, even Monday - I told you I had some stuff - even that I can change if it is good for you. But the problem is, I cannot do it after the 26th. That's for sure, sure, I cannot go pass the 26th. But the rest of the time, I tell you, I am free 24/7 for you. You are the main reason for my visit and I have no problem to free myself for that. But after the 26th, I'll be in a lot of trouble, a whole lot of trouble. And I am even ready to come and stay for two days if you want me to wait for you there. The day you tell me:

11

**CONFIDENTIAL**

"Listen, come on Monday and leave on Tuesday," I can even spend a night there. I have no problem with that because I think it's very important that we meet. But I cannot come later, I assure you - it's not that I don't want to, it's that I really can't go beyond the 26th because I absolutely have to return. That's it.

MT:   Ok. ok. I will call you back, as I told you; I'll call you next week. (...) you're worried about yourself but you do not understand. So, anyway, I'll call you next week as I told you.

FC:   Okay, look, next week, if you call me on Tuesday, I'll be - I told you Tuesday night I'll be on the plane huh, I cannot change that.

MT:   Frédéric, you must help me. I've always told you to help me.

FC:   Mamadie, you know, "you must help me." I am the first to help you.

MT:   You do not help me. You do not help me. You do not help me. When I've I always told you, when I have problems, help me. It is you alone that I can count on.

FC:   Mamadie, Mamadie, Mamadie; listen to me, listen to me, listen to me carefully, listen to me carefully. The last time - you know I'm not a billionaire - the last time when I came to see you, myself, from my own money, I gave you an envelope with 5,000 dollars in it. Are there many people who come to you and bring you 5,000 dollars every day to see you? Do you have a lot of people like that? You know, you cannot tell me that I am not helping you. It's not possible.

MT:   When I told you Tuesday, I'm sick and I have other meetings, you should not get angry for that.

FC:   I'm not angry. I am not angry. I'm telling you, I'm telling you, I have to take everything into consideration. I'm telling you I am here for 12 days and I had informed Cény about it, I told him: "Look, I arrive on the 14th. Between the 14th and the 26th I'm free every day to see Mamadie." I am free every day. So you cannot tell me that I am not making an effort. I came, I stayed here for 12 days, I only came for you, Mamadie. I only came for you. Any day you tell me to come, I come. Of course, I have other meetings scheduled but I am free -

MT:   When I tell you about my meetings, you must wait [inaudible]. I'm not a liar. You have to accept that.

FC:   I am not saying you are a liar. I'm just saying that in a whole week, you cannot tell me: "Frédéric, look, I don't have an hour to talk to you." You cannot tell me that, it's not possible. In a week, even a President of the Republic will receive me to see me for an hour if he wants to see me.

MT:   I cannot make you wait in a corner like that. I cannot do that.

FC:   You can make me wait, it's no problem. You can say: "Frédéric, come on Monday, Tuesday, come on Tuesday, Wednesday, come on any day you want" and I'll come

12

CONFIDENTIAL

and I'll wait in a hotel and I'll wait for you to be available. There is no problem, I'm ready to do that.

MT:   Frédéric, I tell you sometimes we leave in the morning, even in order to eat, I must stop at McDonald's or something like that to buy food. I do not even have time to eat so [inaudible]. You cannot even understand. Because it is not your job [inaudible]. You cannot understand. It is too busy, much too busy. Sometimes in a meeting, people stay there overnight. You cannot understand. [inaudible] But even when I tell you, you cannot understand because you've never done this, it's not your job.

FC:   I don't know. I don't know, but listen, I don't know. Try to - I don't know - think about it calmly and if you want we'll talk on the phone next week and you'll tell me. Me, the entire next week - look, next week, but you cannot call me the week after that. Because I'm free the whole next week but after that I'm not.

MT:   Okay, I have to feed... As I said, next week I'll call you.

FC:   Ok, great. Next week you call me then, - that's it, next week, you call me whenever you want. I am available, ready to come. But it is not this Tuesday huh that I'm leaving, it's the one after that. Next week I'm free ok. Agree?

MT:   I told you I'll call you.

FC:   That's great. Ok? But then I'm telling you, the next week I am completely free for you. You call me whenever you want.

MT:   Ok.

FC:   Agree?

MT:   Yes.

FC:   All right then. Well, in any case, I see you have projects. That is good. That is good. That's a good thing. At the same time, if you want, those things could help you so it's good.

MT:   Ok.

FC:   Ok?

MT:   Yes.

FC:   All right then. Ok, I'll be waiting for your call. Thank you. Thanks.

MT:   Yes.

FC:   Thank you. Ciao ciao.

**0:14:33**      **END OF RECORDING**

13