## **EXHIBIT 6**
### **Pt. IV**

million, with $200,000 to be paid now and $800,000 at a later date.
CILINS further told the CW that, once the case is complete and the
group is not forced out, the CW will receive "five." Based upon my
participation in this investigation and my training and experience,
I believe that the case CILINS refers to is the corruption
investigation by the government of Guinea, the group CILINS refers
to is the Entity or the Guinea Subsidiary, and "five" refers to $5
million. CILINS later reiterated that the CW will receive $5
million if they are not kicked out and the $1 million regardless of
the outcome.

      n.    CILINS then presented to the CW for the CW to sign
a document CILINS referred to as an attestation (the
"Attestation"). CILINS read the Attestation to the CW and told the
CW that they needed to write "Jacksonville" on the Attestation, and
date and sign it. The CW signed the Attestation after which I know
from Agent-1 that the CW and CILINS walked together to a business
center within the airport to make a copy of the Attestation for the
CW.

      o.    As CILINS and the CW walked to the business center,
CILINS reiterated that it is very important for CILINS to be
present when the documents are destroyed and that CILINS has strict
orders to be present for the destruction of the documents. The CW
and CILINS agreed that the CW would go home to get the documents
and call CILINS with a place where they could meet.

    21.    From Agent-1 I know that, after the conclusion of the
April 11 Meeting, the CW provided Agent-1 with a copy of the
Attestation, which had been presented to the CW for the CW's
signature by FREDERIC CILINS, the defendant, during the April 11
Meeting. The Attestation is written in French and is titled
"ATTESTATION." Because the Attestation is in French, my
description of the Attestation below is based upon a draft English
translation of the Attestation prepared by a French translator.
The Attestation, which purports to be a document issued by the CW,
contains, among other things, the following statements, each of
which I know based, among other things, upon information from the
CW and my review of the Contracts described above, is false:

      a.    "I have never signed a single contract with the
          Entity, neither directly or indirectly through
          anyone else."

      b.    "I never intervened with Guinean officials in favor
          of [the Entity] . . ."

      c.    "I have never received any money from [the Entity],

15

p. 212

> neither directly or indirectly. . . . [The Entity]
> never gave me . . . any money, neither directly to
> me nor to anyone else on my behalf.  They did not
> either promise to pay me anything, neither to me,
> nor to anyone else on my behalf."

22.   Based upon my conversations with Agent-1 and other
special agents of the FBI, I know that, later on or about April 11,
2013, the CW again met with FREDERIC CILINS, the defendant,  at an
airport in Jacksonville, Florida (the "Second April 11 Meeting").
An FBI surveillance team conducted physical surveillance of the
Second April 11 Meeting, which was recorded by a recording device
in the CW's possession.  Because the Second April 11 Meeting was
conducted in French, the description below of what occurred during
the Second April 11 Meeting is based upon my review of draft
English summaries of the recordings, which were prepared by French
speakers.  Based upon my review of these draft English summaries,
I know that, in substance and among other things, the following
occurred during the Second April 11 Meeting:

a.   The CW expressed concern to CILINS that the CW
was being asked to lie to the FBI and told CILINS that the CW
wanted money now.  CILINS replied that he would see what he could
do and would try to get $50,000 to give to the CW.   CILINS
expressed that he would need to seek permission from a senior
operative within the Entity to pay the CW the money.   CILINS
stated, in substance, that the CW needed to lie to the FBI.

b.   CILINS told the CW, who had brought to the Second
April 11 Meeting copies of some of the Contracts, that the CW
needed to bring the originals.  CILINS told the CW that CILINS
would call the CW the next day to arrange a time for them to meet
again.

23.   Based upon my conversations with Agent-1, I know that, on
or about April 14, 2013, the CW again met with FREDERIC CILINS, the
defendant,   at  the  same  airport  in  Jacksonville,  Florida  (the
"April 14 Meeting").   Agents from the FBI conducted physical
surveillance of the April 14 Meeting, which was recorded by a
recording device in the CW's possession.  From Agent-1, I know that
shortly after CILINS left the April 14 Meeting, CILINS was arrested
in  possession  of  envelopes  from  Wells  Fargo  bank  containing
approximately $20,000 in United States currency.

16

WHEREFORE, deponent respectfully requests that the defendant be imprisoned, or bailed, as the case may be.

PETER KILPATRICK
Special Agent
Federal Bureau of Investigation

Sworn to before me this
___th day of April, 2013

_James C. Francis IV_    APR 15 2013

HONORABLE JAMES C. FRANCIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

17

p. 214

393

# Exhibit no. 7

[illegible stamp]
[duty stamp:] REPUBLIC OF GUINEA
DUTY STAMP
1,000 FRANCS
[illegible]

## MEMORANDUM OF UNDERSTANDING

### BY AND BETWEEN THE UNDERSIGNED

**MATINDA AND CO.LIMITED-SARL,** single-member company, hereinafter abbreviated "MACO", with its head office in Dubréka, Republic of Guinea.

Party of the first part

And

**BSGR Ressources Guinée SARL,** company governed by the Guinean law, with its head office in Conakry

Party of the second part

**Whereas**

The Company named BSGR Guinea has approached the Guinean authorities to establish a partnership for the development and mining of part of the iron deposits of SIMANDOU on the one hand, and the Company named MATINDA AND CO-LIMITED –SARL so that the latter assists it in the process of obtaining the mining exploration permits.

Thereupon, as a result of joint efforts, by the Order No. A2007/582/MMG/SGG of February 28, 2007 of the Ministry of Mines and Geology, four mining exploration permits for uranium mining covering a total area of 1,413 km$^2$ were granted to BSGR Ressources Guinea in the Prefectures of Lola and N'zérékoré;

Thus, the parties freely agree to the following:

In order to reward the efforts provided, BSGR Guinea agrees to transfer 5% of all its shares to MATINDA AND CO-LIMITED-SARL which accepts the transfer.

This Memorandum, which is binding on the parties, enters into force on the date of its signature.

Signed in Conakry on [hw:] *JUNE 20,* 2007

Drawn up in 2 original copies

| | |
|---|---|
| **BSGR Ressources Guinée** | **MATINDA AND CO LIMITED Sarl** |
| [signature] | **Manager** |
| [hw:] *MANAGING DIRECTOR* | **Mrs. Mamadie TOURE** |
| | [signature] |

[square stamp:] SEEN FOR THE PHYSICAL
AUTHENTICATION OF THE SIGNATURES
CONAKRY, [hw:] *07/20/07*
CHIEF CLERK

[round stamp:] Court of 1st Instance of Konakry 2
Republic of Guinea
Chief Clerk
[Signature]

**p. 216**

[blank page]

# Exhibit no. 8

**COMMISSION CONTRACT**

By and between the undersigned:

**BSG Resources**, represented by Mr. ASHER AVIDAN, Operations Manager authorized for the purposes hereof,

And,

**MATINDA AND CO LIMITED,** represented by Mrs. MAMADIE TOURE, business woman in DUBREKA.

**It was agreed as follows:**

**UNDERTAKING**

**BSG Resources** undertakes to give a total amount of four million dollars as commission for obtaining the Simandou blocks 1 and 2 , located in the Republic of Guinea and covering the prefectures of KEREOUANE and BEYLA.

**MATINDA AND CO LIMITED** undertakes, on its part, to take all necessary steps to obtain the signature of the authorities for the said blocks in favor of **BSG RESOURCES GUINEA**.
**BSG Resources** intends to divide the commission above as follows:
An amount of two (2) million for **MATINDA AND CO LIMITED** with USD one hundred (100) already paid in advance.

The remainder of the amount will be distributed among the people of goodwill who would have contributed to the facilitation of the granting of said blocks, **BSG Resources Guinea** deciding on the distribution depending on the quality of the contribution of each party.
The full amount will be paid immediately after the signature of said document.
In addition, **BSG Resources undertakes** to complete, in a reasonable time, the educational infrastructures, property of Matinda and co limited in the Republic of Guinea.

**Drawn up in duplicate**

Conakry, February 27, 2008

On behalf of BSG Resources Guinea
[signature]
Mr. AVIDAN ASHER
[stamp:] B.S.G.R. Resources Guinea
Operations Manager

On behalf of MATINDA AND CO LIMITED
[signature]
Mrs. MAMADIE TOURE

p. 219

398

# Exhibit no. 9

## MEMORANDUM OF UNDERSTANDING

By and between the undersigned

**BSG Resources Guinea**, represented by Mr. AVIDAN ASHER, Operations Manager,

And,

**MATINDA AND CO. LIMITED,** represented by Mrs. MAMADIE TOURE, business woman in
DUBREKA.

It was agreed as follows:

**BSG Resources undertakes** to give 5% of its shares of Simandou blocks 1 and 2 , located in the
Republic of Guinea and covering the prefectures of kerouané and beyla.

Drawn up in duplicate

Conakry, February 28, 2008

On Behalf of BSG Resources Guinea                On behalf of MATINDA AND CO LIMITED
[signature]                                                    [signature]
Mr. AVIDAN ASHER                                        Mrs. MAMADIE TOURE
[stamp:] B.S.G.R Resources Guinea
Operations Manager

p. 221

# Exhibit no. 10

[Stamp:] Republic
of Guinea
Stamp duty 1000
francs
BA0779327

[Stamp:] Court of
First Instance
Conakry
Rep. Guinea
Chief Clerk

## MEMORANDUM OF UNDERSTANDING

**By and between the undersigned**

Mrs. Mamadie TOURE, business woman, national of Guinea, residing in Dubreka

party of the first part

And

PENTLER HOLDINGS LTD, with its head office in Akara Building, 24 Castro Street, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands, represented by Mr. Avraham LEV RAN

party of the second part

**Whereas**

The Company named BSGR Guinea approached the Guinean authorities with a view to establishing a partnership for the development and mining of part of the iron deposits of SIMANDOU.

As part of this project, BSGR Guinea submitted to the Guinean authorities a proposal for the grant of a shareholding of 15% to the Republic of Guinea and a shareholding of 5% to Mrs. Mamadie TOURE, as local partner. To this effect, BSGR Guinea will found, together with the Republic of Guinea, a public corporation named Compagnie Minière de SIMANDOU.

In order to integrate the shareholding of Mrs. Mamadie TOURE, BSGR Guinea will transfer 17.65% of its capital to Pentler Holdings Ltd, of which 33.30% of the capital will be allocated to Mrs. Mamadie TOURE.

**It is hereby agreed as follows**

**Article 1:**

Pentler Holdings Ltd undertakes to transfer to Mrs. Mamadie TOURE, for free, a shareholding of 33.30% of its capital, as soon as the Compagnie Minière de SIMANDOU is established and obtains the mining rights for the operation of the mining area of SIMANDOU, which will be granted to it by the Republic of Guinea.

Page 1 of 2

[signature]

[Stamp:] Republic of Guinea
Stamp duty 1000 francs
BA0779327

[Stamp:] Court of First Instance Conakry
Rep. Guinea
Chief Clerk

## Article 2

Pentler Holdings Ltd will pay Mrs. Mamadie TOURE dividends for her shareholding of 33.30%, as it does for the other shareholders, after the debts contracted by the Compagnie Minière de SIMANDOU for the operation of the mining area by said company have been repaid and the first dividends have been paid to Pentler Holdings Ltd.

## Article 3

This Memorandum, which is binding on the parties, enters into force on the date of its signature.


**Signed in Conakry on February 20, 2006**


Drawn up in 2 original copies


Mrs. Mamadie TOURE

[signature]


Pentler Holdings Ltd, represented by Mr. Avraham LEV RAN

[stamp:] **PENTLER HOLDINGS Ltd.**
    Akara Building, 24 De Castro Street,       [signature]
      Wickhams Cay 1, Road Town,
         Tortola, B.V.I.
        reg. no. 682814

                        [stamp:] SEEN FOR THE PHYSICAL
                        AUTHENTICATION OF THE SIGNATURES
                        CONAKRY, [hw:] *03/01/06*
                               CHIEF CLERK

             [Stamp:] Court of 1st Instance of Konakry 2
                    Republic of Guinea
                       Chief Clerk
                       [Signature]


Page 2 of 2

**p. 224**

# Exhibit no. 11-1

Stamp: Republic of
Guinea
Stamp duty 1000
francs
BA0622986

Stamp: Illegible

# ENGAGEMENT LETTER

**To:**

Mrs. Mamadie Touré, businesswoman of Guinean nationality, domiciled in Dubreka

**From:**

The Company PENTLER HOLDINGS LTD, domiciled at Akara Building, 24 De Castro Street,
Wickhams Cay 1, Road Town, Tortola, British Virgin Islands, represented by Mr. Avraham LEV
RAN.

**The parties recite as follows**

The company BSGR Guinea contacted the Guinean authorities with the aim of establishing a
partnership for the development and exploitation of part of the SIMANDOU iron deposits.

Within the framework of this project, BSGR Guinea submitted a proposal to the authorities allowing
the Republic of Guinea a 15% shareholding and a 5% shareholding for Mrs. Mamadie TOURE as a
local partner. To this end, the company BSGR Guinea along with the Republic of Guinea shall create
a partially state-owned limited company named Compagnie Minière de SIMANDOU.

In order to incorporate the shareholding of Mrs. Mamadie TOURE, the company BSGR Guinea shall
transfer 17.65% of its capital to the Company Pentler Holdings Ltd, 33.30% of the capital of which
shall be allocated to Mrs. Mamadie TOURE.

The above is subject to a Memorandum of Understanding, signed by Mrs. Mamadie TOURE, on one
hand, and the Company Pentler Holdings Ltd, on the other hand, dated February 20, 2006.

**New Project**

Within the framework of its activities in Guinea, the company BSGR Guinea has obtained exploration
permits for bauxite in the areas of Tougué, Kéniéba, Bafing Makana and Dinguiraye defined by the
geographical coordinates below.

[initial]

Page 1 of 4

Stamp: Republic of
Guinea
Stamp duty 1000 francs
BA0622985

Stamp: Court of First
Instance Conakry
Rep. Guinea
Chief Clerk

**Permit 1: (500 km$^2$) – Prefecture of Koubia**

| POINTS | NORTHERN LATITUDE | WESTERN LONGITUDE |
|--------|-------------------|-------------------|
| A | 12° 00' 00'' | 11° 45' 00'' |
| B | 12° 00' 00'' | 11° 30' 13'' |
| C | 11° 50' 00'' | 11° 30' 13'' |
| D | 11° 50' 00'' | 11° 45' 00'' |

**Permit II: (500 km$^2$) – Prefecture of Koubia**

| POINTS | NORTHERN LATITUDE | WESTERN LONGITUDE |
|--------|-------------------|-------------------|
| A | 12° 09' 45'' | 11° 44' 31'' |
| B | 12° 09' 45'' | 11° 29' 21'' |
| C | 12° 00' 00'' | 11° 29' 21'' |
| D | 12° 00' 00'' | 11° 44' 31'' |

**Permit III: (500 km$^2$) – Prefecture of Mali**

| POINTS | NORTHERN LATITUDE | WESTERN LONGITUDE |
|--------|-------------------|-------------------|
| A | 12° 09' 33'' | 12° 00' 00'' |
| B | 12° 09' 33'' | 11° 44' 31'' |
| C | 12° 00' 00'' | 11° 44' 31'' |
| D | 12° 00' 00'' | 12° 00' 00'' |

**Permit IV: (500 km$^2$) – Prefecture of Mali**

| POINTS | NORTHERN LATITUDE | WESTERN LONGITUDE |
|--------|-------------------|-------------------|
| A | 12° 18' 07'' | 12° 00' 00'' |
| B | 12° 18' 07'' | 11° 42' 43'' |
| C | 12° 09' 45'' | 11° 42' 43'' |
| D | 12° 09' 45'' | 12° 44' 31'' |
| E | 12° 09' 33'' | 11° 44' 31'' |
| F | 12° 09' 33'' | 12° 00' 00'' |

**Permit V: (500 km$^2$) – Prefecture of Mali**

| POINTS | NORTHERN LATITUDE | WESTERN LONGITUDE |
|--------|-------------------|-------------------|
| A | 12° 20' 00'' | 11° 42' 43'' |
| B | 12° 20' 00'' | 11° 26' 27'' |
| C | 12° 09' 45'' | 11° 29' 26'' |
| D | 12° 09' 45'' | 12° 42' 43'' |

Page 2 of 4

**p. 227**

Stamp: Republic of
Guinea
Stamp duty 1000
francs
BA0622984

Stamp: Court of
First Instance
Conakry
Rep. Guinea
Chief Clerk

**Permit VI: (500 km$^2$) – Prefecture of Koubia**

| POINTS | NORTHERN LATITUDE | WESTERN LONGITUDE |
|--------|-------------------|-------------------|
| A | 12° 09' 45'' | 11° 29' 21'' |
| B | 12° 02' 40'' | 11° 20' 56'' |
| C | 11° 50' 00'' | 11° 20' 56'' |
| D | 11° 50' 00'' | 11° 30' 13'' |
| E | 12° 00' 00'' | 11° 30' 13'' |
| F | 12° 00' 00'' | 11° 29' 21'' |

**Permit VII: (500 km$^2$) – Prefecture of Tougué**

| POINTS | NORTHERN LATITUDE | WESTERN LONGITUDE |
|--------|-------------------|-------------------|
| A | 11° 50' 00'' | 11° 30' 13'' |
| B | 11° 50' 00'' | 11° 15' 26'' |
| C | 11° 40' 00'' | 11° 15' 26'' |
| D | 11° 40' 00'' | 11° 30' 13'' |

**Permit VIII: (500 km$^2$) – Prefectures of Tougué and Dinguiraye**

| POINTS | NORTHERN LATITUDE | WESTERN LONGITUDE |
|--------|-------------------|-------------------|
| A | 11° 49' 35'' | 11° 15' 26'' |
| B | 11° 49' 35'' | 11° 00' 00'' |
| C | 11° 40' 00'' | 11° 00' 00'' |
| D | 11° 40' 00'' | 11° 15' 26'' |

**Permit IX: (500 km$^2$) – Prefectures of Tougué, Dinguiraye and Koubia**

| POINTS | NORTHERN LATITUDE | WESTERN LONGITUDE |
|--------|-------------------|-------------------|
| A | 12° 02' 38'' | 11° 20' 55'' |
| B | 12° 05' 30'' | 11° 07' 58'' |
| C | 12° 05' 28'' | 11° 07' 33'' |
| D | 11° 49' 35'' | 11° 07' 33'' |
| E | 11° 49' 35'' | 11° 15' 26'' |
| F | 11° 50' 00'' | 11° 15' 26'' |
| G | 11° 50' 00'' | 11° 20' 55'' |

**Permit X: (500 km$^2$) – Prefectures of Dinguiraye and Tougué**

| POINTS | NORTHERN LATITUDE | WESTERN LONGITUDE |
|--------|-------------------|-------------------|
| A | 12° 05' 24'' | 11° 07' 32'' |
| B | 12° 12' 13'' | 11° 02' 39'' |
| C | 12° 12' 17'' | 11° 00' 00'' |
| D | 11° 49' 35'' | 11° 00' 00'' |
| E | 11° 49' 35'' | 11° 07' 32'' |

Page 3 of 4

p. 228

[Stamp:] Republic
of Guinea
Stamp duty 1000
francs
BA0622983

[Stamp:] Illegible

**Permit XI: (422 km$^2$) – Prefecture of Dinguiraye**

| POINTS | NORTHERN LATITUDE | WESTERN LONGITUDE |
|---|---|---|
| A | 12° 12' 17'' | 11° 00' 00'' |
| B | 12° 00' 12'' | 10° 47' 00'' |
| C | 12° 00' 12'' | 11° 00' 00'' |

**The line A-B is traced parallel to the Guinea-Mali border at approximately 200m.**

**Permit XII: (500 km$^2$) – Prefecture of Dinguiraye**

| POINTS | NORTHERN LATITUDE | WESTERN LONGITUDE |
|---|---|---|
| A | 12° 00' 12'' | 11° 00' 00'' |
| B | 12° 00' 12'' | 10° 46' 58'' |
| C | 11° 49' 51'' | 10° 45' 00'' |
| D | 11° 49' 51'' | 11° 00' 00'' |

**Permit XIII: (500 km$^2$) – Prefecture of Dinguiraye**

| POINTS | NORTHERN LATITUDE | WESTERN LONGITUDE |
|---|---|---|
| A | 11° 49' 51'' | 11° 00' 00'' |
| B | 11° 49' 51'' | 10° 45' 00'' |
| C | 11° 40' 00'' | 10° 45' 00'' |
| D | 11° 40' 00'' | 11° 00' 00'' |

It is understood that the procurement of these exploration permits to the company BSGR Guinea shall entail *de facto* the shareholding of Mrs. Mamadie TOURE in this project, through her free shareholding of 33.30% stipulated under the terms of the Memorandum of Understanding between Mrs. Mamadie TOURE, on one hand, and the Company Pentler Holdings Ltd, on the other hand, dated February 20, 2006.

Done in two originals

The company Pentler Holdings Ltd, represented by Mr. Avraham LEV RAN

PENTLER HOLDINGS e/s
Akara Building, 24 De Castro Street
Wickhams Cay I, Road Town
Tortola, B.V.I.
reg. n° 652839

[Stamp:] Verified for
legalization of signatures
Conakry, 07/21/06
Chief Clerk

[Stamp:] Court of First
Instance Conakry
[Illegible]

Page 4 of 4

p. 229

Exhibit no. 11-2

Stamp: Republic of Guinea
Stamp duty 1000 francs
BA0622982

Stamp: Court of First Instance
[Illegible]

# **ENGAGEMENT LETTER**

**To**:

Mrs. Mamadie TOURE, businesswoman of Guinean nationality, domiciled in Dubreka

**From**:

The company PENTLER HOLDINGS LTD, domiciled at Akara Building, 24 De Castro Street, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands, represented by Mr. Avraham LEV RAN.

**The parties recite as follows**

The company BSGR Guinea contacted the Guinean authorities with the aim of establishing a partnership for the development and use of part of the SIMANDOU iron deposits.

Within the framework of this project, BSGR Guinea submitted a proposal to the authorities allowing the Republic of Guinea a 15% shareholding and a 5% shareholding for Mrs. Mamadie TOURE as a local partner. To this end, the company BSGR Guinea along with the Republic of Guinea shall create a partially state-owned limited company named Compagnie Minière de SIMANDOU.

In order to incorporate the shareholding of Mrs. Mamadie TOURE, the company BSGR Guinea shall transfer 17.65% of its capital to the company Pentler Holdings Ltd, 33.30% of the capital of which shall be allocated to Mrs. Mamadie TOURE.

The above is subject to a Memorandum of Understanding, signed by Mrs. Mamadie TOURE, on one hand, and the Company Pentler Holdings Ltd, on the other hand, dated February 20, 2006.

**New Project**

Within the framework of its activities in Guinea, the company BSGR Guinea has submitted an application for exploration permits for bauxite in the areas of Tougué Nord, Boké and Télémélé Nord defined by the geographical coordinates below.

Page 1 of 2

[Stamp:] Republic of Guinea
Stamp duty 1000 francs
BA0622981

[Stamp:] Court of First Instance
Rep. Guinea

BAUXITE AREA 1

| | Latitude | | | Longitude | | |
|---|---|---|---|---|---|---|
| A | 13 | 24 05 | N | 13 | 0 | W |
| B | 11 | 55 32 | N | 10 | 48 | W |
| C | 11 | 30 | N | 10 | 45 | W |
| D | 11 | 20 | N | 10 | 30 | W |
| E | 11 | 2 | N | 10 | 39 | W |
| F | 11 | 12 | N | 1 | | W |
| G | 11 | 18 17 | N | 11 | 5 | W |
| H | 1 | 17 | N | 1 | 55 | W |
| I | | 40 | N | 17 | 45 | W |
| J | 13 | 40 | N | 11 | 45 | W |
| K | 12 | 0 | N | 11 | 45 | W |
| L | 13 | 0 | N | 12 | 11 | W |

BAUXITE AREA 2

| | Latitude | | | Longitude | | |
|---|---|---|---|---|---|---|
| A | 11 | 20 | N | 13 | 5 | W |
| B | 11 | 20 | N | 13 | 17 | W |
| C | 11 | 10 | N | 3 | 15 | W |
| D | 11 | 10 | N | 3 | 0 | W |

BAUXITE AREA 3

| | Latitude | | | Longitude | | |
|---|---|---|---|---|---|---|
| A | 11 | 0 | N | 14 | 20 | W |
| B | 11 | 0 | N | 14 | 10 | W |
| C | 16 | 55 | N | 14 | 13 | W |
| D | 10 | 55 | N | 13 | 54 | W |
| E | 10 | 40 | N | 11 | 55 | W |
| F | 10 | 40 | N | 14 | 14 | W |

It is understood that the procurement of these exploration permits to the company BSGR Guinea shall entail *de facto* the shareholding of Mrs. Mamadie Touré in this project, through her free shareholding of 33.30% stipulated under the terms of the Memorandum of Understanding  between Mrs. Mamadie Touré, on one hand, and the company Pentler Holdings Ltd, on the other hand, dated February 20, 2006.

Done in two originals

The company Pentler Holdings Ltd, represented by Mr. Avraham Lev Ran

PENTLER HOLDINGS Lt
Akara Building, 24 De Castro Street
Wickhams Cay 1, Road Town
Tortola, B.V.I.
rep. n° 682911

[Stamp:] Verified for legalization of signatures
Conakry, 07/21/06
Chief Clerk

[Stamp:] Court of First Instance Conakry
Chief Clerk
[Illegible]

Page 2 of 2

Exhibit no. 12

Subject to the proper implementation and functioning and the next stages of the operation conducted by our partners on the Simandou project in Guinea, the company Pentler Holdings Ltd undertakes to pay an extra sum of 5 million USD to Mrs. Mamadie Touré, payable in two instalments (each instalment of 2.5 million USD).
The definitive dates of these payments shall be communicated a maximum of 48 hours after the date of signature of this document.

Signed in Freetown on [handwritten:] 07/08/2010

Mrs. Mamadie Touré                                    Pentler Holdings Ltd

[signature]                                          [signature]

# Exhibit no. 13

Subject to the proper implementation and functioning, and the proper execution of the next stages of
the operations conducted by Pentler and its partners in all of its activities in Guinea (commercial,
medical, mining, etc.), the company Pentler Holdings Ltd undertakes to pay an extra sum of 5 million
USD to Mrs. Mamadie Touré, payable in two instalments (each instalment of 2.5 million USD). The
first payment shall be made 24 months after signature of this document. The second payment of 2.5
million shall be made 24 months after the first payment.
The company Matinda & Co. Ltd and Mrs. Mamadie Touré hereby undertake to refrain from making
use of this document in any manner, directly or indirectly, and using this document against the
company Pentler and/or its partners and/or its associates in Guinea and elsewhere.
Mrs. Mamadie Touré hereby undertakes to take full responsibility for all actions taken in Guinea by
any third party against Pentler and/or its associates.

Signed in Freetown on [handwritten:] 08/03/2010

On behalf of Matinda & Co. Ltd
Mrs. Mamadie Touré

[signature]
Pentler Holdings Ltd

Subject to the proper implementation and functioning, and the proper execution of the next stages of the operations conducted by Pentler and its partners in all of its activities in Guinea (commercial, medical, mining, etc.), the company Pentler Holdings Ltd undertakes to pay an extra sum of 5 million USD to Mrs. Mamadie Touré, payable in two instalments (each instalment of 2.5 million USD). The first payment shall be made 24 months after signature of this document. The second payment of 2.5 million shall be made 24 months after the first payment.

The company Matinda & Co. Ltd and Mrs. Mamadie Touré hereby undertake to refrain from making use of this document in any manner, directly or indirectly, and using this document against the company Pentler and/or its partners and/or its associates in Guinea and elsewhere.

Mrs. Mamadie Touré hereby undertakes to take full responsibility for all actions taken in Guinea by any third party against Pentler and/or its associates.

Signed in Freetown on [handwritten:] 08/03/2010

On behalf of Matinda & Co. Ltd
Mrs. Mamadie Touré

[signature]
Pentler Holdings Ltd

# Exhibit no. 14-1

Agreement between:

**Pentler Holdings Ltd.**                    **Matinda & Co. Ltd and**

                                            **Mamadie Touré**

Our collaboration agreement signed in 2005 expired.
Our role as advisor and business provider for all our projects in Guinea in the commercial, mining and medical fields was successfully and professionally fulfilled.

The role of Matinda & Co. Ltd. has contributed to the great success of our mutual business.
Following your decision to cease your activities in Guinea, we have reached an agreement as follows:

Matinda & Co. Ltd. will receive the amount of $3.1 million for its contribution to all the activities carried out in Guinea.

The two companies Pentler Holdings Ltd. and Matinda & Co. Ltd., Mrs. Mamadie Toure, her partners and advisers irrevocably undertake to guarantee absolute confidentiality on all our common business conducted in Guinea and not to disclose, directly or indirectly, any common business.

Matinda & Co. Ltd., Mrs. Mamadie Toure, her partners and advisers hereby undertake not to publish, directly or indirectly, any of the contracts signed with a third party, to respect full responsibility for our activities in Guinea and not to use, directly or indirectly, any document, contract or agreement signed or not signed, written or oral.

Matinda & Co Ltd hereby undertakes not to contact, directly or indirectly, orally or in writing, any of the Guinean companies with which we have had collaborations, contracts, verbal or written agreements; not to resort, directly or indirectly, to legal proceedings without the prior written consent of Pentler and its associates.

[Initialed:]     *MT*                        *M - LV*

p. 239

Matinda & Co. Ltd., Mrs. Mamadie Toure, her partners and advisers hereby withdraw, irrevocably and
definitively, without reservations and conditions, any kind of undertaking or obligation contracted with
Pentler Holdings Ltd and its business partners.

By signing these documents, Matinda & Co. Ltd. and Mrs. Mamadie Toure certify their irrevocable
consent and they irrevocably undertake not to use these documents in relation with a third party.

Matinda & Co. Ltd., Mrs. Mamadie Toure, her partners and advisers undertake to take responsibility for
all the complaints, actions, concerns or any other requests filed by Guinean institutions, companies, and
individuals against Pentler Holdings Ltd and / or its partners.

Pentler Holding Ltd wants to thank you for this collaboration since 2005 and for all the support that
Matinda & Co. Ltd. has given us.

This contract irrevocably supersedes and cancels any written or verbal agreement signed between
Matinda & Co. Ltd, Mrs. Mamadie Toure, her partners and advisers, and Pentler Holdings Ltd and/ or its
partners or any other entities with which Pentler Holdings Ltd and Matinda & co Ltd were in a business
relationship in Guinea during the period 2005-2010.

Signed in Freetown on ………………………………..

Mrs. Mamadie Toure          Matinda & Co. ltd          Pentler Holdings Ltd.
                                                       [stamp] PENTLER HOLDINGS LTD
[signature]                                            [signature]

Witness[signature] [illegible stamp]

Witness……………………………..

p. 240

[blank page]

# Exhibit no. 14-2

[blank page]

## Statement

I, Mrs. Mamadie Toure, legal representative of the company named Matinda & Co. Ltd, hereby declare
that I received the amount of USD 2,400,000 (two million four hundred thousand dollars) from  Pentler
Holdings Ltd., according to our collaboration agreement signed in 2005.


Signed in Freetown on .......................................


Mrs. Mamadie                                    Matinda & Co. Ltd
Toure

[signature]



Witness [signature]

Witness .....................................

[blank page]



**COMITÉ TECHNIQUE
DE REVUE DES TITRES
ET CONVENTIONS MINIERS**

N° 039 /CTRTCM/2014

**RÉPUBLIQUE DE GUINÉE**

........................

Travail –        – Solidarité

Conakry, le 28 mars 2014

**CONFIDENTIEL**

*Le Président*

**Objet :** Transmission recommandation émise
par le CTRTCM au Comité Stratégique

*A*

Monsieur le Président- Directeur Général
VBG – VALE BSGR GUINEÉ
Cité Chemin de Fer – Immeuble Pita – 5ème étage
Conakry – République de Guinée

Monsieur le Président Directeur Général,

Je vous prie de trouver ci-joint, pour votre information, le rapport que le Comité Technique de Revue des Titres et Conventions Miniers (CTRTCM), conformément à son mandat, présente ce jour au Comité Stratégique, au terme de la revue concernant vos titres miniers en République de Guinée. Ce rapport complet contient la recommandation du CTRTCM au Comité Stratégique.

Vous en souhaitant bonne réception, je vous prie de croire, Monsieur le Président Directeur Général, en mes sentiments de distinguée considération.

CTRTCM
Le Président                    Nava TOURÉ

P.J : -    Rapport du CTRTCM au Comité Stratégique

**COMITÉ TECHNIQUE DE REVUE DES TITRES ET CONVENTIONS MINIERS**

# RECOMMANDATION CONCERNANT LES TITRES MINIERS ET LA CONVENTION MINIÈRE DÉTENUS PAR LA SOCIÉTÉ VBG

À l'attention du Comité Stratégique

21/03/2014

# CONFIDENTIEL

## À l'attention du Comité Stratégique

### SYNTHESE

BSGR a obtenu, dans le secteur minier, le bénéfice de plusieurs titres et d'une convention miniers :

- quatre permis de recherche couvrant une superficie totale de 2047 kilomètre carré (km²) dans les préfectures de Beyla, Macenta, N'Zérékoré et Yomou, enregistrés dans le Registre des Titres Miniers sous le numéro A2006/023/DIGM/CPDM suivant Arrêté ministériel N°A 2006/706/MMG/SGG du 06 février 2006, ces permis ayant été renouvelés pour une superficie totale de 1667 km² et ayant été enregistrés dans le Registre des Titres Miniers sous le numéro A2009/124/DIGM/CPDM suivant Arrêté ministériel N°A2009/1327/PR/MMEH/SGG du 10 juin 2009 ;

- trois permis de recherche couvrant une superficie totale de 1286 km² dans la préfecture de Kérouané, enregistrés dans le Registre des Titres Miniers sous le numéro A2006-024/DIGM/CPDM suivant Arrêté ministériel N°2006/707/MMG/SGG du 06 février 2006 ;

- un permis de recherche sur les blocs 1 & 2 Simandou couvrant une superficie totale de 369 km² dans la préfecture de Kérouané, enregistré dans le Registre des Titres Miniers sous le numéro A2008/132/DIGM/CPDM suivant Arrêté ministériel N°72008/4980/MMG/SGG du 09 décembre 2008.

- une convention de base en date du 16 décembre 2009 permettant l'octroi d'une concession minière sur une zone dite de Zogota, d'une superficie totale de 1024 km² à cheval sur les préfectures de Beyla, Macenta, N'Zérékoré et Yomou, enregistrée dans le Registre des Titres Miniers sous le numéro A 2010/171/DIGM/CPDM suivant Décret présidentiel N°D2010/024/PRG/CNDD/SGG du 19 mars 2010.

Aujourd'hui, VBG est titulaire des titres miniers et de la convention minière suivants :

- un permis de recherche sur les blocs 1 & 2 Simandou couvrant une superficie totale de 369 km² dans la préfecture de Kérouané, enregistré dans le Registre des Titres Miniers sous le numéro A2008/132/DIGM/CPDM suivant Arrêté ministériel N°72008/4980/MMG/SGG du 09 décembre 2008 ;

- une convention de base en date du 16 décembre 2009 concernant la zone dite de Zogota ;

2

- une concession minière portant sur la prospection et l'exploitation des gisements de fer de Zogota, résultant de la transformation de quatre permis de recherche initialement octroyés pour les préfectures de Beyla, Macenta, N'Zérékoré et Yomou, enregistrée dans le Registre des Titres Miniers sous le numéro A 2010/171/DIGM/CPDM suivant Décret présidentiel N°D2010/024/PRG/CNDD/SGG du 19 mars 2010 .

Dans le cadre du Programme de revue des titres et des conventions miniers, le Comité Technique a procédé à une revue des titres et de la convention détenus par la société VBG aux fins de recommandation au Comité Stratégique, chargé de formuler un avis aux autorités compétentes sur ces titres et sur la convention.

La procédure administrative menée par le Comité Technique a été organisée afin de permettre à la société titulaire des titres et de la convention miniers de faire valoir utilement ses observations, tant par écrit que par oral.

Sur la base, notamment, de pièces obtenues dans le cadre d'une procédure judiciaire actuellement menée par les autorités américaines et dont l'authenticité ne semble pas douteuse et n'a d'ailleurs été contestée que par l'actionnaire minoritaire de VBG et, au surplus, sans éléments étayant sa position, le Comité Technique estime que les titres et la convention aujourd'hui détenus par VBG ont été obtenus, pour les gisements de Simandou comme pour ceux de Zogota, à la suite de pratiques de corruption.

En conclusion, et compte tenu de l'ensemble de ce qui précède, le Comité Technique estime :

- qu'il existe un ensemble d'indices précis et concordants établissant avec une certitude suffisante l'existence de pratiques de corruption entachant l'octroi à BSGR des titres miniers et de la convention minière pour les gisements de Simandou comme pour ceux de Zogota ; et

- que de telles pratiques de corruption entachent de nullité les titres miniers et la convention minière dont est actuellement détentrice la société VBG.

Le Comité Technique considère, dès lors :

- que ces actes administratifs n'ont pu, en raison de l'irrégularité entachant leur procédure d'octroi, créer des droits au profit de la société qui les avait obtenus ;

- que la société VBG qui, en tout état de cause, en est le titulaire

3

actuel peut se voir opposer cette irrégularité ;

- que si, en l'état des informations obtenues par le Comité Technique, il est vraisemblable que l'actionnaire majoritaire de la société VBG n'a pas participé aux pratiques de corruption, cette circonstance ne saurait affecter en tout ou même en partie la recommandation que devra soumettre le Comité Technique au Comité Stratégique, la validité d'un titre minier ou d'une convention minière étant appréciée intrinsèquement.

En conséquence, le Comité Technique soumet au Comité Stratégique la recommandation suivante :

- proposer au Ministre chargé des Mines de prononcer le retrait du permis de recherche sur les blocs 1 & 2 Simandou couvrant une superficie totale de 369 km$^2$ dans la préfecture de Kérouané, enregistré dans le Registre des Titres Miniers sous le numéro A2008/132/DIGM/CPDM suivant Arrêté ministériel N°72008/4980/MMG/SGG du 09 décembre 2008 ;

- proposer au Président de la République de retirer la concession minière sur la zone dite de Zogota d'une superficie totale de 1024 km$^2$ et couvrant les préfectures de Beyla, Macenta, N'Zérékoré et Yomou, enregistrée dans le Registre des Titres Miniers sous le numéro A 2010/171/DIGM/CPDM suivant Décret présidentiel N°D2010/024/PRG/CNDD/SGG du 19 mars 2010 ;

- proposer, par suite, au Ministre chargé des Mines de prononcer la résiliation de la convention de base en date du 16 décembre 2009 ;

- proposer aux autorités compétentes de faire injonction à la société VBG de communiquer aux services du Ministère des mines l'ensemble des études, rapports, données, résultats, échantillons, etc. qui auraient été réalisés ou obtenus dans le cadre des opérations minières de VBG en Guinée ;

- proposer aux autorités compétentes de prendre toutes dispositions utiles afin que soient exclues de la procédure de réattribution des titres et de la convention objet de la présente recommandation la société VBG, titulaire des titres et de la convention en cause, ainsi que les sociétés qui ont été à l'origine de ces pratiques de corruption, c'est-à-dire BSGR et les sociétés détenues ou contrôlées, directement ou indirectement, par le Groupe BSGR.

4

Le Comité Technique de Revue des Titres et Conventions miniers (le « **Comité Technique** »);

Vu la Constitution ;

Vu la Loi L/95 /036/CTRN du 30 juin 1995, portant Code Minier de la République de Guinée ;

Vu la Loi L/2011/006/CNT/2011 du 09 septembre 2011, portant Code Minier de la République de Guinée, modifiée par la loi L/2013/053/CNT du 8 avril 2013 ;

Vu le Décret D/2012/041/PRG/SGG du 26 mars 2012 portant attributions, composition et fonctionnement de la Commission Nationale des Mines ;

Vu le Décret D/2012/045/PRG/SGG du 29 mars 2012 portant modalités de mise en œuvre d'un Programme de revue des Titres et Conventions miniers par la Commission Nationale des Mines ;

Vu le Décret D/2013/098/PRG/SGG du 23 mai 2013 portant fixation des modalités de mise en œuvre d'un Programme de revue des Titres et Conventions miniers par la Commission Nationale des Mines

Vu le Règlement de Procédure du Comité Technique du 9 septembre 2013 ;

Vu l'ensemble des pièces produites et jointes au dossier et afférentes, notamment, à la procédure écrite ;

Ouï M. Joao Vidoca, représentant la société VBG, et Mes Jean-Yves Garaud, Barthélémy Faye et Sekou Koundiano au cours de la séance du 16 décembre 2013 où siégeaient M. Nava Touré, Président, M. Ibrahima Camara, Vice-président, et MM. Saadou Nimaga, Alhassane Camara, Salim Ahmed Halaby, Ousmane Keita, Mamadou Taran Dallo, El Hadj Ibrahima Bodie Baldé, Ibrahima Bodié Baldé, Ibrahima Kalil Kourouma, membres, le procès-verbal de cette séance étant également joint au dossier ;

Après en avoir délibéré au cours de la séance du 21 mars 2014 où siégeaient M. Nava Touré, Président, M. Ibrahima Camara, Vice-Président et MM. Alkhaly Yamoussa Bangoura, Halaby Ahmed Salim, Saadou Nimaga, Mamadou Taran Diallo, Ibrahima Kalil Kourouma, Ibrahima Bodié Baldé, El Hadj Ibrahima Baldé, Abdoul Karim Sylla, Ousmane Keïta, Morciré Sylla, Seydou Bari Sidibé, membres, Sidikiba Kaba et Bangaly Oularé , membres suppléants

**Soumet au Comité Stratégique la recommandation ci-après.**

\*      \*

\*

5

p. 6

1.  Le Comité Technique est chargé, en application des dispositions des textes susvisés, de soumettre des recommandations au Comité Stratégique se rapportant aux titres et conventions miniers examinés au cours du processus de revue afin que le Comité Stratégique soit lui-même en mesure d'émettre un avis aux Autorités Compétentes au nom de la Commission Nationale des Mines.

2.  Dans ce cadre, le Comité Technique a procédé à la revue des titres miniers et de la convention minière bénéficiant actuellement à la société VBG sur les gisements de Zogota et de Simandou :

    -   un permis de recherche sur les blocs 1 & 2 Simandou couvrant une superficie totale de 369 km$^2$ dans la préfecture de Kérouané, enregistré dans le Registre des Titres Miniers sous le numéro A2008/132/DIGM/CPDM suivant Arrêté ministériel N°72008/4980/MMG/SGG du 09 décembre 2008 ;

    -   une convention de base en date du 16 décembre 2009 concernant la zone dite de Zogota ;

    -   une concession minière portant sur la prospection et l'exploitation des gisements de fer de Zogota, résultant de la transformation des quatre permis de recherche initialement octroyés pour les préfectures de Beyla, Macenta, N'Zérékoré et Yomou, enregistrée dans le Registre des Titres Miniers sous le numéro A 2010/171/DIGM/CPDM suivant Décret présidentiel N°D2010/024/PRG/CNDD/SGG du 19 mars 2010.

3.  L'examen du dossier dont il s'agit a comporté, conformément à l'article 3 du Règlement de Procédure, une phase écrite et une phase orale garantissant les droits de la défense et qui seront résumées ci-après.

4.  Au terme de cette procédure, qui n'a pas été contestée par VBG mais seulement par l'actionnaire minoritaire de cette société - BSGR - le Comité estime que le faisceau des indices recensés ci-après, qui ont été recueillis par le Comité Technique et qui n'ont pas été infirmés au cours de la procédure écrite et orale, conduit à la certitude raisonnable que les titres miniers et la convention minière dont il s'agit ont été obtenus dans des conditions entachant leur octroi.

5.  A ce stade, le Comité Technique entend rappeler trois séries d'éléments concernant la nature et le périmètre de la présente recommandation.

6.  Tout d'abord, le Comité Technique s'est appuyé sur les éléments de preuve qui étaient en sa possession – communiqués à VBG et cités en annexe du présent rapport – pour élaborer la recommandation qu'il soumet au Comité Stratégique.

7.  Par ailleurs, eu égard à la gravité et à l'importance des faits en cause, le Comité Technique a seulement fait porter son analyse sur les conditions

6

d'obtention des titres miniers et de la convention minière dont VBG est aujourd'hui titulaire et ne mentionne pas les autres manquements de cette société à ses obligations administratives ou fiscales. Ces manquements, qui ont pu être constatés par ailleurs, sont également susceptibles d'affecter la validité des titres miniers et de la convention minière dont il est question.

8.   Enfin, ni l'analyse ni les conclusions du Comité Technique – instance administrative consultative - ne préjugent des qualifications pénales que les faits en cause seraient, par ailleurs, susceptibles de recevoir dans les procédures pénales menées en parallèle par les juridictions compétentes.

9.   En conséquence, le Comité Technique soumet au Comité Stratégique la recommandation suivante :

- **proposer au Ministre chargé des Mines de prononcer le retrait du permis de recherche sur les blocs 1 & 2 Simandou couvrant une superficie totale de 369 km² dans la préfecture de Kérouané, enregistré dans le Registre des Titres Miniers sous le numéro A2008/132/DIGM/CPDM suivant Arrêté ministériel N°72008/4980/MMG/SGG du 09 décembre 2008 ;**

- **proposer au Président de la République, de retirer la concession minière sur la zone dite de Zogota d'une superficie totale de 1024 km² et couvrant les préfectures de Beyla, Macenta, N'Zérékoré et Yomou, enregistrée dans le Registre des Titres Miniers sous le numéro A 2010/171/DIGM/CPDM suivant Décret présidentiel N°D2010/024/PRG/CNDD/SGG du 19 mars 2010 ;**

- **proposer, par suite, au Ministre chargé des Mines de prononcer la résiliation de la Convention de base en date du 16 décembre 2009 ;**

  **proposer aux autorités compétentes de faire injonction à la société VBG de communiquer aux services du Ministère des mines l'ensemble des études, rapports, données, résultats, échantillons, etc. qui auraient été réalisés ou obtenus dans le cadre des opérations minières de VBG en Guinée ;**

- **proposer aux autorités compétentes de prendre toutes dispositions utiles afin que soient exclues de la procédure de réattribution des titres et de la convention objet de la présente recommandation la société VBG, titulaire des titres et de la convention en cause, ainsi que les sociétés qui ont été à l'origine de ces pratiques de corruption, c'est-à-dire BSGR et les sociétés détenues ou contrôlées, directement ou indirectement, par le Groupe BSGR.**

Ces différents points sont développés ci-après.

7

# TITRE I – RAPPEL DES FAITS ET DE LA PROCÉDURE

10. Après un bref rappel des faits, le Comité exposera les principales étapes de la procédure qu'il a conduite s'agissant des titres et de la convention dont VBG est actuellement détentrice.

### I.   LES FAITS

### 1. L'origine des interventions de BSGR auprès des autorités

11. Le groupe d'origine familiale Beny Steinmetz Resources Group (« **Groupe BSGR** ») a développé essentiellement son activité dans le secteur du diamant et des ressources naturelles.

12. Afin, selon les informations en la possession du Comité, d'élargir son activité dans ce secteur, le Groupe BSGR a décidé, au début des années 2000, d'investir en République de Guinée dans le secteur minier.

13. Dans ce cadre, le Groupe BSGR s'est attaché les services de M. Frédéric Cilins.

14. Ce dernier, qui disposait d'une expérience des affaires en République de Guinée et qui avait déjà travaillé pour le Groupe BSGR dans d'autres pays d'Afrique de l'ouest, a ainsi servi de représentant de cette entité en République de Guinée à partir de 2005. Comme l'a indiqué M. Frédéric Cilins, la part essentielle de son travail a consisté à présenter la société et à promouvoir sa force de pénétration en Guinée.

15. Le Groupe BSGR a, par ailleurs, recouru à plusieurs sociétés pour le développement de ses activités en Guinée (ensemble « **BSGR** »), notamment les sociétés BSG Resources Limited enregistrée à Guernesey, BSG Resources (Guinea) Limited, également enregistrée à Guernesey, et la société BSG Resources (Guinée) Sarl – société de droit guinéen et détenue, au moment des faits, intégralement et exclusivement par BSGR – qui a été créée pour porter les titres et conventions dont le Groupe BSGR pourrait bénéficier.

16. Des représentants légaux de BSGR – successivement, M. Roy Oron assisté de M. Marc Struik puis, à partir de 2006, M. Asher Avidan, directeur de BSG Resources (Guinée) Sarl – et M. Frédéric Cilins, agent de BSGR en Guinée ainsi qu'il sera exposé ultérieurement, sont entrés en contact avec les autorités guinéennes aux fins de leur indiquer le souhait du Groupe BSGR d'investir dans les mines en Guinée.

17. M. Frédéric Cilins a, dans ce cadre, contacté M. Ibrahima Sory Touré, journaliste, qu'il connaissait, lequel a ensuite mis en relation M. Frédéric Cilins avec sa demi-sœur, Mme Mamadie Touré.

18. Le 19 septembre 2006, Mme Mamadie Touré a ainsi été conviée, en compagnie notamment de MM. Roy Oron, Marc Struik, Asher Avidan et Frédéric Cilins, à une présentation faite par BSGR qui s'inscrivait manifestement dans le cadre d'une opération de « relations publiques ».

8

19. M. Beny Steinmetz et les représentants successifs de BSGR en Guinée –
notamment M. Asher Avidan et M. Frédéric Cilins – ont, dans ces conditions,
demandé à plusieurs reprises à Mme Mamadie Touré d'intervenir auprès du
Chef de l'Etat, son époux, pour que celui-ci donne toutes instructions utiles
aux fins d'attribution à BSGR de droits miniers en République de Guinée.

20. Plusieurs réunions ont été organisées, notamment par Mme Mamadie Touré,
au cours desquelles les représentants de BSGR ont insisté pour que des droits
miniers leur soient accordés, sur les gisements de Zogota tout d'abord et, par
la suite, sur les blocs 1 et 2 de Simandou. Les représentants de BSGR – dont
M. Beny Steinmetz – ont assisté à plusieurs de ces réunions et ont pu,
notamment, rencontrer le Président Lansana Conté.

21. En échange, BSGR promettait que des contreparties financières seraient
versées aux personnes ayant contribué à l'heureux aboutissement de ces
interventions.

## 2. L'obtention des titres et de la convention miniers par BSGR sur les gisements de Zogota et de Simandou

22. Dès le mois de février 2006, BSGR a obtenu deux séries de titres miniers :

- quatre permis de recherche couvrant une superficie totale de 2047
kilomètre carré (km$^2$) dans les préfectures de Beyla, Macenta, N'Zérékoré
et Yomou, enregistrés dans le Registre des Titres Miniers sous le numéro
A2006/023/DIGM/CPDM      suivant      Arrêté      ministériel      N°A
2006/706/MMG/SGG du 06 février 2006,  renouvelés pour une superficie
totale de 1667 km$^2$ et enregistrés dans le Registre des Titres Miniers sous
le     numéro     A2009/124/DIGM/CPDM     suivant     Arrêté     ministériel
N°A2009/1327/PR/MMEH/SGG du 10 juin 2009 ; et

- trois permis de recherche couvrant une superficie totale de 1286 km$^2$ dans
la préfecture de Kérouané, enregistrés dans le Registre des Titres Miniers
sous le numéro A2006-024/DIGM/CPDM suivant Arrêté ministériel
N°2006/707/MMG/SGG du 06 février 2006.

23. Après l'obtention de ces titres, BSGR a, par la suite, cherché à obtenir les
blocs 1 et 2 de Simandou dont était alors titulaire une autre société.

24. Le 28 juillet 2008, un décret présidentiel a retiré à la société qui en était alors
titulaire tous les droits sur les blocs 1 et 2 de Simandou.

25. Quelques mois plus tard, BSGR a pu obtenir les droits afférents aux blocs 1 et
2 de Simandou, soit un permis de recherche sur les blocs 1 & 2 Simandou
couvrant une superficie totale de 369 km$^2$ dans la préfecture de Kérouané,
enregistré dans le Registre des Titres Miniers sous le numéro
A2008/132/DIGM/CPDM suivant Arrêté ministériel N°72008/4980/MMG/SGG
du 09 décembre 2008.

9

26. Enfin, le 16 décembre 2009, BSGR a conclu une convention de base avec la République de Guinée ayant permis l'octroi subséquent d'une concession minière sur une zone dite de Zogota, d'une superficie totale de 1024 km$^2$ s'étendant sur les territoires des préfectures de Beyla, Macenta, N'Zérékoré et Yomou, enregistré dans le Registre des Titres Miniers sous le numéro A2010/171/DIGM/CPDM       suivant       Décret       présidentiel N°D2010/024/PRG/CNDD/SGG du 19 mars 2010.

## 3. L'octroi parallèle d'avantages financiers et de cadeaux à Mme Mamadie Touré ainsi qu'aux autorités

27. Antérieurement puis parallèlement à l'octroi des titres miniers et de la convention minière sur les gisements de Zogota et de Simandou précédemment mentionnés, BSGR a offert des cadeaux et octroyé des avantages aux autorités guinéennes et à leur entourage direct.

28. Au nombre des avantages les plus substantiels figurent notamment ceux qui ont été offerts à Mme Mamadie Touré si l'on en reste à des documents qui :

   - soit prévoient comme contreparties explicites des interventions réussies en vue de l'obtention des titres miniers et de la convention minière ;

   - soit ne prévoient pas une telle contrepartie explicite mais s'inscrivent dans un contexte démontrant ce lien, l'absence de compétences techniques ou commerciales propres de la bénéficiaire ne pouvant pas permettre de justifier autrement de tels avantages à son profit consentis par une société cherchant à obtenir des titres miniers.

29. L'intéressée elle-même a, par ailleurs, expressément reconnu les faits dans son attestation en date du 2 décembre 2013.

30. Deux séries de documents ont, ainsi, été établis dans le cadre de l'intervention de Mme Mamadie Touré pour le compte de BSGR.

   ### Les engagements souscrits par BSGR

31. D'une part, des engagements contractuels ont été souscrits par BSGR – représentée par son directeur général – au profit de la société Matinda and Co Limited dont Mme Mamadie Touré était apparemment la « gérante » :

   - **un protocole d'accord en date du 20 juin 2007** entre BSGR et la société Matinda and Co Limited, prévoyant que « *la Société BSGR Guinée s'est rapprochée des autorités guinéennes en vue d'établir un partenariat pour le développement et l'exploitation d'une partie des gisements de fer de Simandou d'une part, et de la société Matinda and Co Limited SARL afin que celle-ci l'assiste dans les voies et moyens permettant l'obtention des permis de recherches minières* ». Le Protocole stipulait également que « *sur ce, et [par] des efforts conjugués, par arrêté N°A2007/582/MMG/SGG du 28 février 2007, du Ministère des Mines et de*

10

la Géologie, quatre permis de recherches minières pour l'uranium couvrant une superficie total de 1413 km² ont été accordés à la Société BSGR Ressources Guinée dans les Préfectures de Lola et N'zérékoré ». En conséquence, « afin de rétribuer les efforts fournis, la Société BSGR Guinée accepte de transférer 5% de toutes ses actions à la société Matinda and Co Limited SARL qui l'accepte » ;

- **un contrat de commission conclu le 27 février 2008** entre BSGR et la société Matinda and Co Limited – représentée par Madame Mamadie Touré, « femme d'affaires à Dubreka » – par lequel « BSG Resources s'engage de donner une somme totale de quatre millions de dollars à titre de commission pour l'obtention des blocs 1 et 2 de simandou situé en République de Guinée et couvrant les préfectures de Kereouane et Beyla ». En complément, « la société Matinda and Co Limited s'engage pour sa part de faire toutes les démarches nécessaires pour obtenir des autorités la signature pour l'obtention des dits blocs en faveur de la société BSG Resources Guinée ». Il était prévu, par ailleurs, que « la société BSG Resources se propose de répartir la commission ci-dessus comme suit : Une somme de deux (2) millions pour la société Matinda and Co Limited avec imputation de cent (100) USD déjà versée à titre d'avance » et que « le reste de la somme sera répartie entre les personnes de bonne volonté qui auraient contribué à la facilitation de l'octroi des dits blocs, dans lequel la société BSG Resources Guinée diligentera en raison de la qualité de la contribution de chaque partie ». Enfin, « la totalité de la somme sera versée sans délai après la signature du dit document » ;

- **un protocole d'accord conclu le 28 février 2008** entre BSGR et la société Matinda and Co Limited – représentée par Madame Mamadie Touré, « femme d'affaires à Dubreka » – par lequel la société BSG Resources Guinée – représentée par M. Asher Avidan – « s'engage à donner [à la société Matinda and Co Limited] 5% des actions des blocs 1 et 2 de Simandou situé en République de Guinée et couvrant les préfectures de kérouané et beyla ».

32. Ces contrats ont ainsi conditionné expressément le versement de montants importants et de participations dans les droits miniers correspondants à la société Matinda and Co Limited à l'obtention, par BSGR, de droits miniers, tout particulièrement sur la zone de Zogota et les blocs 1 et 2 de Simandou.

   ○ **Les engagements souscrits par la société Pentler Holdings**

33. D'autre part, certains contrats ou engagements ont été souscrits directement au profit de Mme Mamadie Touré par la société Pentler Holdings, dont M. Frédéric Cilins était l'un des dirigeants :

11

436

- **un protocole d'accord a été conclu le 20 février 2006** entre la société Pentler Holdings et Mme Mamadie Touré. Par ce protocole d'accord, il était rappelé notamment que BSGR devait transférer 17,65% de son capital à la société Pentler Holdings. La société Pentler Holdings s'engageait, par ailleurs, à transférer gratuitement 33,30% de son capital à Mamadie Touré « *dès que la Compagnie Minière de Simandou aura été constituée et aura obtenu les titres miniers nécessaires à l'exploitation de la zone minière de Simandou, qui lui sera attribuée par la République de Guinée* » ;

- **deux lettres d'engagement - légalisées le 21 juillet 2006 - de la société Pentler Holdings envers Mme Mamadie Touré ont également été établies.** Dans la première lettre, il était indiqué que « *dans le cadre du développement de ses activités en Guinée la Société BSGR Guinée a déposé une demande de permis de recherche pour la bauxite sur les zones de Tougé Nord, Boké et Télémélé Nord (...). Il est entendu que la délivrance de ces permis de recherche au profit de la Société BSGR Guinée entraînera de fait l'actionnariat de Madame Mamadie Touré dans ce projet de par la participation gratuite de 33,30% prévue selon des termes du Protocole d'Accord signé entre Madame Mamadie Touré d'une part et Société Pentler Holdings Ltd, d'autre part, en date du 20 février 2006* ». Dans la seconde lettre, il était indiqué que « *dans le cadre du développement de ses activités en Guinée la Société BSGR Guinée a obtenu des permis de recherche pour la bauxite sur les zones de Tougué, Kéniéba, Bafing Makana et Dinguiraye (...). Il est entendu que la délivrance de ces permis de recherche au profit de la Société BSGR Guinée entraîne, de fait, l'actionnariat de Madame Mamadie Touré dans ce projet de par la participation gratuite de 33,30% prévue selon des termes du Protocole d'Accord signé entre Madame Mamadie Touré d'une part et Société Pentler Holdings Ltd, d'autre part, en date du 20 février 2006* » ;

- **un document d'engagement de la société Pentler Holdings envers Mme Mamadie Touré signé par les deux parties a été établi le 8 juillet 2010**, indiquant que « *sujet a la bonne déroulement et a la bonne fonctionnement et la suite de l'opération mené par nos partenaires au projet de Simandu en Guinée, la société Paentler Holdings Ltd s'engage a payer a madame Mamadie Touré la somme supplémentaire de 5 millions USD payable en deux parties (chaque payement de 2,5 million USD)* » ;

- **un document d'engagement de la société Pentler Holdings envers Mme Mamadie Touré a été établi le 3 août 2010**, indiquant que « *sujet au bon déroulement et au bon fonctionnement et la bonne suite des opérations menés par Pentler et ses partenaires dans toues les activités en Guinée (commerciales, médicaments, minières etc), la société Pentler Holdings Ltd s'engage a payer a madame Mamadie Touré la*

*somme supplémentaire de 5 millions USD payable en deux parties
(chaque payement de 2,5 million USD). Le premier payement sera
effectué 24 mois après la signature de ce document. Le deuxième
payement de 2,5 millions sera effectué 24 mois après le premier
payement »* ;

- **une déclaration signée mais non datée de Mme Mamadie Touré** a
  également été rédigée. Ce document indiquait que l'intéressée,
  *« représentante de la société Matinda & Co. Ltd déclare par la présente
  avoir reçu de la part de la société Pentler Holdings Ltd. la somme de
  2 400 000 USD (deux millions quatre cents milles dollars) dans le cadre
  de notre contrat de collaboration signé en 2005 »* ;

- **un contrat signé mais non daté mettant apparemment un terme
  aux relations entre la société Pentler Holdings et Mme Mamadie
  Touré** a, enfin, été établi. Ce contrat indiquait, notamment, que *« notre
  contrat de collaboration signé en 2005 est arrivé à son terme. Notre rôle
  de conseiller et d'apporteur d'affaire pour tous nos projets en Guinée dans
  les domaines commerciaux, minier et médical ont été mené de manière
  professionnelle et avec grand succès. Le rôle de la société Matinda & Co.
  Ltd a contribué à la grande réussite de nos affaires mutuelles. Suite à
  votre décision d'arrêter vos activités en Guinée, nous sommes arrivés à
  un accord comme suit : La société Matinda & Co. Ltd recevra la somme de
  3.1 millions pour sa part dans toutes les activités menées en Guinée »*.

### ○ **Versements de M. Frédéric Cilins à Mme Mamadie Touré**

34. Enfin, les versements à Mme Mamadie Touré se sont poursuivis après
    l'obtention des titres miniers et de la convention minière par BSGR. Ainsi :

    - le 27 juillet 2010 un chèque de 100 000 dollars américains a été émis par
      M. Frédéric Cilins au bénéfice de Mme Mamadie Touré ;

    - le 5 août 2010, un chèque de 50 000 dollars américains a été émis par M.
      Frédéric Cilins au profit de Mme Mamadie Touré.

## 4. La prise de participation de Vale dans BSGR

35. Le 30 avril 2010 – soit moins de cinq mois après l'obtention par BSGR de la
    Convention de Base – la société brésilienne Vale (**« Vale »**), acteur majeur
    dans le secteur minier, a conclu un Pacte d'Actionnaires et un Accord Cadre de
    Co-Entreprise avec BSGR.

36. Cette opération a, précisément, consisté en une prise de participation
    majoritaire (51%) de Vale dans BSG Resources (Guinea) Limited, société
    immatriculée à Guernesey et détenant 100% du capital de BSG Resources
    (Guinée) Sarl. BSGR est restée actionnaire à hauteur de 49% de BSG
    Resources (Guinea) Limited.

13

37. A l'issue de cette opération, la société BSG Resources (Guinea) Limited a pris le nom de « **VBG Guernesey** » et la société BSG Resources (Guinée) Sarl pris le nom de VBG – Vale BSGR Guinea (« **VBG** ») (ensemble « **VBG** »).

38. L'opération a ainsi abouti à une modification de la détention capitalistique de BSG Resources (Guinée) Sarl et à un changement de la dénomination de cette société mais aucun transfert de titres miniers ou de la convention minière n'a pour autant été opéré.

39. VBG se trouve ainsi aujourd'hui titulaire des titres miniers et de la convention minière actuellement sous revue par le Comité Technique.

### 5. La tentative de destruction de certains des éléments de preuve

40. En mars 2013, la police fédérale américaine (le Federal Bureau of Investigation, « FBI ») a intercepté et enregistré plusieurs conversations, sur le vif et téléphoniques, entre M. Frédéric Cilins et plusieurs autres interlocuteurs, dont Mme Mamadie Touré. Ces enregistrements ont été transmis par les autorités américaines aux autorités guinéennes.

41. Dans ces échanges, M. Frédéric Cilins a notamment demandé, à plusieurs reprises, à Mme Mamadie Touré de procéder à la destruction des copies des contrats mentionnés ci-dessus.

42. De nouveaux versements de M. Frédéric Cilins - qui disait agir pour le compte de BSGR et, notamment, de M. Beny Steinmetz - à Mme Mamadie Touré étaient évoqués à l'occasion de ces échanges.

43. Sur la base de ces éléments, le FBI a déposé le 15 avril 2013 une plainte devant les juridictions pénales fédérales de New York à l'encontre de M. Frédéric Cilins sur trois terrains :

    la subornation de témoin ;

    - l'entrave au déroulement d'une procédure pénale ;

    - la tentative de destruction de pièces.

44. La procédure pénale menée aux États-Unis d'Amérique se poursuit indépendamment de la procédure administrative menée par le Comité Technique, instance administrative guinéenne, qui n'est pas tenue de surseoir à statuer sur des questions relevant de juridictions d'un autre État.

## II.   LA PROCÉDURE

45.  La procédure a été conduite en plusieurs étapes.

46.  Le 4 octobre 2011, le Ministre des Mines a demandé à VBG, société détentrice des titres miniers et de la convention sous revue, de transmettre l'ensemble des actes, accords ou conventions liant cette société à l'Etat ou à d'autres partenaires.

47.  Par la suite – le 17 novembre 2011 et le 13 décembre 2011– le Ministre des Mines a demandé à VBG de lui communiquer un ensemble d'informations et de documents relatifs aux titres miniers et à la convention minière, un questionnaire détaillé ayant été transmis à cet effet.

48.  Le 3 février 2012, BSGR – actionnaire minoritaire de VBG – a fourni certaines informations et documents relatifs à ces titres et à la convention miniers.

49.  Le 1ᵉʳ mars 2012, BSGR a adressé au Président de la République un courrier faisant état de difficultés dans l'exécution de la convention de base conclue le 16 décembre 2009.

50.  Cette phase a, notamment, permis aux autorités nationales de procéder à un examen détaillé des titres miniers et de la convention minière détenus par la société VBG et d'obtenir, en particulier, des informations sur les modalités d'investissement de Vale en République de Guinée.

51.  A l'occasion de cette analyse, les autorités nationales ont été informées de diverses allégations relatives aux conditions et modalités selon lesquelles les titres miniers et la convention minière sur les gisements de Simandou et de Zogota auraient été obtenus par BSGR.

52.  Le Comité Technique a adressé, le 30 octobre 2012, à VBG – seule partie à la procédure en sa qualité de titulaire des actes en cause – un courrier contenant les allégations précédemment évoquées et demandant à VBG ses observations.

53.  Aux termes de ces allégations, les titres miniers et la convention minière de BSGR en République de Guinée afférents aux gisements de Zogota et de Simandou avaient été obtenus à la suite de la corruption de proches du Président de la République Lansana Conté et de certains membres du Gouvernement guinéen.

54.  Le 26 novembre 2012, Vale – actionnaire de VBG – a indiqué n'avoir aucune information quant aux faits allégués dans la lettre du Comité Technique.

55.  Le 28 novembre 2012, VBG a indiqué au Comité Technique que les allégations concernaient des éléments qui semblaient avoir eu lieu avant l'investissement de Vale en Guinée. VBG en a déduit, dans ce même courrier, que les enquêtes du Comité devraient donc être adressées à BSGR. Cependant, dans ce

15

courrier, VBG a indiqué qu'elle apporterait sa coopération aux enquêtes du Comité.

56. En réponse, le 26 décembre 2012, BSGR, actionnaire minoritaire de VBG, a fourni une consultation juridique signée par un Professeur de droit français (le Professeur Denys de Béchillon) et un ancien Président de section au Conseil d'Etat de France (le Président Daniel Labetoulle) émettant des doutes sur la légalité de la procédure. Par ailleurs, l'actionnaire minoritaire de VBG a apporté des réponses incomplètes aux allégations exposées par le Comité Technique.

57. Le 28 décembre 2012, VBG a communiqué au Comité Technique des informations et documents afférents aux allégations dont il s'agit.

58. Le 15 février 2013, le Comité Technique a indiqué par courrier que VBG était la seule partie à la procédure administrative et a invité cette société à compléter les réponses fournies le 28 décembre 2012.

59. Par un courrier du 22 février 2013, VBG a indiqué au Comité Technique avoir fourni dans ses précédentes correspondances toutes les informations dont cette société disposait afin de répondre au questionnaire.

60. Par un courrier en date du 4 mars 2013, BSGR a soutenu que le Comité Technique ne pouvait demander de nouvelles réponses à ses questions sans imposer une « charge excessive ». BSGR réitérait, à cette occasion, sa thèse selon laquelle la procédure serait illégale.

61. Le 15 mars 2013, BSGR a fourni certaines précisions en réponse aux questions posées par le Comité Technique tout en soutenant que la procédure serait « illégale ».

62. Le 26 mars 2013, BSGR a adressé un courrier au Comité Technique afin de contester la bonne foi du Comité Technique. BSGR soutenait, notamment, dans son courrier que les autorités guinéennes s'employaient à « *salir la réputation de BSGR* ».

63. Le 7 mai 2013, le Comité Technique a adressé à VBG trois documents concernant les allégations qui lui avaient été précédemment notifiées ; une copie de la plainte pénale déposée devant les juridictions pénales fédérales américaines (avec traduction en langue française), une copie de l'acte d'accusation (avec traduction en langue française) et une copie de plusieurs contrats relatifs aux faits dont il s'agit.

64. VBG, titulaire des titres et de la convention sous revue, a répondu, le 13 mai 2013, en indiquant qu'elle ne disposait d'aucune information sur les documents transmis et qu'elle transmettait ces documents à son actionnaire minoritaire BSGR.

65. BSGR a, pour sa part, répondu le 4 juin 2013 par l'intermédiaire de ses conseils juridiques. Bien que cette lettre ait été rédigée en anglais alors que la langue officielle de la République de Guinée tout comme la langue de la procédure est le français, le Comité Technique a accepté d'examiner le document. Il a noté que BSGR soutenait, notamment, que la procédure serait illégale et que les documents transmis seraient des faux grossiers (« crude forgeries ») qui auraient été élaborés avec le concours de membres du Gouvernement de la République de Guinée.

66. Soucieux de détailler encore davantage les règles applicables à la procédure de revue des titres et des conventions miniers, le Comité Technique a adopté, le 9 septembre 2013, un Règlement de Procédure. Ce Règlement, approuvé le même jour par le Ministre des Mines, Président du Comité Stratégique, prévoit que, pour garantir les droits des sociétés minières, une procédure écrite et une procédure orale doivent être conduites par le Comité Technique.

67. La procédure écrite a été poursuivie par le Comité Technique dans ces conditions.

68. Par un courrier du 1er novembre 2013, le Comité Technique a notifié à VBG sa décision de poursuivre la procédure de revue. Il a ainsi été demandé à VBG, dans ce courrier, de préciser les réponses qui avaient été apportées le 26 décembre 2012.

69. Par le même courrier du 1er novembre 2013, le Comité Technique a convié les représentants de VBG à une audition devant le Comité Technique le 10 décembre 2013.

70. Dans son courrier du 7 novembre 2013, VBG a indiqué, notamment, être « *très préoccupé* » par les allégations concernant les conditions d'obtention des droits miniers qu'elle détient.

71. Par un courrier du 19 novembre 2013, le Comité Technique a informé VBG de ce qu'il ne verrait aucun obstacle à ce que, si elle l'estime utile, cette société puisse demander la présence de représentants de son actionnaire minoritaire BSGR lors de l'audition. Dans une telle hypothèse, le Comité Technique indiquait pouvoir faciliter, en coopération avec les autorités compétentes, les formalités consulaires pour les personnes intéressées.

72. Le 25 novembre 2013, VBG a répondu au précédent courrier en indiquant, notamment, qu'elle serait représentée à l'audition par M. Joao Vidoca, son directeur général, et qu'elle serait assistée par ses conseils.

73. Le 29 novembre 2013, le Comité Technique a rappelé dans un courrier à VBG la possibilité pour elle de prévoir la participation de représentants de son actionnaire minoritaire BSGR lors de l'audition et confirmait, à cet égard, que le Comité Technique pourrait étudier les dispositions particulières devant être

17

prises par les autorités compétentes pour permettre l'entrée et la sortie du territoire national des personnes intéressées.

74. Le 2 décembre 2013, VBG a indiqué, par courrier, qu'elle avait « *fait tout ce qui était en son pouvoir pour coopérer aux demandes du Comité Technique* » et que, en ce qui concerne les faits de corruption allégués, elle aurait fait tout son possible pour persuader BSGR, son actionnaire minoritaire, de répondre aux questions du Comité Technique.

75. De nouveaux éléments de preuve confirmatifs des allégations ayant été communiqués à la République de Guinée par les autorités américaines au titre de la coopération judiciaire entre les deux pays, le Comité Technique a décidé de les communiquer à VBG le 4 décembre 2013.

76. Pour permettre à VBG de formuler des observations sur ces documents lors de l'audition, le Comité Technique a indiqué à VBG qu'elle pourrait solliciter un report de la date d'audition jusqu'au 18 décembre 2013.

77. Par courrier en date du 5 décembre 2013, VBG a sollicité du Comité Technique un report de la date d'audition au 16 décembre 2013.

78. Le 8 décembre 2013, BSGR a adressé un nouveau courrier au Comité Technique affirmant que la procédure suivie par ce dernier était irrégulière et indiquant qu'aucun représentant de BSGR ne serait présent à l'audition.

79. La demande de report de VBG ayant été acceptée par le Comité Technique, l'audition du représentant de VBG et de ses conseils juridiques s'est tenue le 16 décembre 2013 à Conakry, dans les locaux du Ministère d'Etat chargé de l'Économie et des Finances.

80. Lors de l'audition, VBG était représentée par M. Joao Vidoca, directeur général de VBG, assisté de ses conseils Me Jean-Yves Garaud, Avocat au Barreau de Paris, Me Barthélémy Faye, Avocat au Barreau de Paris, et Me Sekou Koundiano, Avocat au Barreau de Conakry.

81. Cette audition a permis au représentant de VBG, assisté de ses conseils, de formuler des observations sur la procédure et sur les pièces qui avaient été transmises à VBG et au Comité Technique de poser les questions qu'il jugeait utile sur les faits dont il est question.

82. Une transcription des échanges tenus lors de cette audition a été adressée à VBG le 23 décembre 2013, cette société disposant d'une semaine pour formuler des observations sur ce document.

83. Le 30 décembre 2013, le Comité Technique a reçu les observations de VBG.

84. Le 6 janvier 2014 le Comité Technique, siégeant en séance plénière, a pris connaissance des observations de VBG et a approuvé le procès-verbal de la transcription de l'audition du 16 décembre 2013.

18

85. Par un courrier du 16 janvier 2014, BSGR a de nouveau affirmé, notamment, que la procédure serait irrégulière.

86. Le 6 février 2014 le Comité Technique, siégeant en séance plénière, s'est réuni aux fins d'adopter un projet de recommandation.

87. Par un courrier du 17 février 2014, le Comité a répondu à un courrier de BSGR du 16 janvier 2014 comportant certaines critiques sur la procédure suivie. En particulier, le Comité a rappelé qu'il a pris en compte l'ensemble des échanges avec VBG et son actionnaire minoritaire – quoique celui-ci ne soit pas partie à la procédure – et que BSGR n'a pas été en mesure de présenter des éléments objectifs et sérieux démontrant, notamment, que les éléments de preuve seraient des faux.

88. Le 21 février 2014, le projet de recommandation a été soumis pour observations à VBG.

89. Le 25 février 2014 le Comité Technique a reçu de premières observations de VBG, cette société demandant à avoir communication du « rapport complet » contenant la motivation du projet de recommandation.

90. En outre, VBG s'est déclarée « *très préoccupée* », dans son courrier, de ce que la recommandation semblait « *uniquement basée sur des actions commises par BSGR quand elle était l'unique propriétaire de VBG* ».

91. Enfin, VBG a demandé au Comité Technique d'engager des « *discussions* » après réception de ses observations si elle ou son actionnaire minoritaire en exprimaient le souhait.

92. Le 27 février 2014, par ailleurs, VBG a fait parvenir au Comité Technique un courrier en langue anglaise du conseil de BSGR – accompagné de sa traduction – dans lequel celui-ci contestait de nouveau la régularité de la procédure et l'authenticité des éléments de preuve.

93. Le Président du Comité Technique a fourni une réponse à VBG sur ces différents points dans un courrier du 7 mars 2014.

94. Tout d'abord, il a été rappelé, de nouveau, que seule la validité des actes administratifs est appréciée dans la procédure de revue. Si la validité des titres ou de la convention est affectée par des vices d'origine, une modification ultérieure de l'actionnariat de la société titulaire, qui est sans incidence sur ces vices d'origine, ne peut suffire à les purger.

95. En outre, bien qu'il n'existe pas d'obligation sur ce plan et dans un souci de transparence, le résumé des éléments de fait et de droit qui ressortent des éléments de preuve et qui motivent le projet de recommandation du Comité Technique a été communiqué à VBG.

96. Enfin, il a été rappelé que la procédure ayant déjà été menée jusqu'à son terme, rien ne justifiait une nouvelle audition de VBG ou de son actionnaire minoritaire, ce dernier s'étant, du reste, systématiquement refusé à participer aux côtés de VBG à un dialogue constructif avec le Comité Technique.

97. Le 13 mars 2014, VBG a adressé un courrier en réponse au Comité Technique. Dans cette lettre, VBG a réitéré sa demande tendant à ce qu'une copie du rapport complet soit « *mise à sa disposition avant que le Gouvernement ne prenne une décision finale concernant la validité de ses droits miniers* ».

98. Par ailleurs, VBG a de nouveau porté à la connaissance du Comité que, selon elle, (**i**) seule BSGR serait « *en mesure de fournir une réponse sur les points de fond soulevés dans la lettre du Comité Technique* », que (**ii**) depuis que Vale a pris le contrôle de VBG, VBG n'aurait commis aucun acte répréhensible et que (**iii**) VBG a consenti un « *investissement important en Guinée, en investissant 700 millions de dollars US dans ce projet avec des fonds avancés par Vale* ».

99. Le 13 mars 2014 également, le conseil juridique de BSGR a adressé un courrier au Comité Technique dans lequel il a été indiqué que BSGR « *ne sera pas à même de soumettre sa réponse au Comité Technique* » dans le délai imparti à cet effet. Le conseil juridique de BSGR a, en outre, indiqué que cette société soumettra sa réponse « *avant le lundi 21 mars 2014 à 17 heures* », soit hors du délai fixé par le Comité Technique.

100. En réponse, il a été indiqué à VBG qu'il allait être procédé à l'analyse de ses observations. Il a également été rappelé, dans cette lettre, que VBG – titulaire des titres et de la convention sous revue – ne peut rester étrangère à la discussion de fond qui s'est engagée sur la validité de ces titres et de la convention.

101. En outre, il a été indiqué à nouveau que « *les vices originels qui paraissent, en l'état actuel de l'analyse du Comité Technique, entacher la procédure d'octroi des titres et de la convention aujourd'hui détenus par VBG ne peuvent, en tout état de cause, se trouver purgés du seul fait d'un changement de composition du capital de cette société postérieurement à cet octroi* ».

102. Enfin, s'agissant des observations communiquées au Comité Technique par le conseil juridique de l'actionnaire minoritaire de BSGR, il a été rappelé, à toutes fins utiles, que VBG – seule partie à la procédure - n'a pas sollicité pour elle-même une demande de prorogation de délai.

103. En tout état de cause, il a été précisé dans ce courrier que l'actionnaire minoritaire de VBG ne « *peut se substituer au Comité Technique et à son Président pour conduire la procédure menée devant le Comité Technique* ».

104. Après l'échéance du délai de dépôt des observations fixé par le Comité Technique, ce dernier a reçu, par l'intermédiaire de VBG, un courrier du conseil de l'actionnaire minoritaire de VBG en date du 17 mars 2014. Dans ce courrier, le conseil de l'actionnaire minoritaire de VBG a, de nouveau, contesté la légalité de la procédure conduite par le Comité Technique.

105. Le Comité Technique s'est réuni le 21 mars 2014 pour examiner les observations reçues sur le projet de recommandation.

106. Le Comité Technique a noté que les observations formulées par VBG ou par son actionnaire minoritaire n'apportaient aucun élément de fait ou de droit nouveau justifiant une modification du projet de recommandation.

107. En conséquence, le Comité Technique a décidé de maintenir sa recommandation, qu'il soumet au Comité Stratégique.

21

p. 22

# TITRE II – ANALYSE DES CONDITIONS D'OBTENTION DES TITRES MINIERS ET DE LA CONVENTION MINIÈRE

108. Différents indices, qui résultent des divers éléments de preuve dont dispose le Comité Technique, ont été notifiés à VBG au cours de la procédure écrite et discutés au cours de la procédure orale.

109. Ces indices conduisent à deux conclusions qui seront détaillées ci-après :

- des pratiques de corruption ont été conduites aux fins d'obtention des titres miniers et de la convention minière en cause (**I**) ;

- des tentatives de destruction de certains éléments de preuve des pratiques de corruption dont il s'agit ont été menées (**II**).

110. Il doit être précisé, auparavant, que les indices en cause sont tirés d'éléments de preuve dont l'authenticité a été contestée non pas par VBG, titulaire des titres et de la convention en cause et seule partie à la procédure, mais par l'actionnaire minoritaire de cette société, BSGR.

111. Le Comité Technique a cependant passé outre à cette contestation pour les motifs suivants :

- d'une part, l'analyse intrinsèque des éléments de preuve a conduit à constater qu'ils se confortent mutuellement sans que cette articulation paraisse être le résultat d'une construction ou d'une manipulation ;

- d'autre part, le titulaire des titres miniers et de la convention minière en cause – VBG – n'a, pour sa part, émis aucune critique ni manifesté aucun doute sérieux au cours de la procédure. Cette société s'est bornée, en effet, au cours de la procédure écrite à renvoyer les demandes de production de document ou d'information à son actionnaire minoritaire et, au cours de son audition, à indiquer que le dossier étant actuellement examiné par les autorités judiciaires américaines, notamment, celles-ci étaient mieux placées pour procéder à des investigations additionnelles ;

- enfin, si BSGR, actionnaire minoritaire de la société titulaire des titres et de la convention en cause, a contesté notamment l'authenticité des contrats qui lui avaient été communiqués par le Comité Technique le 7 mai 2013 de même que les documents communiqués à VBG le 4 décembre 2013 et transmis à elle par cette société, cette critique n'a été accompagnée d'aucun élément confortatif sérieux.

  Ainsi, aux fins de démontrer que les contrats qui lui avaient été communiqués constituaient des « faux », BSGR s'est bornée à avancer que la numérotation des timbres légaux ne suivait pas d'ordre logique. Or cet élément ne démontre pas que ces contrats seraient des faux, étant précisé, d'ailleurs, que la convention de base dont VBG est titulaire présente la même caractéristique.

22

p. 23

De la même manière, les affirmations de BSGR relatives au manque de crédibilité de l'attestation de Mme Mamadie Touré ne sont étayées par aucun élément confortatif sérieux.

## I. **LES PRATIQUES DE CORRUPTION AUX FINS D'OBTENTION DES TITRES MINIERS ET DE LA CONVENTION MINIÈRE EN CAUSE**

112. Il ressort des différents éléments de preuve dont dispose le Comité Technique que les titres miniers et la convention minière concernés ont été octroyés, à l'époque des faits, à la suite de pratiques de corruption menées par BSGR auprès des autorités guinéennes en place à la même époque.

113. Plusieurs faits semblent, ainsi, suffisamment établis.

### 1. **C'est parce que Mme Mamadie Touré était l'épouse du Président de la République Lansana Conté que BSGR est entrée en contact avec elle**

114. Le fait que Mme Mamadie Touré ait été, depuis 2000, l'épouse du Président de la République Lansana Conté n'est pas contestable au vu des différents éléments de preuve dont le Comité Technique dispose à cet égard.

115. Ainsi plusieurs éléments de preuve objectifs confirment les déclarations de Mme Mamadie Touré sur ce point, notamment le passeport diplomatique dont elle était titulaire qui la désignait comme « épouse PRG » (c'est-à-dire épouse du Président de la République de Guinée).

116. C'est en raison de la proximité de Mme Mamadie Touré avec le Président Lansana Conté que les représentants de BSGR – notamment MM. Roy Oron, Marc Struik, Asher Avidan et Frédéric Cilins - sont entrés en contact avec elle par l'intermédiaire de son demi-frère, M. Ibrahima Sory Touré.

117. Au reste, Mme Mamadie Touré ne détenait, au moment des faits, aucune compétence ou expertise particulière justifiant qu'une société de la dimension de celle de BSGR et du groupe BSGR entrât en contact avec elle pour s'attacher ses services.

118. La conviction du Comité Technique est donc que la seule raison pour laquelle BSGR, notamment par l'intermédiaire de M. Frédéric Cilins, s'est rapprochée de Mme Mamadie Touré est que celle-ci était, en tant qu'épouse du Chef de l'Etat, susceptible d'exercer une influence sur lui.

119. Des éléments de preuve dont dispose le Comité Technique – et qui ont été communiqués à VBG – mettent en évidence que cette influence était réelle

120. Ces éléments ont, au surplus, été confirmés par les déclarations de Mme Mamadie Touré en date du 2 décembre 2013.

## 2. C'est en contrepartie de son intervention auprès du Président de la République pour que BSGR obtienne les titres et conventions miniers que Mme Mamadie Touré a bénéficié de divers avantages

121. Des différents documents dont le Comité Technique dispose et qu'il a pu analyser, les points suivants ressortent :

- M. Frédéric Cilins, agent de BSGR, d'une part, et MM. Roy Oron et Marc Struik puis M. Asher Avidan, représentants légaux de BSGR en Guinée, d'autre part, ont agi à partir de 2005 en République de Guinée pour le compte de BSGR, afin de faciliter l'installation de cette société dans le pays et d'obtenir, au profit de celle-ci, des titres miniers ;

- Dès son installation en Guinée, BSGR a mis en place, directement par ses représentants légaux ou par l'intermédiaire de M. Frédéric Cilins, une politique systématique d'octroi de cadeaux de valeur aux autorités guinéennes ;

- Surtout, les représentants de BSGR précédemment mentionnés ont approché, par l'intermédiaire de son demi-frère, M. Ibrahima Sory Touré, Mme Mamadie Touré, épouse du Président de la République Lansana Conté, afin que celle-ci intervienne, au profit de BSGR, auprès du Chef de l'État pour que soient octroyés à cette société des droits miniers, notamment sur la zone de Zogota et sur les blocs 1 et 2 de Simandou ;

- Plusieurs réunions ont été organisées, à la demande de BSGR, par Mme Mamadie Touré, au domicile de celle-ci, à Dubréka ou dans le palais présidentiel, afin, notamment, de permettre à BSGR d'exposer au Chef de l'État et aux autorités guinéennes son souhait d'obtenir des titres miniers en Guinée.

122. **Tout d'abord**, à partir de l'obtention, en 2006, de titres miniers, des versements substantiels et des droits gratuits de participation ont bénéficié à Mme Mamadie Touré, soit en contrepartie explicite des interventions effectuées en vue de l'obtention de titres miniers et de la convention minière par BSGR sur les gisements de Zogota et de Simandou, soit dans des circonstances et selon des modalités qui établissent directement un lien entre ces avantages et l'obtention, par BSGR, de droits miniers ;

  i. En particulier, le 20 juin 2007, un protocole d'accord a été conclu entre BSGR et la société Matinda and Co Limited, dont Mme Mamadie Touré est apparemment la gérante, prévoyant qu'en récompense des efforts fournis ayant permis l'obtention par BSGR de permis de recherches minières le 28 février 2007 sur la zone de Zogota – dans les préfectures de Lola et de N'zérékoré –, cette société acceptait de transférer 5% de toutes ses actions à la société Matinda and Co Limited ;

24

    ii.    Le 27 février 2008, un contrat de commission a été conclu par les mêmes parties, prévoyant que BSGR s'engageait à donner quatre millions de dollars américains à la société Matinda and Co Limited « *à titre de commission* » pour l'obtention des blocs 1 et 2 de Simandou ;

    iii.    Le 28 février 2008, un protocole d'accord a été conclu par les mêmes parties, prévoyant que BSGR s'engageait à transférer à la société Matinda and Co Limited 5% des actions de la société exploitante des blocs 1 et 2 de Simandou ;

    iv.    En effet, le 9 décembre 2008, un arrêté ministériel a été pris afin de délivrer à BSGR un permis de recherche sur les blocs 1 et 2 de Simandou (Arrêté ministériel N°72008/4980/MMG/SGG) ;

    v.    Les déclarations de Mme Mamadie Touré confirment les éléments qui précèdent et mettent en évidence, de manière détaillée et précise, les conditions dans lesquelles, en sa présence et à sa demande, des instructions ont été données par le Président de la République au Ministre des Mines pour que le titre minier sur les blocs 1 et 2 de Simandou soit retiré à la société qui en était alors titulaire et octroyé à BSGR.

123. **Par ailleurs**, plusieurs contrats et engagements ont été conclus directement par Mme Mamadie Touré avec la société Pentler Holdings, société dont M. Frédéric Cilins était l'un des dirigeants et qui, en l'espèce, agissait manifestement pour le compte de BSGR;

    i.    Ainsi, le 20 février 2006, soit peu après l'obtention de permis de recherche, un protocole d'accord a été conclu entre la société Pentler Holdings et Mme Mamadie Touré, prévoyant que la société Pentler Holdings s'engageait à transférer gratuitement 33,30% de son capital à Mme Mamadie Touré dès l'obtention des « *titres miniers nécessaires à l'exploitation de la zone minière de Simandou* » ;

    ii.    Par deux lettres d'engagement de la société Pentler Holdings envers Mme Mamadie Touré qui ont été légalisées le 21 juillet 2006, il a été convenu que la délivrance de permis de recherche sur les zones de Tougué, Kéniéba, Bafing Makana et Dinguiraye à BSGR entraînerait « de fait » le transfert gratuit à Mme Mamadie Touré de 33,30% du capital de la société Pentler Holdings ;

    iii.    Le 8 juillet 2010, la société Pentler Holdings s'est engagée à verser à Mme Mamadie Touré la somme de cinq millions de dollars américains afin de prendre en compte la réussite des opérations relatives à l'obtention des droits miniers de Simandou ;

iv. Le 3 août 2010, la société Pentler Holdings s'est également engagée à verser à Mme Mamadie Touré la somme de cinq millions de dollars américains afin de prendre en compte le succès des opérations menées en Guinée.

124. **En outre**, il ressort également de documents signés mais non datés, en particulier d'une déclaration de Mme Mamadie Touré et d'un contrat mettant apparemment fin aux relations entre la société Pentler Holdings et Mme Mamadie Touré, que des versements au profit de celle-ci ont effectivement été envisagés puis effectués par la société Pentler Holdings.

125. **Enfin**, Le 27 juillet 2010 et le 5 août 2010, deux chèques de, respectivement, 100 000 et 50 000 dollars américains, ont été émis par M. Frédéric Cilins au bénéfice de Mme Mamadie Touré, laquelle, dans son attestation, a en effet précisé avoir reçu plusieurs versements de la part de BSGR par l'intermédiaire de M. Frédéric Cilins.

126. **Tous les éléments qui précèdent forment un faisceau d'indices sérieux et concordants permettant d'énoncer que :**

- Par l'intermédiaire de ses représentants légaux, dont, en particulier, MM. Roy Oron et Marc Struik puis, à partir de 2006, M. Asher Avidan, et de son agent en Guinée, M. Frédéric Cilins, BSGR est entrée en contact avec Mme Mamadie Touré, épouse du Président de la République Lansana Conté et susceptible d'exercer une influence sur celui-ci, afin qu'elle intervienne auprès du Chef de l'Etat pour l'obtention effective de titres miniers et de conventions minières sur le territoire national ;

- Mme Mamadie Touré a usé de son influence auprès du Chef de l'Etat, notamment en organisant des réunions avec les représentants de BSGR, pour l'inciter à donner des instructions au Ministre des Mines afin que des titres miniers et des conventions minières soient, en effet, délivrés à BSGR ;

- Plusieurs titres miniers et une convention minière afférents aux gisements de Zogota et de Simandou ont, du fait de ces interventions répétées de Mme Mamadie Touré auprès des autorités guinéennes à la demande de BSGR, été octroyés, à partir de février 2006, à cette société qui, pourtant, ne disposait d'aucune expérience significative dans le secteur minier concerné par les gisements en cause, permettant, dès lors, de douter de l'existence de capacités techniques et financières suffisantes pour mener à bien ces opérations minières, condition pourtant exigée par le droit minier en vigueur ;

- En contrepartie directe de ces interventions, des avantages financiers ont été contractuellement promis et consentis par BSGR à la société Matinda

26

and Co Limited, dont Mme Mamadie Touré était apparemment gérante
(protocole d'accord du 20 juin 2007, contrat de commission du 27 février
2008, protocole d'accord du 28 février 2008) ;

- Ces contrats sont dénués de toute ambiguïté en ce qu'ils établissent
expressément un lien direct entre des bénéfices importants pour la société
Matinda and Co Limited - dont l'activité réelle dans le domaine « médical
ou commercial », ainsi que mentionné sur les contrats, n'est pas établie -
et l'obtention par BSGR de droits miniers, notamment sur les blocs 1 et 2
de Simandou ;

- En contrepartie directe des interventions précédemment rappelées, des
avantages financiers ont également été promis et octroyés à Mme
Mamadie Touré par la société Pentler Holdings - agissant manifestement
pour le compte de BSGR - notamment une prise de prise de participation
gratuite dans celle-ci à hauteur de 33,30% du capital et, par deux fois, le
versement de 5 millions de dollars américains (protocole d'accord du 20
février 2006, lettres d'engagement légalisées le 21 juillet 2006, lettres
d'engagement du 8 juillet 2010 et du 3 août 2010, notamment) ;

- A l'instar de ce qui précède, ces documents sont dénués de toute
ambiguïté en ce qu'ils établissent expressément un lien direct entre des
bénéfices importants pour Mme Mamadie Touré et l'obtention par BSGR
de droits sur le gisement de Zogota et sur les blocs 1 et 2 de Simandou.

127. Ainsi, il résulte de ce qui précède que BSGR a obtenu les titres miniers et la
convention minière en cause en s'engageant à procéder et en procédant, en
effet, à plusieurs reprises, directement ou indirectement, à des versements
importants au profit de Mme Mamadie Touré, épouse du Chef de l'Etat, pour
que celle-ci use de son influence pour le compte de BSGR.

128. Par suite, le Comité Technique estime que BSGR a obtenu les titres miniers et
la convention minière actuellement sous revue à la suite de pratiques de
corruption.

129. Au reste, aucune autre interprétation cohérente et complète des différents
éléments de preuve précédemment rappelés n'est plausible et n'a, d'ailleurs,
été proposée par le titulaire des titres et de la convention en cause ou par les
actionnaires de cette société, qu'ils soient majoritaire ou minoritaire.

130. En outre, le Comité Technique s'est vainement interrogé, compte tenu du
caractère parfaitement concordant des indices rassemblés, sur le caractère
plausible d'autres analyses : aucun élément du dossier ne permet de donner
une interprétation différente de celle du Comité Technique sur les faits en
cause.

131. S'agissant des explications alternatives, proposées le cas échéant par les intéressés, le Comité Technique rappelle qu'en vertu de l'article 3 du Règlement de Procédure, « *en l'absence de réponse aux questions posées ou dans le cas de réponses manifestement insuffisantes, le titulaire est réputé avoir acquiescé aux faits mentionnés dans la notification, pour autant que l'ensemble du dossier ne puisse conduire raisonnablement à une autre conclusion* ».

132. Au cas précis, les faits ci-dessus relatés n'ont pas fait l'objet d'explications plausibles de la part de VBG ou, relayées par elle, de son actionnaire BSGR.

133. En effet, au cours de la procédure écrite comme lors de la procédure orale, ni VBG ni ses actionnaires (Vale ou BSGR) n'ont proposé d'explication des différents faits.

### Au cours de la procédure écrite

- VBG, société détentrice des titres et de la convention miniers à l'heure actuelle et qui comprend deux actionnaires (BSGR à hauteur de 49% et Vale à hauteur de 51%), a indiqué être dans l'impossibilité de donner des réponses concernant des faits antérieurs à l'entrée de Vale dans son capital et a donc, selon ses affirmations, systématiquement transmis à BSGR les questions et demandes d'informations du Comité Technique ;

- BSGR, pour sa part, a fourni des réponses imprécises ou dilatoires, et puis, lorsque des documents lui ont été communiqués, s'est bornée à nier globalement des faits pourtant avérés et à contester l'authenticité des pièces ainsi que la compétence du Comité Technique sans pour autant étayer autrement ses dénégations.

Aucun élément n'a, ainsi, été apporté par BSGR pour contester les éléments de preuve dont cette société a eu communication.

En outre, si M. Frédéric Cilins a, pour sa part, préparé une attestation, celle-ci vient en réalité contredire plusieurs des affirmations de BSGR au cours de la présente procédure.

### Au cours de la procédure orale

VBG, représentée au cours de l'audition par des personnes manifestement plus proches de l'actionnaire majoritaire que de l'actionnaire minoritaire, a indiqué que Vale avait diligenté des vérifications avant d'acquérir les droits qu'elle détient à l'heure actuelle dans VBG mais qu'elle n'avait pas trouvé d'éléments la conduisant à douter de la légalité des titres miniers et de la convention minière dont était alors titulaire BSGR.

Elle a donné comme exemple démontrant l'accomplissement de telles diligences le fait que VBG avait, par un courrier en date du 19 mars 2010, interrogé les autorités guinéennes sur le point de savoir si elles avaient