# EXHIBIT 6
## Pt. VII

CONFIDENTIEL

FC:     Oui mais, où tu veux que je trouve quelque chose ? Quelque chose, c'est combien quelque chose ?

MT:     Un peu d'argent pour ajouter, de ce que j'ai dans mon compte.

FC:     Oui, mais ça veut dire quoi un peu d'argent pour rajouter de ce que tu as dans ton compte ?

MT:     Même si j'ai 400, c'est bon.

FC:     Mais je ne vais pas trouver 400 moi, Mamadie. Tu sais, pourquoi tu pars dans des projets comme ça, quand tu as pas avant de faire ? Parce que c'est pas possible de partir dans des projets si tu as pas les fonds nécessaires pour le projet. Comment tu fais ça ?

MT:     Tu sais, on avait commencé, pour moi ça allait suffire. Je ne savais pas que il a ceci, il y a cela. Il y a des licences, tout ça là à acheter et c'est après c'est venu. Et puis les travailleurs faut les payer, il faut avoir 6 mois de salaires.

FC:     Ah oui, je suis d'accord avec toi. Mais moi, j'ai pas de solution. J'ai pas de solution. Là, tout de suite, tout de suite, j'ai pas de solution. Je te dis...

MT:     Non, c'est pas tout de suite. On attend que le marché commence. Après nous allons faire pour le restaurant. On attend que le marché s'ouvre. Après on va signer le contrat pour le restaurant aussi, c'est comme ça là...

FC:     Ecoute euh... moi je vais prendre une ceasar salad avec du poulet et puis voilà. Tu veux un coup de main ? Qu'est-ce que tu voudrais avoir toi ?

MT:     Un sandwich. Un sandwich.

FC:     Sandwich, comment tu veux ? Grilled sandwich avec du chicken, comme la dernière fois ? ou du maïs avec du poisson.

15m00s          MT :    Comme la dernière fois. Je peux avoir les 20.000 dans ma main ?

FC      "C'est dans une enveloppe, je vais te donner ça tout à l'heure. Je me suis débrouillé pour retrouver ça. Donc tu as un sandwich chicken. Et qu'est-ce que tu... tu penses voyager quand ?

MT :    Comme vous... qu'est-ce que toi tu penses ?

FC:     Moi je pense que, je pense que le temps que ce procès qui est parti avec Soros et tout ça, c'est bien de partir. C'est bien de partir un peu. C'est bien de partir, comme ça, tu es tranquille et ils ne risquent pas de venir te demander, te poser des questions... et voilà  Si -- on sait jamais – je touche du bois -- mais si on sait jamais qu'ils viennent pour te voir pour poser des questions, tout ce que je te dis, c'est ce que tu dois faire.

MT :    Comment ?

FC      De dire que tu n'as rien à faire avec tout ça. Que tu n'as rien à voir avec tout ça...

Une serveuse:  Hello, would you like something to drink ?

FC      Humm, qu'est ce que tu veux boire ? Cranberry juice and then one grilled chicken sandwich and a ceasar salad with chicken.

CONFIDENTIEL

Une serveuse:   Anything to drink for you ?

FC :   No, nothing.

Une serveuse:   No water ?

FC:   No water. Thank you. Euhm Si jamais ils, trucs, quelque chose à dire, c'est que t'as rien à voir avec tout ça. Ca c'est sûr. Même s'ils te disent, "on sait..." ou même s'ils te disent, ils te font des histoires, ils te racontent des mensonges, ils te racontent comme ça "ah oui mais on sait déjà, t'es obligée d'avouer..." même si ils te disent, tu sais comme il t'a fait le vieux en disant "mais t'inquiètes pas je te protège, je serai là, tu peux me dire, tu peux me dire, je te protège". Tu dis "tout ça c'est des conneries." Et c'est même le contraire, tu peux dire comme je t'avais dit l'autre fois "le vieux là-bas, il m'envoie sans arrêt des gens pour me demander de rentrer, et moi j'ai peur de rentrer au pays. Je ne veux pas rentrer au pays parce que je suis pas tranquille." C'est... dans le papier que l'on a fait l'autre jour, dans l'attestation, peut-être même qu'on aurait dû rajouter là-dessus en disant que, pas seulement, tu sais tu étais partie aux Etats-Unis parce que tu avais peur de BSGR, mais c'est pas du tout que tu avais peur de BSGR, c'est que t'avais ici et là ca, et que t'as peur de venir le voir. Peut-être que l'on aurait dû le mettre. Donc après c'est toi, si tu veux partir en début de semaine euh.... je ne sais pas. Moi je serais toi, je partirai tout de suite, j'attendrai pas, c'est pour ça je te dis si tu as besoin de - regarde un peu le billet d'avion, tout ça et tu me dis. Mais moi je peux pas te dire quand. A ta place moi je partirai dans la semaine là. En début de semaine là, je partirai. Parce que [inaudible] à Freetown t'es tranquille. A Freetown, t'as personne qui va t'embêter, en même temps ce qui est bien c'est que quand tu es là-bas, je peux organiser pour que tu récupères ce que tu dois récupérer.(...) Je sais pas, il y a Cissé qu'est là-bas ?

MT :   Oui.

FC:   Bon, si tu veux envoyer Cissé, peut-être. Ou toi, ou Cissé, on est tranquille.

MT :   OK.

FC:   Donc euh, je te laisse regarder toi les billets, avec Mado ?

MT :   OK

FC.   Et on regarde ça.. tu regardes ça ce soir, si tu veux. Tu me rappelles ce soir, tu me rappelles demain. Et on regarde ça. Moi je prends l'avion mardi, je rentre en France.

MT :   OK,

FC.   Ok. Tu as retrouvé...tu as ressorti tous les papiers ?

MT   Oui, mais... j'ai ressorti tous les papiers, mais j'attendais que tu sois là pour euh... avec ce que je t'avais demandé,

FC:   Oui. Oui, oui. Non, mais la pochette que tu as là, c'est ça.

MT   Oui, c'est ça, oui.

FC:   on peut regarder.

CONFIDENTIEL

MT:     Pas avant d'avoir l'argent Frédéric. Et puis on avait dit 50. Toi tu amènes...

FC:     Non, non, non. Premièrement, ça c'est un plus. Le deal qu'on avait. Tu sais moi je change pas.

MT:     Oui mais tu as chnagé, on avait dit 50, toi tu amènes...

**20m00s**

FC:     Non, non, non. Ecoute-moi bien, écoute moi-bien. Je t'ai dit, le deal. Ecoute bien ce que je t'ai dit, et je le répète encore une fois. Le deal, c'est 200, maintenant. Tu vas récupérer ça. Et 800... attends, attends, je vais faire de mon mieux.

MT :    Tu avais dit 50 ?

FC :    Est-ce que tu crois que je suis magicien que je peux trouver l'argent tout de suite. J'arrive de France, tu crois que je me promène avec 50.000 dollars ? Mais ca c'était pas prévu dans le deal. Ca c'est même pas déduit des 800, c'est juste en plus pour t'aider. Donc c'est pas dans le deal, ça n'a rien à voir ça.   Ca, ça n'a rien à voir avec les documents. Rien à voir avec les documents, c'est juste en plus pour t'aider. Tu le sais ça ? Donc ne me dis pas, oui d'abord, t'es pas venu avec 50, t'es venu avec 20. ca n'a rien à voir, c'est juste... même le billet d'avion ça n'a rien à voir avec les documents. Le deal des documents et de l'attestation c'est ce que je t'ai dit : on détruit tous les documents, tu as 200 et puis 800 qui sont à toi , quoi qu'il arrive. Quoi qu'il arrive, tu as 1 million qui sont à toi. Quoi qu'il arrive, 200 maintenant, 800 plus tard. Ca, c'est le deal pour les documents, c'est pas autre chose. C'est pas les 50 ou les 20. Tu le sais ça ? Non ?

MT      Non, moi je pensais que dans le un que tu vas enlever les 50...

FC :    Je ne vais pas enlever, même les 20 là, je vais pas les enlever.

MT :    Alors, qui me donne les 20 ?

FC :    Qui te donne les 20 ? Pour l'instant c'est Frédéric qui te donne les 20. Je suis allé les récupérer chez des co - c'est pour ça que je te dis, tu sais, regarde - je ne te raconte pas d'histoire, tu vois ? Je suis allé les récupérer chez, chez - de trois personnes différentes, avec des enveloppes de la banque, tu vois sur trois enveloppes. Donc pour l'instant les 20, c'est personne d'autre que Frédéric qui te les donne. Comment veux-tu, comment veux-tu que quelqu'un m'envoie en 2 jours 20.000 comme ça de n'importe où ? Je ne suis pas associé aux Etats-Unis, je ne me promène pas avec 50.000 dollars, même pas 20.000. Même pas 20.000. Tiens. Tu comprends. Donc ça, si tu veux, c'est quelque chose qui est en plus. Ce que je t'avais donné -

MT .    Donc c'est en plus des 1 million et puis les 20.000 et puis BSR.

FC      Voilà

MT :    C'est le complément .

FC .    Ce que je t'avais donné l'autre fois à.... Comment ca s'appelle... Qu'est-ce que c'est que je t'avais donné l'autre fois à... ah la la... à Freetown

MT :    Les 5 mille ?

FC .    Oui, les 5 mille, puis après je sais plus quoi, ca c'est toutes les sommes en plus. Personne ne les déduit de rien du tout. Donc tu sais, quand je te dis

CONFIDENTIEL

que on fait le maximum pour t'aider, tu dois comprendre qu'on fait le maximum pour t'aider. Je ne te déduis ça de nulle part, tu vois ? Je ne te déduis ça de nulle part, c'est juste pour t'aider. Voilà. Bah, j'espère que tu comprends qu'on est là pour t'aider... non ?

MT    Je comprends.

FC    Mais, est-ce que tu comprends et tu es d'accord, ou tu comprends, mais t'es pas trop d'accord ?

MT    Je comprends mais pour moi tu allais venir avec les 50 parce que vu... euh

FC    Parce que je ne savais pas combien j'allais pouvoir récupérer. Je ne savais pas. Je te dis, je fais du mieux. La seule chose que je peux te proposer, en plus, et encore une fois c'est pas, ça ne va pas être déduit de rien du tout, c'est de te prendre les billets d'avion, si tu veux. Qu'est ce que tu veux que je te dise, je fais mon maximum. je fais mon maximum. Ah la, la. C'est pas facile tout ça. Tu sais, je comprends que tu as besoin, d'aide. Je comprends. Mais, tu sais, regarde tout au long de ce parcours, qui est toujours avec toi pour te soutenir et qui est pas là pour te soutenir, et tu vas vite voir la différence. Tu vas vite voir la différence. Après, si tu veux, moi je peux pas rentrer dans tes trucs. Tu pars dans un projet, pour faire un restaurant et cela, après d'un coup il te faut 400 mille, comment tu veux que je fasse moi pour te trouver 400 mille ? C'est pas facile. C'est pas facile, et tu aurais dû penser avant. Bon ce qu'il y a de bien, c'est que en avril mai, tu peux ouvrir l'autre sans problème. Ça c'est bien, ça va commencer à faire de, à faire de l'argent ça, hein ?

MT    Oui.

FC    Ah la la. Après ça, tout est là dans les documents. Il n'y a plus rien ? Tu peux me faire voir s'il te plaît ?

MT    Finissons de manger. Je vais te faire voir...

FC    non. C'était juste pour regarder ce qu'il y avait, parce qu'il y a eu tellement de bazar de documents dans tous les sens que... ah la la. Et tu avais trois choses, tu m'as dit ? tu avais les fruits et légumes, et tu avais les poissons aussi. Ça c'est en même temps avec les fruits et légumes ? C'est en même temps avec le marché ça ?

MT    Oui.

FC    Donc, c'est deux magasins ? Un magasin avec le marché, avec les fruits et légumes et les poissons, et un magasin pour le restaurant. C'est bien ça. Oui t'as donné l'idée ?

MT    J'ai contacté beaucoup de gens.

FC    Ouais.

MT    Parce que quand je suis là, il n'y a pas quelqu'un qui me donne de l'argent pour acheter ce que je veux à manger. Donc j'ai pensé, pourquoi ne pas prendre l'argent là, et puis investir sur quelque chose. Alors, j'ai contacté beaucoup de gens. Ils m'ont dit de, de faire le marché de poisson et puis le restaurant. Parce que tous les jours on a besoin de manger. Ils m'ont dit le début c'est pas facile, mais pour l'avenir, c'est bon pour l'avenir.

CONFIDENTIEL

FC :   Et c'est bien situé, ça ?

MT    Oui.

FC:    T'es dans le, dans la, dans la pleine ville ?

MT     C'est un quartier où y a même pas. Y a même pas de trucs comme ça là.

FC:    Donc les gens vont venir, c'est bien ça.

MT :   Oui. Je voulais acheter... on m'avait conseiller d'acheter un terrain, mais comme je n'avais pas d'argent pour acheter un terrain...

FC:    Non il faut pas acheter un terrain, c'est bien. Et là, tu as fait une société pour ça ?

MT     Oui.

FC:    C'est pas, c'est pas Matinda ?

MT:    J'ai fait ça avec Penliana [?] LLC. Mais j'avais pas d'argent d'acheter le terrain alos j'ai loué le magasin...

FC;    T'as bien fait.

MT :   Si je gagne l'argent dans l'avenir, je vais le faire.

FC:    C'est cher la location ?

MT :   Oui. C'est cher, parce que c'est...

FC:    Combien ca vaut ça ?

MT :   Premièrement ça dépend, parce qu'après deuxième, troisième année, quatrième année, cinquième année, et puis ça monte.

FC:    Tu penses que tu as bien négocié ? C'est pas trop cher ?

MT :   Je pense que j'ai bien négocié.

FC:    Oui ?

MT     Je pense que j'ai bien négocié, mais ce qui était mieux c'est si le terrain était pour moi, c'est ce qui était mieux.

FC:    Oui mais un terrain, après il faut construire, c'est cher la construction?

MT :   Oui mais, quand tu achètes un terrain, c'est pour toi pour toujours.

FC:    Je suis d'accord avec toi biensur.

MT     Tu n'as rien a payer à quelqu'un.

FC:    Bien sûr, bien sûr.

MT     C'est différent de ce que je fais maintenant. Mais je suis obligé.

CONFIDENTIEL

FC:  Oui, enfin avoir un terrain, si tu veux, ça...tu vas pas faire juste une petite cabane, tu vas faire quelque chose de grand si c'est un terrain, non ?

MT:  Comme ici.

FC:  C'est grand comme ici ?

MT:  C'est comme ici, que j'allais faire.

FC:  C'est grand quand même. Et là ce que tu as loué c'est grand, comme tout ça ?

MT:  Oui, c'est grand oui.

FC:  Wow, c'est bien ça. Moi je connais là les French market qu'ils font, c'est grand aussi, c'est bien. French market c'est beau, hein ? Des bons produits. Et qui s'occupent d'acheter le matériel, la marchandise, tout ça ?

MT:  On passe avec une société. Oui, on passe avec une société.

FC:  Donc, tu fais les fruits, les légumes, et les poissons ?

MT :  Oui. Et même le pain.

FC:  Ah. C'est bien. C'est une bonne idée. Je ne sais pas si, le restaurant c'est une bonne idée tu crois ? Parce que il n'y en a pas beaucoup là-bas ?

MT:  Non.

FC:  A cet endroit là ?

MT:  Oui. Il y en a pas beaucoup. J'arrive les gens ont besoin de se [inaudible].

FC:  Oui, oui. Non c'est sûr, mais...Tu sais le problème du restaurant, bon après il y a du personnel et faut s'occuper de tour ça. Là, il faut faire attention qu'on te vole pas; C'est pas facile, non plus.

MT  Oui.

FC:  Il y a ta sœur qui va travailler un peu là-bas ?

MT  Non.

FC.  Qui va travailler alors ?

MT :  Il y a des gens que je vais prendre qui vont travailler.

FC:  Oui. Il faut faire attention qu'on ne te vole pas quoi.

MT :  On a un système qu'ils ont mis. "ADP" là, je pense pas s'ils vont voler. Et puis y a le caméra aussi. Je pense pas s'ils vont voler. C'est une société qui paye, qui, qui est chargée de ça... bien sûr je vais les payer, c'est eux qui s'occupent de ça.  A-D-P, ADP.

FC:  ADP ?

MT  Oui.

CONFIDENTIEL

FC:     Ecoute, c'est bien.

MT:     Le restaurant c'est pas facile. Mais quand ca part...[inaudible]

FC.     Oui, non, je suis d'accord avec toi. C'est un peu plus compliqué quoi, le restaurant peut-être.

MT:     Oui, c'est compliqué, oui.

FC:     Et puis il faut du matériel. Parce qu'il y a rien aujourd'hui dans le local où tu vas faire le restaurant ? Ou il y a la cuisine déjà ? Ou il y avait rien ?

MT:     Non, il y a rien. C'est moi qui pose tout.

FC.     Tout ?

MT:     Oui.

FC.     Et tu as déjà la licence de cuisine et tout ? La licence pour faire la cuisine... ouvrir le restaurant ?

MT:     Je dois faire ça. Je dois essayer tout ça.

FC.     Wow, wow. Mais tu sais que c'est long pour avoir une licence de restaurant, c'est pas facile, non ?

MT.     Ah bon ?

FC:     Ah je crois, hein ? Tu as pas ça comme ça hein, une licence de restaurant.

MT.     Je pense pas.

FC:     Parce qu'après ils doivent venir, ils doivent vérifier la cuisine, si elle est bien faite avec les normes, avec ci, avec là. Ils doivent venir inspecter tout, tout la cuisine, parce que tu fais du chaud, il y a les grills, y a les frigos, y a...

MT:     Oui. C'est tout ça, j'ai pris, je dois prendre un [inaudible] .

FC     Oui, non, mais, Tout ça, ca va coûter beaucoup d'argent.

MT:     Oui, mais Frédéric, je n'ai pas de choix. Le peu que j'ai, si je n'investis pas qui va me faire nourrir C'est ça.

FC.     Moi je n'aurai pas commencé les deux en même temps. J'aurai commencé les fruits et légumes, et le poisson mais je n'aurai pas commencé le restaurant tout de suite

MT     La communauté...tout le monde attend le restaurant.

FC.     Oui ?

MT.     Oui. Ils attendent le restaurant, et le marché. Chaque fois, ils me demandent, quand, quand, quand ? Ils sont excités de ça.

FC.     Oui, oui. La communauté, c'est quoi?

MT:     Parce que, y en a pas de restaurant.

CONFIDENTIEL

FC:   Dans le secteur là-bas ?

MT:   Oui.

FC:   Bah écoute, c'est bien. C'est bien d'avoir des projets. Et là-bas, comment ca
se passe à… l'école ? C'est ouvert, pas ouvert ?

MT:   C'est pas ouvert.

FC:   T'as déjà ouvert une partie quand même ? Là où il y a les magasins, les
choses là…

MT:   Oui, oui.

FC:   C'est ouvert?

MT:   Oui. Les magasins, c'est ouvert, oui.

FC:   Et jamais il y a Alpha qui a dit, qu'il voulait reprendre… qu'il voulait te
reprendre ça parce que… jamais il y a eu ça ?

MT:   Non. Ca m'appartient. Ca m'appartient.

FC:   Oui, mais s'il te dit, ça, ça a été donné par euh… parce que avant ça
appartenait à qui ? A l'Etat ? Ou ça appartenait à qui ?

MT:   Non. Là-bas, c'est pour le [inaudible]. Il m'a donné, tout le monde sait ça.

FC:   Oui. Je suis d'accord [inaudible]

MT:   C'est [inaudible] qui était derrière ça.

FC:   C'est pas ça que je te dis. A qui… le terrain, il appartenait à qui ?

MT:   Au patron.

FC:   Personnellement ?

MT:   Oui.

FC:   Ah d'accord.

MT:   Tu savais pas ?

FC:   Non, je ne savais pas, je ne savais pas, si ça appartenait à l'Etat..

MT:   Ca appartenait, on m'a donné….

FC:   Non, je ne savais pas, je ne savais pas, si ça appartenait à l'Etat ou si ça
appartenait au patron personnellement.

MT:   Ca appartenait au patron, personnel, puis il m'a donné. Mais c'est.. c'est la
Première qui était jaloux de ça, pourquoi le patron a donné euh… mais il a
donné, a donné. Elle a dit "Mais, pourquoi?", parce que quand le Préfet m'a
dit la Première l'a appelé, pour lui dire pourquoi comme ça, comme ça, alors
je suis partie immédiatement voir le patron.(…)

CONFIDENTIEL

FC      Oui ?

MT      J'ai dit y a ta Première qui veut le terrain, là. Je comprends pas pourquoi le Préfet m'a parlé de ça. Et puis le Président, j'étais fâchée, je l'ai dit que si je la vois là-bas, je vais acheter le coupe-coupe et se sera pas bon pour elle. Alors, j'étais assis. J'attendais qu'il me donne une réponse, alors c'est là où une réponse, c'est là où il a dit, je te donne encore de l'argent, vas, tu achètes encore 50 coupe-coupe et tu vas travailler. J'ai beaucoup de terrain pourquoi ils s'en prennent pas à ces terrains là, pourquoi...

FC      Comment ça des coupe-coupe ?

MT      Les coupe-coupe ! J'ai dit n'importe qui je vais voir, je vais lui couper chair, là, le pied, ou la main... quelque chose comme ça. Alors  il a dit non  ne fait pas la bagarre  Tiens, va acheter 50 coupe-coupe  celui que tu vois là-bas, fais ce que tu veux. J'ai beaucoup de terrain pourquoi ils s'en prennent pas de ces terrains là, sauf le terrain que je t'ai donné  Il dit ça, c'est la jalousie. Et tout le monde a ri là-bas. Et puis  il a dit, vas, tu vas construire. Mais ne coupe pas, là.

FC      Ah d'accord   Et le Prefet, lui, il était  parce que la Première est allée le voir

MT      Oui  mais il a dit a la Première, j'ai donné, j'ai donné [inaudible] :

FC      Non, l'important, parce que moi je croyais que, avant ces terrains là, l'idée c'était pas sa propriété personnelle

MT      C'était sa propriété personnelle [inaudible]

FC      Ecoute bien, ce que je vais te dire  parce que là, dans l'histoire là, ils peuvent le dire aussi : vous avez   on vous a donné quelque chose de l'Etat, parce que vous étiez

MT      Dans, dans cette affaire...

FC      Non, mais ils peuvent tout mélanger  parce que en fait, Alpha  a essayé un temps de mélanger ça et il a dit.

MT      Non  attends je vais te dire, quand l'autre Préfet était là  je    tu sais il est parti dire à Dadois  que le groupe ils étaient venus, ils voulaient faire quelque chose, le terrain là  comme ça  comme ça. Mais Dadois, il a dit je peux pas. J'ai fouillé, j'ai regardé le terrain  son mari lui a donné  qu'est-ce que vous voulez que je fasse, je ne peux pas la, lui prendre ça. Et il chassé [inaudible] de son bureau, il dit tu veux me créer de problèmes, je dis, je peux pas faire ça. Prendre  euh la petite, qu'est ce qu'elle a fait ? Elle n'a rien fait, je peux pas

FC      Parce que Alpha lui  il disait  ces terrains là, ça appartenait a l'Etat, il lui a été donné gratuitement et donc on doit reprendre ça. Je  te garantie que Alpha a dit ça

MT      Non

FC      Ça sont  mieux  tout mieux

CONFIDENTIEL

MT: il peut pas j'ai tous les papiers. Vous savez dans le pays on a des règles, quand tu as un titre, même le Président, même le Président ne peut pas t'enlever. Quand tu as le titre foncier, personne ne peut enlever.

FC: Je suis d'accord avec toi.

MT: Parce qu'on ne donne pas un titre foncier à deux personnes.

FC: Je suis, mais bien sûr. Mais Alpha a dit, a dit, quelque chose, lui il a dit, comme je t'ai dit, il a dit.. j'avais parlé de ça, il y a 6, 8 mois de ça.. il disait, d'ailleurs, c'est pour ça que, il disait que, il voulait reprendre ça, parce que ça, le titre foncier ça avait été donné, mais avant ça appartenait à l'Etat. Peut-être qu'il avait pas encore cherché, et peut-être que entre temps il a trouvé que, en fait, ça n'appartenait pas à l'Etat, ça appartenait personnellement au patron. Tu vois ?

MT: Frédéric, ça c'est impossible. On donne pas un titre foncier à deux personnes. Alpha.

FC: Non, tu n'as pas compris ce que je voulais dire.

MT: Attendez, le Président. Quand j'étais à Conakry, je faisais la [consultation?], tu sais, il y avait des terrains à côté de moi, à côté de moi qui, le terrain là appartenait à l'Etat, mais ils n'ont pas touché à mon terrain. Ils ont fait tomber la maison des gens, ils avaient des clôtures tout ça. Mais le Président Alpha avait dit, que tous les maisons, si une personne a consulté, ce soit le terrain de l'Etat, de ne pas faire tomber.. de dire à la personne de payer le prix du terrain, mais pas le faire tomber. Parce que au fait, quelqu'un va dire.. pourquoi faire tomber ça ? C'est c'est comme ça, j'étais là-bas, il a dit. Et les clôtures qui étaient à côté de moi, étaient, étaient, appartenaient aux terrains de l'Etat. Donc ils ont fait tomber tous les clôtures. Mais la mienne, personne n'a touché, parce que tout le monde sait. Est-ce que, est-ce que c'est.. je pense pas que c'est quelque chose qui quelque chose qui appartenait.. tant que tu es Président, tu peux donner à qui tu veux.

FC: Mais bien sûr, c'est

MT: C'est pas condamnable.

FC: Non. Je sais que c'est pas condamnable. Mais si ça n'appartient à moi parce que.. Imagine moi je suis Président [inaudible], il y aucun problème.

MT: Frédéric, Frédéric, dans le cas comme ça, c'est méchant, personne ne va, tout le monde dira que c'est méchant. Tu vas voir une dame euh, qui veut investir dans les choses comme ça, tout ça là, tu t'imagines combien j'ai mis là-bas jusqu'à présent ?

FC: Comment il a dit à tout le monde qu'il allait te reprendre.. c'était l'époque.. il y a quelques mois de ça, il avait dit

MT: Non, non. Daddis est venu, il n'a pas repris. Konaté est venu il n'a pas repris. Qui va reprendre ? Tu sais quand Daddis était là, il avait dit.. ils ont cassé ma maison, ils ont pas cassé de.. tous ces mes maisons, mes frères, mes sœurs.. ils ont détruit tout ce qu'on avait là-bas.. jusqu'à.. [?] mais ils n'ont pas touché à cette.. c'est anormal, je pense c'est anormal ça c'est anormal. C'est anormal ça. Ce terrain il a signé, c'est lui qui a signé, il m'a donné car ce que la Première faisait la jalousie avec ça, donc il a signé, il m'a

CONFIDENTIEL

donné. Il dit, c'est pour toi. Va te faire ce que tu dois faire et je te soutiendra. Comment il a parlé de ça pour me récupérer, pour récupérer ça. Les autres n'ont pas fait, parce que la vérité est là. C'est comme lui, il peut donner le terrain à quelqu'un, c'est pas un crime. Est-ce que c'est un crime ? Si un Président de la République donne un terrain à quelqu'un, c'est pas un crime ça ? C'est pas un crime.

FC:   Oui, mais, lui euh, tu sais, tout le bazar qui fait, qu'est-ce que tu crois. Tu sais, c'est un…un type, tu sais lui on peut pas avoir confiance…

MT:   Et quand Daddis était là, tu sais très bien ce qu'il a fait. Il a fait semblant, tu sais très bien ce qu'il a fait, et puis, mais il a dit la vérité. Son mari il a donné, il a donné, même moi je peux donner un terrain à quelqu'un, pourquoi lui le prend ? C'est méchant. Et il a cherché [Bonabo] [?]. Voilà. Il a cherché. Euh, j'avais aidé un militaire, là. C'est lui qui m'a appelé pour me dire ça. J'ai dit c'est méchant, pourquoi il, [Bonabo] [?], que quand son frère était malade, c'est mon papa qui lui avait sauvé parce que mon papa était Major.  Tu sais ça ? Il était Major.

FC:   Oui, il était à l'armée ?

MT:   Il était à l'armée, et c'est les…c'est les français qui lui ont appris. Il a étudié dans affaire de docteur.

FC:   Ah oui ?

MT:   Oui.

FC:   Ah ça je savais pas, ça.

MT:   Il avait sauvé le, l'un des frères de Bonabo. Oui il a fait ça.

FC:   Bonabo [inaudible], tu veux dire ?

MT:   Oui. C'est impossible…est-ce que c'est un crime?

FC:   Qui est encore chez toi ?(…) Ta famille, qui est à Conakry ?

MT:   Ma famille est là-bas… sont là-bas.

FC:   A Forécariah, à Forécariah, y a qui à Forécariah maintenant, dans ta maison ?

MT:   Forécariah ? J'ai pas de maison à Forécariah.

FC:   La petite maison où tu étais ? Enfin la maison où tu étais. La Maison de Forécariah…

MT:   Non, j'ai pas eu…

FC:   Ah pardon…Forécariah… à, à Dubréka ?

MT:   Dubréka, j'ai ma maman qui est partie pour [inaudible]. Et puis j'ai ma sœur qui est là-bas.

FC:   La maison, que je connais de Dubréka, qui habite là-bas ? Ta maman elle est là-bas maintenant ?

CONFIDENTIEL

MT: Oui. Elle est partie dans [inaudible] pour saluer la mort du [inaudible], et puis de suite là.

FC: Donc elle est à Dubréka, maintenant ?

MT: Oui, elle va se retourner.

FC: Et là, elle est avec elle ?

MT: Oui, elle est avec elle, parce que sa...

FC: Qu'est-ce que tu veux ? Tu veux du ketchup, quelque chose ?

MT: Non, c'est bon.

Une serveuse: Do you need anything ? Mayonnaise, Mustard, anything like that?

FC: Mayonnaise ?

MT: Non, c'est bon.

FC: It's ok, thank you.

Une serveuse: Enjoy.

FC: Là, elle est avec la maman à Dubréka alors ?

MT: Oui. Mais qui t'as raconté des trucs là, soit disant qui veut prendre mes terrains ?

FC: Je ne sais plus ce qu'il avait dit, à la Présidence...

MT: A qui ?

FC: Je ne sais pas à qui exactement, mais à la Présidence, ils disaient qu'ils voulaient absolument te reprendre...

MT: C'est méchant. Quelque chose que mon mari m'a donné, puis j'ai... j'ai investi là-bas. C'est méchant.

[Bruits de couverts]

0h43m02s   FC: T'as eu des nouvelles d'Ahmed, non ?

MT: Non. Tu sais, un jour j'étais avec euh le Président, y a la sœur de feu, de feu Sékou Touré, qui était là, et elle avait un problème avec son terrain. Mais tout de suite le Président a donné l'ordre de, d'aller lui... d'aller retourner ça.

FC: Ca veut dire quoi retourner ça ?

MT: Parce que les hommes ont pris ça, pensaient que quand ils sont allé l'aider de prendre les terrains de la sœur de Sékou Touré. Alors comme t'as dit, non, rendez lui son terrain, tout de suite. C'est poli. Rendez-lui, pourquoi prendre ?

FC: Bien sûr.

CONFIDENTIEL

MT      Dans l'immédiat, ils sont partis. Ils ont fait ..Tu sais même le terrain là, il y a
        un des fils du patron, il voulait ce terrain là aussi.

FC      Oui, il y a longtemps. Je me rappelle de ça.

MT      Il voulait ça, mais il a pas eu.

FC      Est-ce que les gens .. je passe complètement à autre chose, hein ? Les gens
        qui l'ont posé des questions l'autre jour, ils t'ont laissé une carte ?

MT      Une carte ?

FC      Une carte de visite ?

MT      C'est leur numéro qu'ils avaient laissé.

FC      Juste le numéro de téléphone. Il n'y a pas une carte de visite ?

MT      Oui  c'est ça, je dis, une carte de visite.

FC      Tu as la carte de visite ici ?

MT      Non, je ne suis pas venu avec.

FC      Ah, c'est dommage.

MT      Pas maintenant  Pourquoi ?

FC      Pour savoir qui c'était. Tu sais, si tu peux. Avec ton téléphone, tu prendras
        une photo, tu m'enverras la photo par téléphone.

MT      D'accord. Je laisserai à personne m'enlever ce terrain là, c'est mon souvenir.

FC      Je sais. Non mais je crois que, si, vu que depuis qu'il a dit ça, il a rien fait, je
        pense qu'il va pas toucher.

MT      Tu sais pourquoi il n'a pas donné aux autres ? Il disait que les autres allaient
        vendre, et ils n'allaient pas réutiliser. C'est pour ça, il disait.  ça je confirme. Il
        disait confiance en toi, je sais que tu peux le faire.

        [Bruits ambiants]

FC      Les gens disent qu'il a sacrifié son frère. Tu crois que c'est vrai ? Alpha ?

MT      J'ai pas entendu ça.

FC      T'as jamais entendu ça ?

MT      Non.

FC      T'as jamais, jamais entendu ça ?

MT      Jamais entendu

FC      Tu sais son frère qui était mort tout de suite après qu'il a été élu.

MT      J'ai entendu, oui. Il était mort. L'un de ses frères

CONFIDENTIEL

FC:     Et Ousmane ? Ousmane Conté ?

MT:     Il va bien.

FC:     Il est ou ? Il est toujours à Conakry ?

MT:     Oui.

FC:     Qui s'occupe de toutes les rizières et de tout ce qu'il avait ?

MT:     Comme quoi ?

FC:     Les rizières. Là où ils faisaient le riz ? Qui s'occupe de ça ?

MT:     Il y a personne.

FC:     Tu veux dire que là où le patron avant, il faisait tout le riz et tout ça, il fait plus rien ?

MT:     Non.

FC:     C'est pas possible. Plus personne fait ça ?

MT:     Plus personne. Les gens se sont partagés. Les villageois, c'est eux qui font ça.

FC:     Ils font pour eux, maintenant.

MT:     Oui. Ils savaient faire. Des chances avec l'argent.

FC:     Bah oui, mais il faut travailler quoi.

MT:     Oui

FC:     Tu sais, à une époque j'étais allé voir, parce qu'il y avait un    il travaillait dans le... comment on appelle ça ? J'étais à Beaufort là-bas. Il y avait euh...des cannes à sucre. Pour faire du sucre et tout ça.. mais il n'y a personne qui travaille. C'est compliqué... c'est compliqué. Ça c'est des bons projets, ça. La canne à sucre. Parce que la canne à sucre, tu fais du sucre. On avait regardé, ce qui restait de la canne à sucre, tu le brûles. Tu fais des [inaudibles] avec ça. Ça c'est des bons projets.

MT:     Oui.

FC:     Maintenant, tu vois. Le Ministère de l'Agriculture et tout ça, il devrait aider les gens à faire ça. Qu'est-ce que tu veux faire.

MT:     Ils veulent faire ça maintenant.

FC:     Maintenant ?

MT:     oui. Ils vont faire ça maintenant.

FC:     Ah non, ah non. Il n'y a personne qui veut rien faire là-bas maintenant. Il faut être fou pour aller faire quelque chose là-bas. A Conakry. Qui tu veux qui aille faire quelque chose là-bas. Avec le vieux, il n'y a rien qui se passe. Tu sais, le pays maintenant il faut juste que l'autre il s'en aille et qu'il y est quelque chose de normal qui se passe là-bas. C'est un truc de fou. Tu sais la

CONFIDENTIEL

la la Guinée, ça pourrait être un pays, comme la Guinée équatoriale, pas Bissau, la Guinée équatoriale, ça pourrait être un pays magnifique, magnifique. Tu te rends comptes du nombre d'années perdues depuis 2005. Je ne parle pas d'avant, avant lorsqu'il n'y avait que Rio Tinto. Je te parle de 2005, 2006. Depuis 2006 qu'il y a le groupe là, on est en 2013, il s'est rien passé. Rien, rien. Ça fait un an, un an et demi que euh le groupe là ils avaient prévu de commencer à évacuer Zogota ou je sais pas quoi. L'autre gisement. Ils ont rien fait, tout est arrêté. Non seulement ils ont tout arrêté, mais ils ont cassé tous les camions, toutes les machines, tout ça. Des millions et des millions de dégâts ils ont fait. C'est, c'est grave de voir que le pays, il est comme ça. Parce que les gens, malheureusement, ceux qui, ceux qui ont le plus souffert de tout ça, c'est la population quoi. Parce qu'il n'y a rien qui se passe, y a pas d'investissements, y a pas de trains, y a pas de si, y a pas de    y a rien. Et tu sais que ça pourrait être euh, je te dis, ça pourrait être un pays comme la, comme la Guinée équatoriale. Avec plein d'activité, avec plein de, plein de choses. Regarde, rien que Freetown avec le peu qu'ils ont déjà de mines, ça va déjà beaucoup mieux. Et ils ont, ils ont... si tu veux, à côté de Conakry, c'est déjà, à côté de la Guinée, c'est comme si la Guinée c'était toute la table, Freetown c'est gros comme ça. C'est ridicule ce qu'ils ont à côté de, à côté de la Guinée. Mais malgré tout, ils travaillent. Quel malheur de ce type là, c'est...Qu'est-ce que tu veux faire ? Ça fait mal au ventre, ça fait mal au cœur. Ça fait mal au cœur. Je vais te manger toutes tes frites hein ? Et, comment il s'appelle, Seny, il reste ici, mais il n'a pas de visa lui pour rester ici ?

MT:     Il est là

FC:     Il est juste là, quoi. Il faut faire attention

MT:     Pourquoi ?

FC:     Bah, parce que quand tu as pas de visa quelque part, si t'es arrêté, ils vont te    tu as des problèmes non ?

MT:     Non, il va bientôt il va avoir son green card.

FC:     Ah bon ? Ah. Comment il a fait ça ?

MT:     Il a, il a, il a appliqué.    donc bientôt ils vont lui donner

FC:     Ah ça c'est bien ça, c'est une bonne nouvelle ça. Ça c'est bien. Et euh... sa femme Florence, elle a une fille aussi non ? Elle est toujours en France, non ?

MT:     Oui

FC:     Alors, elle doit être grande sa fille. Elle doit avoir quoi, 14 ans, 15 ans? Quel âge ?

MT:     Non, non, non.

FC:     Elle avait déjà 4,5 ans quand on l'avait vu. Elle peut être pas 14 ans mais elle doit avoir 12 ans. non ?

MT:     Je pense pas, tu sais elle a 12 ans

FC:     Ça fait déjà combien de temps qu'il est ici ? Moi je me souviens j'avais aidé. J'avais envoyé des, un peu quelque chose à Florence, à Florence    la petite

CONFIDENTIEL

elle était déjà née. Je sais pas quel âge elle avait,  je crois qu'elle avait déjà 2-3 ans... C'était en 2006, 3 ans, 6, oui t'as raison, elle doit avoir 9-10 ans, 9-10 ans. Oui, tu as raison. 9-10 ans. Ah la la. Tu veux un autre Cranberry ? Tu veux un dessert ou quelque chose, non ? Je ne sais pas ce qu'il y a là. Je vais demander ce qu'ils ont comme dessert. Qu'est ce que tu voulais toi ? Je vais demander ce qu'elle a. Toi tu aimes bien la vie ici ?

MT:     C'est pas comme..

FC:     Ca peut pas être comme Conakry, comme la Guinée... c'est tellement différend. Entre l'Afrique et les Etats-Unis. Ca peut pas être pareil.

MT:     Oui, ca c'est vrai. Ici c'est beau. Mais   y a pas de famille qui vient, salut,. C'est la seule différence. Et tu peux pas non plus aller chez les gens, sans rendez-vous.

FC:     Oui.

MT:     Les coutumes diffèrent.

FC:     Après c'est bon, c'est sûr. Mais si tu as des amis ici qui sont africains, tu peux avoir le même comportement que quand tu es en Afrique.

MT:     Oui

FC:     Le tout c'est de pas être tout seul quoi. Il commence à y avoir une petite communauté

MT:     Mais j'aime bien ici.

FC:     C'est sûr que c'est bien, c'est sûr que c'est bien. Ah l'Amérique, c'est l'Amérique, hein ? Tu peux faire ce que tu veux. Moi je pourrai pas venir ici, parce que j'ai ma famille en France et tout ça, mais autrement bon. C'est quand même agréable. Et il y a pas l'hiver ici, déjà ca c'est bien. Encore que ici, à Jacksonville, il fait plus froid qu'à Miami quand même.

MT:     Ah bon ?

FC:     Il n'y a pas de différence [inaudible] en hiver ici

MT:     Oui, un peu, un peu.

FC:     Il fait plus froid ici, que dans le sud à Miami.

MT:     Ah bon. Pourtant tu m'as dit que ici c'est chaud.

FC:     Non c'est chaud, mais je crois que en bas il fait plus chaud là non. Non il fait chaud l'été, mais je te parle de l'hiver. Il y a un peu d'hiver ici là quand même.

MT:     Oui, y a un peu. Mais ça neige pas. Ca neige pas quand même.

FC:     Bah c'est sûr. C'est sûr que c'est pas la vie à Londres hein. A Londres. Mais pourquoi ta maman elle est pas restée à Londres, pourquoi [inaudible]

Une serveuse:   How's everything ? Cranberry ?

FC:     Yes another cranberry, and wich desert you have today ? the desert of the day is?

CONFIDENTIEL

Une serveuse:   [Inaudible]

FC.   Euh, chocolat, citron et ..the other one ?

[Inaudible]

FC   Ah Cheesecake

[Inaudible]

Une serveuse:   and Cranberry Juice ?

FC:   Two please

Une serveuse:   OK.

FC:   Thank you  Hum. Oui, elle était partie avec Ahmad, pour Londres, non ?

MT   Oui

FC:   Et ça lui a pas plu ? Elle devait rester là-bas, non , au départ ?

MT:   En fait, comme elle avait pas ses enfants là-bas, je crois ça, c'était bien mais quelque chose lui manquait. C'est ça...

FC:   Parce que à Londres il y a qui ? Il y a Ahmed avec sa femme et ?

MT:   Ahmed était même pas tranquille là-bas.

FC:   Ahmed il était à Conakry lui. Et après il y a sa femme là-bas et les enfants

MT:   Sa femme, s'est très bien occupé d'elle quand même.

FC:   Il est bien Ahmed, c'est un gentil garçon. Il est gentil, tu sais il essaye d'être droit. Tu sais c'est pas quelqu'un qui essaye de jouer.

MT:   Oui, il est comme ça, il est très gentil.

FC:   Tu es venue en taxi ?

MT.   Oui. Je suis venue en taxi, oui.

01h02m00s   FC.   Et donc les gens là, ils t'ont donné une carte. Une carte de visite ?

MT   Oui

FC:   Avec leurs noms. Et c'est quoi marqué dessus ?

MT.   C'est les écritures, qui sont là bas (..) les écritures, et puis il y a le numéro de téléphone.

FC   oui mais y a pas un nom, il y a le nom des gens quand même, non ?

MT:   Il n'y a pas mis ça. J'ai pas fait attention, mais la c'est le numéro, leur numéro quoi

FC   C'est la femme qui parlait français ?

CONFIDENTIEL

MT     Oui. Mais son français était.

FC:    Un peu moyen quoi...

MT     Oui. Il y avait comme anglais façon là. Il y avait un peu d'anglais là dedans.

FC:    Mais ils étaient gentils. Ils n'étaient pas agressifs quoi ?

MT     Non, ils ne m'ont pas agressé. Ils ne m'ont pas agressé.

FC:    Ils t'ont dit qu'ils faisaient une enquête ?

MT     Oui.

FC:    Par rapport à quoi précisèment, ils ont dit ?

MT:    Ils ont dit qu'ils étaient entrain de faire un enquête, et les pots de vin,
       concernant les contrats miniers en Guinée. C'est ce qu'ils avaient dit. Et ils
       ont dit si j'ai des documents. J'ai dit "non, j'ai pas de documents." Ils ont dit si
       je ne parle pas des documents, ils vont me comparaitre devant le grand jury.
       Et me donner un subpoena. Me donner un subpoena. Ils vont me donner,
       pardon ils vont me donner un subpoena et me comparaître à la Cour devant
       un grand jury.

FC:    c'est quoi un subpoena ?

MT:    J'en ai aucune idée. Aucune idée. J'en ai aucune idée. Et, ils vont me
       comparaitre aux Cours et puis devant le Grand Jury.

FC:    je vais marquer ça. Je vais regarder ce que c'est ce subpeona, je connais
       pas ça.

MT:    Et aussi, ils ont dit, je vais donner tous les papiers à la Cour. Tous les
       documents à la Cour. Du moins...alors je leur ai dit. Moi je n'ai rien dit, hein ?
       je n'ai pas dit si j'ai des documents.

FC:    Tu as dit que tu n'as rien du tout.

MT:    Je n'ai rien dit, et puis...ils ont laissé leur numéro de téléphone, mais comme
       je vous dit je pense que le dossier que nous voulons de tous, c'est le même
       dossier que le Gouvernement américain veut.

FC:    De toute façon, c'est simplement le dossier de de des photocopies qui ont
       atterries chez Alpha, c'est tout.

Une serveuse:   (...)When you're ready. No rush.

FC:    Thank you.

MT     Excuse me.

Une serveuse:   Thank you.

01h05m40s   MT     Et le grand jury, c'est quoi ?

FC:    C'est un jury qui... pour toutes ces opérations là, pour ces choses-là. C'est
       pour ça que je le dis, c'est bien de partir. C'est bien de partir. Un subpoena je
       ne sais pas ce que c'est. [Pause] Bon alors, pourtant je t'avais dit, la

CONFIDENTIEL

dernière fois que l'on s'était vu, je t'avais dit, garde rien chez toi. Tu m'écoutes pas. Tu as eu de la chance. Tu as eu de la chance que ce soit . qu'on t'est demandé quand tu es allée là-bas parce que s'ils viennent chez toi qu'est-ce que tu fais ? Même si c'est des photocopies, des choses comme ça après tu peux pas leur dire que tu es pas au courant. T'as des photocopies chez toi? Pourquoi t'as des photocopies chez toi ? Tu vois.

MT     Tu penses que la photocopie est valable ? Même si [inaudible]…

FC .   La photocopie c'est pas valable, mais peu importe. C'est pas ça. C'est que, si tu dis à quelqu'un je suis au courant de rien et j'ai rien à voir avec tout ça, mais que, il y a des documents ou des photocopies avec ton nom et tout ça, tu peux pas dire que tu n'es pas au courant, parce qu'il y a ton nom. Pourquoi t'as ça chez toi ? Tu sais qu'il faut tout détruire, c'est simple. [Pause] Après, il y a une chance que tu as, c'est que avec ton passeport diplomatique il y a certaines choses qu'ils ne peuvent pas faire. Donc ça c'est déjà une bonne chose . Legal definition is writ commanding a [inaudible] .. Je crois qu'un subpoena c'est une demande officielle, de venir à la Cour. Je crois, hein. [Pause] Je crois que c'est ça. Je crois que c'est ça. Je vais mieux me renseigner. Mais je crois que c'est ça. [pause] C'est pour ça que le mieux c'est de partir, parce que s'il te demande officiellement d'aller là-bas tu peux pas refuser. Si tu es pas là, t'es pas là. Si t'es pas là, on peut rien te demander. Tu comprends ? C'est pour ça le mieux c'est   regarde un peu. Si tu pars t'es obligée de partir avec Ma ?

MT     Oui.

FC:    Ah c'est ça, je crois, c'est une . c'est une demande officielle d'information. [Pause] C'est un ordre. C'est un ordre, d'apparaître à la Cour. Si tu vas.   si tu réponds pas à cette demande d'aller à la Cour, tu es arrêtée. En fait, ca s'écrit S U B P O E N A. C'est ça, subpoena. Ca s'écrit pas "supina". C'est une manière un peu plus compliquée. Ca s'écrit comme ça.

MT     Et le grand jury ?

FC     Le Grand Jury c'est eux qui vont te poser les questions.   Une fois que tu reçois le subpoena tu peux pas ( .. ) parler. C'est un truc officiel quoi. [Pause] Ca peut être fait. Ils peuvent te demander ça, soit par téléphone, soit par.. soit en personne. en te rencontrant. Il faut détruire ça vite. Malheur. Parce qu'ils disent, t'as un autre type de subpoena qui t'impose de venir en disant "je voudrais que vous emmeniez les preuves de ça ça ça.. et t'oblige à les [inaudible] mais après si tu as pas, tu as pas. Si ça n'existe pas, [inaudible] to make copies of documents. .Ils peuvent aussi te demander par la poste, en disant envoyez nous. nous pensons que vous avez des documents comme ça, comme ça, comme ça, envoyez-les nous. [Pause] Tu veux qu'on regarde ça maintenant ?

MT     Mmm

FC:    Hein ?

MT:    Quoi ?

FC     Tu veux qu'on regarde ça maintenant ou qu'est-ce que tu veux faire ?

MT     Qu'est-ce que ? Moi je pensais avoir 50, je sais j'ai dit ça

CONFIDENTIEL

FC:   Je sais. Comment tu veux ? Tu sais je ne suis pas magicien moi, hein ? Euh, je peux voir, si je peux encore trouver. Pas ici, ici j'aurai plus, ça c'est sûr. Mais je quitte après demain... euh non, je ne sais pas quoi te dire. Ça c'est la note, la note de... Quand tu voyages, tu voyages par où ? Tu fais Jacksonville, tu passes par où ?

MT:   Par Bruxelles.

FC:   Tu fais Jacksonville-Bruxelles direct ? Non ? Par New York.

MT:   Non. C'est Bruxelles, Washington, des fois Chicago.

FC:   Là, si tu voyages, tu vas voyager toute seule ? Enfin, avec Ma ?

MT:   Oui, avec Ma.

FC:   Ecoute, je sais, je sais, je sais pas quoi te dire. Là comme ça tout de suite, j'ai pas d'autres solutions. Je vais... laisse-moi... Je te dis pas oui, je te dis pas non. Laisse-moi réfléchir ce que je peux trouver comme solution. Après le problème qu'il y a c'est que...

Une serveuse:   I got you some change.

FC:   No, thank you very much. Thank you, thank you.

Une serveuse:   Oh thank you so much, have a great one.

FC:   De toute façon, même si... de toute façon toi c'est pour ici que tu en as besoin ?

MT:   Oui.

FC:   Si j'arrive, encore à faire quelque chose, il y aura toujours Mado ici.

MT:   Oui, Mado est là.

FC:   Bon, au pire on arrivera toujours à... même si toi t'es pas là, on arrivera à organiser quelque chose. Tu vois ce que je veux dire où pas ?

MT:   Oui.

01h19m04s   FC:   Je vais faire de mon mieux. Je te dis, je te dis mais bon, mais bon tout ça, comme je te dis, c'est en plus. C'est pas quelque chose que je déduis, ou j'enlève de quoi que ce soit.

FC:   Mais tu sais, ne mélange pas tout dans ta tête. Il y a une chose, c'est cette histoire d'urgence pour que tu sois tranquille. Parce que, ces gens là ils rigolent pas, si demain ils viennent, ils ne rigolent pas eux hein.

MT:   Ah bon ?

FC:   Bah non. Tu étais tranquille quand t'étais avec les gens là, quand ils t'ont interrogé ?

MT:   Non.

FC:   Ah bah alors, voilà, tu crois que c'est des gens ils sont tranquilles, bien sûr que non. Bien sûr que non. Donc ça, c'est une urgence de se couper de ça,

CONFIDENTIEL

Se couper de ça, partir un peu, ça c'est une urgence. Après ton projet de, ton projet de restaurant et de machin, bon, ok, mais    ça c'est une urgence, urgence, urgence, y a vraiment urgence.    [Pause] Après si tu veux retrouver moins là-bas, tu veux retrouver que 150 là-bas et que j'essaye de te trouver le moyen d'avoir 50 ici, tu viens me le dire. Ça c'est plus facile.

MT    c'est ?

FC.    Si tu préfères, là-bas, à Sierra, au lieu d'avoir 200, d'avoir que 150 et que j'organise, que j'essaye d'avoir 50 ici, ça tu viens me le dire, ça  Tu comprends ce que je te dis.

MT    Mmm Mmm. C'est-à-dire dans les 200, tu enlèves 50 pour me donner ?

FC    Pour les trouver ici. J'aurai pas ça tout de suite, ça va prendre quelque temps mais c'est ça, tu dois me dire ça. Qu'est-ce que tu préfères faire ? Si t'as besoin de plus ici, plus que là-bas, je sais pas moi. C'est toi qui - comment je peux savoir - c'est toi qui doit me dire.

MT    Frédéric on avait parler de ça, je te dis que j'ai, que j'ai besoin de quelque chose pour ici, tu m'as dit que maintenant tu vas envoyer, que tu vas envoyer

FC.    Non, non, non, je t'ai pas dit. Je t'ai pas dit, si je viens ici, je viens avec 50. Je t'ai dit, je vais voir ce que je peux faire. Je t'ai pas dit oui, je viens avec 50  Et encore une fois, je te les enlève de nulle part. C'est quelque chose que je te donne en plus. Qu'est-ce que    tu peux pas me...me reprocher ça  D'accord ? Maintenant je te pose la question, c'est toi qui décide. Tu as 200. Soit tu les veux là-bas, soit tu les veux ici, soit tu les veux moitié, moitié, c'est toi décide. Maintenant je te pose une question, je m'en fou moi, c'est toi qui décide. Qu'est-ce qui t'arrange ?

MT    Moi, c'est 50 que je voulais pour ici.

FC :    Je n'ai pas. Voilà, je n'ai pas.  En tout cas, avant de partir je n'aurais pas. Je n'aurai pas. Donc je te dis, je peux essayer. Maintenant est-ce que tu veux que je les enlève de là-bas ou est-ce que tu veux pas les enlever de là-bas, qu'est-ce que tu veux faire ?

MT    Je comprends rien, moi. Tu avais dit tu vas essayer 50 et aujourd'hui c'est 20 qu'est annoncé.

FC    Parce que j'ai pas pu avoir. Si toi je te dis demain, tiens, trouve-moi 50 et tu trouves pas tu trouves que 20. Qu'est-ce que tu fais ? Tu m'amènes 20. Voilà. Je ne me suis pas engagé. Je ne t'ai pas dit oui à 100%. On est d'accord ? Je t'ai dit "je vais faire ce que je peux, je vais faire pour le mieux". je t'ai dit "je dois m'occuper de ça, le truc, je vais voir avec...comment je peux faire", j'ai pu faire 20, qu'est-ce que tu veux que je te dise ? Bon, si euh    je te dis, si j'arrive encore à organiser quelque chose et Mado est là, je peux envoyer à Mado. J'ai même pas son téléphone à Mado, mais tu me donneras ça.

MT    Et si Mado est en voyage, parce que Mado m'a dit que lui allait  elle doit aller en Côte d'Ivoire en Afrique

FC    Ah, elle est en Afrique là maintenant ?

MT    Elle doit aller

CONFIDENTIEL

FC: Elle va partir quand ?

MT : Elle me parlait de ça... dès qu'elle veut aller. Je pense pas que...comme elle doit aller là, je sais pas.

FC: Bon écoute, de toute façon il y a quelqu'un qui peut recevoir ça ici ou pas, si je peux trouver quelque chose ?

MT : Combien de temps ? Mais combien de temps ?

FC: Je ne sais pas. Je te dis rien, je te dis ni combien, ni quand parce que après toi tu crois que c'est sûr et certain et après tu vas me faire la même histoire que maintenant pour les 50 d'avant-hier. Et les 50, je te dis moi, je ne suis pas.. donc je sais pas. Mais bon Mamadie tu sais tu peux pas changer comme ça. Toi, ce que t'as besoin, t'as besoin. Le deal, au départ, c'est un million. Sur un million il y a 200 et 800, ca c'était le deal au départ. Tout le reste c'est des choses en plus, tu peux pas me reprocher ça. T'as pas le droit de me reprocher ça. Tu comprends ?

MT : Je comprends.

FC: Tu peux pas me reprocher rien du tout là-dessus, parce que je fais de mon mieux. [Pause] Pourquoi tu voyages pas avec Mado alors ?

MT : Parce qu'elle elle va en Côte d'Ivoire. Moi je vais en Sierra.

FC: Mais après tu vas à Abidjan, tu prends un vol à Abidjan, il y en a tous les jours.

MT : Parce que je n'ai rien à faire en Côte d'Ivoire.

FC: Mais tu vas pas en Côte d'Ivoire. Ah, parce que toi tu passes par Bruxelles, de Bruxelles tu prends direct... oui d'accord, oui d'accord. Oui, t'as raison. [Pause] Bon, on essaye d'avancer un peu ?

1h25m45s   MT : Oui. [Pause] Et les 200, qui garantit les 200 ?

FC: Est-ce que une fois je t'ai dit quelque chose qui ne s'est pas fait. Quand je te dis oui à 100%, est-ce que une fois je t'ai dit quelque chose qui s'est pas fait?

MT: Mais le problème, c'est pas toi qui contrôle, c'est ça.

FC : Non, c'est . c'est qui ?

MT: C'est pas toi qui contrôle.

FC : Je te dis que oui c'est moi qui contrôle, je te dis c'est moi qui contrôle et tu auras à 100% tes 200 à Sierra. C'est sûr à 100%. Est-ce que une fois je t'ai menti ?

MT : On avait dit 300, c'est 200 que je vois.

FC: Mamadie écoute, tu sais moi je suis fatigué de ça. Je vais . je t'ai pas dit 300, c'est 300. Je t'ai dit, je vais voir.

MT : Tu m'avais dit c'était.. Tu m'avais dit que tout le monde s'est mis d'accord sur les 300 .

CONFIDENTIEL

FC:    Non ..non, non. Je t'ai dit je vais..

MT:    Tu m'avais dit ça.

FC:    Bah, écoute tu sais moi je suis fatigué moi Mamadie de ça.

MT:    Mais il faut bien te rappeler, tu m'avais dit.

FC:    Non, je t'ai jamais dit ça. Je t'ai dit, je vais,.. Tu m'as demandé une partie. Je
        t'ai dit, une partie je vais voir quelle... si ça va être possible ou pas. Parce
        que au départ il n'y avait pas 200, 300, 800. Il y avait 1 et c'était tout. C'était
        comme ça. Tu m'as dit, non, non, non, on était assis, là, avec Cissé, tu m'as
        dit il faut essayer de voir si il n'y a pas.

MT:    La dernière fois qu'on avait parlé. La dernière fois qu'on avait parlé, tu m'as
        dit.

FC:    Avant que tu disparaisses.. écoute moi bien

MT:    Mais après on s'est revu ;

FC:    Non, on ne s'est pas revu. Quand on s'est revu c'était, c'était ici..

MT:    Frédéric, je t'ai dit, quand on s'est revu je t'ai dit,.. Tu m'as dit que c'est oui,
        c'est oui, c'est oui. Pourquoi, t'as dit c'est oui, c'est oui, c'est oui..

FC:    Qu'est ce que j'ai dit ?

MT:    Je t'ai dit pourquoi.

FC:    Et là c'était 200 ?

MT:    Et vous êtes revenu et t'as dit 200.

FC:    J'étais pas revenu  ce, la semaine dernière j'avais dit...

MT:    T'avais dit 300, Frédéric. Je ne suis pas un enfant de .. Tu avais dit tu auras
        300 comme ça, on avait parlé de ça.

FC:    Bon. Ecoute, alors ça veut dire que je t'ai menti ? Qu'est-ce que tu veux faire
        ? Moi je suis fatigué de ça, Mamadie. Tu veux faire quoi ? Tu me dis ce que
        tu veux faire. Moi je, je suis fatigué. Tu me fais de reproches. Je viens, je
        t'amène de l'argent, je te trouve des solutions, je te fais ci, cela. Moi je suis
        fatigué. Donc, tu me dis ce que tu veux. C'est toi qui décide, voilà. Tu veux,
        tu veux. Tu veux pas, tu veux pas. Je ne suis pas un enfant non plus et je ne
        suis pas ton enfant de courses. Donc, je te, je te dis que

MT:    Frédéric, je suis plus fatiguée que toi  étant donné une femme et un enfant
        avec, je suis plus fatiguée que toi.

FC:    Et alors, je dois supporter tout ce que tu me fais supporter.

MT:    Non, je suis plus fatiguée. Quand tu me dis que c'est ça, normalement ça doit
        être ça.

FC:    Bon alors, je t'ai menti. Je suis désolé, je t'ai menti.

MT:    Quand tu me dis  Quand tu me dis, ça, après, c'est ça

CONFIDENTIEL

FC:   Alors, quand je te dis 50, c'était... j'ai pris un engagement de te donner 50, c'est ça ? Mais c'est de l'argent qui vient de chez moi. Qu'est-ce que tu peux me reprocher ? Je te l'enlève de nulle part.

MT:   Frédéric, j'ai bonne mémoire. Tu m'avais dit 300, tu as dit tout est d'accord. Tu m'as dit ça. J'ai entendu, tu m'as dit ça.

FC:   Non.

MT    Et c'était là bas tu m'as dit ça. C'était là-bas.

FC:   Pas du tout. C'est pas du tout. C'est quand on était ici..

MT    Non, c'est là-bas. Si tu te rappelles, c'est là-bas.

01h29m00s   FC ,   Ecoute-moi bien. Avant de disparaître, on était ici. Tu m'as dit  il y avait Cissé qui était là - tu m'as dit écoute, l'histoire des uns, et tout ça ici et là, je veux absolument avoir une partie. Je t'ai dit je sais pas, je vais voir.  Qu'est ce que tu veux, tu m'as demandé d'avoir 300 et machin, je veux avoir quelque chose. Je t'ai dit écoute je sais pas, je vais voir ce que je peux avoir. Quand je t'ai dit que j'ai eu une réponse positive, après quand on s'est vu, je t'ai dit, tu as disparu, j'ai eu une réponse positive. La réponse positive, la réponse positive, c'était pour avoir une partie. Maintenant la partie, c'est une partie des 200 qu'on m'a donné. Qu'est ce que tu veux que je te dise ? On m'a donné, je te les donne. Tu les veux, tu les veux, tu les veux pas, tu les veux pas. Je ne sais pas quoi te dire. Voilà. Je ne sais pas te dire mieux que ça. Maintenant, ces papiers là, si tu veux les garder et aller les amener chez eux, va les amener chez eux. C'est toi qu'on va prendre, que l'on va mettre en prison, c'est ton machin.... Donc de toute façon toi ton intérêt c'est de les détruire, donc je ne vois même pas quelle histoire tu fais là. Parce que de toute façon, ça, c'est une bombe atomique pour toi. C'est ça. Si je veux t'aider de partir en Sierra, c'est pourquoi tu crois ? C'est parce qu'ils vont te prendre, ils vont te prendre, ils vont te faire une tête comme ça, te poser des questions des questions des questions, et ça va être un drame. C'est pour ça je te dis que je veux absolument t'aider et que tu ailles là-bas et que tu sois tranquille. Parce que ton histoire de fruits et légumes, si tu es ici, et qu'ils te font, qu'ils t'envoient de subpeona et tout ce bazar, et qu'ils t'emmènent là-bas. Ton histoire de fruits et légumes, tu peux oublier. Ton histoire de restaurant, tu peux oublier. Ton histoire de maison ici, tu peux oublier. Tu crois qu'ils vont te laisser comme ça toi. Depuis longtemps je te dis ça, donc écoute . Tu sais, je ne suis pas un enfant non plus, hein.

MT:   Et moi, je suis un enfant ?

FC:   Non. Non. Ah oui, toi t'es un enfant parce que tu prends des décisions qui sont très mauvaises. Oui. C'est une bonne idée d'aller voir Samy. C'était une très très bonne idée d'aller donner des photocopies à Samy. Parce que si tu es dans la merde aujourd'hui avec des subpoena, avec des gens qui veulent  ton truc, c'est à cause de ça

MT    Non.

FC:   Ah non ? C'est à cause de quoi alors ?

MT    Si tu étais,  si tu étais arrangé comme il fallait, ça n'allait pas arriver.  Ca n'allait pas arriver.

FC:   Ok, ok

CONFIDENTIEL

MT:  On me dit aujourd'hui on te paye ça, et demain on te paye ça.  On te dit
aujourd'hui on te paye ça, demain on te paye ça.  Ca a été toujours comme
ça, Frédéric. Soit raisonnable.

FC:  Bah écoute, je ne sais pas quoi te dire.

MT:  Quand tu dis à quelqu'un, je vais te faire ça, et que tu changes. Une fois,
deux fois, trois fois. Je vais te donner deux, et tu viens avec euh un. Je vais
te donner 3, et tu viens avec euh... tu vois qu'est-ce que ça fait ?

FC:  Ok..

MT:  C'est pas.

FC:  C'est pas à cause de ça qu'il y a une enquête, hein ? S'il y a une enquête,
c'est parce qu'il y a Samuel qui est allé se promener avec tout ce que tu lui
as donné hein ?

MT:  Je l'ai pas demandé, de, de...

FC:  Ah, je te dis pas que tu lui as demandé, en tout cas, tu lui as donné. Si tu lui
avais pas donné, il ne serait pas allé voir... il ne serait pas allé voir Fofana, il
ne serait pas allé le vieux, et il ne serait pas allé voir les Soros et compagnie.
Voilà.

MT:  Qui est Fofana ?

FC:  Fofana, c'est le Ministre des mines. Et oui, Mamadie, tu peux faire ce que tu
veux, s'il y a a...s'il y a un gros bordel aujourd'hui, c'est parce que Samy est
passé par ici. Crois-moi, crois-moi, je sais exactement ce que je dis, parce
que je connais un peu le dossier quand même. Voilà, bon. Je ne dis pas que
tu es une enfant, mais je dis que tu as fait de mauvaises décisions. Voilà.
[Pause] Je vais vite voir juste l'écran, je reviens, voir à quelle heure il est mon
vol.

[Pause]

Homme non-identifié:  Stand up. Put your hands behind your back [inaudible]

01h35m32s       **FIN DE L'ENREGISTREMENT**

Société Civile Professionnelle
Yann JEZEQUEL
Christine PINHEIRO
Et Anne-Sophie GRUEL
Huissiers de Justice associés
44 rue Poliveau
75005 PARIS

Puis j'ai placé la clé USB sous scellé afin d'être annexée au présent procès verbal de constat.

## TELLES SONT MES CONSTATATIONS

Et de tout ce que dessus, j'ai fait et rédigé le présent procès verbal de constat, pour servir et valoir ce que de droit.

## SOUS TOUTES RESERVES

## ACTE SOUMIS A LA TAXE PARAFISCALE



# Pièce n° 4

REDE Page 117 of 138

## Free Checking

**WACHOVIA**   01   1010270213432   038   50   0 11

Electronic Delivery

FREDERIC CILINS
BRIGITTE BURE
252 CHEMIN DES INDICAS          P5
JUANLES PINS 08190
FRANCE

---

## Free Checking

7/20/2010 thru 8/17/2010

Account number:    1010270213432
Account owner(s):  FREDERIC CILINS
                   BRIGITTE BURE

### Account Summary

| | |
|---|---|
| Opening balance 7/20 | $4,259.49 |
| Deposits and other credits | 151,290.00 |
| Checks | 150,300.00 - |
| Other withdrawals and service fees | 1,790.64 - |
| Closing balance 8/17 | $3,458.85 |

### Deposits and Other Credits

| Date | Amount | Description |
|---|---|---|
| 7/22 | 99,970.00 | FUNDS TRANSFER (ADVICE 2010072200010416) RCVD FROM WELLS FARGO NY IN/BANK LEUMI LE IS CRG=CILINS FREDERIC RFB=814-05-9038659MU OBI= REF=1007221242005803  07/22/10  08:36AM FT |
| 8/04 | 1,350.00 | COUNTER DEPOSIT |
| 8/06 | 49,970.00 | FUNDS TRANSFER (ADVICE 2010080600007959) RCVD FROM WELLS FARGO NY IN/BANK LEUMI LE IS CRG=CILINS FREDERIC RFB=814-06-C038617MU OBI= REF=1008061774002788  08/06/10  07:45AM FT |
| **Total** | **$151,290.00** | |

### Checks

| Number | Amount | Date | Number | Amount | Date | Number | Amount | Date |
|---|---|---|---|---|---|---|---|---|
| 0096 | 100,000.00 | 8/02 | 0098 | 300.00 | 8/09 | | | |
| 0097 | 50,000.00 | 8/06 | **Total** | **$150,300.00** | | | | |

---

WACHOVIA BANK , AVENTURA NORTH

page 1 of 3
WF04-000142

**p. 190**

REDE Page 5 of 32



096
63-643/670

27th July 2/0
Date

Pay to the
Order of    MANADIE TOURE                    $ 100.000,00

One hundred thousand dollars                    Dollars

WACHOVIA
Wachovia Bank, a Division of Wells Fargo Bank, N.A.

For _____

⑈067006432⑈ 1010276213432⑈ 0096 ⑈0010000000⑈

REQUEST 0000537205000000 100000.00
ROLL RCIA   20100802  00000 730924868
JOB RCIA  P  ACCT 490010276213432
REQUESTOR U217693
8331170  06/21/2013

Subpoena Processing Philadelphia
Y1372-110
Philadelphia PA 19101

GUWF04-000174

615

**p. 191**



REQUEST 00005377263660001 500 000 0 0
SCLL ECIA   201000809  0000092339028187
JOB ECIA  P  ACCT 4001010276213432
REQUESTOR 0217693
4331170  05/21/2019

Subpoena Processing Philadelphia
Y1372-110
Philadelphia  PA  19101

**p. 192**

# Pièce n° 5

Conakry le 3 Septembre 2009

À Mr Le Directeur Général de la F.I.B

Objet : Demande de changement du nom
de bénéficiaire d'un ordre de virement

Monsieur,

Je viens par la présente vous demander de bien vouloir procéder au changement du nom de bénéficiaire de l'ordre de virement d'un montant de Neuf cent quatre vingt dix huit mille dollars 998,000.00 USD

Vous veudrez bien mettre MAMADIE TOURE comme bénéficiaire et le N° de compte 1762717 de l'ordre de virement au lieu de MATILDA LTD initialement fait le 20 Aout 2009

Vous en souhaitant bonne réception, veuillez croire Monsieur le Directeur Général à l'expression de notre considération distinguée.

Ghassan Boutros
Directeur Général

REF: 10234/LP8130

## INVOICE 489

DATE: 20/12/2009                    TO: L.M.S

| 01 | reparation circuit de control/Caterpillar s/n: cat4592032Ng23 | 01 | 2000 | 2000 |

TOTAL AMMOUNT (USD)          US $  2000

Ammount in words : Two  Thousand United States Dollars.

ROKEL COMMERCIAL BANK (SL) LTD

25/27 SIAKA STEVENSSTREET,FREETOWN,SIERRA LEONE

SWIFT CODE: RCBKSLFR

BENEFICIARY'S A/C NO.   1732915


Authorized Signature

620

# Pièce n° 6

622

Approved:

        ELISHA J. KOBRE/STEPHEN SPIEGELHALTER
        Assistant United States Attorney/
        Trial Attorney, Criminal Division, Fraud Section

Before:   HONORABLE JAMES C. FRANCIS
        United States Magistrate Judge
        Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

    13 MAG 975

------------------------------x

UNITED STATES OF AMERICA,   :    **COMPLAINT**

      - v. -         :    Violations of
                   18 U.S.C. §§ 1512(c)(2),
                   1510, 1519

FREDERIC CILINS,       :
                   COUNTY OF OFFENSE:
     Defendant.     :    NEW YORK

------------------------------x

SOUTHERN DISTRICT OF NEW YORK, ss.:

       PETER KILPATRICK, a Special Agent with the Federal Bureau
of Investigation ("FBI"), being duly sworn, deposes and states:

COUNT ONE

(Tampering With A Witness, Victim, or Informant)

    1.  From at least in or about March 2013 through on or about
April 14, 2013, in the Southern District of New York and elsewhere,
FREDERIC CILINS, the defendant, willfully, knowingly, and
corruptly, did obstruct, influence, and impede official proceedings
and attempt to do so, to wit, CILINS offered money to another
person to cause that person to deliver to CILINS, for destruction,
documents required to be produced pursuant to a grand jury
subpoena.

    (Title 18, United States Code, Sections 1512(c)(2) and 2.)

COUNT TWO

(Obstruction of a Criminal Investigation)

    2.  From at least in or about March 2013 through on or about
April 14, 2013, in the Southern District of New York and elsewhere,
FREDERIC CILINS, the defendant, willfully and knowingly, endeavored
by means of bribery to obstruct, delay, and prevent the

1

communication of information relating to a violation of criminal statutes of the United States by a person to a criminal investigation, to wit, CILINS offered money to another person in exchange for that person's agreement to provide to CILINS, for destruction, documents requested from that person by agents of the Federal Bureau of Investigation conducting an investigation relating to violations of criminal statutes.

(Title 18, United States Code, Sections 1510 and 2.)

COUNT THREE
(Destruction, Alteration, and Falsification of
Records in A Federal Investigation)

3.    From at least in or about March 2013 through on or about April 15, 2013, in the Southern District of New York and elsewhere, FREDERIC CILINS, the defendant, willfully and knowingly, and with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, namely the United States Department of Justice, and in relation to and in contemplation of such matter, did knowingly alter, destroy, mutilate, conceal, cover up, falsify, and make false entries in records, documents, and tangible objects, to wit, CILINS directed an individual, from whom agents of the Federal Bureau of Investigation conducting an investigation regarding potential violations of federal criminal law, had requested certain documents, to destroy those documents.

(Title 18, United States Code, Sections 1519 and 2.)

4.    I have been a Special Agent of the FBI for approximately 4 years.  During my time with the FBI, I have participated in public corruption and other white-collar investigations.  I am presently assigned to Squad C4, a public corruption and civil rights unit.  I have based investigated, among other things, white-collar crime, including violations of the Foreign Corrupt Practices Act, wire fraud, election crimes, and public corruption in and around New York.

5.    I have participated in the investigation of this matter, and I am familiar with the information contained in this complaint based on my own personal participation in the investigation, my review of documents, conversations I have had with other law enforcement officers about this matter, my training and experience, and discussions I have had with other law enforcement personnel. Because this Complaint is being submitted for the limited purpose of establishing probable cause to arrest the defendant, I have not

included the details of every aspect of the investigation. Where actions, conversations and statements of others are related herein, they are related in substance and in part, except where otherwise indicated.

## THE DEFENDANT

6. From immigration records and from my participation in this investigation, I know that FREDERIC CILINS, the defendant, is a citizen of France who has identified himself as a representative of a particular business entity not based in the United States engaged in the mining industry (the "Entity"), as further described below.

## OVERVIEW OF THE DEFENDANT'S CRIMES

7. As described below, FREDERIC CILINS, the defendant, has made repeated efforts to obstruct an ongoing federal grand jury investigation in this District concerning potential money laundering violations and potential violations of the Foreign Corrupt Practices Act ("FCPA"), including such violations by a domestic concern as defined by the FCPA, relating to bribes to officials of a former government of the country of Guinea for the purpose of obtaining valuable mining concessions in Guinea. During monitored and recorded phone calls and face-to-face meetings with a cooperating witness assisting in this investigation, CILINS, among other things, agreed to pay large sums of money to the cooperating witness to induce the cooperating witness to: (1) provide to CILINS, for destruction, documents CILINS knew had been requested from the cooperating witness by special agents of the FBI and which were to be produced before a federal grand jury; and (2) sign an affidavit containing numerous false statements regarding matters within the scope of the grand jury investigation. CILINS repeatedly told the cooperating witness that the documents needed to be destroyed "urgently" and that CILINS needed to be present to personally witness the documents being burned.

## THE GRAND JURY INVESTIGATION

8. From my participation in this matter, I know that, from in or about January 2013 through the present, a federal grand jury in this District has been conducting a criminal investigation regarding potential violations of criminal law, including money laundering and conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957; and violations of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-3 (the "Grand Jury Investigation"). Among other things, the Grand Jury Investigation concerns the

transfer into the United States from outside the United States of payments in furtherance of a scheme to corruptly obtain valuable mining concessions in Guinea, including a particular valuable mining concession in Guinea's Simandou region (the "Simandou Concession"). Subjects of the Grand Jury Investigation include one or more "domestic concerns" within the meaning of the Foreign Corrupt Practices Act and certain of the proceeds of potential bribes were wired to or through this District.

9. Based, among other things, upon my review of publicly available press articles, I know that the current government of Guinea is conducting an investigation into potential corruption in Guinea by, among others, a particular business entity not based in the United States engaged in the mining industry (the "Entity"). The investigation by the government of Guinea concerns, among other things, whether the Entity or its affiliates obtained the Simandou Concession by means of bribes paid to officials of a former government of Guinea. For example, a November 2, 2012 article in the Financial Times (the "FT Article") reported that "a [Guinean] government committee has launched a corruption probe and is demanding answers about how [the Entity] secured in 2008 the rights to the half of Simandou that had earlier that year been stripped from [another mining enterprise]." The FT Article further stated that the committee conducting the government of Guinea Investigation had made "graft allegations" relating to the Entity's acquisition of interests in Simandou and a smaller deposit nearby. According to the FT Article, the committee conducting the government of Guinea Investigation is considering "reclaiming the rights" to the Simandou Concession from the Entity.

10. Beginning in or about March 2013, as part of the Grand Jury Investigation, the Government has been working with a cooperating witness (the "CW").[1] The CW is the former wife of a now deceased high-ranking official in the government of Guinea (the "Guinean Official"). From another Special Agent with the Federal Bureau of Investigation ("Agent 1"), I know that, on or about February 2, 2013, before the Government began meeting with the CW, Agent 1 served upon the CW a grand jury subpoena, dated February 2, 2013, requiring the CW to testify before the grand jury and provide

_____

[1] The CW is cooperating in the Government's investigation in the hopes of obtaining immunity for the CW's own potential criminal conduct within the scope of the Grand Jury Investigation. Information provided by the CW has proven accurate and reliable and has been corroborated by, among other things, phone records, physical surveillance, and consensually recorded phone conversations and meetings.

documents to the grand jury relating to the Grand Jury
Investigation (the "Grand Jury Subpoena"). With respect to the
production of documents, the Grand Jury Subpoena required the CW to
produce before the grand jury, among other things:

> Any and all documents - including but not
> limited to contracts, bank or other financial
> records, records of cash payments or gifts,
> transaction records, . . . and any other
> records - reflecting or otherwise concerning:
> the Simandou concession, . . . [the Entity]
> and related entities . . .

11.   From the CW, I learned that, while the CW was the wife of
the Guinean Official, who was then still in office and empowered to
influence the award of mining concessions, the CW was visited by
several individuals including FREDERIC CILINS, the defendant, who
identified themselves as representatives of the Entity.  According
to the CW, these individuals told the CW, on behalf of the Entity,
that they wished to invest in mines in Guinea and asked the CW for
help with the Guinean Official, who was then CW's spouse.  CILINS
offered the CW $12 million, to be distributed to the CW and
ministers or officials within the government of Guinea who might be
needed to secure the mining rights if all went well after their
introduction to the Guinean Official.  The CW later arranged and
was present for a meeting between CILINS and the Guinean Official.
The CW described further meetings with CILINS and others
identifying themselves as being associated with the Entity
concerning bribe payments by representatives of the Entity to
officials of the government of Guinea.  The CW also described
personally receiving money from the Entity through an individual
the CW described as associated with the Entity as part of the
Entity's scheme to corruptly influence the Guinean Official and
other officials in an effort to obtain mining contracts for the
Entity.

12.   The CW also referenced a series of contacts which the CW
entered into with the Entity and its affiliates setting forth the
terms of payments by the Entity and its affiliates by which the
Entity intended to corruptly influence those necessary to its
scheme to secure for the Entity mining rights in Guinea, including
the Simandou concession.  From Agent-1 I know that the CW told
Agent-1 that FREDERIC CILINS, the defendant, was present when some
of these contracts were signed.

13.   From a source assisting the Grand Jury Investigation (the
"Source"), among other sources, I have received photocopies, but
not originals, of several contracts between the Entity and its

affiliates, on the one hand, and the CW and companies controlled by
the CW, on the other, as described by the CW (collectively, the
"Contracts"). From Agent-1 I know that copies of two of the
Contracts were also separately provided to Agent-1 by the CW.
Because the Contracts are in French, I have relied upon draft
English translations of the Contracts in describing some of the
Contracts below. As described by the CW and as set forth in the
Contracts, the Contracts set forth the terms of payments by the
Entity, through a wholly owned subsidiary of the Entity, to the CW
for the CW's assistance in securing for the Entity mining rights in
Guinea, including the Simandou Concession. From my review of the
Contracts, I know that the Contracts concern, among other things,
the Entity and related entities and the Simandou Concession and are
therefore documents required to be produced by the Grand Jury
Subpoena. The following paragraphs briefly describe some of the
Contracts, each of which was, from at least February 2, 2013, under
subpoena by the grand jury.

     a. I have reviewed a draft English translation of a
document titled "Protocole D'Accord" ("Protocol-1"), which is dated
June 20, 2007. Protocol-1, which is in French, appears to be a
contract between an entity I know is a company controlled by the CW
(the "CW's Company") and a Guinea-based wholly owned subsidiary of
the Entity (the "Guinea Subsidiary"). According to Protocol-1,
"[Guinea Subsidiary] approached the Guinean authorities with a view
to establishing a partnership for the development and exploitation
of part of the iron deposits of SIMANDOU, and also the [CW's
Company] in order that the latter might assist it in the ways and
means which would allow it to obtain permits for mining research."
Protocol-1 further recounts that "with the combined efforts"
various mining research permits were granted by the Ministry of
Mines and Geology to the Guinea Subsidiary. Moreover, Protocol-1
sets forth that "[i]n order to remunerate the efforts provided, the
[Guinea Subsidiary] agrees to transfer 5% of all its shares or
stock to the [CW's Company], which agrees to this." Protocol-1
appears to be signed by CW, as "The Manager" of the CW's Company
and by an individual listed as the "Chief Executive" of the Guinea
Subsidiary.

     b. I have reviewed another document titled "Protocole
D'Accord" ("Protocol-2"). From Agent-1, I know that the CW
provided a copy of Protocol-2 to Agent-1. From my review of a
draft English translation of Protocol-2, which is in French and is
dated February 28, 2008, I know that Protocol-2 also appears to be
a contract between the CW's Company and the Guinea Subsidiary.
Protocol-2 provides that "[the [Entity] commits to giving 5% of
the shares of stock of blocks 1 and 2 of Simandou, situated in the
Republic of Guinea." Protocol-2 appears to be signed by only one

6

CW, on behalf of the CW's Company, and by a representative of the Entity ("Individual-1").

c. I have reviewed another of the Contracts titled, in French, "Contrat De Commission" (the "Commission Contract"). From Agent-1, I know that the CW provided a copy of the Commission Contract to Agent-1. From my review of a draft English translation of the Commission Contract, which is in French and is dated February 27, 2008, one day before the date of Protocol 2, I know that the Commission Contract states, in pertinent part, the following:

> [The CW's Company] commits for its part to taking all necessary steps to obtain from the authorities the signature for the obtaining of the aforementioned blocks [of the Simandou mine] on behalf of [the Guinea Subsidiary].

> [The Guinea Subsidiary] proposes to distribute the commission above as follows:

> The amount of two (2) million for the [CW's Company] with attribution of one hundred (100) USD already paid out as an advance. The remainder of the amount will be distributed among persons of good will who may have contributed to facilitating the granting of the aforementioned blocks, regarding which [the Guinea Subsidiary] will be conscientious with respect to the quality of the contribution of each party. The totality of the amount will be paid out without delay after signature of the aforementioned document.

The Commission Contract appears to be signed by the CW, on behalf of CW's Company, and by Individual-1, on behalf of [the Guinea Subsidiary].

d. I have reviewed another of the Contracts, which is titled "Lettre D'Engagement" (the "Engagement Letter") and is undated. From my review of a draft English translation of the Engagement Letter, which is in French, I know that the Engagement Letter is addressed to the CW from a particular holding company (the "Holding Company"). The Engagement Letter recounts that "[the Guinea Subsidiary] approached the Guinean authorities in view of establishing a partnership for the development and exploitation of part of the iron deposits of SIMANDOU" and that "[i]n the context

/

of this project, [the Guinea Subsidiary] submitted a proposal to the Guinean authorities, which allows shareholding . . . up to 5% by [the CW] as a local partner." The Engagement Letter further states, among other things, that "[i]n order to incorporate the shareholding of [the CW], [the Guinea Subsidiary] will transfer 17.65% of its capital to the Holding Company], of which 33.30% of the capital will be attributed to [the CW]."

e.    I have reviewed another of the Contracts, which is untitled and dated August 3, 2010 (the "August 3, 2010 Contract"). From Agent-1, I know that the CW provided a copy of the August 3, 2010 Contract to Agent-1. From my review of a draft English translation of the August 3, 2010 Contract, which is in French, I know that the August 3, 2010 Contract is signed by the Holding Company.  In the August 3, 2010 Contract, the Holding Company agreed to pay the CW, subject to "the favorable pursuit, good functioning, and positive outcome of the operations that [the Holding Company] and its partners carry out in all their activities in Guinea (commerce, medicine, mining, etc.) . . . . the additional amount of 5 million US dollars, payable in two parts (each payment being 2.5 million US dollars)." The first payment was to be made "24 months after the signature of this document" and the second "24 months after the first payment." The August 3, 2010 Contract required the CW to conceal the CW's relationship with the Holding Company, reciting that the CW and the CW's company "commit herewith to make no use of this document, in any manner whatsoever, directly or indirectly, and to not use this document against the [Holding Company] and/or its partner and/or its associates in Guinea or elsewhere."

14.    From the CW, I know that some of the money paid to the CW by the Entity and its affiliates or agents was wired to a bank account in Florida controlled by the CW.

## THE DEFENDANT'S OBSTRUCTION OF THE GRAND JURY PROCEEDING AND THE FBI INVESTIGATION

15.    From Agent-1, I have learned that in or about early March 2013, Agent-1 learned from the CW that FREDERIC CILINS, the defendant, contacted the CW by phone in an effort to reach an agreement with the CW under which CILINS would pay money to the CW in exchange for the CW providing CILINS with originals of the Contracts. CW thereafter participated in a number of consensually recorded and monitored phone calls with CILINS and several consensually monitored and recorded face-to-face meetings with CILINS, which are described below. These phone calls and meetings were all conducted in French and the descriptions below of these phone calls and meetings are therefore based upon my review of

14

draft English summaries of the recordings. As further detailed below, during the course of these phone calls and meetings, CILINS, referencing documents evidencing payments from the Entity and its affiliates to the CW, including the Contracts, told the CW that the documents needed to be "destroyed" and agreed to pay the CW money for originals of the documents and for signing a statement denying that the CW had ever entered into any contracts with the Entity or received any money from the Entity.

11.  Either Agent-1 or I was present for each of the telephone calls between the CW and FREDERIC CILINS, the defendant, described below. From Agent-1, I learned that Agent-1 learned from the CW that prior to the phone calls described below, the CW had discussions with CILINS regarding potential payments by CILINS to the CW in exchange for documents concerning the Entity and its affiliates, including the Contracts. Each call was recorded and, for each call, either I, if I was not present, or Agent-1 verified that the CW's call was placed to a particular phone number that I know, based upon records from T-Mobile, is subscribed to by "Frederic Cilins."

a.  On or about March 15, 2013, the CW called CILINS. During this phone call, which was monitored and recorded, CILINS told the CW that he wanted to meet the CW the following week. The CW asked CILINS what CILINS was going to offer the CW. CILINS replied that he needed to see the CW in person. CILINS again reiterated that he needed to speak to the CW, but did not want to speak on the phone. The CW asked CILINS whether, when they meet, the CW should bring "the documents." CILINS responded that it was up to the CW whether to bring the documents to that meeting, but said that they first needed to meet to go over the details and then execute it. Based upon information from the CW and my familiarity with this investigation, I believe that the "documents" referenced during this phone call include the Contracts and other agreements between the CW and the Entity or the Guinea Subsidiary concerning bribe payments for mining concessions in Guinea.

b.  On or about March 18, 2013, the CW spoke again with CILINS. During this call, which was monitored and recorded, the CW and CILINS discussed when the CW and CILINS would be able to meet in person. When the CW said that the CW would be unavailable to meet that week, CILINS responded that it was in the CW's interest to meet as there might be a great deal of discussion of money during the meeting. The CW asked how much money CILINS would give the CW, and CILINS responded by referencing a previous discussion during which CILINS and the CW had discussed money. CILINS reiterated that they needed to meet, as the money question was one which they could not resolve on the telephone.

9

631

c.    On or about March 20, 2013, the CW again called CILINS. During his call, which was monitored and recorded, the CW and CILINS discussed their plans for an upcoming, face-to-face meeting in Jacksonville, Florida. The CW told CILINS that the CW wanted an agreement during the meeting and asked whether another individual ("CC-1") who, based upon publicly available information, I know is a high ranking individual within the Entity, had agreed to the sum of money that CW had requested. CILINS responded, "Of course." CILINS stated that, after the meeting in Jacksonville, Florida, CILINS would work with an attorney to draft papers concerning their agreement. CILINS again stated that he did not want to discuss details of the arrangement by telephone.

17    Based upon information from the CW, my familiarity with this investigation, and my training and experience, I believe that during the foregoing phone conversations, FREDERIC CILINS, the defendant, was discussing plans to meet with the CW to offer the CW money to either destroy, or provide to CILINS for destruction or concealment, documents relating to the Simandou Concession and the Entity and related entities, including the Contracts described above, which were, and remain, the subject of the Grand Jury Subpoena.

18.    Based upon my conversations with Agent-1 and other special agents of the FBI, I know that, on or about March 25, 2013, following the phone conversations described above in which FREDERIC CILINS, the defendant, discussed with the CW paying the CW money in exchange for documents relating to the Simandou Concession and the Entity and related entities, including the Contracts, the CW met with CILINS at an airport in Jacksonville, Florida (the "March 25 Meeting"). Agents from the FBI conducted physical surveillance of the March 25 Meeting, which was recorded by a recording device in the CW's possession. Because the March 25 Meeting was conducted in French, the description below of what occurred during the March 25 Meeting is based upon my review of draft English summaries of the recordings. Based upon my review of these draft English summaries, I know that, in substance and among other things, the following occurred during the March 25 Meeting:

a.    CILINS told the CW, in substance and in part, that the CW will receive $800,000 which the remainder, which the CW will receive when it is over, will be somewhere else. After the CW asked how they will proceed with this agreement, CILINS replied that he, CILINS, would need to come back so that they can destroy the papers. CILINS told the CW that, at the same time, some of the funds intended for the CW will be invested with a lawyer, while the rest would go to the CW. After the CW told CILINS that the CW did not understand, CILINS reiterated that after he, CILINS, returns to

19

632

destroy the case s, part of the money will be held by the lawyer
and the rest would go immediately to the CW. Based upon what I
have learned from the CW and my familiarity with this
investigation, I believe that the documents CILINS refers to during
this portion of the conversation include the Contracts and any
other documents relating to the Entity and related entities
concerning payments to the CW and others to secure mining rights in
Guinea, including the Simandou Concession. Moreover, I believe
that, when CILINS tells the CW that the CW will receive additional
money when it is over, CILINS is referring to additional payments
that CILINS and his co-conspirators will give to the CW for
delivering to CILINS the documents after the government of Guinea's
corruption investigation into the Entity has concluded favorably
for the Entity.

b.    CILINS described that CILINS was visited by a
private investigative agency and questioned regarding documents
relating to the Entity's mining contracts in Guinea and other
documents in which, according to CILINS, the CW is mentioned. When
the CW asked what to do if the CW were to be questioned by the same
private investigative agency, CILINS, in substance, directed the CW
to reply that the CW has no involvement in the matter, has never
received any money, and that the CW does not have anything to do
with the contract. CILINS further told the CW that CILINS would
return with a document which the CW could refer to for answers in
case the CW is ever questioned.

c.    The CW asked CILINS what to do if the
American government got involved. CILINS asked, in substance and
in part, whether the CW is currently being bothered by officials
from the government, to which the CW replied no. CILINS told the
CW that he, CILINS, hoped that they would never come. The CW
recounted that CILINS had told the CW, during a previous
conversation, that they could come knock at the door and therefore
the CW should destroy the papers. CILINS posited that the papers
must be in the United States and that the next time CILINS comes
they will need to destroy the papers. Based upon information from
the CW, my conversations with Agent-1, and my familiarity with this
investigation, I believe that when CILINS told the CW, in the
context of discussion regarding a potential investigation by the
United States Government, that they could come at any time and that
the CW should destroy the papers, CILINS is expressing concern
regarding a potentially imminent investigation by the government of
the United States and directing the CW for that reason to destroy
documents, including the Contracts.

d.    CILINS told the CW that CILINS needed to
return to France the next day, but that he, CILINS, would return to

11

the United States, arriving in Miami, on April 8, 2013. CILINS
further told the CW that CILINS would come to Jacksonville, Florida
to meet with the CW between April 8, 2013 and April 14, 2013.

15.    Based upon my conversations with Agent-1 and other
special agents of the FBI, I know that, on or about April 11, 2013
the CW met again with FREDERIC CILINS, the defendant, at the same
airport in Jacksonville, Florida (the "April 11 Meeting"). Prior
to the April 11 Meeting, Agent-1 directed the CW to advise CILINS
that the FBI, along with a federal grand jury, were conducting a
grand jury investigation by providing CILINS with a ruse account of
having recently been approached by FBI agents concerning that
investigation, as further described below.

16.    An FBI surveillance team conducted physical surveillance
of the April 11 Meeting, which was recorded by a recording device
in the CW's possession. Because the April 11 Meeting was conducted
in French, the description below of what occurred during the April
11 Meeting is based upon my review of draft English summaries of
the recordings, which were prepared by French speakers. Based upon
my review of those draft English summaries, I know that, in
substance and in part, the following took place during the April 11
Meeting:

a.    The CW began the meeting by describing to CILINS
that, during a recent visit by the CW to the United States
immigration office to obtain an extension for the CW's visa, the CW
was approached by two individuals who identified themselves as FBI
agents.    The agents told the CW that they are currently
investigating bribe payments and mining contracts in Guinea. The CW
further told CILINS that the CW was told by the agents that if the
CW does not want to talk, the CW would receive a subpoena after
which the CW would be required to appear in front of the grand
jury, testify and turn over all the documents.    CILINS asked
whether the CW told the agents that the CW did not have any
documents, to which the CW replied that the CW did tell the FBI
agents that the CW had no documents.

b.    CILINS replied that the documents need to be
destroyed very urgently.    CILINS repeated the word "urgently"
multiple times.  The CW told CILINS that the CW believes that the
documents they want to destroy are the same documents that the U.S.
government is after, and that the CW does not know what to do at
this point.  CILINS replied that he, CILINS, told the CW a long
time ago that the CW should not keep anything here and that the CW
should destroy immediately everything.

c.    CILINS asked whether the agents left the CW with a

paper.  The CW replied that they left the CW with a phone number.
CILINS asked for the phone number and told the CW that CILINS will
need to get that phone number.

          d.    The CW then asked CILINS what a grand jury is, and
added that  the CW went online to find out and brought CILINS a
paper explanation.  Based upon my conversation with Agent-1, I know
that at this point the CW took out and showed to CILINS a printout
that the CW told CILINS the CW had gotten from the internet, but
that had previously been provided to the CW by Agent-1.   This
document described, in French, the nature and functions of a grand
jury in the United States.  From Agent-1, I know that CILINS was
observed by FBI agents reading the printout.  CILINS then stated
that there is only one thing that needs to be done immediately, and
that thing is what CILINS had already told the CW.

          e.    CILINS told the CW that CILINS had a report (the
"Report") regarding an investigation performed by a particular law
firm which, in substance, described the CW's participation in a
bribery scheme involving mining concessions in Guinea.  CILINS told
the CW that, according to the Report, evidence of the commission
paid to the CW in connection with the Guinean mining concessions
awarded to the Guinea Subsidiary consists of nine documents bearing
the letterhead of the Entity, including, among other things, a
series of draft agreements and a final sealed document stipulating
that $2.5 Million were promised to the CW for services guaranteeing
the rights to the Simandou Concession.

          f.    After reading another short portion of the Report,
CILINS stopped reading and told the CW that they need to destroy
the papers urgently.  CILINS again repeated the word "urgently"
several times.  CILINS stated that he was surprised that the FBI
agents came to see the CW rather than calling the CW to come to
them.  CILINS told the CW, in substance, that the CW will need to
be firm with the CW's story.  CILINS told the CW that when they ask
whether the CW knows the Entity or has been a participant in any
activity, the CW can claim that the CW knows them as they are a
company like many others in Conakry, which is the capital of
Guinea, but that the CW has never been involved in anything else.

          g.    CILINS asked the CW whether the CW has the
documents at home and told the CW that it is certain that they have
to do it, which I understand, based upon my knowledge of this
investigation, to mean destroying the documents, urgently.  After
the CW explained to CILINS that the documents were in a vault,
CILINS told the CW that the CW absolutely needs to do it this
afternoon when the CW goes back home.  CILINS asked whether the CW
has anybody else who the CW can send to get the documents in order

for them to be destroyed.  The CW replied that only the CW has access to the documents.

h.  CILINS told the CW that it is important for the CW to issue a statement in the legal proceeding regarding the Entity.  CILINS told the CW that, in the statement, the CW needs to stipulate that the CW has nothing to do with the matter.  CILINS asked the CW whether that is clear, to which the CW replied yes.  CILINS also suggested that the CW may want to deny that the CW had been married to the Guinean Official.

i.  CILINS asked the CW, in substance, whether the FBI agents appeared to know about the documents.  The CW replied that the CW does not know.  CILINS directed the CW not to talk about anything over the phone and that, whenever the CW is talking about something, the CW should move the phone far away as "they" are listening to everything.

j.  CILINS then told the CW that there should not be any documents left and that they need to find a place to burn all of them, adding that they cannot do it at the CW's house.  CILINS again told the CW that they need to take care of it fast now as in the past they delayed too much.  CILINS further told the CW that the matter is serious and that if the original documents are found the CW could lose everything the CW owns in the United States and be tried and deported.  CILINS further stated that what is done is done and was a significant mistake.

k.  CILINS told the CW that CILINS was asked to be present in person to witness the documents being burned in order to guarantee that nothing is left behind.  When the CW suggested that the CW could take care of it without CILINS, CILINS repeated that CILINS was instructed to see it happen in person and that CILINS cannot lie when he is asked whether he, CILINS, saw the papers being burned.

l.  CILINS stated that, based upon what the CW had told him, the situation is now very urgent.  CILINS told the CW that he was willing to return to meet with the CW on Saturday, April 13, or Sunday, April 14, to complete what they have to do.  Based upon my participation in this investigation and prior conversation during the April 11 Meeting, I believe that CILINS' reference to what the CW previously told him is a reference to what the CW had previously described to CILINS as a visit by FBI agents and the agents' mention of returning with a grand jury subpoena.

m.  CILINS then also discussed with the CW money CILINS would pay the CW.  CILINS told the CW that the CW would receive $1

14

million, with $200,000 to be paid now and $800,000 at a later date.
CILINS further told the CW that, once the case is complete and the
group is not forced out, the CW will receive "five." Based upon my
participation in this investigation and my training and experience,
I believe that the case CILINS refers to is the corruption
investigation by the government of Guinea, the group CILINS refers
to is the Entity or the Guinea Subsidiary, and "five" refers to $5
million.   CILINS later reiterated that the CW will receive $5
million if they are not kicked out and the $1 million regardless of
the outcome.

n.    CILINS then presented to the CW for the CW to sign
a   document   CILINS   referred   to   as   an   attestation   (the
"Attestation"). CILINS read the Attestation to the CW and told the
CW that they needed to write "Jacksonville" on the Attestation, and
date and sign it. The CW signed the Attestation after which I know
from Agent-1 that the CW and CILINS walked together to a business
center within the airport to make a copy of the Attestation for the
CW.

o.    As CILINS and the CW walked to the business center,
CILINS reiterated that it is very important for CILINS to be
present when the documents are destroyed and that CILINS has strict
orders to be present for the destruction of the documents.  The CW
and CILINS agreed that the CW would go home to get the documents
and call CILINS with a place where they could meet.

21.    From Agent-1 I know that, after the conclusion of the
April 11 Meeting, the CW provided Agent-1 with a copy of the
Attestation, which had been presented to the CW for the CW's
signature by FREDERIC CILINS, the defendant, during the April 11
Meeting.   The Attestation is written in French and is titled
"ATTESTATION."    Because   the   Attestation   is   in   French,   my
description of the Attestation below is based upon a draft English
translation of the Attestation prepared by a French translator.
The Attestation, which purports to be a document issued by the CW,
contains, among other things, the following statements, each of
which I know based, among other things, upon information from the
CW and my review of the Contracts described above, is false:

a.    "I have never signed a single contract with the
Entity, neither directly or indirectly through
anyone else."

b.    "I never intervened with Guinean officials in favor
of [the Entity] . . . ."

c.    "I have never received any money from [the Entity],

18

neither directly or indirectly. . . . [The Entity
never gave me . . . any money, neither directly to
me nor to anyone else on my behalf.  They did not
either promise to pay me anything, neither to me,
nor to anyone else on my behalf."

22.   Based upon my conversations with Agent-1 and other
special agents of the FBI, I know that, later on or about April 11,
2013, the CW again met with FREDERIC CILINS, the defendant, at an
airport in Jacksonville, Florida (the "Second April 11 Meeting").
An FBI surveillance team conducted physical surveillance of the
Second April 11 Meeting, which was recorded by a recording device
in the CW's possession.  Because the Second April 11 Meeting was
conducted in French, the description below of what occurred during
the Second April 11 Meeting is based upon my review of draft
English summaries of the recordings, which were prepared by French
speakers.  Based upon my review of these draft English summaries,
I know that, in substance and among other things, the following
occurred during the Second April 11 Meeting:

a.    The CW expressed concern to CILINS that the CW
was being asked to lie to the FBI and told CILINS that the CW
wanted money now.  CILINS replied that he would see what he could
do and would try to get $50,000 to give to the CW.  CILINS
expressed that he would need to seek permission from a senior
operative within the Entity to pay the CW the money.  CILINS
stated, in substance, that the CW needed to lie to the FBI.

b.    CILINS told the CW, who had brought to the Second
April 11 Meeting copies of some of the Contracts, that the CW
needed to bring the originals.  CILINS told the CW that CILINS
would call the CW the next day to arrange a time for them to meet
again.

23.   Based upon my conversations with Agent-1, I know that, on
or about April 14, 2013, the CW again met with FREDERIC CILINS, the
defendant, at the same airport in Jacksonville, Florida (the
"April 14 Meeting").  Agents from the FBI conducted physical
surveillance of the April 14 Meeting, which was recorded by a
recording device in the CW's possession.  From Agent-1, I know that
shortly after CILINS left the April 14 Meeting, CILINS was arrested
in possession of envelopes from Wells Fargo Bank containing
approximately $20,000 in United States currency.

16

WHEREFORE, deponent respectfully, requests that the defendant be imprisoned, or be led, as the case may be.

PETER KILPATRICK
Special Agent
Federal Bureau of Investigation

Sworn to before me this
___th day of April, 2013

HONORABLE JAMES C. FRANCIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

639

# Pièce n° 7



## PROTOCOLE D'ACCORD

### ENTRE LES SOUSSIGNES

Société MATINDA AND CO.LIMITD-SARL Unipersonnelle en abrégé 'MACO' dont le siège social se trouve à Dubréka, République de Guinée

D'une part

Et

La Société BSGR Ressources Guinée SARL de droit guinéen, dont le siège social est sis à Conakry

D'autre part

Etant préalablement exposé que

La Société BSGR Guinée s'est rapprochée des autorités guinéennes en vue d'établir un partenariat pour le développement et l'exploitation d'une partie des gisements de fer de SIMANDOU d'une part, et de la Société MATINDA AND CO LIMITED –SARL afin que celle-ci l'assiste dans les voies et moyens permettant l'obtention des permis de recherches minières

Suite à ces efforts conjugués, par arrêté N°A2007 5825/MMG/SGG du 28 Février 2007 du Ministère des Mines et de la Géologie quatre permis de recherches minières pour uranium pouvant une superficie totale de 1412 km² ont été accordés à la Société BSGR Ressources Guinée dans les Préfectures de Lola et N'zérékoré

Ainsi, les parties conviennent librement de ce qui suit :

Afin de rétribuer les efforts fournis, la Société BSGR Guinée accepte de transférer 5% de toutes ses actions à la société MATINDA AND CO LIMITED SARL qui l'accepte

Le présent protocole qui vaut loi entre les parties entre en vigueur dès sa date de signature

Signé à Conakry le                         2007

Fait en 2 exemplaires originaux

La Société BSGR                        La Société MATINDA AND CO LIMITED Sarl
Ressources Guinée

La Gérante

Mme Mamadie TOURE

# Pièce n° 8

CONTRAT DE COMMISSION

Entre les soussignés :

La société BSG Resources representée par Monsieur ASHER AVIDAN directeur des
opérations ayant le pouvoir à l'égard des présentes.

Et,

La société MATINDA AND CO LIMITED, représenté par Madame MAMADIE TOURE
femme d'affaires à OUBREKA.
Il a été convenu ce qui suit :

## ENGAGEMENT

La société BSG Resources s'engage de donner une somme totale de quatre millions de
dollars à titre de commission pour l'obtention des blocs 1 et 2 de simandou situé en
République de Guinée et couvrant les préfectures de KERIOUANE et BEYLA

La société MATINDA AND CO LIMITED s'engage pour sa part de faire toutes les
démarches nécessaires pour obtenir des autorités la signature pour l'obtention des dits blocs
en faveur de la société BSG RESOURCES GUINEE
La société BSG Resources se propose de repartir la commission ci-dessus comme suit :
Une somme de deux (2) millions pour la société MATINDA AND CO LIMITED avec
imputation de cent (100) USD déjà versée à titre d'avance.

Le reste de la somme sera repartie entre les personnes de bonne volonté qui auraient contribué
à la facilitation de l'octroi des dits blocs, dans lequel la société BSG Resources Guinée
diligentera en raison de la qualité de la contribution de chaque partie.
La totalité de la somme sera versée sans délai après la signature du dit document.
En outre, la société BSG Resources s'engage dans un délai raisonnable à la réalisation des
infrastructures scolaires sous la propriété de Matinda and co limited en République de Guinée

Fait en double exemplaire

Conakry le 27 Février 2008

Pour la société BSG Resources Guinée        Pour la société MATINDA AND CO LIMITED

Mr AVIDAN ASHER        Mme MAMADIE TOURE

# Pièce n° 9

## PROTOCOLE D'ACCORD

Entre les soussignés

La société BSG Resources Guinée représentée par Monsieur ASHER, ci-après désigné BSGR, dénommé ci-après, désignées aux présentes

Et

La société MATINDA AND CO LIMITED représentée par Madame MAMADIE TOURE, dénommée ci-après MATINDA

Il a été convenu ce qui suit :

La société BSG Resources s'engage à fournir les prestations, travaux et ouvrages au sein de la République de Guinée et conformément aux conditions définies aux présentes.

Fait en deux exemplaires

Conakry, le ...

Pour la société BSG Resources Guinée          Pour la société MATINDA AND CO LIMITED

Monsieur DAVID ASHER          Madame MAMADIE TOURE

# Pièce n° 10

# PROTOCOLE D'ACCORD

Entre les soussignés

Madame Mamadie TOURÉ, ..... d'affaires, de nationalité guinéenne, demeurant .....
Guinée,

d'une part

Et,

La Société PENTLER HOLDINGS LTD ..... située à Akara Building, 24 de castro street, Wickhams cay I, Road town, tortola, british Virgin Islands, representée par .....
membre ..... de la ....

d'autre part

Il a été préalablement exposé que :

..... la BSGR ..... assurer des campagnes d'activités pétrolières en ..... à ..... techniques pour le ..... et de l'indicatif ..... d'une partie des gisements de ..... de SIMANDOU.

..... la ..... de donner à remise aux autorités guinéennes une proposition qui permet ..... de la République de Guinée à hauteur de 15% de l'actionnariat ..... Madame Mamadie TOURÉ en tant que partenaire locale à hauteur de 5%. A ..... ces société BSGR feront constituera ..... la République de Guinée une société qui aura ..... participation ..... que qui sera dénommée Campagnie Minière de SIMANDOU.

Afin d'intégrer l'actionnariat de Madame Mamadie TOURÉ la société BSGR et ses ..... transférera ..... 5% de son capital, la société Pentler Holdings Ltd dont 15.50% ..... seront attribués à Madame Mamadie TOURÉ.

Il est convenu que :

## Article 1 :

La société Pentler Holdings Ltd s'engage à transférer à Madame Mamadie TOURÉ ..... participation estimée de 15.50% de son capital, dès que la Compagnie Minière ..... SIMANDOU aura été constituée d'autre partie des titres miniers nécessaires à l'exploitation des ..... concernant le SIMANDOU ..... à ..... attribuée par la République de Guinée.



<u>Article 2</u>

Madame Mamadie TOURE bénéficiera du versement de dividendes par la société Pentler Holdings Ltd de sa participation de 33,30% au même titre que les autres actionnaires dès que les dettes contractées par la Compagnie Minière de SIMANDOU pour les besoins de l'exploitation de la zone minière par ladite société auront été remboursées et les premiers dividendes versés à la société Pentler Holdings Ltd

<u>Article 3</u>

Le présent protocole qui vaut accord, les parties entre en vigueur dès sa date de signature.

Signé à Conakry en date du 20 février 2006

Pour la Compagnie Minière de Simandou

Madame Mamadie Touré

La société Pentler Holdings Ltd, représentée par Monsieur Avraham LEV-RAN

PENTLER HOLDINGS Ltd
Mara Building, 3rd De Castro Street,
Wickhams Cay 1, Road Town,
Tortola, B.V.I.
Tel: 494'5814

**p. 225**

# Pièce n° 11-1



# LETTRE D'ENGAGEMENT

Envers :

Madame Mamadie TOURÉ, femme d'affaires, de nationalité guinéenne, domiciliée à
Dabola.

De :

La Société PENTLER HOLDINGS LTD, domiciliée à Akara Building, 24 de Castro Street,
Wickhams Cay 1, Road Town, Tortola, British Virgin Islands, représentée par Monsieur
Avraham LEVRAN.

## Etant préalablement exposé que

La Société BSGR Guinée s'est rapprochée des autorités guinéennes en vue d'établir un
partenariat pour le développement et l'exploitation d'une partie des gisements de fer de
SIMANDOU.

Dans le cadre de ce projet, BSGR Guinée a soumis aux autorités guinéennes une proposition
qui permet l'actionnariat de la République de Guinée à hauteur de 15% et l'actionnariat à
Madame Mamadie TOURÉ en tant que partenaire locale à hauteur de 5%. A cet effet, la
société BSGR Guinée constituera, avec la République de Guinée, une société anonyme à
participation publique, qui sera dénommée Compagnie Minière de SIMANDOU.

Afin d'intégrer l'actionnariat de Madame Mamadie TOURÉ dans cette BSGR Guinée
transférera 17,65% de son capital à la Société Pentler Holdings Ltd dont 35,30% du capital
seront attribués à Madame Mamadie TOURÉ.

Les éléments exposés ci-dessus ont fait l'objet d'un Protocole d'Accord signé entre Madame
Mamadie TOURÉ d'une part et Société Pentler Holdings Ltd d'autre part, en date du 20
février 2006.

## Nouveau Projet

Dans le cadre du développement de ses activités en Guinée la société BSGR Guinée souhaite
des permis de recherche pour la bauxite sur les zones de Touqué, Kéniéba, Parlay, Maléa et
Dinguiraye selon les coordonnées géographiques ci-après.

Page 1 sur 4

651

p. 227

TIMBRE FISCAL
1.000 FRANCS

Permis I (500 Km²) - Préfecture de Koulla

| POINTS | VILLE DE NORD | LONGITUDE DE L'EST |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

Permis II (500 Km²) - Préfecture de Kouba.

| POINTS | VILLE DE NORD | LONGITUDE DE L'EST |
|---|---|---|
| A | 13° 09' 45" | 11  31  31 |
| B | 12° 09' 45" | |
| C | 13° 00' 60" | 11  72  21 |
| D | 12° 00' 00" | 11  31  3 |

Permis III (500 km²) - Préfecture de Mali

| POINTS | VILLE DE NORD | LONGITUDE DE L'EST |
|---|---|---|
| A | 13  00  45" | |
| B | 12  00  45" | 11  14 |
| C | | |
| D | | |

Permis IV (500 Km²) - Préfecture de Mali

| POINTS | VILLE DE NORD | LONGITUDE DE L'EST |
|---|---|---|
| A | 12° 18' 07" | 11  00  00 |
| B | 12° 18' 07" | 12  45" |
| C | 12  00  45" | |
| D | 12  09  45" | 12  45  31 |
| | | |
| | | |

Permis V (500 km²) - Préfecture de Mali

| POINTS | VILLE DE NORD | LONGITUDE DE L'EST |
|---|---|---|
| A | 12  20' 00" | |
| B | | |
| C | | |
| D | 12  00  45" | |

p. 228



Permis VI : (500 Km²) - Préfecture de Koubia.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|-----------------|
| A | 12° 09' 45'' | 11° 29' 21'' |
| B | 12° 02' 40'' | 11° 29' 56'' |
| C | 11° 50' 00'' | 11° 29' 56'' |
| D | 11° 50' 00'' | 11° 30' 13'' |
| E | 12° 00' 00'' | 11° 30' 13'' |
| F | 12° 00' 00'' | 11° 29' 21'' |

Permis VII : (500 Km²) - Préfecture de Tougué.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|-----------------|
| A | 11° 50' 00'' | 11° 30' 13'' |
| B | 11° 50' 00'' | 11° 15' 26'' |
| C | 11° 40' 00'' | 11° 15' 26'' |
| D | 11° 40' 00'' | 11° 30' 13'' |

Permis VIII : (500 Km²) - Préfectures de Tougué et Dinguiraye.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|-----------------|
| A | 11° 49' 35'' | 11° 15' 26'' |
| B | 11° 49' 35'' | 11° 00' 00'' |
| C | 11° 40' 00'' | 11° 00' 00'' |
| D | 11° 40' 00'' | 11° 15' 26'' |

Permis IX : (500 Km²) - Préfectures de Tougué, Dinguiraye et Koubia.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|-----------------|
| A | 12° 02' 38'' | 11° 29' 55'' |
| B | 12° 05' 30'' | 11° 07' 58'' |
| C | 12° 05' 58'' | 11° 07' 33'' |
| D | 11° 49' 35'' | 11° 07' 33'' |
| E | 11° 49' 35'' | 11° 15' 26'' |
| F | 11° 50' 00'' | 11° 15' 26'' |
| G | 11° 50' 00'' | 11° 29' 55'' |

Permis X : (500 Km²) - Préfectures de Dinguiraye et Tougué.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|-----------------|
| A | 12° 05' 24'' | 11° 07' 32'' |
| B | 12° 12' 13'' | 11° 02' 39'' |
| C | 12° 12' 17'' | 11° 00' 00'' |
| D | 11° 49' 35'' | 11° 00' 00'' |
| E | 11° 49' 35'' | 11° 07' 32'' |

Page 4 sur 4



Permis XI (422 Km²) - Préfecture de Dinguiraye.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|--------------|------------------|
| A | | |
| B | | |
| C | | |

La ligne A-B est tracée parallèle à la frontière Guinée-Malienne à environ 200 m.

Permis XII (500 Km²) - Préfecture de Dinguiraye.

| POINTS | LATITUDE NORD | LONGITUDE EST |
|--------|--------------|---------------|
| A | 12 00 12 | 11 00 00 |
| B | 12 06 12 | 10 46 28 |
| C | 11 02 51 | 10 17 00 |
| D | 11 10 51 | 11 00 00 |

Permis XIII (500 Km²) - Préfecture de Dinguiraye.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|--------------|------------------|
| A | 11 40 | 11 00 00 |
| B | 11 40 51 | 10 37 00 |
| C | 11 30 00 | 10 15 00 |
| D | 11 10 00 | 11 00 00 |

Il est entendu que la délivrance de ces permis de recherche au profit de la Société Tbodr Guinée entraîne de fait, l'actionnariat de Madame Manadu TOURE dans ce projet de par la participation gratuite de 33,30% prévue selon les termes du Protocole d'Accord signé entre Madame Manadu TOURE d'une part et Société Pentler Holdings Ltd d'autre part en date du 20 février 2006.

Fait en 2 exemplaires originaux.

La société Pentler Holdings Ltd représentée par Monsieur Avraham EICHLER.



PENTLER HOLDINGS s.A.
Akara Building 24 De Castro Street
Wickhams Cay I, Road Town
Tortola B.V.I.
reg. n° ........

p. 230

# Pièce n° 11-2



# LETTRE D'ENGAGEMENT

Entre :

Madame Mamadie TOURE, [...] [...] de nationalité guinéenne, domiciliée à
Dubréka

De :

La Société PENTLER HOLDINGS LTD, domiciliée à Akara Building, 24 de Castro street
Wickhams Cay 1, Road Town, Tortola, British Virgin Islands, représentée par Monsieur
Avraham LEV RAN

Il est préalablement exposé que :

La Société BSGR Guinée s'est rapprochée des autorités guinéennes [...] [...] [...] un
partenariat pour le développement et l'exploitation d'une partie des gisements de fer de
SIMANDOU

Dans le cadre de ce projet, BSGR Guinée a soumis aux autorités guinéennes une proposition
qui permet l'actionnariat de la République de Guinée à hauteur de 15% et l'actionnariat de
Madame Mamadie TOURE en tant que partenaire local à hauteur de 5%. A cet effet, la
société BSGR Guinée constituera avec la République de Guinée une société autonome à
participation publique qui sera dénommée Compagnie Minière de SIMANDOU.

Afin d'intégrer l'actionnariat de Madame Mamadie TOURE, la société BSGR Guinée
transfèrera 17,65% de son capital à la Société Pentler Holdings Ltd dont 5% du capital
seront attribués à Madame Mamadie TOURE.

Les éléments exposés ci-dessus ont fait l'objet d'un Protocole d'Accord signé entre Madame
Mamadie TOURE d'une part et Société Pentler Holdings Ltd d'autre part en date du 20
février 2006.

Nouveau Projet

Dans le cadre du développement de ses activités en Guinée, la société BSGR Guinée a déposé
une [...] de de permis de recherche pour la bauxite sur les zones de Boffa, Boké, Badiar et
Télimélé, le Nord selon les coordonnées géographiques annexées.

656



ZONE DROITE 1

| | | | | | | |
|---|---|---|---|---|---|---|

ZONE GAUCHE 1

| | | | | | | |
|---|---|---|---|---|---|---|

ZONE GAUCHE 1

| | | | | | | |
|---|---|---|---|---|---|---|

Il est entendu que la délivrance de ces permis de recherche au profit de la Société OSead Guinée entraînera de fait l'actionnariat de Madame Mamadic TOURE dans ce projet de par la participation gratuite de 33.30% prévue selon des termes du Protocole d'Accord signé entre Madame Mamadic TOURE d'une part et Société Pentler Holdings Ltd d'autre part, en date du 20 février 2006.

Fait en 2 exemplaires originaux.

La société Pentler Holdings Ltd, représentée par Monsieur Avraham LEV-RAN.

PENTLER HOLDINGS Ltd
Akara Building, 24 De Castro Street
Wickhams Cay 1 Road Town
Tortola, B.V.I
reg. n° 680813

Page 2 sur 2

# Pièce n° 12

Sujet a la bonne déroulement et a la bonne fonctionnement   et la suite de
l'operation mené par nos partenaires au projet de Simandu en Guinee, la société
Paender Holdings Ltd s'engage a payer a madame Mamadie Toure la somme
supplémentaire de 5 millions USD payable en deux parties (chaque payement de
2.5 million USD)
Les dates définitives de ces deux payements seront communiquées en
maximum 48 heures après la date de signature de ce document.

Signe à Freetown en date du  8 - 7 - 2010

Madame Mamadie Toure                     Pentler Holdings Ltd

659

# Pièce n° 13

660

Sujet au bon déroulement et au bon fonctionnement et la bonne suite des
opérations menés par Pentler et ses partenaires dans toues les activités en
Guinée (commerciales, médicaments, minières etc). la société Pentler Holdings
Ltd s'engage à payer à madame Mamadie Toure la somme supplémentaire de 5
millions USD payable en deux parties (chaque payement de 2.5 million USD).
Le premier payement sera effectué 24 mois après la signature de ce document
Le deuxième payement de 2.5 millions sera effectué 24 mois après le premier
payement
La société Malinda & Co. Ltd et madame Mamadie Toure s'engage par la
présente de ne pas faire usage de ce document de quelque manière que ce soit
directement ou indirectement et ne pas utiliser ce document contre la société
Pentler et/ ou ses partenaires et/ou ses associés en Guinée ou ailleurs.
Madame Mamadie Toure s'engage par la présente de prendre toutes les
responsabilités sur toutes actions mené en Guinée par toute tierce partie contre
Pentler et/ ou ses associées

Signé à Freetown en date du .....

Pour Malinda & Co. Ltd
Mme Mamamdie Toure

Pentler Holdings Ltd

E TTAYO PAPE GRANUN

661

p. 237

Sujet au bon déroulement et au bon fonctionnement et la bonne suite des opérations menés par Pentler et ses partenaires dans toutes les activités en Guinée (commerciales, médicaments, minières etc), la société Pentler Holdings Ltd s'engage a payer a madame Mamadie Toure la somme supplémentaire de 5 millions USD payable en deux parties (chaque payement de 2 5 million USD) Le premier payement sera effectué 24 mois après la signature de ce document Le deuxième payement de 2.5 millions sera effectué 24 mois après le premier payement.

La société Matinda & Co Ltd et madame Mamadie Toure s'engage par la présente de ne pas faire usage de ce document de quelque manière que ce soit directement ou indirectement et ne pas utiliser ce document contre la société Pentler et/ ou ses partenaires et/ou ses associes en Guinée ou ailleurs. Madame Mamadie Toure s'engage par la présente de prendre toutes les responsabilités sur toutes actions mené en Guinée par toute tierce partie contre Pentler et/ ou ses associées.

Signé a Freetown en date du:

Pour Matinda & Co. Ltd
Mme Mamamdie Toure

Pentler Holdings Ltd.

# Pièce n° 14-1

Contrat entre:


Pentler Holdings Ltd.                                    Matinda & Co. Ltd et


                                                         Mamadie Toure


Notre contrat de collaboration signé en 2005 est arrivé à son terme
Notre role de conseiller et d'apporteur d'affaire pour tous nos projets en Guinée
dans les domaines commerciaux, minier et médical ont été mené de manière
professionnelle et avec grand succès

Le rôle de la société Matinda & Co. Ltd a contribué à la grande réussite de nos
affaires mutuelles
Suite à votre décision d'arrêter vos activités en Guinée, nous sommes arrivés à
un accord comme suit :

La société Matinda & Co. Ltd recevra la somme de 3.1 millions pour sa part dans
toutes les activités menées en Guinée.

Les deux sociétés Pentler Holdings Ltd et la société Matinda & Co. Ltd, Mme
Mamadie Toure, ses partenaires et conseillers s'engagent irrévocablement à
assurer la confidentialité absolue sur toutes nos affaires communes menées en
Guinée et à ne pas dévoiler directement ou indirectement une affaire ou des
affaires communes

La société Matinda & Co. Ltd, Mme Mamadie Toure, ses partenaires et
conseillers s'engagent à ne pas publier directement ou indirectement des
contrats signés avec une partie tierce, à respecter l'entière responsabilité de nos
activités en Guinée et de ne pas faire l'usage directement ou indirectement
d'aucun document, contrat ou accord signé ou pas signé écrit ou verbal

La société Matinda & Co. Ltd s'engage par la présente à ne pas prendre contact
directement ou indirectement, verbalement ou par écrit, avec aucunes des
sociétés en Guinée avec lesquelles nous avons eu des collaborations, des
contrats, des accords verbaux ou écrits, de ne pas utiliser directement ou
indirectement la voix de la justice sans avoir l'accord préalable écrit de la société
Pentler et ses associés

La société Matinda & Co. Ltd  Mme Mamadie Toure, ses partenaires et conseillers se désistent par la présente, irrévocablement et d'une manière définitive, sans réserves et conditions, de toute sorte d'engagement ou obligation contractés avec la société Pentler Holdings Ltd et ses partenaires d'affaire.

La société Matinda & Co. Ltd et Mme Mamadie Toure certifient par signature de ces documents son accord irrévocable et s'engagent irrévocablement à ne pas faire l'usage de ces documents avec une tierce partie.

La société Matinda & Co. Ltd, Mme Mamadie Toure, ses partenaires et conseillers s'engagent à prendre toute la responsabilité concernant les réclamations actes, plaintes ou toutes autres demandes de la part des institutions, sociétés, personnes guinéen à l'encontre de la société Pentler Holdings Ltd et / ou ses partenaires.

La société Pentler Holding Ltd vous remercie pour cette collaboration depuis l'année 2005 et pour tout le soutien que la société Matinda & Co. Ltd nous a apporté.

Ce contrat remplace et annule irrévocablement tout accord écrit ou verbal signé entre la société Matinda & Co. Ltd, Mme Mamadie Toure, ses partenaires et conseillers, et Pentler Holdings Ltd et/ ou ses partenaires ou toutes autres entités avec lesquelles Pentler Holdings Ltd et Matinda & co Ltd ont été en relation d'affaire en Guinée durant la période 2005 – 2010.

Signé à Freetown en date du.. ..

Madame Mamadie          Matinda & Co. ltd          Pentler Holdings Ltd
Toure

Témoin.

Témoin.

665

**p. 241**

# Pièce n° 14-2