## EXHIBIT 7

# IN THE MATTER OF AN ARBITRATION UNDER THE RULES OF ARBITRATION OF THE INTERNATIONAL CENTRE FOR THE SETTLEMENT OF INVESTMENT DISPUTES

BSG Resources Limited

(Claimant)

vs

The Republic of Guinea

(Respondent)

## REQUEST FOR ARBITRATION

Mishcon de Reya Solicitors
Summit House
12 Red Lion Square
WC1R 4QD
London
Tel: +44 (0) 20 7440 7060
Fax: +44 (0) 20 7831 3487

# Table of Contents

| | | |
|---|---|---|
| 1. | INTRODUCTION | 3 |
| 2. | THE PARTIES | 4 |
| 2.1 | The Claimant | 4 |
| 2.2 | The Respondent | 5 |
| 3. | FACTUAL BACKGROUND | 6 |
| 3.1 | Simandou Zogota | 6 |
| 3.1.1 | Simandou South Permits | 6 |
| 3.1.2 | Simandou North Permits | 7 |
| 3.1.3 | Memorandum of Understanding | 8 |
| 3.1.4 | The Extended Simandou Permits | 9 |
| 3.1.5 | Investments in Simandou Zogota | 10 |
| 3.1.6 | The Zogota Mining Concession | 11 |
| 3.1.7 | The Zogota Mining Convention | 11 |
| 3.2 | Blocks 1 & 2 | 13 |
| 3.2.1 | Blocks 1 & 2 Permit | 13 |
| 3.2.2 | Provisions in the Zogota Mining Convention in relation to Blocks 1 & 2 | 14 |
| 3.2.3 | Investments made in Blocks 1& 2 | 14 |
| 3.3 | The Joint Venture with Vale | 14 |
| 3.3.1 | The participation by Vale | 14 |
| 3.3.2 | Investments made following the participation by Vale | 15 |
| 3.4 | The Republic of Guinea's unlawful taking of BSGR's investments | 16 |
| 3.4.1 | The agreement to provide funds and to rig the 2010 Presidential election in return for rights in Simandou | 16 |
| 3.4.2 | The unlawful taking of BSGR's investments | 17 |
| 3.5 | The anti-corruption situation in Guinea | 20 |
| 3.6 | The Republic of Guinea is seeking new investors in Simandou Zogota and Blocks 1 & 2 in violation of BSGR's rights | 21 |
| 3.7 | Other breaches by the Republic of Guinea | 22 |
| 4. | JURISDICTION | 23 |
| 4.1 | Jurisdiction *ratione personae* | 24 |
| 4.2 | The existence of a legal dispute | 24 |
| 4.3 | A dispute arising directly out of an investment | 26 |
| 4.4 | Consent | 28 |
| 5. | RELIEF SOUGHT | 29 |
| 6. | PROCEDURAL ISSUES | 30 |

## I.   **INTRODUCTION**

1.   BSG Resources Limited ("**BSGR**" or "**Claimant**"), a company incorporated under the laws of the Bailiwick of Guernsey ("**Guernsey**") hereby requests the institution of arbitration proceedings against the Republic of Guinea ("**Guinea**" or "**Respondent**") in accordance with Articles 25 and 36 of The Convention on the Settlement of Investment Disputes Between States and Nationals of Others States ("**ICSID Convention**") and Rules 1 and 2 of the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings ("**ICSID Institution Rules**").

2.   This Request for Arbitration ("**Request**") is brought against Guinea for the unlawful taking of BSGR's mining investments in Guinea, without adequate or any compensation being provided to BSGR. This unlawful taking is the result of a politically motived, internationally concerted campaign against BSGR in order to satisfy the interests of a newly elected President, Alpha Condé, and his financiers.

3.   Once President Alpha Condé was elected, he made it one of his prime goals to expel BSGR from Guinea, including by the use of unlawful means. He established a Technical Committee that concluded a seriously flawed review of *inter alia* the acquisition of BSGR's mining rights. The Technical Committee was acting in the interest of the President who did not intend it to act in an independent or impartial manner or to undertake an objective fact finding exercise. The investigation conducted by the Technical Committee was not in line with internationally recognised principles of due process. The lawfulness of the process has rightly been contested by BSGR since its very beginning, as has the ultimate unlawful taking of BSGR's mining investments in Guinea. As will be shown in detail below, BSGR acquired the mining rights by lawful means and Guinea's measures were unlawful, illegitimate and in breach of the applicable investment laws. BSGR became a victim of the President's interests and his powerful allies.

## 2.   THE PARTIES

### 2.1   The Claimant

4.      BSGR is a company registered under the laws of Guernsey with the registration No 46565, with its principal office in West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX (Exhibit C-1). BSGR was incorporated in 2003 as a limited company in Jersey and migrated in March 2007 to Guernsey.

5.      BSGR is an international diversified mining company with operations in multiple countries across metals and mining operations in Africa and Eastern Europe, including ferro-nickel, diamonds, iron ore and gold. BSGR has a fifteen-year track record of providing risk capital for developing and executing mining operations in challenging environments. It employs several thousand people and has African stakeholders in South Africa, Zambia, Botswana, Tanzania, Sierra Leone, the Democratic Republic of Congo and the Republic of Guinea.

6.      By 2005, when BSGR expressed its interest in exploring Guinea's iron ore deposits, BGSR had assembled a significant portfolio of mining and metal assets involving a number of commodities including diamonds, gold, iron ore and other related ferrous metals, copper, nickel, manganese, cobalt and chrome.

7.      BSGR has made its investments directly and through a series of subsidiaries, including the Guernsey company BSG Resources (Guinea) Limited ("BSGR Guernsey") and the Guinean company BSG Resources (Guinea) Limited Sarl ("**BSGR Guinea**"). Up to and until 30 April 2010, BSGR held 100% of the shares in BSGR Guernsey which held, in turn, 100% of the shares in BSGR Guinea. On 30 April 2010, BSGR entered into a joint venture agreement ("Framework Agreement") and a shareholders agreement ("Shareholder Agreement") with the Brazilian company Vale S.A. ("Vale") and sold 51% of its shares in BSGR Guernsey to Vale.

8.      BSGR Guinea later changed its name to VBG-Vale BSGR Guinea Sarl ("**VBG Guinea**"). BSGR Guernsey changed its name to VBG-Vale BSGR Guernsey ("**VBG Guernsey**").

9.    BSGR has taken all necessary internal actions required under ICSID Institution Rule
      2 to bring the present proceedings (Exhibit C-2).

10.   BSGR has authorised Mishcon de Reya to institute and pursue these proceedings
      on its behalf (Exhibit C-2). Any communication in this matter should be directed to
      following counsel:

      Karel Daele
      James Libson
      Heidrun Walsh
      Mishcon de Reya Solicitors
      Summit House
      12 Red Lion Square
      London WC1R 4QD
      United Kingdom
      Tel.: +44 207406 7060
      Fax: +44 20 7831 3487
      Email: Karel.Daele@Mishcon.com
            James.Libson@Mishcon.com
            Heidrun.Walsh@Mishcon.com

## 2.2   The Respondent

11.   The Republic of Guinea is a country in West Africa.

12.   To the best of Claimant's knowledge and belief, service of this Request for
      Arbitration shall be made on the Government of Guinea using the following contact
      details:

      President Alpha Condé
      Presidency of the Republic
      Le Palais Sékhoutouréya
      Conakry, Republic of Guinea

      Mr Mohamed Said Fofana
      Prime Minister
      Cite des Nations
      Conakry, Republic of Guinea

      Mr Kerfalla Yansané
      Minister of Mining and Geology (MMG)
      Building OFAB-CBG
      Almamya Kaloum
      BP 295 Conakry, Republic of Guinea

      Mr Mohamed Diare
      Minister of Economy and Finance

Bd. du Commerce, Boulbinet, Kaloum
BP 579 Conakry, Republic of Guinea

Mr Goureissy Sow
Agent Judiciaire de l'Etat
B.P. 1005
Conakry, Republic of Guinea

The Secretariat of the Republic of Guinea
258 Belsize Road
London
NW6 4BT
United Kingdom
E-mail: ambaguilondres@mae.gov.gn

13.    To the best of Claimant's knowledge and belief, Guinea is represented by Orrick
       Rambaud Martel. Their contact details are:

       Orrick Rambaud Martel
       31 Avenue Pierre 1er de Serbie
       75782 Paris Cedex 16
       France
       Tel +33 (0) 1 53 53 75 00
       Fax: +33 (0) 1 53 53 75 01

## 3.    **FACTUAL BACKGROUND**

### 3.1    **Simandou Zogota**

14.    In 2005, BSGR and its BVI subsidiary BSG Resources (Guinea) Limited ("**BSGR
       BVI**") expressed an interest in exploring and exploiting potentially economic
       concentrations of iron ore in south eastern Guinea, in the region surrounding
       Mount Simandou. Their representatives had meetings with the Ministry of Mining
       and the Agency for the Promotion and Development of Mining in Guinea
       ("**CPDM**") and subsequently applied for a series of mining titles. All of these titles
       relate to areas near the village of Zogota.

### 3.1.1    Simandou South Permits

15.    On 6 February 2006, BSGR, through its subsidiary BSGR BVI, acquired four
       exploration permits covering an area of 2,047 square kilometres in the prefectures
       of Beyla, Macenta, Nzérékoré and Yomou. The permits were registered with the
       Register of Mining Titles under No. A/2006/023/DIGM/CPDM. In what follows, the

permits will be collectively referred to as the "Simandou South Permits". Ministerial Order No. A/2006/706/MMG/SGG granting the Simandou South Permits (Exhibit C-3) was signed by the then Minister of Mines, Dr Ahmed Tidiane Souare, who was Prime Minister of Guinea from May 2008 to December 2008 and was, as Minister of State and special counsel, a close advisor to President Alpha Condé.

16.   The Simandou South Permits were valid for three years and renewable under certain conditions. Under Article 4 of the Permits, BSGR BVI was required to run an exploration programme and spend an exploration budget. If the exploration work identified economically exploitable deposits, the Government was required under Article 10 of the Permits to issue one or more exploitation permits. Pursuant to Article 11 of the Permits, BSGR, through BSGR BVI, paid handling fees, stamp duty and surface area fees to the Treasury of Guinea and other Guinean authorities to keep the Permits in place.

### 3.1.2   Simandou North Permits

17.   On 6 February 2006, BGSR, through its subsidiary BSGR BVI, also acquired three exploration permits covering an area of 1,286 square kilometres in the prefecture of Kérouané. The permits were registered with the Register of Mining Titles under No. A/2006/024/DIGM/CPDM. In what follows, the permits will be collectively referred to as the "Simandou North Permits". Ministerial Order No. A/2006/707/MMG/SGG granting the Simandou North Permits was also signed by Dr. Ahmed Tidiane Souare (Exhibit C-4).

18.   The Simandou North Permits were valid for three years and renewable under certain conditions. Under Article 4 of the Permits, BSGR BVI was required to run an exploration programme and spend an exploration budget. If the exploration work identified economically exploitable deposits, the Government was required under Article 10 of the Permits to issue one or more exploitation permits. Pursuant to Article 11 of the Permits, BSGR, through BSGR BVI, paid handling fees, stamp duty and surface area fees to the Treasury of Guinea and other Guinean authorities to keep the Permits in place.

### 3.1.3   Memorandum of Understanding

19.     On 20 February 2006, BSGR, through BSGR BVI, and Guinea entered into a
        Memorandum of Understanding setting out the framework for BSGR's investments
        in the country and its partnership with the Government of Guinea ("**the Zogota
        MOU**") (Exhibit C-5). The preamble establishes that Guinea understood that it was
        entering into a partnership with the BSGR group, including BSGR and its various
        subsidiaries:

> "*La République de Guinée dans son désir de favoriser l'exploitation et la
> valorisation de ses ressources minières a décidé que de telles activités
> pourront être entreprises par ou avec l'aide d'investisseurs privés en vue
> d'accroître le développement économique et le bien-être des populations.*
>
> *Dans le cadre de cette politique la République de Guinée entend faire
> valoriser les importantes ressources minières de fer des Zones de
> Simandou par leur exploitation, leur transformation et leur
> commercialisation.*
>
> *BSGR, intéressée par les grandes potentialités minières de la République de
> Guinée s'est rapproché des autorités guinéennes en vue d'établir un
> partenariat pour le développement d'une partie des gisements de fer de
> Simandou denommé dans le présent: Project des Mines de Fer de
> Simandou.*
>
> *BSGR est un groupe minier international spécialisé dans la recherche, la
> mise en valeur et la commercialisation des ressources minérales et dans le
> cadre du présent projet a délégué à sa filiale BSG Resources (Guinea)
> Limited la gestion du Projet des Mines de Fer de Simandou.*
>
> *BSGR est actionnaire majoritaire d'une société d'opérations minières
> dénommée Bateman Engineering spécialisée dans l'ingénierie, la
> construction et la gestion minière.*
>
> *BSGR a la volonté, les compétences techniques et la capacité financière
> pour collaborer avec la République de Guinée afin de prendre différentes
> initiatives commerciales […]*
>
> *Pour concrétiser cette volonté de partenariat, les parties ont décidé de
> conclure le présent protocole d'accord pour régir leurs relations futures.*"
>
> [English translation: "*The Republic of Guinea in its desire to favour the
> operation and the development of its mineral resources has decided that
> such activities shall be carried out by or with the assistance of private
> investors in order to improve the economic development and the wellbeing
> of the population.*
>
> *Pursuant to this principle, the Republic of Guinea intends to develop the
> important ferrous mineral resources of the Simandou Areas through its
> operation, transformation and marketing.*

> *BSGR, who manifested an interest for the high mining potentials of the Republic of Guinea, initiated contacts with the Guinean authorities in order to set up a partnership for the development of a part of the Simandou Iron Deposits, hereafter called the Simandou Iron Mines Project.*
>
> *BSGR is an international mining group dedicated to the prospecting, development and trading of mineral resources, and with respect to this project, BSGR has delegated to its subsidiary BSGR Guinea the management of the Simandou Iron Mines Project.*
>
> *BSGR holds a majority interest in an engineering company named Bateman Engineering, dedicated to mining, metals and minerals engineering, construction and management.*
>
> *BSGR has the financial capacities to cooperate with the Republic of Guinea to take various commercial initiatives [...]*
>
> *To achieve this desire of partnership, the Parties have decided to enter into this Memorandum of Understanding to govern their future relations."*

20. Under Article 1 of the Zogota MOU, BSGR agreed to produce, within a period of 30 months, a feasibility study of the so-called Simandou Iron Mining Project, including an analysis of its requirements in terms of infrastructure, communication, transport and energy. In a second stage, depending on the results of the feasibility study, BSGR and Guinea would enter into a mining convention and incorporate a public mining company in which the Government was to take a 15% shareholding. The Zogota MOU was entered into for a period of 3 years (Article 5) and included an ICSID arbitration clause (Article 6.5).

### 3.1.4   The Extended Simandou Permits

21. As indicated above, the Simandou South Permits and Simandou North Permits were to expire after three years but were renewable under certain conditions.

22. On 21 January 2009, BSGR, through its subsidiary BSGR Guinea, applied for an extension for parts of the areas covered by the Simandou South Permits and the Simandou North Permits and retroceded other parts.

23. On 10 February 2009, the company BSG Guernsey was incorporated as a 100% subsidiary of BSGR. On 18 February, BSGR BVI and BSGR Guernsey entered into a Share Purchase Agreement according to which 100% of the shares of BSGR Guinea were transferred to BSGR Guernsey.

24.     On 10 June 2009, BSGR, through its subsidiary BSGR Guinea, acquired four
        explorations permits covering an area of 1,667 square kilometres in the prefectures
        of Macenta, N'Zerekore and Beyla in Simadou South and Kérouané in Simandou
        North. The permits were registered with the Register of Mining Titles under No.
        A/2009/124/DIGM/CPDM. In what follows, the permits will be collectively referred
        to   as   "the   Extended   Simandou   Permits".      Ministerial   Order   No.
        A/2009/1327PR/MMEH/SGG granting the Extended Simandou Permits was signed
        by the then Minister of Mines and Geology, Mahmoud Thiam (Exhibit C-6).

25.     The Extended Simandou Permits were valid for two years. Under Article 4 of the
        Permits, BSGR Guinea was required to run an exploration programme and spend
        an exploration budget. If the exploration work identified economically exploitable
        deposits, the Government was required under Article 11 of the Permits to issue
        one or more exploitation permits. Pursuant to Article 12 of the Permits, BSGR,
        through BSGR Guinea, paid handling fees, stamp duty and surface area fees to the
        Treasury of Guinea and other Guinean authorities to keep the Permits in place.

3.1.5   Investments in Simandou Zogota

26.     Apart from the funds invested to acquire the above-mentioned mining titles, BSGR,
        either directly or through its subsidiaries BSGR BVI, BSGR Guernsey and BSGR
        Guinea, invested substantially in Simandou Zogota.

27.     It constructed three base camps (in N'Zerekore, Kerouane and at the base of the
        Simandou mountain), drilled a total of 155 holes and 13,331 meters, took and
        tested over 12,000 samples and contracted several subcontractors, including
        Energold Drilling Corporation, Fugro Airborne Surveys, MSA Geoservices (Pty)
        Limited, Foraco SAS and Geoprospect Limited.

28.     The work product of these investments was used to make another substantial
        investment, namely the drafting and submission on 16 November 2009 of the
        Zogota Feasibility Study (Exhibit C-7). The Zogota Feasibility Study was the work of
        BSGR and its subsidiaries and a series of external consultants (paid for directly or
        funded by BSGR), including Snowden Mining Industry Consultants, SGS South
        Africa, IC Exploration, SRK Consulting Engineers and Scientists,   Bateman

Engineering, WSP Group, Digby Wells and Associates and ENVIRON. The completion of the Study in such a short time was a major achievement.

### 3.1.6 The Zogota Mining Concession

29. In light of the positive outcome of the Zogota Feasibility Study, BSGR, through its subsidiary BSGR Guinea, applied for a mining concession in November 2009.

30. On 19 March 2010, BSGR Guinea acquired a mining concession covering an area of 1,024 square kilometres in the prefectures of Beyla, Macenta, Nzérékoré and Yomou. The mining concession was registered with the Register of Mining Titles under No. A/2010/171/DIGM/CPDM. In what follows, this mining title is referred to as "the Zogota Mining Concession". Presidential Order No. D/2010/024/PRG/CNDD/SGG granting the Zogota Mining Concession was signed by then President at interim, General Sékouba Konate (Exhibit C-8). The Presidential Order also includes a written statement of Prime Minister JM Doré that says "Seen and approved" on each page.

31. The Zogota Mining Concession was valid for twenty-five years. Under Article 6 of the Concession, the Government was required, upon the application by BSGR Guinea, to issue one or more exploitation permits. Pursuant to Article 9 of the Concession, BSGR, through BSGR Guinea, paid handling fees, stamp duty and surface area fees to the Treasury of Guinea and other Guinean authorities to acquire and keep the Concession in place.

### 3.1.7 The Zogota Mining Convention

32. Following the filing of the Zogota Feasibility Study, the Government of Guinea set up a commission with the task of reviewing the Zogota Feasibility Study and entered into a mining convention with BSGR (Exhibit C-9). Article 1 of the Ministerial Order stated as follows:

> "*Il est créé, sous l'autorité du Ministre des Mines et de l'Energie, une commission technique chargée d'examiner l'étude de faisabilité présentée par la Société BSGR et d'élaborer une convention minière entre la République de Guinée et ladite société*"

> [English translation: "*Under the authority of the Ministry of Mines and Energy, a technical commission is established to examine the feasibility study presented by BSGR and agree a mining convention between the Republic of Guinea and the company.*"]

33. The Commission was composed of representatives from all relevant Government ministries, including Transportation, Development, Mines, Administration of Land, Treasury and the President's office. It comprised 20 people, whose names were recorded in the decree establishing the commission and published in the Official Journal of the Republic of Guinea.

34. On 16 December 2009, the Government of Guinea and BSGR, through its subsidiaries BSGR Guinea and BSGR Guernsey, entered into a Convention for Iron Mining at Zogota/N'Zerekore ("**the Zogota Mining Convention**") (Exhibit C-10).

35. The Zogota Mining Convention encompassed the Zogota Mining Concession, but was broader than that. The Convention not only dealt with the exploitation of the Zogota mine as such, it also dealt with the transport, export and commercialisation of the iron ore. Under the Convention, BSGR, together with its subsidiaries, undertook to invest USD 2,54 billion in the construction of: (1) an open-pit iron mine with a capacity of 30 million tonnes per annum; (2) an industrial zone in and around Zogota (including 102 kilometres of railway, offices, water treatment plant, a hospital, a power plant, living quarters and warehouses, etc) and (3) an iron ore port in Buchanan in Liberia, including warehouses, offices, living quarters (Articles 10(1) and 11)).

36. BSGR further undertook to invest an additional USD 1 billion in the refurbishment of the railway between Conakry and Kankan (Article 12). This railway was to be dedicated to the transport of people and goods in order to unlock the rural areas of Guinea and stimulate economic growth.

37. The Zogota Mining Convention came into force on 19 March 2010 by Presidential Order No. 003/PRG/CNDD/SGG/2010 of the same date, signed by then President at interim, General Sékouba Konate (Exhibit C-11). The Presidential Order also includes a written statement of Prime Minister JM Doré that says "Seen" on each page.

## 3.2     Blocks 1 & 2

### 3.2.1     Blocks 1 & 2 Permit

38.     In February 1997, Rio Tinto, through its local subsidiary Simfer SA, had acquired four exploration permits on the Simandou mountain. These permits related to four blocks, known as Blocks 1 & 2 in Simandou North and Blocks 3 & 4 in Simandou South. In July 2008, the Government of Guinea decided to withdraw Rio Tinto's and Simfer's mining rights over Simandou Blocks 1 & 2 because they had failed to comply with the applicable 1995 Mining Code. After their lawful withdrawal from Rio Tinto and Simfer, the exploration rights in Simandou Blocks 1 & 2 became available and BSGR successfully applied for them.

39.     On 9 December 2008, BSGR, through BSGR BVI, acquired an exploration permit in Simandou Blocks 1 & 2 covering an area of 369 square kilometres in the prefecture of Kérouané. The permit was registered with the Register of Mining Titles under No. A/2008/132/DIGM/CPDM. In what follows, this mining title will be referred to as "the Blocks 1 & 2 Permit". Ministerial Order No. A/2008/4980/MMG/SGG granting the Blocks 1 & 2 Permit was signed by the then Minister of Mines and Geology, Louceny Nabé (Exhibit C-12). Later, President Alpha Condé appointed Mr. Louceny Nabé as head of the Guinean Central Bank.

40.     The Blocks 1 & 2 Permit was valid for three years and was renewable under certain conditions. Under Article 4 of the Permit, BSGR BVI was required to run an exploration programme and spend an exploration budget. If the exploration work identified economically exploitable deposits, the Government was required under Article 10 of the Permit to issue one or more exploitation permits. Pursuant to Article 11 of the Permit, BSGR, through BSGR Guinea, paid handling fees, stamp duty and surface area fees to the Treasury of Guinea and other Guinean authorities to acquire and keep the Permit in place.

41.     On 5 May 2009, the Republic of Guinea approved the transfer of the Blocks 1 & 2 Permit from BSGR BVI to BSGR Guinea (Exhibit C-13).

42.     VBG Guinea further applied for a renewal of the Blocks 1 & 2 Permit and a mining concession for Blocks 1 & 2. In accordance with Article 50 of the 1995 Guinean Mining Code, an exploration permit is tacitly renewed where the Republic of

Guinea fails to decide on an application for a renewal or a concession within three months after its presentation. As the Republic of Guinea failed to make a decision on VBG Guinea's application, the Blocks 1 and 2 Permit were renewed.

### 3.2.2   Provisions in the Zogota Mining Convention in relation to Blocks 1 & 2

43.   The Zogota Mining Convention did not only contain provisions in relation to Simandou Zogota. Other provisions related to Blocks 1 & 2. Under Article 10(2) of the Zogota Mining Convention, BSGR and its subsidiaries undertook to invest in Blocks 1 & 2 by constructing (1) two open-pit iron mines, (2) an industrial zone in and around Kerouané, including industrial equipment and installations and living quarters and (3) an extension of the iron ore port in Buchanan in Liberia. To determine the modalities of a mining concession for Blocks 1 & 2 and the conditions for operating the two Blocks, BSGR Guernsey and BSGR Guinea further undertook to submit, within 24 months from the signing of the Zogota Mining Convention, a Blocks 1 & 2 Feasibility Study.

### 3.2.3   Investments made in Blocks 1 & 2

44.   Apart from the funds invested to acquire the Blocks 1 & 2 Permit, BSGR, either directly or through its subsidiaries BSGR Guernsey and BSGR Guinea, invested substantially in Blocks 1 & 2. It constructed a base camp, drilled a total of 94 holes and 15,846 meters and started to work on a feasibility study for the Blocks. The BSGR group, including BSGR Guernsey, BSGR Guinea, BSG Resources (Liberia) Limited and BSGR (Liberia) Limited, further signed a Memorandum of Understanding with the Republic of Liberia regarding the export of iron ore from Zogota and Simandou Blocks 1 & 2 through the port of Buchanan in Liberia. The parties also agreed to negotiate a commercial agreement including an infrastructure development agreement.

## 3.3   The Joint Venture with Vale

### 3.3.1   The participation by Vale

45.   After acquiring the Extended Simandou Permit and signing the Zogota Mining Convention, BSGR began to look for a partner to invest additional capital and

know how in Simandou Zogota and Blocks 1 & 2. Thus, in 2010, it started negotiations with the Brazilian mining company Vale S.A. ("**Vale**") regarding the establishment of a Joint Venture and the sale, by BSGR to Vale, of 51% of the shares of BSGR Guernsey. The negotiation culminated in the conclusion of a Joint Venture Framework Agreement and a Shareholders Agreement between Vale and BSGR each dated 30 April 2010 (Exhibits C-14 and C-15). BSGR and Vale jointly committed to invest between USD 8 and 19 billion.

46.    As the transaction did not involve a transfer of shares of BSGR Guinea, there was no obligation to inform the Government of Guinea and to seek its authorisation. Nevertheless, the Government was kept informed.

47.    On 16 April 2010, Guinea confirmed that it had no objection to the joint venture and Vale's acquisition of 51% of the share capital of BSGR Guernsey (Exhibit C-16). It was in the interest of Guinea to have a financially strong joint venture partnership that was determined and able to accelerate the development of the Projects.

48.    After Vale's acquisition of a 51% stake in BSGR Guernsey, the name of the company was changed to VBG Guernsey. The name of BSGR Guinea was changed to VBG Guinea.

### 3.3.2    Investments made following the participation by Vale

49.    From July 2010 onwards, works in Simadou Zogota progressed quickly. The Government authorised VBG Guinea to proceed with the works on the Conakry-Kankan railway in accordance with the Zogota Mining Convention. A feasibility study was provided by VBG Guinea which was approved and on 22 November 2010 the Government authorised the construction work for the first 40 km of the railway line. Following this authorisation, the construction works on the first 9 km started and studies were commissioned for the following 330 km sections.

50.    In July 2010, the Government also authorised VBG Guinea to undertake a feasibility study concerning the construction of the railway from Zogota to Sanquille, which would permit the connection of the mines to the existing railway in Liberia.

51.     A drilling programme was undertaken, of which 35,000 meters was carried out in
        the first 14 months as were preparation and procurement activities for the
        installation of crushing and screening plants for the Zogota deposit.

52.     Further activities included the conduct of social and environmental studies as well
        as the construction of camps, maintenance and paving of access roads.  The linking
        of the sites of Zogota and Blocks 1 & 2 was also undertaken.

53.     In September 2011, BSGR and its partner Vale were able to submit the feasibility
        study in respect of Blocks 1 & 2, just three years after BSGR had been granted
        exploration permits in those areas. This was a very impressive accomplishment and
        stood in contrast to Rio Tinto, which had not managed to produce a feasibility
        study at all despite having had its permits for 11 years.

## 3.4     The Republic of Guinea's unlawful taking of BSGR's investments

### 3.4.1     The agreement to provide funds and to rig the 2010 Presidential election in return
for rights in Simandou

54.     Unknown to BSGR, in around late 2009 or early 2010, Alpha Condé (then a
        Presidential candidate for the forthcoming elections in March 2010 in Guinea),
        made a deal with business interests in South Africa according to which: (1) they
        would provide significant funds, believed to be USD 50 million, to Alpha Condé and
        assist in rigging the forthcoming Presidential election in Guinea to ensure that Alpa
        Condé was elected; and (2) in return, Alpha Condé agreed that he would, when he
        became President, grant the South African business interests shares in the mining
        assets of Guinea, including in particular Simandou where BSGR had its mining titles,
        and make payments in the amount of USD 14 million.

55.     In accordance with the deal struck, the Presidential election was rigged in favor of
        Alpha Condé. In the first round of the election, Alpha Condé only secured 18.25%
        of the votes whilst his main rival, Cellou Dalein Diallo, secured 43.69%. In the
        second round, the number of voters on the voter register was altered and the raw
        data results were actively changed. As a result, it was wrongly recorded that Alpha
        Condé secured 52.52% of the votes and he became the new President of Guinea.

Widespread violence followed this about-turn in the results, with reports suggesting a number of deaths.

56. Also a number of payments were made by the South African business interests to circles around Alpha Condé and, later on, by circles around Alpha Condé to the South Africans.

### 3.4.2 The unlawful taking of BSGR's investments

57. A crucial remaining part of the deal was that Alpha Condé had agreed to provide to the South Africans a stake in the Guinean mining sector, and in particular Simandou. To do so, President Alpha Condé had to get BSGR out. This happened as follows.

58. First of all, President Alpha Condé, enlisted the assistance of his friend and advisor, George Soros, a billionaire and a man of great influence. Together, they announced that all existing mining contracts would be re-examined and a new mining code would be produced, which entered into force on 9 September 2011.

59. Secondly, President Alpha Condé instructed various law firms, including Heenan Blaikie and DLA, and private investigators to find evidence of alleged contractual breaches and/or alleged corruption by BSGR.

60. Thirdly, in around mid-2012, the campaign group Global Witness began a smear campaign against BSGR. It did so at the encouragement of, and/or in concert with, Mr Soros and Alpha Condé. Global Witness issue several press issues, for example on 9 November 2012, 16 April 2013, 19 April 2013 and 15 August 2013 and 5 September 2013, in which it accused BSGR of large-scale corruption and called on national authorities to start criminal investigations into BSGR.

61. Global Witnesses' press releases were intended to be, and were, published internationally by a number of newspapers and online news sites. The intention and/or effect of doing so was to bring increasing pressure to bear on BSGR in support of the attempts by Alpha Condé, assisted by George Soros unlawfully to take BSGR's mining and exploration rights in Guinea. This led in particular to

extensive press coverage against BSGR by Tom Burgis and Misha Glenny in the Financial Times, for example on 3 November 2012 and 20 April 2013.

62.    Finally, a three-tier review Committee was established in Guinea to review *inter alia* the granting of BSGR's mining titles. The review committees were appointed and controlled by President Alpha Condé, in that: (1) the president and members of the National Mining Commission were appointed by the President; (2) the Strategic Committee was comprised of four members and answered directly to the President; (3) its decisions were only executed after approval by the President; and (4) the Technical Committee was led by an official named by the President.

63.    The Technical Committee wrote to VBG Guinea on 30 October 2012 accusing BSGR of obtaining the mining titles by corruption (Exhibit C-17). The accusations were based on the investigations mentioned above, but nevertheless incorrect and without a proper basis.  For the avoidance of doubt, those accusations and any similar accusations are denied in the strongest possible terms.

64.    From day one, BSGR understood that the entire process before the Technical Committee was nothing but an attempt to justify the forthcoming withdrawal of its mining investments. It was also abundantly clear to BSGR that the entire process violated Guinean and international fundamental principles of law and the dispute resolution provisions of the Zogota Mining Convention.

65.    Even before the Technical Committee had completed its review and without providing BSGR with all the evidence on which it relied, President Alpha Condé had already declared his intention to take BSGR's interests. On 21 October 2013, Tom Burgis of the Financial Times reported that (Exhibit C-18):

> *"In his clearest statement of intent to date, Mr Condé declared in a speech at the start of October that his government had started a battle to recover our mines which were acquired fraudulently."*

66.    On 4 November 2013, in an interview, President Alpha Condé stated that (emphasis added):

> *"We are currently engaged in an extremely difficult battle, which you are following, since the international press has been publishing it. This is our battle to retrieve our wealth….. I'm not fighting to retrieve this wealth for me; I'm fighting to retrieve this wealth for Guinea.*

18

> *Every Guinean patriot should make this his own fight. All people who are willing to fight with me to ensure that the riches of Guinea serve the people of Guinea, are people I'm ready to work with……. This Technical Committee is responsible for the review of the contract and makes proposals. We expect the Technical Commission to make proposals to the committee that I chair. We will make a decision based on the proposition that will be made by the Commission concerning the blocks 1 and 2. It is very important is that the world realizes that <u>it is a scandal that someone may supposedly pay a few hundred million, and can make up to 5 billion on the back of the Guinean people</u>. I believe that this is now something known worldwide."*

67.     On 21 March 2014, the Technical Committee issued its report and recommended, on 28 March 2014, to the Strategic Committee to withdraw the Zogota Mining Concession, the Zogota Mining Convention and the Blocks 1 & 2 Permit on the basis of its alleged and wholly incorrect findings that BSGR had allegedly obtained those rights by bribery and other unlawful means (Exhibit C-19).

68.     On 2 April 2014, the Strategic Committee issued its opinion to President Alpha Condé and the Minister of Mines and Geology, concurring with the Technical Committee's recommendation. As a result of these unlawful findings, the President of Guinea was able to deprive BSGR of the mining titles it lawfully acquired under President Lansana Conte.

69.     On 17 April 2014, the President of the Republic of Guinea issued Presidential Order No. D/2014/098/PRG/SGG revoking Presidential Order No. D2010/024/PRG/CNDD/SGG and thereby unlawfully terminating the Zogota Mining Concession (Exhibit C-20).

70.     On 18 April 2014, the Minister of Mines and Geology of the Republic of Guinea issued Ministerial Order No. A2014/1204/MMD/SGG revoking Ministerial Order No. A2008/I-4980/MMG/SGG and thereby unlawfully terminating the Blocks 1 and 2 Permit (Exhibit C-21).

71.     On 23 April 2014, the Minister of Mines and Geology of the Republic of Guinea issued Ministerial Order No. A2014/1206/MMD/SGG unlawfully terminating the Zogota Mining Convention (Exhibit C-22).

72.     On 24 April 2014, the Government of Guinea informed VBG Guinea and BSGR of
        those acts, resulting in the expropriation of BSGR's iron ore mining investments in
        Guinea without any compensation (Exhibit C-23).

73.     As will be demonstrated in the course of these proceedings, the Technical
        Committee's findings were fundamentally incorrect and were based on unreliable
        evidence. The investigations of the Technical Committee were by no means
        intended to be an objective fact finding mission.

74.     It is not only the legality and outcome of the investigation process that is contested
        by BSGR, but also the legality and constitutionality of the Technical Committee.
        The Technical Committee was *inter alia* tainted by an abuse of power, ignored the
        presumption of innocence and the rules governing the burden of proof and violated
        internationally recognized principles of due process. From the very beginning of its
        constitution, BSGR expressed its grave concerns with the legality of the procedure,
        the outcome of which was prejudiced by the interests of the President from its
        very beginning.

## 3.5     The anti-corruption situation in Guinea

75.     The actions taken by the Government of Guinea against BSGR are in stark contrast
        with its general ambivalent attitude towards alleged corruption and provide yet
        another indication of the political conspiracy against BSGR. A report by AfriMap of
        September 2013 on the anti-corruption policies in Guinea concludes that (Exhibit
        C-24):

        > *"Anti-corruption measures – especially the establishment of the anti-*
        > *corruption bodies – are, according to some, just taken to please*
        > *development partners and not genuinely to combat corruption that benefits*
        > *the authorities themselves. For others, the ineffectiveness of the anti-*
        > *corruption measures is due to a lack of political will, the absence of a*
        > *national strategy, the inappropriate legal framework, lack of public trust,*
        > *insufficient resources and a lack of capacity of the anti-corruption bodies".*

76.     The report further mirrors BSGR's complaints about the Technical Committee and
        the investigation conducted by it. In relation to the Guinean corruption control,
        audit and prevention bodies, the report states as follows:

> "*The lack of independence of [the corruption control, audit and prevention bodies] seriously limits their action and may in fact contribute to the perception that they are used as political tools because they are almost all administratively located within the President's Office*"

and

> "*An additional problem is that the majority of these organs, if not all of them, report directly to the executive, which raises serious questions about their independence. The most active of these organs are placed under the umbrella of the President's Office …*"

77.   The report further confirms BSGR's complaints about the role and the power of President Alpha Condé and the impact on the corruption agenda:

> "*The anti-corruption strategy depends on checks and balances that are very weak and lack institutional coherence, as is the case with the public procurement system. The weaknesses of these systems reflect the weaknesses of all three branches of government in Guinea – the executive, legislature and judiciary. These institutions inherited and still maintain a long tradition of an authoritarian system in which the over-powerful executive is deprived of any effective internal checks and balances, thus encouraging rule by fiat*";

and

> "*Guinea is still ruled by a very powerful presidential regime which guarantees the omnipotence of the President at the head of a dominant and all-powerful executive*"

and

> "*The nature of the powers of the President of the Republic over the ANLC and the other control bodies shows a hierarchical relationship and not supervision. Indeed, the President has powers of appointment, dismissal and instruction over the bodies in charge of prevention and repression of corruption attached to him or placed under his authority*".

## 3.6   The Republic of Guinea is seeking new investors in Simandou Zogota and Blocks 1 & 2 in violation of BSGR's rights

78.   It has been widely reported that the Government of Guinea is currently offering BSGR's withdrawn mining titles to other investors. The same reports also indicate that various mining companies, including Rio Tinto, Glencore, Vale, ArcellorMittal and BHP Billiton, have already expressed an interest in acquiring those titles.

79. For example, on 1 July 2014, the Mining Weekly reported that "*the Guinean government was expected to start a process of selecting a developer for the concession of the northern deposit, which has been the subject of a significant row*" and "*Guinea would start a new auction process for the northern concession, and would allow Vale to enter the bidding process*".

80. On 5 July 2014, Africa Mining Intelligence reported that "*Glencore, the only major that hasn't yet planted its flag in Guinea, is trying to gain a piece of the iron ore bonanza in the West African country, possibly to replace Beny Steinmetz Group Resources (BSGR) that was booted out of the Simandou project*".

81. On 7 July 2014, the Motley Fool reported that "*as the government of Guinea prepares to announce how it will proceed with an auction for rights to develop the northern half of the vast iron-ore deposit in the Simandou mountains, the mining community is sharpening its collective elbows to position itself for individual advantage. Already some of the biggest names in mining – including ArcelorMittal (NYSE: MT) , BHP Billiton (NYSE: BHP), Glencore (NASDAQOTH: GLNCY) and Vale (NYSE: VALE)  – have expressed more than passing interest in being part of the process, and with billions of dollars at stake, it could get nasty*" and "*regardless of which companies are actually involved in the upcoming auction, it's clear that major players remain interested and that the prize is worth enough to them that using whatever means necessary to gain an edge is fair game*".

82. However, in order to preserve the *status quo* during the pendency of the present proceedings, the Republic of Guinea must be restrained from awarding the mining titles, which were unlawfully taken away from BSGR, to any third party.

## 3.7   Other breaches by the Republic of Guinea

83. Prior to the unlawful taking of BSGR's mining rights, the Republic of Guinea additionally breached a number of its obligations under the Zogota Mining Convention. By way of examples, the following may be noted.

84. Under Article 32 of the Zogota Mining Convention, the Republic of Guinea guaranteed that it would stabilize the applicable legislation for the entire duration of the Zogota Mining Convention. However, in breach of Article 32 of the Zogota

Mining Convention, one of the first legislative initiatives of President Alpha Condé
was the replacement of the 1995 Mining Code.

85.    In accordance with Article 10(2) of the Zogota Mining Convention, VBG Guinea
       filed a Feasibility Study for Blocks 1 & 2 in September 2011. On the basis of this
       Study, and in accordance with Article 43 of the 1995 Mining Code, the Republic of
       Guinea was obliged to negotiate issue a mining concession and determine the
       exploitation modalities of Blocks 1 & 2. However, the Republic of Guinea simply
       ignored the Feasibility Study and failed to grant a mining concession.    Article 44 of
       the 1995 Mining Code also provides that an indemnity must be paid by Guinea if a
       mining concession is not granted to the inventor.

86.    Under Article 29(c) of the Zogota Mining Convention, the Republic of Guinea
       declared and warranted that it had verified, prior to the conclusion of the Zogota
       Mining Convention, that (1) BSGR Guinea met all the requirements under the
       Mining Code and (2) there were no impediments whatsoever to granting the
       Zogota Mining Concession and the Zogota Mining Convention. Under Article 29(d)
       of the Zogota Mining Convention, the Republic of Guinea further declared and
       warranted that its signing of the Zogota Mining Convention and the execution of its
       obligations thereunder did not violate any law or regulation. However, five years
       later, the Republic of Guinea wrongfully withdrew the Zogota Mining Concession
       and wrongfully terminated the Zogota Mining Concession because they had
       allegedly been granted fraudulently.

87.    Under Article 31 of the Zogota Mining Convention, the Republic of Guinea
       undertook to pay a fair and equitable compensation based on the market value of
       the mining operations in case of expropriation or nationalisation. However, by
       withdrawing BSGR's mining titles, the Republic wrongfully expropriated BSGR's
       investments without paying any compensation whatsoever.

## 4.    **JURISDICTION**

88.    Article 25 of the ICSID Convention determines certain conditions that have to be
       satisfied in order for ICSID to retain jurisdiction over a dispute submitted to it: (1)
       there must be a dispute between a national of a Contracting State and another
       Contracting State, (2) the dispute must be legal, (3) the dispute must arise directly

out of an investment and (4) there must be consent in writing to submit the dispute to the ICSID Centre. Each of these conditions is met.

## 4.1    Jurisdiction *ratione personae*

89.    The parties to the dispute are BSGR and the Republic of Guinea.

90.    BSGR is a company incorporated under the laws of Guernsey. Guernsey constitutes a British Crown dependency of the United Kingdom of Great Britain and Northern Ireland ("**UK**"). The ICSID Convention entered into force in the UK on 18 January 1967. On 11 June 1973 the UK notified ICSID that Guernsey had approved its consent to the ICSID jurisdiction. BSGR is therefore a national of a Contracting State.

91.    The Republic of Guinea signed the ICSID Convention on 27 August 1968 and deposited instruments of ratification on 4 November 1968. The ICSID Convention entered into force in the Republic of Guinea on 4 December 1968.

92.    The dispute is therefore between a Contracting State (the Republic of Guinea) and a national of another Contracting State (BSGR), as required by Article 25(1) of the ICSID Convention.

## 4.2    The existence of a legal dispute

93.    The dispute involves Guinea's violation of its obligations under Guinean law and international law, including those identified below. The measures taken by the Government of Guinea violate BSGR's legal rights as an investor in the mining industry in Guinea.  The dispute is clearly legal in nature because it concerns the existence of scope of BSGR's legal rights, and the nature and extent of the relief to be granted to BSGR for its losses suffered as a result of the Republic of Guinea's violation of those legal rights.  This dispute is therefore a legal dispute, as required by Article 25(1) of the ICSID Convention.

94.    Article 5 of the Guinean Investment Code provides foreign nationals or companies against the expropriation of their investment(s)(Exhibit CL-1):

> "*(1) L'Etat guinéen ne prend aucune mesure d'expropriation ou de nationalisation des investissements réalisés par les personnes ou les entreprises sous réserve des cas d'utilité publique constatés dans les conditions prévus par la loi.*
>
> *(2) Dans le cas d'utilité publique, les mesures d'expropriation ne doivent pas être discriminatoires et doivent prévoir une juste et adéquate réparation dont le montant sera déterminé selon les règles et pratiques habituelles du droit international.*"

> [English translation: "*(1) The Guinean State does not take any measure of expropriation or nationalisation against investments by persons or companies unless for public purposes determined in accordance with the law.*
>
> *(2) In the case of a public purpose, the expropriation measures must not be discriminatory and must provide a fair and accurate compensation the amount of which shall be determined in accordance with the rules and common practices of international law*"]

95. Article 6 of the Guinean Investment Code guarantees foreign nationals or companies equal or national treatment:

> "*Sous réserve des lois et règlements de la République, les personnes physiques et morales étrangères régulièrement établis en Guinée reçoivent le même traitement que les ressortissants guinéens eu égard aux droit[s] et obligations relatifs à l'exercice de leurs activités.*"

> [English translation: "*Subject to the laws and regulations of the Republic, foreign natural persons and legal entities regularly established in Guinea receive the same treatment as the nationals of Guinea in relation to the rights and obligations to exercise their activities*"

96. Guinea's unlawful withdrawal of BSGR's mining titles amount to an expropriation or nationalisation of its investment in violation of Article 5 of the Guinean Investment Code and a breach of the standard of equal treatment in violation of Article 6 thereof.

97. BSGR's rights under the Guinean 1995 Mining Code (Exhibit CL-2), in particular its rights under Articles 11, 21 and 22 have also been violated.

98. Article 11 of the Guinean Mining Code constitutes a so-called umbrella clause according to which the Republic of Guinea guarantees the observation of the mining agreements that it enters into. A breach by the Republic of Guinea of the Zogota Mining Concession and the Zogota Mining Concession therefore constitutes a breach of Article 11 of the 1995 Mining Code. In section 3.7 here

above, various breaches by the Republic of Guinea of the Zogota Mining Convention and the Zogota Mining Concession have been described, each of which is also a breach of Article 11 of the 1995 Mining Code.

99.     Article 21 of the 1995 Mining Code guarantees mining investors a number of rights, including: (1) the right to dispose freely of their property and organize their enterprise as they wish; (2) the freedom of hiring and firing, subject to prevailing laws and regulations; (3) unlimited access to raw materials; (4) the freedom of circulation of personnel and products within the Republic of Guinea; (5) the freedom to import goods and services and any necessary funds; and (6) the freedom to dispose of their products on international markets and to export and dispose of products in foreign markets.

100.    Article 22 of the 1995 Mining Code further protects foreign investors against discrimination.

101.    On 7 May 2014, BSGR issued a Notice of Dispute to the Government of Guinea (Exhibit C-25). The Notice of Dispute was addressed to Alpha Conde (President of Guinea), Mohamed Said Fofana (Prime Minister), Kerfally Yansané (Minister of Mines and Geology), Mohamed Diare (Minister of Economy and Finances) and the Embassy of Guinea in the UK. By letter of its counsel dated 15 May 2014, the Government denied any wrongdoing (Exhibit C-26).

## 4.3     A dispute arising directly out of an investment

102.    As described above, this dispute principally concerns the Republic of Guinea's unlawful taking of BSGR's mining investments in Guinea, without adequate or any compensation being provided to BSGR.

103.    The ICSID Convention does not offer any definition or even description of the term "investment". The Guinean Investment Code does not define the term "investment" either. Thus, without a precise definition of "investment" it is appropriate to give the term a broad interpretation.

104.    Between the end of 2005 and 30 April 2010, BSGR has invested, either directly or through BSGR BVI, BSGR Guernsey and BSGR Guinea, over USD 150 million in to

Simandou Zogota and Blocks 1 & 2. BSGR and its subsidiaries conducted substantial exploration activities, drilled hundreds of holes and thousands of meters and prepared feasibility studies for both Zogota (finalized and submitted) and Blocks 1 & 2 (in preparation). The studies resulted, in turn, in the acquisition of the Zogota Mining Concession and the conclusion of the Zogota Mining Convention. Under the Zogota Mining Concession and the Zogota Mining Convention, BSGR secured the right to exploit one of the best iron ore desposits in the world for a period of 25 years. In return, BSGR undertook to invest over USD 2.5 billion in the construction of an open-pit mine, a 102 km railway, a port, a hospital, living quarters and so forth and an additional USD 1 billion in the refurbishment of the Conakry-Kankan railway.

105. Following the sale to Vale of a 51% shareholding in (then) BSGR Guernsey, now VBG Guernsey, BSGR continued to invest in both Simandou Zogota and the Blocks 1 & 2. On 31 December 2012, its total investment exceeded USD 185 million, including the USD 150 million referred to in the previous paragraph.

106. Today, BSGR remains a 49% shareholder of VBG Guernsey, the intermediate company that directly holds 100% of the shares in VBG Guinea. Also this shareholding constitutes an investment in the context of the ICSID Convention and the Guinean Investment Code.

107. BSGR's investment not only consists of mining titles, financial contributions and the holding of shares. It also consists of the technical and technological means that were devoted to both Simandou Zogota and Blocks 1 & 2. Simandou's challenging location, about 700 km from Guinea's coast, means that it will cost at least USD 10 billion to exploit. While it is undisputed that Mount Simandou contains one of the best and largest known iron deposits in the world, it is also considered to be one of the most difficult deposits to be extracted, being covered by a mountain. Considering those difficulties, these operations were from the outset time intensive, costly and, of course, risky.

## 4.4    Consent

108.    The Government of Guinea has consistently consented to submit its investment disputes to the jurisdiction of ICSID.

109.    Article 28 (2) of the Guinean Investment Code provides as follows:

> "[…] les différends entre l'Etat Guinéen et les ressortissants étrangers, relatifs à l'application ou l'interprétation du présent code, sont, sauf accord contraire des parties en cause, définitivement réglés par arbitrage conduit conformément aux dispositions de la convention du 18 mars 1985 pour le « Règlement des différends relatifs aux investissements entre Etats et ressortissants d'autres Etats » établie sous l'égide de la Banque Internationale pour la Reconstitution et le Développement, ratifiée par la République de Guinée le 4 novembre 1986 …"

> [English Translation: "[…] disputes between the Guinean government and foreign nationals regarding the application or interpretation of this Code, shall, unless otherwise agreed by the parties, be finally settled by arbitration conducted in accordance with the provisions of the Convention of 18 March 1985 for the "Regulation of Investment Disputes between States and Nationals of other States" established under the auspices of the International Bank for Reconstruction and Development, ratified by the Republic of Guinea November 4, 1986 …"]

110.    Article 184 of the 1995 Mining Code provides as follows:

> "Les différends opposant un ou plusieurs investisseurs miniers à l'État et relatifs à l'étendue de leurs droits et obligations, à l'exécution ou l'inexécution de leurs engagements à la fin de leurs titres, à la cession, la transmission ou à l'amodiation de leurs droits qui en résultent peuvent être soumis à la procédure de règlement amiable.

> Si une des parties estime que la procédure amiable a échoué, le différend est porté soit devant les tribunaux guinéens compétents soit à l'arbitrage international conformément aux dispositions de la convention du 18 Mars 1965 pour le règlement des Différends relatifs aux investissements entre États et ressortissants d'autres États, établie sous l'égide de la Banque Internationale pour la Reconstruction et le Développement. "

> [English translation: "Disputes between one or several mining investors and the State with regard to the extent of their rights and obligations, the performance or non-performance of their undertakings at the end of their titles, assignment, transfer, or subleasing of their rights arising therefrom may be subjected to an amicable settlement procedure.

> If one of the parties feels that the amicable settlement has failed, the dispute is to be brought before either the appropriate Guinean court or international arbitration in accordance with the agreement of March 18

*1965 for the settlement of disputes with respect to investments between States and nationals of other States, established under the aegis of the Banque Internationale pour la Reconstruction et de Développement."]*

111.    Also the Zogota Mining Convention and the Zogota MOU, which are both signed by the Government, provide for the settlement of disputes arising thereunder by arbitration under the ICSID arbitration clause (Article 38(2) of the Zogota Mining Convention and Article 6(5) of the Zogota MOU).

112.    By letter dated 15 March 2013, BSGR informed the Government of Guinea and the Secretary General of ICSID that it was an investor and that it accepted Guinea's offer to arbitrate any dispute with Guinea under the ICSID Convention (Exhibit C-27). In any event, BSGR reconfirms its acceptance of Guinea's offer to arbitrate its disputes in accordance with the ICSID Convention by bringing this Request for Arbitration.

## 5.    **RELIEF SOUGHT**

113.    BSGR seeks the following relief:

   i)      a provisional measure ordering the Republic of Guinea not to tender BSGR's withdrawn mining titles or otherwise award those titles or a part thereof to a third party during the pendency of the present proceedings;

   ii)     a declaration that the Republic of Guinea's withdrawal of the Blocks 1 & 2 Permit, the Zogota Mining Concession and the Zogota Mining was illegal and unlawful;

   iii)    specific performance, by reinstituting the Blocks 1 & 2 Permit, the Zogota Mining Concession and the Zogota Mining Concession, alternatively damages in the amount to be determined in the course of these proceedings;

   iv)     moral damages in the amount to be determined in the course of these proceedings;

   v)      an order compelling the Republic Government of Guinea to (1) have an accurate summary of the award published in the Financial Times, on A-3 format, within 30 days of the date of the award and at the expense of the Republic of Guinea and (2) to submit the summary for approval to BSGR 15 days before publication. Failing an agreement between BSGR and the

> Republic of Guinea on the text of the summary, the summary will be determined by the Tribunal;

vi)　pre and post award interest on any amount to be paid in accordance with ii) and iii) here-above;

vii)　the costs of these proceedings and the legal fees; and

viii)　all other relief that the Tribunal deems appropriate.

114.　BSGR reserves its rights to supplement or otherwise amend its claims and the relief requested in connection therewith in the course of these proceedings.

## 6.　PROCEDURAL ISSUES

115.　BSGR proposes a three member Tribunal appointed in accordance with the following method of appointment:

(1)　Appointment of one arbitrator by the Claimant within 20 days of the registration of the Request for Arbitration;

(2)　Appointment of one arbitrator by the Respondent within 20 days from the appointment of the Claimant's party-appointed arbitrator;

(3)　Appointment of the third arbitrator, who shall be the president of The Tribunal, jointly by the two party-appointed arbitrators within 30 days from of the appointment of the Respondent's party-appointed arbitrator and after having consulted the parties;

(4)　In the event that a party fails to appoint its arbitrator or the two party-appointed arbitrators are unable to reach agreement on the identity of the third arbitrator within the time limits specified above, the Chairman of the ICSID Administrative Council shall appoint the arbitrator or arbitrators not yet appointed.

116.　BSGR proposes to conduct the proceedings in English and hold the proceedings in London or Paris.

**Signed**

Mishcon de Reya

**Mishcon de Reya**

Submitted for and on behalf of BSG Resources Limited

1 August 2014

Mishcon de Reya Solicitors
Summit House
12 Red Lion Square
WC1R 4QD London
Tel: +44 (0) 20 7440 7060
Fax: +44 (0) 20 7831 3487