**EXHIBIT 8**

**IN THE MATTER OF AN ARBITRATION**

**UNDER THE RULES OF ARBITRATION OF THE INTERNATIONAL CENTRE**

**FOR SETTLEMENT OF INVESTMENT DISPUTES**

**(1) BSG RESOURCES (GUINEA) LIMITED**

**(2) BSG RESOURCES (GUINEA) SÀRL**

**Claimants**

- v -

**THE REPUBLIC OF GUINEA**

**Respondent**

_____

**REQUEST FOR ARBITRATION**

_____

**Karel Daele**
**James Libson**
**Mishcon de Reya LLP**
**Africa House**
**70 Kingsway**
**WC2B 6AH**
**London**
**Tel: +44 (0) 203 321 7060**
**Fax: +44 (0) 203 761 1856**

## CONTENTS

I.      INTRODUCTION ..................................................................................................4

II.     THE PARTIES ......................................................................................................5

2.1     The Claimants.......................................................................................................5

2.2     The Respondent ....................................................................................................6

III.    STATEMENT OF THE NATURE AND CIRCUMSTANCES OF THE DISPUTE
        GIVING RISE TO THE CLAIMS........................................................................8

3.1     Introduction ..........................................................................................................8

3.2     The geographical areas in question.....................................................................11

3.3     The Guinean opportunity.....................................................................................12

3.4     Investment in Simandou North and Simandou South...........................................13

3.5     Application for and grant of Blocks 1 and 2 Permit ............................................14

3.6     The Base Convention and the Zogota Mining Concession…................................15

3.7     Joint Venture with Vale……...............................................................................17

3.8     Further investments in relation to Zogota and Blocks 1 and 2 .............................19

3.9     The election of Alpha Condé and the campaign against the Claimants .................20

3.10    The Technical Committee "investigation"…….....................................................25

3.11    The end game………………………………………...........................................27

3.12    Expropriation of the mining and infrastructure rights………… ..........................30

3.13    The Measures were politically motivated…........................................................32

IV.     BREACHES OF THE BASE CONVENTION ....................................................35

4.1     Protections offered by the Base Convention........................................................35

4.2     Summary of breaches of the Base Convention ....................................................38

4.3     Reservation .........................................................................................................41

V.      BREACHES OF THE INVESTMENT CODE ...................................................41

5.1     Protections offered by the Investment Code........................................................41

5.2     Summary of breaches of the Investment Code ....................................................42

5.3     Reservation .........................................................................................................43

VI.     BREACHES OF THE MINING CODE ..............................................................43

6.1     Protections offered by the Mining Code..............................................................43

6.2     Summary of breaches of the Mining Code ..........................................................45

6.3     Reservation .........................................................................................................46

VII.     **BREACHES OF THE BOT ACT** ...................................................................**46**

7.1     The Base Convention constitutes a BOT agreement ................................. 46

7.2     Protections offered by the BOT Act ......................................................... 51

7.3     Summary of breaches of the BOT Act ...................................................... 51

7.4     Reservation ............................................................................................... 53

VIII.   **BREACHES OF INTERNATIONAL LAW** ...........................................**53**

IX.     **RELIEF SOUGHT BY THE CLAIMANTS** ............................................**54**

X.      **ICSID JURISDICTION** ..........................................................................**56**

10.1    This dispute is a legal dispute .................................................................. 57

10.2    This dispute arises directly out of an investment..................................... 57

        a.       Mining Code.................................................................................... 58

        b.       Investment Code.............................................................................. 59

        c.       BOT Act. ......................................................................................... 60

        d.       Base Convention ............................................................................. 61

10.3    This dispute is between a contracting state and a national of another contracting state............. 61

10.4    The Parties have consented in writing to ICSID Arbitration .................... 63

        a.       Base Convention ............................................................................. 63

        b.       Investment Code.............................................................................. 65

        c.       Mining Code.................................................................................... 66

        d.       BOT Act .......................................................................................... 67

XI.     **CONSTITUTION OF THE ARBITRAL TRIBUNAL** ...........................**67**

## I.   **INTRODUCTION**

1.   This Request for Arbitration is submitted on behalf of:

> (1)   BSG Resources (Guinea) Limited ("**BSGR Guernsey**"); and

> (2)   BSGR Resources (Guinea) Sàrl ("**BSGR Guinea**"),

together, the "**Claimants**".

2.   BSGR Guernsey and BSGR Guinea hereby request arbitration against the Republic of Guinea ("**Guinea**", "**the Republic of Guinea**" or the "**Respondent**") under the Arbitration Rules of the International Centre for Settlement of Investment Disputes ("**ICSID**") and in accordance with (i) Articles 25 and 36 of the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "**ICSID Convention**") and (ii) Rules 1 and 2 of the Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings (the "**ICSID Institution Rules**").

3.   The Claimants' request is made pursuant to each of the following:

> (i)   Article 38 of the "*Convention de Base entre La Republique de Guinee et BSGR Resources Pour l'Exploitation des Gisements de Minerai de Fer a Zogota/N'Zerekore*" (the "**Base Convention**") dated 16 December 2009 made between (i) Guinea, (ii) BSGR Guernsey and (iii) BSGR Guinea[1];

> (ii)   Article 184 of the 1995 Guinean Mining Code (the "**Mining Code**")[2];

> (iii)    Article 28(2) of the 1987 Guinean Investment Code (as amended in 1995) (the "**Investment Code"**)[3]; and

---

[1] Base Convention between the Republic of Guinea and BSG Resources (Guinea) Limited and BSG Resources (Guinea) SARL dated 16 December 2009 (Exhibit C-1).
[2] Mining Code of the Republic of Guinea dated 30 June 1995 (Exhibit CL-1).
[3] Investment Code of the Republic of Guinea 1987 amended 30 June 1995 (Exhibit CL-2).

(iv)    Article 13(2) of the Act on the Financing, Construction, Exploitation, Maintenance and Transfer of Development Infrastructures by the Private Sector (the "**BOT Act**").[4]

4.    The underlying background facts giving rise to this arbitration also give rise to a claim brought by the Claimants' parent company in ICSID Case No. ARB/14/22, *BSG Resources Limited* ("**BSGR**") v. *Guinea* (the "**First ICSID Arbitration**"). The Claimants in this arbitration, and BSGR as Claimant in the First ICSID Arbitration, will in due course make an application for the consolidation of this arbitration and the First ICSID Arbitration.

## II.    THE PARTIES

## 2.1    The Claimants

5.    **BSGR Guernsey** is a company incorporated in accordance with the laws of Guernsey and with its registered office in Guernsey, West Wing Frances House, Sir William Place St Peter Port Guernsey GY1 1GX.[5]

6.    **BSGR Guinea** is a company incorporated in accordance with the laws of Guinea, registered in the Registre du Commerce et du Credit Mobilier de Guinée under number RCCM/GC-KAL/013.755A/2006 of 24 November 2006 and with its registered offices at Immeuble Bleu, 5ème étage Résidence 2000, Moussoudougou-C/Matam, Conakry, Republic of Guinea, Post Box 6389.[6]

7.    The Claimants hereby appoint Karel Daele and James Libson at Mishcon de Reya LLP as their counsel in this arbitration and authorise them to submit this Request for

---

[4] Guinea Act L/97/012/AN *on the Financing, Construction, Exploitation, Maintenance and Transfer of Development Infrastructures by the Private Sector* dated 1 June 1998 (Exhibit CL-3).
[5] Deed of Incorporation dated 10 February 2009 (Exhibit C-2).
[6] Deed of Incorporation dated 16 November 2006 (Exhibit C-3).

Arbitration, and to take all other steps necessary for the prosecution of this proceeding. A specific Power of Attorney evidencing the same is attached.[7]

8.    All communications intended for the Claimants in connection with this arbitration should be directed to its counsel:

**Karel Daele**
**James Libson**
**Mishcon de Reya LLP**
**Africa House**
**70 Kingsway**
**WC2B 6AH**
**London**
**Tel:  +44 (0) 203 321 7060**
**Fax: +44 (0) 203 761 1856**
E-mail: Karel.Daele@Mishcon.com; James.Libson@Mishcon.com

9.    BSGR Guernsey and BSGR Guinea are each members of the BSGR group of companies (referred to as the "**BSGR group**" herein), an international diversified mining group with operations in multiple countries.

## 2.2    **The Respondent**

10.    The Respondent in this arbitration is Guinea.

11.    To the best of the Claimants' knowledge and belief, communications intended for Guinea in connection with this arbitration should be directed to the Government of Guinea using the following contact details:

(i)    President Alpha Condé
Présidence de la Republique
Le Palais Sékhoutouréya
Conakry, République de Guinée

(ii)    Monsieur Mohamed Said Fofana
Premier Ministre
Chef du Gouvernement

---

[7] Power of Attorney of BSG Resources (Guinea) Limited dated 6 October 2015 (Exhibit C-4); Power of Attorney of BSG Resources (Guinea) SARL dated 6 October 2015 (Exhibit C-5).

Cite des Nations
Conakry, République de Guinée

(iii)   Ministre Kerfalla Yansané
Ministére des Mines de la Géologie (MMG)
Immeuble OFAB-CBG
Almamya Kaloum
BP 295 Conakry, République de Guinée
Fax: +224 30 41 49 13

(iv)   M. Ministre de L'Economie et des Finances
Mohamed Diare
Bd. du Commerce, Boulbinet, Kaloum
BP 579 Conakry, République de Guinée
E-mail: mef.mdb@gov.gn

(v)   The Secretariat of the Republic of Guinea
Guinean Embassy
42 Upper Berkeley Street
London, W1H 5PW
United Kingdom
E-mail: ambaguilondres@mae.gov.gn

12.   To the best of the Claimants' knowledge and belief, Guinea is represented in the disputes in this arbitration by Orrick Herrington & Sutcliffe LLP and DLA Piper France LLP, co-counsel to Guinea in the First ICSID Arbitration.   Their contact details are as follows:

(i)   Laurent Jaeger, Pascal Agboyibor, Noël Chahid-Nourai, Yann Schneller and Quirec de Kersauson
Orrick Herrington & Sutcliffe LLP
31 Avenue Pierre 1er de Serbie
75782 Paris Cedex 16
France
Tel: +33 (0) 1 53 53 75 00
Fax: +33 (0) 1 53 53 75 01
Email: ljaeger@orrick.com; pagboyibor@orrick.com; nchahidnourai@orrick.com; yschneller@orrick.com; and qdekersauson@orrick.com

(ii)   Michael Ostrove, Scott Horton, Theobald Naud and Sârra-Tilila Bounfour
DLA Piper France LLP
27 rue Laffitte
75009 Paris
France

7

Tel: +33 1 40 15 24 00
Fax: +33 1 40 15 24 01
Email: michael.ostrove@dlapiper.com; scott.horton@dlapiper.com;
theobald.naud@dlapiper.com; and sarra-tilila.bounfour@dlapiper.com

## III.    STATEMENT OF THE NATURE AND CIRCUMSTANCES OF THE DISPUTE GIVING RISE TO THE CLAIMS

### 3.1    Introduction

13.    In summary, the Claimants and their investments have been treated in an unlawful, unfair, inequitable and discriminatory manner by Guinea and in a manner which demonstrated a blatant disregard and breach of both (i) the express undertakings the State itself had provided directly to the Claimants; and (ii) applicable Guinean and international law.

14.    At the heart of this case is the unlawful and forcible withdrawal and revocation of certain highly valuable investments held by the Claimants in Guinea, comprised in particular of the following vested rights:

(i)    An iron ore mining concession granted to BSGR Guinea on 19 March 2010 over an area of 1,024 square kilometres on Mount Younon in Simandou South, near the village of Zogota (the "**Zogota Mining Concession**")[8];

(ii)    A mining and infrastructure agreement dated 16 December 2009 entered into by the Claimants with the Republic of Guinea regarding largely (though not exclusively) the rights and obligations arising from the Zogota Mining Concession (the "**Base Convention**")[9];

(iii)    A prospecting permit granted to BSGR Guinea over an area referred to as Simandou Blocks 1 and 2 (covering an area of 369 square kilometres in the prefecture of Kérouané) granted on 9 December 2008, giving rise to (i) an exclusive right to prospect for iron ore and (ii) a right to develop and operate

---

[8] Ordinance No.003/PRG/CNDD/SGG/2010 dated 19 March 2010 (Exhibit C-6).
[9] Exhibit C-1.

the area (by way of operating permit or mining concession) upon completion of a feasibility study (the "**Blocks 1 and 2 Permit**")[10].

15.    Those and other vested rights were expropriated by the Republic of Guinea, principally by means of three executive orders: (i) a Presidential Order dated 17 April 2014 terminating the Zogota Mining Concession[11], (ii) a Ministerial Order dated 18 April 2014 terminating the Blocks 1 and 2 Permit[12] and (iii) a Ministerial Order dated 23 April 2014 terminating the Base Convention.[13] The effect of these acts of expropriation was to strip BSGR Guinea of all of its relevant assets. Thus, as a further consequence, BSGR Guernsey's 100% shareholding in BSGR Guinea, which represented a valuable investment made by BSGR Guernsey in Guinea, was similarly expropriated.

16.    The expropriation of those rights was without justification and the Claimants are entitled to be compensated (and to the other relief claimed herein) for the loss of those vested rights.

17.    The purported justification for this unlawful expropriation was given in a report of a committee (the "**Technical Committee**") dated 21 March 2014 (the "**Technical Committee Report**").[14]   The Technical Committee had been established by the current President, Mr Alpha Condé, to investigate allegations of corruption against the BSGR group. The Report recommended the withdrawal of the vested rights identified above on the putative basis that those rights had allegedly been obtained by corruption. In particular, the Technical Committee Report incorrectly alleged that the BSGR group had obtained the rights enumerated above by bribing Ms Mamadie Touré, the alleged fourth wife of a former President (General Lansana Conté). General Conté was the President of Guinea from 5 April 1984 until his death on 22 December 2008.

18.    However, the process adopted by the Technical Committee when investigating the allegations made against the BSGR group and in producing its report was

---

[10] Decree No 2008/4980/MMG/SGG dated 9 December 2008 (Exhibit C-7).
[11] Decree D 2014/098/PRG/SGG dated 17 April 2014 (Exhibit C-8).
[12] Decree No. A 2014/1204/MMG/SGG dated 18 April 2014 (Exhibit C-9).
[13] Decree No. A 2014/1206/MMG/SGG dated 23 April 2014 (Exhibit C-10).
[14] Technical Committee Report dated 21 March 2014 (Exhibit C-11).

fundamentally flawed and involved a violation of both Guinean and international standards of due process. Further, and in any event, the allegations made by the Technical Committee and its putative "recommendations" were and are demonstrably false and provided no basis whatsoever for the expropriation that took place in April 2014.

19. What is more, at the time of the entry into the Base Convention on 16 December 2009 and the granting of the Zogota Mining Concession on 19 March 2010, President Conté had been dead for over a year and Ms Touré (who was not in any case his fourth wife) was living in Sierra Leone, having fled following a military coup by Captain Moussa Dadis Camara. Ms Touré had no possible influence at that (or any other) time.

20. As regards the Blocks 1 and 2 Permit granted on 9 December 2008, there was similarly no credible evidence put forward by the Technical Committee to support its allegation that this was obtained by corruption, and it is demonstrably untrue.

21. Even if one goes further back in time (as the Technical Committee purported to do in its Report) to the granting of earlier mining rights to the BSGR group (known as the Simandou North Permits and the Simandou South Permits), there is no substance at all to the Technical Committee's allegations.

22. Guinea's conduct in or around April 2014 resulted in the expropriation, without compensation, of the Claimants' investments in Guinea, including their very substantial and valuable mining and infrastructure rights and the valuable investments that BSGR Guernsey had made in Guinea via its 100% shareholding in BSGR Guinea.

23. The Claimants have therefore brought this arbitration in order to obtain protection from and compensation for Guinea's unlawful conduct, and in particular for the violation of its duties and obligations under (i) the Guinean Investment Code, (ii) the Guinean Mining Code, (iii) the BOT Act, (iv) the Base Convention and (v) international law. The Claimants have suffered and continue to suffer very significant

losses as a result of Guinea's unlawful conduct. In these proceedings, the Claimants therefore seek all available relief in respect of that unlawful conduct.

### 3.2    The geographical areas in question



24.    The mining rights and agreements in question in this arbitration covered two geographical areas in particular:

(i)      "Simandou North and Simandou South" shown in the map above as Simandou-South Zogota. This included (in Simandou South) an area on Mount Younon, near the village of Zogota which became known as the Zogota Project; and

(ii)     An area referred to herein as "Simandou Blocks 1 and 2" shown in the map above as Block 1 and Block 2.

**3.3**    **The Guinean opportunity**

25.    By 2005, the BSGR group had assembled a significant and diverse portfolio of mining and metal assets and, in Africa, had invested in South Africa, Sierra Leone, Zambia and the DRC.  It had developed a reputation as an ambitious and accomplished investor in the African natural resources market.

26.    BSGR learned that large iron ore resources were thought to exist in the Simandou region of Guinea. However, no survey had ever identified the precise locations of these deposits.

27.    BSGR, through its subsidiary BSGR Guinea BVI, set about preparing its application for prospecting permits over areas of Simandou North and Simandou South. Prospecting permits (also known as research permits or exploration permits) conferred on the holder the exclusive right to conduct exploratory (i.e. prospecting) work over the area they covered. They did not confer a right to mine any deposits which were discovered. The application process was governed by Guinea's 1995 Mining Code.

28.    On 6 February 2006 the then Minister of Mines, Dr Ahmed Tidiane Souaré, issued two ministerial orders:

   (i)    The first order granted BSGR Guinea BVI four prospecting permits covering 2047 square kilometers in the prefectures of Beyla, Macenta, Nzérékoré and Yomou (the "**Simandou South Permits**")[15];

   (ii)    The second order granted BSGR Guinea BVI three prospecting permits covering 1286 square kilometers in the prefecture of Kérouané (the "**Simandou North Permits**")[16].

29.    On 20 February 2006 the BSGR group, through its BVI entity, entered into a Memorandum of Understanding with Guinea, which set out the framework for the

---

[15] Decree No. 2006/706/MMG/SGG dated 6 February 2006 (Exhibit C-12).
[16] Decree No. 2006/707/MMG/SGG dated 6 February 2006 (Exhibit C-13).

parties' co-operation (the "**MOU**").[17]   The BSGR group committed to carrying out a Feasibility Study within 30 months of the date on which the prospecting permits were granted. The Feasibility Study was to include a detailed analysis of the infrastructures required, including communication networks, export facilities and the supply of electricity. Guinea, in turn, undertook to grant BSGR a mining concession within six months of the completion of the Feasibility Study, provided that BSGR had complied with the relevant regulations of the Mining Code.

### 3.4    <u>Investment in Simandou North and Simandou South</u>

30.    BSGR then began to plan its exploration programme. In November 2006, BSGR Guinea was established as a local company in Guinea and a 100% subsidiary of BSGR Guernsey. All its activities were conducted out of the company office in Quartier Minière, Conakry.

31.    An exploration camp was established in Kérouané in late 2006 and geological mapping and drilling activities were commenced in Simandou North. Several contractors were engaged, including (i) MSA Geological Consultants, a well-known South African company, to conduct detailed field mapping and (ii) Fugro Airborne Surveys (Pty) Limited to conduct airborne geophysical surveys of the areas covered by its prospecting permits.

32.    Initial fieldwork in 2007 in Simandou South resulted in the discovery of an iron ore deposit on Mount Younon, near the village of Zogota. This became known as the Zogota Project. Consequently, it was decided to cease exploration work in Simandou North (as the initial drilling results were not encouraging) and to move the staff and equipment onto the Zogota Project.  A second exploration camp was established in N'Zérékoré (about an hour and a half's drive from Zogota).

33.    Foraco (a French drilling company) and another company, Geoprospects Ltd, were contracted to carry out the drilling activities in Zogota. An additional camp was set up

---

[17] Memorandum of Understanding between the Republic of Guinea and BSG Resources (Guinea) Limited (incorporated in the British Virgin Islands and the predecessor of BSGR Guernsey) dated 20 February 2006 (Exhibit C-14).

in Simandou South, much closer to the drilling sites, in order to expedite progress on the Zogota Project.

34.    Foraco's and Geoprospects' work continued through 2008 and 2009 and a total of 180 holes and 16,173 metres were drilled.  In accordance with the Mining Code and the terms of the relevant permits, monthly activity reports were submitted to the CPDM throughout this period and the BSGR group worked towards the completion of a Feasibility Study in respect of the Zogota Project.

**3.5    Application for and grant of Blocks 1 and 2 Permit**

35.    On 28 July 2008, the Republic of Guinea withdrew the mining rights on Simandou Blocks 1 to 4 from Rio Tinto's subsidiary Simfer S.A ("**Simfer**").[18] These areas therefore became available to other interested mining companies, including BSGR.

36.    On 5 August 2008, BSGR Guinea submitted an application for a prospecting permit in respect of Simandou Blocks 1, 2 and 3.  At least two other companies (AfriCanada and a Chinese company) also submitted applications.

37.    On 9 December 2008, the Minister of Mines at the time, Dr Loucény Nabé, issued a decree granting BSGR Guinea a prospecting permit over Simandou Blocks 1 and 2, covering an area of 369 square kilometres in the prefecture of Kérouané (the "**Blocks 1 and 2 Permit**")[19].

38.    The validity of the Blocks 1 and 2 Permit, issued by Minister of Mines Nabé under the presidency of the deceased General Lansana Conté, was confirmed by the regime that succeeded General Conté, i.e. by President Captain Camara and his Minister of Mines Mr Thiam:

(i)    on 21 January 2009 BSGR Guinea applied to renew the Simandou North Permits and Simandou South Permits. 50% of each of Simandou South and

---

[18] Withdrawal decision D/2008/041/PRG/SGG dated 28 July 2008 (Exhibit C-15).
[19] Exhibit C-7.

Simandou North was retroceded, as required by the Mining Code. The renewal of these permits was granted by Minister Thiam on 10 June 2009. [20]

(ii)     on 5 May 2009, Minister Thiam issued a certificate confirming the validity of the Blocks 1 and 2 Permit.   BSGR Guinea therefore commenced work on its drilling programme for Blocks 1 and 2 in May 2009. [21]

### 3.6     The Base Convention and the Zogota Mining Concession

39.     Meanwhile, BSGR and the Claimants continued to work towards the completion of the Feasibility Study in respect of the Zogota Project. After much hard work, the Feasibility Study was completed and submitted to the CPDM on 16 November 2009.[22] Running to some 450 pages, it demonstrated the existence of a commercially operational iron ore deposit at Zogota. It was the first such Feasibility Study ever to be submitted to the CPDM.

40.     The CPDM conducted an initial review of the Feasibility Study and recommended to the Ministry of Mines that BSGR and its subsidiaries be invited to commence negotiations for a mining and infrastructure agreement. On 1 December 2009 Minister Thiam established a Commission to conduct these negotiations.[23]

41.     The Commission consisted of 20 members from numerous governmental departments, the Central Bank and the National Company of Mining Infrastructure.  Mr Avidan and Mr Struik led the negotiations on behalf of BSGR. The Commission met every day from around 9am to 6pm, and met with BSGR on several of those days. BSGR paid for the catering during these negotiations and also paid each member of the Commission a daily allowance, in line with standard practice.

42.     It was very important to the BSGR group to obtain permission from Guinea to export iron ore through Liberia. Given the proximity of the Zogota Project to the Liberian

---

[20] Decree No. A 2009/1327/PR/MMEH/SGG dated 10 June 2009 (Exhibit C-16).
[21] Certificate of Validity of Permit dated 5 May 2009 (Exhibit C-17).
[22] Letter from BSGR Guinea to the Government of Guinea enclosing Feasibility Study dated 16 November 2009 (Exhibit C-18).
[23] Decree No. A 2009/3466/PRG/SGG/MMEH dated 1 December 2009 (Exhibit C-19).

border, and the existence of rail and port infrastructure in Liberia, the project's economic viability depended upon the ability to export the iron ore mined at Zogota from Liberia, rather than from Guinea.  The exportation of iron ore from Zogota through Liberia added an important infrastructure component to the deal with Guinea. This component included inter alia (i) the construction of a 102 km heavy cargo railway between the mine in Zogota and the village of Sanniquellie on the border with Liberia (the "**Sanniquellie railway**"), (ii) the rehabilitation of the existing cargo railway between Sanniquellie and the port of Buchanan on the Liberian coast and (iii) the rehabilitation of the port of Buchanan. In addition, BSGR agreed to reconstruct the 600 km passenger and light cargo railway between Conakry and Kankan (the "**Trans-Guinean railway**"). The details of this infrastructure agreement formed part of the negotiations of the Base Convention.

43.     In return for also granting the right to export through Liberia the iron ore from Blocks 1 and 2 (should a mining concession later be granted for those areas), BSGR also agreed to extend the Trans-Guinean railway with another 200 km, to the city of Kérouané. To be able to export the expected additional 30 million tons of iron ore from Blocks 1 and 2, additional infrastructure works were also agreed, including (i) the construction of a heavy cargo railway between Blocks 1 and 2 and Sanniquellie, (ii) the construction of a second heavy cargo railway between Sanniquellie and the port of Buchanan and (iii) the construction of a new deep-sea port southeast of Buchanan.

44.     The Base Convention was signed on 16 December 2009.  It constituted a "*mining agreement*" for the purposes of the Mining Code and *"BOT agreement"* for the purposes of the BOT Act. The Base Convention defined the rights and obligations of the respective parties thereto and the conditions on which BSGR's mines would be operated.  In the words of Article 11 of the Mining Code, it was a "*guarantee to the mine title holder that these conditions will remain unvaried*".  It also specified the terms on which BSGR Guinea was entitled to operate within the Zogota Mining Concession, including with regard to commercial production of iron ore and its sale.

45.     The Base Convention also spelt out the scale of the investments to be made by the BSGR group, over two "phases", and which included, in Phase I, the building of (i) an

16

open cast iron ore mine at Zogota; (ii) the construction of the Sanniquellie railway; (iii) the reconstruction of 50% of the Trans-Guinean railway; and (iv) the construction of an industrial area at Zogota. In Phase II, BSGR was required to (v) construct a new railway from Blocks 1 and 2 to Sanniquellie; (vi) construct a second railway between Sanniquellie and Buchanan in Liberia; (vii) develop a new port southeast of Buchanan and (viii) complete the rehabilitation of the Trans-Guinean railway between Conakry and Kankan and (ix) extend the Trans-Guinean railway from Kankan to Kérouané.

46.    BSGR Guinea was also required to submit a Feasibility Study in respect of Blocks 1 and 2 within 24 months of the date of signature of the Base Convention. The conclusions and terms of the Feasibility Study would facilitate the negotiations for the grant of a mining concession over Blocks 1 and 2. By Articles 11 and 12 of the Base Convention, the BSGR group, and BSGR Guinea in particular, undertook to invest billions of dollars in *inter alia* the construction of the Zogota mine and the Trans-Guinean railway.

47.    On 19 March 2010, Guinea's new President, General Sékouba Konaté:

(i)    ratified the Base Convention by Presidential Decree;[24] and

(ii)    granted BSGR Guinea a mining concession in relation to the Zogota deposit (an area of 1,024 square kilometres within Simandou South), in accordance with Article 8 of the Base Convention.[25]

## 3.7   Joint Venture with Vale

48.    The award of the Blocks 1 and 2 Permit had dramatically increased the size of the iron ore project in Guinea, and the investment needed to sustain it had increased correspondingly. Thus, the BSGR group began to look for a joint venture partner in April 2009.

---

[24] Exhibit C-6.
[25] Exhibit C-1.

49.  After a number of prospective partners were deemed unsuitable, the BSGR group eventually entered into negotiations with Vale in February 2010 regarding the creation of a joint venture and in particular, the potential sale to Vale of a stake in BSGR Guernsey.

50.  On 19 March 2010 Minister Thiam wrote to Vale, stating that the Government of Guinea welcomed the proposed joint venture and assuring Vale that BSGR held legal rights through a duly obtained mining concession.[26]

51.  On 16 April 2010, BSGR informed the Ministry of Mines that negotiations regarding a joint venture with Vale were taking place.  BSGR explained that "*the intention is that the Joint Venture will involve the purchase by Vale of a share of 51% in BSG Resources (Guinea) Limited and, consequently, an indirect share in BSG Resources (Guinea) SARL*". The letter explained that although no formal approval was required under the terms of the Mining Code or the Base Convention, both BSGR and Vale agreed that the obtaining of such approval for the implementation of the joint venture was an important element in its success.

52.  The Ministry of Mines confirmed, by countersigning BSGR's letter on the same day, that it had no objection to the proposed joint venture and specifically the acquisition of a 51% share of the share capital of BSG Resources (Guinea) Limited.[27]

53.  During this time the parties negotiated the detailed terms of a Framework Agreement and a Shareholders' Agreement, which were signed on 30 April 2010. This involved the purchase by Vale of a 51% stake in BSGR Guernsey. Vale agreed to pay a total of USD 2.5 billion for the stake, of which USD 500 million was paid immediately and the USD 2 billion balance was to be paid as and when contractually agreed milestones had been met.

54.  BSGR Guernsey was renamed "*VBG – Vale BSGR (Guinea) Guernsey*" and its subsidiaries were also renamed to reflect the joint venture.

---

[26] Letter from Mahmoud Thiam to Vale dated 19 March 2010 (Exhibit C-20).
[27] Letter from BSGR to Minister of Mines Mahmoud Thiam dated 16 April 2010 with endorsement (Exhibit C-21).

55.     On 14 June 2010 the Guinean Court of First Instance in Conakry formally registered "VBG – Vale BSGR Guinea" as the new name of BSGR Guinea. However, as noted earlier, each company remained as the same corporate entity and, for consistency each will continue to be referred to herein as BSGR Guernsey and BSGR Guinea respectively.

## 3.8   Further investments in relation to Zogota and Blocks 1 and 2

56.     At first, the BSGR group and its joint venture partner Vale were able to perform their obligations under the Base Convention and the Blocks 1 and 2 Permit without obstruction and work progressed quickly.

57.     On 2 July 2010, Minister Thiam directed the Claimants to commence work on the feasibility study in respect of Sanniquellie railway.[28]   On the same day, Minister Thiam also directed to commence work on the feasibility study for the Trans-Guinean railway.[29]

58.     On 25 October 2010 BSGR notified the Ministry of Mines that the name of BSGR Guinea had been changed.  On 1 November 2010 Minister Thiam acknowledged the change and "*wish[ed] the new company great success*".[30]

59.     On 22 November 2010, Ministry of Mines Thiam authorized BSGR Guinea to commence work on the first 40 km of the Trans-Guinean railway.[31]  Following this authorisation, the construction of the first 9km started and studies were commissioned for the following 330 km sections.

60.     Further activities included the completion of further social and environmental studies as well as the construction of camps, maintenance and paving access roads.

---

[28] Order of Service No. 0685/MMG/CAB dated 2 July 2010 (Exhibit C-22).
[29] Notice to Proceed from Ministry of Mines and Ministry of Transport dated 2 July 2010 (Exhibit C-23).
[30] Letter from BSGR to Ministry of Mines dated 25 October 2010 (Exhibit C-24).
[31] Letter from Ministry of Mines and Ministry of Transport to VBG Vale BSGR-Guinea dated 22 November 2010 (Exhibit C-25).

61.     After much hard work, on 14 September 2011 BSGR and its joint venture partner
        submitted a Feasibility Study in respect of Simandou Blocks 1 and 2, just three years
        after BSGR had been granted a prospecting permit in those areas.[32] This was a very
        impressive accomplishment and stood in contrast to Simfer S.A. (a subsidiary of Rio
        Tinto and which was the prior holder of a mining concession in those areas) which
        had failed to produce a feasibility study at all (and to date still have not produced such
        a study). The Feasibility Study demonstrated the existence of commercially
        operational deposits within Simandou Blocks 1 and 2. In accordance with its rights
        under Article 10 of the Blocks 1 and 2 Permit, Article 26 of the Mining Code and
        Article 10.2 of the Base Convention, BSGR Guinea applied for a mining concession
        to be issued.

## 3.9     The election of Alpha Condé and the campaign against the Claimants

62.     President Alpha Condé was confirmed as the new President of Guinea by the Supreme
        Court on 3 December 2010. This followed a challenge to the election result on the
        basis of fraud in some electoral districts. The Claimants' troubles began shortly
        thereafter.

63.     On 8 February 2011, the Claimants' local counsel and others met with President
        Condé and three members of the Ministry of Transportation. At that meeting President
        Condé and the Minister of Transportation, Ahmed Tidiane Traoré, made their position
        clear:

        (i)     President Condé refused to sign the Protocole d'Accord regarding the
                rehabilitation of the Trans-Guinean Railway. President Condé stated that he
                would not sign any final document before a new Mining Code was issued and
                there was an agreement regarding the time and cost of the initiative;

        (ii)    President Condé stated that he would claim 50% of the money that BSGR
                received from Vale under the joint venture agreement. He commented that, "*it*

---

[32] Feasibility Study dated 14 September 2011 (Exhibit C-26).

*is inconceivable that people get rich thanks to assets that should belong to the Guinean people*";

(iii)    Under a new Mining Code, the Government would get 20% free carry with the option to buy (at market value) an additional 15% of all mining projects in the country;

(iv)    All deals signed before the accession of President Condé's government which did not privilege the interests of the Guinean people would be revised and their terms amended; and

(v)    Minister Traoré noted that the USD 1 billion that had been committed to the rehabilitation of the Trans-Guinean railway may not be sufficient, and that BSGR might have to pay the difference, from the money it owed Guinea from the sale of its rights and concessions to Vale.

64.    The new Government's intention to extort money from the Claimants was clear. What followed can best be described as a campaign against the BSGR group and the Claimants fought both on the ground in Guinea and in the international press and which culminated, in April 2014, in the forcible (and predetermined) taking by executive decree of the valuable mining and other rights which the BSGR group and the Claimants had obtained by dint of their hard work and expertise, as outlined above.

65.    On 10 February 2011 the legal adviser to the Ministry of Mines, Momo Sakho, issued a document entitled "*Policy Information for the Guinean Mining Sector*", essentially announcing a shake-up of current mining practices and the intention of the State to take profit from all phases of mining activity.[33]

66.    At two meetings in early February 2011, President Condé demanded a sum of USD 1.25 billion from BSGR to be paid to him. He further threatened to halt the building of the Trans-Guinean railway and withdraw the consent to exporting iron ore through

---

[33] Policy Information for the Guinean Mining Sector dated 11 February 2011 (Exhibit C-27).

Liberia. The demands were made on the wholly unjustified basis that Guinea ought to be entitled to share in the monies the BSGR group had received from Vale for participating in the joint venture. President Condé thought that BSGR had received a sum of USD 2.5 billion from Vale up front for the joint venture (the actual figure was USD 500 million). He wrongly considered that it was appropriate in such circumstances that he (or Guinea) ought to receive 50% of the monies received by BSGR pursuant to that joint venture.

67.    Unsurprisingly, President Condé's demands were rejected by both BSGR and Vale. There was simply no basis whatsoever for Guinea to demand any such payment; or for BSGR to pay it - particularly in circumstances where (i) Guinea had been aware of and had consented to the terms of the joint venture; and (ii) BSGR and its subsidiaries had obtained its rights in full compliance with the Mining Code.

68.    However, the fact that the President was himself prepared to make this demand for payment is significant. It demonstrates that, from the outset, the new government was - from the top down - prepared to make unlawful demands and threats against the BSGR group which had nothing to do with the group's performance or conduct in Guinea; but everything to do with the value extracted from its investments.

69.    Moreover, not only was the President prepared to make threats, but he was also prepared to carry them out. In an effort to explain the background to the joint venture, the BSGR group wrote to the President on 14 March 2011 setting out the benefits that the group's investments would have for Guinea and the reasons behind seeking external investment from a joint venture partner.[34]

70.    Guinea did not respond to this letter.  Rather, it subsequently began an unjustified investigation into BSGR and its subsidiaries. Its unlawful interference with BSGR, its subsidiaries and their individual and collective investments, was clearly linked to the refusal to accede to President Condé's unjustified demands for payment.

---

[34] Letter from BSGR to the President of Guinea dated 14 March 2011 (Exhibit C-28).

71.   According to the whistle-blower website Mediapart, the subsequent investigations into BSGR were directly linked to its refusal to accede to President Condé's demands for payment:

> *"The Steinmetz Group is certainly in trouble since it refused to put its hand in its pocket to preserve its rights in Simandou. Rio Tinto, which still owns half (but originally owned it in its entirety), has agreed to pay an additional 700 million dollars. It was when BSGR refused, that investigations into its dealings began."*[35]

72.   For example, thereafter:

(i)   On 4 March 2011 the Financial Times reported a senior official from the Ministry of Mines saying *"All contracts will be reviewed and reworked by the beginning of the second half of this year... The government will become a minority shareholder in all mining contracts"*; [36]

(ii)   On 8 April 2011, the Ministry of Transportation wrongfully halted all work on the ground in respect of the Trans-Guinean railway and informed BSGR Guinea that the completion of the railway would be put out to tender;[37]

(iii)   On 9 September 2011 a new mining code was introduced and duly came into force ("the 2011 Mining Code");

(iv)   On 4 October 2011 the Ministry of Mines wrongfully issued a notice to stop all of BSGR Guinea's works in Guinea, bizarrely claiming that they had been initiated "without authorisation" or by a company of which it was unaware named "VALE";[38]

(v)   On 31 October 2011, the Ministry of Mines acknowledged receipt of the Feasibility Study in respect of Blocks 1 and 2 (submitted on 14 September

---

[35] Mediapart *"Guinea, mining paradise that makes the world's mouth water"* dated 7 October 2013 (Exhibit C-29).

[36] Financial Times *"Guinea to review mining licence"* dated 4 March 2011 (Exhibit C-30).

[37] Stop Notice from Ministry of Transport dated 8 April 2011 (Exhibit C-31).

[38] Stop Notice from Ministry of Mines dated 4 October 2011 (Exhibit C-32).

2011). However, notwithstanding (a) that clear notice had been provided to the Ministry of Mines regarding the joint venture between Vale and BSGR; (b) the Ministry's own formal acknowledgment of this (e.g. on 16 April 2010 and 1 November 2010) and (c) the Conakry Court of Appeal Order of 14 June 2010, the Ministry inexplicably stated that it did not recognize the entity which had carried out the Feasibility Study;[39] and

(vi)    On 17 November 2011 the Ministry of Mines wrongfully repeated its earlier unlawful notice to stop the works. In the same document, the Ministry of Mines began to make substantial, detailed and unjustified inquires of the Claimants.[40]

73.    Despite the significant disruption that this caused to its activities, the BSGR group responded to those queries in detail. In a letter to the Minister of Mines dated 28 November 2011, BSGR explained its activities in Guinea and its partnership with Vale and provided access to a data room containing documents supporting that explanation.[41]

74.    On 19 January 2012 the Ministry of Mines wrote again to BSGR, to complain that it had delayed submitting its Feasibility Study on Zogota, despite the fact that the original Feasibility Study had been submitted to the Ministry of Mines in November 2009 and was available in the data room.[42]  Nevertheless, in an attempt to co-operate, BSGR agreed to provide the Feasibility Study again, in hard copy.

75.    On 3 February 2012 BSGR's lawyers, Skadden Arps and Veil Jourde, submitted to the Ministry of Mines four copies of 15 lever arch files comprising 50,000 pages confirming the legality of BSGR Guinea's vested rights in Zogota and Blocks 1 and 2. This was despite the fact that Guinea had already been kept fully abreast of the joint venture agreement. For example, ten hard copies of the complete Zogota Feasibility Study had already been handed over to the CPDM and the Ministry of Mines in

---

[39] Letter from Ministry of Mines dated 31 October 2011 (Exhibit C-33).
[40] Letter from Ministry of Mines to VBG Vale-BSGR dated 17 November 2011 (Exhibit C-34).
[41] Letter from BSGR to Ministry of Mines dated 28 November 2011 (Exhibit C-35).
[42] Letter from Ministry of Mines to BSGR dated 19 January 2012 (Exhibit C-36).

November 2009. Moreover, and notwithstanding that Guinea's requests fell outside of any audit and inspection rights afforded by *inter alia* the Mining Code and the Base Convention, the BSGR group had provided all relevant documents to Guinea in electronic copy in the data room.

76. However, notwithstanding the co-operation which BSGR sought to achieve with the Government, it continued to face disruption to its activities in Simandou, leading it to conclude that the objective of the State was to expropriate its assets.

77. Accordingly, on 28 February 2012, BSGR complained about this interference. It wrote to President Condé, raising its many concerns and calling for the President's personal intervention to "*take every possible measure to remove the obstacles*" faced.[43]   This request was rebuffed: Mohamed Lamine Fofana, the Minister of Mines, replied on 20 March 2012, and accused BSGR of attempting to "*establish privileged communication links*" by writing directly to the President.

## 3.10   The Technical Committee "investigation".

78. Instead of assisting the BSGR group, Guinea did the precise opposite: on 26 March 2012 a National Mining Commission ("**NMC**") was established by Presidential decree.  The NMC was granted the power to examine "*the extension, renewal, lease and cancellation applications for mining titles on the basis of the provisions of the [2011] Mining Code*".[44]

79. This was shortly followed by a further Presidential decree, dated 29 March 2012, dividing the responsibilities of the NMC between two sub-committees:[45]

    i)       the Strategic Committee, which was given responsibility for political and strategic issues related to the overall review programme for Mining Permits and Conventions;  and

---

[43] Letter from BSGR to President of Guinea dated 28 February 2012 (Exhibit C-37).
[44] Decree D/2012/041/PRG/SGG dated 26 March 2012 (Exhibit C-38).
[45] Decree D/2012/045/PRG/SGG dated 29 March 2012 (Exhibit C-39).

ii)     the Technical Committee, which was described as "*the operational arm of the [NMC] concerning the overall continuation, redevelopment or withdrawal [of mining rights]*".  It was responsible for daily activities related to analyses of Mining Permits and Conventions.

80.    On 11 October 2012, Guinea stated that it would not grant BSGR Guinea a right to export the iron ore originating from Simandou Blocks 1 and 2 through Liberia.[46] Guinea gave no justification for the decision, which was a material breach of the Base Convention. In addition, the Feasibility Study had made it clear that the export of ore via Liberia was central to the economic and technical viability of the project.

81.    On 30 October 2012, the Technical Committee wrote to BSGR Guinea (the "**Allegations Letter**").[47]  In that letter, the Technical Committee wrongfully accused the BSGR group of obtaining mining titles by corruption (but without providing disclosure of any of the evidence relied upon). The Technical Committee wrongfully alleged in particular that (i) BSGR Guinea had failed to co-operate with previous requests for information; (ii) the joint venture with Vale was illegal and (iii) that BSGR Guinea had obtained its mining rights by corruption.

82.    Each of the allegations made by the Technical Committee was (and is) demonstrably wrong. For the avoidance of doubt, each and every allegation against the Claimants and the BSGR group as recorded on 30 October 2012 is emphatically denied.

83.    That letter also outlined a procedure for a "*Program of Review of Mining Titles and Agreements*" which was "*intended to detect any irregularities and make these titles and agreements consistent with the provisions of the Mining Code of 2011*". However, the procedure adopted by the Technical Committee (and by Guinea in general) was both (i) unlawful under Guinean law and/or international law; and (ii) devoid of either procedural and/or substantive fairness.  As such, not only was the process of investigation of the spurious allegations against BSGR entirely flawed, the eventual "*recommendations*" made by the Technical Committee itself were unsafe, wrong, and cannot be given any weight.

---

[46] Letter from Government of Guinea to Ricardo Saad of Vale dated 11 October 2012 (Exhibit C-40).
[47] Letter from Technical Committee to BSGR dated 30 October 2012 (Exhibit C-41).

84.    From this stage, the campaign against the BSGR group gathered momentum. The
       Allegations Letter itself stated that:

> *"The CTRTCM intends to maintain the strict confidentiality of this letter
> as well as the allegations appearing in it and the procedures that will
> follow. Nevertheless, any final decision or action by the Government as
> well as any explication of said decision or action will be made public
> upon completion. You are hereby requested to respect this confidentiality
> and avoid any public comments regarding this procedure until its
> conclusion. Failure to do so will be grounds for the CTRTCM to take any
> measure deemed appropriate.*"

85.    Despite this, on 3 November 2012, Tom Burgis of the Financial Times published an
       article based on the contents of the Allegations Letter.  It was clear that the author had
       seen the Allegations Letter before it had even been provided to BSGR or to Mahmoud
       Thiam, who was implicated in the letter.[48]

86.    BSGR responded to the Allegations Letter on 26 December 2012.[49]  In the following
       months, BSGR made multiple requests to the Technical Committee for disclosure of
       the evidence that it purportedly relied upon.   It was not until 7 May 2013, over six
       months after the date of the Allegations Letter, that the Technical Committee first
       provided BSGR with an (obviously incomplete) handful of documents.

## 3.11    **The end game**

87.    The Technical Committee review ran in parallel with a campaign waged by Guinea in
       the local and international press which sought to prejudice BSGR's case.    It also
       evidenced that the process itself had been pre-judged and that it was directed towards
       the specific goal of ousting BSGR. This was apparent even prior to the
       commencement of the review. For example, on 7 February 2012, the Minister of
       Mines, Mohamed Fofana, stated during the Investing in African Mining Indaba
       conference in Cape Town that BSGR "*didn't follow the law*" in reaching a deal with
       Vale.

---

[48] Financial Times article dated 3 November 2012 (Exhibit C-42).
[49] Letter from BSGR to Technical Committee dated 26 December 2012 (Exhibit C-43).

88.     This prejudicial treatment continued and intensified after the Allegations Letter.  By way of example:

(i)      In March 2013, Mr Avidan, the President of BSGR, had been declared persona non grata in Guinea.  He received no formal notice of this.

(ii)     In April 2013, two BSGR employees in Guinea (Mr Bangoura and Mr Touré) were imprisoned without charge and held in appalling conditions.  Mr Bangoura was a security agent and Mr Touré was Director of External Relations. As identified in the evidence that Mr James Libson of Mishcon de Reya LLP gave to the High Court in England, they were subjected to numerous human rights violations committed by Guinea, including the ordeal of being held in prison for seven months without charge (before they were released on bail) during which they were held in appalling conditions.

(iii)    On 14 June 2013, President Alpha Condé was interviewed at Chatham House during a question and answer session entitled "Guinea in Transition: Reform, Resources and Regional Relations".  In response to a question about declaring BSGR's President, Asher Avidan, a persona non grata, Alpha Condé accused BSGR of playing "*a role in some of the political turmoil faced in Guinea at the moment*" and, notwithstanding a hollow reference to remaining "*respectful of the principle of innocent until proven guilty*", commented that "*soon there should be some revelations that will allow more openness into the matter*".

(iv)    On 17 June 2013, in an interview with President Condé for the UK Channel Four News, BSGR was described as Condé's "*bête noire*".  President Condé added that "*I don't see how this deal [the granting of rights to BSGR] is of any benefit to Guinea*".

(v)     On 21 October 2013, Tom Burgis of the Financial Times reported that, "*in his clearest statement of intent to date, Mr Condé declared in a speech at the start*

*of October that his government had "started a battle to recover our mines which were acquired fraudulently."*[50]

89.    Against the above background, Guinea's intention to strip the Claimants of their mining and infrastructure rights had become clear. But any lingering doubts were removed by the public views of President Condé during an interview on 4 November 2013, in which he stated that:

> *"We are currently engaged in an extremely difficult battle, which you are following, since the international press has been publishing it. This is our battle to retrieve our wealth....I'm not fighting to retrieve this wealth for me; I'm fighting to retrieve this wealth for Guinea.*
>
> *Every Guinean patriot should make this his own fight.*
>
> *All people who are willing to fight with me to ensure that the riches of Guinea serve the people of Guinea, are people I'm ready to work with....... This Technical Committee is responsible for the review of the contract and makes proposals. We expect the Technical Commission to make proposals to the committee that I chair. We will make a decision based on the proposition that will be made by the Commission concerning the modules 1 and 2. It is very important that the world realizes that it is a scandal that someone may supposedly pay a few hundred million, and can make up to 5 billion on the back of the Guinean people. I believe that this is now something known worldwide."*[51]

90.    Although not explicitly named, it is plain that the "*contract*" under review was the Base Convention. The emotive language and the invocation of a patriotic call to arms – that too before having even seen the Technical Committee's recommendations – made it perfectly clear that President Condé had already decided that BSGR Guinea's mining rights and infrastructure had been removed.  As he stated: "*We [the committee which he chairs] will make a decision*".

91.    It should be noted that other mining companies were not subject to the same review process. For example, on 22 April 2011, Rio Tinto announced that it and its subsidiary (Simfer) had entered into a "Settlement Agreement" with Guinea which "*secure[d] Rio Tinto's mining title in Guinea*".   The agreement related to Blocks 3 and 4 of

---

[50] Financial Times article dated 21 October 2013 (Exhibit C-44).
[51] Transcript of interview with Alpha Condé dated 4 November 2013 (Exhibit C-45).

Simandou, in respect of which Rio Tinto maintained prospecting permits.  In return for the "*resolution of all outstanding issues and finalisation of new investment agreement terms*" Simfer had agreed to pay USD 700 million to Guinea. In addition, the key terms of the Settlement Agreement included the grant to Guinea (at no cost) of a 15% stake in the project, with the right to take up a further 20% stake.[52] Similarly, in or around March 2013 it appears that RusAl agreed to make a payment to Guinea of around USD 832 million which, according to a press report from that time, "*will reassure RusAl about its future both with regards resuming operations at the Friguia refinery and conserving its rights on the part of the giant Dian Dian bauxite deposit*" in a deal which "*brings to mind the $700 million that Rio Tinto laid out in 2011 in an out-of-court settlement with Conakry in order to maintain its rights on Simandou.*" Similarly, it appears that Sable Mining Africa was granted lucrative mining rights by Guinea, including the right to export through Liberia.

92.   Throughout the process before the Technical Committee, BSGR complained about the lack of due process and apparent prejudice being shown to the company, including by reference to bringing ICSID proceedings. These complaints were not heeded.

## 3.12   Expropriation of the Claimants' investments in Guinea

93.   Against that background, it was unsurprising when on 21 March 2014, the Technical Committee recommended to the Strategic Committee that it propose to the Minister of Mines *inter alia* (i) the withdrawal of the Blocks 1 & 2 Permit; (ii) the withdrawal of the Zogota Mining Concession and (iii) the cancellation of the Base Convention.[53]

94.   The Technical Committee made this recommendation on the alleged basis (which is emphatically denied) that BSGR and/or BSGR Guernsey and/or BSGR Guinea had allegedly obtained those rights by corruption and other unlawful means. It stated that:

---

[52] Rio Tinto Press Release, *"Rio Tinto and Government of Guinea sign new agreement for Simandou iron ore project"* dated 22 April 2011 (Exhibit C-46).

[53] The Technical Committee further recommended that (iv) BSGR Guinea be enjoined to "*communicate to the services of the Ministry of Mines all studies, reports, data, results samples etc. that would have been realized or obtained in the mining operations of VBG in Guinea*" and (v) BSGR Guinea and members of the BSGR group be excluded "*from the proceedings of reattribution of the titles and agreement subject to this recommendation*".

> *"There is a series of precise and concurring indications that establish with sufficient certainty the existence of corrupt practices tarnishing the granting of mining titles and the mining agreement in question to BSGR;*
>
> *[…] Such corrupt practices nullify the mining titles and the mining agreement currently held by VBG"*

95.     On 2 April 2014, the Strategic Committee issued its opinion to President Condé and the Minister of Mines and Geology, concurring with the Technical Committee's recommendation.

96.     On 17 April 2014, President Condé issued a Presidential Order terminating the Zogota Mining Concession which stated that "*due to the fraudulent nature of the conditions of its enactment, Decree D/2010 […] dated March 19, 2010, granting BSG Resources (Guinea) Limited the mining concession for the zone known as Zogota […] is revoked.*"[54]

97.     On 18 April 2014, the Minister of Mines issued a Ministerial Order terminating the Blocks 1 and 2 Permit which stated that "*due to the fraudulent nature of the conditions of its enactment, Ministerial Order […] granting to BSGR Guinea Limited the mining exploration permit for Simandou blocks 1 & 2 encompassing a surface area of 369 km2 in the Kérouané Prefecture […] is revoked.*"[55]

98.     On 23 April 2014, the Minister of Mines issued a Ministerial Order terminating the Base Convention which stated that "*as a consequence of Decree D/2014/098/PRG/SGG of April 17, 2014 concerning the revocation of Decree […] dated March 19, 2010, granting a mining concession to BSG Resources (Guinea) Limited, the cancellation of the agreement entered into on December 16, 2009, between the Republic of Guinea and the companies BSG Resources (Guinea) Limited and BSG Resources (Guinea) Sarl for mining the Zogota/ N'Zérékoré iron ore deposits is certified.*"[56]

---

[54] Exhibit C-8.
[55] Exhibit C-9.
[56] Exhibit C-10.

99.     On 24 April 2014, the Government of Guinea informed the Claimants of the termination of the Base Convention, the Zogota Mining Concession and the Blocks 1 and 2 Permit, resulting in the expropriation of their mining and infrastructure rights, without any compensation having been paid or even offered.[57]

100.    These actions of Guinea, which individually and collectively resulted in the unlawful revocation and/or termination of the Claimants' mining and infrastructure rights, including (i) the Zogota Mining Concession, (ii) the Blocks 1 and 2 Permit, and (iii) the Base Convention, will collectively be referred to herein as "**the Measures**".

101.    As a result of the Measures, the Claimants were illegitimately stripped of their investments in Guinea, including the very significant mining and infrastructure rights which they had lawfully and painstakingly accumulated (as described above). As a further consequence, Guinea removed and deprived BSGR Guinea of all of its relevant assets. This in turn resulted in the permanent and substantial deprivation of the value of BSGR Guernsey's 100% shareholding in BSGR Guinea, and thus the expropriation of that valuable investment.

102.    Moreover, as a yet further consequence of the Measures, the Government of Guinea illegitimately retained the benefit of the investments made and/or work done and/or services performed in Guinea to its benefit, including *inter alia* the Feasibility Studies that had been completed on the Trans-Guinean railway and on Blocks 1 and 2; the works that had been undertaken at Zogota (including building villages and roads for employees, environmental studies and construction of the mines); and the works that had been undertaken on the various railways. Guinea has to date provided no compensation in respect of these valuable rights investments.

### 3.13    The Measures were politically motivated

103.    The Claimants do not need to provide any explanation for the true motives behind Guinea's conduct in order to succeed in their claims in this arbitration. For example, it is enough that they establish that Guinea has expropriated their rights without

---

[57] Letter from Government of Guinea to BSGR dated 24 April 2014 (Exhibit C-47).

providing compensation. They do not need to go on to identify (let alone prove) the reasons as to why Guinea wanted to expropriate those rights.

104.    However, the facts enumerated above demonstrate that there was a determined campaign of harassment waged by Guinea against the BSGR group and the Claimants; and that, contrary to the impression which Guinea sought to give, this campaign had nothing to do with the merits of the investments made by the BSGR group in Guinea or its conduct. What has now emerged is a substantial body of evidence which indicates that there was, in fact, an ulterior motive behind this campaign and the imposition of the Measures. This motive illuminates Guinea's conduct and clearly demonstrates that its complaints about the BSGR group were a mere fig leaf to distract from the true purpose behind the campaign which resulted in the Measures.

105.    The true explanation for Guinea's actions is that the mining and infrastructure rights which were validly held by the Claimants, and of which they were stripped in April 2014, had been promised by President Condé before his election, to other outside interests. Those interests fulfilled their side of the illicit bargain by assisting President Condé in coming to power.  Once he was in power, he fulfilled his side of the bargain by stripping the BSGR group of its rights.

106.    The evidence is set out in full in the statement Dag Cramer made to the English High Court in respect of BSGR's judicial review application (the "**Cramer Judicial Review statement**").[58]  In summary, the available evidence suggests that, unbeknown to BSGR, in early 2010, the then Presidential candidate Alpha Condé entered into a series of secret and unlawful agreements pursuant to which he would be provided with funds and logistical support to rig the upcoming election, in exchange for providing those supports with rights in the country's mines, including Simandou.

107.    More specifically, the evidence strongly indicates that the election was rigged, resulting in a huge swing in Alpha Condé's favour from 18% of the vote in the first round of the election to 52% in the second round, securing victory. Funds were

---

[58] Dag Cramer Judicial Review Witness Statement dated 25 November 2014 (Exhibit C-48).

transferred to Alpha Condé by way of a recorded loan of USD 25 million and further unrecorded transfers believed to be "much much more" to support this process.

108.   In light of this, President Condé attempted to reward his backers. For example, he entered into an agreement known as the Palladino Contract, pursuant to which the provider of a USD 25 million loan in funding for his election was put in a position where it could become entitled to a 30% share in the assets of SOGUIPAMI, the state mining company.   Similarly, he promised Sable Mining Africa valuable mining concessions in return for providing logistical and financial assistance during the election. Accordingly, it was necessary for President Condé to nationalise or expropriate assets to fulfil these illicit deals.   The actions taken against the BSGR group must be viewed against this background.

109.   Moreover, the treatment of the BSGR group by Guinea contrasted strikingly with the treatment of (i) Rio Tinto, which in return for a payment of USD 700 million to Guinea and the granting of a 15% stake in its mines was excused from the entire review process; (ii) RusAl, which similarly agreed to make a payment to Guinea of USD 836 million; and (iii) Sable Mining Africa, which was granted lucrative mining rights by Guinea, including the right to export through Liberia.

110.   This difference in treatment has raised suspicions that the deal with Sable Mining Africa was a cover to reward it for financial and logistical assistance provided to President Condé during his election campaign and to Sable's director, Aboubacar Sampil, who is implicated in the rigging of the election and remains a close associate of President Condé's son.   That the three companies were treated so differently from the BSGR group – which refused to make a payment to President Condé – is a further indication of the political motivation behind the prejudicial review of the BSGR group's rights.   Thus, far from obtaining its rights by corruption, as alleged, it was the BSGR group's refusal to pay a bribe which ultimately led to the revocation of its rights.

111.   Furthermore, President Condé enlisted help from overseas supporters in order to cause BSGR maximum harm and prejudice. This extended to placing pressure upon the BSGR's UK PR advisors to terminate BSGR's retainer and the making and spreading

of allegations that BSGR had repeatedly attempted to organise a coup d'état in Guinea. This has also led to the questioning without foundation of unconnected businessmen in Guinea and the US about their links with BSGR, purely on the basis that they share the same nationality as Mr Steinmetz.

112.    In summary, the withdrawal of the Claimants' mining and infrastructure rights was a political process orchestrated by President Condé for his own interests.

## IV.    **BREACHES OF THE BASE CONVENTION**

### 4.1    **Protections offered by the Base Convention**

113.    The Base Convention provided the Claimants individually and/or collectively with a number of important protections, including in particular those identified below.

114.    By virtue of Article 4(ii), Guinea undertook to grant the Claimants facilities and guarantees to facilitate the carrying out of the Project (as defined in the Base Convention), including the construction of the mines and the railways.

115.    By virtue of Article 7, Guinea undertook to comply with the terms and conditions of the Base Convention and to act in good faith in the fulfilment of its obligations thereunder throughout the period of the agreement.

116.    By virtue of Article 8, Guinea undertook to execute the Zogota Mining Concession in accordance with the provisions of the Mining Code and the Base Convention.

117.    By virtue of Article 14.2(a), Guinea undertook to provide BSGR Guinea with the authorisation required to construct the railway to export the iron ore.

118.    By virtue of Article 22.1, Guinea promised that BSGR Guinea and/or (on a proper construction and as relevant) BSGR Guernsey would enjoy the rights conferred upon them under (i) the Base Convention; (ii) the Mining Code and (iii) the Mining Concession.

119.    By virtue of Article 22.1(a) to Article 22.1(l), Guinea was obliged to protect the following rights (*inter alia)* of BSGR Guinea and/or (on a proper construction and as relevant) BSGR Guernsey:

(i)      the exclusive right to carry out the Mining Operations (as defined in the Base Convention);

(ii)     the right to freely arrange its assets and to organize the businesses as it sees fit;

(iii)    the freedom to recruit and dismiss, in accordance with current legislation in the Republic of Guinea;

(iv)     the free circulation in the Republic of Guinea of its staff, assets and products;

(v)      the right to unrestricted importation of goods and services, including insurance and the funds required for the Mining Operations;

(vi)     the freedom to export and to sell the Mining Produce from the Concession (as defined in the Base Convention) on the international and/or domestic market;

(vii)    the right to transport or have transported the Mining Produce to a storage, processing or loading location;

(viii)   the right to benefit from any agreement entered into between the Government and other Governments to facilitate the transport of the Mining Produce over the territory of these Governments;

(ix)     the freedom to set up in Guinea processing plants and iron ore processing;

(x)      the right to acquire, use and operate any means of communication, and type of aircraft or other means of transport as well as the auxiliary facilities or equipment required for the Mining Operations;

(xi)     the freedom to carry out large-scale sampling and attempts at processing the Mining Produce from the Concession in order to determine the mining potential; and

(xii)    the freedom to take, take out and export reasonable quantities, specimens or samples as part of the Prospecting Activities (as defined in the Base Convention).

120.    By virtue of Article 29, Guinea gave a number of warranties to BSGR Guinea and/or (on a proper construction and as relevant) BSGR Guernsey, including *inter alia* that:

(i)    pursuant to paragraph c), prior to signature the Government satisfied itself that BSGR Guinea had all qualifications necessary under the Mining Code and that there was nothing to prevent the granting of a mining concession and the signature of the Base Convention;

(ii)    pursuant to paragraph d), signature of the agreement and execution of its obligations was not in violation of any law, regulation, decree or order of any national or local authority or Guinean court;

(iii)    pursuant to paragraph e), it would ensure that the administrative authorities provide all assistance necessary and provide all permits necessary for the Mining Operations (as defined) as stipulated in the applicable Guinean law;

(iv)    it would facilitate all administrative steps and procedures by all appropriate means in accordance with Guinean law and provide all reasonable assistance needed for carrying out the Project and the Project Installations.

121.    By virtue of Article 31, Guinea was obliged in the event of an expropriation or nationalization of assets to pay fair and equitable compensation based on the market value of the Mining Operations at the date of the expropriation or nationalization.

122.    Under Article 32 of the Base Convention, Guinea warranted:

(i)    pursuant to its first paragraph, that from the date of the grant of the Concession and throughout its full duration, the stabilization of Current Legislation (as referred to and defined in the Base Convention) and of all provisions stipulated in the Base Convention; and

(ii)    pursuant to its fourth paragraph, that BSGR Guinea would benefit from any more favourable provision in a mining agreement Guinea entered into with another mining company carrying out similar activities.

123.    Under Article 36.2, Guinea promised that any cancellation of the Mining Concession would be "*in accordance with the Mining Code*".

## 4.2    Summary of breaches of the Base Convention

124.    The Measures taken by Guinea as described above violated Guinea's obligations under the Base Convention.  In particular (but without limitation):

125.    In breach of its obligations under Article 4(ii), Guinea failed to grant and afford to the Claimants the facilities and guarantees to facilitate the carrying out of the Project (as defined).

126.    In breach of its obligations under Article 7, Guinea failed to comply with the terms and conditions of the Base Convention and/or to act in good faith in the fulfilment of its obligations thereunder throughout the period of the agreement.

127.    In breach of its obligations under Article 8, Guinea failed to ensure that the Mining Concession was executed in accordance with the provisions of the Mining Code and the Base Convention.

128.    In breach of its obligations under Article 14.2(a), Guinea did not provide the authorisation to construct the railway to export the iron ore.

129.    In breach of its obligations under Article 22.1, Guinea failed to ensure that the Claimants enjoyed the rights conferred upon each of them under (i) the Base Convention and/or (ii) the Mining Code and/or (iii) the Zogota Mining Concession.

130.    In breach of its obligations under Article 22.1(a) to Article 22.1(l) of the Base Convention, Guinea failed to guarantee and to afford to BSGR Guinea and/or BSGR Guernsey:

(i)      the exclusive right to carry out the Mining Operations (as referred to and defined in the Base Convention);

(ii)     the right to freely arrange its assets and to organize the businesses as it sees fit;

(iii)    the freedom to recruit and dismiss, in accordance with current legislation in the Republic of Guinea;

(iv)     the free circulation in the Republic of Guinea of its staff, assets and products;

(v)      the right to unrestricted importation of goods and services, including insurance and the funds required for the Mining Operations;

(vi)     the freedom to export and to sell the Mining Produce from the Concession (as referred to and defined in the Base Convention) on the international and/or domestic market;

(vii)    the right to transport or have transported the Mining Produce to a storage, processing or loading location;

(viii)   the right to benefit from any agreement entered into between the Government and other Governments to facilitate the transport of the Mining Produce over the territory of these Governments;

(ix)     the freedom to set up in Guinea processing plants and iron ore processing;

(x)      the right to acquire, use and operate any means of communication, and type of aircraft or other means of transport as well as the auxiliary facilities or equipment required for the Mining Operations;

(xi)     the freedom to carry out large-scale sampling and attempts at processing the Mining Produce from the Concession in order to determine the mining potential; and

(xii)    the freedom to take, take out and export reasonable quantities, specimens or samples as part of the Prospecting Activities (as referred to and defined in the Base Convention).

131.    Further, Guinea breached its obligations under Article 29.  In particular:

(i)    in breach of Article 29(c), Guinea acted on the illegitimate and unlawful basis that the grant of the Zogota Mining Concession and/or the signature of the Base Convention was inappropriate and/or unjustified (despite having no foundation for doing so);

(ii)    in breach of Article 29(d), Guinea acted on the illegitimate and unlawful basis that the signature of the agreement and/or the execution of its obligations was in violation of law (despite having no foundation for doing so);

(iii)    in breach of Article 29(e), Guinea failed to ensure that the administrative authorities provided BSGR Guinea (and/or BSGR Guernsey) with all assistance necessary and/or provided all permits necessary for the Mining Operations (as defined) as stipulated in the applicable Guinean law; and

(iv)    Guinea failed to facilitate all administrative steps and procedures by all appropriate means in accordance with Guinean law and/or provide all reasonable assistance needed for carrying out the Project.

132.    In breach of its obligations under Article 31, Guinea took measures of expropriation or nationalization against each of BSGR Guinea and BSGR Guernsey, and against their respective investments and/or assets (as described above), without payment of fair and equitable compensation based on the market value of the Mining Operations at the date of the expropriation or nationalization.

133.    In breach of its obligations under Article 32, Guinea failed to stabilize the Current Legislation and/or all provisions stipulated in the Base Convention in that *inter alia* it adopted measures, including by way of new legislation and/or laws, in order to take the Claimants' respective assets.  Pending document production, the Claimants

expressly reserve their right to rely on any more favourable provision in any mining agreement concluded at a later date, as referred to in Article 32 (fourth paragraph). The Claimants will require Guinea to disclose all mining agreements concluded following the Base Convention in order that they can properly enforce their rights under Article 32.

134.   In breach of Article 36.2, Guinea failed to cancel the Zogota Mining Concession in accordance with the Mining Code (or on any lawful basis whatsoever). For the avoidance of any doubt, the Claimants aver that there was in fact no legitimate basis for the withdrawal or revocation of the Zogota Mining Concession (whether pursuant to the Mining Code or any other instrument).

135.   The breaches of the Base Convention as set out above give rise to liability on the part of Guinea to each of BSGR Guernsey and BSGR Guinea, including for losses suffered by each of BSGR Guernsey and BSGR Guinea as a result of these breaches. Furthermore, by reason of the Republic of Guinea's conduct and/or omissions to date and threatened conduct and/or omissions, each of BSGR Guernsey and BSGR Guinea have suffered and/or will suffer a significant or total loss in the value of all or part of their investments.

## 4.3   Reservation

136.   For the avoidance of doubt, the Claimants reserve the right to add to or modify each of the allegations of breach of the Base Convention, set out above.

## V.   BREACHES OF THE INVESTMENT CODE

## 5.1   Protections offered by the Investment Code

137.   Article 1 of the Investment Code provides that it is:

> "*intended to define the framework and conditions in which investments in Guinea are operated, the guarantees offered to investors, as well as the encouragment accorded to those who contribute significantly to the achievement of the priority economic and social development objectives*".

138.    By virtue of Article 5 of the Investment Code, Guinea was and is obliged:

(i)    not to proceed to any expropriation or nationalization of investments carried out by individuals or corporations unless the measures taken are (i) for public purposes determined in accordance with the law and (ii) non-discriminatory; and

(ii)    in the event of non-discriminatory expropriation or nationalization for public purposes determined in accordance with the law, to provide fair and adequate compensation according to principles of international law.

139.    By virtue of Article 6(1) of the Investment Code, Guinea was and is obliged to afford foreign nationals or companies the same treatment as Guinean nationals or companies as regards the applicable law and obligations relating to their activities.

140.    Article 30 of the Investment Code further provides that:

"*No law or regulation taking effect after the date of execution of the investment may restrict the guarantees referred to in the book 1 of this code regarding said investment. Similarly, no law or regulation taking effect after the effective date of approval may reduce or eliminate the benefits or impede the exercise of the rights that have been granted to the company and its investors*".

## 5.2    Summary of breaches of the Investment Code

141.    The Measures taken by Guinea as described above violate a number of Guinea's obligations under the Investment Code.

142.    In breach of its obligations under Article 5 of the Investment Code, Guinea has taken measures of expropriation or nationalization against each of the Claimants and/or their investments (including *inter alia* the mining and infrastructure rights identified above; and/or the shareholding rights held by BSGR Guernsey in BSGR Guinea):

(i)    for purposes other than public purposes and/or other than as provisioned by law; and/or

(ii)    in a discriminatory fashion; and/or

(iii)     without providing fair and/or adequate (or any) compensation for its measures of expropriation or nationalization.

143.    In breach of its obligations under Article 6 of the Investment Code, Guinea has failed to afford each of the Claimants and/or their investments (including *inter alia* their mining and infrastructure rights and/or (ii) the shareholding rights held by BSGR Guernsey in BSGR Guinea)) the same treatment as Guinean nationals or companies as regards the applicable law and obligations relating to their activities.

144.    In breach of its obligations under Article 30 of the Investment Code:

(i)     Guinea failed to respect the benefits and guarantees to which the Claimants were entitled under *inter alia* Article 5 of the Investment Code;

(ii)     Guinea failed to apply the 1995 Mining Code to the Claimants and/or their investments; and

(iii)     Guinea purported to apply the 2011 Mining Code to the Claimants and/or their investments.

145.    The breaches of the Investment Code as set out above give rise to liability on the part of Guinea to each of the Claimants, including for losses suffered by each of the Claimants as a result of these breaches.  Furthermore, by reason of Guinea's conduct and/or omissions to date and threatened conduct and/or omissions, each of the Claimants have suffered and/or will suffer a significant or total loss in the value of all or part of its investments.

## 5.3    Reservation

146.    For the avoidance of doubt, the Claimants reserve the right to add to or modify each of the allegations of breach of the Investment Code, set out above.

## VI.    BREACHES OF THE MINING CODE

## 6.1    Protections offered by the Mining Code

43

147.    By virtue of Article 11, Guinea was and is obliged to perform its obligations under any mining agreements entered into by Guinea.

148.    By virtue of Article 21, Guinea was and is obliged to guarantee to each of the Claimants:

(i)      the right to dispose freely of their property and to organize their enterprise as they wish;

(ii)     the freedom of hiring and firing, subject to prevailing laws and regulations;

(iii)    unlimited access to raw materials;

(iv)     the freedom of circulation of personnel and products within Guinea;

(v)      the freedom to import goods and services and any necessary funds; and

(vi)     the freedom to dispose of their products on international markets and to export and dispose of products in foreign markets.

149.    By virtue of Article 22, Guinea was and is obliged not to discriminate against each of the Claimants as compared with Guinean nationals.

150.    By virtue of Article 26, Guinea was and is obliged to recognize that the grant of an prospecting permit conferred on BSGR Guinea confers *inter alia* the exclusive right to prospect for iron ore and the exclusive right to an operating permit or mining concession for the deposits found within the prospecting site.

151.    By virtue of Article 41, Guinea was and is obliged to recognise that the grant of a concession conferred on BSGR Guinea confers *inter alia* the exclusive right to carry out all kinds of prospecting and development of deposits of mining substances.

152.    Finally, by virtue of Article 43, upon the filing of a feasibility study for Simandou Blocks 1 and 2, Guinea was obliged to negotiate a mining concession in order to determine the practical issues associated with the exploitation of Blocks 1 and 2.

## 6.2   **Summary of breaches of the Mining Code**

153.   The Measures taken by Guinea as described above violate a number of Guinea's obligations under the Mining Code.

154.   In breach of Article 11, Guinea has failed to perform its obligations owed to each of BSGR Guernsey and BSGR Guinea under the Base Convention.

155.   In breach of Article 21, Guinea has failed to guarantee and to afford to each of BSGR Guernsey and BSGR Guinea:

   (i)      the right to dispose freely of their property and to organize their enterprise as they wish;

   (ii)     the freedom of hiring and firing, subject to prevailing laws and regulations;

   (iii)    unlimited access to raw materials;

   (iv)     the freedom of circulation of personnel and products within the Republic of Guinea;

   (v)      the freedom to import goods and services and any necessary funds; and

   (vi)     the freedom to dispose of their products on international markets and to export and dispose of products in foreign markets.

156.   In breach of Article 22, Guinea has discriminated against each of BSGR Guernsey and BSGR Guinea as compared with Guinean nationals.

157.   In breach of Article 26, Guinea failed to recognise and respect BSGR Guinea's exclusive right to prospect for iron ore and its exclusive right to an operating permit or mining concession.

158.   In breach of Article 41, Guinea failed to recognise and respect BSGR Guinea's exclusive right to carry out all kinds of prospecting and development of deposits of mining substances.

159.   In breach of Article 43, Guinea (i) ignored the Feasibility Study submitted by BSGR Guinea for Simandou Blocks 1 & 2 in September 2011; and (ii) failed to grant a mining concession. Furthermore, BSGR Guernsey and BSGR Guinea claim an indemnity pursuant to Article 44.

160.   The breaches of the Mining Code as set out above give rise to liability on the part of Guinea to each of BSGR Guernsey and BSGR Guinea, including for losses suffered by each of BSGR Guernsey and BSGR Guinea as a result of these breaches. Furthermore, by reason of Guinea's conduct and/or omissions to date and threatened conduct and/or omissions, each of BSGR Guernsey and BSGR Guinea has suffered and/or will suffer a significant or total loss in the value of all or part of its investments.

## 6.3   Reservation

161.   For the avoidance of doubt, BSGR Guernsey and BSGR Guinea each reserve the right to add to or modify each of the allegations of breach of the Mining Code, set out above.

## VII.   BREACHES OF THE BOT ACT

## 7.1   The Base Convention constitutes a BOT agreement

162.   The BOT Act was the relevant legislation operative in Guinea at the material time at which the Claimants obtained their infrastructure rights.  The BOT Act addresses aspects of the financing, construction, operation, maintenance and transfer of development infrastructure projects, including mining infrastructures and transport infrastructures, such as railways and ports.

163.   Article 1.1 of the BOT Act defines a "*BOT agreement*" as "*any operation of financing, construction, operation, maintenance, and potentially transfer of ownership of development infrastructures by the private sector, in all its different variants, as indicated in Article 1.4 below*".

46

164.    Article 1.2 provides the following definition of "*development infrastructures by the private sector*":

> "*Any infrastructure and development project normally financed and operated by the public sector, but which will be now fully or partially undertaken by the private sector, including but not limited to [...] **mining infrastructures**, transport infrastructures such as roads, ports, railways and airports, power installations [...] and free zones...*" (emphasis added)

165.    Articles 1.3 to 1.11 of the BOT Act then lists a number of variants and contractual arrangements under which development infrastructures may be financed, constructed, operated, maintained and potentially transferred including Articles 1.3 and 1.4, which provide respectively:

(i)     "*Build-Operate-Transfer" (BOT): An agreement through which an investor takes on the financing and construction of a given infrastructure or development project, and its operation and maintenance. The investor operates the infrastructure over a determined period during which it is authorized to receive fees, charges and miscellaneous costs from the user under user tariffs not exceeding the levels indicated in its bid or negotiated and included in the contract, to enable the investor to recover its investment and its costs of operation and maintenance of the project, including its profit margin. At the end of the initial predetermined period, which must not exceed the duration defined in Article 12 below, the investor transfers the infrastructure to the State, in its entirety and free of charge*";

(ii)    "*Build-and-Transfer" (BT): an agreement through which an investor takes on the financing and construction of a given infrastructure or development project, and after its completion transfers it to the State, in exchange for reimbursement of the investment cost plus a reasonable profit margin, in accordance with a pre-established financing plan approved by the parties. This type of contract may be applied to any infrastructure construction or development project operation, including structures which, for strategic or security reasons, must be operated directly by the State or any entity designated by it*".

166.    By virtue of the nature and duration of the rights granted to and obligations imposed on the Claimants by the Base Convention, the latter constitutes a "*BOT agreement*".

167.    The purpose of the Base Convention to set out the infrastructure arrangements between Guinea and the BSGR group was set out at the very beginning of the agreement. The preamble provides that:

> *"Whereas in this framework the Republic of Guinea has informed the mining investors of […] the principle that the mining infrastructures (railway and port) located on the national territory belong to the Government as well as any new mining infrastructure that would be implemented;*
>
> *[…] Whereas BSG Resources wishes to develop the areas at its disposal through the design, financing, development and construction in Guinea of a complex consisting of an iron ore mine and its dependencies (plants, storage areas, power stations, lodgings etc) and of a railway, with a nominal production capacity of 30 million ton a year of iron ore".*

168.    Article 10(1) of the Base Convention detailed the development infrastructures that the BSGR group, and in particular BSGR Guinea, agreed to construct in relation to the Zogota operation:

> *"The Company shall develop:*
>
> *a)    An open cast iron ore mine at Zogota in the prefecture of N'Zérékoré;*
> *b)    An industrial area at Zogota that shall include:*
> *• Storage and loading areas,*
> *• Workshops,*
> *• A railway line in Guinea 102 km long,*
> *• A railway depot,*
> *• Facilities and equipment,*
> *• Electrical power station with output of ..... MW,*
> *• Offices,*
> *• A water treatment station,*
> *• A residential area;*
> *• A hospital for employees.*
> *c)    A port area in Buchanan, Republic of Liberia, which shall include:*
> *•    Storage and loading areas,*
> *•    Workshops,*
> *•    Offices,*
> *•    A residential area.*
> *d)    The Conakry-Kankan railway"*

169.    Article 10(2) of the Base Convention detailed the development infrastructures that the BSGR group, and in particular BSGR Guinea, agreed to construct in relation to the operations in and around Blocks 1 and 2:

*"The Company will develop in this phase:*

- *Two iron ore mines,*
- *Industrial facilities and equipment,*
- *Suitable railway infrastructure required for removing the iron ore.*
- *A residential area at Kerouane,*
- *Extension of equipment and installations to the port of Buchanan".*

170.   Articles 11 and 12 of the Base Convention detailed BSGR Guinea's financing obligations in relation to the infrastructure:

*"The Company undertakes to invest as part of this Agreement the sum of USD 2,542,000,000 to carry out the project, broken down as follows:*

*Mines: USD 243,000,000*
*Industrial facilities and equipment: USD 496,000,000*
*Residential areas and hospital: USD 71,000,000*
*Railway and rolling stock: USD 845,000,000*
*Port: USD 463,000,000*
*Contingency (20%): USD 424,000,000"*

and

*"The Company undertakes to rebuild this railway and will submit the feasibility study to the Government for approval. The cost of this reconstruction is budgeted at USD 1billion (1,000,000,000) plus 20% for contingencies. The Company undertakes to build 50% of this railway during the first phase of the project".*

171.   Article 16.1.1 of the Base Convention set out the ownership structure of the Sanniquellie railway and BSGR Guinea's payment obligations:

*"It is expressly agreed that the Government shall be the owner of the railway irrespective of its method of financing. The railway line of 102 km that will be constructed in Guinean territory outside of the Concession Perimeter shall be subject to a usage fee.*

*The Company shall carry out the surveys, finance and construct the railway line and provide for its operation and maintenance. The Company shall allocate the agreed fees for use of the railway as a repayment for the investment it will have made.*

*After complete repayment of the loans, the Company shall continue to provide maintenance of the railway and shall pay the Government fees*

> *for use of the railway. These fees shall be fixed according to the same*
> *principles as those used in similar infrastructure used under the same*
> *conditions in the Republic of Guinea"*

172.    Article 16.2.1 of the Base Convention stipulated the development and maintenance of
the other infrastructures:

> *"Subject to compliance with the Applicable Law, the Company can build,*
> *use, improve and maintain any infrastructure, including roads, bridges,*
> *airfields, port or rail installations, and transport-related installations, as*
> *well as electrical power stations, telephone and other communications*
> *lines, pipelines, water pipes or other networks or installations necessary*
> *for the Mining Operations.*
>
> *At the Company's request, the Government and the Company must*
> *analyse such infrastructure or other requirements related to the Mining*
> *Operations, including but not limited to energy and transportation*
> *requirements with a view to entering into a fair agreement for the*
> *sharing of costs and profits from such infrastructure."*

173.    The arrangements in relation to the Sanniquellie railway constituted a classic Build-
Operate-Transfer agreement: the BSGR group, and in particular BSGR Guinea, was
required to construct, finance, operate and maintain the railway and to pay a usage
fee. Until BSGR Guinea had recouped its investment in the railway, it was allowed to
set-off the investment against the usage fee. Once the investment was recouped,
BSGR Guinea was required to pay the usage fee to Guinea. It was the parties'
understanding to put the same mechanism in place in relation to all the other
development infrastructures that the BSGR group would construct and finance, except
for the Trans-Guinea railway.

174.    The arrangements in relation to the Trans-Guinean railway were different in the sense
that the BSGR group only agreed to finance and construct the railway but not to
operate and maintain it. Once the construction would be completed, BSGR would
immediately transfer the railway to Guinea. The Trans-Guinean railway arrangement
therefore constituted a "*Build-Transfer*" agreement, be it that Guinea was not
required, contrary to what is provided in the classic definition of a classic Build-
Transfer agreement, to reimburse BSGR's investment cost.

**7.2**     **Protections offered by the BOT Act to the Claimants and their investments**

175.     By virtue of Article 7.1, Guinea guaranteed *inter alia* the free and peaceable use of the investments made by the Claimants throughout the duration of the Concession.

176.     Pursuant to Article 7.2.2, Guinea guaranteed to provide all permits and all authorisations necessary to construct, operate and maintain the infrastructures to exercise the rights guaranteed by the BOT Act and the BOT agreement.

177.     By virtue of Article 7.2.7, Guinea guaranteed the Claimants that it would not expropriate the assets or capital that was the subject of the BOT Agreement.

178.     Under Article 7.2.12, Guinea guaranteed the investor adequate compensation in case the infrastructures were retroceded to the State before the agreed deadline.

**7.3**     **Summary of breaches of the BOT Act**

179.     The Measures and other conduct of Guinea described above violated a number of Guinea's obligations under the BOT Act, including in particular as described below.

180.     In breach of Article 7.1, Guinea did not provide the Claimants (or either of them) with the free and peaceful usage of their mining and transportation infrastructures. In particular:

    (i)     the unlawful termination or revocation by Guinea of the Base Convention and the unlawful withdrawal or revocation of the Blocks 1 and 2 Permit and the Zogota Mining Concession in or around April 2014, violated the Claimants' right to the free and peaceful usage of the works they had undertaken at Zogota as described above;

    (ii)    by letter of 8 April 2011, the Minister of Transport wrongfully ordered BSGR Guinea to stop all the work on the ground in respect of the Trans-Guinean railway;

(iii)    by letter of 4 October 2011, the Minister of Mines wrongfully ordered BSGR Guinea to stop all of its works in Guinea, including the construction of the Zogota mine and the construction of the Sanniquellie railway.

181.    In breach of Article 7.2.2, Guinea did not provide all the permits and authorizations necessary to exercise the rights guaranteed by the BOT Act and the Base Convention. In particular:

(i)    by letter of 8 April 2011, the Minister of Transport wrongfully ordered BSGR Guinea to stop all the work on the ground in respect of the Trans-Guinean railway. BSGR Guinea was thus no longer authorized to work on the construction of the Trans-Guinean railway; and

(ii)    by letter of 4 October 2011, the Minister of Mines wrongfully ordered BSGR Guinea to stop all of its works in Guinea, including the construction of the Zogota mine.  BSGR Guinea was thus no longer authorized to work on the construction of a mine in Zogota and the construction of the Sanniquellie railway

182.    In breach of its obligations under Article 7.2.7, Guinea expropriated each of the Claimants' valuable investments and assets described above, including in particular (i) the mining and infrastructure rights and agreements identified above; and/or (ii) the shareholding rights held by BSGR Guernsey in BSGR Guinea.

183.    The breaches of the BOT Act as set out above give rise to liability on the part of Guinea to each of BSGR Guernsey and BSGR Guinea, including for losses suffered by each of BSGR Guernsey and BSGR Guinea as a result of these breaches. Furthermore, by reason of the Republic of Guinea's conduct and/or omissions to date and threatened conduct and/or omissions, each of BSGR Guernsey and BSGR Guinea has suffered and/or will suffer a significant or total loss in the value of all or part of its investments.

**7.4**    **Reservation**

184.    For the avoidance of doubt, BSGR Guernsey and BSGR Guinea each reserve the right to add to or modify each of the allegations of breach of the BOT Act, set out above.

## VIII.    BREACHES OF INTERNATIONAL LAW

185.    Guinean law incorporates and/or applies customary international law.  By way of example, Article 5 of the Investment Code refers to and applies *"the rules and conventional practices of international law"*. Furthermore, Article 21 of the Mining Code refers to and incorporates fundamental freedoms guaranteed *"in accordance with international conventions"*.

186.    Accordingly, Guinea was bound as a matter of Guinean law (which incorporates and/or applies customary international law) by the following principal obligations:

(i)    not to expropriate the Claimants' rights and investments unless the taking was for a public purpose, as provided by law, conducted in a non-discriminatory manner and with compensation in return;

(ii)    to prevent arbitrary conduct in relation to the Claimants' rights and investments in Guinea;

(iii)    to provide the Claimants with full protection and security;

(iv)    to accord to BSGR fair and equitable treatment;

(v)    to prevent a denial of justice; and

(vi)    not to engage in an abuse of rights.

187.    For the reasons set out above, Guinea's conduct amounted to a clear breach of each of those obligations owed to Claimants, and for which the Claimants are each entitled to relief.

## IX.    RELIEF SOUGHT BY THE CLAIMANTS

188.    The Claimants will be seeking all available relief, including (without limitation) an award:

(1)    Declaring that Guinea's termination of each of the Base Convention, the Zogota Mining Concession and the Blocks 1 and 2 Permit was illegal and unlawful;

(2)    Declaring that Guinea's expropriation of BSGR Guernsey's shareholding in BSGR Guinea was illegal and unlawful;

(3)    Declaring that Guinea unlawfully failed to ensure that the Claimants' rights were protected in accordance with Guinean and/or international law;

(4)    Ordering that Guinea forthwith:

(i)    restore the Base Convention and observe the rights granted to BSGR Guinea and to BSGR Guernsey under the Base Convention;

(ii)    restore the Zogota Mining Concession and observe the rights granted to BSGR Guinea under the Zogota Mining Concession;

(iii)    restore the Blocks 1 and 2 Permit and observe the rights granted to BSGR Guinea under the Blocks 1 and 2 Permit;

(iv)    ensure that BSGR Guernsey's and BSGR Guinea's respective rights, assets and investments are protected in accordance with Guinean and international law;

(v)    prevent BSGR Guernsey's and BSGR Guinea's respective rights, assets and investments from being further subject to expropriation or to any measure having similar effect;

(vi) ensure that BSGR Guernsey and BSGR Guinea and their respective investments are treated in a non-discriminatory manner;

(vii) ensure that each of BSGR Guernsey and BSGR Guinea have:

    a. the right to dispose freely of their property and to organize their enterprise as they wish;

    b. the freedom of hiring and firing, subject to prevailing laws and regulations;

    c. unlimited access to raw materials;

    d. the freedom of circulation of personnel and products within the Republic of Guinea;

    e. the freedom to import goods and services and any necessary funds; and

    f. the freedom to dispose of their products on international markets and to export and dispose of products in foreign markets.

(5) Ordering that Guinea:

(i) ensure that an accurate summary of the Award is published in the Financial Times (in A3 size) within 30 days of the date of the Award and at the expense of Guinea; and

(ii) submit the summary of the Award for approval to the Claimants 15 days before publication. Failing an agreement between the Claimants and Guinea on the text of the summary, the text of the summary will be determined by the Tribunal.

(6) Ordering that Guinea provide prompt, adequate and effective compensation to the Claimants for Guinea's unlawful conduct, described above, in an amount to be quantified during this arbitration, as compensation for the losses suffered

to date and for any future losses suffered by BSGR Guernsey and/or BSGR Guinea;

(7)    Ordering that Guinea provide prompt adequate and effective compensation and/or a *quantum meruit* in respect of the investments made and/or work done and/or services performed by the Claimants (or each of them), and for which Guinea has taken the benefit but (as yet) provided no compensation;

(8)    Ordering that Guinea pay moral damages in the amount to be determined in the course of these proceedings;

(9)    Ordering that Guinea pay interest on such sums and for such periods as the Tribunal deems appropriate;

(10)   Ordering that Guinea pay the Claimants' costs occasioned by this arbitration including, without limitation, arbitrators' fees, administrative costs fixed by ICSID, the arbitrators' expenses, the fees and expenses of any experts, and the legal costs incurred by the parties;

(11)   Granting the Claimants all other relief that the Tribunal deems appropriate.

189.   Notwithstanding any future protection, Guinea must pay the Claimants (and each of them) compensation for the losses suffered to date; and Guinea remains liable for any future loss suffered by the Claimants (and each of them).

190.   The Claimants reserve the right to add to, modify and/or amend this Request for Arbitration in due course and to add to, modify and/or amend the relief sought, including by reference to any further steps of Guinea (or agencies or instrumentalities or entities for which Guinea is responsible) that affect the Claimants' investments.

## X.    ICSID JURISDICTION

191.   Four conditions must be met in order for ICSID to have jurisdiction over a dispute. Those conditions are set out in Article 25(1) of the ICSID Convention, which provides as follows:

> "*The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally*".

192.   Thus, the four conditions are: (1) the dispute must be "*legal*"; (2) it must be one "*arising directly out of an investment*"; (3) it must be "*between a Contracting State and a national of another Contracting State*"; and (4) the parties to the dispute must "*consent in writing to submit* [it] *to the Centre*".

193.   The present dispute between the Claimants and Guinea fulfils each of these conditions for the reasons set out below.

## 10.1   This dispute is a legal dispute

194.   The subject matter of the present dispute is Guinea's breaches of each of the applicable investment laws, the BOT Act and the Base Convention, including its illegal and continued expropriation of the Claimants' mining and infrastructure rights in Guinea without providing prompt, adequate and effective compensation.

195.   The dispute is clearly legal in nature because it concerns the existence or scope of each of the Claimants' legal rights, and the nature and extent of the relief to be granted to the Claimants.

## 10.2   This dispute arises directly out of an investment

196.   As described above, this dispute principally concerns Guinea's expropriation and maltreatment of the Claimants' investments in Guinea, including in particular its unlawful withdrawal and/or termination of (i) the Blocks 1 and 2 Permit, (ii) the Base

Convention and (iii) the Zogota Mining Concession, its expropriation of BSGR Guernsey's shareholding in BSGR Guinea (each of which constituted a qualifying investment within the meaning of Article 25); and its consequent failure to comply with its obligations under (i) the Base Convention, (ii) the Investment Code (iii) the Mining Code; (iv) the BOT Act and (v) international law, in respect of each of those investments. Accordingly, it is clear that this condition is satisfied.

### a. Mining Code

197. As regards the **Block 1 and 2 Permit,** it constitutes a mining prospecting permit under Article 10 of the Mining Code. By virtue of Article 26 of the Mining Code, the holder of a prospecting permit is conferred the exclusive right to (i) prospect for mining substances for which the permit is issued and (ii) an operating permit or concession for deposits found within the prospecting site. Article 26 further provides that a prospecting permit confers a moveable, indivisible and non-assignable right on the permit holder.

198. As regards the **Zogota Mining Concession**, it constitutes a mining concession under Article 10 of the Mining Code.  By virtue of Article 41 of the Mining Code, a holder of a mining concession is conferred the exclusive right to carry out all kinds of prospecting and development of the mining deposits for which the concession is granted. The Article further provides that a mining concession requires *"sizable works and investments"* and confers an immoveable, divisible and assignable right on the concession holder. Article 3 of the Mining Code expressly provides that the right to extract substances pursuant to an operating title - such as a mining concession - is a species of property.

199. As regards the **Base Convention**, it constitutes a mining agreement under Article 11 of the Mining Code which provides that such agreements *"define the rights and obligations of the respective parties and set out the legal, financial tax and social condition which govern operation for the duration of the agreement".* The Article further provides that a mining agreement "*constitutes a guarantee to the mine title holder that these conditions will remain unvaried*".

200.    Article 184 of the Mining Code refers to holders of mining titles and mining agreements as "*mining investors*".

201.    In other words, where holders of mining rights or mining agreements are considered to be "*investors*", the mining rights and agreements that they are holding must be considered "*investments*". Furthermore, the Claimants' analysis follows the orthodox approach in investment treaty cases. Numerous investment treaty cases have recognised that a mining title constitutes an "*investment*" in the host state.

    b.    *Investment Code*

202.    Whilst the Investment Code does not define the term "*investor*" or "*investment*", there can be no doubt that the Claimants are "*investors*" and their mining titles and mining agreements are "*investments*".

203.    **Firstly**, Book 1 of the Investment Code is entitled *"General conditions of investment and guarantees to investors*". It contains Article's 2 to 7. Article 2 provides that "*any person is free to undertake a commercial, industrial, mining, agricultural or services activity in the territory of the Republic of Guinea, in compliance with the applicable laws and regulations of the Republic*".

204.    In other words, any person, natural or legal, that undertakes mining activities in Guinea is considered to be an "*investor*" and the mining activities are considered to be "*investments*".

205.    **Secondly**, Part A of the preamble to the Investment Code entitled "*General conditions of investment*" provides that "*to promote investment in Guinea, a very liberal [Investment] Code has been adopted in 1987 by Decree No. 001/PRG/87*" (emphasis added). This Code is still in place today. Taking into account the very liberal approach to investments in the Investment Code and without any indications to the contrary in the Investment Code, mining rights and mining agreements such as the Blocks 1 and 2 Permit, the Base Convention and the Zogota Mining Concession constitute "investments".

59

206. **Thirdly**, Part A of the preamble to the Investment Code lists the following fundamental principles which apply (subject to reciprocity) to investments:

- *the freedom to do business for any person meeting the legal conditions, without any discrimination of whatever nature;*
- *The equal treatment between natural and legal persons and Guineans;*
- *The freedom to transfer funds […]*
- *The equality between the public and the private sector;*
- ***The protection of rights acquired;***
- *The freedom for all foreigners to conduct economic activities in Guinea without the obligation of an association with a Guinean"* (emphasis added)

207. The fact that the protection of "*rights acquired*" is a fundamental principle of the Investment Code establishes that the rights themselves, such as the Blocks 1 and 2 Permit, the Base Convention and the Zogota Mining Concession, constitute "*investments*".

  c.    *BOT Act*

208. Whilst the BOT Act does not contain a definition of "*investment*", Article 1.13 does define an "*investor*" as "*one or more legal entities, Guinean or foreign, concession holders of one or more structures belonging to a complex that they have constructed or rehabilitated at their cost in accordance with the terms of a BOT Agreement signed with the State*".

209. As indicated earlier, by virtue of the Base Convention which qualifies as a BOT agreement, BSGR Guinea and BSGR Guernsey hold concessions over the mines and railways (inter alia) that they undertook to construct, finance, operate and maintain. Therefore, the Claimants are "*investors*" under the BOT Act and the infrastructures that they were constructing, until the Measures were implemented by the Government of Guinea, qualify as "*investments*".

       d.   *Base Convention*

210.    Whilst the Base Convention does not contain a definition of "*investment*", Article 1 does define "*the Investor*" as "*BSG Resources (Guinea) Limited, company under the law of Guernsey, with registered office in Guernsey*". The Government of Guinea thus considered at least BSGR Guernsey to be an "*investor*". The rights and obligations that BSGR Guernsey undertook by signing the Base Convention must therefore be considered to constitute an "*investment*".

**10.3**    **This dispute is between a contracting state and a national of another contracting state**

211.    The present dispute is between BSGR Guernsey and BSGR Guinea, as Claimants, and Guinea as Respondent.

212.    Guinea signed the ICSID Convention on 27 August 1968 and deposited instruments of ratification on 4 November 1968. The ICSID Convention entered into force in the Republic of Guinea on 4 December 1968.

213.    As for BSGR Guernsey, it is a company registered under the laws of the Bailiwick of Guernsey on 10 February 2009 with the registration number 50001. Guernsey constitutes a British Crown dependency of the United Kingdom of Great Britain and Northern Ireland ("**the United Kingdom**").

214.    The ICSID Convention entered into force in the United Kingdom on 18 January 1967. On 11 June 1973, the United Kingdom designated Guernsey as a constituent subdivision of the United Kingdom pursuant to Article 25(1) and Article 25(3) of the ICSID Convention and notified the Centre that Guernsey had approved its consent to ICSID jurisdiction. BSGR Guernsey is therefore a national of another Contracting State for the purposes and within the meaning of Article 25(2)(b) of the ICSID Convention.

215.    As for BSGR Guinea, it is a company incorporated under the laws of Guinea on 24 November 2006. However, BSGR Guinea and Guinea have agreed that, because of

foreign control, BSGR Guinea should be treated as a national of another Contracting State for the purposes and within the meaning of Article 25(2)(b) of the ICSID Convention; and BSGR Guinea has been treated as such at all material times.

216. More specifically, on 16 December 2009, BSGR Guinea, BSGR Guernsey and the Republic of Guinea entered into the Base Convention. On its true and proper construction, by the Base Convention the Parties agreed to treat BSGR Guinea as a national of another Contracting State within the meaning and for the purposes of Article 25(2)(b). The Claimants will rely upon all the terms of the Base Convention for their true meaning and full effect.

217. In particular, the Claimants will rely (without limitation) upon:

(i) Article 1 which defines "*control*" as the direct or indirect ownership by a company or any other entity of at least fifty percent (50%) of the shares providing a majority of the voting rights at the general meeting of another company or entity, or a holding providing  authority to determine policy and management;

(ii) Article 7, under which Guinea provided a good faith undertaking to comply with the terms and conditions set out in the Base Convention (including its obligations contained in and/or revealed by Articles 36.2 and/or 38.2);

(iii) Article 38.2, which, in addition to the reference to "*the Parties*" (including BSGR Guinea) making a request for arbitration to ICSID, specifically refers to the ability of "*the Company*", defined as BSGR Guinea, to appoint an arbitrator;

(iv) Article 36.2, which refers to the fact that *"the Concession can be terminated if the Company refuses to carry out a final decision in arbitration in accordance with clause 38 of this Agreement."* Thus, Article 36.2 specifically contemplates BSGR Guinea being party to an ICSID arbitration, and thus bound by an ICSID arbitration award, pursuant to Article 38; and

(v)     Annex 1 of the Base Convention, according to which the parent company of BSGR Guinea and BSGR Guernsey, BSG Resources Limited, incorporated in Guernsey, confirmed on behalf of the BSGR group that BSGR Guinea was authorized to enter into the Base Convention.

218.    Further, and in any event, at all material times, BSGR Guinea has been wholly owned and/or controlled by BSGR Guernsey.

## 10.4    The Parties have consented in writing to ICSID Arbitration

219.    The requirements of Article 25 of the ICSID Convention are satisfied in relation to the disputes arising under each of (i) the Base Convention, (ii) the Investment Code, (iii) the Mining Code and (iv) the BOT Act. The Claimants have taken all necessary actions required under ICSID Institution Rule 2 to bring the present proceedings.

### a.     Base Convention

220.    Article 38 of the Base Convention is headed "*Settlement of Disputes*". Subsection 38(1) is entitled "*Amicable phase*" and provides:

> "*In the event of a dispute and/or conflict between the Parties in respect of this Agreement and/ or the Concession, including but not limited to its validity, interpretation, execution, non-compliance or termination, the Parties undertake in the first instance to try to resolve the dispute or conflict between them amicably.*
>
> *Failing an amicable settlement within a period of one hundred and twenty (120) Days from the date of receipt of the notice sent by one Party to the other of the dispute or conflict between them, the provisions of clause 38.2 shall apply*"

221.    Subsection 38(2) is entitled "*Binding Arbitration*" and provides:

> "*The Parties agree to submit to the arbitration of the ICC any dispute arising from or related to this Agreement that has not be [sic] resolved under clause 38.1, using the Arbitration Convention of this institution.*
>
> *In addition, the Parties agree to make all requests and submissions to ICSID or to the International Arbitration Court, depending upon the*

*case, and to undertake any other actions and supply all information required to set up the arbitration proceedings.*

*Unless the Parties agree otherwise, the arbitration procedure shall take place in Paris (France) and shall be conducted in French.*

*There shall be three (3) arbitrators: one appointed by the Government, one appointed by the Company, and the third appointed by the two (2) arbitrators already chosen.*

*One of the Parties can start the arbitration process by sending the other Party a notice to that effect, including:*

a)   *Reference to the provision in this Agreement that has led to the dispute;*
b)   *Reference to the mining rights issued as part of this Agreement;*
c)   *The nature of the dispute that has led to the complaint and, if applicable, any sum of the complaint for damages or compensation;*
d)   *The facts that cause any complaint, and*
e)   *The remedy sought.*

*The Party that receives the notification must reply within thirty (30) Days, confirming or rejecting the complaint in whole or in part, and if applicable stating the nature and circumstances of any counter-complaint. Failure to reply within the period allocated is considered a refusal by this Party to accept the complaint and leads to the arbitration process provided for in this Agreement.*

*The Parties recognize that the decision handed down following arbitration under this Agreement is binding, final and without appeal.*

*The fact that one of the Parties does not take part in the arbitration is not a reason to reject the arbitration tribunal's jurisdiction or its decision. The Parties expressly waive any objections to arbitration procedures and the decision arising therefrom, unless the said arbitration does not comply with the requirements stipulated in this Agreement.*

*The Parties hereby expressly waive any immunity of jurisdiction and any immunity of execution, for themselves and their respective employees (except those of the Government exclusively reserved for diplomatic work), for the requirements of executing any decision or judgment handed down in respect of this Agreement.*"

222.   Article 38(1) and (2) of the Base Convention grants jurisdiction to hear the present dispute on the ground that:

(i)     the dispute arises from and/or relates to the Base Convention and the Zogota Mining Concession;

(ii)    each of the Claimants is a party to the Base Convention; and

(iii)   by letter dated 9 April 2015 to Guinea, the Claimants attempted to resolve this dispute amicably but have failed to do so.[59] The 120 period referred to in Article 38(1) thus expired on 10 August 2015 (being 120 days from the date of receipt of the notice by Guinea).

      *b.    Investment Code*

223.    Article 28(2) of the Investment Code provides for ICSID arbitration as follows:

> *"[...] Disputes between the Guinean government and foreign nationals regarding the application or interpretation of this Code, shall, unless otherwise agreed by the parties, be finally settled by arbitration conducted:*
>
> *in accordance with the provisions of the Convention of 18 March 1985 for the "Regulation of Investment Disputes between States and Nationals of other States" established under the auspices of the International Bank for Reconstruction and Development, ratified by the Republic of Guinea November 4, 1986"*

224.    Article 28(2) of the Investment Code contains an offer by Guinea to arbitrate disputes arising between the Guinean government and foreign nationals.

225.    As stated above, BSGR Guernsey is a foreign national and, for the purposes of the Investment Code, BSGR Guinea is also a foreign national.

226.    In accordance with Article 28(2) of the Investment Code and the ICSID Convention, the Claimants are entitled to refer the present disputes to arbitration under the ICSID Arbitration Rules.

---

[59] Letter from Mishcon de Reya to President Alpha Condé and others dated 9 April 2015 (Exhibit C-49).

227.   Accordingly, by filing this Request for Arbitration, BSGR Guernsey and BSGR Guinea each accept the offer to arbitrate its dispute with Guinea in accordance with Article 25 of the ICSID Convention and within the meaning of Article 28(2) of the Investment Code.

c.   *Mining Code*

228.   Article 184 of the Mining Code is headed '*Settlement of Disputes*' and provides as follows:

> *"Disputes between one or several mining investors and the State with regard to the extent of their rights and obligations, the performance or non-performance of their undertakings at the end of their titles, assignment, transfer, or subleasing of their rights arising therefrom may be subjected to an amicable settlement procedure.*
>
> *If one of the parties feels that the amicable settlement has failed, the dispute is to be brought before either the appropriate Guinean court or international arbitration in accordance with the agreement of March 18 1965 for the settlement of disputes with respect to investments between States and nationals of other States, established under the aegis of the International Bank for Reconstruction and Development"*

229.   For the reasons set out above, the Claimants and Guinea have failed to resolve their disputes amicably.

230.   Article 184 of the Mining Code contains an offer by Guinea to arbitrate disputes arising between Guinea and "*mining investors*". Each of BSGR Guernsey and BSGR Guinea is a mining investor within the meaning of the Mining Code.

231.   It is established practice that a national of a Contracting State may accept an offer to arbitrate contained in the legal instrument by instituting proceedings and that this shall count as having satisfied Article 25 of the ICSID Convention.

232.   Accordingly, by filing this Request for Arbitration, the Claimants hereby accept the offer to arbitrate its dispute with Guinea in accordance with Article 25 of the ICSID Convention and within the meaning of Article 184 of the Mining Code.

233.    By letter dated 9 April 2015, the Claimants reached out to Guinea in an attempt to settle this dispute amicably. However, the settlement discussions failed, granting an ICSID Tribunal jurisdiction to determine their claims.

d.    *BOT Act*

234.    Article 13(2) of the BOT Act provides that "*the BOT Agreement may freely determine the bodies and the procedure for settlement of disputes between the State and the investor. Any institutional arbitration clause may be stipulated, with the State, through this Law, hereby waiving any immunity from jurisdiction*".

235.    In other words, by virtue of Article 13(2) of the BOT Act, Guinea consents to any dispute resolution mechanism incorporated in a BOT Agreement.

236.    Taking into account that (i) the Base Convention constitutes a BOT agreement and (ii) the Base Convention contains an ICSID arbitration clause, Guinea has offered to arbitrate disputes under the BOT Act under the ICSID Convention.

237.    It is established practice that a national of a Contracting State may accept an offer to arbitrate contained in the legal instrument by instituting proceedings and that this shall count as having satisfied Article 25 of the ICSID Convention.

238.    Accordingly, by filing this Request for Arbitration, BSGR Guernsey and BSGR Guinea each accept the offer to arbitrate its dispute with Guinea in accordance with Article 25 of the ICSID Convention and within the meaning of Article 13(2) of the BOT Act.

## XI.    CONSTITUTION OF THE ARBITRAL TRIBUNAL

239.    Pursuant to Article 37(2)(b) of the ICSID Convention, and Rule 2 of the ICSID Arbitration Rules, the Claimants propose that a three member Arbitral Tribunal be appointed.

240.    Given that there is considerable overlap between the issues in this arbitration and the issues in the First ICSID Arbitration, the Claimants in this arbitration, and BSG

Resources Limited as Claimant in the First ICSID Arbitration, will in due course make an application for the consolidation of this arbitration and the First ICSID Arbitration.

241.   It follows that the same three member Tribunal already appointed to determine the issues in the First ICSID Arbitration (namely, Professor Gabrielle Kaufmann-Kohler, as President of the Tribunal, Professor Albert Jan van den Berg and Professor Pierre Mayer) should also be appointed as the Tribunal in this arbitration.

242.   The above should be taken as the Claimants' proposal for the purpose of Rule 2(1)(a) of the ICSID Arbitration Rules.  Accordingly, the 20-day time limit contained in Rule 2(1)(b) of the ICSID Arbitration Rules shall run from the date of registration of this Request.

243.   This Request for Arbitration is submitted in five signed copies pursuant to Rule 23(a) of the ICSID Arbitration Rules.

**Signed**

*Mishcon de Reya LLP*

**Mishcon de Reya LLP**

Submitted for and on behalf of BSG Resources (Guinea) Limited and BSG Resources (Guinea) SARL

**13** October 2015

**Karel Daele**
**James Libson**
**Mishcon de Reya LLP**
**Africa House**
**70 Kingsway**
**WC2B 6AH**
**London**
**Tel: +44 (0) 203 321 7060**
**Fax: +44 (0) 203 761 1856**

**Counsel for the Claimants**