## EXHIBIT 9

**LONDON COURT OF INTERNATIONAL ARBITRATION**

```
--------------------------------------------------------------------X
                                                        :
In the Matter of a Proposed Arbitration in Accordance   :
with the LCIA Rules of Arbitration between              :
                                                        :
                                                        :
VALE S.A.                                               :
                                                        :
                                  Claimant,             :
                                                        :
              – and –                                   :
                                                        :
                                                        :
BSG RESOURCES LIMITED                                   :
                                                        :
                                                        :
                                  Respondent.           :
                                                        :
--------------------------------------------------------------------X
```

## REQUEST FOR ARBITRATION

1. Claimant Vale S.A. ("Vale"), by its attorneys Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), requests arbitration under the Rules of Arbitration of the London Court of International Arbitration (the "LCIA Rules") against Respondent BSG Resources Limited ("BSGR").[1]

2. In accordance with Article 1.1 of the LCIA Rules, Vale sets out below (I) specifics about the parties to this arbitration, (II) a copy of the arbitration agreements and a statement of the governing law, seat, and language of the arbitration, (III) a brief statement describing the nature and circumstances of the dispute and specifying the claims brought, and (IV) the nomination of Claimant's arbitrator.

---

[1]    "BSGR" refers to Beny Steinmetz Group Resources. See ¶ 7 infra.

1

3.  In accordance with Article 1.2 of the LCIA Rules, Claimant is submitting four copies of this Request for Arbitration (including all accompanying documents) to the Registrar. Claimant confirms that copies of this Request for Arbitration and all accompanying documents are being served simultaneously by courier on Respondent both at its registered office and with its authorised agents for service,[2] and on its counsel, Skadden, Arps, Slate, Meagher & Flom (UK) LLP.

4.  Claimant also encloses herewith the registration fee of £1,750, as prescribed by the LCIA Schedule of Costs.

## I.    THE PARTIES TO THE ARBITRATION

5.  Claimant Vale is a public limited company (*Pr. Sociedade Anónima*) registered under the laws of Brazil, with its principal office at Av. Graca Aranha, 26, 20.300-900, Rio de Janerio, RJ, Brazil.  Vale's principal lines of business are mining and related logistics. It is the world's largest producer of iron ore, and also produces nickel, manganese ore, ferroalloys, coal, copper, platinum group metals, gold, silver, cobalt and potash, phosphates, and other fertilizer nutrients.  Vale's securities are traded on the stock exchanges of São Paulo, New York, Hong Kong, Madrid, and Indonesia, as well as on Euronext, and are included in the Índice Bovespa benchmark index of the São Paulo Stock Exchange.

6.  All communications and notices intended for Vale in this proceeding should be directed to its counsel Cleary Gottlieb at the following addresses:

---

[2]    BSG Management Services Limited, Level 3, 7 Old Park Lane, London, W1K 1QR (*see* Framework Agreement (as defined below) (Ex. C-1), s. 16.10(h); Shareholders' Agreement (as defined below) (Ex. C-2), s. 17.10(h)).

Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
NY 10006

| | |
|---|---|
| Telephone: | +1 212 225 2000 |
| Fax: | +1 212 225 3999 |

Attention:     Jonathan I. Blackman (jblackman@cgsh.com)
Joaquin P. Terceño (jterceno@cgsh.com)
Esti T. Tambay (etambay@cgsh.com)

Cleary Gottlieb Steen & Hamilton LLP
City Place House
55 Basinghall Street
London EC2V 5EH

| | |
|---|---|
| Telephone: | +44 207 614 2200 |
| Fax: | +44 207 600 1698 |

Attention:     Jonathan Kelly (jkelly@cgsh.com)
Adam Bryan (abryan@cgsh.com)
Magnus Jones (majones@cgsh.com)

7.    Respondent BSGR is a company registered under the laws of Guernsey with registered number 46565, with its registered office at West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX.  BSGR is principally engaged in mining operations in Africa and eastern Europe, and also engages in power generation and oil and gas exploration and production.  The company is wholly owned by Nysco Management Corporation Limited, a company incorporated in the British Virgin Islands, which is in turn wholly owned by the Balda Foundation, an irrevocable trust established in the Principality of Liechtenstein whose beneficiaries are Beny Steinmetz, an Israeli businessman domiciled in Switzerland who ultimately controls BSGR, and members of his family.

8.    Upon information and belief, BSGR is represented by:

3

Skadden, Arps, Slate, Meagher & Flom (UK) LLP
40 Bank Street
Canary Wharf
London E14 5DS

| Telephone: | +44 207 519 7000 |
| Fax | +44 207 519 7070 |

| Attention: | David Kavanagh (david.kavanagah@skadden.com) |
| | David Edwards (david.edwards@skadden.com) |

## II.  THE ARBITRATION AGREEMENTS

9.  Vale brings this arbitration against BSGR in connection with (i) a joint venture

Framework Agreement between Vale and BSGR dated 30 April 2010 (the "Framework

Agreement"), and (ii) a Shareholders' Agreement between Vale, BSGR and BSGR

Resources (Guinea) Limited ("BSGR Guernsey")[3] dated 30 April 2010 (the

"Shareholders' Agreement") (collectively, the "Agreements").  True and accurate

copies of the Framework Agreement and the Shareholders' Agreement are submitted

with this Request for Arbitration as Exhibits C-1 and C-2.

10.  Section 16.10 of the Framework Agreement provides:

### 16.10  Governing Law: Arbitration

a)  This Agreement is governed by English law. The Parties agree that
all disputes arising out of or in connection with this Agreement, or
with its negotiation, legal validity or enforceability, or with its
consequences, whether the alleged liability shall be said to arise
under the law of England or under the law of some other country,
and whether the same shall be regarded as contractual claims or
not, shall be exclusively governed by and determined only in
accordance with English law.

b)  Any dispute, controversy or claim arising between any of the
Parties to this Agreement out of or in connection with this
Agreement, including any question regarding the existence,
validity, or termination of this Agreement, shall be referred to and
finally resolved by arbitration under the Rules of Arbitration of the
London Court of International Arbitration (the "LCIA Rules"),

---

[3]  BSGR Guernsey subsequently became VBG Guernsey (as defined below) in the circumstances described in
Section III.A of this Request.

4

which Rules are deemed to be incorporated by reference into this Section 16.10. There shall be three arbitrators, and the Parties agree that one arbitrator shall be nominated by each Party to the arbitration for appointment by the LCIA Court in accordance with the LCIA Rules. The third arbitrator, who shall act as the chairman of the tribunal, shall be nominated by agreement of the two Party-nominated arbitrators within 14 days of the confirmation of the appointment of the second arbitrator, or in default of such agreement, appointed by the LCIA Court. The seat or place of arbitration shall be London, England. The language to be used in the arbitral proceedings shall be English. The award shall be final and binding on the parties to the arbitration and may be entered and enforced in any court having jurisdiction. Any request for arbitration shall be served on the other party pursuant to the notice provision in Section 16.2 of this Agreement.

c) In order to facilitate the comprehensive resolution of related disputes, and upon request of any party to an arbitration pursuant to this Section 16.10, an arbitral tribunal may, within 90 days of its appointment, consolidate the arbitration proceedings before it with any other arbitration proceedings or proposed arbitration proceedings involving the Parties. An arbitral tribunal shall not consolidate such arbitration proceedings unless it determines that (i) there are issues of fact or law common to the arbitrations in question so that a consolidated proceeding would be more efficient than separate proceedings and (ii) no party to the proceedings sought to be consolidated would be materially prejudiced as a result of such consolidation for any reason, including (a) a failure to have an equal say in the formation of the arbitral tribunal which would hear the consolidated proceedings, (b) a failure to be heard on the issue of consolidation or (c) undue delay. Unless the parties to the proceeding sought to be consolidated agree otherwise, the arbitral tribunal first formed shall determine the disputes arising in the consolidated proceedings. In the event of different rulings on the question of consolidation by differently constituted arbitral tribunals formed pursuant to this Section 16.10, there shall be no consolidation of proceedings unless all of the parties to the proceedings sought to be consolidated agree otherwise.

d) By agreeing to arbitration in accordance with this Section 16.10, the Parties do not intend to deprive any competent court of its jurisdiction to issue a pre-arbitral injunction, pre-arbitral attachment or other order in aid of the arbitration proceedings or the enforcement of any award. The arbitral tribunal shall have full authority to order a Party to seek modification or vacation of any order issued by a national court, and to award damages or give other appropriate relief for the failure of any Party to respect the arbitral tribunal's orders to that effect.

5

e)   The Parties hereby waive their rights to apply or appeal under Sections 45 and 69 of the Arbitration Act 1996.

f)   To the extent that any Party hereto (including permitted assignees of any Party's rights or obligations under the Agreement) may be entitled, in any jurisdiction, to claim for itself or its revenues, assets or properties, sovereign immunity from service of process, from suit, from the jurisdiction of any court, from attachment prior to judgment, from attachment in aid of execution of an arbitral award or judgment (interlocutory or final), or from any other legal process, and to the extent that, in any such jurisdiction there may be attributed such a sovereign immunity (whether claimed or not), each Party hereto hereby irrevocably agrees, to the extent permitted by law, not to claim, and hereby irrevocably waives generally, to the extent permitted by law, such sovereign immunity.

g)   Vale hereby confirms that it has irrevocably appointed TMF Corporate Services Limited at its registered office for the time being, being at the date hereof Pellipar House, 1st floor, 9 Cloak Lane, London, EC4R 2RU as its authorized agent for service of process in England of the kind described in Section 16.10(b) above. If for any reason Vale does not have such an agent in England, it will promptly appoint a substitute process agent and notify BSGR of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.

h)   BSGR hereby confirms that it has irrevocably appointed BSG Management Services Limited, a company registered in England and Wales with registered no. 05459227 at its registered office for the time being, being at the date hereof Level 3, 7 Old Park Lane, London, W1K 1QR as its authorized agent for service of process in England of the kind described in Section 16.10(b) above. If for any reason BSGR does not have such an agent in England, it will promptly appoint a substitute process agent and notify Vale of such appointment. Nothing herein shall affect the right to serve process in any other manner permitted by law.[4]

11.   The arbitration clause of the Shareholders' Agreement is found in Section 17.10 and is substantially identical to that above, other than in respect of provisions concerning multiparty arbitration and joinder, which are not relevant to this Request for Arbitration.[5]

---

[4]   Framework Agreement (Ex. C-1), s. 16.10.

[5]   See Shareholders' Agreement (Ex. C-2), s. 17.10.

12. In accordance with Section 16.10(c) of the Framework Agreement and Section 17.10(d) of the Shareholders' Agreement, Vale requests that its claims in connection with the Framework Agreement and Shareholders' Agreement be heard in a single, consolidated arbitration. Vale invites Respondent to acknowledge its agreement to this consolidation proposal in its Response to the Request for Arbitration.

## III. THE DISPUTE AND THE CLAIMS

13. In this arbitration, Vale seeks damages for fraudulent misrepresentations and fraudulent inducement by BSGR in connection with Vale's entry into the Agreements, which led Vale to pay BSGR $500 million and to invest a further $750 million in mining concessions in Guinea. It has now come to light that BSGR obtained those concessions by bribery and corruption of Guinean government officials. The Government of Guinea has revoked the concessions after its investigation into how BSGR obtained them uncovered the bribery and corruption that BSGR had committed.

14. Vale was induced to enter into the Agreements with BSGR on the basis of fulsome representations by BSGR and its representatives that it had not engaged in bribery or any other unlawful activities in connection with its obtaining the mining concessions. These representations have proven to be false and to have been made fraudulently by BSGR. As detailed further below, one of BSGR's agents, who was involved in BSGR's efforts in Guinea to obtain the concessions, has already pleaded guilty in the United States to criminal acts that he committed, at BSGR's direction and with its knowledge, in an unsuccessful effort to destroy documentary evidence of the bribery in which BSGR had engaged. The Government of Guinea has discovered additional evidence tying BSGR to corrupt activities. On the basis of this evidence, the Government of Guinea has found that BSGR bribed Guinean officials to obtain the

7

concessions in which BSGR subsequently induced Vale to invest, and on the basis of that finding has revoked the concessions.

15. These corrupt activities all occurred prior to Vale's investment, and were completely contrary to the representations made by BSGR to Vale that neither it nor its agents had engaged in any such conduct. Notwithstanding this fact, the Government of Guinea's revocation of the concessions due to BSGR's corrupt activities has resulted in Vale losing its entire $750 million investment in the mining operations under the concessions, as well as the $500 million that it initially paid to BSGR when it entered into the Agreements. Vale thus seeks the return of the money that BSGR fraudulently obtained from it, the additional damages it has suffered from the loss of its investment attributable to BSGR's misconduct, rescission of its Agreements with BSGR, and (if and to the extent necessary) a declaration that the Agreements have been frustrated, relieving Vale of any further obligations it would have under those Agreements.

## A. Background

16. On 9 December 2008, the Republic of Guinea awarded an exploration permit to BSG Resources (Guinea) S.à r.l. ("BSGR Guinea"), a company registered in Guinea and a 100% subsidiary of BSGR Guernsey,[6] to explore for, *inter alia*, iron ore in the Simandou region. BSGR Guinea was subsequently awarded a second exploration permit on 10 June 2009, as well as various permits for exploration in Liberia (by the Government of Liberia) on 10 September 2008 and 28 November 2008.

17. On 16 December 2009, BSGR Guinea entered into an agreement with the Republic of Guinea (the "Basic Agreement"), pursuant to which BSGR Guinea was granted a

---

[6] Notwithstanding the nearly identical names – BSG Resources (Guinea) Limited and BSG Resources (Guinea) S.à r.l. – it is important to distinguish between the joint venture company, BSGR Guernsey, and its wholly-owned subsidiary, BSGR Guinea, which was the permit-holder and concessionaire in Guinea (as further set out at ¶ 20 and note 6).

8

concession on 19 March 2010 to exploit blocs 1 and 2 of the Simandou iron ore deposit ("Simandou Blocs 1 and 2") and the Zogota iron ore deposit, all of which are located in the far east of Guinea (collectively, the "Concession Areas"). The exploitation rights for Simandou Blocs 1 and 2 had previously belonged to the British-Australian mining company Rio Tinto Group, prior to the Republic of Guinea's withdrawing those exploitation rights from Rio Tinto in July 2008.

### B. Formation of the Joint Venture between Vale and BSGR

18.  After BSGR obtained the exploration permits, entered into the Basic Agreement with the Republic of Guinea, and was granted the right to exploit the Concession Areas, it approached Vale with the possibility of selling Vale an interest in the concessions. In early 2010, BSGR and Vale began negotiations towards establishing a joint venture for the exploitation of the Concession Areas. Vale wished to acquire an interest in the development of the Simandou deposit, which was widely acknowledged to be one of the largest, if not the largest, remaining unexploited iron ore deposits in the world, whilst BSGR needed a partner that could both invest capital and offer technical expertise for the development of the Concession Areas, which was a condition of BSGR Guinea's concession rights. The project name for the negotiations between Vale and BSGR to create this joint venture was "Project Hills."

19.  The Project Hills negotiations culminated in a suite of agreements – including the Framework Agreement and the Shareholders' Agreement – between Vale and BSGR (the "Transaction Documents"), each dated on or about 30 April 2010, by which Vale agreed to purchase a 51% stake in BSGR Guernsey (and thus an indirect controlling interest of BSGR Guinea, the rights-holder for the Concession Areas). Under the Framework Agreement, Vale agreed to pay to BSGR a total consideration of US$2.5

billion for this stake in BSGR Guernsey, with US$500 million paid upon execution of the Framework Agreement and the remainder deferred pending the completion of various milestones in the development of the Concession Areas.

20.    Following execution of the Transaction Documents on 30 April 2010, BSGR Guernsey was renamed VBG – Vale-BSGR Guinea Limited ("VBG Guernsey" or the "JVCo") and its subsidiary BSGR Guinea was renamed VBG – Vale-BSGR Guinea S.à r.l. ("VBG Guinea").[7] The Shareholders' Agreement governed the relationship between BSGR, Vale, and the JVCo. Pursuant to the Shareholders' Agreement, Vale had exclusive responsibility for the "day-to-day business and activities" of both VBG Guernsey and VBG Guinea, subject to certain minority rights of BSGR.

21.    From the time of its acquisition, Vale made significant investments towards developing the Concession Areas and ensuring that VBG Guinea remained in compliance with its obligations under the Basic Agreement. Vale invested approximately US$750 million into the development of the Concession Areas (the "Project"), including funding nearly all preliminary works necessary to commence mining operations at Zogota (such as earthworks and drilling operations, geological studies, and significant infrastructure investments), and funding a feasibility study for Simandou Blocs 1 and 2, which was submitted to the Government of Guinea in September 2011. Including the initial payment of $500 million to BSGR, Vale has thus to date spent approximately $1.25 billion in reliance on its Agreements with BSGR and the statements and representations made by BSGR to induce Vale to enter into the Agreements and other Transaction Documents.

---

[7]    For convenience of reference, in this Request for Arbitration the Guernsey-incorporated joint venture company is referred to as "BSGR Guernsey" and the Guinea-incorporated rights holder as "BSGR Guinea" where the context relates to the period prior to 30 April 2010, and as "VBG Guernsey" and "VBG Guinea" (respectively) after that date, even though the entities remained the same throughout.

10

## C. Representations and Warranties Related to Anti-Corruption

22. As part of the Project Hills transaction, BSGR made a series of representations and warranties to Vale, including the following representations made in the Framework Agreement in respect to anti-corruption matters:

Framework Agreement, Schedule 4, Part B

*Section 3 – Regulatory Matters*

3.1 The businesses of each BSGR Guinea Group Company have been carried on and are being carried on in compliance with all Applicable Law [...];

3.2 [...] As of the date of this Agreement, no BSGR Guinea Group Company is aware of the existence of circumstances which represent a real threat that any Relevant Permit (including any Exploration Permit, the Mining Concession and the Basic Agreement) is likely to be revoked or restricted or amended in such a manner which is materially prejudicial to the interests of a BSGR Guinea Group Company;

3.5 In regard to the operations of the BSGR Guinea Group and all matters governed by this Agreement, none of BSGR nor any BSGR Guinea Group Company nor any BSGR Advisory Company nor any of their respective agents have paid, offered, promised, or authorised the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to know that any portion of such exchange is for the purpose of:

(a) corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSGR, any BSGR Guinea Group Company, any BSGR Advisory Company or any other person in obtaining or retaining business, or directing business to any third party;

(b) securing an improper advantage;

(c) corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Entity in order to assist BSGR, any BSGR Guinea Group Company or any other person in obtaining or retaining business, or directing business to any third party; or

(d) providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s),

and no agent of any BSGR Guinea Group Company has done or procured or induced any person to do any of the foregoing.

3.6    In connection with this Agreement, and any Ancillary Agreements, and (where relevant) their respective obligations thereunder, no BSGR Guinea Group Company nor any BSGR Advisory Company nor any of their agents:

(a)    has taken any action, directly or indirectly, that has resulted or would result in a violation of any applicable laws implementing the OECD Convention on Bribery of Foreign Public Officials in International Business Transactions (the "OECD Convention") or any similar laws or regulations to which any BSGR Guinea Group Company, any BSGR Advisory Company or any of their respective agents is subject; or

(b)    have paid, offered, promised, or authorized the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to know that any portion of such exchange is for the purpose of:

(i)    corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSGR, any BSGR Guinea Group Company, any BSGR Advisory Company or any other person in obtaining or retaining business, or directing business to any third party;

(ii) securing an improper advantage;

(iii) corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Governmental Entity in order to assist BSGR, any BSGR Guinea Group Company or any other person in obtaining or retaining business, or directing business to any third party; or

(iv) providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s),

and no agent of any BSGR Guinea Group Company has done or procured or induced any person to do any of the foregoing.


*Section 4 – Litigation*

4.2    No litigation, arbitration or administrative proceedings are threatened or pending by or against any BSGR Guinea Group

Company where, in each case, or in aggregate, the negative resolution of which would adversely affect any BSGR Guinea Group Company in the performance of its obligations under this Agreement and/or any Ancillary Agreement and/or the Basic Agreement to which it is a party *and to the knowledge of BSGR no fact or circumstance exists which may give rise to any such litigation, arbitration or proceedings.* [Emphasis supplied.]

23. In addition, Vale received further assurances and comfort in respect of BSGR's position

on compliance when Mr. Steinmetz personally certified that:

    1.    In connection with the business of BSG Resources (Guinea) Ltd. and/or the transactions [contemplated in the Framework Agreement], I have complied and will comply with the prohibitions of "Anti-Bribery Laws" (Anti-Bribery Laws include any applicable anti-bribery law, rule, or regulation of any locality, or any other law, rule or regulation of similar purpose and effect). ·

    2.    In connection with the business of BSG Resources (Guinea) Ltd. and/or the transactions contemplated in the Joint Venture Framework Agreement, I have not and will not, directly or indirectly including through a third party:

        a.    Pay, offer, promise, or authorize the payment of money or anything of value, to a Government Official […] or to anyone else, while knowing or having reason to believe that any portion of such exchange is for the purpose of:

            i.    corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSG Resources (Guinea) Limited or any other person in obtaining or retaining business, or directing business to any third party;

            ii.    securing an improper advantage;

            iii.    corruptly inducing such Government Official(s) to use their influence to affect or inflluence any act or decision of a Government Authority in order to assist BSG Resources- (Guinea) Limited or any other person in obtaining or retaining business, or directing business to any third party; or

            iv.    providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s).

    3.    I do not know or have reason to believe that BSG Resources (Guinea) Limited, its subsidiaries and affiliates or their respective

13

officers, directors, employees, or anyone acting on their behalf, or any third party in connection with the business of BSG Resources (Guinea) Ltd. and/or the transactions contemplated in the Joint Venture Framework Agreement has paid or will pay, offer, promise or authorize the payment of money or anything of value, directly or indirectly while knowing or having reason to believe that any portion of such exchange is for the purpose of:

a. corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSG Resources (Guinea) Limited or any other person in obtaining or retaining business, or directing business to any third party;

b. securing an improper advantage;

c. corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Government Authority in order to assist BSG Resources (Guinea) Limited or any other person in obtaining or retaining business, or directing business to any third party; or

d. providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s).[8]

24. David Clark, a director of BSGR, made a similar certification in respect of points 1 and 3 above.[9]

25. In reliance and on the basis of these representations and warranties and on the personal certifications from Mr. Steinmetz and Mr. Clark, Vale entered into the Transaction Documents.

## D. The Technical Committee's Investigation into Bribery by BSGR

26. More than two years after Vale and BSGR had entered into the Transaction Documents and Vale had invested in reliance on the representations that BSGR had not engaged in any corrupt activities, on 30 October 2012, the *Comité Technique de Revue des Titres et Conventions Miniers* (the Technical Committee for the Review of Mining Titles and Agreements of the Government of the Republic of Guinea, or "Technical Committee")

---

[8] Certificate of Beny Steinmetz, dated 9 April 2010 (Ex. C-3).

[9] Certificate of David Clark, dated 30 April 2010 (Ex. C-4).

14

wrote to VBG Guinea expressing its intention to investigate the manner in which BSGR Guinea (as VBG Guinea was called at the time it acquired its mining titles) had obtained its Guinean mining titles (the "Notification Letter").[10] The Notification Letter set forth that the Technical Committee's investigation was focused on various corrupt actions alleged to have been carried out by BSGR Guinea and its agents in order improperly to influence the Government of Guinea into awarding it the mining rights to the Concession Areas (the "Corrupt Activities").

27. According to the Notification Letter, the Corrupt Activities included that BSGR, acting through its confidential agent Frédéric Cilins and other representatives:

    a. had paid at least $2.5 million in cash to the then-President's wife, Mamadie Touré, for her assistance in obtaining the President's support for granting the mining rights to Simandou Blocs 1 and 2 to BSGR Guinea;

    b. had entered into a Commission Agreement with Mrs. Touré, contracting to pay her a further $2.5 million;

    c. had offered other gifts to Mrs. Touré and her brother, Ibrahima Touré, and appointed Ibrahima Touré as a director, and later a Vice-President, of BSGR Guinea;

    d. had given the then-President of Guinea a diamond-encrusted watch valued at more than US$60,000;

    e. had given numerous and substantial gifts to the Minister of Mines, Mahmoud Thiam, including the use of the BSGR corporate jet; and

    f. had entered into at least one other Commission Agreement under which individuals acting on behalf of the Government of Guinea and their family

---

[10] Notification Letter (with translation), dated 30 October 2012 (Ex. C-5).

members would be rewarded for assisting with BSGR Guinea's procurement of the rights to the Concession Areas.

28. The Corrupt Activities further included allegations that, upon being awarded the mining rights to the Concession Areas, BSGR Guinea (i) had made regular payments to high-ranking military officials during the military regime in Guinea; and (ii) had assisted in and supported the illegal sale of military hardware from an Israeli defence company to the Guinean army during the period of military rule over the country that pre-dated the current government.

29. The Technical Committee requested explanations from VBG Guinea in response to these allegations,[11] and explained the procedure of the investigation that it intended to carry out. After reviewing the Notification Letter's allegations, Vale insisted that BSGR – as the entity that had been in sole control of VBG Guinea at the time that it had acquired the rights to the Concession Areas – respond substantively to the allegations. BSGR instead purported to challenge the legality and integrity of the Technical Committee, while refusing to cooperate substantively with its investigation.

30. Over the following months, BSGR provided only partial responses to the Technical Committee, despite repeated requests from both the Technical Committee and Vale that it respond in full to the allegations made in the Notification Letter. Beyond conclusory denials of the Technical Committee's charges and media statements that BSGR was a victim of a global conspiracy to expropriate its mining license assets, BSGR's only substantive response was to assert that various documents obtained by the Technical Committee's investigation evidencing the payment of bribes on its behalf were all

---

[11] The Notification Letter included as an annex a questionnaire with a detailed list of information and documents requested by the Technical Committee, which the Guinean Minister of Mining and Geology had originally sent to VBG on 17 November 2011.

16

"forgeries." The credibility of these assertions was, to say the least, substantially undermined when Mr. Cilins, acting on behalf of BSGR, was recorded by the United States Federal Bureau of Investigation ("FBI") offering substantial monies to Mamadie Touré to procure the destruction of those documents, he was arrested, and he subsequently pleaded guilty to attempting to destroy those documents. See ¶¶ 34-37 infra.

31.  On 16 December 2013, following approximately a year of stonewalling by BSGR, the Technical Committee held a hearing in Conakry, Guinea into the Corrupt Activities. Despite the Technical Committee confirming that BSGR could attend this hearing – and even offering to assist it with the logistical arrangements – and despite Vale's repeated insistence that BSGR needed to attend as it was the only party capable of properly addressing the allegations and protecting VBG Guinea's rights in the Concession Areas, BSGR refused to appear at the hearing; BSGR did not send any representatives of the company, nor even its legal counsel, nor any other authorised representative. VBG Guinea was instead represented by Vale representatives and appointees, none of whom, of course, had been involved with BSGR Guinea at the time of the Corrupt Activities, nor could provide any substantive answers to the Technical Committee's questions.

32.  On the basis of its investigation, on 28 March 2014, the Technical Committee communicated its recommendation to the Strategic Contract Review Committee (the "Strategic Committee")[12] that it propose to the Minister of Mines and the President that the Government of Guinea withdraw the rights to the Concession Areas from VBG

---

[12]  While the Technical Committee is the operational arm of the contract review process, it answers to the Strategic Committee, which is responsible for political and strategic questions related to mining contract review, is composed of several Ministers, and reports directly to the President of Guinea.

Guinea and exclude VBG Guinea and BSGR from participating in the reallocation of the concessions (the "Recommendation").[13] The Recommendation was based on the Technical Committee's findings that BSGR had obtained the concessions through what the Technical Committee had found were corrupt practices that invalidated those concessions. The Recommendation indicated that Vale had not participated in any of the Corrupt Activities, nor had otherwise contravened Guinean law.

33. Following the Technical Committee's Recommendation, on 2 April 2014, the Strategic Committee issued its opinion to the President and the Minister of Mines and Geology, concurring with the Recommendation. On 17 April 2014, the President's Cabinet decided to adopt the Strategic Committee's opinion. On that basis, the Government of Guinea formally withdrew the rights to the Concession Areas from VBG Guinea by a Presidential Decree on 17 April 2014 and orders signed by the Minister of Mines dated 18 and 23 April 2014 (collectively, the "Withdrawal Decision").[14] Both the Presidential Decree and the ministerial order of 18 April 2014 stated that these rights were being revoked because of the fraudulent means through which they had been obtained by BSG Resources (Guinea) Limited. The Guinean Government did not find any involvement by Vale in the fraudulent conduct relating to the acquisition of the mining licenses, which occurred more than one year before Vale made any investment in VBG.

---

[13] Recommendation and Report of the Technical Committee, dated 21 March 2014 (Ex. C-6). A translation will be supplied as soon as it is available.

[14] Withdrawal Decision (Ex. C-7) (with translation).

### E. Additional Criminal Investigations into BSGR Guinea's Acquisition of the Rights to the Concession Areas

34. The Technical Committee is not the only governmental body to have investigated BSGR's actions with regard to BSGR Guinea's acquisition of the rights to the Concession Areas. Around January 2013, a United States Federal Grand Jury in the Southern District of New York, with the aid of the FBI, began a criminal investigation concerning potential money laundering and violations of the Foreign Corrupt Practices Act 1977 ("FCPA"), relating to BSGR's alleged bribes to Guinean Government officials in connection with its obtaining the mining rights to the Concession Areas (the "Grand Jury Investigation"). The Grand Jury Investigation is still ongoing.

35. The FBI arrested Mr. Cilins, one of the BSGR agents referenced in the Notification Letter, on 14 April 2013, after recording several conversations during which he offered Mrs. Touré payment in exchange for her destroying five contracts that were subject to a subpoena in the Grand Jury Investigation and in return for her agreeing to make false statements in connection with the Grand Jury Investigation. These contracts provided for payments from a subsidiary of BSGR to Mrs. Touré and affiliated entities in exchange for her assisting in BSGR's obtaining rights to the Concession Areas.

36. On 15 April 2013, the United States Department of Justice (the "US DOJ") filed a criminal complaint against Mr. Cilins, alleging that he sought to obstruct justice and destroy documents relevant to the Grand Jury Investigation. The complaint against Mr. Cilins alleged that he had offered Mrs. Touré – who was acting as a cooperating witness in the Grand Jury Investigation – US$1 million to destroy the contracts.[15] These are the same contracts that BSGR has repeatedly claimed are "forgeries."

---

[15] *USA v. Cilins*, Criminal Complaint 13 MAG 975, dated 15 April 2013 (Ex. C-8).

37. On 18 February 2014, the US DOJ filed a Superseding Indictment against Mr. Cilins, which added a conspiracy charge against him, alleging that he and others "sought to obstruct the investigation of allegations that a business entity based outside the United States that is engaged in the mining industry had paid bribes to obtain a valuable mining concession in Guinea's Simandou regions."[16] The charge referred to two other co-conspirators, including one that is believed to be Mr. Steinmetz, to whom Mr. Cilins expressly referred as the person on whose behalf he was acting in the conversations recorded by the FBI.[17]

38. On 10 March 2014, a few weeks before his trial was set to begin, Mr. Cilins pleaded guilty to a charge of obstruction of justice, admitting that he "agreed to pay money to [Mrs. Touré] to induce [her] to destroy, and to provide to [him] for destruction, documents, including documents related to allegations concerning the payment of bribes to obtain mining concessions in the Simandou region of Guinea."[18]

39. BSGR is also under investigation by law enforcement agencies in several other countries in relation to its illicit activities in Guinea, including by authorities in Switzerland, France, and the United Kingdom. In August 2013, Swiss and French authorities carried out a number of coordinated raids on properties linked to Mr. Steinmetz and BSGR's management as part of their investigations. In early September 2013, it was reported that the United Kingdom's Serious Fraud Office and Guernsey's

---

[16] *USA v. Cilins*, Superseding Indictment 13 Cr. 315, dated 18 February 2014 (Ex. C-9).

[17] *USA v. Cilins*, Superseding Indictment 13 Cr. 315, dated 18 February 2014 (Ex. C-9).

[18] *USA v. Cilins*, Superseding Information 13 Cr. 315, dated 10 March 2014 (Ex. C-10).

Financial Investigations Unit had also opened inquiries into BSGR's business in Guinea.[19]

## F. Statement of Claims

### 1) Fraudulent Misrepresentation

40. The findings of the Technical Committee outlined in Section III.D unequivocally establish that the representations and warranties given by BSGR, Mr. Steinmetz, and Mr. Clark in respect of anti-corruption, as described in Section III.C, were false. It is clear that these representations were crucial in inducing Vale to enter into the Transaction Documents, particularly in the circumstances where Vale insisted on receiving personal certifications that the Concession Areas had not been obtained through corruption from Mr. Steinmetz, the principal of BSGR, and Mr. Clark, a director of BSGR, prior to entering into the Transaction Documents.

41. The Technical Committee's Recommendation also makes it clear that the misrepresentations of BSGR, Mr. Steinmetz, and Mr. Clark were made fraudulently: *i.e.*, they were knowingly false, made without belief in their truth or recklessly as to their truth. The Technical Committee found that BSGR had obtained the concessions through corrupt activities, evidenced by contracts providing for payments to individuals in exchange for their successfully influencing the Government of Guinea to award the concessions to BSGR. This puts BSGR's misrepresentations outside the limitation of liability clause in the Framework Agreement, which does not exclude liability in cases of fraud.[20]

---

[19]  Inquiry over Steinmetz Guinea mining deal extends to UK and Guernsey, The Guardian, 4 September 2013 (Ex. C-11).

[20]  See Framework Agreement (Ex. C-1), s. 16.13; Schedule 5, s. 3.15.

42. The consequences of fraudulent misrepresentation under English law (the law applicable to the Transaction Documents) are an entitlement to the rescission of the relevant contracts and damages based on the claimant's reliance interest (*i.e.*, such that a claimant is put back in the position it would have been in had it not entered into the contract).

### 2) *Breach of Warranty*

43. The representations made by BSGR regarding anti-corruption were repeated as warranties in the Framework Agreement.[21] Following the Technical Committee's Recommendation and the Government of Guinea's subsequent Withdrawal Decision, it is clear that BSGR breached such warranties, entitling Vale to damages in the amount of its expectation interest (*i.e.*, such that it is put in the position it would have been in had the warranties not been breached).

### 3) *Frustration*

44. The revocation of VBG Guinea's mining rights in respect of the Concession Areas has frustrated the Shareholders' Agreement and the Framework Agreement, by making it commercially impossible for the parties to perform their obligations under those agreements or, at the very least, rendering those obligations radically different from the obligations that the parties undertook when the agreements were made.

45. The Transaction Documents contain *force majeure* clauses providing that a revocation of the mining rights that is "beyond the control" of all parties will result in the obligations under those agreements being suspended while the parties cooperate in good faith with a view to reaching a mutually viable solution. Those provisions (a) specifically exclude revocation resulting directly from corrupt transactions engaged in

---

[21] Framework Agreement (Ex. C-1), s. 8.1; Schedule 4.

by one party and thus not beyond its control, and (b) cannot sensibly be applied to, and were plainly not drafted in contemplation of, a revocation in circumstances disqualifying VBG Guinea from any substitute licence, such that no amount of cooperation "in good faith" can result in a viable solution.[22]

46. Under the Law Reform (Frustrated Contracts) Act 1943, not only are the frustrated contracts discharged, but Vale is also entitled to recover all sums that it has paid pursuant to such contracts.[23]

## IV. VALE'S NOMINEE FOR ARBITRATOR

47. Under 16.10(b) of the Framework Agreement and 17.10(b) of the Shareholders' Agreement, the parties have agreed that the Arbitration be heard by a three-member Arbitral Tribunal, with one arbitrator appointed by Claimant, one arbitrator appointed by Respondent, and the Tribunal chairman appointed jointly by the other two arbitrators.

48. Vale hereby nominates as its arbitrator:

David AR Williams QC

Essex Court Chambers
24 Lincoln's Inn Fields
London WC2A 3EG

---

[22] See Framework Agreement (Ex. C-1), s. 12.6; Shareholders' Agreement (Ex. C-2), s. 15 (incorporating Framework Agreement s. 12.6 by reference). See, in particular, Framework Agreement (Ex. C-1) s. 12.6(a) (if a "*Force Majeure Event*" occurs, "*either Party may propose appropriate revisions to this Agreement, and both Parties will endeavor to find a mutually acceptable solution*"), s. 12.6(b)(iv)-(v) ("*Force Majeure Event*" defined to include "*the revocation, annulment or materially adverse restriction of the Basic Agreement, the Mining Concession or any of the Guinea Exploration Permits for reasons which are beyond the control of the Parties and are not otherwise connected to any direct or indirect action by either Party against or in violation of any of the Basic Agreement, the Mining Concession and the Guinea Exploration Permits*" and "*the implementation of any action, without either Party having had any direct or indirect involvement in causing the implementation of such action, which materially and adversely affects the rights granted to ProjectCo under the Basic Agreement, the Mining Concession and/or any of the Guinea Exploration Permits*" (emphasis added)), and s. 12.6(c)(iii) (if Vale determines that a "*Force Majeure Event*" has occurred, then "*the Parties will continue to cooperate in good faith with a view to reaching a mutually viable solution to the Force Majeure Event*").

[23] Law Reform (Frustrated Contracts) Act 1943, s. 1.

23

England
Telephone:     +44 (0)20 7813 8000
Facsimile:     +44 (0)20 7813 8080

Bankside Chambers
88 Shortland Street
Auckland
New Zealand
P.O. Box 405, Shortland Street
Telephone:     (64 9) 367 6896
Facsimile:     (64 9) 367 6895

## V.  PRAYER FOR RELIEF

49.  For the foregoing reasons, Vale respectfully requests the Tribunal to grant the following
relief:

### Relief for Fraudulent Misrepresentation

    a.  Rescission of the Framework Agreement and the Shareholders' Agreement;

    b.  Damages in the sum of approximately $1.25 billion for fraudulent

       misrepresentation in respect of the misrepresentations set forth in Section

       III.C, above, of whatever nature in an amount to be determined in the course

       of this arbitration, as well as interest on such sum at an appropriate rate;

and/or

### Relief for Frustration

    c.  A declaration that the Framework Agreement and Shareholders' Agreement

       are discharged by frustration;

    d.  Recovery of monies paid by Vale under the Framework Agreement and

       Shareholders' Agreement, as well as interest on such sum at an appropriate

       rate;

and/or

*Relief for Breach of Warranty*

 e. An award of damages for breach of contract in respect of all losses and costs caused to Vale in respect of the breaches set forth in Section III.D, above, of whatever nature in an amount to be determined in the course of this arbitration, as well as interest on such sum at an appropriate rate;

50. In any event, Vale further requests that the Tribunal grant:

 a. An order requiring BSGR to pay all costs of this arbitration including the fees and expenses of the Tribunal, the administrative charges of the LCIA, the fees and expenses of any experts appointed by the Parties or the Tribunal and all reasonable legal and other costs;

 b. Interest on any sums awarded from the date of the award until payment; and

 c. Such other relief as deemed appropriate and proper.

Respectfully submitted on 28 April 2014.

Cleary Gottlieb Steen & Hamilton LLP

By: _Cleary Gottlieb Steen & Hamilton LLP_

Jonathan I. Blackman
Joaquin P. Terceño
Esti T. Tambay
One Liberty Plaza
NY 10006
New York
Telephone:    +1 212 225 2000
Fax:          +1 212 225 3999

Jonathan Kelly
Adam Bryan
Magnus Jones
City Place House
55 Basinghall Street
London EC2V 5EH
Telephone:    +44 207 614 2200
Fax:          +44 207 600 1698

## Index to Exhibits

| Exhibit | Description | Date |
|---------|-------------|------|
| C-1 | Framework Agreement | 30 April 2010 |
| C-2 | Shareholders' Agreement | 30 April 2010 |
| C-3 | Certificate of Beny Steinmetz | 9 April 2010 |
| C-4 | Certificate of David Clark | 30 April 2010 |
| C-5 | Notification Letter (with translation) | 30 April 2012 |
| C-6 | Recommendation and Report of the Technical Committee (translation to be supplied) | 21 March 2014 |
| C-7 | Withdrawal Decision (with translation) | 24 April 2014 |
| C-8 | *USA v. Cilins*, Criminal Complaint 13 MAG 975 | 15 April 2013 |
| C-9 | *USA v. Cilins*, Superseding Indictment 13 Cr. 315 | 18 February 2014 |
| C-10 | *USA v. Cilins*, Superseding Information 13 Cr. 315 | 10 March 2014 |
| C-11 | *Inquiry over Steinmetz Guinea mining deal extends to UK and Guernsey*, The Guardian | 4 September 2013 |