## EXHIBIT 10



**Claim form**
**(arbitration)**

In the High Court of Justice
Business and Property Courts of England & Wales
Wales
Commercial Court (OBD)

*[stamp: HIGH COURT OF JUSTICE ... 10 May 2019 ... BUSINESS & PROPERTY COURTS OF ENGLAND & WALES]*

*for court use only*

| Claim No. | CL-2019-000262 |
|---|---|
| Issue date | |

## In an arbitration claim between

Claimant

BSG Resources Limited (In Administration) of West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX

Defendants

1) Vale S.A. of Av. Graca Aranha, 26, 20.300-900, Rio de Janerio, RJ, Brazil

2) Filip De Ly of Law Faculty, Erasmus University, PO Box 1738, NL-3000 DR Rotterdam, The Netherlands

3) David A.R. Williams QC of Essex Court Chambers, 24 Lincoln's Inn Fields, London WC2A 3EG

4) Michael Hwang S.C. of Essex Court Chambers, 24 Lincoln's Inn Fields, London WC2A 3EG

## In the matter of an arbitration between

Claimant

Vale S.A. of Av. Graca Aranha, 26, 20.300-900, Rio de Janerio, RJ, Brazil

Respondent

BSG Resources Limited (In Administration) of West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX

*Set out the names and addresses of persons to be served with the claim form stating their role in the arbitration and whether they are defendants.*

See above. The Second to Fourth Defendants are the co-arbitrators in the arbitration (the Second Defendant is the Chairman).

| Defendants' names and addresses | As above | ☐ This claim will be heard on: |
|---|---|---|
| | | at     am/pm |
| | | ☐ This claim is made without notice. |

N8 Claim form (arbitration)
This form is reproduced from *http://hmctsformfinder.justice.gov.uk/HMCTS/FormFinder.do* and is subject to Crown copyright protection. Contains public sector information licensed under the Open Government Licence v1.0

| | Claim No. | |
|---|---|---|

Remedy claimed and grounds on which claim is made.

See attached Annex.

| Claim No. | |
|---|---|

The claimant seeks an order for costs against the Defendants.

Statement of truth
The Claimant believes that that facts stated in these particulars of claim are true.
I am duly authorised by the Claimant to sign this statement.

Full name: KAREL DAELE

Name of claimant's legal representative's firm: MISHCON DE REYA LLP...

Signed _____      position or office held: PARTNER
    Claimant's legal representatives

Mishcon de Reya LLP
Africa House
70 Kingsway
London
WC2B 6AH

Tel: 02033217000
Ref: 40252.8/James Libson / Karel Daele

Claimant's or claimant's solicitor's address to which documents should be sent if different from overleaf. If you are prepared to accept service by DX, fax or e-mail, please add details.

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

**IN THE MATTER OF AN ARBITRATION CLAIM**

**BETWEEN:**

**BSG RESOURCES LIMITED (in administration)**

<u>Claimant</u>

**and**

**(1) VALE S.A.**
**(2) FILIP DE LY**
**(3) DAVID A.R. WILLIAMS**
**(4) MICHAEL HWANG**

<u>Defendants</u>

---

## ANNEX TO ARBITRATION CLAIM FORM

---

**Introduction**

1. This is an application by BSG Resources Limited (in administration) ("BSGR") in relation to an arbitration award dated 4 April 2019 made by Professor Filip De Ly (Chairman), Sir David A.R. Williams QC and Dr Michael Hwang SC, in LCIA arbitration number 142683 (the "**Award**").[1]

2. This application is brought under ss.68 and 24 of the Arbitration Act 1996 (the "**Act**"):

    (1) challenging the Award on the grounds of serious irregularity affecting the Tribunal, the proceedings or the Award;

    (2) for an order (in respect of all issues):

---

[1] Documents referred to in this Annex are cross-referenced to Exhibit KND2 to the Second Witness Statement of Karel Norbert Daele, which is being filed in support of this application.

(a)     setting the Award aside in whole or in part, or

(b)     declaring the Award to be of no effect in whole or in part, or

(c)     alternatively, in respect of the Tribunal's failure to deal with an issue pursuant to s.68(2)(d), remitting the Award to the Tribunal, in whole or in part, for reconsideration.

3.     The grounds of serious irregularity relied on by BSGR are:

(1)     A pattern of conduct giving rise to apparent bias under s.68(2)(a), s.24(a) and d(i) of the Act by the Tribunal (or the co-arbitrators).

(2)     Failure to conduct the proceedings fairly and impartially as between the parties, giving each party a reasonable opportunity of putting its case and dealing with that of its opponent, or to adopt procedures so as to provide a fair means for the resolution of the matters falling to be determined, under s.68(2)(a) and s.33 of the Act.

(3)     Failure to deal with an issue, namely that once the Tribunal found that the joint venture agreements had been frustrated, damages were limited to recovery of Vale's initial payment to BSGR, under s.68(2)(d).

**Pattern of Apparent Bias**

4.     There exist grounds from which a fair minded and informed observer would conclude that there was a real possibility that the Tribunal did not fairly determine the issues on the basis of the evidence and arguments adduced before them, giving rise to apparent bias.

5.     The arbitral proceedings consisted of three phases: the proceedings with (i) the original Tribunal comprised of The Honourable Charles N Brower, Sir David A.R. Williams, QC and Dr Michael Hwang SC (1 August 2014 – 4 August 2016); (ii) the truncated Tribunal consisting of Mr Williams and Mr Hwang (4 August 2016 – 17 August 2016); and (iii) the reconstituted Tribunal comprised of Professor Filip De Ly, Mr Williams and Mr Hwang (17 August 2016 – 4 April 2019). These phases are connected not only by the co-arbitrators, but also by a

pattern of apparent bias that ran through each of the three phrases. Whilst the Tribunal has discretionary powers when it comes to procedural decisions, when looking at them not in isolation but together a pattern of conduct appears, from which a fair minded and informed observer would conclude that there was a real possibility that the Tribunal was biased.

6.    The full history of the conduct of this arbitration is set out in the second witness statement of Mr Daele, and BSGR relies on the full pattern of conduct that is described in that statement.

7.    BSGR relies specifically on the following matters, which are developed in turn below:

(1)    The Tribunal's refusal to admit the ICSID hearing transcripts and the post-hearing briefs (together referred to as the "**ICSID Material**") into the record despite the Tribunal's initial ruling that the ICSID evidence was relevant and its availability to the Tribunal a matter of fairness. Indeed, it was because the Tribunal considered that the ICSID evidence was relevant and a matter of fairness that the Tribunal ordered BSGR to produce monthly reports on the status of the ICSID proceedings[2] and disclose to the LCIA Tribunal all documents produced in the ICSID case.[3] In decisions dated 6 September 2017 (PO 24), 26 November 2017 (PO 25), 25 October 2018 (PO 27) and in the Award, the Tribunal did a U-turn, claiming that the ICSID evidence was irrelevant with respect to the issues it had to decide in this case.

(2)    The Tribunal's refusal to reschedule the final hearing at a time when BSGR's counsel of choice (who had represented BSGR from the outset of the arbitration) was available. In this regard, the Tribunal's unreasonable rush to schedule the hearing compares unfavourably with the Tribunal's two-year delay in rendering the Award.

(3)    The Tribunal's failure to reconsider, properly or at all, the earlier decisions taken largely by the previous Chairman, who was removed by the LCIA for apparent bias. The co-arbitrators had spent very limited time on those decisions. They were very largely decisions of the previous Chairman and the arbitral secretary, and their standing should have been reconsidered and re-determined by the Tribunal.

---

[2] KND2/1402-1405, Email from Tribunal to the Parties dated 9 December 2014; KND2/1405-1422, Decision of the Tribunal dated 16 December 2014.
[3] KND2/1469-1474, Record Sharing Decision dated 28 June 2015.

(4) The co-arbitrators' refusal to reproduce the original appointment procedure for the appointment of a new Chairman to replace the previous Chairman who had been removed for apparent bias. They attempted to maintain the final hearing dates and push forward with the appointment of Professor Park with only a few weeks to go before the final hearing, which was wholly unjustified and unfair in a highly complex arbitration. The LCIA intervened, exercising its power under LCIA Rules Article 11.1 and appointed the new Chairman, with the result that the contractually agreed, original appointment procedure was not followed.

## (1) The Tribunal's refusal to consider and to admit the ICSID hearing transcripts and the post-hearing briefs into the record

### The Consensus that the Bribery Issue was central and the LCIA would need the full body of evidence on it from ICSID

8. Throughout the LCIA proceedings, there had been consensus among the Parties and the Tribunal that the ICSID record was relevant to determine what was referred to as the **"Bribery Issue"**, namely the allegations of bribery and corruption underlying Vale's claims against BSGR. The Tribunal repeated in various decisions that it needed the "full body of evidence" from both proceedings (ICSID and LCIA) to ensure "fairness, efficiency and consistency" in its conduct of the proceedings.

9. **First,** in the First Stay Decision dated 16 December 2014, the Tribunal denied BSGR's application for a stay of the LCIA arbitration pending the decision in the related ICSID proceedings.[4] Only in the latter was the full evidence regarding the Bribery Issue, which was at the centre of the LCIA case, to be heard, since it was only in the ICSID proceedings that Guinea was a party (and would have to call witnesses, including those said to have been implicated in bribes). The Tribunal denied the application (on the basis that it was too early to tell how the ICSID case would develop) but expressly confirmed the relevance of the ICSID evidence[5]:

---

[4] KND2/1386-1401, BSGR's Application for Stay dated 20 October 2014; KND2/2455-2482, Vale's Observations on BSGR's Stay Application dated 3 November 2014; KND2/2483-2499, BSGR's Reply on Stay Application dated 10 November 2014; KND2/2500-2516, Vale's Rejoinder on Stay Application dated 17 November 2014.
[5] KND2/1405-1422, First Stay Decision dated 16 December 2014.

(1)     The Tribunal stated (even at this early stage of the proceedings) that the Bribery Issue was at the heart of the LCIA arbitration:

"*based on the Parties' arguments and the limited evidence offered in this proceeding to date, that **the Bribery Issue will serve as a central focus in both arbitrations***"[6] (emphasis added)

(2)     The Tribunal said it would need to see the "***full body of evidence from all sources***" to be "*in a position to determine if Vale's claims may stand even assuming Guinea's evidence is somehow defective and unreliable*"[7].

(3)     It directed BSGR to file monthly reports on the status of the ICSID proceedings[8]. The Tribunal chased BSGR when it was late in submitting an update.[9]

(4)     And it required the parties to reach an agreement on the sharing of information between the LCIA and ICSID Tribunal[10]. On 30 April 2015, the Tribunal reminded the parties to come to an agreement to "*share documents between this arbitration and the ICSID arbitration.*"[11]

10.     This decision was (i) an express recognition by the Tribunal of the central relevance of the ICSID evidence to the LCIA arbitration and Vale's claim; and (ii) a basis on which BSGR's application for a stay was refused, because the Tribunal would have the full record from both proceedings placed before it by means of record sharing.

11.     Vale, for its part, also expressly recognised that the ICSID evidence was relevant to the LCIA action. It acknowledged the "*factual overlap between the LCIA and ICSID arbitrations*"[12]. It asserted that the Tribunal should have access to the:

---

[6] KND2/1416, First Stay Decision, para. 37.
[7] KND2/1416-1417, First Stay Decision, para. 40.
[8] KND2/1419-1420, First Stay Decision para. 50.
[9] KND2/2517-2518, Procedural Order No. 9 dated 23 November 2015, para. 5.
[10] KND2/1419, First Stay Decision, para. 49.
[11] KND2/1430-1441, Tribunal's Decision on Claimant's Request Concerning U.S. Discovery dated 30 April 2015, para 28f.
[12] KND2/1445-1449, Letter from Vale to the Tribunal dated 8 May 2015.

*"__full body of evidence from all sources__ in order to determine the claims before them"*[13]

And that:

*"As the Tribunal recognizes, __the mutual exchange of evidence and submissions filed in the two proceedings is therefore necessary to ensure fairness, efficiency and consistency__ by allowing the respective tribunal and parties to compare materials produced or submitted in the other arbitration."*[14]

12.     **Second**, the renewed Second Stay Application (dated 20 May 2015) was dismissed for effectively the same reasons[15]. The Tribunal again emphasised the importance of sharing the evidence of both proceedings:

*"__full disclosure of documents from the two proceedings__ would minimize the risk of __inconsistent decisions__."*[16]

13.     **Third,** on 28 June 2015, the Tribunal issued the "Record Sharing Decision". It ordered that BSGR would disclose, on an ongoing basis, all documents from the ICSID proceedings to Vale and the LCIA Tribunal within seven days of the documents being filed or the evidence becoming available in the ICSID case.[17] All documents that were filed in the ICSID proceedings were relevant, the Tribunal did not make a distinction. As to the LCIA record, the Parties were allowed to share documents with Guinea and the ICSID Tribunal with the exception of third party witness statements and documents for which BSGR claimed confidentiality.

14.     Furthermore, Vale relied in the LCIA proceedings on the witness statements of Messrs Souaré, Nabé and Kanté, which Guinea had filed in the ICSID proceedings.[18] This was in

---

[13] Ibid.
[14] Ibid.
[15] KND2/1478-1490, Second Stay Decision dated 24 July 2015.
[16] KND2/1464-1465, Email from the Tribunal to the Parties dated 23 May 2015.
[17] KND2/1469-1474, Record Sharing Decision dated 28 June 2015.
[18] KND2/2519-3009, Vale's Statement of Reply dated 24 March 2016, which was filed together with the witness statements of Messrs Souaré, Nabé and Kanté. Their witness statements specifically allow them to be used in the ICSID and LCIA proceedings.

recognition of the relevance of the ICSID evidence, yet, as noted below, the Tribunal later refused to admit the cross examination of those same witnesses.

15. **Fourth**, in a decision on document production dated 18 March 2016 (referred to as the "**Third Document Production Decision**") the Tribunal repeated (i) that the Bribery Issue was a central focus of the LCIA proceeding, and (ii) the LCIA Tribunal would need to have a full record of the evidence going to that issue in order to be able to fairly determine it:

> "The Tribunal points out that all of its document production rulings have taken into account **the "Bribery Issue" lying at the centre of the dispute**. It is within that context that the Tribunal has set out the relevant parameters for what it deems relevant and material. That the scope of documents either Party must produce may be wider than in other arbitrations is a by-product of the Tribunal's aim to resolve the dispute in the **fairest manner possible** and **based on a full record of evidence**."[19] (emphasis added)

16. **Fifth**, consistent with the decisions referred to above, on 20 January 2017 the Tribunal (this time with the new Chairman in place after Judge Brower was removed for apparent bias) granted Vale its request to introduce further exhibits which it said would "further expose **BSGR's bribery and corruption, are directly relevant to the issues raised by both parties throughout the proceedings.**"[20] (emphasis added).

### *The Tribunal's U-turn – Refusal to Admit the ICSID Material*

17. On 9 June 2017 BSGR asked the Tribunal to reopen the record to add transcripts from the ICSID final hearing (the "**ICSID Transcripts**") and certain other related materials.

18. The ICSID Transcripts were directly relevant to the Bribery Issue and would support BSGR's defence against the allegations of corruption and bribery. BSGR explained in its letter of 9 June 2017 that the "cross examination [of key Guinean witnesses] provided key evidence that supported BSGR's claim that it obtained its rights lawfully." It said that the ICSID Tribunal "heard from three witnesses who were not heard before the LCIA Tribunal. In respect of the witnesses which the LCIA Tribunal did hear, their evidence at times departed from the evidence they provided to the

---

[19] KND2/1878-1889.
[20] KND2/2290-2301, Email from the Tribunal to the Parties dated 20 January 2017.

*LCIA Tribunal."* BSGR provided a detailed explanation as to the relevance of the ICSID Transcripts in the LCIA proceedings.[21]

19. On 6 September 2017[22], almost three months after BSGR's request, the Tribunal took a decision. Instead of deciding it, it "stayed" the request. It said, in a baffling formulation of words, that:

> *"if and to the extent necessary or proper, the Arbitral Tribunal will reopen the proceedings, alternatively will deal with the issue of the ICSID hearing transcript in any other appropriate way or award."*

20. In light of the previous decisions as regards the importance of the ICSID evidence to the LCIA proceedings and the Bribery Issue which was "at the centre of the dispute", this decision was:

    (1) A failure by the Tribunal to decide the request, and an abdication of its duty to do so. It was not open to the Tribunal to "stay" the request. If the Tribunal did not decide the point until the Award (as it appeared to be suggesting), it would never have the opportunity of considering the material.

    (2) Completely inconsistent with the consensus (across all three phases of the arbitration) of the parties and the Tribunal that (i) the ICSID evidence was highly relevant and central to the Bribery Issues (that, according to the Tribunal, lay "at the centre of the dispute") to be decided in the LCIA case; and (ii) it was vital that the Tribunal had access to the full body of evidence on the Bribery Issue to ensure fairness, efficiency and consistency.

    (3) A failure to give reasons for its decision. There was no analysis of the competing arguments (expressed by the parties in extensive correspondence[23]) as to why the ICSID Transcripts should or should not be admitted to the record.

---

[21] KND2/2356-2365, Letter from BSGR to the Tribunal dated 9 June 2017.
[22] KND2/2426-2428, Procedural Order No. 24 dated 6 September 2017.
[23] KND2/2371-2397, Letter from Vale dated 16 June 2017; Letter from BSGR dated 23 June 2017; Letter from Vale dated 27 June 2017; Letter from BSGR dated 30 June 2017; Letter from Vale dated 4 July 2017; Letter from BSGR dated 14 July 2017; Letter from BSGR dated 27 July 2017.

(4) An inadequate, inconsistent and confusing formulation of words, designed it appears to allow the Tribunal to refuse to decide the request. Had the Tribunal acted fairly and confined itself to the evidence and submissions before it, the only reasonable response (and the only one that could be expected from any reasonable tribunal) would have been to accept the ICSID Transcripts (and allow each party a submission on them if they wished).

(5) Thoroughly objectionable and unfair. This was only 3 months after the proceedings had been closed and there was no reason why the ICSID Transcripts could not have been admitted (particularly given that Vale's own evidence relating to the Bribery Issue, for which it applied to add to the record after the proceedings had been closed, was admitted).

21. BSGR renewed its request that the Tribunal admits the ICSID Transcripts pointing out the inherent unfairness in the Tribunal's decision.[24] BSGR, in an attempt to find a route through, asked the Tribunal to look at the ICSID Transcripts *de bene esse*[25]. It would be plain to the Tribunal from doing so (i) the relevance of the ICSID Transcripts and (ii) the weight that could be attached to them. The Tribunal refused to accede even to that request. On 26 November 2017[26] the Tribunal said *"this is not the appropriate time for a final decision on the Respondent's requests"* and repeated its strange formulation (as per PO 24 above in para 7(1)). There was no explanation as to why this was *"not the appropriate time"* and it is difficult to conceive of why, as the Tribunal was in the midst of its deliberations.

22. On 12 June 2018, BSGR sought also to put the post-hearing briefs from ICSID before the LCIA Tribunal.[27] This request was not addressed by the Tribunal until 25 October 2018, just under six months before the Award was made.[28] The Tribunal "stayed" the request again and repeated its bizarre formulation (as per PO 24 above 7(1).

23. BSGR's application to add the ICSID Transcripts was after the Tribunal had closed the proceedings (on 3 March 2017) but that was no bar to its inclusion:

---

[24] KND2/2429-2430, Letter from BSGR to the Tribunal dated 18 October 2017.
[25] Ibid.
[26] KND2/2432-2434, Procedural Order No. 25 dated 26 November 2017.
[27] KND2/3010-3167, BSGR Post-Hearing Brief dated 12 June 2018.
[28] KND2/2444-2447, Procedural Order No. 27 dated 25 October 2018.

(1)     the Tribunal said in terms that new evidence could be accepted right up to the date of the Award (see PO 23 dated 3 March 2017, para. 13, and Award para. 165: *"Hence, new evidence could be accepted up until the rendering of the Award"*[29]);

(2)     the Tribunal had, shortly before (after the record had closed), admitted to the record further evidence produced by Vale on the Bribery Issue (to which BSGR did not object)[30];

(3)     the ICSID Transcripts only became available after the LCIA final hearing, because the ICSID hearing had taken place shortly afterwards (and the Tribunal had refused to wait until it was complete); and

(4)     the Tribunal did not render its Award for almost 2 years later, which was ample time for it to take the ICSID Transcripts and materials into account (and allow the parties to make a written submission on it, if it so wished).

### The Tribunal's Inconsistent and Unfair Post-Facto Explanation in the Award

24.     In the Award, the Tribunal said that it had determined not to allow the ICSID Material. Its reasons for doing so are incredible, and it was a decision that, by reason of its flawed decision making, no reasonable tribunal could reach:

(1)     The Tribunal said that the ICSID Transcripts were *"irrelevant"* (para. 167.2 and 167.3)[31]. That is incomprehensible when set against the record of decisions by the Tribunal as set out above. Those decisions were predicated on the relevance of the ICSID evidence and the desire for this Tribunal to have before it the full record from the ICSID proceedings in order ensure fairness, efficiency and consistency on the Bribery Issue "at the centre of the dispute".

(2)     The Tribunal said it could not know what weight could be given to the ICSID Transcripts (para. 167.1)[32]. That was equally astonishing. The LCIA Tribunal had

---

[29] KND2/2351, Procedural Order No. 23 dated 3 March 2017 [13]; KND2/48-49, Award [165].
[30] KND2/2366-2370, Letter from vale to the Tribunal dated 26 May 2017.
[31] KND2/49-50.
[32] KND2/49.

admitted into the record all the preceding materials from the ICSID proceedings (which it had <u>required</u> BSGR to provide within 7 days of production in the ICSID proceedings). That included witness statements from the very witnesses who had been cross-examined on the ICSID Transcripts. The Tribunal had the witnesses' written evidence (of Messrs Souaré, Nabé and Kanté) but refused to look at the challenge to that evidence put in cross-examination. The Tribunal had the means to know what weight could be given to it by looking at that material, but refused to do so.

(3)    The ICSID Material was plainly of central relevance to the LCIA proceedings, had the Tribunal considered it. For example:

    (a)    The ICSID Material demonstrates that BSGR was neither directly nor indirectly (through Mme Touré or anyone else) involved in the withdrawal of Rio Tinto's rights[33], directly contrary to the LCIA Tribunal's finding that BSGR was involved[34].

    (b)    The ICSID Material demonstrates that the decisions to grant BSGR the permits in Blocks 1 and 2 were legal and legitimate.[35] There was no credible evidence of undue influence exercised by President Conté or Mamadie

---

[33] KND2/1239, Nabé/8/193/16-25 ("*Q: My question is: the reason to withdraw Blocks 1 and 2, is it because of a desire to grant Blocks 1 and 2 to BSGR? A: The determination to grant it to BSGR was simply an accelerator. Q: Had it not been for BSGR's application for permits for Blocks 1 and 2, was the decision anyway taken to withdraw Blocks 1 and 2? A: Yes. There was already a decree in July 2008, as early as July 2008.*"); KND2/1363, Nabé/8/187/12-18 ("*Q. The decision to withdraw the two blocks from Rio Tinto, was it legitimate? A. Yes, I consider it to have been legitimate. Q. Was it legal? A. Yes, all the more so that it was legitimate. So it was sort of consequently legal because it was legitimate. That's inherent in the process.*"); KND2/828-829, Souaré/6/62 to 6/63/3 ("*They never retroceded. Q. So this is a breach of the Mining Code? A. It could be understood that way.*"); KND2/824, Souaré 6/58/22-24 ("*generally speaking we can say that Rio Tinto did not yield total satisfaction in the eyes of the government.*"); KND2/908, Souaré/6/142/8-24 ("*Q. ...you said that the Council of Ministers ordered the Minister of Mines to apply the law and withdraw the Rio Tinto concession on Blocks 1 and 2. The essential point, which decided was the source of the decision, was the decision of Rio Tinto to freeze its mining projects at Simandou because of the drop in the iron ore prices. A. Yes, that's right. Q. So... A. Yes, it played that role. But it was the ultimate drop that tilted the balance. So far, you understand tht there was a fight between the giant and the junior around Simandou. The State was not only virtuous, but also for fear of the legal and financial consequences, refrained so far from withdrawing the blocks from Rio Tinto to given them to BSGR. But once the giant had sinned, through this announcement, it was the little detail that tilted the balance.*"); KND2/3023-3037 and 3054-3060, BSGR's Post-Hearing Brief, in particular paras. 29-57 and 104-117.
[34] Award paras. 569; para 631 – 634;
[35] KND2/1363, Nabé/8/187/12-18; Nabé/8/185/18-20 ("*Q: The decision to grant Blocks 1 and 2 to BSGR, was this decision taken by the Council of Ministers, yes or no?. A: Yes*"); KND2/1371, Nabé/8/195/1-3 ("*Q: This reflects the consensus of the council? A: This is without doubt: take it away from Rio Tinto and given to BSGR.*"); KND2/1363, Nabé/8/187/19-25.

Toure (or any other). In this light, the LCIA Tribunal could not have found that BSGR was granted the permits in Simandou Blocks 1 and 2 through corruption and bribery[36].

(c) The ICSID Material confirms that there was no evidence that Pentler or any of the people involved with Pentler had an influence on the granting of any of the exploration rights to BSGR.[37] This is of direct relevance to the LCIA Tribunal conclusion that BSGR through the help of Pentler obtained the Mining Rights in Guinea.[38]

(d) Mr Souaré had given contradictory statements in his evidence.[39] The LCIA Tribunal accepted the witness testimony of Mr Souaré[40] when, had it seen the ICSID Material, it should not have done so.

---

[36] See e.g. Award, paras. 562-569; 629; 634; 637.
[37] KND2/865, Souaré/6/99/24 ("*Pentler? No, I don't know that company.*"); KND2/918, Souaré/6/152/17-20 ("*Q. Do you know whether Ismaël Daou or [Aboubacar Bah] at one point paid any bribes to Guinean officials? A. Well, I don't even know these people, I didn't even know them.*"); and KND2/865, Souaré/6/99/14-18 ("*Q. In everything that we've mentioned this morning, do you know somebody by the name of Ismaël Daou? A. No. Q. Do you know somebody by the name of Aboubacar Bah? A. No.*")
[38] Award paras 429-430.
[39] KND2/788, Souaré/6/22/6-10 ("*I was telling you that the first directive was: "Well, Mr Minister, here you have people who are interested in your sector. Please make that task easier, facilitate that task. That is perfectly normal."*"); KND2/939, Souaré/6/173/1-7 ("*A: He sees operators, he trusts them, and he calls the minister and he says 'please facilitate things for them'. So far there was nothing to indicate that this was improper or illegal, because that day he did not say specifically that such-and-such zone is to be attributed that is already granted to another company.*"); KND2/855, Souaré/6/89/10-11 ("*[...] because I wasn't asked, the President didn't ask me to give a permit to BSGR, he said help.*"); Schedule/593-594, BSGR's Post-Hearing Brief, para. 88.
[40] Award para. 628.1

(e)    Likewise, Mr Nabé had given contradictory statements.[41] The Tribunal accepted witness testimony from Mr Nabé[42], when it ought not to have done so in the light of Mr Nabé's oral evidence.

(4)    The Tribunal made specific reference in its Award to other evidence of witnesses who had not appeared or been cross-examined before it (e.g. of Mme Touré – see para. 262; Mr Noy paras. 182, 184, 185; Mr Struik para. 223, 225, 231) and was apparently well able to determine the weight of that evidence. The weakness of this reasoning (and its patent inconsistency) can only be viewed by a fair minded and informed observer as conduct which gives rise to a real possibility that this Tribunal was biased.

(5)    The Tribunal said that BSGR had not *"specifically indicated what precise evidence"* from the ICSID proceedings that it sought to submit and *"without any sufficient precision as to what material was relevant and why"* (para. 167.2). That was incorrect and disingenuous. On 9 June 2017 (and in further exchanges with Vale between 16 June – 27 July 2017[43]) BSGR had explained the relevance of the ICSID Transcripts in detail (and invited the Tribunal to allow the parties to file further submissions on the relevance of the ICSID Transcripts[44]).    It was also plain and obvious that the ICSID Transcripts went to the Bribery Issue. At no stage prior to the Award did the Tribunal ask BSGR to be more specific as to what matters it intended to rely on and

---

[41] KND2/1369, Nabé/8/193/16-25 (*"Q: My question is: the reason to withdraw Blocks 1 and 2, is it because of a desire to grant Blocks 1 and 2 to BSGR? A: The determination to grant it to BSGR was simply an accelerator. Q: Had it not been for BSGR's application for permits for Blocks 1 and 2, was the decision anyway taken to withdraw Blocks 1 and 2? A: Yes. There was already a decree in July 2008, as early as July 2008."*); while Nabé testified in the LCIA hearing that he was summoned to a meeting with the President in 2008 where he was told to "hurry up" and grant the permits for Simandou Blocks 1 and 2 to BSGR (Award para 564); in the ICSID hearing he could not remember that he had been instructed by the President to grant BGSR the mining permits: KND2/1320, Nabé/8/144/6-9 (*"Q: The President told Nabé to grant Blocks 1 and 2 to BSGR. Nabé said that he understood. Do you agree with this description of events? A: I don't recall the details as described here"*); Nabé/8/144/16-19 (*"A: I stand by what I said. I do not recall that Mr Avidan was there during a meeting where I was with the President, nor do I recall that the President himself talked about BSGR"*).
[42] Award para. 628.5 see in contrast KND2/894, Souaré/6/128/5-8; KND2/3010-3167, BSGR's Post-Hearing Brief, para. 114; KND2/1320, Nabé/8/144/6-9 (*"Q: The President told Nabé to grant Blocks 1 and 2 to BSGR. Nabé said that he understood. Do you agree with this description of events? A: I don't recall the details as described here"*); KND2/1320, Nabé/8/144/16-19 (*"A: I stand by what I said. I do not recall that Mr Avidan was there during a meeting where I was with the President, nor do I recall that the President himself talked about BSGR"*).
[43] KND2/2371-2397, Letter from Vale dated 16 June 2017; Letter from BSGR dated 23 June 2017; Letter from Vale dated 27 June 2017; Letter from BSGR dated 30 June 2017; Letter from Vale dated 4 July 2017; Letter from BSGR dated 14 July 2017; Letter from BSGR dated 27 July 2017.
[44] KND2/2356-2365, BSGR's letter dated 9 June 2017.

its relevance; that, submits BSGR, is because the relevance of the ICSID Transcripts was obvious to the Tribunal.

(6) Finally, the Tribunal said that the ICSID Transcripts were *"highly unlikely to change the conclusions of the Tribunal"* in the Award and the evidence would have *"no bearing on the relief to be awarded"*. As to that:

(a) it was impossible for the Tribunal to form that view without seeing the evidence – this was evidence which went directly to the Bribery Issue "at the centre of the dispute";

(b) the Tribunal's Award makes specific and damning findings of bribery and corruption against BSGR, on matters which it well knew were the subject of the ICSID proceedings (including the evidence given on the ICSID Transcripts), and it is inconceivable that this material "had no bearing" on those matters;

(c) the findings of bribery and corruption were central to its conclusions that BSGR had dishonest knowledge for the purposes of the fraudulent misrepresentation claim and had acted in breach of warranty; and

(d) it was a gross breach of due process to exclude obviously (or even potentially) relevant evidence going to findings as serious as the ones this Tribunal made. No Tribunal acting reasonably would take that course, and the Tribunal's attempt to explain it away is thoroughly unconvincing.

25. In those circumstances, a fair minded and informed observer would conclude that there was a real possibility that the Tribunal was biased. The Chairman of the original Tribunal, Judge Brower, had been removed because of his prejudgment (in the eyes of a fair-minded observer) of matters going to the Bribery Issue, including as to whether Mme Touré was the

14

wife of President Conte[45]. The Tribunal refused to admit evidence going to those very same matters.

## (2) The Tribunal refused to reschedule the final hearing and thereby deprived BSGR of its counsel of choice

26.    In early September 2016, the reconstituted Tribunal (which had refused to stay the proceedings while a challenge against the co-arbitrators was pending[46]) looked to fix the final hearing. The final hearing (listed for August and September 2016) was vacated following the removal of the Chairman, Judge Brower, on 4 August 2016 (though not without considerable effort by the co-arbitrators to maintain the final hearing dates in circumstances where that was obviously unfeasible, on which see further below).

27.    On 30 August 2016 and 6 September 2016, BSGR said that its counsel, David Wolfson QC was not available for a three-week hearing before May 2017, and provided detail of his prior commitments.[47] Mr Wolfson had been BSGR's counsel from the outset (more than 2 years earlier). The removal of Judge Brower was, of course, no fault of BSGR's and the re-listing of the final hearing ought not to penalise it because of Judge Brower's apparent bias.

28.    At what became a so-called "educatory hearing" taking place in 5-8 September 2016, Vale's counsel made various slurs on Mr Wolfson's availability and his integrity, including an assertion that *"that's not how any lawyer I know at that level conducts herself (sic)"*. Mr Wolfson responded personally to the Tribunal by letter (on 12 September 2016[48]). He said he had allowed himself 30 days preparation for this complex 3 week trial (worth in excess of US$ 1 billion), which was unexceptional. Vale responded with further vitriol on the same day.

29.    Remarkably, the Tribunal refused to list the final hearing so that Mr Wolfson could attend. On 17 October 2016 (just 10 days after BSGR had requested the removal of the co-arbitrators under s 24), in Procedural Order No. 17[49], it said *"the Arbitral Tribunal is insufficiently convinced"* that Mr Wolfson was unavailable until May 2016. That was not a decision that any reasonable Tribunal could make. The Tribunal went on to list the final

---

[45] KND2/1938-2004, Decision from the LCIA Division dated 4 August 2016, para. 318.
[46] KND2/2173-2175, Procedural Order No. 16 dated 29 August 2016.
[47] KND2/2161-2162; 2182-2194.
[48] KND2/2241-2243, Letter from David Wolfson QC dated 12 September 2016.
[49] KND2/2256-2275.

hearing for February and April 2017 for dates that Mr Wolfson could not make. The latter period was only shortly before Mr Wolfson was available.

30. There was (and still is) no basis on which to disbelieve Mr Wolfson and to decline BSGR's request to schedule the merits hearing a short time later. He had personally given details of his availability. As experienced and busy senior counsel, having held the dates for August and September 2016 in his diary (which were vacated), and with several other complex matters in his diary (which were explained to the Tribunal), it was not unexpected that Mr Wolfson would be next available for a trial of this magnitude in May 2017.

31. The Tribunal's unreasonable refusal to schedule the final hearing when Mr Wolfson was available was a serious situation for BSGR.

32. Mr Wolfson had been involved from the outset and in all decisions in the case. Vale were represented by senior lawyers who had likewise acted for it from the outset. Proceeding when BSGR's chosen and longstanding counsel was unavailable, in circumstances where this was brought about because of the Chairman's apparent bias (and through no fault of BSGR) would be unfair and unjust.

33. In order to keep its counsel of choice, BSGR tried to find a solution. On 9 November 2016[50] it suggested that the final hearing be split with the first week held in April 2017 (on dates that the Tribunal had proposed) and the second and potential third week after the dates fixed for the ICSID hearing (which was due to start on 10 May 2017 for 2 to 3 weeks and in which BSGR's counsel would be engaged). This proposal was outright rejected on 7 December 2016.[51]

34. On 26 January 2017 (when the s. 24 removal proceedings against the co-arbitrators were still pending), less than a month before the provisionally scheduled final hearing, the Tribunal finally confirmed the final hearing dates and reiterated that it remained *"not convinced"* about Mr Wolfson's unavailability.[52] That was a thoroughly objectionable decision and without any reasonable basis.

---

[50] KND2/2276-2278.
[51] KND2/2279-2282, Procedural Order No. 18 dated 7 December 2017.
[52] KND2/2306-2336.

35.     While it is accepted that a tribunal should conduct proceedings in an efficient manner and without unnecessary delays, the desire for efficiency cannot override the Tribunal's duty of fairness and equality in the proceedings. There was no reason why the Tribunal could not have re-scheduled the hearing by a matter of a few months (at most). The rush to fix a hearing is to be contrasted with the 2 years which it then took the Tribunal to produce its Award.

36.     A reasonable tribunal would not have taken a decision to proceed with a final hearing which BSGR's counsel could not attend. A fair minded and informed observer could not help but conclude that there was a real possibility this was done for ulterior reasons, because the evidence and submissions could not in any rational sense, justify it. BSGR was placed in an invidious position and forced to take the decision not to attend the final hearing.[53]

(3) The Tribunal's failure to reconsider, properly or at all, the earlier decisions taken by the previous Chairman, who was removed by the LCIA for apparent bias

37.     As noted above, Judge Brower was removed as Chairman on 4 August 2016 by the LCIA for apparent bias. Article 27(4) of the Act required the reconstituted Tribunal to determine whether and to what extent the previous decisions of the original Tribunal (and infected by the apparent bias) should stand.

38.     The co-arbitrators had spent very limited time on those decisions. They were decisions taken largely by Judge Brower, with his arbitral secretary Mr Daly, and they should have been re-determined by the reconstituted Tribunal. That was particularly the case as the Chairman was removed for apparent bias and the co-arbitrators had (they admitted and averred in their responses to the LCIA challenges) been in full agreement with all of the controversial decisions he had proposed[54].

39.     It was not until 26 January 2017 (almost 6 months after Judge Brower was removed and just weeks before the final hearing was to start) that the Tribunal decided on the section 27(4) issues in relation to the most important and controversial decisions adopted when Judge Brower was Chairman. The Tribunal said that those decisions "*do not raise issues as to a serious irregularity affecting the Tribunal or the proceedings which may cause substantial injustice to either*

---

[53] KND2/2337, BSGR's letter to the Tribunal dated 31 January 2017.
[54] KND2/1920-1926, Co-arbitrators' comments on BSGR's challenge dated 20 June 2016.

*of the Parties in the arbitration"*[55]. It was impossible for it to know that without opening those decisions and re-deciding them. These decisions included extremely extensive disclosure orders by which BSGR was required to obtain documents from third parties and BSGR's solicitors, Mishcon de Reya LLP, required to provide certifications drafted by Vale. The Tribunal said that the decision was "*state of the art*" and "*balanced*" when it was anything but[56]. This is to be viewed against the background that (i) the co-arbitrators signed off on the decisions taken by the previous Chairman (in respect of which they had very little active input indeed); (ii) the co-arbitrators had a vested interest in not overturning decisions which they had signed off (with little active input); and (iii) the co-arbitrators were still subject to challenge proceedings in the Commercial Court brought by BSGR. Under these circumstances, a fair minded and informed observer would conclude that there was a real possibility that the Tribunal was biased.

**(4) The co-arbitrators' refusal to reproduce the original appointment procedure for the appointment of the Chairman after Judge Brower was removed for apparent bias**

40.     In summary, and as developed in the second witness statement of Mr Daele[57]:

(1)     The co-arbitrators pushed forward with the appointment of Professor Park with only a few weeks to go before the final hearing. This was unreasonable and unjustified. It was never going to be possible to proceed with the final hearing, and the appointment of Professor Park was sought only by circumventing the parties' original appointment procedure for the Chairman.

(2)     It took the LCIA to intervene, exercising its power under LCIA Rules Article 11.1, and notwithstanding the LCIA's earlier decision that the original appointment procedure should be followed by the co-arbitrators.

(3)     The new Chairman was appointed by the LCIA on 17 August 2016. At the time of his appointment, the co-arbitrators were still maintaining that the final hearing should still start on 29 August 2016, just over a week later.

---

[55] KND2/2306-2336, Procedural Order No 19 dated 26 January 2017.
[56] Daele 2, para 96(c)(i) and (ii)
[57] Daele 2, para 72

18

(4)     In the circumstances of Judge Brower's removal (and the exceptional nature of it), the co-arbitrators should have provided for a period of reflection, and at least a stay until the new Chairman was in place. They did not do so. Instead, the co-arbitrators pursued the appointment of a new Chairman at break-neck speed with the stated aim of their being ready to start at the hearing fixed for 29 August 2016.

Conclusion on Pattern of Apparent Bias

41.     The above matters (and those set out in the Second Witness Statement of Mr Daele) together gave rise to a pattern of conduct from which a fair minded and informed observer would conclude that there was a real possibility that the Tribunal was biased.

**Failure to Conduct Fair Proceedings**

42.     There was a failure by the Tribunal to comply with its duty under s.33 of the Act to "*act fairly and impartially as between the parties, giving each party a reasonable opportunity of putting his case and dealing with that of his opponent*" or to "*adopt procedures suitable to the circumstances of the particular case... so as to provide a fair means for the resolution of the matters falling to be determined.*"

43.     BSGR relies on the same grounds as set out in Ground 1 above in relation to apparent bias. If the Court concludes that there was no apparent bias, it is invited to find that there was, by reason of those matters, a breach of the Tribunal's duty under s.33 in that:

(1)     The Tribunal did not act fairly and impartially between the parties.

(2)     The Tribunal did not give each party a reasonable opportunity of putting its case, in particular it did not give BSGR a reasonable opportunity of adducing full evidence on the Bribery Issue from the ICSID proceedings in a manner which was inconsistent and unfair.

(3)     The Tribunal did not adopt procedures which provided a fair means for resolution of the dispute. On the contrary, it fixed a final hearing at which BSGR's counsel could not attend (following removal of the Chairman of the original Tribunal for apparent bias) and refused to admit relevant and material evidence without explanation, and

when the explanation came (in the Award) it was inconsistent and unjustifiable on any rational basis.

**Failure to Deal with the Frustration Damages Issue**

44.    BSGR argued that if the Tribunal found frustration, any remedy should be limited to the initial sum paid by Vale to BSGR under the joint venture agreement. See BSGR's Statement of Rejoinder, para. 525.[58]

45.    The Tribunal referred in terms to BSGR's argument in the Award, at para. 335, noting:

*"BSGR argues that any remedy under this head should be limited to the consideration paid directly to BSGR under the joint venture agreement."*[59]

46.    The footnote to para. 335 (footnote 246) refers to BSGR's Statement of Rejoinder on the point.

47.    Having recognised that this issue arose, the Tribunal then failed to deal with it.

48.    At para. 982 of the Award, the Tribunal refused to order any remedy for frustration, on the basis that it found that Vale had elected for deceit damages (and that this excluded any remedy for frustration). However, it failed to deal with BSGR's argument that, having found frustration, the only remedy that could be ordered was limited to the initial sum paid by Vale to BSGR.

49.    That was a failure to deal with an issue, pursuant to s.68(2)(d) of the Act.

**Substantial Injustice**

50.    The serious irregularities identified above led to substantial injustice to BSGR in that:

---

[58] BSGR's Statement of Rejoinder.
[59] KND2/92.

(1) The proceedings were conducted and the Award rendered by a Tribunal which had the appearance of bias. BSGR will say this is sufficient in itself to amount to substantial injustice.

(2) The failure by the Tribunal to conduct the proceedings fairly (contrary to s.33 of the Act), including by its failure to admit relevant evidence and to hold a final hearing which BSGR's counsel could not attend, led to an Award which (at the least) may have been different had the Tribunal acted fairly between the parties.

(3) Had the Tribunal dealt with the Frustration Damages Issue, at the very least that might realistically have led to a different result, including a very substantial reduction in the damages award (and/or costs award). It could have reduced the damages award to the initial sum paid by Vale to BSGR, namely US$ 500 million.

**Relief Sought**

51. By reason of the matters set out above, namely serious irregularity giving rise to substantial injustice, BSGR seeks an order setting aside the Award and/or declaring it to be of no effect (s.68(3)(b) and (c) of the Act).

52. As regards the first and second ground of challenge, that follows from a finding of apparent bias or a failure to conduct the proceedings fairly. That could not be cured by remitting the Award to the Tribunal.

53. For the third ground of challenge (even if apparent bias / failure to conduct the proceedings fairly is not made out), there is a complete loss of confidence in the Tribunal being able to determine these matters (having determined them once against BSGR) and the Award should not be remitted to them. It is a discrete question of law which could be determined by a new Tribunal. The present circumstances are highly unusual and outweigh the presumption of remittal in respect of s.68(2)(d).

**Exhaustion of Remedies before the LCIA Tribunal**

54. Section 70(2) of the Act requires that a claimant exhaust any available remedies before the Tribunal. There are no such remedies available nor any process of review in respect of which these grounds could be pursued before the Tribunal or the LCIA.

**Extension of Time to Bring This Challenge**

55.     By an Order dated 17 April 2019, BSGR was granted an extension of time to 10 May 2019 in which to bring this challenge.[60]

---

[60] KND2/3168-3169.