CLEARY GOTTLIEB STEEN & HAMILTON LLP
Jonathan I. Blackman
Jeffrey A. Rosenthal
Lisa M. Schweitzer
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to Vale S.A.*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BSG RESOURCES LIMITED (in administration),<br><br>     Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 19-11845 (SHL) |

**VALE S.A.'S OPPOSITION TO THE MOTION OF THE**
**JOINT ADMINISTRATORS FOR A PROTECTIVE ORDER**

# TABLE OF CONTENTS

**Page:**

PRELIMINARY STATEMENT ........................................................................ 1

BACKGROUND ......................................................................................... 4

A. BSGR's Convoluted Corporate Structure ..................................................... 4

B. BGSR's Conduct Prior to the Arbitration .................................................... 7

C. BSGR's Efforts to Derail the Arbitration and Resist Document Disclosure ................. 9

D. The Guernsey Administration ................................................................ 11

E. BSGR's Conduct in the Chapter 15 Proceedings ............................................ 13

ARGUMENT .......................................................................................... 15

I. Vale's Discovery Requests Are Proportional to the Needs of This Case and Are
Relevant to Issues of Fundamental Importance to These Proceedings – BSGR's
COMI and Bad Faith ............................................................................... 17

    A. Vale's Discovery Requests Address Core COMI Issues. ............................... 17

    B. Vale Has the Right to Determine Through Discovery Whether the Chapter 15
    Petition Is Brought in Bad Faith. .......................................................... 20

    C. Vale's Discovery Requests Are Proportional and Relevant to the Court's
    Recognition of the Guernsey Administration As Either A Foreign Main or
    Foreign Nonmain Proceeding. ............................................................. 24

II. The Joint Administrators' "Particular Objections" Have No Legal Basis in
Either the Case Law or This Court's Discovery Practice. .................................... 27

    A. The Joint Administrators Must Produce All Requested Documents That They,
    BSGR and Its Affiliates Hold In their "Possession, Custody or Control." ............... 27

    B. BSGR's Historic Abuse of Corporate Forms Warrants Discovery Relating to
    the Period Prior To the Commencement of the Guernsey Administration. ............... 31

    C. The Joint Administrators Have Not Identified Any Bases for Their Assertions of
    Privilege and Attorney Work Product Protections. ....................................... 33

    D. The Joint Administrators' Proposed Narrative Responses To Vale's Requests
    for Tangible Documents Undermines the Express Standards Set Out by Rule 34. .... 35

III. The Joint Administrators' Proposed Order Seeks to Improperly Restrict
Vale's Depositions. ............................................................................... 36

IV. The Joint Administrators' Proposed Order Presents No Guidance On The Scope of
Discovery ........................................................................................... 39

CONCLUSION ........................................................................................ 40

# TABLE OF AUTHORITIES

**Page(s)**

**Rules and Statutes**

11 U.S.C. § 362 ..................................................................................................   2

11 U.S.C. § 1517 ................................................................................................   2

11 U.S.C. § 1521 ..........................................................................................*passim*

Fed. R. Bankr. P. 7026 .......................................................................................   15

Fed. R. Civ. P. 26(b)(1) ................................................................................24-25

Fed. R. Civ. P. 26(b)(5)(A) ...............................................................................   33

Fed. R. Civ. P. 26(c) .........................................................................................   15

Fed. R. Civ. P. 34(a)(1) .................................................................................27-28

Fed. R. Civ. P. 34(a)(1)(A) ...............................................................................   35

Fed. R. Civ. P. 34(b)(2) .....................................................................................   35

**Cases**

*Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*,
138 F.R.D. 438 (D.N.J. 1991) ............................................................................   30

*Carling v. Peters*,
No. 10 Civ. 4573(PAE)(HBP), 2012 WL 1071232 (S.D.N.Y. Mar. 30, 2012) ....................   34

*Carlson v. Geneva City Sch. Dist.*,
277 F.R.D. 90 (W.D.N.Y. 2011) ........................................................................   35

*Condit v. Dunne*,
225 F.R.D. 100 (S.D.N.Y. 2004) ........................................................................   26

*DeSmeth v. Samsung Am., Inc.*,
No. 92 CIV. 3710(LBS)RLE, 1998 WL 74297 (S.D.N.Y. Feb. 20, 1998) .........................   28

*Eliacin v. County of Broome*,
488 F. App'x 504 (2d Cir. 2012) ........................................................................   37

*Fischer v. Forrest*,
No. 14 Civ. 1304 (PAE) (AJP), 2017 WL 773694 (S.D.N.Y. Feb. 28, 2017)...................... 25

*Gerling Int'l Ins. Co. v. Comm'r of Internal Revenue*,
839 F.2d 131 (3d Cir. 1988)................................................................... 30

*Guadalupe v. City of New York*,
No. 15 Civ. 0220 (CM), 2016 WL 3570545 (S.D.N.Y. June 24, 2016)............................... 25

*Hunter Douglas, Inc. v. Comfortex Corp.*,
No. CIV. A. M8-85 (WHP), 1999 WL 14007 (S.D.N.Y. Jan. 11, 1999) ............................. 30

*In re A.R. Baron & Co.*,
280 B.R. 794 (Bankr. S.D.N.Y. 2002)............................................................ 31

*In re Adelphia Commc'ns Corp.*,
No. 02-41729(REG), 2007 WL 601452 (Bankr. S.D.N.Y. Feb. 20, 2007) ........................ 33

*In re Andover Togs, Inc.*,
231 B.R. 521 (Bankr. S.D.N.Y. 1999)......................................................... 28

*In re Basis Yield Alpha Fund (Master)*,
381 B.R. 37 (Bankr. S.D.N.Y. 2008)......................................................... 18

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund., Ltd.*,
374 B.R. 122 (Bankr. S.D.N.Y. 2007), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008) ...................... 18

*In re Bear Stearns High-Grade Structured Credit Strategies Master Fund., Ltd.*,
389 B.R. 325 (S.D.N.Y. 2008)............................................................18-19

*In re Bello*,
528 B.R. 562 (Bankr. E.D.N.Y. 2015)......................................................... 28

*In re Chevron Corp.*,
749 F. Supp. 2d 170 (S.D.N.Y.), *aff'd sub nom. Lago Agrio Plaintiffs v.*
*Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010) ................................................ 33

*In re Creative Fin. Ltd.*,
543 B.R. 498 (Bankr. S.D.N.Y. 2016)...................................................*passim*

*In re Fairfield Sentry Ltd.*,
714 F.3d 127 (2d Cir. 2013)..............................................................*passim*

*In re Gerova Fin. Grp., Ltd.*,
  482 B.R. 86 (Bankr. S.D.N.Y. 2012) ................................................................. 19

*In re Millennium Glob. Emerging Credit Master Fund Ltd.*,
  458 B.R. 63 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 88 (S.D.N.Y. 2012) ......................... 18

*In re OAS S.A.*,
  533 B.R. 83 (Bankr. S.D.N.Y. 2015) ................................................................. 19

*In re Ocean Rig UDW Inc.*,
  570 B.R. 687 (Bankr. S.D.N.Y. 2017) ............................................................... 18

*In re Oi Brasil Holdings Coöperatief U.A.*,
  578 B.R. 169 (Bankr. S.D.N.Y. 2017) (Lane, J.) ......................................... 21, 26, 31

*In re Rapid-Am. Corp.*,
  No. 13-10687 (SMB), 2018 WL 882398 (Bankr. S.D.N.Y. Feb. 12, 2018) ................. 15-16

*In re Schick*,
  No. 96 B 42902(SMB), 1997 WL 465217 (Bankr. S.D.N.Y. Aug. 12, 1997) ................... 33

*In re Serviços de Petróleo Constellation S.A.*,
  600 B.R. 237 (Bankr. S.D.N.Y. 2019) ........................................................... 17-19

*In re SPhinX, Ltd.*,
  351 B.R. 103 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007) ..............*passim*

*In re Suntech Power Holdings Co.*,
  520 B.R. 399 (Bankr. S.D.N.Y. 2014) ........................................................ 18, 26, 32

*In re Teligent, Inc.*,
  358 B.R. 45 (Bankr. S.D.N.Y. 2006) ................................................................ 28

*In re Toft*,
  453 B.R. 186 (Bankr. S.D.N.Y. 2011) ................................................................. 2

*In re Zyprexa Injunction*,
  474 F. Supp. 2d 385 (E.D.N.Y. 2007), *aff'd sub nom. Eli Lilly & Co. v. Gottstein*,
  617 F.3d 186 (2d Cir. 2010) ........................................................................ 15

*Jacoby v. Hartford Life & Accident Ins. Co.*,
  254 F.R.D. 477 (S.D.N.Y. 2009) .................................................................... 26

*Jones v. Hirschfeld*,
219 F.R.D. 71 (S.D.N.Y. 2003) ........................................................................   15

*Schiller v. City of New York*,
No. 04 Civ. 7922 KMK JCF, 2007 WL 136149 (S.D.N.Y. Jan. 19, 2007) ........................   16

*Senat v. City of New York*,
255 F.R.D. 338 (E.D.N.Y. 2009) ......................................................................   37

*Smithfield Bus. Park, LLC v. SLR Int'l Corp.*,
No. 12-CV-00282, 2013 WL 5705601 (E.D.N.C. Oct. 18, 2013) ........................................35-36

*Soo Line R.R. Co. v. Travelers Indem. Co.*,
No. 18-cv-1989, 2019 WL 2296596 (D. Minn. May 30, 2019) ..........................................   36

**Other Authorities**

U.N. Comm'n on Int'l Trade Law, *Model Law on Cross-Border Insolvency with
Guide to Enactment and Guidance* (2014),
https://www.uncitral.org/pdf/english/texts/insolven/1997-Model-Law-Insol-2013-Guide-
Enactment-e.pdf ..............................................................................................   18

Vale S.A. ("Vale") hereby submits its opposition (the "Opposition") to the *Motion of the Joint Administrators for a Protective Order Pursuant to Fed. R. Civ. P. 26, Made Applicable to these Proceedings by Fed. R. Bankr. P. 9014*, ECF No. 27 (the "Motion") filed on July 3, 2019, by the Joint Administrators[1] in their capacity as court-appointed representatives for BSGR in the Guernsey Administration.  In support of the Opposition, Vale respectfully states as follows:

## PRELIMINARY STATEMENT

1.      In their Motion for a Protective Order, the Joint Administrators ask this Court to deny the vast majority of Vale's document requests, and to thus allow BSGR to avoid producing documents critical to the Chapter 15 recognition inquiry, based on transparently untenable claims that, *inter alia*, BSGR is somehow immune from producing any documents that do not fall within its ill-founded and unduly restrictive definition of matters related to a debtor's center of main interest ("COMI"); that BSGR does not have access to documents of its own parents, subsidiaries and affiliates; and that the Joint Administrators need not produce numerous other documents based solely on the Joint Administrators' *ipse dixit* that they are protected by unspecified privileges or subject to other vague and conclusory objections such as proportionality.  As set forth in greater detail below, the Joint Administrators' contentions have no merit.[2]  Indeed, the Motion – a vague and unfocused request for protective relief based on thin legal arguments – is yet another effort by BSGR to drag out the Chapter 15 proceeding, run up costs and avoid disclosure of even the most basic information about BSGR and the Guernsey administration.

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in Vale's *Initial Objection to the Joint Administrators' Verified Petition for Recognition of Foreign Proceedings Under Chapter 15 of the United States Bankruptcy Code*, ECF No. 29 ("Vale's Initial Objection").

[2]      After agreeing to prompt discovery at earlier hearings, the Joint Administrators have now attempted to formalistically claim that Vale may not seek discovery because it has not filed an objection to the Petition.  *Compare* Hr'g Tr. 32:10-16, June 13, 2019 ("Sealing Hr'g Tr."), *with* Mot. ¶ 5.  Such arguments are mooted by Vale's Initial Objection filed on July 10, 2019.

2.      In particular, as BSGR's largest creditor,[3] Vale has a right to conduct discovery on the relief sought by the Joint Administrators, including with regard to the two issues at the core of the Petition: (1) whether Guernsey is BSGR's COMI; and (2) whether the company's bad faith behavior warrants denial of such relief to the extent the Guernsey proceeding is not a main proceeding, or alternatively, would warrant relief from the automatic stay requirement set out in 11 U.S.C. § 362 and the granting of other similar relief.[4]  The Joint Administrators' restricted and selective interpretation of the applicable COMI analysis in this indisputably contested proceeding ignores the breadth of Second Circuit case law allowing the pre-recognition discovery that Vale seeks.  Furthermore, Vale may obtain discovery from as far back as the initiation of the London Court of International Arbitration ("LCIA") in April 2014 to probe whether BSGR's Petition filings were made in good faith – including discovery relevant to whether BSGR's COMI truly moved to a "letterbox jurisdiction" such as Guernsey and whether the controllers of BSGR have siphoned assets from BSGR or have otherwise not proceeded in good faith.  Each of Vale's document requests is relevant, imposes a burden proportional to the value of the information sought and maps onto the factors examined by courts in this District as pertinent to determining the location of a debtor's COMI and whether relief is warranted in response to a debtor's bad faith actions.[5]

---

[3]      Despite the Joint Administrators' insistence that Vale's status as a creditor to BSGR is "in dispute," Mot. ¶ 4, BSGR's own filings in Guernsey list Vale as a creditor, and the Joint Administrators' counsel has admitted the same. *See* Ex. E §§ 5.1, 5.2, 5.3, ECF No. 5-7 § 6.3; Hr'g Tr. 7:10-23, June 4, 2019 ("First Day Mots. Hr'g Tr.").

[4]      As set forth in Vale's Initial Objections, the Joint Administrators have sought in the alternative to have this action recognized as a foreign nonmain proceeding within the meaning of 11 U.S.C. § 1517 of the Bankruptcy Code and have thereby requested discretionary relief to seek a stay of Vale's U.S. enforcement proceeding pursuant to 11 U.S.C. § 1521. Vale intends to contest the legitimacy of such recognition and discretionary relief, and is for that additional reason entitled to discovery related to whether BSGR is proceeding in bad faith.

[5]      The Joint Administrators' Motion claims that "[t]o the extent that Vale contends that the discovery remains relevant to the determination of public policy issues under section 1506 of the Bankruptcy Code, Vale is . . . mistaken." Mot. ¶ 36. In fact, to the extent discovery reveals that BSGR or the Joint Administrators are perpetrating a fraud, Vale reserves its right to invoke such a public policy exception.  *See In re Toft*, 453 B.R. 186 (Bankr. S.D.N.Y. 2011) (denying Chapter 15 recognition as manifestly contrary to U.S. public policy where the foreign representative filed for recognition in furtherance of a crime).

2

3.      Additionally, the Joint Administrators' wholesale refusal to produce any documents "not held by BSGR" based on their claim that the Joint Administrators have "no control or authority" over the companies, entities and persons in BSGR's corporate group – from Balda, the Liechtenstein foundation through which Beny Steinmetz, whose very initials form the name B[eny] S[teinmetz] G[roup] R[esources], and his family own BSGR, to Onyx, which, until recently, operated as BSGR's corporate "back office" for all financial and administrative purposes, to Octea Ltd., BSGR's wholly owned subsidiary that owns diamond mines in Sierra Leone – is wholly without merit.  As set forth below, such documents are plainly within BSGR's possession, custody or control, and the Court should not permit the Joint Administrators to escape their document production obligations by engaging in a corporate shell game.  It is indisputable that this Court has authority to order intracorporate discovery where, as here, a corporation is deeply intertwined with its corporate affiliates.  The Court should accordingly either order the Joint Administrators to produce any such documents that are responsive to Vale's requests or order them to represent that they do not have access to documents that are within BSGR's possession, custody or control (which would itself go to key issues in this case). The Joint Administrators have not provided clear information to Vale on these issues, notwithstanding Vale's request for such information since the earliest meet and confer on discovery in June.

4.      The Joint Administrators' further request, not addressed in their motions but buried in their proposed order, that this Court quash the four depositions noticed by Vale and instead replace them with a single 30(b)(6) deposition "on topics relating to COMI" – an about face from the Joint Administrators' prior on-the-record agreement to make those witnesses available for depositions, Hr'g Tr. 6:1-8, June 24, 2019 – is also wholly without merit.  The Joint Administrators have not even attempted to brief this point and have made no showing whatsoever as to why these

depositions cannot go forward.

5.      Now well into the second month of this Chapter 15 Petition, with the Joint Administrators' elusive approach to discovery and BSGR's history of persistent dilatory tactics, the Motion can only be construed as yet another attempt to obstruct and frustrate Vale's efforts to enforce its legal rights and to conduct the purported restructuring outside of the light of day. Vale therefore respectfully asks the Court to deny the Motion and to order the immediate production of all documents responsive to Vale's requests.

## **BACKGROUND**

6.      Vale holds a $2 billion arbitral award against BSGR (the "Award"), Pet. Ex. C, ECF Nos. 5-3 and 5-4, for BSGR's fraud in inducing it to enter into a joint venture to develop an iron ore mining concession in Guinea that was later revoked when it was discovered to have been acquired by BSGR through bribery and corruption.

7.      BSGR's Motion and its refusal to produce documents in response to nearly all of Vale's requests is the latest manifestation of its *modus operandi* – to conceal evidence of improper dealings and to delay and evade responsibility for its actions, including obligations owed to Vale as BSGR's largest creditor. This background is material to the Chapter 15 Petition – and thus Vale's discovery request – because it goes to the heart of BSGR's operations, who is directing them and from where, and the Joint Administrators' level of involvement in running BSGR's affairs, all of which affect the COMI analysis as well as BSGR's alternate grounds for relief. The discovery requests to which BSGR has objected as irrelevant concern these very relevant subjects.

## A. **BSGR's Convoluted Corporate Structure.**

8.      Debtor BSGR sits within a notoriously complex web of corporate relationships which comprise the holdings of Beny Steinmetz – a billionaire who maintains residences in Switzerland and Israel. BSGR itself is a limited liability company that is registered in Guernsey,

but whose operations have historically extended worldwide.[6]   Indeed, through its direct subsidiaries, BSGR currently maintains operations or assets in Sierra Leone,[7] Nigeria, and in an undeveloped oil and gas field located somewhere "in the Middle East."  *See* Pet. Ex. E §§ 5.1, 5.2, 5.3, ECF No. 5-7 (the "Joint Administrators' Second Progress Report") ; Amended Declaration of Malcolm Cohen ¶¶ 9(a), 9(b), ECF No. 24 (the "Am. Cohen Decl.").  BSGR also apparently expects to share in the revenues of a major mining concession in Guinea in the near future as the result of a settlement of a claim BSGR had brought against the Republic of Guinea before the International Centre for the Settlement of Investment Disputes (the "ICSID Arbitration").  Am. Cohen Decl. ¶ 22, ECF No. 24.  Notably, while the Joint Administrators claim that the "central decision-making function . . . took place in Guernsey," Am. Cohen Decl. ¶ 47, ECF No. 24, they have provided no information on where BSGR's employees actually work or where its management sits.

9.      BSGR is not a truly independent company, but is instead controlled by its namesake, Beny Steinmetz (the B.S. in *BS*GR) through an elaborate arrangement.  Specifically, BSGR is wholly owned by a BVI-based holding company called Nysco Management Corp. ("Nysco"), which is, in turn, wholly owned by the Balda Foundation.  Am. Cohen Decl., Ex. 1, ECF No. 24-1.  The Balda Foundation is a trust established in the Principality of Liechtenstein whose board is chaired by Steinmetz's personal lawyer, and whose only beneficiaries are Steinmetz and his family.  *See* Award ¶ 175.[8]

---

[6]      BSGR was initially incorporated in Jersey, another off-shore jurisdiction, but moved its place of incorporation to Guernsey on March 9, 2007.  Am. Cohen Decl., Ex. 2, ECF No. 24-2.

[7]      Octea Limited – the holding company for a group of diamond mining companies operating in Sierra Leone – was registered in the British Virgin Islands ("BVI") until January 2, 2019.  For unknown reasons, and almost one year after BSGR commenced its administration in Guernsey, it migrated Octea Limited's country of incorporation to Guernsey.  Am. Cohen Decl. ¶ 9(a), ECF No. 24.

[8]      It is no accident that Steinmetz set up the Balda Foundation as a *stiftung* foundation in Liechtenstein; this type of foundation is expressly designed to allow the founder to retain effective control over his assets, while purporting to shield them from creditors.  *See* Schweitzer Decl., Ex. A (Marxer & Partner, The Liechtenstein

10.     The Balda Foundation appears to exercise control over BSGR's affairs.    For instance, Vale understands that BSGR only entered into the joint venture with Vale after the Foundation Council issued a resolution approving it.    And while Steinmetz characterizes himself as an "external advisor" to BSGR, *see* Award ¶ 698, there is no question that he actively directed the work of BSGR and its affiliated companies, *see, e.g.*, *id.* ¶¶ 609, 712, and that he continues to do so even as the company has gone into administration in Guernsey, *see infra* ¶¶ 22-27.

11.     The Balda Foundation and Steinmetz arranged for BSGR to be managed largely through a company called Onyx Financial Advisors Limited ("Onyx").    Onyx is an ostensibly independent company,[9] but even the compliance department of Mossack Fonseca – the notorious Panamanian law firm that BSGR used to create shell companies for its various questionable schemes – concluded of Onyx and BSGR:  "They are the same."  Schweitzer Decl., Ex. B (Monica Mark, *The Panama Papers May Help Unravel the Corruption 'Deal of the Century*,' BuzzfeedNews, Apr. 7, 2016).[10]

12.     As might be expected from a company that organizes itself in this deliberately obscure way, the structure in which BSGR holds its assets likewise reveals an arrangement that appears engineered to put assets out of the reach of BSGR's creditors.    Since its entry into administration, BSGR appears to have taken steps to pledge or divest each of its major assets in

---

Foundation at CGS&H p. 3 (2010)).

[9]        Onyx is incorporated in the BVI and is itself comprised of a complex corporate structure, with affiliates or offices located around the world – but not in Guernsey.  *See* Schweitzer Decl., Ex. C (*New evidence ties BSGR to company behind Guinea mine bribery*, Global Witness, Aug. 15, 2013).

[10]        It is no coincidence that Onyx's U.K. operation was formerly known as "BSG Management Services Limited," that it shares an address with BSGR, or that it was BSGR's "authorized agent for service of process in England" in BSGR's agreements with Vale.  Award ¶¶ 176, 24(h).  BSGR director Dag Cramer was CEO of Onyx and Sandra Merloni-Horemans, who ran the Onyx business in Switzerland, also sat on the boards of most BSGR-affiliated companies and served as Secretary of the Balda Foundation Council.  In fact, Onyx appears to have existed exclusively to provide management services and business support to companies owned or controlled by Steinmetz. *See id.* ¶ 175.  Furthermore, Onyx did not just help BSGR carry out its daily affairs by maintaining its documents, processing its payments and executing most of the BSG Group's documents; it was Onyx's practice to hold "shelf companies" in letterbox jurisdictions that it deployed to help BSGR play corporate shell games.  *See id.* ¶ 195.

favor of other entities with Steinmetz connections:

- *BSGR's settlement of the ICSID Arbitration*:  In February 2019, BSGR's parent, Nysco, announced in a press release that BSGR had settled its claim against the Government of Guinea, Schweitzer Decl., Ex. D (*Settlement of the Dispute between the Republic of Guinea and BSG Resources*, Feb. 25, 2019 ("BSGR Press Release")).  Instead of resulting in a realization of assets for the benefit of BSGR's creditors, the purported settlement diverts proceeds from a mining concession to a "new group of investors (presented by and including Beny Steinmetz)," *id.*, organized through a new U.K.-registered company called Niron Metals plc ("Niron").  Niron's shareholder – Global Special Opportunities Limited ("GSOL") – and at least one of its directors (Marcos Camhis) have a close relationship with BSGR and its affiliates, Schweitzer Decl., Ex. E (*Mick Davis and the team ready to take on Beny Steinmetz's former iron ore assets*, Africa Intelligence, Issue 434, Mar. 5, 2019), and Niron has itself confirmed that Steinmetz "may have a minority participation directly in Niron in the future," Schweitzer Decl., Ex. F (Neil Hume and David Sheppard, *Mick Davis Comeback orchestrated by Beny Steinmetz's group*, Financial Times, Apr. 15, 2019).

- *BSGR's claim against George Soros*:  BSGR's Joint Administrators claim that BSGR's "only asset in the United States" is a $10 billion claim against George Soros, which is secured in favor of a Bermuda-registered company called Litigation Solutions Limited.  Am. Cohen Decl. ¶¶ 29, 33, ECF No. 24.  Litigation Solutions Limited has no apparent track record as a litigation funder or online presence.  It does, however, appear to share two directors with Star West Investments Limited ("Star West"),[11] which both happens to be another of BSGR's secured creditors, Joint Administrators' Second Progress Report § 6.3, and which shares directors with other companies associated with Steinmetz.[12]

- *Octea Limited*:  One of BSGR's direct subsidiaries, Octea, operates a functioning diamond mine in Sierra Leone, which BSGR claims is "not presently producing cash flows which are available to the Debtor."  Am. Cohen Decl. ¶ 9(a), ECF No. 24.  It turns out that Octea's shares are coincidentally charged to Star West as security for a loan of $151 million.  Joint Administrators' Second Progress Report § 6.1.  This loan was acquired by Star West from GSOL, which also happens to be a parent company of Niron – the newly formed entity that will be the direct beneficiary of BSGR's settlement with the Republic of Guinea.

## B.  BGSR's Conduct Prior to the Arbitration.

13.    As recounted in Vale's Initial Objection, BSGR's interactions with Vale – its

---

[11]    *See* Schweitzer Decl., Ex. G (Bermuda Registrar of Companies, Litigation Solutions Ltd.); Schweitzer Decl., Ex. H (Bermuda Registrar of Companies, Star West Investments Ltd.).

[12]    Nicholas John Hoskins is a director at Americano Nickel Ltd., Maxwell L.H. Quinn is a director at Americano Nickel Finance Ltd., and Jozef C. Hendricks is a director at both Americano Nickel Ltd. and GSOL.  *See* Schweitzer Decl., Ex. I (Bermuda Registrar of Companies, Americano Nickel Ltd.); Ex. J (Bermuda Registrar of Companies, Americano Nickel Finance Ltd.).  GSOL is the parent company of Niron and the Americano Nickel entities are its subsidiaries.  *See* Schweitzer Decl., Ex. E (*Mick Davis and the team ready to take on Beny Steinmetz's former iron ore assets*, Africa Intelligence, Issue 434, Mar. 5, 2019).

largest creditor – rest upon a bedrock of deceit and a misuse of its corporate relationships. Initial Objection ¶¶ 3, 4. Following a four-year-long dispute (whose delays and complexity were largely the result of BSGR's tactical decisions), a tribunal of three well-regarded arbitrators awarded Vale all of its asserted damages (over $2 billion, including pre- and post-award interest accrued to date). The tribunal found that BSGR induced Vale to invest in a joint venture (the "VBG Joint Venture") through a litany of false statements about BSGR's operations in Guinea and the manner by which it acquired its mining rights to the Simandou (Guinea) iron ore deposit.

14.    The tribunal found that, in response to Vale's due diligence inquiries, BSGR and its agents issued false or misleading certifications and failed to disclose agreements and shareholdings that could have exposed the participation of consultants and agents in helping BSGR procure its mining rights, revealing "red flags" of bribery. *See, e.g.*, Award ¶¶ 476, 493-94, 503-05, 511, 540, 549, 568-69, 578, 676, 697, 700, 712, 719-20, 734, 739-40.

15.    The tribunal also found that BSGR concealed its corruption in part by exploiting its notoriously convoluted corporate structure. On the very same day that Vale broadened the scope of its due diligence questionnaires to cover additional BSGR affiliates, BSGR engaged in a covert restructuring that moved two subsidiaries that had interacted with its agents in Guinea outside of its corporate group. *Id.* ¶¶ 426, 683-87. As the tribunal noted, "[n]o explanation has been provided by BSGR" for the timing and nature of the changes it made to its corporate structure. *Id.* ¶ 687. Ultimately, the tribunal found that BSGR "deliberately restructured the BSG Group in order to avoid disclosure obligations," *id.* ¶ 719.2 – a telling sign of "the lengths to which BSGR went in order to conceal" its actions from others, *id.* ¶ 687.

16.    BSGR also abused its corporate form to dissipate the income it received from its fraud on Vale. Documents seized by Swiss authorities in their corruption investigation of

Steinmetz and his affiliates reveal that as soon as Vale paid BSGR an "upfront payment" of $500

million, BSGR up-streamed the full amount to the Balda Foundation – its ultimate beneficial owner

and the very same entity that BSGR now claims is irrelevant to Vale's document requests.

17.    Vale understands that, after receiving Vale's $500 million, the Balda Foundation

promptly made substantial payments to BSGR's management and related entities (including to

Onyx and other Steinmetz enterprises).   Today, of course, the Joint Administrators claim that

BSGR no longer has any cash, and that it is being funded through an affiliate loan.   Joint

Administrators' Second Progress Report § 7.2.

**C.  BSGR's Efforts to Derail the Arbitration and Resist Document Disclosure.**

18.    Vale initiated the LCIA Arbitration on April 28, 2014, shortly after the Government

of Guinea determined that BSGR had engaged in bribery and corruption to procure its concessions

and revoked the mining rights held by VBG Guinea.   Am. Cohen Decl. ¶ 15, ECF No. 24; Cohen

Decl. Ex. 6-1 at 3-5, ECF No. 24-7.   The parties each appointed two distinguished co-arbitrators,

who then nominated a chairman; the full tribunal was constituted on August 1, 2014.   Award

¶¶ 26-27.

19.    Shortly thereafter, BSGR's bad faith conduct in the proceedings began.   On

September 8, 2014, it initiated the ICSID Arbitration against the Republic of Guinea and then

immediately (and unsuccessfully) tried to stay the first-filed LCIA Arbitration pending the

resolution of that second dispute.   Award ¶ 29.   As the LCIA Arbitration moved to the document

disclosure phase, BSGR employed a similar strategy of delay and obstruction that characterizes its

prosecution of the present Chapter 15 Petition.

20.    In the LCIA Arbitration, BSGR conceded that it had possession, custody, or control

of relevant documents held by its direct or indirect subsidiaries, but objected to the production of

documents held by non-subsidiary affiliates and the witnesses it put forward in the arbitration.[13]

On October 17, 2015, the tribunal nonetheless ordered it to make efforts to search for and produce

documents held by BSGR's circle of affiliates.  Award ¶ 48.  BSGR repeatedly failed to comply

with the tribunal's orders, necessitating three further decisions on document production.  *Id.* ¶¶ 51,

54, 70.

       21.      In every other aspect of the LCIA Arbitration, BSGR's strategy was to delay and

frustrate the proceedings for as long as possible, including by using the following bad faith tactics:

- *Multiple attempts to remove members of the tribunal*:  Once BSGR understood that the tribunal would not allow it to hide behind its corporate structure during document production, BSGR tried more drastic steps to disrupt the proceedings.  Just three months before the scheduled start of the August 2016 merits hearing, BSGR challenged all three members of the tribunal (including the co-arbitrator that it had itself appointed) on several grounds, Award ¶¶ 65-67, which was rejected as to the co-arbitrators, *id.* ¶ 82.[14]  BSGR then filed a second challenge application just six days before the merits hearing, simultaneously initiating proceedings in the English High Court to remove the co-arbitrators.  *Id.* ¶¶ 100, 112.  These applications were all rejected, *id.* ¶ 120, and the English High Court remarked that the challenge had been "totally without merit" and that BSGR had "mischaracterised the nature of some of the underlying proceedings in a way which was seriously misleading." Schweitzer Decl., Ex. K (*BSG Resources Ltd. v. Vale SA and Ors* [2017] EWHC 760 ¶¶ 3, 7 (Comm) (Eng.)).

- *Four separate stay applications*:  BSGR made *four* applications to stay the LCIA Arbitration, including twice on the basis of its later-filed ICSID Arbitration, Award ¶¶ 29-30, 36-38. After the merits hearing, BSGR tried to prevent issuance of a final award by filing its Guernsey Administration, even as it acknowledged that no automatic stay applied because it had not applied to recognize the administration outside of Guernsey.  *Id.* ¶ 156.  Each stay application was denied.

- *Boycotts of hearings*:  After removing the tribunal's first chairman, BSGR refused to permit the tribunal to be promptly reconstituted such that a merits hearing could be held on the scheduled dates.  *Id.* ¶¶ 87-89.  In its place, the newly reconstituted tribunal held an educatory hearing for the new chairman, which BSGR boycotted.  *Id.* ¶¶ 101-11.  BSGR then claimed that it could not attend any merits hearing at any time in the subsequent *nine* months owing

---

[13]     BSGR made these objections even though it had already shown that it had the capacity to collect the records over which it now claims to lack control.  BSGR conceded that when it learned of the arrest of its agent Frédéric Cilins in the United States that Onyx had arranged to image all of its own and BSGR's potentially relevant servers and to scan hard copies of documents held in their offices around the world, and it did the same for electronic devices (including mobile telephones and laptops) held by others, including Steinmetz.

[14]     BSGR did succeed in removing the chairman of the tribunal on the basis of anonymized comments he had made about the case at an arbitration conference.  Award ¶ 82.

to the purported unavailability of one particular barrister. *Id.* ¶ 114. Once the hearing was re-scheduled in spite of this objection, BSGR refused to show up or provide its witnesses for cross-examination, but nonetheless continued to participate in the proceedings. *Id.* ¶¶ 130-31, 140-61.

- *Failure to make required payments*: Even as BSGR prosecuted its costly challenges and parallel litigations, it failed to make administrative payments required by the LCIA, *id.* ¶ 144, and disobeyed an English High Court order requiring it to pay Vale's legal fees associated with BSGR's frivolous challenge to the co-arbitrators, Schweitzer Decl., Ex. K (*BSG Resources Ltd. v. Vale SA and Ors* [2017] EWHC 760 (Comm) (Eng.)).

## D. The Guernsey Administration.

22.     As part of BSGR's effort to disrupt the LCIA Arbitration proceedings, BSGR put itself into administration by an order of the Royal Court of Guernsey dated March 6, 2018. It made its application in secret, on the basis of an affidavit from one of its directors, Peter Harold Driver (the "Driver Affidavit"), which BSGR has since attempted to keep hidden from its creditors, including by seeking a sealing order from this Court.

23.     By BSGR's own admission, the Guernsey Administration was a deliberate attempt to frustrate Vale's effort to recover on the impeding award. In March 2018, BSGR's director, Dag Cramer, told Bloomberg that BSGR was "drawing up the drawbridge, filling up the moat, [and] putting some sharks in the moat, to make sure [BSGR] can stay the distance . . . even if there are adverse awards against it." Schweitzer Decl., Ex. L (Thomas Biesheuvel, *Beny Steinmetz Puts Mining Company BSGR Into Administration*, Bloomberg, Mar. 7, 2018). Cramer added: "We're not in liquidation, no one is forcing this upon us." *Id.*[15] Cramer also told Reuters that he would be "sta[ying] on as director" and that this "*technical procedure* would not affect daily operations of subsidiaries." Schweitzer Decl., Ex. N, (Barbara Lewis, *Administrators seek to return Steinmetz's mining firm BSGR to solvency*, Reuters, Mar. 7, 2018) (emphasis added).

---

[15]     According to another publicly available article, the Driver Affidavit makes clear that BSGR was motivated by the expectation that it was "highly likely that the judgment [in the LCIA Arbitration] may be handed down in favour of Vale." Schweitzer Decl., Ex. M (*Secret Dealings Tying UK Conservatives' CEO to Bribery Scandal Billionaire*, Global Witness, May 3, 2019).

24.    Given this beginning, it is perhaps unsurprising that during the nearly two-year pendency of the Guernsey Administration, the Joint Administrators – who are funded by BSGR's parent company, Nysco, Am. Cohen Decl. Ex. 1, ECF No. 24-1; Joint Administrators' Second Progress Report § 7.2 – have taken no discernible steps to reorganize BSGR and do not appear to have been involved in actively managing its affairs.  Indeed, the Joint Administrators do not appear to have even been involved in negotiating BSGR's settlement of the ICSID Arbitration, which BSGR states will result in the diversion of part of the mining concession to a "new group of investors (presented by and including Beny Steinmetz)."  Schweitzer Decl., Ex. D (BSGR Press Release).  The announced settlement appears, in fact, to have been initiated and negotiated by Beny Steinmetz and Dag Cramer on behalf of BSGR, with no sign of any involvement or even prior knowledge by the Joint Administrators. [16]  Apparently caught blindsided by BSGR's and Steinmetz's maneuvering, the Joint Administrators have now tried to distance themselves from BSGR's press release and have dismissed the settlement as non-binding.  Schweitzer Decl., Ex. M (*Secret Dealings Tying UK Conservatives' CEO to Bribery Scandal Billionaire*, Global Witness, May 3, 2019).

25.    There is also evidence that during the Joint Administrators' tenure, BSGR has continued to dissipate its assets.  While Vale has not been provided an unredacted version of the Driver Affidavit, according to a press report regarding the affidavit, BSGR apparently represented that a judgment in the amount of $500 million in the LCIA Arbitration "would leave BSGR with a deficiency of assets of at least $368 million," Schweitzer Decl., Ex. M (*Secret Dealings Tying*

---

[16]    *See* Schweitzer Decl., Ex. O (*Sarkozy the peacemaker between Conde and Diallo*, Africa Intelligence, Issue 796, Mar. 13, 2019).  Steinmetz himself gave an interview following the settlement, in which he referred to the company's actions in the first person – "*We* were enemies.  Now *we* are friends and partners with the Guinean government" – and addressed BSGR's future plans for developing the concession.  Schweitzer Decl., Ex. P (Franz Wild and Thomas Biesheuvel, *Mining Billionaire Ends Bitter Guinea Dispute After Months of Secret Negotiations*, Bloomberg, Feb. 25, 2019) (emphasis added).

*UK Conservatives' CEO to Bribery Scandal Billionaire*, Global Witness, May 3, 2019), which suggests that, in early 2018, BSGR's assets must have totaled approximately $132 million. However, the Joint Administrators have also claimed that as of March 7, 2019, BSGR had "no liquid assets." Joint Administrators' Second Progress Report § 7.2.

26.    In the meantime, the Joint Administrators have taken no discernible action to recover assets for the company's creditors. Neither of their two progress reports indicate any effort to investigate what happened with the $500 million that Vale paid BSGR in 2010 or whether BSGR may have any claims against those recipients. *See generally* Pet. Ex. D, ECF No. 5-6 (the "Joint Administrators' First Progress Report"); Joint Administrators' Second Progress Report. Instead, the Joint Administrators appear to be focusing their efforts – and may be only funded – to pursue actions deemed beneficial to Steinmetz, including its far-fetched claim against Soros and its full-court press to oppose Vale's petitions to have the award enforced in London and New York. The Joint Administrators' inaction with respect to reorganization and the recovery of assets is in contrast to representations made by the Joint Administrators themselves, which accordingly raises questions as to where and with whom the true control of BSGR lies. *See* Am. Cohen Decl. ¶ 44, ECF No. 24 (stating that Joint Administrators "have been working closely with the Debtor's management and advisors").

27.    For purposes of opposing the Motion for a Protective Order, it is not Vale's burden to demonstrate the entirety of the Joint Administrators' efforts; rather Vale provided this background to reinforce how its requests – which are routine in every case – are particularly relevant given the serious questions regarding where COMI lies and the apparent likelihood that this Petition is a continuation of BSGR's past behavior.

**E.  BSGR's Conduct in the Chapter 15 Proceedings.**

28.    Promptly after receiving the Award, Vale applied for enforcement in London and

New York, on April 18, 2019, and April 23, 2019, respectively.  It was avowedly in response to the latter action that the Chapter 15 Petition was filed.[17]

29.    On June 6, 2019, just two days after BSGR made its First Day Motions, Vale submitted informal document requests to the Joint Administrators.  On June 14, 2019, after being informed that the Joint Administrators would not respond to its informal requests, Vale submitted formal document requests ("First Document Requests"), interrogatories ("First Interrogatories") and noticed the depositions for certain key witnesses ("Deposition Notices") in accordance with the procedures set out in the Federal Rules of Civil Procedure.

30.    In response, on July 3, 2019, the Joint Administrators filed the pending Motion, attaching their *Answers and Objections to Vale, S.A.'s (i) First Request for Production of Documents and (ii) First Set of Interrogatories*, ECF No. 27-2 (the "Doc. Objs." and "Interrog. Objs.", cumulatively the "Objs.").  In it, they appear to represent that discovery has proceeded apace.  *See* Mot. ¶ 9 n.1.  To the contrary, the Joint Administrators' approach to the discovery process has thus far been slow, minimal and elusive.  For example:

- The Joint Administrators promised an initial production of documents responsive to the First Document Requests on June 26 and eventually produced twelve documents on June 27, which they claim amounted to "over 1,000 pages."  Mot. ¶ 9 n.1.  However, five of the twelve documents were filed along with the Petition itself, and 1,023 of the pages consist of a single document:  a heavily redacted copy of the Driver Affidavit and its exhibits, which include approximately 100 fully redacted pages.

- The Joint Administrators have yet to provide any responses to Vale's First Interrogatories beyond a plethora of broad sweeping objections and commitments to provide future responses, notwithstanding the fact that their responses were due on July 12 under the Federal Rules, and despite promising to reply to them by the week of June 23, 2019.  Their current Motion makes only a passing reference to the First Interrogatories.  *See* Mot. ¶ 34.

- Despite representing that they would promptly submit an agreed confidentiality order to accelerate document production, Hr'g Tr. 7:6-18, June 24, 2019, the Joint Administrators have dragged their feet, taking two weeks to even respond to a mark-up to the order under

---

[17]    At the First Day hearing on the Petition, the Court rejected the Joint Administrators' request for a TRO against continuation of briefing of the New York enforcement action.

14

negotiation provided by Vale.

- The Joint Administrators have backtracked from their prior statement that they would produce for depositions the four individuals to whom Vale had sent deposition notices (the Joint Administrators and two BSGR directors: Dag Cramer and Peter Harold Driver). *See* Hr'g Tr. 6:1-8, June 24, 2019. They now seek protection from *all* these depositions and propose only a single 30(b)(6) deposition.

31.     Vale therefore submits this Opposition to ask that the Court put an end to the Joint Administrators' attempts at obstructing the regular progression of this proceeding and to allow Vale to finally acquire the information necessary to fully and properly resolve this dispute.

## ARGUMENT

32.     Rule 26(c) of the Federal Rules of Civil Procedure sets forth the procedure for obtaining a protective order, which has been "made applicable" to bankruptcy proceedings through Rules 7026 and 9014 of the Federal Rules of Bankruptcy Procedure.  Fed. R. Bankr. P. 7026; Fed. R. Civ. P. 26(c).  In relevant part, Rule 26(c)(1) provides that "[a] party or any person from whom discovery is sought may move for a protective order . . . [and] [t]he court may, for good cause, issue an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense."

33.     "The touchstone of the court's power under Rule 26(c) is the requirement of 'good cause.'"  *In re Zyprexa Injunction*, 474 F. Supp. 2d 385, 415 (E.D.N.Y. 2007), *aff'd sub nom. Eli Lilly & Co. v. Gottstein*, 617 F.3d 186 (2d Cir. 2010).  "A party seeking a protective order pursuant to Rule 26(c)(1) must prove that good cause exists to support its issuance."  *In re Rapid-Am. Corp.*, No. 13-10687 (SMB), 2018 WL 882398, at *2 (Bankr. S.D.N.Y. Feb. 12, 2018) (citing *Refco Grp. Ltd. v. Cantor Fitzgerald, L.P.*, No. 13 Civ. 1654(RA)(HBP), 2014 WL 5420225, at *4 (S.D.N.Y. Oct. 24, 2014)); *Jones v. Hirschfeld*, 219 F.R.D. 71, 74-75 (S.D.N.Y. 2003) ("The burden of persuasion in a motion . . . for a protective order is borne by the movant.").

34.     "To establish 'good cause,' a party must demonstrate 'a particular need for

protection.'" *Rapid-Am. Corp.*, 2018 WL 882398, at *2 (quoting *Duling v. Gristede's Operating Corp.*, 266 F.R.D. 66, 71 (S.D.N.Y. 2010)); *id.* at *4 (denying motion for protective order where movant did not have standing to challenge the subpoenas it sought to quash and where information requested was sufficiently relevant and proportional under Rule 26's "broad[]" standard). In other words, the party moving for a protective order must show through "specific examples or articulated reasoning" "that disclosure will result in a clearly defined, specific and serious injury." *Id.* (citations omitted). The alleged harm "must be significant, not a mere trifle." *Schiller v. City of New York*, No. 04 Civ. 7922 KMK JCF, 2007 WL 136149, at *5 (S.D.N.Y. Jan. 19, 2007) (quoting *Cipollone v. Liggett Grp., Inc.*, 785 F.2d 1108, 1121 (3d Cir. 1986)); *id.* at *20 (denying motion for protective order upon finding that movant had waived its privilege claims and had failed to show that the harm that might result from disclosure was sufficiently severe).

35.     Here, the Joint Administrators have failed to carry that substantial burden. All of Vale's discovery requests are directly relevant to the issues before this Court – (1) whether Guernsey is BSGR's COMI; and (2) whether the Joint Administrators and BSGR have pursued recognition as either a foreign main or foreign nonmain proceeding in bad faith and, as such, whether they are entitled to the relief sought from this Court. Further, the Joint Administrators have utterly failed to support their proportionality objections, which are in any event undermined by both the substantial amount in controversy in this proceeding and the plainly unburdensome nature of Vale's requests. Moreover, the additional "particular objections" raised by the Joint Administrators have no basis either in the case law or in this Court's discovery practice.[18] Accordingly, the Court should deny the Motion, reject all of the Joint Administrators' requests for

---

[18]     In fact, the Joint Administrators' Motion fails to cite a single case analogous to the present dispute where a protective order was granted and discovery denied. Instead, even the Joint Administrators' description of the legal standard relevant to their Motion relies solely on cases decided outside of this Circuit, some of which appear only minimally relevant to the issues before this Court. Mot. ¶¶ 16-18.

relief, and order the immediate production of all the documents and information sought by Vale.

I.    **Vale's Discovery Requests Are Proportional to the Needs of This Case and Are Relevant to Issues of Fundamental Importance to These Proceedings – BSGR's COMI and Bad Faith.**

    A.    *Vale's Discovery Requests Address Core COMI Issues.*

36.    As the Joint Administrators concede, Mot. ¶ 32, Vale is entitled to discovery necessary to ascertain the location of BSGR's COMI.[19]  However, the Joint Administrators seek to artificially circumscribe the scope of Vale's discovery, relying on an overly narrow and misleading interpretation of COMI based solely on the general factors articulated in *In re SPhinX, Ltd.*, 351 B.R. 103 (Bankr. S.D.N.Y. 2006), *aff'd*, 371 B.R. 10 (S.D.N.Y. 2007).  *See* Mot. ¶ 33.

37.    In so doing, the Joint Administrators ignore that since *SPhinX* was decided nearly thirteen years ago, courts within the Second Circuit have developed a wide breadth of case law explicitly recognizing that courts may consider "any relevant activities" of the debtor in performing a COMI analysis.  *See, e.g.*, *In re Fairfield Sentry Ltd.*, 714 F.3d 127, 137 (2d Cir. 2013) ("[t]h[e] nonexclusive list [set forth in *SPhinX*] is a helpful guide, but consideration of these specific factors is neither required nor dispositive"); *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. 237, 272-77 (Bankr. S.D.N.Y. 2019) (stating that *SPhinX* list was "nonexclusive" and considering factors of particular relevance to the location of the debtor's "nerve center").  Indeed, a review of the relevant Second Circuit case law after *SPhinX* illustrates that courts have looked far beyond the limited view adopted by the Joint Administrators.  In fact, Vale's discovery requests track the various elements courts in this Circuit routinely consider relevant to their COMI analysis,

---

[19]    In their Motion for a Protective Order, the Joint Administrators spill much ink in arguing (1) that the Bankruptcy Code does not contemplate creditor discovery against a foreign representative; and (2) that, to the extent the Bankruptcy Code does allow such discovery, it should be limited to the statutory requirements governing recognition of a foreign main proceeding.  Mot. ¶¶ 19-22, 25-31.  Yet the Joint Administrators' later admission that "Vale may be entitled to certain limited discovery prior to the Recognition Hearing" on COMI-related issues, Mot. ¶ 32, concedes that this is far from the case.  As this Court has recognized, discovery is applicable at this stage of the proceedings, *see* First Day Mots. Hr'g Tr. 54:18-20; Sealing Hr'g Tr. 22:12-18, 34:6-12.

including, *inter alia*:[20]

- the location of the debtor's primary assets including the location of investment property and liquid assets,[21] *see, e.g.*, First Doc. Requests No. 1, 13, First Interrogs. No. 1;

- the location of the debtor's nerve center, "including from where the debtor's activities are directed and controlled,"[22] who actually manages the debtor, and the location of the debtor's board meetings and board meeting minutes,[23] *see, e.g.*, First Doc. Requests No. 3, 14, 15, First Interrogs. No. 2;

- the day-to-day management of investments and business operations,[24] and whether the purported COMI is where the debtor conducts its "regular business" or is a letterbox jurisdiction,[25] *see, e.g.*, First Doc. Requests No. 15, 64, First Interrogs. No. 3;

- board member residences,[26] *see, e.g.*, First Doc. Requests No. 6; First Interrogs. No. 5;

- the location of the majority of the debtor's creditors including beneficial owners[27] and the business' investors,[28] *see, e.g.*, First Doc. Requests No. 4, 17;

- the location of meetings with creditors,[29] the expectations of creditors with regard to the location of a debtor's COMI,[30] and whether there exists any objective evidence that could provide interested parties with notice that a debtor's COMI was in a particular jurisdiction,[31]

---

[20]    The Joint Administrators' limited view also fails to consider that the factors enumerated in *In re SPhinX* are derived from the UNCITRAL Model Law, which lists additional factors that may be relevant for the determination of COMI. *See In re Basis Yield Alpha Fund (Master)*, 381 B.R. 37, 47 (Bankr. S.D.N.Y. 2008); *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. at 273 (same). Such additional factors include, *inter alia*, "the location in which commercial policy was determined," "the location from which purchasing and sales policy, staff, accounts payable and computer systems were managed," and "the location from which contracts . . . were organized." *See* U.N. Comm'n on Int'l Trade Law, *Model Law on Cross-Border Insolvency with Guide to Enactment and Guidance* ¶¶ 144-47 (2014), https://www.uncitral.org/pdf/english/texts/insolven/1997-Model-Law-Insol-2013-Guide-Enactment-e.pdf. These factors are also directly relevant to Vale's discovery requests. *See, e.g.*, First Doc. Requests No. 30, 33, 36, 37, 45, 51, 52, 53, 61, 62, 63.

[21]    *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. 63, 77 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 88 (S.D.N.Y. 2012).

[22]    *In re Suntech Power Holdings Co.*, 520 B.R. 399, 416 (Bankr. S.D.N.Y. 2014) (citation omitted).

[23]    *In re SPhinX*, 351 B.R. at 108.

[24]    *In re Millennium Glob. Emerging Credit Master Fund Ltd.*, 458 B.R. at 77.

[25]    *In re Fairfield Sentry Ltd*., 714 F.3d at 130; *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund., Ltd.*, 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007) ("the COMI presumption may be overcome particularly in the case of a letterbox company not carrying out any business [in the country] . . . in which its registered office is situated" (internal quotations and citations omitted)), *aff'd*, 389 B.R. 325 (S.D.N.Y. 2008).

[26]    *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund., Ltd.*, 389 B.R. 325, 338 (S.D.N.Y. 2008).

[27]    *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. at 283.

[28]    *In re SPhinX*, 351 B.R. at 119.

[29]    *In re Ocean Rig UDW Inc.*, 570 B.R. 687, 704 (Bankr. S.D.N.Y. 2017).

[30]    *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. at 274-75; *In re Fairfield Sentry Ltd.*, 714 F.3d at 130.

[31]    *In re Fairfield Sentry Ltd.*, 714 F.3d at 130.

*see, e.g.*, First Doc. Requests Nos. 12, 13, 17;

- whether investors were clearly informed of the purported COMI,[32] *see, e.g.*, First Doc. Request No. 18;

- the location of counterparties to agreements,[33] *see, e.g.*, First Doc. Requests No. 31, 53, 61, 62, 63;

- the location of bank accounts and accounts receivable,[34] *see, e.g.*, First Doc. Requests No. 10, 11, 32;

- the location where the business' books and records are kept including investor registries,[35] *see, e.g.*, First Doc. Requests No. 7, 22, 28; 40, 43;

- the location of employees and managers including investment managers and administrators,[36] *see, e.g.*, First Doc. Requests Nos. 4, 5, 6, 8, 39, 44, 60;

- the location of a holding company's subsidiaries and the location of their principal assets,[37] *see, e.g.*, First Doc. Requests No. 9, 19, 34, 35, 38, 41, 42, 46, First Interrogs. No. 5, 7, 8;

- the COMI of the debtor's parent company if and when the parent and debtor subsidiary are "inseparable,"[38] *see, e.g.*, First Doc. Requests No. 9, 20, 21, 52;

- the location where litigation adversaries have served or attempted to serve process,[39] *see, e.g.*, First Doc. Requests No. 57, 58; and

- whether the purported COMI is "subject to tactical removal"[40] and the activities of the foreign representative liquidator, including whether the representative "[did] any more than the statutory minimum" by obtaining ledgers, journals, securing bank records and ascertaining the location of the debtors' assets,[41] *see, e.g.*, First Doc. Requests No. 16, 23, 24, 25, 26, 27, 44, 59, 64, 65, 66, 67, 68; First Interrogs. No. 4, 6, 10.

        38.     The above list of examples[42] clearly demonstrates that Vale's requests are indeed

---

[32]    *In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 91 (Bankr. S.D.N.Y. 2012).

[33]    *See In re Bear Stearns High-Grade Structured Strategies Master Fund., Ltd.*, 389 B.R. at 337 (considering the location of counterparties to master repurchase and swap agreements).

[34]    *Id.* at 338.

[35]    *Id.* at 337, and the location of the business' physical office, *In re Gerova Fin. Grp., Ltd.*, 482 B.R. 86, 91-92 (Bankr. S.D.N.Y. 2012).

[36]    *In re Fairfield Sentry Ltd.*, 714 F.3d at 137, 139; *In re Bear Stearns High-Grade Structured Credit Strategies Master Fund., Ltd.*, 389 B.R. at 337.

[37]    *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. at 281-82.

[38]    *In re OAS S.A.*, 533 B.R. 83, 102-03 (Bankr. S.D.N.Y. 2015); *In re Serviços de Petróleo Constellation S.A.*, 600 B.R. at 287.

[39]    *In re Gerova Fin. Grp., Ltd.*, 482 B.R. at 91.

[40]    *In re Creative Fin. Ltd.*, 543 B.R. 498, 517-18 (Bankr. S.D.N.Y. 2016).

[41]    *Id.* at 502.

[42]    All Document Requests and/or Interrogatories not here delineated are nonetheless relevant to the examination

well within this Court's precedent on COMI discovery.

39.    This is especially true where the Petition on its face raises serious questions about whether BSGR's COMI is Guernsey, including by failing to identify the individuals and/or entities who "direct, control and coordinate the corporation's activities," *In re Fairfield Sentry Ltd.*, 714 F.3d at 138 n.10 (citation omitted), where those individuals or entities are located, how BSGR's investments are managed, where its business operations are conducted and the status of its assets. *See e.g.,* Am. Cohen Decl. ¶ 44, ECF No. 24 (representing that the Joint Administrators are working closely with the Debtor's management and advisors); Am. Cohen Decl. Ex. 1, ECF No. 24-1; Joint Administrators' Second Progress Report § 7.2 (representing that the Guernsey Administration is being funded by BSGR's parent company, Nysco, located in BVI).  Indeed, the Amended Cohen Declaration states that in January 2019, the "country of incorporation" of BSGR's wholly owned subsidiary, Octea Limited, was moved from the BVI to Guernsey, Am. Cohen Decl. ¶ 9(a), raising legitimate questions of whether other similar actions were undertaken. As such, Vale's requests are plainly relevant to the determination of BSGR's COMI, even under the Joint Administrators' own narrow and misleading interpretation of the COMI factors.[43]

B.    *Vale Has the Right to Determine Through Discovery Whether the Chapter 15 Petition Is Brought in Bad Faith.*

40.    The Motion entirely ignores that Vale is entitled to pre-recognition discovery to probe whether BSGR is pursuing its Guernsey Administration and Chapter 15 Petition in good faith.  This is particularly true where, as here, the Debtor's history of engaging in corrupt business

---

of BSGR's bad faith under COMI or more generally as part of the Court's grant of discretionary relief under 11 U.S.C. § 1521.  *See infra* ¶¶ 40-46.

[43]    The Joint Administrators thus object to such basic COMI requests as for "documents sufficient to identify all creditors of BSGR," *see* First Doc. Request No. 17; *In re SPhinX*, 351 B.R. at 117 (identifying "the location of the majority of the debtor's creditors" as a factor) and documents reflecting actions undertaken by the Joint Administrators to investigate the transfer of assets and in connection with the discharge of their duties, *see* First Document Request No. 16, 32, 59, 65; *In re SPhinX*, 351 B.R. at 117 (identifying "the location of the debtor's primary assets" and "the location of those who actually manage the debtor" as factors).

dealings and using corporate restructurings to conceal them, as well as the Joint Administrators' actions (and in many respects, inaction) throughout BSGR's administration, raise serious concerns that they are proceeding in bad faith. Likewise, because the Joint Administrators have sought alternative discretionary relief from the Court to stay proceedings under 11 U.S.C. § 1521, *see* Petition ¶ 1, Vale is entitled to obtain discovery to ascertain whether the Chapter 15 proceedings were not initiated in bad faith, which would be material to the Court's exercise of discretion as the Joint Administrators request.

41.     "U.S. bankruptcy courts are not helpless in the face of bad faith filing." *In re Creative Fin. Ltd.*, 543 B.R. 498, 522 (Bankr. S.D.N.Y. 2016). They must "be mindful of the Second Circuit's repeated reminders . . . to examine circumstances 'to ensure that a debtor has not manipulated its COMI in bad faith.'" *Id.* at 523 (quoting *In re Fairfield Sentry Ltd.*, 714 F.3d at 138). The Bankruptcy Code specifically contemplates relief to creditors in response to a debtor's bad faith actions, which could "without limitation" be evidenced by any of the following behaviors: (a) the redistribution of assets "in the face of an imminent adverse ruling"; (b) attempts at controlling a foreign representative or other independent fiduciary; (c) behavior resulting in the deprivation of the resources needed for a foreign representative to fulfill his/her duties; and/or (d) the "orchestrati[on of a] chapter 15 case to deprive . . . [a] creditor of much or all of the fruits of its judgments." *Id.* at 513.

42.     Accordingly, a creditor is entitled to challenge the recognition of a foreign main proceeding on the basis that such a proceeding was initiated in bad faith; "a COMI manipulated in bad faith would not be a valid COMI upon which to rely at all." *Id.* at 524; *see also In re Oi Brasil Holdings Coöperatief U.A.*, 578 B.R. 169, 240 (Bankr. S.D.N.Y. 2017) (Lane, J.) (noting that a debtor manipulates its COMI when it tries to "opportunistic[ally] shift" its business operations in

the period before filing a Chapter 15 petition in order to exploit insiders or "thwart[] third-party expectations" (citation omitted)).  The principle that courts may consider the debtor's good or bad faith likewise applies to the Joint Administrators' alternative request for recognition of the Guernsey Administration as a foreign nonmain proceeding.  Pet. 3 n.1, ECF No. 5.  Because a court's grant of a stay in favor of those proceedings is entirely discretionary under 11 U.S.C. § 1521, the Court may – and should – deny such relief in the event of a bad faith filing.  *See In re Creative Fin. Ltd.*, 543 B.R. at 513 n.87 (denying recognition as foreign main and nonmain proceedings for failure "to establish the presence of even an establishment" in the BVI and noting that a "case [could] turn on the Debtor's good faith or bad faith . . . after hearing the evidence.").

43.    Accordingly, Vale's document requests and interrogatories address precisely the type of behavior suggesting bad faith considered by the Bankruptcy Court in *In re Creative Finance*.  This includes, for example, requests for BSGR's and its affiliates' historic financial records tracking the redistribution of assets over time.  *See, e.g.*, First Doc. Requests No. 7, 8, 28, 32, 42, 43; First Interrogs. No. 1.  It also includes communications, budgets and information exchanges between the Joint Administrators and BSGR that would identify the resources provided to the Joint Administrators in managing the bankruptcy, verifying whether there have been attempts by BSGR to control the Joint Administrators, and examining the motivation for the Chapter 15 proceedings.  *See e.g.*, First Doc. Requests No. 24 through 27, First Interrogs. No. 6, 9, 10.

44.    The Joint Administrators have nevertheless refused to make available to Vale documents foundational to the issues before the Court, and which directly implicate the standards set forth in *In re Creative Finance*.  Their position is particularly untenable in light of the fact that it is the Joint Administrators' burden to establish both the COMI "in any instances where the court

22

regards the issues to be sufficiently material to warrant further inquiry" and the "establishment"

for purposes of a 11 U.S.C. § 1521 analysis. *In re Creative Fin. Ltd.*, 543 B.R. at 515, 520.

45.     Here, the evidence already known to Vale and this Court puts both BSGR's and the

Joint Administrators' good faith into question and implicates each of the considerations articulated

in *In re Creative Fin.*, entitling Vale to obtain discovery to ascertain whether BSGR is pursuing

its administration and this Chapter 15 petition in good faith.  In particular:

- BSGR's own directors have made it clear that BSGR voluntarily entered into the Guernsey Administration with the express purpose of frustrating Vale's ability to collect on an impending award.  *See supra* ¶ 23.  In almost two years since initiating the Administration, the Joint Administrators did not bother to have it recognized in any other jurisdiction (not even in the United Kingdom, even though this would have supported their argument for staying the LCIA Arbitration, *see supra* ¶ 21); they only initiated this U.S. proceeding once Vale had begun to take steps to enforce its award.  This all suggests that the Chapter 15 Petition was "orchestrat[ed] . . . to deprive . . . [a] creditor of much or all of the fruits of its judgments."  *In re Creative Fin. Ltd.*, 543 B.R. at 513.

- The Guernsey Administration is funded by Nysco – an intervening BVI-based holding company which wholly owns BSGR and which is ultimately controlled by Steinmetz.  *See supra* ¶ 9.  This is especially salient given the apparent inability or unwillingness of the Joint Administrators to control BSGR's affairs (i.e., by exercising sole authority over the resolution of BSGR's ICSID Arbitration, a major contingent asset), to take steps towards any reorganization of the company's affairs, or to recover assets for the company's creditors by investigating BSGR's transactions with its affiliates, agents, or former management, each of whom is ultimately accountable to Steinmetz.  *See supra* ¶ 26.  There is thus ample reason to suspect that BSGR has "attempt[ed] . . . to control a [foreign representative], who was supposed to act as [an] independent fiduciary, by the purse strings," or otherwise "deprive[d] the [foreign representative] of the resources he needed to properly do his job," *In re Creative Fin. Ltd.*, 543 B.R. at 513, and raises serious questions about where the "nerve center" of the company lies.

- Vale also has reason to suspect that BSGR has manipulated its COMI or "establishment," or dissipated assets "in the face of an imminent adverse ruling" against it.  *Id.* at 513.  As noted below, the Joint Administrators' evidence leaves open many questions about whether Guernsey is in fact BSGR's COMI.  And it is difficult to overstate BSGR's long history of using its convoluted corporate structure and web of affiliates to conceal or dissipate assets. *See supra* ¶¶ 8-12.  As noted above, BSGR apparently entered the Guernsey Administration with at least $132 million net assets, but is now cashless.  *See supra* ¶ 25.  Moreover, the company's current asset holding structure, as described above and in the Joint Administrators' reports, appears to be designed to enable all assets to accrue to the benefit of affiliated companies with opaque ownership structures and, ultimately, to Steinmetz's personal benefit – outside the reach of creditors.  *See supra* ¶¶ 8-12.

- The likelihood of bad faith in this Chapter 15 Petition is made especially clear given the context of BSGR's litigation tactics. These include refusals to comply with directives and court orders, and efforts to delay proceedings on patently frivolous grounds both during the LCIA Arbitration (i.e., through challenges of arbitrators that were "totally without merit") and after the issuance of the Award (i.e., by seeking on the First Day a TRO before this Court without any evidence of imminent harm). *See generally supra* ¶ 21 (describing an assortment of delay tactics).

46.    Thus, Vale's discovery requests, far from being irrelevant to a COMI analysis, are vital to testing the Joint Administrators' representations regarding their control of BSGR and rebutting any presumption that Guernsey is BSGR's COMI (or its alternative claim that Guernsey is the place of "establishment"). Furthermore, Vale's discovery aims to create an evidentiary record relevant to the Court's determination as to whether, in light of BSGR's potential bad faith filing, the Joint Administrators are entitled to a stay or any other discretionary relief under 11 U.S.C. § 1521.

C.    *Vale's Discovery Requests Are Proportional and Relevant to the Court's Recognition of the Guernsey Administration As Either A Foreign Main or Foreign Nonmain Proceeding.*

47.    The Joint Administrators' boilerplate objections on the basis of relevance and proportionality go no further than to simply repeatedly restate "Rule 26"[44] and must be rejected. Further, the Joint Administrators conflate "relevance" and "proportionality" as if these terms were interchangeable. But these objections have differing standards, neither of which are met by the Joint Administrators' vague, cookie-cutter responses to Vale's document requests.

48.    In determining whether the requested discovery is "proportional to the needs of the case" for purposes of a motion for a protective order, Rule 26 directs courts to consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving

---

[44]    *See, e.g.*, Objs. ¶¶ 1, 2, 5, 6, 7, 8, 9, 11, 16, 18, 20, 24, 25, 26, 27, 28, 30, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 51, 52, 53, 55, 56, 57, 58, 59, 60, 62, 65, ECF No. 27-2.

the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Fed. R. Civ. P. 26(b)(1).

49.    Here, and despite their repeated invocation of a "proportionality" objection, the Joint Administrators have failed to state with specificity the grounds for their objections.  They have offered no further details of the burden of production, nor have they provided any context for the purported disproportionate effects producing responsive documents would have on them.[45] *See Fischer v. Forrest*, No. 14 Civ. 1304 (PAE) (AJP), 2017 WL 773694, at *3 (S.D.N.Y. Feb. 28, 2017) ("[T]he responses to requests . . . stating that the requests are 'overly broad and unduly burdensome' is meaningless boilerplate.  Why is it burdensome?  How is it overly broad?  This language tells the Court nothing."); *Guadalupe v. City of New York*, No. 15 Civ. 0220 (CM) (JCF), 2016 WL 3570545, at *3 n.3 (S.D.N.Y. June 24, 2016) (opining that the defendant's "interposition of boilerplate objections to each and every request for admission" was "troubling" and "[i]n some cases . . . frivolous," noting that "[s]uch practices are inconsistent with counsel's obligation to employ the Rules of Civil Procedure 'to secure the just, speedy and inexpensive determination of every action and proceeding'" (quoting Fed. R. Civ. P. 1)).

50.    Indeed, documents sought by certain requests for which the Joint Administrators have claimed a disproportionate burden in production should either be within their control or easy to obtain and produce, given the fiduciary relationship between the Joint Administrators and BSGR and the essentiality of the documents to the Joint Administrators' management of the Guernsey administration.  *See, e.g.*, Requests No. 7, 28, 64 and 65 (relating to BSGR's financial statements and investigations by Joint Administrators into the transfer of assets).  To the extent that the Joint Administrators, as fiduciaries, suggest that they lack access to certain information relating to

---

[45]    Likewise, the Joint Administrators fleetingly and generally reference the EU GDPR without any explanation of how it interferes with their capacity to produce documents.  *See, e.g.*, Doc. Objs. ¶¶ 5, 6.

BSGR, this is especially relevant to this Court's COMI analysis and worthy of discovery in and of itself.  *See In re Creative Fin. Ltd.*, 543 B.R. at 502.

51.     Even if the Joint Administrators had actually explained the basis for their "proportionality" objection, it would not entitle them to a protective order.  By any standard, the amount at stake – whether the $2 billion Award, or the $132 million in assets that BSGR apparently controlled at the initiation of the Guernsey Administration, *see supra* ¶ 25 – is substantial.  Consequently, discovery into the issues at stake is well proportioned to any purported burden faced by the Joint Administrators under Rule 26.

52.     The Joint Administrators' "relevance" objections similarly suffer from boilerplate formulations that are too generalized to prevent discovery under the Federal Rules.  *See Jacoby v. Hartford Life & Accident Ins. Co.*, 254 F.R.D. 477, 478 (S.D.N.Y. 2009) ("'[B]oilerplate objections . . . are a paradigm of discovery abuse.'" (citation omitted)).  Relevance under Rule 26 is "an extremely broad concept."  *Condit v. Dunne*, 225 F.R.D. 100, 105 (S.D.N.Y. 2004).  Moreover, the Joint Administrators' pinhole view of COMI, which they have myopically defined as the factors set forth in *SPhinX*, Mot. ¶ 33, does not align with the relevance standard previously embraced by this Court.  *In re Oi Brasil Holdings*, 578 B.R. at 195 ("The Second Circuit has cited the *SPhinX* factors as a helpful guide, but noted that consideration of these specific factors is neither required nor dispositive." (citation omitted)) ; *see also In re Creative Fin. Ltd.*, 543 B.R. at 504 (considering a range of pre-recognition activities as relevant to the COMI inquiry); *In re Fairfield Sentry Ltd.*, 714 F.3d at 137 (same); *In re Suntech Power Holdings Co.*, 520 B.R. 399, 416-18 (Bankr. S.D.N.Y. 2014) (same).

53.     Accordingly,   the   Joint   Administrators'   unsubstantiated   boilerplate "proportionality" and "relevance" objections provide no basis for a protective order.

## II.    The Joint Administrators' "Particular Objections" Have No Legal Basis in Either the Case Law or This Court's Discovery Practice.

54.    The Joint Administrators also raise a number of "particular objections" to Vale's discovery requests, including that they (1) cannot be required to produce documents held by BSGR's affiliates, Mot. ¶¶ 37, 38; (2) should not be required to produce documents from the time period prior to the commencement of the Guernsey Administration, Mot. ¶¶ 39-41; and (3) require protection from the Court to "preserve the [undefined] privileges" they claim are applicable to certain documents Vale has requested, Mot. ¶ 42.  Additionally, the Joint Administrators' written answers and objections, which were attached to their Motion, propose to satisfy certain document requests by producing narrative responses rather than the underlying documents themselves.  Doc. Objs. ¶¶ 3, 6, 12, 13-15, 22, 64, 66, 67.  The Joint Administrators have failed to justify any of these objections, each of which runs counter to relevant case law and this Court's discovery practice.

### A.    The Joint Administrators Must Produce All Requested Documents That They, BSGR and Its Affiliates Hold In their "Possession, Custody or Control."

55.    In prior litigations and in the LCIA Arbitration, BSGR has either voluntarily produced documents from its affiliates, officers and directors, or was ordered to do so.  *See supra* ¶¶ 18-21 (LCIA Arbitration).  Nonetheless, the Joint Administrators have now objected to producing documents from any entities besides BSG Resources Ltd. itself.  *See, e.g.*, Doc. Objs. ¶ 3.  This refusal cannot be justified under the relevant case law given the positions that BSGR has previously taken in document disclosure, and all that Vale now knows about BSGR's corporate practices and arrangements.

56.    The Joint Administrators cite no authority to support their contention that discovery should be limited to BSGR and may not extend to the documents of BSGR's parents, affiliates, subsidiaries, officers and directors.  *See generally* Mot. ¶¶ 37-38.  In fact, Rule 34 of the Federal Rules of Civil Procedure, allows a party to request documents "in the responding party's

possession, custody or control." Fed. R. Civ. P. 34(a)(1).    "A party is deemed to have control over documents that it has the right, authority, or ability to obtain upon demand," and even "legal limitations which may limit a party's ability to obtain a requested item do not necessarily preclude a determination that the party does in fact have possession, custody or control over the document or thing." *In re Andover Togs, Inc.*, 231 B.R. 521, 547 (Bankr. S.D.N.Y. 1999) (citation omitted); *see also In re Teligent, Inc.*, 358 B.R. 45, 60 (Bankr. S.D.N.Y. 2006) ("If a party has the legal right *or* practical ability to obtain documents from a non-party, he has 'control' of those documents within the meaning of Rule 34." (emphasis added)); *accord In re Bello*, 528 B.R. 562, 566-67 (Bankr. E.D.N.Y. 2015) (same).    The notion of control thus necessarily extends beyond the corporate form and exists when, *inter alia*, the subsidiary has "access to documents [held by the parent] in the ordinary course of business." *DeSmeth v. Samsung Am., Inc.*, No. 92 CIV. 3710(LBS)RLE, 1998 WL 74297, at *9 (S.D.N.Y. Feb. 20, 1998).

57.    The Joint Administrators have provided no evidence to suggest that documents held within BSGR's corporate family or its other affiliates lie outside of their control.    Although the Joint Administrators categorically state that they cannot "identify and produce documents held by third-parties," Mot. ¶ 37, they have not even identified which of the entities cited in Vale's First Document Requests would allegedly qualify as such, and have not provided satisfactory answers to Vale on the location of BSGR's documents and records or the scope of documents and records under the possession, custody, or control of BSGR or the Joint Administrators.    Moreover, far from demanding "a survey of potentially dozens of persons and entities in order to search for documents," Mot. ¶ 37, Vale seeks those documents that BSGR effectively controls through BSGR's close relationship with these affiliates and their common ties to BSGR's ultimate principal,  Beny Steinmetz.

28

58.     In this case, it is essential not to permit BSGR to exploit its convoluted network of corporate relationships and affiliations to avoid its obligation to produce documents held by its affiliates and aliases for Beny Steinmetz.  As has been made apparent from BSGR's obstructionist efforts during document disclosure in the LCIA Arbitration, BSGR is all too willing to hide behind formalistic distinctions to evade disclosure.  *See supra ¶* 20.  The LCIA tribunal rejected these distinctions, and so should this Court.

59.     When BSGR is not resisting document productions, these same distinctions have no impact on its daily operations or its exercise of control over documents held by affiliates.  In the LCIA Arbitration, it became clear that Onyx – a company that does not have an evident corporate affiliation with BSGR – actually served as BSGR's "back office," maintaining BSGR's documents and agreements, managing its administrative and financial activities, carrying out its questionable corporate restructurings, and even collecting BSGR's (and its own) documents as the threat of litigation against BSGR arose.  *See supra ¶* 11.  Just as Onyx was essential to the daily operations of BSGR, the Balda Foundation appears to have had control over BSGR's assets and affairs, notably including that it took hold of the full $500 million paid by Vale to BSGR shortly after the payment was made.  *See supra ¶¶* 16-17.  Meanwhile, Nysco – the intervening company through which the Balda Foundation owns BSGR – is funding the Guernsey Administration, which gives it significant control over the Joint Administrators' actions.  *See supra ¶* 24.  And although Steinmetz purports to be a mere "advisor" to BSGR and its affiliates, he has constantly served as a de facto executive, *see supra ¶* 10, and appears to have retained this role during the Guernsey Administration, meeting with foreign officials and issuing statements on BSGR's behalf, *see supra ¶* 24.

60.     Given that BSGR's corporate affairs are deeply intertwined with those of other

entities owned or otherwise controlled by Steinmetz, and that documents appear to flow freely between them, it is apparent that BSGR has the "practical ability" to obtain documents from Onyx, Nysco and the Balda Foundation.[46] *See Hunter Douglas, Inc. v. Comfortex Corp.*, No. CIV. A. M8-85 (WHP), 1999 WL 14007, at *3 (S.D.N.Y. Jan. 11, 1999) (requiring disclosure of relevant documents by overseas parent of subsidiary defendant because "documents ordinarily flow[ed] freely between them"); *Gerling Int'l Ins. Co. v. Comm'r of Internal Revenue*, 839 F.2d 131, 141 (3d Cir. 1988) ("Where the relationship is thus such that the agent-subsidiary can secure documents of the principal-parent to meet its own business needs and documents helpful for use in the litigation, the courts will not permit the agent-subsidiary to deny control for purposes of discovery by an opposing party." (citing *First Nat'l City Bank v. Internal Revenue Serv.*, 271 F.2d 616, 618 (2d Cir. 1959))); *Camden Iron & Metal, Inc. v. Marubeni Am. Corp.*, 138 F.R.D. 438, 443-44 (D.N.J. 1991) (ordering defendant subsidiary to produce documents held by non-party parent which played "a significant role" in and had final approval over the transactions underlying the dispute before the court, and which exchanged documents with the subsidiary "in the normal course of business").

61.    Moreover, despite BSGR's present objection to producing documents maintained by its direct subsidiaries – Octea Limited, West African Power Limited and Roslindale PTE Ltd. – it has previously acknowledged that its subsidiaries' documents are in BSGR's possession, custody or control, and voluntarily agreed to produce all such documents to Vale in the LCIA

---

[46]    Vale currently has less information regarding BSGR's relationship with Niron, a company that was established less than one year ago. What Vale *does* know, however, is that this entity shares directors with BSGR-affiliated companies and that Steinmetz was able to convince the Republic of Guinea to award Niron a major mining concession as part of BSGR's settlement of the ICSID Arbitration. Given BSGR's history of creating new entities that have obscure but real connections with Steinmetz, as well as its interest in redirecting any mining proceeds away from BSGR – and its creditors – it seems apparent that Niron is being used as a stand-in for BSGR. *See supra* ¶ 12. Whatever the formal nature of BSGR's relationship with Niron, it is likely that BSGR has the ability to exercise control over this newly formed entity. Accordingly, Vale asks the Court to order BSGR to produce all responsive documents held by Niron that are within BSGR's or its affiliates' (including Steinmetz's) control.

Arbitration.  *See supra* ¶ 20.  The Joint Administrators articulate no logical reason that they cannot

now produce documents held by BSGR's disclosed direct subsidiaries or why subsidiaries wholly

held by the company are somehow not in their control.

62.     Finally, in their capacity as foreign representatives and fiduciaries of BSGR, the

Joint Administrators effectively "stand[] in the shoes of [BSGR]."  *In re A.R. Baron & Co.*, 280

B.R. 794, 799 (Bankr. S.D.N.Y. 2002) (citing *Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d

114, 118 (2d Cir. 1991)).  Moreover, the Joint Administrators claim to have taken over decision-

making for BSGR and claim to be "working closely with the Debtor's management and advisors

to preserve and ultimately monetize the Debtor's valuable assets . . . and to defend against asserted

liabilities."  Am. Cohen Decl. ¶¶ 44, 47 ECF No. 24.  As such they should have the ability, and

therefore have the obligation, to produce any documents over which BSGR would have control.

> **B.      *BSGR's Historic Abuse of Corporate Forms Warrants Discovery Relating to the Period Prior To the Commencement of the Guernsey Administration.***

63.     For purposes of pre-recognition discovery, the inquiry for reviewing whether a

debtor has sought a Chapter 15 petition in bad faith (including the relevant time period) is case-

specific.  *See In re Oi Brasil Holdings*, 578 B.R. at 243 ("The Court takes to heart the Second

Circuit's guidance that the factors relevant for COMI are open-ended and must be developed by

courts on a case-by-case basis.").  While the Joint Administrators rely on the Second Circuit's

decision in *In re Fairfield* to incorrectly conclude that "the relevant period is the time of the

Chapter 15 petition," Mot. ¶ 40, they omit a key caveat to *Fairfield* Court's decision:  "the relevant

time period is the time of the Chapter 15 petition, *subject to an inquiry into whether the process

has been manipulated.*" *In re Fairfield Sentry Ltd.*, 714 F.3d 127, 130 (2d Cir. 2013) (emphasis

added).  Indeed, courts examining bad faith in COMI manipulation or actions to otherwise evade

creditors regularly look beyond the narrow timeline that the Joint Administrators prescribe.  *See*

*In re Creative Fin. Ltd.*, 543 B.R. at 504 (considering evidence regarding judgment against debtor in English courts that preceded the debtor's initiation of foreign insolvency proceedings); *In re Suntech Power Holdings Co.*, 520 B.R. at 416-18 (considering the pre-recognition activities of the joint provisional liquidators).[47]

64.     Vale has made a handful of requests for documents dating back to 2014 which are limited in scope and directly relevant to questions of whether BSGR has filed its Chapter 15 Petition in bad faith.  *See* First Doc. Requests No. 7, 8, 28, 40, 43 (requesting financial statements for BSGR and its affiliates); First Doc. Requests No. 11 (requesting BSGR's and its affiliates' bank statements); First Doc. Requests No. 5 (requesting "documents sufficient to identify all employees of BSGR, including their location, title and employment status").[48]  These requests reflect the fact that ever since Vale initiated its LCIA Arbitration in April 2014, BSGR has settled on a strategy of frustrating Vale's ability to recover for the fraud BSGR had perpetrated against it. Given that, by 2014, BSGR already had established a track record of using corporate restructurings to divert payments or hide its assets, *see supra* ¶¶ 13-17, Vale is entitled to probe whether BSGR began laying the groundwork for its bad faith administration that same year.[49]

---

[47]     Notably, the Joint Administrators themselves concede that the date of the Chapter 15 Petition is not the only relevant period of inquiry for examining COMI.  *See* Proposed Order ¶ 2; Mot. ¶¶ 40-41 (alternatively extending the time period for COMI analysis to March 6, 2018 – the date of initiation of the Guernsey Administration, and over a year before the Chapter 15 Petition).

[48]     Given that records such as financial statements, bank statements and employment records are created and retained in the normal course of business, the Joint Administrators' suggestion that providing responsive documents would be overly burdensome raises eyebrows.

[49]     If the Court does not permit Vale to seek disclosure of these documents dating back to 2014, it should at least order BSGR to produce all relevant documents dating back to the beginning of 2016.  At that point, the tribunal in the LCIA Arbitration had issued decisions on document production ordering BSGR to produce documents from its affiliates (including some of the same entities for whom BSGR now again resists disclosure).  *See supra* ¶ 20.  As a result, by this time, it had become clear to BSGR that its corporate shell games would not permit it to sidestep the document disclosure orders of the tribunal in the LCIA Arbitration and that more drastic actions might be required to keep the proceeds of its fraud, as evidenced in part by BSGR's subsequent actions in the LCIA Arbitration to evade its responsibilities.

C.     *The Joint Administrators Have Not Identified Any Bases for Their Assertions of Privilege and Attorney Work Product Protections.*

65. The Joint Administrators have failed to meet their burden of proving that unspecified documents that Vale seeks to discover "may be protected by work product, attorney-client or other privileges." Mot. ¶ 42. The Motion and Objections neither identify the privileges apparently applicable to Vale's requests nor justify the Joint Administrators' privilege assertions with a log, as required by the Local Rules.

66.     Rule 26(b)(5) of the Federal Rules of Civil Procedure specifically requires a party that "withholds information otherwise discoverable by claiming that the information is privileged" to "(i) expressly make the [privilege] claim; and (ii) describe the nature of the documents, communications, or tangible things not produced or disclosed – and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim." Fed. R. Civ. P. 26(b)(5)(A); *see also In re Adelphia Commc'ns Corp.*, No. 02-41729(REG), 2007 WL 601452, at *3 (Bankr. S.D.N.Y. Feb. 20, 2007) ("The party claiming the privilege bears the burden of showing its applicability." (citing *Smith v. Conway Org., Inc.*, 154 F.R.D. 73, 77 (S.D.N.Y. 1994))). "Local rules amplify this requirement and require a 'privilege log.'" *In re Schick*, No. 96 B 42902(SMB), 1997 WL 465217, at *4 (Bankr. S.D.N.Y. Aug. 12, 1997) (citing LBR 7034-1(b)); *In re Chevron Corp.*, 749 F. Supp. 2d 170, 182-85 (S.D.N.Y.) (failure to produce privilege log could result in waiver of privilege where rule required filing of privilege log at the time of motion to quash subpoena to produce documents), *aff'd sub nom. Lago Agrio Plaintiffs v. Chevron Corp.*, 409 F. App'x 393 (2d Cir. 2010). The Joint Administrators have not complied with any of the above rules, and therefore have not asserted, if not waived, proper bases for their privilege objections.

67.     Furthermore, in their Objections, the Joint Administrators assert that they will not

produce three additional document categories: (1) "case management strategies," *see* Doc. Objs. ¶¶ 25-27, 59; (2) BSGR's revenue sharing arrangements with Niron and settlement negotiations with Guinea, which the Joint Administrators claim are protected from disclosure under Rule 408 of the Federal Rules of Evidence, *see id.* ¶¶ 45, 55; and (3) "agreements which by their terms are confidential and/or subject to non-disclosure provisions," *see id.* ¶ 63. The Motion fails to even mention, let alone seek to justify, any of these objections, and they are in any case meritless.

68.     *First*, the Joint Administrators do not cite – and Vale is not aware of – any case law indicating that "case management strategies" are either privileged or an improper subject of discovery specifically within Chapter 15 adversary proceedings. In fact, documents akin to those requested by Vale, *see, e.g.*, First Doc. Requests No. 25-27, 59, are routinely produced in Chapter 15 proceedings. *See, e.g.*, Decl. Jasper R. Berkenbosch, *In re Oi Brasil Holdings Coöperatief U.A.*, No. 17-11888 (SHL) (Bankr. S.D.N.Y. July 7, 2017) (Lane, J.), ECF No. 4 (exhibiting multiple letters from the foreign representative to the debtor discussing foreign proceedings). The Joint Administrators' objections are therefore not sufficiently stated and the immediate disclosure of all related documents should be required.

69.     *Second*, contrary to the Joint Administrators' assertions, Mot. ¶¶ 45, 55, "Rule 408 of the Federal Rules of Evidence merely renders evidence of settlement discussions inadmissible in court; it does not create any privilege or other protection from disclosure." *Carling v. Peters*, No. 10 Civ. 4573(PAE)(HBP), 2012 WL 1071232, at *5 (S.D.N.Y. Mar. 30, 2012) (citing *Primetime 24 Joint Venture v. Echostar Commc'n Corp.*, No. 98 Civ. 6738(RMB)(MHD), 2000 WL 97680, at *4 n.5 (S.D.N.Y. Jan. 28, 2000)). Thus, the Court should reject this objection and order the immediate disclosure of all revenue sharing agreements with Niron and Guinea-related negotiations, *see* Doc. Requests No. 45, 55, particularly because Vale seeks them not to prove

liability but to understand the role of the Joint Administrators, if any, in the negotiations themselves.

70.    *Finally*, the Joint Administrators cannot avoid their obligation to disclose relevant agreements executed by or on behalf of BSGR simply because those documents contain confidentiality and/or non-disclosure provisions.  *See* Doc. Objs. ¶ 63.  Vale is prepared to enter a confidentiality stipulation with regard to those documents, but there is simply no legal basis or privilege – and indeed, the Joint Administrators have not identified any – for refusing to produce these relevant documents.

D.    *The Joint Administrators' Proposed Narrative Responses To Vale's Requests for Tangible Documents Undermines the Express Standards Set Out by Rule 34.*

71.    Rule 34(a)(1)(A) of the Federal Rules of Civil Procedure allows a party to "serve on any other party a request . . . to produce . . . any designated documents" in the party's "possession, custody, or control."  The party from whom documents have been requested may specifically respond and object to each such request, *see* Fed. R. Civ. P. 34(b)(2), but Rule 34 contemplates no procedure whereby a party might satisfy its production burden by producing a narrative description of the requested documents instead of the documents themselves, as the Joint Administrators propose.  *See* Doc. Objs. ¶¶ 3, 6, 12, 13-15, 22, 64, 66-67.

72.    Indeed, multiple courts have found that narrative answers are not responsive to document requests and have issued orders compelling production of the underlying documents where only narratives were initially offered.  *See, e.g.*, *Carlson v. Geneva City Sch. Dist.*, 277 F.R.D. 90, 96-97 (W.D.N.Y. 2011) (finding that written narratives describing medical treatment of employee in lieu of medical treatment notes were insufficient where employer sought production of records from non-party healthcare providers); *Smithfield Bus. Park, LLC v. SLR Int'l Corp.*, No. 12-CV-00282, 2013 WL 5705601, at *6 (E.D.N.C. Oct. 18, 2013) (holding that the

plaintiff's response was "insufficient," where the defendant's "request seeks documents and tangible things and [the p]laintiff's response . . . simply provides narrative information."); *Soo Line R.R. Co. v. Travelers Indem. Co.*, No. 18-cv-1989 (SRN/TNL), 2019 WL 2296596, at *5-6 (D. Minn. May 30, 2019) (finding insufficient the plaintiff's narrative response to a request for documents because the defendant "[wa]s entitled to discover the basis for [the plaintiff's] allegation . . . and those documents" supporting it).

73.    The Joint Administrators' suggested use of a narrative in lieu of a verified interrogatory response or the production of documents raises further questions and concerns as to their motives, when the underlying documents could easily be provided.  *See e.g.*, First Doc. Requests No. 66, 67 (documents filed in the Guernsey proceeding or in connection with the Chapter 15 Petition); First Doc. Requests No. 12, 13 (documents sufficient to identify BSGR's creditors); First Doc. Requests No. 14, 15 (documents sufficient to identify the nature of BSGR's business activities conducted from Guernsey, the United States, the United Kingdom, Guinea, Sierra Leone, Switzerland, Israel and Nigeria); First Doc. Requests No. 22 (documents sufficient to identify the locations of BSGR's books and records); First Document Request No. 64 (documents sufficient to identify the location of meetings attended by the Joint Administrators). It is hard to escape the inference that there is something in these documents that the Joint Administrators wish to avoid disclosing.  Accordingly, the Court should not permit the Joint Administrators to provide narratives in lieu of documents in response to Vale's discovery requests.

### III.    The Joint Administrators' Proposed Order Seeks to Improperly Restrict Vale's Depositions.

74.    Without any briefing on the matter, the Joint Administrators' Proposed Order unilaterally asks the Court to quash the Cohen, Callewaert, Driver and Cramer depositions requested by Vale, and to instead substitute an insufficient replacement: a single 30(b)(6)

deposition of one BSGR representative.  Proposed Order ¶¶ 3-4, ECF No. 27-1.  No justification

is provided – the Joint Administrators only state summarily that Vale is not entitled to discovery

from its deposition notices.  Mot. ¶ 11.  Even if they had briefed this issue, the Joint Administrators'

objections are baseless.  Notably, counsel for the Joint Administrators has already expressly stated

before the Court that the Joint Administrators would allow Vale to depose these very same fact

witnesses.  Hr'g Tr. 6:1-9, June 24, 2019 ("[W]e did receive from Vale . . . notices of deposition

of the two joint administrators and two of the . . . members of board of directors . . . we are happy

to produce those parties for deposition, whether they'd be in New York or London or Guernsey.").

The Joint Administrators should not be allowed to now make such an about-face without prior

notice to Vale and without any briefing in their motions or statements to the Court in this regard.[50]

75.    Each Deposition Notice is relevant to either the determination of BSGR's COMI or

whether the Chapter 15 Petition was pursued in bad faith.  Vale is entitled to depose both Cohen

and Callewaert in their fiduciary capacity as Joint Administrators and foreign representatives,

including on the topics of whether they have fulfilled their fiduciary duties, their roles in the

Guernsey Administration, the Chapter 15 filings and their interactions with BSGR's management.

Indeed, Cohen verified the petition seeking recognition in this case and submitted an initial and

amended declaration in support of such petition.  *See* Cohen Decl. ¶ 5; Am. Cohen Decl. ¶ 5.  The

Joint Administrators' own statements call into question their fiduciary roles and their ongoing

engagement with BSGR.  *See* Am. Cohen Decl. ¶ 44, ECF No. 24 (stating that the Joint

---

[50]    The Joint Administrators may not now seek to brief this, or any other, issue for the first time in their motion
on reply.  *See, e.g.*, *Eliacin v. County of Broome*, 488 F. App'x 504, 505 n.1 (2d Cir. 2012) (holding that plaintiff did
not "properly challenge [the] discovery order in her opening brief"); *J.P. Morgan Chase Bank v. Altos Hornos de
Mexico*, S.A. de C.V., 412 F.3d 418, 428 (2d Cir. 2005) ("[A]rguments not made in an appellant's opening brief are
waived even if the appellant pursued those arguments in the district court or raised them in a reply brief."); *Senat v.
City of New York*, 255 F.R.D. 338, 339 (E.D.N.Y. 2009) ("As to whether the court should preclude objections, there
is consistent authority that a failure to serve timely responses to interrogatories and document requests serves as a
waiver of objections.").

Administrators "have been working closely with the Debtor's management and advisors"); *id.* ¶ 8 (stating that BSGR is still engaged in "the exploration, development, extraction, refinement and marketing of natural resource products" worldwide, including through its subsidiaries). Fact depositions of foreign representatives are common within this Court's discovery practice. *See, e.g.*, Stipulated Order, *In re Oi Brasil Holdings Coöperatief U.A.*, No. 17-11888 (SHL) (Bankr. S.D.N.Y. Aug. 11, 2017), ECF No. 37 (Lane, J.) (allowing the creditor to depose the debtor's insolvency trustee); Stipulation & Order (I) Scheduling Combined Hr'g on Pet. for Recognition & Relief, (II) Fixing Disc. & Briefing Deadlines and (III) Specifying Form & Manner of Service of Notice, *In re PT Bakrie Telecom TBK*, No. 18-10200 (SHL) (Bankr. S.D.N.Y. Feb. 28, 2018), ECF No. 33 (Lane, J.) (scheduling deposition by noteholder-creditors of the debtor's foreign representative). Likewise, Vale is entitled to depose Peter Harold Driver, whose affidavit formed the basis of the Guernsey Administration and whose testimony is thus central to this Court's determination of COMI. *See* Am. Cohen Decl. ¶¶ 40-41.

76. Finally, Vale's request to depose another of BSGR's directors, Dag Cramer, should not be quashed. Immediately upon BSGR's decision to enter into administration, Cramer told Bloomberg: "We're not in liquidation, no one is forcing this upon us," *see* Schweitzer Decl. Ex. L (Thomas Biesheuvel, *Beny Steinmetz Puts Mining Company BSGR Into Administration*, Bloomberg, Mar. 7, 2018) and similarly told Reuters that he would be "sta[ying] on as director" and that this "technical procedure would not affect daily operations of subsidiaries," *see* Schweitzer Decl. Ex. N (Barbara Lewis, *Administrators seek to return Steinmetz's mining firm BSGR to solvency* at 1, Reuters, Mar. 7, 2018). Dag Cramer's comments allude to the fact that the Joint Administrators may have initiated the administration proceedings in bad faith and Vale is entitled to depose him on this issue, among others. Accordingly, this Court should compel the

depositions of all four noticed fact witnesses.

**IV.    The Joint Administrators' Proposed Order Presents No Guidance On The Scope of Discovery.**

77.    Regardless of how the Court rules, it should not adopt the Joint Administrators' Proposed Order, which, contrary to relevant law, vaguely outlines that requests for the production of information "unrelated to the location of BSGR's COMI" be stricken, Proposed Order ¶ 2, ECF No. 27-1; and otherwise offers no concrete guidance as to which document requests and interrogatories are denied or why.    Additionally, the Proposed Order adopts the Joint Administrators' exceedingly narrow definition of relevant COMI factors as a filter for the Court's action.    As has been pointed out above, *see supra* ¶¶ 36-39, Vale's requests, interrogatories and deposition notices intend to cover a swathe of different issues and inquiries relevant to COMI that Courts are entitled to pursue in discovery.    Aside from proscribing outright the disclosures required to adjudicate Vale's allegations of bad faith, *see supra* ¶¶ 40-46, the Proposed Order's language fails to offer any actionable, useful guidance as to the proper scope of discovery.

## **CONCLUSION**

78.     For the foregoing reasons, Vale respectfully requests that the Court deny the Joint

Administrators' Motion for a Protective Order, enter the Counter-Proposed Order attached hereto

as Ex. 1, and compel the Joint Administrators to immediately produce documents responsive to its

requests, respond to interrogatories and produce for deposition witnesses Malcolm Cohen, William

Callewaert, Peter Harold Driver and Dag Cramer.

Dated:  New York, New York
        July 19, 2019

CLEARY GOTTLIEB STEEN & HAMILTON LLP

/s/Lisa M. Schweitzer
Jonathan I. Blackman
Jeffrey A. Rosenthal
Lisa M. Schweitzer
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Counsel to Vale S.A.*

**<u>EXHIBIT 1</u>**

**Counter-Proposed Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BSG RESOURCES LIMITED (in administration),<br><br>      Debtor in a Foreign Proceeding. | Chapter 15<br><br>Case No. 19-11845 (SHL) |

### COUNTER-PROPOSED ORDER DENYING THE JOINT ADMINISTRATORS' MOTION FOR A PROTECTIVE ORDER AND COMPELLING THE JOINT ADMINISTRATORS TO COMPLY WITH VALE S.A.'S DOCUMENT REQUESTS, INTERROGATORIES AND NOTICED DEPOSITIONS

Upon due consideration of the *Motion of the Joint Administrators for a Protective Order Pursuant to Fed. R. Civ. P. 26, Made Applicable to these Proceedings by Fed. R. Bankr. P. 9014*, ECF No. 27 (the "Motion") filed on July 3, 2019, by William Callewaert and Malcolm Cohen (together, the "Joint Administrators"), in their capacity as court-appointed representatives for BSG Resources Limited ("BSGR") in a bankruptcy proceeding pending before the Royal Court of Guernsey (the "Guernsey Administration"); and having considered the opposition of Vale S.A. ("Vale"), a creditor in the above-captioned case, to the Motion; and a hearing having been held on July 29, 2019 (the "July 29, 2019 Hearing"); and upon the evidence adduced and proffered and the statements of counsel made at the July 29, 2019 Hearing; and the Court having determined that good and sufficient cause exists for the relief granted as set forth in this Order;

**IT IS HEREBY ORDERED**, **ADJUDGED AND DECREED** that**:**

1.      The Motion is denied in its entirety.

2.      Without limiting the foregoing, the Court specifically overrules the following objections raised in the *Joint Administrators' Answers and Objections to Vale, S.A.'s First Request*

1

*for Production of Documents*, ECF No. 27-2 at 7-40 (the "<u>Document Objections</u>" or "<u>Doc. Objs.</u>")

and in the *Joint Administrators' Answers and Objections to Vale, S.A.'s First Set of*

*Interrogatories*, ECF No. 27-2 at 41-46 (the "<u>Interrogatory Objections</u>" or "<u>Interrog. Objs.</u>") on

the basis of:

- relevance, Doc. Objs. ¶¶ 3, 4, 5, 6, 7, 8, 9, 10, 11, 13, 16, 17, 18, 20, 21, 23, 24, 25, 26, 27, 28, 29, 30, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 51, 52, 53, 55, 56, 57, 58, 59, 60, 62, 64, 65, 68; Interrog. Objs. ¶¶ 1, 2, 5, 6, 7, 8, 9;

- proportionality, Doc. Objs. ¶¶ 3, 4, 6, 7, 8, 9, 11, 16, 17, 18, 20, 21, 24, 25, 26, 27, 28, 29, 30, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 51, 52, 53, 55, 56, 57, 58, 59, 60, 62, 65; Interrog. Objs. ¶¶ 1, 2, 5, 6, 7, 8, 9;

- substitution of a narrative response for the production of documents, Doc. Objs. ¶¶ 3, 6, 12, 13, 14, 15, 22, 64, 66, 67;

- protection from disclosure of "case management strategies," Doc. Objs. ¶¶ 25, 26, 27, 59;

- protection from disclosure under Federal Rule of Evidence 408, Doc. Objs. ¶¶ 45, 55;

- protection from disclosure of confidentiality or non-disclosure provisions in certain requested documents, Doc. Objs. ¶ 63; and

- protection from disclosure under the *EU General Data Protection Regulation (GDPR): Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016*, Doc. Objs. ¶¶ 5, 6.

3.      Any privilege not specifically identified in either the Document Objections or the

Interrogatory Objections is hereby waived.

4.      The relevant time period for Vale's First Document Requests shall be January 1,

2014 to the present.

5.      On or before August 4, 2019, the Joint Administrators shall provide Vale with a

verified description of all the documents and records in the possession, custody and control of

BSGR and/or the Joint Administrators, and shall identify the location of all of those documents and records.

6.      The Joint Administrators shall produce documents responsive to Vale's First Document Requests on a rolling basis, and shall complete their production of all documents responsive to Vale's First Document Requests by August 15, 2019.

7.      On or before August 15, 2019, the Joint Administrators shall serve Vale with complete answers to Vale's First Interrogatories.

8.      On or before August 15, 2019, the Joint Administrators shall provide Vale with a complete privilege log identifying all documents withheld or redacted, supported by specific reasoning for each privilege claim.

9.      The Joint Administrators' request to quash the depositions of Dag Cramer, Malcolm Cohen, Peter Harold Driver and William Callewaert is hereby denied with prejudice. The Joint Administrators shall promptly provide Vale with a reasonable selection of dates on which these witnesses will be available for deposition prior to September 20, 2019 such that the parties can schedule them for mutually convenient dates following the production of all documents responsive to Vale's First Document Requests and service of the Joint Administrators' Responses to Vale's First Interrogatories.

10.      The Court shall retain jurisdiction to resolve any disputes or controversies arising from this order.

New York New York

Dated: _____, 2019

_____
HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE