**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

BSG RESOURCES LIMITED (in
administration),

     Debtor in a Foreign Proceeding.

Chapter 15

Case No. 19-11845 (SHL)

## DECLARATION OF LISA M. SCHWEITZER IN SUPPORT OF VALE S.A.'S OPPOSITION TO THE MOTION OF THE JOINT ADMINISTRATORS FOR A PROTECTIVE ORDER

I, Lisa M. Schweitzer, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.    I am an attorney duly admitted to practice before this Court, and I am a partner of the law firm Cleary Gottlieb Steen & Hamilton LLP ("Cleary Gottlieb"), counsel for Vale S.A. ("Vale").  I respectfully submit this declaration ("Schweitzer Declaration") in connection with *Vale S.A.'s Opposition to the Motion of the Joint Administrators for a Protective Order* ("Opposition").[1]

2.    Attached hereto as Exhibit A is a true and correct copy of "The Liechtenstein Foundation," an informational pamphlet published by Marxer & Partner, a law firm headquartered in Liechtenstein.

3.    Attached hereto as Exhibit B is a true and correct copy of an article by Monica Mark, *The Panama Papers May Help Unravel the Corruption 'Deal of the Century,'* published by BuzzFeed News, dated April 7, 2016.

---

[1]    Unless otherwise indicated, capitalized terms not defined herein have the meaning ascribed to them in Vale's *Initial Objection to the Joint Administrators' Verified Petition for Recognition of Foreign Proceedings Under Chapter 15 of the United States Bankruptcy Code*, ECF No. 29.

4.    Attached hereto as <u>Exhibit C</u> is a true and correct copy of an article, *New evidence ties BSGR to company behind Guinea mine bribery*, published on the Global Witness website, dated August 15, 2013.

5.    Attached hereto as <u>Exhibit D</u> is a true and correct copy of a press release, *Settlement of the Dispute between the Republic of Guinea and BSG Resources*, published by BusinessWire, dated February 25, 2019 ("<u>BSGR Press Release</u>").

6.    Attached hereto as <u>Exhibit E</u> is a true and correct copy of an article, *Mick Davis and the team ready to take on Beny Steinmetz's former iron ore assets*, published in Issue 434 of Africa Intelligence, dated March 5, 2019.

7.    Attached hereto as <u>Exhibit F</u> is a true and correct copy of an article by Neil Hume and David Sheppard, *Mick Davis Comeback Orchestrated by Beny Steinmetz's Group*, published on the Financial Times website, dated April 15, 2019.

8.    Attached hereto as <u>Exhibit G</u> is a true and correct copy of the Director's Register of Litigation Solutions Limited, published by the Government of Bermuda's online Registrar of Companies and last accessed on July 19, 2019.

9.    Attached hereto as <u>Exhibit H</u> is a true and correct copy of the Director's Register of Star West Investments Limited, published by the Government of Bermuda's online Registrar of Companies and last accessed on July 19, 2019.

10.    Attached hereto as <u>Exhibit I</u> is a true and correct copy of the Director's Register of Americano Nickel Limited, published by the Government of Bermuda's online Registrar of Companies and last accessed on July 17, 2019.

11.    Attached hereto as Exhibit J is a true and correct copy of the Director's Register of Americano Nickel Finance Limited, published by the Government of Bermuda's online Registrar of Companies and last accessed on July 17, 2019.

12.    Attached hereto as Exhibit K is a true and correct copy of the judgment and order in *BSG Resources Ltd. v. Vale SA and Ors* [2017] EWHC 760 (Comm) (Eng.).

13.    Attached hereto as Exhibit L is a true and correct copy of an article by Thomas Biesheuvel, *Beny Steinmetz Puts Mining Company BSGR Into Administration*, published on the Bloomberg website, dated March 7, 2018.

14.    Attached hereto as Exhibit M is a true and correct copy of an article, *Secret Dealings Tying UK Conservatives' CEO to Bribery Scandal Billionaire*, published on the Global Witness website, dated May 3, 2019.

15.    Attached hereto as Exhibit N is a true and correct copy of an article by Barbara Lewis, *Administrators seek to return Steinmetz's mining firm BSGR to solvency*, published on the Reuters website, dated March 8, 2018.

16.    Attached hereto as Exhibit O is a true and correct copy of an article, *Sarkozy the peacemaker between Conde and Diallo*, published in Issue 796 of Africa Intelligence, dated March 13, 2019.

17.    Attached hereto as <u>Exhibit P</u> is a true and correct copy of an article by Franz Wild and Thomas Biesheuvel, *Mining Billionaire Ends Bitter Guinea Dispute After Months of Secret Negotiations*, published on the Bloomberg website, dated February 25, 2019.

I declare under penalty of perjury that the foregoing is true and correct.  Executed on July 19, 2019, in New York, New York.

/s/ Lisa M. Schweitzer
Lisa M. Schweitzer

# Exhibit A

# The Liechtenstein Foundation

**MARXER & PARTNER**

RECHTSANWÄLTE

Marxer & Partner Attorneys-at-Law
Heiligkreuz 6
9490 Vaduz
Liechtenstein
Phone  +423-235.81.81
Fax      +423-235.82.82
info@marxerpartner.com
www.marxerpartner.com/en

**Summary of:**
MARXER & PARTNER
Liechtensteinisches Wirtschaftsrecht
1st edition 2009, Liechtenstein-Verlag, Schaan
ISBN 978-3-905762-04-4

Current version: 23rd March 2010

# Contents

| | |
|---|---|
| 1. The Liechtenstein Foundation and Its Advantages | 5 |
| 2. Sources of Liechtenstein Foundation Law | 9 |
| 3. Definition and Types of Foundations | 11 |
| 4. Setting up a Foundation | 12 |
| 5. Organization of the Foundation | 15 |
| 5.1. The Founder | 15 |
| 5.2. The Foundation Council | 18 |
| 5.3. The Audit Authority | 20 |
| 5.4. The Control Body and Other Executive Bodies | 22 |
| 5.5. The Representative | 24 |
| 6. The Beneficiaries | 24 |
| 7. Foundation Governance | 29 |
| 8. Foundations and Estate Law | 31 |
| 9. Foundations and Asset Protection | 33 |
| 10. Accounting | 35 |
| 11. Termination of the Foundation | 36 |
| 12. Transitional provisions | 38 |
| 13. Taxes and Fees | 39 |
| 14. What Can Marxer & Partner Do for You? | 41 |

## 1. The Liechtenstein Foundation and Its Advantages

A foundation is used to make assets legally independent from the founder by transferring them to a legal entity in its own right, i.e. the foundation. Unlike a corporation, a foundation has no members but does have beneficiaries who are entitled to enjoy the foundation assets and/or income according to the will of the founder.

The new Liechtenstein foundation law came into force on 1st April 2009. It offers both common-benefit (charitable) and private-benefit foundations an attractive legal basis and therefore provides Liechtenstein with a good starting position in the «competition for foundation law regimes». In international legal literature, the new foundation law has rightly been described as systematically and substantively first-rate, indeed as pioneering.

The Liechtenstein foundation is an excellent tool for estate planning and asset protection. Some of its advantages are:

- **Flexible System of Beneficial Interests:**
  The founder has complete freedom regarding whom he wants to appoint as the beneficiary of the foundation. He also has an entirely free choice regarding how to shape the respective beneficial interests. Thus it is possible, inter alia, to determine the amount and timing of each and all distributions and to set terms and conditions. A distribution can comprise the entire income of the foundation's assets in any given year or pertain to an annual fixed amount. It is also possible to make distributions payable only once the beneficiaries reach a certain age. Similarly, it is permitted to define only a class of potential beneficiaries (such as the founder's family) and to leave it to the discretion of the foundation council to whom it will make distributions and in what amount. The arrangements governing beneficial interests can also be modified provided the founder has made provision for this to happen. Besides, the founder can provide for a combination of private-benefit and common-

5

benefit purposes by dedicating some of the foundation's assets to common-benefit purposes and the rest to supporting his family or others. Similarly, it is also possible to convert a family foundation into a charitable foundation after a certain time.

### Estate Planning for Many Generations to Come:

In testamentary dispositions it is usually impossible to make arrangements lasting several generations. Furthermore, the monitoring of testamentary stipulations can only be carried out with great difficulty, especially if the heirs live in different countries. In addition, provided they are unanimous, in most cases the heirs can deviate from instructions contained in the will. With a Liechtenstein foundation, however, the founder can exactly specify the beneficiaries across many generations. There is no «rule against perpetuities» in Liechtenstein law. The foundation council carries out these instructions and checks their observance. Provided the founder has made provision for it to happen, the arrangements governing beneficial interests can be modified.

### No Lengthy Probate is Necessary:

The assets of the foundation are not within the estate of the founder since he or she is not the owner of the foundation's assets; instead, the foundation itself, being a legal entity, owns them. For this reason there will be no probate proceedings in relation to the foundation's assets upon the founder's death. This is a big advantage, especially if the foundation assets (bank accounts, real estate, etc.) are situated in different countries or the founder has lived in different locations. In such cases, probate can be both very time-consuming and costly. In the event of a beneficiary's death, his or her beneficial interests do not form part of their estate. Instead, the successor beneficiaries as determined by the founder become the foundation's new beneficiaries. They hence need not wait for the outcome of any probate proceedings but gain access to their foundation benefits immediately provided the founder has not arranged otherwise.

### Continued Commitment of the Founder is Possible:

Liechtenstein law allows the founder to retain broad powers over the foundation he has established. Thus, the founder may become a member of the foundation council or may appoint himself as the foundation's beneficiary. He can also reserve the right to revoke the foundation, amend the Foundation Articles or dismiss and appoint members of the foundation council. By contrast, the foundation may also be designed by the founder in such a way that he has no power over it whatsoever.

Besides, the founder may set up other executive bodies in addition to the foundation council. On the one hand, these may be controlling bodies which ensure the implementation of the founder's will in the long term (so-called protectors). On the other hand, the executive bodies may be entrusted with powers such as investment decisions or even decisions regarding distributions. The founder may designate successors for all members of the executive bodies. Finally, the founder may, if he so desires, name the foundation after himself so that his name – especially with common-benefit foundations – is «perpetuated» in a positive sense.

### Asset Protection:

By establishing a Liechtenstein foundation, personal assets can be protected from unjustified interference by third parties («asset protection»). Since Liechtenstein has only concluded enforcement treaties with Switzerland and Austria, foreign judgments from other countries are not enforced in Liechtenstein. Therefore, legal action against a Liechtenstein foundation must in most cases be brought before Liechtenstein courts. Furthermore, a Liechtenstein foundation is an effective way to protect the founder and the beneficiaries against political turmoil in their home countries.

### Preservation of Family Assets:

By transferring his assets to a Liechtenstein foundation, the founder can ensure that family assets are kept together across generations. The same applies, for instance, if he transfers shares of his

closely held company to a foundation. Under Liechtenstein law a foundation can hold a company's shares in accordance with the founder's wishes for decades. The flexibility necessary for any conceivable economic activity can be achieved by way of an appropriate design of the foundation documents. If no foundation is set up, the assets of the deceased including the shares in his family business are, in most cases, divided up between his heirs. If the heirs die, then their own heirs come into play and so forth. It will therefore not be possible to preserve the family assets or the family business under the same management for a long time.

■ **Decades of Tradition of Liechtenstein Foundation Law:**
In recent years, many countries have discovered the foundation and have adopted new foundation legislation, often following the Liechtenstein model. Liechtenstein has a more than 80-year-old tradition in this field. Legal practitioners, the courts and administrative authorities are intimately familiar with foundation law and practice. This is particularly true for our law firm, which was founded in 1925. The high number of court decisions in the area of foundation law contributes to legal certainty. In addition, the Foundation Articles may provide that disputes between the foundation and its beneficiaries must be decided by arbitration rather than the public courts.

■ **Liechtenstein as a Modern Financial Center at the Heart of Europe:**
Liechtenstein borders Austria and Switzerland and is easily accessible. Since 1923 there has been a customs and monetary union with Switzerland. Since 1995 Liechtenstein has been a member of the European Economic Area (EEA) and thus participates fully in the free movement of goods, services and capital within the European single market. In addition, Liechtenstein is a member of the WTO, EFTA, the UN, the Council of Europe, the OSCE and many other international organizations.

Liechtenstein has a progressive and stable legal, economic and social regime. The authorities are pro-business and customer-orientated. Unlike in other countries, even during the economic crises of recent years no government aid to banks or other financial intermediaries has proven necessary. Standard & Poor's and Moody's have given the country a triple A rating.

In the fight against financial crime, Liechtenstein has continually adapted its regulations to the latest developments. The country has implemented the third EU Money Laundering Directive and the FATF recommendations and thus adheres to the highest international standards in combating money laundering and organized crime. Liechtenstein has also concluded agreements with several countries permitting the exchange of tax information on reasonable request. There is, however, no automatic exchange of information and non-individualized inquiries («fishing expeditions») are prohibited. Liechtenstein thus meets the globally accepted standards in the field of tax, which is why the country appears on the OECD's White List. Even with all this, Liechtenstein has preserved its traditional advantages: taxes are low and predictable and there are strict laws in place designed to safeguard the proper conduct of business.

■ **Marxer & Partner Attorneys-at-Law: Your Contact for Foundation-Related Matters**
Marxer & Partner, founded in 1925, is the oldest and largest law firm in Liechtenstein and has decades of experience and expertise in foundation law. In Section 14, you will learn how Marxer & Partner can advise and assist you with all foundation matters.

## 2. Sources of Liechtenstein Foundation Law

The Liechtenstein foundation law was codified in 1926 and, up until very recently, had been amended only selectively. Its provisions have been used as a model for a number of foreign legislation, such as the

Austrian Private Foundation Act of 1993, the Panamanian Law on the «fundación de interés privado» of 1995 or Jersey's new Foundation Act of 2009.

In order to adjust to the latest scientific findings on «Foundation Governance» extensive preparations for a re-enactment of the Liechtenstein foundation law were carried out from 2001 to 2008. Liechtenstein financial service providers including Marxer & Partner as well as experts in international foundation law were closely involved in the government's reform work. On 26th June 2008, the new foundation law was passed by Parliament and published in the Liechtenstein law gazette (LGBl.) 2008 no. 220. While maintaining the traditional liberalism of Liechtenstein foundation law, new and innovative solutions meeting the highest standards of modern foundation law were devised on many issues.

The new foundation law is enacted in art 552 §§ 1-41 of the Persons and Companies Act (PGR) and came into force on 1st April 2009. Henceforth, these provisions will be referred to only as §§ 1-41. The legislative text is available for download in German and English on www.marxerpartner.com/en. In addition, the general section on legal entities laid out in art 106-245 PGR applies to foundations, too. The current version of the PGR can be viewed on www.gesetze.li (in German only).

Since 1995 Liechtenstein, while fully maintaining the Customs Treaty with Switzerland, has participated in the European Economic Area (EEA), to which all EU countries as well as the EFTA countries Iceland, Norway and Liechtenstein belong. Further information can be found on www.liechtenstein.li/en. Thanks to the EEA Agreement, the four fundamental freedoms of the EU, namely the free movement of goods, persons, services and capital, also apply to Liechtenstein. As a consequence, entities created under Liechtenstein law must not be discriminated against in any EU or EEA country.

## 3. Definition and Types of Foundations

### The Foundation as a Special-Purpose Fund
The foundation is defined in § 1 of the new foundation law. The founder transfers assets to a legal entity, i.e. the foundation, for the long-term achievement of a specific purpose designated by him. The foundation assets are legally separated from the founder's private assets. A foundation has no owners or members but does have beneficiaries, i.e. individuals in whose favor the foundation purpose is achieved and which may include the founder himself. The founder if he so desires can retain certain rights subsequently to the creation of the foundation. In order to achieve the founder's intentions, the foundation makes use of its executive bodies, particularly the foundation council.

Every foundation must have a foundation purpose. Although the founder has a free choice with regard to this, the foundation can only carry on a commercial business to a very limited extent, e.g. if the business directly serves the purpose of a common-benefit foundation. A public-benefit foundation is therefore allowed to run a hospital. Within these limits, the foundation has full legal capacity and the power to conclude any type of legal transaction.

The main distinction is made between common-benefit and private-benefit foundations:

### Common-Benefit Foundations
Under § 2 para 2, a common-benefit foundation is a foundation whose activities are entirely or predominantly intended to serve common-benefit purposes. It supports the public in whatever area may be required: charity, religion, science, culture, sport or ecology. A common-benefit foundation can also address a limited group of people only, e.g. by providing financial support for needy employees of a particular company including their dependents. However, a family foundation is, by operation of law, never a common-benefit foundation even if it is aimed at supporting only those family members who are in need.

**Private-Benefit Foundations**

Pursuant to § 2 para 3, a private-benefit foundation has entirely or predominantly private or personal purposes. If it is unclear whether the common-benefit purpose or the private-benefit purpose predominates, which is a rare case, the foundation is characterized as being common-benefit. In the Foundation Articles it is also possible for the founder to specify certain «time phases» whereby the foundation is, for example, a family foundation during his lifetime but converts into a common-benefit foundation after his death.

§ 2 para 4 provides a definition of the family foundation. «Pure family foundations» are foundations whose assets «exclusively serve the defrayal of costs of upbringing or education, provision for or support of members of one or more families or similar family interests» whereas «mixed family foundations» are foundations «which predominantly pursue the purpose of a pure family foundation but which supplementally also serve common-benefit or other private-benefit purposes».

It is also possible to set up a «maintenance foundation» for the purpose of providing for certain individuals or a family without there having to exist a situation of need. Furthermore, a private-benefit foundation can be used to hold shares in a company which, in turn, operates a business («holding foundation»). The purpose of this type of foundation is to exert a dominant influence on company policy. By contrast, a private-benefit foundation is not entitled to directly run a business itself.

## 4. Setting up a Foundation

A foundation is set up either inter vivos by the socalled «declaration of establishment» or mortis causa by means of a testament or inheritance contract. The declaration of establishment (§ 14) is a declaration of intent by the founder to set up a foundation. An inter vivos foundation may have one or more founders. These may be either natural persons or legal entities domiciled anywhere in the world. The declaration of establishment must be in written form and requires authentication of the signatures of the founder(s).

A foundation can also be set up by a Liechtenstein trustee as the founder's agent. In this case the identity of the founder is not disclosed to the authorities. However, it is still the principal and not the agent who is entitled to exercise the founder's rights (see Section 5.1).

The minimum capital of a foundation is 30,000 Swiss francs, euros or US dollars. Following the acquisition of legal personality, the founder can always make subsequent endowments. Third parties can also donate funds to the foundation. The term «foundation assets» refers to the entire assets of the foundation including subsequent endowments and donations. Liechtenstein foundation law recognizes no duty to preserve assets and no prohibition of subsequent contributions. However, the foundation council is prohibited from making distributions to beneficiaries if this would diminish the amount owed to the foundation's creditors.

**Foundation Documents**

The declaration of establishment is embodied in the foundation documents. The Foundation Articles, or Foundation Charter (referred to in the legislation as the «Foundation Deed»), contain the key elements of the foundation and must be signed by either the founder or the founder's agent with the signatures authenticated. § 16 para 1 lists the mandatory content of the Foundation Articles, e.g. the name of the foundation, the foundation purpose, the appointment and functioning of the foundation council, and the identity of the founder or his agent should the founder decide to remain anonymous. Hence, if a foundation is set up by an agent, the founder need not sign any foundation documents and is not identified in the Foundation Articles.

§ 16 para 2 contains optional elements of a foundation which have to be included in the Foundation Articles in case the foundation at hand is to feature such elements. This includes provisions regarding the reser-

vation of founder's rights or else the empowerment of the foundation council to amend the Foundation Articles and By-Laws. If By-Laws or Regulations are, or may be, issued, there must be a reference to this fact in the Articles.

Under § 17, in addition to the Foundation Articles, the founder can also set up By-Laws (referred to in the legislation as a «Supplementary Foundation Deed»). The By-Laws must originate either from the founder or his agent and can deal with areas that need not necessarily be included in the Foundation Articles such as provisions regarding the beneficiaries. By-Laws can be issued only if the Foundation Articles specifically say that they can. In addition, they are not permitted to contradict the Foundation Articles. Besides Foundation Articles and By-Laws, it is also possible to adopt Regulations (§ 18). These can be issued by the founder and his agent as well as by the foundation council and contain internal arrangements or instructions such as asset management targets. Here too, Regulations can be created only if the Foundation Articles specifically say so. By contrast, the «letter of wishes», which is a letter of intent written by the founder and addressed to the foundation council, is no foundation document and therefore has no binding effect. However, it can be taken into account when interpreting the founder's intentions.

**Entry in the Public Register / Notification of Formation**

Subsequent to the declaration of establishment, common-benefit foundations must be entered in the Public Register. It is only by being registered that they become legal entities. Under § 19 para 3 in conjunction with art 90 of the Public Register Ordinance, the entry must contain facts such as the foundation's name, the foundation purpose as well as the identity of the members of the foundation council and of the auditors provided auditors have been appointed (see Section 5.3). Other details like the name of the founder or his agent or the identity of the beneficiaries are not registered. As regards registered facts, anyone can obtain a register extract from the Land and Public Register Office (GBOERA; www.gboera.llv.li) on request.

Private-benefit foundations, e.g. family foundations, need not be entered in the Public Register. They acquire legal personality immediately once the declaration of establishment has been made. Nevertheless, under § 20 a so-called «notification of formation» must be deposited with the Land and Public Register Office within 30 days. This notification must contain the foundation's name and purpose as well as the identity of its Representative (see Section 5.5) and the members of the foundation council. It must also certify that the founder has validly designated the beneficiaries or the class of beneficiaries. The accuracy of the notification of formation must be certified by an attorney admitted in Liechtenstein, by a professional trustee or by a holder of an entitlement in accordance with art 180a PGR. On each amendment of a fact contained in the notification of formation, a notification of amendment must be deposited. The Land and Public Register Office is entitled to verify the accuracy of the deposited notifications. Upon application of the foundation, the Land and Public Register Office issues an official confirmation of the deposition of these notifications. The Land and Public Register Office is not permitted to provide any information to third parties except to confirm that the unregistered foundation is in existence. This excludes information granted to certain Liechtenstein government agencies.

## 5. Organization of the Foundation

### 5.1. The Founder

The founder is the central person in foundation law: The purpose of a foundation is to carry out his or her intentions. The founder can be either an individual or a legal entity domiciled in Liechtenstein or abroad. A foundation may, except where it has been set up by testamentary disposition, have one or more founders. The founder has all the rights contained in § 3, particularly the right to apply for supervisory measures with the Princely Court of Justice. Besides, the founder can apply to the Court in order to have an incorrectly adopted dissolution canceled or, conversely, move for the adoption of a dissolution wrongfully

denied. The founder can also be a member (or chairman) of the foundation council or of another executive body. He can also be a beneficiary of the foundation and, in fact, even its sole beneficiary.

Even where a foundation is established on a fiduciary basis by a trustee acting as an agent, the principal, i.e. the person funding the foundation, will always be the actual founder in the eyes of the law. This enables the founder to remain anonymous to the outside world if he so desires. Naturally, his identity must be revealed to the members of the foundation council as this is the only way for them to help carry out his intentions.

### Right of Revocation

As long as the foundation has not come into being, the founder is able to revoke the declaration of establishment at any time. Hence foundations that need to be registered can be freely revoked until their entry in the Public Register. All other foundations can be revoked until the signature on the Foundation Articles is authenticated. In case of foundations mortis causa, it suffices to amend the testamentary disposition accordingly.

Once the foundation has come into being, it will generally be irrevocable. The founder no longer owns the assets he has contributed to the foundation. The foundation is a separate legal entity with the purpose to pursue the founder's will as laid down in the foundation documents. However, under § 30 the founder is permitted to declare in the Foundation Articles that he retains the right to revoke the foundation and/or to amend the foundation documents. If the founder has done so, he can exercise these rights by a simple declaration to the foundation council without the need to observe any particular form.

These rights of the founder cannot be assigned or bequeathed nor may they be delegated to the foundation council. If the founder is a legal entity, no reservation is permitted. In case of multiple founders, these rights can only be exercised by all the founders jointly provided the Foundation Articles do not direct otherwise. If one of the founders ceases to exist, the rights lapse unless the foundation documents provide otherwise. Where a foundation is established on a fiduciary basis by an agent, it is not the agent but the principal, i.e. the person having funded the foundation, to enjoy the rights of § 30. However, these rights can be exercised by an agent on behalf of the principal.

If the founder exercises his right of revocation, the foundation council must adopt a resolution to dissolve and liquidate the foundation. Any assets remaining must be distributed to the ultimate beneficiary. The founder having exercised the right to revoke the foundation is deemed to be the ultimate beneficiary himself unless the foundation documents provide otherwise.

### Right of Amendment

When exercising the right of amendment (§ 30), the founder can freely amend the declaration of establishment as well as the foundation documents without, however, revoking the foundation. Hence the founder may, for instance, appoint new beneficiaries including himself. As always, the foundation council can only carry out distributions if to do so will not diminish the amounts owed to the foundation's creditors.

### Consequences of Granting Certain Rights to the Founder

The existence of rights as laid down in § 30 (right to revoke the foundation or to amend the declaration of establishment) can have a variety of consequences. For instance, it can be argued that the founder has not irrevocably transferred his assets to the foundation and that therefore the Statute of Limitations for forced heirship claims against the foundation only begins to run on the founder's death. Furthermore, it could be asserted that these founder's rights are subject to enforcement and thus capable of being attached by any of the founder's creditors. Should this viewpoint be upheld by the courts, the creditor having attached the founder's rights could declare a revocation himself or could appoint the founder as the sole beneficiary using his powers of amendment. To date, there is no Liechtenstein case law on this subject.

Moreover, in case of a right of revocation the beneficiaries have no right of information and disclosure under § 9 provided the founder himself is the ultimate beneficiary. Under § 11 the founder can appoint either himself, an audit company or a trusted person as a control body. Such a control body must carry out an annual review of the proper use of foundation assets. If a control body is set up, the beneficiaries are only permitted to request information about the purpose and organization of the foundation or about their own rights in relation to the foundation.

Finally, the reservation of founder rights has possible consequences for the tax situation abroad. Due to the economic approach in tax law, «controlled foundations» are often treated as fiscally transparent and foundation assets continue to be attributed to the founder himself. On the other hand, there will normally be no gift or inheritance tax liability with controlled foundations since there has been no effective financial divestment.

### Contracts of Mandate

The founder can, if he so desires, conclude a Contract of Mandate with the members of the foundation council. The founder is granted a power of instruction, e.g. with regard to the exercise of the foundation council's discretion in case of discretionary foundations. The obligations of the council members arising from the Contract of Mandate are purely in personam: their duties as members of the executive body always prevail. However, within these limits members of the foundation council are perfectly free to conclude Contracts of Mandate.

### 5.2. The Foundation Council

### Composition and Functions

In order to achieve the founder's intentions, the foundation makes use of its executive bodies. The only compulsory executive body of any foundation is the foundation council (§§ 24 et seq.). It manages the business of the foundation (administration, bookkeeping etc.) and rep-

resents it. Its main task is the furtherance of the founder's intentions. The foundation council must consist of at least two members who can be either individuals or legal entities domiciled in Liechtenstein or abroad. According to art 180a PGR, one foundation council member must be either a Liechtenstein trustee or a person with similar status (a «180a Person»). Both the founder and the beneficiaries can be members of the foundation council.

The Foundation Articles must contain provisions on the appointment, dismissal, term of office, adoption of resolutions and power of representation (authority to sign) of the foundation council. With registered foundations, the name, date of birth, nationality and place of residence, or else the corporate name, domicile and registered office, of the members of the foundation council as well as the authority to sign (collective or single) must be entered into the Registry. In case of non-registered foundations, these details must be recorded in the notification of formation. Foundation council members can be either paid or unpaid. The foundation council must be appointed for the first time by either the founder or the founder's agent upon the foundation's establishment. Unless provided otherwise, the appointments are valid for a three-year term with multiple reappointment being permitted. Frequently, foundation council members are granted the right to co-opt new members (co-optation). In addition, it is often provided in the Foundation Articles that members can appoint a successor in the event of death, incapacity or departure from office.

### Amendment Rights of the Foundation Council

Subject to the conditions contained in §§ 31 et seq., the foundation council has the right to amend the Foundation Articles and By-Laws. An amendment of the foundation purpose by the foundation council or another executive body is only allowed «if the purpose has become unachievable, impermissible or irrational or if circumstances have changed to the extent that the purpose has acquired a quite different significance or effect, so that the foundation is estranged from the intention of the founder». The presumed intention of the founder is crucial. In addition, the right of amendment must be expressly provid-

ed for in the Foundation Articles. If no power of amendment has been included in the Foundation Articles, the foundation purpose can only be altered by judicial decree.

According to § 32 either the foundation council or another executive body can be given the authority to amend other contents of the Foundation Articles (apart from the foundation purpose) or of the By-Laws. This can include, for example, the foundation's organization or beneficial interest arrangements provided, however, that the foundation purpose is not affected. In addition, the foundation council must have a substantively justified reason to do so. The right pursuant to § 32 must be included in the Foundation Articles. In the absence of such a provision, any amendment of either the Foundation Articles or the By-Laws can only be ordered by a judge.

### Liability of the Foundation Council

The foundation council is responsible to fulfill the foundation purpose in strict compliance with the provisions in the foundation documents. The members of the foundation council are personally liable under art 218 et seq. PGR for any negligently or intentionally caused loss. In the declaration of establishment, the liability of unpaid council members for slight negligence can be excluded. Entitlement to compensation is primarily enjoyed by the prejudiced foundation. On a subsidiary basis, creditors themselves may make a claim. Art 182 para 2 PGR codifies the «Business Judgment Rule», whereby a member of the administration is deemed to act diligently «if in his commercial decision-making he is not governed by irrelevant interests and it must reasonably be assumed that he is acting for the good of the legal entity on the basis of appropriate information».

### 5.3. The Audit Authority

According to § 27, every foundation subject to the supervisory oversight of the Foundation Supervisory Authority (see Section 7) must appoint an audit authority. Thus, in the case of common-benefit foun-

dations but also private-benefit foundations whose Foundation Articles make them subject to voluntary oversight by the Foundation Supervisory Authority, the auditors constitute a mandatory body of the foundation. The auditors are under an obligation to verify once a year whether the foundation assets are being managed and used in accordance with the foundation purpose. An audit report must be submitted to both the foundation council and the Foundation Supervisory Authority. Auditors, auditing firms, professional trustees or trust companies can be appointed as the auditors.

The auditors must be independent of the foundation. In particular, the following are prohibited from acting as auditors: anyone who belongs to an existing foundation body such as the foundation council; anyone who is an employee of the foundation; anyone with close family ties to members of executive bodies of the foundation; or anyone who is a beneficiary of the foundation. The auditors are appointed by judicial decree, the foundation and the Foundation Supervisory Authority both being a party to the proceedings. Either the founder or the foundation council can make two proposals stating their preference.

With common benefit foundations, the Foundation Supervisory Authority can waive the requirement to appoint auditors at the foundation's request in two cases. Firstly, this is possible if the foundation's assets amount to less than 750,000 Swiss francs and the foundation does not publicly call for donations or run a business along commercial lines. Secondly, an exemption can be accorded if it appears reasonable to do so for other motives. This will be the case if, for example, the foundation pursues an investment and distribution policy in such a way as to enable direct oversight by the Foundation Supervisory Authority. Direct oversight is possible, inter alia, where the assets and their performance are easily verifiable.

Outside the aforementioned cases of mandatory appointment of auditors, it is possible to provide for a voluntary appointment of auditors in the Foundation Articles. Voluntary auditing does not entail any duty of oversight by the Foundation Supervisory Authority. Finally, the foun-

dation council is always at liberty to instruct external auditors to check individual transactions in any particular case without granting them the status of an executive body.

### 5.4. The Control Body and Other Executive Bodies

**Control Body**

The founder may specify in the Foundation Articles that a control body pursuant to § 11 is or can be established. The control body is under an obligation to verify once a year whether the foundation assets are being managed and distributed in accordance with the foundation purpose. A report must be submitted to the foundation council. In the event of the foundation council's non-compliance with the foundation purpose, the control body must inform the beneficiaries and the court. If a control body is established, the beneficiaries are not permitted to assert the full rights of information and disclosure as stated under § 9 (see Section 6). Instead, they can only inspect the foundation documents and request information about the purpose and organization of the foundation and about their own rights in relation to the foundation. In addition, the beneficiaries can require the submission of the control body's reports.

The founder himself, a judicially appointed auditor or a trusted advisor of the founder may be appointed as the control body. The «trusted advisor» (confidant) is one or more natural persons specified by the founder who have sufficient specialist knowledge in the sphere of law and business to be able to perform their duties. This includes, for example, an attorney who is also a friend of the founder. The confidant is not appointed by the court but must be independent of the foundation council.

**Additional Executive Bodies**

Besides this, the Foundation Articles may specify that additional executive bodies are or can be established pursuant to § 28. The founder is largely free in this respect as well as in the choice of the members and

the extent of any relevant powers. § 28 mentions executive bodies to be used «to specify a beneficiary from the category of beneficiaries, to specify the time, level and condition of a distribution, to manage the assets, to advise and assist the foundation council, to monitor the administration of the foundation in order to safeguard the purpose of the foundation, to reserve consents or issue instructions, as well as to safeguard the interests of the foundation participants». These executive bodies can be given rights to advise, consent, instruct or veto. They do, however, not have any representation authority. Nevertheless, it is possible for the foundation council to grant them – or any third party – legally valid powers of attorney.

In practice, protectors, collators and asset managers are appointed quite often. These executive bodies are not defined legally, so their powers must be described in the foundation documents. Even so, a certain semantic content has established itself over time in this regard. Thus, a protector is used as an optional monitoring body for the foundation and will mediate between the foundation council and the beneficiaries. Generally, protectors come from the founder's family or circle of friends or else are family advisers. The protector may also be granted approval rights in relation to amendments of the Foundation Articles and By-Laws or the dissolution of the foundation, as well as the right to appoint and dismiss members of the foundation council (appointor) or a right of approval to this effect.

With discretionary foundations, a collator is sometimes granted the right to choose a beneficiary from the class of beneficiaries or the right to identify the date, amount and conditions of a distribution. These powers are often granted to the protector instead, especially if no collator is appointed. Finally, sometimes an asset manager is set up as a voluntary body responsible for the management of the foundation's bankable assets. The asset manager can be given administrative authority with regard to the bank.

## 5.5. The Representative

According to art 239 et seq. PGR, foundations must appoint a Representative to carry out representation in relation to the Liechtenstein authorities. The Representative is a process agent of the foundation and, by operation of law, can be served, on behalf of the foundation, with any statement and communication whatsoever from all domestic courts and administrative authorities. The Land and Public Register Office (GBOERA) can waive the duty to appoint a Representative if the foundation's representation is secured otherwise or if a domestic delivery address has been designated. If the foundation has no Representative and if none of these exceptions apply, the foundation will be dissolved and liquidated after a request of GBOERA to remedy this situation will have been ignored. The Representative must be appointed at the time of the declaration of establishment and, with registered foundations, must be entered in the Public Register. In this case, his name will appear in the relevant register extracts. With non-registered foundations, the Notification of Formation must contain the Representative's details. The Notification of Formation's content will, however, not be disclosed to third parties. This does not affect the right of disclosure to domestic criminal prosecution authorities, the Liechtenstein Financial Intelligence Unit (FIU; www.fiu.llv.li) and the Liechtenstein Financial Market Authority (FMA; www.fma-li.li).

## 6. The Beneficiaries

When setting up a foundation, particular attention must be paid to the foundation purpose. The Foundation Articles must state the foundation purpose including the designation of named beneficiaries or of beneficiaries identifiable on the basis of objective criteria. Alternatively, a class of beneficiaries can be designated. Only common-benefit foundations need not specify beneficiaries or a class of beneficiaries. In practice, the beneficiary or beneficiaries are often not identified in the Foundation Articles themselves: instead, the Articles contain a reference to the By-Laws where they are specified. The inclusion of an explicit reference in the Foundation Articles that the beneficiaries are designated in the By-Laws is mandatory.

§ 5 defines the beneficiary as «the natural person or legal entity that with or without valuable consideration in fact, unconditionally or subject to certain prerequisites or conditions, for a limited or unlimited period, with or without restrictions, revocably or irrevocably, at any time during the legal existence of the foundation or on its termination derives or may derive an economic benefit from the foundation (beneficial interest)». The identity of the beneficiaries will not be made public and will not be registered in the Public Register or included in the Notification of Formation.

The law provides for four categories of beneficiaries. Entitled beneficiaries (§ 6 para 1) are beneficiaries who, on the basis of the foundation documents (the Foundation Articles, By-Laws or Regulations), have a legal claim to benefit, to a specified or specifiable extent, from the foundation assets or foundation income. Therefore, in relation to the foundation, entitled beneficiaries have a legally enforceable right to their benefit. Any discretion of the foundation council to this effect is excluded.

Prospective beneficiaries (§ 6 para 2) are individuals who have a legal entitlement laid down in the foundation documents to be appointed at a later date as a successor to an entitled beneficiary. This may be the case after the occurrence of a condition precedent or the reaching of a specific date (such as the demise of a prior beneficiary). Potential beneficiaries who have no right to become an entitled beneficiary but instead simply have an uncertain prospect of maybe obtaining a distribution in the future are not prospective beneficiaries in the sense of § 6 para 2. Whether there is a legal entitlement or not can only be determined by interpreting the foundation documents.

The third category of beneficiaries are the discretionary beneficiaries (§ 7). They belong to the class of beneficiaries specified by the

founder, their beneficial interest being placed in the discretion of the foundation council or another body appointed for this purpose (such as a protector or collator). Foundations with discretionary beneficiaries are called discretionary foundations. Discretionary beneficiaries have no legally enforceable claim to receive any particular benefit from the foundation: they only have a legal right to obtain a distribution once the foundation council has adopted a Resolution in this respect. Once the distribution has been made, all the discretionary beneficiary's rights are extinguished. However, discretionary beneficiaries do have inspection rights under § 9 but only insofar as their own rights are concerned.

An ultimate beneficiary (§ 8) is a beneficiary who, in accordance with the foundation documents, is intended to receive the remaining assets following the liquidation of the foundation. If no beneficiary exists at all, the foundation's assets go to the Principality of Liechtenstein, which must make use of the assets, to the extent possible, in accordance with the foundation purpose.

Since the designation of beneficiaries is regarded as an essential part of the foundation establishment process, the Foundation Articles must include the designation of named beneficiaries or of beneficiaries identifiable on the basis of objective criteria. Alternatively, a class of beneficiaries can be designated. There are three exceptions to this rule. Firstly, this provision does not apply in the case of common-benefit foundations since, by definition, they serve the general public (§ 107 para 4a PGR). Thus common-benefit foundations can, but need not, specify particular beneficiaries. Secondly, it is permissible for the Foundation Articles to contain an express reference to the By-Laws and to leave the identification of the beneficiary or beneficiaries to the By-Laws. In practice, this happens very often. Thirdly, in exceptional cases it may be that the beneficiaries are evident in light of the foundation purpose.

A beneficial interest can relate to the foundation income only or also to the foundation assets (principal). Although Liechtenstein foundation

law recognizes no duty to preserve the foundation assets, the foundation council is prohibited from making distributions to beneficiaries if this would diminish the amount owed to the foundation's creditors. The founder may also designate himself as either the sole beneficiary or as one of several beneficiaries. Furthermore, under § 30 the founder can reserve the right to amend the declaration of establishment (see Section 5.1), making it possible for him to amend the rules governing the beneficiaries at any time. Within the framework of §§ 31 et seq., the foundation council can be granted a right to amend the rules governing beneficiaries contained in the Foundation Articles or in the By-Laws (see Section 5.2).

Usually, the foundation documents create a cascade of beneficiaries by appointing secondary beneficiaries who gain their beneficial interest upon the death of the primary beneficiary. It is often also specified who will be the third, fourth and fifth rank beneficiaries etc. In the event of a beneficiary's death, his or her beneficial interest does not form part of the estate because the entitlement is extinguished on the beneficiary's death. It is then the beneficiaries next in line who come into play. Legal status as a beneficiary is strictly personal and not transferable or inheritable unless the founder issues express instructions to the contrary. Finally, the Foundation Articles or By-Laws must also contain a provision for the distribution of assets in the event of the foundation's dissolution.

**Rights of the beneficiaries**

The foundation is not a corporation over which shareholders can exert influence based on their stake in the company. In order to address the risk that the members of the Foundation Council might be behaving like the owner of the foundation assets, § 9 grants the beneficiaries information and disclosure rights. These rights are enjoyed not just by the entitled beneficiaries and the prospective beneficiaries but also by the current discretionary beneficiaries. However, persons who have only a prospect to a future discretionary benefit do not enjoy them. Beneficiary rights include the right to view documents and the right to receive general, reporting and accounting information. The beneficiary

has the right to inspect business records and documents and to make copies thereof and also to examine and investigate all business conduct personally or through an agent.

However, the law contains certain restrictions on beneficiary rights. First, these rights are only enjoyed by the beneficiary «insofar as his rights are concerned». The beneficiary has to be directly and personally affected. Thus, events in the past occurring prior to the acquisition of the beneficial interest can only be investigated if they directly affect the beneficiary's current rights. Second, there is a very comprehensive general misuse clause under which this right must not be exercised with dishonest intent, in an abusive manner or in a manner that conflicts with the interests of the foundation or other beneficiaries. Third, beneficiary rights may exceptionally be denied «for important reasons to protect the beneficiary» such as to prevent a young person's idleness after he has learnt of his beneficial interest.

Beneficiary rights have to be asserted in civil proceedings. The Articles can, however, also provide for mandatory arbitration in Liechtenstein or abroad. The existence of beneficiary rights is presumed, the permissibility of restrictions has to be proved by the foundation council. Often the foundation documents state the possible reasons for which a request for information may be refused. Although these reasons bind neither the court nor the foundation council, the corresponding provisions must be taken into account when assessing the balance of interests.

§§ 10-12 provide important exceptions, which partially suspend the beneficiary rights under §9, in situations where the foundation council is supervised by other participants. If the founder has reserved a right of revocation under § 30 (see Section 5.1) and he is himself the ultimate beneficiary, then the beneficiaries will not have any information rights because in this case the founder himself already has a considerable ability to exercise control and monitoring. If a Control Body is set up under § 11 (see Section 5.4), the beneficiaries are only permitted to request information about the purpose and organization of the foun-

dation or about their own rights in relation to the foundation. Besides, the beneficiaries will not have any information rights if the foundation is subject to supervision by the Foundation Supervisory Authority (see Section 7). In each case, however, beneficiaries have the irrevocable right to ask the judge to redress any grievances.

## 7. Foundation Governance

Foundation governance is taken to mean all the rules that contribute to make the foundation bodies act in accordance with their duties and in the interest of the founder. Regulations designed to protect the foundation against any misconduct by its executive bodies are extremely important due to the absence of any owners who could play a supervisory role (shareholders, for example). They are also vital due to the potential for possible conflicts of interest, e.g. of members of the foundation council. A distinction can be drawn between external governance in the sense of supervision by state authorities and internal governance in the form of mutual monitoring rights of foundation participants. When the new Liechtenstein foundation law was created, special emphasis was placed on instituting a modern system of foundation governance. One innovation is that the Foundation Supervisory Authority itself is not entitled to order coercive measures. Instead, just like foundation participants, the Authority has to apply to a court for them to be instituted. This combination of ongoing supervision and judicial decision-making authority (application-based court supervision) is indeed a role model.

### Common-Benefit Foundations

Under § 29, common-benefit foundations are subject to the supervision of the Foundation Supervisory Authority (STIFA). STIFA is a department of the Land and Public Register Office and must ensure ex officio that foundation assets are managed and disbursed in accordance with the foundation purpose. To this end, it is entitled to demand any information from the foundation's executive bodies and can also inspect the foundation's books. Furthermore, STIFA is required to check the

annual report produced by the foundation's auditors. Coercive measures such as the removal of foundation bodies, the conduct of special audits or the annulment of resolutions of the Foundation Council must be applied for by STIFA in the Princely Court of Justice.

For the purposes of internal governance, under § 27 every common-benefit foundation must be audited by independent auditors. In addition, any participant, i.e. the founder, the beneficiaries and all foundation executive bodies and their members have the right to petition the court to initiate supervisory measures. STIFA is a party in these proceedings.

### Private-Benefit Foundations

Private-benefit foundations whose Foundation Articles make them subject to supervision by STIFA must also undergo, as far as supervisory matters are concerned, the same regime as common-benefit foundations. If the Foundation Articles do not make them subject to voluntary foundation supervision, private-benefit foundations are not subject to any ongoing state supervision. For this reason, internal governance is well developed. Firstly, beneficiaries have comprehensive access and information rights under § 9: they have the right to inspect the business records and documents and to make copies thereof, and also to examine and investigate all business conduct personally or through an agent, provided this right has not been restricted (see previous section).

In addition, with private-benefit foundations too, all participants (founders, beneficiaries and executive bodies as well as their members) have the right, under § 29 para 4, to apply directly to the Princely Court of Justice for supervisory measures such as the removal of foundation bodies, the conduct of a special audit or the cancelation of resolutions taken by the foundation council. Finally, the court may, either on request by the parties or ex officio and possibly in response to a communication from STIFA or the public prosecutor, order an amendment of the foundation documents provided the preconditions contained in §§ 33 et seq. are met. In these proceedings the Foundation Supervisory Authority has the status of a party.

## 8. Foundations and Estate Law

As a general rule, a beneficial interest is awarded ad personam so that after the death of a beneficiary it is the beneficiaries next in line and not the heirs of the deceased beneficiary who will obtain a beneficial interest. If it is intended for a beneficial interest to be inherited, this must be explicitly provided for in the foundation documents. Therefore, if the deceased was a beneficiary during his lifetime only, his or her foundation benefits do not form part of the estate. This was confirmed by the Liechtenstein Constitutional Court (www.stgh.li).

This has nothing to do with the question of whether and how a contribution of assets by the deceased to a foundation can be challenged by his heirs for breach of their compulsory portion («forced heirship»). According to § 38 para 1, every contribution of assets to the foundation, including an additional or subsequent endowment (see Section 4), can be challenged by the contributor's heirs in the same way as a donation. In practice, therefore, heirs whose compulsory portion is prejudiced by the establishment of, or subsequent endowment to, a foundation by the deceased sometimes bring «compulsory portion supplementary claims» against Liechtenstein foundations. The competent forum for such claims is the Princely Court of Justice. The action is not directed against the very existence of the foundation but rather seeks the delivery, by the foundation to the claimant (i.e., the forced heir), of that amount of assets required to give the claimant that which he or she is entitled to by the applicable forced heirship legislation. Thus, in case of a successful claim the foundation is ordered to pay to the claimant a specified monetary amount rather than being dissolved.

If conflict of laws rules make Liechtenstein law applicable, § 785 of the General Civil Code is applied, whereby on application by any child or spouse entitled to a compulsory portion, gifts (and thus contributions of assets to a foundation) must be taken into account when calculating the estate (compulsory gift portion). Contributions to common-benefit foundations are, however, not taken into account. The same applies to contributions made to a foundation earlier than two years before the

death of the contributor. If the founder has reserved founder's rights under § 30 (see Section 5.1), this two-year period, according to prevailing doctrine, does not start to run until either the death of the founder or his irrevocable renunciation to exercise powers over the assets concerned.

If there is a case with an international connection (in other words, if the deceased was not a Liechtenstein citizen residing in Liechtenstein), compulsory portion supplementary claims are governed by the law stipulated in art 29 of the Liechtenstein Private International Law Act. This provision declares applicable the law of the state whose citizen the deceased was at the time of his death. However, the deceased is entitled to opt, in his Will, for the law of the state of his last habitual residence to be applicable. In addition to the law governing the succession, a compulsory portion claim must also (i.e., cumulatively) be in accordance with the law governing the acquisition process itself. If, therefore, a French testator made an inter vivos donation to a Liechtenstein foundation and provided for Liechtenstein law to be applicable to this endowment, a claim, brought against the foundation by his heirs, to supplement the compulsory portion will only be successful if all the preconditions contained in both French and Liechtenstein law are met, e.g. compliance with both the French and the Liechtenstein statutes of limitation. If the claim to supplement the compulsory portion turns out to be prescribed under Liechtenstein law, the claim cannot be successfully made.

If the applicable estate law is that of a Common Law country, claims to supplement the compulsory portion are, in most cases, irrelevant since Common Law countries normally do not know forced heirship rules. If, therefore, English or New York law is the law governing the succession, the children of the deceased person do not have a compulsory portion and, therefore, cannot make any claim against a Liechtenstein foundation. Questions about how to treat, for Liechtenstein conflict of laws purposes, the English family provision rules or the elective share statutes known in some US States have not arisen before Liechtenstein courts so far.

## 9. Foundations and Asset Protection

Asset Protection generally means the protection of private assets from civil money judgments. Liechtenstein law has managed to strike an appropriate balance between the legitimate interests of the founder in the protection of assets, on the one hand, and the interests of the creditors in the collectibility of their debts against the foundation, the founder or the beneficiaries, on the other.

### Creditors of the Foundation

Under § 37 para 1, a creditor of the foundation can only pursue his claims against the foundation assets themselves. There is no personal liability on the part of the founder or other persons, e.g. the beneficiaries or the foundation council members. Only if the founder has not fully paid in the dedicated assets can the foundation council be required to provide the creditors with all necessary information regarding the enforceability of their claims, including the identity of the founder. The founder can, however, always avert this by simply making the pledged contribution to the foundation. Finally, under § 37 para 2 the Foundation Council is prohibited from making distributions to beneficiaries if this would diminish the amount owed to the foundation's creditors. If the foundation's executive bodies act against this provision, they will be liable for damages (see Section 5.2).

### Creditors of the Founder

Under § 38 para 1, creditors of the founder who cannot recover damages against him because he has transferred assets to a foundation may dispute this endowment according to the Liechtenstein Legal Remedies Code. In addition, creditors of the founder may, in very exceptional cases, gain access to the foundation's assets by way of «reverse piercing» if the founder effectively misuses the foundation. This would be the case, for example, if the founder still took all decisions regarding the foundation without ever even involving the foundation council. As the Constitutional Court has made clear, the mere reservation of founders' rights or the existence of a contract of mandate between the founder and the members of the foundation council does not lead

to a «lifting of the foundation veil» and will thus not give rise to reverse piercing.

Finally, the law does not exclude an enforcement of the founders' rights under § 30 (see Section 5.1). Thus, it could well be that the courts would affirm the enforceability of founders' rights in favor of creditors, at least if the founder has reserved the right of revocation and is, at least in part, the ultimate beneficiary; or else, if the founder has reserved the right to comprehensive amendments. The courts could thus allow the founder's creditors to exercise his rights in his place. To date, there is no Liechtenstein case law on the subject.

### Creditors of the Beneficiaries

Creditors of beneficiaries can be indemnified out of distributions which have already been made to the beneficiaries since those distributions represent an integral part of the beneficiaries' own assets. Under § 36 para 1, the founder of a family foundation (see Section 3) may provide in the Foundation Articles «that the creditors of beneficiaries shall not be permitted to deprive these beneficiaries of their entitlement to a beneficial interest or prospective beneficial interest acquired without valuable consideration, or individual claims arising from such an interest, by way of safeguarding proceedings, compulsory enforcement or bankruptcy». The founder can thus specify that the entitlement of Entitled Beneficiaries or Prospective Beneficiaries (see Section 6) against the family foundation is not enforceable in favor of the beneficiaries' creditors. Again, this does not hold true for amounts already distributed.

In case of a mixed family foundation, this enforcement privilege applies only to those entitlements which serve the defrayal of costs of upbringing or education, provision for or support of family members or similar family interests. The enforcement privilege must be included in the Foundation Articles. Similar provisions exist in other jurisdictions, such as in many U.S. states (spendthrift trusts or protective trusts).

Nevertheless, the enforcement of a said privilege is problematic where enforcement proceedings have a foreign element. Since case law is lacking in this respect, it is unclear how foreign courts would decide such matters. There is, therefore, the risk that foundation assets situated abroad, such as bankable assets deposited at a foreign bank, would be seized by the competent court at the bank's domicile disregarding the enforcement privilege awarded by Liechtenstein law.

### Private International Law

The applicable law for creditor disputes is set out in art 75 of the Legal Remedies Code. Simply put, a cumulative connection is necessary in order to successfully raise an enforcement claim: only if the claim is permitted under both the law of the residence or domicile of the debtor and the law governing the acquisition process itself, can it be enforced.

## 10. Accounting

Foundations which operate a business along commercial lines, which is only permissible under very limited circumstances (see Section 3), will be subject to the general accounting standards contained in art 1045 et seq. PGR. These foundations must produce a balance sheet as well as annual audited financial statements (balance sheet, income statement and appendix, if applicable). For all other common-benefit or private-benefit foundations, the foundation council must, pursuant to § 26, keep records of the use of foundation assets. These records must conform to the principles of proper accounting. The comprehensiveness of the records depends on the financial circumstances of the foundation. However, there is no general duty to carry out detailed bookkeeping at all. In addition, a Schedule of Assets must be maintained, showing the asset position and the asset investments. All books and records and business correspondence must be kept for ten years.

With registered foundations whose Foundation Articles forbid them to run a business along commercial lines, the Foundation Council must go through a yearly Declaration Procedure pursuant to art 182b PGR. Every year, a declaration signed by the foundation council must be

submitted to the Land and Public Register Office (GBOERA) confirming that for the previous fiscal year there is a statement of assets and that no business was run along commercial lines. Failing this, the Land and Public Register Office must alert the foundation and, after at least another twelve months, initiate dissolution and liquidation proceedings (art 971 PGR). In addition, a penalty may be imposed. The correctness of the declaration may be reviewed by GBOERA within two years if the declaration is not confirmed by an auditor or an auditing company. – With non-registered foundations, i.e. with the vast majority of private-benefit foundations, no declaration procedure needs to be performed.

## 11. Termination of the Foundation

### Dissolution

The termination of a foundation, governed by art 130 et seq. and art 552 §§ 39 et seq. PGR, requires (a) a reason for the dissolution, (b) the initiation of liquidation proceedings, and (c) a confirmation of deletion of the Public Register entry. The dissolution itself changes the foundation's purpose: thenceforth, the foundation must align all its activities towards the termination of its existence. Possible reasons for dissolution include the institution of bankruptcy proceedings in relation to the foundation assets, a court order or a decision in favor of dissolution by the foundation council.

In most cases, it is the foundation council which decides to dissolve the foundation. Such a resolution is compulsory if the council has received a lawful revocation by the foundation, if the foundation's purpose has been achieved or can no longer be achieved, if the foundation's statutory lifetime has expired, or if other grounds for the foundation's dissolution as derived from the articles apply. If, for example, the entire assets of the foundation have been distributed to the beneficiaries, the foundation council must decide in favor of dissolution. In the absence of any provision to the contrary in the Foundation Articles, a decision in favor of dissolution must be adopted unanimously. If a ground for

dissolution exists but no resolution in favor of dissolution has been adopted by the foundation council, the beneficiaries or the Foundation Supervisory Authority (STIFA) can apply for a court order dissolving the foundation. Conversely, the court must, again on application by either the foundation beneficiaries or STIFA, set aside an improperly taken decision to dissolve the foundation.

### Liquidation

Dissolution of the foundation results in the initiation of liquidation proceedings. The foundation's liabilities must be settled, the assets must be sold and the liquidation proceeds must be distributed among the ultimate beneficiaries. If no beneficiaries can be ascertained at all, which is extremely rare, the proceeds of liquidation go to the Principality of Liechtenstein, which must apply the assets in a manner as compatible as possible with the existing foundation purpose. With registered foundations the distribution can usually only take place six months after the dissolution has been published (half-year block) and after three public invitations to register claims (debt calls, creditor calls) have been issued. With foundations that are not registered in the Public Register, i.e. with almost all private-benefit foundations, no creditor call and no half-year block take place.

### Cancelation

On completion of liquidation proceedings, the Office of Land and Public Registration (GBOERA) issues a certificate of cancelation. For this purpose, a cancelation permit from the Tax Authority stating that all taxes have been paid is required. In case of foundations supervised by STIFA, STIFA must be informed of the cancelation. If, after cancelation of the foundation, undistributed foundation assets come to light, GBOERA must, at the request of interested parties (such as former beneficiaries and foundation council members or creditors) or sua sponte, open «Subsequent Liquidation Proceedings» (Nachtragsliquidation) regarding the canceled foundation. During these proceedings, the detected assets are distributed by official liquidators. Foundations supervised by STIFA must inform STIFA of subsequent liquidation proceedings. In order to bring claims against a canceled foundation, the

Princely Court of Justice must, on application by a participant, appoint a curator for the canceled foundation.

**Conversion and Change of Domicile**

Under § 41 private-benefit foundations can, without dissolution and liquidation, be converted by the foundation council into an Anstalt («Establishment») or a Treuunternehmen («Trust Enterprise») provided the foundation purpose and the founder's will are respected. Anstalts and Trust Enterprises are Liechtenstein legal entities. The conversion must be authorized by the Foundation Articles. The conversion leads to an automatic transfer of assets to the new entity. However, all rights of third parties, e.g. of the foundation's creditors, are upheld. Liechtenstein law does not provide for a merger between foundations.

Pursuant to art 234 PGR, it is possible to transfer the domicile of a Liechtenstein foundation abroad, and thus change the law applicable to the foundation, without the foundation being liquidated in Liechtenstein and then being reestablished abroad. For this purpose, a permit from the Land and Public Register Office is required, which will only be granted if, inter alia, the laws of the foreign country allow a Liechtenstein legal entity to become domestic without liquidation and subsequent reestablishment.

## 12. Transitional provisions

**Principle and Restrictions**

Liechtenstein's current foundation law as described above took effect on 1st April 2009. The question of which provisions of the new law should apply to foundations set up before this date («legacy foundations») is governed by the detailed transitional provisions. These can be found in art II of the Act of 26th June 2008, law gazette 2008 no. 220, as amended by law gazette 2009 no. 247. In principle, the new foundation law applies only to foundations set up on or after 1st April 2009. An overview of the old law on foundations, valid up to 31st March

2009, can be found in MARXER & PARTNER, Companies and Taxes in Liechtenstein, 8th edition, Liechtenstein Verlag, Vaduz 2003, p. 85-104.

The principle of «old law for legacy foundations» is, however, significantly restricted in two ways. Firstly, and in very simplifying terms, any dealings with the Land and Public Register Office (GBOERA), e.g. upon the replacement of a foundation council member, are governed by the new law. All legacy foundations have to file a Transitional Notice («Überführungsanzeige») containing the same information as a notification of formation (see Section 4). Secondly, art 1 para 4 of the transitional provisions contains a list of those provisions of the new law that also apply to foundations established before 1st April 2009. These are mainly rules relating to foundation governance, e.g. rules on the beneficiaries' rights to information and disclosure, on supervision by STIFA or on the right of the foundation council to amend the foundation documents.

Thus, the provisions on access to information by beneficiaries (§§ 5-12; see Section 6) also apply to all existing foundations. All existing common-benefit foundations had to be entered in the Public Register by 1st April 2010 and subjected to supervision by STIFA. Finally, the transitional provisions contain ways to restructure private-benefit foundations which would be void under the new law due to the absence, in the Foundation Articles or By-Laws, of even rudimentary criteria on the beneficiaries or the class of beneficiaries (see § 16 para 1 (4) of the new law and Section 6).

## 13. Taxes and Fees

Currently, foundations generally pay a reduced annual capital tax of 1‰ of the foundation assets, the minimum being 1,000 Swiss francs per annum (art 83 Tax Code). The minimum amount must be paid to the tax authority (www.stv.llv.li) for one year in advance. More information on the current Liechtenstein tax law can be found in MARXER & PARTNER, Companies and Taxes in Liechtenstein, 8th edition, Liechten-

stein Verlag, Vaduz 2003, p. 155-187. However, in May 2010 a bill to enact a new Tax Code was introduced in Parliament. The bill is set to enter into force on 1st January 2011. According to the new law, foundations will be taxed at a slightly higher rate. The definite tax rate is still subject to parliamentary discussion.

The fees of the Land and Public Register Office are dealt with in Schedule 2 to the GBOERA Fees Ordinance. For example, the registration fee is 700 francs and the fee for filing a notification of formation 300 francs. Costs for a certified official confirmation or a certified register extract amount to 15 francs. The fees of the supervisory authority (STIFA) for the evaluation of audit reports (200-1,000 francs), for deciding about an exemption from the duty to appoint an auditor (150 francs) and for the inspection of foundation documents (150 to 2,000 francs) are cited in art 13 of the Foundation Law Ordinance. If STIFA needs to apply to the court for supervisory measures, hourly fees of 150 francs are assessed.

Like all other jurisdictions surveyed by the OECD's «Global Forum on Transparency and Exchange of Information for Tax Purposes», Liechtenstein has committed to tax information exchange on request as provided for in art 26 of the OECD Model Convention. Liechtenstein will, however, only grant legal and administrative assistance in tax matters and fiscal crimes if this is stipulated in an international treaty applicable between Liechtenstein and the requesting state. On 1st July 2010, Liechtenstein had concluded bilateral tax treaties (TIEAs – short for «Tax Information Exchange Agreements» – or double taxation agreements) with 16 countries, 14 of them (e.g. the treaties with Germany, the UK, the US and France) providing for an exchange of information on reasonable request. The agreement between Liechtenstein and the UK is special in that it includes the «Liechtenstein Disclosure Facility» (LDF) offering UK taxpayers a unique opportunity of becoming UK tax compliant under very favorable terms (see www.marxerpartner.com/ldf for further information). Thanks to these agreements, Liechtenstein figures on the OECD White List as a jurisdiction having «substantially implemented the internationally agreed tax standard».

In all cases, however, Liechtenstein will only provide assistance to a foreign country provided a well-founded and specific request for information, which is subject to strict conditions, has been made. Amongst others, the request must contain information as to the identity of the taxpayer whose liability is in question; and it must state the precise facts of the case including the nature, form and time span of the requested information. There is no automatic exchange of information in tax matters and non-individualized inquiries (so-called «fishing expeditions») are not permitted.

## 14. What Can Marxer & Partner Do for You?

Marxer & Partner Attorneys-at-Law was founded in 1925. The oldest and largest law firm in Liechtenstein consists of approximately 30 lawyers and 60 administrative professionals and offers international companies and individuals comprehensive legal advice and support in all areas of law. Our activities focus mainly on foundation, trust, corporate, estate and tax law. As to foundations, we are frequently asked to give legal opinions, to represent the foundation or beneficiaries before Liechtenstein courts and administrative authorities or to act as arbitrators. Besides, we can also take on the establishment and administration of your foundation.

A foundation can be set up easily. There is no need for you to be present before a notary public, a court or an administrative authority. The foundation documents can be drafted in any language. Our lawyers will correspond with you in many different languages. We have 85 years of experience with foundation matters, especially in dealing with complex family and financial structures involving different legal systems. Over the decades, we have built up a large cooperative network with leading law firms, accountants, trust companies, asset managers and banks worldwide. Marxer & Partner is the Liechtenstein member of Lex Mundi (www.lexmundi.com), a worldwide association of leading independent law firms.

We are very happy to give you a personal overview of our services. Please feel free to contact any of our lawyers. For a list of our partners and associates, including biographical notes, see www.marxerpartner.com/en.

**Further Reading:**

- DOMINIQUE JAKOB: Die liechtensteinische Stiftung. Eine strukturelle Darstellung des Stiftungsrechts nach der Totalrevision vom 26. Juni 2008 («The Liechtenstein Foundation»), published by Marxer & Partner; Liechtenstein Verlag, Schaan 2009, ISBN 978-3-905762-03-7, German only.
- MARXER & PARTNER: Liechtensteinisches Wirtschaftsrecht («Liechtenstein Business Law»); Liechtenstein Verlag, Schaan 2009, ISBN 978-3-905762-04-4, German only.

**MARXER & PARTNER**

**RECHTSANWÄLTE**

Marxer & Partner | Attorneys-at-Law
Heiligkreuz 6 · 9490 Vaduz · Liechtenstein
Phone +423-235.81.81 · Fax +423-235.82.82
info@marxerpartner.com · www.marxerpartner.com/en

# Exhibit B

**BuzzFeed.News**        REPORTING TO YOU

WORLD

# The Panama Papers May Help Unravel The Corruption "Deal Of The Century"

Anti-corruption investigators who have spent years probing a deal between an Israeli diamond dealer and the West African country of Guinea hope the Panama Papers will shed light on one of the most lucrative mining contracts in Africa's history.



**Monica Mark**
BuzzFeed News World Correspondent

Last updated on April 7, 2016, at 2:37 p.m. ET
Posted on April 6, 2016, at 10:08 p.m. ET



A woman walks past a diamond mining company owned by Israeli diamond magnate
Beny Steinmetz in Sierra Leone
*Issouf Sanogo / AFP / Getty Images*

When Israeli tycoon Beny Steinmetz signed a deal for
a 50% stake in one of the world's richest mineral
deposits, he expected it would rake in the kind of
money that had propelled him to the top of global rich
lists. As a prolific buyer of De Beers' diamonds, and a
supplier to the likes of Tiffany & Co., Steinmetz was
used to maneuvering the murky world of mining. The
Simandou mine, filled with iron ore and located in a
remote forest in West Africa's Guinea, was supposed
to be no different.

But Steinmetz's investment, made in 2008, sucked
him into a scandal of staggering proportions. The first
cracks appeared when a new government came to
power in 2010 and began investigating mining
contracts. Since then, there have been raids on offices
linked to the billionaire in Switzerland, alleged
associates nabbed by FBI stings, purported allies
turned informants, and a lengthy and bitter public
battle with the current government of Guinea, where
an independent inquiry concluded that he acquired
the stake through corruption under former dictator
Lansana Conté. Steinmetz's company, BSG Resources
Ltd. (BSGR), denies paying any bribes and all other
charges against them.

The scandal has gone on for years now as investigators build their case, attempting to show that BSGR used a shell company to bribe the wife of the country's former dictator in exchange for their stake in a mine valued at $4 billion — for which they paid nothing. That Mamadie Touré took bribes isn't in question. But there was always one piece missing — how do you go about proving the bribes came from BGSR? Now that may be about to change.

On Sunday, journalists around the world, coordinated by the International Consortium of Investigative Journalists (ICIJ), began publishing information from one of the top offshore law firms in the world, Mossack Fonseca. Within the documents, called the Panama Papers, is an email that may hand transparency campaigners their evidence.

"BSG uses off shore companies and structures as part of its legitimate and fiscally responsible tax planning," a spokesman for the company, which goes by both BSG and BSGR, wrote to BuzzFeed News by email in response to questions about information within the Panama Papers. "When relevant disclosure of these arrangements is required by law or regulators it is given. There has been no wrongdoing by BSG."

An independent inquiry in Guinea — later accepted by the government — did not think the same. It concluded in 2014 that BSGR acquired its mining

permits through "corrupt practices," and stripped the company of them.

The mining sector is one of the worst afflicted by corruption, but nailing it has been notoriously difficult. It has been estimated that Africa loses at least $50 billion annually — though some estimates put it three times as high — through illicit outflows that are then stashed in tax havens like Panama. Anti-corruption and pro-transparency organizations like Global Witness now hope that the information in the Panama Papers — including names linked to Steinmetz — may expose the corrupt practices underpinning what has come to be known as "the deal of the century."

The confidential documents from Mossack Fonseca, which were leaked to German newspaper *Suddeutsche Zeitung* and shared with the ICIJ and more than 100 news organizations worldwide, names at least 18 Africans so far. Almost all of them are linked to the continent's vast natural wealth industry, which routinely enriches African elites while doing little to improve the lives of most citizens. Journalists have so far examined only a fraction of the 11 million documents that were leaked.



Guinean President Alpha Condé
*Remy De La Mauviniere / AP*

On the surface, Steinmetz's investments in Guinea, a country that consistently languishes at the bottom of global poverty indexes, appeared straightforward enough. Buried beneath the Simandou mine, in the country's hilly interior, were thousands of tons of iron ore needed to fuel a global construction boom. In 2008, government officials accused the mine's operator, British-Australian mining giant Rio Tinto, of deliberately leaving it fallow for over a decade, mainly to block competitors from acquiring it while they themselves concentrated on other mines. The government stripped Rio Tinto of ownership in 2008 and handed half of the mine's four concessions to Steinmetz's company, BSGR.

The dramatic change in ownership was pushed through just a few days before former dictator

Lansana Conté died at age 74 in December 2008. BSGR didn't actually pay for the mine, but instead pledged to invest $165 million into exploring and upgrading it. Two years later, they sold 51% of their stake to another company — this time for $2.5 billion.

Put another way, BSGR netted a profit of some $2.2 billion — then worth twice the entire GDP of Guinea — in return for investing just $165 million. That prompted Mo Ibrahim, the Sudanese billionaire whose foundation promotes good governance in Africa, to ask whether "the Guineans who did that deal" were "idiots, or criminals, or both."

Investigators from Global Witness believe BSGR's backdoor entrance to the deal was Touré, Conté's fourth wife. She has told investigators she was offered millions in bribes by a representative of BSGR in exchange for guaranteeing they got the concessions.

Alpha Condé, who was elected president in 2010, vowed to crack down on corruption in the mining sector upon coming to power, and looked into the deal as part of that pledge. Using evidence from the Guinean government's report, the FBI and Department of Justice began their own probes into whether the Foreign Corrupt Practices Act had been violated. FBI agents had Touré, the former dictator's wife, wear a wire and tape a conversation in which a BSGR representative, a French citizen named Frederic

Cilins, offered her millions of dollars to destroy potentially incriminating documents. When agents later swooped in on Touré's Florida property, where she was then living, they seized $1 million worth in assets, including properties and restaurant equipment they claimed were connected with the alleged bribes. Cilins was jailed for two years on charges of obstructing an anti-corruption investigation.

From there, though, the trail became too tangled to trace. Transcripts from the wiretaps, released by the Guinean investigations team, include a conversation in which Cilins tells Touré to destroy apparently corrupt contracts "urgently" — instructions he says come directly from Steinmetz. The Guinean probe had found checks and contracts purportedly exchanged between the two, which it said were evidence of the bribes.

BSGR has argued in court that Cilins was not a formal employee at the time and therefore his actions were independent of the company, and said the evidence from the Guinean probe is "fabricated," Global Witness campaigners said. Steinmetz is also suing the company for their reports.

"Investigators are trying to prove that BSGR bribed its way to getting Simandou and for that they need access to the offshore documents," Daniel Balint-Kurti, a Global Witness researcher, told BuzzFeed

News. "One of the important things the Panama Papers is doing is revealing the ownership of secret companies like Onyx and Pentler, which were shrouded in mystery."

These two companies are at the heart of the investigations. One payment of at least $2 million was made to Touré through Matinda, a company incorporated in the British Virgin Islands that she owned, and which in turn had received that cash from a company called Pentler Holdings Ltd., according to documents that form the basis of the indictment by the feds. Co-founded by Cilins, Pentler itself came under investigation by Mossack Fonseca's legal department in 2014, as they tried to determine the owner behind it. The question came down to Onyx — a company that helped incorporate Pentler.

"Onyx is important because it set up … Pentler Holdings, a shadowy offshore company that signed corrupt deals in one of the world's biggest mining scandals," Leigh Baldwin from Global Witness told the ICIJ.

And here's where BSGR comes back in. Onyx is a company that provides administrative and management services for BSGR. Onyx's chief executive is also a director on the board of BSGR.

BSGR has described Onyx as wholly separate and fully independent. Mossack Fonseca, according to the leaked Panama documents, came to a different conclusion in 2014: "They are the same," an email from the Mossack Fonseca's compliance department <u>said</u>.

"This email tightens the noose around BSGR. It makes it much harder for them to argue that they were independent of the companies involved in the Simandou bribery case," Global Witness's Balint-Kurti told BuzzFeed News.

BSGR claims the Guinean government are corrupt, and have launched a case against them which will open in January 2017. Neither Steinmetz nor BSGR have been charged in the Swiss or American inquiries, which are both in the preliminary stages. "When it goes to court, we can expect BSGR to use the same argument it's been using in public, which is that whatever [bribes were paid] did not engage BSGR or Beny Steinmetz," Balint-Kurti said.



Monica Mark is the West Africa Correspondent for BuzzFeed News and is based in Dakar, Senegal.

Contact <u>Monica Mark</u> at <u>monica.mark@buzzfeed.com.</u>

Got a confidential tip? <u>Submit it here.</u>

# Exhibit C

15th August 2013
www.globalwitness.org



**global witness**

# New evidence ties BSGR to company behind Guinea mine bribery

- *Beny Steinmetz Group Resources director set up company that promised bribes*

- *BSGR misled with claims Pentler Holdings was set up independently*

- *Representatives wired payments to president's wife*

- *Global Witness revealed in April that BSGR and Pentler signed corrupt contracts*

A director of Beny Steinmetz Group Resources set up a company that signed corrupt deals with the wife of an African president in a multi-billion-dollar mine scandal, Global Witness has learned.

Pentler Holdings Ltd, an offshore company that held shares in BSGR's mining interests in Guinea, promised millions of dollars in bribes, according to contracts seen by Global Witness. BSGR says Pentler was established independently. New information shows that claim is misleading.

In April Global Witness revealed that BSGR and Pentler promised Mamadie Touré, a wife of former Guinean President Lansana Conté, millions of dollars to help obtain rights to Simandou – a remote mountain range that may be the world's largest iron ore reserve. In Guinea, where nearly half the population live on less than a dollar a day, ordinary people have yet to benefit from that wealth.[1]

In 2008, the Beny Steinmetz Group was already a major player in the global diamonds trade—the biggest buyer of rough diamonds from De Beers[2] and a leading supplier to New York luxury jeweller Tiffany & Co. But in mining, BSGR was still a junior dwarfed by giants like Rio Tinto and Vale. Then it pulled off the seemingly impossible:  it acquired rights to Simandou for nothing and the next year sold half of them on for $2.5 billion—more than twice Guinea's entire state budget for 2010. The Sunday Times called it "the deal of the century".[3] A US grand jury is investigating.

The bribes were detailed in the contracts signed by both Pentler and BSGR. Those documents are also cited extensively in US court records.[4] In one of the contracts, Mamadie Touré signs to confirm receipt of $2.4 million.

BSGR's former representative in Guinea is under arrest in the US for trying to destroy the

**Contact:**
**Daniel Balint-Kurti** | t: +44 (0) 207 492 5872 | m: +44 (0)7912 517 146 | e: dbalint-kurti@globalwitness.org
**Leigh Baldwin** | t: +44 (0) 207 492 5889 | m: +44 (0)7715 068 300 | e: Lbaldwin@globalwitness.org

1

documents and obstructing a grand jury investigation. BSGR argues that the contracts are forged.[5] It says the corruption allegations are "entirely baseless" and that it has always acted "to the highest standards of corporate governance".

**Intimate links**

BSGR says Pentler was established independently by three people who acted for BSGR in Guinea: Frédéric Cilins, Michael Noy and Avraham Lev Ran.[6] Global Witness has seen evidence that Pentler in fact belonged to Onyx Financial Advisors, a company intimately linked to the Beny Steinmetz Group.

When Pentler was set up in the British Virgin Islands on 28 October 2005, all 50,000 of its shares were held by Onyx Financial Advisers, according to Pentler's certificate of authorised capital, seen by Global Witness. The signature on the certificate is that of Sandra Merloni-Horemans, a director of both Onyx and BSGR.[7]

The Onyx name has been used by the Beny Steinmetz Group in more than one country – the UK, Switzerland and the British Virgin Islands and possibly others – making it unclear which of several entities founded Pentler.[8] What is clear is the link with BSGR.

Onyx's chief executive officer, Dag Cramer, is also a BSGR director and heads two other Steinmetz group companies.[9] Onyx in London was originally incorporated in 2005 as BSG Management Services Ltd before changing name in 2011.[10]

Merloni-Horemans is also a director of Onyx (UK)'s Geneva-based parent company. US stock exchange filings show that Nir Livnat, executive chairman of the Beny Steinmetz Group, can be contacted care of Onyx in Geneva.[11] The same document also gives Onyx, Geneva as the contact address for Steinmetz's brother, Daniel, who owns a stake in the Steinmetz Group.[12]

**The Mayfair Set**

In London, Onyx Financial Advisors manages investments for Beny Steinmetz Group companies[13] and shares an address with BSGR.[14] That Park Lane office is on the business cards of Cramer and Asher Avidan, BSGR's president – a sign that the location is central to both companies' operations.



Frédéric Cilins represented BSGR in Guinea from 2005 as it sought rights to Simandou.[15] In July 2008 the government confiscated half of the concession from Australian mining giant Rio Tinto. Five months later, the rights were handed to BSGR.

**Contact:**
**Daniel Balint-Kurti** | t: +44 (0) 207 492 5872 | m: +44 (0)7912 517 146 | e: dbalint-kurti@globalwitness.org
**Leigh Baldwin** | t: +44 (0) 207 492 5889 | m: +44 (0)7715 068 300 | e: Lbaldwin@globalwitness.org

Contracts dated between 2006 and 2010 show Pentler promised Touré cash and shares to advance the deal.[16]

In April Cilins was arrested in an FBI sting after trying to pay Touré to destroy her contracts with Pentler and BSGR Guinea, according to a US indictment.[17]  His partners, Noy and Lev Ran, also feature in the court documents: An FBI wiretap recorded Cilins discussing his progress with Noy, while both Lev Ran and Cilins handled payments, the court heard.

Noy declined to comment when contacted by Global Witness through a third party. Lev Ran did not respond to written requests for comment. There are no charges against Noy and Lev Ran.

FBI surveillance transcripts show Cilins tried to persuade Touré to sign a document saying she had never taken bribes, the prosecution told the court. Bank records show both Cilins and Lev Ran personally transferred hundreds of thousands of dollars to her, it said. Cilins wrote checks from an Israeli bank account with a balance of more than

$1 million,[18] while Lev Ran wired funds to Touré.[19] "We have never denied there were wire transfers to Mamadie Touré," Cilins' defence attorney told the court on 3 July, adding that the payments were for legitimate business.[20]

"The whole case is slander," Noy was quoted as saying in a 30 June 2013 interview with Ynet News, the website of Israel's Yedioth Ahronoth newspaper. "It's all nonsense, but unfortunately there's a legal procedure and I can't respond to everything."

### Power of attorney

BSGR says Cilins, Noy and Lev Ran set up Pentler on their own to formalise the trio's existing activities in Guinea.

"Lacking a permanent presence in Guinea, BSGR sought to work with Michael Noy, Avraham Lev Ran and Frédéric Cilins, who had extensive business operations in Guinea, which they subsequently established as Pentler Holdings," BSGR said in a 9 May statement on its website.[21]

**The Mysterious Margali**

Pentler's certificate of authorised capital, an incorporation document that details the company's shareholders, is stamped by Margali Management as the company's sole director. It is unclear who owns Margali because the company is registered in the opaque British Virgin Islands, where that information is secret.  It has the same BVI address as Mossack Fonseca & Co, the services provider that incorporated both Pentler and Onyx Financial Advisors Ltd (BVI).  Mossack Fonseca is "believed to be an industry leader" in creating anonymous offshore firms, The Economist wrote in April 2012.[22]

Margali also assisted in BSGR's high-profile deals with New York luxury jeweller Tiffany & Co. In March 2011, Tiffany lent $50 million to Koidu Holdings SA, a Beny Steinmetz Group company that operates a diamond mine in Sierra Leone.  Margali signed the loan agreement as a director of Koidu. BSGR guaranteed the loan. The contact for both Koidu and BSGR is Sandra Merloni-Horemans and the address given is Onyx's office in Geneva.[23]

**Contact:**
**Daniel Balint-Kurti** | t: +44 (0) 207 492 5872 | m: +44 (0)7912 517 146 | e: dbalint-kurti@globalwitness.org
**Leigh Baldwin** | t: +44 (0) 207 492 5889 | m: +44 (0)7715 068 300 | e: Lbaldwin@globalwitness.org

3



*BSGR President Asher Avidan signed contracts with Mamadie Touré, promising the former Guinean president's wife huge bribes to help obtain mining rights. On the right is Mamadie Touré's brother, Ibrahima Sory Touré – also a top BSGR official.*

Avraham Lev Ran was one of Pentler's founders, according to BSGR.  That should have given him power to act for the company. But Global Witness has learned that Lev Ran was not authorised to act on Pentler's behalf until 13 February 2006 – three and a half months after it was created – when Pentler granted him power of attorney. Merloni-Horemans, the Onyx and BSGR director, signed the authorisation.

Just a week later, that authority was used to transfer 33 per cent of Pentler to Mamadie Touré.[24] The following month, Pentler acquired 17.65 per cent of BSGR's Simandou holding. That would have given Touré a 5.9 per cent stake in a mine estimated to be worth billions of dollars. (It is unclear if this contract was implemented: a later contract, signed by BSGR in June 2007, puts Touré's stake at 5 per cent.)

**Unanswered questions**

While confirming that he travelled to the US to obtain the contracts, Cilins said in his defence that they were forgeries and that Touré was using them for blackmail.[25] His attorney compared Cilins' actions to those of a restaurant owner who pays a small settlement to settle a customer's false claim of slipping on his floor, rather than face a costly legal battle.[26]

BSGR also says the contracts are not genuine. "Our client (and the relevant employees and individuals involved) has informed us that the documents which you allege are signed by our client are in fact forged," wrote Skadden, Arps, Slate, Meagher &

**Contact:**
**Daniel Balint-Kurti** | t: +44 (0) 207 492 5872 | m: +44 (0)7912 517 146 | e: dbalint-kurti@globalwitness.org
**Leigh Baldwin** | t: +44 (0) 207 492 5889 | m: +44 (0)7715 068 300 | e: Lbaldwin@globalwitness.org

Flom, a London law firm acting for BSGR, in a 4 June letter to the Guinean mining committee investigating the Simandou deals. "Versions of the alleged documents have been used in previous attempts to blackmail our client in connection with false allegations of bribery and corruption."[27]

Global Witness sent questions about Pentler to BSGR and Rory Godson, a former business editor of the Sunday Times whose London firm Powerscourt represents BSGR (see endnotes).[28]

Both BSGR and Powerscourt declined to answer the questions. The only response was a threatening letter from BSGR's solicitors, Mishcon de Reya, which appeared to acknowledge the relationship between Onyx and Pentler.

Global Witness's questions "relate in part to confidential information that could not have been obtained except direct from one or two Onyx employees or from its computer systems," Mishcon lawyer James Libson wrote on 26 July. "Please explain, as a matter of urgency, how you obtained information about Onyx and any connection with Pentler Holdings Limited and Margali Management."

**Spotlight on Beny Steinmetz**

These new revelations add to pressure on BSGR to explain its dealings over Simandou, including its involvement with Pentler. At the same time, focus is also sharpening on Beny Steinmetz himself.

While BSGR has said that Steinmetz is just a consultant to the company,[29] he and his family are the only publicly known beneficiaries of trusts that own the Beny Steinmetz Group.[30] Ehud Olmert, a

former Israeli prime minister reported to have lobbied for BSGR,[31] described Steinmetz as a "one-man show", according to The New Yorker.[32]

Cilins' indictment details his telephone call to a "co-conspirator", identified in court documents only as CC-1. The New Yorker and two other publications – Israel's Ynet News and Main Justice, a US website – have now identified that co-conspirator as Steinmetz.[33] This confirms information given to Global Witness by a person with knowledge of the investigation.

In the text of a telephone call submitted to the court by the FBI, Cilins told Touré how CC-1 personally ordered him to destroy the contracts:

"I went specially to see him [CC-1]," Cilins said. "I told him. . . [Mamadie Touré] will never betray you – [Touré] will never give away any documents."

According to Cilins, CC-1 said:  "I want you to destroy these documents…I want you to tell me, 'I saw that the documents were destroyed; it's over, there are no more documents.'"[34]

The United States attorney has made clear that the grand jury is interested in Steinmetz personally, as well as BSGR.

A grand jury subpoena served on Touré on 2 February ordered her to hand over "any and all documents … reflecting or otherwise concerning: the Simandou concession, **Beny Steinmetz**, BSG Resources Ltd. and related entities" (Emphasis added).[35]

"BSGR operates in a fully transparent manner, working in partnership with host governments at

Contact:
**Daniel Balint-Kurti** | t: +44 (0) 207 492 5872 | m: +44 (0)7912 517 146 | e: dbalint-kurti@globalwitness.org
**Leigh Baldwin** | t: +44 (0) 207 492 5889 | m: +44 (0)7715 068 300 | e: Lbaldwin@globalwitness.org

both national and local level," BSGR said in its 9 May press release. "Good governance is intrinsic to its Group mission."

Guineans have long been trapped in poverty as elites siphon off the nation's wealth. Global Witness has demonstrated clear evidence of corruption over Simandou, one of Africa's most valuable assets.  BSGR's stated commitment to transparency means it now needs to explain its ties to the offshore company at the centre of the storm.

---

**Notes to editors:**

1. For Global Witness's previous statements on BSGR and Simandou, see:

   1. Damning video and contracts show BSGR was lying in Guinea mining scandal
      http://www.globalwitness.org/library/damning-video-and-contracts-show-bsgr-was-lying-guinea-mining-scandal   (19 April 2013)
   2. Corruption arrest in US puts Beny Steinmetz Group Resources in the frame
      http://www.globalwitness.org/library/corruption-arrest-us-puts-beny-steinmetz-group-resources-frame   (16 April 2013)
   3. Beny Steinmetz Group Resources must publicly address questions over Guinea mining concession
      http://www.globalwitness.org/library/beny-steinmetz-group-resources-must-publicly-address-questions-over-guinea-mining-concession   (9 November 2012)

2. Pentler Holdings Ltd was incorporated on 28th February 2005 in the British Virgin Islands. BSGR said in a 9 May statement that the company was set up by its advisers Frédéric Cilins, Michael Noy and Avraham Lev Ran, after which "Pentler took a participation of 17.65 per cent equity stake in BSGR Guinea Ltd BVI in March 2006. This arrangement ended when BSGR re-acquired the entire equity from Pentler Holdings in March 2008."

3. Global Witness's questions to BSGR and Powerscourt:

   1. Is Beny Steinmetz, as an individual, in any way a subject of investigations surrounding the court case United States of America v. Frédéric Cilins (Case 1:13-cr-00315-KMW)?
   2. Publicly available documents pertaining to the case allege transfers by Avraham Lev Ran to entities linked with Mamadie Toure. Does BSGR acknowledge that these payments took place?
   3. Were BSGR or any of its employees or advisers aware of these payments?
   4. If so, were the payments in any way connected with BSGR's activities in Guinea?
   5. A 9th May press release by BSGR states: "Lacking a permanent presence in Guinea, BSGR sought to work with Michael Noy, Avraham Lev Ran and Frédéric Cilins, who had extensive business operations in Guinea, which they subsequently established as Pentler Holdings." Did BSGR have any involvement

**Contact:**
**Daniel Balint-Kurti** | t: +44 (0) 207 492 5872 | m: +44 (0)7912 517 146 | e: dbalint-kurti@globalwitness.org
**Leigh Baldwin** | t: +44 (0) 207 492 5889 | m: +44 (0)7715 068 300 | e: Lbaldwin@globalwitness.org

in the establishment of Pentler Holdings? If so, please describe this involvement in as much detail as possible.

6.

    a. How much did Pentler pay for its 17.65 per cent of BSGR Guinea Ltd. BVI?

    b. Did the agreement for the transfer include provision to transfer part of this stake to Mamadie Toure?

    c. Was a transfer to Mamadie Toure or her companies in any way envisaged at the time of the transfer?

7. Did Matinda, or any other entity related to Mamadie Toure, at any time receive a stake in Pentler, or a stake in Simandou in any other form?

8. How much did BSGR pay to reacquire Pentler's equity in 2010?

9. Could BSGR provide full details of the all beneficiaries of Pentler, past and present?

On 11 July 2013, Global Witness sent additional questions to BSGR, Powerscourt and Onyx:

1. What is the Beny Steinmetz Group's relationship with Onyx Financial Advisors?

2. Is Onyx Financial Advisors a Beny Steinmetz Group company?

3. Who is/are the beneficial owner(s) of Onyx Financial Advisors SA (Switzerland)?

4. Who is/are the beneficial owner(s) of Onyx Financial Advisors (BVI)?

5. Aside from the Onyx Financial Advisors registered in the UK, British Virgin Islands and Switzerland, are there any other companies by that name in any jurisdiction?

6. Which, if any, of these Onyx Financial Advisors are owned by or associated with the Beny Steinmetz Group?

7. Did Onyx Financial Advisors have any involvement in the establishment of Pentler Holdings Ltd?

8. Was Sandra Merloni-Horemans involved in establishing Pentler Holdings Ltd?

9. Is Margali Management part of, or is it any way connected with, the Beny Steinmetz Group?

---

**Endnotes**

[1] Source: United Nations Millenium Development Goals Indicators http://bit.ly/w1s5gU

[2] "Today, Steinmetz is the largest buyer of rough diamonds from De Beers, and one of the major suppliers of Tiffany & Company." The New Yorker, "Buried Secrets: How an Israeli billionaire wrested control of one of Africa's biggest prizes", by Patrick Radden Keefe, July 8, 2013:  http://nyr.kr/13gLgSy (last accessed 7 August 2013). See also Forbes.com, "The World's Billionaires #488: Beny Steinmetz" http://onforb.es/19torxq  (last accessed 7 August 2013) and Diamond Certification Laboratory of Australia, "Sierra Leone diamond miner set for HK listing", 22 January 2012 http://dclacertificationlaboratory.blogspot.co.uk/2012/01/sierra-leone-diamond-miner-set-for-hk.html (last accessed 7 August 2013)

**Contact:**
**Daniel Balint-Kurti** | t: +44 (0) 207 492 5872 | m: +44 (0)7912 517 146 | e: dbalint-kurti@globalwitness.org
**Leigh Baldwin** | t: +44 (0) 207 492 5889 | m: +44 (0)7715 068 300 | e: Lbaldwin@globalwitness.org

[3] The Sunday Times, "Deal of the Century", by Danny Fortson, 6 May 2012. The article says: "a year and a half after snatching it [Simandou] up, Steinmetz sold a 51% stake of the concession — which he received for free — to Vale for $2.5 billion in August 2010." The Financial Times also reported that "BSGR had paid nothing for its permits at Simandou, as is standard practice in the industry"; see "What lies beneath", 7 November 2012, by Tom Burgis, Helen Thomas and Misha Glenny; http://www.ft.com/cms/s/0/db0642da-2827-11e2-a335-00144feabdc0.html#axzz2Bd1yygZ8  See also Global Witness's 9 November 2012 2013 statement: http://www.globalwitness.org/library/beny-steinmetz-group-resources-must-publicly-address-questions-over-guinea-mining-concession.

[4] The contracts are cited in *United States of America v. Frédéric Cilins*, United States District Court, Southern District of New York, document 13, filed 6 June 2013. The testimony was given on 15 April (see Global Witness 16 April 2013 statement: http://www.globalwitness.org/library/corruption-arrest-us-puts-beny-steinmetz-group-resources-frame).

[5] See quotation from lawyers' letter later in article. Also see, for example, BSGR's 9 May 2013 statement, "Response to BSGR Guinea press speculation", posted here http://www.bsgresources.com/media and last retrieved by Global Witness on 7 August 2013: "BSGR has always, and will continue to act to the highest standards of Corporate Governance in all 12 countries in which it operates. In all of these countries BSGR operates in a fully transparent manner, working in partnership with host governments at both national and local level. Good governance is intrinsic to its Group mission of balancing business success with its responsibilities to the communities in which it operates and the environment that supports them. BSGR is confident that its activities and position in Guinea will be fully vindicated…Against the background of the exceptional commercial success of BSGR in Guinea and the subsequent media exposure surrounding the deal, BSGR became the victim of numerous extortion attempts by individuals who were seeking economic gains. The modus operandi of these attempts involved at times the use of forged documentation, blackmail and harassment." Questioning the authenticity of the contracts is also an argument used by Cilins in his defence: See *United States of America v. Frédéric Cilins*, document 16, filed 13 June 2013. A defence submission filed on July 8 2013 (document 32) included an affidavit from a forensic document analyst, Albert H. Lyter III, examining "inconsistencies or irregularities that would cause concern regarding the validity or veracity" of the contracts. Lyter makes observations that are "sufficient to question the validity and veracity of the examined documents, including: the presence of multiple type fonts on several documents, noting that "a simple addition of material not originally present on the document must be considered"; "several documents contained images of the same signature… the presence of the same signature on multiple documents is an indication of manipulation of the documents"; "several signatures and/or signature blocks… appear to be misaligned in relationship to the remaining text of the documents. This may be due to the addition of material via manipulation of the document". Lyter said that "a full and complete examination of the original documents using all of the requisite tools and methods of examination available would be the appropriate next step".

[6] See BSGR's 9 May Statement

[7] According to filings from UK Companies House [ADD DOC LINK], retrieved by Global Witness on 8 July 2013, Sandra Merloni-Horemans is both a director and company secretary of Onyx Financial Advisors Ltd (see filing of 20 May 2005 for BSG Management Services Ltd ("First directors and secretary and intended situation of registered office"). According to the certificate of incorporation, Onyx was incorporated by Dag Cramer on 20 May 2005 as BSG Management Services Limited. Companies House records show that the company changed

**Contact:**
**Daniel Balint-Kurti** | t: +44 (0) 207 492 5872 | m: +44 (0)7912 517 146 | e: dbalint-kurti@globalwitness.org
**Leigh Baldwin** | t: +44 (0) 207 492 5889 | m: +44 (0)7715 068 300 | e: Lbaldwin@globalwitness.org

8

its named to Onyx Financial Advisors on 7 March 2011. Filings in Geneva for Onyx's parent company, Onyx Financial Advisors SA, retrieved the same day, also list Merloni-Horemans as a director.

[8] See the following links for incorporation documents from the UK, Switzerland and the British Virgin Islands
UK: http://bit.ly/14LY5Vz
BVI: http://bit.ly/1eK1GSR
Swiss: http://bit.ly/1bvP4yT

[9] For Dag Cramer, see "Meet the team" on the BSGR website:
http://www.bsgcapitalmarkets.com/about/meet-the-team.aspx (last accessed 12 July 2013). It reads: "Dag Cramer is the CEO of BSG Capital Markets and BSG Management Services… In 2003 he joined Onyx SA as CEO. Onyx provides management and administrative services to BSG Investments." The website also has information regarding Sandra Merloni-Horemans, see "Meet the board" on BSGR's website:
http://www.bsgresources.com/about/meet-the-board (last accessed 12 July 2013). It says: "She joined BSGR in 1989 and has extensive experience in natural resource projects and capital market operations."
Dag Cramer: http://bit.ly/13kDvdX
Sandra Merloni-Horemans: http://bit.ly/1cChMSR

[10] See the following links for incorporation documents from the UK, showing the name change [LINK HERE]

[11] http://www.sec.gov/Archives/edgar/data/1292026/000120919105009569/xslF345X02/doc3.xml

[12] "Brother and partner of diamond billionaire Benny Steinmetz, Daniel Steinmetz, with his son Raz, owns a stake in the Steinmetz Group." http://www.forbes.com/lists/2006/81/biz_06israel_Daniel-Raz-Steinmetz_4QAX.html

[13] Onyx is BSGR's "management and administration company", according to particulars of claim filed by BSGR with the High Court in London in April 2013. Onyx also provides management and administrative services to BSG Investments, according to Dag Cramer's profile on the website of BSG Capital Markets
Screenshot: http://bit.ly/1cChMSR
http://www.bsgcapitalmarkets.com/about/meet-the-team.aspx

[14] See the following links for screenshots of the Onyx and BSGR contact pages, accessed by Global Witness on 8 July 2013
Screenshot of BSGR contact page: http://bit.ly/15EUP7I
Screenshot of Onyx contact page: http://bit.ly/1a5cKw8
The BSGR contacts page is http://www.bsgresources.com/contact-us and the address for Onyx Financial Advisers is http://www.onyxfa.com/contact-us/ (last accessed 12 July 2013).

[15] "M Cilins avait travaillé pendant des années en Afrique quand en 2005, il a informé BSGR du potentiel que pouvait renfermer la Guinée en termes de projets portant sur les télécommunications et les ressources minérales," BSGR wrote on 26 December to Guinea's Mining Review Committee (letter seen by Global Witness). "M Cilins a assisté ou représenté BSGR au cours de réunions avec le Ministre des Mines et le Centre de Promotion et de Développement Miniers." (Translation: Mr Cilins had worked for years in Africa when, in 2005, he informed BSGR of the potential that Guinea could have in terms of telecommunications and mineral

**Contact:**
**Daniel Balint-Kurti** | t: +44 (0) 207 492 5872 | m: +44 (0)7912 517 146 | e: dbalint-kurti@globalwitness.org
**Leigh Baldwin** | t: +44 (0) 207 492 5889 | m: +44 (0)7715 068 300 | e: Lbaldwin@globalwitness.org

resource projects. Mr Cilins assisted or represented BSGR during meetings with the Minister of Mines and the Centre de Promotion et de Développement Miniers.)

[16] Contracts seen by Global Witness.

[17] See Global Witness statement of 19 April: http://www.globalwitness.org/library/damning-video-and-contracts-show-bsgr-was-lying-guinea-mining-scandal.

[18] *United States of America v. Frederic Cilins*, court transcript 3 July 2013: Prosecution: "…he told the Pretrial Services officer that the only account that he has is a bank account in which he owns – he has 200 euros in a checking account, that he doesn't have another savings account. We now find that he does have other accounts, he has an account in – a Wachovia Bank account, PHA Investment Account, that's I believe what defense counsel was referring to, that's the account to which $150,000 flowed from his other bank Leumi account into that account and then out from that account in two checks in 2010 to the cooperating witness…" […] "But what I think your Honor knows – what we know objectively is that we have a Bank Leumi account, which we don't have the details on, that's where the 150,000 came that went to the cooperating witness…" […] Defence:  "So you Honor, as I said earlier, I was aware that he had had – the government has produced the Bank Leumi account. I was aware that he had a Bank Leumi account. Mr. Cilins has indicated to Mr. Lehr while we were – while this was going on that the last time he knew there was money in the Bank Leumi account, there was over a million dollars in that Bank Leumi account. He does not know what is in it now, he has not had access to it for months, but the last there was a money in a Bank Leumi account it was a bank sitting there for monies that he dealt with business." […] Prosecution: "Although defense counsel sort of breezed by it, now it seems that the defendant has admitted that's a bank account at Bank Leumi which at last he knew had a million dollars or perhaps more in it. And that is in contradiction to what he told Pretrial Services that the only account he had was a checking account with 200 euros. So I mean that's just another example of the misstatements the defendant has made."

[19] *United States of America v. Frédéric Cilins,* document 13: "Bank records also show that this same Avraham Lev Ran – a co-owner of the Surf Road LLCs – transferred $149,970 and $99,970 on July 21 and August 5, 2010, respectively, from an account in Israel to an account in Florida that belonged to the CW [Mamadie Touré]." *United States of America v. Frédéric Cilins*, transcript 3 July 2013: "…bank records show […] that the defendant transferred two checks in in 2010, one for roughly 100,000, one for 50,000, from himself to the cooperating witness [Mamadie Touré]".

[20] *United States of America v. Frédéric Cilins*, transcript 3 July 2013: Cilins defence attorney, Michelle Smith, told the court: "Your Honor, I would like to begin my reply beginning back with Avraham Lev Ran and the wire transfers to Mamadie Touré. Your Honor, we have never denied there were wire transfers to Mamadie Touré, the government's informant in this case, and indeed the documents that we believe the government have in its possession on Mr. Cilins' thumb drive and computers indicate they conducted legitimate business over the years, including chicken, a school in Guinea, the purchase of computers and other documents. And your Honor these span back to 2007, 2008, 2010, 2011. There may have been some business in 2012 […] For example I have a document here for $113,000 worth of computer equipment, another 97,000, the building of a school in Conakry, the building of a school on another piece of land, on and on, legitimate business between these parties going back for years."

**Contact:**
**Daniel Balint-Kurti** | t: +44 (0) 207 492 5872 | m: +44 (0)7912 517 146 | e: dbalint-kurti@globalwitness.org
**Leigh Baldwin** | t: +44 (0) 207 492 5889 | m: +44 (0)7715 068 300 | e: Lbaldwin@globalwitness.org

[21] http://www.bsgresources.com/media (last accessed 7 August 2013). Screenshot: http://bit.ly/15EUWjK

[22] See The Economist, "Shells and shelves", 7 April 2012:http://www.economist.com/node/21552196 (last accessed 12 July 2013).

[23] A US Securities Exchange Commission filing by Tiffany & Co. detailing the loan agreement can be viewed here: http://apps.shareholder.com/sec/viewerContent.aspx?companyid=TIF&docid=7845512

[24] Contract seen by Global Witness

[25] *United States of America v. Frédéric Cilins*, document 16, p8: "Mr. Cilins' various telephone calls and meetings between himself and Mamadie Toure in Jacksonville, Florida in 2013 were to obtain these false documents so that he and BSGR and others could no longer be blackmailed and extorted," the defence told the court in a submission dated 13 June 2013.

[26] *United States of America v. Frédéric Cilins*, transcript 3 July 2013: "If the documents are false, he [Cilins] did not commit a crime," Cilins' defence attorney, Michelle smith, told the court. "...the point I'm trying to make, Judge, is that just like a business settles nuisance lawsuits. We see it every day in the civil arena. Somebody comes in, I slipped and fell in your restaurant.  The restaurant owner knows it didn't happen, and their lawyer says yeah, but it will cost you $100,00 to defend the suit, pay him 75, pay him 100, pay him 125, whatever it is to get him out of your face, call the accountant and write it off. That is exactly what Mr Cilins was doing here. These documents had been put forth at least four separate times since 2010 as part of blackmail and extortion. At least on one occasion, if not two, the attorney for Ms Mamadie Touré backed down when their attorneys confronted them. He would have promised her the moon, the stars and the world."

[27] "Even without a full forensic examination it is clear that several of the documents attached to your letter are crude forgeries: Certain of the alleged documents, for example, bear official fiscal stamps. The (sequential) numbering on the stamps is not consistent with the purported dates of the documents themselves, i.e. stamps that appear on later documents contain numbering that precedes the numbering on stamps attached to earlier dated documents (which of course would be impossible if the documents and the stamps were genuine). This suggests that officials within the Guinea Government were complicit in the creation of such documents and, potentially, in the wider threat to our client's interests in Guinea. The other documents attached to your letter also contain notable discrepancies from the versions previously shown to our client in the circumstances described above." Letter seen by Global Witness, Skadden, Arps, Slate, Meagher & Flom (UK) LLP to Nava Touré, Comité Technique de Revue des Titres et Conventions Miniers, 4 June 2013.

[28] E-mail from Global Witness to BSGR and Rory Godson, 2 July 2013. See "Notes to Editors" for full list of questions submitted to BSGR.

[29] "Mr. Steinmetz is in fact a consultant for [the Beny Steinmetz Group], however it is broadly perceived in the public domain that these companies are interchangeable with Mr Steinmetz personally." Letter from Mishcon de Reya, acting for BSGR, to Global Witness, 15 February 2013.

**Contact:**
**Daniel Balint-Kurti** | t: +44 (0) 207 492 5872 | m: +44 (0)7912 517 146 | e: dbalint-kurti@globalwitness.org
**Leigh Baldwin** | t: +44 (0) 207 492 5889 | m: +44 (0)7715 068 300 | e: Lbaldwin@globalwitness.org

[30] "The Steinmetz family interests have extended into mining, oil, gas, power generation, real estate and financial investments. Beny and his immediate family are among the beneficiaries of trusts which own the Steinmetz business group (BSG)." 11 April 2013 statement by BSGR http://www.bsgresources.com/media

[31] See for example Maariv, 31 May 2009 (Hebrew): http://www.nrg.co.il/online/16/ART1/897/316.html

[32] The New Yorker, "Buried Secrets"

[33] Ynet News, "Beny Steinmetz reveals all cards", 30 June 2013: http://www.ynetnews.com/articles/0,7340,L-4398445,00.html. Main Justice, "Unnamed 'co-conspirator' in BSGR probe said to be Israeli Beny Steinmetz", 17 June 2013: http://www.mainjustice.com/justanticorruption/2013/06/17/unnamed-co-conspirator-in-bsgr-probe-said-to-be-israeli-beny-steinmetz/ . Both articles last accessed 12 July 2013.

[34] United States of America v. Frédéric Cilins, document 13

[35] Subpoena seen by Global Witness

**Contact:**
**Daniel Balint-Kurti** | t: +44 (0) 207 492 5872 | m: +44 (0)7912 517 146 | e: dbalint-kurti@globalwitness.org
**Leigh Baldwin** | t: +44 (0) 207 492 5889 | m: +44 (0)7715 068 300 | e: Lbaldwin@globalwitness.org

12

# Exhibit D



# Settlement of the Dispute between the Republic of Guinea and BSG Resources

February 25, 2019 02:00 AM Eastern Standard Time

LONDON--(BUSINESS WIRE)--The Republic of Guinea and Nysco, the 100% shareholder of BSG Resources ("BSGR") (together "the parties"), jointly announce the settlement of their dispute over mining concessions and licenses in the Republic of Guinea ("Guinea").

Following this agreement, BSGR relinquishes its claims on blocks 1 and 2 of SIMANDOU and both parties waive all outstanding procedures.

At the request of the Republic of Guinea, a new group of investors (presented by and including Mr. Beny Steinmetz) will exploit the ZOGOTA deposit, in order to export iron ore, according to an accelerated timetable.

The parties are delighted that this agreement opens a new chapter in their relationship that enables the development of a world-class mining project for the benefit of the people of Guinea.

## Contacts

For BSGR:

Buchanan

Bobby Morse, +44 (0)20 7466 5000

Senior Partner

BSGR@buchanan.uk.com

# Exhibit E



**EXPLORATION-PRODUCTION**

# Mick Davis and the team ready to take on Beny Steinmetz's former iron ore assets

The end to the epic legal battle between Conakry and **Beny Steinmetz Group Resources** (BSGR) over Guinea's vast iron ore resource *Simandou* on February 25, was shortly followed by the news that Sir **Mick Davis**, chief executive and treasurer of the UK's Conservative Party, will be overseeing the development of the smaller iron ore project *Zogota*. Davis is joined by a number of mining experts to start this new adventure.

## Sector veterans

The main member of the new group of investors "presented by and including" Israeli billionaire **Beny Steinmetz** to operate *Zogota* is London-based firm **Niron Metals**. This company, which was incorporated on June 12, 2018 with the aim to explore iron projects, has three directors, including Davis.

Davis is a sector heavyweight. He previously headed Swiss group **Xstrata**, which merged with Anglo-Swiss trading house **Glencore** in 2013. He was also the financial director of Australian concern **Billiton** before its merger with **BHP**, and held senior positions with South Africa's national power utility **Eskom** (IOL 682). He served as chairman of the Holocaust Memorial Commission of the United Kingdom and in February joined the board of British cybersecurity investment firm **Haven Cyber Technologies**.

Fellow Niron board member, British mining expert **Varda Shine**, built the bulk of her career climbing the ranks at **De Beers**, where she served as chief executive of the group's trading arm, **Diamond Trading Co**. Shine is currently a board member of South African platinum mining giant **Lonmin** and of Israeli diamond producer **Sarine Technologies** (AMI 426). She also works for British coaching firm **Merryck & Co**.

## A partner in nickel

Africa Mining Intelligence - 142 rue Montmartre - 75002 Paris, France - Tel: + 33 1 44 88 26 10 - Fax: + 33 1 44 88 26 15
client@indigo-net.com - Africaintelligence.com

| Page 1/2



The third Niron board member is Greek entrepreneur **Marcos Camhis**, who heads the Bahamas-based private equity firm **Global Special Opportunities** (GSOL), a shareholder of Niron. In 2015, **Americano Nickel**, a GSOL subsidiary, bought Glencore's shares in the Ivorian nickel project *Sipilou* alongside **IC Nickel**, of which **Marcus Struik**, the former MD of BSGR subsidiary **BSGR Metals & Mining Corp**, was appointed an advisor (AMI 393).

Camhis founded Geneva-based investment firm **Fos Asset Management** and set up **EFG Fund Solutions**, a platform run by Switzerland's **EFG Bank** that offers alternative investment solutions.

## End to the battle of the century

The path was made clear for Niron to enter Guinea's iron ore sector following the amicable settlement - as *Africa Mining Intelligence* foresaw (AMI 431) - of the **ISCID** arbitration launched by BSGR in 2014 against the Guinean state. Former French president **Nicolas Sarkozy** mediated months of talks between the two parties to find an end to their dispute (WAN 795). BSGR had been asking for several billion dollars in compensation after **Alpha Conde**'s government removed its rights to blocks 1 and 2 of the *Simandou* iron ore project and *Zogota* deposit. The two parties agreed to end the arbitration and drop all other outstanding procedures in a deal that sees BGSR walk away from *Simandou*. They will now seek to develop *Zogota*, which, like all iron ore projects in Guinea, will require heavy investment in evacuation infrastructure before it can be completed, even if production is exported out through Liberia.

© *Copyright Africa Mining Intelligence.*
*Reproduction and dissemination prohibited (Intranet...) without written permission -*
*108340369*



Publication edited by
Indigo Publications (Paris, France)
Published on AfricaIntelligence.com (Commission paritaire 1220 W 92894)

# Exhibit F

**Mining**

# Mick Davis comeback orchestrated by Beny Steinmetz's group

Industry veteran's vehicle was asked to develop iron ore deposit in Guinea



Mick Davis, the former head of Xstrata, is also treasurer of the Conservative party in the UK

Neil Hume and David Sheppard in London  APRIL 15, 2019

Mick Davis, the Conservative party chief executive and former head of Xstrata, has launched his comeback to the mining industry through a deal orchestrated by BSGR, the miner that has been embroiled in bribery and corruption investigations.

Niron Metals, an investment vehicle co-founded and chaired by Sir Mick, was asked to develop an iron ore deposit in Guinea by BSGR and its advisers, according to people familiar with the deal.

BSGR is the mining group controlled by the family of Beny Steinmetz, the Israeli diamond trader. It has always denied allegations of wrongdoing.

The deal formed part of a wider agreement hammered out between BSGR and the government of Guinea that helped end a long-running dispute over mining rights in the

resource-rich west African country, centred on allegations of corruption against Mr Steinmetz, an Israeli billionaire.

Sir Mick, who is also treasurer of the UK's governing Conservative party, is one of the most recognised names in mining, having run Xstrata until it was bought by Glencore in 2013.

After leaving Xstrata, Sir Mick set up X2 Resources, another mining vehicle that secured billions of dollars of commitments from investors but ultimately failed to pull off a deal.

Niron, whose directors include Greek fund manager Marcos Camhis and Varda Shine, a former head of diamond trading for De Beers, was registered in the UK last year and marks his latest return to the industry.

Little is known about Niron. Only one shareholder, a Bermuda-based private equity group called Global Special Opportunities Ltd, has been publicly disclosed at UK Companies House.

Its new interest in the Zogota iron ore deposit will establish links to Mr Steinmetz and BSGR, which has been embroiled in corruption and bribery investigations in the US, Switzerland and Israel.

It will also take Sir Mick into one of the most difficult mining jurisdictions in the world. Almost every company that has tried to develop an iron ore project in the former French colony has run into difficulties.

In the late 1990s Rio Tinto won the rights to develop the huge Simandou iron ore deposit during the dictatorship of Lansana Conté. But in 2008 the regime stripped Rio of half those rights, saying it had missed a deadline to start mining.

It handed them to BSGR, which subsequently struck a $2.5bn deal to develop Simandou with Vale, the world's biggest producer of iron ore, the key ingredient in steelmaking.

Mr Conté's successor, Alpha Condé, later launched an inquiry into how BSGR came to obtain the rights and concluded in 2014 that they had been won through bribery and cancelled its claim on Simandou as well Zogota.

BSGR and Mr Steinmetz denied any wrongdoing and launched an international arbitration case. Guinea filed counterclaims and the two sides were waiting for a ruling before they suddenly agreed to end their legal fight in February.

In return for waiving its claims, Guinea asked BSGR to find an investor prepared to develop the Zogota deposit. It picked Sir Mick and Niron Metals.

Niron said the company had started work on a feasibility study and was in discussions with Guinea on a number of issues, including payments and project milestones.

"Niron believes the Zogota deposit can be brought into production on an accelerated timetable therefore the study will be expedited within six months as an approximate guide at this stage," it said.

BSGR is reckoned to have spent $160m on preliminary development work at Zogota, which could be capable of producing 5m to 10m tonnes of iron ore a year.

Niron confirmed GSOL and Sir Mick were shareholders in Niron.

"Sir Mick Davis is the majority shareholder of Niron and currently holds 75 per cent of the equity. GSOL holds the remaining minority stake," it said.

"Beny Steinmetz does not have a participation in Niron through GSOL but may have a minority participation directly in Niron in the future depending on the development and success in the project."

A spokesman for Mr Steinmetz and BSGR, which was placed into administration last year to protect itself from the outcome of litigation, also refused to comment on whether he was a shareholder in Niron.

Sir Mick's plans to develop Zogota still require backing of BDO, administrator to BSGR. Niron will also have to navigate the fallout from a separate arbitration case brought by Vale against BSGR.

Last week, Vale was awarded almost $1.3bn by a London tribunal "for fraud and breaches of warranty by BSGR in inducing Vale to enter into a joint venture" in Guinea. Vale plans to pursue collection of the award.

# Exhibit G



Published on *Government of Bermuda* (https://www.gov.bm)

Home > Litigation Solutions Limited (Nicholas John Hoskins) - 51960

---

Company Name

# Litigation Solutions Limited

Registration Number

# 51960

## Directors

Back to Registrar of Companies Directory  [1]

First Name

Nicholas

Middle Name or Initial

John

Surname

Hoskins

Address:

Victoria Place

31 Victoria Street

Hamilton

Bermuda

HM 10

First Name

Maxwell

Middle Name or Initial

L.H.

Surname

Quin

Address:

Victoria Place
31 Victoria Street
Hamilton
Bermuda
HM 10

First Name

Sabby

Middle Name or Initial

Surname

Mionis

Address:

22 Shimon Rokach Str
Tel Aviv
Israel

First Name

Michael

Middle Name or Initial

Surname

Raphael

Address:

20 Homer Avenue

Nicosia

Cyprus

1097

---

**Source URL:** https://www.gov.bm/51960/litigation-solutions-limited-nicholas-john-hoskins-51960

**Links**

[1] https://www.gov.bm/registrar-of-companies-directory

# Exhibit H



Published on *Government of Bermuda* (https://www.gov.bm)

Home > Star West Investments Limited (Maxwell L.H. Quin) - 51720

---

Company Name

# Star West Investments Limited

Registration Number

# 51720

## Directors

Back to Registrar of Companies Directory    [1]

First Name

Maxwell

Middle Name or Initial

L.H.

Surname

Quin

Address:

Victoria Place

31 Victoria Street

Hamilton

Bermuda

HM 10

First Name

Jozef

Middle Name or Initial

C.

Surname

Hendriks

Address:

34 South Road
Southampton
Bermuda
SN 01

First Name

Nicholas

Middle Name or Initial

John

Surname

Hoskins (alternate)

Address:

Victoria Place
31 Victoria Street
Hamilton
Bermuda
HM 10

---

**Source URL:** https://www.gov.bm/51720/star-west-investments-limited-maxwell-lh-quin-51720

**Links**

[1] https://www.gov.bm/registrar-of-companies-directory

# Exhibit I



# GOVERNMENT OF BERMUDA

Company Name

# Americano Nickel Limited

Registration Number

# 50376

## Directors

| First Name | Middle Name or Initial | Surname |
| --- | --- | --- |
| Jozef | Charles | Hendriks |

Address:

34 South Road
Southampton
Bermuda
SN 01

| First Name | Middle Name or Initial | Surname |
| --- | --- | --- |
| Nicholas | John | Hoskins |

Address:

Victoria Place
31 Victoria Street
Hamilton
Bermuda
HM 10

First Name

Marcos

Middle Name or Initial

Surname

Camhis

Address:

22A, Route de Gy
Meinier
Geneva
Switzerland
1252

Printer-friendly version     Back to Registrar of Companies Directory

# Exhibit J



# GOVERNMENT OF BERMUDA

Company Name

# Americano Nickel Finance Limited

Registration Number

# 50377

## Directors

| First Name | Middle Name or Initial | Surname |
|---|---|---|
| Maxwell | L.H. | Quin |

Address:

Victoria Place
31 Victoria Street
Hamilton
Bermuda
HM 10

| First Name | Middle Name or Initial | Surname |
|---|---|---|
| Kevin | John | Gold |

Address:

5 Kingstown Street
London
United Kingdom
NW1 8JP

First Name

Dimitris

Middle Name or Initial

Surname

Paschos

Address:

Norwood Carriage House'

34 Pitts Bay Road

Pembroke

Bermuda

HM 06

Printer-friendly version        Back to Registrar of Companies Directory

# Exhibit K

Case No: CL-2016-000617

**Neutral Citation Number: [2017] EWHC 760 (comm)**
**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

The Rolls Building
Fetter Lane
London EC4A 1NL

Thursday, 9 February 2017

BEFORE:

**MR JUSTICE POPPLEWELL**

----------------------

BETWEEN:

**BSG RESOURCES LTD**

Claimant

- and -

**VALE SA and OTHERS**

Defendant

----------------------

**STEPHEN HOUSEMAN QC** (instructed by Mishcon De Reya LLP) appeared on behalf of the Claimant

**DAVID FOXTON QC and JAMES WILLAN** (instructed by Cleary Gotlieb Steen & Hamilton LLP) appeared on behalf of the First Defendant

**WENDY MILES QC and WILLIAM HOOKER** (instructed by Boies, Schiller & Flexner (UK) LLP) appeared on behalf of the Second and Third Defendants

----------------------

**Judgment**
(As Approved)

--------------------

Digital Transcript of WordWave International Ltd trading as DTI
8th Floor, 165 Fleet Street, London, EC4A 2DY
Tel No: 020 7404 1400  Fax No: 020 7404 1424
Web: www.DTIGLOBAL.com    Email: TTP@dtiglobal.eu
(Official Shorthand Writers to the Court)

No of words: 1026
No of folios: 14

MR JUSTICE POPPLEWELL:

1. It is accepted that BSGR should pay the costs of the first defendant and of the second and third defendants, ("the co-arbitrators") of the removal application and the disclosure application.

2. On behalf of Vale and on behalf of the co-arbitrators I am invited to order those costs be paid on an indemnity basis. I will take first the costs of the removal application. What is submitted is that there is conduct which takes the case out of the norm and in respect of which the court should mark its disapproval of the way in which the case has been conducted by ordering indemnity costs.

3. In my view those submissions are well-made. The claim was, as I have found, totally without merit. As to the delegation claim, the co-arbitrators' observations could not properly have been challenged, and, as I said in my judgment, that should have put an end to the matter. There had been a thorough examination of the issues by the LCIA Division, including at an oral hearing leading to a carefully reasoned decision which concluded that the Tribunal worked entirely in keeping with the way in which arbitral tribunals normally function and that they had spent an appropriate and proportionate time on the decisions.

4. As to the decision under section 24(2) of the Act Mr Houseman Q.C. submits that because section 24(2) requires prior remedies to be extinguished, it expressly recognises that applications under section 24 can properly be made following the decision by, for example, the arbitral institution. That is so, but it is not an answer to the point I have been addressing. That is a requirement that must be fulfilled, but it does not mean that it is appropriate in every case to go on to make an application to the court. As the DAC report itself identifies, it will be a rare case in which in those circumstances the court will reach a different decision and careful thought needs to be given as to whether the case is an appropriate one in which to seek to persuade the court to differ from the arbitral institution. In this case there was no sound basis for the removal request or for the court to reach a different conclusion from the LCIA Division.

5. As to the misrepresentation claim, this was not raised before the LCIA Division and is therefore plainly barred; and it is, as I found it in my judgment, perfectly plain from the language of the correspondence that the representation alleged was not made.

6. Moreover, the requirement to establish on the evidence substantial injustice was one which BSGR made no real attempt to grapple with. As I found in my judgment, there was simply no evidence of substantial injustice.

7. The allegations were serious allegations which should only have been made after careful consideration and should have been formulated with precision. However, as I found, the application was conducted in an entirely inappropriate manner with the allegations shifting on a regular basis. In addition, there were aspects of Mr Dale's witness statement which mischaracterised the nature of some of the underlying proceedings in a way which was seriously misleading. For example, the record sharing decision was characterised as an unprecedented decision ordering the record to be shared when it was effectively in its relevant parts a consent order.

8.  Allegations of intentional misconduct were made at various stages. In a letter of 15 December 2016 Mishcons made clear that the allegation was at that stage that the co-arbitrators had taken deliberate steps to conceal the true position. That was reflected in submissions by leading counsel for BSGR made to Blair J at the directions hearing that the co-arbitrators took steps to conceal the nature and scope of delegation, perhaps hoping to discourage a proper investigation into their own professional conduct and that the co-arbitrators opposition to disclosure was of a piece, a strategy of concealment adopted by them and that the co-arbitrators had brought about any timing difficulties by their own self-interested obstruction to this investigation.

9.  For those reasons it is right that the court should mark its disapproval of the conduct of the section 24 removal application which has in those respects been quite out of the norm and I order that the costs be assessed on an indemnity basis.

10. So far as the costs of the disclosure application are concerned I take a different view. That was a self-standing application within the section 24 proceedings on which there were matters to be debated as to the proper extent of any disclosure. On behalf of the co-arbitrators and Vale it is argued that because there was never any attempt to engage with and therefore discharge the burden of proving the question of substantial injustice the removal application was hopeless and the disclosure application was, therefore, equally hopeless as part and parcel of the same set of proceedings. However, in my view although that is a justification for the costs of the disclosure application being awarded against BSGR, and also because the application failed, that is not a good reason for those costs being assessed on the indemnity basis. So costs of the disclosure application will be assessed on the standard basis.

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Case No CL-2016-000617

Before The Hon. Mr Justice Popplewell
**Sitting In Private**
**9 February 2017**

**B E T W E E N:**



### BSG RESOURCES LIMITED

**Claimant**

- and -

**(1) VALE S.A.**
**(2) MR DAVID WILLIAMS QC**
**(3) MR MICHAEL HWANG SC**
**(4) MR FILIP DE LY**

**Defendants**

---

## ORDER

---

**UPON HEARING** Counsel for the Claimant, Counsel for the First Defendant and Counsel for the Second and Third Defendants at the hearing of matters consequential upon the dismissal of the Claimant's claim for relief under section 24 of the Arbitration Act 1996 ("**Section 24 Claim**").

**AND UPON** the Court having previously reserved the costs of the Claimant's application for specific disclosure ("**CPR 31.12 Application**").

**AND UPON** the Claimant having sought the Court of Appeal's permission to appeal the dismissal of the CPR 31.12 Application.

I

295

**IT IS ORDERED THAT:**

1.      Any application for permission to appeal the dismissal of the Section 24 Claim is adjourned until the application for permission to appeal the dismissal of the CPR 31.12 Application has been finally determined by the Court of Appeal, or if such permission is granted, the determination of the appeal.

2.      Save as set out in paragraph 3 below, the Claimant shall pay the First Defendant's costs and the Second and Third Defendants' costs of and occasioned by the Section 24 Claim, to be assessed on the indemnity basis.

3.      The Claimant shall pay the First Defendant's costs and the Second and Third Defendants' costs of and occasioned by the CPR 31.12 Application, to be assessed on the standard basis.

4.      By 4pm on Thursday 23 February 2017, the Claimant shall pay to the First Defendant the following sums as summarily assessed in accordance with paragraphs 2 and 3 above, respectively:

   (a)      £105,000 in respect of the costs ordered under paragraph 2 above; and

   (b)      £75,000 in respect of the costs ordered under paragraph 3 above.

5.      By 4pm on Thursday 23 February 2017, the Claimant shall pay to the Second and Third Defendants (together) the following sums as summarily assessed in accordance with paragraphs 2 and 3 above, respectively:

   (a)      £60,000 in respect of the costs ordered under paragraph 2 above; and

   (b)      £75,000 in respect of the costs ordered under paragraph 3 above.

[ ]

PTA Template 269C1 - OCT16 - First Appeal                                          (GS 27.01.17)

## IN THE COURT OF APPEAL, CIVIL DIVISION

REF: **A3/2017/0298**


Her Majesty's [SEAL]
Court of Appeal

2 2 FEB 2017

**BSG Resources Ltd    –v–    Vale S.A. & Ors**

## ORDER made by the Rt. Hon. Lord Justice Christopher Clarke

On consideration of the appellant's notice and accompanying documents, but without an oral hearing, in respect of an application for permission to appeal

| |
|---|
| **Decision:  granted, refused, adjourned.**  An order granting permission may limit the issues to be heard or be made subject to conditions. |
| Permission to appeal the dismissal by Popplewell J of the appellants 'application for a disclosure order is refused. The appeal is totally without merit. |

**Reasons**

On the section 24 application the judge decided:

(1) That the Co-arbitrators did not delegate their own adjudicative responsibilities to the Chairman;

(2) That there was no improper delegation of tasks by the Chairman to the Secretary for the purpose of section 24 of the Act; there being nothing offensive in receiving the views of the Secretary so long as the arbitrator made up his own mind by exercising intendent judgment;

(3) That even if the Chairman had improperly delegated the preparation of drafts to the Secretary that would not have provided any basis for removing the Co-arbitrators

(4) That it was entirely legitimate for the Co-arbitrators to rely on the Chairman to determine the tasks of the Secretary as they did; and entirely appropriate for the Co-arbitrators to entrust the supervision of the Secretary to the Chairman

(5) That the Co-arbitrators did not in their letters negligently misrepresent the true extent of the delegation; and

(6) That the applicant wholly failed to establish that it had suffered substantial injustice. No attempt had been made to show that the decision might have been different had the Co-arbitrators taken a different approach to decision making. The assertion that the applicant had lost trust and confidence in the Co-arbitrators was not sufficient. Indeed, the nature of the three decisions themselves was incapable of causing substantial injustice, the decisions being orders made by agreement or aimed to secure compliance with previous (unchallenged) orders, I do not regard the substantial injustice test as requiring appellate consideration.

The judge also concluded that

(7) An adjudicator soliciting or receiving views from a tribunal secretary or a judicial assistant does not impair his ability to exercise independent judgment and that the Chairman's email to the Secretary and the members of the tribunal's respective time records were not indicative of any impropriety;

(8) In any event the applicant consented to the Secretary being appointed when they knew that he was a qualified lawyer;

(9) It was normal for arbitrators other than the Chairman to have a lesser involvement at the interlocutory stages of the arbitration;

There would be no realistic prospect of the Court of Appeal, if it had jurisdiction, which it does not, holding that these conclusions were erroneous.   Indeed if (7) was wrong all of the judgments of this court prepared following input from judicial assistants, of which this is one, would be vulnerable to challenge.

There is also no realistic prospect of persuading the full court, if it had jurisdiction, that the judge should have ordered the disclosure sought because there is no real prospect of showing that the disclosure sought would or should have altered Popplewell J's conclusion that the Co-arbitrators should not be removed. Such disclosure would never show that the Co-arbitrators did not, contrary to their evidence, approve the drafts as a result of their own independent judgment. Nor would it enable the applicant to get over the hurdle of showing that it has suffered substantial injustice. The orders in issue were in any event either orders by agreement or orders designed to secure compliance with another unchallenged order.
In relation to **ground 1** the judge's reasoning in [41] to [53] in favour of the test of necessity is unassailable.

In relation to **Ground 2** the judge was entitled to find, as he did in [71] of the judgment, that the documents sought were not necessary for the fair determinate of the claim.

In relation to **Ground 3** the judge's rejection of a distinction between evidence showing the process of decision making and the substance thereof was justified. The process is an integral art of the decision making.

In relation to **Ground 4** the judge was right to hold that the court should normally give effect to the agreement of the parties that documents should remain confidential. He was not in error in describing disclosure of confidential documents as impermissible under the *Locabail* principle and Article 30.2.  of the LCIA Rules. Those principles require confidentiality, although, as the judge recognised the court has power to order disclosure.

In relation to **Ground 5** the judge exercised a discretion and there is no prospect of persuading the full court that such exercise was aberrant. I cannot regard him as having fettered his discretion. In exercising it he was entitled to take into account the *Locabail* principle and Article 30 of the LCIA Rules.

Further the grant of permission now might involve (as may be intended) wholly undesirable disruption of the arbitration process.

I have considerable doubt as to whether this court has jurisdiction by reason of section 24 (6) of the 1996 Act. It would seem very odd that permission is required from the first instance judge to appeal a final, but not an interlocutory decision, in proceedings under section 24. If the court does have jurisdiction it should be very slow to grant permission to appeal against a procedure decision made in the course of proceedings under section 24 (6).

I will assume in the applicant's favour that I have jurisdiction. Even so, for the several reasons set out above I refuse to grant permission to appeal.

**Information for or directions to the parties**

This case falls within the Court of Appeal Mediation Scheme automatic pilot categories*. Yes ☐     No ☐

Recommended for mediation     Yes ☐     No ☐

If not, please give reason:

**Where permission has been granted, or the application adjourned**
a)    time estimate (excluding judgment)
b)    any expedition

Signed:
Date: 22nd February 2017

**Notes**
(1)    Rule 52.6(1) provides that permission to appeal may be given only where –
        a)    the Court considers that the appeal would have a real prospect of success; or
        b)    there is some other compelling reason why the appeal should be heard.
(2)    Where permission to appeal has been refused on the papers, that decision is final and cannot be further reviewed or appealed.  See rule 52.5 and section 54(4) of the Access to Justice Act 1999.
(3)    Where permission to appeal has been granted you must serve the proposed bundle index on every respondent within 14 days of the date of the Listing Window Notification letter and seek to agree the bundle within 49 days of the date of the Listing Window Notification letter (see paragraph 21 of CPR PD 52C).

Case Number: **A3/2017/0298**

DATED  22ND FEBRUARY 2017
IN THE COURT OF APPEAL


BSG RESOURCES LIMITED
- and -
DAVID WILLIAMS QC
- and -
MICHAEL HWANG SC
- and -
VALE S.A.
- and -
FILIP DE LY


# O R D E R

Copies to:

Mishcon De Reya LLP
DX 37954
Kingsway
Ref: JLL/KD/EF/40252.8

Boies, Schiller & Flexner (Uk) LLP
25 Old Broad Street
London
EC2N 1HQ
Ref: 15054.0001/VE

Lower Court Ref: CL2016000617

# Exhibit L

# Bloomberg

## News Story

03/07/2018    16:53:20 [BN] Bloomberg News

## Beny Steinmetz Puts Mining **Company BSGR Into Administration (1)**

- **BSGR fighting multiple legal battles over Guinea iron deposit**
- **U.S., Israeli prosecutors said rights were obtained corruptly**

By Thomas Biesheuvel

(Bloomberg) –– Billionaire Beny Steinmetz's mining company put itself into administration as it fights legal battles on multiple fronts over the disputed rights to one of the world's biggest untapped iron ore deposits.

"We're not in liquidation, no one is forcing this upon us," Dag Cramer, a director of BSGR, said by phone. "This is drawing up the drawbridge, filling up the moat, putting some sharks in the moat, to make sure we can stay the distance on both the arbitration and litigation that we have, even if there are adverse awards or developments that would normally prevent us from doing this."

BSG Resources Ltd. is seeking compensation at the World Bank arbitration tribunal in Paris after Guinea stripped it of a license to mine half the giant Simandou deposit in 2014. The company also is suing George Soros, claiming the billionaire cost it $10 billion through a defamation campaign that caused it to lose the rights.

Brazil's Vale SA filed its claim at the private arbitration court after Guinea stripped its joint venture with BSGR of its rights to Simandou following a government probe that found licenses were obtained through corruption. Vale is seeking the award to cover an upfront payment to BSGR and money it invested in the West African nation. BSGR has previously said it's confident it will prevail in the dispute.

### Steinmetz Probe

At the same time, Steinmetz is being probed by Israeli prosecutors, who accuse BSGR of paying millions of dollars in bribes to Guinean officials to secure the rights. He was detained in 2016 and released on bail and his travel was restricted, before those restrictions were lifted last year. He has also faced a U.S. investigation. Steinmetz has denied any wrongdoing.

BDO LLP was appointed as administrator yesterday by the Royal Court of Guernsey, where BSGR is registered. Cramer said this will not impact the trading of any of its subsidiary businesses, including the Koidu diamond mine in Sierra Leone.

"We're putting ourselves in the hands of professionals who will protect us during the remainder of the race," he said.

(Updates with arbitration details in fourth paragraph.)

Related ticker:
3600258Z IA (BSG Resources Ltd)

To contact the reporter on this story:
Thomas Biesheuvel in London at tbiesheuvel@bloomberg.net

This report may not be modified or altered in any way. The BLOOMBERG PROFESSIONAL service and BLOOMBERG Data are owned and distributed locally by Bloomberg Finance LP ("BFLP") and its subsidiaries in all jurisdictions other than Argentina, Bermuda, China, India, Japan and Korea (the "BFLP Countries"). BFLP is a wholly-owned subsidiary of Bloomberg LP ("BLP"). BLP provides BFLP with all the global marketing and operational support and service for the Services either directly or through a non–BFLP subsidiary in the BLP Countries. BFLP, BLP and their affiliates do not provide investment advice, and nothing herein shall constitute an offer of financial instruments by BFLP, BLP or their affiliates.

# Bloomberg

To contact the editors responsible for this story:
Lynn Thomasson at lthomasson@bloomberg.net
Nicholas Larkin, Alex Devine

This report may not be modified or altered in any way. The BLOOMBERG PROFESSIONAL service and BLOOMBERG Data are owned and distributed locally by Bloomberg Finance LP ("BFLP") and its subsidiaries in all jurisdictions other than Argentina, Bermuda, China, India, Japan and Korea (the "BFLP Countries"). BFLP is a wholly-owned subsidiary of Bloomberg LP ("BLP"). BLP provides BFLP with all the global marketing and operational support and service for the Services and distributes the Services either directly or through a non-BFLP subsidiary in the BLP Countries. BFLP, BLP and their affiliates do not provide investment advice, and nothing herein shall constitute an offer of financial instruments by BFLP, BLP or their affiliates.

# Exhibit M



*Article / May 3, 2019*

## SECRET DEALINGS TYING UK CONSERVATIVES' CEO TO BRIBERY SCANDAL BILLIONAIRE

Senior British politician has serious questions to answer over bribery-tainted mining block

🐦 *Tweet (https://twitter.com/intent/tweet?text=Secret dealings tying UK Conservatives' CEO to bribery scandal billionaire&url=https://www.globalwitness.org/en/campaigns/corruption-and-money-laundering/secret-dealings-tying-uk-conservatives-ceo-bribery-scandal-billionaire/&via=global_witness)*

**f** *Share (https://www.facebook.com/dialog/share?app_id=157143375056708&display=popup&href=https://www.globalwitness.org/en/and-money-laundering/secret-dealings-tying-uk-conservatives-ceo-bribery-scandal-billionaire/)*

**DONATE (/EN/DONATE/)**

›

A company fronted by the Chief Executive of the British Conservative Party is set to pay $50 million to seal a deal between the government of Guinea and a mining firm that has engaged in high-level bribery there. The controversial deal, seen by Global Witness, aims to extricate billionaire Beny Steinmetz from criminal investigations that have been launched in Switzerland, Israel and elsewhere.

Global Witness has previously exposed how the company BSGR, led by Steinmetz, bribed the wife of the Guinean president to obtain one of the world's largest iron ore concessions in 2008. Those corrupt practices led Guinea to eventually cancel BSGR's mining rights in 2014, sparking a long-running legal dispute between Guinea and BSGR. The latest deal involving Mick Davis – who is both Chief Executive and Treasurer of the Conservatives – purports to resolve that dispute. The payment and other key details have until now been kept secret.

https://www.globalwitness.org/en/campaigns/corruption-and-money-laundering/secret-dealings-tying-uk-conservatives-ceo-bribery-scandal-billionaire/



**See full report: https://bit.ly/2GVgtRx**

Under the deal, struck by BSGR and Guinea in February, Niron – the company headed by Davis - will get rights to mine a concession called Zogota. This was one of the blocks withdrawn from BSGR over corruption. Steinmetz is now to be a co-investor alongside Niron. At the same time, Guinea is to withdraw from criminal proceedings targeting Steinmetz in Switzerland and has promised not to make any "disparaging remarks" against Steinmetz or BSGR for ten years.

Niron belongs to a secretly-owned firm in the Bahamas, according to documents in the UK's corporate registry.

Taken together, these revelations mean there are serious questions to answer for one of the governing Conservative Party's most important back-room operators. Why is he playing a key role in such a controversial deal? Why has he decided to team up in Guinea with a billionaire whose company has an established record of bribery there? And who are Niron's secret financial backers?

The opaque settlement process also involves the world's fifth biggest accountancy company, BDO, which signed off the new arrangements in its position as administrator of Steinmetz's stricken company.

## BRIBING THE PRESIDENT'S WIFE

Between 2012 and 2014, Global Witness exposed (https://www.globalwitness.org/id/reports/guineas-deal-century/) how BSGR bribed the wife of Guinea's then-president with millions of dollars to obtain a gigantic iron ore concession in the Simandou mountains, a lush forested area home to endangered West African chimpanzees and white-lipped frogs. Once BSGR got the rights in 2008 it promptly sold half of them to the world's number one iron miner, Vale, for $2.5 billion—twice Guinea's entire national budget at the time.



Former French president Nicolas Sarkozy met with Guinean President Alpha Conde in February, striking a deal that could get a billionaire off the hook for bribery (Credit: Presidency, Republic of Guinea)

In 2012, a new Guinean president launched a corruption inquiry into the granting of BSGR's licences, resulting in the cancellation of the Simandou blocks as well as rights to nearby Zogota. BSGR then took Guinea to arbitration at the International Court for Settlement of Investment Disputes (ICSID) in Paris in 2014, whereupon Guinea counter-sued. All the indications were that BSGR was heading for a major defeat. But in February this year, Guinea and BSGR stunned observers after suddenly agreeing to end the dispute, in a deal brokered by former French president Nicolas Sarkozy. (https://www.bloomberg.com/news/articles/2019-02-25/steinmetz-stages-guinea-comeback-in-sarkozy-brokered-deal)

BSGR crowed that it had been cleared. Beny Steinmetz told Bloomberg: "We were enemies. Now we are friends and partners with the Guinean government. We have both put aside the past and BSGR and its employees and advisers have been vindicated."

But earlier this month BSGR lost a second arbitration case relating to the deal, this time against Vale in London. It was ordered to pay out a whopping $1.25 billion. The case, heard and concluded entirely in secret, was over the same issues as the Guinea dispute – notably whether BSGR had bribed the former president's wife, Mamadie Toure. The three arbitration judges ruled on 4th April that BSGR had indeed bribed Toure, by offering her shares to secure her "assistance in influencing [former] President [Lansana] Conte".

"BSGR made a false representation in declaring that there had not been any bribery of Mme Toure," reads the ruling.

In unusually outspoken remarks, the judges said it would be wrong for them "to accept bribery as a fact of life in some countries and keep eyes shut when faced with allegations of corruption".

BSGR's claim in February that it had been vindicated is now hard to take seriously.

BSGR has said corruption allegations are "entirely baseless" and that it always acted "to the highest standards of corporate governance".

## 'SETTLEMENT' DEAL IS ONLY PROVISIONAL

Announcing the agreement with Guinea in February, BSGR said that it relinquished its claims on the concessions under dispute in Simandou.  A "new group of investors (presented by and including Beny Steinmetz)" would instead exploit the remaining disputed mining block, Zogota. This "new group" would include Niron—of which Davis is a director.

But the new documents seen by Global Witness show that the "Settlement Term Sheet" agreed between Guinea and BSGR in February is only provisional. The arbitration process between BSGR and Guinea has, in fact, only been *suspended*, and – contrary to an announcement by the two parties – no final settlement has been reached. The agreement is dependent on financial arrangements with Niron being formalized. BDO would also have to carry out "due diligence" checks—which, if thoroughly conducted, should involve establishing who Niron's financial backers and beneficiaries are.

https://www.globalwitness.org/en/campaigns/corruption-and-money-laundering/secret-dealings-tying-uk-conservatives-ceo-bribery-scandal-billionaire/

"The discontinued ICSID arbitration should only be finally terminated once the transaction has been agreed and executed by all relevant parties," the administrators said in correspondence seen by Global Witness. "Any Party may request that the ICSID proceeds to issue a final award if it wishes to no longer pursue the Transaction."

BSGR and Guinea had previously released a statement saying they "jointly announce the settlement of their dispute". Asked about this, BSGR's administrators said: "We are aware that statements have been made, purportedly on behalf of BSGR, to the effect that the dispute has been settled… Any third party statements were not authorised by the administrators." The administrators said that, in fact, "no binding settlement agreement had been reached."

The Guinean government did not reply to questions from Global Witness. In February Bloomberg quoted mining minister Abdoulaye Magassouba as saying the agreement is "for the good of the people. It's with this aim that the government will try hard to work in a win-win partnership with the investors."

## TORY CHIEF EXEC'S CAGEY BACKERS

"Niron Plc will pay to the Republic of Guinea the sum of 50,000,000 USD, according to a schedule to be defined between the parties," says the Settlement Term Sheet, signed by the BDO administrators and the Guinean government. But Niron was not even a signatory to the agreement.

However, Niron has been discussing Zogota with BSGR. The BDO administrators refer in their correspondence to a 14th February letter from Niron to BSGR, saying that it contains further information on proposed transactions. Contacted by Global Witness, Niron declined to say what was in the 14th February letter.

The Settlement Term Sheet ties Beny Steinmetz (officially BSGR's "advisor") to Niron, as it says that he introduced Niron to Guinea.



BSGR executives promised Mamadie Toure, the former Guinean president's wife, huge bribes to help obtain mining rights.

The document says: "The Republic of Guinea requested the BSGR advisor [Steinmetz], to present a new investor, Niron Plc, a well-known actor of the mining sector, with a view to mining the Zogota deposits. After examination of its technical and financial capacities, the Republic of Guinea decided to enter into a partnership with Niron Plc with a view to mining said deposits."

"Well known" is hardly a fitting epithet for Niron. It was only registered as a company in June 2018, and it was another six months before its name first appeared in the mainstream financial press—barely a month before the agreement.

https://www.globalwitness.org/en/campaigns/corruption-and-money-laundering/secret-dealings-tying-uk-conservatives-ceo-bribery-scandal-billionaire/

A February 2013 Niron internal document entitled "Confidential presentation" seen by Global Witness says that it was seeking a stabilization of capital and three nickel assets, of which two are labelled "world-class". This document is dated before the provisional settlement deal, at a time when the financial press was describing Niron as a speculative venture on the hunt for mining assets.

Press reports have said that Niron was set up by Mick Davis. When first approached by Global Witness, Niron also said that Mick Davis was the majority shareholder.

But from the assets listed in the "Confidential presentation" Niron seems virtually indistinguishable from its parent company, a mysterious Bahamas-registered entity called Global Special Opportunities Ltd (GSOL). The mining assets listed in the document are, in fact, controlled not by Niron, but by GSOL, according to comments GSOL sent Global Witness.

Questioned further by Global Witness, Niron and GSOL conceded that "at incorporation GSOL was the sole shareholder", saying Davis would become the majority owner in due course.

GSOL was created several years ago, but its Bahamas registration allows it to keep its ultimate ownership secret. GSOL declined to disclose its owners when asked by Global Witness, saying simply that it "has many institutional and private investors" and that it is not tied to Beny Steinmetz or companies associated with him.

Niron said: "GSOL brings to Niron experience in mining, logistics and infrastructure development, as well as significant financial resources."

It added: "Beny Steinmetz does not have a participation in Niron through GSOL but may have a minority participation directly in Niron in the future depending on the development and success of the project and subject to the agreement of all relevant parties."

BDO, as administrators for BSGR, said: "At this stage, we are not in a position to comment on the ownership structure or ultimate beneficial owners of Niron or GSOL."

GSOL said it operates to the "highest professional, ethical and environmental standards". Niron says on its website that it "is committed to achieving the highest environmental, social and ethical standards in all its activities".

Bloomberg has reported that BSGR is due to get a portion of revenues from Zogota under the new deal. And BSGR's two administrators from BDO said in a 5th March letter seen by Global Witness that they would need "to reach an agreement with Niron regarding the revenue sharing arrangement", which would be integral to the final BSGR-Guinea deal.



In return for its bribes, BSGR got much coveted mining rights in Guinea. (Credit: Rio Tinto)

Niron said: "There are currently no revenue sharing agreements in place with BSGR but we are in discussion with the administrators of the company."

The documents also indicate that while BSGR is technically in administration, BDO allowed Steinmetz and BSGR director Dag Cramer to negotiate with Guinea with few restrictions, expecting BDO to agree to their *faits accomplis*. The administrators are due to receive over £900,000 in fees for the first year of the administration – all financed by Nysco, a Beny Steinmetz company.

The administrators appear to have been largely been left out of the loop of the settlement discussions. They were only sent a copy of the Settlement Term Sheet once it had been agreed between BSGR's leaders and Guinea. The administrators then had it translated into English and countersigned it.

In response to questions by Global Witness, BDO confirmed "that negotiation of the administration between DLC and Guinea was presented as a *fait accompli*, which the administrators went along with, but also overruled." It said that the administrators have complied with legal obligations and are acting in the best interests of creditors.

BDO said it has "made clear throughout to the company's former management and intermediaries that they have no legal authority to, and should not purport to, commit BSGR to any arrangement without the administrators' unambiguous express authority."

## BSGR ON VERGE OF COLLAPSE

BSGR has banked on the administration process being a form of protection, possibly against eventual adverse court rulings. When BDO was appointed in March 2018, BSGR director Dag Cramer told Reuters his company had "voluntarily put ourselves into administration" (https://uk.reuters.com/article/uk-bsgr-lawsuit-administration/administrators-seek-to-return-steinmetzs-mining-firm-bsgr-to-solvency-idUKKCN1GK2KM), as a means of protection against "any adverse or malicious development out of our control". By the time it went into administration, BSGR had already decided to cease attending the arbitration hearings with Vale, arguing that it would not be "treated fairly" (https://www.bloomberg.com/news/articles/2017-05-19/steinmetz-said-to-skip-1-2-billion-vale-hearing-risking-loss).

On 27th February 2018, BSGR director Peter Harold Driver filed a confidential affidavit with the Royal Court of Guernsey, which ultimately presides over the administration process for BSGR. He said it was "highly likely that the judgment may be handed down in favour of Vale".

Estimating that the Vale claim would come to at least $500 million (less than half of the eventual amount), he said an adverse court decision "would leave BSGR with a deficiency of assets of at least $368 million and it is thus clearly insolvent on a balance sheet basis".

Driver said that in such circumstances, appointing administrators was "the optimal step to protect the assets" for the benefit of BSGR's creditors.

Yet at the same time, Driver was inexplicably upbeat about its chances in the Guinea arbitration case, saying BSGR had been advised that its "claims against Guinea are strong". This was despite the fact that both cases revolved around the same bribery allegations. By the time it filed for administration, BSGR was not faring well in the Guinea arbitration. An expert appointed by the arbitrating tribunal had shot down BSGR's claims that contracts detailing the bribes were forgeries (https://www.thetimes.co.uk/article/steinmetz-bribery-contracts-not-forged-expert-says-h2k8rr3cj). Guinea and BSGR then announced their unexpected reconciliation just as a final ruling was expected.

Driver also talked up BSGR's chances of winning a $10 billion claim in New York against billionaire George Soros, where BSGR accused him of doing "anything and everything he could… to attack plaintiffs [BSGR] and falsely accuse them of corruption" in securing Simandou. BSGR has also accused Global Witness of being part of a conspiracy, pointing to our funding from the Open Society Foundations, which was founded by Soros. (See our response to such allegations here (https://www.globalwitness.org/en/blog/bsgr-we-havent-been-intimidated-or-taken-instructions-anybody-so-far-and-were-not-about-start/).) The case against Soros has been suspended since late 2017, awaiting the resolution of the Guinea-BSGR arbitration in Paris.

## TSUMANI OF DIRE DEVELOPMENTS

The key to understanding some of BSGR's statements is their usefulness as PR, to counter a tsunami of dire developments—not just court cases but also criminal investigations in the US (https://www.newyorker.com/magazine/2013/07/08/buried-secrets), Switzerland (https://www.24heures.ch/economie/justice-suisse-chasse-temoins-cles/story/12452039?track) and Israel (https://www.telegraph.co.uk/business/2016/12/19/bsgr-boss-beny-steinmetz-arrested-israel-guinea-bribery-claims/). One of Steinmetz's agents was convicted in New York for obstruction of justice (https://www.reuters.com/article/us-usa-guinea-mining-idUSKBN0FU23S20140725) in 2014, after the FBI secretly recorded him trying to bribe Mamadie Toure to destroy incriminating documents and telling her to lie to investigators. Steinmetz himself was arrested by Israeli police in 2016 over the Guinea affair.

Amid these events, Steinmetz and three fellow company officials also failed in a legal bid (https://www.independent.co.uk/news/media/press/victory-for-press-freedom-as-billionaire-fails-legal-bid-to-force-anti-bribery-group-to-hand-over-9940967.html) to force Global Witness to hand over its source material, where they unsuccessfully argued that our reporting on the scandal had infringed their privacy.

The Settlement Term Sheet also casts a light on the company's determined PR effort. Guinea and BSGR undertook not to "make disparaging remarks" about each other for 10 years. This allowed BSGR to paint the agreement in the most favourable – but misleading - light, with little fear of contradiction from the Guinean side.

# Deposits and Other Credits

| Date | Amount | Description |
| --- | --- | --- |
| 7/22 | 99,970.00 | FUNDS TRANSFER (ADVICE 2010072200010415) RCVD FROM WELLS FARGO NY IN/BANK LEUMI LE IS ORG=CILINS FREDERIC RFB=814-05-0038659MU OBI= REF=1007221242005803 07/22/10 08:36AM ET |
| 8/04 | 1,350.00 | COUNTER DEPOSIT |
| 8/06 | 49,970.00 | FUNDS TRANSFER (ADVICE 2010080600007959) RCVD FROM WELLS FARGO NY IN/BANK LEUMI LE IS ORG=CILINS FREDERIC RFB=814-05-0038917MU OBI= REF=1008051774002788 08/06/10 07:45AM ET |
| **Total** | **$151,290.00** | |

BSGR's agents paid hundreds of thousands of dollars to Mamadie Toure. One of them was Frenchman Frederic Cilins – later sentenced to two years in the US for obstruction of justice.

But with its loss in court to Vale, BSGR must fear for its future as a going concern.

And this may not be the end of it.

On the day the agreement was revealed, the Office of the Attorney General of Geneva stated: "The corruption of foreign public officers is pursued automatically: the Genevan penal process is proceeding and the case has been almost prepared for trial." BSGR's administrators said they have "received no indication that BSGR will be charged with any offence in Switzerland or elsewhere".

Switzerland's *Tribune de Génève* newspaper has, however, reported that Switzerland's investigation into BSGR's dealings in Guinea has focused on top figures (https://www.tdg.ch/economie/argentfinances/guinee-procedure-genevoise-beny-steinmetz/story/26013025) at the company, including Beny Steinmetz. The Settlement Term Sheet itself refers to "criminal proceedings pending in Switzerland concerning the activities of BSGR". BSGR denies any corruption over obtaining mining blocks in Guinea.

But Switzerland's determination to pursue the bribery case, Vale's victory and the possibility the Guinea arbitration case could be reopened, mean reports of BSGR's comeback were deeply premature. This is a scandal that could run and run.

## FIND OUT MORE

Daniel Balint-Kurti, *Head of Investigations*

dbalint-kurti@globalwitness.org (mailto:dbalint-kurti@globalwitness.org)
+44 (0) 207 492 5872
+44 (0) 7912 517 146

# Exhibit N



—



**BUSINESS NEWS**

MARCH 8, 2018 / 12:57 PM / A YEAR AGO

# Administrators seek to return Steinmetz's mining firm BSGR to solvency



LONDON (Reuters) - Administrators for BSG Resources (BSGR) said on Thursday they would work to return the mining firm to solvency and pay creditors in full after it voluntarily entered administration to protect it from legal disputes related to a project in Guinea.

BSGR, the mining arm of billionaire Beny Steinmetz's businesses, is caught up in a row linked to Guinea's vast Simandou iron ore reserves. BSGR and Steinmetz deny any wrongdoing in the dispute.

BSGR is also suing financier George Soros for $10 billion (7.24 billion pounds) in damages over lost contracts. Soros has sought to have the lawsuit dismissed. A judge put the case on hold in November.

BSGR Director Dag Cramer told Reuters on Wednesday that going into administration was to protect the company against "any adverse or malicious development out of our control."

"It's very, very simple. This is not a liquidation. This is not a bankruptcy. We have voluntarily put ourselves into administration," he said.

Cramer said he would stay on as director and the technical procedure would not affect daily operations of subsidiaries or the firm's determination to "go the distance" with arbitration over Guinea.

Accountancy and business advisory firm BDO said in a statement emailed on Thursday that its representatives in London and in Guernsey had been appointed by a court as joint administrators on March 6.

"Our primary objective is to return BSGR to solvency and to ensure that all creditors will be paid in full," BDO said.

"If the company can be returned to solvency and continue as a going cor administration will end and the company will revert to the control of its directors," it added.

BSGR is a private firm registered in Guernsey whose subsidiaries include the Koidu diamond mine in Sierra Leone.

A BSGR spokesman told Reuters that Steinmetz did not sit on BSGR's board or have an executive role, but "is the beneficiary of the foundation that owns BSG Resources".

As part of international efforts to improve transparency, Guinea's government under President Alpha Conde, elected in 2010, launched a review of mining contracts signed before 2011.

Within its review the West African nation investigated how BSGR obtained rights to the Simandou deposit, the world's largest untapped iron ore reserves, in 2008.

Anglo-Australian mining group Rio Tinto (RIO.AX) (RIO.L) and BSGR have made legal claims against each other over the mining rights in Simandou.

Reporting by Barbara Lewis; Editing by Alexander Smith and Edmund Blair

*Our Standards:*    *The Thomson Reuters Trust Principles.*

MORE FROM REUTERS

# Exhibit O



DIPLOMATIC AFFAIRS

# Sarkozy the peacemaker between Conde and Diallo

In Conakry, Nicolas Sarkozy was key to engineering the political side of the deal between the Israeli businessman Beny Steinmetz and the Guinean president. Here's how he did it.

Dressed entirely in white, on 21 February **Alpha Conde** held a series of meetings (together and individually) with **Beny Steinmetz**, who has been battling it out in the courts with the Guinean state for the last seven over the *Simandou* mining site, and **Nicolas Sarkozy** (WAN 795). The boss of **Beny Steinmetz Group Resources** (BSGR) and the Guinean president ultimately agreed to drop the many legal actions that they had initiated against the other party.

## Deadline 2020

What role did Sarkozy play in this unexpected outcome? According to several participants in these meetings, the former French president offered to endorse the political aspect of the deal between the two men. Sarkozy was in part able to do so because for some years he has been close to **Cellou Dalein Diallo**, Alpha Conde's leading opponent whom he met through his unofficial advisor on African affairs, **Robert Bourgi**.

Since the start of his dispute with Beny Steinmetz, Alpha Conde has also been making overtures to his opponent. Reaching an agreement with the two main 'sponsors' of the **Union democratique des forces de Guinee** (UFDG) has cleared the way for the Guinean president to seek a third term in 2020.

## Deal

The presence of Nicolas Sarkozy in Conakry just a few days after **Francois Hollande**'s visit also conferred on this deal a sub-regional significance, as Cellou Dalein Diallo is also receiving the discreet backing of the Ivorian president **Alassane Ouattara**. The former

West Africa Newsletter - 142 rue Montmartre - 75002 Paris, France - Tel: + 33 1 44 88 26 10
client@indigo-net.com - Africaintelligence.com

|Page 1/2

FRANCE/GUINEA : Sarkozy the peacemaker between Condé and Diallo



French president took advantage of his friendship with Outtara to outline a further possible deal during the same meeting: the Ivorian president would commit to distancing himself from the Guinean opposition leader if Alpha Conde were for his part to abandon any intention of hosting **Laurent Gbagbo** in Guinea. Currently residing in Brussels after being provisionally released in February by the **International Criminal Court** (ICCI), the leader of the **Front populaire ivoirien** (FPI) has not given up hope of finding a host country in Africa.

On 22 February, Nicolas Sarkozy was in Abidjan to report back on his meeting with Ouattara, and it seems that Sarkozy was also operating with the approval of Paris. France's ambassador in Conakry, **Jean-Marc Grosgurin**, made a point of keeping a close eye on the various stages of the talks that were held between the various players at the Sekhoutoureya palace.

*© Copyright West Africa Newsletter.*
*Reproduction and dissemination prohibited (Intranet...) without written permission -*
*108340369*



Publication edited by
Indigo Publications (Paris, France)
Published on AfricaIntelligence.com (Commission paritaire 1220 W 92894)

West Africa Newsletter - 142 rue Montmartre - 75002 Paris, France - Tel: + 33 1 44 88 26 10
client@indigo-net.com - Africaintelligence.com

| Page 2/2

# Exhibit P

Technology

# Mining Billionaire Ends Bitter Guinea Dispute After Months of Secret Negotiations

By <u>Franz Wild</u> and <u>Thomas Biesheuvel</u>

February 25, 2019 1:30 AM *Updated on February 25, 2019 3:10 AM*

▶ Israeli mining tycoon's company reconciles with Guinea

▶ Mick Davis to start developing iron ore mine in Guinea



Beny Steinmetz *Source: Dag Lars Cramér on behalf of Nornverdandi*

LISTEN TO ARTICLE

➺ 6:21

**In this article**

RIO
**RIO TINTO PLC**
4,842.50 GBp
▲ +62.50 +1.31%

VALE3
**VALE SA**
52.59 BRL
▼ -0.10 -0.19%

IOE1
**Generic 1st 'IOE'
Future**
899.50 CNY/MT
▲ +4.50 +0.50%

Israeli mining tycoon Beny Steinmetz is making a dramatic return to Guinea after the billionaire ended a bitter dispute with the West African country that brought his business empire to its knees.

The settlement, brokered by former French President Nicolas Sarkozy, ends a seven-year-old dispute centered around one of the world's richest mineral deposits that included a colorful list of characters from billionaire George Soros to former U.K. leader Tony Blair and mining heavyweights Rio Tinto Group and Vale SA.

After months of secret negotiations, Steinmetz's BSG Resources Ltd. agreed with Guinean President Alpha Conde to withdraw allegations of corruption leveled against each other over years and to drop a two-year-old arbitration case over one of the world's most-fabled mineral deposits -- the Simandou iron-ore project. Guinea also agreed to partner

with mining grandee Mick Davis, who will develop the Zogota iron-ore mine once the disputes have been settled, marking a comeback for one of the industry's biggest names.



Nicolas Sarkozy *Photogrpaher: Jean-Christophe Magnenet/AFP via Getty Images*

The reconciliation puts Steinmetz, BSGR and Davis in prime position to lead the development of Guinea's massive iron-ore reserves. Mining giants like Rio Tinto, Vale and Aluminum Corp. of China have all failed to develop projects in the country.

"A good agreement is much better than any war," Steinmetz, who acts as an adviser to BSGR, said in a phone interview on Sunday. "We were enemies. Now we are friends and partners with the Guinean government. We have both put aside the past and BSGR and its employees and advisers have been vindicated."

For Steinmetz, the heir to one of Israel's premier diamond businesses, the arrangement is a remarkable return to favor in Guinea. BSGR entered administration a year ago to protect itself from the outcome of litigation and arbitration it was involved in related to the country. In 2012, Guinea stripped BSGR of its rights to Zogota and half of Simandou, thought by miners to be the world's biggest undeveloped iron-ore deposit. A government committee alleged he and his officials paid millions in bribes to obtain the rights.



Mick Davis *Photographer: Gianluca Colla/Bloomberg*

"We are all really pleased with the situation," Steinmetz said. "Guinea wants to work and they see us as the pioneers of the iron-ore situation, because nobody else has picked it up. Production and export of iron ore will be expedited and this is a win-win situation for everyone."

Sarkozy, who was in office between 2007 and 2012, had a relationship with both sides and was able to broker the deal, according to a person with knowledge of his role.

Long-time director Dag Cramer negotiated the deal for BSGR, a firm owned by a Steinmetz family foundation.

Under its terms, the company relinquishes rights to Simandou and Zogota, and Davis will develop the smaller deposit.

BSGR keeps an economic interest in Zogota, which, according to Steinmetz, will move toward producing "very fast." The company will get a share of the revenue from the new project, which will be developed by Davis in partnership with Guinea.

### 'Win-Win'



Beny Steinmetz and Alpha Conde. *Source: Dag Lars Cramér on Behalf of Nornverdandi*

"We're pleased with the agreement," Guinea's Mines Minister Abdoulaye Magassouba said in an emailed statement, adding that the new projects will be in line with the country's new mining code. "It's for the good of the people. It's with this aim that the government will try hard to work in a win-win partnership with the investors."

The reconciliation suited both sides. Guinea faced the possibility of an embarrassing loss in arbitration court, while BSGR would have been able to do little with an award by the tribunal if Guinea's government remained hostile. The government withdrew all allegations of corruption against BSGR and Steinmetz.



null

Steinmetz, 62, was originally sent out by his family to secure supplies of rough diamonds, introducing him to difficult environments across the globe. He developed a diamond mine in Sierra Leone before setting his sights on Simandou in neighboring Guinea. Ailing President Lansana Conte stripped Rio Tinto of its rights to half of the asset, which the Anglo-Australian miner hadn't developed in a decade of control. The rights lost by Rio were transferred to Steinmetz weeks before the president passed away in 2008.

BSGR rapidly sold half of its Guinean assets to iron-ore mining giant Vale SA for $2.5 billion.

Simandou *Source: Rio Tinto*

### Mining Review

After Conde was elected in 2010, he announced a review
and clean-up of the mining industry, Guinea's main source
of income. Billionaire hedge fund manager George Soros
and former U.K. Prime Minister Tony Blair advised on and
funded Conde's initiative. A lurid dossier of alleged
corruption against Steinmetz became the basis for BSGR's
loss of rights in 2012.

Steinmetz and BSGR always denied any wrongdoing and
insisted they would one day be vindicated. Rio Tinto,
meanwhile, is now under investigation in the U.K. and
Australia for payments it made to a consultant to try to
restore its rights to Simandou.

The Guinean saga has been more than just a painful
business loss for Steinmetz. He has been the subject of
investigations by authorities in the U.S., Switzerland,
Romania and Israel, where he was briefly detained in 2016
and then placed under house arrest.

Though Simandou has long been a fabled asset, developing
it may be impossible. It would require an investment of $20
billion, including the construction of railway lines across a
mountainous country. Rio attempted to later sell its share of
the project to Aluminum Corp. of China, but the deal
collapsed last year.

### Mick the Miner

Davis may have a favorable solution, with the government
allowing him to export via an existing railway line through
neighboring Liberia, using his newly formed Niron Metals
venture.

"Niron believes that the Zogota deposit can be brought into
production on an accelerated timetable, thereby helping to
unlock the potential of Guinea's rich resources for the

benefit of all stakeholders, including the Government and people of Guinea," the company said in a statement.

Davis, nicknamed Mick the Miner, was one of the industry's most successful operators in the early part of the decade as the mining industry boomed on China's rampant industrialization. As Xstrata Plc's chief executive officer, Davis led a team renowned for transforming the coal producer through about 40 deals worth $35 billion over 10 years from 2002, before agreeing to a friendly merger with commodity trader Glencore Plc, where Ivan Glasenberg managed to beat him to the top job.

Since then, the U.K. Conservative Party treasurer has struggled to regain a footing. His private equity vehicle X2 Resources folded after failing to make any deals amid volatile commodity prices and disparate investors who couldn't agree on what assets to buy.

Have a confidential tip for our reporters?

GET IN TOUCH

Before it's here, it's on the Bloomberg Terminal.

LEARN MORE

*(Updates with comments from Niron comments in third from last paragrpah.)*

Terms of Service
Trademarks  Privacy Policy
©2019 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices    Contact Us Help