NEW YORK
LONDON
SINGAPORE
PHILADELPHIA
CHICAGO
WASHINGTON, DC
SAN FRANCISCO
SILICON VALLEY
SAN DIEGO
LOS ANGELES
TAIWAN
BOSTON
HOUSTON
AUSTIN
HANOI
HO CHI MINH CITY

**Duane Morris®**

*FIRM and AFFILIATE OFFICES*

FREDERICK D. (RICK) HYMAN
DIRECT DIAL: +1 212 692 1063
PERSONAL FAX: +1 212 208 4521
*E-MAIL:* RHyman@duanemorris.com

*www.duanemorris.com*

SHANGHAI
ATLANTA
BALTIMORE
WILMINGTON
MIAMI
BOCA RATON
PITTSBURGH
NEWARK
LAS VEGAS
CHERRY HILL
LAKE TAHOE
MYANMAR
OMAN
*A GCC REPRESENTATIVE OFFICE
OF DUANE MORRIS*

ALLIANCES IN MEXICO
AND SRI LANKA

August 27, 2019

*VIA ELECTRONIC MAIL AND CM/ECF*

The Honorable Sean H. Lane
United States Bankruptcy Court for the
Southern District of New York
One Bowling Green
New York, NY 10004-1408
shl.chambers@nysb.uscourts.gov

    Re:    *In re BSG Resources Limited*, No. 19-11845 (SHL)

Dear Judge Lane:

    We represent William Callewaert and Malcolm Cohen (the "Joint Administrators") in their capacity as Joint Administrators and Foreign Representatives for the Debtor BSG Resources Limited (in administration) ("BSGR") in the above-referenced proceeding (the "Chapter 15 Case").[1] The Joint Administrators submit this letter in response to the Court's *Memorandum Endorsed Order* dated August 22, 2019 (the "Memorandum Order"). By the Memorandum Order, the Court requested an update as to the status of BSGR's responses to the written discovery sought by Vale S.A. ("Vale").

**I.    Introduction**

    Vale is a creditor of BSGR. On June 14, 2019, Vale served its first set of document requests (the "Document Requests") and its first set of interrogatories (the "Interrogatories" and collectively with the Document Requests, the "Vale Discovery") on BSGR. The Document Requests consist of sixty-eight (68) paragraphs and seek documents (and in most cases "any and

---

[1] Capitalized terms not otherwise defined herein are intended to have the meaning set forth in the *Amended Declaration of Malcolm Cohen* [Docket No. 24].



The Honorable Sean H. Lane
August 27, 2019
Page 2

all documents") that Vale contends relate to BSGR's administration pending before the Royal Court of Guernsey (the "Guernsey Administration"). Likewise, the Interrogatories include eight (8) broad written inquiries.

The Vale Discovery is extremely broad. On July 3, 2019, the Joint Administrators filed a *Motion for a Protective Order* (the "Protective Order Motion") [Docket No. 27] seeking to narrow the scope of the Vale Discovery to the actual issues to be decided by this Court in the Chapter 15 Case (the "Recognition Issues"). Vale objected to the Protective Order Motion, which was fully briefed by both parties. On July 29, 2019, this Court held argument on the Protective Order Motion. At that hearing, Your Honor determined that Vale was entitled to discovery on a range of certain topics relating to BSGR's "center of main interest" ("COMI"), as well as the conduct of the Guernsey Administration (the "July 29 Ruling").

As explained in detailed herein, the Joint Administrators have been working diligently and expeditiously to gather, review, and prepare for production to Vale documents and other information responsive to the Vale Discovery consistent with the July 29 Ruling. In connection with that effort, the Joint Administrators are required to comply with the Data Protection (Bailiwick of Guernsey) Law, 2017 ("Guernsey Data Protection Law") and Regulation (EU) 2016/679 of the European Parliament and of the Council of 27 April 2016, commonly referred to as the General Data Protection Regulation (the "EU GDPR" and generally with the Guernsey Data Protection Law, "GDPR"). GDPR imposes severe penalties on parties that fail to comply with GDPR. The Joint Administrators, their counsel and other professionals must necessarily proceed with caution.

**II.    Overview of the duties of the Joint Administrators**

It is important, in the context of the discovery process, to understand the duties of the Joint Administrators, especially as it relates to the management and production of documents. Although Administrators, as a rule, secure company documents and records, they do not perform a review of every historical document. This is not a step necessary to enable an Administrator to carry out his duties. In most circumstances, such a process would be economically unviable.

The Joint Administrators wish to communicate to the Court their duties with regard to the review and maintenance of BSGR's books and records. These duties are not itemized in Guernsey statute, but rather arise from their understanding and interpretation of best practice in the context of Guernsey insolvency proceedings.

**A.    Preservation of documents**

Upon their appointment, the Joint Administrators complied with best practice by directing BSGR's personnel to preserve all hard and soft copy records. They have also supervised the scanning and periodic backup of BSGR records to preserve them for the purposes of the administration.

DuaneMorris

The Honorable Sean H. Lane
August 27, 2019
Page 3

### B. Ordinary course review of documents in the context of a Guernsey Administrative proceeding

The Joint Administrators' primary function and obligation is to fulfil the purpose of the Order of the Guernsey Court under which they were appointed, namely "the survival of the Company, and the whole or any part of its undertaking, as a going concern." The means by which this objective is to be achieved is a matter for the professional judgement of the Joint Administrators themselves, albeit subject to oversight by the Guernsey Court. In seeking to achieve the purpose of the administration, the Joint Administrators are not required to monetize the assets of BSGR unless they consider it expedient for them to do so.

In carrying out their duties, particularly where the objective of the administration is to preserve BSGR's business, the Joint Administrators' focus is necessarily and properly forward rather than backward looking. The main issues for the Joint Administrators have been controlling the conduct the two arbitrations to which BSGR is party and the District Court litigation against George Soros, as well as understanding, protecting and supervising BSGR's other assets including its subsidiaries' operations in Sierra Leone.

In performing their duties, the Joint Administrators are not subject to an obligation to carry out any specific review of the historic transactions or documents of BSGR, except to the extent that such a review is required to fulfil the objective of the administration. For this reason, the Joint Administrators have not carried out extensive reviews of BSGR's historic documentation, except where such review is necessary for them to understand its assets, liabilities and business dealings. The review which they have carried out has not been directed towards identifying the categories of documents which Vale has requested in discovery in these Chapter 15 proceedings. For example, the detailed evidential basis for BSGR's Guernsey COMI going back several years prior to the administration filing has not until recently been a subject of enquiry by the Joint Administrators. Much of the discovery which has been requested by Vale is related to areas which has been of interest to the Joint Administrators, but has not needed to be marshalled in a systematic manner consistent with the response to an extensive discovery request.

It is also worth mentioning that the Joint Administrators had not taken the decision to file for Chapter 15 relief until shortly before the filing took place and they only took the decision to file in response to Vale's enforcement actions commenced immediately following the making of the award in the LCIA arbitration proceedings. They had thus not had the opportunity to review and prepare BSGR's records in advance to enable them to comply with their discovery obligations in these Chapter 15 proceedings. This is an important issue for the Court to understand in the context in which the Joint Administrators have been working on discovery in this matter. While Vale has characterized the Joint Administrators' conduct as blatantly dilatory, the facts do not support this accusation. The administration has been staffed with a small BDO team which has since at least the granting of the LCIA arbitration award in favor of Vale, been heavily involved in determining and then implementing their strategy with regard to the challenge of that award, as well as being involved at the same time in seeking to evaluate and diligence the possible settlement



The Honorable Sean H. Lane
August 27, 2019
Page 4

of the ICSID arbitration between BSGR and Guinea. It is therefore inevitable that the Joint Administrators have not been able to devote their full attention since the Chapter 15 filing to responding to Vale's discovery requests. However, they have now reached a point where they have briefed and are deploying a larger team to comply with their discovery obligations, as well as their obligations under GDPR, in an expeditious manner.

### III.    The Chapter 15 Petition

The Joint Administrators initiated this Chapter 15 Case in order to preserve one of BSGR's most significant assets: the litigation claim against George Soros and related entities (collectively the "Soros Defendants") pending before the District Court (the "Soros Claim"). The Soros Claim is BSGR's only asset in the United States, and possibly its most valuable asset anywhere in the world. Accordingly, the prospects of success of the Guernsey Administration will be severely hampered if the Joint Administrators lose control of the Soros Claim.

The relief sought in this Chapter 15 Case is necessary to assist BSGR's foreign restructuring efforts and to protect those efforts from the significant and irreparable harm that could result from creditors and other parties taking unrestrained action against BSGR assets in the United States. In particular, it is incumbent that BSGR be able to prosecute the Soros Claim without interference from Vale. Such interference and impairment will significantly reduce the ability of BSGR, through the Joint Administrators, to achieve a successful outcome of the Guernsey Administration, including satisfying its stated purpose as the survival of BSGR and the whole or any part of its undertaking as a going concern.

### IV.    Chronology of work done to date on meeting discovery obligations

#### A.    Initial document review

In connection with the commencement of the Chapter 15 Case, the Joint Administrators undertook a manual review of certain categories of BSGR documents in their possession that the Joint Administrators anticipated would be necessary to support chapter 15 recognition of the Guernsey Administration. In particular, this review focused on documents submitted to the Guernsey Court in connection with the Guernsey Administration.

#### B.    Review in connection with the Vale Discovery

Immediately upon receiving the Vale Discovery, the Joint Administrators and their team held numerous meetings to discuss the process that would be adopted in order to produce documents responsive to each Document Request and Interrogatory.

Each of the discovery requests that the Joint Administrators agreed appeared to be relevant was considered in turn and, based upon the knowledge of the Joint Administrators' staff the most likely location for the documents that would meet the criteria was identified. The team member,

DuaneMorris

The Honorable Sean H. Lane
August 27, 2019
Page 5

using their knowledge of the events and matters arising in the administration, would review the documents held on the electronic case file (the document management system) into which case files and emails are saved. The BSGR document management system is organized into folders but where documents are saved is at the discretion of the user saving the files. The BSGR case file contains over 37,000 unique documents.

The reviewer, having considered what event or matter arising would have generated a document that may be responsive would search the folder that they considered most likely to contain the document sought. The files were sorted by type and the document names reviewed to assess whether they appeared to imply that they were responsive. The reviewer then took the following action:

- If the document names did not provide a definitive indication that the document was relevant, then that document would be opened and reviewed. If no relevant document was found then the next stage of the review comprised considering documents attached to emails (and not filed otherwise): again, these were individually reviewed manually by opening and reading each document.

- If the folder that had been identified as the most likely source for a document of a particular category did not contain any relevant document, the reviewer proceeded to the next most likely folder and repeated the review process.

- If the previously identified folders did not contain any documents that were responsive then the reviewer would carry out a keyword search. The keyword search would be conducted at a basic level: the reviewer would consider what keyword(s) were most likely to identify responsive documents. Any documents identified were manually reviewed on a document-by-document basis. If the keyword search resulted in positive results then the reviewer would perform a review of the entire folder in which that document had been filed.

Once the reviewer had identified a responsive document it was copied to a separate location for subsequent upload to the Relativity portal.

At this stage, however, it became apparent that there were significant issues concerning data privacy, both in respect of the Guernsey Data Protection Law and the EU GDPR. The production of discovery by the Joint Administrators across borders inherently implicates complex and sensitive issues associated with Guernsey Data Protection Law and GDPR and related regulations. In order to assist them navigate these many issues, the Joint Administrators retained Ogier and Fieldfisher, firms with a well-known technology group with expertise in Data Protection-related matters, in July 2019. Based on conversations with attorney's from Ogier and Fieldfisher, the Joint Administrators thought it helpful for purposes of this letter to provide an overview of GDPR generally and the steps that the Joint Administrators and their respective counsel have undertaken to ensure compliance.

DuaneMorris

The Honorable Sean H. Lane
August 27, 2019
Page 6

V.  **GDPR Issues**

   A.  **Overview of General Data Protection Regulation**

The European Union ("EU") is a group of 28 countries, operating as a cohesive economic and political block. The EU has emphasized protecting the privacy of its citizens' personal data and of any other personal data within the EU. The GDPR is a comprehensive framework that provides both general rules for the processing of personal data and specific rules for transfer of personal data to non-EU states. GDPR was effective as of May 25, 2018. Guernsey is not a member of the EU, although it currently has a limited relationship with the EU, governed by Protocol 3 to the Treaty of Accession to the European Community of 1973 and has taken measures to ensure that their data protection regimes provide standards of protection for personal data equivalent to those in force within the EU. Guernsey enacted Data Protection (Bailiwick of Guernsey) Law 2017 which came into force to coincide with the enactment of GDPR and broadly replicates the primary features of the GDPR.

Generally, GDPR applies to "any processing of personal data" (*see* Article 2 (1) GDPR) and generally sets forth the rules that must be followed by the controllers of such data. The scope of "processing" is broad and includes any operation "performed on personal data," whether by manual or automated means (*see* Article 2 (4) GDPR). This encompasses collecting, recording, organizing, structuring, storing and erasure of data. A "controller" is a natural or legal person, public authority, agency or other body that, alone or jointly with others, determines the purpose and means of the processing of personal data (*see* Article 4 (7) GDPR). The Joint Administrators and BSGR are independent controllers of personal data and therefore subject to compliance with GDPR (*see* Article 5 (2), GDPR).

Under GDPR, the processing of personal data shall be adequate, relevant and limited to what is necessary in relation to the purposes for which it is being processed (Recital 39, GDPR). As such, any processing requires an on-going evaluation of the proportionality of the processing activities to ensure that personal data is necessary for reaching the purpose of processing and that excessive data is not being furnished.

Accordingly, the Joint Administrators' production of documents on behalf of BSGR pursuant to Vale S.A.'s requests – both to Duane Morris for initial review and later to Vale S.A. -- must comply with GDPR to the extent they contain personal data. This includes information that relates to an "identified or identifiable individual" (*see* Article 4 (1) GDPR), and includes information related to an individual's home or working life. Data is personal if a person can be directly or indirectly identified, by reference to an identifier. This may occur where the data identifies one or more characteristics that express physical, physiological, psychological, genetic, economic, cultural or social identity, whether or not an individual is actually identified. The mere possibility of identification, brings data within the broad scope of the GDPR. As a result, a combination of information that can lead to identification must be protected whether or not the



The Honorable Sean H. Lane
August 27, 2019
Page 7

individual is named. Complicating this further, the language of Article 4(1), is passive, therefore the "combination of information" does not necessarily have to be in the possession of the controller or processor.

Violations of GDPR are punishable with fines of up to €20,000,000.00 (US$22,253,900.00) or up to 4% of a controller's total worldwide annual turnover, whichever is higher (*see* Article 83, section 5). In July 2019, the UK's Information Commissioner's Office issued an intention to fine British Airways GP£204,600,000 and the Marriot International, Inc. Group GP£110,390,200 for GDPR infringements relating to the mishandling of personal data. In January 2019, the French Supervisory Authority fined Google €50,000,000 for failing to be transparent with data subjects about its processing of their data. In July 2019, the Greek Supervisory Authority fined PWC Business Solutions €150,000 for using the incorrect legal grounds for processing personal data.[2]

### B.    Compliance with GDPR

Due to the reach of GDPR and the potential risk of significant fines, the Joint Administrators have reasonably proceeded with great caution before producing documents to ensure the privacy of each individual and ensure that all personal information is adequately protected. Compliance with Vale's comprehensive and wide-ranging discovery necessarily requires the transfer of information from the EU to multiple parties in a "third country". The universe of responsive documents naturally includes personal information about identifiable individuals. These include information relating to at least the following:

---

[2] GDPR compliance is monitored by each EU member state's "Supervisory Authority" (*see* Article 51(1), GDPR). Supervisory Authorities are authorized to receive complaints (*see* Article 57(1)(f), GDPR) and are responsible for conducting investigations (*see* Article 57(1)(h)) in relation to potential non-compliance.



The Honorable Sean H. Lane
August 27, 2019
Page 8

| | |
|---|---|
| *BSGR* | Former and current directors, personnel, consultants, employees, shareholders, benefactors, contractors of each of BSGR and BSGR associated companies |
| *Guinean Government* | Guinean heads of state, government members, former members, associates, connected persons, associated officials and advisers |
| *Legal* | Members of the judiciary, court officers, arbitrators, bailiffs, greffiers, legal practitioners, legal professors, witnesses and experts |
| *BDO Personnel* | BDO administrators, employees, contractors |
| *Public Officials* | Former and current company registrars, heads of state, public officials, ministerial officials |
| *Other Third Parties* | Known public figures, including financiers, businesspeople and their associates, journalists, accountants, consultants, parties to litigation (including their employees, consultants, associates, advisers, benefactors, financiers) |

Article 44 of the GDPR provides that any transfer of personal data that is undergoing processing or is intended for processing after transfer to a third country has to comply with the conditions set forth in Chapter V of GDPR. This includes compliance with conditions for onward transfers of personal data from the third country to another party. Safeguards for the transfer of personal data shall provide that where an onward transfer occurs, the same level of data protection must be afforded to the data as under the GDPR.

In order to comply with Chapter V, among other things, a two-step process must be followed. First, the transfer must correspond to the requirements for data processing within the EU, *i.e.*, data processing activities will only be lawful if, following an assessment, they are covered by one of six lawful basis for processing (*see* Article 6, GDPR). These include consent, a contract with the data subject, compliance with an EU legal obligation, or in order to protect the vital interest of the person, necessary for a task carried out in the public interest, or in the legitimate interests of the exporter (except where those interests are overridden by the interests or rights and freedoms of the data subject).[3] Second, the transfer has to comply with the conditions in Article 44 of GDPR to ensure "an adequate level of data protection." If both conditions are fulfilled, data can be transferred to third party-recipients.

---

[3] Compliance with the Vale S.A. discovery requests is based upon BSGR's legitimate interest. To identify "legitimate interest" as the basis for processing, a legitimate interest balance test was conducted , as required by GDPR, for the purposes of assessing the necessity of transferring personal data to a "third country" against individual's rights and freedoms.



The Honorable Sean H. Lane
August 27, 2019
Page 9

In order to ensure that an adequate level of data protection with respect to transfers to the US, either (a) parties must contract consistent with European Commission Standard Contractual Clauses (also known as "Model Clauses") or (b) rely on Article 49 of GDPR which permits third-country data transfers in limited cases (*e.g.*, if necessary for the exercise or defense of legal claims) and only where the transfer is not repetitive, concerns only a limited number of data subjects, is necessary for the purposes of compelling legitimate interests.[4]

      C.      **The Standard Contractual Clauses**

In order to provide such assurance, and in order to obtain access to documents with personal data, the Joint Administrators and Duane Morris necessarily negotiated and executed an agreement consistent with the Standard Contractual Clauses. The Standard Contractual Clauses include significant detail regarding the categories of personal data to be transferred and therefore require significant diligence regarding the data included in discovery materials which was performed by Fieldfisher. They also require that the importer and exporter to make certain representations and covenants regarding the treatment of the data (and expose the parties to liability for any breach). The agreement is accompanied by a "transfer letter" that further details, among other things, the roles and responsibilities over the personal data transferred, the legal basis for transferring and the discovery review assumptions insofar as they relate to EU personal data. Duane Morris' data privacy experts in London worked very closely with Fieldfisher, the Joint Administrators and their firms, BDO LLP and BDO Limited (Guernsey), to negotiate and finalize the agreement and the letter. Certainly, Duane Morris attorneys and BDO attorneys spent considerable time getting comfortable with the transfer process, implementing internal controls, and interacting with, and obtaining required approvals from, senior management at the respective firms. This took longer than anticipated which delayed transfer of the initial transmission of data to Duane Morris for its review.

Duane Morris now has access to approximately 320 documents and has undertaken a review of those documents to identify all personal data and further examine the documents for relevance, privilege and other confidential or commercially sensitive information that would be damaging to the business of BSGR and its subsidiaries. As noted above, this requires a very careful review given the breadth of scope of personal data. Following review, Duane Morris will provide redacted versions of the documents to the Joint Administrators and Fieldfisher for confirmation. Promptly upon such confirmation, responsive documents will be produced to Vale S.A.'s counsel.

---

[4] The latter option can only be used as a "once off" and was relied on for the initial batch of documents delivered to Duane Morris earlier in the matter.

### D. GDPR Protocol

The Joint Administrators and their counsel at Fieldfisher and Duane Morris have prepared a draft GDPR protocol for execution between the Joint Administrators on behalf of BSGR and Vale S.A. The protocol sets out the background to the proceedings, rules for the redaction of discovery material, appointment of a single contact, treatment of personal data contained in discovery materials, and other general provisions. An initial draft of the protocol was delivered to Vale S.A.'s counsel on August 22, 2019.

Generally, the draft protocol provides that documents will be produced to Vale S.A. in a form that redacts certain categories of personal information. This information has been categorized into two classes: (1) generally, (a) names of family members, (b) home addresses, (c) dates of birth, (d) nationality, (e) ID document details, (f) personal bank account details, (g) home phone and fax numbers, (h) personal check details, and (i) signatures, and (2) generally, (a) names of person, (b) position, job title and occupation, (c) business name, government affiliation and jurisdiction, (d) directorships and director business details, (e) business addresses and email addresses, (f) subjects initials, and (g) business phone and fax numbers. The Joint Administrators have proposed to redact in full personal information in category 1 above, and redact personal information in category 2 above to the extent irrelevant or excessive. All redacted information will identify the type of personal information that was removed. If Vale S.A. considers the disclosure of such information necessary for purpose of the case, the Joint Administrators have suggested that Vale S.A. provide notice to the Joint Administrators providing reasonable detail as to why it is necessary. Upon receipt of any such notice, the Joint Administrators shall advise if any such information cannot be provided, identifying the data privacy law on which they rely with a brief explanation for their decision. If the parties are thereafter unable to reach resolution, the matter may be brought before this Court.

Where personal information is provided, the draft protocol mandates that Vale S.A. limit its processing to the purposes of the preparation, assessment, conduct and administration of the case and requires that it maintain certain minimum security requirements, among other things. Vale S.A. could transfer such information to third parties to the extent it ensures those third parties comply with the protocol as if they were a party thereto. In the event that such transfer is to a recipient in a "third country," it must ensure that safeguards are in place similar to those contained in the Standard Contractual Clauses referred to above.

Following the receipt of the above advice the Joint Administrators were in a position to continue with its discovery process. In the intervening period, the obligations had multiplied, due to the July 29 Ruling extending the documents deemed to be relevant beyond those that the Joint Administrators had believed were relevant to the limited recognition issues (*i.e.*, COMI).



The Honorable Sean H. Lane
August 27, 2019
Page 11

### VI.    Implementing new protocols and reviewing documents for production

Consequently, the Joint Administrators were faced with an extremely onerous task involving a significant volume of documents that needed to be sifted and reviewed to identify: (i) responsive documents from the total population of documents; (ii) documents that are relevant to the discovery request from that sub-population; (iii) any Data Privacy related information contained in the documents; and (iv) any privileged documents.

The review process therefore required a significant change in strategy, adopting a stratified approach to identify responsive documents from various sources, and that will undergo the above review, which can be summarized as follows:

(i)    firstly, using the existing file structure on the Joint Administrators' document management system, targeted reviews will be undertaken to identify "easy win" documents which are expected to be in a particular location;

(ii)    following the above targeted reviews, key word searches will be performed on the document management system to identify responsive documents;

(iii)    finally, key word searches will be performed over the dataset comprising the company's records.

The aforementioned sources of data have been forensically collected from a variety of different sources and locations, as follows:

- BDO's document management system
- emails from a dedicated BSGR mailbox
- The mailboxes of the Joint Administrators
- BSGR's email system (administered by a third party vendor in Guernsey)
- BSGR's pre-administration file system (administered by a third party vendor in Guernsey)
- BSGR's post-administration file system (administered by a third party vendor in Guernsey).

The data from the above sources requires specialist processing in order to make it searchable, remove duplicates, extract attached and embedded files and extract the metadata from each document. Once this specialist processing has been undertaken, the de-duplicated files will be uploaded to BDO's secure online platform, where it will be searched and reviewed.



The Honorable Sean H. Lane
August 27, 2019
Page 12

### A. Data from BDO's document management system

BDO's corporate IT team extracted the BSGR folder from the document management system, the BSGR mailbox and the mailbox of Malcolm Cohen. This is a complex process: BDO's data now sits within the cloud, and consequently, this is a two-stage process, whereby each data source must be prepared before it can be downloaded. A separate exercise was carried out by BDO's IT team in Guernsey to extract the mailbox of William Callewaert.

### B. Data from the Company's books and records

The Company's books and records are held in two primary locations. Those books and records pre dating 2016 (approximately) are held on a network-attached storage ("NAS") server, administered by a third party IT provider, that is physically located in a secure environment in Guernsey. Those books and records created from 2016 onwards (approximately) are held on a secure web based platform, called Sharepoint (administered by the same third party IT provider).

Following their appointment, the Joint Administrators took the following steps:

1. The status of the NAS server was switched to 'read only' on 16 March 2018;
2. The status of Sharepoint was switched to 'read only' on 19 March 2018;
3. All of the Company's email boxes were switched to 'litigation hold' on 19 March 2018;
4. The NAS server was forensically imaged on 26 September 2018 and a copy of that image is held securely by the Joint Administrators;
5. Sharepoint was forensically imaged on 26 September 2018 and on 18 July 2019, copies of those images are held securely by the Joint Administrators.

The Joint Administrators also note that a third party document storage provider called Inventus holds copies, on a secure (and hibernated) basis, of a number of the Company's book and records that were required for disclosure during the Republic of Guinea arbitration.

### C. Ongoing work for the purpose of discovery

Currently, the folders from the document management system and the BSGR mailbox have been processed. These two data sources totaled 17GB in volume and comprised 52,972 documents. Following processing, the de-duplicated data, amounting to 37,730 documents, was uploaded to the online platform to be searched.

BDO are now processing the mailboxes of the Joint Administrators, which total 107 GB in volume. This is expected to take four days to complete, after which the data will be uploaded to the review platform and searched.



The Honorable Sean H. Lane
August 27, 2019
Page 13

The data from BSGR's systems is expected to be available for processing imminently. Some manual work will be required to isolate the data that should be processed from these systems, but the total amount of data collected is approximately 506 GB. Therefore, we expect that it will take approximately twenty days for the processing to complete before it can be searched in the review platform.

**VII.    Anticipated Timeline**

The documents to be produced fall into three categories: (1) documents that have been retrieved and which are being reviewed by Duane Morris for GDPR and privilege issues; (2) documents concerning BSGR maintained on BDO's document management system; and (3) BSGR documents which were imaged under BDO's supervision in Guernsey.

Documents in category one are being reviewed by Duane Morris for GDPR, privilege and confidentiality purposes. Redactions on these bases will be reviewed by BDO prior to production. These documents will be produced next week.

Documents in category No. 2 are currently being reviewed and gathered by BDO, after which they will be subject to review by Duane Morris for GDPR, privilege and confidentiality purposes. Redactions on these bases will be reviewed by BDO prior to production. Thereafter, these documents will be produced in a rolling production, with a target date of September 27 for completion of production.

Documents in category No. 3 will then be reviewed and gathered by BDO, after which they will be subject to review by Duane Morris for GDPR, privilege and confidentiality purposes. Redactions on these bases will be reviewed by BDO prior to production. Thereafter, these documents will be produced in a rolling production, with a target date of October 26 for completion of production.

Counsel for the Joint Administrators and a representative of BDO will be available in the courtroom at the status conference scheduled for August 29, 2019 at 2:00 p.m. to answer any questions Your Honor may have in connection with this proposed schedule.

Respectfully submitted,

*/s/ Frederick D. Hyman*
Frederick D. Hyman, Esq.