# Exhibit A

| |
|---|
| Professional Civil Partnership |
| Yann JEZEQUEL |
| Christine PINHEIRO |
| And Anne-Sophie GRUEL |
| Associated Bailiffs |
| 44 rue Poliveau |
| 75005 PARIS |

SENT LETTER

[logo] BAILIFF

# CERTIFIED REPORT

## YEAR TWO THOUSAND THIRTEEN, NOVEMBER TWENTY-NINTH

**AT THE REQUEST OF:**

**THE GOVERNMENT OF THE REPUBLIC OF GUINEA**, represented by the President of the Republic in office
Address for service located at the law-firm DLA PIPER UK LLP
17 rue Scribe 75009 PARIS

**WHICH STATES:**

That it takes high interest in transcribing the phone records and the conversations between Mamadie Touré and Frédéric Cilins.

Which asks me, as a consequence, in order to ensure the protection of its rights, to note all relevant findings and to prepare a report.

**THEREFORE, COMPLYING WITH THIS REQUISITION:**

I the undersigned, **Christine PINHEIRO**, bailiff at the Tribunal de Grande Instance of PARIS [Superior Court], residing at 44, rue Poliveau 75005 PARIS,

Hereby certified that I received today, at my office and to my attention, a closed envelope,

**I SAW, RECOGNIZED AND FOUND THE FOLLOWING:**

Professional Civil Partnership
Yann JEZEQUEL
Christine PINHEIRO
And Anne-Sophie GRUEL
Associated Bailiffs
44 rye Poliveau
75005 PARIS

I opened the envelope and I found an USB stick inside it.

I found that this USB stick contains:

- the following folders:



- a draft transcript.

I found that the folders contain audio records.

I have listened to each of the audio files.

I subsequently took note that the transcript on the USB stick is the exact transcript of said recordings and it is reproduced below:

2

CONFIDENTIAL

## RECORDING OF A MEETING OF APRIL 11, 2013

Transcript of recording of a meeting between Mamadie Touré ("MT") and Frédéric Cilins ("FC").

---

**REFERENCES:**

    **Case: 4.11.2013 CW Meeting with Cilins 12-2PM**

    **File: 0372_001 .WAV**

---

| | | |
|---|---|---|
| **0:00:00** | **START OF RECORDING** | |
| | FBI: | This is special agent Vanessa [Stelli]. This is April 11th, 2013. This is going to be a consensually monitored conversation between the [CHS] and Frédéric Cilins. |
| **18:16** | FC | [From the phone of MT] Hello? |
| | MT: | [On the phone with FC] I can't find where you are. |
| | FC: | [From the phone of MT] In the room over there. In the airport. |
| | MT: | No, I can't find it. Which room? |
| | FC: | [inaudible] |
| | MT: | All right, I see you. |
| | FC: | Ah ok |
| | MT: | Hello. |
| | FC: | How are you? |
| | MT: | I'm fine. Are you doing well? |
| | FC: | [In] good shape? |
| | MT: | Yeah. |
| | FC: | Yeah? Do you want to grab a bite? |
| | MT: | Ok. |
| | | [inaudible - music] |
| | FC: | Did Cény drop you off? |
| | MT: | Cény didn't drop me off  because I told him 3 p.m. so he said he couldn't come. |

CGS&H p. 118

CONFIDENTIAL

FC:     The check. Yeah, yeah we want the check and um...

MT:     Thank you.

FC:     And um... What was I saying? Yes - what you should get when - if the group is not thrown out and it - its project is confirmed, the 5 that you should get, you'll get it for sure, no problem. Moreover, some people's story, what we are discussing now, that is, instead of being one when you [inaudible], it's going to be 200 now and 800 when the other leaves. 200 now it's because I've tried. You told me try to get an amount right away, because I need for [inaudible] there. So that's why you have 200 -

MT:     But then you told me 300.

FC:     I - listen, I thought of getting 300, I got 200. I'll keep trying. 200's for sure, it's accepted. I'll still see if I can get 200-250 maybe, I'll get the most. But I got 200. You see? I'll try, I promise you I'll try.

MT:     But beside the 5, there will be nothing.

FC:     There will be the 5 and there will be 800. That will make 6 with what you have. That's one thing, it's already accepted. Depending - listen carefully to what I tell you - because I've always told you that, because I know it's like that. Depending on how it ends. If it's good for him, if we don't cut too right, left, I don't know, there will be more. I don't know how much. There will be 3, 4, 5 more, I don't know. But there will be more. And that's the communication I was given directly by number 1, I don't even want to mention his name. It's like that. Okay? And that's for sure.

**1:14:03**     MT:     Number one? Michael?

FC:     No, no.. Beny [whispering].

MT:     Ok.

FC:     Ok? Everything I tell you is directly from Beny. The other day when I tell you, I'm - I'm waiting there during the meeting, I went on a journey, I traveled to see him directly, talk face to face, and have - everything I tell you comes from him. Nobody else. All right?

MT:     I didn't know.

FC:     Nobody else. Nobody else. I purposely went to see him, to see him and discuss all this thoroughly. I always told him, I always told him. Just last week, I told him, I told Beny, I always repeated that she was - that she'll never betray you, she'll never betray you, she'll never give the documents to anyone. He told me "look", he said "look, that's fine, but I want you to go see. I want you to destroy these documents." He told me, you see, "do what you want but I want you to tell me "I saw Mamadie and the documents, it's finished, there are no more documents." And with that, I tell you, I repeat, to make it clear in your mind, you'll have the scheduled 5 in any case. You will have them, if they're not kicked off. If they're still in the project. What you will have, whatever happens, is the one million, that is 200 plus 800, you'll have that - see I've got a piece of paper just like that for [he writes on a

CONFIDENTIAL

MT:    Who?

FC:    You know who. There's only one person I speak to. The the the the.... the big boss. So if he says, "I want you to watch when it's destroyed," I can't lie to him. I can't lie to anybody.

MT:    So what can I do? Because I tell you I will do it. I've already signed this -

FC:    This is - sorry - this is not about signing. This is - the deal was that, the deal was to destroy it when we come back, but we must - we're here to make the copies.

       [Inaudible then silence]

FC:    Thank you. Do you have a place to put - to put this?

MT:    Mmm.

FC:    Let's fold it. Fold it like this?

MT:    Yes

       [Silence]

FC:    Now we take a taxi, I'll wait for you, you'll take your key, we go there, we destroy them and that way everything's fine.

MT:    You can't leave with me, Frédéric

FC:    Oh dear, as you like, well I don't know. I can't tell him it's done, if it's not done. That's what I - if I haven't seen, I can't tell him. I can't -

MT:    I told you, I'll do it.

FC:    I know you'll do it, because it is in your interest to do so, but do you understand what I mean? I can't tell him yes if - I can't tell him that I was there if I wasn't there. I can't lie to him. I can't lie to him.

MT:    Then, in this case I have to go home, and I'll call you.

FC:    Ok. You go there. You do it and you give me - you tell me the address where you want us to meet and uh .. You send me a message on the phone and I will take a taxi and meet you wherever you want.

MT:    Ok.

FC:    All right?

MT:    Yes

FC:    Ok. That's settled. So I will wait for your call then? I'll wait here.

MT:    Ok.

CGS&H p. 140

# Exhibit B

**Exhibit C-574**

*TRANSLATION*

[crest] REPUBLIC AND CANTON OF GENEVA
     Judiciary                                Geneva, Office of the Public Prosecutor building
     **Public Prosecutor**                     on October 18, 2013 at 9:15 A.M.

[stamp:] COPY                   **Prosecutor:**    Claudio MASCOTTO

                                    **Court Registrar:**  Michel PECORINI
                                    **Analysts:**       Makenga TSHITUNDU and Yvan LOVO

Ref:    CP/262/2013
        P/12914/2013
To be noted in all communications.

     *Makenga TSHITUNDU and Yvan LOVO, financial crime analysts, are in attendance at the hearing*

## MINUTES OF THE HEARING

Atty. BONNANT assisting:

**Beny STEINMETZ**
Born on April 2, 1956, businessman,
Domiciled c/o Atty. Marc BONNANT, Chemin Kermely 5, 1208 Geneva 12
Defendant, already having been read his rights and responsibilities;
Appearing in accordance with a summons to appear;

Who declares:

I acknowledge that I am being heard as a defendant within the context of proceedings CP/262/2013, in fulfillment of letters rogatory of the Republic of Guinea and the United States of America, as well as national proceedings P/12914/2013. You provide me with a copy of the American request and the decision by the Swiss Federal Office of Justice to enter into the case.

**I am accused of having, since 2005, personally and through the *Beny Steinmetz Group* (BSG) and *Onyx Financial Advisors SA*, which I control at least partially, participated in a promise and/or the granting of undue advantages to one or more influential persons at the level of the Presidency or Government of the Republic of Guinea, with a view to the assignment of mining concessions in this country to the *Beny Steinmetz Group*, conduct falling within the context of Article 322 *septies* of the Criminal Code, punishing the corruption of foreign public officials.**

You read me my rights as established under Articles 107 and 158 of the Swiss Code of Criminal Procedure, copies of which have been provided to me.

I absolutely contest having committed any crime. I have not corrupted anyone. All the corruption allegations are completely false.

[signature] [signature] [signature] [signature] [signature]

**CGS&H p. 1**

**Minutes of the hearing of October 18, 2013, page: 2**

Further, I confirm for you the terms of the recent letter by my attorney. While I would be willing to speak in the national proceedings only, I refuse to speak within the context of the mutual assistance requested by Guinea. With regard to the United States, I have not yet reviewed their request.

You ask me why I do not wish to respond to the Guinean request. The response can be found in the letter that my attorney sent you on October 9, 2013.

You indicate to me that it would be appropriate for me to raise all the complaints that I am making toward Guinea in an appeal, which I can lodge against the closure decision.  Two judicial authorities, the Federal Criminal Court and the Federal Court, can then hear my arguments. This is without taking into consideration the extraordinary remedy provided for under Article 2 of the Federal Act on International Mutual Assistance in Criminal Matters – Mutual Assistance Act, IMAC. You draw my attention to the fact that my legal protection is sufficiently guaranteed at this stage of the proceedings. You add that, by refusing to speak within the context of the mutual assistance proceedings, I also refuse to speak within the context of the national proceedings, since the minutes of my hearing may then be placed on record in the mutual assistance proceedings.

I respond to you that I am willing to immediately reply to all questions in the national proceedings.

You draw my attention to this fact, which I already know, that my declarations in the national proceedings will be placed on record in the mutual assistance proceedings and will form the object, in future, of a closure decision.

You indicate to me that I will be summoned again in the coming weeks to be heard, and that you will again ask me whether I agree to speak.

**Atty. Marc BONNANT**

My client will reexamine his refusal to speak once the outcome of the closure decision on the mutual assistance proceedings is known. What he will not accept is to speak to the Guinean authorities, since Guinea is not a constitutional state. Conversely, my client is willing to speak in both the national proceedings and in the mutual assistance requested by the United States, insofar as the United States undertakes to not transmit to Guinea the minutes of the hearing of Mr. STEINMETZ.

In relation to participation in acts of public authority by representatives of Guinea, I confirm to you that we object to these. We have not, however, deemed it necessary to appeal your decision and that of the Federal Office of Justice, as ONYX has already lodged appeals posing the question of principle of the absence of a constitutional state in Guinea.

You ask me what the position of Mr. STEINMETZ will be if the ONYX appeal is dismissed. We will continue to maintain silence until the closure decision. Having said this, if we are unsuccessful in fighting the granting of mutual assistance to Guinea, this would then pose for my client the question of effectively defending himself in the national proceedings, and my opinion is that a person cannot defend himself by silence.

After reading, I maintained my position and signed at 9:45 A.M.

[signature] [signature] [signature] [signature] [signature]



**REPUBLIQUE ET CANTON DE GENEVE**
Pouvoir judiciaire
**Ministère public**

Genève, bâtiment du Ministère public
le 18 octobre 2013 à 9 heures 15



Procureur : Claudio MASCOTTO

Greffier : Michel PECORINI
Analystes : Makenga TSHITUNDU et Yvan LOVO

Réf : CP/262/2013
P/12914/2013
à rappeler lors de toute communication.

*M. Makenga TSHITUNDU et M. Yvan LOVO, analystes en criminalité financière,*
*assistent à l'audience*

### PROCES-VERBAL D'AUDIENCE

Me BONNANT assiste

**Monsieur Beny STEINMETZ,**
né le 2 avril 1956, homme d'affaires,
domicilié, c/o Me Marc BONNANT, Chemin Kermely 5, 1208 Genève 12
prévenu , rendu attentif à ses droits et devoirs;
qui se présente sur mandat de comparution;

Lequel déclare:

Je prends note que je suis entendu en qualité de prévenu dans le cadre de la procédure CP/262/2013, en exécution de commissions rogatoires de la République de Guinée et des États-Unis d'Amérique, ainsi que de la procédure nationale P/12914/2013. Vous me remettez copie de la requête américaine et de la décision d'entrée en matière de l'Office fédéral de la justice.

Il m'est reproché d'avoir, dès 2005, personnellement et au travers du *Beny Steinmetz Group* **(BSG)** et d'*Onyx Financial Advisors SA*, que je contrôle en tout cas partiellement, participé à la promesse et/ou à l'octroi d'avantages indus à une ou plusieurs personnes influentes au niveau de la présidence ou du gouvernement de la République de Guinée, en vue de l'attribution de concessions d'exploitation minière dans ce pays en faveur du *Beny Steinmetz Group*, comportement tombant sous le coup de l'article 322$^{\text{septies}}$ CP réprimant la corruption d'agents public étrangers.

Vous me rendez attentif à mes droits au sens des articles 107 et 158 CPP, dont copies m'ont été remises.

Je conteste absolument avoir commis le moindre crime. Je n'ai corrompu personne. Toutes les allégations de corruption sont totalement fausses.

Pour le surplus, je vous confirme les termes du récent courrier de mon avocat. Autant je serais disposé à m'exprimer dans la procédure nationale exclusivement, autant je refuse de m'exprimer dans le cadre

de l'entraide demandée par la 'Guinée. Pour ce qui est des Etats-Unis, je n'ai pas encore pris connaissance de leur demande.

Vous me demandez pour quelle raison je ne souhaite pas répondre à la demande guinéenne. La réponse se trouve dans le courrier que mon avocat vous a fait parvenir le 9 octobre dernier.

Vous m'indiquez qu'il me sera loisible de soulever tous les griefs que j'adresse à la Guinée lors du recours que je pourrai interjeter contre la décision de clôture. Deux instances judiciaires, le Tribunal pénal fédéral puis le Tribunal fédéral pourront alors connaitre de mon argumentation. C'est sans compter la voie extraordinaire prévue à l'article 2 EIMP. Vous attirez mon attention sur le fait que ma protection juridique est suffisamment garantie à ce stade de la procédure. Vous ajoutez qu'en refusant de m'exprimer dans le cadre de l'entraide je refuse également de m'exprimer dans le cadre de la procédure nationale, puisque le procès-verbal de mon audition pourrait ensuite être versé dans la procédure d'entraide.

Je vous réponds que je suis disposé à répondre immédiatement à toutes questions dans la procédure nationale.

Vous attirez mon attention sur ce fait, que je connais déjà, que mes déclarations dans la procédure nationale seront versées dans la procédure d'entraide et feront l'objet à terme d'une décision de clôture.

Vous m'indiquez que je serai à nouveau convoqué pour être entendu dans les semaines qui viennent et que vous me demanderez alors à nouveau si j'accepte de m'exprimer.

**Me Marc BONNANT**

Mon client réexaminera son refus de s'exprimer une fois connu le sort de la décision de clôture de l'entraide. Ce qu'il n'accepte pas, c'est de s'exprimer pour les autorités guinéennes, car la Guinée n'est pas un Etat de droit. Par contre, mon client est disposé à s'exprimer aussi bien dans la procédure nationale que dans l'entraide demandée par les Etats-Unis, sous réserve que les Etats-Unis s'engagent à ne pas transmettre à la Guinée le procès-verbal de l'audition de M. STEINMETZ.

S'agissant de la participation aux actes de l'autorité des représentants de la Guinée, je vous confirme que nous y sommes opposés. Nous n'avons cependant pas jugé nécessaire de recourir contre votre décision et celle de l'Office fédéral de la justice, dès lors qu'ONYX a déjà interjeté des recours posant la question de principe de l'absence d'Etat de droit en Guinée.

Vous me demandez quelle sera l'attitude de M. STEINMETZ si le recours d'ONYX devait être rejeté. Nous continuerons d'opposer le silence jusqu'à la décision de clôture. Cela dit, si nous devions échouer à combattre l'octroi de l'entraide à la Guinée, se poserais alors pour mon client, la question de se défendre efficacement dans la procédure nationale, et mon opinion est qu'on ne se défend pas par le silence.

Après lecture, persiste et signe à 9 heures 45

# Exhibit C

# The Liechtenstein Foundation

**MARXER & PARTNER**

RECHTSANWÄLTE

Marxer & Partner Attorneys-at-Law
Heiligkreuz 6
9490 Vaduz
Liechtenstein
Phone  +423-235.81.81
Fax      +423-235.82.82
info@marxerpartner.com
www.marxerpartner.com/en

**Summary of:**
Marxer & Partner
Liechtensteinisches Wirtschaftsrecht
1st edition 2009, Liechtenstein-Verlag, Schaan
ISBN 978-3-905762-04-4

Current version: 23rd March 2010

## Contents

| | |
|---|---|
| 1. The Liechtenstein Foundation and Its Advantages | 5 |
| 2. Sources of Liechtenstein Foundation Law | 9 |
| 3. Definition and Types of Foundations | 11 |
| 4. Setting up a Foundation | 12 |
| 5. Organization of the Foundation | 15 |
| 5.1. The Founder | 15 |
| 5.2. The Foundation Council | 18 |
| 5.3. The Audit Authority | 20 |
| 5.4. The Control Body and Other Executive Bodies | 22 |
| 5.5. The Representative | 24 |
| 6. The Beneficiaries | 24 |
| 7. Foundation Governance | 29 |
| 8. Foundations and Estate Law | 31 |
| 9. Foundations and Asset Protection | 33 |
| 10. Accounting | 35 |
| 11. Termination of the Foundation | 36 |
| 12. Transitional provisions | 38 |
| 13. Taxes and Fees | 39 |
| 14. What Can Marxer & Partner Do for You? | 41 |

## 1. The Liechtenstein Foundation and Its Advantages

A foundation is used to make assets legally independent from the founder by transferring them to a legal entity in its own right, i.e. the foundation. Unlike a corporation, a foundation has no members but does have beneficiaries who are entitled to enjoy the foundation assets and/or income according to the will of the founder.

The new Liechtenstein foundation law came into force on 1st April 2009. It offers both common-benefit (charitable) and private-benefit foundations an attractive legal basis and therefore provides Liechtenstein with a good starting position in the «competition for foundation law regimes». In international legal literature, the new foundation law has rightly been described as systematically and substantively first-rate, indeed as pioneering.

The Liechtenstein foundation is an excellent tool for estate planning and asset protection. Some of its advantages are:

- **Flexible System of Beneficial Interests:**
  The founder has complete freedom regarding whom he wants to appoint as the beneficiary of the foundation. He also has an entirely free choice regarding how to shape the respective beneficial interests. Thus it is possible, inter alia, to determine the amount and timing of each and all distributions and to set terms and conditions. A distribution can comprise the entire income of the foundation's assets in any given year or pertain to an annual fixed amount. It is also possible to make distributions payable only once the beneficiaries reach a certain age. Similarly, it is permitted to define only a class of potential beneficiaries (such as the founder's family) and to leave it to the discretion of the foundation council to whom it will make distributions and in what amount. The arrangements governing beneficial interests can also be modified provided the founder has made provision for this to happen. Besides, the founder can provide for a combination of private-benefit and common-

benefit purposes by dedicating some of the foundation's assets to common-benefit purposes and the rest to supporting his family or others. Similarly, it is also possible to convert a family foundation into a charitable foundation after a certain time.

■ **Estate Planning for Many Generations to Come:**

In testamentary dispositions it is usually impossible to make arrangements lasting several generations. Furthermore, the monitoring of testamentary stipulations can only be carried out with great difficulty, especially if the heirs live in different countries. In addition, provided they are unanimous, in most cases the heirs can deviate from instructions contained in the will. With a Liechtenstein foundation, however, the founder can exactly specify the beneficiaries across many generations. There is no «rule against perpetuities» in Liechtenstein law. The foundation council carries out these instructions and checks their observance. Provided the founder has made provision for it to happen, the arrangements governing beneficial interests can be modified.

■ **No Lengthy Probate is Necessary:**

The assets of the foundation are not within the estate of the founder since he or she is not the owner of the foundation's assets; instead, the foundation itself, being a legal entity, owns them. For this reason there will be no probate proceedings in relation to the foundation's assets upon the founder's death. This is a big advantage, especially if the foundation assets (bank accounts, real estate, etc.) are situated in different countries or the founder has lived in different locations. In such cases, probate can be both very time-consuming and costly. In the event of a beneficiary's death, his or her beneficial interests do not form part of their estate. Instead, the successor beneficiaries as determined by the founder become the foundation's new beneficiaries. They hence need not wait for the outcome of any probate proceedings but gain access to their foundation benefits immediately provided the founder has not arranged otherwise.

■ **Continued Commitment of the Founder is Possible:**

Liechtenstein law allows the founder to retain broad powers over the foundation he has established. Thus, the founder may become a member of the foundation council or may appoint himself as the foundation's beneficiary. He can also reserve the right to revoke the foundation, amend the Foundation Articles or dismiss and appoint members of the foundation council. By contrast, the foundation may also be designed by the founder in such a way that he has no power over it whatsoever.

Besides, the founder may set up other executive bodies in addition to the foundation council. On the one hand, these may be controlling bodies which ensure the implementation of the founder's will in the long term (so-called protectors). On the other hand, the executive bodies may be entrusted with powers such as investment decisions or even decisions regarding distributions. The founder may designate successors for all members of the executive bodies. Finally, the founder may, if he so desires, name the foundation after himself so that his name – especially with common-benefit foundations – is «perpetuated» in a positive sense.

■ **Asset Protection:**

By establishing a Liechtenstein foundation, personal assets can be protected from unjustified interference by third parties («asset protection»). Since Liechtenstein has only concluded enforcement treaties with Switzerland and Austria, foreign judgments from other countries are not enforced in Liechtenstein. Therefore, legal action against a Liechtenstein foundation must in most cases be brought before Liechtenstein courts. Furthermore, a Liechtenstein foundation is an effective way to protect the founder and the beneficiaries against political turmoil in their home countries.

■ **Preservation of Family Assets:**

By transferring his assets to a Liechtenstein foundation, the founder can ensure that family assets are kept together across generations. The same applies, for instance, if he transfers shares of his

closely held company to a foundation. Under Liechtenstein law a foundation can hold a company's shares in accordance with the founder's wishes for decades. The flexibility necessary for any conceivable economic activity can be achieved by way of an appropriate design of the foundation documents. If no foundation is set up, the assets of the deceased including the shares in his family business are, in most cases, divided up between his heirs. If the heirs die, then their own heirs come into play and so forth. It will therefore not be possible to preserve the family assets or the family business under the same management for a long time.

- **Decades of Tradition of Liechtenstein Foundation Law:**
  In recent years, many countries have discovered the foundation and have adopted new foundation legislation, often following the Liechtenstein model. Liechtenstein has a more than 80-year-old tradition in this field. Legal practitioners, the courts and administrative authorities are intimately familiar with foundation law and practice. This is particularly true for our law firm, which was founded in 1925. The high number of court decisions in the area of foundation law contributes to legal certainty. In addition, the Foundation Articles may provide that disputes between the foundation and its beneficiaries must be decided by arbitration rather than the public courts.

- **Liechtenstein as a Modern Financial Center at the Heart of Europe:**
  Liechtenstein borders Austria and Switzerland and is easily accessible. Since 1923 there has been a customs and monetary union with Switzerland. Since 1995 Liechtenstein has been a member of the European Economic Area (EEA) and thus participates fully in the free movement of goods, services and capital within the European single market. In addition, Liechtenstein is a member of the WTO, EFTA, the UN, the Council of Europe, the OSCE and many other international organizations.

Liechtenstein has a progressive and stable legal, economic and social regime. The authorities are pro-business and customer-orientated. Unlike in other countries, even during the economic crises of recent years no government aid to banks or other financial intermediaries has proven necessary. Standard & Poor's and Moody's have given the country a triple A rating.

In the fight against financial crime, Liechtenstein has continually adapted its regulations to the latest developments. The country has implemented the third EU Money Laundering Directive and the FATF recommendations and thus adheres to the highest international standards in combating money laundering and organized crime. Liechtenstein has also concluded agreements with several countries permitting the exchange of tax information on reasonable request. There is, however, no automatic exchange of information and non-individualized inquiries («fishing expeditions») are prohibited. Liechtenstein thus meets the globally accepted standards in the field of tax, which is why the country appears on the OECD's White List. Even with all this, Liechtenstein has preserved its traditional advantages: taxes are low and predictable and there are strict laws in place designed to safeguard the proper conduct of business.

- **Marxer & Partner Attorneys-at-Law: Your Contact for Foundation-Related Matters**
  Marxer & Partner, founded in 1925, is the oldest and largest law firm in Liechtenstein and has decades of experience and expertise in foundation law. In Section 14, you will learn how Marxer & Partner can advise and assist you with all foundation matters.

## 2. Sources of Liechtenstein Foundation Law

The Liechtenstein foundation law was codified in 1926 and, up until very recently, had been amended only selectively. Its provisions have been used as a model for a number of foreign legislation, such as the

Austrian Private Foundation Act of 1993, the Panamanian Law on the «fundación de interés privado» of 1995 or Jersey's new Foundation Act of 2009.

In order to adjust to the latest scientific findings on «Foundation Governance» extensive preparations for a re-enactment of the Liechtenstein foundation law were carried out from 2001 to 2008. Liechtenstein financial service providers including Marxer & Partner as well as experts in international foundation law were closely involved in the government's reform work. On 26th June 2008, the new foundation law was passed by Parliament and published in the Liechtenstein law gazette (LGBl.) 2008 no. 220. While maintaining the traditional liberalism of Liechtenstein foundation law, new and innovative solutions meeting the highest standards of modern foundation law were devised on many issues.

The new foundation law is enacted in art 552 §§ 1-41 of the Persons and Companies Act (PGR) and came into force on 1st April 2009. Henceforth, these provisions will be referred to only as §§ 1-41. The legislative text is available for download in German and English on www.marxerpartner.com/en. In addition, the general section on legal entities laid out in art 106-245 PGR applies to foundations, too. The current version of the PGR can be viewed on www.gesetze.li (in German only).

Since 1995 Liechtenstein, while fully maintaining the Customs Treaty with Switzerland, has participated in the European Economic Area (EEA), to which all EU countries as well as the EFTA countries Iceland, Norway and Liechtenstein belong. Further information can be found on www.liechtenstein.li/en. Thanks to the EEA Agreement, the four fundamental freedoms of the EU, namely the free movement of goods, persons, services and capital, also apply to Liechtenstein. As a consequence, entities created under Liechtenstein law must not be discriminated against in any EU or EEA country.

## 3. Definition and Types of Foundations

### The Foundation as a Special-Purpose Fund

The foundation is defined in § 1 of the new foundation law. The founder transfers assets to a legal entity, i.e. the foundation, for the long-term achievement of a specific purpose designated by him. The foundation assets are legally separated from the founder's private assets. A foundation has no owners or members but does have beneficiaries, i.e. individuals in whose favor the foundation purpose is achieved and which may include the founder himself. The founder if he so desires can retain certain rights subsequently to the creation of the foundation. In order to achieve the founder's intentions, the foundation makes use of its executive bodies, particularly the foundation council.

Every foundation must have a foundation purpose. Although the founder has a free choice with regard to this, the foundation can only carry on a commercial business to a very limited extent, e.g. if the business directly serves the purpose of a common-benefit foundation. A public-benefit foundation is therefore allowed to run a hospital. Within these limits, the foundation has full legal capacity and the power to conclude any type of legal transaction.

The main distinction is made between common-benefit and private-benefit foundations:

### Common-Benefit Foundations

Under § 2 para 2, a common-benefit foundation is a foundation whose activities are entirely or predominantly intended to serve common-benefit purposes. It supports the public in whatever area may be required: charity, religion, science, culture, sport or ecology. A common-benefit foundation can also address a limited group of people only, e.g. by providing financial support for needy employees of a particular company including their dependents. However, a family foundation is, by operation of law, never a common-benefit foundation even if it is aimed at supporting only those family members who are in need.

**Private-Benefit Foundations**

Pursuant to § 2 para 3, a private-benefit foundation has entirely or predominantly private or personal purposes. If it is unclear whether the common-benefit purpose or the private-benefit purpose predominates, which is a rare case, the foundation is characterized as being common-benefit. In the Foundation Articles it is also possible for the founder to specify certain «time phases» whereby the foundation is, for example, a family foundation during his lifetime but converts into a common-benefit foundation after his death.

§ 2 para 4 provides a definition of the family foundation. «Pure family foundations» are foundations whose assets «exclusively serve the defrayal of costs of upbringing or education, provision for or support of members of one or more families or similar family interests» whereas «mixed family foundations» are foundations «which predominantly pursue the purpose of a pure family foundation but which supplementally also serve common-benefit or other private-benefit purposes».

It is also possible to set up a «maintenance foundation» for the purpose of providing for certain individuals or a family without there having to exist a situation of need. Furthermore, a private-benefit foundation can be used to hold shares in a company which, in turn, operates a business («holding foundation»). The purpose of this type of foundation is to exert a dominant influence on company policy. By contrast, a private-benefit foundation is not entitled to directly run a business itself.

## 4. Setting up a Foundation

A foundation is set up either inter vivos by the socalled «declaration of establishment» or mortis causa by means of a testament or inheritance contract. The declaration of establishment (§ 14) is a declaration of intent by the founder to set up a foundation. An inter vivos foundation may have one or more founders. These may be either natural persons or legal entities domiciled anywhere in the world. The declaration of establishment must be in written form and requires authentication of the signatures of the founder(s).

A foundation can also be set up by a Liechtenstein trustee as the founder's agent. In this case the identity of the founder is not disclosed to the authorities. However, it is still the principal and not the agent who is entitled to exercise the founder's rights (see Section 5.1).

The minimum capital of a foundation is 30,000 Swiss francs, euros or US dollars. Following the acquisition of legal personality, the founder can always make subsequent endowments. Third parties can also donate funds to the foundation. The term «foundation assets» refers to the entire assets of the foundation including subsequent endowments and donations. Liechtenstein foundation law recognizes no duty to preserve assets and no prohibition of subsequent contributions. However, the foundation council is prohibited from making distributions to beneficiaries if this would diminish the amount owed to the foundation's creditors.

**Foundation Documents**

The declaration of establishment is embodied in the foundation documents. The Foundation Articles, or Foundation Charter (referred to in the legislation as the «Foundation Deed»), contain the key elements of the foundation and must be signed by either the founder or the founder's agent with the signatures authenticated. § 16 para 1 lists the mandatory content of the Foundation Articles, e.g. the name of the foundation, the foundation purpose, the appointment and functioning of the foundation council, and the identity of the founder or his agent should the founder decide to remain anonymous. Hence, if a foundation is set up by an agent, the founder need not sign any foundation documents and is not identified in the Foundation Articles.

§ 16 para 2 contains optional elements of a foundation which have to be included in the Foundation Articles in case the foundation at hand is to feature such elements. This includes provisions regarding the reser-

vation of founder's rights or else the empowerment of the foundation council to amend the Foundation Articles and By-Laws. If By-Laws or Regulations are, or may be, issued, there must be a reference to this fact in the Articles.

Under § 17, in addition to the Foundation Articles, the founder can also set up By-Laws (referred to in the legislation as a «Supplementary Foundation Deed»). The By-Laws must originate either from the founder or his agent and can deal with areas that need not necessarily be included in the Foundation Articles such as provisions regarding the beneficiaries. By-Laws can be issued only if the Foundation Articles specifically say that they can. In addition, they are not permitted to contradict the Foundation Articles. Besides Foundation Articles and By-Laws, it is also possible to adopt Regulations (§ 18). These can be issued by the founder and his agent as well as by the foundation council and contain internal arrangements or instructions such as asset management targets. Here too, Regulations can be created only if the Foundation Articles specifically say so. By contrast, the «letter of wishes», which is a letter of intent written by the founder and addressed to the foundation council, is no foundation document and therefore has no binding effect. However, it can be taken into account when interpreting the founder's intentions.

**Entry in the Public Register / Notification of Formation**

Subsequent to the declaration of establishment, common-benefit foundations must be entered in the Public Register. It is only by being registered that they become legal entities. Under § 19 para 3 in conjunction with art 90 of the Public Register Ordinance, the entry must contain facts such as the foundation's name, the foundation purpose as well as the identity of the members of the foundation council and of the auditors provided auditors have been appointed (see Section 5.3). Other details like the name of the founder or his agent or the identity of the beneficiaries are not registered. As regards registered facts, anyone can obtain a register extract from the Land and Public Register Office (GBOERA; www.gboera.llv.li) on request.

Private-benefit foundations, e.g. family foundations, need not be entered in the Public Register. They acquire legal personality immediately once the declaration of establishment has been made. Nevertheless, under § 20 a so-called «notification of formation» must be deposited with the Land and Public Register Office within 30 days. This notification must contain the foundation's name and purpose as well as the identity of its Representative (see Section 5.5) and the members of the foundation council. It must also certify that the founder has validly designated the beneficiaries or the class of beneficiaries. The accuracy of the notification of formation must be certified by an attorney admitted in Liechtenstein, by a professional trustee or by a holder of an entitlement in accordance with art 180a PGR. On each amendment of a fact contained in the notification of formation, a notification of amendment must be deposited. The Land and Public Register Office is entitled to verify the accuracy of the deposited notifications. Upon application of the foundation, the Land and Public Register Office issues an official confirmation of the deposition of these notifications. The Land and Public Register Office is not permitted to provide any information to third parties except to confirm that the unregistered foundation is in existence. This excludes information granted to certain Liechtenstein government agencies.

## 5. Organization of the Foundation

### 5.1. The Founder

The founder is the central person in foundation law: The purpose of a foundation is to carry out his or her intentions. The founder can be either an individual or a legal entity domiciled in Liechtenstein or abroad. A foundation may, except where it has been set up by testamentary disposition, have one or more founders. The founder has all the rights contained in § 3, particularly the right to apply for supervisory measures with the Princely Court of Justice. Besides, the founder can apply to the Court in order to have an incorrectly adopted dissolution canceled or, conversely, move for the adoption of a dissolution wrongfully

denied. The founder can also be a member (or chairman) of the foundation council or of another executive body. He can also be a beneficiary of the foundation and, in fact, even its sole beneficiary.

Even where a foundation is established on a fiduciary basis by a trustee acting as an agent, the principal, i.e. the person funding the foundation, will always be the actual founder in the eyes of the law. This enables the founder to remain anonymous to the outside world if he so desires. Naturally, his identity must be revealed to the members of the foundation council as this is the only way for them to help carry out his intentions.

### Right of Revocation

As long as the foundation has not come into being, the founder is able to revoke the declaration of establishment at any time. Hence foundations that need to be registered can be freely revoked until their entry in the Public Register. All other foundations can be revoked until the signature on the Foundation Articles is authenticated. In case of foundations mortis causa, it suffices to amend the testamentary disposition accordingly.

Once the foundation has come into being, it will generally be irrevocable. The founder no longer owns the assets he has contributed to the foundation. The foundation is a separate legal entity with the purpose to pursue the founder's will as laid down in the foundation documents. However, under § 30 the founder is permitted to declare in the Foundation Articles that he retains the right to revoke the foundation and/or to amend the foundation documents. If the founder has done so, he can exercise these rights by a simple declaration to the foundation council without the need to observe any particular form.

These rights of the founder cannot be assigned or bequeathed nor may they be delegated to the foundation council. If the founder is a legal entity, no reservation is permitted. In case of multiple founders, these rights can only be exercised by all the founders jointly provided the Foundation Articles do not direct otherwise. If one of the founders

ceases to exist, the rights lapse unless the foundation documents provide otherwise. Where a foundation is established on a fiduciary basis by an agent, it is not the agent but the principal, i.e. the person having funded the foundation, to enjoy the rights of § 30. However, these rights can be exercised by an agent on behalf of the principal.

If the founder exercises his right of revocation, the foundation council must adopt a resolution to dissolve and liquidate the foundation. Any assets remaining must be distributed to the ultimate beneficiary. The founder having exercised the right to revoke the foundation is deemed to be the ultimate beneficiary himself unless the foundation documents provide otherwise.

### Right of Amendment

When exercising the right of amendment (§ 30), the founder can freely amend the declaration of establishment as well as the foundation documents without, however, revoking the foundation. Hence the founder may, for instance, appoint new beneficiaries including himself. As always, the foundation council can only carry out distributions if to do so will not diminish the amounts owed to the foundation's creditors.

### Consequences of Granting Certain Rights to the Founder

The existence of rights as laid down in § 30 (right to revoke the foundation or to amend the declaration of establishment) can have a variety of consequences. For instance, it can be argued that the founder has not irrevocably transferred his assets to the foundation and that therefore the Statute of Limitations for forced heirship claims against the foundation only begins to run on the founder's death. Furthermore, it could be asserted that these founder's rights are subject to enforcement and thus capable of being attached by any of the founder's creditors. Should this viewpoint be upheld by the courts, the creditor having attached the founder's rights could declare a revocation himself or could appoint the founder as the sole beneficiary using his powers of amendment. To date, there is no Liechtenstein case law on this subject.

Moreover, in case of a right of revocation the beneficiaries have no right of information and disclosure under § 9 provided the founder himself is the ultimate beneficiary. Under § 11 the founder can appoint either himself, an audit company or a trusted person as a control body. Such a control body must carry out an annual review of the proper use of foundation assets. If a control body is set up, the beneficiaries are only permitted to request information about the purpose and organization of the foundation or about their own rights in relation to the foundation.

Finally, the reservation of founder rights has possible consequences for the tax situation abroad. Due to the economic approach in tax law, «controlled foundations» are often treated as fiscally transparent and foundation assets continue to be attributed to the founder himself. On the other hand, there will normally be no gift or inheritance tax liability with controlled foundations since there has been no effective financial divestment.

### Contracts of Mandate

The founder can, if he so desires, conclude a Contract of Mandate with the members of the foundation council. The founder is granted a power of instruction, e.g. with regard to the exercise of the foundation council's discretion in case of discretionary foundations. The obligations of the council members arising from the Contract of Mandate are purely in personam: their duties as members of the executive body always prevail. However, within these limits members of the foundation council are perfectly free to conclude Contracts of Mandate.

### 5.2. The Foundation Council

### Composition and Functions

In order to achieve the founder's intentions, the foundation makes use of its executive bodies. The only compulsory executive body of any foundation is the foundation council (§§ 24 et seq.). It manages the business of the foundation (administration, bookkeeping etc.) and rep-

resents it. Its main task is the furtherance of the founder's intentions. The foundation council must consist of at least two members who can be either individuals or legal entities domiciled in Liechtenstein or abroad. According to art 180a PGR, one foundation council member must be either a Liechtenstein trustee or a person with similar status (a «180a Person»). Both the founder and the beneficiaries can be members of the foundation council.

The Foundation Articles must contain provisions on the appointment, dismissal, term of office, adoption of resolutions and power of representation (authority to sign) of the foundation council. With registered foundations, the name, date of birth, nationality and place of residence, or else the corporate name, domicile and registered office, of the members of the foundation council as well as the authority to sign (collective or single) must be entered into the Registry. In case of non-registered foundations, these details must be recorded in the notification of formation. Foundation council members can be either paid or unpaid. The foundation council must be appointed for the first time by either the founder or the founder's agent upon the foundation's establishment. Unless provided otherwise, the appointments are valid for a three-year term with multiple reappointment being permitted. Frequently, foundation council members are granted the right to co-opt new members (co-optation). In addition, it is often provided in the Foundation Articles that members can appoint a successor in the event of death, incapacity or departure from office.

### Amendment Rights of the Foundation Council

Subject to the conditions contained in §§ 31 et seq., the foundation council has the right to amend the Foundation Articles and By-Laws. An amendment of the foundation purpose by the foundation council or another executive body is only allowed «if the purpose has become unachievable, impermissible or irrational or if circumstances have changed to the extent that the purpose has acquired a quite different significance or effect, so that the foundation is estranged from the intention of the founder». The presumed intention of the founder is crucial. In addition, the right of amendment must be expressly provid-

ed for in the Foundation Articles. If no power of amendment has been included in the Foundation Articles, the foundation purpose can only be altered by judicial decree.

According to § 32 either the foundation council or another executive body can be given the authority to amend other contents of the Foundation Articles (apart from the foundation purpose) or of the By-Laws. This can include, for example, the foundation's organization or beneficial interest arrangements provided, however, that the foundation purpose is not affected. In addition, the foundation council must have a substantively justified reason to do so. The right pursuant to § 32 must be included in the Foundation Articles. In the absence of such a provision, any amendment of either the Foundation Articles or the By-Laws can only be ordered by a judge.

### Liability of the Foundation Council

The foundation council is responsible to fulfill the foundation purpose in strict compliance with the provisions in the foundation documents. The members of the foundation council are personally liable under art 218 et seq. PGR for any negligently or intentionally caused loss. In the declaration of establishment, the liability of unpaid council members for slight negligence can be excluded. Entitlement to compensation is primarily enjoyed by the prejudiced foundation. On a subsidiary basis, creditors themselves may make a claim. Art 182 para 2 PGR codifies the «Business Judgment Rule», whereby a member of the administration is deemed to act diligently «if in his commercial decision-making he is not governed by irrelevant interests and it must reasonably be assumed that he is acting for the good of the legal entity on the basis of appropriate information».

### 5.3. The Audit Authority

According to § 27, every foundation subject to the supervisory oversight of the Foundation Supervisory Authority (see Section 7) must appoint an audit authority. Thus, in the case of common-benefit foun-

dations but also private-benefit foundations whose Foundation Articles make them subject to voluntary oversight by the Foundation Supervisory Authority, the auditors constitute a mandatory body of the foundation. The auditors are under an obligation to verify once a year whether the foundation assets are being managed and used in accordance with the foundation purpose. An audit report must be submitted to both the foundation council and the Foundation Supervisory Authority. Auditors, auditing firms, professional trustees or trust companies can be appointed as the auditors.

The auditors must be independent of the foundation. In particular, the following are prohibited from acting as auditors: anyone who belongs to an existing foundation body such as the foundation council; anyone who is an employee of the foundation; anyone with close family ties to members of executive bodies of the foundation; or anyone who is a beneficiary of the foundation. The auditors are appointed by judicial decree, the foundation and the Foundation Supervisory Authority both being a party to the proceedings. Either the founder or the foundation council can make two proposals stating their preference.

With common benefit foundations, the Foundation Supervisory Authority can waive the requirement to appoint auditors at the foundation's request in two cases. Firstly, this is possible if the foundation's assets amount to less than 750,000 Swiss francs and the foundation does not publicly call for donations or run a business along commercial lines. Secondly, an exemption can be accorded if it appears reasonable to do so for other motives. This will be the case if, for example, the foundation pursues an investment and distribution policy in such a way as to enable direct oversight by the Foundation Supervisory Authority. Direct oversight is possible, inter alia, where the assets and their performance are easily verifiable.

Outside the aforementioned cases of mandatory appointment of auditors, it is possible to provide for a voluntary appointment of auditors in the Foundation Articles. Voluntary auditing does not entail any duty of oversight by the Foundation Supervisory Authority. Finally, the foun-

dation council is always at liberty to instruct external auditors to check individual transactions in any particular case without granting them the status of an executive body.

### 5.4. The Control Body and Other Executive Bodies

**Control Body**

The founder may specify in the Foundation Articles that a control body pursuant to § 11 is or can be established. The control body is under an obligation to verify once a year whether the foundation assets are being managed and distributed in accordance with the foundation purpose. A report must be submitted to the foundation council. In the event of the foundation council's non-compliance with the foundation purpose, the control body must inform the beneficiaries and the court. If a control body is established, the beneficiaries are not permitted to assert the full rights of information and disclosure as stated under § 9 (see Section 6). Instead, they can only inspect the foundation documents and request information about the purpose and organization of the foundation and about their own rights in relation to the foundation. In addition, the beneficiaries can require the submission of the control body's reports.

The founder himself, a judicially appointed auditor or a trusted advisor of the founder may be appointed as the control body. The «trusted advisor» (confidant) is one or more natural persons specified by the founder who have sufficient specialist knowledge in the sphere of law and business to be able to perform their duties. This includes, for example, an attorney who is also a friend of the founder. The confidant is not appointed by the court but must be independent of the foundation council.

**Additional Executive Bodies**

Besides this, the Foundation Articles may specify that additional executive bodies are or can be established pursuant to § 28. The founder is largely free in this respect as well as in the choice of the members and

the extent of any relevant powers. § 28 mentions executive bodies to be used «to specify a beneficiary from the category of beneficiaries, to specify the time, level and condition of a distribution, to manage the assets, to advise and assist the foundation council, to monitor the administration of the foundation in order to safeguard the purpose of the foundation, to reserve consents or issue instructions, as well as to safeguard the interests of the foundation participants». These executive bodies can be given rights to advise, consent, instruct or veto. They do, however, not have any representation authority. Nevertheless, it is possible for the foundation council to grant them – or any third party – legally valid powers of attorney.

In practice, protectors, collators and asset managers are appointed quite often. These executive bodies are not defined legally, so their powers must be described in the foundation documents. Even so, a certain semantic content has established itself over time in this regard. Thus, a protector is used as an optional monitoring body for the foundation and will mediate between the foundation council and the beneficiaries. Generally, protectors come from the founder's family or circle of friends or else are family advisers. The protector may also be granted approval rights in relation to amendments of the Foundation Articles and By-Laws or the dissolution of the foundation, as well as the right to appoint and dismiss members of the foundation council (appointor) or a right of approval to this effect.

With discretionary foundations, a collator is sometimes granted the right to choose a beneficiary from the class of beneficiaries or the right to identify the date, amount and conditions of a distribution. These powers are often granted to the protector instead, especially if no collator is appointed. Finally, sometimes an asset manager is set up as a voluntary body responsible for the management of the foundation's bankable assets. The asset manager can be given administrative authority with regard to the bank.

## 5.5. The Representative

According to art 239 et seq. PGR, foundations must appoint a Representative to carry out representation in relation to the Liechtenstein authorities. The Representative is a process agent of the foundation and, by operation of law, can be served, on behalf of the foundation, with any statement and communication whatsoever from all domestic courts and administrative authorities. The Land and Public Register Office (GBOERA) can waive the duty to appoint a Representative if the foundation's representation is secured otherwise or if a domestic delivery address has been designated. If the foundation has no Representative and if none of these exceptions apply, the foundation will be dissolved and liquidated after a request of GBOERA to remedy this situation will have been ignored. The Representative must be appointed at the time of the declaration of establishment and, with registered foundations, must be entered in the Public Register. In this case, his name will appear in the relevant register extracts. With non-registered foundations, the Notification of Formation must contain the Representative's details. The Notification of Formation's content will, however, not be disclosed to third parties. This does not affect the right of disclosure to domestic criminal prosecution authorities, the Liechtenstein Financial Intelligence Unit (FIU; www.fiu.llv.li) and the Liechtenstein Financial Market Authority (FMA; www.fma-li.li).

## 6. The Beneficiaries

When setting up a foundation, particular attention must be paid to the foundation purpose. The Foundation Articles must state the foundation purpose including the designation of named beneficiaries or of beneficiaries identifiable on the basis of objective criteria. Alternatively, a class of beneficiaries can be designated. Only common-benefit foundations need not specify beneficiaries or a class of beneficiaries. In practice, the beneficiary or beneficiaries are often not identified in the Foundation Articles themselves: instead, the Articles contain a refer-

ence to the By-Laws where they are specified. The inclusion of an explicit reference in the Foundation Articles that the beneficiaries are designated in the By-Laws is mandatory.

§ 5 defines the beneficiary as «the natural person or legal entity that with or without valuable consideration in fact, unconditionally or subject to certain prerequisites or conditions, for a limited or unlimited period, with or without restrictions, revocably or irrevocably, at any time during the legal existence of the foundation or on its termination derives or may derive an economic benefit from the foundation (beneficial interest)». The identity of the beneficiaries will not be made public and will not be registered in the Public Register or included in the Notification of Formation.

The law provides for four categories of beneficiaries. Entitled beneficiaries (§ 6 para 1) are beneficiaries who, on the basis of the foundation documents (the Foundation Articles, By-Laws or Regulations), have a legal claim to benefit, to a specified or specifiable extent, from the foundation assets or foundation income. Therefore, in relation to the foundation, entitled beneficiaries have a legally enforceable right to their benefit. Any discretion of the foundation council to this effect is excluded.

Prospective beneficiaries (§ 6 para 2) are individuals who have a legal entitlement laid down in the foundation documents to be appointed at a later date as a successor to an entitled beneficiary. This may be the case after the occurrence of a condition precedent or the reaching of a specific date (such as the demise of a prior beneficiary). Potential beneficiaries who have no right to become an entitled beneficiary but instead simply have an uncertain prospect of maybe obtaining a distribution in the future are not prospective beneficiaries in the sense of § 6 para 2. Whether there is a legal entitlement or not can only be determined by interpreting the foundation documents.

The third category of beneficiaries are the discretionary beneficiaries (§ 7). They belong to the class of beneficiaries specified by the

founder, their beneficial interest being placed in the discretion of the foundation council or another body appointed for this purpose (such as a protector or collator). Foundations with discretionary beneficiaries are called discretionary foundations. Discretionary beneficiaries have no legally enforceable claim to receive any particular benefit from the foundation: they only have a legal right to obtain a distribution once the foundation council has adopted a Resolution in this respect. Once the distribution has been made, all the discretionary beneficiary's rights are extinguished. However, discretionary beneficiaries do have inspection rights under § 9 but only insofar as their own rights are concerned.

An ultimate beneficiary (§ 8) is a beneficiary who, in accordance with the foundation documents, is intended to receive the remaining assets following the liquidation of the foundation. If no beneficiary exists at all, the foundation's assets go to the Principality of Liechtenstein, which must make use of the assets, to the extent possible, in accordance with the foundation purpose.

Since the designation of beneficiaries is regarded as an essential part of the foundation establishment process, the Foundation Articles must include the designation of named beneficiaries or of beneficiaries identifiable on the basis of objective criteria. Alternatively, a class of beneficiaries can be designated. There are three exceptions to this rule. Firstly, this provision does not apply in the case of common-benefit foundations since, by definition, they serve the general public (§ 107 para 4a PGR). Thus common-benefit foundations can, but need not, specify particular beneficiaries. Secondly, it is permissible for the Foundation Articles to contain an express reference to the By-Laws and to leave the identification of the beneficiary or beneficiaries to the By-Laws. In practice, this happens very often. Thirdly, in exceptional cases it may be that the beneficiaries are evident in light of the foundation purpose.

A beneficial interest can relate to the foundation income only or also to the foundation assets (principal). Although Liechtenstein foundation law recognizes no duty to preserve the foundation assets, the foundation council is prohibited from making distributions to beneficiaries if this would diminish the amount owed to the foundation's creditors. The founder may also designate himself as either the sole beneficiary or as one of several beneficiaries. Furthermore, under § 30 the founder can reserve the right to amend the declaration of establishment (see Section 5.1), making it possible for him to amend the rules governing the beneficiaries at any time. Within the framework of §§ 31 et seq., the foundation council can be granted a right to amend the rules governing beneficiaries contained in the Foundation Articles or in the By-Laws (see Section 5.2).

Usually, the foundation documents create a cascade of beneficiaries by appointing secondary beneficiaries who gain their beneficial interest upon the death of the primary beneficiary. It is often also specified who will be the third, fourth and fifth rank beneficiaries etc. In the event of a beneficiary's death, his or her beneficial interest does not form part of the estate because the entitlement is extinguished on the beneficiary's death. It is then the beneficiaries next in line who come into play. Legal status as a beneficiary is strictly personal and not transferable or inheritable unless the founder issues express instructions to the contrary. Finally, the Foundation Articles or By-Laws must also contain a provision for the distribution of assets in the event of the foundation's dissolution.

**Rights of the beneficiaries**

The foundation is not a corporation over which shareholders can exert influence based on their stake in the company. In order to address the risk that the members of the Foundation Council might be behaving like the owner of the foundation assets, § 9 grants the beneficiaries information and disclosure rights. These rights are enjoyed not just by the entitled beneficiaries and the prospective beneficiaries but also by the current discretionary beneficiaries. However, persons who have only a prospect to a future discretionary benefit do not enjoy them. Beneficiary rights include the right to view documents and the right to receive general, reporting and accounting information. The beneficiary

has the right to inspect business records and documents and to make copies thereof and also to examine and investigate all business conduct personally or through an agent.

However, the law contains certain restrictions on beneficiary rights. First, these rights are only enjoyed by the beneficiary «insofar as his rights are concerned». The beneficiary has to be directly and personally affected. Thus, events in the past occurring prior to the acquisition of the beneficial interest can only be investigated if they directly affect the beneficiary's current rights. Second, there is a very comprehensive general misuse clause under which this right must not be exercised with dishonest intent, in an abusive manner or in a manner that conflicts with the interests of the foundation or other beneficiaries. Third, beneficiary rights may exceptionally be denied «for important reasons to protect the beneficiary» such as to prevent a young person's idleness after he has learnt of his beneficial interest.

Beneficiary rights have to be asserted in civil proceedings. The Articles can, however, also provide for mandatory arbitration in Liechtenstein or abroad. The existence of beneficiary rights is presumed, the permissibility of restrictions has to be proved by the foundation council. Often the foundation documents state the possible reasons for which a request for information may be refused. Although these reasons bind neither the court nor the foundation council, the corresponding provisions must be taken into account when assessing the balance of interests.

§§ 10-12 provide important exceptions, which partially suspend the beneficiary rights under §9, in situations where the foundation council is supervised by other participants. If the founder has reserved a right of revocation under § 30 (see Section 5.1) and he is himself the ultimate beneficiary, then the beneficiaries will not have any information rights because in this case the founder himself already has a considerable ability to exercise control and monitoring. If a Control Body is set up under § 11 (see Section 5.4), the beneficiaries are only permitted to request information about the purpose and organization of the foun-

dation or about their own rights in relation to the foundation. Besides, the beneficiaries will not have any information rights if the foundation is subject to supervision by the Foundation Supervisory Authority (see Section 7). In each case, however, beneficiaries have the irrevocable right to ask the judge to redress any grievances.

## 7. Foundation Governance

Foundation governance is taken to mean all the rules that contribute to make the foundation bodies act in accordance with their duties and in the interest of the founder. Regulations designed to protect the foundation against any misconduct by its executive bodies are extremely important due to the absence of any owners who could play a supervisory role (shareholders, for example). They are also vital due to the potential for possible conflicts of interest, e.g. of members of the foundation council. A distinction can be drawn between external governance in the sense of supervision by state authorities and internal governance in the form of mutual monitoring rights of foundation participants. When the new Liechtenstein foundation law was created, special emphasis was placed on instituting a modern system of foundation governance. One innovation is that the Foundation Supervisory Authority itself is not entitled to order coercive measures. Instead, just like foundation participants, the Authority has to apply to a court for them to be instituted. This combination of ongoing supervision and judicial decision-making authority (application-based court supervision) is indeed a role model.

### Common-Benefit Foundations

Under § 29, common-benefit foundations are subject to the supervision of the Foundation Supervisory Authority (STIFA). STIFA is a department of the Land and Public Register Office and must ensure ex officio that foundation assets are managed and disbursed in accordance with the foundation purpose. To this end, it is entitled to demand any information from the foundation's executive bodies and can also inspect the foundation's books. Furthermore, STIFA is required to check the

annual report produced by the foundation's auditors. Coercive measures such as the removal of foundation bodies, the conduct of special audits or the annulment of resolutions of the Foundation Council must be applied for by STIFA in the Princely Court of Justice.

For the purposes of internal governance, under § 27 every common-benefit foundation must be audited by independent auditors. In addition, any participant, i.e. the founder, the beneficiaries and all foundation executive bodies and their members have the right to petition the court to initiate supervisory measures. STIFA is a party in these proceedings.

### Private-Benefit Foundations

Private-benefit foundations whose Foundation Articles make them subject to supervision by STIFA must also undergo, as far as supervisory matters are concerned, the same regime as common-benefit foundations. If the Foundation Articles do not make them subject to voluntary foundation supervision, private-benefit foundations are not subject to any ongoing state supervision. For this reason, internal governance is well developed. Firstly, beneficiaries have comprehensive access and information rights under § 9: they have the right to inspect the business records and documents and to make copies thereof, and also to examine and investigate all business conduct personally or through an agent, provided this right has not been restricted (see previous section).

In addition, with private-benefit foundations too, all participants (founders, beneficiaries and executive bodies as well as their members) have the right, under § 29 para 4, to apply directly to the Princely Court of Justice for supervisory measures such as the removal of foundation bodies, the conduct of a special audit or the cancelation of resolutions taken by the foundation council. Finally, the court may, either on request by the parties or ex officio and possibly in response to a communication from STIFA or the public prosecutor, order an amendment of the foundation documents provided the preconditions contained in §§ 33 et seq. are met. In these proceedings the Foundation Supervisory Authority has the status of a party.

## 8. Foundations and Estate Law

As a general rule, a beneficial interest is awarded ad personam so that after the death of a beneficiary it is the beneficiaries next in line and not the heirs of the deceased beneficiary who will obtain a beneficial interest. If it is intended for a beneficial interest to be inherited, this must be explicitly provided for in the foundation documents. Therefore, if the deceased was a beneficiary during his lifetime only, his or her foundation benefits do not form part of the estate. This was confirmed by the Liechtenstein Constitutional Court (www.stgh.li).

This has nothing to do with the question of whether and how a contribution of assets by the deceased to a foundation can be challenged by his heirs for breach of their compulsory portion («forced heirship»). According to § 38 para 1, every contribution of assets to the foundation, including an additional or subsequent endowment (see Section 4), can be challenged by the contributor's heirs in the same way as a donation. In practice, therefore, heirs whose compulsory portion is prejudiced by the establishment of, or subsequent endowment to, a foundation by the deceased sometimes bring «compulsory portion supplementary claims» against Liechtenstein foundations. The competent forum for such claims is the Princely Court of Justice. The action is not directed against the very existence of the foundation but rather seeks the delivery, by the foundation to the claimant (i.e., the forced heir), of that amount of assets required to give the claimant that which he or she is entitled to by the applicable forced heirship legislation. Thus, in case of a successful claim the foundation is ordered to pay to the claimant a specified monetary amount rather than being dissolved.

If conflict of laws rules make Liechtenstein law applicable, § 785 of the General Civil Code is applied, whereby on application by any child or spouse entitled to a compulsory portion, gifts (and thus contributions of assets to a foundation) must be taken into account when calculating the estate (compulsory gift portion). Contributions to common-benefit foundations are, however, not taken into account. The same applies to contributions made to a foundation earlier than two years before the

death of the contributor. If the founder has reserved founder's rights under § 30 (see Section 5.1), this two-year period, according to prevailing doctrine, does not start to run until either the death of the founder or his irrevocable renunciation to exercise powers over the assets concerned.

If there is a case with an international connection (in other words, if the deceased was not a Liechtenstein citizen residing in Liechtenstein), compulsory portion supplementary claims are governed by the law stipulated in art 29 of the Liechtenstein Private International Law Act. This provision declares applicable the law of the state whose citizen the deceased was at the time of his death. However, the deceased is entitled to opt, in his Will, for the law of the state of his last habitual residence to be applicable. In addition to the law governing the succession, a compulsory portion claim must also (i.e., cumulatively) be in accordance with the law governing the acquisition process itself. If, therefore, a French testator made an inter vivos donation to a Liechtenstein foundation and provided for Liechtenstein law to be applicable to this endowment, a claim, brought against the foundation by his heirs, to supplement the compulsory portion will only be successful if all the preconditions contained in both French and Liechtenstein law are met, e.g. compliance with both the French and the Liechtenstein statutes of limitation. If the claim to supplement the compulsory portion turns out to be prescribed under Liechtenstein law, the claim cannot be successfully made.

If the applicable estate law is that of a Common Law country, claims to supplement the compulsory portion are, in most cases, irrelevant since Common Law countries normally do not know forced heirship rules. If, therefore, English or New York law is the law governing the succession, the children of the deceased person do not have a compulsory portion and, therefore, cannot make any claim against a Liechtenstein foundation. Questions about how to treat, for Liechtenstein conflict of laws purposes, the English family provision rules or the elective share statutes known in some US States have not arisen before Liechtenstein courts so far.

## 9. Foundations and Asset Protection

Asset Protection generally means the protection of private assets from civil money judgments. Liechtenstein law has managed to strike an appropriate balance between the legitimate interests of the founder in the protection of assets, on the one hand, and the interests of the creditors in the collectibility of their debts against the foundation, the founder or the beneficiaries, on the other.

### Creditors of the Foundation
Under § 37 para 1, a creditor of the foundation can only pursue his claims against the foundation assets themselves. There is no personal liability on the part of the founder or other persons, e.g. the beneficiaries or the foundation council members. Only if the founder has not fully paid in the dedicated assets can the foundation council be required to provide the creditors with all necessary information regarding the enforceability of their claims, including the identity of the founder. The founder can, however, always avert this by simply making the pledged contribution to the foundation. Finally, under § 37 para 2 the Foundation Council is prohibited from making distributions to beneficiaries if this would diminish the amount owed to the foundation's creditors. If the foundation's executive bodies act against this provision, they will be liable for damages (see Section 5.2).

### Creditors of the Founder
Under § 38 para 1, creditors of the founder who cannot recover damages against him because he has transferred assets to a foundation may dispute this endowment according to the Liechtenstein Legal Remedies Code. In addition, creditors of the founder may, in very exceptional cases, gain access to the foundation's assets by way of «reverse piercing» if the founder effectively misuses the foundation. This would be the case, for example, if the founder still took all decisions regarding the foundation without ever even involving the foundation council. As the Constitutional Court has made clear, the mere reservation of founders' rights or the existence of a contract of mandate between the founder and the members of the foundation council does not lead

to a «lifting of the foundation veil» and will thus not give rise to reverse piercing.

Finally, the law does not exclude an enforcement of the founders' rights under § 30 (see Section 5.1). Thus, it could well be that the courts would affirm the enforceability of founders' rights in favor of creditors, at least if the founder has reserved the right of revocation and is, at least in part, the ultimate beneficiary; or else, if the founder has reserved the right to comprehensive amendments. The courts could thus allow the founder's creditors to exercise his rights in his place. To date, there is no Liechtenstein case law on the subject.

### Creditors of the Beneficiaries

Creditors of beneficiaries can be indemnified out of distributions which have already been made to the beneficiaries since those distributions represent an integral part of the beneficiaries' own assets. Under § 36 para 1, the founder of a family foundation (see Section 3) may provide in the Foundation Articles «that the creditors of beneficiaries shall not be permitted to deprive these beneficiaries of their entitlement to a beneficial interest or prospective beneficial interest acquired without valuable consideration, or individual claims arising from such an interest, by way of safeguarding proceedings, compulsory enforcement or bankruptcy». The founder can thus specify that the entitlement of Entitled Beneficiaries or Prospective Beneficiaries (see Section 6) against the family foundation is not enforceable in favor of the beneficiaries' creditors. Again, this does not hold true for amounts already distributed.

In case of a mixed family foundation, this enforcement privilege applies only to those entitlements which serve the defrayal of costs of upbringing or education, provision for or support of family members or similar family interests. The enforcement privilege must be included in the Foundation Articles. Similar provisions exist in other jurisdictions, such as in many U.S. states (spendthrift trusts or protective trusts).

Nevertheless, the enforcement of a said privilege is problematic where enforcement proceedings have a foreign element. Since case law is lacking in this respect, it is unclear how foreign courts would decide such matters. There is, therefore, the risk that foundation assets situated abroad, such as bankable assets deposited at a foreign bank, would be seized by the competent court at the bank's domicile disregarding the enforcement privilege awarded by Liechtenstein law.

### Private International Law

The applicable law for creditor disputes is set out in art 75 of the Legal Remedies Code. Simply put, a cumulative connection is necessary in order to successfully raise an enforcement claim: only if the claim is permitted under both the law of the residence or domicile of the debtor and the law governing the acquisition process itself, can it be enforced.

## 10. Accounting

Foundations which operate a business along commercial lines, which is only permissible under very limited circumstances (see Section 3), will be subject to the general accounting standards contained in art 1045 et seq. PGR. These foundations must produce a balance sheet as well as annual audited financial statements (balance sheet, income statement and appendix, if applicable). For all other common-benefit or private-benefit foundations, the foundation council must, pursuant to § 26, keep records of the use of foundation assets. These records must conform to the principles of proper accounting. The comprehensiveness of the records depends on the financial circumstances of the foundation. However, there is no general duty to carry out detailed bookkeeping at all. In addition, a Schedule of Assets must be maintained, showing the asset position and the asset investments. All books and records and business correspondence must be kept for ten years.

With registered foundations whose Foundation Articles forbid them to run a business along commercial lines, the Foundation Council must go through a yearly Declaration Procedure pursuant to art 182b PGR. Every year, a declaration signed by the foundation council must be

submitted to the Land and Public Register Office (GBOERA) confirming that for the previous fiscal year there is a statement of assets and that no business was run along commercial lines. Failing this, the Land and Public Register Office must alert the foundation and, after at least another twelve months, initiate dissolution and liquidation proceedings (art 971 PGR). In addition, a penalty may be imposed. The correctness of the declaration may be reviewed by GBOERA within two years if the declaration is not confirmed by an auditor or an auditing company. – With non-registered foundations, i.e. with the vast majority of private-benefit foundations, no declaration procedure needs to be performed.

## 11. Termination of the Foundation

### Dissolution

The termination of a foundation, governed by art 130 et seq. and art 552 §§ 39 et seq. PGR, requires (a) a reason for the dissolution, (b) the initiation of liquidation proceedings, and (c) a confirmation of deletion of the Public Register entry. The dissolution itself changes the foundation's purpose: thenceforth, the foundation must align all its activities towards the termination of its existence. Possible reasons for dissolution include the institution of bankruptcy proceedings in relation to the foundation assets, a court order or a decision in favor of dissolution by the foundation council.

In most cases, it is the foundation council which decides to dissolve the foundation. Such a resolution is compulsory if the council has received a lawful revocation by the founder, if the foundation's purpose has been achieved or can no longer be achieved, if the foundation's statutory lifetime has expired, or if other grounds for the foundation's dissolution as derived from the articles apply. If, for example, the entire assets of the foundation have been distributed to the beneficiaries, the foundation council must decide in favor of dissolution. In the absence of any provision to the contrary in the Foundation Articles, a decision in favor of dissolution must be adopted unanimously. If a ground for dissolution exists but no resolution in favor of dissolution has been adopted by the foundation council, the beneficiaries or the Foundation Supervisory Authority (STIFA) can apply for a court order dissolving the foundation. Conversely, the court must, again on application by either the foundation beneficiaries or STIFA, set aside an improperly taken decision to dissolve the foundation.

### Liquidation

Dissolution of the foundation results in the initiation of liquidation proceedings. The foundation's liabilities must be settled, the assets must be sold and the liquidation proceeds must be distributed among the ultimate beneficiaries. If no beneficiaries can be ascertained at all, which is extremely rare, the proceeds of liquidation go to the Principality of Liechtenstein, which must apply the assets in a manner as compatible as possible with the existing foundation purpose. With registered foundations the distribution can usually only take place six months after the dissolution has been published (half-year block) and after three public invitations to register claims (debt calls, creditor calls) have been issued. With foundations that are not registered in the Public Register, i.e. with almost all private-benefit foundations, no creditor call and no half-year block take place.

### Cancelation

On completion of liquidation proceedings, the Office of Land and Public Registration (GBOERA) issues a certificate of cancelation. For this purpose, a cancelation permit from the Tax Authority stating that all taxes have been paid is required. In case of foundations supervised by STIFA, STIFA must be informed of the cancelation. If, after cancelation of the foundation, undistributed foundation assets come to light, GBOERA must, at the request of interested parties (such as former beneficiaries and foundation council members or creditors) or sua sponte, open «Subsequent Liquidation Proceedings» (Nachtragsliquidation) regarding the canceled foundation. During these proceedings, the detected assets are distributed by official liquidators. Foundations supervised by STIFA must inform STIFA of subsequent liquidation proceedings. In order to bring claims against a canceled foundation, the

Princely Court of Justice must, on application by a participant, appoint a curator for the canceled foundation.

**Conversion and Change of Domicile**

Under § 41 private-benefit foundations can, without dissolution and liquidation, be converted by the foundation council into an Anstalt («Establishment») or a Treuunternehmen («Trust Enterprise») provided the foundation purpose and the founder's will are respected. Anstalts and Trust Enterprises are Liechtenstein legal entities. The conversion must be authorized by the Foundation Articles. The conversion leads to an automatic transfer of assets to the new entity. However, all rights of third parties, e.g. of the foundation's creditors, are upheld. Liechtenstein law does not provide for a merger between foundations.

Pursuant to art 234 PGR, it is possible to transfer the domicile of a Liechtenstein foundation abroad, and thus change the law applicable to the foundation, without the foundation being liquidated in Liechtenstein and then being reestablished abroad. For this purpose, a permit from the Land and Public Register Office is required, which will only be granted if, inter alia, the laws of the foreign country allow a Liechtenstein legal entity to become domestic without liquidation and subsequent reestablishment.

## 12. Transitional provisions

**Principle and Restrictions**

Liechtenstein's current foundation law as described above took effect on 1st April 2009. The question of which provisions of the new law should apply to foundations set up before this date («legacy foundations») is governed by the detailed transitional provisions. These can be found in art II of the Act of 26th June 2008, law gazette 2008 no. 220, as amended by law gazette 2009 no. 247. In principle, the new foundation law applies only to foundations set up on or after 1st April 2009. An overview of the old law on foundations, valid up to 31st March

2009, can be found in Marxer & Partner, Companies and Taxes in Liechtenstein, 8th edition, Liechtenstein Verlag, Vaduz 2003, p. 85-104.

The principle of «old law for legacy foundations» is, however, significantly restricted in two ways. Firstly, and in very simplifying terms, any dealings with the Land and Public Register Office (GBOERA), e.g. upon the replacement of a foundation council member, are governed by the new law. All legacy foundations have to file a Transitional Notice («Überführungsanzeige») containing the same information as a notification of formation (see Section 4). Secondly, art 1 para 4 of the transitional provisions contains a list of those provisions of the new law that also apply to foundations established before 1st April 2009. These are mainly rules relating to foundation governance, e.g. rules on the beneficiaries' rights to information and disclosure, on supervision by STIFA or on the right of the foundation council to amend the foundation documents.

Thus, the provisions on access to information by beneficiaries (§§ 5-12; see Section 6) also apply to all existing foundations. All existing common-benefit foundations had to be entered in the Public Register by 1st April 2010 and subjected to supervision by STIFA. Finally, the transitional provisions contain ways to restructure private-benefit foundations which would be void under the new law due to the absence, in the Foundation Articles or By-Laws, of even rudimentary criteria on the beneficiaries or the class of beneficiaries (see § 16 para 1 (4) of the new law and Section 6).

## 13. Taxes and Fees

Currently, foundations generally pay a reduced annual capital tax of 1‰ of the foundation assets, the minimum being 1,000 Swiss francs per annum (art 83 Tax Code). The minimum amount must be paid to the tax authority (www.stv.llv.li) for one year in advance. More information on the current Liechtenstein tax law can be found in Marxer & Partner, Companies and Taxes in Liechtenstein, 8th edition, Liechten-

stein Verlag, Vaduz 2003, p. 155-187. However, in May 2010 a bill to enact a new Tax Code was introduced in Parliament. The bill is set to enter into force on 1st January 2011. According to the new law, foundations will be taxed at a slightly higher rate. The definite tax rate is still subject to parliamentary discussion.

The fees of the Land and Public Register Office are dealt with in Schedule 2 to the GBOERA Fees Ordinance. For example, the registration fee is 700 francs and the fee for filing a notification of formation 300 francs. Costs for a certified official confirmation or a certified register extract amount to 15 francs. The fees of the supervisory authority (STIFA) for the evaluation of audit reports (200-1,000 francs), for deciding about an exemption from the duty to appoint an auditor (150 francs) and for the inspection of foundation documents (150 to 2,000 francs) are cited in art 13 of the Foundation Law Ordinance. If STIFA needs to apply to the court for supervisory measures, hourly fees of 150 francs are assessed.

Like all other jurisdictions surveyed by the OECD's «Global Forum on Transparency and Exchange of Information for Tax Purposes», Liechtenstein has committed to tax information exchange on request as provided for in art 26 of the OECD Model Convention. Liechtenstein will, however, only grant legal and administrative assistance in tax matters and fiscal crimes if this is stipulated in an international treaty applicable between Liechtenstein and the requesting state. On 1st July 2010, Liechtenstein had concluded bilateral tax treaties (TIEAs – short for «Tax Information Exchange Agreements» – or double taxation agreements) with 16 countries, 14 of them (e.g. the treaties with Germany, the UK, the US and France) providing for an exchange of information on reasonable request. The agreement between Liechtenstein and the UK is special in that it includes the «Liechtenstein Disclosure Facility» (LDF) offering UK taxpayers a unique opportunity of becoming UK tax compliant under very favorable terms (see www.marxerpartner.com/ldf for further information). Thanks to these agreements, Liechtenstein figures on the OECD White List as a jurisdiction having «substantially implemented the internationally agreed tax standard».

In all cases, however, Liechtenstein will only provide assistance to a foreign country provided a well-founded and specific request for information, which is subject to strict conditions, has been made. Amongst others, the request must contain information as to the identity of the taxpayer whose liability is in question; and it must state the precise facts of the case including the nature, form and time span of the requested information. There is no automatic exchange of information in tax matters and non-individualized inquiries (so-called «fishing expeditions») are not permitted.

## 14. What Can Marxer & Partner Do for You?

Marxer & Partner Attorneys-at-Law was founded in 1925. The oldest and largest law firm in Liechtenstein consists of approximately 30 lawyers and 60 administrative professionals and offers international companies and individuals comprehensive legal advice and support in all areas of law. Our activities focus mainly on foundation, trust, corporate, estate and tax law. As to foundations, we are frequently asked to give legal opinions, to represent the foundation or beneficiaries before Liechtenstein courts and administrative authorities or to act as arbitrators. Besides, we can also take on the establishment and administration of your foundation.

A foundation can be set up easily. There is no need for you to be present before a notary public, a court or an administrative authority. The foundation documents can be drafted in any language. Our lawyers will correspond with you in many different languages. We have 85 years of experience with foundation matters, especially in dealing with complex family and financial structures involving different legal systems. Over the decades, we have built up a large cooperative network with leading law firms, accountants, trust companies, asset managers and banks worldwide. Marxer & Partner is the Liechtenstein member of Lex Mundi (www.lexmundi.com), a worldwide association of leading independent law firms.

We are very happy to give you a personal overview of our services. Please feel free to contact any of our lawyers. For a list of our partners and associates, including biographical notes, see www.marxerpartner.com/en.

**Further Reading:**

- DOMINIQUE JAKOB: Die liechtensteinische Stiftung. Eine strukturelle Darstellung des Stiftungsrechts nach der Totalrevision vom 26. Juni 2008 («The Liechtenstein Foundation»), published by Marxer & Partner; Liechtenstein Verlag, Schaan 2009, ISBN 978-3-905762-03-7, German only.
- MARXER & PARTNER: Liechtensteinisches Wirtschaftsrecht («Liechtenstein Business Law»); Liechtenstein Verlag, Schaan 2009, ISBN 978-3-905762-04-4, German only.

**MARXER & PARTNER**

RECHTSANWÄLTE

Marxer & Partner | Attorneys-at-Law
Heiligkreuz 6 · 9490 Vaduz · Liechtenstein
Phone +423-235.81.81 · Fax +423-235.82.82
info@marxerpartner.com · www.marxerpartner.com/en

# Exhibit D



The Balda Foundation

Heilig Kreuz 6

9490 Vaduz

Liechtenstein

October 15, 2010.

Dear Sirs,

I hereby kindly request you to consider, in your full discretion and subject to your procedures for review and evaluation of distributions, to grant me a distribution to support me with my housing cost and living expenses in general.

Yours sincerely,

Beny Steinmetz

23, Quai du Mont Blanc, 1201 Geneva, Switzerland

CIRCULAR LETTER RESOLUTION OF THE FOUNDATION COUNCIL OF

# BALDA FOUNDATION

October 18, 2010.

Pursuant to § 7 of the Statutes of Balda Foundation, Vaduz, dated 12/19 June and 1 July 2009, the content of any beneficial interest as well as the prerequisites and the procedure of an eventual appointment of funds and/or income to Beneficiaries are subject to the absolute discretion of the Foundation Council as shall be resolved in the manner determined thereafter and in the By-laws.

Pursuant to Art. II. 1. of the By-Laws of the Foundation dated 12 December 2005, the power to appoint a beneficial interest is vested in the Foundation Council. It is in the Foundation Council's free and absolute discretion to decide from time to time whether, when and for the benefit of which member(s) of the Class of Beneficiaries of the Foundation distributions, grants or other benefits shall be made or awarded, to what extent, in which shares and proportions and in which manner distributions, grants or other benefits shall be made or awarded and whether any distribution, grant or other benefits shall be made or awarded to the debit of the principal assets of the Foundation and/or the income thereof.

Pursuant to the statutes of the Balda Foundation, the Foundation Council may pass resolutions in writing on proposals. Such resolutions by circular letter require the unanimous consent of all members. Substitution is not permitted.

## RESOLUTIONS:

Further to the written request received from Mr Beny Steinmetz on October 15, 2010, in due consideration of the above and in exercise of the powers conferred upon us we have considered to make a distribution to Mr Beny Steinmetz to support him with his housing cost and livelihood in general.

Therefore, we hereby unanimously resolve as follows:

* To appoint as beneficiary Mr Beny Steinmetz for an amount of US$ 1,000,000

The distribution of the mentioned benefit will be effected according to the appointed beneficiary's request.

_____          _____
Me Marc Bonnant                                      Mr. Peter Goop


_____
Rothschild Trust Guernsey Limited

CGS&H p. 8

BSGR_LCIA_2_0037278

# BALDA FOUNDATION

(the "Foundation")

## MINUTES OF THE MEETING OF THE FOUNDATION COUNCIL

held on July 1, 2010 at 11.30h
in Vaduz, Liechtenstein


Notice :          Notice to this meeting was waived by all persons entitled thereto.


Present :

Foundation Council ;

- **Dr Peter Goop ("PG")**
- **Me Marc Bonnant ("MB")**
- **Rothschild Trust Guernsey Limited, represented by Messrs Robert Payne ("RP") and Richard Baldock ("RB")**

By invitation ;

- **Mr. Jesus Cortes ("JC") of Marxer & Partner**
- **Mrs. Sandra Merloni - Horemans ("SMH") of Onyx Financial Advisors Limited**
- **Mr. Dag Cramer ("DLC") and Ms. Melissa Chapman ("MC") of BSG Management Services Limited**
- **Mr. David Clark ("DMC")**


Agenda :

1. Waiver of the convening notices
2. Ratification of the Board Minutes of November 25, 2009
3. Review and approval of the financial statements for the period ending December 31, 2009
4. Review and ratification of historical overview for the period 2002 to 2009
5. Review of treasury and cash forecast report
6. Review of treasury policy
7. Investment proposal ; BSG Mercury
8. Review of charity report and proposal
9. Review and ratification distributions report
10. Discussion on increase advisory fees for Mr B. Steinmetz
11. BSG Management Service Companies ; Review Cost Report 2009
12. Review and discussion Onyx Bonus Payment Proposal
13. Miscellaneous



**CGS&H p. 17**

BSGR_LCIA_2_0037287

1. Introduction / General comments

After being confirmed that there was a quorum in accordance with the Statutes of the Balda Foundation (hereinafter referred to as the "Foundation"), the meeting was declared open and it was said that it had been called to discuss the agenda as mentioned above. PG was elected chairman and SMH was appointed as secretary.

2. Ratification of the Minutes of the Meeting of the Foundation Council held on November 25, 2009

After review, it was decided to approve the following resolution ;

> **Resolution :**
>
> **The minutes of the meeting of the Balda Foundation dated November 25, 2009 were ratified by the Members of the Foundation Council.**

3. Review and Approval of the Financial Statements

The financial statements of the Balda Foundation as of December 31, 2009, as were presented and as approved by the Board of Directors of NYSCO Management Corp., were presented to the Foundation Council for discussion and approval.

> **Resolution :**
>
> **It was agreed to approve the financial statements as of December 31, 2009.**

4. Strategy, review of current investments

DLC presented the Foundation Council Members with an update in respect of the current and proposed investments within the underlying structures of the Foundation. It was suggested that the Foundation Council should acknowledge the decision of the Board of Directors of "NYSCO Management Corp." in respect of the current and proposed investments as detailed in the investment report and the financial statements of December 31, 2009.

> **Resolution :**
>
> **It was agreed to acknowledge the decision of the Board of Directors of NYSCO Management Corp. in respect of the current and proposed investments under the Foundation.**

5. Review and ratification of historical overview for the period 2002 to 2009

DLC presented the Foundation Council with a historical overview of the results and variation in the NAV of the Balda Foundation during the period 2002 to 2009, as were presented and as approved by the Board of Directors of NYSCO Management Corp.

> **Resolution :**
>
> **After discussion, it was agreed to approve and ratify the historical overview for the period 2002 to 2009.**



6. Review of treasury and cash forecast report

MC presented the Foundation Council with the treasury and cash forecast report for 2010 as was included in the board pack

>   **Resolution :**

>   **After discussion, it was agreed to approve the treasury and cash report for the year 2010.**

7.   Review and Approval of Treasury Policy

MC presented the Foundation Council with the draft Treasury Policy (as discussed during previous meetings) and recommended that this be approved and adopted by the Foundation Council in respect of the Foundation and its subsidiaries.

>   **Resolution :**

>   **After discussion and review, it was agreed to adopt the Treasury Policy (which shall be included in these minutes as Annex A).**

8.   Investment proposal ; BSG Mercury

Following receipt of the proceeds from the transaction which BSG Resources Ltd concluded with Vale in respect of BSGR's iron ore project in Guinea, and the subsequent substantial liquidity in the foundation, DLC confirmed to the Foundation Council that the group was actively reviewing opportunities (in capital markets) to conservatively invest on a long term basis. He subsequently introduced the Foundation Council to Mr Nic Spicer ("NS") as BSG's analyst with BSG Capital Markets in London.

NS presented the Council with a proposal for a segregated investment portfolio as was included in the board pack; he explained the recommendations and processes for setting up endowment type mandates for a selected group of managers which will focus on long term real capital appreciation.

>   **Resolution :**

>   **After discussion, the foundation council agreed in principle to approve the proposal and method for setting up a segregated investment portfolio and agreed with DLC and NS that they will provide the foundation council with an update on the selection of (and allocation to) the managers as well as proposed benchmarks for the portfolio.**

9.   Review of charity report and proposal

The Foundation Council discussed the report on the charities which was included in the board pack.

>   **Resolution :**

>   **After discussion, the foundation council approved the report and agreed to continue supporting the proposed children's charities.**

BSGR_LCIA_2_0037289

## 10. Review and ratification distributions report

The Foundation Council reviewed the distributions made during the period 2004 to June 2010 to both Mr Beny Steinmetz and Miss Merav Steinmetz. PG requested MC to change the denomination of the distributions made to Mr Steinmetz to support him with his living expenses in Switzerland to which she agreed.

**Resolution :**

**After discussion, the Foundation Council reconfirmed all distributions made to Mr Beny Steinmetz and Miss Merav Steinmetz during the period 2004 to June 2010.**

## 11. Discussion on increase advisory fees for Mr B. Steinmetz

At the request of DLC, the Foundation Council considered the proposed increase of the advisory fees, payable under the advisory contract between Mr Beny Steinmetz and the Balda Foundation dated January 1, 1998, back to the level before April 2008; in effect, representing an increase from the current amount of USD 300,000 per year to USD 400,000 per year.

**Resolution :**

**After discussion, the Foundation Council (a) approved the proposed increase in advisory fees for the services provided by Mr Beny Steinmetz and (b) agreed to authorise Mr Marc Bonnant to represent the Foundation and to execute, on its behalf, the corresponding addendum to the advisory services agreement between Mr Steinmetz and the Foundation, which shall have effect as from July 1, 2010 (which shall be included in these minutes as Annex B) .**

## 12. Discussion on increase fees of the foundation council members

Following the substantial increase in the foundation's assets, the Foundation Council considered to increase the fees of each of the foundation council members from CHF 50,000 to CHF 80,000 (this last amount representing the level of the fees before April 2008).

**Resolution :**

**After discussion, the Foundation Council approved the proposed increase in foundation council fees, which increase shall have effect as from July 1, 2010.**

## 13. BSG Management Service Companies ; Review Cost Report 2009

DLC presented the Foundation Council Members with an update on the 2010 expense report of the BSG management companies which continues to show a continued decrease in comparison to the 2008 and 2009 budgets.

**Resolution :**

**After discussion, it was agreed to ratify the 2010 expense budget and report of the BSG management companies.**



14. <u>Review and discussion Onyx Bonus Payment Proposal</u>

The Foundation Council confirmed having received the proposal to grant Onyx Financial Advisors Limited ("Onyx") a bonus payment. In view of the significant growth in the foundation's NAV (and as reflected in the financial statements), the Foundation Council considered to remunerate Onyx in recognition for their efforts, by payment of a bonus equal to 0.5% of the funds received by the Balda Foundation at the time of the closing of the Vale transaction.

**Resolution :**

**After discussion, the Foundation Council approved to grant Onyx Financial Advisors Limited a bonus payment of USD2,500,000.**

There being no further matters to discuss, the Meeting was declared closed and in presence of the afore mentioned attendants this document was executed.


_____              _____
Peter Goop, Chairman                    Sandra Merloni - Horemans, Secretary

CIRCULAR LETTER RESOLUTION OF THE FOUNDATION COUNCIL OF

## BALDA FOUNDATION

April 28, 2010.

Pursuant to the statutes of Balda Foundation, of Heilig Kreuz 6, 9490 Vaduz, Liechtenstein, the Foundation Council may pass resolutions in writing on proposals. Such resolutions by circular letter require the unanimous consent of all members. Substitution is not permitted.

### RESOLUTION:

Further to the investment proposal received from Dag L. Cramer on April 28, 2010 in respect of the operations of BSG Resources Limited in Guinea, we hereby decide as follows ;

To approve the entering into by BSG Resources Ltd into a joint venture with Vale S.A. with respect to the Balda Foundations' wholly (indirectly) owned subsidiary BSG Resources (Guinea) Limited in relation to the designing, financing, development and operation of certain iron ore mines in the Republic of Guinea owned (indirectly) by BSGR Guinea, the transportation and export of these minerals and the construction of the related infrastructure and facilities as described in the investment proposal.

For approval of the resolution:

_____          _____
Marc Bonnant                        Peter Goop


_____
Rothschild Trust Guernsey Limited

# Exhibit E

CIRCULAR LETTER RESOLUTION OF THE FOUNDATION COUNCIL OF

# BALDA FOUNDATION

### March 30, 2011.

Pursuant to § 7 of the Statutes of Balda Foundation, Vaduz, dated 12/19 June and 1 July 2009, the content of any beneficial interest as well as the prerequisites and the procedure of an eventual appointment of funds and/or income to Beneficiaries are subject to the absolute discretion of the Foundation Council as shall be resolved in the manner determined thereafter and in the By-laws.

Pursuant to Art. II. 1. of the By-Laws of the Foundation dated 12 December 2005, the power to appoint a beneficial interest is vested in the Foundation Council. It is in the Foundation Council's free and absolute discretion to decide from time to time whether, when and for the benefit of which member(s) of the Class of Beneficiaries of the Foundation distributions, grants or other benefits shall be made or awarded, to what extent, in which shares and proportions and in which manner distributions, grants or other benefits shall be made or awarded and whether any distribution, grant or other benefits shall be made or awarded to the debit of the principal assets of the Foundation and/or the income thereof.

Pursuant to the statutes of the Balda Foundation, the Foundation Council may pass resolutions in writing on proposals. Such resolutions by circular letter require the unanimous consent of all members. Substitution is not permitted.

### RESOLUTIONS:

Further to our meeting with Mr Beny Steinmetz on November 17, 2010 and subsequent discussions with Mr Dag Cramer, in due consideration of the above and in exercise of the powers conferred upon us we have considered to make a distribution to Mr Beny Steinmetz.

Therefore, we hereby unanimously resolve as follows:

- To appoint as beneficiary Mr Beny Steinmetz for an amount of US$ 20,000,000

The distribution of the mentioned benefit will be effected according to the appointe beneficiary's request.

Me Marc Bonnant

Mr. Peter Goop

Rothschild Trust Guernsey Limited

CGS&H p. 51

BSGR_LCIA_2_0037557



*Balda*
*Res 0*
*22/3/11*

Me Marc Bonnant

Dr Peter Goop

Rothschild Trust Guernsey Limited

March 22, 2011.

Dear Council Members,

Further to our conversations over the past few months, I would now like to formalize my request for a distribution by the Balda Foundation in order to support me to assist Scorpio Real Estate (an Israeli company under my private ownership) with its commitments.

I therefore hereby kindly request you to consider, in your full discretion and subject to your procedures for review and evaluation of distributions, to grant me a distribution in the amount of USD20,000,000.

I look forward to hearing from you and appreciate your consideration.

Yours truly

Beny Steinmetz

23, Quai du Mont Blanc, 1201 Geneva, Switzerland

BSGR_LCIA_2_0037558

# Exhibit F

Witness Statement of Benjamin Steinmetz

**IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE LONDON INTERNATIONAL COURT OF ARBITRATION**

**CASE NO 142683**

**BETWEEN**

**VALE S.A.**

**(Claimant)**

**and**

**BSG RESOURCES LIMITED**

**(Respondent)**

---

**Witness Statement**

**BENJAMIN STEINMETZ**

---

I, **BENJAMIN STEINMETZ,** will say as follows:

1.     I want to make a number of matters clear at the beginning of this statement, which I will expand upon later.

2.     **First,** neither I nor any of the businesses with which I am associated have, to my knowledge, or at my direction been involved in any corruption, bribery or other criminal activities.

Witness Statement of Benjamin Steinmetz

66.     So while I was aware that Pentler was going to try to ask Ms Touré to restate the falsity of
        the allegations she had made and get her to withdraw them again, I never assumed that they
        would be able get her to withdraw the statements, or that such a withdrawal would lead to
        the end of the Comité Technique process. I accordingly advised BSGR that it needed to
        carry on dealing with the allegations contained in the Comité Technique letter.

67.     I did not offer money, through Mr Cilins or in any other way, for Ms Touré to sign a further
        statement or destroy documents.  Mr Cilins did not travel to America on my or BSGR's
        instructions – or with our authority.  He was not authorised by me or BSGR in any capacity
        whatsoever. When I found out about his arrest I was as shocked and surprised as anyone.

68.     As to the transcripts of Mr Cilins conversations with Ms Touré, I would say just one thing.
        (There is much more to say about the transcripts, but I will leave that to submissions from
        BSGR's lawyers).  It is a very common thing for people to speak as if they have my
        authority, when they do not.  I have experienced it many times.  People seek to improve
        their position in a negotiation by saying they know me, or have access to me or speak with
        my authority.  In truth, no one does.  I can't bind any company or organisation and only
        make recommendations or provide my advice.  This is not a form of arrogance, it is just a
        statement of what often happens.  I recognise that I have influence and people may seek to
        improve their position by claiming an association they do not have. This happens regularly
        when someone approaches me and says that someone else has said something in my name.
        There is little I can do about it – except to make it very clear when I do give authority to
        speak in my name.  This was not one of those occasions.  I repeat.  Mr Cilins did not travel
        to speak to Ms Touré with my authority, on my behalf or on behalf of BSGR or anyone
        associated with BSGR.

## F.  THE NEGOTIATIONS WITH VALE

69.     Turning now to the deal with Vale, there was plenty of interest in the Simandou project.
        BSGR was engaged in talks with various third parties about the project, including Chinalco.
        Once we had ceased discussions with the Libyan Investment Authority and Chinalco, we
        were in active discussions with Baosteel. Although I now know that there had been some
        emails a little earlier, for me, Vale's interest came following the Indaba conference in
        February 2010, after which Vale conducted a site visit of Simandou blocks 1 and 2. After the
        site visit, although I am not sure exactly when, Eduardo Ledsham met with me and Mr
        Cramer in London and suggested a deal. I now cannot recall the details of what he
        suggested, but I do remember that I countered with a proposal similar to the deal which
        was eventually done. Mr Ledsham said he would have to discuss it with the Vale

Witness Statement of Benjamin Steinmetz

> management. He came back the next day and said that Vale was indeed interested in a deal
> on those terms.

70.     From that expression of interest until completion BSGR and Vale worked at great speed to
        get the deal done. As can be seen from the deal that was done, it suited both parties.
        BSGR was not desperate to sell and would have found other counterparties if the Vale deal
        had not come off, but, all the same, we were more than happy to partner with Vale who
        had the balance sheet and experience to take the project forward. In fact, the negotiations
        went very well. Although intense, they were conducted in a cooperative and constructive
        spirit. The deal meant much more to us than the $500 million payment: we also saw it as a
        deal to secure the project in the long term. Only a large corporate with a strong balance
        sheet had the financial capability to commit the US$10 billion plus and complete the project.
        Accordingly, the greatest success of the deal for BSGR was that Vale committed to
        providing the funds, even though the cost of that funding was so high at 16%.

71.     I was involved in the headline commercial negotiations, although my contributions, as
        always, remained subject to the board's approval and I made that clear to Vale several
        times. The deal was very intensive and the BSGR team spent many hours and days in
        meetings with Vale and with the two teams of lawyers first in Brazil and then in London.
        Negotiating and getting deals done is one of the areas where I am able to provide real value
        for the BSG group and I accordingly played a role in these negotiations with Vale. BSGR
        board members, such as Mr Cramer, were fully involved and the board was kept updated
        constantly. The BSGR "team" was split and different people were involved in different
        strands. Mr Struik, for example, was dealing with all of the technical issues while Yossie
        Tchelet dealt with the financial due diligence. I would have had nothing to add to these
        conversations and was not involved with them.

72.     I attended the initial meetings with Vale in Rio de Janeiro in March 2010. Daniella
        Chimosso dos Santos, Vale's senior lawyer, was in all of the meetings but the focus was
        always commercial. As one would expect. these meetings were cordial and concentrated
        on the business opportunity. The impression Vale gives of them in their statement of case,
        that the sole or main content of the discussions surrounded how BSGR obtained its
        licences and FCPA type enquiries, is entirely false. Had that been the principal topic of
        conversation it is unlikely that negotiations would have progressed very far given the tone
        that that would have set. Instead we spoke about the opportunity. Vale was as keen to
        impress as BSGR was, if not more so. They took every opportunity to tell us about their
        operating and marketing capacities and wanted to give the impression that they were the

Witness Statement of Benjamin Steinmetz

best in the world. They were also keen to explain that they were knowledgeable about the geology of the Simandou region because of the geological similarity to its Carajás mine in Brazil – which the BSGR team, at Vale's invitation, went to visit.

73.     In addition I met with Roger Agnelli, then Vale's CEO, several times. We got on well and discussed this deal as well as several other possible deals between Vale and BSGR. Mr Agnelli, José Martins, Clovis Torres and other senior managers were all very complimentary about the work BSGR had done on the ground in Guinea. They told us that we had done a world class job in a very short time.   Shortly after we had completed the Vale deal, Mr Agnelli, Mr Etchart, Mr Cramer and I took a trip to Panama together where we dined with the President in order to discuss a possible Panamanian copper project that BSGR had sourced previously and had already spent time and money looking into.   I had suggested it to Mr Agnelli as another deal BSGR and Vale could do together. Mr Agnelli told me that he had looked at the mine twice already and rejected it each time. However, he said that because I had asked he would look at it again, and make the effort to come to Panama with Mr Etchard to have dinner with the Panamanian President. We got as far as signing a memorandum of understanding with Vale in relation to this deal, although it then did not go ahead because there was, if I remember correctly, some kind of land rights dispute with local people around the mine. I was also invited to the opening of Vale's coal mine in Mozambique where I was presented to the President of Mozambique as Vale's esteemed partner in its Guinea project and BSGR brought to their attention other possible deals, including, for example, in Africa, Russia and Kazakhstan. Relations between me and Mr Agnelli, and between Vale and BSGR more generally, were very friendly and cooperative and there was plenty of goodwill. Indeed the collaboration between a very large corporation and a smaller company with an entrepreneurial spirit was a great combination.

74.     Later, once the Government of Guinea started its campaign against us and before he was replaced, Mr Agnelli called me to tell me that George Soros had just called him.   It was soon after Rio Tinto had paid US$700 million to stay in Guinea.   Mr Soros asked Mr Agnelli to meet him and Mr Agnelli wondered whether I should go with him but, in the end, went alone.   He reported back to me that Mr Soros had told him that the Simandou project was in jeopardy but that the issue could be solved by paying the government US$500 million. Mr Agnelli wanted to know what I thought.   I told him that I would recommend refusing that deal – or anything like that.   BSGR had done nothing wrong.   Rio Tinto, on the other hand, did not have a licence and had behaved terribly while they were in Guinea which were reasons why they had no choice but to pay if they wanted to stay in or return to the country.   Not only had we acquired all our rights properly, we were committed to investing

Witness Statement of Benjamin Steinmetz

US$1 billion into the country in respect of the Trans-Guinean railway, as well a further US$10 billion in the project itself. We should not be extorted to pay any more.

75.    Vale refers to rumours about my reputation in the diamond business in Africa.[20]  They do not substantiate the allegations.  I believe I and our diamond business have an excellent reputation and know of nothing that would suggest otherwise.  In any case, this was not mentioned to us at the time and I can only imagine Vale refer to it now simply to attempt to discredit BSGR.

76.    The FCPA/ABL due diligence was an important strand of a deal that contained many strands of work.  It was no more prominent than normal in this type of deal.  In any case, BSGR and I were only too happy to answer the questions and provide the information and comfort required.

77.    As to my involvement in this aspect of the deal, I remember, of course, being asked to sign and signing the anti-bribery certificate that was required by Vale.  I do not specifically remember signing the document itself but am confident that I read it at the time as I would have realised it was an important document. I also would have taken advice on its contents from our lawyers on the deal, Skadden.  Looking at it again now, I was quite correct to sign it.  Based on my knowledge both then and now, it is true.

78.    The only other aspect of the negotiations that related to the FCPA issues that I recall was a short deliberation that I participated in about whether the Pentler relationship should be disclosed. I cannot remember if it was someone from the BSGR side or Skadden themselves who mentioned it first.  Skadden knew the relationship we had with Pentler because they had advised on the dispute I refer to above.  I was ambivalent as to whether Pentler should be disclosed, and listened to the advice that was given. The advice was that we did not have to disclose the relationship. They were our former partner and shareholder in the business and the existence of a minority shareholder in the business was a matter of record from the accounts and elsewhere. As to Ms Touré or Ibrahima Touré or the Pentler owners as individuals, that question did not even occur to us. There was never a relationship with Ms Touré. The only relationship with Mr Touré was as an employee (and this was disclosed). And there was no relationship with the Pentler owners as individuals – only with Pentler itself. In any case, had the advice been to disclose the relationship with Pentler, that is what would have been done.

## G.  VALE AND THE GOVERNMENT OF LIBERIA

---

[20] SoC, para 55 and Witness Statement of Alex Monteiro, dated 29 January 2015, paras 36 and 37.

# Exhibit G

Exhibit C-1
**CONFORMED COPY**

BSG RESOURCES LIMITED

and

VALE S.A.

_____

JOINT VENTURE FRAMEWORK AGREEMENT

_____

Dated: 30 April 2010

shall be translated into dollars at the Exchange Rate on the day immediately prior to the date of this Agreement (or, if such date is not a Business Day, on the Business Day immediately preceding such day).

1.7     BSGR Limitations Exchange Rate. Where it is necessary to determine whether a monetary limit or threshold referred to in Schedule 5 has been reached or exceeded and the value of the Claim is expressed in a currency other than dollars, the value of that Claim shall be translated into dollars at the Exchange Rate on the date of receipt by BSGR of written notification from or on behalf of Vale in accordance with the provisions of this Agreement of the existence of such Claim (or, if such day is not a Business Day, on the Business Day immediately preceding such day).  The amount of any sum payable by BSGR in discharge or settlement of such Claim shall be converted into dollars (where such amount is expressed in a currency other than dollars) at the Exchange Rate on the date of such amount being agreed or finally determined ("**Settlement Date**"), provided always that any such sum shall continue to be payable even if after conversion into dollars the relevant sum at the Settlement Date would be below a relevant monetary limit or threshold referred to in Schedule 5.

1.8     BSGR Awareness. A reference in this Agreement to "*so far as BSGR is aware*", "*so far as any BSGR Guinea Group Company is aware*" or "*to the knowledge of any BSGR Guinea Group Company*" or any similar reference shall be construed as the actual knowledge as at the date of this Agreement of Yossie Tchelet, Marc Struik, Asher Avidan and David Clark of BSGR, David Barnett (in his capacity as an external advisor) and Benjamin Steinmetz (in his capacity as an external advisor to BSGR/the Balda Foundation) (the "**BSGR Principals**"), together with such knowledge as the BSGR Principals should have had, taking into consideration their office and respective duties, had they each made all reasonable enquiry in relation to the matter in question as at the date of this Agreement.

## Section 2.     Sale and Purchase of the Sale Shares

2.1     Sale and Purchase. On the terms and subject to the conditions of this Agreement, at Completion BSGR shall sell and transfer and Vale shall purchase, or procure that a wholly-owned subsidiary of Vale shall purchase, for the Purchase Price, all of the Sale Shares free and clear of all Encumbrances. Full title to, and legal and beneficial ownership of, all of the Sale Shares, together with all rights and benefits attaching to them, shall pass to Vale or its nominated subsidiary upon Completion.

2.2     Designation. Vale shall have the right to designate a wholly-owned subsidiary to purchase the Sale Shares as set out in Section 2.1 by written notice to BSGR to be received no later than the Completion Date, provided that Vale shall remain responsible for its obligations hereunder and shall procure that such wholly-owned subsidiary complies with the provisions of this Agreement, as applicable.

This page is part of the Joint Venture and Framework Agreement entered into as of 30 April 2010 by and between BSG Resources Limited and Vale S.A.

# Exhibit H

**IN THE MATTER OF ARBITRATION NO 142683**

**UNDER THE LCIA ARBITRATION RULES BETWEEN:**

**VALE S.A.**

**Claimant**

**-and-**

**BSG RESOURCES LIMITED**

**Respondent**

—————————————————————————

**WITNESS STATEMENT OF ALEX MONTEIRO**

—————————————————————————

CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
United States
Telephone: +1 212 225 2000
Facsimile: +1 212 225 3999

City Place House
55 Basinghall Street
London EC2V 5EH, UK
Telephone: +44 207 614 2200
Facsimile: +44 207 600 1698

*Counsel for Claimant*

memorialize agreed-upon commercial terms in a transaction agreement, and negotiate the other terms and conditions around the transaction. I was first introduced to BSGR by Mr. Ledsham during meetings held in Rio de Janeiro, Brazil in early March 2010.

## II.    DUE DILIGENCE DISCUSSIONS WITH BSGR

### A.    March 2010 Meetings in Rio de Janeiro

9.    In March 2010, Vale and BSGR held three meetings at Vale's offices in Rio de Janeiro to discuss the proposed joint venture. I attended these meetings with Ledsham, Daniela Chimisso (Vale Deputy General Counsel), among others from Vale.

10.    BSGR was represented at these meetings by Beny Steinmetz (BSGR's principal), Yossie Tchelet (Chief Financial Officer of BSGR), Asher Avidan (Chief Executive Officer of BSGR and BSG Resources (Guinea)), and David Barnett (internal counsel at BSGR).

11.    One of the main topics at these meetings was understanding how BSGR had obtained its rights to Simandou Blocks 1 and 2 after they were revoked from Rio Tinto, despite BSGR's lack of experience in the iron ore mining business and small size relative to other mining companies. BSGR was very responsive to Vale's concerns in this respect.

12.    *First*, BSGR provided a clear explanation as to why Rio Tinto lost its concession in the first place. BSGR explained that Rio Tinto had held the rights covering Simandou Blocks 1 and 2 for more than a decade, yet had done very little to develop the area. Based on my knowledge of the Guinean Mining Code, which requires certain development milestones to be met or else the Government will revoke rights over 50% of the areas, it was clear that withdrawal of Rio Tinto's concession was proper as a consequence of its inaction.

3

# Exhibit I

**To:**       'David.Trafford@sc.com'[David.Trafford@sc.com]
**Cc:**       Dag Cramer[dag@bsgms.com]
**From:**     Beny Steinmetz
**Sent:**     Tue 13/04/2010 4:27:45 PM
**Subject:**  Re:

Thanks , we are getting similair answers from our side . I think bottom line , 2% is the right price incl client risk .

----- Original Message -----
From: Trafford, David <David.Trafford@sc.com>
To: Beny Steinmetz
Sent: Tue Apr 13 18:09:51 2010
Subject: RE:

I hope it is not too late.  The person I have spoken to is actually called David Tucker (07827322413 / dtucker@hatch-europe.com ) and he works for Hatch Engineers in London.   He is on holiday hence it took a while for him to come back to me.

Tucker said that a fee of USC0.30 (30 cents) per tonne might be appropriate, but with current market pricing that is too low and a figure of 1 to 1.5% is more likely.   For that price the agent should take some payment risk and some financing risk.  Insurance and freight would be "spot" depending on whether customers want to buy FOB or CIF.

A marketing agreement should be for a short period of time and have break clauses.   To look at a longer term arrangement and perhaps one including exclusivity - it could be geographic exclusivity - then the agent should work off a lower commission and also give some assurance to the producer about volumes.  You would want to know who else they act for, how successful the marketing arrangements have been and how long they have been doing it (obviously does not apply in your case).

A big issue is if the agent is also a producer.   How do you know that you got the best price / terms / customers for your product.   How to build a brand for your product in competition with your agent's own brand.

We are going to come back to Dag in answer to his question.  In the meantime, I hope that this is helpful.

Kind regards
David
+4420 7885 5459 Direct line
+4479 1755 4567 Mobile

-----Original Message-----
From: Beny Steinmetz [mailto:beny@onyx-suisse.com]
Sent: 12 April 2010 16:28
To: Trafford, David
Subject: Re:

David , can your guys be able to tell me what is the right number (%) for an off take agreement to be charged by the Buyer . To incl all relevant staff ,on buyer ,  like cumstmer risk responsabilty on payment

BSGR-LCIA-0002099

,time and legnth  of payment , market research and knowledge ( custemr
base ) etc ..
What does trading comanies charges normaly ??
Beny


----- Original Message -----
From: Trafford, David <David.Trafford@sc.com>
To: Beny Steinmetz
Sent: Mon Apr 12 12:33:38 2010
Subject: RE:

I have briefed the team and discussed likely pricing.  We intend to send
you a short (three or four pages) presentation tomorrow.   Is that OK?
Kind regards
David
+4420 7885 5459 Direct line
+4479 1755 4567 Mobile

-----Original Message-----
From: Beny Steinmetz [mailto:beny@onyx-suisse.com]
Sent: 12 April 2010 11:33
To: Trafford, David
Subject:

David , was good meeting with y . This letter on potential financing on
thr Guinea project with pricing range is very important . Pls expedite .
Thanks Beny
This email and any attachments are confidential and may also be
privileged.  If you are not the addressee, do not disclose, copy,
circulate or in any other way use or rely on the information contained
in this email or any attachments.  If received in error, notify the
sender immediately and delete this email and any attachments from your
system.  Emails cannot be guaranteed to be secure or error free as the
message and any attachments could be intercepted, corrupted, lost,
delayed, incomplete or amended.  Standard Chartered PLC and its
subsidiaries do not accept liability for damage caused by this email or
any attachments and may monitor email traffic.


Standard Chartered PLC is incorporated in England with limited liability
under company number 966425 and has its registered office at 1
Aldermanbury Square, London, EC2V 7SB.


Standard Chartered Bank ("SCB") is incorporated in England with limited
liability by Royal Charter 1853, under reference ZC18.  The Principal
Office of SCB is situated in England at 1 Aldermanbury Square, London
EC2V 7SB. In the United Kingdom, SCB is authorised and regulated by the
Financial Services Authority under FSA register number 114276.


If you are receiving this email from SCB outside the UK, please click

BSGR-LCIA-0002099_0002

http://www.standardchartered.com/global/email_disclaimer.html to refer
to the information on other jurisdictions.


This email and any attachments are confidential and may also be privileged.  If you are not the
addressee, do not disclose, copy, circulate or in any other way use or rely on the information
contained in this email or any attachments.  If received in error, notify the sender immediately and
delete this email and any attachments from your system.  Emails cannot be guaranteed to be
secure or error free as the message and any attachments could be intercepted, corrupted, lost,
delayed, incomplete or amended.  Standard Chartered PLC and its subsidiaries do not accept
liability for damage caused by this email or any attachments and may monitor email traffic.


Standard Chartered PLC is incorporated in England with limited liability under company number
966425 and has its registered office at 1 Aldermanbury Square, London, EC2V 7SB.


Standard Chartered Bank ("SCB") is incorporated in England with limited liability by Royal Charter
1853, under reference ZC18.  The Principal Office of SCB is situated in England at 1
Aldermanbury Square, London EC2V 7SB. In the United Kingdom, SCB is authorised and
regulated by the Financial Services Authority under FSA register number 114276.


If you are receiving this email from SCB outside the UK, please click
http://www.standardchartered.com/global/email_disclaimer.html to refer to the information on
other jurisdictions.


This message has been scanned for malware by Viatel MailControl, a service from Viatel

BSGR-LCIA-0002099_0003

# Exhibit J



*Press Release / April 19, 2013*

## DAMNING VIDEO AND CONTRACTS SHOW BSGR WAS LYING IN GUINEA MINING SCANDAL

🐦 *Tweet (https://twitter.com/intent/tweet?text=Damning video and contracts show BSGR was lying in Guinea mining scandal&url=https://www.globalwitness.org/en/archive/damning-video-and-contracts-show-bsgr-was-lying-in-guinea-mining-scandal/&via=global_witness)*

**f** *Share (https://www.facebook.com/dialog/share?app_id=157343375056703&display=popup&href=https://www.globalwitness.org/video-and-contracts-show-bsgr-was-lying-guinea-mining-scandal/)*

**DONATE (/EN/DONATE/)**  ›



Beny Steinmetz Group Resources says there was no corrupt behaviour in its acquisition of licences to one of the world's largest iron ore concessions, in the West African nation of Guinea. It asserts that the wife of a former Guinean dictator had no involvement in its business dealings. All such allegations, it says, are part of a smear campaign.

Global Witness has seen evidence to the contrary.

A series of secret contracts seen by Global Witness spell out how BSGR promised Mamadie Touré (sometimes known as Mamadie Conté) millions of dollars and shares in the massive Simandou iron ore concession in return for help in acquiring the licences. Along with the stake in Simandou – a mountain range in the forested region of southeastern Guinea – Mme Touré was also promised stakes in uranium and bauxite mines that were granted to BSGR. Mme Touré was, at the time the deals were signed, one of the four wives of Guinean dictator Lansana Conté, who came to power in a 1984 coup, ruling the country until his death in December 2008. BSGR acquired the licences to Simandou two weeks before he died.

Just as contentious is the allegation by a Guinean mining review committee that BSGR asked Mme Touré to ensure that licences to Simandou were taken away from the company then holding them – the mining giant Rio Tinto. Blocks 1 and 2 – half the concession - were confiscated from Rio in July 2008, five months before they were granted to BSGR. The Guinean government said at the time that Rio had not met production deadlines.

A leaked video (http://youtu.be/HOfNE2gZH1o) from a September 2006 meeting held by BSGR – an edited version of which we post online today - shows Mme Touré at the event with top BSGR officials. One of those who speak at the event is Frédéric Cilins, an adviser to BSGR who was arrested on Sunday in Florida, standing accused of obstructing a federal grand jury investigation into BSGR by seeking to destroy the secret contracts.

The FBI arrested Mr Cilins in a sting operation, after he allegedly tried to pay Mme Touré to hand over contracts she had signed in relation to Simandou in order for them to be destroyed, according to the indictment. Mr Cilins also instructed Mme Touré to tell the FBI, should she be questioned in relation to Simandou, that she had no involvement with BSGR, the indictment says.

Mme Touré now lives in Jacksonville, Florida, where she owns three properties. Property records indicate that Mr Cilins and another official who has worked for BSGR may have been tied to the purchase of these properties. Global Witness faxed a list of questions to a number listed as being for Mme Touré on Thursday evening but received no reply.

BSGR did not reply to that side-meeting. Global Witness later confronted Mamadie Touré directly. Global Witness has been seeking comment from BSGR on corruption allegations since November last year. The company has declined to engage with us, instead saying that our refusal to provide a pre-publication copy of our planned reports was "deeply suspicious", and accusing us of orchestrating a smear campaign. BSGR has, at the same time, been using the law firm Mishcon de Reya – former lawyers to Princess Diana - to try to force us to give up our source material.

BSGR has denied all allegations of corruption and said that it is committed to transparency, saying in a press release of 25 March this year that it "acquired its exploration and mining rights in Guinea after a fully transparent and legal process". In the same statement, BSGR also denounced the Guinean government as "illegitimate" and said the mining review process was biased and contrary to the Guinean constitution. After Cilins' arrest, BSGR issued a new statement saying that he is not an employee of the company – although in a letter to the mining review committee, BSGR acknowledged that Mr Cilins has represented BSGR in meetings.

"BSG Resources has over 6,000 employees and operates in 12 countries globally… We are not aware of any allegations against any of our employees," BSG Resources said in the statement. "Allegations of fraud in obtaining our mining rights in Guinea are entirely baseless."

### The Simandou flip

Global Witness has previously raised concerns about BSGR's acquisition of blocks 1 and 2 of Simandou, noting the huge profits that the company made by flipping half their interest on to Vale, the world's largest miner of iron. BSGR paid nothing for its rights to Simandou and sold 51% of its stake to Vale in 2010 for $2.5 billion. Of this sum, $500 million was paid out immediately, with the remainder to be paid in stages. Even allowing for the $160 million that BSGR says it invested in Simandou and a neighbouring concession, the profit was immense. The Guinean government's entire annual budget in 2010 amounted to just $1.2 billion.

BSGR struck the deal with Vale under a period of often brutal military rule from December 2008. Longstanding opposition figure Alpha Condé was elected President two years later and, pledging to fight against corruption, launched a review of past mining contracts. The review committee has, among other matters, written to BSGR with detailed questions over alleged corruption linked to the Simandou deal and the way in which BSGR obtained its blocks.

In November last year Global Witness issued a statement, calling on BSGR to provide full answers to these allegations. Since then, we have seen three leaked letters from BSGR to the review committee, denying the allegations. In particular, BSGR states in a March 15 letter to the review committee that that Mamadie Touré was not married to President Conté and that questions relating to her were in any case "not pertinent…. As BSGR has never approached Mme Touré on the subject of the Simandou project".

There is an abundance of reports and news articles from the Guinean media stating that Mamadie Touré was one of President Conté's wives. This is also accepted as fact by Guinea's mining review committee. In Global Witness' opinion it seems unlikely that so many sources in Guinea are mistaken. Furthermore, it does not seem clear why BSGR would seek to question her relation to the former president if she was in no way connected to the company.

Still less credible is that BSGR "never approached Mme Touré on the subject of the Simandou project".

### Text, lies and video tape

In the video taken at a BSGR public relations event of 19 September 2006, Mme Touré – in the presence of Mr Cilins and surrounded by military guards, is introduced to: Asher Avidan, President of BSGR since June 2006; Roy Oron, a senior BSGR official who was described in the Guinean press at the time as being the General Manager of BSGR Afrique and who was CEO of all of BSGR from 1998 to 2007; and Mark Struik, at the time BSGR's Chief Operating Officer and currently the CEO of its Mining and Metals Division. The person introducing the BSGR officials to Mme Touré is her brother, Ibrahima Sory Touré, then the Vice-President of BSGR's Guinean subsidiary.

The video also shows Mr Struik announcing, in English, BSGR's plans to start drilling in Simandou in November 2006 – despite the rights to the concession still belonging to Rio Tinto and there being no plans for Rio to give them up. Mr Cilins – the suspect recently arrested in Florida - is interpreting for Mr Struik.

The previous year, BSGR had formally initiated its relationship with Mamadie Touré by agreeing to a "collaboration contract", which is referred to in a later termination contract seen by Global Witness. Global Witness has seen a series of other agreements btetween BSGR and affiliated entities. These agreements include:

--: An undated declaration signed by Mamadie Touré, representing a company called Matinda, that she received $2.4 million, which was payment stemming from her 2005 "collaboration contract" with a company called Pentler Holdings Ltd, registered in the British Virgin Islands. Pentler Holdings, registered by the company services firm Mossack Fonseca & Co. was a corporate vehicle that held 17.65% of BSGR Guinea.

It should be noted that the US indictment states that the "cooperating witness" (whom we know to be Mamadie Touré) has acknowledged that she has received funds at a bank account she controls in Florida.

--: Various promises and commitments (it is unclear whether these were honoured or whether they constituted a plot). These notably include a "commission contract" of 27 February 2008, signed by Asher Avidan on behalf of BSGR and by Mamadie Touré on behalf of her company Matinda, saying that "BSG Resources commits to give a total sum of four million dollars as a commission for obtaining blocks 1 and 2 of Simandou, situated in the Republic of Guinea." The contract says that "Matinda and Co. commits… to do everything necessary to obtain from the authorities the signature for the obtaining of the said blocks in favour of the company BSG Resources Guinea." BSGR "proposes" to distribute the commission in two halves: $2 million directly to Matinda and the other half to "people of good will who will have contributed to the facilitation of the granting of the said blocks". The contract also commits BSGR to building "school infrastructure" in Guinea belonging to Matinda.

A further undated "termination contract" (July 2010, according to one source) that ends the Pentler-Matinda relationship and in which Pentler commits to pay Matinda "$3.1 million for its part in all the activities carried out in Guinea". This document is signed by Mme Touré and by an unknown individual for Pentler.

--: The granting to Mme Touré's company Matinda of five per cent of BSGR's Simandou blocks and also to its uranium and bauxite (aluminium ore) blocks in Guinea.

## Florida property

Property and corporate documents related to Mme Touré's three houses in Jacksonville, Florida, where she moved to after the death of President Conté, also indicate a link to BSGR.

One of the properties Mme Touré is listed as owning in Florida's property records is

4658 Fern Hammock Drive, which was sold 50% to Mme Touré under her own name and 50% to her company Matinda and Co. LLC. The "Articles of Organisation" for Matinda and Co list its original registered agent as the Aventura, Florida-based lawyer Adam R. Schiffman. Mr Schiffman is the registered agent for several companies, including at least two where the owners are listed in a 2012 corporate document as: Avraham Lev Ran, who signs on behalf of the BSGR vehicle Pentler in a 20 February 2006 "letter of engagement" agreed with Mme Touré; and Mr Cilins. Another company that Mr Schiffman is the registered agent for, FMA USA, also has Mr Lev Ran and Mr Cilins as its owners.

When taken together – the video, the contracts, the property documents and the US indictment – there is compelling evidence that BSGR obtained its rights to one of the world's most important mining assets through bribery. BSGR's replies regarding Mme Touré and Mr Cilins fail to convince. Instead of answering our questions seriously, the company has resorted to labeling us as part of a plot and refusing to engage with us.

## Answers please

As the US Department of Justice investigates the company's behaviour in Guinea and as the Guinean government persists in asking difficult questions, BSGR should realise this is not a plot. The issues being raised are serious and matter very much for the people of Guinea, whose lives have for decades been blighted by corruption.

In light of Mr Cilins' arrest and the release of this new evidence, it's time BSGR stopped dodging the questions – and started providing answers.

Contact:

Daniel Balint-Kurti: +44 207 492 5872; +44 7912 517 146. E-mail: dbalint-kurti@globalwitness.org

Simon Taylor: +44 7957 142 121. E-mail: staylor@globalwitness.org

Notes to Editors:

The video discussed in the story above is available on Youtube: http://youtu.be/HOfNE2gZH1o (http://youtu.be/HOfNE2gZH1o)

Global Witness has published two previous press releases on BSGR. See our statement of 16 April, "Corruption arrest in US puts Beny Steinmetz Group Resources in the frame (http://www.globalwitness.org/library/corruption-arrest-us-puts-beny-steinmetz-group-resources-frame)", and our statement of 9 November 2012, "Beny Steinmetz Group Resources must publicly address questions over Guinea mining concession (http://www.globalwitness.org/library/beny-steinmetz-group-resources-must-publicly-address-questions-over-guinea-mining-concession)".

# Exhibit K

*Confidential*
*Attorney-Client Privileged*
*Attorney Work Product*

### Certification of Benjamin Steinmetz

1. In connection with the business of BSG Resources (Guinea) Ltd. and/or the transactions between BSG Resources Limited and Vale S.A. contemplated in the Joint Venture Framework Agreement dated       April 2010 (the "Framework Agreement"), I have complied and will comply with the prohibitions of "**Anti-Bribery Laws**" (Anti-Bribery Laws include any applicable anti-bribery law, rule, or regulation of any locality, or any other law, rule or regulation of similar purpose and effect).

2. In connection with the business of BSG Resources (Guinea) Ltd. and/or the transactions contemplated in the Joint Venture Framework Agreement, I have not and will not, directly or indirectly including through a third party:

    a. Pay, offer, promise, or authorize the payment of money or anything of value, to a Government Official, as defined below, or to anyone else, while knowing or having reason to believe that any portion of such exchange is for the purpose of:

        i. corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSG Resources (Guinea) Limited or any other person in obtaining or retaining business, or directing business to any third party;

        ii. securing an improper advantage;

        iii. corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Government Authority in order to assist BSG Resources (Guinea) Limited or any other person in obtaining or retaining business, or directing business to any third party; or .

        iv. providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s).

"**Government Official**" means (i) an employee, officer or representative of, or any person otherwise acting in an official capacity for or on behalf of, (a) a national government, political subdivision thereof, or local jurisdiction therein; (b) an instrumentality, board, commission, court, or agency, whether civilian or military, of any of the above, however constituted; (c) a government-owned/government-controlled association, organization, business or enterprise; or (d) a political party (collectively "**Government Authority**"); (ii) a legislative, administrative, or judicial official, regardless of whether elected or appointed; (iii) an officer of or individual who holds a position in a political party; (iv) a candidate for political office; (v) an individual who holds any other official, ceremonial, or other appointed or inherited position with a government or any of its agencies; or (vi) an officer or employee of a supra-national organization (*e.g.*, World Bank, United Nations, International Monetary Fund, OECD).

3. I do not know or have reason to believe that BSG Resources (Guinea) Limited, its subsidiaries and affiliates or their respective officers, directors, employees, or anyone acting on their behalf, or any third party in connection with the business of BSG Resources (Guinea) Ltd. and/or the transactions contemplated in the Joint Venture Framework Agreement has paid or will pay, offer, promise, or authorize the payment of money or anything of value, directly or indirectly, to a Government Official while knowing or having reason to believe that any portion of such exchange is for the purpose of:

   a. corruptly influencing any act or decision of such Government Official(s) in their official capacity, including the failure to perform an official function, in order to assist BSG Resources (Guinea) Limited or any other person in obtaining or retaining business, or directing business to any third party;

   b. securing an improper advantage;

   c. corruptly inducing such Government Official(s) to use their influence to affect or influence any act or decision of a Government Authority in order to assist BSG Resources (Guinea) Limited or any other person in obtaining or retaining business, or directing business to any third party; or

   d. providing an unlawful personal gain or benefit, of financial or other value, to such Government Official(s).

4. With respect to my current and future activities in connection with the business of BSG Resources (Guinea) Ltd. and/or the transactions contemplated in the Joint Venture Framework Agreement, if any, I will comply with the BSG Resources (Guinea) Limited Anti-Bribery Compliance Program to be provided by Vale S.A.

I agree to immediately notify the Vale S.A. if subsequent developments cause the certifications and information reported hereinafter to be no longer accurate or complete.

Date: 9.04.2010

Benjamin Steinmetz

# Exhibit L



Israel News  |  Middle East  |  World  |  Magazine  |  Jewish World  |  Opinion  |  Culture  |

Travel  |  Health & Science  |  Business  |  Tech  |  Art  |  עברית

Weather: **28C**  ☁  Tel Aviv-Jaffa                      [                    ] web

# Business & Finance



Beny Steinmetz
Photo: Sivan Farag

facebook

print

send to friend

comment

## Beny Steinmetz reveals all cards

**World's richest Israeli breaks years-long silence, opening up about allegations of bribery in Guinea to get concessions, rivalry with American tycoon George Soros, running away from media, complicated relations with birth country**

Tsach Shpitsen  |  Published:  06.30.13 , 07:27

"Am I an Israeli?" Beny Steinmetz wonders out loud. "That's a good question."

Sitting at the table, speaking in a swift flow of Hebrew and heavily-accented English, Beny Steinmetz seems as Israeli as falafel. His gaunt, jeans-clad visage and his direct and often impatient talk do not betray his immense wealth.

| Alleged Corruption |
| --- |
| **US arrests man linked to Israeli tycoon in Africa graft probe** |
| Reuters |
| Beny Steinmetz' rep in Guinea charged with obstructing investigation into potential illegal payments made to obtain mining concessions in West African country |

But the occasional offhand way in which he talks about billion-dollar deals in exotic countries and his personal acquaintance with African rulers hint at his ranking at the top of the world's wealthiest individuals.

Considered the richest Israeli in the world, Steinmetz's shying from the public eye has shrouded him in mystery, deepened even more by the nature and location of most of his dealings, which stretch from Sierra Leone to Kosovo.

Unlike fellow tycoon Lev Leviev, who often deigns to expound on his business with the media, Steinmetz keeps to behind the scenes, even while leaping between his Israeli estates to his businesses worldwide.





**Unlike Leviev, avoids talking to media (Photo: Zvika Tishler)**

It is during his current leap to Israel, for the purpose of visiting his son who serves in an infantry regiment in the IDF, that Steinmetz has uncharacteristically agreed to this interview, one of the few interviews he has given in his life.

This irregular decision to break his long silence was not without motive. Steinmetz and his company, BSGR (Beny Steinmetz Group Resources), are currently embroiled in an alleged corruption affair in Guinea, Africa, and the taciturn tycoon is anxious to defend his and his company's good name.

According to suspicions, BSGR, a mega-corporation involved in resource mining, including diamonds, gold and iron, bribed top government officials to receive prospecting concessions in the poor African country.

One of BSGR's Guinea partners is currently standing trial in the US, and the affair is closely followed by the world's economic media.

Therefore, the media-shy Steinmetz is now haunted by his name, and his photograph appears next to snappy headlines on corruption in Africa, in an affair in which every detail is closely scrutinized and reported.

To this interview he arrived without an entourage, accompanied only by the Dutch CEO of BSGR, and without preconditions, armed only with his convictions.

At the outset, Steinmetz clarified that he was not adept with the details of the affair ("I don't get down to the ground much in Guinea"), but as the conversation progressed he exhibited an impressive familiarity with every aspect and document related to the affair.

It's clear he is troubled. "I was dragged into an insane situation," he says, "and I want to paint a clearer picture."

### 'Middle-class must be taken care of'

Steinmetz, 57, was born in Netanya. His father was one of Israel's pioneers in the diamond industry, and his son promptly followed in his footsteps after his army service.

Today, 36 years later, he runs a diamond and iron mining empire, and deals in real estate, gas and oil, as well.

His company, BSGR, has a unique corporate structure: It's controlled by a trust fund, of which Steinmetz is a beneficiary. Thus, he does not fill any official role and is "uninvolved," he claims, in the corporation's management.

He prefers to call himself an "advisor" or "emissary" for the group. "I don't make decisions in BSGR," he reiterates. "The group works in many countries and has a very varied activity. I'm not involved in all the activities, but only advise in those I can contribute of myself and of my connections."

The question of Steinmetz's ownership over BSGR, as well as the issue of his Israeli citizenship, has been making the Israeli Tax Authority (ITA) busy over recent years.

According to the ITA, Steinmetz has devised an exceptionally creative tax construction for the corporation, thanks to which he pays too low rates; but Steinmetz claims his tax plan is completely legitimate and stands to all trust fund taxation laws.

**Unrelated to taxation, do you define yourself as Israeli?**

"I was born here, I went to the army here. My children grew up and went to the army here. I feel international-Israeli. I also have a French passport."

**Why don't you leave Israel completely, especially in light of your dispute with the Tax Authority? You have your businesses in Switzerland. Live there.**

"I do live there. I don't live here."

**But you still have a home in the community of Arsuf.**

"What does that have to do with it? I don't have businesses in Israel. My businesses here were no great success. I love this country like any Israeli, but that doesn't matter. There are many Israelis who live abroad and love the country."

**Are you emotionally connected to Israel? Do you care what happens here?**

"Of course I care, but I don't read Israeli newspapers regularly."

**Do you vote?**

"No. I don't have an Israeli driver's license or an Israeli ID card."

**What do you think about the Israeli anti-tycoon wave?**

"I'm not involved. I think it's unnecessary, that it's a shame. I don't think capitalism has been exploited here, though I must say I'm not very familiar with the Israeli market. I don't live here and I'm not involved, but I think anything like hatred and populism isn't right.

"It isn't restricted to Israel, but happens in other countries too. I think success is a good thing, not bad, and I know that no one wants a situation here where big businessmen say, 'I've had enough with Israel. I'm going to invest abroad.' It's very bad for Israeli economy. Success isn't a bad thing."

**Nonetheless, isn't a change in priorities warranted?**

"Maybe the system needs an overhaul. Maybe more care should be taken with regard to the poor and the middle class, but hating the rich doesn't help. That's my opinion on the matter, but it's not very informed."

## 'We were naïve'

Steinmetz's Guinea adventure began in 2006. BSGR examined the African country – just as it does many other points on the globe – and decided to get into the picture. Guinea, a former French colony on western Africa, is one of the world's poorest nations. Despite the huge potential of its natural resources – including gold and iron – most of its nine million citizens are illiterate, and their life expectancy is below 50 years.

In 2006, BSGR bid and won two concessions to prospect for iron ore in eastern Guinea. They soon made an impressive discovery in a region called Zogota. "We were very excited," smiles Marc Struik, in charge of natural resources in the firm.

"We thought this is a very serious find. At the time, iron ores was a highly valued commodity, and we estimated there were billions of tons of high-quality iron ore. In the end it was much less, but still it's a very special find."

In 2008, Guinea saw a dramatic course of events: The government decided to take part of the mining concessions owned by the Rio Tinto company – an Australian mining giant which held the rights for 12 years – in an area called Simandou, one of the world's largest iron-ore deposits.

BSGR seized the opportunity, filed a request for the prospecting concessions in the area and on December 2008 outbid its competitors and won the coveted concession.

But the deal was crooked, say the firm's detractors: BSGR got the concessions for a paltry sum. They say the company paid nothing – except for ridiculously low tolls – for a huge golden egg, rare resources which belong to the destitute Guineans.

Steinmetz chuckled. "It's the same all around the world," he said. "It's exactly like no one pays anything to the State of Israel for the right to prospect for gas, but only royalties and taxes for the gas itself.

"When you sell a prospecting concession you're only selling potential. You pay tolls for the right to invest and look for something."

**How come you won the concession? There were other bidders.**

"We proved to them the company works fast, employs a lot of personnel, that we have engineering and financial capabilities and that we came to do business. The government had a lot of positive data on us."

In April 2010, less than two years after winning the concession, BSGR closed one of its largest deals, and inadvertently supplied its detractors with more ammunition: It partnered up with Brazilian mining giant Vale, which bought 51% of the Guinean project for a gargantuan $2.5 billion – $500 million of which Vale promptly anted up.

Not bad for BSGR's initial investment of only $160 million, but also, according to Steinmetz, where the troubles began.

"The problem started probably because of grudge over the sale to Vale. People were saying the BSGR bought property for $100 or $200 million and sold it for $5 billion. It's not true: It sold 10% for $500 million with an option to rise to 51% for an addition $2 billion."

Equipped with a cash-rich partner, Steinmetz's people continued to work vigorously at the promising Guinea project. But meanwhile, the country saw a regime-change: Incumbent President Alpha Condé was elected and with him the positive atmosphere the corporation enjoyed rapidly evaporated.



**Guinea President Alpha Conde (Photo: AFP)**

"At first we were glad about the elections," Steinmetz says bitterly. "We saw that the leader of the Junta which controlled the country relinquished his power with dignity, and we thought it was a good sign for the region's stability. We were naïve."

**Can you put your finger on the point in time where you think things started to go wrong?**

"I recall in 2011 the company held a ceremony, with Vale's CEO and former Brazilian President Lula da Silva in attendance. The Guinea project CEO approached me and said, 'Listen, son, there's something strange going on. They haven't invited BSGR to sit with Lula and the president, Alpha Condé.

"I was there as the company's emissary and I didn't think too much of it, but the CEO immediately realized something was wrong."

The second portent appeared two weeks later, when Alpha Condé unexpectedly halted BSGR's works on a train in Guinea, due to its commitment to develop infrastructure in the country as part of the concession deal.

"They said they want to cease the operations because the price is too high," Steinmetz said. "Do you understand how chaotic that place is? What do they care how much it costs; the company gave it for free! Moreover, it wasn't too expensive. After all, in charge of the operation was one of Brazil's largest construction firms, one of the largest in world, not some anonymous contractor.

"All of a sudden they started saying nonsense such as, 'The train is too narrow, we want it wider.'

"There was another thing. There was a Vale dinner which I attended, in which Lula, who just finished his presidency, asked the Guinean president how he intended to get finance for his country.

"What did Alpha Condé answer? He said, 'I'll go to my friends – Muammar Gaddafi, Ahmadinejad and Hugo Chavez – they'll help.' Do you understand what this is about? You must understand: In countries like Guinea, the president is everything. It's Alpha Condé."

### 'It's utter garbage'

The bomb exploded for BSGR on October 30, 2012 in the form of an official letter from a committee that examines contracts and concessions in the resources area in Guinea.

The committee was established by the new regime with the express purpose of investigating all the mining contracts signed between the state and private businesses.

Under the title "Accusations," the committee listed a long series of harsh allegations of corrupt conduct by BSGR.

Among others, the company was accused it had given precious gifts – including a miniature model of a diamond studded car – to Guinea's former mining minister, and paid a sum of $2.5 million in cash to a woman named Mamadie Touré, who was romantically involved with President Condé.

The allegations painted a serious picture: BSGR's concessions to prospect for iron in Simandou and in other regions were allegedly obtained by corrupt means.

"This letter is a joke," Steinmetz raged. "All the committee members are the president's puppets. It's a ridiculous and deceitful report. All this nonsense that we gave away watches, cars."

**But you really did give a diamond-studded car.**

"It's true, the company gave a small model of a diamond-studded car in a formal ceremony, in front of a TV camera in the presence of dozens of people. It's a standard corporate gift by BSGR, worth $1,000. In production costs it was $700. We gave over 50 such gifts worldwide. Come on, isn't this a joke?"

**And the watch you gave former President Condé?**

"We never gave any watch. It's utter garbage."

**The committee noted a meeting that took place between you and former president Condé in a Geneva hospital, where he was hospitalized. They claim you went there to convince him to give you the concession.**

"I was never in a hospital in Geneva, never in my life. Even if you kill me, I wouldn't know how to get to a Geneva hospital. It's a joke."

This is where Frederic Cilins comes in, the man who will move the story from Guinea to New York. The Americans got involved in January 2013, after they became suspicious that sources within BSGR are involved in bribery in Guinea; apparently they suspected money laundering and questionable money transfers from Africa to the United States.

For the purpose of the investigation, the FBI enlisted Mamadie Touré, the president's lover.

Touré had numerous phone conversations with Frederic Cilins, a French citizen who was BSGR's partner on the Guinea project. In these talks, which Touré recorded for the FBI, Cilins is heard pleading with Touré to destroy documents which allegedly pertain to the bribery affair in Guinea, and promises her millions of dollars in return.

In April 2013, Cilins was arrested by the FBI in a Florida airport, and 10 days later an indictment was filed against him on charges of obstructing justice and incitement to perjury.

In one of the recording, the FBI claims, Cilins specifically names Beny Steinmetz. Following is a transcript, released here for the first time, of one of the phone conversations:

"I went especially to meet him (Steinmetz), and talk to him about all this in a very clear way. I told him last week: 'Touré will never betray you. Touré will never give the documents. He told me, 'That's fine, but I want you to go and see – I want you to destroy these documents.'" The American prosecutor also noted that Steinmetz and Cilins were very close.

**Do you know Frederic Cilins?**

"I met him three or four times, after the Vale deal was closed."

**The prosecutor said you were close.**

"Am I close with anyone? This is completely false data. Simply untrue. Anyway, I shouldn't discuss matters which are currently under investigation. I was not approached by anyone, it's all hearsay and someone is running a campaign."

**What's the explanation?**

"Let Cilins explain. He's in court. What there is are plenty of news reports, a lot of media and a lot of gossip. I'm not aware that there are any questions related to me or the company."

**Cilins claims Mamadie Touré tried to extort BSGR. Is that true?**

"I can tell you this: The company was the target of numerous extortion attempts. We never surrendered to these attempts. We buffeted them resolutely."

**In a letter sent to you by the Guinea committee it was claimed Mamadie Touré got $2.5 million from you.**

But Steinmetz denies the allegation vehemently. "I'm not the issue here," he says. "The issue is that neither BSGR nor I did anything wrong, only good things. The company here is the victim, whose assets are the target of robbery. Let me tell you another thing: I've been working in this field for 36 years: The day after I was released from the army, in 1977, I boarded a plane and flew to Belgium. Since then I worked in over 50 countries, and we never had any problems. There were successes, there were failures, but we never appeared in court.

"There, even now, after this affair came about, no one came out and said that this happens to them as well with Steinmetz or with BSGR. If someone is a sexual predator, and someone brave enough testifies against him, usually other women come out and complain too. Not with us. There are no skeletons in the closet.

"The company doesn't pay anything to anyone, not one penny to politicians; we simply don't do this kind of things. This is a well-oiled, evil machine which operates against BSGR and me, run by the president and his associates."

### 'Wait, it's not over'

Steinmetz points two fingers on the Guinea affair. The first is directed at President Alpha Condé, who he calls "corrupt" and "obsessive." The second, more complex and fantastic, is directed toward billionaire George Soros, the American tycoon who made his fortune on the currency exchange. His worth is estimated at $14 billion, which ranks him among the world's richest men.

Soros has several fingers in the Guinea pie. Among others, he gave substantial donations to aid groups in the country. These groups, said associates of BSGR, took part in the change of public opinion against the corporation and stand behind the corruption allegations.

According to a Bloomberg report, Soros financed the first investigation against BSGR, which led to the committee's report.

"Soros hates us," says an associate of BSGR. "He thought for some reason that Beny mocked him when he lost money in Russia, even though it's not true. He's Alpha Condé's friend, and apart from that, he doesn't like Israel. He donates to a lot of pro-Palestinian groups."

Soros himself responded to the claims that he has a personal feud with Steinmetz in an interview with the Financial Times: "I have no business interest in the mining industry of Guinea and have no intention of acquiring any. I have not met Mr. Steinmetz nor have I ever spoken with him. I have no personal grudge against him."

**Soros is just trying to help the people of Guinea, isn't he? He makes contributions to organizations aiding the Guineans.**

"Great help. If there wouldn't be business investments in Guinea, none of the citizens would benefit. Investors need to get rewarded for their investment, especially in unstable countries. Even Soros wants to make money when he's investing up against the Pound. To me it's capitalistic hypocrisy, it's nonsense. The social organizations tried to persuade Alpha Condé to issue a new mining bill; if under this law no one would invest, then what is it good for? How is it helping the people? All the major mining companies have left the country."

**So you're going against the social organizations?**

"No. I'm sure that some of them are doing a great job, that's not the issue. What I'm saying is that Guinea has a corrupt leader, who has found a target that's easy to fight. He doesn't think we will fight back; perhaps he is inexperienced with Israelis. It is war, and I'm telling you we will win in."

**At this point it seems they are beating you.**

"Who's beating us?!"

**Soros. The Guinean government. You are now under attack, and your reputation was damaged.**

"Let's wait until the end. It's not over yet. They may have damaged mine and BSGR's reputation with their accusation campaign, but it's not over."

**Does it make you regret entering Guinea?**

"In business you never regret. If I regret, I just sit at home all day and cry over the things I did or did not do. We are businessmen. We are fighters, we are at war and we will win. We will not give these concessions back."

**Meanwhile, the project in Guinea is stuck.**

"That's right. Nothing will happen there in the next 10 years, and it's sad. BSGR came to Guinea, invested hundreds of millions of dollars. It could have been possible now to export iron ore after a $10 billion investment. The whole region would bloom. One year of production would have doubled or tripled Guinea's GDP.

"What happened there is that a bad president came to power, and for his own personal reasons, he stopped the work. It's all agenda, politics, corruption and tales. The committee that was put together there is fraud; it's not like having a Sheshinski or a Tzemach Committee here, when you know their intentions are clean; these committees were not established to just get Tshuva. It's different in Guinea. It's simply African corruption at its worst, and the terrible thing here is that they mask it as carrying about Guinea."

## 'Some would say I'm cold-hearted'

**How much does this concern you? Is it an annoying background buzz or an urgent matter?**

"It's not urgent. I have 11,000 things to deal with. It's more of an annoying buzz. Although it is bad publicity. The company works all over the world, and up until today it had the best reputation possible. In a nutshell, it is a disturbing background buzzing. But it does not keep me up at night."

**Is there anything that does keep you up at night?**

"Of course. Everyone has something like that. I'm a family man, and my family is very important to me. But business does not keep me from sleeping."

**You didn't lose any sleep even after leaving the Isramco partnership just a moment before the natural gas in the Tamar gas field was found?**

"In retrospect it was a rough business error, but I have a long list of mistakes."

**Did your gut feeling mislead you?**

"Whoever only has good gut feelings is probably doing very little. I can tell you about a very long list of mistakes I have made, alongside many successes."

**You're not the emotional type.**

"I don't know how to answer that. It's hard for me to characterize myself. I think I'm balanced. Some people might say I'm cold-hearted."

**And hate the media. And avoid interviews.**

"That's right. I have no interest in it. It's not because I'm shy or scared, it's just not my style. I don't need it. It angers me that a timed, planned and paid smearing campaign is run against me in the press. We will fight it and we have already won the lawsuit we filed in London."





**Idan Ofer, Steinmetz's opponent for world's richest Israeli (Photo: Yaron Brener)**

**Isn't it important for business, to keep in touch with the media?**

"Not for my business. I was almost never interviewed. The media does not set anything, and the truth is that I don't really care what everyone thinks."

**The international media, by the way, has yet to determine whether you or Idan Ofer win the title of the richest Israeli in the world.**

"That's nonsense."

**With all honesty, how much is money important to you?**

"I care about my family and I care about the interest, the challenge and the doing. Money is secondary, but of course I have a great privilege to say that."

## 'There are enough anti-Semitic businessmen'

"I would want you to know everything, from A to Z. The whole case is slander. It's all nonsense, but unfortunately there's a legal procedure and I can't respond to everything" is what the Israeli businessman Michael Noy claims from France, after his name has also been mentioned in this affair.

Noy and Frederic Cilins were business partners in 2006-2008 in BSGR Guinea, and according to the FBI, Noy was involved in an attempt to destroy Mamadie Touré's documents. In a recording that is first revealed here, Noy is heard speaking with Cilins.

**Noy:** "Did she agree to give you everything?" (The FBI claims he is referring to the documents)

**Cilins:** "Yes. It's done."

**Noy:** Really?

**Cilins:** "Yes. I now have everything that was on one side and will have the rest Saturday night."

**Noy:** "That's good. But I believe… that Touré should leave."

In another recording, Cilins is heard reporting to Noy that Touré has signed a statement (which was false according to the FBI) in which she had no contact with BSGR. In that same conversation, Cilins reports to Noy that Touré also told him that the US authorities are interested in a compromise.

Noy sounds interested in what Touré said to the authorities and how the meeting ended. Cilins responds to his questions and afterwards is heard saying: "We shouldn't talk so much on the phone."

"I cannot refer to the content of the recordings because it is under investigation," Noy explains, "but many of the quotes in the transcripts are not in the recordings. There's talk that's half French and half African.

"It is also unclear from the recordings which documents they're talking about and why they started recording only in March, and what happened in the entire year that had passed from when we spoke with her and her representatives and found out they were spreading fake paperwork?"

**Are you claiming that Touré is the one who tried to extort you?**

"There were several instances in the past year in which she or other representatives approached with the papers to BSGR and requested that they pay fees. Even though we have no relation with BSGR since 2008, they turned to us to help them get out of this mess.

"At least 10 people claim they brought on the deal and deserve to get money but that's how it is when you get to Africa. They tell you that there are 10 people waiting for you downstairs and you don't understand because you didn't make appointment with anyone and all these people come and say they want

to be your partners. One sells you a forest; the other sells you a mine that doesn't belong to him. That's how it works and it's not because they're bad or deceitful. They're innocent and that's how it works."

Noy, 62, turned to the global commodity market at the age of 36. He exported luxury goods, including perfumes, from France to Russia. After that he tried selling medicine to Russia and China. In the mid '90s he met Cilins, and the two formed a company called CW FRANCE. According to him, the company mainly dealt with selling medicine to Africa.

"We even sold medicine to the Defense Ministry," Noy claims. "We saved hundreds of thousands of dollars to the State."

**How did you get to work in Guinea?**

"We sold drugs all over Africa, not just Guinea. Guinea is a pretty small market of ours. We worked in Uganda, Kenya and Congo."

**And how did you reach a deal with BSGR?**

"It was entirely a coincidence since we knew their general manager at the time, Roy Oron, from a previous job in South Africa. Oron asked us whether we work in Guinea and was mainly interested in the area of Simandou."

**So you were actually the ones to make the connection with Guinea?**

"Yes, you could say that."

**What about the allegation that they gave bribes for concessions?**

"BSGR did not pay a dime. At first they didn't want this business. I pushed them to take it and they did not pay one dime for this contract. They took on a great risk. They did not receive inheritances or gifts. They worked in places no normal person would go to."

**But the recordings have Cilins talking about Steinmetz and his awareness of the document shredding.**

"There's just bashing Beny without knowing. I know how they got the concessions. I know that where they invested $200 million where you wouldn't even invest $10. When he said I should invest I told him to do it on his own, I won't put $5 in that place. It's madness. It's all nonsense."

**The FBI claims that in a strange coincidence, you embarked on a cruise from the US two days after Cilins' arrest?**

"I, Cilins and Avi Lev Ran (another business partner of the two in BSGR Guinea) had to leave two days after the arrest. I was supposed to go on a cruise to Europe that had been planned three and a half weeks ahead of time. Lev Ran had planned on going on a plane that was booked three weeks in advance, and I intentionally did not want to change anything so that no one would think we were running away. We left as planned."

**What do you have to say to those writing about this story?**

"Do not destroy the Israeli reputation. There are enough anti-Semitic businessmen and anti-Israelis who are trying to ruin and make problems for Israeli companies. In this story, 99.9% of what you hear is nonsense."

- •Follow Ynetnews on **Facebook** and **Twitter**

פרסום ראשון: 06.30.13 ,07:27

share      share      share      send to friend      comment

# Exhibit M

## DIRECT SUMMONS TO APPEAR BEFORE THE CRIMINAL COURT OF PARIS

THE *date* OF *Month*, TWO THOUSAND AND THIRTEEN

UPON THE REQUEST OF:

- **BENY STEINMETZ GROUP RESOURCES LTD (BSGR),** registered at the clerk of the court of Guernsey, under number 46565, and whose head office is located at West Wing, Frances House, Sir William Place, Saint-Peter Port, Guernsey, and represented by Mr. Dag CRAMER

- **Mr. BENY STEINMETZ**, born on April 2nd, 1956 in Israel, of dual French-Israeli nationality, living at 23 quai du Mont Blanc 1201 GENEVA (SWITZERLAND)

With legal representation by:

**Mr. Richard MALKA**, Attorney, 226 rue du Faubourg Saint Honoré 75008 PARIS. Tel. 01 56 59 60 20, Office C 593

Both specifically electing domicile in his cabinet, according to the instructions of Article 53, Paragraph 2 of the law of July 29th, 1881

I, the Undersigned Clerk,

**SUMMON:**

- **MARECHAL EDITIONS – LE CANARD ENCHAÎNÉ** with a capital of 100.000 €, registered at the Paris RCS (Registry of Trade and Companies) under number 582 093 324, and whose head office is located at 2 rue des Petits Pères 75002 PARIS

  *As liable under civil law*

- **Mr. Michel GAILLARD**, publishing director of the CANARD ENCHAÎNÉ, whose offices are located at 2 rue des Petits Pères 75002 PARIS

  *As defendant*

2113

BSGR-LCIA-0000218
**CGS&H p. 1**

To appear in person at the correctional hearing of the High Court of PARIS, 17th Chamber (Chamber of the Press), located in this city, at the Courthouse, 4 Boulevard du Palais, 75001 PARIS

*The   at   o'clock*

In the presence of the State Prosecutor to whom a copy of the current summons has been notified in the conditions provided for by Article 53 of the law of July 29th, 1881.

*Very important:*

*You are required to appear personally at the hearing, either alone or assisted by an attorney. You may also, but only in certain cases, be represented by an attorney.*

*If you feel you are unable to attend the hearing, you must send a letter to the President of the Court in order to explain the reasons for your absence. You will attach all substantiating documents to your letter.*

*If, at the hearing, your reasons are accepted by the Court, a new summons to appear will be sent for a later hearing. Otherwise, the case will be decided in your absence.*

*In any letter you may send, you must note the date, time and place of the hearing which you are asked to attend (as well as the room number indicated on the first page).*

*I am informing you that you must appear at the hearing in possession of proof of income and your tax assessment or non-assessment or you must leave them with the attorney who represents you.*

## MAY IT PLEASE THE COURT

Defamed by remarks of exceptional gravity in the *CANARD ENCHAÎNÉ* edition of September 25th, 2013, since they have been accused, no more or no less, of having prepared a coup in Guinea, in addition to various acts of corruption, the plaintiffs can only seek conviction of the publisher and editor of the *CANARD ENCHAÎNÉ*, since it is impossible to identify the author of the article under prosecution, this article having bravely been signed under the name of Jérôme Canard, in connection with the crime of public defamation of a private individual.

2

BSGR-LCIA-0000218_0002
**CGS&H p. 2**

## 1.    BACKGROUND

### 1.1    BSGR and its founder, Mister Beny STEINMETZ

BSGR is a mining company that employs close to 6,000 people, in twelve different countries.

Since its creation and for about 35 years, the company has never been subject to any accusation of corruption and, in addition, it is committed to include within each one of its programs a strong environmental dimension, developing social, medical and humanitarian programs, and investing in economic development programs of the concerned states.

Beny STEINMETZ, founder of this group, has in parallel created the charity organization Agnès and Beny STEINMETZ that takes action in each one of these countries.

### 1.2    The investments in Guinea Conakry

Since 2006, BSGR has been involved in various projects in Guinea, leading the exploration work of its subsoil, which is rich in various minerals, following the example of many other international mining companies.

Guinea, whom population has reached 10 million inhabitants, is one of the poorest countries in the world, despite its natural wealth, and this is particularly due to its political instability which strongly hinders the completion of any long-term project, to such a point that international investors have described it as "*the country of cursed resources*".

Unfortunately, BSGR has experienced this curse...

Indeed, in 2008, the Guinean government cancelled exploitation permits accorded to the mining giant RIO TINTO for deposits of iron ores located in the SIMANDOU region, arguing that the company had failed to comply with the mining code and to explore the territories for which it had been granted exploitation rights.

BSGR got a research permit in this region, and, in 2009, obtained a concession agreement.

It is clearly this particular company that was targeted in the CANARD ENCHAÎNÉ article, under the designation "*BSG*".

This company then invested over $160 million on site for drilling and feasibility studies, but also in schools, clinics and cultural centers.

3

BSGR-LCIA-0000218_0003
**CGS&H p. 3**

Later, it went into a partnership with the Brazilian group VALE in order to continue with further exploration of mineral deposits, to exploit them, to create a railway line at a cost of $1 billion and to invest over $8 billion in infrastructure in order to transport the iron ore, which would have resulted in significant development of the economy in this region.

Over $600 million were also invested in Guinea, of which approximately $300 million came from BSGR.

### 1.3    The seizure of power by President Alpha CONDÉ

In November 2010, Mr. Alpha CONDÉ was elected as President of Guinea after a vote, the legality of which had been widely disputed, since he received 18% of the votes in the first round, as opposed to 44% of the votes for his opponent and then, miraculously, 52.5% in the second round.

Since then, the legislative elections were postponed year after year, while peaceful demonstrations were bloodily repressed by the government and hundreds of people have been shot to death by bullets from the security forces of the President Alpha CONDÉ.

Then, the new president Alpha CONDÉ entrusted his son Mohammed with an omnipotent role in the mining negotiations.

In addition, he surrounded himself with former financier and raider George SOROS and with former British Prime Minister Tony BLAIR in order to renegotiate all mining contracts previously granted, to the great satisfaction of some of his new Chinese, Russian or South-African partners.

In addition, in June 2012, the *Sunday Times* newspaper also revealed that a secret agreement had been concluded with a South-African businessman who had loaned $25 million to the new government in exchange for a 30% interest in all mining rights of Guinea.

Former Prime Minister Tony BLAIR, for his part, claimed he intervened in an impartial role, in order to help the Guinean government while he was comfortably appointed by a sovereign wealth fund of Abu Dhabi, which, by a strange coincidence, had just signed a collaboration agreement with Guinea.

As for the billionaire George SOROS, the world's 30th richest man, thanks to his currency speculation which ruined entire economies, he put his American law firm of 4,200 people, private investigators, his own private foundations and more at the disposal of the new government.

BSGR was then requested to go through a renegotiation of the previous contracts, so that the proposed transaction had no chance of being economically viable.

4

BSGR-LCIA-0000218_0004
**CGS&H p. 4**

In spite of BSGR's cooperation with this process, a real enterprise of destabilization was initiated with false documents, accommodating reports and, above all, accusations of corruption allowing the expropriation of its mines.

Two employees of the BSGR group were also imprisoned, and then kept in detention, despite a decision by the Conakry Indictment Division, the government then decided to consider suspending the appeals to the court of cassation, retroactively...

This is how all the elements were put together to start a strong slander and disinformation campaign against Mr. Beny STEINMETZ and his group, Mr. Beny STEINMETZ being dramatically presented as the richest man in Israel – which he is not -, systematically associating him with people operating in Africa he had never heard of before, solely because they were Israeli citizens, using all possible clichés of the Israeli secret service and mercenaries of this country who might be in Africa, multiplying charges of corruption, etc., etc..

For example, the British newspaper *The Guardian*, echoed by the magazine, *M Le Monde*, in its issue of September 7th, 2013, claimed there were searches conducted by French and Swiss police at the request of the United States in a subsidiary branch belonging to BSGR, when in reality, the search had solely been conducted by the Swiss police, in the presence of the French police, since they acted on their territory, upon the request of a Guinean investigating judge and not of the American authorities.

A right of reply was also later published by the French magazine.

In addition, a few days later, the newspaper *Le Monde* also published a very long article dealing with "*the Simandou billions*," that was much more balanced, while still reporting allegations of corruption in the entourage of President Alpha CONDÉ but also reporting "*dark motives*" of Tony BLAIR and George SOROS.

It was also established that George SOROS had not hesitated to obtain data about the BSGR group through a leading English communication company ... appointed by BSGR to defend itself and, in fact, betrayed by it, which resulted in significant financial compensation in England.

Based on these conditions, a few days before a risky legislative vote for President Alpha CONDÉ's party, *LE CANARD ENCHAÎNÉ* published an irresponsible article, calling the plaintiffs into question and this article was immediately used as propaganda by the Guinean regime in order to call upon patriotic feelings and rekindle ethnic tensions.

2.    DISCUSSION

5

BSGR-LCIA-0000218_0005
**CGS&H p. 5**

**2.1** The slanderous article published on page 3 of the *CANARD ENCHAÎNÉ* dated SEPTEMBER 25ᵗʰ, 2013

Under the headline "NOTES FROM THE CIA AND THE DGSE ANNOUNCING A COUP IN CONAKRY" and the subheading "*According to intelligence, disturbances could be triggered as early as next week*", the article begins as follows:

"*French, South-African and Israeli mercenaries, who have contacts in Paris and in Africa, and who are supported by a king of diamonds, are preparing a coup in Guinea, a real mining paradise. This is the resounding thesis defended in two documents respectively written by the American and French Intelligence Services (CIA and DGSE), and checked by "Le Canard".*

*The French document refers to a "serious risk of ongoing operations, tending to destabilize the Guinean state", and to an "operating mode", during major demonstrations, to "encourage the police and armed forces to use force and, thus, to create                                                                         martyrs."*

*The American text, entitled "Note on Security Issues in Guinea" and dated September 13, refers to the "financing of opposition parties" and to the "recruitment of Fulani militia", an ethnic group allegedly hostile to President Alpha Condé. The background of the upcoming parliamentary elections (September 28ᵗʰ), he adds, will be favorable to "violent mass demonstrations in Conakry and in other cities". These movements could "serve as a cover for targeted operations carried out by the mercenaries."*

Then under the subtitle "*Mining Goes Bust* ", the article continues as follows:

"*If these words remind one of a spy novel, they rely on a reality which is not less fictional, which has been discussed in these columns fifteen days ago - a story of international corruption around a fabulous iron mine.*

*The story begins in 2008, when the old Guinean President Lansana Conté ends his fifth five-year dictatorship term. The French- Israeli billionaire Beny Steinmetz, who made a fortune (the first Israeli fortune) in diamonds, is this time eyeing the largest untapped iron ore deposits in the world, at the site of Simandou, in the southeast of Guinea. The magnate woos the head of state, his wife and its ministers, while his group (BSG) obtains a part of the mining rights for $165 million. A few weeks later, he will sell half to    the    Brazilian    group    Vale    for    the    price    of    2.5    billion!*

*After Conté's death (in December 2008), a military junta seized power and Steinmetz attempted to "secure" his property. One of his agents, Victor Kenan, signed a contract with the Israeli security firm CST Global that is at the service of the junta.  A note of the U.S. intelligence services claims that this company would later train and lead the "red berets" presidential guard, responsible for the massacre of 157 civilians, on September 28ᵗʰ, 2009, in a stadium in Conakry.*

*But in December 2010, the country's first democratic election, won by Alpha Condé, worried Steinmetz. This socialist plans to reconsider all the mining contracts. The President launches a clean hands operation, with the assistance of various*

6

2118

BSGR-LCIA-0000218_0006
**CGS&H p. 6**

*international organizations and the financier George Soros.    The result: the
investigation bounces back to the United States, where Lansana Conté's widow has a
bank account with a few million dollars channeled from the Steinmetz Group ".*

Then under the subtitle "*Blessed bread ("Beny money") for Sarko*", the article goes on
to state:

*"Since he also carries on business in France and Switzerland, the justices of four states
have something against this peaceful diamond producer. And his French friends do not
lift a finger. However, last May, Beny offered Nicolas Sarkozy a visit to Israel: Beny
paid for all bills. Other UMP bigwigs in close relations with this patron, such as Jean-
Francois Copé, Claude Goasguen or Patrick Balkany, show the same restraint.*

*Did Steinmetz decide to protect his Guinean interests by ruthless methods? It is the
belief of the French and U.S. services, which do not provide proof but make some
connections. The Americans emphasize that a certain Victor Nassar, an Israeli and a
"security consultant for BSG for many years", showed up in July in Johannesburg for a
"mercenary recruitment operation ", assisted by the South-African Willem Ratte, once
"connected to the pro-apartheid extreme-right."*

Finally, under the last subtitle "*The party of the ugly*", the article concludes as follows:

*"Officially, the objective was to enlist volunteers for NATO in Afghanistan. Therefore,
why were the candidates asked about "their French language skills and their
knowledge of West Africa"? Nassar has also secured the services of the Frenchmen
Patrick Klein, alias "Lieutenant Chambert", an ex "ugly" from Bob Demiard's team,
and Steve Bokhobza, who, with Klein, played the role of a small putsch activist in the
Comoros Islands, last April. Without any success.*

*The American document claims that the three men have contributed to the creation of a
phony Guinean movement, the National Party for Renewal, "probably sponsored by
BSG".  This party has drafted a "memorandum seized by the Guinean investigators",
foreseeing that BSG would retain its mining rights, "in case the Party for Renewal
would participate in a future government".*

The whole article is considered as defamatory by each of the plaintiffs.

## 2.2    The defamatory accusations against Mister Beny STEINMETZ

It is indeed clear from this article that Mr. Beny STEINMETZ, mentioned by name,
supports mercenaries preparing a coup in Guinea according to the alleged documents of

7

BSGR-LCIA-0000218_0007
**CGS&H p. 7**

secret                                                                              services.

Therefore, it is alleged that he might have been directly involved in an operation consisting "*of encouraging the police and the armed forces to use force and to thus create martyrs during large demonstrations*".

Therefore, it is alleged that Mr. STEINMETZ would participate in a real coup that might involve death.

In addition, the planning of this putsch would lead him to finance phony opposition parties, to recruit ethnic militias and to organize targeted operations led by mercenaries, all this for the purpose of profit since his motivation would be "*the protection of his Guinean interests by ruthless methods*", the interrogative formulation used is purely academic, since any reader clearly understands that the "*Israeli billionaire*" is behind this whole operation.

Mr. Beny STEINMETZ is also accused of signing, through one of his agents, Victor KENAN, a contract with an Israeli security company that would have trained the red berets presidential guard responsible for the massacre of 157 civilians.

In fact, Mr. Beny STEINMETZ has never had any connection with the security company in question.

Neither he nor BSGR ever had Mr. Victor KENAN, 76 years old, as their agent.

And this is a detail, but the sum of \$2.5 billion raised for the participation of the VALE Company has never been paid to BSGR group, due to the freezing of the operation of the mines involved.

To date, the plaintiffs have thus exposed more expenses and investments than profits they earned from this transaction.

The "*Mr. STEINMETZ's group*" – and, therefore, Mr. STEINMETZ himself - is also accused of having transferred "*several million dollars*" to the account of the Guinean head of state's widow.

Mr. Beny STEINMETZ and BSGR are also clearly accused of acts of corruption.

It is then argued that the justices of four states have something against this "*peaceful diamond-producer*".

In reality, it is solely the Guinean justice system (if a procedure is actually underway in the United States, it does not concern Beny STEINMETZ nor BSGR but a former partner of the group).

It is also suggested, which is sufficient to characterize the slander, that "*the French and American services*" are convinced that Mr. Beny STEINMETZ has decided to protect his interests "*by ruthless methods*", by carrying out a coup, since immediately after this insinuation, "*a certain Victor Nassar, an Israeli and a security consultant for BSG for years*" is mentioned as the person that allegedly launched a recruitment campaign to destabilize the regime.

8

BSGR-LCIA-0000218_0008
**CGS&H p. 8**

With others, he would have also created a "*phony Guinean movement*", "*probably sponsored by BSG*" that might have undertaken to protect the mining interests of the group.

In plain language, Mr. Beny STEINMETZ has thus recruited mercenaries in order to carry out a putsch aimed at placing a puppet party into power that would protect his interests.

However, none of the plaintiffs even know Mr. Victor NASSAR.

**Finally, Mr. Beny STEINMETZ is accused to have, no more or no less, recruited mercenaries, prepared a coup, organized a violent insurgency, corrupted the Guinean government, destabilized a regime by illegal means, everything in order to place a puppet party in power and to protect his own mining interests.**

There is no need to insist on the defamatory nature of these charges, which, if proven to be true, would constitute crimes as well as an international scandal.

### 2.3    The defamatory accusations against BSGR

**Regarding BSGR, it is directly targeted as being Mr. STEINMETZ's company that might be the beneficiary of the planned coup, that might have sponsored a phony political party in order to preserve its rights of extraction, that would have corrupted Lansana CONTÉ's widow by transferring a few million dollars to her account, that would have employed the mercenary Victor NASSAR while it is suggested that the latter was preparing a putsch.**

It is thus clearly suggested that the company would participate in the development of a putsch in a sovereign country, through the use of violent, illegal and criminal means, and while using corruption.

These charges are of exceptional gravity and were expressed while nobody even tried to hear the other side or to verify any of the information published under an anonymous signature.

### 2.4    The damage

The article continued and dramatically announced in its headline, in red letters, under the title "*NOTES FROM THE CIA AND DGSE ANNOUNCE A PUTSCH IN CONAKRY*", which consists of an assembled mix of gossip, none of which has been subject to any minimal verification nor any investigative journalism.

The damage has been considerable for Mr. Beny STEINMETZ and BSGR, after this article has been published in different countries and by different media in France, England, Israel ... and of course, especially in Guinea where it has been extensively exploited by the current government, and this, on the eve of an important election.

The harm to Mr. Beny STEINMETZ and BSGR group's honor and reputation, and

9

BSGR-LCIA-0000218_0009
**CGS&H p. 9**

being accused, no more or no less, of trying to overthrow a sovereign power at the cost of "*martyrs*" and without hesitating to use mercenaries, is exceptional.

The fabrications made by the CANARD ENCHAÎNÉ, which does not hesitate to invent connections between Mr. Beny STEINMETZ, BSGR and individuals whom they did not even know, until reading their names in the article, are simply irresponsible.

The punishment for such a disinformation campaign, with incalculable consequences, should match the extent of the disrepute caused by the defamation.

The EDITIONS MARSHAL - CANARD ENCHAÎNÉ Company and Mr. Michel GAILLARD will be jointly condemned to pay the sum of €100,000 in favor of Mr. Beny STEINMETZ and €100,000 in favor of BSGR.

The entirety of these funds will be transferred to Guinean charity organizations.

In addition, important measures of judicial publication appear to be necessary in order to correct the damage caused.

## FOR THE ABOVE REASONS

**To enforce** the criminal law against Michel GAILLARD according to requisitions of the Public Ministry,

**To declare** Mr. Beny STEINMETZ and BSGR as admissible as civil prosecution,

**To determine** that the article published in the *CANARD ENCHAÎNÉ* of September 25th, 2013, on page 3, under the heading " "*NOTES FROM THE CIA AND THE DGSE ANNOUNCING A COUP IN CONAKRY*", whose words are replicated in chapter 2.1 of this summons, constitute an offense of public defamation against an individual, in this case Mr. Beny STEINMETZ and BSGR Company, as provided for and punishable by Articles 23 , 29 paragraph 1 and article 32 paragraph 1 of the law of July 29th, 1881:

*Therefore,*

**To declare** Michel GAILLARD, as the principal author, guilty of the offense of public defamation of an individual, as provided for and punishable by Articles 23 , 29 paragraph 1 and article 32 paragraph 1 the law of July 29th, 1881,

**To condemn** jointly Mr. Michel GAILLARD and LES EDITIONS MARSHAL - CANARD ENCHAÎNÉ Company to pay each plaintiff the sum of €100,000 in damages, a sum that the civil parties undertake to transfer to Guinean charity associations,

10

2122

BSGR-LCIA-0000218_00010
**CGS&H p. 10**

**To order,** as additional compensation, the publication of the upcoming judgment in ten newspapers of the choice of the plaintiffs and at the expense of the defendant who is civilly liable, while each publication may not exceed the sum of €8,000,

**To order** the provisional execution of the upcoming judgment,

**To condemn** Michel GAILLARD and LES EDITIONS MARSHAL - CANARD ENCHAÎNÉ to pay the plaintiffs the sum of €10,000 according to article 475-1 of the Criminal Procedure Code as well as all costs.

**List of exhibits:**

- **Article in the CANARD ENCHAÎNÉ dated September 25, 2013**

11

BSGR-LCIA-0000218_0011
**CGS&H p. 11**

**CITATION DIRECTE**
**DEVANT LE TRIBUNAL CORRECTIONNEL DE PARIS**

**L'AN DEUX MILLE TREIZE ET LE**

**A LA REQUETE DE :**

- **La Société BENY STEINMETZ GROUP RESSOURCES LTD (BSGR)**, immatriculée au greffe de Guernescy, sous le numéro 46565 dont le siège social est situé West Wing, Francis House, Sir William Place, Saint-Peter Port, Guernesey, représentée par Monsieur Dag CRAMER

- **Monsieur BENY STEINMETZ**, né le 2 avril 1956 en Israël, de nationalité franco-israélienne, demeurant 23 quai du Mont Blanc 1201 GENEVE (SUISSE)

Ayant pour Avocat :

**Maître Richard MALKA**, 226 rue du Faubourg Saint Honoré 75008 PARIS. Tél. 01 56 59 60 20, Vestiaire C 593

Tous deux élisant expressément domicile en son cabinet, conformément aux dispositions de l'article 53 alinéa 2 de la loi du 29 juillet 1881

J'ai Huissier Soussigné,

**DONNE CITATION A :**

- **Monsieur Michel GAILLARD**, directeur de la publication du CANARD ENCHAÎNÉ, domicilié en cette qualité 2 rue des Petits Père 75002 PARIS

  *En qualité de prévenu*

- **SA LES EDITIONS MARECHAL – LE CANARD ENCHAÎNÉ**, SA au capital de 100.000 €, inscrite au RCS de Paris sous le numéro 582 093 324 dont le siège social est situé 2 rue des Petits Pères 75002 PARIS

  *En qualité de civilement responsable*

2124

BSGR-LCIA-0000218_0012
**CGS&H p. 12**

A comparaître en personne à l'audience correctionnelle du Tribunal de Grande Instance de PARIS, 17ème Chambre (Chambre de la Presse) siégeant en ladite ville, au Palais de Justice, 4 Boulevard du Palais, 75001 PARIS

*Le                                à            heures*

En présence de Monsieur le Procureur de la République à qui copie de la présente citation est notifiée dans les conditions prévues par l'article 53 de la loi du 29 Juillet 1881.

*Très important :*

*Vous êtes tenu de vous présenter personnellement à cette audience seul ou assisté d'un avocat. Vous pouvez aussi, mais dans certains cas seulement, vous y faire représenter par un avocat.*

*Si vous estimez être dans l'impossibilité de venir à l'audience, vous devez adresser une lettre au Président du Tribunal pour expliquer les raisons de votre absence. Vous joindrez à votre lettre toutes pièces justificatives.*

*Si à l'audience vos raisons sont admises par le Tribunal, une nouvelle citation vous sera adressée pour une audience ultérieure. Dans le cas contraire, l'affaire sera jugée malgré votre absence.*

*Vous devez rappeler dans toute correspondance la date, l'heure et le lieu de l'audience à laquelle vous êtes convoqué (ainsi que le numéro de la chambre indiquée en première page).*

*Je vous informe que vous devez comparaître à l'audience en possession des justificatifs de vos revenus ainsi que de vos avis d'imposition ou de non imposition ou les communiquer à l'avocat qui vous représente.*

2

BSGR-LCIA-0000218_0013
CGS&H p. 13

## PLAISE AU TRIBUNAL

Diffamés par des propos d'une exceptionnelle gravité dans l'édition du 25 septembre 2013 du *CANARD ENCHAÎNÉ*, puisqu'il leur est imputé, ni plus ni moins, de préparer un coup d'état en Guinée, outre différents faits de corruption, les parties civiles ne peuvent que solliciter la condamnation de la société éditrice du *CANARD ENCHAÎNÉ* et de son directeur de publication, faute de pouvoir identifier l'auteur de l'article poursuivi puisque celui-ci est courageusement signé Jérôme Canard, à raison du délit de diffamation publique envers particulier.

## 1.    LE CONTEXTE

### 1.1    La Société BSGR et son fondateur Monsieur Beny STEINMETZ

La Société BSGR est une société minière qui emploie près de 6 000 personnes, dans douze pays différents.

Depuis sa création et depuis près de 35 ans, elle n'a jamais fait l'objet de la moindre accusation de corruption et s'oblige, par ailleurs, à inclure dans chacun de ses programmes une forte dimension environnementale, développant des programmes sociaux, médicaux et humanitaires, investissant par ailleurs dans les programmes de développement économique des pays concernés.

Monsieur Beny STEINMETZ, fondateur de ce groupe, a parallèlement créé la fondation caritative Agnès et Beny STEINMETZ qui intervient dans chacun de ces pays.

### 1.2    Les investissements en Guinée Conakry

Depuis 2006, la Société BSGR s'est impliquée dans divers projets en Guinée, menant des travaux d'exploration de son sous-sol, riche en différents minerais, à l'instar de bien d'autres sociétés minières internationales.

La Guinée, dont la population atteint dix millions d'habitants, est un des pays les plus pauvres du monde, en dépit de ses richesses naturelles, et, ce, en particulier à raison de son instabilité politique, qui entrave considérablement l'aboutissement de tout projet à long terme, à tel point que les investisseurs internationaux l'ont qualifié de *« pays de ressources maudites »*.

La Société BSGR a malheureusement fait l'expérience de cette malédiction...

En effet, en 2008, le gouvernement de Guinée annulait des licences d'exploitation accordées au géant minier RIO TINTO sur des gisements de minerais de fer situés dans la région du SIMANDOU, à raison de la défaillance de cette société à respecter le code minier et à explorer les territoires dont l'exploitation lui avait été concédée.

3

BSGR-LCIA-0000218_0014
**CGS&H p. 14**

La Société BSGR se voyait alors accorder un permis de recherches dans cette région, puis, en 2009, un accord de concession.

C'est donc bien cette société qui est visée par l'article du *CANARD ENCHAINÉ* sous l'appellation *« BSG »*.

Cette société investissait alors plus de 160 millions de dollars sur place en forages et en études de faisabilité, mais aussi en écoles, dispensaires, centres culturels.

Elle s'associait par la suite au groupe brésilien VALE, aux fins de continuer l'exploration des gisements miniers, de les exploiter, de créer une ligne de chemin de fer passager pour un coût d'un milliard de dollars et d'investir plus de 8 milliards de dollars en infrastructure, afin de transporter le minerais de fer, ce qui aurait eu pour effet de développer considérablement l'économie de cette région.

Plus de 600 millions de dollars supplémentaires étaient en outre investis en Guinée, dont approximativement 300 millions de dollars par la Société BSGR.

### 1.3    La prise du pouvoir par le Président Alpha CONDÉ

Au mois de novembre 2010, Monsieur Alpha CONDÉ a été élu Président de la Guinée au terme d'un scrutin dont la régularité a été très largement contestée, celui-ci ayant obtenu 18 % des votes au premier tour, contre 44 % à son opposant, puis, miraculeusement, 52,5 % au deuxième tour.

Depuis, les élections législatives ont été repoussées d'année en année, alors que des manifestations pacifiques étaient réprimées dans le sang par le pouvoir, des centaines de personnes y trouvant la mort sous les balles des forces de l'ordre du Président Alpha CONDÉ.

Le nouveau Président Alpha CONDÉ confiait alors à son fils Mohamed un rôle omnipotent dans les tractations minières.

Il s'entourait en outre de l'ancien financier et raider Georges SOROS et de l'ancien premier ministre britannique Tony BLAIR afin de renégocier tous les contrats miniers précédemment accordés, à la plus grande satisfaction de certains de ses nouveaux partenaires chinois, russes ou sud-africains.

En juin 2012, le journal *Sunday Times* a en outre révélé qu'un accord secret avait été conclu avec un homme d'affaires sud-africain ayant prêté 25 millions de dollars au nouveau pouvoir en échange d'une participation de 30 % sur tous les droits miniers de la Guinée.

L'ex-premier ministre Tony BLAIR, pour sa part, prétendait intervenir en aide, à titre totalement désintéressé, au pouvoir guinéen, alors qu'il était confortablement appointé par un fonds souverain d'Abou DHABI qui, par une singulière coïncidence, avait justement signé un accord de collaboration avec la Guinée.

4

2127

BSGR-LCIA-0000218_0015
**CGS&H p. 15**

Quant au milliardaire Georges SOROS, trentième fortune mondiale grâce à ses spéculations sur des monnaies ayant pour effet de ruiner des économies entières, il mettait à la disposition du nouveau pouvoir son cabinet d'avocats américain de 4 200 personnes, des enquêteurs privés, ses fondations particulières, etc…

Il était alors réclamé à la Société BSGR une renégociation des contrats passés, telle que l'opération envisagée n'avait plus aucune chance d'être économiquement viable.

En dépit de la coopération du groupe BSGR à ce processus, une véritable entreprise de déstabilisation était initiée avec faux documents, rapports complaisants et surtout accusations de corruption permettant l'expropriation de ses mines.

Deux employés du groupe BSGR étaient également incarcérés, puis maintenus en détention, en dépit d'une décision de la chambre d'accusation de Conakry, le gouvernement décidant alors de considérer comme suspensif les pourvois en cassation et ce, avec effet rétroactif…

Tous les éléments étaient ainsi réunis pour démarrer une lourde campagne de calomnie et de désinformation à l'encontre de Monsieur Beny STEINMETZ et de son groupe, Monsieur Beny STEINMETZ étant spectaculairement présenté comme l'homme le plus riche d'Israël - ce qu'il n'est pas -, l'associant systématiquement à des personnages opérant en Afrique et dont il n'avait jamais entendu parler auparavant, au seul prétexte qu'ils étaient de nationalité israélienne, utilisant tous les poncifs possibles sur les services secrets israéliens et les mercenaires de ce même pays qui se trouveraient en Afrique, multipliant les accusations de corruption, etc, etc.

Pour exemple, le journal anglais *The Guardian*, relayé par le magazine *M Le Monde*, dans son édition du 7 septembre 2013, prétendait à la réalisation de perquisitions menées par des polices françaises et suisses à la demande des Etats-Unis dans une filiale du groupe BSGR, alors qu'en réalité cette perquisition était menée par la seule police suisse, en présence de la police française, puisqu'agissant sur son sol, à la demande, non pas des autorités américaines, mais d'un juge d'instruction guinéen.

Un droit de réponse était d'ailleurs publié par le magazine français par la suite.

Le journal *Le Monde* publiait en outre, quelques jours plus tard, un très long article consacré *« aux milliards de Simandou »*, beaucoup plus équilibré, bien que faisant toujours état des accusations de corruption de l'entourage du Président Alpha CONDÉ mais relevant aussi bien les *« motivations obscures »* de Tony BLAIR et de Georges SOROS.

Il a été d'ailleurs établi que ce dernier n'avait pas hésité à obtenir des informations sur le groupe BSGR par l'intermédiaire d'une importante société de communication anglaise… mandatée par BSGR pour se défendre, et, en fait, trahie par celle-ci, ce qui a donné lieu à un important dédommagement financier en Angleterre.

C'est dans ces conditions que, quelques jours avant un scrutin législatif à risque pour le parti du Président Alpha CONDÉ, *LE CANARD ENCHAÎNÉ* publiait un article

5

BSGR-LCIA-0000218_0016
**CGS&H p. 16**

irresponsable, mettant en cause les parties civiles et d'ailleurs immédiatement utilisé par la propagande du régime guinéen pour appeler au sentiment patriotique et raviver des tensions ethniques.

## 2.    DISCUSSION

### 2.1    L'article diffamatoire publié en page 3 du *CANARD ENCHAÎNÉ* DU 25 SEPTEMBRE 2013

Sous le titre *« DES NOTES DE LA CIA ET DE LA DGSE ANNONCENT UN COUP D'ETAT A CONAKRY »* et le sous-titre *« Selon les services secrets, les troubles pourraient être déclenchés dès la semaine prochaine »*, l'article débute ainsi :

*« Des mercenaires français, sud-africains et israéliens, disposant de relais à Paris et en Afrique et soutenus par un roi du diamant, préparent un coup d'Etat en Guinée, véritable eldorado minier. C'est la thèse retentissante défendue dans deux notes rédigées respectivement par les services de renseignement américain (CIA) et français (DGSE), et que « Le Canard » a pu consulter.*

*Le document français évoque « de sérieux risques d'opérations en cours, tendant à déstabiliser l'État guinéen ». Et un « mode opératoire » consistant, lors de grandes manifestations, à « inciter la police et les forces armées à recourir à la force et ainsi créer des martyrs ».*

*Le texte américain, intitulé « Note sur les questions de sécurité en Guinée » et daté du 13 septembre, évoque le « financement de partis d'opposition » et le « recrutement de milices peules », ethnie supposée hostile au président, Alpha Condé. Le contexte des prochaines élections législatives (28 septembre), ajoute-t-il, sera propice à « de violentes manifestations de masse à Conakry et dans d'autres villes ». Ces mouvements pourraient « servir de couverture à des opérations ciblées, menées par les mercenaires».*

Puis sous l'intertitre *« Culbute minière »*, l'article se poursuit ainsi :

*« Si ces écrits ont des relents de roman d'espionnage, ils s'appuient sur une réalité non moins romanesque, évoquée dans ces colonnes il y a quinze jours. Une affaire de corruption internationale autour d'une fabuleuse mine de fer.*

*L'histoire commence en 2008, alors que le vieux président guinéen Lansana Conté termine son cinquième quinquennat de dictature. Le milliardaire franco-israélien Beny Steinmetz, qui a fait fortune (la première d'Israël) dans le diamant, lorgne cette fois le plus grand gisement ferreux non exploité de la planète, le site de Simandou, au sud-est de la Guinée. Le magnat courtise le chef de l'Etat, son épouse, ses ministres, et son groupe (BSG) récupère pour 165 millions de dollars une partie des droits d'extraction. Quelques semaines plus tard, il en revendra la moitié au groupe brésilien Vale au prix de 2,5 milliards !*
*A la mort de Conté (en décembre 2008), une junte militaire prend le pouvoir et Steinmetz tente de « sécuriser » son bien. Un de ses agents, Victor Kenan, passe un*

6

BSGR-LCIA-0000218_0017

*contrat avec la société israélienne de sécurité CST Global, qui se met au service de la junte. Cette boîte, raconte la note des Renseignements américains, formera et entraînera la garde présidentielle des « bérets rouges », responsable du massacre de 157 civils, le 28 septembre 2009, dans un stade de Conakry.*

*Mais, en décembre 2010, la première élection démocratique du pays, remportée par Alpha Condé, inquiète Steinmetz. Ce socialiste n'envisage-t-il pas de remettre à plat tous les contrats miniers ? Le Président lance une opération mains propres, aidé par diverses organisations internationales et par le financier George Soros. Résultat : l'enquête rebondit aux Etats-Unis, où la veuve de Lansana Conté possède un compte, nourri de plusieurs millions par le groupe de Steinmetz ».*

Puis sous l'intertitre « *Pain beny pour Sarko* », l'article se poursuit ainsi :

*« Ce dernier exerçant aussi son activité, en France et en Suisse, la justice de quatre Etats en veut désormais à ce paisible diamantaire. Et ses amis français ne lèvent pas le petit doigt. Pourtant, en mai dernier, Nicolas Sarkozy s'est fait offrir une visite en Israël: c'est Beny qui a réglé tous les frais. D'autres huiles UMP proches de ce mécène, comme Jean-François Copé, Claude Goasguen ou Patrick Balkany, observent la même retenue.*

*Steinmetz a-t-il décidé de sauvegarder ses intérêts guinéens par des moyens musclés ? C'est la conviction des services français et US, qui n'apportent pas de preuves mais font des rapprochements. Les Américains soulignent qu'un certain Victor Nassar, israélien et « consultant en sécurité pour BSG depuis des années », s'est pointé, en juillet, à Johannesburg pour une « opération de recrutement de mercenaires », aidé par le Sud-Africain Willem Ratte, naguère « lié à l'extrême droite pro-apartheid ».*

Enfin, sous le dernier intertitre « *Le parti des affreux* », l'article se conclut ainsi :

*« Officiellement, il s'agissait d'enrôler des volontaires pour l'Otan en Afghanistan. Pourquoi, alors, les candidats étaient-ils interrogés sur « leurs compétences en français et leur connaissance de l'Ouest africain » ? Nassar s'est également attaché les services des Français Patrick Klein, alias « Lieutenant Chambert », un ex« affreux » de l'équipe de Bob Demiard, et de Steve Bokhobza, qui, avec Klein, a joué au petit putschiste aux Comores, en avril dernier. Sans succès.*

*Les trois hommes, explique la note américaine, ont contribué à la création d'un mouvement guinéen bidon, le Parti national pour le renouveau, « sans doute sponsorisé par BSG ». Ce parti a rédigé un « mémorandum, saisi par les enquêteurs guinéens », prévoyant que BSG conserverait ses droits d'extraction, « au cas où le Parti du renouveau participerait à un futur gouvernement ».*

L'ensemble de cet article est estimé diffamatoire par chacune des parties civiles.

7

BSGR-LCIA-0000218_0018

**CGS&H p. 18**

**2.2    Les imputations diffamatoires à l'encontre de Monsieur Beny STEINMETZ**

Il résulte en effet de cet article que Monsieur Beny STEINMETZ, nommément cité, soutient des mercenaires préparant un coup d'état en Guinée selon de prétendues notes de services secrets.

Il serait ainsi directement impliqué dans une opération consistant *« lors de grandes manifestations à inciter la police et les forces armées à recourir à la force et ainsi créer des martyrs »*.

Ainsi, Monsieur Beny STEINMETZ participerait à un véritable coup d'état qui impliquerait des morts.

De même, la préparation de ce putsch l'amènerait à financer des partis d'opposition bidons, à recruter des milices ethniques et à organiser des opérations ciblées menées par des mercenaires, tout ceci par esprit de lucre puisqu'il s'agirait de *« sauvegarder ses intérêts guinéens par des moyens musclés »*, la formulation interrogative utilisée étant purement académique, tout lecteur comprenant clairement que le *« milliardaire israélien »* serait derrière toute cette opération.

Il est également imputé à Monsieur Beny STEINMETZ d'avoir, par l'intermédiaire de l'un de ses agents, Victor KENAN, passé un contrat avec une société israélienne de sécurité qui aurait entraîné la garde présidentielle des bérets rouges responsable du massacre de 157 civils.

En réalité, Monsieur Beny STEINMETZ n'a jamais eu le moindre lien avec la société de sécurité en question.

Il n'a pas davantage eu pour agent Monsieur Victor KENAN, âgé de 76 ans, pas plus que la Société BSGR.

Et c'est un détail, mais la somme de 2,5 milliards de dollars évoquée pour prix de la participation de la Société VALE n'a jamais été versée au groupe BSGR, en raison du gel de l'exploitation des mines concernées.

A ce jour, les parties civiles ont ainsi exposé plus de dépenses et d'investissements, qu'elles n'ont perçu de profits sur cette opération.

Il est également imputé *« au groupe de Monsieur STEINMETZ »*, et donc à lui-même, d'avoir nourri de *« plusieurs millions »* le compte de la veuve du chef d'Etat guinéen.

Il est ainsi clairement imputé à Monsieur Beny STEINMETZ et à la Société BSGR des actes de corruption.

Il est ensuite prétendu que la justice de quatre Etats en voudrait désormais à ce *« paisible diamantaire »*.

8

2131

En réalité, il s'agit de la seule justice guinéenne (si une procédure est effectivement en cours aux Etats-Unis, elle ne concerne pas Monsieur Beny STEINMETZ ni la Société BSGR mais un ancien partenaire du groupe).

Il est également suggéré, ce qui suffit à caractériser la diffamation, que *« les services français et US »* ont la conviction que Monsieur Beny STEINMETZ aurait décidé de sauvegarder ses intérêts *« par des moyens musclés »*, en réalisant un coup d'état, puisqu'immédiatement après cette insinuation, il est fait état *« d'un certain Victor Nassar, israélien et consultant sécurité pour BSG depuis des années »*, qui aurait lancé une opération de recrutement pour déstabiliser le régime.

Avec d'autres, il aurait d'ailleurs créé *« un mouvement guinéen bidon »*, *« sans doute sponsorisé par BSG »* et qui se serait engagé à protéger les intérêts miniers du groupe.

En clair, Monsieur Beny STEINMETZ a donc recruté des mercenaires pour réaliser un putsch destiné à placer au pouvoir un parti fantoche qui protégerait ses intérêts.

Or, aucune des parties civiles ne sait même qui est Monsieur Victor NASSAR.

**En définitif, il est imputé à Monsieur Beny STEINMETZ d'avoir ni plus ni moins recruté des mercenaires, préparé un coup d'état, organisé une insurrection violente, corrompu le pouvoir guinéen, déstabilisé un régime par des moyens illégaux, le tout pour placer au pouvoir un parti fantoche et protéger ses intérêts miniers.**

Il n'y a nullement besoin d'insister sur le caractère diffamatoire de ces imputations qui, si elles étaient avérées, constitueraient des crimes aussi bien qu'un scandale international.

## 2.3    Les imputations diffamatoires à l'encontre de la société BSGR

**S'agissant de la Société BSGR, elle est directement visée comme étant la société de Monsieur Beny STEINMETZ qui serait bénéficiaire du coup d'état envisagé, qui aurait sponsorisé un parti politique bidon aux fins de conserver ses droits d'extraction, qui aurait corrompu la veuve de Lansana CONTE en nourrissant son compte de plusieurs millions, qui aurait engagé le mercenaire Victor NASSAR alors qu'il est suggéré que ce dernier préparait un putsch.**

Il est ainsi clairement suggéré que cette société participerait à l'élaboration d'un coup d'état dans un pays souverain, par le recours à des moyens violents, illégaux et criminels, et en usant de corruption.

Ces imputations, d'une exceptionnelle gravité, ont été formulées sans même que quiconque ne prenne la peine, de manière contradictoire, de vérifier la moindre des informations diffusées sous une signature anonyme.

## 2.4    Le préjudice

9

BSGR-LCIA-0000218_0020

**CGS&H p. 20**

L'article poursuivi, et spectaculairement annoncé en Une, en lettres rouges, sous le titre *« DES NOTES DE LA CIA ET DE LA DGSE ANNONCENT UN COUP D'ETAT A CONAKRY »*, constitue un véritable assemblage de ragots, dont aucun n'a fait l'objet de la moindre vérification et du moindre travail journalistique.

Le préjudice en a été considérable pour Monsieur Beny STEINMETZ et la Société BSGR, cet article ayant été repris dans différents pays et par différents médias en France, en Angleterre, en Israël… et bien évidemment, surtout, en Guinée où il a été abondamment exploité par le pouvoir en place, et ce à la veille d'une échéance électorale importante.

L'atteinte à l'honneur et à la considération de Monsieur Beny STEINMETZ et du groupe BSGR, accusés ni plus ni moins d'avoir voulu renverser un pouvoir souverain au prix de *« martyrs »* et en n'hésitant pas à recourir à des mercenaires, est exceptionnelle.

Les affabulations du *CANARD ENCHAÎNÉ*, qui n'hésite pas à inventer des liens entre Monsieur Beny STEINMETZ, la Société BSGR et des individus dont ils ne connaissaient même pas l'existence avant de lire leur nom dans l'article poursuivi, sont tout simplement irresponsables.

La sanction d'une telle entreprise de désinformation, aux conséquences incalculables, doit être à la hauteur du discrédit entraîné par la diffamation réalisée.

La Société LES EDITIONS MARECHAL – LE CANARD ENCHAÎNÉ et Monsieur Michel GAILLARD seront ainsi solidairement condamnés au paiement d'une somme de 100.000 € au profit de Monsieur Beny STEINMETZ et de 100.000 € au profit de la Société BSGR.

L'intégralité de ces sommes sera versée à des associations caritatives guinéennes.

En outre, d'importantes mesures de publication judiciaire apparaissent nécessaires pour réparer l'atteinte causée.

### PAR CES MOTIFS

**Faire application** de la loi pénale à Monsieur Michel GAILLARD selon les réquisitions du Ministère Public,

**Déclarer** Monsieur Beny STEINMETZ et la Société BSGR recevables en leur constitution de partie civile,

**Dire et juger** que l'article publié dans l'édition du *CANARD ENCHAÎNÉ* du 25 septembre 2013, en page 3, sous le titre *« DES NOTES DE LA CIA ET DE LA DGSE ANNONCENT UN COUP D'ETAT A CONAKRY »* et dont les propos sont reproduits

10

2133

BSGR-LCIA-0000218_0021

**CGS&H p. 21**

au chapitre 2.1 de la présente citation, constitue le délit de diffamation publique envers un particulier, en l'espèce Monsieur Beny STEINMETZ et la Société BSGR, tel que prévu et réprimé par les articles 23, 29 alinéa I et 32 alinéa 1 de la loi du 29 juillet 1881 :

*En conséquence,*

**Déclarer** Monsieur Michel GAILLARD coupable, en sa qualité d'auteur principal, du délit de diffamation publique envers un particulier, prévu et réprimé par les articles 23, 29 alinéa 1 et 32 alinéa 1 de la loi du 29 juillet 1881,

**Condamner** solidairement Monsieur Michel GAILLARD et la Société LES EDITIONS MARECHAL – LE CANARD ENCHAÎNÉ à payer à chaque partie civile la somme de **100.000 €** à titre de dommages et intérêts, somme que les parties civiles s'engagent à verser à des associations caritatives guinéennes,

**Ordonner** à titre de réparation complémentaire la publication du jugement à intervenir dans dix journaux au choix des parties civiles et aux frais du prévenu et du civilement responsable, sans que chaque publication puisse excéder la somme de **8.000 €**,

**Ordonner** l'exécution provisoire du jugement à intervenir,

**Condamner** Monsieur Michel GAILARD et la Société LES EDITIONS MARECHAL – LE CANARD ENCHAÎNÉ à payer aux parties civiles la somme de **10.000 €** au titre de l'article 475-1 du Code de Procédure Pénale ainsi qu'aux entiers dépens.

**Liste des pièces :**

- **Article du CANARD ENCHAÎNÉ du 25 septembre 2013**

11

2134

BSGR-LCIA-0000218_0022
CGS&H p. 22

# Exhibit N

Technology

# Mining Billionaire Ends Bitter Guinea Dispute After Months of Secret Negotiations

By Franz Wild and Thomas Biesheuvel
February 25, 2019 1:30 AM *Updated on February 25, 2019 3:10 AM*

▶  Israeli mining tycoon's company reconciles with Guinea
▶  Mick Davis to start developing iron ore mine in Guinea



Beny Steinmetz *Source: Dag Lars Cramér on behalf of Nornverdandi*

LISTEN TO ARTICLE

➜ 6:21

**In this article**

RIO
**RIO TINTO PLC**
4,842.50 GBp
▲ +62.50 +1.31%

VALE3
**VALE SA**
52.59 BRL
▼ -0.10 -0.19%

IOE1
**Generic 1st 'IOE'
Future**
899.50 CNY/MT
▲ +4.50 +0.50%

Israeli mining tycoon Beny Steinmetz is making a dramatic return to Guinea after the billionaire ended a bitter dispute with the West African country that brought his business empire to its knees.

The settlement, brokered by former French President Nicolas Sarkozy, ends a seven-year-old dispute centered around one of the world's richest mineral deposits that included a colorful list of characters from billionaire George Soros to former U.K. leader Tony Blair and mining heavyweights Rio Tinto Group and Vale SA.

After months of secret negotiations, Steinmetz's BSG Resources Ltd. agreed with Guinean President Alpha Conde to withdraw allegations of corruption leveled against each other over years and to drop a two-year-old arbitration case over one of the world's most-fabled mineral deposits -- the Simandou iron-ore project. Guinea also agreed to partner

with mining grandee Mick Davis, who will develop the Zogota iron-ore mine once the disputes have been settled, marking a comeback for one of the industry's biggest names.



Nicolas Sarkozy *Photogrpaher: Jean-Christophe Magnenet/AFP via Getty Images*

The reconciliation puts Steinmetz, BSGR and Davis in prime position to lead the development of Guinea's massive iron-ore reserves. Mining giants like Rio Tinto, Vale and Aluminum Corp. of China have all failed to develop projects in the country.

"A good agreement is much better than any war," Steinmetz, who acts as an adviser to BSGR, said in a phone interview on Sunday. "We were enemies. Now we are friends and partners with the Guinean government. We have both put aside the past and BSGR and its employees and advisers have been vindicated."

For Steinmetz, the heir to one of Israel's premier diamond businesses, the arrangement is a remarkable return to favor in Guinea. BSGR entered administration a year ago to protect itself from the outcome of litigation and arbitration it was involved in related to the country. In 2012, Guinea stripped BSGR of its rights to Zogota and half of Simandou, thought by miners to be the world's biggest undeveloped iron-ore deposit. A government committee alleged he and his officials paid millions in bribes to obtain the rights.



Mick Davis *Photographer: Gianluca Colla/Bloomberg*

"We are all really pleased with the situation," Steinmetz said. "Guinea wants to work and they see us as the pioneers of the iron-ore situation, because nobody else has picked it up. Production and export of iron ore will be expedited and this is a win-win situation for everyone."

Sarkozy, who was in office between 2007 and 2012, had a relationship with both sides and was able to broker the deal, according to a person with knowledge of his role.

Long-time director Dag Cramer negotiated the deal for BSGR, a firm owned by a Steinmetz family foundation.

Under its terms, the company relinquishes rights to Simandou and Zogota, and Davis will develop the smaller deposit.

BSGR keeps an economic interest in Zogota, which, according to Steinmetz, will move toward producing "very fast." The company will get a share of the revenue from the new project, which will be developed by Davis in partnership with Guinea.



### 'Win-Win'

"We're pleased with the agreement," Guinea's Mines Minister Abdoulaye Magassouba said in an emailed statement, adding that the new projects will be in line with the country's new mining code. "It's for the good of the people. It's with this aim that the government will try hard to work in a win-win partnership with the investors."

Beny Steinmetz and Alpha Conde. *Source: Dag Lars Cramér on Behalf of Nornverdandi*

The reconciliation suited both sides. Guinea faced the possibility of an embarrassing loss in arbitration court, while BSGR would have been able to do little with an award by the tribunal if Guinea's government remained hostile. The government withdrew all allegations of corruption against BSGR and Steinmetz.



null

Steinmetz, 62, was originally sent out by his family to secure supplies of rough diamonds, introducing him to difficult environments across the globe. He developed a diamond mine in Sierra Leone before setting his sights on Simandou in neighboring Guinea. Ailing President Lansana Conte stripped Rio Tinto of its rights to half of the asset, which the Anglo-Australian miner hadn't developed in a decade of control. The rights lost by Rio were transferred to Steinmetz weeks before the president passed away in 2008.

BSGR rapidly sold half of its Guinean assets to iron-ore mining giant Vale SA for $2.5 billion.

Simandou *Source: Rio Tinto*

## Mining Review

After Conde was elected in 2010, he announced a review
and clean-up of the mining industry, Guinea's main source
of income. Billionaire hedge fund manager George Soros
and former U.K. Prime Minister Tony Blair advised on and
funded Conde's initiative. A lurid dossier of alleged
corruption against Steinmetz became the basis for BSGR's
loss of rights in 2012.

Steinmetz and BSGR always denied any wrongdoing and
insisted they would one day be vindicated. Rio Tinto,
meanwhile, is now under investigation in the U.K. and
Australia for payments it made to a consultant to try to
restore its rights to Simandou.

The Guinean saga has been more than just a painful
business loss for Steinmetz. He has been the subject of
investigations by authorities in the U.S., Switzerland,
Romania and Israel, where he was briefly detained in 2016
and then placed under house arrest.

Though Simandou has long been a fabled asset, developing
it may be impossible. It would require an investment of $20
billion, including the construction of railway lines across a
mountainous country. Rio attempted to later sell its share of
the project to Aluminum Corp. of China, but the deal
collapsed last year.

## Mick the Miner

Davis may have a favorable solution, with the government
allowing him to export via an existing railway line through
neighboring Liberia, using his newly formed Niron Metals
venture.

"Niron believes that the Zogota deposit can be brought into
production on an accelerated timetable, thereby helping to
unlock the potential of Guinea's rich resources for the

benefit of all stakeholders, including the Government and people of Guinea," the company said in a statement.

Davis, nicknamed Mick the Miner, was one of the industry's most successful operators in the early part of the decade as the mining industry boomed on China's rampant industrialization. As Xstrata Plc's chief executive officer, Davis led a team renowned for transforming the coal producer through about 40 deals worth $35 billion over 10 years from 2002, before agreeing to a friendly merger with commodity trader Glencore Plc, where Ivan Glasenberg managed to beat him to the top job.

Since then, the U.K. Conservative Party treasurer has struggled to regain a footing. His private equity vehicle X2 Resources folded after failing to make any deals amid volatile commodity prices and disparate investors who couldn't agree on what assets to buy.

Have a confidential
tip for our
reporters?

GET IN TOUCH

*(Updates with comments from Niron comments in third from last paragrpah.)*

Before it's here, it's on
the Bloomberg
Terminal.

LEARN MORE

Terms of Service
Trademarks Privacy Policy
©2019 Bloomberg L.P. All Rights Reserved
Careers Made in NYC Advertise Ad Choices    Contact Us Help

# Exhibit O

# LIONBRIDGE

STATE OF NEW YORK    )
                       )
                       ss
COUNTY OF NEW YORK    )

## **CERTIFICATION**

This is to certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from French into English of the attached article "When Nicolas Sarkozv Plays a Business Intermediary," dated August 23, 2019.

Kristen Duffy, Senior Managing Editor
Lionbridge

Sworn to and subscribed before me

this _2nd_ day of _September_ 20 _19_.

ETHAN WIN LY
NOTARY PUBLIC-STATE OF NEW YORK
No. 01LY6323702
Qualified in New York County
My Commission Expires 04-27-2023

259 W 30th Street, 11th Floor    New York, NY 10001    +1.212.631.7432

## *When Nicolas Sarkozv Plays a Business Intermediary*

Le Monde

Friday, August 23, 2019

Copyright 2019 *Le Monde* Interactif All Rights Reserved

# Le Monde

**Section:** *LE MONDE*; Pg. 4

**Length:** 764 words

**Byline:** Ch. Ct
**Highlight**: The former head of the French State, who became an attorney, was with *Beny Steinmetz* on a trip to Conakry, in February.

## Body

The French Embassy at Conakry only learned about it at the last moment. And only because of the presence on the plane of armed French security officers, charged with protecting a VIP individual. On February 21, Nicolas Sarkozy is all smiles in front of the Guinean President, Alpha Condé. As a former head of state, attorney, business intermediary? Probably a little of each, to try to unravel the Simandou file, the largest iron ore reserve in the world...

Nicolas Sarkozy knows the Franco-Israeli billionaire *Beny Steinmetz*, the main protagonist in the case, who managed – only for a time – to get his hands on this treasure before being deprived of it in 2004 by Alpha Condé.

It is therefore alongside Mr. *Steinmetz*, and in the businessman's private plane, that Nicolas Sarlozy arrived in Conakry. A few days later, a press release announced the conclusion of an agreement between Guinea and the *Beny Steinmetz* Group Resources (BSGR), one of the nebulous entities of the Franco-Israeli's mining companies.

The text, not definitive, to which *Le Monde* had access, opens the way – its signatories hope – to freezing a certain number of judicial proceedings between the two parties – in particular before the International Center for the settlement of the disputes concerning investments (Cirdi) – and to reinstate *Beny Steinmetz* in Guinea. The protocol of agreement stipulates that BSGR renounce all claims against Simandou, but at the same time offers the Franco-Israeli billionaire the opportunity to position himself on another Guinean mining concession, that of Zogota.

*"Putting an End to All This"*

How can we explain this about-face when Guinea seemed to have an opportunity to win the proceedings before the Cirdi? *"It had been going on for too long, the procedure was likely to be delayed again and cost us millions of dollars in attorney fees,"* claimed President Alpha Condé in Le Monde. *It also discouraged investors from taking an interest in Simandou. We had to put an end to all this."* The chances of recovering hundreds of millions of dollars in compensation were not guaranteed either. *"The BSGR was placed under judicial management [in March 2018]. It is almost an empty shell, with no assets to recover for Guinea,"* says a participant in the case.

When Nicolas Sarkozy Plays a Business Intermediary

"For several months, **Beny Steinmetz** insisted I settle the dispute. In Lomé, in Nouakchott... I always refused," *adds the Guinean President. Before the meeting in Conakry, several confidential meetings were held in the rooms of the Plaza Athénée, the Parisian palace that* **Beny Steinmetz** *frequents. Around him were his friend Ivory Coast Defense Minister Hamed Bakayoko and a special adviser to the Guinean President who became State Minister, Tibou Kamara, to facilitate the search for an agreement. At the end of the negotiations, Nicolas Sarkozy was invited as a mediator. He had previously met with* Mr. **Steinmetz** *in Paris in his offices on Miromesnil Street.*

"(Nicolas) Sarkozy has been a friend of **(Beny) Steinmetz** *for a long time, states Alpha Condé, and when he told me we could talk to him, I said OK."* For his part, the former Socialist Minister Michel Sapin states that *"Alpha [Condé] was very happy with its effect. I'm in Heaven!"* Michel Sapin was in Conakry a few days before the arrival of Nicolas Sarkozy in the company of François Hollande, who had come to visit his old Guinean comrade. *"Alpha was too happy that Sarkozy asked him for a favor,"* Sapin adds.

A little air of revenge, for the Guinean president? When Sarkozy was at the Élysée, Alpha Condé suspected him of interference in the Ivorian case. "*I sleep a lot better since the election of François [Hollande]*," he once told a French diplomat. Asked by **Le Monde** about his role in this reconciliation, mediation and his possible remuneration, Nicolas Sarkozy did not follow up. In a letter dated April 15, 2019, BDO – the international accounting firm that administers the BSGR – explained that it had not *"mandated Mr. Sarkozy"* and had not paid him emoluments. The agreement between Guinea and Mr. **Steinmetz** does not put an end to the accusations of corruption brought against him by the Swiss courts in the Simandou case. His trial is expected to be held soon in Switzerland.

**Load-Date:** August 22, 2019

---

End of Document

## *Quand Nicolas Sarkozy joue les intermédiaires d'affaires*

Le Monde

vendredi 23 août 2019

Copyright 2019 *Le Monde* Interactif tous droits réservés

# Le Monde

**Section:** *LE MONDE*; Pg. 4

**Length:** 764 words

**Byline:** Ch. Ct

**Highlight:** L'ancien chef de l'Etat français, devenu avocat, était aux côtés de *Beny Steinmetz* lors d'un déplacement à Conakry, en février

## Body

L'ambassade de France à Conakry ne l'avait appris qu'au dernier moment. Et seulement en raison de la présence à bord de l'avion d'officiers de sécurité français armés, chargés de la protection d'une haute personnalité. Le 21 février, Nicolas Sarkozy se présente tout sourire devant le président guinéen, Alpha Condé. En tant qu'ancien chef de l'Etat, avocat, intermédiaire d'affaires? Sans doute un peu des trois, pour tenter de dénouer le dossier Simandou, du nom de la plus grande réserve au monde de minerai de fer…

Nicolas Sarkozy connaît le milliardaire franco-israélien *Beny Steinmetz*, le personnage central du dossier, parvenu – pendant un temps seulement – à mettre la main sur ce trésor avant d'en être privé en 2004 par Alpha Condé.

C'est donc aux côtés de M. *Steinmetz*, et dans l'avion privé de l'homme d'affaires, que Nicolas Sarlozy est arrivé à Conakry. Quelques jours plus tard, un communiqué de presse annonçait la conclusion d'un accord entre la Guinée et la *Beny Steinmetz* Group Ressources (BSGR), l'une des entités de la nébuleuse de sociétés du minier franco-israélien.

Le texte, non définitif, auquel *Le Monde* a eu accès, ouvre la voie - espèrent ses signataires - au gel d'un certain nombre de procédures judiciaires entre les deux parties – notamment devant le Centre international pour le règlement des différends relatifs aux investissements (Cirdi) – et à remettre *Beny Steinmetz* en selle en Guinée. Le protocole d'accord stipule ainsi que la BSGR renonce à toute prétention sur Simandou, mais il offre dans le même temps au milliardaire franco-israélien la possibilité de se positionner sur une autre concession minière guinéenne, celle de Zogota.

### *«Mettre un terme à tout ça»*

Comment expliquer ce revirement alors que la Guinée semblait avoir la possibilité de gagner la procédure engagée devant le Cirdi? *«Cela durait depuis trop longtemps, la procédure risquait de traîner encore et de nous coûter des millions de dollars en avocats, explique au Monde le président Alpha Condé. Elle décourageait aussi les investisseurs de s'intéresser à Simandou. Il fallait mettre un terme à tout ça.»* Les chances de récupérer des centaines de millions de dollars de dédommagements n'étaient pas garanties non plus. *«La BSGR a été placée sous administration judiciaire [en mars 2018]. C'est quasiment une coquille vide, sans actifs à récupérer pour la Guinée»*, précise un acteur du dossier.

Quand Nicolas Sarkozy joue les intermédiaires d'affaires

*«Depuis plusieurs mois, **Beny Steinmetz** me faisait des appels du pied pour régler le contentieux. A Lomé, à Nouakchott… J'avais toujours refusé»*, ajoute le président guinéen. Avant la rencontre de Conakry, plusieurs réunions confidentielles s'étaient tenues dans les salons du Plaza Athénée, le palace parisien où **Beny Steinmetz** a ses habitudes. Autour de lui se trouvaient son ami le ministre ivoirien de la défense, Hamed Bakayoko, et un conseiller spécial du président guinéen devenu ministre d'Etat, Tibou Kamara, chargé de faciliter la recherche d'un accord. Sur la fin des négociations, Nicolas Sarkozy était convié en tant que médiateur. Il avait auparavant reçu M. **Steinmetz** à Paris dans ses bureaux de la rue Miromesnil.

*«[Nicolas] Sarkozy est un ami de [**Beny**] **Steinmetz** depuis longtemps, assure Alpha Condé, et quand il m'a dit qu'on pouvait discuter avec lui, j'ai fait: OK.»* De son côté, l'ancien ministre socialiste Michel Sapin assure qu'*«Alpha [Condé] était très content de son effet. Aux anges!»* Michel Sapin était à Conakry quelques jours avant l'arrivée de Nicolas Sarkozy en compagnie de François Hollande, venu rendre visite à son vieux camarade guinéen. *«Alpha était trop content que Sarkozy lui demande une faveur»*, ajoute M. Sapin.

Un petit air de revanche, pour le président guinéen? Du temps où M. Sarkozy était à l'Elysée, Alpha Condé le soupçonnait d'ingérence dans le dossier ivoirien. *«Je dors beaucoup mieux depuis l'élection de François [Hollande]»*, avait-il un jour confié à un diplomate français. Sollicité par **Le Monde** sur son rôle dans cette réconciliation, la médiation et son éventuelle rémunération, Nicolas Sarkozy n'a pas donné suite. Dans un courrier du 15 avril 2019, BDO – le cabinet international d'expertise comptable qui administre la BSGR – explique qu'il n'avait pas *«mandaté M. Sarkozy»* et ne lui avait pas versé d'émoluments. L'accord conclu entre la Guinée et M. **Steinmetz** ne met pas un terme aux accusations de corruption portées contre lui par la justice helvétique dans l'affaire Simandou. Son procès devrait se tenir prochainement en Suisse.

**Load-Date:** August 22, 2019

End of Document

# Exhibit P

LexisNexis Newsdesk®

# Mick the Miner in a hole over Guinea ore; Administrators threaten to thwart Xtrata boss's return

## The Sunday Times (London)
### Edition 1, National Edition

**Publish Date:** Aug 04, 2019 8:00 AM

**Section:** BUSINESS AND MONEY;NEWS, p.3

**Length:** 551 words

Sir Mick Davis's return to mining through a deal in west Africa could yet be unravelled, according to a court claim.

Davis, former boss of Xstrata and Tory party chief executive, nicknamed Mick the Miner, surprised the industry in February when he confirmed that his new company Niron planned to develop the prized Zogota iron-ore deposit in Guinea.

The project had been owned by Israeli diamond magnate Beny Steinmetz, but his group, BSGR, was stripped of its rights after allegations of political corruption.

Niron was appointed Zogota's developer as part of a settlement between BSGR and the Guinean government. However, BSGR has been in administration since March last year. In court papers filed in America last month, its administrators at BDO claim the settlement is still subject to their scrutiny and could be unwound.

The papers, filed as part of a dispute between BSGR's administrators and the Brazilian mining giant Vale, say: "The joint administrators have produced to Vale documents which demonstrate that they [the administrators] have actively prevented any settlement absent their review and approval. Currently, there is at most a 'non binding' settlement that remains subject to thorough diligence, review, and perhaps termination or renegotiation by the joint administrators." The claim, rejected by BSGR's parent company, raises questions over the agreement, which was presented as an end to decades of controversy and raised hopes of an economic boost for Guinea.

BSGR was stripped of rights to Zogota and half of the neighbouring Simandou deposit in 2014 after being accused by the Guinean government of having obtained the Simandou rights using bribery, sparking probes in the US and Switzerland. Steinmetz's group always denied the accusations, and had pursued Guinea through international arbitration to try to reclaim the rights, but the two sides dropped allegations against each other in February as part of the deal in which Davis was appointed to develop Zogota. Niron was introduced to Guinea by Steinmetz, who would receive a share of Niron's proceeds from Zogota. It was announced soon before the London Court of International Arbitration ordered BSGR to pay $1.25bn to Vale, its former joint-venture partner in Guinea, after finding BSGR liable for using bribery to win mining rights. BSGR denies any corruption and is appealing.

Vale is attempting to enforce the award, and has been investigating the Zogota deal with a view to trying to claim the asset.

Niron is part-owned by the Bahamian private equity outfit GSOL, which has had dealings with Steinmetz over a nickel venture in Macedonia. Vale claims there are links between GSOL and creditors to BSGR as part of a wider claim, also denied, that BSGR appears to have engineered ways to keep assets out of Vale's reach. BSGR said the claims were inaccurate, but declined to elaborate. In June, GSOL and Niron director Marcos Camhis told The Sunday Times that Niron was run "completely independently" from Steinmetz's group and there was "no shareholding relationship". He added that a revenue-sharing agreement over Zogota had not been formalised.

BSGR's parent company said: "It's a done deal between Guinea and BSGR." Davis, GSOL and Niron declined to comment. The Guinean mines ministry did not return an email seeking comment.



## THE SUNDAY TIMES

Rachel Millard

Copyright 2019 Times Newspapers Limited All Rights Reserved

**Harvest Date:** Aug 04, 2019 8:14 AM

**Industry:** Mines & Mining (73%), Mining & Extraction (73%)
**Subject:** Negative Personal News (90%), Holding Companies (89%), Appointments (88%), Agreements (73%), Settlement & Compromise (72%), International Law (72%), Parent Companies (71%), Corruption (70%), Bribery (70%), Political Corruption (70%), Alternative

Dispute Resolution (67%), Political Parties (67%), UK Conservative Party (67%), Executives (67%)





# Exhibit Q



# Settlement of the Dispute between the Republic of Guinea and BSG Resources

February 25, 2019 02:00 AM Eastern Standard Time

LONDON--(BUSINESS WIRE)--The Republic of Guinea and Nysco, the 100% shareholder of BSG Resources ("BSGR") (together "the parties"), jointly announce the settlement of their dispute over mining concessions and licenses in the Republic of Guinea ("Guinea").

Following this agreement, BSGR relinquishes its claims on blocks 1 and 2 of SIMANDOU and both parties waive all outstanding procedures.

At the request of the Republic of Guinea, a new group of investors (presented by and including Mr. Beny Steinmetz) will exploit the ZOGOTA deposit, in order to export iron ore, according to an accelerated timetable.

The parties are delighted that this agreement opens a new chapter in their relationship that enables the development of a world-class mining project for the benefit of the people of Guinea.

## Contacts
For BSGR:

Buchanan

Bobby Morse, +44 (0)20 7466 5000

Senior Partner

BSGR@buchanan.uk.com

# Exhibit R

**Mining**

# Mick Davis comeback orchestrated by Beny Steinmetz's group

Industry veteran's vehicle was asked to develop iron ore deposit in Guinea



Mick Davis, the former head of Xstrata, is also treasurer of the Conservative party in the UK

Neil Hume and David Sheppard in London  APRIL 15, 2019

Mick Davis, the Conservative party chief executive and former head of Xstrata, has launched his comeback to the mining industry through a deal orchestrated by BSGR, the miner that has been embroiled in bribery and corruption investigations.

Niron Metals, an investment vehicle co-founded and chaired by Sir Mick, was asked to develop an iron ore deposit in Guinea by BSGR and its advisers, according to people familiar with the deal.

BSGR is the mining group controlled by the family of Beny Steinmetz, the Israeli diamond trader. It has always denied allegations of wrongdoing.

The deal formed part of a wider agreement hammered out between BSGR and the government of Guinea that helped end a long-running dispute over mining rights in the

resource-rich west African country, centred on allegations of corruption against Mr
Steinmetz, an Israeli billionaire.

Sir Mick, who is also treasurer of the UK's governing Conservative party, is one of the
most recognised names in mining, having run Xstrata until it was bought by Glencore in
2013.

After leaving Xstrata, Sir Mick set up X2 Resources, another mining vehicle that secured
billions of dollars of commitments from investors but ultimately failed to pull off a deal.

Niron, whose directors include Greek fund manager Marcos Camhis and Varda Shine, a
former head of diamond trading for De Beers, was registered in the UK last year and
marks his latest return to the industry.

Little is known about Niron. Only one shareholder, a Bermuda-based private equity group
called Global Special Opportunities Ltd, has been publicly disclosed at UK Companies
House.

Its new interest in the Zogota iron ore deposit will establish links to Mr Steinmetz and
BSGR, which has been embroiled in corruption and bribery investigations in the US,
Switzerland and Israel.

It will also take Sir Mick into one of the most difficult mining jurisdictions in the world.
Almost every company that has tried to develop an iron ore project in the former French
colony has run into difficulties.

In the late 1990s Rio Tinto won the rights to develop the huge Simandou iron ore deposit
during the dictatorship of Lansana Conté. But in 2008 the regime stripped Rio of half
those rights, saying it had missed a deadline to start mining.

It handed them to BSGR, which subsequently struck a $2.5bn deal to develop Simandou
with Vale, the world's biggest producer of iron ore, the key ingredient in steelmaking.

Mr Conté's successor, Alpha Condé, later launched an inquiry into how BSGR came to
obtain the rights and concluded in 2014 that they had been won through bribery and
cancelled its claim on Simandou as well Zogota.

BSGR and Mr Steinmetz denied any wrongdoing and launched an international arbitration case. Guinea filed counterclaims and the two sides were waiting for a ruling before they suddenly agreed to end their legal fight in February.

In return for waiving its claims, Guinea asked BSGR to find an investor prepared to develop the Zogota deposit. It picked Sir Mick and Niron Metals.

Niron said the company had started work on a feasibility study and was in discussions with Guinea on a number of issues, including payments and project milestones.

"Niron believes the Zogota deposit can be brought into production on an accelerated timetable therefore the study will be expedited within six months as an approximate guide at this stage," it said.

BSGR is reckoned to have spent $160m on preliminary development work at Zogota, which could be capable of producing 5m to 10m tonnes of iron ore a year.

Niron confirmed GSOL and Sir Mick were shareholders in Niron.

"Sir Mick Davis is the majority shareholder of Niron and currently holds 75 per cent of the equity. GSOL holds the remaining minority stake," it said.

"Beny Steinmetz does not have a participation in Niron through GSOL but may have a minority participation directly in Niron in the future depending on the development and success in the project."

A spokesman for Mr Steinmetz and BSGR, which was placed into administration last year to protect itself from the outcome of litigation, also refused to comment on whether he was a shareholder in Niron.

Sir Mick's plans to develop Zogota still require backing of BDO, administrator to BSGR. Niron will also have to navigate the fallout from a separate arbitration case brought by Vale against BSGR.

Last week, Vale was awarded almost $1.3bn by a London tribunal "for fraud and breaches of warranty by BSGR in inducing Vale to enter into a joint venture" in Guinea. Vale plans to pursue collection of the award.

# Exhibit S

**Africa**

## Beny Steinmetz denies Swiss bribery charges over mining deal

Prosecutor accuses tycoon of 'bribing foreign officials and forgery' in Guinea between 2005-10



Beny Steinmetz and two associates are alleged to have paid $10m to one of the wives of Lansana Conté to secure mining rights ©
FINANCIAL TIMES

Neil Munshi in Lagos and Sam Jones in Zurich AUGUST 13, 2019

Israeli diamond tycoon Beny Steinmetz has denied charges made by Swiss prosecutors that he bribed Guinean officials to win lucrative mining licences in the west African country.

Mr Steinmetz and two associates are alleged to have paid $10m to one of the wives of Lansana Conté, the former president of Guinea, in order to secure rights to one of the world's largest untapped reserves of iron ore, partially through Swiss bank accounts. Prosecutors are seeking prison terms of two to 10 years for the three.

The Israeli billionaire has been enmeshed in legal battles around the globe stemming from allegations that his business orchestrated a bribery scheme to win the prized mining prospect, a source of the key ingredient needed to make steel.

In an indictment filed with Geneva's criminal court, a prosecutor accused Mr Steinmetz of "bribing foreign officials and forgery" in Guinea between 2005-2010 while operating his business from Geneva.

Claudio Mascotto, the Geneva prosecutor, said he had been investigating the case since 2013. The bribery allegations were first revealed in the Financial Times in 2012.

Mr Steinmetz paid "bribes to one of the wives of former Guinean president Lansana Conté with a view to ousting a competitor and granting Beny Steinmetz Group Resources [BSGR] mining rights in the region of Simandou," the prosecutor's office said in a statement.

**The indictment announced by the Swiss prosecutor's office is as misjudged as it is absurd in view of the dropping of all claims against BSG Resources and Beny Steinmetz by the Guinean government**

**BSGR**

The bribes were hidden using forged documents and "false invoices", according to the indictment.

Marc Bonnant, Mr Steinmetz's Geneva-based lawyer, said the charges were baseless.

"Beny Steinmetz denies categorically any wrongdoings," he told the FT. "He never paid a single cent to any president in Guinea or to any public agent in Guinea, neither did he ever give instructions for such monies to be paid."

Mr Steinmetz now lives in Israel, but returned to be questioned by prosecutors and attended every hearing over the past six years, Mr Bonnant said. The billionaire will attend the trial, he added.

Mr Steinmetz has long denied wrongdoing in his dealings in Guinea, which have been the subject of a series of corruption probes in Guinea, the US, Switzerland and Israel, where he was detained and questioned by police in 2016.

Earlier this year, Mr Steinmetz reached a settlement with Guinean authorities over the rights to portions of the giant Simandou project in which both parties agreed to "waive all outstanding procedures".

The Guinean government also granted another mining license to a group in which Mr Steinmetz is an investor.

"Not only do the Guinean authorities recognise today that there has never been corruption, but they give back [another mining license] to the alleged corruptor," Mr Bonnant said.

The deal in February brought an end to a saga that began in 2008 when Mr Conté stripped Anglo-Australian miner Rio Tinto of its license for the northern half of the deposit. Days before he died later that year, Mr Conté granted the same rights to BSGR, a mining arm of Mr Steinmetz's business empire.

His successor, Alpha Condé, later launched an inquiry into the deal and concluded the rights had been won through bribery. He cancelled BSGR's claims on Simandou and Zogota, another large deposit, though the company denied any wrongdoing and fought the decision through international arbitration.

Under the February deal, BSGR relinquished its rights to blocks 1 and 2 of the project, and Guinea asked a group of investors, including Mr Steinmetz and former Xstrata boss Mick Davis, to develop Zogota.

BSGR said: "The indictment announced by the Swiss prosecutor's office is as misjudged as it is absurd in view of the dropping of all claims against BSG Resources and Beny Steinmetz by the Guinean government."

Last year BSGR was placed into administration in the face of the legal battles swirling around its dispute with Guinea.

BSGR was ordered to pay iron ore producer Vale $1.25bn after it was found liable for fraudulent misrepresentations, including a bribery scheme, by a London arbitration court.

Details of the award, made in April, emerged in the US where Vale is seeking a court order to enforce the decision, which relates to an ill-fated joint venture in Guinea.

Copyright The Financial Times Limited 2019. All rights reserved.

19-11845-shl    Doc 46-1    Filed 09/09/19    Entered 09/09/19 18:00:38    Exhibits A-HH
Pg 131 of 216

# Exhibit T

DATED: 18 December 2018

NYSCO MANAGEMENT CORP,

and

BSG RESOURCES LIMITED (in administration)

and

WILLIAM CALLEWAERT AND MALCOLM COHEN as joint administrators of BSG RESOURCES LIMITED

---

FUNDING AGREEMENT

---

This **Agreement** is made on 18 December 2018 by and between:

(1)     **NYSCO MANAGEMENT CORP.,** a company incorporated in the British Virgin Islands with registered number 299796, whose registered office is at Rodus Building, Road Reef Marina, Road Town, Tortola, British Virgin Islands (the **Parent**);

(2)     **BSG RESOURCES LIMITED**, a company incorporated in Guernsey with registered number 46565 whose registered office is at West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX acting by the Administrators (the **Company**); and

(3)     **WILLIAM CALLEWAERT** of BDO Limited of Rue du Pré, St Peter Port, Guernsey, GY1 3LL and **MALCOLM COHEN** of BDO LLP of 55 Baker Street, London, W1U 7EU in their capacity as joint administrators of the Company (the **Administrators** and each an **Administrator**),

each a **Party** and together, the **Parties**.

BACKGROUND

(A)     Pursuant to an order of the Guernsey Court dated 6 March 2018, the Administrators were appointed to the Company for the purposes set out in that order and the laws of Guernsey.

(B)     In order to achieve the purposes referred to in Recital (A) above, the Company requires funding to pay certain fees, costs and expenses arising in connection with its administration and the Parent has agreed to provide the Loan (as defined below) on the terms and upon the conditions set out in this Agreement to fund the payment of such fees, costs and expenses on behalf of the Company.

(C)     The Parties acknowledge that the General Costs Facility and the Adverse Costs Facility (each as defined below), shall be facilities of the last resort and shall only be drawn by the Administrators if the Company does not otherwise have sufficient funds available to meet the relevant obligations.

(D)     By entering into this Agreement, the Parties have agreed that this Agreement shall supersede and replace the funding letter dated 27 February 2017 [sic], but in fact executed on 27 February 2018, and that payments made pursuant to that letter and/or the payments made by the Parent on behalf of the Company with the pre-approval of the Administrators (as listed in Schedule 1) shall be treated as deemed drawdowns under this Agreement and shall be repayable by the Company in accordance with this Agreement.

It is agreed as follows:

1.     INTERPRETATION

In this Agreement, unless the context otherwise requires, the definitions and interpretation set out in this clause 1 apply:

2

027

1.1    Definitions

**Administration** means the administration of the Company pursuant to an order of the Guernsey Court dated 6 March 2018;

**Administration Account** means the account with account details: W Callewaert & M Cohen Administrators of BSG Resources Limited, sort code 15-10-00 and account number 29463681 (or such other account as the Administrators may designate from time to time by notice in writing to the Parent) in which the Buffer Amount is or will be held by the Administrators on behalf of the Company;

**Administration Budget** means the itemised budget of Administration Fees and Expenses, General Costs and, to the extent known and/or foreseeable by the Administrators, Adverse Costs that the Administrators anticipate, to the best of their knowledge in the then current circumstances, will be incurred during the subsequent 12 month period following each anniversary of the Administration;

**Administration Fees and Expenses** means any remuneration, costs, charges and expenses properly incurred by the Company and/or the Administrators in respect of the Administration (including, without limitation, any Advisors' fees and all other costs, disbursements and expenses payable in the Administration such as running costs of the office, salaries of key employees (including any associated payroll taxes) and other disbursements, including any applicable VAT or other local sales taxes payable in any relevant jurisdiction) pursuant to section 383 of the Companies (Guernsey) Law 2008;

**Adverse Costs** means any fees, costs and expenses which the Company or the Administrators may be required to pay pursuant to an order of any court or tribunal or other body of similar nature of competent jurisdiction, to any party to Proceedings (including, without limitation, any arbitration costs, any litigation costs, any costs for applying for mutual recognition of the Administration in a foreign jurisdiction, any professional advisors' fees and all other costs and disbursements) and whether such order is awarded against the Company or the Administrators but excluding Excluded Adverse Costs;

**Adverse Costs Facility** has the meaning given to such term in clause 2.1.3;

**Advisors** means any professional service provider engaged by the Administrators;

**Approved Administration Budget** means Administration Budget as approved by the Parent in accordance with clause 4.1;

**Approved Fees and Expenses** means:

(a)    any Pre-Administration Fees and Expenses; and

(b)    any Administration Fees and Expenses

3

028

which are approved by the Royal Court or any other payments made by or on behalf of the Company and which have been approved by the Administrators from time to time;

**ATE Insurance Cover** has the meaning given to it in clause 7.1;

**Availability Period** means the period from the date of this Agreement up to and including the earlier of:

(a)     the date on which the Administrators (including any additional or replacement administrator or liquidator from BDO Limited and/or BDO LLP, as appropriate) cease to act as Administrators of the Company; and

(b)     subject to the exceptions set out in clause 8 (*Cancellation*), the date specified by the Parent in accordance with the terms of any notice given under clause 8.1;

**Budgeted Costs** means the itemised budget of costs and expenses to be incurred by the Advisors in respect of any Litigation Fees and Expenses as agreed between the Company and Parent from time to time;

**Buffer Amount** means the amount of £100,000 or, £180,000 upon the release to the Parent, pursuant to the terms of the escrow agreement, of an amount of at least £500,000 of the Escrow Amount following the Company receiving ATE Insurance Cover to be maintained at all times in the Administration Account;

**Business Day** means a day (other than a Saturday or Sunday) on which banks are open for general business in St Peter Port, Guernsey and London, England;

**Company Account** means the account with account details: W Callewaert & M Cohen Administrators of BSG Resources Limited, sort code 15-10-00 and account number 29457665 (or such other account as the Administrators may designate from time to time by notice in writing to the Parent) opened by the Administrators on behalf of the Company;

**Disputed Part** has the meaning set out in clause 5.3;

**Escrow Amount(s)** means the amount of GBP 1,500,000 in respect of the ICSID Proceedings as may be varied under the terms of clause 7.1, and such other amount as may be requested by the Administrators in accordance with clause 7.2;

**Excluded Adverse Costs** means:

(a)     any Adverse Costs which were incurred prior to the making of the administration order in relation to the Company;

(b)     any Adverse Costs which do not rank as an expense of the Administration pursuant to section 383 of the Companies (Guernsey) Law 2008; and

4

029

(c)    any Adverse Costs which have been fully recovered under any after the event insurance policy held by the Company;

**Facility** means any of the Adverse Costs Facility, the Litigation Fees and Expenses Facility and/or the General Costs Facility and **Facilities** means any or all of them;

**Fees, Costs and Expenses** means each or all of the Pre-Administration Fees and Expenses, the Litigation Fees and Expenses, the Historic Fees and Expenses, the General Costs and/or any Adverse Costs;

**General Costs** means:

(a)    any Administration Fees and Expenses that may be incurred by the Administrators on behalf of Company in order to effect the day to day running of the Company; and

(b)    any and all costs itemised in each Approved Administration Budget;

but excluding any Adverse Costs or Litigation Fees and Expenses;

**General Costs Facility** has the meaning given to such term in clause 2.1.1;

**Historic Fees and Expenses** means those fees and expenses paid by the Parent with the consent of the Administrators on behalf of the Company prior to the date of this Agreement as set out in Schedule 1;

**ICSID Proceedings** means *BSG Resources Limited, BSG Resources (Guinea) Limited and BSG Resources (Guinea) Sarl ("BSGR") v. The Republic of Guinea ("Guinea")* (ICSID Case No. ARB/14/22);

**Litigation Fees and Expenses** means any Administration Fees and Expenses properly incurred by the Company and/or the Administrators in contemplation of, and/or as a result of, any Proceedings (including, without limitation, any arbitration costs, any litigation costs, any costs for applying for mutual recognition of the Administration in a foreign jurisdiction, any professional advisors' fees and all other costs and disbursements but excluding, for the purposes of this definition only, (i) the US Proceedings to the extent the US Proceedings are funded by a third party funder; and (ii) any element relating to the Administrators' fees included within the scope of Administrators Approved Fees and Expenses in respect of which funding is separately provided under the General Costs Facility;

**Litigation Fees and Expenses Facility** has the meaning given to such term in clause 2.1.2;

**Loan** means any principal amounts advanced or deemed to have been advanced by the Parent in connection with the Facilities, provided always that it shall not include the Escrow Amount;

030

**Parent's Debt** means all indebtedness of the Company to the Parent that exists or arises otherwise than by virtue of this Agreement;

**Pre-Administration Fees and Expenses** means any remuneration, costs, charges and expenses properly incurred by the Administrators or their Advisors in respect of the Company prior to commencement of the Administration;

**Proceedings** means each of the following:

(a)     *Vale S.A. v BSG Resources Limited* (LCIA Arbitration No. 142683);

(b)     the ICSID Proceedings;

(c)     the US Proceedings;

(d)     all litigation arising from the Company's investment in Cunico Co-op, including but not limited to the Dutch proceedings issued by Cunico Resources N.V. in the Chamber of Commerce (KvK) in the Netherlands (KvK-number 34273235), except in relation to any appeal of the first instance decision in the Dutch proceedings KvK-number 34273235;

(e)     any recognition or similar proceedings relating to the Administration in (i) England, (ii) France, (iii) the Netherlands, (iv) the US or (v) such other jurisdictions as may be agreed between the Parent and the Company from time to time;

(f)     any proceedings commenced directly against the Company or the Administrators, other than where initiated by the Parent;

(g)     any proceedings commenced by, or in respect of, any creditor of the Company, including but not limited to Standard Chartered Bank;

(h)     any arbitration, litigation, tribunal, court proceedings or other body of similar nature of competent jurisdiction, in connection with the proceedings listed in sub-paragraphs (a) to (g) inclusive above in any jurisdiction to which the Company or the Administrators is or may be party to from time to time; and

(i)     any proceedings initiated to enforce any judgment, award or settlement in connection with the proceedings listed in sub-paragraphs (a) to (i) inclusive above;

**Royal Court** means the Royal Court of Guernsey;

**Unpaid Fees, Costs and Expenses** means any Fees, Costs and Expenses which are due and payable but remain unpaid from time to time;

**US Proceedings** means the proceedings in the United States District Court for the Southern District of New York against George Soros and his Open Society Foundations but excludes any

6

031

Proceedings in respect of the recognition of the Administration pursuant to Chapter 15 of the US Bankruptcy Code or otherwise; and

**Utilisation Request** has the meaning as set out in clause 5.1 of this Agreement;

**VAT** means:

(a)    any tax imposed in compliance with the Council Directive of 28 November 2006 on the common system of value added tax (EC Directive 2006/112); and

(b)    any other tax of a similar nature, whether imposed in a member state of the European Union in substitution for, or levied in addition to, such tax referred to in paragraph (a) above, or imposed elsewhere.

1.2    References to one gender shall include all genders and references to the singular shall include the plural and vice versa.

1.3    References to clauses and recitals are references to clauses and recitals of this Agreement. Headings shall be ignored in construing this Agreement.

1.4    References to:

1.4.1    a person shall include any individual, company, partnership, joint venture, association, organisation, institution, trust or agency or unincorporated association (whether or not having separate legal personality); and

1.4.2    a company shall include any company, corporation or any body corporate, wherever incorporated.

1.5    The word "including" shall be construed as being by way of illustration or emphasis only and does not limit the generality of any preceding words.

1.6    References to statutes or other legislation includes all re-enactments, modifications and amendments.

1.7    Reference to the Administrators means all or any one of them, as appropriate and includes any person appointed as an additional or replacement administrator or liquidator from time to time (provided such appointee is from the firm of BDO Limited or BDO LLP) and (as appropriate) each of those persons in their capacities as former administrators or liquidators.

1.8    References to "USD" or "$" are references to United States dollars and references to "GBP" or "£" are references to British pound sterling.

2.    **THE LOAN**

2.1    Subject to the terms of this Agreement, the Parent makes available to the Company:

7

032

2.1.1    a GBP loan in an aggregate amount which is equal to no more than

(a)    £1,575,539.07 (which includes the amounts set out in clause 2.4 below as calculated in accordance with Schedule 2) for the period from the date of this Agreement until 5 March 2019; and

(b)    from 6 March 2019 onwards, such amounts as set out in each Approved Administration Budget,

in each case to be used for the purposes of funding the General Costs (the "**General Costs Facility**");

2.1.2    a GBP loan in an aggregate amount which is equal to the Litigation Fees and Expenses agreed in accordance with clause 6.2 (the "**Litigation Fees and Expenses Facility**"); and

2.1.3    a GBP loan in an aggregate amount of £1,500,000, or as may otherwise be requested by the Administrators in accordance with clause 7, for the purposes of meeting any Adverse Costs (the "**Adverse Costs Facility**") which shall be paid into an escrow account pending utilisation.

2.2    The Parties agree that the General Costs Facility and the Adverse Costs Facility shall only be drawn by the Company if the Administrators, acting reasonably, believe that the funds are required to meet the relevant Fees, Costs and Expenses and the Company does not otherwise have sufficient funds available to meet such Fees, Costs and Expenses.

2.3    The Parties agree that a certificate from the Company as to the aggregate amount of the Loan and any interest accrued on the same at any time shall, in the absence of manifest error, be conclusive.

2.4    The Parties acknowledge that the Parent made three payments of (i) £435,000, (ii) £91,000, and (iii) £300,000 pursuant to the terms of a letter agreement dated 27 February 2017 [sic], but in fact executed on 27 February 2018, which has been used by the Administrators prior to the date of this Agreement to meet certain Fees, Costs and Expenses.

2.5    Subject to clause 9 (*Ranking*) and clause 10 (*Repayment*), the principal amounts of each advance made under any Facility from time to time shall accrue interest daily at a rate of 3 per cent per annum.

2.6    Notwithstanding the purposes of the Facilities, the Parent is not directly engaging the Administrators and this Agreement does not seek to replace the statutory requirements or any commonly accepted industry guidance relating to the conduct of administrations of this nature generally.  The Parent hereby agrees and acknowledges that nothing in this Agreement or in the arrangements contemplated by it, shall fetter or prejudice the Administrators' statutory duties and obligations.

8

3.      **THE BUFFER AMOUNT**

3.1     On the first day of the Availability Period, the Parent shall transfer the Buffer Amount into the Administration Account.

3.2     The Buffer Amount shall be utilised by the Company and/or the Administrators for the following purposes:

3.2.1   if the Parent fails to comply with its obligations under this Agreement and in such circumstances the Administrators shall be entitled to issue a notice requiring the Parent to top up the Administration Account and the Parent shall within 15 Business Days of receiving such notice transfer sufficient funds to the Administration Account to ensure the Buffer Amount is maintained at all times during the Availability Period; or

3.2.2   at the sole election of the Administrators, and where funds are not already held in an escrow account for this purpose, for the payment of any Adverse Costs itemised in each Approved Administration Budget or as separately approved by the Parent. In such circumstances the Administrators shall be entitled to issue a notice requiring the Parent to top up the Administration Account and the Parent shall within 15 Business Days of receiving such notice transfer sufficient funds to the Administration Account to ensure the Buffer Amount is maintained at all times during the Availability Period or

3.2.3   at the sole election of the Administrators, prior to the end of the Availability Period, for the payment of Fees, Costs and Expenses itemised in each Approved Administration Budget and provided always that a Utilisation Request is delivered in accordance with clause 5 (*Drawdown*).

3.3     Subject to clause 3.2.3 above, the Company shall return any unused balance of the Buffer Amount to the Parent immediately prior to the end of the Administration.

3.4     To the extent that the Buffer Amount or any part thereof is applied towards Fees, Costs and Expenses in accordance with this Agreement, such application shall be deemed as a drawdown of the relevant Facility.

4.      **ADMINISTRATION BUDGET**

4.1     On the first anniversary of the Administration, and each anniversary thereafter (or such shorter periods as may be agreed between the Parties), the Administrators shall submit the Administration Budget to the Parent. Subject to the remaining part of this clause 4.1, the Parent shall agree the Administration Budget within 15 Business Days of submission of the same. If the Parent is not satisfied with any part of the Administration Budget, the Parties agree to discuss the Administration Budget in good faith to reach an agreed Administration Budget within 10 Business Days of submission. The Approved Administration Budget may be used by the Administrators in any application to the Royal Court for Approved Fees and Expenses.

9

034

4.2    The Parties acknowledge and agree that the Administration Budget for the period up to 5 March 2019 has been agreed between the Parties and has been submitted to the Royal Court for approval and is attached hereto as Schedule 3.

4.3    The Parties acknowledge and agree that there will be occasions where it will not be possible to foresee all Fees, Costs and Expenses and submit these in the Administration Budget. The Parent hereby authorises the Administrators to take such steps as are reasonably necessary in order to preserve the Company's position in, and/or preserve, the Administration, such steps which may include the incurrence of any fees, costs and disbursements.

4.4    Any costs incurred pursuant to clause 4.3 above shall be limited to £25,000 per instance and the Administrators shall promptly notify the Parent of any costs incurred and shall, as soon as reasonably possible, provide the Parent with reasonable details of such costs.

4.5    If the Parent fails to comply with the time period set out in clause 4.1, the Parent hereby irrevocably and unconditionally authorises the Administrators to fund the relevant Fees, Costs and Expenses from the Buffer Amount until such time as the Administration Budget is approved.

5.    DRAWDOWN

5.1    Subject to the terms of this Agreement and except as set out in clause 6.2 (*Litigation Fees and Expenses*), the Parent will, subject to the Parent receiving a request (the **"Utilisation Request"**) from the Company, transfer an amount as detailed in the Utilisation Request to the Company Account or to such other account as may be specified in the Utilisation Request. Each Utilisation Request must:

5.1.1    be in writing, signed by at least one of the Administrators on behalf of the Company, and sent to the Parent by email to m.bonnant@bon-a.ch or such email address notified to the Administrators from time to time, and/or such other person or persons at the Parent as may be notified by the Parent in writing to the Administrators;

5.1.2    state which Facility it relates to and the amount requested, by reference to the Approved Administration Budget or this Agreement;

5.1.3    specify the purpose or purposes for which the amount will be used;

5.1.4    provide copies of such relevant invoices, court orders and any other documentation as the Parent may reasonably request, including, in the case of the Administrator's fees, a detailed breakdown (together with narrative) of such fees;

5.1.5    state the Business Day on which payment of the amount is to be made which shall be not less than 15 Business Days from the date of the Utilisation Request and shall be in the Availability Period.

10

035

5.2     Except with the prior consent of the Parent, no Utilisation Request may be made in respect of the General Costs Facility where such utilisation would breach the limits on the General Costs Facility set out in clause 2.1.1.

5.3     If the Parent is not satisfied with certain payments requested as part of the Utilisation Request only, whether in relation to the purpose specified and/or the amount proposed (the "**Disputed Part**"), the Parent shall specify which purpose(s) and/or amount(s) is/are not agreed and shall promptly consult with the Administrators, and in any case within 5 Business Days of the date of the Utilisation Request, regarding the Disputed Part. The Parent shall not delay the transfer of any non-disputed payments request in such Utilisation Request which do not comprise the Disputed Part.

5.4     Subject to clause 5.3, if the Parent fails to comply with the time period contained in the Utilisation Request, the Parent hereby irrevocably and unconditionally authorises the Administrators to pay all such invoices in full from the Buffer Amount.

6.      **LITIGATION FEES AND EXPENSES**

6.1     The Administrators will use their reasonable endeavours to ensure that the Advisors shall, from time to time, and prior to incurring any Litigation Fees and Expenses, submit the Budgeted Costs to the Administrators and the Parent for their approval.

6.2     The Parent shall be responsible for the payment of all Litigation Fees and Expenses to each respective Advisor in respect of: (i) the ICSID Proceedings, (ii) the Proceedings described in sub-paragraphs (a) to (d) of the definition of Proceedings in clause 1.1 (*Definitions*), and (iii) any other Proceedings where agreed in advance between the Parent and the Administrators from time to time, and such payments shall be deemed utilisations for the purposes of this Agreement and form part of the Litigation Fees and Expenses Facility.

6.3     Except as described in clause 6.2, the Company shall be responsible for the payment of all other Litigation Fees and Expenses to each respective Advisor in respect of all other Proceedings, which shall be agreed between the parties from time to time and transferred by the Parent to the Company Account in accordance with clause 5 (*Drawdown*).

6.4     If the Parent fails to meet the Litigation Fees and Expenses for which it is responsible pursuant to clause 6.2 above, the Parent hereby irrevocably and unconditionally authorises the Administrators to pay such amount to the respective Advisor from the Buffer Amount.

6.5     The Parties agree to discuss, in good faith, any Litigation Fees and Expenses that are incurred in excess of the Budgeted Costs.

6.6     The Parties acknowledge and agree that there will be occasions where it will not be possible to submit Budgeted Costs in advance of incurring any Litigation Fees and Expenses. The Parent hereby authorises the Administrators to take such steps as are reasonably necessary in order to

11

036

preserve the Company's position in any relevant arbitration or litigation or otherwise and/or in preserving the Administration, such steps which may include the incurrence of any fees, costs and disbursements and/or use of the Buffer Amount.

6.7    Any costs incurred pursuant to clause 6.6 above shall be limited to £25,000 per instance and the Administrators will promptly notify the Parent of the necessity of incurring the costs and, shall as soon as reasonably possible, provide the Parent with details of such costs including invoices evidencing the same where possible and appropriate.

## 7.    ADVERSE COSTS

7.1    The Parties acknowledge that the Parent has paid the Escrow Amount to Ogier, to be held in their client account and, following the execution of an escrow agreement, in an escrow account to be held by Ogier in accordance with the escrow agreement, pending the final determination of the ICSID Proceedings. Upon confirmation that the Company has obtained "after the event insurance" insuring against Adverse Costs of up to £1,000,000 ("ATE Insurance Cover") which may arise from the ICSID Proceedings, the Escrow Amount shall be reduced by an amount equal to the ATE Insurance Cover and returned to the Parent.

7.2    Notwithstanding clause 7.1, the Parties acknowledge and agree that Proceedings may incur additional Adverse Costs and, as such, the Escrow Amount may be increased from time to time. Within 15 Business Days of being notified of any Proceedings pursuant to which Adverse Costs may arise, the Parent undertakes, upon the written request of the Administrators, to place such additional Escrow Amount into either (i) the escrow account specified in clause 7.1, or (ii) other other escrow account to be held by Ogier or other relevant Advisors in accordance with an escrow agreement, pending the final determination of the respective Proceedings.

7.3    The Parties acknowledge and agree that the Escrow Amount shall be used to meet the Adverse Costs in accordance with the terms of the relevant escrow agreement. Any payment from the Escrow Amount shall be a deemed drawdown under this Agreement and form part of the Adverse Costs Facility.

7.4    If the Parent fails to comply with the time period contained in this clause 7 or, if, on final determination of the Proceedings, a shortfall exists, the Parent hereby irrevocably and unconditionally authorises the Administrators to pay all such Adverse Costs from the Buffer Amount.

7.5    In the event of any conflict between the terms of this clause 7 and any relevant escrow agreement, the terms of such escrow agreement shall prevail.

## 8.    CANCELLATION

8.1    The Parent may, if it gives the Administrators and the Company not less than three months' (or such shorter period as the Administrators may agree) prior notice in writing, cancel its obligation

037

to advance further monies under the Facilities following expiration of such three month period. All other obligations of the Parent under this Agreement shall remain in full force and effect.

8.2    The cancellation of the Parent's obligation to advance further monies under the Facilities shall not affect the Parent's obligation to pay any Fees, Costs and Expenses which (i) have been incurred or (ii) will be incurred and which cannot reasonably be avoided, whilst preserving the Company's position in each relevant arbitration or litigation or otherwise, and working towards the implementation of an orderly termination of the Administration. Any Adverse Costs transferred into an escrow account in accordance with clause 7 shall not be affected by any notice provided by the Parent pursuant to clause 8.1.

9.    RANKING

9.1    The Parties acknowledge that the Administrators' remuneration and any costs, charges and expenses properly incurred in the Administration (which, for the avoidance of doubt, includes the Fees, Costs and Expenses) are payable from the Company's assets in priority to all other claims pursuant to section 383 of the Companies (Guernsey) Law, 2008.

9.2    It is hereby agreed that the repayment of the Loan and any interest outstanding hereunder shall be subordinate to:

9.2.1    firstly, to any secured creditors that take priority over any Fees, Costs and Expenses in accordance with Guernsey law; and

9.2.2    secondly, to the payment of all other Fees, Costs and Expenses (including, to the extent relevant, any Unpaid Fees, Costs and Expenses).

10.    REPAYMENT

10.1    Subject to clause 9 (*Ranking*), immediately prior to the end of the Availability Period, the Company shall repay to the Parent the Loan and any interest outstanding hereunder.

10.2    Subject to clause 10.4, to the extent funds are available within the Company, the Company may (at the discretion of the Administrators) repay the Loan and/or any interest (or part thereof) to the Parent at any time during the course of the Administration.

10.3    Where the Company wishes to make a prepayment or payment to the Parent pursuant to clause 10.2 it shall:

10.3.1    provide advance written notice to the Parent specifying the amount of such prepayment or payment and to which Facility the prepayment or payment relates; and

10.3.2    ensure that the prepayment or payment amount is for no less than £50,000.

13

038

10.4    The Parent acknowledges and agrees that where there are insufficient funds available in the Company to repay the Loan and any interest outstanding hereunder, the Parent shall have no recourse to any asset of the Administrators or of the Company.

11.    **OBLIGATIONS AND RESTRICTION**

11.1    The Parent undertakes that it shall not, at any time during the Availability Period, do anything (or omit to do something) that may prejudice its ability to meet its obligations under this Agreement.

11.2    The Parent expressly reserves its rights against all subsidiaries of the Company.

12.    **REPRESENTATIONS AND WARRANTIES**

12.1    Each of the following representations and warranties is made by the Parent as at the date of this Agreement:

12.1.1    it is a limited liability company, duly incorporated and validly existing under the laws of the British Virgin Islands, with power to own its assets and to carry on its business (and other activities) as they are being conducted;

12.1.2    it has the power and authority to enter into this Agreement and to perform its obligations and exercise its rights under it;

12.1.3    entering into this Agreement and performing its obligations and exercising its rights do not conflict with any law applicable to it, its memorandum and articles of association or any agreement binding upon it (or its assets);

12.1.4    it is able to pay its debts as they fall due and will not become unable to do so as a consequence of entering into this Agreement; and

12.1.5    it is not insolvent or bankrupt under the laws of any jurisdiction nor will it become insolvent or bankrupt under the laws of any jurisdiction as a consequence of entering into this Agreement and it has not, in any jurisdiction, commenced or had commenced against it any proceedings or other actions for or indicative of insolvency or bankruptcy.

13.    **PAYMENTS**

13.1    All payments due to be made under this Agreement shall be made:

13.1.1    in British pounds sterling or such other currencies as agreed between the Parties in immediately available funds without any set-off or counterclaim; and

13.1.2    to such account as notified to the Parent by the Administrators in writing from time to time, or pursuant to the terms of this Agreement.

14

039

13.2    When any payment under this Agreement would otherwise be due on a day which is not a Business Day, the due date for payment shall be extended to the next following Business Day unless such Business Day falls in the next calendar month in which case payment shall be made on the immediately preceding Business Day.

14.    **WHOLE AGREEMENT**

14.1    This Agreement sets out the whole agreement between the Parties relating to the subject matter of this Agreement at the date of this Agreement to the exclusion of any terms implied by law which may be excluded by contract and supersedes any previous written or oral agreement between the Parties in relation to the matters dealt with in this Agreement.

14.2    This Agreement supersedes each other agreement or arrangement between the Parties regarding any matter of the type for which this Agreement provides (including, without limitation, the letter dated 27 February 2017 [sic], but in fact executed on 27 February 2018, from the Parent to the Administrators) and each such agreement or arrangement has no further effect.

15.    **SURVIVAL**

15.1    If any Administrator is:

15.1.1    removed from office by order of the Royal Court;

15.1.2    resigns his office by giving notice of resignation to the Royal Court;

15.1.3    vacates his office if the administration order is discharged; or

15.1.4    in any other way ceases to be an administrator of the Company,

each a **Vacation of Office**, any Vacation of Office shall not affect any rights or remedies of that Administrator that may have accrued up to the date of his Vacation of Office, including the right to claim damages in respect of any breach of this Agreement which existed at or before the date of his Vacation of Office, and the Parties hereby agree that such rights or remedies shall be capable of enforcement by the Administrators on and from the date of his Vacation of Office.

16.    **NO SET OFF**

The Parent may not set off any obligation of the Company to the Parent (including any contingent or unmatured obligation) or any part thereof against any obligations and liabilities (whether present or future, actual or contingent) of the Parent under this Agreement or any part thereof.

040

17.    ASSIGNMENT

No Party may, without the prior written consent of the others, assign, hold on trust or otherwise transfer the benefit of all or any of its obligations under this Agreement, or any benefit arising under or out of this Agreement.

18.    NOTICES

18.1    Any notice or other communication in connection with this Agreement (each, a **"Notice"**) shall be:

18.1.1    in writing;

18.1.2    delivered by email, hand, pre-paid first class post or courier; and

18.1.3    sent to the address set out in the header of this Agreement or such other address as may be notified to the sending Party by the other Parties from time to time.

18.2    A Notice shall be effective upon receipt and shall be deemed to have been received:

18.2.1    72 hours after posting, if delivered by pre-paid first class post;

18.2.2    at the time of delivery, if delivered by hand or courier; or

18.2.3    24 hours after it was sent, if sent by email.

18.3    The Parent irrevocably appoints Perla Limited as process agent in Guernsey to accept service of notices pursuant to this Agreement on its behalf, such appointment to take effect from the date of this Agreement.

18.4    If any person appointed as agent for service is unable for any reason to act as agent for service of process, the Parent must immediately (and in any event within five days of such event taking place) appoint another agent on terms acceptable to the Parties.

19.    ADMINISTRATORS' LIABILITY

19.1    The Administrators are party to this Agreement solely to receive the benefit of this Agreement.

19.2    None of the Administrators, their company, firm, partners, personal representatives or employees, shall incur any personal liability under, by virtue of or in connection with this Agreement or under or in connection with any document entered into pursuant to or in connection with this Agreement.

19.3    The Parties hereby declare, acknowledge and agree that such exclusion of personal liability in respect of this Agreement and the transactions contemplated by this Agreement shall extend to any matter or claim howsoever, whenever, and wherever arising, and whether such claim is

16

041

formulated in contract, tort or restitution or by reference to any other remedy or right, and in whatever jurisdiction or forum.

19.4    Whether or not acting as agent of the Company, the Administrators shall when acting in the name and on behalf of the Company incur no personal liability by reason of acting in such capacities.

19.5    The exclusion of liability in this clause 19 shall continue notwithstanding termination of this Agreement and shall be in addition to and not qualified by or in substitution for, any right of indemnity, recovery, or relief otherwise available to the Administrators and apply to claims in contract, tort or otherwise.

20.    **CONFIDENTIALITY**

This Agreement is confidential between the Parties and (save as required by law or current insolvency practice) shall not be disclosed to any other person without the consent of all other Parties to this Deed.

21.    **NO THIRD PARTY RIGHTS**

The Parties do not intend that any term of this Agreement shall be enforceable by any person who is not a Party, except for any successors in office (provided that, in the case of the Administrators, any such successors are from BDO LLP or BDO Limited) or permitted transferees or assignees of such Party.

22.    **COUNTERPARTS**

This Agreement may be executed in any number of counterparts each of which shall be deemed an original, but all the counterparts shall together constitute one and the same instrument.

23.    **GOVERNING LAW**

This Agreement shall be governed by and construed in accordance with laws of Guernsey and the Parties irrevocably agree that the courts of Guernsey are to have jurisdiction to settle any disputes which may arise out of or in connection with this Agreement.

This Agreement has been entered into by the Parties or their duly authorised representatives on the date first set out above.

042

## Schedule 1

### Historic Fees and Expenses

means those fees and expenses paid by the Parent with the consent of the Administrators on behalf of the Company prior to the date of this Agreement as set out in Schedule 1;

| | |
|---|---:|
| **Operating Costs** | |
| Staff costs including tax & social security contributions | 92,396 |
| Legal and Professional fees | 22,255 |
| General office costs | 369 |
| | 115,020 |
| **Legal Fees & Associated Costs** | |
| Legal Fees | 927,721 |
| IT Services | 64,843 |
| | 992,564 |
| **Joint Administrator's Fees** | |
| Joint Administrators' pre-appointment fees | 64,500 |
| Joint Administrators' post-appointment fees | 296,780 |
| Joint Administrators' general disbursements | 3,175 |
| | 364,455 |
| **Total loaned to BSG Resources Ltd (In Administration)** | 1,472,038 |

043

## Schedule 2
## Clause 2.1.1(a) Calculation

**General Costs to 5 March 2019**                                          £

| | |
|---|---:|
| Budget to 5 March 2019 | 901,239.07 |
| Estimated Administrators' Expenses | 354,300.00 |
| Operational Costs | 320,000.00 |
| | **1,575,539.07** |

## Schedule 3
### Budget - 6 March 2018 to 5 March 2019

| | Hours | Amount | Avg. Rate |
|---|---|---|---|
| **A APPOINTMENT** | | | |
| A1 - Discussions with the Board | 35.75 | 20,110.98 | 562.54 |
| A2 - Preparing Papers for Appointment | 8.80 | 3,691.08 | 419.44 |
| A3 - Preparing for Trading and Control | 16.50 | 8,094.60 | 490.58 |
| A4 - Attendance at Hearing | 15.00 | 8,145.00 | 543.00 |
| A5 - Statutory Matters | 5.40 | 1,769.76 | 327.73 |
| | 81.45 | 41,811.42 | 513.34 |
| **B DAY ONE MATTERS** | | | |
| B1 - Statutory notices | 7.25 | 3,143.03 | 433.52 |
| B2 - Internal set ups | 20.50 | 9,050.10 | 441.47 |
| B3 - Attending site | 13.00 | 4,212.00 | 324.00 |
| B4 - Establishing control | 26.75 | 11,393.33 | 425.92 |
| B5 - Setting up banking facilities | 2.50 | 746.28 | 298.51 |
| B6 - Notices to creditors | 15.20 | 4,745.48 | 312.20 |
| | 85.20 | 33,290.21 | 390.73 |
| **C LITIGATION MATTERS** | | | |
| C1 - Initial meetings with lawyers | 26.50 | 16,464.35 | 621.30 |
| C2 - Review of documentation | 20.00 | 9,831.81 | 491.59 |
| C3 - Further meetings | 40.00 | 19,665.17 | 491.63 |
| C4 - Development and documenation of strategy and funding | 40.45 | 23,030.33 | 569.35 |
| C5 - Implementation of strategy (year 1 only) | 111.85 | 48,393.33 | 432.66 |
| C6 - Cunico Settlement | 59.75 | 30,183.24 | 505.16 |
| C7 - ICSID Arbitration | 249.40 | 137,985.59 | 553.27 |
| C8 - Adverse Costs | 112.55 | 61,435.31 | 545.85 |
| C9 - Mutual Recognition | 56.85 | 25,605.61 | 450.41 |
| | 717.35 | 372,594.72 | 519.40 |
| **D TRADING** | | | |
| D1 - Debtor review | 22.00 | 8,302.20 | 377.37 |
| D2 - Subsidiary Engagement and Agreements | 80.00 | 33,663.96 | 420.80 |
| D3 - Monitoring cashflow | 130.00 | 41,468.89 | 318.99 |
| D4 - Preparing/Authorising payment runs | 98.00 | 38,087.90 | 388.65 |
| D5 - Maintaining contact with mgmt | 114.00 | 37,882.08 | 332.30 |
| D6 - Employee liaising | 36.00 | 10,788.20 | 299.67 |
| D7 - Review of strategy | 24.50 | 11,799.38 | 481.61 |
| D8 - D & O and Other Insurance | 17.20 | 8,212.80 | 477.49 |
| | 521.70 | 190,205.39 | 364.59 |
| **E TAX** | | | |
| E1 - Advice on steps to maintain residency | 8.00 | 4,016.55 | 502.07 |
| E2 - Meetings in Guernsey | 54.85 | 37,120.75 | 676.77 |
| E3 - Other ad-hoc matters | 6.00 | 2,990.96 | 498.49 |
| | 68.85 | 44,128.26 | 640.93 |
| **F STATUTORY MATTERS** | | | |
| F1 - Reporting requirements | 37.50 | 13,502.80 | 360.07 |
| F2 - Companies House filings | 10.00 | 4,378.70 | 437.87 |
| | 47.50 | 17,881.50 | 376.45 |
| **G GENERAL ADMINISTRATION** | | | |
| G1 - Cashiering entries | 21.00 | 2,050.68 | 97.65 |
| G2 - Internal checklists and reviews | 123.10 | 60,887.29 | 494.62 |

| | | | |
|---|---|---|---|
| G3 - Liaising between offices | 77.60 | 34,220.00 | 440.98 |
| | 221.70 | 97,157.96 | 438.24 |
| | | | |
| H OTHER MATTERS | | | |
| H1 - Discussions with Star West | 5.00 | 2,327.00 | 465.40 |
| H2 - Review of group structure | 5.00 | 2,458.00 | 491.60 |
| H3 - Dealing with enquiries | 33.00 | 16,859.42 | 510.89 |
| H4 - Management Meeting | 154.10 | 61,886.41 | 401.60 |
| H5 - Standard Chartered | 113.20 | 56,422.69 | 498.43 |
| H6 - Funding Issues/Agreement | 78.05 | 40,072.56 | 513.42 |
| | 388.35 | 180,026.07 | 463.57 |
| | | | |
| | 4264.20 | 977,095.52 | 229.14 |
| Agreed Discounts | | | |
| - Additional 10% discount on the additional breakdowns | | ( 10,196.00) | |
| - Additional forensics work on ICSID closing submissions | | ( 53,969.00) | |
| - Further Discount - Contested Time | | ( 11,691.45) | |
| Total Discounts Applied | | ( 75,856.45) | |
| | | | |
| Totals | 4264.20 | 901,239.07 | 211.35 |

046

**EXECUTION**

........................................................
SIGNED by
on behalf of NYSCO MANAGEMENT CORP.

Director

........................................................
SIGNED for and on behalf of **BSG RESOURCES LIMITED** (in administration) by William Callewaert as joint
Administrator (acting as agent and without personal liability)

........................................................
SIGNED by **WILLIAM CALLEWAERT** for and on behalf of the Administrators (without personal liability)

20

047

EXECUTION

.............................................................
SIGNED by
on behalf of **NYSCO MANAGEMENT CORP.**

.............................................................
SIGNED for and on behalf of **BSG RESOURCES LIMITED** (in administration) by William Callewaert as joint
Administrator (acting as agent and without personal liability)

.............................................................
SIGNED by **WILLIAM CALLEWAERT** for and on behalf of the Administrators (without personal liability)

20

048

# Exhibit U

**To:**       'Ben.Brewerton@FTIConsulting.com'[Ben.Brewerton@FTIConsulting.com]
**Cc:**       Dag Cramer[dag@onyxfa.com];
'asher@bsgresources.com'[asher@bsgresources.com];
'Oliver.Winters@fticonsulting.com'[Oliver.Winters@fticonsulting.com]
**From:**     Beny Steinmetz
**Sent:**     Sun 04/11/2012 8:04:08 AM
**Subject:**  Re: Draft formal release for Monday

Dear all , Am thinking hard on  our press release . And think we should be harder and more focus
and even answer the algetion against BSGR in more specif way ! Am repeating , that it is not a
fight about keeping the assets or fight algeation aginst us , it is a fight on BSGR and my Ebny
Steinmetz reputation .  So every word is important and need to be punchy and ! I think that the
general of the press release is good, especialy the start , what is lacking is the follwoing : (not
nesserly by order)
- we discover Zogota ,total greenfield . Because of that , and because Rio had done nothing ( 6
holes over 10 years in block 1/2 ) Conte adviced Rio and took it away from them already in
begeining of 2008. At end 2008 BSGR was awared these two blocks, as nobody else applied for
them ( worried from Rio reaction ) .
- BSGR invested a lot of money and in record time drilled .......Meters , and have done Pre
feisabilty study on this exploartin area which was just an promising exploration area !
All that in the worst political time in Guinea , when everybody else stoped working , and under 4
differenet regims .
BSGR were speaking with few potential startegic invetors to join ,when it was apparant by the
banks  commison by BSGR to raise dent for development , that there is no debt availble for
Guinea . Vale apprtoched BSGR and at record time close a deal , which Vale thought was a very
good deal and was extrenly impressed from the techincal jog BSGR have preformed .BSGR sold
part , also with conditional milestone with exit possibilties for Vale during the time . Vale is the nu
1 Iron ore producer in the world , and have bothe financial and technical capacity to execute this
heavy logistical project . GoG wellcomed Vale and VBG (BSGR /Vale ) got all the needed
approval from all GoG bodies /enteties concerned . ( Many of the people are still current minsietrs
, incl Minister Finance and minister mining .
This great achivment was cust by the arrival of AC ,who ,as has been learned later have
promised "sold " our asset in return for election money and additional money after eelction , for
accounts unknown , public and private .
Imistaly afer election , AC have stoped VBG project , (the cancan conakry rail and addtional work
on exit rail to Liberi as per our mining liecncse ) .
-than came demands for 50% of the assets from us , ( to GoG and to private ) , and intdimation
camagin started . Saying we had no right to sell to Vale 51 % .
- than with his best friend Soros long time enemy of Beny , who promised him evidnce of mal
practice . 2 years of invstigation have come with nothing .Soros , and old Billionaire , convicted
criminal for inside trading in France have made it his new life mission to take the assest and
smear Beny .
In order to gather more legitmicy ,one of Soros founation have hired Tony Blaire services as well .
In mean time , a report of Collier , indepent Franco/Canadian law firm , costing 300000k euro
financed by Glencore , who also tried to sniff around the asset with a target of getting it  , said
clearly that all BSGR /VBG acts and leicnses are inorder and by the book and to best practice .
AC have choosen to hide this report as it went aginst his plans .
In the meantime , Muhamd , AC son ,closest to him , who tool an official postion as advisor few
months ago , was involved in all the murky and corrupte transaction . Starting "Paladino" ,(owned
by unken SA person and Tokyo Sikuhale from SA )  where against ( as said before ) money ,  for
millions of $ was given to AC in return to a stake in the Guinea public who will keep the
goverment stakes in all mining co ! . Mohamed have got during this perion millions of $ to his
private accounts . When the scandal broke publicy ,the GoG return so called the lawn .
AIOC .  CIF . And latest  B@A /agneilli who have worked closely with AC son last few months to
take over the logtics of the whole iron ore in the country and also the mining sitelf . Also the public
cry over it have stoped the plot .

BSGR-LCIA-0002750

All this happening under the so called supervision and with the people of Soros and Blaire at the minsitries .
The latest joke is the so called commite . .....


I think we should say it strongly !
Ideas



----- Original Message -----
From: Beny Steinmetz
To: Brewerton, Ben <Ben.Brewerton@FTIConsulting.com>
Cc: dag@onyxfa.com <dag@onyxfa.com>; asher@bsgresources.com
<asher@bsgresources.com>; Winters, Oliver <Oliver.Winters@fticonsulting.com>; Brewerton,
Ben <Ben.Brewerton@FTIConsulting.com>
Sent: Sun Nov 04 07:40:27 2012
Subject: Re: Draft formal release for Monday

Is there anything in the ST ?

Sent from my iPad

On 3 Nov 2012, at 23:10, "Brewerton, Ben" <Ben.Brewerton@FTIConsulting.com> wrote:


11am UK time works fine for me.

I've attached a latest draft for us to use as basis for tomorrow's call

The Sunday Times has not posted tomorrow's stories on line as yet but I'll circulate the story
tomorrow morning.

Regards

Ben


_____
From: Beny Steinmetz [beny@onyx-suisse.com]
Sent: 03 November 2012 21:20
To: Brewerton, Ben; 'dag@onyxfa.com'; 'asher@bsgresources.com'
Cc: Winters, Oliver
Subject: Re: Draft formal release for Monday

Tomorrow we do confg call between 11 to 11.3H UK time as I will be busy before

----- Original Message -----
From: Brewerton, Ben <Ben.Brewerton@FTIConsulting.com>
To: Beny Steinmetz; 'dag@onyxfa.com' <dag@onyxfa.com>; 'asher@bsgresources.com'
<asher@bsgresources.com>
Cc: Winters, Oliver <Oliver.Winters@fticonsulting.com>
Sent: Sat Nov 03 14:38:46 2012
Subject: Re: Draft formal release for Monday

Thanks Beny, I'll tweak release and send round again tonight ahead of call tomorrow morning. Could we possibly do tomorrow's call at 10.30am rather than 10?

Thanks

----- Original Message -----
From: Beny Steinmetz [mailto:beny@onyx-suisse.com]
Sent: Saturday, November 03, 2012 01:39 PM
To: Brewerton, Ben; 'dag@onyxfa.com' <dag@onyxfa.com>; 'asher@bsgresources.com' <asher@bsgresources.com>
Cc: Winters, Oliver
Subject: Re: Draft formal release for Monday

Beside the few little points I mention before , here is my advice that on Asher quate,that he will say n that over 4 years of work , BSGR have inveted over 160m$ of it own money in the country and manage to create hugh value but have a greenfield discovery and develop anther rescource in a record time , (on which other compny were sitting for 10years doing nothing . It is this hugh value that gave appiatete to corapte and bad people to try and steal it away from BSGR . This will not happen ! BSGR is proud to be the pioneer of the iron business in Guinea ! "

----- Original Message -----
From: Brewerton, Ben <Ben.Brewerton@FTIConsulting.com>
To: Beny Steinmetz; 'dag@onyxfa.com' <dag@onyxfa.com>; 'asher@bsgresources.com' <asher@bsgresources.com>
Cc: Brewerton, Ben <Ben.Brewerton@FTIConsulting.com>; Winters, Oliver <Oliver.Winters@fticonsulting.com>
Sent: Sat Nov 03 12:36:58 2012
Subject: Draft formal release for Monday


All

Just to start the ball rolling while I was online, please find attached a draft statement for release via PRNewswire on Monday.

It is an edited version of the lawyer's version, with a quote included which is the punchier parts of the statement we issued this morning.

This morning's statement has been distributed and I've drawn it to people's attention and am waiting for them to review it and come back to me.

Regards

Ben




Confidentiality Notice:
This email and any attachments may be confidential and protected by legal privilege. If you are not the intended recipient, be aware that any disclosure, copying, distribution or use of the e-mail or any attachment is prohibited. If you have received this email in error, please notify us

BSGR-LCIA-0002750_0003

immediately by replying to the sender and then delete this copy and the reply from your system.
Thank you for your cooperation.

**<BSGR Announcement Regarding Simandou Project, Guinea v2 word.doc>**

BSGR-LCIA-0002750_0004

# Exhibit V

**Exhibit C-731**

**To:**    'asher@bsgresources.com'[asher@bsgresources.com]; David Barnett[david@bsgms.com]
**From:**    Beny Steinmetz
**Sent:**    Mon 09/05/2011 2:13:46 PM
**Subject:**    Re: Symposium.

Will try to sort it with Roger this evening . Leave it with me


----- Original Message -----
From: Asher Avidan <asher@bsgresources.com>
To: Beny Steinmetz; 'david@bsgms.com' <david@bsgms.com>
Sent: Mon May 09 16:04:19 2011
Subject: Fw: Symposium.

This is very bad, I will make a comment and then leave to the lawyers.... We are damaging the brand of Vale!

_____

From: ricardo.saad@vale.com <ricardo.saad@vale.com>
To: Asher Avidan
Cc: Beny Steinmetz <beny@onyx-suisse.com>; daniela.chimisso@vale.com <daniela.chimisso@vale.com>; David Barnett <david@bsgms.com>; eduardo.ledsham@vale.com <eduardo.ledsham@vale.com>
Sent: Mon May 09 14:54:05 2011
Subject: Re: Symposium.


Dear Asher,

Just let you know that we are revising the delegates list, because there was a confusion among the organizers and VBG Communication team. I will send you the revised one asap.

Regarding the communication strategy applied in both events (Liberia and Guinee) we are following a corporate approach, where it is assumed that Vale has a strong brand, so it makes more effective and powerfull the communication process. We are doing the same as Rio and BHP, where they use the corporate branding.
I understand we have talked about it some times and I assumed you have agreed with.

best regards
Ricardo Saad




Asher Avidan <asher@bsgresources.com>

09/05/2011 08:25
Para
    "ricardo.saad@vale.com" <ricardo.saad@vale.com>
cc
    Beny Steinmetz <beny@onyx-suisse.com>, "eduardo.ledsham@vale.com" <eduardo.ledsham@vale.com>, "daniela.chimisso@vale.com" <daniela.chimisso@vale.com>,

BSGR-LCIA-0002337

David Barnett <david@bsgms.com>
Assunto
    Symposium.

Dear Ricardo, Since I haven't heard anything and on the meantime we are waiting I would appreciate If you'll send me the list of the delegation to the Symposium, as was sent to the organizers.

Thanks

Asher Avidan

President BSGR

www.bsgms.com

7 Old Park Lane
London W1K 1QR
United Kingdom

-----Original Message-----
From: Asher Avidan
Sent: Sunday, May 08, 2011 6:42 PM
To: ricardo.saad@vale.com
Cc: Beny Steinmetz; 'eduardo.ledsham@vale.com'; daniela.chimisso@vale.com; 'David Barnett'
Subject: FW: IMG01851-20110410-1228.jpg
Importance: High

Ricardo.

I got another call about it just now from another official that visited the stands, and I attached the picture from Liberia Symposium and which I refuse to believe that in the beginning BSGR logo was in the boot, but your guy (Abubacar Camara) Hided it and took it off. I totally disagree to this. TOTALLY.

Asher Avidan

Dear Ricardo.

Following our discussion (you and me) and in accordance with our JV agreement- I urge you to make sure and re verify that BSGR will be mentioned and appear as much as VALE on all the domains and media. It should be on: The Logo, the signs, publicity, presentation, brochures,

Reception etc.
Since I don't want to repeat the mistakes from the last ceremony in Guinea and recently the same mistake was made in Liberia, I feel like I must remind you this issue, and especially after I heard today from the organizers of the Symposium that the "Cervice de comonication" of Vale demanded them and insisted to take out the Logo of BSGR and leave Vale only! If this will be the case it will damage and jeopardize our Lobby and efforts that we do today vis-a-vis the people of the entire Administration and especially THE PRESEDENT. I don't want to remind and mention the damage we had on experience, This time it will be crucial.  Moreover, the steering committee (pilotage) of the Symposium just phoned me to stress that only Vale is mentioned on the booth and I quote "GoG has no convention with Vale whatsoever and we are starting to make a scandal about this as it is shocking to us".

I thank you for the cooperation.
Good luck.
Asher

Asher Avidan

President BSGR

www.bsgms.com

7 Old Park Lane
London W1K 1QR
United Kingdom

This message has been scanned for malware by Viatel MailControl, a service from Viatel

# Exhibit W

**To:**      'asher@bsgresources.com'[asher@bsgresources.com]
**From:**    Beny Steinmetz
**Sent:**    Mon 09/05/2011 4:21:48 PM
**Subject:** Re: Symposium.

I think it is very good , just the legal staff in begeining should go to end , and don't speak about conseceanse . Just say again that it is against our legal agreement. That is all . Don't threathen . Most imprtant is the rest ! Also say that BSGR always acted and acts in good face and trying to make the best for VBG , and will continoue doing so !

----- Original Message -----
From: Asher Avidan <asher@bsgresources.com>
To: Beny Steinmetz
Sent: Mon May 09 18:11:28 2011
Subject: RE: Symposium.

Beny- itâ€™s strong but I think itâ€™s good. Adviseâ€¦


Ricardo- This is a very serious legal issue and  I assume you have consulted with your legal department before responding. However, although I think you are totally wrong with your legal approach, allow me to comment as a Director of VBG, and as someone who understands the inside politics of the country and the sensitivity to the our partnership.

With all due respect to the brand of Vale which I admire very much, allow me to remind you that the brand of Rio Tinto did not protect them from losing it.  GoG have never signed with Vale and Vale does not exist in Guinea as far as iron ore is concerned.

From your answer below, I understand that there is a deliberate approach from Vale Corporate to see BSGR as damaging your name and image in Guinea and Liberiaâ€¦ However, in all due respect, allow me to stress that it is the exact contrary in Guinea.  In spite of what you might think BSGR has still lots of admiration in this country. To make a long story short, take my humble advise and act according to our official agreement by putting BSGR beside Vale in order avoid tomorrow confrontations and serious questions from the Symposium audience which we will not be able to prevent or control.

 The  long term damage from the consequences of this ambiguous message risks to legitimating the message and attempt of the President to separate BSGR from VBG and all what comes with it.

Clearly this approach which have been repeated in the past, in our opinion, is damaging the project/BSGR/and VBG.


For the record, please note again that I have never agreed to subscribe to this as you implied below.


Good luck again.

Asher

BSGR-LCIA-0002338

Asher Avidan

President BSGR

www.bsgms.com <http://www.bsgms.com>

7 Old Park Lane

London W1K 1QR

United Kingdom

From: ricardo.saad@vale.com [mailto:ricardo.saad@vale.com]
Sent: Monday, May 09, 2011 2:54 PM
To: Asher Avidan
Cc: Beny Steinmetz; daniela.chimisso@vale.com; David Barnett; eduardo.ledsham@vale.com
Subject: Re: Symposium.

Dear Asher,

Just let you know that we are revising the delegates list, because there was a confusion among
the organizers and VBG Communication team. I will send you the revised one asap.

Regarding the communication strategy applied in both events (Liberia and Guinee) we are
following a corporate approach, where it is assumed that Vale has a strong brand, so it makes
more effective and powerfull the communication process. We are doing the same as Rio and
BHP, where they use the corporate branding.
I understand we have talked about it some times and I assumed you have agreed with.

best regards
Ricardo Saad

BSGR-LCIA-0002338_0002

Asher Avidan <asher@bsgresources.com>

09/05/2011 08:25

      Para

      "ricardo.saad@vale.com" <ricardo.saad@vale.com>

cc

      Beny Steinmetz <beny@onyx-suisse.com>, "eduardo.ledsham@vale.com"
<eduardo.ledsham@vale.com>, "daniela.chimisso@vale.com" <daniela.chimisso@vale.com>,
David Barnett <david@bsgms.com>

Assunto

      Symposium.

Dear Ricardo, Since I haven't heard anything and on the meantime we are waiting I would
appreciate If you'll send me the list of the delegation to the Symposium, as was sent to the
organizers.

Thanks

Asher Avidan

President BSGR

www.bsgms.com

7 Old Park Lane
London W1K 1QR
United Kingdom

-----Original Message-----
From: Asher Avidan
Sent: Sunday, May 08, 2011 6:42 PM

BSGR-LCIA-0002338_0003

To: ricardo.saad@vale.com
Cc: Beny Steinmetz; 'eduardo.ledsham@vale.com'; daniela.chimisso@vale.com; 'David Barnett'
Subject: FW: IMG01851-20110410-1228.jpg
Importance: High

Ricardo.

I got another call about it just now from another official that visited the stands, and I attached the picture from Liberia Symposium and which I refuse to believe that in the beginning BSGR logo was in the boot, but your guy (Abubacar Camara) Hided it and took it off. I totally disagree to this. TOTALLY.

Asher Avidan


Dear Ricardo.

Following our discussion (you and me) and in accordance with our JV agreement- I urge you to make sure and re verify that BSGR will be mentioned and appear as much as VALE on all the domains and media. It should be on:  The Logo, the signs, publicity, presentation, brochures, Reception etc.
Since I don't want to repeat the mistakes from the last ceremony in Guinea and recently the same mistake was made in Liberia, I feel like I must remind you this issue, and especially after I heard today from the organizers of the Symposium that the "Cervice de comonication" of Vale demanded them and insisted to take out the Logo of BSGR and leave Vale only! If this will be the case it will damage and jeopardize our Lobby and efforts that we do today vis-a-vis the people of the entire Administration and especially THE PRESEDENT. I don't want to remind and mention the damage we had on experience, This time it will be crucial.  Moreover, the steering committee (pilotage) of the Symposium just phoned me to stress that only Vale is mentioned on the booth and I quote "GoG has no convention with Vale whatsoever and we are starting to make a scandal about this as it is shocking to us".

I thank you for the cooperation.
Good luck.
Asher

Asher Avidan

President BSGR

www.bsgms.com

7 Old Park Lane
London W1K 1QR
United Kingdom

BSGR-LCIA-0002338_0004

# Exhibit X

**Exhibit C-717**

| | |
|---|---|
| **From:** | mahmoud.thiam@gmail.com |
| **Sent:** | Tuesday, May 26, 2009 9:47 AM |
| **To:** | D s2 DS2 <beny@onyx-suisse.com> |
| **Subject:** | Re: |

Yes. Very good
------Original Message------
From: D s2 DS2
To: Mahmoud Thiam 1
Subject: Re:
Sent: May 26, 2009 13:32

Have y given the Letter from PM ? Good ?

----- Original Message -----
From: mahmoud.thiam@gmail.com <mahmoud.thiam@gmail.com>
To: Beny Steinmetz
Sent: Tue May 26 05:15:50 2009

Pres wants to send me to see lybians father or son to clarify. Wants to call father tom to tell him kouyate does not talk for guinea and will never be pres in guinea
Sent from my BlackBerry● wireless device


Sent from my BlackBerry● wireless device

**CGS&H p. 1**

CONFIDENTIAL

MT014983

# Exhibit Y

**To:**      Asher Avidan[Asher.Avidan@bsgresources.gg]; Marc
Struik[Marc.Struik@bsgresources.gg]; 'Beny Steinmetz'[beny@bsg-investments.com]
**Cc:**      Patrick Saada[Patrick.Saada@bsgresources.gg]
**From:**   Beny Steinmetz
**Sent:**   Tue 18/09/2007 6:48:19 AM
**Subject:** [SPAM] Re: Aredor and bloc 1&2

Hi Asher ,
Myua dvice is to go on Aredor for the whole , both Kimberlite and alluvial as it is a must ,
otherwise we will face lots of problem in future . And we can wait a bit more time .
On additional iron or block , say 1 and 2 , I agree that we prepare a very good presanatation and
show how well we have done and doing etc as you suggested . We should NOT talk about Rio in
any written paper , as it is not our problem and goverment should do their own desicon and
otherwise it can come back to us as a bomerag !
Thanks Beny
Sent from my Blackberry

-----Original Message-----
From: "Asher Avidan" <asher@bsgresources.com>
Date: Tue, 18 Sep 2007 01:30:05
To:<marc@bsgresources.com>, "Beny Steinmetz" <beny@bsg-investments.com>
Cc:"Patrick Saada" <patrick@bsgresources.com>
Subject: Aredor and bloc 1&2

Dear all,

Here is the latest news I received today from the Minister of mines re-our request to have Aredor
and blocks 1 and 2:
First and above all we are going to have it and now it is just a matter of technical issues.
Aredor:
The minister has decided to hand it over to us, so as from tomorrow he will write a letter to the
President that will officially terminate Aredor contract.
The only problem we have with this for the time being, is that the Minister decided to give us the
permit only for the kimberlite and to let the alluvial for the artisans in the region. If we
should accept this formula it will take up to two weeks. On the other hand, if we will insist to have
the alluvial as well it might take some more time.

My personal opinion is that we have to go for the alluvial as well and like that we will prevent any
misunderstanding that we might face with the local people in the future.
 I strongly think that that's the best way to go or at least give it a try. On the other hand if we will
leave it as he proposed I am sure that we will control the products from the artisans since I know
all of the main chiefs and the key people in the area.

Blocks 1 and 2:
Since we are talking about taking them away from a huge company like Rio Tinto, they will need
to have a real argument to hand it over to us. Therefore the minister suggested that we prepare a
presentation of all the investments that we have made and all the work that we have done over
the past 12 months. Soon after this presentation, the President will take it away from Rio
Tinto who are not doing anything in those two blocks, and will hand it over to BSGR.

In the next few days I am going to meet some of the key people in the country including the Prime
minister, the Lady and maybe the President to push them forward so as to reduce some technical
and administrative problems.
I suggest that Marc should present our activities in Simandou and for that I will fix a date which I
will inform you of.
For Aredor I would like to have your opinion whether to keep it as was suggested or to insist for

the alluvial.

Best Regards,
Asher Avidan

BSGR-LCIA-0001066_0002

# Exhibit Z

**To:**      'dag@bsgms.com'[dag@bsgms.com]
**From:**    Beny Steinmetz
**Sent:**    Sun 03/10/2010 7:48:37 AM
**Subject:** FW: Guinea sets deadline for Rio's ore blocks (Reuters) / Guinea presidential runoff
may be delayed again (CNN)

Dag , try and get hold of Jon to work on it now ....

----- Original Message -----
From: Beny Steinmetz
To: 'asher@bsgresources.com' <asher@bsgresources.com>; 'Jon.Simmons@fd.com'
<Jon.Simmons@fd.com>; 'nina.mitz@fd.com' <nina.mitz@fd.com>
Cc: 'dag@bsgms.com' <dag@bsgms.com>; 'marc@bsgresources.com'
<marc@bsgresources.com>
Sent: Sun Oct 03 09:17:50 2010
Subject: Re: Guinea sets deadline for Rio's ore blocks (Reuters) / Guinea presidential runoff may
be delayed again (CNN)

Jon , it is really impossible and upsetting to see this . Pls contact Rueters and let them change
and or come with appology !! Pls today !!

Beny

----- Original Message -----
From: Asher Avidan <asher@bsgresources.com>
To: Jon.Simmons@fd.com <Jon.Simmons@fd.com>; nina.mitz@fd.com <nina.mitz@fd.com>
Cc: Beny Steinmetz; 'Dag Cramer' <dag@bsgms.com>; marc@bsgresources.com
<marc@bsgresources.com>
Sent: Sun Oct 03 09:01:47 2010
Subject: FW: Guinea sets deadline for Rio's ore blocks (Reuters) / Guinea presidential runoff may
be delayed again (CNN)

Jon– I just had enough from this disinformation and bulshit coming deliberately from Reuters and
itâ€™s not the first time.  I have the impression that someone external is on it and we sleep in our
watch.

Iâ€™m referring to this: Guinea stripped Rio of the two blocks during the rule of former President
Lansana Conte, who died in December 2008 and was replaced in a bloodless coup by a military
junta.

BSG, which is controlled by Israeli billionaire diamond trader Benny Steinmetz, won the two
blocks from the junta-led transitional government in April and sealed a deal with Brazilian mining
giant Vale (VALE5.SA <http://www.reuters.com/finance/stocks/overview?symbol=VALE5.SA> )
(VALE.N <http://www.reuters.com/finance/stocks/overview?symbol=VALE.N> ) to explore them.

We never got the blocks from the â€œ Junta- Led transitional Gov in Aprilâ€  as you know. In
fact- we had nothing from the Junta.

I think we must do all it takes to change it ASAP.

Thanks.

BSGR-LCIA-0002222

Asher

From: Galia Ben Ishay [mailto:galia@bsg-investments.com]
Sent: Sunday, October 03, 2010 7:57 AM
To: beny@bsg-investments.com; yossie@bsgresources.com; asher@bsgresources.com; 'Marc Struik'
Cc: patrick@bsgresources.com; 'Ohad Schwartz'; aviv@bsg-investments.com
Subject: Guinea sets deadline for Rio's ore blocks (Reuters) / Guinea presidential runoff may be delayed again (CNN)


Guinea sets deadline for Rio's ore blocks

REUTERS - By Saliou Samb

CONAKRY | Sat Oct 2, 2010 12:09pm EDT

CONAKRY (Reuters) Rio Tinto has until February to formally give up its rights to part of Guinea's giant Simandou iron ore concession or it will risk losing its remaining stakes, the West African state's top mining official said.

The Anglo-Australian miner (RIO.AX <http://www.reuters.com/finance/stocks/overview?symbol=RIO.AX> ) (RIO.L <http://www.reuters.com/finance/stocks/overview?symbol=RIO.L> ), which has invested $680 million in what it says is the world's largest undeveloped iron ore deposit, has been in dispute with Guinea over blocks 1 and 2, which the government gave to BSG Resources in April.

"We have asked in vain for Rio Tinto to give us written confirmation (that) they have given up half of Simandou in accordance with the mining code," Mines Minister Mahmoud Thiam told Reuters in an interview late on Friday.

"If this isn't done by February 2011, Rio risks losing the other two blocks under its control and could definitively lose its rights to the zone," he said.

A Rio spokesman declined to comment specifically on the two blocks but said, "We continue to engage with the Guinean government on a range of matters and are committed to developing the project and realizing the benefits for the people of Guinea."

Rio in June said it retained "full rights" to the entire Simandou concession. It signed a $1.35 billion deal with Aluminum Corp of China, known as Chinalco, in July for development of the Simandou deposit.

Guinea stripped Rio of the two blocks during the rule of former President Lansana Conte, who died in December 2008 and was replaced in a bloodless coup by a military junta.

BSG, which is controlled by Israeli billionaire diamond trader Benny Steinmetz, won the two blocks from the junta-led transitional government in April and sealed a deal with Brazilian mining giant Vale (VALE5.SA <http://www.reuters.com/finance/stocks/overview?symbol=VALE5.SA> ) (VALE.N <http://www.reuters.com/finance/stocks/overview?symbol=VALE.N> ) to explore them.

BSGR-LCIA-0002222_0002

CONTRACT SECURITY

Guinea is in the midst of elections, which are meant to return the former French colony to civilian rule, and the country's two presidential front-runners have both said they will review mining deals signed during the transition.

Analysts have said, however, they do not expect either candidate to take an aggressive approach, given Guinea's reliance on mining for revenues and infrastructure projects.

"It will be very difficult for a future government to unilaterally cancel the mining deals that we have passed during the transition period," Thiam said.

He said all of the deals were in accordance with the country's mining laws, guaranteed swift development of resources and provided key infrastructure.

Guinea has yet to set a date for a run-off election between former Prime Minister Cellou Dallein Diallo and veteran opposition leader Alpha Conde amid political infighting over poll preparations.

Thiam also said a deal signed with U.S. oil firm Hyperdynamics (HDY.A <http://www.reuters.com/finance/stocks/overview?symbol=HDY.A> ) in March giving the company rights to develop 24,000 square kilometers offshore was unlikely to be overturned by the next government regardless of who wins, because it had preserved 70 percent of the exploration zone for Guinea instead of 66 percent before the accord.

He said international oil firms, including Malaysia's Petronas (PETR.KL <http://www.reuters.com/finance/stocks/overview?symbol=PETR.KL> ), and Ivory Coast's Petroci had expressed interest in exploring for oil off the coast of Guinea in the remaining area.

He added that UK-listed miner Bellzone's (BZM.L <http://www.reuters.com/finance/stocks/overview?symbol=BZM.L> ) iron ore mine and railway spur project connecting the Kalia mine site and the deepwater port of Matakan would probably cost $5 billion. Bellzone has said the China Investment Fund will help fund the project.

(Writing and additional reporting by Richard Valdmanis, editing by Jane Baird)

http://www.reuters.com/article/idUSTRE69113F20101002
<http://www.reuters.com/article/idUSTRE69113F20101002>

- - - - - - - - - - - - - - - -

Guinea presidential runoff may be delayed again

CNN - From Joe Penny

October 3, 2010 -- Updated 0224 GMT (1024 HKT)

Conakry, Guinea (CNN) -- Miscommunication, technical issues and a big soccer game mean the proposed date for Guinea's runoff presidential election is no longer viable, the electoral commission said.

"The October 10th date is no longer feasible," Thierno Seydou Bayo, spokesperson for Guinea's National Independent Electoral Commission (CENI) said regarding a second-round presidential poll between two candidates, Cellou Dalein Diallo and Alpha Conde, which was originally scheduled for September 19 but delayed because of election violence.

Bayo indicated the runoff in the West African nation may occur later this month.

The news Friday came more than one week after CENI submitted the October 10 date to the president's secretary for verification, according to Bayo.

Military junta leader Gen. Sekouba Konate, who serves as president, said Wednesday on state TV that he never received the date proposal.

Konate said he was creating a committee to ensure the election process would take place in a timely manner.

Meanwhile, Diallo <http://topics.edition.cnn.com/topics/Cellou_Dalein_Diallo> 's party has accused CENI chief Louseny Camara of being an Alpha Conde activist and threatened to boycott elections if he remained head of the commission. Camara has denied the allegations.

In a public communique on state TV Wednesday, the National Transitional Council, a governmental consulting body, recommended Camara's immediate dismissal.

The electoral commission crisis and miscommunication with the president is compounded by technical difficulties holding the election back, such as the posting of voter lists outside polling stations and the shipment of new alphanumeric voting cards.

"The cards were printed in South Africa. We received most of them but not all, so we made another order," Bayo said.

Analysts are worried that a drawn-out election process could bring violence or an army takeover.

One person was killed and some 50 injured in street clashes in the nation's capital between supporters of Diallo and Conde <http://topics.edition.cnn.com/topics/Alpha_Conde> in September.

Konate told the French public radio station RFI in an interview this week that "if the two candidates cannot get along, I will make my rounds and if necessary I will install a civilian as head of state by force."

"The risk of the army taking over if things go wrong is real," Said Djinnit, the U.N.'s top officer for West Africa, told Reuters recently.

In addition, Bayo noted that the even if all the voting materials were ready, the national soccer team is scheduled to play Nigeria at home on October 10. An election on that date would curtail turnout, he said.

Diallo won nearly 44 percent of the first ballot in June, far outpacing Conde, who finished second, according to official returns.

http://edition.cnn.com/2010/WORLD/africa/10/02/guinea.runoff/
<http://edition.cnn.com/2010/WORLD/africa/10/02/guinea.runoff/>

BSGR-LCIA-0002222_0004

# Exhibit AA

Message

| From: | Advisor [advisor@onyxfa.com] |
|---|---|
| Sent: | 05/04/2013 11:41:40 |
| To: | Daniel Pollak [/O=BSG RESOURCES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL.POLLAK] |
| Subject: | Re: Draft |

Hi Daniel , you have send me the below which have nothing to do with me ? , I guess it is the suggestion of J Viel off on have it as part of BSGR response to the so called CT ,which I think make sense . Anyway I can't help or advice on it and leave this entirely to our lawyers . I met that only once in my life for 5 min as she was present in the room , but we haven't spoken etc , so I have noob in or knowledge of her .
Best Beny

Sent from my iPad

On 5 Apr 2013, at 12:41, "Daniel Pollak" <daniel@bsgresources.com> wrote:ity

STRICTLY CONFIDENTIAL

AFFIDAVIT

My name is Mamady Touré. I am a Guinean citizen.  I have spent most of my life in Guinea, and I am currently living in the United States.

Some representatives of the company BSGR came to see me and indicated to me that the Republic of Guinea was accusing them of acts in which I was allegedly involved. They explained to me what those acts were, and they asked me if I agreed to say what I thought about them. I agreed because what they reported to me is false, and today I wish to attest to the following.

My family situation

I am the half-sister of Mr. Ibrahim Touré, and not his sister. We have never been very close, but rather have been rivals.

I was never married to President Conté, who is now deceased. It seems that it is being said that I was his fourth wife. That is false.

My relationship with the BSGR company

It seems that it is being said that I allegedly signed some agreements with BSGR and that BSGR was to pay me fees in exchange for my services for their benefit.

That is false. I have never signed any agreements with BSGR, either directly, or through anyone whatsoever.

It appears that it is being said that I allegedly interceded with official leaders of Guinea for the benefit of BSGR so that BSGR could obtain mining rights in Guinea.

That is false. I have never intervened with Guinean leaders for the benefit of BSGR. I have never given instructions or asked anyone to make decisions in favor of BSGR. I have never had an interest in the country's mining business.

It appears that it is being said that BSGR allegedly paid me some money. That is false. I have never received money from BSGR either directly or indirectly. There has been talk about a USD 7 million check that they allegedly delivered to me. That never happened. It is said that they allegedly delivered money to me in cash, some sums of USD 2.5 million and USD 150,000. That is false.  They have never paid me those sums, nor, furthermore, any sum, either to me, directly, or to anyone else on my behalf. Nor have they promised to pay anything either to me or to anyone whomsoever on my behalf.

Finally, I would like to say that it is ridiculous that I allegedly moved to the United States because I was allegedly afraid that BSGR would harm me physically. That idea has never entered my mind.

I am very shocked by the facts that BSGR has set forth to me. My name is being used, and I have nothing to do with this company or with the acts of which they are being accused.

In          ,
On          April  2013

Sent from my BlackBerry® wireless device

Advisor



The contents of this e-mail are confidential to the recipient named above. If you are not a named recipient please notify the sender and ensure that this e-mail is deleted and not read or copied or disclosed to anyone else. ONYX Financial Advisors (UK) Limited is registered in England and Wales. Registered address 7 Old Park Lane, London W1K 1QR, UK.    Registered No: 05459227.

Before printing, please think about the environment

Message

| | |
|---|---|
| **From:** | Advisor [advisor@onyxfa.com] |
| **Sent:** | 05/04/2013 11:41:40 |
| **To:** | Daniel Pollak [/O=BSG RESOURCES/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=DANIEL.POLLAK] |
| **Subject:** | Re: Draft |

Hi Daniel , you have send me the below which have nothing to do with me ? , I guess it is the suggestion of J Viel off on have it as part of BSGR response to the so called CT ,which I think make sense . Anyway I can't help or advice on it and leave this entirely to our lawyers . I met that only once in my life for 5 min as she was present in the room , but we haven't spoken etc , so I have noob in or knowledge of her .
Best Beny

Sent from my iPad

On 5 Apr 2013, at 12:41, "Daniel Pollak" <daniel@bsgresources.com> wrote:ity

STRICTLY CONFIDENTIAL


ATTESTATION

Je m'appelle Mamady Touré.  Je suis de nationalité guinéenne, j'ai vécu la plus grande partie de ma vie en Guinée et j'habite aujourd'hui aux Etats-Unis.

Des représentants de la société BSGR sont venus me voir et m'ont indiqué que la République de Guinée leur reprochait des faits dans lesquels j'aurais été impliquée.  Ils m'ont exposé quels étaient ces faits et m'ont demandé si j'étais d'accord pour dire ce que j'en pensais.  J'ai été d'accord parce que ce qu'ils m'ont rapporté est faux et je souhaite aujourd'hui attester ce qui suit.


Ma situation familiale

Je suis la demi-sœur de M. Ibrahim Touré, et non sa sœur.  Nous n'avons jamais été très proches mais plutôt des rivaux.

Je n'ai jamais été marié avec le Président Conté aujourd'hui décédé.  Il paraît qu'on dit que j'ai été sa quatrième épouse, c'est faux.

Mes relations avec la société BSGR

Il paraît qu'on dit que j'aurais signé des contrats avec BSGR et que BSGR devait me payer des commissions en contrepartie de mes services en leur faveur.

C'est faux.  Je n'ai jamais signé aucun contrat avec BSGR ni directement, ni par l'intermédiaire de qui que ce soit.

Il paraît qu'on dit que j'aurais intercédé auprès de dirigeants officiels de Guinée en faveur de BSGR pour que BSGR obtienne des droits miniers en Guinée.

C'est faux.  Je ne suis jamais intervenue auprès de dirigeants guinéens en faveur de BSGR.  Je n'ai jamais donné d'instructions ni demandé à quiconque de prendre des décisions en faveur de BSGR.  Je ne me suis jamais intéressée aux affaires minières du pays.

Il paraît qu'on dit que BSGR m'aurait versé de l'argent.  C'est faux.  Je n'ai jamais touché d'argent de la part de BSGR ni directement, ni indirectement.  On parle d'un chèque de 7 ou 10 millions USD qu'ils m'auraient remis.  Ca ne s'est jamais passé.  On dit qu'ils m'auraient remis de l'argent en liquide, des sommes de 2,5 millions USD et 150.000 USD.  C'est faux, ils ne m'ont jamais versé ces sommes ni d'ailleurs aucune somme, ni à moi ni directement, ni à quelqu'un d'autre pour mon compte.  Ils ne m'ont pas non plus promis de me verser quoi que ce soit, ni à moi, ni à qui que ce soit pour mon compte.

Enfin, je voudrais dire que c'est ridicule de dire que j'aurais déménagé aux Etats-Unis parce que j'aurais eu peur que BSGR porte atteinte à ma personne.  Cette idée ne m'est pas passée par la tête.

**CGS&H p. 3**

BSGR_LCIA_0019854

Je suis très choquée par les faits que m'a exposés BSGR.  On utilise mon nom, je n'ai rien à voir avec cette société ni avec les faits qu'on leur reproche.


Fait à  ,
Le        avril 2013

Sent from my BlackBerry® wireless device


Advisor



The contents of this e-mail are confidential to the recipient named above. If you are not a named recipient please notify the sender and ensure that this e-mail is deleted and not read or copied or disclosed to anyone else. ONYX Financial Advisors (UK) Limited is registered in England and Wales. Registered address 7 Old Park Lane, London W1K 1QR, UK.   Registered No: 05459227.

Before printing, please think about the environment

**CGS&H p. 4**

BSGR_LCIA_0019855

# Exhibit BB



# Guernsey Registry

**Guernsey Registry**

Market Building
PO Box 451, Fountain Street
St. Peter Port, Guernsey,
GY1 3GX

Tel: +44 1481 743800
Fax: +44 1481 743801
Email: enquiries@guernseyregistry.com

www.guernseyregistry.com

# Statement of the Register

## BSG RESOURCES LIMITED

### ENTITY DETAILS

| | | | | | |
|---|---|---|---|---|---|
| **Registered Number:** | 46565 | **Registered Date** | 09-Mar-2007 | **Status** | Normal |
| Registered Name | BSG RESOURCES LIMITED | | | **Effective Date** | 09-Mar-2007 |
| **Alternative Name** | N/A | | | | |
| **Registered Address** | West Wing<br>Frances House<br>Sir William Place<br>St Peter Port<br>Guernsey<br>GY1 1GX | | | **Effective Date** | 02-Jul-2007 |
| **Entity Type** | Non Cellular Company | | | **Liability Type** | Limited by Shares |
| **Economic Activity** | Asset, property, investment, intellectual property and other holding companies | | | | |

I hereby certify that the attached statement of the register for BSG RESOURCES LIMITED, registration number 46565 provides a full extract of all publicly available information presently held on the electronic Register maintained at the Guernsey Registry.

Damon Hackley
Registrar
Monday, February 26, 2018

*Cutting edge technology with heritage integrity*

**Effective Date**        **Previous Name**

Please note: in some cases the director appointment dates may reflect the company re-registration date (after 1 July 2008-the date on which the new Companies Law came into force) rather than the actual appointment date of the director.

| Start Date | End Date | Director Type | Name | Service Address |
|---|---|---|---|---|
| 28-Nov-2008 | 18-Oct-2013 | Director | Kevin  McAuliffe | |
| 28-Nov-2008 | 14-Apr-2014 | Director | David Michael Clark | |
| 28-Nov-2008 | | Director | Dag Lars Cramer | West Wing Frances House Sir William Place  St Peter Port Guernsey GY1 1GX |
| 28-Nov-2008 | 31-Jan-2016 | Director | Sandra  Merloni-Horemans | |
| 28-Nov-2008 | 18-Mar-2010 | Director | David  Granot | |
| 28-Nov-2008 | 31-May-2012 | Director | Stephen Douglas Oke | |
| 01-Jun-2013 | 28-Feb-2015 | Director | David Jeremy Mallory Trafford | |
| 14-Apr-2014 | | Director | Peter Harold Driver | West Wing Frances House Sir William Place  St Peter Port Guernsey GY1 1GX |
| 01-May-2016 | | Director | Gustaf Fredrik Bodin | Norra Fiskartorpsvägen 98    Stockholm SWEDEN SE - 115 41 |

| Start Date | End Date | Agent Type | Name | Service Address |
|---|---|---|---|---|
| 28-Nov-2008 | 14-Apr-2014 | Resident Agent | David Michael Clark | |
| 14-Apr-2014 | | Resident Agent | Peter Harold Driver | |

Please note: not all documents that were filed with the Registry before 1 July 2008 will show on the electronic record.

| Ref | Received | Status | Submission / Document Type | Registered | Scanned Pages |
|---|---|---|---|---|---|
| DM652004 | 07-Jan-2008 | Registered | Annual Return/Annual Return | 07-Jan-2008 | 2 |
| DM9773 | 10-Jul-2007 | Registered | Allotments/Allotments | 10-Jul-2007 | 1 |
| 148978 | 08-Jan-2009 | Registered | AV Non Regulated Companies/Annual Validation Form | 08-Jan-2009 | 5 |
| 184132 | 26-Mar-2007 | Registered | Migration In/Migration Documents | 26-Mar-2007 | 49 |
| 184132 | 26-Mar-2007 | Registered | Migration In/Memorandum of Association | 26-Mar-2007 | 16 |
| 184132 | 26-Mar-2007 | Registered | Migration In/Articles of Association | 26-Mar-2007 | 30 |

*cutting edge technology with leading integrity*

JA000032

| 246567 | 04-Jan-2010 | Registered | AV Non Regulated Companies/Annual Validation Form | 04-Jan-2010 | 5 |
| 257741 | 19-Jan-2010 | Registered | Res - Audit Exempt - Annual/Resolution Form | 19-Jan-2010 | 2 |
| 257741 | 19-Jan-2010 | Registered | Res - Audit Exempt - Annual/Resolution Attachment | 19-Jan-2010 | 1 |
| 257747 | 19-Jan-2010 | Registered | Res - Audit Exempt - Annual/Resolution Form | 19-Jan-2010 | 2 |
| 257747 | 19-Jan-2010 | Registered | Res - Audit Exempt - Annual/Resolution Attachment | 19-Jan-2010 | 1 |
| 257781 | 19-Jan-2010 | Registered | AV Amendment/AV Amendment | 19-Jan-2010 | 5 |
| 276078 | 18-Mar-2010 | Registered | Change Director/Change of Director Form | 18-Mar-2010 | 2 |
| 277356 | 01-Apr-2010 | Registered | Res - Alter Articles/Resolution Form | 01-Apr-2010 | 2 |
| 277356 | 01-Apr-2010 | Registered | Res - Alter Articles/Resolution Attachment | 01-Apr-2010 | 21 |
| 319467 | 04-Jan-2011 | Registered | AV Non Regulated Companies/Annual Validation Form | 04-Jan-2011 | 5 |
| 384872 | 03-Jan-2012 | Registered | AV Non Regulated Companies/Annual Validation Form | 03-Jan-2012 | 5 |
| 421000 | 31-May-2012 | Registered | Change Director/Change of Director Form | 31-May-2012 | 2 |
| 446903 | 02-Jan-2013 | Registered | AV Non Regulated Companies/Annual Validation Form | 02-Jan-2013 | 4 |
| 482160 | 06-Jun-2013 | Registered | Change Director/Change of Director Form | 06-Jun-2013 | 2 |
| 493553 | 18-Oct-2013 | Registered | Change Director/Change of Director Form | 18-Oct-2013 | 2 |
| 504432 | 02-Jan-2014 | Registered | AV Non Regulated Companies/Annual Validation Form | 02-Jan-2014 | 4 |
| 535098 | 14-Apr-2014 | Registered | Change Director/Change of Director Form | 14-Apr-2014 | 2 |
| 561058 | 08-Jan-2015 | Registered | AV Non Regulated Companies/Annual Validation Form | 08-Jan-2015 | 4 |
| 584086 | 05-Mar-2015 | Registered | Change Director/Change of Director Form | 05-Mar-2015 | 2 |
| 586929 | 02-Jul-2007 | Registered | Change Address/Change of Reg Office Address Form | 02-Jul-2007 | 1 |
| 606652 | 05-Oct-2015 | Registered | Res - Audit Exempt - Indefinite/Resolution Form | 05-Oct-2015 | 2 |
| 606652 | 05-Oct-2015 | Registered | Res - Audit Exempt - Indefinite/Resolution Attachment | 05-Oct-2015 | 1 |
| 624270 | 15-Jan-2016 | Registered | AV Non Regulated Companies/Annual Validation Form | 15-Jan-2016 | 4 |
| 633948 | 28-Jan-2016 | Registered | Change Director/Change of Director Form | 28-Jan-2016 | 2 |
| 645371 | 03-May-2016 | Registered | Change Director/Change of Director Form | 03-May-2016 | 2 |
| 671715 | 10-Jan-2017 | Registered | AV Non Regulated Companies/Annual Validation Form | 10-Jan-2017 | 4 |

*cutting edge technology with Leisure integrity*

14

| 726613 | 16-Jan-2018 | Registered | AV Non Regulated Companies/Annual Validation Form | 16-Jan-2018 | 4 |

## DISCLAIMER

This 'Statement of The Register' reflects the information held on the Register at the date and time of production of the Statement. It should be noted that legislation governing registered entities requires certain actions and events to be notified, and in some cases certain documents to be delivered, to the Registry within prescribed time frames. It is possible that actions or events affecting the information provided in this Statement have taken place that have not yet been notified to, or in the case of paper submissions processed by the Registry. This "Statement of The Register" therefore only reflects actions and events of which the Registry has been notified in the appropriate form, and in the case of paper submissions those which have been processed, at the date and time of production of this Statement.

*cutting edge technology with historic integrity*

15

JA000034

# Exhibit CC

This document is provided for information purposes only by QUBC and should not be copied, reproduced, published or distributed.

**Bloomberg**                                                                                    News Story

03/07/2018   16:53:20 [BN] Bloomberg News

## Beny Steinmetz Puts Mining **Company BSGR Into Administration (1)**

- BSGR fighting multiple legal battles over Guinea iron deposit
- U.S., Israeli prosecutors said rights were obtained corruptly

By Thomas Biesheuvel

(Bloomberg) –– Billionaire Beny Steinmetz's mining company put itself into administration as it fights legal battles on multiple fronts over the disputed rights to one of the world's biggest untapped iron ore deposits.

"We're not in liquidation, no one is forcing this upon us," Dag Cramer, a director of BSGR, said by phone. "This is drawing up the drawbridge, filling up the moat, putting some sharks in the moat, to make sure we can stay the distance on both the arbitration and litigation that we have, even if there are adverse awards or developments that would normally prevent us from doing this."

BSG Resources Ltd. is seeking compensation at the World Bank arbitration tribunal in Paris after Guinea stripped it of a license to mine half the giant Simandou deposit in 2014. The company also is suing George Soros, claiming the billionaire cost it $10 billion through a defamation campaign that caused it to lose the rights.

Brazil's Vale SA filed its claim at the private arbitration court after Guinea stripped its joint venture with BSGR of its rights to Simandou following a government probe that found licenses were obtained through corruption. Vale is seeking the award to cover an upfront payment to BSGR and money it invested in the West African nation. BSGR has previously said it's confident it will prevail in the dispute.

### Steinmetz Probe

At the same time, Steinmetz is being probed by Israeli prosecutors, who accuse BSGR of paying millions of dollars in bribes to Guinean officials to secure the rights. He was detained in 2016 and released on bail and his travel was restricted, before those restrictions were lifted last year. He has also faced a U.S. investigation. Steinmetz has denied any wrongdoing.

BDO LLP was appointed as administrator yesterday by the Royal Court of Guernsey, where BSGR is registered. Cramer said this will not impact the trading of any of its subsidiary businesses, including the Koidu diamond mine in Sierra Leone.

"We're putting ourselves in the hands of professionals who will protect us during the remainder of the race," he said.

(Updates with arbitration details in fourth paragraph.)

Related ticker:
3600258Z IA (BSG Resources Ltd)

To contact the reporter on this story:
Thomas Biesheuvel in London at tbiesheuvel@bloomberg.net

This report may not be modified or altered in any way. The BLOOMBERG PROFESSIONAL service and BLOOMBERG Data are owned and distributed locally by Bloomberg Finance LP ("BFLP") and its subsidiaries in all jurisdictions other than Argentina, Bermuda, China, India, Japan and Korea (the "BFLP Countries"). BFLP is a wholly-owned subsidiary of Bloomberg LP ("BLP"). BLP provides BFLP with all the global marketing and operational support and service for the Services and distributes the Services either directly or through a non-BFLP subsidiary in the BLP Countries. BFLP, BLP and their affiliates do not provide investment advice, and nothing herein shall constitute an offer of financial instruments by BFLP, BLP or their affiliates.

# Bloomberg

This document is intended for and provided to OUBC. UBC may not redistribute this content or make it available to a "Third Party" without Bloomberg's prior written consent. Users are solely responsible for determining appropriate distribution.

To contact the editors responsible for this story:
Lynn Thomasson at lthomasson@bloomberg.net
Nicholas Larkin, Alex Devine

This report may not be modified or altered in any way. The BLOOMBERG PROFESSIONAL service and BLOOMBERG Data are owned and distributed locally by Bloomberg Finance LP ("BFLP") and its subsidiaries in all jurisdictions other than Argentina, Bermuda, China, India, Japan and Korea (the "BFLP Countries"). BFLP is a wholly-owned subsidiary of Bloomberg LP ("BLP"). BLP provides BFLP with all the global marketing and operational support and service for the Services and distributes the Services either directly or through a non-BFLP subsidiary in the BLP Countries. BFLP, BLP and their affiliates do not provide investment advice, and nothing herein shall constitute an offer of financial instruments by BFLP, BLP or their affiliates.

# Exhibit DD





BUSINESS NEWS

MARCH 8, 2018 / 12:57 PM / A YEAR AGO

# Administrators seek to return Steinmetz's mining firm BSGR to solvency



LONDON (Reuters) - Administrators for BSG Resources (BSGR) said on Thursday they would work to return the mining firm to solvency and pay creditors in full after it voluntarily entered administration to protect it from legal disputes related to a project in Guinea.

BSGR, the mining arm of billionaire Beny Steinmetz's businesses, is caught up in a row linked to Guinea's vast Simandou iron ore reserves. BSGR and Steinmetz deny any wrongdoing in the dispute.

BSGR is also suing financier George Soros for $10 billion (7.24 billion pounds) in damages over lost contracts. Soros has sought to have the lawsuit dismissed. A judge put the case on hold in November.

BSGR Director Dag Cramer told Reuters on Wednesday that going into administration was to protect the company against "any adverse or malicious development out of our control."

"It's very, very simple. This is not a liquidation. This is not a bankruptcy. We have voluntarily put ourselves into administration," he said.

Cramer said he would stay on as director and the technical procedure would not affect daily operations of subsidiaries or the firm's determination to "go the distance" with arbitration over Guinea.

Accountancy and business advisory firm BDO said in a statement emailed on Thursday that its representatives in London and in Guernsey had been appointed by a court as joint administrators on March 6.

"Our primary objective is to return BSGR to solvency and to ensure that all creditors will be paid in full," BDO said.

"If the company can be returned to solvency and continue as a going cor administration will end and the company will revert to the control of its directors," it added.

BSGR is a private firm registered in Guernsey whose subsidiaries include the Koidu diamond mine in Sierra Leone.

A BSGR spokesman told Reuters that Steinmetz did not sit on BSGR's board or have an executive role, but "is the beneficiary of the foundation that owns BSG Resources".

As part of international efforts to improve transparency, Guinea's government under President Alpha Conde, elected in 2010, launched a review of mining contracts signed before 2011.

Within its review the West African nation investigated how BSGR obtained rights to the Simandou deposit, the world's largest untapped iron ore reserves, in 2008.

Anglo-Australian mining group Rio Tinto (RIO.AX) (RIO.L) and BSGR have made legal claims against each other over the mining rights in Simandou.

Reporting by Barbara Lewis; Editing by Alexander Smith and Edmund Blair

*Our Standards:*     *The Thomson Reuters Trust Principles.*

MORE   FROM   REUTERS

# Exhibit EE

Witness Statement of Sandra Merloni-Horemans

# IN THE MATTER OF AN ARBITRATION UNDER THE ARBITRATION RULES OF THE LONDON INTERNATIONAL COURT OF ARBITRATION

## CASE NO 142683

## BETWEEN

## VALE S.A.

## (Claimant)

## and

## BSG RESOURCES LIMITED

## (Respondent)

---

## Witness Statement

## SANDRA MERLONI-HOREMANS

---

I, **SANDRA MERLONI-HOREMANS,** will state as follows:

## A. INTRODUCTION

1.      I am a Belgian citizen. My native language is Dutch and I also speak French, English and Italian.

2.      I make this statement in relation to the claim by Vale SA ("Vale") against BSG Resources Limited ("BSGR"). Save where I indicate otherwise, the facts and matters set out in this statement are based on my own knowledge and recollection.

1

Witness Statement of Sandra Merloni-Horemans

3.      This witness statement has been prepared with the assistance of BSGR's lawyers, Mishcon de Reya. I have refreshed my memory by looking at correspondence and other documents from the relevant time. I have also reviewed Vale's Request for Arbitration and Statement of Claim, along with the accompanying documents and witness statements.

## B. PERSONAL BACKGROUND

4.      I started my career in 1989 as an administrative and trading assistant to the rough diamond trading division at R. Steinmetz & Sons NV in Antwerp (Belgium). In 1994 I resigned from R. Steinmetz & Sons NV and moved to Onyx B.V.B.A. (Belgium), where I worked as a senior management assistant between 1994 and 1998.

5.      From 1998 to December 2014 I worked as Director and Head of Administration of Onyx Financial Advisors S.A. in Geneva and Onyx Financial Advisors Ltd, B.V.I. including its subsidiaries in the United Kingdom, the Netherlands, Italy and South Africa (**"Onyx"**).

6.      While working for Onyx, I was responsible for the administration of the Onyx Financial Advisors S.A. team based in Geneva. This involved keeping the clients' corporate back up office and maintaining the clients' corporate files, constitutional documents, minutes books and legal files. I also acted as director, proxy holder or company secretary to boards of directors of clients' companies if and where required. I provided clients with advice as to fiscal optimization of international holding and trading structures for both private and corporate clients. I also assisted the clients' M&A teams and front offices for transactions related to diamonds, mining & metals, natural resources, energy, real estate and capital markets.

7.      When working at Onyx, I reported to Dag Cramer, but in relation to the day to day matters I operated mostly independently. I only contacted him to discuss the bigger strategic points when I felt that it was necessary to do so.

8.      Throughout the time period relevant to these proceedings, 2005 to 2013, I refer the Tribunal to the structure chart of the Onyx group detailing the Onyx group of companies which is correct as at 31 December 2014.[1] One of Onyx's main clients was the BSG group of companies. Onyx Financial Advisors Limited BVI was under contract to the Balda Foundation, which ultimately holds the BSG group of companies. Onyx provided management, corporate, administrative and financial services to the foundation and the underlying companies. As pointed out above, my main responsibility in Geneva was to keep the corporate back office of the BSG group of companies and other clients' companies. As

---

[1] Onyx Group Structure Chart dated 31 December 2014 (Exhibit R-240).

# Exhibit FF

# BuzzFeed News

**REPORTING TO YOU**

WORLD

# The Panama Papers May Help Unravel The Corruption "Deal Of The Century"

Anti-corruption investigators who have spent years probing a deal between an Israeli diamond dealer and the West African country of Guinea hope the Panama Papers will shed light on one of the most lucrative mining contracts in Africa's history.



**Monica Mark**
BuzzFeed News World Correspondent

Last updated on April 7, 2016, at 2:37 p.m. ET
Posted on April 6, 2016, at 10:08 p.m. ET



A woman walks past a diamond mining company owned by Israeli diamond magnate Beny Steinmetz in Sierra Leone
*Issouf Sanogo / AFP / Getty Images*

When Israeli tycoon Beny Steinmetz signed a deal for
a 50% stake in one of the world's richest mineral
deposits, he expected it would rake in the kind of
money that had propelled him to the top of global rich
lists. As a prolific buyer of De Beers' diamonds, and a
supplier to the likes of Tiffany & Co., Steinmetz was
used to maneuvering the murky world of mining. The
Simandou mine, filled with iron ore and located in a
remote forest in West Africa's Guinea, was supposed
to be no different.

But Steinmetz's investment, made in 2008, sucked
him into a scandal of staggering proportions. The first
cracks appeared when a new government came to
power in 2010 and began investigating mining
contracts. Since then, there have been raids on offices
linked to the billionaire in Switzerland, alleged
associates nabbed by FBI stings, purported allies
turned informants, and a lengthy and bitter public
battle with the current government of Guinea, where
an independent inquiry concluded that he acquired
the stake through corruption under former dictator
Lansana Conté. Steinmetz's company, BSG Resources
Ltd. (BSGR), denies paying any bribes and all other
charges against them.

The scandal has gone on for years now as investigators build their case, attempting to show that BSGR used a shell company to bribe the wife of the country's former dictator in exchange for their stake in a mine valued at $4 billion — for which they paid nothing. That Mamadie Touré took bribes isn't in question. But there was always one piece missing — how do you go about proving the bribes came from BGSR? Now that may be about to change.

On Sunday, journalists around the world, coordinated by the International Consortium of Investigative Journalists (ICIJ), began publishing information from one of the top offshore law firms in the world, Mossack Fonseca. Within the documents, called the Panama Papers, is an email that may hand transparency campaigners their evidence.

"BSG uses off shore companies and structures as part of its legitimate and fiscally responsible tax planning," a spokesman for the company, which goes by both BSG and BSGR, wrote to BuzzFeed News by email in response to questions about information within the Panama Papers. "When relevant disclosure of these arrangements is required by law or regulators it is given. There has been no wrongdoing by BSG."

An independent inquiry in Guinea — later accepted by the government — did not think the same. It concluded in 2014 that BSGR acquired its mining

permits through "corrupt practices," and stripped the company of them.

The mining sector is one of the worst afflicted by corruption, but nailing it has been notoriously difficult. It has been estimated that Africa loses at least $50 billion annually — though some estimates put it three times as high — through illicit outflows that are then stashed in tax havens like Panama. Anti-corruption and pro-transparency organizations like Global Witness now hope that the information in the Panama Papers — including names linked to Steinmetz — may expose the corrupt practices underpinning what has come to be known as "the deal of the century."

The confidential documents from Mossack Fonseca, which were leaked to German newspaper *Suddeutsche Zeitung* and shared with the ICIJ and more than 100 news organizations worldwide, names at least 18 Africans so far. Almost all of them are linked to the continent's vast natural wealth industry, which routinely enriches African elites while doing little to improve the lives of most citizens. Journalists have so far examined only a fraction of the 11 million documents that were leaked.



**Guinean President Alpha Condé**
*Remy De La Mauviniere | AP*

On the surface, Steinmetz's investments in Guinea, a country that consistently languishes at the bottom of global poverty indexes, appeared straightforward enough. Buried beneath the Simandou mine, in the country's hilly interior, were thousands of tons of iron ore needed to fuel a global construction boom. In 2008, government officials accused the mine's operator, British-Australian mining giant Rio Tinto, of deliberately leaving it fallow for over a decade, mainly to block competitors from acquiring it while they themselves concentrated on other mines. The government stripped Rio Tinto of ownership in 2008 and handed half of the mine's four concessions to Steinmetz's company, BSGR.

The dramatic change in ownership was pushed through just a few days before former dictator

Lansana Conté died at age 74 in December 2008. BSGR
didn't actually pay for the mine, but instead pledged
to invest $165 million into exploring and upgrading it.
Two years later, they sold 51% of their stake to
another company — this time for $2.5 billion.

Put another way, BSGR netted a profit of some $2.2
billion — then worth twice the entire GDP of Guinea
— in return for investing just $165 million. That
prompted Mo Ibrahim, the Sudanese billionaire whose
foundation promotes good governance in Africa, to
ask whether "the Guineans who did that deal" were
"idiots, or criminals, or both."

Investigators from Global Witness believe BSGR's
backdoor entrance to the deal was Touré, Conté's
fourth wife. She has told investigators she was offered
millions in bribes by a representative of BSGR in
exchange for guaranteeing they got the concessions.

Alpha Condé, who was elected president in 2010,
vowed to crack down on corruption in the mining
sector upon coming to power, and looked into the deal
as part of that pledge. Using evidence from the
Guinean government's report, the FBI and
Department of Justice began their own probes into
whether the Foreign Corrupt Practices Act had been
violated. FBI agents had Touré, the former dictator's
wife, wear a wire and tape a conversation in which a
BSGR representative, a French citizen named Frederic

Cilins, offered her millions of dollars to destroy
potentially incriminating documents. When agents
later swooped in on Touré's Florida property, where
she was then living, they seized $1 million worth in
assets, including properties and restaurant equipment
they claimed were connected with the alleged bribes.
Cilins was jailed for two years on charges of
obstructing an anti-corruption investigation.

From there, though, the trail became too tangled to
trace. Transcripts from the wiretaps, released by the
Guinean investigations team, include a conversation
in which Cilins tells Touré to destroy apparently
corrupt contracts "urgently" — instructions he says
come directly from Steinmetz. The Guinean probe had
found checks and contracts purportedly exchanged
between the two, which it said were evidence of the
bribes.

BSGR has argued in court that Cilins was not a formal
employee at the time and therefore his actions were
independent of the company, and said the evidence
from the Guinean probe is "fabricated," Global
Witness campaigners said. Steinmetz is also suing the
company for their reports.

"Investigators are trying to prove that BSGR bribed its
way to getting Simandou and for that they need
access to the offshore documents," Daniel Balint-
Kurti, a Global Witness researcher, told BuzzFeed

News. "One of the important things the Panama Papers is doing is revealing the ownership of secret companies like Onyx and Pentler, which were shrouded in mystery."

These two companies are at the heart of the investigations. One payment of at least $2 million was made to Touré through Matinda, a company incorporated in the British Virgin Islands that she owned, and which in turn had received that cash from a company called Pentler Holdings Ltd., according to documents that form the basis of the indictment by the feds. Co-founded by Cilins, Pentler itself came under investigation by Mossack Fonseca's legal department in 2014, as they tried to determine the owner behind it. The question came down to Onyx — a company that helped incorporate Pentler.

"Onyx is important because it set up … Pentler Holdings, a shadowy offshore company that signed corrupt deals in one of the world's biggest mining scandals," Leigh Baldwin from Global Witness told the ICIJ.

And here's where BSGR comes back in. Onyx is a company that provides administrative and management services for BSGR. Onyx's chief executive is also a director on the board of BSGR.

The Panama Papers May Help Unravel The Corruption "Deal Of The Century"      Page 9 of 9
19-11845-shl    Doc 46-1    Filed 09/09/19    Entered 09/09/19 18:00:38    Exhibits A-HH
Pg 208 of 216

BSGR has described Onyx as wholly separate and fully independent. Mossack Fonseca, according to the leaked Panama documents, came to a different conclusion in 2014: "They are the same," an email from the Mossack Fonseca's compliance department said.

"This email tightens the noose around BSGR. It makes it much harder for them to argue that they were independent of the companies involved in the Simandou bribery case," Global Witness's Balint-Kurti told BuzzFeed News.

BSGR claims the Guinean government are corrupt, and have launched a case against them which will open in January 2017. Neither Steinmetz nor BSGR have been charged in the Swiss or American inquiries, which are both in the preliminary stages. "When it goes to court, we can expect BSGR to use the same argument it's been using in public, which is that whatever [bribes were paid] did not engage BSGR or Beny Steinmetz," Balint-Kurti said.

 Monica Mark is the West Africa Correspondent for BuzzFeed News and is based in Dakar, Senegal.

Contact Monica Mark at monica.mark@buzzfeed.com.

Got a confidential tip? Submit it here.

# Exhibit GG

Steinmetz will fight corruption charges in Geneva court - lawyer | Reuters

 



# Steinmetz will fight corruption charges in Geneva court - lawyer

Stephanie Nebehay

\* Israeli diamond trader rejects Swiss indictment

\* Will fight charges in court, lawyer tells Reuters

\* Revives headache after BSGR left Guinea iron ore project

By Stephanie Nebehay

GENEVA, Aug 13 (Reuters) - Israeli billionaire Beny Steinmetz rejects Swiss corruption charges against him in connection with winning mining contracts in Guinea and will appear in court to fight them, his Geneva lawyer told Reuters on Tuesday.

Geneva prosecutors' indictment of the diamond trader and two others this week revives a headache that appeared to have eased this year when Beny Steinmetz Group Resources (BSGR) walked away from a giant iron ore project in the West African nation.

BSGR abandoned the Simandou project as part of a settlement announced in February ending a long-running dispute, the company and Guinea's government said at the time.

Claudio Mascotto, a Geneva prosecutor, said on Monday he was seeking prison terms of two to 10 years for Steinmetz and two associates over the alleged payment of $10 million in bribes for mining licences between 2005 and 2010.

"His defence is simple, he absolutely contests all the charges against him," Marc Bonnant, a prominent Geneva lawyer representing Steinmetz, told Reuters.

"They have no basis in the facts or in law," he said.

Swiss newspapers identified the co-defendants as a Frenchman and a Belgian woman. A trial is not expected for months.

The prosecutor accused the three of "having promised in 2005 and then paid or had bribes paid to one of the wives of former Guinean President Lansana Conte", so as to have mining rights in Simandou allocated to BSGR.

"Just as the Guinea government has backtracked on its claims, here too it will be proven that there was no wrongdoing in Steinmetz's activities," the billionaire's spokesman said on Tuesday.

"It should be emphasised that the investigation was launched in Switzerland at the request of the Guinea government, and under international arbitration Guinea has retracted its claims, which is why these are baseless charges."

Guinea's mines minister, Abdoulaye Magassouba, told Reuters on Monday that the government was not involved in trying to prosecute Steinmetz, given February's agreement.

"We have signed specific agreements with Steinmetz and we will fully respect the terms of the agreement. It is not possible for a hostile action against BSGR to come from the government," he said.

Administrators for BSGR, a private firm registered in Guernsey, said in March 2018 they would work to return the mining firm to solvency and pay creditors in full after it voluntarily entered administration to protect it from legal disputes related to the project in Guinea.

The Conakry government is no longer party to the Geneva criminal case, but Mascotto pressed ahead after six years of investigation and multiple requests abroad for legal assistance.

The Geneva daily Le Temps reported he had sought assistance from Guinea, Israel and Ukraine to trace alleged financial flows and identify account owners.

Steinmetz, a former resident of Geneva who moved back to Israel in 2016, returned to attend questioning sessions by the prosecutor, Bonnant said.

"He has given all the indications he could and all the documents to which he had access," Bonnant said. "And of course he will attend the trial." (Reporting and writing by Stephanie Nebehay; Additional reporting by Steven Scheer in Jerusalem and Saliou Samb in Conakry; Editing by Michael Shields and Mark Potter)

*Our Standards:*   *The Thomson Reuters Trust Principles.*

**MORE FROM REUTERS**

# Exhibit HH

## Contact

www.linkedin.com/in/yossie-
tchelet-6650b38 (LinkedIn)

## Top Skills

Accounting

Business Planning

Business Strategy

## Languages

English (Native or Bilingual)

Hebrew (Native or Bilingual)

Afrikaans (Professional Working)

## Certifications

Chartered Accountant

# Yossie Tchelet

Strategic Financial Specialist

Rehovot Area, Israel

## Summary

Experienced Financial Specialist with a demonstrated history of working in the banking, private equity & mining & metals industry. Skilled in Negotiation, Business Planning, Investor Relations, Entrepreneurship, and Accounting. Strong finance professional graduated from University of South Africa. ACA,CA(SA).

———

## Experience

### OCTEA LIMITED

Strategic Financial Specialist

March 2017 - Present

Guernsey

Provision of professional services including advisory services to Octea's Board and support to its mining operations team.

### BSG

Strategic Financial Specialist

September 2003 - February 2017 (13 years 6 months)

Participated in capital raisings involving corporate bond issuances(Israel), IPO's and project finance for resource projects in Africa, Asia and other locations. Involved in the M&A, evaluation and due diligence of a number of large scale mining and resource transactions across Africa and Eastern Europe.

### Investec

4 years 1 month

Global Finance Manager Specialised and Structured Finance

January 2001 - September 2003 (2 years 9 months)

Involved travel to other offices in South Africa, London and Mauritius. Other offices were Ireland and Australia.

Internal Auditor/Forensic Accountant

September 1999 - January 2001 (1 year 5 months)

https://www.investec.co.za/

PKF

Senior Accountant

February 1996 - August 1999 (3 years 7 months)

previously known as Fisher Hoffman Sithole

http://www.pkf.co.za/

———

## Education

University of South Africa/Universiteit van Suid-Afrika

Bachelor of Commerce (BCom); BCompt(Hons),CTA · (1990 - 1997)

Institute of Chartered Accountants in England and Wales

ACA  · (2015)

SAICA: South African Institute of Chartered Accountants

CA(SA) · (1999)