# CLEARY GOTTLIEB STEEN & HAMILTON LLP

One Liberty Plaza
New York, NY 10006-1470
T: +1 212 225 2000
F: +1 212 225 3999

clearygottlieb.com

WASHINGTON, D.C. · PARIS · BRUSSELS · LONDON · MOSCOW
FRANKFURT · COLOGNE · ROME · MILAN · HONG KONG
BEIJING · BUENOS AIRES · SÃO PAULO · ABU DHABI · SEOUL

D: +1 212-225-2086
jrosenthal@cgsh.com

THOMAS J. MOLONEY
DAVID G. SABEL
JONATHAN I. BLACKMAN
RICHARD S. LINCER
JAMES A. DUNCAN
STEVEN M. LOEB
CRAIG B. BROD
NICOLAS GRABAR
CHRISTOPHER E. AUSTIN
HOWARD S. ZELBO
DAVID E. BRODSKY
ARTHUR H. KOHN
RICHARD J. COOPER
JEFFREY S. LEWIS
PAUL J. SHIM
STEVEN L. WILNER
ANDRES DE LA CRUZ
DAVID C. LOPEZ
MICHAEL A. GERSTENZANG
LEWIS J. LIMAN
LEV L. DASSIN
NEIL Q. WHORISKEY
JORGE U. JUANTORENA
MICHAEL D. WEINBERGER
DAVID LEINWAND
DIANA L. WOLLMAN
JEFFREY A. ROSENTHAL
ETHAN A. KLINGSBERG
MICHAEL D. DAYAN
CARMINE D. BOCCUZZI, JR.
JEFFREY D. KARPF
KIMBERLY BROWN BLACKLOW
ROBERT J. RAYMOND
SUNG K. KANG
LEONARD C. JACOBY
SANDRA L. FLOW
FRANCISCO L. CESTERO
FRANCESCA L. ODELL

WILLIAM L. MCRAE
JASON FACTOR
JOON H. KIM
MARGARET S. PEPONIS
LISA M. SCHWEITZER
JUAN G. GIRÁLDEZ
DUANE MCLAUGHLIN
BREON S. PEACE
MEREDITH E. KOTLER
CHANTAL E. KORDULA
BENET J. O'REILLY
ADAM E. FLEISHER
SEAN A. O'NEAL
GLENN P. MCGRORY
MATTHEW P. SALERNO
MICHAEL J. ALBANO
VICTOR L. HOU
ROGER A. COOPER
AMY R. SHAPIRO
JENNIFER KENNEDY PARK
ELIZABETH LENAS
LUKE A. BAREFOOT
PAMELA L. MARCOGLIESE
PAUL M. TIGER
JONATHAN S. KOLODNER
DANIEL ILAN
MEYER H. FEDIDA
ADRIAN R. LEIPSIC
ELIZABETH VICENS
ADAM J. BRENNEMAN
ARI D. MACKINNON
JAMES E. LANGSTON
JARED GERBER
COLIN D. LLOYD
COREY M. GOODMAN
RISHI ZUTSHI
JANE VANLARE
DAVID H. HERRINGTON

KIMBERLY R. SPOERRI
AARON J. MEYERS
DANIEL C. REYNOLDS
ABENA A. MAINOO
HUGH C. CONROY, JR.
JOSEPH LANZKRON
MAURICE R. GINDI
KATHERINE R. REAVES
RAHUL MUKHI
RESIDENT PARTNERS

SANDRA M. ROCKS
S. DOUGLAS BORISKY
JUDITH KASSEL
DAVID E. WEBB
PENELOPE L. CHRISTOPHOROU
BOAZ S. MORAG
MARY E. ALCOCK
HEIDE H. ILGENFRITZ
KATHLEEN M. EMBERGER
AVRAM E. LUFT
ANDREW WEAVER
HELENA K. GRANNIS
JOHN V. HARRISON
CAROLINE F. HAYDAY
NEIL R. MARKEL
KENNETH S. BLAZEJEWSKI
ANDREA M. BASHAM
LAURA BAGARELLA
SHIRLEY M. LO
JONATHAN D.W. GIFFORD
SUSANNA E. PARKER
RESIDENT COUNSEL

LOUISE M. PARENT
OF COUNSEL

September 25, 2019

VIA ELECTRONIC MAIL AND ECF

The Honorable Sean H. Lane
United States Bankruptcy Court for the Southern District of New York
One Bowling Green
New York, NY 10004-1408
shl.chambers@nysb.uscourts.gov

Re:   *In re BSG Resources Limited*, No. 19-11845 (SHL)[1]

Dear Judge Lane:

      In accordance with the parties' agreed-upon schedule, we write on behalf of Vale in reply to the Joint Administrators' September 18, 2019 letter to the Court (the "Opposition Letter"), ECF No. 54. At the outset, we note that the Opposition Letter does not address the facts established in Vale's submission on the role at BSGR of its namesake and principal Beny Steinmetz and the substantial grounds for ordering discovery from Mr. Steinmetz, other than by arguing that the Joint Administrators, not Mr. Steinmetz, now have final decision-making authority over BSGR. Instead, the Joint Administrators merely retread arguments regarding their discovery obligations that the Court previously rejected. As such, the Joint Administrators should be directed to search for and produce Mr. Steinmetz's documents, including his emails, forthwith, in addition to the other discovery sought by Vale.

      The Joint Administrators' Opposition Letter is reflective of BSGR's continued overarching strategy: to produce as little as possible to Vale as slowly as possible, openly flouting the Court's prior order to produce documents responsive to Vale's requests "forthwith."[2] Notably,

---

[1]   Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in Vale's September 9, 2019 letter to the Court (the "Vale Letter"), ECF No. 46.

[2]   Hr'g Tr. 61:22-23, July 29, 2019.

notwithstanding the Court's repeated admonition that the Joint Administrators should commence rolling productions immediately, since the last Court conference they have only produced the 320 documents first promised on August 27, 2019,[3] of which only 211 were non-duplicative.[4] No other documents have been produced.

I. **The Joint Administrators Do Not Attempt to Refute That Beny Steinmetz Owns, Controls, and Acts on Behalf of BSGR**

At the August 29, 2019 hearing, the Court asked for briefing on the Joint Administrators' "factual basis" for refusing to produce Beny Steinmetz's documents,[5] posing the following questions in bold:

1. *Is Beny Steinmetz the beneficial owner of BSGR?*[6] As Vale explained in its Letter, Steinmetz is BSGR's principal beneficial owner: BSGR is wholly owned by Nysco, which is wholly owned by the Balda Foundation, and Steinmetz and his family are the sole beneficiaries of the Balda Foundation. Vale Letter at 4. Steinmetz has used the Balda Foundation as his personal ATM, regularly funneling multi-million dollar payments from Balda to himself, his family, and his businesses. *Id.* The Joint Administrators offer no response to the Court's question or Vale's answer.

2. *What role does Steinmetz occupy in BSGR's governance structure, and what power does he wield over BSGR's corporate decision-making?*[7] As set forth in the Vale Letter, Steinmetz has actively directed the work of BSGR and its affiliated companies, and has acted and continues to act as the *de facto* CEO of BSGR. Vale Letter at 6. The Joint Administrators do not deny Mr. Steinmetz's historical control, and attempt to dismiss Mr. Steinmetz's continued financial influence over BSGR and his continued involvement in BSGR's affairs with the conclusory point that they have final decision-making authority as administrators. Opp'n Letter at 4-5.

3. *Has Steinmetz historically negotiated deals on BSGR's behalf?*[8] Vale's Letter established that Steinmetz was, *inter alia*, the lead negotiator for BSGR's joint venture with Vale to develop the Simandou mining concession in Guinea. Vale

---

[3] *See* Letter from the Joint Administrators to the Court, dated Aug. 27, 2019, at 7, 13, ECF No. 45.

[4] Of the documents produced, several were redacted in clearly overbroad ways not permitted by the Protective Order, such as to redact allegedly "commercially sensitive information." Vale reserves all rights with regard to such redactions. The Opposition Letter also asserts—without citation—that the Court's order on discovery "agreed to revisit the scope of production" on the basis of an alleged "disproportionate burden" imposed by Vale's discovery requests. Opp'n Letter at 1 n.2. The Court's order contains no such agreement or any suggestion that the Joint Administrators are invited to continue to delay production by raising further objections.

[5] Hr'g Tr. 55:12, Aug. 29, 2019.

[6] Hr'g Tr. 46:8-9, Aug. 29, 2019.

[7] Hr'g Tr. 50:16-19, Aug. 29, 2019.

[8] Hr'g Tr. 49:11-14, Aug. 29, 2019.

Hon. Sean H. Lane, p. 3

> Letter at 2, 4-5. Notwithstanding that this was the very subject of the Court's question, the Joint Administrators are dismissive of Vale's "devot[ing] considerable effort to reciting Steinmetz's alleged historic relationship with the Debtor," Opp'n Letter at 4, but do not contest the substance of this point.

4. ***Has Steinmetz continued to do so even after the initiation of the Guernsey Administration?*[9] *In particular, did he attempt to negotiate a settlement of the ICSID Arbitration?*[10]** Steinmetz personally negotiated a potential settlement of BSGR's ICSID Arbitration, which settlement would have the effect of diverting proceeds from the Simandou mining concession to Steinmetz himself and also provided him with certain collateral benefits, including an extraordinary agreement by Guinea not to assist another country, Switzerland, in criminal proceedings against him. Vale Letter at 6-8. As detailed below, the Joint Administrators acknowledge that Steinmetz was personally involved in settlement negotiations with the Government of Guinea, Opp'n Letter at 4-5; *Declaration of William Callewaert* ("Callewaert Declaration") ¶ 18, ECF No. 54-1, and do not dispute that Steinmetz would receive personal benefits from the negotiated settlement, but rather only discuss whether they have any role in ultimately approving the settlement. This is irrelevant to whether discovery from Steinmetz is proper.

In short, as Vale made clear in its Letter in response to the Court's questions, Steinmetz owns, controls, and continues to act on behalf of BSGR. Moreover, Steinmetz, through Nysco, provides the Joint Administrators their alleged sole source of funding for the Guernsey Administration. Vale Letter at 8.

Rather than address the Court's questions and Vale's arguments head on, the Joint Administrators instead try to sidestep them by raising four arguments, all of which fail.

*First*, the Joint Administrators continue to attempt to draw a formalistic distinction between a *de facto* and *de jure* CEO, and argue that they have no discovery obligations as to the former. This distinction, however, finds no support in the law, which grants discovery from an "affiliated non-party . . . if there is a continuing economic relationship between the party and the non-party . . . 'or if the non-party was acting as "agent" of the corporation with respect to the events or transactions at issue in the litigation.'" Vale Letter at 3 n.8 (quoting *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, No. 14-CV-04394 (AJN) (BCM), 2016 WL 5408171, at *6 (S.D.N.Y. Sept. 27, 2016)).[11] As it is indisputable both that Steinmetz is the ultimate beneficial owner of BSGR *and* that he held himself out as an agent of BSGR with respect to events at issue in this litigation (before and after the commencement of the administration, both of which are

---

[9] Hr'g Tr. 45:1-2, 50:19-24, 51:7-9, 52:10-13, 54:22-25, Aug. 29, 2019.

[10] Hr'g Tr. 55:6-8, Aug. 29, 2019.

[11] The only case cited by the Joint Administrators in purported support of this distinction, *In re General Vision Services, Inc.*, 423 B.R. 790 (Bankr. S.D.N.Y. 2010), has no application in this context—it examines the application to *de facto* officers of the six-year statute of limitations governing derivative actions against corporate directors under New York law, not discovery obligations under the Federal Rules of Civil Procedure. *Id.* at 791-94.

subjects of sustained discovery requests), the Joint Administrators must produce documents from Steinmetz, BSGR's *de facto* chief executive, that are responsive to Vale's requests.

*Second*, the Joint Administrators attempt to reinvent the meaning of "control" in Rule 34 by arguing that it requires that the Joint Administrators "control Steinmetz." Opp'n Letter at 4. The question is not whether the Joint Administrators control Steinmetz, but whether Steinmetz's documents are within BSGR's possession, custody, and control. Rule 34 requires that BSGR produce documents from its "Number One" that are within its possession, custody, or control, and "[a] party is deemed to have control over documents that it has the 'right, authority, or ability to obtain upon demand.'" *In re Andover Togs, Inc.*, 231 B.R. 521, 547 (Bankr. S.D.N.Y. 1999) (citation omitted). As noted above, corporations are deemed to have the "'practical ability' to obtain documents from an affiliated non-party," and thus "control" for the purposes of Rule 34, "if there is a continuing economic relationship between the party and the non-party . . . or if the non-party was acting as an 'agent' of the corporation with respect to the events or transactions at issue in the litigation. *Royal Park Invs.*, 2016 WL 5408171, at *6 (internal citations omitted); *see also In re Northwest Assocs., Inc.*, 245 B.R. 183, 188 (Bankr. E.D.N.Y. 1999) (ordering the production of documents in the "possession, custody or control" of two individuals who had no legal ties to a debtor and who held themselves out as "merely consultants" based on their involvement in forming the debtor, managing its day-to-day operations, and treating its funds as their own for personal expenses); *In re Ron San Realty*, 457 F. Supp. 994, 996 (S.D.N.Y. 1978) (affirming the bankruptcy court's decision granting discovery from an individual with no formal employment relationship with the corporate debtor because he had the "final say" over the debtor's operations and had, on the debtor's behalf, hired and fired personnel, opened and closed new locations, negotiated leases, signed contracts, prepared financial statements, and signed checks). Thus, as established by Vale, by virtue of Steinmetz's role as the *de facto* head of BSGR, economic ties to BSGR that include his beneficial ownership and funding provided by Nysco,[12] and his continuing role as BSGR's agent (including by negotiating a material settlement on BSGR's behalf), Steinmetz's documents are in BSGR's control and thus in the Joint Administrators' control for purposes of discovery. *See* Vale Letter at 2-3.

*Third*, the Joint Administrators now, for the first time, concede that "Steinmetz negotiated with the Republic of Guinea," Callewaert Decl. ¶ 18, but attempt to escape the implications of that admission by contending that "[t]o the extent that Steinmetz has had discussions with the Republic of Guinea, . . . he was acting on his own behalf and not as an agent of the Joint Administrators," Opp'n Letter at 5.[13] Notably, the Joint Administrators previously

---

[12] The Joint Administrators cannot simply brush away the significance of Nysco's influence over BSGR as the sole source of funding of the Guernsey administration merely by repetition of the mantra that the Joint Administrators have final approval over any actions taken by BSGR during the administration.

[13] The Joint Administrators' contention that they are in control notwithstanding Steinmetz's role in the negotiations is not only irrelevant for purposes of discovery, but is contrary to the facts even as described in their own submission. The Joint Administrators purport to be in control because they "declined to approve" Steinmetz's settlement term sheet and "[i]nstead . . . entered into a non-binding Settlement Term Sheet with the Republic of Guinea." Opp'n Letter at 5. But nowhere do the Joint Administrators' submissions indicate that the terms of their "non-binding term sheet" with the Republic of Guinea differ in any material way from those negotiated by Steinmetz. Simply describing Steinmetz's negotiations as "non-binding" does not negate the role or importance of Steinmetz to BSGR's operations, nor the relevance of his actions to the COMI analysis. Furthermore, it does not change the fact that while the Joint Administrators claim they are undertaking diligence regarding the settlement—*for more than six*

represented to the Court on multiple occasions that they were in charge of those settlement negotiations, and that it was "very troubling for [Vale] to suggest that [the Joint Administrators] are not the ones negotiating this settlement." Hr.'g Tr. 38:22-39:2, July 29, 2019. At the August 29, 2019 hearing, the Joint Administrators began to backtrack from this position, telling the Court that they "cannot tell you for sure anything." Hr'g Tr. 55:9-10, Aug. 29, 2019. They have now resiled completely from their prior representations to the Court, admitting in the Opposition Letter and Mr. Callewaert's Declaration that Steinmetz negotiated a settlement with the Government of Guinea. Opp'n Letter at 5; Callewaert Decl. ¶ 18. Moreover, the fact that Steinmetz purportedly was not acting as an agent of the Joint Administrators does not change the fact that Steinmetz was negotiating with the Government of Guinea regarding a purportedly material claim held by BSGR during the pendency of the Administration. As the Court has repeatedly made clear, "[i]f [Steinmetz] has been active in the . . . corporate governance and the decisions made by [BSGR]," that is "relevant to COMI" notwithstanding the Joint Administrators' representation that "only [they] have the authority" to consummate a transaction on BSGR's behalf.[14]

*Fourth*, the Joint Administrators bizarrely invoke the hearsay rule in an attempt to disqualify statements made by BSGR and its principals in newspaper and magazine articles that are cited by Vale in support of its discovery requests. The hearsay rule prevents a declarant from entering a statement into evidence that "the declarant does not make while testifying at the current trial or hearing," and that "a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c); *see also* Fed R. Evid. 802. But courts have uniformly and soundly rejected the notion that this rule applies to a party's attempts to seek discovery. *See, e.g., Freydl v. Meringolo*, No. 09 Civ. 07196 (BSJ) (KNF), 2011 WL 2566087, at *3 (S.D.N.Y. June 16, 2011) ("The plaintiff is correct that competency, hearsay and authenticity are not valid grounds on which to object to discovery demands because they implicate evidentiary rules, not applicable to pretrial discovery").[15] Indeed, the Joint Administrators' proffered approach would be contrary to Federal Rule of Civil Procedure 26(b)(1), which allows parties to "obtain discovery regarding *any* nonprivileged matter" subject to a balancing test, and states explicitly that documents "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1) (emphasis added); *see also Villella v. Chem. & Mining Co. of Chile Inc.*, No. 15 Civ. 2106 (ER), 2019 WL 171987 at *2 (S.D.N.Y. Jan. 11, 2019) (discovery is appropriate when the evidence sought is "material or may lead to the discovery of material evidence"). The limitations on the use of hearsay at trial present a compelling reason to *grant*—not deny—discovery so that a party may obtain admissible evidence

---

*months*—the Republic of Guinea and BSGR's own parent company consider it to be a "done deal," and have taken steps to implement that settlement while the Joint Administrators do nothing. *See* Vale Letter at 7.

[14] Hr'g Tr. 50:16-24, Aug. 29, 2019.

[15] *See also, e.g., United States v. Barnes*, 443 F. Supp. 137, 138 (S.D.N.Y. 1977) ("[F]or pretrial purposes the court is not bound by the rules of evidence concerning matters other than privileges . . . and I am therefore empowered to hear any relevant evidence, such as affidavits or other reliable hearsay." (citations omitted)); *EmployBridge, LLC v. Riven Rock Staffing, LLC*, Civ. No. 16-833 (WJ) (KK), 2017 WL 4271329 at *3 (D.N.M. Jan. 26, 2017) (holding that a declaration in support of a discovery motion is not hearsay); *Fleming v. Parnell*, No. C13-5062 (BHS), 2014 WL 25621, at *2 (W.D. Wash. Jan. 2, 2014) (finding that statements in declaration in support of discovery motion were not hearsay); *Arista Records LLC v. Does 1-27*, 584 F. Supp. 2d 240, 254-56 (D. Me. 2008) (rejecting defendants' request to strike hearsay cited in support of a discovery motion); *Hawthorn Mgmt. Servs., Inc. v. Dep't of Housing & Urban Dev.*, No. Civ. 3:96CV2435 (AHN), 1997 WL 821767 at *2 n.1 (D. Conn. Dec. 18, 1997) (considering newspaper articles in connection with a discovery motion).

that it has a non-frivolous basis to suspect may exist. While the Joint Administrators attempt to reject Vale's reliance on public press statements about Steinmetz's central role in the settlement negotiations and in BSGR generally, such statements are not only relevant to the issues at hand, but the Joint Administrators' choice to proceed with a litigation strategy of employing roadblocks and dilatory tactics—even following the Court's prior admonition that continued discovery delays could result in sanctions—further underscores the need for Vale to rely on this evidence in addition to the ample historic evidence of Steinmetz's control.

Notwithstanding these arguments, the Joint Administrators appear to concede in a footnote that certain documents from Steinmetz are responsive and relevant, and agree to produce such documents that are already "among the Joint Administrators' Books and Records," and to run searches within these records for Steinmetz's email addresses that have been specifically identified by Vale. Opp'n Letter at 5 n.10. This approach misses the point entirely. Vale's application was never about whether the Joint Administrators are required to produce their own "Books and Records" reflecting communications to or from Steinmetz; of course they are. Rather, Vale's application addresses whether the Joint Administrators are obligated—by virtue of their deemed "control"—to produce Steinmetz's own files (including his emails) concerning work he performed on behalf of BSGR. The law cited above and in Vale's Letter demonstrates that the answer is clearly yes and the Joint Administrators' discussion of their willingness to search their own "Books and Records"—which likely have only a small fraction of the documents in question, particularly because it appears that Steinmetz affirmatively circumvented the Joint Administrators in his negotiations with the Government of Guinea and elsewhere—is nothing more than a diversion.

II.     **There Is No Basis Under U.S. Law for the Joint Administrators' Refusal to Produce Responsive Documents Held By Onyx.**

The Joint Administrators do not contest that Onyx (f/k/a BSG Management Services Limited) had the same physical address and management team as BSGR, and until recently operated as its corporate and administrative "back office."[16] Conceding, as they must, that the two companies have been closely interrelated, the Joint Administrators nevertheless assert that they should not be obligated to produce Onyx's documents since they do not share "a *current* business relationship." Opp'n Letter at 5 (emphasis added). As with Steinmetz's documents, that argument is defeated by established caselaw.

It is black letter law that corporations must produce documents held by their former affiliates.[17] A party cannot shirk its legal obligation to produce documents from an affiliate by

---

[16]    *See* Award ¶¶ 24(h), 175-76, 195, Pet. Ex. C, ECF Nos. 5-3 and 5-4.

[17]    *See, e.g.*, *Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 314 F.R.D. 341, 347 (S.D.N.Y. 2016) (granting plaintiff's motion to compel and ordering the assignee of certain distressed assets to produce documents held by the non-party assignor, even though the assignment of rights "occurred before the litigation was filed," "because regardless of when the assignment occurred, the prejudice to defendants is equal either way" (citation omitted)); *cf. JPMorgan Chase Bank v. Winnick*, 228 F.R.D. 505, 506 (S.D.N.Y. 2005) (compelling a plaintiff bank—which, prior to the onset of the litigation, entered a credit agreement assigning to it certain non-party lenders' rights to file suit—to produce documents held by one of the non-party signatories to that agreement, holding that it would be "both logically inconsistent and unfair to allow the right to sue to be transferred . . . free of the obligations that go with litigating a claim").

separating ties with that affiliate.[18] Since Onyx and BSGR operated as constituent parts of a single organization, sharing their namesake, their address, and even their directors and officers, allowing BSGR to avoid producing documents from Onyx based on steps it has taken to remove its formal corporate ties "would be patently unfair."[19]

### III. The Joint Administrators Must Produce Documents from Current and Former Officers and Directors.

The Joint Administrators raise three arguments to avoid producing documents in the possession of BSGR's current and former officers and directors, which they have both the "authority" and "practical ability" to obtain, and which therefore fall within the Joint Administrators' possession, custody, or control. *In re Teligent, Inc.*, 358 B.R. 45, 60 (Bankr. S.D.N.Y. 2006) ("If a party has the legal right or practical ability to obtain documents from a non-party, he has 'control' of those documents within the meaning of Rule 34."). None has merit.

*First*, the Joint Administrators again argue incorrectly that Rule 34 requires that BSGR currently have "control over" its former officers and directors, as opposed to over their documents. As detailed above, that point relies on a complete misunderstanding of Rule 34, and the authorities cited by the Joint Administrators do not support this proposition.[20] BSGR has now retreated from prior statements minimizing the post-administration role of its officers and directors, and presents no reason why they should be treated any differently than the officers and directors of any corporation for discovery purposes. Whereas they had previously represented to the Court under oath that "the Guernsey Administration has the effect of suspending the management powers of the Debtor's directors and officers," *Amended Declaration of Malcom Cohen in Support of Verified Chapter 15 Petition for Recognition of Foreign Main Proceeding and Related Relief* ("Cohen Declaration") ¶ 47, ECF No. 24, they now assert that "the Company's directors remain in office and their powers do not cease," *Declaration of Matthew Newman* ("Newman Declaration") ¶ 6, ECF No. 54-2.

---

[18]    *In re NTL, Inc. Sec. Litig.*, 244 F.R.D. 179, 196 (S.D.N.Y. 2007), *aff'd sub nom. Gordon Partners v. Blumenthal*, No. 02 Civ. 7377 (LAK), 2007 WL 1518632 (S.D.N.Y. May 17, 2007) (rejecting the defendant corporation's argument that it "did not have 'control' over any documents or [electronically stored information] relevant to plaintiffs' document requests" on the grounds that those documents were in the possession of a non-party—which, together with the defendant, used to form constituent parts of a single, now-defunct entity—and holding that "it would be patently unfair" for the defendant to avoid its legal obligations through an "artificial separation of [corporate] entities").

[19]    *Id.*

[20]    The Joint Administrators rely on *Siegmund v. Xuelian*, No. 12-62539-CIV, 2016 WL 1359595 (S.D. Fla. Apr. 6, 2016), but that case dealt with the opposite factual situation to the one presently before the Court—a request that two former directors produce a company's documents. *Id.* at *2. The court's holding in *Siegmund* that the former directors need not comply with that request because "[m]erely holding the status as being the former director of a corporation does not satisfy the 'control' standard under Rule 34," has no relevance whatsoever on BSGR's discovery obligations. The Joint Administrators also mischaracterized the holding in *Royal Park Investments*, 2016 WL 5408171, at *6, failing to mention that a *variety of factors*—including whether "the non-party was acting as an 'agent' of the corporation with respect to the events or transactions at issue in the litigation"—can provide a basis for requiring an employer to search documents held by former employees.

*Second*, the Joint Administrators attempt to distinguish the holding in *Montesa v. Schwartz*, No. 12 Civ. 6057 (CS) (JCM), 2015 WL 13173164, at *1 (S.D.N.Y. Feb. 20, 2015)—that individuals must produce documents from email accounts used to conduct business even if they are "personal" email accounts—on the grounds that the former board members directed to comply with discovery orders in *Montesa* were parties to that case. But as another court in this district has stated explicitly, "the [*Montesa*] court's ruling did not rest on that ground." *Royal Park Invs.*, 2016 WL 5408171, at *6 n.5. Indeed, the *Montesa* court itself separately made clear that its decision in no way hinged on the board members' involvement in the suit. Order at 2, *Montesa v. Schwartz*, No. 12-cv-06057-CS-JCM (S.D.N.Y. Mar. 6, 2015), ECF No. 366 ("[E]ven if the Second Circuit grants immunity to the [individual defendants], the Defendant District would not be relieved of its obligation to search and provide relevant email correspondences in the personal possession of these defendants.").

*Third*, the Joint Administrators object to Vale's request for "personal" emails from BSGR's current and former directors, which the Joint Administrators allege are beyond the reach of discovery. Vale does not seek "unfettered access" to BSGR's directors' private documents and emails, as the Joint Administrators seek to suggest, Opp'n Letter at 7,[21] but asks the Joint Administrators to collect responsive documents from any email *account* (including a supposed "personal" email account) that BSGR's officers and directors *use to conduct BSGR business*. Such emails are plainly within the scope of discovery and within BSGR's control: "[i]f responsive emails kept on [an] officer['s] and founder['s] personal email accounts are not subject to Rule 34 notice to produce, it would be tantamount to an invitation for executives to keep an email equivalent of two sets of correspondence, one discoverable and the other not—a recipe for deceit."[22] Indeed, as the Court has recognized, "[i]f somebody's conducting business of an enterprise through personal email, . . . it's not protected as a personal email." Hr'g Tr. 44:13-17, Aug. 29, 2019.

Here, there is no question that, like Steinmetz, BSGR's current directors are using non-BSGR email domains to conduct BSGR business. Indeed, the Joint Administrators admit that "@bsgresources.com email addresses" were only issued to six custodians: Daniel Pollak, Douglas Horrocks, Johan Van Der Braber, Malcolm Barnes, Owen Clemett, and Peter Driver. Opp'n Letter

---

[21] The Joint Administrators' reliance on *Ogden v. All-State Career Sch.*, 299 F.R.D. 446, 450 (W.D. Pa. 2014) is misplaced. In that hostile work environment and disparate treatment dispute, the defendant employer sought copies of the plaintiff's photos and videos posted on social media for the purposes of determining whether plaintiff was truly offended by the words and statements used by his coworkers. The court held that the employer was entitled to discovery of the plaintiff's electronic communications insofar as relevant to the underlying cause of action. The same holds here, where BSGR employees have been using and continue to use non-BSGR email accounts to conduct business in a manner relevant to these proceedings.

[22] *CA, Inc. v. AppDynamics, Inc.*, No. CV 13-2111 (WFK) (SIL), 2014 WL 12860591 at *4 (E.D.N.Y. Sep. 8, 2014); *see also id.* at *3 ("[W]here an individual creates documents in furtherance of his functions as a corporate officer, those documents are within the corporation's control for Rule 34 purposes and must be disclosed in response to a proper notice for production."); *Chevron Corp. v. Salazar*, 275 F.R.D. 437, 448-49 (S.D.N.Y. 2011) (ordering subpoena recipient to produce former employee's business emails sent and received using personal email address); *Riddell Sports Inc. v. Brooks*, 158 F.R.D. 555, 558 (S.D.N.Y. 1994) (finding that, where materials are created "in connection with the officer's functions as a corporate employee, the corporation has a proprietary interest in them and has a fiduciary duty to turn them over on demand").

at 3 n.4.[23] This makes clear that many current and former BSGR directors, including Dag Cramer, Sandra Merloni-Horemans, Yossie Tchelet, Asher Avidan, and Marc Struik, were not issued "@bsgresources.com email addresses," and therefore necessarily would have used non-BSGR email addresses to conduct BSGR business. As reflected by the board meeting minutes recently produced by the Joint Administrators, these individuals routinely attended BSGR Board and Committee meetings, and were responsible for directing BSGR to make significant corporate decisions, including those that brought BSGR into this dispute. And, indeed, the limited communications produced by the Joint Administrators confirm that Dag Cramer, a current BSGR director, frequently used a non-BSGR address—dag@nornverdandi.com—to carry out his BSGR board duties.[24] As such, the Joint Administrators have as much a legal duty to produce Cramer's (and other current or former directors') emails to and from this or any other email address for the purpose of conducting BSGR business as they do to produce emails from @bsgresources.com email addresses.

******

For the foregoing reasons, Vale reiterates its request that the Court order the Joint Administrators to immediately collect and produce all responsive documents held by Beny Steinmetz, BSGR's other current and former directors and officers, Onyx, Nysco, and Balda.

Respectfully submitted,

/s/ Jeffrey Rosenthal

cc: Frederick Hyman, Esq.
Michael R. Lastowski, Esq.

---

[23] Were the Joint Administrators permitted to limit their searches to "@bsgresources.com email addresses," their productions would exclude any documents that are in the custody of Steinmetz and the vast majority of BSGR's current and former directors, including Dag Cramer, Sandra Merloni-Horemans, Yossie Tchelet, Asher Avidan, and Marc Struik. *See* Vale Letter at 11-12. This is exactly the opposite of what the Court's ruling contemplates, and would prevent any meaningful answers to its questions.

The Joint Administrators' list of sources from which "data have been forensically collected" raises more questions than it answers. *See* Opp'n Letter at 3. For example, it is not clear what kinds of documents are in BSGR's network-attached storage file and web-based platform file systems, and whether such documents are emails or standalone files. Further, there is no indication that the Joint Administrators have made any efforts to retain documents generally. These important questions are fundamental to the integrity of these proceedings, and BSGR should be prepared to answer them at the October 2 hearing.

[24] The Joint Administrators designated these communications as "confidential" pursuant to the parties' Protective Order. Vale will provide these communications to the Court upon request, and reserves its rights to challenge these confidentiality designations.