# Exhibit A

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------x
In re:                                             :
                                                   :    Chapter 15
Oi Brasil Holdings Coöperatief U.A.,               :
                                                   :    Case No. 17-11888 (SHL)
          Debtor in a Foreign Proceeding.          :
                                                   :
------------------------------------------------------------x
------------------------------------------------------------x
In re:                                             :
                                                   :    Chapter 15
Oi Brasil Holdings Coöperatief U.A.,               :
                                                   :    Case No. 16-11794 (SHL)
          Debtor in a Foreign Proceeding.          :
                                                   :
------------------------------------------------------------x
------------------------------------------------------------x
In re:                                             :
                                                   :    Chapter 15
OI S.A., et al.,[1]                                :
                                                   :    Case No. 16-11791 (SHL)
          Debtors in a Foreign Proceeding.         :
                                                   :    (Jointly Administered)
------------------------------------------------------------x

## <u>CONFIDENTIALITY STIPULATION AND PROTECTIVE ORDER</u>

This Stipulation (the "<u>Stipulation</u>" or "<u>Protective Order</u>") is entered into by and between

the undersigned counsel, acting for and on behalf of their respective clients: (a) Jasper R.

Berkenbosch, as the duly appointed trustee (*curator*) (the "<u>Insolvency Trustee</u>") of Oi Brasil

Holdings Coöperatief U.A. ("<u>Coop</u>") in its bankruptcy proceeding, Case No. F.13/17/163

pending before the District Court of Amsterdam; (b) Oi S.A., (c) Antonio Reinaldo Rabelo Filho

in his capacity as the foreign representative of the Brazilian RJ Proceeding of each of Oi S.A.

(*under Judicial Reorganization*), Oi Móvel S.A. (*under Judicial Reorganization*), and Telemar

---

[1]    The debtors in the jointly administered chapter 15 cases and the four identifying digits of the tax number of
       each are:  Oi S.A. (5.764); Telemar Norte Leste S.A. (0.118); Oi Brasil Holdings Coöperatief U.A. (8518);
       and Oi Móvel S.A. (3.963).

Norte Leste S.A. (*under Judicial Reorganization*) and the purported foreign representative of the

RJ Proceeding of Coop (the "Foreign Representative"),[2] (d) a steering committee of an ad hoc

group of bondholders, who hold bonds issued or guaranteed by each of Coop, Oi S.A., Portugal

Telecom International Finance B.V. ("PTIF") and Telemar Norte Leste S.A., represented by

Cleary Gottlieb Steen & Hamilton LLP (the "Steering Committee"); and (e) an international

committee of bondholders, primarily of Coop and PTIF, represented by Dechert LLP

(the "International Bondholder Committee" and, together with the Insolvency Trustee, Oi S.A.,

the Foreign Representative, the Steering Committee, and each of the members of the Steering

Committee and the International Bondholder Committee, the "Parties" and each a "Party").

WHEREAS Oi S.A., Oi Móvel S.A., Telemar Norte Leste S.A. and Coop are subject to

jointly consolidated chapter 15 proceedings (Case No. 16-11791) (the "Brazilian Chapter 15

Proceeding") pending in the United States Bankruptcy Court for the Southern District of New

York (the "Bankruptcy Court");

WHEREAS, on July 7, 2017, the Insolvency Trustee filed its Verified Petition and

Motion for an Order (I) Recognizing the Dutch Bankruptcy Proceeding as the Foreign Main

Proceeding For Oi Brasil Holdings Coöperatief U.A.; (II) Recognizing the Insolvency Trustee as

the Foreign Representative; (III) Modifying the Prior Recognition Order; (IV) Modifying the

Prior Joint Administration Order and (V) Granting Certain Related Relief (D.I. 2 in Case No. 17-

11888) (as supplemented, the "Insolvency Trustee Petition") in a new chapter 15 proceeding for

---

[2] Use of the term "Foreign Representative" is for convenience only.  As described in greater detail in the Insolvency Trustee Petition (as defined below), the Insolvency Trustee disputes Mr. Rabelo's purported status as the foreign representative with respect to Coop.  The Parties (as defined below) agree that nothing contained herein shall be used in support of or against any arguments that Mr. Rabelo is the foreign representative with respect to Coop and that all Parties' rights are reserved in this regard.
.

Coop (Case No. 17-11888) (the "Dutch Chapter 15 Proceeding" and, together with the Brazilian

Chapter 15 Proceeding, the "Chapter 15 Proceedings") in the Bankruptcy Court;

WHEREAS, the Parties have served each other with, or have received from the other

Parties, document requests and subpoenas in connection with the relief requested by the Petition

("Discovery Materials" are all documents and information provided pursuant to such requests or

subpoenas);

WHEREAS, the Parties have agreed that certain Discovery Materials be subject to a

protective order, pursuant to Federal Rule of Bankruptcy Procedure 7026 and Federal Rule of

Civil Procedure 26 incorporated therein, to protect the confidentiality of sensitive information;

and

WHEREAS, the Parties have entered into this Stipulation and agreed to be bound by its

terms;

**NOW THEREFORE, IT IS HEREBY STIPULATED, AGREED, AND IT IS**

**ORDERED THAT**:

1.       Confidential Information.  Any Party producing documents (a "Producing Party")

to any Party (a "Receiving Party") pursuant to a document request or subpoena may designate as

"Confidential" and/or "Attorneys' Eyes Only" that portion of the Discovery Materials that it in

good faith believes meets any of the criteria below, provided that Confidential and/or Attorneys'

Eyes Only information shall not include: (a) information that is publicly available in

substantially the same form in which it was provided; (b) information that was, is or becomes

public knowledge, not in violation of this Protective Order; (c) information that is voluntarily de-

designated by the Producing Party; (d) information rightfully acquired from an independent

source without restrictions as to use; or (e) information that is at any time independently developed by a Party without use of or reliance upon any Discovery Materials.

(a)     Subject to the foregoing conditions and limitations in paragraph 1, any Producing Party may designate as "Confidential" any information that the Producing Party reasonably believes in good faith as of the date of production contains or constitutes:  (a) non-public information that is commercially sensitive, including, without limitation, research, business development or financial analysis, confidential technical information and data, or trade secrets; or (b) information that a Party is required by contract, law, regulation, or court order to protect from disclosure (all information designated as such, including the document itself as well as the information therein, the "Confidential Discovery Material").

(b)     Subject to the foregoing conditions and limitations in paragraph 1, any Producing Party may designate as "Attorneys' Eyes Only" any information that the Producing Party reasonably believes in good faith as of the date of production contains or constitutes: (a) information reflecting any Party's acquisition or holdings of any securities of any of the above-captioned debtors or their subsidiaries or affiliates, as well as any options, participations or derivative instruments that grant an economic interest in any of the above-captioned debtors or (b) non-public information reasonably likely to cause undue harm to the reputation of, or embarrassment to, any individual (all information designated as such, including the document itself as well as the information therein, the "Attorneys' Eyes Only Discovery Material").

4

(c)     Nothing herein shall prevent a Producing Party from designating Discovery

Materials as both "Confidential" and "Attorneys' Eyes Only", it being the

understanding of the Parties that any Discovery Materials with such dual

designations shall be subject to the heightened restrictions on use applicable to

Attorneys' Eyes Only Discovery Materials.

2.      <u>Designation of Documents</u>.  A Producing Party may designate Discovery

Materials as Confidential and/or Attorneys' Eyes Only Discovery Materials by applying the

legend "Confidential" and/or "Attorneys' Eyes Only" to each page containing any Confidential

and/or Attorneys' Eyes Only Discovery Material.  In the case of electronically stored

information, the "Confidential" and/or "Attorneys' Eyes Only" legend, if any, shall be printed on

the cover or container of the disk, tape, or other medium in which the electronic form data is

stored, and the "Confidential" and/or "Attorneys' Eyes Only" legend shall be applied, by

electronic means to each electronic document or other electronically stored information

containing any Confidential and/or Attorneys' Eyes Only Discovery Materials.  The failure to

designate a document as "Confidential" and/or "Attorneys' Eyes Only" does not constitute a

waiver of such claim, and a Producing Party may so designate a document after such document

has been produced in accordance with paragraph 11, with the effect that such document is

subject thereafter to the protections of this Stipulation.  In the case of deposition transcripts,

counsel for any Party may designate on the record as Confidential and/or Attorneys' Eyes Only

such portions as they may specify that are Confidential Discovery Material or Attorneys' Eyes

Only Discovery Material (as applicable) or contain testimony that the designating party

reasonably believes relied upon Confidential Discovery Material or Attorneys' Eyes Only

Discovery Material (as applicable).

5

3.       Treatment of Confidential Information.  Producing Parties shall produce

Confidential Discovery Material to counsel of record to the Receiving Parties in the Chapter 15

Proceedings, and not directly to any Party.  Any information designated as "Confidential" shall

be maintained in confidence by any Receiving Party.  Provided that disclosure is not otherwise

prohibited by this Stipulation, Confidential Discovery Materials may only be disclosed to (a) any

officer, director, representative (including outside counsel other than counsel of record in the

Chapter 15 Proceedings) or employee of any named or subsequently joining Party, who needs to

review the Confidential Discovery Materials in order to properly prosecute, defend, account for,

or settle litigation in the Chapter 15 Proceedings; *provided that* receipt of any Confidential

Discovery Material by counsel to a Party shall not itself be deemed to be receipt of Confidential

Discovery Material by any officer, director, representative or employee of such Party; (b)

counsel of record for the Parties to the Chapter 15 Proceedings; (c) counsel of record for any new

party that has satisfied the requirements of paragraph 15, provided that disclosure is reasonably

necessary to the Chapter 15 Proceedings; (d) legal assistants, secretaries, staff or agents and

consultants working with or for counsel referenced in (b) and (c) in connection with the Chapter

15 Proceedings; (e) litigation support services, including outside copying services; (f) persons

expected to be deponents, trial witnesses, and hearing witnesses in the Chapter 15 Proceedings

and counsel to such persons, provided that counsel to such expected deponents or witnesses has a

good faith basis for believing that such deponents or witnesses had access to or personal

knowledge of such Confidential Discovery Materials prior to its production in the Chapter 15

Proceedings; (g) any person identified as an author or recipient of a document either on the face

of the document or in the metadata associated with the document, or any other person for which

counsel to the Receiving Party has a good faith basis for believing that such person has seen the

document or is aware of the information contained in the document prior to its production in the

Chapter 15 Proceedings; (h) court officials involved in the Chapter 15 Proceedings; (i) court

reporting personnel involved in taking or transcribing testimony in the Chapter 15 Proceedings;

(j) any mediator or arbitrator engaged by the Parties to the Chapter 15 Proceedings, or appointed

by the Bankruptcy Court; and (k) outside consultants, financial advisors or experts retained, or

current employees or directors of the Parties consulted, for the purpose of assisting outside

counsel of record who has appeared in the Chapter 15 Proceedings on behalf of a Party in the

Chapter 15 Proceedings, provided that they comply with the requirements of paragraph 14; or (l)

any other person, with the express written consent of the Producing Party.

     4.    <u>Treatment of Attorneys' Eyes Only Information</u>.  Any information designated as

"Attorneys' Eyes Only" Discovery Materials shall be maintained in confidence by counsel to any

Receiving Party.  Provided that disclosure is not otherwise prohibited by this Stipulation,

Attorneys' Eyes Only Discovery Materials may only be disclosed to (a) counsel of record to the

Parties in the Chapter 15 Proceedings or counsel affiliated with a law firm that has appeared in the

Chapter 15 Proceedings on behalf of a Party, (b) legal assistants, secretaries, staff or agents and

consultants working with or for counsel referenced in (a) in connection with the Chapter 15

Proceedings; (c) litigation support services, including outside copying services; (d) any person

identified as an author or recipient of a document either on the face of the document or in the

metadata associated with the document, or any other person for which counsel to the Receiving

Party has a good faith basis for believing that such person has seen the document or is aware of

the information contained in the document prior to its production in the Chapter 15 Proceedings;

(e) the Bankruptcy Court, persons employed by the Bankruptcy Court, videographers and

stenographers transcribing or recording the testimony or argument at a hearing, trial or

deposition; or (f) any other person, with the express written consent of the Producing Party.

5.      <u>Provision to Witnesses – Resolution of Disputes</u>.  If any Party desires to provide

Confidential and/or Attorneys' Eyes Only Discovery Materials to any witness, the provision of

which would not be permitted under paragraphs 3 and/or 4 above, including as an exhibit at the

deposition of any witness, and if the Parties cannot resolve the matter consensually, the Party

seeking to prevent the disclosure to the witness shall make a telephonic application to the

Bankruptcy Court in accordance with that certain Stipulated Scheduling Order (D.I. 27 in Case

No. 17-11888), and the Parties shall not disclose the Confidential and/or Attorneys' Eyes Only

Discovery Materials until the Bankruptcy Court has ruled on the matter.  No Party shall disclose

Confidential or Attorneys' Eyes Only Discovery Materials to anyone not set forth in paragraphs

3 and/or 4 above, unless and until the Producing Party has agreed that the materials may be

disclosed, or the Bankruptcy Court has so ruled.

6.      <u>Provision to International Bondholder Committee and Steering Committee

Witnesses</u>.  Notwithstanding any other provision of this Protective Order, and in order to ensure

that the deposition of any officer, director, representative or employee of any member of the

International Bondholder Committee or the Steering Committee does not affect the ability of that

witness (or the institution of which such witness is an officer, director, employee or

representative) to continue to trade debt or other securities issued or guaranteed by Oi S.A. and

its affiliates, if any Party desires to provide to any witness that is an officer, director,

representative or employee of any member of the International Bondholder Committee or the

Steering Committee any Confidential and/or Attorneys' Eyes Only Discovery Materials that do

not identify such witness as an author or recipient thereof either on the face of any documents or

in the metadata associated with such documents (the "Outside Discovery Materials"), the Party must consult with counsel defending such witness at the deposition prior to presenting the witness with any such Outside Discovery Materials.  If the Party conducting the examination with respect to the Outside Discovery Materials is not the Producing Party of the Outside Discovery Materials, and counsel are unable to agree that the witness has seen the document or is aware of the information contained in the document, that Party may not present such materials to the witness.  If the Party taking the deposition is the Producing Party, and counsel are unable to agree that the witness has seen the document or is aware of the information contained in the document, the Party conducting the examination may nonetheless proceed to present the witness with the Outside Discovery Materials if they represent on the deposition record that the Outside Discovery Materials will be publicly disclosed immediately after the closing of the record by filing such materials on the Bankruptcy Court's docket in the Chapter 15 Proceedings.  If, within six (6) hours of the closing of the record of the deposition, the Party has not filed the Outside Discovery Materials on the Bankruptcy Court's docket, counsel for the witness may do so at any time thereafter, and such filing will not be deemed to be a violation of this Protective Order.

7.      Provision to Witnesses – Individuals Present.  If Attorneys' Eyes Only Discovery Materials are to be employed in the course of a deposition to any witness, absent the consent of the Producing Party, all persons other than the following shall be excluded from the deposition during the use of such Attorneys' Eyes Only Discovery Materials: (a) counsel for any Party; (b) counsel for the witness and the witness; and (c) the stenographer transcribing and/or videographer recording the testimony.  To the extent that the Parties dispute whether an individual can be present during a deposition in which Attorneys' Eyes Only Material is to be employed, and they are unable to resolve that dispute, any Party may make a telephonic

9

application to the Bankruptcy Court in accordance with that certain Stipulated Scheduling Order

seeking to resolve the matter, and no individual that is the subject of the dispute shall be present

unless and until the Bankruptcy Court has ruled on the matter.

       8.    <u>Permitted Purposes</u>.  All Confidential and/or Attorneys' Eyes Only Discovery

Materials disclosed in the Chapter 15 Proceedings shall be used solely in connection with the

Chapter 15 Proceedings (including, but not limited to, appeals, retrials, counterclaims,

crossclaims or matters referred to arbitration, if any); provided that the disclosure in the Chapter

15 Proceedings of Confidential and/or Attorneys' Eyes Only Discovery Materials shall not waive

any objection a party may have to the admissibility or relevance of such materials to any such

proceeding.  Confidential and Attorneys' Eyes Only Discovery Materials produced in the

Chapter 15 Proceedings may not otherwise be used in connection with any other litigation,

judicial or regulatory proceeding or for any business, commercial, competitive, personal or other

purpose, but nothing in this Stipulation will prevent the Parties from agreeing to deem any

Confidential and/or Attorneys' Eyes Only Discovery Materials as produced in other litigations or

proceedings or, absent such agreement, from seeking the production of such materials in other

litigations or proceedings including, for example, by issuing a subpoena to the Producing Party

and/or moving to compel the production of such materials.  Any summary, compilation, notes,

memoranda, analysis, or copy containing Confidential and/or Attorneys' Eyes Only Discovery

Material, and any electronic image or database containing Confidential and/or Attorneys' Eyes

Only Discovery Materials shall be subject to the terms of the Protective Order to the same extent

as the material or information from which such summary, compilation, notes, copy, memoranda,

analysis, electronic image or database is derived.

9.      Court Filings.  All Confidential and/or Attorneys' Eyes Only Discovery Materials filed in any court, and all portions of pleadings, motions or other papers filed with any court that disclose Confidential and/or Attorneys' Eyes Only Discovery Material, shall be filed in redacted form, with all Confidential and Attorneys' Eyes Only Discovery Materials redacted along with an unredacted copy filed under seal with the Clerk of the Court and kept under seal until further order of the Bankruptcy Court and provided to the Bankruptcy Court and all Parties entitled to receive such Confidential and/or Attorneys' Eyes Only Discovery Materials.  Anything designated as Confidential and/or Attorneys' Eyes Only Discovery Materials may be filed under seal without other or further application to the Bankruptcy Court, and the Clerk of the Court is hereby directed to accept the same for filing under seal.

10.     Compelled Disclosure.  Notwithstanding the foregoing, solely in the event that a Receiving Party is or its representatives are requested or required (through discovery, subpoena, civil investigative demand, or other similar legal or investigative process) to disclose any of the Confidential and/or Attorneys' Eyes Only Discovery Material, the Receiving Party shall provide the Producing Party with prompt written notice of any such request or requirement so that the Producing Party may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Stipulation in respect of such request or requirement.  If, in the absence of a protective order or other remedy or the receipt of a waiver by the Producing Party, a Receiving Party is nonetheless, in the opinion of its counsel, legally compelled to disclose such Confidential and/or Attorneys' Eyes Only Discovery Materials or else stand liable for contempt or suffer other censure or penalty, the Receiving Party may, without liability under this Stipulation, disclose only that portion of the Confidential and/or Attorneys' Eyes Only Discovery Materials which its  counsel advises it is legally required to disclose, provided that the

Receiving Party exercises its commercially reasonable efforts to preserve the confidentiality of the Confidential and/or Attorneys' Eyes Only Discovery Material, including, without limitation, by taking commercially reasonable measures to cooperate with the Producing Party to obtain an appropriate protective order or other reliable assurance that confidential treatment will be accorded the Confidential and/or Attorneys' Eyes Only Discovery Materials by the party to whom such material will be produced, and then only with as much prior written notice to the Producing Party as is practical under the circumstances. In no event will a Receiving Party oppose action by a Producing Party to obtain a protective order or other relief to prevent the disclosure of the Confidential and/or Attorneys' Eyes Only Discovery Material or to obtain reliable assurance that confidential treatment will be afforded the Confidential and/or Attorneys' Eyes Only Discovery Material.

11.    <u>No Waiver</u>.  Neither this Stipulation nor disclosure of any Confidential and/or Attorneys' Eyes Only Discovery Materials by a Producing Party shall be deemed by implication or otherwise to vest in the Receiving Party rights in or to such Confidential and/or Attorneys' Eyes Only Discovery Materials other than the right to use such Confidential Discovery Materials solely in accordance with this Stipulation.  It is understood and agreed by the Parties that no failure or delay by a Producing Party in exercising any right, power, or privilege pursuant to this Stipulation shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any right, power or privilege pursuant to this Stipulation.  If at any time a Producing Party determines or realizes that certain testimony or some portion(s) of Discovery Materials that it previously produced should be designated as "Confidential" and/or "Attorneys' Eyes Only", the Producing Party may apprise the Parties in writing, and such designated testimony or portion(s) of Discovery Materials will

thereafter be treated as Confidential /or Attorneys' Eyes Only Discovery Materials under the terms of this Stipulation, provided, however, that the Producing Party shall, at its cost, provide the Receiving Party with substitute copies, bearing the legend "Confidential" and/or "Attorneys' Eyes Only" of any such Discovery Materials at which time the Receiving Party shall promptly return to the Producing Party or destroy the copies of such substituted Discovery Materials. In the event that a Receiving Party opts to destroy the substituted Discovery Materials, it shall promptly notify the Producing Party when the substituted Discovery Materials are appropriately destroyed. Entry into this Stipulation and/or producing Confidential /or Attorneys' Eyes Only Discovery Materials pursuant hereto shall not prejudice in any way a Producing Party's rights to object to the authenticity or admissibility into evidence of any testimony or other evidence subject hereto.

12.    <u>Privileged Information</u>.  If a Party through inadvertence produces or provides any material that it believes is subject to the attorney-client privilege, common interest privilege, work-product doctrine, or other protection from discovery, the Producing Party may give written notice to the Receiving Party that the material is subject to a claim of attorney-client privilege, common interest privilege, work-product, or other protection and request that the material be returned to the Producing Party.  If a party receives any material that on its face appears to be subject to attorney-client privilege, common interest privilege, work-product doctrine, or other protection, the Receiving Party shall immediately notify the Producing Party so that the Producing Party may exercise its rights hereunder and request the return of the material.  In either event, the Receiving Party shall return to the Producing Party or destroy such material, together with all copies thereof, and shall not retain any copy of same (or the information contained therein), in any form.  Return of the material to the Producing Party shall not constitute

an admission or concession, or permit any inference, that the returned material is, in fact,

properly subject to the attorney-client privilege, common interest privilege, work-product

doctrine, or other protection, nor shall it foreclose any Party from seeking an order from the

Bankruptcy Court that the assertion of attorney-client privilege, common interest privilege,

work-product doctrine, or other protection is not proper for any reason other than a waiver

caused by the inadvertent production.  In the event that a Receiving Party opts to destroy the

inadvertently produced material, it shall promptly notify the Producing Party when the material

is appropriately destroyed.

13.     Objections to Designation.  In the event a Receiving Party objects to any

designation of testimony or Discovery Materials as "Confidential" or "Attorneys' Eyes Only",

the Receiving Party shall so inform the Producing Party, stating the grounds of the objection, and

they shall have two (2) days to attempt to resolve the objection, at the end of which the

Receiving Party may seek a ruling from the Bankruptcy Court that such information should not

be treated as Confidential and/or Attorneys' Eyes Only Discovery Material, provided that no

Confidential and/or Attorneys' Eyes Only Discovery Material shall be filed in the public record

prior to such a determination by the Bankruptcy Court (except, for the avoidance of doubt, as

permitted by paragraph 9 under seal), and provided further that the burden shall be on the

Producing Party to justify the claim that disputed material has been properly designated.

14.     Use by any Professional Firm or Individual Retained in Connection with the

Chapter 15 Proceedings.  Counsel for the Party retaining any professional firm or individual,

including outside consultants, financial advisors, or experts (collectively, the "Permitted

Recipients," and each a "Permitted Recipient") shall provide a copy of this Stipulation to the

Permitted Recipient or a representative of the Permitted Recipient, and the Permitted Recipient

14

or a representative of the Permitted Recipient must execute a non-disclosure declaration (in a

form substantially similar to the non-disclosure declaration attached hereto as Exhibit A (the

"Non-Disclosure Declaration")) to be bound by this Order prior to the Permitted Recipient

receiving any Confidential and/or Attorneys' Eyes Only Discovery Material.

15.   Additional Parties.  In the event an additional party files pleadings, or otherwise

participates in the Chapter 15 Proceedings, it shall not have access to Confidential Discovery

Material until the new party has itself, or by its counsel, executed and filed with the Bankruptcy

Court its executed Non-Disclosure Declaration.

16.   Third Party Beneficiaries.  Third parties that produce documents pursuant to a

subpoena or otherwise respond to discovery requests in the Chapter 15 Proceedings are intended

third-party beneficiaries of this Stipulation and have the right to enforce the terms of this

Stipulation, as necessary to, *inter alia*, protect the confidentiality of the Confidential and/or

Attorneys' Eyes Only Discovery Materials they produce.

17.   Enforcement Pending Entry.  The Parties agree to be bound by the terms of this

Stipulation pending the entry of this Stipulation by the Bankruptcy Court, and any violation of its

terms shall be subject to the same sanctions and penalties as if this Stipulation has been entered

by the Bankruptcy Court.  The provisions of this Stipulation shall, absent written permission of

the Producing Party or further order of the Bankruptcy Court, continue to be binding throughout

and after the conclusion of the Chapter 15 Proceedings, including without limitation any appeals

therefrom.

18.   Disposition of Confidential and/or Attorneys' Eyes Only Discovery Material.

Except as otherwise agreed by the parties, within sixty (60) days of the later of (a) one (1) year

from the date hereof, or (b) the closing of the Dutch Chapter 15 Proceeding, all persons having

received Confidential and/or Attorneys' Eyes Only Discovery Material shall, upon written request by the Producing Party, make reasonable efforts to either return such material and all copies thereof that are reasonably accessible to the Producing Party or to destroy all such Confidential and/or Attorneys' Eyes Only Discovery Material and certify that fact to the Producing Party. If any Party possesses documents that it cannot reasonably access to return or destroy as set forth in the previous sentence, the provisions of this order shall continue to apply. To the extent that any Receiving Party is a party to pending or threatened legal proceedings which prevent the destruction of such documents, that Receiving Party will notify in writing the Producing Party of the pending or threatened legal proceedings and the basis upon which the documents are prevented from being destroyed. The Producing Party will then have two (2) weeks to object in writing. If the Producing Party objects, the parties shall first meet and confer in an effort to resolve the dispute. If the parties are unable to resolve the dispute, counsel for either party shall, before filing any motion, arrange a conference call with the Bankruptcy Court with all counsel involved in the dispute. The Bankruptcy Court will endeavor to resolve the dispute without the filing of any motions. If the Producing Party does not object, or if the dispute is ultimately resolved in the Receiving Party's favor, the time for the Receiving Party to return or destroy such documents shall be tolled until the conclusion of such legal proceedings. Documents that have been received electronically and that cannot be returned or destroyed must be electronically deleted and deleted from "trash" files. For avoidance of doubt, notwithstanding any other provisions herein, this paragraph 18 applies to Confidential and/or Attorneys' Eyes Only Discovery Material only, and does not require that counsel for the Parties destroy work product, correspondence, expert reports or court filings. Confidential and/or Attorneys' Eyes Only Discovery Material submitted to the Court shall be subject to any sealing order entered in

the Chapter 15 Proceedings and applicable court rules regarding the handling of confidential

materials.

19.    <u>Counterparts</u>.  This Stipulation may be signed in counterparts.

RESPECTFULLY SUBMITTED,

Dated:  August 7, 2017

_/s/ Corinne Ball_

Corinne Ball, Esq.
Stephen J. Pearson, Esq.
Bryan M. Kotliar, Esq.
Anna Kordas, Esq.
JONES DAY
250 Vesey Street
New York, New York  10281
Telephone:  (212) 326-3939
Facsimile:  (212) 755-7306

*Attorneys for Jasper R. Berkenbosch,*
*Solely in his Capacity as Insolvency Trustee*

_/s/ John K. Cunningham_

John K. Cunningham
Mark P. Franke
WHITE & CASE LLP
1221 Avenue of the Americas
New York, New York 10020-1095
Telephone: (212) 819-8200

Southeast Financial Center
200 South Biscayne Blvd., Suite 4900
Miami, Florida 33131
Telephone: (305) 371-2700
Jason N. Zakia
Richard S. Kebrdle
Laura L. Femino

*Attorneys for Oi S.A. and the Foreign*
*Representative*

_/s/ Luke A. Barefoot_

Richard J. Cooper
Luke A. Barefoot
CLEARY GOTTLIEB STEEN
& HAMILTON LLP
One Liberty Plaza
New York, NY 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999

*Attorneys for the Steering Committee*

_/s/ Alan S. Brilliant_

Alan S. Brilliant
Shmuel Vasser
Benjamin E. Rosenberg
DECHERT LLP
1095 Avenue of the Americas
New York, NY 10036-6797
Telephone: (212) 698-3500
Facsimile: (212) 698-3599

*Attorneys for the International*
*Bondholder Committee*

**SO ORDERED:**

New York, New York

Dated: August 11, 2017

**_/s/ Sean H. Lane_**
HONORABLE SEAN H. LANE
UNITED STATES BANKRUPTCY JUDGE

**Exhibit A to Confidentiality Stipulation and Protective Order**

## NON-DISCLOSURE DECLARATION

I, _____, declare under penalty of perjury, the

following:

I reside at _____    in the City / County of

_____ and State of _____ in

_____;

I have read the annexed Stipulation and Protective Order, dated July ___, 2017, in the

matters entitled *In re Oi Brasil Holdings Coöperatief U.A.*, No. 17-11888 (SHL), *In re Oi Brasil

Holdings Coöperatief U.A*, No. 16-11794 (SHL), *In re Oi S.A.* et al., No. 16-11791 (SHL), which

are pending in the United States Bankruptcy Court for the Southern District of New York.

I am fully familiar with and agree to comply with and be bound by the provisions of that

Protective Order and consent to the jurisdiction of the United States Bankruptcy Court for the

Southern District of New York; and I will not divulge to persons other than those specifically

authorized by the Protective Order, and will not copy or use, except solely for the purpose of the

Chapter 15 Proceedings (as defined in the Protective Order), any information designated as

"Confidential" or "Attorneys' Eyes Only".

I declare under penalty of perjury under the laws of the United States that the foregoing is

true and correct.

Dated: _____

# Exhibit B

**Document Filed Under Seal**

# Exhibit C

Cleary Gottlieb Steen & Hamilton LLP
2 London Wall Place
London
EC2Y 5AU

MACFARLANES

24 April 2020





10.1   The Joint Administrators have authorised a third party to provide Nysco Management Corporation ("**Nysco**") and Balda Foundation ("**Balda**") with access to documents from the LCIA arbitration between your client and the Company (the "**LCIA Documents**"). The LCIA Documents are not the same documents as the Chapter 15 Documents.

10.2   Your client is in possession of the LCIA Documents and has obtained permission from the Court to use the LCIA Documents for the purpose of the English Fraud Proceedings, with the result that the Joint Administrators cannot control the use of the LCIA Documents in the English Fraud Proceedings (some/all of the LCIA Documents will no doubt be deployed by your client). As such, granting access to Nysco and Balda does not result in wider dissemination of the LCIA Documents than already exists.

10.3   The Joint Administrators only agreed to provide Nysco and Balda with access to the LCIA Documents because your client confirmed it had no objection to this (but would not provide the LCIA Documents itself, despite being in possession of them) in your letter to Byrne and Partners LLP, legal counsel to Nysco and Balda, dated 29 January 2020.



Yours faithfully

Macfarlanes LLP

Macfarlanes LLP

# Exhibit D

**Document Filed Under Seal**

# Exhibit E

**Document Filed Under Seal**

# Exhibit F

**Document Filed Under Seal**

# Exhibit G

**Document Filed Under Seal**

# Exhibit H

**Document Filed Under Seal**

# Exhibit I



Tel: +44 1481 724561
Fax: +44 1481 711657
mail@bdo.gg
www.bdo.gg

PO Box 180
Place du Pré
Rue de Pré
St Peter Port
Guernsey
GY1 3LL

5 March 2020

TO ALL KNOWN AND CONTINGENT CREDITORS

Dear Sirs

**BSG Resources Limited (the 'Company') - In Administration**

In accordance with the Order of the Royal Court of Guernsey ('the Administration Order') handed down on 6 March 2018, I am reporting the progress made in the administration of the Company (the 'Administration') for the period from 6 September 2019 to 5 March 2020 ('the Period'), that being the fourth six month period of the Administration.

1    **Statutory Information**

William Callewaert and Malcolm Cohen of BDO Limited and BDO LLP, respectively, were appointed Joint Administrators (the 'Joint Administrators') of the Company by the Royal Court of Guernsey ('the Royal Court') on an application made by the Company.  The appointment was made by way of an order of the Royal Court dated 6 March 2018 (the 'Administration Order')

The Company's registered office address is West Wing, Frances House, Sir William Place, St Peter Port, Guernsey, GY1 1GX and the Company's registered number is 46565.

2    **Background to the Administration**

Full details of the background to the appointment of the Joint Administrators were provided in their first report dated 5 September 2018.

In summary, the directors took the decision to apply to the Royal Court of Guernsey to place the Company into Administration with a view to realising its two major contingent assets, the ICSID arbitration against the Government of the Republic of Guinea and the claim against George Soros and other related parties in the United States, for the court-ordered purpose of the survival of the Company, and the whole or any part of its undertaking, as a going concern.

3    **Approach to the Administration**

As we stated in our first report, the Joint Administrators' role is to fulfil the purpose of the Administration Order as detailed above.  In order to achieve this, the Joint Administrators have been working with and gathering information from the Company's directors and

BDO Limited    Registered in Guernsey number 29684
Directors        J M Hallett FCA  S M Phillips FCA CPA  R M Searle FCA C.Dir  A M Trebert FCCA

BDO Limited is registered to carry out audit work in the UK by The Institute of Chartered Accountants in England and Wales.

BDO Limited, a limited liability company incorporated in Guernsey, is a member of BDO International Limited, a UK company limited by guarantee, and forms part of the international BDO network of independent member firms.



working with many of its historic advisors who possess information which is relevant to the conduct of the Administration with the aim of fulfilling the purpose of the Administration Order.

The affairs of the Company, particularly the litigation matters, are varied, complex and largely interrelated and the Joint Administrators and their team have spent a considerable amount of time liaising with the Company's management, advisors and the lawyers instructed on each individual matter to progress those matters with the overall aim of fulfilling the purpose of the Administration Order.

As advised in our previous reports, the Joint Administrators have retained the Company's premises in Guernsey and its existing employees in order to maintain the historic knowledge and cooperation of these key individuals and to ensure the best prospects of a successful outcome for the Administration.

## 4    Litigation Matters

An overview of each of the major litigation matters are set out below.

### 4.1  Claim Against the Republic of Guinea

As previously reported, in March 2019, a non-binding settlement term sheet was signed by the Joint Administrators (on behalf of the Company), as well as by representatives of two of the Company's subsidiaries (each of which is a co-claimant to the ICSID arbitration) and the Government of Guinea.  The settlement term sheet sets out a provisional structure for the potential consensual settlement of the ICSID arbitration, but does not impose binding obligations on any of the parties to it.  Following the signing of the settlement term sheet, the parties to the ICSID arbitration asked the tribunal to suspend work on producing its ruling, pending the finalisation of a binding settlement.  This suspension of the arbitration remains in force but can be brought to an end by any party if negotiations regarding a binding settlement break down at any time.

The non-binding settlement envisages that, if binding arrangements for a settlement are agreed, all of the Company's claims to the Simandou and Zogota exploration and mining licenses shall be released in return for the Government of Guinea granting a new mining license over the Zogota deposits, to be exploited by a third party, Niron Metals plc ('Niron'), with the Company being entitled to participate in the revenues from this license.

The Joint Administrators will not enter into any binding settlement until they are satisfied that it is in the best interests of the Company and its creditors and other stakeholders. A review of Niron's preliminary plans, projections and feasibility studies has been undertaken and, at the time of our previous report, a member of the Joint Administrators' team with specialist mining expertise had visited the Zogota site with a representative of Niron.

Since our last report to creditors Niron has continued to have its own external consultants on site to prepare a detailed feasibility study and plan.  This includes looking in detail at mining, transport and logistics.  We understand that they have also been in discussions with relevant governments, contractors and other third parties which will be needed to export



the iron ore deposits.  The Joint Administrators have maintained communications with Niron and anticipate being provided with Niron's detailed feasibility study in the coming weeks.

Due to the complexities involved, it is the Joint Administrators' intention to engage their own external specialist mining consultants to assess Niron's final feasibility study.  In this regard, the Joint Administrators approached three well-regarded international firms of mining consultants to obtain proposals.  The Joint Administrators have chosen the firm that they believe will offer the necessary expertise and have agreed a budgeted cost for the work to assess the feasibility study.  This will include further site visits.  However, as Nysco has not yet provided funding for this activity (see section 7.1 below on Nysco's relationship to the Company and its funding of the Administration), and absent other sources of financing, the Joint Administrators have not been able to instruct the firm to commence their work and are at present unable to progress their detailed evaluation of the settlement.

The Joint Administrators currently anticipate that it will be several more months before this work is completed and they are in a position to conclude on the acceptability of this deal or an alternative deal with similar or better economic effect for the Company.

The Joint Administrators have previously mentioned the matter of inaccurate reports that had appeared in the press to the effect that the proposed settlement has been finalised and is binding on the parties to it.  Although the Joint Administrators made it clear (and maintain their position) that these reports were incorrect and inaccurate it is apparent that they are being represented as fact by certain parties.  The Joint Administrators continue to monitor reports made in the press about the settlement term sheet and the Company generally and will consider whether any steps should be taken in respect of any such reports.

The Joint Administrators became aware from press reports in late July/early August 2019 that the Republic of Guinea was seeking developers for the Simandou iron ore deposit (being one of the deposits that are the subject of the ICSID claim).  The Joint Administrators immediately wrote to the Republic of Guinea (both directly and via its legal representatives) in order to reserve the Company's rights to take such action as considered necessary to protect the Company's interests against the Republic of Guinea (which include its interests in the Simandou Deposits). It was subsequently reported in an article in the Financial Times on 13 November 2019 that a Chinese backed joint venture had been awarded the right to exploit Simandou.  The Joint Administrators wrote to the Republic of Guinea's intermediary and its lawyers expressing their concerns regarding this arrangement again. A telephone discussion was held between the Joint Administrators and their lawyers and with lawyers representing the Republic of Guinea in this regard and it has been agreed that a meeting between the Joint Administrators and the Republic of Guinea be held to consider this matter further. Due to the recent elections that have been held in Guinea this meeting has not yet taken place.

As noted above, there is still a significant amount of work to be done before the Joint Administrators will be in a position to determine whether a binding settlement of the claim against the Republic of Guinea is in the best interests of the Company. If the Joint Administrators do agree to a binding settlement deal, the Joint Administrators will seek the sanction of the Royal Court prior to entering into it.



### 4.2 Filing for Mutual Recognition Under Chapter 15 of the Bankruptcy Code

As previously reported, the Joint Administrators have made an application to the US Bankruptcy Court for the Southern District of New York (the 'Bankruptcy Court') for recognition of the Administration under Chapter 15 of Title 11 of the United States Bankruptcy Code ('Chapter 15').

Chapter 15 recognition, if granted upon the terms requested by the Joint Administrators, will enable the Joint Administrators to obtain a stay of any action to execute against or attach the Company's assets located in the US.  Such relief will allow the Joint Administrators to retain control of the Soros Proceedings (as detailed in section 4.4 below) and any subsequent award arising therefrom, with a view to an eventual distribution of any realisations received by the Company in respect of the Soros Proceedings to the Company's creditors in accordance with the order of priorities provided for under Guernsey law.

The Chapter 15 application is being vigorously contested by Vale S.A ('Vale'), the largest unsecured creditor of the Administration, on the basis that Vale alleges the Joint Administrators' application does not meet the tests required to be granted Chapter 15 recognition as a foreign main proceeding and in particular that the Company's centre of main interest ('COMI') is not located in Guernsey. As well as satisfying other legal requirements, COMI must be found to be in Guernsey in order for the application to be successful, on the basis that the relief is being sought by insolvency office holders appointed in main plenary proceedings which are being conducted under the laws of Guernsey (and which are therefore capable of being recognised in other jurisdictions).

The Joint Administrators are continuing to respond to a significant and wide-ranging document discovery request from Vale that comprises some 68 individual document requests (the 'Document Requests') that Vale considers to be relevant to the determination of the COMI of the Company.

The discovery process has proven to be particularly complex due to the very large size of BSGR's full document population, the multi-jurisdictional nature of the Administration, the new (and largely untested) restrictions on cross-border data transfer imposed by the European General Data Protection Regulations ('GDPR') and the need to ensure that the documents released are not subject to qualifying privilege ('Privilege').

As production has continued and, in the Joint Administrators' view, been substantially completed, Vale have disputed the appropriateness of a number of the searches prepared by the Joint Administrators to identify documents responsive to the Document Requests.

In order to assist in reaching resolution of these disputes, the Bankruptcy Court appointed a Discovery Neutral (a retired Bankruptcy Judge) whose role is to understand the issues in dispute, assist the parties in coming to an agreement or, in the absence of an agreement, to issue recommendations to the presiding Judge in the Bankruptcy Court as to the appropriate steps to be taken to resolve the issues.

Following several meetings with the Discovery Neutral, and related correspondence between the parties, the process is continuing.  However, a number of the disputes have now been settled and the Joint Administrators' team is continuing to work to complete the production.



To date the Joint Administrators' team has reviewed over 92,000 documents as part of the discovery process that has included reviewing documents for responsiveness, GDPR and Privilege as well as conducting a quality control process.  It is anticipated that at least a further 13,000 documents will be reviewed as part of this process.

When document discovery is complete, the Joint Administrators anticipate that the Bankruptcy Court will schedule a hearing for the Chapter 15 Recognition. In advance of such hearing, Vale will have an opportunity to take the depositions of certain witnesses.

**4.3  Claim by Vale S.A.**

*English proceedings against BSGR*

As mentioned in our last report, on 4 April 2019 the London Court of International Arbitration ('LCIA') made an award in favour of Vale in respect of proceedings brought by Vale against the Company relating to alleged fraudulent misrepresentation. The award was for US$1,246,580,846 plus pre- and post-award interest. The total claimed by Vale is in excess of US$2 billion. On 9 May 2019 Vale obtained an enforcement order from the High Court of Justice in England ('the High Court').  That order was stayed pending the outcome of a challenge of the LCIA's decision by the Joint Administrators on behalf of the Company.

A trial of certain preliminary issues was held on 4 September 2019. In its judgment issued on 20 September 2019 the Court made the following orders:

a.  Vale's application for the Company to pay security for the award was denied;

b.  The Company was ordered to pay security for Vale's costs of the challenge in the amount of $510,000;

c.  The Court declined to set aside an order enabling Vale to enforce the award or to stay enforcement of the award;

d.  The Court permitted the Company to amend its Challenge Application; and

e.  The Court refused Vale's application to impose a condition on the Company pursuing the Challenge Application that the Company pay the outstanding costs order of Mr Justice Popplewell (made prior to the appointment of the Joint Administrators).

The Challenge Application itself was heard on 28 and 29 November 2019.  The Court dismissed the challenge in a judgment given at the end of the trial.  Costs were awarded to Vale on the indemnity basis.  These costs were covered by the payment of security for costs made pursuant to the 20 September 2019 order.

*US enforcement proceedings*

In addition to seeking to enforce the LCIA award in the UK, Vale has been seeking recognition of the LCIA award in the US District Court for the Southern District of New York ('the District Court') and to enforce that award in the USA (the 'Enforcement Proceedings'). If successful, Vale could seek to interrupt or control the Company's claim against George Soros and his Open Society Foundation (the 'Soros Proceedings') and any subsequent award arising from the Soros Proceedings.  The Company contested the Enforcement Proceedings



in the District Court pending the outcome of the Challenge Application and the granting of relief under Chapter 15 of the Bankruptcy Code, which would stay the Enforcement Proceedings and any other proceedings commenced in respect of assets located in the US.

Following the dismissal of the Challenge Application, the Joint Administrators' objections to the entering of an award in favour of Vale reflecting the decision of the LCIA were moot. Accordingly, the Joint Administrators and Vale negotiated a stipulation that was presented to the District Court on 21 February 2020 consenting to the entering of a judgment in favour of Vale and that is expected to be ordered by the District Court shortly.

The stipulation also dealt with the issue of Vale's right to enforce its judgment in the USA. Over the preceding weeks, the Joint Administrators have been working intensively with their lawyers to prevent enforcement taking place prior to a decision by the Bankruptcy Court on recognition of the Chapter 15 petition, which could in effect render Chapter 15 relief pointless if the Company had already lost control of its US located asset. The Joint Administrators' US lawyers had been working on the preparation of an application for a temporary injunction to prevent Vale from enforcing prior to the recognition hearing. At the same time, the District Court had asked both parties to file a statement setting out their views on the possible effects of enforcement by Vale on the ongoing insolvency proceedings and as to which court in the USA should hear the application for a temporary injunction.

Whilst these documents were being prepared, intensive discussions were taking place between the parties' respective lawyers with a view to a consensual temporary resolution of these issues.   Subject to approval by the District Court, the Joint Administrators and Vale have agreed that (amongst other things) Vale will refrain from taking certain enforcement action in the US for a period of 150 days, during which time the Joint Administrators expect that the Chapter 15 application will have been decided by the Bankruptcy Court, and that for a period of 90 days Vale would refrain from seeking discovery from the Company in furtherance of the enforcement of its judgement against the Company.

### Claims against third parties

In addition to seeking to make recoveries from the Company, Vale also commenced action in the High Court in November 2019 seeking recovery from the Company's parent companies, as well as from individuals currently or formerly connected with the Company (including Mr Beny Steinmetz). Vale also applied for and were granted a worldwide freezing order ('WFO') over the assets of the defendants up to the amount of its claim. The Joint Administrators understand that the defendants intend to defend the claim and to apply to have the WFO set aside or amended.

Following the making of the WFO, the Joint Administrators have been working with their lawyers to assess its effect on the Administration and have become involved in extensive correspondence and discussions both with Vale and with certain defendants concerning requests for information which the defendants are required to produce to Vale.

Although not directly covering the Company itself, the WFO has nonetheless had an effect upon the operation of the Administration. Indeed, the WFO restricts the activities of one of BSGR's two directors and the Company's funding source, Nysco. As well as requiring the attention and involvement of those BSGR personnel who are continuing to assist the Joint



Administrators in carrying out their functions, the detailed terms of the WFO have caused a hiatus in funding the Administration due in particular to the restrictions imposed upon Nysco when dealing with its assets and cash.  Although the situation has been alleviated to some extent in recent weeks, there remains a large backlog of payments to the Joint Administrators and their lawyers, whose continued forbearance and commitment to the interests of the creditors as a whole is acknowledged and appreciated by the Joint Administrators.  It is imperative for the successful continued operation of the Administration and the fulfilment of the Court ordered objective of the Administration that these funding difficulties can be resolved in the near future.

### 4.4  Claim against George Soros

We previously reported that in 2017, prior to the Joint Administrators' appointment, the Company had filed a complaint against George Soros and related parties in the District Court.  The complaint asserts various claims against George Soros, his Open Society Foundations and related entities arising out of or related to their alleged actions intentionally to deprive the Company of its iron ore mining interests in the Simandou region of Guinea.  The complaint seeks not less than US$10 billion in damages.

The defendants filed a motion to dismiss and in November 2017 the District Court granted the defendants' request for a stay of the litigation pending resolution of the ICSID Arbitration described above, without otherwise ruling on the merits of a motion to dismiss.

When we last reported, the litigation had been stayed until the next hearing, which was scheduled for 10 December 2019.  In the event and in light of the other significant matters which were ongoing in the Administration, including the Chapter 15 application and the proceedings commenced by Vale, the Joint Administrators agreed to a further extension of the stay pending a hearing which has now been scheduled to take place on 24 March 2020.

The Soros litigation is potentially one of the two largest assets of the Company and therefore the resolution of the litigation is expected to play an important role in the Joint Administrators' efforts to preserve the Company or any part of its undertaking as a going concern. The Joint Administrators are currently considering their approach to the 24 March hearing.

### 4.5  Cunico Litigation

As previously reported, the Company is directly involved as a party to four separate litigation proceedings:

- It is a respondent to proceedings brought in the District Court of Amsterdam, Netherlands by, amongst others, a Dutch registered company, Cunico Resources NV ('Cunico'). The Company (and the co-defendants) are contesting the jurisdiction of the District Court of Amsterdam.  A hearing was scheduled for pleadings on that specific issue on 14 November 2019.  However, Cunico requested that the court delay the hearing because there were cross-party settlement discussions going on. All other parties bar one agreed to the delay.  The Court requested an update by 25 February 2020 as to whether the parties wished to continue the proceedings prior to this date, the Company's Dutch lawyers received a request from Cunico and other



parties to the dispute for a further stay in order to continue settlement discussions. Based upon advice from the Company's lawyers, the Joint Administrators have agreed to a further stay. Subsequently, the Court granted a further stay until 17 June 2020.

- The Company is a co-claimant in appeal proceedings against Cunico (amongst others) in the Court of Appeal in Amsterdam. These proceedings were struck off the docket but can be recommenced at any given time by any of the parties. As previously reported, the Joint Administrators used their own specialist investigator to look into the underlying assets to assess the likelihood of making recoveries if the Company is successful in its appeal in respect of the Cunico litigation. However, the information that the Joint Administrators have identified is not up to date and it is difficult for the Joint Administrators to determine whether further action is in the best interests of the Company. The Joint Administrators have held discussions with Cunico's lawyers in order to explore alternative approaches to ascertain the current asset base of Cunico. Any continuation of the appeal would be subject to obtaining litigation funding. Dutch attorneys have provided advice as to the likelihood of success of an appeal. The Joint Administrators are awaiting further communications with Cunico's lawyer to assist them in assessing the likelihood of any assets of value being available in order to evaluate the likelihood of obtaining litigation funding, the prospects of success and the prospects of any subsequent recovery.

- As previously advised, the Dubai Courts made judgement in favour of the Company against Cunico Marketing FZE ('CMFZE') and rejected an appeal. Dubai lawyers have commenced execution.

- In respect of the matter where the Company is a co-defendant in an action filed in the Supreme Court of the Bahamas, no Statement of Claim has been filed. The Joint Administrators continue to monitor the situation and will take appropriate action should it become necessary.

In respect of the other litigation in which the Company is indirectly involved, these proceedings continue to be stayed, are subject to extensions, put on hold or discussions are taking place between the parties. Settlement discussions with the other parties are being undertaken as appropriate with the objective of maximising the return, if any, to the Company.

The Joint Administrators will continue to monitor all aspects of the Cunico Litigation, whether the Company has a direct or indirect interest, in order to maximise the return (or minimise the loss), if any, to the Company.



## 5    Assets

In addition to the potential litigation recoveries mentioned above, the other main assets of the Company are as follows:

### 5.1  Octea Limited and Subsidiaries

As previously reported, the Company owns a direct subsidiary company, Octea Limited ('Octea'), that acts as the holding company for a group of companies engaged in diamond mining, extraction and refinement based in Sierra Leone, as well as the marketing and sale of diamonds.

The Joint Administrators monitor Octea's performance in consultation with its management and have observer status on its board.  Whilst operations at the mine have been proceeding satisfactorily, there has been a continued requirement for investment in capital expenditure which, coupled with a persisting depressed rough diamond market, has resulted in difficult trading conditions.

Prior to the appointment of the Joint Administrators, the Company advanced funds to Octea under the provisions of a loan combination agreement dated 31 July 2012.  As at 29 February 2020, the balance owed by Octea to the Company is US$166million.

The repayment of the balances will be dependent on the financial success of the underlying diamond operations described above. The Joint Administrators note that Octea will only be in a position to repay the balances due to the Company when prior ranking debts due to Star West Investments Limited (detailed below) have been satisfied. The Company is further exposed to the financial position of Octea pursuant to a guarantee in favour of Star West Investments Limited.

### 5.2  West African Power Limited

As previously reported, the Company owns a direct subsidiary company, West African Power Limited ('WAPL'), which ultimately holds, through a group of subsidiary undertakings, a minority investment in a Nigerian company, Amperion Power Distribution Company Limited ('Amperion'). Amperion is the owner of a power station located in Geregu, Nigeria.

For several years WAPL has been in dispute on a number of issues with its investee company and with the majority shareholder in Amperion, Forte Oil PLC ('Forte'), which has historically exercised de facto control over Amperion and who, it is alleged, has denied WAPL its rights to participate in its management.

During 2019 Forte disposed of its interest in Amperion to Calvados Global Services Limited ('Calvados'), a company understood to be owned by Femi Otedola, the previous majority shareholder of Forte.

On 17 June 2019 and 19 June 2019 Calvados filed applications with the Federal High Court in Lagos, Nigeria to prevent WAPL from transferring or otherwise dealing with its shares in Amperion. In addition, an order was sought permitting Calvados to dilute WAPL's shareholding in Amperion as a consequence of its alleged failure to offset its capital contribution to the acquisition of the Geregu power station.



The Joint Administrators understand that following an initial judgment made in favour of Calvados an appeal was filed by WAPL which has resulted in the initial judgment being stayed pending determination by the Nigerian Court of Appeal. The Joint Administrators further understand that the matter has not yet been formally listed for a substantive hearing and that liaison with the Court of Appeal registry is ongoing.

### 5.3 Roslindale PTE Ltd

The Company holds 64,826,482 redeemable preference shares in Roslindale PTE Ltd ('Roslindale').  The shares were issued at US$1 per share and carry the right to a preferential dividend which is payable as and when determined by Roslindale's board of directors.

As previously reported, the Company's management recognised an impairment to the value of these shares during 2016 to US$1,000 in aggregate, as a result of significant uncertainty over future cash flows attributable to this asset.

The Joint Administrators understand that the underlying asset of Roslindale is an undeveloped oil and gas field located in the Middle East that is the subject of territorial disputes between Israel and Cyprus.  The Joint Administrators further understand that no dividend has been received from this investment to date.

The Joint Administrators are not presently in a position to determine whether this asset has any realisable value to the Company.

### 5.4 Bank Account

The Company holds a bank account with Banque J Safra Sarasin in Switzerland.  At the date of appointment there was US$17,947 in this account. As at 20 February 2020, the balance of funds total US$13,454. The movement in this balance is attributable to bank charges levied.

### 5.5 Debtors

#### BSG Capital Markets Limited ('Capital Markets')

As previously reported, Capital Markets is indebted to the Company for US$1.8m, which sum fell due for payment on 31 December 2018.  The Joint Administrators demanded payment of this amount but settlement has not been forthcoming, reportedly due to continued inadequate liquidity in Capital Markets.

The discussions with the debtor regarding a formal proposal to repay the amount outstanding were paused following the making of the WFO, but are expected to be recommenced shortly.

#### BSG Real Estate Limited ('Real Estate')

The sum of US$32,823 is due to the Company in respect of rent receivable from Real Estate, which occupied part of the Company's offices in Guernsey.

The Joint Administrators have demanded payment of this balance, which remains unpaid.



**Former Employee**

A former employee of the Company and of two of the Company's subsidiaries, Asher Avidan, was arrested in Israel in 2016.  The Company provided US$290,000 equivalent, to be lodged as a bail bond.  The bond was subsequently released, but was remitted to Mr Avidan rather than being repaid to the Company.

Mr Avidan has refused to repay the monies to the Company. The Joint Administrators have received funding to retain an Israeli law firm to recover the amount due, however during December 2019 Mr Avidan was made a respondent to the WFO issued by the High Court. Accordingly, the Joint Administrators concluded that there was no benefit in taking further steps to recover this debt at present, but will continue to monitor the position with respect to the WFO and its effect on Mr Avidan.

**5.6 Investigation of Assets**

The Joint Administrators have a duty to identify any potential assets of the Company other than those mentioned above and continue to review the Company's records and investigate any potential claims that the Company may have against third parties.  The Joint Administrators are also mindful of, and continue to monitor developments concerning, potential additional claims which may be made for the benefit of the Company and its creditors.  To the extent that the Joint Administrators take steps to pursue any such claims we will report to and update creditors accordingly.

If you are aware of any asset or potential asset that is not included above, please provide relevant information to the Joint Administrators.

**6    Creditors**

**6.1 Secured Creditors**

**Standard Chartered Bank PLC ('SCB')**

SCB is the historic lender to the Company and certain of its subsidiary undertakings and has asserted a claim to have security over all proceeds flowing into the Company to the extent of the full amount of the debt owing to it.  Prior to the appointment of the Joint Administrators, the debt due to SCB was US$16m, which SCB allege increased to some US$75m plus accruing interest as a result of the Company entering administration.  The Joint Administrators (on behalf of the Company) and SCB respectively have currently reserved all their rights in respect of the SCB position until it becomes necessary to resolve the question of the quantum of SCB's claim.

The Joint Administrators have continued to be in communication with SCB on a regular basis.



**Star West Investments Limited ('Star West')**

During 2016 and 2017, Star West acquired, on broadly the existing commercial terms, loan facilities between SCB and Octea and Laurelton Diamonds Inc. ('Laurelton') where the Company acted as the guarantor of those facilities.

As a result of the acquisition of the debt from SCB and Laurelton, Star West became the beneficiary of a security granted over the shares of Octea as security for the Company's guarantees of Octea's facility obligations to SCB and Laurelton.

To date, the guarantees provided by the Company under the terms of the facility have not been called upon by Star West and at present there is no debt due to Star West by the Company (although the Joint Administrators understand that there may be a technical default under the facility documents with respect to the Company entering Administration).

As at 29 February 2020, Octea is believed to be indebted to Star West in the amount of US$161million.

## 6.2 Unsecured Creditors

Following the unsuccessful challenge of the LCIA award, Vale S.A. is the principal unsecured creditor with a claim in excess ofUS$2 billion plus accruing interest. As previously reported, the total of the other known unsecured claims is currently believed to be some US$7 million.

## 7 Receipts and Payments Account

Attached is a summary of the receipts and payments account for the Administration to date. We comment as follows:

## 7.1 Funding

The Company has no liquid assets with which to fund the costs of the Administration.

As previously reported, a formal funding agreement between Nysco Management Corp. (the Company's immediate parent company) ('Nysco') and the Company was entered into on 18 December 2018 (the 'Funding Agreement'). The Funding Agreement sets out the terms on which Nysco has agreed to provide funding by way of loan facilities for certain aspects of the Administration.

Since our previous report £1,521,079 has been received from Nysco in respect of the Joint Administrators' fees, disbursements and legal costs incurred. However, over recent months and in particular since the making of the WFO, there has been a significant backlog of payments due under the Funding Agreement. The Joint Administrators have made it clear to representatives of Nysco that the lack of funding is now making it problematical for both the Joint Administrators themselves and for many of their advisors to progress the Administration as they would wish.



Included in the above amount is an accrual for the sum of £10,000 requested and received from Nysco in order to settle the initial legal costs expected to be incurred by the Israeli law firm in pursuing the debt due from the Company's former employee, Mr Avidan. These legal costs have not yet been incurred.

A sum of £100,000 is held by the Joint Administrators as a buffer amount which may be utilised under various circumstances including to settle certain unexpected costs that may arise.

A summary of the total amount loaned to the Company as at 25 February 2020 is set out as Appendix 1.

**7.2 Asset Realisations**

There have been no asset realisations in the Period.

**7.3 Payments**

Payments made in the period comprise the Joint Administrators' fees and disbursements and legal costs incurred by them. The Joint Administrators' fees and disbursements are discussed in detail at paragraph 8 below.

In the Period of this report legal costs incurred total £374,646 for which funding of £288,527 has been requested and of which £118,255 has been received.

In addition to the above, the Joint Administrators have engaged Duane Morris LLP to act for them in regard to certain of the US proceedings.  Nysco has been paying Duane Morris's costs direct and to date has paid $500,000.

A total of nearly £1million is currently owed to a number of law firms whose fees are paid directly by Nysco.

**7.4 Trading**

Prior to the Joint Administrators' appointment, the Company acted as an adviser and administration function for a number of its subsidiaries and has continued to do so. Operational costs have been incurred, principally in respect of salaries and legal and professional fees.

Under the terms of a management agreement, fees will become payable to the Company from its direct subsidiary, Octea, upon the occurrence of certain milestones.  The quantum and timing of this management fee is presently uncertain.

**8    Joint Administrators' Remuneration**

Following the first anniversary of the Joint Administrators' appointment, in accordance with the Funding Agreement, the Joint Administrators prepared a budget setting out their expected fees that would be incurred in the year to 5 March 2020.  The fee budget was



agreed at £1,129,857 which represented an estimated 2,195 hours of work.  This budget was approved by the Royal Court.

During the period covered by this report, the legal proceedings involving the Company, most significantly the Chapter 15 application and related document discovery, has resulted in the need for significant costs to be incurred in excess of the amount budgeted  In the period 6 March 2019 to 25 February 2020 the time spent amounted to 6,265.45 hours at a cost of £2,884,752.

The tables at Appendix 2 summarise the Joint Administrators' time costs incurred in the Period of this report and from appointment up to the date of preparation.

As at 25 February 2020 time costs totalling £1,995,557 have been incurred by the Joint Administrators since 6 September 2019.

In the period of this report Nysco advanced £1,521,079 to the Administration account in respect of the Joint Administrators' fees, disbursements and legal costs payable by the Company.

At the time of preparing this report £1,358,862 of requested funding remains outstanding. The Joint Administrators' fees for the month of February 2020 are expected to be in the region of £250,000 but have not yet been requested.

Since November 2019 Joint Administrators' fees amounting to £156,791 have been deferred for payment and will be payable should funds become available.

9    **Disbursements**

Direct disbursements are recovered in respect of precise sums paid or payable to third parties during the Administration.  In the Period covered by this report, expenses totalling £280,644 have been incurred, as detailed in the table below.

| Disbursement | Amount £ |
|---|---|
| Data processing & hosting | 170,723.59 |
| Air travel | 20,759.44 |
| Ground travel | 1,408.19 |
| Hotels & subsistence | 1,918.02 |
| Office holder insolvency bonds | 362.88 |
| Public relations advice | 10,262.00 |
| Other | 10.00 |
| Legal costs | 75,200.00 |
| | 280,644.12 |

Data processing & hosting costs have been incurred principally in respect of the discovery process in the Chapter 15 case in the US.  The expenses relate to the costs of engaging paralegal staff to review the Company's documents for responsiveness to the discovery requests, the licencing of the document review software platform and the cost of hosting the data on remote storage to allow access by the Joint Administrators' US lawyers.



Air travel predominately relates to travel to the US by the Joint Administrators and their team to attend US court hearings in respect of the Chapter 15 application.

The arbitration proceedings and other matters relating to the Company or entities associated with the Company resulted in a significant amount of media interest. The costs reported relate to the Joint Administrators' public relations advisors who manage media relations at their direction.

Legal costs disbursements relate to £75,200 incurred in respect of advice relating to the interaction of the GDPR and the US discovery process.

## 10  Future of the Administration

As mentioned above, the court-ordered purpose of the Administration is the survival of the Company and the whole or any part of its undertaking as a going concern.

The two major contingent assets in this Administration are the ICSID arbitration against the Republic of Guinea and the US litigation against George Soros. The status of these two matters has been set out above and the outcomes will determine the future strategy of the Administration and whether or not it will be possible for the Joint Administrators to achieve the purpose of the Administration. The Joint Administrators have taken legal advice as to the applicable legal requirements in this regard (in respect of which privilege is not waived) and will continue to do so.

If you require any further information, please contact the Joint Administrators at William.Callewaert@bdo.gg.

Yours faithfully
For and on behalf of
BSG Resources Limited

William Callewaert
Joint Administrator

15



**Appendix 1**
**Joint Administrators' Summary Receipts and Payments Account**

| | Notes | From 1 Sep 2019 To 25 Feb 2020 £ | From 6 Mar 2018 To 25 Feb 2020 £ |
|---|---|---|---|
| **RECEIPTS** | | | |
| Funds loaned by Nysco Management Corporation | 1 | 1,521,079 | 2,308,812 |
| Buffer amount loaned by Nysco Management | 2 | - | 100,000 |
| Interest received | | 151 | 304 |
| | | 1,521,231 | 2,409,117 |
| **PAYMENTS** | | | |
| Joint Administrators' Fees | 3 | 1,191,797 | 1,723,078 |
| Joint Administrators' Disbursements | 3 | 80,391 | 94,566 |
| Legal Fees and Disbursements | 4 | 234,479 | 476,756 |
| Bank Charges | | 520 | 634 |
| | | ( 1,507,188) | ( 2,295,035) |
| **Total/Balance Held By The Joint Administrators** | | 14,043 | 114,082 |
| **MADE UP AS FOLLOWS** | | | |
| UK Administration Account | | | 43 |
| UK Buffer Account | 2 | | 100,262 |
| Guernsey Administration Account | | | 13,778 |
| | | | 114,082 |
| **NYSCO LOAN ACCOUNT** | | | |
| **Operating Costs** | | | |
| Salaries and associated costs (tax & soc.sec.) | 5 | ( 124,495) | ( 432,763) |
| Legal & professional fees | | ( 24,004) | ( 169,317) |
| Insurance: D&O cover | 6 | ( 102,333) | ( 201,093) |
| Office costs | | ( 7,509) | ( 58,830) |
| | | ( 258,341) | ( 862,003) |
| **Legal Fees & Associated Costs** | | | |
| Legal fees & disbursements | | ( 400,846) | ( 2,879,321) |
| IT services (online document archival) | 7 | ( 16,845) | ( 114,963) |
| US Legal Fees | 8 | ( 384,527) | ( 384,527) |
| | | ( 802,218) | ( 3,378,811) |
| **Joint Administrators' Fees & Disbursements** | | | |
| Pre-appointment fees & disbursements | | | ( 64,500) |
| Post-appointment fees | | ( 1,191,797) | ( 2,973,494) |
| Post-appointment disbursements | | ( 80,391) | ( 99,590) |
| | | ( 1,272,188) | ( 3,137,584) |
| **Total Loaned To BSG Resources Ltd (In Administration)** | | ( 2,332,747) | ( 7,378,398) |

Notes

1. The Company's direct parent company, Nysco Management Corporation, has agreed to fund the Joint Administrators' fees, disbursements and legal costs.
2. Nysco Management Corporation has provided the sum of £100,000 to be held in respect of costs that require immediate funding.



3.  The Joint Administrators' fees are approved by the Royal Court of Guernsey.  Funding for fees and disbursements totalling £1,359k has been requested from Nysco Management Corp and has not yet been received.  Fees for February 2020 have not been requested but are expected to be in the region of £250k.

4.  During the period funding has been requested for legal fees and disbursements totalling £286k, of which £118k has been received. The balance of the £234k relates to funding received in this period for costs incurred in the previous period.

5.  The Company retains two members of staff who provide administrative and operational functions.

6.  Director and Officer insurance indemnity cover has been obtained in respect of the retained employees.

7.  IT services includes the provision of cloud-based storage for data and digital documents relating to various legal proceedings.



Appendix 2

**BSG Resources Limited (In Administration)**
**Summary of Joint Administrators' Time Costs**
**For the Period of this report (6 September 2019 to 25 February 2020)**

For the Period 6 September 2019 to 25 February 2020

| | Partner £712 per hour | | Principal/Director £457 per hour | | Senior Manager/Manager £402 per hour | | Other £230 per hour | | Total £420 per hour | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Hours | £ | Hours | £ | Hours | £ | Hours | £ | Hours | £ |
| Appointment Matters | - | - | - | - | - | - | - | - | - | - |
| Day One Matters | - | - | - | - | - | - | - | - | - | - |
| Litigation Matters | 496.30 | 362,936.45 | 891.20 | 407,286.23 | 1,952.85 | 799,033.94 | 95.65 | 30,455.69 | 3,436.00 | 1,599,712 |
| Trading Matters | 53.05 | 28,121.91 | 118.80 | 54,062.37 | 58.85 | 21,306.29 | 10.25 | 940.95 | 240.95 | 104,432 |
| Tax | - | - | - | - | - | - | - | - | - | - |
| Statutory Compliance | 1.90 | 1,382.65 | 15.10 | 6,280.56 | 22.60 | 7,734.78 | 0.75 | 168.75 | 40.35 | 15,567 |
| General Administration | 58.20 | 41,734.05 | 129.05 | 57,113.28 | 260.15 | 94,260.69 | 84.40 | 12,394.71 | 531.80 | 205,503 |
| Other Matters | 39.75 | 28,332.50 | 58.85 | 29,757.29 | 29.60 | 12,254.40 | | | 128.20 | 70,344 |
| Agreed Discount | - | - | - | - | - | - | - | - | | |
| Agreed Deferral | | | | | | | | | - | 156,791 |
| | 649 | 462,508 | 1,213 | 554,500 | 2,324 | 934,590 | 191 | 43,960 | 4,377 | 1,838,766 |

For the Period of the Administration

| | Partner £703 per hour | | Principal/Director £455 per hour | | Senior Manager/Manager £386 per hour | | Other £203 per hour | | Total £437 per hour | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Hours | £ | Hours | £ | Hours | £ | Hours | £ | Hours | £ |
| Appointment Matters | 21.50 | 14,943.00 | 49.10 | 22,839.00 | 10.85 | 4,030.00 | - | - | 81.45 | 41,812 |
| Day One Matters | 6.50 | 4,526.00 | 33.90 | 12,987.00 | 45.00 | 16,100.00 | 0.30 | 33.00 | 85.70 | 33,646 |
| Litigation Matters | 1,120.05 | 800,413.68 | 1,700.95 | 788,134.10 | 2,331.10 | 940,986.29 | 134.90 | 40,518.59 | 5,287.00 | 2,570,053 |
| Trading Matters | 137.25 | 80,211.23 | 456.10 | 188,817.58 | 301.10 | 96,455.40 | 18.05 | 2,378.01 | 912.50 | 367,862 |
| Tax | 6.35 | 4,440.23 | 25.21 | 16,772.29 | 1.00 | 302.40 | 3.65 | 646.00 | 36.21 | 22,161 |
| Statutory Compliance | 5.35 | 3,865.91 | 115.70 | 44,290.16 | 93.30 | 28,339.73 | 42.30 | 6,026.63 | 256.65 | 82,522 |
| General Administration | 166.65 | 118,851.70 | 355.50 | 159,751.90 | 599.50 | 219,952.23 | 105.40 | 14,352.78 | 1,227.05 | 512,909 |
| Other Matters | 187.45 | 132,648.09 | 349.15 | 169,460.96 | 269.90 | 105,014.50 | 36.25 | 5,081.13 | 842.75 | 412,205 |
| Agreed Discount | - | - | - | - | - | - | - | - | - | - | 75,856.00 |
| Agreed Deferral | - | - | - | - | - | - | - | - | - | - | 156,791.00 |
| | 1,651 | 1,159,900 | 3,086 | 1,403,053 | 3,652 | 1,411,181 | 341 | 69,036 | 8,729 | 3,810,522 |

# Exhibit J

**Document Filed Under Seal**

# Exhibit K

Sworn by: Peter Harold Driver
For: Applicant
Number: First
Exhibit: PHD1
Date: 27 February 2018

## IN THE ROYAL COURT OF GUERNSEY

## (ORDINARY DIVISION)

IN THE MATTER OF BSG RESOURCES LIMITED

AND

IN THE MATTER OF PART XXI OF THE COMPANIES (GUERNSEY) LAW, 2008

---

## AFFIDAVIT COURT SHEET

---

**Party Filing the Affidavit:**           BSG Resources Limited (the Applicant)
**Advocate for the Applicants:**          Ogier (Mathew Newman)
**Deponent:**                             Peter Harold Driver
**The number of the Affidavit:**          First
**Date sworn**:                           27 February 2018
**Number of pages:**                      1019 (including exhibit)
**Exhibit:**                              PHD1

|    | DOCUMENT/S EXHIBTED | DATE | PAGE/S |
|----|---------------------|------|--------|
| 1. | Statement of the Register for BSG Resources Limited ("**BSGR**") | 26/02/18 | 12 |
| 2. | Memorandum and Articles of Incorporation for BSGR | - | 16 |
| 3. | Migration documents for BSGR (letter from Carey Olsen to Greffe dated 23/3/07 (enclosing Certificate of Continuance) and Application to Royal Court dated 6 March 2007) | - | 40 |

| | | | |
|---|---|---|---|
| 4. | "Upwards" Group structure chart | 31/12/17 | 43 |
| 5. | "Downwards" Group structure chart | 31/12/17 | 44 |
| 6. | Comite Technique de Revue des Titres et Conventions Miniers ("**CTRTCM**") notification to VBG-Vale BSGR Ltd ("**VBG**") (now BSG Resources (Guinea) Limited) of its intention to recommend to the Strategy Committee of the Government of Guinea that the mining and exploration rights of VBG in Guinea be withdrawn | 21/02/14 | 45 |
| 7. | Basic Agreement between The Republic of Guinea and BSGR (including English translation) | 16/12/09 | 50 |
| 8. | CTRTCM recommendation to the Strategic Committee | 28/3/14 | 182 |
| 9. | BSGR's Request for Arbitration initiated with the International Centre for Settlement Disputes ("**ICSID**") against the Government of Guinea | 1/8/14 | 670 |
| 10. | BSG Resources (Guinea) Limited's (previously VBG) request for arbitration against the Republic of Guinea | 13/10/15 | 702 |
| 11. | BSGR's Memorial / Statement of Claim against the Republic of Guinea | 29/2/16 | 770 |
| 12. | Unaudited Company Financial Statements for BSGR for the year ended 31 December 2017 | 31/12/17 | 920 |
| 13. | Implementation Agreement between BSGR and Standard Chartered Bank and others | 30/09/14 | 948 |
| 14. | Report from BDO to BSGR in support of BSGR's Application for an Administration Order | 26/02/18 | 1010 |
| 15. | Profile / CV for Malcolm Cohen | - | 1016 |
| 16. | Profile / CV for William Callewaert | - | 1017 |
| 17. | Letter of Consent to Act from Malcolm Cohen to BSGR | 26/02/18 | 1018 |
| 18. | Letter of Consent to Act from William Callewaert to BSGR | 26/02/18 | 1019 |
| 19. | BDO's draft budget in respect of administration of BSGR for year one | - | 1020 |

Sworn by: Peter Harold Driver
For: Applicant
Number: First
Exhibit: PHD1
Date: 27 February 2018

***IN CAMERA***

IN THE ROYAL COURT OF GUERNSEY

(ORDINARY DIVISION)

IN THE MATTER OF BSG RESOURCES LIMITED

AND

IN THE MATTER OF PART XXI OF THE COMPANIES (GUERNSEY) LAW, 2008

---

### AFFIDAVIT OF PETER HAROLD DRIVER IN SUPPORT OF COMPANY'S APPLICATION FOR AN ADMINISTRATION ORDER

---

I, **PETER HAROLD DRIVER** of Memories, 2 Elm Court, Fosse Andre, St Peter Port, GY1 1XB having been duly sworn, being over 18 years of age, having personal knowledge of the facts sworn herein and being competent to testify as a witness hereby **MAKE OATH AND SAY AS FOLLOWS:**

1    I am a director of BSG Resources Limited ("**BSGR**"), which company's registered office address is West Wing, Frances House, Sir William Place, St Peter Port, Guernsey GY1 1GX.  I make this affidavit on behalf of BSGR in support of its application dated 27 February 2018 for an administration order in respect of BSGR ("**Application**").

2    I am duly authorised by BSGR's board of directors ("**Board**") to make this affidavit.

3    In so far as the content of this affidavit is within my personal knowledge it is true, and in so far as it is not within my personal knowledge, it is true to the best of my information, knowledge and belief.

4    There is now produced and shown to me marked **"Exhibit PHD1"** a bundle of true copy documents.  References to page numbers are references to that Exhibit.  The Exhibit contains substantially commercially sensitive and highly confidential material and, as

LIT-22150032-4

such, the first part of the Application is for the matter to be heard *in camera* and for the Court file to be sealed. I am advised that submissions will be made on this point at the hearing of the Application.

## History and Background Information

5    BSGR is a non-cellular limited liability company incorporated in Guernsey with registered number 46565. A copy of a Statement of the Register in respect of BSGR, dated 26 February 2018, is at <u>pages 12 to 15</u> and a copy of BSGR's Memorandum and Articles of Incorporation are at <u>pages 16 to 39</u>.

6    BSGR was originally incorporated in Jersey as a limited liability company on 30 July 2003, with registration number 85774. However, the company was migrated to Guernsey on 9 March 2007 and so ceased to be registered in Jersey on that date and from thereon continued in Guernsey. A copy of the relevant documentation in this regard, obtained from the Guernsey Registry (including a letter from Carey Olsen to the Greffe dated 23 March 2007, a copy of the Certificate of Continuance of a Jersey Company Overseas and the Application to the Royal Court in Guernsey, stamped as granted by the Royal Court) is at <u>pages 40 to 42.</u>

7    BSGR is actively engaged through subsidiaries and associates in a wide range of activities which are related to the exploration, development, extraction, refinement and marketing of a diversified range of natural resource products in a number of sectors, including diamonds and power (including renewable energy). BSGR previously also actively engaged in the iron ore and ferronickel sectors.

8    The trading of BSGR is limited to advisory and technical services provided to a number of subsidiaries. Its trading interests can be categorised as follows:

   (a)    Diamond operation held through a subsidiary, Octea Limited (incorporated and registered in the BVI) with mining operations in the Republic of Sierra Leone;
   (b)    Power operation held through a subsidiary, West African Power Limited (incorporated and registered in Guernsey) with a 38% investment operating in the Federal Republic of Nigeria;
   (c)    Iron ore operation held through a subsidiary, BSG Resources (Guinea) Limited (although see paragraphs 12 to 24 below, noting that operations have currently ceased); and
   (d)    Oil and gas operation investment in Roslindale Pte Limited (although this is presently only valued in the region of US$1,000).

9    BSGR is not (and never has been) regulated by the Guernsey Financial Services Commission.

10   To my knowledge, there is no current application seeking to place BSGR into administration or compulsory liquidation and no resolution has been passed by BSGR to wind itself up under part XXII of The Companies (Guernsey) Law, 2008, as amended (**"Companies Law"**).

LIT-22150032-4

11    Two group structure charts showing (i) the 'upwards' group structure and (ii) the 'downwards' group structure as relevant to BSGR, are at <u>page 43</u> and <u>page 44</u> respectively.

**Recent History**

12    One of BSGR's most significant operations is in respect of world class iron ore deposits in Guinea, comprising:

12.1    An iron ore mining concession granted to BSG Resources (Guinea) SARL ("**BSGR Guinea**") on 19 March 2010 over an area in Simandou South, near the village of Zogota ("**Zogota Mining Concession**");

12.2    A mining and infrastructure agreement dated 16 December 2009 entered into by two subsidiaries of BSGR, BSGR Guinea and VBG-Vale BSGR Ltd ("**VBG**") (now BSG Resources (Guinea) Limited) with the Republic of Guinea regarding the rights and obligations arising from the Zogota Mining Concession ("**Basic Agreement**"); and

12.3    A prospecting permit granted to BSGR Guinea over an area referred to as Simandou Blocks 1 and 2 granted on 9 December 2008 ("**Blocks 1 and 2 Permit**").

13    In 2010, BSGR entered into a joint venture agreement with the Brazilian mining company, Vale S.A. in relation to the development of the three rights set out above.

14    In 2011, a new President of Guinea, Alpha Condé, came to power. Following President Condé's election, BSGR faced obstruction in developing its mining rights. In 2012, BSGR was informed that President Condé had set up a committee aimed at investigating how certain mining rights in Guinea had been obtained (the Comité Technique de Revue des Titres et Conventions Miniers ("**CTRTCM**")). Throughout the CTRTCM process, BSGR complained about the lack of due process and apparent prejudice being shown to it. BSGR denied – and continues to deny – the allegations made against it by the CTRTCM.

15    In response to the allegations of corruption made by CTRTCM against the wider BSG Group, the Board of BSGR initiated a review using an independent professional accountancy firm, to verify the accuracy of its internal controls, processes and payment procedures, including confirmation that payments made by the Group were proportionate and of an appropriate business nature. This review has not revealed any matters that support the allegations of wrongdoing.

16    However, in March 2014, the CTRTCM recommended to the Strategy Committee of the Government of Guinea that the Zogota Mining Concession, the Blocks 1 and 2 Permit and the Basic Agreement be cancelled, and the companies within BSGR's control be prevented from being reawarded those rights ("**Notification**"). Copies of the Notification and the Basic Agreement are at <u>pages 45 to 49</u> and <u>pages 50 to 181</u> respectively.

17    In April 2014, the Government of Guinea accepted the recommendations of the Strategy Committee of the Government of Guinea to strip VBG of its mining licences for Simandou and Zogota concession areas and to exclude VBG and BSGR from participating in the tender process to reallocate the mining titles.

LIT-22150032-4

18    The Board firmly believes that the basis of the CTRTCM recommendation (a copy of which is at <u>pages 182 to 669)</u> is not legitimate, and the expropriation of VBG's mining titles to be the illegal practices of the Alpha Condé government in Guinea as illegally importuned, influenced, motivated and ultimately controlled by the illegal conduct of Mr George Soros and his co-conspirators.

19    In May 2013, BSGR initiated arbitration proceedings with the International Centre for Settlement Disputes ("**ICSID**") against Guinea.  A copy of BSGR's Request for Arbitration initiated with ICSID against Guinea dated 1 August 2014 is at <u>pages 670 to 701.</u>

20    Following BSGR's re-purchase of Vale S.A.'s ("**Vale**") shares in VBG in March 2015, VBG was renamed to BSG Resources (Guinea) Limited and also issued an ICSID claim against Guinea dated 13 October 2015 in respect of its mining rights (<u>pages 702 to 769</u>). Subsequently, the two claims against Guinea were consolidated, and a Statement of Claim was issued on behalf of BSGR, VBG and BSGR Guernsey on 29 February 2016 (<u>pages 770 to 919</u>).  BSGR is seeking the restitution of its mining titles and agreements as well as damages arising out of the revocation of these interests.  The Statement of Claim summarises BSGR's position as follows:

    "*In summary, the Claimants and their investments have been treated in an unlawful, unfair, inequitable and discriminatory manner by the Guinean State (including by its agencies and/or instrumentalities) and in a manner which demonstrated a blatant disregard and breach of both (a) the express undertakings the State itself had provided directly to the Claimants and (b) applicable Guinean and international law (which guaranteed protection to the Claimants and their investments)*".

21    The ICSID hearing was held between 22 May to 2 June 2017, in Paris. Guinea called most of BSGR's witnesses and one of its experts. BSGR called all of Guinea's witnesses. The hearing was broadly favourable for BSGR. As a result of the testimony of one of Guinea's witnesses, the Tribunal has ordered a forensic examination of several key documents which BSGR has disputed the authenticity of. Once this process is complete, there will be an opportunity for closing submissions and the Tribunal will then make its award.  The Board has been advised to expect an award by the end of 2018 or early 2019.

22    Separately, Vale has filed a claim against BSGR in the London Court of International Arbitration ("**LCIA**"), seeking to recoup the circa USD1.3 billion it invested that it allegedly lost as a result of the expropriation by the Government of Guinea.  The LCIA process is confidential, pursuant to Article 30 of the 1998 LCIA Rules, and specific procedural orders made by the LCIA Tribunal, which is one of the reasons why this affidavit must be kept under seal.  The hearing was due to commence on 22 August 2016.  However, on 5 August 2016, the Chairman of the Tribunal was removed by the LCIA on the basis of an appearance of bias.  The Chairman was replaced, and a new hearing scheduled for February 2017.  BSGR did not attend the hearing on the basis of serious concerns as to the Tribunal bias and unfairness, the unavailability of its chosen Counsel (which the Tribunal ignored), and the unavailability of certain witnesses.

23    Board/Legal Advice

Board/Legal Advice

24    As a result of CTRTCM's review and the actions of the Government of Guinea, operations at the mine have ceased and the timing of the recommencement of operation is uncertain.

Board/Legal Advice

Board/Legal Advice    The Board

continue to closely monitor those assumptions and judgements.

**Current Financial Position**

25    Commercially Sensitive Information

**BSG RESOURCES LIMITED**
**UNAUDITED COMPANY STATEMENT OF FINANCIAL POSITION**

**AS AT 31 DECEMBER 2017**



Commercially Sensitive Information

LIT-22150032-4

26   Commercially Sensitive Information

27   Commercially Sensitive Information

(a)   <u>Related party loans receivable - $142.52m</u>

Just under 99% of the balance relates to a secured loan to Octea Limited ("**Octea**"), the repayment date is 31 December 2021 and the loan bears interest at 6 month USD LIBOR +5% per annum.  The loan is secured by a charge on the assets of Octea and repayable out of distributable profits subject to the repayment of any preferred finance loan.  BSGR has provided a letter of support to Octea to meet Octea's obligations until Octea is able to settle its liabilities in the ordinary course of business.

(b)   Commercially Sensitive Information

Commercially Sensitive Information

**Contingent Liabilities**

28   BSGR has two significant contingent liabilities as detailed below:

*Vale SA claim against BSGR*

29   The background to this claim is set out above.  The LCIA has heard the case and judgment is expected imminently.  As explained in paragraph 22 above, BSGR did not attend the hearing Board/Legal Advice
Board/Legal Advice

*Guarantee to Star West Investments Limited*

30   As at 31 December 2017, BSGR had provided two guarantees to Star West Investments Limited ("**Star West**") in respect of facilities provided to Octea and Koidu Limited.  The total amount outstanding in respect of these facilities is $150m.  The maturity date of both facilities is 30 September 2022, with repayments from June 2018 to September 2022 as a function of surplus cash exceeding $5m.

LIT-22150032-4

31    Board/Legal Advice

## Standard Chartered Agreement

32    As regards the liabilities of BSGR, notably it is a party to an Implementation Agreement relating to the restructuring of a US$92,000,000 amortising term loan facility agreement originally dated 28 January 2011, as amended and restated by amendment and restatement agreements dated 23 November 2011, 28 March 2013 and 30 September 2014 between BSGR, Group Parties, and Standard Chartered Bank ("**SC Agreement**"). A copy of the SC Agreement, which is dated 20 September 2016, is at pages 948 to 1009.

33    Under the terms of the SC Agreement, Standard Chartered Bank has taken assignment of the cashflows anticipated to be received into BSGR, leaving little or no cash coming into BSGR to fund the proposed administration.  However, I explain further below (in paragraphs 51 and 52) why it is considered that this potential issue has been resolved.

## Litigation Funding Agreement

34    In the interests of completeness, another material agreement is the Litigation Funding Agreement between Litigation Solutions Limited ("**LSL**") and (1) BSGR; (2) BSG Resources (Guinea) Limited; and (3) BSG Resources (Guinea) SARL ("**LFA**"), which relates to BSGR's involvement in the Soros Claim (as defined below).  Further, there is a Security Agreement between the same parties to the LFA (the "**SA**"), which should be read in conjunction with the LFA.

35    Board/Legal Advice

## Contingent Assets

36    BSGR has two contingent assets as detailed below:

### BSGR's claim against the Government of Guinea

37    The background to this claim is set out in paragraphs 12 to 21 above and the exhibited documents referred to in those paragraphs.  As I have stated, the Board has been advised to expect an award by the end of 2018 or early 2019.

38    Board/Legal Advice

LIT-22150032-4

Board/Legal Advice

_BSGR's claim against George Soros_

39    These proceeding are the proceedings in the United States District Court, Southern District of New York, which are known as BSG Resources (Guinea) Limited, BSG Resources (Guinea) SARL, and BSGR v. George Soros, Open Society Foundations, Open Society Institute, Foundation to Promote Open Society, Open Society Foundation, Inc., Alliance for Open Society International, Inc., Open Society Policy Center, and Open Society Fund (Civil Action No. 1:17-cv-02726-JFK) ("**Soros Claim**").

40    The Soros Claim, which seeks at least $10bn in damages relating to claims in illegal interference with contract, fraud, defamation and other matters relating to Mr Soros' actions against BSGR, has been stayed pending the outcome of BSGR's claim against the Government of Guinea.

41    Board/Legal Advice

**Trading Results**

42    BSGR's trading income derives from the management and technical advisory services provided to Octea Diamonds Limited (and the wider Octea Group of companies). Commercially Sensitive Information

Commercially Sensitive Information

**Solvency Test**

43    I am advised that for BSGR to be solvent both the balance sheet and the cash flow must indicate a solvent position i.e. a positive net asset position and being able to demonstrate an ability to pay its debts as and when they become due in the short to medium term.

44    Board/Legal Advice

45    Commercially Sensitive Information

Commercially Sensitive Information

46    Board/Legal Advice

47    It is therefore the conclusion of the Board that BSGR is now, or is likely to become imminently, an insolvent entity. The Board considers that the appointment of administrators is the optimal step to protect the assets and allow realisations to be maximised for the benefit of, in the first instance, all creditors of BSGR.

**Administration Order**

48    I understand that in addition to showing the Court that BSGR is, or may become insolvent, the Board also needs to show that one of the purposes of the administration order is or may be achieved. Commercially Sensitive Information Commercially Sensitive Information

49    The proposed appointees are Malcolm Cohen of BDO LLP in London and William Callewaert of BDO Limited in Guernsey. I am aware that both are experienced insolvency practitioners and the Board has approved them as proposed appointees. Copies of their CVs setting out their experience and credentials are at pages 1016 and 1017 and copies of letters from them to the Board of BSGR confirming their consent to act as joint administrators are at pages 1018 and 1019.

50    A copy of the proposed joint administrators' schedule of charges, prepared pursuant to Practice Direction 3 of 2015 is contained in the joint administrators' report at page 1014, and I also refer to the details in the report more generally in that regard. A copy of the joint administrators' draft budget for the first year of the administration is at page 1020.

51    The proposed joint administrators have estimated the amount required to fund the first four months of the administration as being approximately $900,000. To ensure that the proposed joint administrators are able to fund the administration, they are investigating a number of mechanisms to enable Nysco Management Corp., BSGR's immediate parent, to pay the costs of the administration to the extent that BSGR does not have access to its own funds.

52    It is expected that cash inflows will be received by BSGR from the middle of 2018 in respect of the management fee due from the Octea subsidiaries and it is expected that

these inflows will be sufficient to fund the administration from that point onwards. Commercially Sensitive Information

Commercially Sensitive Information

53      I would respectfully ask that the Court grant the Application in the terms sought.

SWORN by the said          )
PETER HAROLD DRIVER        )
At St Peter Port           )
This 27th day of February  )
2018

Before me

........................................................................

~~Solicitor~~/Notary Public/Advocate of more than 5 years' call



Martyn Baudains
Notary Public
Redwood House
St Julian's Avenue
St Peter Port
Guernsey GY1 1WA
Channel Islands
T: +44 1481 721672

10                                              LIT-22150032-4

# Exhibit L

**Document Filed Under Seal**

# Exhibit M

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

NEW YORK

WASHINGTON, D.C.

PARIS

BRUSSELS

FRANKFURT

COLOGNE

MOSCOW

2 London Wall Place
London EC2Y 5AU
T: +44 20 7614 2200
F: +44 20 7600 1698

clearygottlieb.com

ROME

MILAN

HONG KONG

BEIJING

BUENOS AIRES

SÃO PAULO

ABU DHABI

SEOUL

Your ref: JXB/IHM/667627
Our ref: 28205-156

20 April 2020

Macfarlanes LLP
20 Cursitor Street
London                                                                              **By email**
EC4A 1LT

Dear Sir or Madam,

**BSG Resources Limited (in Administration) ("BSGR")**

We refer to your letter of 17 April 2020 and we adopt the defined terms used therein.

We have sought to engage with you and with the Joint Administrators' US counsel to find a position that allows Vale to make proper and legitimate use of the Chapter 15 Documents in the English Fraud Proceedings and the English Enforcement Proceedings. We can see no basis on which the Joint Administrators would properly wish to oppose or frustrate that use (and tellingly you have not suggested any such basis).

The only reasonable inference to be drawn from the five months of refusal to provide consent is that the Joint Administrators are driven by considerations other than the interests of BSGR's creditors. In this regard, please confirm whether the Joint Administrators (or their representatives) have had any communications or discussions with Mr Steinmetz, Balda, Nysco, Mr Cramer or any other party associated or representing BSGR's former management and/or shareholders about Vale's requests for consent to use the Chapter 15 Documents in the English Fraud Proceedings and the English Enforcement Proceedings. If so, please provide the records of all such discussions or communications.

<u>The English Fraud Proceedings</u>

As to the English Fraud Proceedings, we addressed the position in our email of 16 April 2020 (Brady/Mackie). We do not intend to repeat that position here, other than to say that Vale's position remains that the Joint Administrators have already agreed to the use of the Chapter 15 Documents in the English Fraud Proceedings. The objective evidence of that agreement, in the form of our e-mail and letter exchanges, speaks for itself. We do not see any prospect of the Joint Administrators being allowed by a court to resile from that agreement, and again it is remarkable that they should seek to: your letter represents a further attempt to move the

Cleary Gottlieb Steen & Hamilton LLP is a Limited Liability Partnership registered in England and Wales Number OC310280. It is authorised and regulated
by the Solicitors Regulation Authority. A list of the members and their professional qualifications is open to inspection at the registered office,
2 London Wall Place, London EC2Y 5AU. Cleary Gottlieb Steen & Hamilton LLP or an affiliated entity has an office in each of the cities listed above.

Macfarlanes LLP, Page 2

goalposts by now seeking to introduce new, additional conditions to your clients' consent that were not previously identified.

The Joint Administrators are not entitled to renege on the agreement they have already made. The remainder of this letter is written without prejudice to Vale's position.

<u>The English Enforcement Proceedings</u>

Your clients have repeatedly ignored or failed to engage with our reasonable requests for consent for use of the Chapter 15 Documents.  These include our letters of 19 December 2019, 6 January 2020, 17 January 2020, 21 January 2020, 28 February 2020 and 9 March 2020.

Your substantive reply, such as it is, discloses no reasonable basis for the Joint Administrators' continued refusal to provide consent, nor any explanation as to why our previous requests relating to the English Enforcement Proceedings went unanswered.

Your letter comments on the relevance of the Chapter 15 Documents to the English Enforcement Proceedings as follows: "*many of those documents will be of no relevance at all*". However, your letter of 6 March 2020 took precisely the opposite position and asserted that "*[w]hilst the Joint Administrators are unable to confirm that the Chapter 15 Documents encompass all of the documents which Vale seeks to obtain from Mr Cramer [...] they consider that <u>there is likely to be significant overlap</u>*" (emphasis added). We simply do not understand this unexplained change in position.

It also stands in stark contrast to your clients' readiness to provide documents that they consider "*unlikely [...] to be relevant*" to Nysco and Balda in relation to the English Fraud Proceedings, without any type of filtering process of the sort they are now proposing Vale and the Joint Administrators should undertake in respect of the Chapter 15 Documents.  We refer to your letter of 17 March 2020 to Byrne and Partners in this respect.

The Joint Administrators' seemingly unconditional willingness to assist those that are paying them, Nysco and Balda, by consenting to them accessing documents belonging to BSGR that the Joint Administrators consider unlikely to be relevant, while simultaneously denying Vale the right to use the Chapter 15 Documents without an onerous and wasteful review process, appears to be transparently driven by the Joint Administrators' desire to please their funders.

You are aware of our client's position that the Joint Administrators have engaged in a wholesale abuse of the confidentiality designation process by designating virtually every document produced in the Chapter 15 Proceedings as confidential.  Such over-designation is not harmless; rather it exponentially increases the costs and burdens associated with the litigation of issues in the Chapter 15 Proceedings and generally.  It also is directly contrary to the principle that litigation should proceed on a public basis, including in the United States where your clients chose to bring the Chapter 15 Proceedings.

The issue of the improper confidentiality designations will to some extent be less immediately pressing if the Joint Administrators provide consent to the use of the Chapter 15 Documents in the English Enforcement Proceedings.  For many documents, it may be that the issue simply does not arise in the future.  It is not, however, appropriate for the Joint Administrators to seek to tie Vale's hands as to what arguments it may wish to make in the future about the confidentiality designations.

Macfarlanes LLP, Page 3

The condition that the Joint Administrators seek to impose on use of the Chapter 15
Documents, that Vale agrees "*that it will not challenge the designation of the Chapter 15
Documents as confidential*", seeks to prevent Vale from challenging the improper
confidentiality designations in whole.  That is notwithstanding that we have already identified
to the Joint Administrators' US counsel numerous documents where it is beyond dispute that
no basis for confidentiality exists.

The Joint Administrators' condition is therefore not acceptable.  It is wholly inappropriate for
the Joint Administrators to ask Vale to waive all rights to challenge the Joint Administrators'
improper confidentiality designations in the Chapter 15 Proceedings in order to be able to use
the documents for legitimate purposes elsewhere, and there is no principled basis to do so.
Indeed, we consider that an agreement of the type sought by the Joint Administrators may
antagonise, and be rejected by, the United States Bankruptcy Court insofar as overbroad
confidentiality designations are contrary to US public policy and create significant
administrative burdens on its courts.

To the extent that the Joint Administrators intend to insist that the price of their cooperation is
a waiver of Vale's rights to challenge the improper confidentiality designations, then Vale is
content to litigate the confidentiality issues before Judge Lane.

As we have made clear, Vale intends to seek costs sanctions against the Joint Administrators
in any such litigation, and reserves its rights in full as to the Joint Administrators' conduct in
embarking on wasteful litigation that is not in the interests of BSGR's creditors.

Vale's proposal

Vale remains willing to agree an amendment to the Confidentiality Stipulation that permits
Vale to use the Chapter 15 Documents in the English Enforcement Proceedings and would be
content for the amendment also to record the agreement that has been reached as to the
English Fraud Proceedings.  As we previously stated, Vale is willing to agree to treat the
Chapter 15 Documents as if they were disclosed by the Joint Administrators in the English
Enforcement Proceedings for the purposes of CPR 31.22.  While Vale is not willing to waive
its future rights wholesale, as noted above, we believe this is a reasonable proposal that will
provide the most efficient path forward.

Please let us know if this can be agreed by 4pm on 22 April 2020. Please also provide the
confirmation and the records and communications requested above by the same time. In the
absence of agreement, Vale will take such steps as may be appropriate to resolve the matter
before Judge Lane.

Yours faithfully,

*Cleary Gottlieb Steen & Hamilton LLP.*

Cleary Gottlieb Steen & Hamilton LLP