Page 1

1    UNITED STATES BANKRUPTCY COURT

2    SOUTHERN DISTRICT OF NEW YORK

3    Case No. 19-11845-shl

4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

5    In the Matter of:

6

7    BSG RESOURCES LIMITED (IN ADMINISTRATION) AND WILLIAM

8    CALLEWAERT AND MALCOM COHEN, AS JOINT ADMINISTRATORS,

9

10            Debtors.

11   - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                   United States Bankruptcy Court

14                   One Bowling Green

15                   New York, NY   10004

16

17                   August 6, 2020

18                   3:03 PM

19

20

21   B E F O R E :

22   HON SEAN H. LANE

23   U.S. BANKRUPTCY JUDGE

24

25   ECRO:   UNKNOWN

1    HEARING re Doc. #94 Motion For An Order (I) Affirming

2    Confidentiality Designations And (II) Modifying The Court's

3    Confidentially Stipulation ***Time Change From 2:00-3:00***.

4

5    HEARING re Doc. #95 (Seal) Joint Administrators Motion To

6    File Under Seal: Their Appendix of Confidential Documents.

7

8    HEARING re Doc. #99 (Seal) Vale's Motion To File Under Seal:

9    Vale S.A.'s Opposition To The Motion Of The Joint

10   Administrators For An Order (I) Affirming Confidentiality

11   Designations And (II) Modifying The Court's Confidentiality

12   Stipulation And To File Under Seal Certain Exhibits To The

13   Declaration Of Jeffrey A. Rosenthal.

14

15   HEARING re Doc. #101 (Seal) Joint Administrator's Motion To

16   File Under Seal: Certain Exhibits To Reply In Support Of

17   Their Motion For An Order (I) Affirming Confidentiality

18   Designations And (II) Modifying The Courts Confidentiality

19   Stipulation.

20

21   HEARING re Doc. #108 (Seal) Vale's Motion To File Under

22   Seal: Exhibit A To The Letter Of Jeffrey A. Rosenthal.

23

24

25   Transcribed by:  Sonya Ledanski Hyde

```
 1    A P P E A R A N C E S :

 2

 3    DUANE MORRIS LLP

 4         Attorneys for Joint Administrators

 5         222 Delaware Avenue

 6         Wilmington, DE, 19801

 7

 8    BY   RICK HYMAN (TELEPHONICALLY)

 9         JARRET HITCHINGS (TELEPHONICALLY)

10

11    CLEARLY GOTTLIEB STEEN & HAMILTON LLP

12         Attorneys for Vale

13         One Liberty Plaza

14         New York, NY, 10006

15

16    BY   JEFFREY ROSENTHAL (TELEPHONICALLY)

17         LISA VICENS (TELEPHONICALLY)

18         EMMA BERDUGO (TELEPHONICALLY)

19

20    ALSO APPEARING:

21    MALCOLM COHEN (TELEPHONICALLY)

22    STEVE PETERS (TELEPHONICALLY)

23    NADA NICHOLS (TELEPHONICALLY)

24

25
```

```
 1                    P R O C E E D I N G S

 2            THE COURT:  Good afternoon.  This is Judge Lane in

 3     the United States Bankruptcy Court for the Southern District

 4     of New York, here for a 3:00 hearing in the BSG Resources

 5     Limited Chapter 15 case on discovery issues.  Let me find

 6     out who is here on behalf of the joint administrators.

 7            MR. HYMAN:  Good afternoon, Your Honor.  It's Rick

 8     Hyman from Duane Morris.  And my colleague, Jarret

 9     Hitchings, is on as well.  I believe from the joint

10     administrators and BDO, we have Malcolm Cohen, Steve Peters,

11     and Nada Nichols.  If there is anybody I missed, please let

12     me know.

13            THE COURT:  All right.

14            MR. ROSENTHAL:  Good afternoon, Your Honor.  I

15     hope that you are doing well.  This is Jeff Rosenthal on

16     behalf of Vale, of Clearly Gottlieb Steen & Hamilton.  And I

17     am joined by my colleagues, Lisa Vicens and Emma Berdugo.

18            THE COURT:  All right.  Good afternoon to you all.

19     I hope that all of you are surviving as well as can be hoped

20     during this period of pandemic.  And not to mention the

21     tropical storm earlier this week, as if things weren't

22     challenging enough.  I certainly am sitting in a house

23     without any power, but I have managed to get myself all

24     ready for today's hearing.

25            So my first question to everyone is what should we
```

Page 5

1    do today.  And it's asked in light of the most recent set of

2    papers that I've gotten back and forth from various parties.

3    I understand the discovery dispute, but there's been a lot

4    that's been provided to me that really go to the scope of

5    what's happening in the actual underlying foreign proceeding

6    and how folks can most efficiently use their time.  I

7    recognize that proceedings are expensive.  We've spent a lot

8    of time in court together.  And I know that you've also gone

9    to see the discovery neutral, who provided a report dated --

10   I believe it was July 13th of his activities and what he has

11   done, as well as sort of an attachment, an appendix to the

12   report of the discovery neutral about his various rulings on

13   various issues and various documents and what has been

14   worked out and what has not.

15           But there's a lot -- again, putting that aside,

16   just an explanation and sort of a good illustration of the

17   costs involved in what's gone on in this Chapter 15

18   proceeding, which is ancillary to a foreign proceeding.  And

19   there's a lot of debate back and forth about what should and

20   shouldn't happen in the foreign proceeding.  Of course I'm

21   not the judge sitting in the foreign proceeding.  So it's

22   really in some ways none of my business.  At the same time,

23   I'm trying to figure out if this proceeding here is in aid

24   of a foreign proceeding, what is it that we should actually

25   be doing here and what shouldn't we be doing here.

Page 6

1            So originally this was scheduled based on a motion

2     of the joint administrators for an order affirming

3     confidential designations and requesting modification of

4     course, a stipulation dealing with confidentiality

5     designations.  And so we set that up.  And again, the

6     conversation has expanded to talk about what's going on in

7     the Chapter 15 proceeding, in the foreign proceeding

8     overseas.  So I thought it made sense to tackle that first.

9            I've read everybody's submissions back and forth,

10    including the very last Vale letter that was filed either

11    today or yesterday or whenever it was.  And so I've read

12    stacks and stacks of papers, whether it's in connection with

13    the discovery issue or in connection with what's going on in

14    the overseas proceeding.  But I do think it makes sense to

15    talk about that proceeding if there's going to be a sea

16    change in terms of what it is that we're doing here and what

17    we should be doing here.  So I'll hear first from the

18    foreign administrators, and then I'll here from Vale.

19            MR. HYMAN:  Yes, thank you, Your Honor.  It's Rick

20    Hyman.  And excuse us if Jarret Hitchings jumps in and we

21    tag team a little bit.  But let me give you our perspective

22    of where things are.  And we appreciate that this has not

23    been an easy Chapter 15.  It hasn't been an easy Chapter 15

24    for any of us, including Your Honor.  And we regret being

25    before Your Honor again on yet another discovery issue.

Page 7

1           One area, however, where the joint administrators

2      and Vale have been able to reach some common ground -- and

3      there haven't been many during this case -- but one is

4      generally with respect to the administration Guernsey.  The

5      parties agree that the joint administrators should be at

6      this time discharged and that a liquidator be appointed in

7      their place, a liquidator of choosing by Vale is Alvarez and

8      Marsal, and the parties have no objection to that.

9           While the reasons certainly differed for this

10     decision, the end result would be the same.  Just very

11     generally, Your Honor, the basis for the joint

12     administrator's application was that the purpose of the

13     administration could no longer be achieved.  We've talked a

14     lot about the purpose of the administration, which was to

15     return the company to solvency and pay off its creditors.

16     The reason for this from the joint administrator's

17     perspective is solely due to the lack of funding.

18          We haven't spoken about this much during the case,

19     Your Honor, but I think you are generally aware of the

20     worldwide freezing order that had been obtained by Vale over

21     Nysco and other parties.  As a result of that and other

22     matters, Nysco has not undertaken its or performed its

23     obligations under the funding agreement, and many of the

24     professionals in this case still have unpaid time into 2019.

25     It has just become untenable to continue under those

Page 8

1    circumstances, and without funding, the joint administrators

2    do not believe that the purpose can be achieved.

3             No doubt Vale will advise on Vale's belief on why

4    the administration should be disbanded and the liquidators

5    will be appointed, but the end result again would be the

6    same.

7             In that regard, the parties did agree to submit

8    substantially contemporaneous applications in Guernsey.  The

9    joint administrator's application was to discard the

10   administration, and Vale's application was to convert to a

11   liquidation and have a liquidator appointed.

12            The parties submitted those applications, Your

13   Honor, without notice to the Court.  That was primarily at

14   the urging of Vale, who, as you can see from some of their

15   pleadings or letters that they have submitted, were very

16   concerned about this information getting out and maintaining

17   the confidentiality.  And it did threaten the JA's, the

18   joint administrators, with personal liability if they

19   disclosed anything to Nysco or others.  And indeed, the

20   joint administrators agreed to go forward without any

21   notice.

22            There was an initial hearing in Guernsey on the

23   applications on July 28th.  I think both parties were

24   hopeful that at that date there would be a handover from the

25   joint administrators to the liquidators, but that wasn't to

1    be.  Among other reasons, the Guernsey court expressed

2    considerable concern regarding the lack of notice.  And

3    again, I'm sure we'll hear other reasons why that hearing

4    didn't go forward.  But from the joint administrator's

5    perspective, it was primarily because of the lack of notice

6    to Nysco and to Standard Chartered Bank, who, as Your Honor

7    knows, are two of the larger creditors aside from Vale in

8    this matter.

9          The hearing in Guernsey has been adjourned to

10   August 11th, which is this coming Tuesday.  It was adjourned

11   to allow Nysco and Standard Chartered some opportunity to

12   appear at the hearing on the discharge in the conversation

13   to a liquidation and to provide some notice and to allow the

14   joint administrators to provide some additional evidence in

15   support of their application, which they have done.

16         We understand, Your Honor, that Nysco has appeared

17   and has requested an extension of that hearing to September

18   15th.  The parties will -- I think again the joint

19   administrators and Vale are united in objecting and

20   contesting that.  It's hard to see what grounds Nysco might

21   have to extend it given their breach under the funding

22   agreement.

23         All that said, following that hearing, the joint

24   administrators and Vale came together and tried to do what

25   they could to limit the costs going forward, and in

Page 10

1    connection with that engaged in some discussions with regard

2    to the adjournment of this hearing.  The discussions related

3    largely upon issues that were brought before Your Honor

4    yesterday by Vale, which largely relate to the filing of

5    their June 26th letter that they delivered to the joint

6    administrators.  We're not going to go into the letter.  The

7    joint administrators are preparing a response but leave it

8    to say that the joint administrators do categorically reject

9    virtually all of the allegations that are made therein.  But

10   that's neither here nor there, and we don't think, frankly,

11   it's material for the judges decision, the Guernsey judge's

12   decision coming next week or shortly thereafter if the

13   matter gets adjourned.

14          The parties tried to reach some agreement.  And

15   indeed, on August 4th the parties did reach an agreement.

16   And it involve allowing Vale to submit the letter, the June

17   26th letter under seal to the Guernsey court with some

18   exceptions that related to some information that the joint

19   administrators did want redacted.  Some of that information

20   related to the Niron materials which are subject to an NDA

21   and others related to BDO work papers.  The parties were

22   able to reach an agreement on that.  And again, it was

23   premised on Vale filing their motion under seal.

24          The following day, Your Honor, we found that Vale

25   determined that it wasn't able -- that there were procedural

1   hurdles in Guernsey to filing that motion under seal.  We

2   had already reached out to the Court to suggest an

3   adjournment or request an adjournment, a mutual request for

4   an adjournment out to August 18th or some later date as may

5   be reasonably agreed to upon some further extension of the

6   hearing date, recognizing that Nysco may request something.

7            It was only after that agreement that we heard

8   that there was some issue with filing the motion and

9   documents under -- the letter and documents associated

10  therewith under seal.  The request had been made at that

11  point by Vale through Guernsey counsel that the joint

12  administrators take the burden of filing that, and

13  presumably with the risk that if the joint administrators

14  were unsuccessful, that those materials would be filed in

15  the court without the confidentiality designation under

16  seal.  That was not something that was acceptable to the

17  joint administrators, Your Honor.  And it was at that point

18  that we got the request or the demand from Vale to put this

19  hearing back on.

20           We could get into the substance of the issues

21  relating to confidentiality and the designation, but we're

22  hopeful that we don't have to get there.  We see on the

23  horizon -- the end is near.  We see on the horizon that

24  there is going to be a transfer.  We think that to the

25  extent that a new foreign representative in the form of

Page 12

1    Alvarez and Marsal is appointed and wants to continue with

2    this Chapter 15, that it should be Alvarez and Marsal's

3    determination as to what documents should be released from

4    the confidentiality designation or not.  It may very well

5    be, given where the source of Alvarez and Marsal's likely

6    funding is going to come from, that they would agree to lift

7    the confidentiality designation as to virtually every

8    document.

9           We don't think the time is right now to go through

10   these issues.  We think that we have an agreement on an

11   adjournment that was going to take us out past the point

12   where we didn't have to spend more of the Court's time and

13   waste additional resources, but we find ourselves here

14   today, Your Honor.

15          So, again, we are willing to address some of these

16   issues.  Frankly don't think it's necessary or in the best

17   interests of the estate.  We are certainly willing -- I say

18   we, the joint administrators, are certainly willing and

19   continue to be willing to support any motion to seal that is

20   made by Vale in accordance with the agreement that we had

21   struck, but they simply weren't willing to take that burden

22   on themselves.

23          The documents that Vale is seeking to lift the

24   confidentially designation do not relate to any of the

25   documents that were on this Court's calendar in connection

Page 13

1    with the existing motion.  And before Your Honor today, they

2    are different documents.  We don't think it's been properly

3    raised before this Court.  We hope it doesn't ever have to

4    be raised before this Court because we hope to be notifying

5    Your Honor shortly after the August 11th hearing or as may

6    be extended to August 25th perhaps in Guernsey, that there

7    will be new parties in front of Your Honor.

8             THE COURT:  All right.  Thank you for that very

9    comprehensive recap.  Let me hear from Vale.

10            MR. ROSENTHAL:  Good afternoon again, Your Honor.

11   Jeff Rosenthal from Clearly Gottlieb.  Let me start, Your

12   Honor, since you mentioned Judge Gropper, I just wanted to

13   say on behalf of I think both parties what an enormous

14   assistance Judge Gropper was in helping us resolve certain

15   issues.  And your recollection is right.  It was July 13th

16   that Judge Gropper sent the report to Your Honor.

17            The one thing I'll note with regard to that is

18   Judge Gropper ordered that certain documents be produced

19   because he rejected the claim of privilege over them.  It's

20   four weeks later, we're still waiting for compliance with

21   Judge Gropper's order.

22            With regard to how we get here today and what Vale

23   sees as the most efficient path forward, we obviously got

24   this document discovery and we took some depositions,

25   including in the middle of June we took the deposition of

Page 14

1    one of the two joint administrators, Mr. Callewaert, who is

2    located in Guernsey.  He is the only member of the BDO team

3    located in Guernsey.

4             And during the course of this time, we learned

5    about a really shocking level of dissipation of assets

6    during the administration, primarily by Beny Steinmetz and

7    his family and his cohorts under the noses of the joint

8    administrators.  And we uncovered a lot of evidence of a

9    complete lack of oversight by the joint administrators.  And

10   in fact, Mr. Callewaert testified at his deposition, for

11   example, that he was --

12            THE COURT:  Can I interrupt you for a second?

13            MR. ROSENTHAL:  Sure.

14            THE COURT:  Obviously those sort of allegations --

15   and I read the entire -- I don't know if it was 36 pages of

16   submissions, 56 pages.  I don't know.

17            MR. ROSENTHAL:  Okay.

18            THE COURT:  Whatever it was, I read it.

19            MR. ROSENTHAL:  I won't go through that, Your

20   Honor.

21            THE COURT:  But if we get into it now, I know that

22   their honor being attacked, I will then elicit a response

23   from the joint administrators.  And frankly, my jurisdiction

24   as a Chapter 15 judge, I obviously am always concerned about

25   fraud on a court and fraud in proceedings, but we're really

Page 15

1    talking about the Guernsey case.

2           MR. ROSENTHAL:  Yes.

3           THE COURT:  And I am sure that that things are --

4    it's clear that things are fast and furious in the Guernsey

5    proceeding amidst a lot of very concerning developments.

6    And I'll use that term as it covers a lot of things, and

7    there are a lot of things here and various ranges of

8    concern.  But I'm afraid that if we spend our time today

9    focusing on those issues, we are never going to even get to

10   the Chapter 15 issues, which is given what's going on and

11   the path that the foreign proceeding seems to be likely to

12   take, what are we doing here in Chapter 15?  So that's

13   really what I want to focus on.

14          MR. ROSENTHAL:  Your Honor, I could not agree

15   more.  And obviously given the Court's familiarity with that

16   letter, I have no need whatsoever to address it now today.

17          So as Mr. Hyman noted, after we sent that letter,

18   there was common ground between Vale and the joint

19   administrators whereby the joint administrators would seek

20   to discharge the administration and support the appointment

21   of liquidators.  And that was done without notice to Nysco

22   for reasons that Your Honor obviously is familiar with given

23   that you've read that letter --

24          THE COURT:  Right.

25          MR. ROSENTHAL:  -- and you've seen Vale's

Page 16

1    concerns.

2         The Guernsey court was not presented with our

3    reasons why there should be a discharge of the

4    administration.  And when the Guernsey court convened a

5    hearing a week-and-a-half ago, the Guernsey court, quite

6    frankly, was confused.  And it was confused as to why if

7    this is solely about funding, why notice hadn't been given

8    to the funder about the application to discharge.  So it,

9    based on the record before it, logically said come back to

10   me in two weeks after you've given notice to the funder.

11        And Nysco, by the way, is not a creditor.  In

12   fact, Nysco owes money to BSGR and is the funder here.  And

13   it's Beny Steinmetz's company.  So, notice was given to

14   Nysco and the parties were given instructions to kind of

15   come back in two weeks and give the court more information

16   as to what's going on.

17        So, as Mr. Hyman noted, they recently made a

18   supplemental submission to the Guernsey court focused

19   exclusively on the fee issue.  And Nysco has made an

20   application to try to push back the hearing for five weeks.

21   And we are obviously very concerned at the threat of

22   dissipation of assets during that time, given what's

23   happened to date.  And Vale has concluded that it's very

24   important, especially in light of the Guernsey court's

25   request, to be able to give the Guernsey court a full

Page 17

1      understanding as to why we believe there needs to be a

2      discharge of the administration and appointment of the

3      liquidators.

4              So we thought an easy way to avoid spending Your

5      Honor's time on this would be to get the agreement of the

6      parties, that we'll submit this letter.  The letter has lots

7      of references to materials that have been designated as

8      confidential.  Vale does not believe any of it's

9      confidential.  And in fact, we had expected originally that

10     at today's hearing we would be arguing as to why

11     confidentiality should be listed in its entirety with

12     respect to this, which is one path forward, because that

13     would eliminate any dispute regarding whether we could

14     submit it to the Guernsey court or not.

15             But a second path forward that's spared the Court

16     having to prepare for and then sit through today's hearing

17     was allowing us to submit this to the Guernsey court.  And

18     we agreed that we would request that the Guernsey court

19     consider it under seal, as this Court might consider it

20     under seal.  And the joint administrators came back to us

21     with support for that proposition.  And literally within an

22     hour or two -- not the next day, but within an hour or two

23     of advising the Court that there was no need to have this

24     hearing today, we learned that there was kind of not exactly

25     a meeting of the minds between the Guernsey lawyers because

1    our Guernsey counsel had understood that the joint

2    administrators be the ones that would make the sealing

3    application because, in fact, as with cases before this

4    Court, we cannot in good faith represent to the Guernsey

5    court that this information is confidential.  It's the joint

6    administrator's position that this information is

7    confidential and so sensitive that the court should only

8    receive it in-camera.  And we said to them that you should

9    be making this application, because we can't make that

10   representation to the court.

11           We thought a solution was worked out whereby both

12   parties would make the application and we would rely upon

13   the joint administrators to carry the burden.  But they sent

14   us a letter shortly before I wrote to Your Honor saying that

15   they were not willing to make an application.  They would be

16   willing to express support for ours, but they were not

17   willing to make an application.

18           The other thing that they refused that caused us

19   to have to come to Your Honor to accept is they took the

20   position that if the Guernsey court in looking at these

21   materials concluded that these materials were not

22   confidential and that it should be as a matter of Guernsey

23   public policy on the public docket, because that's the

24   judgement of the Guernsey court, they said that we would

25   have to withdraw the letter entirely.  We couldn't submit it

1    if the Guernsey court insisted that it be public.

2           And that was something that, frankly, was

3    unacceptable to us.  Because, number one, we think that

4    these aren't confidential in the first place, so there is a

5    strong likelihood that the Guernsey court would reject its

6    sealing, and that we ought to just therefore go ahead before

7    Your Honor and have Your Honor rule, as has been teed up

8    today, about the confidentiality of these documents.  And

9    I'll get to that in a moment.

10          And secondly, it struck us as bizarre because --

11   and I'm going to read one of many lines Your Honor has seen

12   in pleadings from the joint administrators.  But in their

13   reply brief, the first sentence of Paragraph 42 says, "The

14   joint administrators are appointed officers of the Guernsey

15   court.  In this regard, they are accountable only to the

16   Guernsey court.  And we were frankly flabbergasted that they

17   were taking the position that they would not allow

18   confidentiality and whether it should be public or not to be

19   decided by the Guernsey court and that it needed to be

20   decided by the ancillary court, namely Your Honor --

21          THE COURT:  Can I interrupt for just one second?

22   And I don't pretend to be an expert on Guernsey court

23   procedures.  But hearing what you're saying, I just wonder

24   if given your desire to be heard in a court in Guernsey,

25   that I've just -- I guess I'm just wondering why you

Page 20

1    couldn't file what you're going to file and say these

2    documents are being filed, as I often see, under seal and in

3    an abundance of caution even though don't believe they

4    should be under seal.  And that's a matter of debate in more

5    than one judicial forum.  And the court can make its

6    determination and act appropriately.  And then joint

7    administrators can say that they support the filing to

8    whatever extent they want to support it.  But, I mean, I'm

9    just wondering why there isn't a way to do it to preserve

10   your issues.  Because, frankly, a lot of these things are

11   closer in nexus to the Guernsey court's proceeding than they

12   are to this proceeding, which is ancillary.  So I have some

13   concern -- certainly to the extent that we have to decide

14   recognition, that's really what the lodestone is and the

15   anchor is for all of the proceedings that we've done here,

16   which, frankly, have gone further afield than that.  But I

17   think that's the way I've always thought of it, because I

18   think that that's what the charge is in the Chapter 15

19   cases.

20         But to the extent that there is litigation going

21   on where the confidentiality of certain documents is in

22   debate in the actual underlying proceeding, I have some

23   concern about being the tail wagging the dog by offering my

24   opinion in the sense that then I'm afraid of getting a --

25   what is the expression -- like ahead of my skis.  I just

Page 21

1    don't know that I should be the one making that

2    determination in a way where someone may try to -- you know,

3    it's fine and it's good.  Also, I'm not sure that -- I have

4    some concerns given what I'm hearing about doing it because

5    I'm not sure that this Chapter 15, frankly, is going to

6    survive.  And there's every reason from what I'm hearing to

7    think that it may not survive, in which case I am then

8    issuing rulings that aren't really tethered to, again, what

9    my central purposes is as an aid to determine whether this

10   meets all the requirements for recognition or any additional

11   relief that's requested.

12           So I guess I am saying this all by way of thinking

13   out loud.  I am probably offering up ice in the winter.  All

14   of you are smart folks who have thought about this

15   extensively.  So I apologize to the extent that I'm sort of

16   retreading old ground.  But to the extent that -- I offer it

17   to the extent that my thinking could be at all helpful in

18   giving you some comfort or some ability to act in a certain

19   way where I can essentially assist.

20           Because I guess my thought is I can understand

21   where Vale is coming from.  And from my point of view, the

22   fact that everyone agrees -- well, everyone in this room,

23   virtual room -- agrees there should be a sea change in the

24   overseas proceeding seems to be highly relevant to the

25   Chapter 15.  And I certainly am just trying to find a way to

Page 22

1    sort of unlock the ability to do that and have all you nice

2    people spend less money here until it's absolutely

3    necessary.

4              MR. ROSENTHAL:  Your Honor, as usual, I think your

5    insights are spot-on.  We did think that that was exactly

6    how it would play out, that we would make the application,

7    we would say we don't believe that these are confidential.

8    But in an abundance of caution, we are asking that it be

9    filed under seal.  And the one trick to this is that the

10   Guernsey -- notwithstanding what I think you've been told by

11   the JAs during other portions of this case, we understand

12   that the hurdles for confidentiality in Guernsey are very

13   high.  And the only way that that would have a chance of --

14   I mean, we filed things under seal, Your Honor, saying the

15   exact same thing.  And Your Honor has questioned it but has

16   kind of accepted it under seal conditionally, waiting to

17   kind of hear what the ultimate response is for the joint

18   administrators.

19             Our understanding is that unless the joint

20   administrators carry the water in Guernsey -- and it could

21   be alongside us, but unless they carry the water, that it

22   will be rejected in Guernsey.  And that in itself was okay

23   with us as well because we are prepared that's alleged to be

24   the foreign main proceeding, and we are prepared to say

25   whatever the Guernsey court decides with respect to these

Page 23

1    documents, the Guernsey court decides it has the one -- it's

2    the court that's most invested in the future either of

3    return to solvency or liquidation of this company and let it

4    make its decisions about public docket versus private in-

5    camera.

6            But the joint administrators, they added to us

7    after we thought we had this agreement a second condition,

8    with the condition being that if the Guernsey court rejects

9    their position and says this isn't confidential, we would

10   actually have to withdraw it.  And that wasn't acceptable --

11           THE COURT:  I guess my question is can't you just

12   file it and let the chips fall where they may?  The Guernsey

13   court I would think is more than capable of making its own

14   determinations.  And if the joint administrators -- I mean,

15   I guess what I'm saying is do you really need their

16   agreement at all?  And --

17           MR. ROSENTHAL:  Regrettably, Your Honor,

18   regrettably, we do insofar as they have written us a letter.

19   And we did not put the correspondence before Your Honor.

20   They had written us a letter that says if we file this and

21   the Guernsey court rejects sealing, we must withdraw it or

22   we will in breach of this Court's protective order.  And our

23   Guernsey --

24           THE COURT:  This court, meaning the court in the

25   United States, the Southern District of New York?

1              MR. ROSENTHAL:  That is what they have informed --

2              THE COURT:  Well, I categorically -- categorically

3      -- reject that.  And I'm happy to enter an order that

4      eviscerates any notion that that would be in violation of

5      anything.

6              MR. ROSENTHAL:  Your Honor, that's always

7      yesterday's thoght, frankly.  Because if Your Honor enters

8      that order that says you defer this decision to the Guernsey

9      court so long as we tee it up under seal, that's wonderful

10     as far as we are concerned.  But we couldn't get there.

11             THE COURT:  It's a preposterous notion, frankly.

12     And if I wasn't sitting in Westchester County without power,

13     I'd probably write an opinion shortly, because the whole

14     notion is offensive.

15             MR. ROSENTHAL:  Your Honor, I won't submit the

16     letter to you, but that's the letter we got.

17             THE COURT:  All right.  Let me hear from the joint

18     administrators on that notion.

19             MR. ROSENTHAL:  Your Honor, can I mention just one

20     other thing just before we go by?  With regards to the

21     future of this Chapter 15, I don't know what will happen to

22     it.  Because there may be purposes that the liquidators when

23     they're appointed decide that a Chapter 15 makes sense.  And

24     I would, frankly, leave it to their independent good

25     judgement.  But I don't want to presuppose as the JAs have

Page 25

1    just suggested.  But with that, I'll pass it over to them.

2            THE COURT:  No, listen.  I actually agree with

3    that.  My concern is that to the extent that I am being

4    potentially called upon to weigh in on something that's

5    affecting the foreign main proceeding, I grow progressively

6    more uncomfortable to the extent that there might not even -

7    - this proceeding may not survive further developments in

8    the foreign main proceeding.  It may, it may not.  But I

9    think as a matter of comity, C-O-M-I-T-Y, the closer we get

10   to having issues of whether this proceeding will go forward

11   and in what guise, that really does counsel for me to

12   exercise my discretion to pull back.  Because right now I'm

13   not sure we have a recognition to address.  We don't --

14   that's an open question.  And the parties who are here are

15   not the parties who presumably, if things go the way I'm

16   reading the tea leaves, wouldn't be the folks who would make

17   that decision.

18            So I agree with you, we'll figure it out in the

19   fullness of time.  But it's relevant in my mind to the

20   extent that I exercise my discretion as a matter of

21   international comity.  So let me hear from the joint

22   administrators.

23            MR. HYMAN:  And we appreciate your comments, Your

24   Honor.  And sometimes, unfortunately, this case is more

25   comedy, E-D-Y, than comity.

1          THE COURT:  Well, sometimes you need to laugh or

2    you cry.

3          MR. HYMAN:  We've been doing a lot of both in this

4    case, Your Honor.  We appreciate Your Honor's comments.  The

5    position that the joint administrators had taken was that

6    the use of some of these documents, which we continue to

7    take the position are confidential and were produced in

8    connection with the Chapter 15 issues focused on

9    recognition, which Your Honor properly noted may never come

10   before Your Honor, would be improperly used in connection

11   with that letter, which, as you've read, is somewhat

12   incendiary and will have to merit a response from the joint

13   administrators, although the parties remained focused on a

14   single end.

15          The concern that we had was that the agreement

16   that had been reached was really unequivocal.  The agreement

17   was that Vale would file the pleadings under seal, and it

18   was on that basis that we sought to adjourn the hearing and

19   mutually do so.

20          THE COURT:  Well, that's fine.  But courts can

21   accept that or not accept that.  We all know that in U.S.

22   courts, right?  I have taken certain things as confidential

23   with the thought that we're keeping our powder dry, as

24   Chapman likes to say, for the main event.  And so I don't

25   have a stakeholder who has come in to say I want to

Page 27

1    participate and I can't meaningfully participate because of

2    these confidential designations.  If that were the case, the

3    rubber would hit the road and we would have been having

4    these conversations much earlier and we needed to get

5    decisions much earlier.  We haven't had that, so we try to

6    figure out the most efficient way to sequence things.

7            But the court in Guernsey, like any court, has its

8    own authority to determine what's appropriate or not.  And,

9    frankly, even if I was going to rule on some things, the

10   court in Guernsey has its own standards and its own things

11   that it has to look at, and it might reach different

12   conclusions.  And so what I think, and my order here, was

13   for this proceeding.  And so I don't think that it really

14   plays any role at all in what needs to be done in Guernsey.

15           MR. HYMAN:  Our thought, Your Honor, was that the

16   documents had been produced in connection with this Chapter

17   15, and the Chapter 15 at this point may or may not survive.

18   It ultimately will be up to the determination of another

19   foreign representative to the extent that one is appointed.

20           The agreement that we reached with Vale did have

21   the burden on them.  I take your point, and we will -- if

22   Your Honor's ruling is that the documents are subject to

23   filing --

24           THE COURT:  I don't see why they wouldn't be.  I

25   can't imagine that that court wouldn't have its own

Page 28

1    independent jurisdiction as a foreign court to determine

2    what is confidential and not confidential for purposes of

3    that proceeding.  And the chips fall where they may.  So it

4    certainly in my mind would not violate anything in this

5    court's orders, proceedings.  We have always talked about

6    what is confidential in this proceeding, what's subject to

7    privilege or not.  And that's why we've teed these things

8    up.  But that's under U.S. law.  And they incorporate

9    foreign law, but it's U.S. law and U.S. considerations all

10   tethered to the Chapter 15.  And so the foreign court will

11   do what it's supposed to do under its own standards and what

12   it needs to determine.  And, frankly, I would think if I

13   were that foreign court, I would not take very kindly to a

14   U.S. court -- any perception that a U.S. court was trying to

15   tell it what should and should not be made public in its

16   proceedings.  And I don't think I have authority to do that.

17        So, again, those things come up in the context of

18   someone saying, well, it's subject to a confidentiality

19   order somewhere else.  But again, I'm hearing the opposite.

20   I'm hearing that these things can't be used here because

21   they are subject to some confidentiality order from

22   overseas.  So it seems to be an odd circle that I'm -- the

23   confidentiality here in front of me is piggybacking on

24   something overseas, and now I'm being used as a basis for

25   confidentiality for something overseas.  So it doesn't seem

1    to make a whole lot of sense to me.

2           Again, what I thought is the confidentiality for

3    purposes of this proceeding, that's what I decide.  And

4    foreign courts do what they're supposed to do.  And again,

5    in Chapter 15 where we are an ancillary proceeding that is

6    for purposes of recognition or giving assistance to a

7    foreign court and a foreign proceeding so as to avoid having

8    to file a separate full-blown insolvency proceeding here,

9    that only further supports the notion that I am not telling

10   the foreign court what is and is not confidential in front

11   of it.

12          MR. ROSENTHAL:  Your Honor -- go ahead.

13          MR. HYMAN:  The only confidentiality -- thanks,

14   Jeff.  The only confidentiality stip, Your Honor, is the

15   confidentiality stip that was entered in this Chapter 15

16   case.  These were documents that were produced in the

17   chapter 15 case subject to --

18          THE COURT:  But let's be candid here.  The

19   confidentiality stipulation here was in aid of getting

20   things produced with the thought that, as is often the case

21   in U.S. proceedings, that parties will then determine what

22   actually is needed for the case and then fight about the

23   confidentiality of those documents rather than spend

24   countless hours and money talking about every scrap of

25   paper, however meaningless it is to the litigation, whether

1    that meaningless scrap of paper is confidential.  And the

2    American system often allows folks in discovery to designate

3    things confidential or with the thought that then there is a

4    procedure for challenging that.  And that's exactly what

5    that order provides.

6           So it's a prophylactic measure.  It's not a

7    determination by this court.  I've read Judge Gropper's

8    discovery neutral report.  He, in fact, overruled a number

9    of confidentiality designations.  And I have already told

10   you that I have some serious reservations about others.  So,

11   again, it seems to me that in the context of what needs to

12   be done in the foreign proceeding, it is exceedingly weak

13   argument on many grounds for you to rely on that for

14   purposes of insisting that Vale is somehow going to be

15   subject to sanctions here for doing it.

16           I appreciate that people would want to bring this

17   to me, because good lawyers say, well, let's address the

18   issue, we want to have an understanding with the court, we

19   would hate to have a different understanding and find out

20   that after the fact.  So I applaud you for teeing up the

21   issue, and that's fine.  But again, so my question is, is

22   there anything else the foreign administrators want to say

23   in terms of an argument that you think I'm missing for

24   purposes of that particular issue that was in the letter

25   that is sort of the holdup in terms of Vale making its

Page 31

1    submission?

2            MR. HYMAN:  Your Honor, we have heard you.  The

3    joint administrators are on the line.  And if they would

4    like to comment, they certainly can.  I think what we would

5    suggest is that we work with Vale and on a mutual basis do

6    what we can to file that paper with the letter and the

7    associated documents under seal.  We will corroborate with

8    them in doing so, whether it needs to be on our motion or

9    otherwise.  For purposes of the hearing that was in front of

10   Your Honor this morning or this afternoon, we would like to

11   adjourn that in light of the goings on in Guernsey to a date

12   after the appointment of the new foreign representative so

13   that they could be heard on issues with respect to

14   confidentiality designations, with respect to the other

15   universe of documents to the extent they want to.  It may

16   very well be that they don't want to be heard.  It may be

17   that they don't want to be appointed, the foreign

18   representative in this case is just dismissed.  I think

19   generally we would like to avoid the further costs and

20   expense and the use of this Court's time in matters that are

21   very likely to be moot in the very near future.

22           THE COURT:  All right.  So I guess my question

23   then is whether you need an order.  I can understand if

24   that's something that is appropriate and clarifies the

25   record if needed.  I'm certainly happy to not issue an

Page 32

1    order.  But if, based on my ruling or my expression of

2    opinion today, Vale wants to submit an order that basically

3    says that for purposes of -- that there essentially would

4    not be a -- would not be considered a violation of the

5    confidentiality order for Vale to submit documents to the

6    Guernsey court under seal based on the assertion of

7    privilege that has been made by the joint administrators and

8    that those issues are sub judice here for purposes of

9    whether they're confidential for purposes of U.S. law in the

10   Chapter 15 proceeding.  But the question of whether they're

11   confidential for purposes of the Guernsey proceeding is an

12   issue to be decided by the Guernsey court.  And I'm sure you

13   can say it more eloquently than I just said it.  But let me

14   ask Valet wither such an order would be appropriate.

15            MR. ROSENTHAL:  So, Your Honor, you actually read

16   my mind in a way, which is that given the deadline that our

17   Guernsey co-counsel has of filing something by tomorrow and

18   their nervousness with proceeding in light of the letter

19   they had received, I think for purposes of today, if Your

20   Honor just so orders this transcript, I think that we can

21   give them the comfort that they can proceed, and will do so

22   in consultation with the joint administrators, but knowing

23   that ultimately it's for the Guernsey court to decide what

24   it feels about confidentiality.  And if they would like us

25   to get a written order from the court too, then we'll come

1   back to Your Honor and ask for one.  But I think for the

2   moment if you can just so order this transcript, that would

3   be sufficient for our purposes.

4            THE COURT:  All right.  Any objection -- I'm

5   sorry, go ahead.

6            MR. HYMAN:  I'm sorry.  The only thing that I

7   wanted to add, Your Honor, is in connection with the

8   discussions and the agreements that had been previously

9   made, you know, were materials that the parties agreed would

10  be redacted, including materials relating to Niron, which

11  would reach the NDA and BDO's working papers.  We would

12  expect based on this Court's order that that will continue

13  to be upheld.  Those agreements will be upheld.  And

14  anything that is submitted, we'll redact those categories

15  that had been previously agreed to by Vale.

16           MR. ROSENTHAL:  Your Honor, I think that -- so

17  there was one particular portion relating to one set of

18  confidential documents that, frankly, we were prepared to

19  say if we avoid bothering this Court, we'll take kind of the

20  90 percent of a loaf and redact portions of it.  But,

21  frankly, if now we're going to the Guernsey court and

22  telling the Guernsey court you decide what's confidential

23  and what's not confidential, and it won't be filed until the

24  Guernsey court has a right to weigh in.  We don't see any

25  basis to say, but Guernsey court, we can't even show you

1   this stuff.  We'll just show it off to the Guernsey court

2   and let the Guernsey court decide.

3          THE COURT:  Well, let me -- I don't have a problem

4   intellectually with that.  But given that we're trying to

5   get this done so that a filing can be made tomorrow, my

6   thought would be that maybe you just avoid the kind of

7   granular detail.  And if there are things that you didn't

8   think were as important to get in front of the Guernsey

9   court that didn't really implicate what you were trying to

10  do and the story you were trying to tell, that I would sort

11  of urge you to follow your initial instincts and just take

12  that issue off the table just so we can keep the record as

13  clear as possible if that's -- it just seems to be -- go

14  ahead.

15         MR. ROSENTHAL:  Your Honor, I'm sorry, I didn't

16  mean to interrupt you, Your Honor.

17         These documents that we had agreed to take off the

18  table to avoid having to come to the court today are very

19  important because they relate to the joint administrator's

20  role in connection with purported settlement of the exit

21  arbitration that Your Honor has heard a lot of.  And we

22  don't see why one aspect of confidentiality is any different

23  than another such that they don't even want the Guernsey

24  court to get to see this.  And that strikes us as odd.  I

25  guess maybe what we can do, Your Honor, as a middle ground,

1    is we can make two separate filings.  We could put the

2    letter before the court with that one piece of information

3    redacted and let the Guernsey court decide what to do with

4    that letter.  And also, you know, for this one other piece

5    of information, submit it separately so if the Court wants

6    to handle that separately, the Court has the ability to

7    handle that separately.

8         THE COURT:  So I would imagine that what -- am I

9    missing something in the sense that what the Guernsey court

10   would look at is what I'm being asked to look at, which is

11   whether these things are confidential for purposes of the

12   arbitration rules.  And that's I think pretty -- what I

13   understand it, whether documents created for purpose of the

14   arbitration and documents produced by another party that are

15   not otherwise in the public domain.  But that's all to the

16   extent that there is no disclosure as a legal duty.

17        So I would think that to the extent that the

18   Guernsey court may decide that they are relevant for some

19   determination that should be public, that is a different --

20   they'll look at it, and they'll decide for purposes of their

21   proceeding and the law in Guernsey, or any applicable law

22   that they're applying, how that plays out.  Am I missing

23   something?

24        MR. HYMAN:  Your Honor, these really fall into two

25   classes of documents that had been agreed to be redacted

Page 36

1    from any filings --

2            THE COURT:  No, I understand that.  I understand

3    that.  But again, we're talking about a filing to be made to

4    the Guernsey court.  And so, again, I'm not sure how my

5    ruling here under U.S. law in terms of the arbitration

6    documents would be binding on the Guernsey court anyway.

7    They would have a similar issue.  Again, it seems like --

8    you all have had lots of discussions about lots of

9    agreements.  I'm not here to enforce your agreements.

10   That's not what I'm doing.  So what I've been told is the

11   holdup to proceeding was the notion that this Court's order,

12   and this Court's order alone, would subject Vale to

13   sanctions for filing something in the Guernsey court under

14   seal and then letting the Guernsey court decide whether it

15   should be under seal or not with both the joint

16   administrators and Vale having an opportunity to weigh in.

17           And so as I'm thinking out loud, about the

18   standard, again, my point is that they may apply that

19   standard under the facts and circumstances and applicable

20   Guernsey law, and they could come up with a different

21   decision than I might if those issues are in front of me.

22   And since that's the foreign main proceeding -- again, I'm

23   just sort of thinking out loud.  I'm trouble seeing as how

24   my -- the prophylactic order that was entered dealing with

25   confidentiality in this case would somehow be problematic in

1    any way, shape, or form to putting that in front of the

2    Guernsey court.

3            MR. HYMAN:  The issue on one of the categories,

4    Your Honor, is documents relating to the Niron settlement

5    that were produced in this case, obviously, in the Chapter

6    15 case.  These documents, as you know, relate to an ongoing

7    settlement discussion.  The concern that we have is that

8    disclosure of those --

9            THE COURT:  But I don't have that.  So where is

10   that case pending?

11           MR. HYMAN:  There is no case that's pending.  It's

12   the settlement effectively of the Guinea arbitration

13   proceeding that --

14           THE COURT:  So why am I the arbiter of what should

15   and shouldn't be confidential for purposes of that foreign

16   proceeding as opposed to the Guernsey court where the main

17   proceeding is?

18           MR. HYMAN:  I would argue, Your Honor, only

19   because these were documents that were produced in

20   connection with the recognition hearing in the United

21   States.

22           THE COURT:  Yeah, but they could be not produced

23   in the court.  What difference does that make?  I mean, if

24   somebody had a copy of them anyway, anybody who was a party

25   to the arbitration could seek to present those to the

Page 38

1    Guernsey court as confidential, and the Guernsey court to

2    decide whether to take them or not.

3              MR. HYMAN:  No, I understand that.  But these were

4    documents that were produced by the joint administrators

5    subject to an NDA with Niron.  And there is certainly a risk

6    if these documents are disclosed that it exposes the joint

7    administrators to liability for breach of that NDA.

8              THE COURT:  But why isn't that an argument to make

9    to the Guernsey court?

10             MR. HYMAN:  We certainly can make that argument to

11   the Guernsey court, Your Honor, and we'll do so if we need

12   to.  The reason why we wouldn't necessarily need to get

13   there as they were produced under this Court's

14   confidentiality stip, which --

15             THE COURT:  But wasn't everything we're talking

16   about produced in the context of this case?

17             MR. HYMAN:  It was.  Everything was.

18             THE COURT:  So why is -- to quote Shakespeare, why

19   is that so particular then?  I'm not sure what separates

20   that from any of the other documents.

21             MR. HYMAN:  The very obviously confidential nature

22   of those documents.  And we would argue --

23             THE COURT:  I don't have a category of very

24   obviously confidential versus confidential.  That's not a

25   category.

1          MR. HYMAN:  I understand that, Your Honor.  Again

2     --

3          THE COURT:  Legally that's just -- that's just

4     legal gibberish.  I don't understand what that means.

5          MR. HYMAN:  If these were documents that were

6     produced by the joint administrators in that capacity in

7     connection with the Chapter 15 case that relate to

8     confidential discussions with Your Honor regarding the

9     settlement --

10         THE COURT:  I understand what you said -- but you

11    -- I understand what you said, but I don't understand why

12    they're any different than everything else that we're

13    talking about.

14         MR. HYMAN:  I understand that, Your Honor.  And

15    you're correct.  Because everything else we are also arguing

16    is confidential.

17         THE COURT:  So I just -- I'm really having --

18         MR. HYMAN:  I -- I --

19         THE COURT:  I'm having issues in the sense that

20    parties are both trying to do the same thing to get

21    information to the Guernsey court, which is the foreign main

22    proceeding, that while you have incredibly different

23    vantagepoints of both of your positions call into question

24    whether the foreign proceedings should go ahead as

25    constituted, which you both seem to agree the answer is no,

Page 40

1    and raise some questions to whether the foreign proceedings

2    should go forward at all.  That is the host body for this

3    Chapter 15.  And without it, this case here in the U.S.

4    doesn't exist.  And again, I'm having trouble using this

5    case as the ancillary -- and that's what's in the caselaw,

6    the statute, the legislative history -- it's the ancillary

7    proceeding to use this case as a shield so that the foreign

8    court doesn't get the information it needs to consider.  And

9    that's really my animating principle here.

10            So if there are documents that are produced here,

11   they were all in connection with recognition.  Frankly, I've

12   never seen a case where recognition has been dealt with so

13   leisurely, in all my years on the bench, in my decade on the

14   bench.  It's been a mystery to me.  But, again, this is the

15   tail end of the dog, because we exist for purposes of that

16   proceeding.  And I just have trouble using a prophylactic

17   discovery order that deals with confidentiality as a matter

18   of getting documents produced as a basis to preclude a

19   foreign court from doing what it needs to do. And so

20   certainly the arbitration proceeding, if it's subject to the

21   same -- certainly the arbitration standard talks about to

22   the extent that disclosure is a legal duty, that certainly

23   is something that is supposed to be considered.  What you're

24   telling me, this is a settlement conversation that I guess

25   would be covered by 408.

1          So anything else from the joint administrators on

2     this?

3          MR. HYMAN:  Your Honor, just one last point on the

4     Niron documents.  While you're right, we're arguing that

5     they're confidential, like all other documents that we've

6     argued are confidential.  The difference here really is that

7     they are subject to a confidentiality agreement with a third

8     party.  And what this does is it exposes the joint

9     administrators to liability from that third party.  If what

10    Your Honor is saying, you don't want to deal with that here,

11    although it was issued under or produced under the

12    confidentiality stip here, we will address it in the

13    Guernsey court if that's Your Honor -- the point that we

14    were trying to make is Vale had already agreed that they

15    were going to file it with those materials redacted.  And

16    now given Your Honor's ruling here today --

17         THE COURT:  I understand.  I understand.

18         MR. HYMAN:  -- they've changed their mind, and now

19    they want to file them.

20         THE COURT:  So let me ask Vale.  I am a little

21    uncomfortable to use our discussion today to walk back what

22    was previously agreed to.  That's not my intent.  My intent

23    was to facilitate an ability for the parties to get what

24    they need to get in front of the Guernsey court to the

25    Guernsey court.

Page 42

1           This issue, not only is it not related to what is

2    technically in front of me in the discovery motion, it isn't

3    even related to the more -- to the main issue that we're

4    talking about today such that I have any detail, facts, or

5    ability to make an intelligent and nuanced ruling.  So my

6    concern is that today is not the day to fight that fight.

7    And if Vale thought it could make its submission to the

8    foreign without it, then it should make its submission to

9    the foreign court without it, reserving all rights down the

10   road to address this in a more appropriate time and in a

11   more fulsome way.  It just seems like if we're under the gun

12   for a ruling that needs to -- a submission that needs to be

13   made by tomorrow, today is not the day to cross that

14   particular bridge.

15           MR. ROSENTHAL:  So, Your Honor, responding briefly

16   to that.  As Your Honor noted, there's no such thing as kind

17   of confidential and really confidential, legally cognizable

18   definition.  Vale never made this agreement.  What Mr. Hyman

19   is saying is just plan wrong.  What Vale did was we made a

20   compromise offer, a settlement negotiation to avoid having

21   to disturb Your Honor today.  And in our settlement offer,

22   we said to them if you let us file everything but this one

23   particular passage that you care about -- we care about it a

24   lot, too, but you know what, we'll take the 90 percent if it

25   avoids having to spend the time preparing for the hearing,

1    disturbing Your Honor, and moving forward and filing this on

2    Tuesday when the Court really wanted it in Guernsey.  And

3    they rejected that.

4            And now what Mr. Hyman is doing is he's saying I

5    want to get that deal back.  I want to have the compromise

6    that I rejected that made you come to court today and having

7    been forced to come to court today.  I think Your Honor was

8    spot on by saying let the Guernsey court decide maybe with

9    respect to this particular passage that they're talking

10   about, maybe they have a compelling argument for the

11   Guernsey court.  And maybe the Guernsey court looks at it

12   and says, okay, I'm not going to allow this to be publicly

13   disclosed.  That's fine with us.  But we think the Guernsey

14   court should be able to see it.  That's all we care about.

15   Because we think that that passage is very material to the

16   Guernsey court's consideration of whether there is a hope of

17   solvency, which is what the key issue is before the Guernsey

18   court in deciding whether to appoint liquidators.  Because

19   that passage that they want redacted goes to the question of

20   solvency.

21           So I think the throwing the issue to the Guernsey

22   court to decide and letting them make their argument and why

23   this is super-duper confidential, so even if everything else

24   is released, don't release this publicly, Your Honor, in

25   Guernsey.  Let them make that.  But to suggest that this was

1    a deal that we are reneging on, that's dead wrong.  Because

2    if we had a deal, we wouldn't be before Your Honor today.

3           THE COURT:  That's a fair point. But let me ask

4    you.  This the only thing where I've actually been -- it's

5    been identified to me where there is an argument, a tangible

6    argument about prejudice to the joint administrators in the

7    form of potential liability for violation of an NDA.  I

8    don't know -- I don't have the NDA in front of me, and I

9    don't have something that says -- certainly it was produced

10   in the context of production here and under the protective

11   order.

12           And I didn't hear an argument that said even with

13   the protective order we can't produce this.  I haven't read

14   it.  I don't know if it has qualifications.  Again, I'm not

15   in a position to do a particularly nuanced analysis of any

16   of this today, and that's my concern.

17           MR. ROSENTHAL:  So, Your Honor, what would help us

18   then, because I don't want to be accused of submitting

19   something therefore that they say we shouldn't have

20   submitted, can we get on the record right now, what

21   paragraph number of this letter they are saying we need to

22   redact.  Because I need to give clarity to my Guernsey

23   counsel.

24           THE COURT:  That's fair.

25           MR. HYMAN:  Jarret, are you on the line?  Do you

1    have reference to the paragraphs?

2              MR. HITCHINGS:  I am on the line, but it will take

3    a moment to get reference to the paragraph.

4              MR. HYMAN:  Okay.  I apologize Your Honor.

5    Without having documents on hand sitting on a desk,

6    sometimes it's a little bit more difficult to access.

7              Nada, do you happen to have the redacted version

8    of the letter that had been filed with reference to the

9    paragraphs?

10             THE COURT:  All right.  As you figure this out,

11   I'm going to put myself on mute for one minute to address

12   something else that just came in.  But I'll be back in three

13   minutes or less.

14             MR. HYMAN:  Thank you.

15             (Recess)

16             THE COURT:  All right.  I am back.  Thank you for

17   your accommodation.

18             MR. HYMAN:  Jeff, what I would request -- I think

19   Nada is looking for the paragraphs right now.  But it we

20   could do this offline, I think that there had been agreement

21   as to what those paragraphs were.

22             THE COURT:  No, I don't think it's a good idea to

23   go offline.  I just got off the phone to swap out various

24   things that are plugged into a generator.  We're going to

25   resolve this now so that we have it all buttoned up.  It's

1    okay if we have to wait a minute or two.

2              MR. HYMAN:  Okay.  Your Honor, Ms. Nichols is

3    looking at this now.  She is on a line that -- she doesn't

4    have audio.  And that is why we're not hearing from her.

5    But she is going to shoot us an email.

6              THE COURT:  All right.

7              MR. HYMAN:  I apologize for the delay.

8              THE COURT:  No, that's all right.  I'm assuming

9    Vale would prefer to get this done now.

10             MR. ROSENTHAL:  Absolutely.  My Guernsey counsel

11   is skittish and wants to know exactly what they can and

12   can't do.  So I'd rather have no ambiguity in this

13   transcript.

14             THE COURT:  And my concern is that right now I

15   have my devices powered up, I have an ability to respond to

16   all you nice people promptly, but I'm not sure how long that

17   lasts.  All the charging of all my devices is timed for

18   getting things done today.  So I haven't looked at my power

19   bar on all my devices, but now is the time.

20             MR. HYMAN:  I appreciate that, Your Honor.  We

21   have the same issue in Armonk and have no power --

22             THE COURT:  I'm sure.  I know Judge Wiles

23   apparently was looking at the sale order in the McClatchy

24   Press case using a flashlight the other day.  So I really

25   shouldn't complain.

1            MR. ROSENTHAL:  We had closing arguments on

2    Tuesday scheduled in LATAM that Judge Garrity pushed back to

3    Wednesday, because I understand the bankruptcy court was

4    closed on Tuesday.

5            THE COURT:  Well, I had all-day hearings on

6    Wednesday, and I had -- the Chapter 13 calendar, I had about

7    90 cases on.  And they brought me the 90 files rather than

8    have me go in Tuesday because they weren't sure what things

9    were going to look like.  Which probably was a good call

10   given the extensive power outages that took place in New

11   York.

12           MR. ROSENTHAL:  So you have no power where you

13   live now, Your Honor?

14           THE COURT:  I don't.  I don't.  And even more

15   troubling, the next ConEd truck that I see will be the

16   first.  I have --  usually you see some signs before you get

17   power back.  I have seen absolutely nothing.  And that's

18   because they have apparently just a lot of places to visit.

19   So I am hoping by this weekend.  But, again, during a

20   pandemic without power, you know, you just say, well,

21   everybody's happy and healthy.  And so I guess while I am

22   complaining, I probably shouldn't, because there are a lot

23   of people who are dealing with a lot worse.

24           MR. ROSENTHAL:  It's definitely not a good

25   combination.  My brother lives in Croton, and he is using

1    his own private generator also right now.

2              THE COURT:  Well, that's when it pays to have

3    listened to your father-in-law's advice years ago to make

4    sure you're all ready for all this stuff.  The generator I'm

5    sunning was a Christmas present, so god bless him.

6              MR. HYMAN:  The one clarification or the one thing

7    that I can add is that the four documents that related to

8    neuron are the documents that were referenced in our email

9    correspondence back and forth regarding the settlement

10   discussions.

11             MR. ROSENTHAL:  So my understanding is the

12   documents -- and I might as well read them into the record.

13   Again, because we will tell our Guernsey counsel not to

14   submit these documents.  But my understanding is that they

15   are JA-108010, 21591, 21589, and 133020.  And we would

16   accept not submitting those at this time to the Guernsey

17   court.  But in terms of what paragraphs to redact, I really

18   would like clarity so that we can, again, have the

19   transcript that we can so order and send it to our Guernsey

20   colleagues.

21             MR. HYMAN:  We agree that those are the documents.

22             THE COURT:  All right.  So I'm not sure exactly

23   who is reviewing exactly what and what we're waiting for.

24             MR. HYMAN:  We are waiting for Ms. Nichols, who

25   has just sent me an email.  And unfortunately, she is not on

1   a speaking line, so she hasn't been able to add any value.

2   She is adding plenty of value, but just electronically.

3              What we have now is Paragraph 24, Paragraph 25,

4   Paragraph 26, Clauses 11 and 12, Paragraph 30, and 128,

5   Clause 2.  I'm just waiting for confirmation from Ms.

6   Nichols that that is complete.

7              MR. ROSENTHAL:  Your Honor?

8              THE COURT:  Yes.

9              MR. ROSENTHAL:  I don't know if Your Honor -- this

10  is in Exhibit A of our letter to the Court on Tuesday.

11             THE COURT:  All right.

12             MR. ROSENTHAL:  So to the extent that the concern

13  is that in those paragraphs there is a percentage number or

14  a dollar sign number, I think, one, that's very material to

15  the Guernsey court to be able to know if it wants to know.

16  But we would be okay if necessary to redact the specific

17  percentage number or dollar sign number in those paragraphs.

18  But beyond that, I don't see what it is.  And maybe we're

19  not being asked to redact anything other than that.

20             THE COURT:  So let me ask Counsel what the docket

21  number is for Vale's recent submission just so I can pull it

22  up quickly.

23             MR. ROSENTHAL:  Let me get that from somebody with

24  the docket numbers.  I think it's 107.

25             THE COURT:  Yeah, okay.  That looks like it might

1    be it, so hold on a second.  Yes, the August 5th letter.

2    And which document you're saying that I should refer to?

3              MR. ROSENTHAL:  It's Exhibit A, Your Honor,

4    although that was filed under seal, so we separately emailed

5    that to you.

6              THE COURT:  I have that.  And so what page of

7    Exhibit A, which is I guess 36 pages?

8              MR. ROSENTHAL:  Yeah.  Page 5 of the letter,

9    Paragraphs 1 through 4.  I presume that their concern there

10   is the percentage that's in there.  And I won't read it into

11   the record in light of the concerns.  But we would be okay

12   with redacting those two percentage numbers that are in that

13   paragraph.  And the next paragraph you see we have several

14   dollar sign numbers.  I would be okay with redacting that.

15   I don't imagine they're asking us to redact more than that,

16   but Mr. Hyman can say so.  I don't see anything else in

17   there that would be at all sensitive.

18              And like I said, I do think that that's material

19   information for the Guernsey court in evaluating solvency

20   and the ability of the administration to achieve solvency.

21   But for now, we're okay to resolve this issue by redacting

22   those percentage and dollar sign numbers.  And the same

23   thing in these other paragraphs that we just cited.

24              MR. HYMAN:  We're obviously referring just to the

25   neuron information, Jeff.  We're not referring to the

Page 51

1   redaction of the entire paragraph.  We didn't have a marked

2   up version available to us, so I'm just giving you the

3   paragraph numbers where those materials --

4            MR. ROSENTHAL:  So what I'm saying is if there is

5   --

6            THE COURT:  I guess the thought is he needs to

7   know exactly what it is that you're requesting redaction of.

8   Because, again, there was a letter sent that said we're

9   going to consider you are in violation of a court order if

10  you submit this.  I've given you my views about that

11  generally.  You came back and said we are particularly

12  concerned about these particular issues dealing with Niron,

13  and a combination to try to not get into that, I am

14  encouraging Vale to just put that to the side.  But again,

15  we need to know exactly what it is.  So if it's Paragraph

16  24, what on Paragraph 24.

17           So here's what we're going to do.  I think people

18  need to have a conference call and you need to get the

19  person who knows what the information is on that conference

20  call.  And then you can set something up and then we can

21  reconvene after that on this same line, Court Solutions

22  line.  But I can understand that it needs to be specific.

23  It can't be, well, this is what I have in front of me, this

24  is what I think our concern is.  It needs to be specific.

25           MR. HYMAN:  We can do that, Your Honor.  And I

Page 52

1    think what I would suggest that we provide the specific

2    redactions to Mr. Rosenthal and his team.  And if there is

3    any dispute, which we hope that there is not, we can come

4    back to Your Honor.  But hopefully we don't have to waste

5    any more of Your Honor's time.

6              THE COURT:  Okay.  All right.  So how quickly can

7    you get that to them?

8              MR. HYMAN:  I think we should be able to get that

9    to them within the hour.

10             MR. ROSENTHAL:  And, Your Honor, I frankly think

11   that we should just get on a call right now.  Because I

12   really think that there is a percentage and there's a dollar

13   sign.  And if there's anything beyond that that they're

14   looking to redact, it doesn't seem appropriate.  I mean,

15   Paragraph 2612, for example, is based on public information.

16   So I don't understand this.  But like I said, I can

17   understand if it's the assigns or the percentages, but this

18   shouldn't be more drawn out.

19             And in fact, Paragraph 12, we have a footnote to

20   that.  Your Honor can see it.  2612, the footnote is Niron's

21   annual report.  It's not even what they produced to us.

22             MR. HYMAN:  Jeff, if you set up a call for eight

23   minutes from now, 4:30, we can all jump on a phone call and

24   we could walk through this without wasting Judge Lane's

25   time, and hopefully we can come up with a resolution.

Page 53

1            THE COURT:  All right.  So here's what we're going

2     to do.  You're going to do that, and then we're going to

3     reconvene at 5:00 on this line so we can put it on the

4     record and address any issues so that they're clear and

5     there's no potential misunderstanding going forward.  So

6     I'll get out of your hair now, and I'll talk to you all at

7     5:00.

8            MR. ROSENTHAL:  Thank you, Your Honor.  And we

9     will send you a dial-in link right now.

10           THE COURT:  Yeah.  You'll send the dial-in.  And

11     then we'll dial back into Court Solutions at 5:00.

12           MR. ROSENTHAL:  Exactly.  Thank you, Your Honor.

13           THE COURT:  All right.  Thank you.

14           (Whereupon these proceedings were concluded at

15     4:23 PM)

16

17

18

19

20

21

22

23

24

25

Page 54

1                    C E R T I F I C A T I O N

2

3        I, Sonya Ledanski Hyde, certified that the foregoing

4    transcript is a true and accurate record of the proceedings.

5

6

7

8    Sonya Ledanski Hyde

9

10

11

12

13

14

15

16

17

18

19

20    Veritext Legal Solutions

21    330 Old Country Road

22    Suite 300

23    Mineola, NY 11501

24

25    Date:  August 10, 2020